```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE NORTHERN DISTRICT OF TEXAS

 3                            DALLAS DIVISION

 4
     UNITED STATES OF AMERICA,      )        3:21-CR-236-E
 5              Government,          )
                                    )
 6                                  )
     VS.                            )        DALLAS, TEXAS
 7                                  )
                                    )
 8   WILLIAM ROY STONE, JR.,        )
     JOSEPH EVENTINO DELEON,        )
 9              Defendants.         )        July 25, 2023

10

11              TRANSCRIPT OF JURY TRIAL, VOLUME 1

12              BEFORE THE HONORABLE ADA E. BROWN

13                 UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:        MS. JENNA DANELLE RUDOFF
                                UNITED STATES DEPARTMENT OF JUSTICE
18                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
19                              1100 Commerce Street
                                Dallas, Texas  75242
20                              jenna.rudoff@usdoj.gov
                                (214) 659-8600
21

22                              MS. DONNA S. MAX
                                UNITED STATES DEPARTMENT OF JUSTICE
23                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
24                              1100 Commerce Street
                                Dallas, Texas  75242
25                              donna.max@usdoj.gov
                                (214) 659-8664
```

```
 1                                   MR. MARCUS J. BUSCH
                                     UNITED STATES DEPARTMENT OF JUSTICE
 2                                   NORTHERN DISTRICT OF TEXAS
                                     U.S. Courthouse, Third Floor
 3                                   1100 Commerce Street
                                     Dallas, Texas  75242
 4                                   marcus.busch@usdoj.gov
                                     (214) 659-8642
 5

 6   FOR THE DEFENDANT,             MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:        Gallian Firm
 7                                   Parkside Tower
                                     3500 Maple Avenue
 8                                   Suite 720
                                     Dallas, Texas  75219
 9                                   gregg@GallianDefenseFirm.com
                                     (214) 432-8860
10

11                                   MS. JACLYN ANNETTE GALLIAN
                                     Bryan Cave Leighton Paisner
12                                   2200 Ross Avenue
                                     Suite 4200
13                                   Dallas, Texas  75201
                                     jaclyn.gallian@bclplaw.com
14                                   (214) 721-8058

15
     FOR THE DEFENDANT,             MR. GREG WESTFALL
16   JOSEPH EVENTINO DELEON:        Westfall Sellers
                                     1701 River Run
17                                   Suite 801
                                     Fort Worth, Texas  76107
18                                   greg@westfallsellers.com
                                     (817) 928-4222
19
                                     MR. FRANK SELLERS
20                                   Westfall Sellers
                                     1701 River Run
21                                   Suite 801
                                     Fort Worth, Texas  76107
22                                   frank@westfallsellers.com
                                     (817) 928-4222
23

24

25
```

```
 1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1              JURY TRIAL VOLUME 1 - JULY 25, 2023
 2                    P R O C E E D I N G S
 3         THE COURT:  All right.  Thank you so much.  Everybody
 4    please be seated.  We've got a full house.
 5         Okay.  I just stuck my head in and talked to the
 6    jury.  They're settling in.  I told them we're going to do some
 7    tech stuff.  Anytime we have a delay I'm happy for it to always
 8    be my fault, just let me know.  I told them it would probably
 9    be 10 minutes, 15 minutes.
10         So I want to cover a couple of preliminary things.
11    As always happens, we have a little hiccup.  Juror Number 1 now
12    has some crisis information they need to share with us.  So we
13    will see what that is.  I don't know what it is.  I haven't
14    talked to him.  But he wanted to speak to me privately.
15         So if you guys are okay, I will bring him out, bring
16    him in front of me, and we'll figure out what it is.  But I
17    think we kicked the tires pretty good.
18         Yes, sir?
19         MR. GALLIAN:  Just as a refresher, he was the one
20    that talked about that August 4th Friday being an issue and
21    that's the same child care issue day that we have, so that
22    might be it, but I think that may be some context.
23         THE COURT:  And I thought it was the juror -- the
24    blond guy with the beard that had the Friday issue.
25         MR. GALLIAN:  That's this Friday.
```

```
 1                 THE COURT:  That's this Friday.  Oh, maybe it is next
 2      Friday.
 3                 MR. GALLIAN:  The foreign exchange student.
 4                 THE COURT:  Gotcha.  Okay.  Sounds good.  Okay.  That
 5      may be what it is then.  I'm such a sceptic.  Probably that's
 6      all.  But I haven't talked to him, so we will find out.  Want
 7      to bring him out?
 8                 And I propose we talk to him off the record, and we
 9      will put it on the record if need be.
10                 (Discussion off the record)
11                 SECURITY OFFICER:  All rise for the jury.
12                 (Jury in)
13                 SECURITY OFFICER:  Please be seated.
14                 (Pause)
15                 SECURITY OFFICER:  All rise.
16                 THE COURT:  Please be seated.
17                 All right.  Members of the jury, thanks for your
18      patience.
19                 Please be seated, everybody.
20                 We are so glad to have you here.  We're going to take
21      good care of you.  I'm working on your issue.  Don't worry
22      about it.  I got you.
23                 JUROR NUMBER 1:  Thank you.
24                 THE COURT:  You're welcome.
25                 Okay.  Mr. Todd -- so my beautiful Nikki has been
```

 1   replaced by an outstandingly handsome Todd.  I didn't want you

 2   to blink twice and wonder where she went.

 3          I'm going to read some preliminary instructions to

 4   you.  And ready to do that.

 5          Members of the jury:

 6          Now that you have been sworn, I will give you some

 7   preliminary instructions to guide you in your participation in

 8   the trial.

 9          Duty of the jury.

10          It will be your duty to find from the evidence what

11   the facts are.  You and you alone will be the judges of the

12   facts.  You will then have to apply to those facts the law as

13   the Court -- me -- will give it to you.  You must follow that

14   law whether you agree with it or not.  Perform these duties

15   fairly.  Do not let any bias, sympathy or prejudice that you

16   may feel toward one side or the other influence your decision

17   in any way.  In particular, do not let racial, ethnic, national

18   origin, or other bias influence your decision in any way.

19          Nothing the Court may say or do during the course of

20   the trial is intended to indicate or should be taken by you as

21   indicating what your verdict should be.

22          Evidence.

23          The evidence from which you will find the facts will

24   consist of the testimony of witnesses, documents, and other

25   items received into the record as exhibits and any facts that

1    the lawyers agree to or stipulate to that the Court may

2    instruct you to find.

3           Certain things are not evidence and must not be

4    considered by you.  I will list them for you now.

5           1.  Statements, arguments, and questions by lawyers

6    are not evidence.

7           2.  Objections to questions are not evidence.

8           Lawyers have an obligation to their clients to make

9    objections when they believe evidence being offered is improper

10   under the Rules of Evidence.  You should not be influenced by

11   the objection or by the Court's ruling on it.  If the objection

12   is sustained, ignore the question.  If it is overruled, treat

13   the answer like any other.

14          If you are instructed that some item of evidence is

15   received for a limited purpose only, you must follow that

16   instruction.

17          3.  Testimony that the Court has excluded or told you

18   to disregard is not evidence and must not be considered.

19          4.  Anything you may have seen, heard, or read

20   outside the courtroom is not evidence and must be disregarded.

21   You are to decide the case solely on the evidence presented

22   here in the courtroom.

23          There are two kinds of evidence:  direct and

24   circumstantial.  Direct evidence is direct proof of a fact such

25   as testimony of an eyewitness.  Circumstantial evidence is

1   proof of facts from which you may infer or conclude that other

2   facts exist.

3          I will give you further instructions on these as well

4   as other matters at the end of the case, but keep in mind that

5   you may consider both kinds of evidence.

6          It will be up to you to decide which witnesses to

7   believe, which witnesses not to believe, and how many of any of

8   any witness' testimony to accept or reject.  I will give you

9   some guidance for determining the credibility of witnesses at

10   the end of the case.

11          Rules for a criminal case.

12          As you know, this is a criminal case.  There are

13   three basic rules about a criminal case that you must keep in

14   mind.  First, the Defendants are presumed innocent until proven

15   guilty.  The superseding indictment brought by the Government

16   against the Defendants is only an accusation, nothing more.  It

17   is not proof of guilt or anything else.  The Defendants,

18   therefore, start out with a clean slate.

19          Second, the burden of proof is on the Government

20   until the very end of the case.  The Defendants have no burden

21   to prove their innocence or to present any evidence or to

22   testify.

23          Since the Defendants have the right to remain silent,

24   the law prohibits you from arriving at your verdict by

25   considering that the Defendants may not have testified.

1          Third, the Government must prove the Defendants'

2    guilt beyond a reasonable doubt.  I will give you further

3    instructions on this point later, but bear in mind that in this

4    respect a criminal case is different than a civil case.

5          Conduct of the jury.

6          Now, a few words about your conduct as jurors.

7          During the course of the trial, do not speak with any

8    witness or with the Defendants or with any of the lawyers in

9    the case.  Please do not talk with them about any subject at

10   all.  You may be unaware of the identity of everyone connected

11   with the case; therefore, in order to avoid even the appearance

12   of impropriety, do not engage in conversation with anyone in or

13   about the courtroom or courthouse.  It is best that you remain

14   in the jury room during breaks in the trial and do not linger

15   in the hall.

16         In addition, during the course of the trial, do not

17   talk about the trial with anyone else, not your family, not

18   your friends, not the people with whom you work.  Also, do not

19   discuss this case among yourselves until I have instructed you

20   on the law and you have gone to the jury room to make your

21   decision at the end of the trial.  Otherwise, without realizing

22   it, you may start forming opinions before the trial is over.

23   It is important that you wait until all of the evidence is

24   received and you have heard my instructions on rules of law

25   before you deliberate among yourselves.

 1          You as jurors must decide this case based solely on

 2    the evidence presented here within the four walls of this

 3    courtroom.  This means that during the trial you must not

 4    conduct any independent research about this case, the matters

 5    in this case, the individuals or corporations involved in the

 6    case.

 7          In other words, you should not consult dictionaries

 8    or reference materials, search the Internet, websites, or blogs

 9    or use any other electronic tools to obtain information about

10    this case or to help you decide the case.  Please do not try to

11    find out information from any source outside the confines of

12    this courtroom.

13          I know that many of you use cell phones, the

14    Internet, and other tools of technology.  You also must not

15    talk to anyone at any time about this case or use these tools

16    to communicate electronically with anyone about the case.  This

17    includes your family and your friends.

18          You may not communicate with anyone about the case

19    through any means, including your cell phone, through e-mail --

20    you can tell how old this is -- BlackBerry, iPhone, text

21    messaging, or on Snapchat or Twitter or through any blog or

22    website, including Facebook, Google+, WhatsApp, Instagram,

23    LinkedIn or YouTube.  And I'm sure there are 50 more I don't

24    even know about, because I'm old.

25          You may not use any similar technology of social

 1   media even if I have not specifically mentioned it here.

 2          I expect you will inform me as soon as you become

 3   aware of another juror's violations of these instructions.  A

 4   juror who violates these restrictions jeopardizes the fairness

 5   of these proceedings and a mistrial could result, which would

 6   require the entire trial process to start over.

 7          Course of the trial.

 8          I will now give you a roadmap to help you follow what

 9   will happen over the entire course of this trial.  First, the

10   Government will make an opening statement, which is simply an

11   outline to help you understand the evidence as it is admitted.

12          Next, the Defendants' attorneys may, but do not have

13   to, make an opening statement.  Opening statements are neither

14   evidence nor are arguments.

15          The Government will then present its witnesses, and

16   counsel for the Defendants may cross-examine them.

17          Following the Government's case, the Defendants may,

18   if they wish, present witnesses whom the Government may

19   cross-examine.

20          If either Defendant decides to present evidence, the

21   Government may introduce rebuttal evidence.

22          After all the evidence is in, the attorneys will

23   present their closing arguments to summarize and interpret the

24   evidence for you.  And the Court will instruct you on the law.

25          After that, you will retire to deliberate on your

1  verdict.

2           If you would like to take notes during the trial, you

3  may do so.  On the other hand, you're not required to take

4  notes if you prefer not to do so.  Each of you should make your

5  own decision about this.

6           If you decide to take notes, be careful not to get so

7  involved in the note-taking that you become distracted from the

8  ongoing proceedings.  Your notes should be used only as memory

9  aids.  You should not give your notes precedence over your

10  independent recollection of the evidence.

11          If you do not take notes, you should rely upon your

12  own independent recollection of the proceedings, and you should

13  not be unduly influenced by the notes of other jurors.

14          Notes are not entitled to any greater weight than the

15  memory or impression of each juror as to what the testimony may

16  have been.  Whether you take notes or not, each of you must

17  form and express your own opinions as to the facts of this

18  case.

19          You will note that we do have an official court

20  reporter making a record of the trial; however, we will not

21  have typewritten transcripts of this record available for your

22  use in reaching a decision in this case.

23          And I do want to add a point on this.  When you watch

24  Law & Order and TV shows, you will hear the judge say, "Todd,

25  read back that witness's testimony."  That's not how that

 1    happens in real life.  The way it works in real life is, if
 2    this were a traffic ticket case and Juror Number 1 believed
 3    that the officer said the light was red and Juror Number 2
 4    believed that the officer said the light was yellow, what I
 5    would allow to happen is, if there was a dispute as to the
 6    testimony, we would all come back into the courtroom during
 7    your deliberations, Todd would fire up his computer, and I
 8    would have him read back just the portion of the testimony
 9    where the officer said the light was green or the light was red
10    or yellow.  That would be it, to resolve the conflict.
11         So just so you know from TV, I don't have him read
12    back an entire transcript.
13         The Government will now read the superseding
14    indictment which lays out the allegations against the
15    Defendants and the crimes they have been accused of.  After
16    that, the Defendants will enter their pleas of guilty or not
17    guilty.
18         Government?
19         MS. MAX:  Thank you, Your Honor.
20         Superseding indictment.  The Grand Jury charges:
21         Introduction.
22         At all times material to this superseding indictment:
23         1.  Defendant William Roy Stone, Jr., was a retired
24    special agent of the Federal Bureau of Investigation.
25         2.  Defendant Joseph Eventino DeLeon is a resident of

1   Fort Worth, Texas.

2          From in or around November 2015 to in or around

3   August 2019, Stone and DeLeon engaged in a scheme and artifice

4   to defraud and deceive the victim, herein further identified by

5   the initials CT, with false statements including:  that Stone

6   was still an active agent with the Federal Bureau of

7   Investigation; that CT was under federal probation and,

8   pursuant thereto, was under the supervision of Stone and

9   DeLeon; that CT was obligated to pay Stone's expenses

10  associated with Stone's supervision of CT's probation; and,

11  that CT owed restitution to one or more companies.

12         As a result of the fraud, CT also felt compelled to

13  give Stone large sums of money and additional property to

14  facilitate Stone's purchase of various items including a house

15  and motor vehicles, and to give DeLeon money and property.

16         In furtherance of the scheme, Stone convinced CT that

17  if she did not comply with Stone's directives regarding the

18  alleged federal probation, including paying Stone's expenses,

19  providing Stone with large sums of money and property, and

20  paying the fictitious restitution that Stone represented was

21  owed by CT to one or more companies, that CT would go to prison

22  and that her children would be taken away from her.

23         5.  Accordingly, as a result of Stone's and DeLeon's

24  deception, from in or around December 2015 to in or around

25  December 2019, CT gave Stone approximately $700,000.00 in money

1   and property.

2         6.   At Stone's direction, CT also gave DeLeon over

3   $50,000.00 in money and property for his participation in the

4   scheme.

5         Count One.

6         Conspiracy to commit wire fraud.

7         A violation of 18 United States Code, Section 1349

8   (18 United States Code, Section 1343).

9         7.   The Grand Jury realleges and incorporates by

10  reference the allegations contained in paragraphs 1 through 6

11  of this superseding indictment, as if fully set forth herein.

12        8.   Starting in or about November 2015 and continuing

13  until in or about August 2019, in the Northern District of

14  Texas and elsewhere, Defendants William Roy Stone, Jr., and

15  Joseph Eventino DeLeon did knowingly and willfully combine,

16  conspire, confederate, and agree with each other to commit the

17  offense of wire fraud, in violation of 18 United States Code,

18  Section 1343.

19        Objects of the conspiracy.

20        9.   The object of the conspiracy was to unlawfully

21  defraud CT of money and other property in return for Stone's

22  and DeLeon's purported involvement in CT's fictitious federal

23  probation.

24        10.   It was further the object of the conspiracy to

25  unlawfully defraud CT of money and property by falsely claiming

1   that CT owed restitution to one or more companies.

2          Manner and means of the conspiracy.

3          11.   In furtherance of the conspiracy and joint

4   scheme and artifice to defraud:

5          a.   Stone and DeLeon told CT that she was under

6   "secret probation" in "Judge Anderson's court in Austin,

7   Texas," and that the Judge had allowed Stone and DeLeon to

8   mentor and supervise CT's probation.

9          b.   Stone told CT that there were many terms and

10  conditions of the alleged probation, including the following:

11  that CT had to report to Stone and DeLeon on her activities and

12  conduct while on probation; that CT could not travel outside of

13  the State of Texas without the Judge's approval; that CT had to

14  provide a list to Stone of all the property and assets that she

15  had recently inherited from her grandmother, and that CT had to

16  transfer some of the inherited assets out of a trust and put

17  those assets into her name; that CT was only allowed to use

18  social media to promote her business; and that CT could not

19  disclose to anyone that she was on federal probation.

20         c.   Stone repeatedly threatened CT with incarceration

21  and losing her children if she did not follow the alleged terms

22  and conditions of probation.

23         d.   Stone told CT that he needed to travel to Austin,

24  Texas on many occasions to meet with Judge Anderson and discuss

25  CT's probation and that she had to pay Stone's expenses

1    associated with those trips.

2         e.   Stone further defrauded CT into supporting

3    Stone's lifestyle, including giving Stone large sums of money

4    to purchase and remodel a house, to purchase motor vehicles for

5    Stone, and to pay restitution to one or more companies that

6    Stone said CT owed even though Stone deposited those funds into

7    a bank account under his control and subsequently used those

8    funds to purchase a house.

9         f.   Stone and DeLeon further convinced CT that she

10   should also compensate DeLeon for his efforts in supervising

11   her probation.

12        g.   Stone and DeLeon engaged in several tactics to

13   convince CT that the probation was real, and to maintain

14   control over her life, including the following:

15        i.   Convincing CT that her family wanted to take her

16   inheritance away from her and that she should distance herself

17   from them;

18        ii.  Convincing CT that Stone had the ability to

19   monitor her cell phone communications;

20        iii. Convincing CT that she was required to provide

21   a daily record of her activities to Stone and DeLeon, written

22   on note cards that CT photographed and sent via text to Stone

23   and/or DeLeon at their direction;

24        iv.  Placing "spoof" calls between Stone and CT and

25   the fictitious Judge Anderson to question CT about her conduct

1   while on probation;

2           v.  Enlisting the aid of an individual, who is known

3   to the Grand Jury, to prepare a message purporting to be from

4   the United States Drug Enforcement Administration "Intelligence

5   Center" inquiring about CT;

6           vi.  Claiming to discuss CT's probation with a

7   psychiatrist and telling CT about those discussions;

8           vii.  Claiming that Judge Anderson indicated he would

9   discharge CT's probation if CT agreed to marry Stone.

10          H.  DeLeon carried a handgun while providing

11  purported protective services to CT in furtherance of the

12  scheme.

13          I.  Stone and DeLeon deposited the moneys they

14  received from CT into their bank accounts or caused CT to pay

15  third parties on Stone's behalf, which caused financial

16  institutions, including J.P. Morgan Chase and Wells Fargo, to

17  engage in interstate wire transmissions from the state of Texas

18  to out-of-state servers, as further described in Counts Two

19  through Seven.

20          All in violation of 18 United States Code, Section

21  1349 (18 United States Code, Section 1343).

22          Counts Two through Seven.

23          Wire fraud.

24          Violation of 18 United States Code, Section 1343.

25          12.  The Grand Jury realleges and incorporates by

1  reference the allegations contained in paragraphs one through

2  eleven of the superseding indictment, as if fully set forth

3  herein.

4       13.  From in or about November 2015 and continuing

5  until in or about August 2019, in the Northern District of

6  Texas, the Defendant, William Roy Stone, Jr., having knowingly

7  and intentionally devised and intended to devise a scheme and

8  artifice to defraud the victim, CT, and to obtain money by

9  means of false and fraudulent pretenses, representations, and

10 promises, as described in paragraphs one through eleven of this

11 indictment, transmitted or caused to be transmitted by means of

12 wire communication in interstate commerce writings, signs,

13 signals, pictures and sounds for the purpose of executing the

14 scheme or artifice, to wit:  financial transactions between

15 financial institutions in Texas and out-of-state financial

16 servers, on or about the dates described below, each such

17 transmission constituting a separate count:

18       Count 2.  Date:  June 3, 2016.  Financial

19 institution:  J.P. Morgan Chase.  Transaction:  Withdrawal for

20 cash.  Amount:  $9,000.00.

21       Count 3.  June 17, 2016.  Financial institution:

22 J.P. Morgan Chase.  Transaction:  Cashier's check to Park Place

23 Mercedes.  Amount:  $76,816.90.

24       Count 4.  June 24, 2016.  Financial institution:

25 J.P. Morgan Chase.  Transaction:  Withdrawal for cash.  Amount:

 1   $5,000.00.

 2          Count 5.  September 1, 2016.  Financial institution:

 3   J.P. Morgan Chase.  Transaction:  Cashier's check payable to

 4   Texas Toyota of Grapevine.  Amount:  $24,003.47.

 5          Count 6.  Settlement 13, 2016.  Financial

 6   institution:  J.P. Morgan Chase.  Transaction:  Withdrawal by

 7   cashier's check payable to Stone.  Amount:  $154,500.00.

 8          Count 7.  October 18, 2016.  Financial institution:

 9   J.P. Morgan Chase.  Transaction:  Withdrawal by check payable

10   to Bath Kitchen Design center.  Amount:  $25,000.00.

11          Each in violation of 18 United States Code, Section

12   1343.

13          Count 8:

14          Engaging in monetary transactions in property derived

15   from specified unlawful activity.

16          Violation of 18 United States Code, Section 1957(a).

17          14.  The Grand Jury realleges and incorporates by

18   reference the allegations contained in paragraphs one through

19   thirteen of this superseding indictment, as if fully set forth

20   herein.

21          15.  On or about September 23, 2016, in the Northern

22   District of Texas, and elsewhere, the Defendant, William Roy

23   Stone, Jr., knowing that the funds involved represented the

24   proceeds of some form of unlawful activity, engaged in and

25   attempted to engage in a monetary transaction, in and affecting

1    interstate commerce, in criminally derived property of a value

2    greater than $10,000.00, which property, in fact, was derived

3    from specified unlawful activity, namely, wire fraud, in

4    violation of 18 United States Code, Section 1343, that is,

5    Stone purchased a house by cashier's check, by and through a

6    financial institution, to wit, Wells Fargo, which was engaged

7    in or the activities of which affected interstate commerce.

8             All in violation of 18 United States Code, Section

9    1957(a).

10            Count Nine.

11            Federal impersonation of a federal officer or

12   employee.

13            Violation of 18 United States Code, Section 912.

14            16.  The Grand Jury realleges and incorporates by

15   reference the allegations contained in paragraphs one through

16   fifteen of this superseding indictment, as if fully set forth

17   herein.

18            17.  From in or about November 2015 through in or

19   around 2019, in the Northern District of Texas, the Defendant,

20   William Roy Stone, Jr., falsely assumed and pretended to be an

21   officer and employee acting under the authority of the United

22   States or any department, agency, or office thereof, that is, a

23   special agent of the Federal Bureau of Investigation, and acted

24   as such, and in such assumed and pretended character, knowingly

25   with intent to defraud, demanded and obtained money and other

1    things of value totaling approximately $700,000.00 from the

2    victim, CT.

3              In violation of 18 United States Code, Section 912.

4              Signed by the foreperson of the Grand Jury.

5              THE COURT:  Mr. Stone and Mr. DeLeon, if you will

6    please rise.

7              Mr. Stone.

8              DEFENDANT STONE:  Yes, ma'am.

9              THE COURT:  You stand charged by indictment with

10   Count One of conspiracy to commit wire fraud; with Counts Two

11   through Seven, wire fraud; and Count Eight, for engaging in

12   monetary transactions and property derived from specified

13   unlawful activity; and in Count Nine, for false impersonation

14   of a federal officer or employee.

15             How do you plead to these counts?

16             DEFENDANT STONE:  Not guilty, Your Honor.

17             THE COURT:  Thank you, sir.  You may be seated.

18             Mr. DeLeon, you stand charged by indictment with

19   Count One -- you stand charged by indictment with Count One,

20   conspiracy to commit wire fraud.

21             How do you plead to this indictment?

22             DEFENDANT DELEON:  Not guilty, Your Honor.

23             THE COURT:  Thank you, sir.  Please be seated.

24             Members of the jury, you have heard the charging

25   instrument, superseding indictments read to you.  Both

1    Defendants have now pled not guilty.  It is now time for the

2    Government to begin their opening statement.

3             Does anyone need a break before we begin?

4             Lawyers, everybody okay?

5             All right.  Government, would you like a warning as

6    to time?

7             MS. RUDOFF:  Yes, Your Honor.  If you could give me a

8    five-minute warning and then a two-minute warning.

9             THE COURT:  Sure.

10            MS. RUDOFF:  Thank you.

11            THE COURT:  You're welcome.

12            MS. RUDOFF:  May I proceed, Your Honor?

13            THE COURT:  Oh, please.

14            MS. RUDOFF:  Opposing counsel, Your Honor, members of

15    the jury, and may it please the Court.

16            Protect and serve.  Some people hear this phrase and

17    they immediately think of law enforcement, police officers,

18    state troopers, even federal agents.  It is an oath that they

19    take, a duty they are sworn to uphold, the very reason they get

20    to wear a badge and carry a gun, to protect and serve.

21            And with that badge, with that duty, and even with

22    that gun, comes a power, a power that's capable of changing

23    someone's life; a presence, a presence that can provide a sense

24    of safety and sometimes fear.  But most importantly, an

25    authority, the kind of authority that demands respect and

1    requires submission.

2           Throughout the course of this trial, you will learn

3    that when Casi Thompson first met the defendants, Bill Stone

4    and Joe DeLeon, she was told they were in law enforcement.  She

5    was shown the badge and the gun.  She was led to believe they

6    had the power, the presence, and the authority, and that they

7    were in her life for one reason, to protect and serve.

8           Unfortunately for Casi, the evidence will show the

9    only people the Defendants ever protected were each other, and

10   the only interests they ever served were their own, because the

11   reality is Joe DeLeon and Bill Stone inserted themselves into

12   Casi Thompson's life for a very different reason, to control

13   and exploit, a duty they assigned themselves, a duty you will

14   learn they absolutely upheld.

15          So to understand how the Defendants ended up in this

16   courtroom today charged with the offenses you just heard read

17   in the indictment, we have to go back to when their meeting

18   first began.  It was approximately 2005.

19          The evidence will show that in 2005, when Casi first

20   met Joe DeLeon, she was a mere 23 years old, and she was at the

21   start of a decades-long downward spiral.  You see, at the time

22   Casi was an addicted to meth.  She was estranged from her

23   family.  She had been denied access to her child, and she had

24   absolutely no friends she could trust.

25          Introduced to DeLeon by the only friend she had, Casi

1    saw this connection as a chance to possibly have a stable

2    person in her otherwise unstable life.

3         From their first meeting, DeLeon told Casi he was law

4    enforcement.  He even showed her a law enforcement ID and a gun

5    and spoke often about his long days on the job handling murder

6    investigations and hostage situations.  But what Casi didn't

7    know at the time was that none of this was true.  It was all

8    lies, in-depth, carefully crafted lies, lies that DeLeon

9    continued to carry out for the next ten years.  The purpose of

10   such lies?  To make sure Casi believed he was law enforcement,

11   that he had the power and the authority and that she could

12   trust him, that he was there to protect her.  And that's

13   exactly what Casi Thompson believed.

14        Shortly after their first meeting, DeLeon told Casi

15   that his colleague, then FBI agent Bill Stone, wanted to meet

16   her.  Still only 23 years old, very much on drugs and involved

17   with a rough crowd, Casi was skeptical.  Having never met a

18   federal agent before and absolutely no idea how federal law

19   enforcement even worked, she reached out to the Dallas FBI

20   office.  She made a phone call to see if Stone was, in fact, an

21   agent.  And you will hear that not only did the FBI office

22   confirm that at the time Stone was an agent, but that DeLeon

23   continued to encourage her to have that meeting.

24        The evidence will show from their first meeting Stone

25   told her that as an FBI agent he had the ability and the power

1   to make criminal charges go away and prior convictions

2   disappear.

3        But once again, what Casi didn't know at the time, it

4   was all lies, in-depth, carefully crafted lies, lies that Stone

5   also carried out for the next ten years.  The purpose of these

6   lies?  To make sure Casi believed that Bill Stone had even more

7   power than just a police officer, the highest level of

8   authority, and ultimately that she could trust him, that he was

9   there to protect her.  And that's exactly what Casi Thompson

10  believed.

11       You will hear that after meeting the Defendants, Casi

12  spent the next decade battling her drug addiction, eating

13  disorders, family issues, legal problems, and financial

14  turmoil, and that in 2014 Casi Thompson had hit rock bottom.

15       Still heavily addicted to meth, her grandfather had

16  passed away.  Her mom was diagnosed with breast cancer.  Her

17  mom and brother had taken her children away from her.  She had

18  been arrested a few times, was in and out of jail, and she was

19  facing a felony charge for possession of drugs out of Hood

20  County, Texas.

21       Currently out on bond, but looking at the possibility

22  of spending years in prison and losing her kids for good, Casi

23  knew she had to make a change, and for the first time in her

24  life she committed to that change.  She committed to getting

25  her life back on track, getting sober, and proving herself

 1    worthy to her children and to her family.

 2            And while her path to sobriety, as she will tell you,

 3    was by no means a straight one, she eventually got there and

 4    she did so on her own.

 5            You will learn that in 2015 Casi returned home from

 6    her last visit to rehab ever.  She was sober and healthy and

 7    she was ready for her future, a fresh start, one that she knew

 8    had to include taking responsibility for the poor choices of

 9    her past, both legally and personally.

10            Legally, Casi decided to enter a plea of guilty to

11    the felony charges she was facing out of Hood County, and the

12    Judge granted her a six-year deferred adjudication, a probation

13    that required her to comply with conditions of the Court.

14            Those conditions included to meet and check in with

15    her probation officer, not travel without the Court's

16    permission, maintain suitable employment, take care of her

17    children, refrain from drug or alcohol use, allow for home

18    visits by her probation officer, avoid persons or places of

19    disreputable character and not associate with those with

20    criminal records, complete community service hours, pay a fine

21    and court costs, and pay restitution.

22            Casi accepted the conditions of her Hood County

23    probation, and she took it very seriously.  And the evidence

24    will show she was a model probationer.  She was always in full

25    compliance and often even ahead of the curve.

1          Personally, though, it was very important for Casi to

2   work on reconnecting with her now two small children that had

3   been removed from her as well as her family and, most

4   importantly to Casi, her grandmother.  The woman who raised her

5   meant everything to her and was the most important person in

6   her life.

7          Determined to prove herself to her grandmother, Casi

8   reenrolled in college and promised her grandmother she would

9   graduate with a 4.0.

10          Casi's grandmother was so proud.  She trusted and

11   believed in Casi all over again.  And to show Casi just how

12   proud she was, she decided to change her will and make Casi the

13   sole executor of her entire estate, an estate that at the time

14   Casi knew was worth at least $1 million.

15          Nervous about taking on this financial stress and

16   concerned about how her family might react to this news, Casi

17   once again turned to and confided in the only people she

18   believed she could truly trust at the time, the Defendants.

19   And it was with this new information the Defendants' one reason

20   to be in Casi Thompson's life suddenly turned into at least a

21   million reasons more.

22          The evidence will show that soon after Casi was named

23   as the executor and heir of her grandmother's estate, her

24   grandmother became very ill.  And on November 6, 2015, just one

25   month before Casi finished her very first semester of college

1   with the 4.0 that she promised, her grandmother sadly passed

2   away.

3           Casi was tasked with the difficult job of planning

4   the funeral and engaging with family she hadn't really seen

5   much in ten years.  But Casi rose to the occasion, and on

6   November 9, 2015, she laid her grandmother, Myrna Thompson, to

7   rest.

8           Aside from the friends and the family present at the

9   funeral, you will hear that Casi was surprisingly accompanied

10  by somebody else, the Defendant, Joe DeLeon.

11          You will hear that he was standing off to the side,

12  not engaging with Casi or any of the guests, but that he told

13  Casi he had to escort her to this funeral, that it was for her

14  protection.  What she needed protection from, Casi wasn't

15  really sure, and DeLeon wouldn't yet say.

16          You will learn that right after the funeral DeLeon

17  followed Casi back to her home and revealed to her that Bill

18  Stone had called, that Bill Stone was flying in to the Dallas

19  area from Washington, D.C., and they needed to all meet.

20  Apparently it was urgent.  And because Casi's history with

21  illegal drugs and arrests had been the primary bases for most

22  of her interactions with the Defendants over the last ten

23  years, Casi assumed the meeting and the urgency could only mean

24  one thing, and she was scared.

25          You will hear that when Bill Stone arrived to meet

 1    with Casi and DeLeon, he delivered news to Casi that would

 2    absolutely change her life forever, news that Stone had gotten

 3    a call from two different District Attorney's offices in nearby

 4    counties in the Dallas area that were investigating old cases

 5    apparently involving Casi, that these offices were about to

 6    issue felony indictments and they were coming to arrest her.

 7          Even worse, Stone told Casi that her family was once

 8    again coming after her and her children, just like Stone knew

 9    her family had actually done in the past.

10          Stone explained that Casi's family was upset about

11    the money, grandma's will, and they were out to prove she was

12    nothing more than a criminal and a drug addict and in no way

13    fit to be in charge of her children or the family estate.

14          You will hear that in response to this Casi was

15    overcome with fear.  She was terrified that her family would

16    think she had failed again, horrified that her drug-filled past

17    was resurfacing and petrified that new felony charges meant

18    prison and losing her kids forever.

19          DeLeon and Stone, though, they quickly assured Casi

20    they would make sure those things didn't happen, that they were

21    there to protect her.  In the meantime, Stone instructed Casi

22    not to tell anyone what was going on and to go about her

23    business as normal.

24          Most importantly, Stone instructed her to go to the

25    probate hearing on her grandmother's will and to take DeLeon

1   with her for her protection, he said.  And, of course, Casi

2   trusted them.  They were law enforcement.  They had a duty to

3   protect and serve.  They had looked out for her for the past

4   ten years.  So Casi did what she was instructed to do, and she

5   patiently waited for the Defendant to return with news.

6          The evidence will show on September 14, 2015, Casi

7   attended her grandmother's probate hearing and was officially

8   named the executor of the Thompson estate.  With DeLeon in tow,

9   Casi learned for the very first time the estate was worth more

10   than $3 million.  And at that same moment, the Defendants

11   learned that as well.

12          Within 48 hours of learning the full value of the

13   estate, Stone and DeLeon told Casi they needed to meet again,

14   another crisis.

15          The evidence will show that on December 16, 2015,

16   Stone and DeLeon once again arrived at Casi's house.  Stone

17   told Casi that he had successfully made those possible state

18   charges go away, but had found out that she may be indicted on

19   federal drug trafficking charges, based on events that took

20   place during her illicit past.

21          Casi was bewildered, confused, stressed, scared, and

22   naturally she had questions, questions like how would this new

23   case affect the Hood County probation I'm already on.  Would

24   the Hood County judge revoke her probation and sentence her to

25   prison because of this new charge?  Would the federal judge in

1   the new case automatically sentence her to prison because she

2   had already been given probation before?

3             These were questions that Stone had fast and easy

4   answers to, answers that DeLeon seemed to confirm.

5             And as always, the Defendants told Casi they had a

6   plan, a plan to protect her.

7             You will hear that plan was for Stone to drive to

8   Austin, meet with the judge assigned, and see if he could work

9   something out.  And to Casi, I mean, Stone was an FBI agent,

10  right?  And she trusted the Defendants.  Why wouldn't she?

11            At the time not only did she believe they were law

12  enforcement with decades of experience on the job, but that

13  they had the power and the authority and, even more

14  significantly, that they had supposedly, as they told her,

15  gotten her out of criminal charges in the past, just like they

16  said they would do now.

17            Once again, Casi did exactly as she was instructed to

18  do, and she waited for the Defendants to return with news.

19            You will hear within just a few days DeLeon called

20  Casi, told her they needed to meet again.  Casi was anxious,

21  panicked, fearful.  She needed to know what the federal judge

22  said what, in fact, she was facing.

23            The evidence will show that when the three of them

24  met, Stone told Casi she was, in fact, facing federal drug

25  trafficking charges, charges that carried a possibility of 50

1   years in prison, charges supported by video evidence Stone

2   claimed he reviewed himself, charges that according to the

3   Defendants even the best attorney in the world could not help

4   her escape.

5        And while it seemed as though she had no option but

6   to prepare to go to prison, to lose her freedom and her

7   children, Bill Stone revealed that she had maybe one other

8   option, and that option was him.

9        You will hear that Bill Stone said while he was in --

10   while he was in Austin meeting with the judge, "Judge

11   Anderson," he advocated on her behalf, told the judge Casi was

12   a good person, "salvageable," and was worthy of a second

13   chance.

14        Stone told Casi that he worked out a deal of a

15   lifetime for her, a federal probation, a strict, intrusive and

16   highly confidential probation; and that as long as she adhered

17   to the conditions and made no mess-ups, she would avoid the

18   possibility of decades in prison, and the case he would make

19   sure was forever sealed.

20        But she had to keep it a secret, a secret from her

21   family and her closest friends and, most importantly, a secret

22   from her real probation officer or the judge in Hood County,

23   because Stone explained that if the judge or probation officer

24   in Hood County heard that while on their probation she got a

25   new criminal case, they would revoke her current probation and

1    they would sentence her to prison with zero hesitation.

2           Casi had never dealt with anyone or anything on the

3    federal criminal side.  She had no familiarity with how the

4    process worked or who the people involved may be.  The only

5    federal agent she had ever met was Bill Stone.

6           So to Casi, this was the only option, a secret

7    long-term federal probation.  Follow the order of the Court,

8    the direction of DeLeon and Stone, and she would soon be free,

9    or at least that's what she thought.

10          You will hear the conditions of this secret federal

11   probation, the conditions the Defendants told Casi she had to

12   now follow, the court-ordered conditions.

13          Some of the conditions you will hear included that

14   the Defendants would act as her probation officer and be in

15   charge of communicating her progress and compliance back to the

16   Court; that she had to check in with them by phone and meet in

17   person on a daily and weekly basis; that her daily whereabouts

18   and communications would be subject to review and surveillance;

19   that she could not travel without the court's permission.

20          She had to provide a list of all of her assets and

21   finances.  She had to maintain her 4.0 GPA that she already had

22   and finish her degree.  She had to take care of her children

23   and life responsibilities.  She had to refrain from drug or

24   alcohol use.  She had to avoid persons or places of bad

25   character and couldn't associate with those with criminal

1    records.  And most importantly, at least to the Defendants, she

2    had to pay costs associated with her probation for the

3    Defendants' time and travel expenses, and that she also had to

4    pay restitution; conditions that you will hear and recognize

5    sounded very similar to the conditions Casi already had to

6    follow for her Hood County probation.

7            So at the time, sort of made sense to her.  So just

8    as she has done for the last ten years, she believed what the

9    Defendants told her, and she agreed to that secret federal

10   probation.

11           At this point, why wouldn't she?  She trusted them.

12   She still believed they had power and authority, a duty to

13   protect and serve.  But unfortunately for Casi, the only duty

14   the Defendants planned to uphold was their own, to control and

15   exploit, because now you see with Casi under the guise of this

16   federal probation, the very real threat of decades in prison,

17   Bill Stone and Joe DeLeon had the full and total control of

18   every aspect of Casi's life.  And more than that, they now had

19   3 million reasons to exploit her to the fullest, reasons that

20   Casi wasn't even aware at the time, things that Casi couldn't

21   have known at the time; the fact that almost everything the

22   Defendants told her was a lie, carefully crafted lies; lies

23   that the Defendants carried out on a daily basis in front of

24   her for another four years; lies that you will hear were

25   disturbing, evil, and criminal; lies that brought all of us

1  here to this courtroom today; lies that put those two men in

2  those chairs.

3          The lies -- there were no criminal charges in

4  neighboring counties.  There was no federal investigation for

5  drug trafficking.  There was no secret federal probation, no

6  Judge Anderson.  There was no prison time.  There were no FBI

7  analysts.  There was no attack and infiltration by her family.

8  There were no travel expenses or flights from D.C. to Dallas.

9  In fact, you will hear Bill Stone lived in the Dallas area the

10 entire time.

11         More lies.  DeLeon wasn't even law enforcement.  He

12 never had been.  And Bill Stone -- well, Bill Stone hadn't

13 worked for the FBI or any law enforcement agency since October

14 2015, one month before Casi Thompson's grandmother even passed.

15         The evidence will also show that from December 2015

16 to December 2016, while following the directions of the

17 Defendants and adhering to these rules of federal probation,

18 the Defendants received more than $800,000.00 in cash and

19 property from Casi.

20         Each purpose -- or each purchase and payment

21 portrayed by the Defendants as necessary to cover their travel

22 expenses, time, and needs all related to the secret probation.

23 Each dollar was crucial and critical to Casi's freedom and

24 keeping her children, the two most important things to Casi,

25 the things that the Defendants knew she would never put a price

```
 1   on.
 2              You will hear that even after the Defendants secured
 3   more than $800,000.00 from Casi within just the first year of
 4   this secret probation, 2016, they didn't stop there.  They
 5   carried on this scheme for three more years.  That was three
 6   more years Casi was subjected to isolation, degradation, and
 7   living in constant fear, years in which you will hear the
 8   Defendants controlled Casi in every single way:  financially,
 9   mentally, emotionally, and even physically.
10              You will hear the years were full of sinister lies
11   and deceit, all done to ensure one goal, Casi's compliance, to
12   make sure that Casi submitted to the Defendants' requests.
13   Because at the time Casi fully believed her freedom depended on
14   the Defendants, but, in fact, you will hear the Defendants knew
15   their freedom started to depend on her.
16              The evidence will show that DeLeon and Stone knew
17   what they were doing was wrong; that if anyone found out about
18   it, they could be arrested and their freedom gone.  So they did
19   everything they could to keep Casi quiet, compliant, and their
20   scheme a secret.
21              You will also hear that in approximately 2018, after
22   Casi had spent almost two years on this federal probation,
23   where she was cut off from the rest of the world and having to
24   live a secret life that consisted only of her children and the
25   Defendants, Casi and Bill Stone began a romantic relationship.
```

 1          Now, we understand this is something that each of you
 2   sitting here today might think doesn't really make any sense.
 3   But you will hear, to Casi living for several years under the
 4   full and total control of the Defendants and being conditioned
 5   to think they are the only people in the world who love and
 6   care for her and could protect her, it made a lot of sense to
 7   her at the time.

 8          You see, her conditions of secret probation included
 9   that she couldn't freely engage with friends.  She couldn't go
10   on dates or even travel without the permission and approval of
11   Bill Stone.  So realistically you will hear that the only
12   thing -- the only person Casi could do much of anything with at
13   the time, day in, day out, was Bill Stone.

14          On top of that, at the time Bill Stone had convinced
15   Casi that he was a truthful, stand-up professional and powerful
16   man, in fact the only man willing to protect her, to love her
17   and keep her safe.

18          But the evidence will show that as the romantic
19   relationship progressed, Casi became deeply concerned that this
20   romantic relationship could negatively impact her probation.
21   She worried whether one fight with Stone as her boyfriend could
22   result in a bad report to the Court from her "probation
23   officer."

24          Still very much committed to her probation and
25   determined to follow the conditions to keep her children and

 1    stay out of jail, the evidence will show that several times
 2    Casi asked Stone if she could have a new probation officer,
 3    because she really wanted to keep their professional and
 4    personal situation separate.  You will hear that each and every
 5    time Casi asked, the answer was simply no.
 6              Frustrated with this response and genuinely afraid
 7    for her freedom, Casi asked more questions.  Could she go talk
 8    to the judge herself?  Could she drive down to Austin and meet
 9    with someone else who worked for probation?  But once again,
10    the answer was no.  And as Casi became more worried about her
11    situation and her freedom being at risk, Bill Stone began to
12    worry about his own too.
13              You will hear that Stone was becoming so worried that
14    Casi might figure out that he and DeLeon were frauds that he
15    started taking his lies, his manipulation, and his efforts to a
16    whole new level.
17              You will hear about fake calls that Stone
18    coordinated, calls from "Judge Anderson," voicemails from "DEA
19    Agent Jordan Green," phone calls from "FBI analysts" named
20    Avery and Ainsley, and even fake phone calls from "Dr. Bryant,"
21    a supposed FBI psychologist.
22              You will hear about the fake videos Bill Stone
23    claimed existed of Casi, videos that he told her he not only
24    watched, but explained the details to her so explicitly and
25    specifically it seemed absolutely impossible for them not to be

1  real.

2          He also conducted even more surveillance of Casi.  He

3  started accessing her phone daily, every text, every e-mail,

4  every photo, and even her social media without her consent or

5  knowledge.

6          He would drive by her house, check for her vehicles,

7  and tell her that other law enforcement officers were doing the

8  same.

9          And the evidence will show that when Bill Stone --

10  sorry.  The evidence will show that Bill Stone was willing to

11  do anything to keep Casi under his control and unaware of the

12  exploitation.  Absolutely anything.  Even proposing marriage to

13  her.

14          You will hear that marriage proposal was Casi's

15  breaking point.  It was just too much.  She couldn't take it

16  anymore.  So she secretly reached out to her best and oldest

17  childhood friend, Darilyn Crites.  You will hear that Casi

18  shared the details of her situation, the secret probation, not

19  wanting to marry Stone, but absolutely terrified that if she

20  didn't submit her life was over.  Her freedom would be gone,

21  her children taken away forever.

22          She didn't know what to do, and she needed help.

23          You will hear that Casi's cry for help, which took

24  place in July of 2019, was one that took more than four years

25  for Casi to muster up the strength to even do.  And it was that

1    cry for help that turned out to be the real key to Casi's

2    actual freedom, freedom from the control, manipulation, and

3    exploitation of the Defendants.

4           Once real law enforcement was made aware of the

5    situation, an investigation began.  You will hear about this

6    investigation.  It was lengthy.  It was handled by the Texas

7    Rangers and the Department of Justice Office of Inspector

8    General, an investigation that included retrieval of thousands

9    of financial documents, text messages, phone records, photos,

10   and lots of recorded calls and interviews.

11          It also showed evidence and efforts by the Defendants

12   to work together and devise another plan, a plan to now cover

13   up all their lies and crimes.

14          You will get to see and hear about all of this, the

15   evidence, the physical, tangible evidence, because, ladies and

16   gentlemen, this case is not just based on what Casi Thompson

17   said.  It's absolutely based on what the evidence will show.

18   And that evidence, as you will see and hear over the next

19   several weeks, will tell the exact same story Casi first told.

20          That investigation, all the evidence recovered, all

21   the facts that were independently corroborated is why the

22   Defendants sit here today charged with those nine separate

23   counts listed in the indictment.

24          Count One, conspiracy to commit wire fraud from

25   November 2015 until August 2019.

1        Count Two, that William Stone engaged in wire fraud

2  on or about the dates listed in the indictments and

3  transactions referenced.

4        Count Eight, that on or about September 23, 2016,

5  William Stone engaged in money laundering.

6        And Count Nine, that from approximately November 2015

7  to August 2019, William Stone engaged in the false

8  impersonation of a federal agent to defraud Casi Thompson.

9        At the conclusion of the trial, you will see the

10  truth for what it is.  The truth is that Bill Stone and Joe

11  DeLeon cannot be trusted.  The facts are that they have no

12  power, no presence, no authority.  The evidence will make clear

13  that they are master manipulators, that they preyed on the

14  weaknesses and vulnerabilities of someone that they deemed less

15  than they were.

16        There was no duty to protect and serve, only to

17  control and exploit.

18        And, ladies and gentlemen, that truth, those facts,

19  that evidence will leave you with only one conclusion, one

20  verdict, that the Defendants are guilty of all the offenses

21  charged.

22        THE COURT:  Thank you, Government.

23        Members of the jury, do we need a stretch break?

24  Yes, let's take a five-minute recess.

25        SECURITY OFFICER:  All rise for the jury.

```
 1              THE COURT:  And feel free to leave your things if you
 2    wish to.  However you would like to do it.
 3              Thank you.
 4              (Jury out)
 5              THE COURT:  Okay.  Everybody, please be seated.
 6    Thank you.
 7              (Recess)
 8              SECURITY OFFICER:  All rise.
 9              THE COURT:  Please be seated.  Okay.  Please be
10    seated.  Thank you.
11              Everybody back from your break?  Everybody ready to
12    jump in?
13              MR. GALLIAN:  Ready.
14              THE COURT:  Would you like a warning, if any?
15              MR. GALLIAN:  No, Your Honor.
16              THE COURT:  Okay.  Fair enough.
17              If everybody will check your phones, make sure they
18    are off.  And with that, we'll grab the jury.
19              You're doing a great job.  Let me know if you need
20    something.
21              (Pause)
22              SECURITY OFFICER:  All rise for the jury.
23              (Jury in)
24              THE COURT:  Okay.  Everyone, please be seated.
25              So the defense counsel is going to do his opening
```

 1   statement for you.  I'll sit down here in just a minute.  I
 2   think we talked about this, but just so we're clear, I want you
 3   to understand that when you walk in, we all wait for you,
 4   because you-all are judges too.  You are judges of the facts,
 5   and I'm the judge of the law.  So you don't have these hot
 6   little robes -- you're welcome -- but you are as important as I
 7   am today and probably more so.
 8            With that said, Mr. Gallian -- if you will give him
 9   the time and attention you did everyone else.  And I look
10   forward to your presentation, sir.
11            MR. GALLIAN:  May it please the Court.
12            THE COURT:  Please.
13            MR. GALLIAN:  Members of the jury, this case is about
14   lies, lies, and more lies.  Lies by the victim, Casi Thompson,
15   and lies by my client, Bill Stone.
16            I go out on a branch here and say this will be the
17   weirdest case that I ever work in my life.  In my time as a
18   prosecutor, in my nearly decade as a criminal defense attorney,
19   there will be no case that ever comes in my career that is
20   anything like this.  And because this is a weird -- weird case,
21   I'm going to do something a little bit unorthodox.
22            As a criminal defense attorney, I'm going to tell you
23   the truth, the good, the bad, and the ugly truth.  I will tell
24   you everything, so that you have a very clear picture of
25   exactly what this case is about.

1          In pursuit of the truth, there are two very important

2    things you need to know.  Did Bill Stone create a super secret

3    federal probation?  Yes, he did.  Did Joseph DeLeon know about

4    it?  Did he know that it was fake?  No, he did not.

5          So now you're sitting here thinking why are we here.

6    Did I just confess to everything?  Am I the worst criminal

7    defense attorney in the world?  No.  I've streamlined the

8    issues for you.

9          You don't need to decide if there is a super secret

10   probation.  You don't need to decide if there were fake phone

11   calls, fake analysts, fake -- it was all fake.

12         Bill Stone is charged in four separate offenses

13   totalling nine counts:  conspiracy to commit wire fraud, wire

14   fraud, engaging in monetary transactions derived from specified

15   unlawful activity -- a mouthful -- and false impersonation of

16   an FBI agent.

17         At the crux of each charge is one thing and one thing

18   only:  Did Bill Stone create the super secret federal probation

19   to defraud Casi Thompson?  Did he do it to deprive her of money

20   and property?  That's the question that I'm asking you to hone

21   in on.  And the evidence will very clearly show you that that

22   is not the case.

23         The evidence will show that this super secret federal

24   probation began in the fall/winter of 2015 and lasted until the

25   summer of 2019.

1              The evidence, I believe, will show that this started

2    as a weird, twisted, and messed-up way to help Casi Thompson

3    through a very troubling time in her life; a way to help her

4    navigate a very complex, troubling, and very unfortunate time.

5              Now, I will concede that in 2019 this probation did

6    nothing to help Casi Thompson.  It was very much used as a way

7    to control her and to manipulate her.

8              The conditions of her probation, this super secret

9    federal probation that's fake, you already heard the

10   prosecution talk about it.  The conditions of this probation

11   mirrored the State probation.  There were no community service.

12   There were no drug tests.  There were no classes that she had

13   to attend.  Her conditions were straightforward.  Do well in

14   school, support your kids, work, and have food on the table for

15   your family.  Those were her conditions.

16             Now, to understand this story, you have to understand

17   a little bit more about the people who were involved.  This is

18   what the case comes down to, these three individuals:  Casi

19   Thompson, William "Bill" Stone, our client, and Joseph DeLeon.

20             Casi Thompson was raised in Granbury, Texas.  And as

21   the prosecution has already conceded, from 2005 all the way to

22   2014, Casi Thompson struggled very heavily with

23   methamphetamine.

24             But something you need to know about Casi Thompson is

25   that she doesn't come from a family likely like yours or mine.

1    Casi comes from a family with, to put it bluntly, a lot of

2    issues.

3           Her mom and her -- Casi's mom and her have always had

4    a very hard and a very challenging relationship.  Her brother

5    has dealt with his own issues.  Her and her father have no real

6    relationship.  But there was one very important person in

7    Casi's life.  That person was Myrna Thompson, her biological

8    grandma, the one that had the will.  Myrna emotionally

9    supported Casi and financially supported everybody in the

10   family.

11          Now, like I said, this isn't a family like yours or

12   mine.  Myrna would buy Casi, her mom, and her brother lavish

13   gifts.  What do I mean by lavish?  From 2005 to 2015, the

14   evidence will show that Myrna Thompson bought Casi Thompson

15   multiple cars.  Not the down payment, not the monthly payment.

16   Bought the car free and clear.  Very nice vehicles.  She's free

17   to do it.

18          The evidence will show from 2005 to 2014, Myrna

19   bought Casi multiple houses.  I'm not talking about the down

20   payment.  I'm not talking about the monthly mortgage payment.

21   Would buy hundreds of thousands of dollars in houses and pay

22   for them free and clear.  And at the end of each year, she

23   would pay the property tax as well.

24          This was a woman who was the rock of the Thompson

25   family, a woman that would do anything for anyone in her family

1    and financially support them as well.

2             Now, when you hear $700,000.00, $800,000.00 -- and I

3    suspect that the prosecution is going to say it over and over

4    and over again, because to all of us that is a lot of money.  A

5    lot of money.  But in the Thompson family, that's not a lot of

6    money.  Think of it as a Thompson conversion rate.  No one on

7    this jury has ever likely had a house paid for, multiple cars.

8    That was Myrna's way of expressing her love, her devotion, and

9    her appreciation of people in her family, the same way that

10   Casi showed it to Bill.

11            This is a picture of Myrna.

12            The evidence will show very clearly that Casi, at

13   multiple times in this investigation, lied repeatedly to

14   investigators.

15            Bill Stone, our client, born and raised in Longview,

16   Texas, followed in his dad's footsteps.  His dad was a police

17   chief for Longview Police Department.  He was with the police

18   department over 40 years.

19            Bill served admirably in the Marines, and he worked

20   at the Irving Police Department -- it's important, Irving

21   Police Department -- until 1995.

22            After that, he transferred into the FBI where he

23   started at the Phoenix field office, transferred to the Phoenix

24   field office in the late '90s.  And by the early 2000s, he got

25   his office of preference and he transferred back to Dallas

 1   where he remained from the early 2000s until he retired.

 2          Again, important, he retired October 31, 2015.  I

 3   will not argue another date.  I will not try and muddy the

 4   waters.  Bill Stone retired from the FBI October 31, 2015.

 5          Bill is a liar.  I suspect that a lot of you are

 6   going to think Bill is a bad guy.

 7          What the evidence will show is that Bill is not a

 8   criminal.  Bill truly cared for Casi, wanted to help her, and

 9   this was his weird way of doing it.  It was far from perfect.

10   It was far from good, but it wasn't criminal.

11          Finally, Joseph DeLeon, to my knowledge, has never

12   been in law enforcement, and I have never heard anyone say that

13   he held out as law enforcement.  The first time I heard that

14   was today in the courtroom.  But based on what I know, Joe

15   DeLeon is a Fort Worth native, and he truly respects law

16   enforcement.

17          It is not my job to defend Joseph DeLeon.  To put it

18   bluntly, I don't care what you decide to do with Joseph DeLeon.

19   But I believe the evidence -- again, telling you the truth, I

20   believe the evidence will very clearly show that Joseph DeLeon

21   did not know the super -- the federal probation was fake.

22          Now, to understand this case a little bit better, we

23   need to go through the timeline.

24          In 2002, 21 years ago, Joe and Bill meet for the

25   first time.  It's all you need to know.  They have been friends

1    since 2002.

2           Since approximately 2005, 2006, this is when Casi,

3    Joe, and Bill meet for the first time.  You heard the

4    prosecutors mention it -- when they sat down with Bill, Bill

5    was an FBI agent at the time.

6           2007, Casi was arrested in Irving, Texas, for

7    possession of methamphetamine.  Guess who Casi Thompson called?

8    Bill Stone.  She reached out.

9           2010, Casi, then Gomez, was arrested again in Hood

10   County, Texas.

11          May 27, 2014, Casi was again arrested in Hood County,

12   Texas.

13          In September of 2014, Casi finally makes a decision,

14   which was probably a good decision, to go to rehab.  It wasn't

15   her first stint in rehab.  She's gone multiple times.  She went

16   in September 2014.  Who did she call when she was leaving?  Who

17   did she send a message to when she was leaving?  Joseph DeLeon.

18          Here is what you need to know.  The Government will

19   have you believe, as they've argued, that Joe and Bill just

20   appeared.  But the evidence will show that's not true.  Because

21   Casi returns from rehab in February 2015.  She's there for

22   about four or five months.  Guess who Casi starts calling all

23   the time?  Bill Stone.

24          Casi Thompson and Bill Stone talked for hours after

25   hours after hours February, March, April, May, June.  All the

1   time.

2          In February 2015, Bill and Casi began this -- started

3   this relationship, very clear from the cell phone records that

4   we'll go through.  They are talking all the time.

5          In July 2015, Myrna falls, hurts her shoulder, and

6   her health starts to degrade.  Who does she call the next day?

7   Bill Stone.

8          There's a lot that happens in this time, and that's

9   why I decided to do this little PowerPoint, because Casi begins

10   the probation for the case she was arrested for May 2014.  She

11   finally reaches this agreement and starts the probation in Hood

12   County, an actual probation, August 2015.  That probation is

13   for six years.  It is in Hood County, Texas.  It is with a real

14   judge with a real probation officer with real conditions.

15          Two months later, Bill retires from the FBI,

16   October 31, 2015.  Casi at this time has a lot going on.

17   Myrna's health is starting to degrade.  It's the only mother

18   figure that she actually has.  She is stressed out because out

19   of all of the times that she's ever been arrested, this is the

20   first time she's ever actually had to be on probation.  And

21   then the unthinkable happens.  November 4, 2015, Myrna passes

22   away.  Her world as she knows it starts to fall apart.

23          Bill notices it.  I'm sure that Joseph DeLeon notices

24   it as well.

25          So that's when it starts.  Casi is spiraling.  He can

1   see it.  And in Bill's way, he creates this super secret

2   probation.  Yes, it scares the crap out of her.  Yes, she is

3   worried.  The conditions of this probation:  Do good in school,

4   take care of your kid, work if you can, and have food in the

5   fridge for your family.  Those were the conditions.  And yes,

6   Joseph DeLeon and Bill Stone held her accountable to those

7   conditions.

8           February 26, 2016.  Myrna's life insurance policy

9   finally pays out.  Over a million dollars gets dropped right in

10  Casi Thompson's bank account.  What does she do?  She starts

11  spending it.

12          March 2016, Casi buys a new car.  Trades in her

13  Lexus, gets a new Lexus.  At that point she sold a house just

14  to buy another house.

15          She decided that the Lexus that she had in March 2016

16  wasn't nice enough.  And so her, Bill went to the dealership

17  together and they both bought Mercedes vehicles together.  And

18  yes, Casi bought him that vehicle.  That is why in the

19  indictment you heard $76,000.00 to Park Place Mercedes.  You

20  are probably thinking why is that.  This is what it is.  Bill

21  and Casi buy Mercedes together.

22          Well, it didn't stop there.  September 2016, Bill and

23  Casi buy a house together.  Now, I will concede that the deed

24  on that property is only going to say Bill Stone's name, will

25  not say Casi Thompson.  I'm sure the prosecution will make a

1    big deal out of that, but they bought that house together.

2           They had every intention of living in the house

3    together.  In fact, they had so many intentions of doing it

4    that they remodeled it together.  They hired a team to come

5    into the house, completely gut it.  And they designed the house

6    together.  They picked out the finishes together.  They met

7    with the contractors together.  They picked the backsplash

8    together.  They designed the room for her son together.

9           And I say nothing notable until 2018, because there

10   really isn't.  I will concede there was a lot of money that

11   Casi Thompson gave Bill Stone in 2016, a lot, a lot more than

12   any of us will ever be given, ever.  This was Casi's way of

13   showing her affection and her appreciation for Bill Stone.

14          Casi did so well on this Hood County probation.  You

15   heard the prosecution already mention it, that she gets

16   released from the Hood County probation, the real one.  She

17   starts August 2015, it's for six years.  She only does three

18   years, gets off for good behavior.  Probation is terminated.

19          At the end of 2018, Casi will admit based on messages

20   that we found that her and Bill start trying to have a kid

21   together.  By June of 2019, Casi and Bill are very openly

22   talking about buying a house, selling the Colleyville house,

23   buying a house together in Granbury.

24          Casi and Bill go to Key West, a vacation they took

25   together in June of 2019.

```
 1              Here is something interesting about criminal cases.
 2   I have never seen Casi Thompson.  I don't get to depose her.
 3   We don't get depositions.  The first time I'll ever talk to her
 4   is on the stand.  But I think the evidence will very clearly
 5   show that on this trip something happened.  And I think the
 6   evidence will show that Casi started to realize some of the
 7   freedom; that Hood County probation was over with, she was free
 8   from that, and she wanted to be off this super secret federal
 9   probation, and she started pushing back.  She started asking
10   questions.  She started pushing back, and she wanted off of
11   this secret probation.
12              June 12, 2019, Casi starts to pull away from Bill.
13   Now, this is where Bill goes the wrong way.  Rather than just
14   acknowledge it, rather than let her go, rather than to say, you
15   know what, I made it all up, you're free to go, do what you
16   need to do, instead he does the exact opposite.  And when you
17   first hear the evidence, it is going to do and have the same
18   effect that it did on me -- what the heck?
19              But rather than letting her go, he turns up the heat.
20   He turns up the heat tenfold.  You think you are going to leave
21   this relationship?  Boom, how about a spoof phone call.  I'm
22   going to pretend like I'm in judge's chambers in Austin, and
23   I'm going to call you, and we're going to talk about probation
24   stuff.  That wasn't enough?  Boom, I'm going to have one of my
25   friends pretend that they are a DEA agent and scare you on a
```

1    voicemail.  Well, it worked.  Two weeks later, they get
2    engaged.  It worked.
3              And you're going to hear all those phone calls.
4    You're going to hear everything.
5              Casi ends the engagement five days later.  She
6    panics.  She reaches out to law enforcement.  And here we are.
7              She sat down with Ranger Briley July 29, 2019.
8              The evidence will show that this is not a motive
9    question about money.  The evidence will show that Casi
10   Thompson was on probation from -- sorry -- secret probation
11   from 2015 all the way through 2019.  The only money she gave
12   Bill was in the year 2016.  And there's a whole lot of
13   purchases that I have a whole lot of questions for Ms. Thompson
14   about.
15             Look at the motive.  The evidence will very clearly
16   show that at the beginning of the probation, Bill, through this
17   weird, twisted way, had Casi's best intentions in his heart.
18   And at the end, that couldn't be further from the truth.  It
19   was used as a way to control her, to manipulate her, to keep
20   her in the relationship.  But it wasn't criminal.
21             There is going to be a lot of phone call evidence in
22   this case.  A lot.  And you're going to hear those phone calls.
23   And what the evidence will show is that there is two things I
24   want to point out -- I want you to pay attention to in these
25   phone calls, two very important things.  When these phone calls

1   are made, Casi has already been told that this federal

2   probation is fake.  It does not exist.  It was never real.

3   Okay?  She's been told that.  The agents that investigated the

4   case said there was no probation.

5          Listen to the questions that she asks him.  Truly

6   listen to the questions that she asks him.  She knows it wasn't

7   about the money.

8          Number two, on these phone calls -- and you're going

9   to hear a lot of them -- listen to my client, Bill Stone.

10  Truly listen to him.  The only thing that he cares about --

11  because it wasn't helping his criminal defense attorney with

12  good evidence.  The only thing that he cares about is getting

13  her back.  When will we talk again?  When will I see you again?

14  When are you ready to talk?  He never cared about the money.

15  This wasn't about the money.

16         I'm not asking you to like what Bill did.  That's why

17  I discussed it in jury selection.  I'm not asking -- sure as

18  heck not asking you to agree with what he did.  I'm not even

19  asking you to think that Bill Stone is a good guy.  I'm asking

20  you to answer this one question.  Can the Government prove this

21  case beyond all reasonable doubt, that Bill Stone had the

22  intent in this probation to steal money and to steal property?

23         The evidence will very clearly show that that is not

24  the case.

25         And at the end of the case, I will stand right here

 1   and I will yell just as long and I will ask you to return a

 2   verdict of not guilty.

 3            Thank you.

 4            THE COURT:  Thank you, Mr. Gallian.

 5            Members of the jury, are we okay to proceed a little

 6   further?  Does anyone need a break?  If so, just raise your

 7   hand a little bit.  If not, we will keep trucking.

 8            Lawyers, doing okay?

 9            Off the record for a moment.

10            (Discussion off the record)

11            THE COURT:  Let me know, counsel, whenever you are

12   ready.  Take your time preparing.

13            MR. WESTFALL:  Thank you, Your Honor.  I'm ready.

14            All right.  May it please the Court.

15            THE COURT:  Todd, are you ready?

16            Please, sir.

17            MR. WESTFALL:  My name is Greg Westfall.  And Frank

18   Sellers and I speak for Joe.

19            Joe is 64 years old.  He was born in the United

20   States, but he was raised in both Mexico and the United States.

21   So he's bilingual.

22            He has lived in Fort Worth, Texas, since forever.

23   And he and his sister have a couple of different locations of a

24   very popular Mexican restaurant in Fort Worth called Benito's.

25   So he's been in the restaurant business basically his entire

1    adult life.  He also has been around law enforcement basically

2    his entire adult life.

3              And Joe has three passions.  First is the United

4    States of America.  Joe is incredibly proud to be from the

5    United States of America.  He never fails to tell veterans

6    thank you for your service.  It's almost cheesy how patriotic

7    he is.  But that's Joe.

8              Joe loves his community.  He has been a

9    representative of the Hispanic community in Fort Worth since

10   forever, which is how he got involved with law enforcement,

11   which is his third passion.

12             Joe was a volunteer translator with the Fort Worth

13   Police Department before the Fort Worth Police Department had

14   Hispanic officers.  Joe would be called to come down to a

15   hostage situation or a standoff or a SWAT operation and

16   translate.  He met Bill Stone working on a human trafficking

17   case with some Hondurans in 2002 in Fort Worth, Texas.  That's

18   how they met.

19             Joe has never represented himself as a police

20   officer.  And you're not going to see a single shred of

21   evidence in this entire case that says he has.

22             He was -- he taught at the academy.  He taught at the

23   Citizens Academy.  He has been to the FBI Citizens Academy.

24   But he is not a law enforcement officer, okay?

25             But his restaurant became like a hangout for law

1   enforcement.  And that's where he first met Casi Thompson, is

2   she was hanging around with a private investigator who hung

3   around at the restaurant, and so they all moved in kind of

4   these same circles and it's all been around law enforcement.

5          That is Joe DeLeon.

6          One of Joe's friends, of course, as you know by now,

7   is Bill Stone.  Bill Stone is a special agent in the FBI.  Bill

8   Stone had -- I mean, Joe had his cell phone number.  Joe worked

9   with him on at least a couple of cases.  And that was a really

10  big deal.  Joe came to idolize Bill Stone.  It was so cool to

11  have this friend, this really close friend that's in the FBI.

12         At a point, Bill Stone told Joe that Joe was a

13  cooperating individual, a confidential -- a confidential

14  informant for the FBI.  It's also called a 137.  And you'll see

15  text messages of Joe sending information to Bill Stone, things

16  he hears on the street in Fort Worth, Texas.  And you'll see

17  that over and over again.

18         He had a handle.  He was known as Squeaky Clean,

19  okay?  This whole -- probably charade.

20         You're going to see a lot of text messages.  You're

21  going to hear a lot of phone calls.  You're going to see a lot

22  of documents, literally thousands of text messages.  You're

23  never going to see a text message where Joe is pretending like

24  he is law enforcement or even making a reference to it.  You're

25  never going to see a text message where Joe and Bill Stone are

having, like, a conspiratorial conversation, you know, saying

like, oh, yeah, we know the deal, you know the deal.  No, no,

no, no.  You're going to see text message after text message of

Bill Stone lying to Joe about the same things that he lied to

Casi about.

        Joe DeLeon and Casi Thompson have known each other

since the mid-2000s, okay?  But as you heard already, Casi

Thompson and Bill Stone had a relationship that was independent

of Joe DeLeon.

        You will see telephone messages -- I mean literally

three hours of phone time a day between Bill Stone and Casi

Thompson, literally, in 2016, 2017.

        There's a lot of other names that you're going to

hear in this case.  You're going to hear about Avery.  Avery

was supposed to be an intelligence analyst that an FBI agent

uses, and Bill Stone had Avery who would tell him whenever

Casi's name popped up somewhere on the Internet or something.

And he -- Joe -- I mean, Bill would always know what's going

on.  If there was talk on the street, hanging out, whatever,

Avery would tell him.

        There's Dr. B, or Dr. Bryant, one of Bill's very best

friends.  Casi had to do sessions with Dr. Bryant.  Dr. Bryant

was referenced a lot in jokes.  You'll see text messages where

he's talking to Joe about Dr. Bryant.

        Dr. Suzanne, Dr. S, was Dr. Bryant's wife.  She was

```
 1    a -- I think a medical doctor.  And you will see references to
 2    her.  You will see an entire exchange where Dr. S is supposedly
 3    on the other line and Bill is talking to Joe.
 4              You will -- Blanca is another intelligence analyst.
 5              There is Judge Anderson you have already heard about
 6    down in Austin, right?  Well, he had to go through the court
 7    coordinator -- at least that's what Bill said, you had to go
 8    through the court coordinator to get to Judge Anderson.
 9              There's a Jerry who is an investigator.
10              There is Lindsey who -- I can't remember what Lindsey
11    does.
12              There is a Linda.
13              There's an Ainsley.
14              There's a Toby.
15              There's a Chet.
16              And there's one important thing that all of these
17    people have in common, one unifying factor.  None of them
18    exist.  None of them exist.  They're all made up by Bill.
19              The same lies that Bill told to Casi, Bill told to
20    Joe.  And that's what you're going to see in the evidence.
21              Avery, okay?  Casi believed it; Joe believed it.
22    Because Joe didn't -- I mean, when they're just talking with
23    each other, which they do a lot, it's not like ho, ho, ho, ho,
24    you know, you know Avery's B.S., right?  No.  He's talking to
25    Joe about Avery, seriously.
```

 1          Bill had a close friend named Dr. B, Dr. S.  Bill was

 2  still a special agent.  And this may have been more of a lie of

 3  omission than comission.  I don't know.  Because all we have is

 4  text messages and phone conversations that are recorded.

 5          We don't know what Casi is going to say, okay?

 6  Unless it's in some of the written stuff that we've seen or in

 7  text messages.

 8          So -- but I have never seen -- I mean, you won't see

 9  anything that really sets out exactly what the representation

10  was until the end of this when our client is cooperating with

11  the FBI and challenging Bill Stone about were you an FBI agent,

12  were you an FBI agent?  You know, when did you retire?

13          And he's like, ah, yeah, sometime back -- sometime

14  back.  Still lying to him.

15          But then he brings up the point, you know, if you

16  weren't really in the FBI, then you can't manage a probation.

17          It's not really in their job description anyway, but

18  that was the hook, right?

19          So Bill was still going to Washington, D.C.  Bill was

20  going to the Middle East.  And Bill's Verizon phone records

21  show exactly where he was, which was in Colleyville, Texas.

22  Over and over and over again he tells Casi and Joe that he's

23  out of town when he's not.  At least his phone is not that he's

24  calling her all the time on.

25          Bill was still going to overseas work.  Bill is

 1   working for the CIA.  That one comes out.

 2         Bill could listen to their phone calls.  Now, this

 3   was a very big deal.  Both Casi and Joe believed that Bill

 4   could hear what they said on the phone, and it was probably

 5   because of Avery, right?

 6         But you'll hear Casi talking to Ranger Briley and

 7   saying, are you sure the phone is okay?  Are you sure I can use

 8   this phone and Bill can't hear it?

 9         And you will hear Joe saying to Ranger Briley, are

10   you sure the phone is okay?  Are you sure I can use this phone

11   and Bill won't hear it?

12         Yeah, you can't make this up.

13         2014 to 2015, Casi is in a rough time.  You know,

14   she'd been a methamphetamine addict for ten years.  And when

15   you are in your addiction, anyone that knows anything about

16   addiction or has known people with addictions, you know, you're

17   not your best self.  What matters is the drug, how we get the

18   drug.  Sometimes we can cut corners, right?  And to be able to

19   carry on the addiction turns you into a con.  And then you

20   get -- you get cleaned up, and you are the regular you.  And, I

21   mean, it can be a miracle.

22         But I can't buy that she was a victim for ten years,

23   not if she was also a methamphetamine addict.  And that's just

24   the simple truth, okay?

25         September 9, 2014, checks into rehab.

 1              December 19, 2014, first court date on her new felony

 2      indictment, methamphetamine.

 3              August 25th, she goes on probation.

 4              Now, watch this.  Bill Stone had told Joe DeLeon that

 5      she was a confidential informant also.  And you can see Joe

 6      DeLeon dutifully reporting to Bill as though Casi is a

 7      confidential informant.

 8              Bill had indeed made -- represented to Casi that when

 9      she got arrested in Irving that one time he made it disappear,

10      either -- he represented it somehow, because she believed it

11      and so did Joe.

12              2014, 2015, you're going to see lots of

13      communications, lots of telephone records.  It is going to go,

14      you know, Bill's telephone records, Joe's telephone records,

15      Casi's telephone records.

16              Bill had a way to delete all of his text messages,

17      and so Bill's text messages are only available on our client's

18      phone.  Casi's text messages were deleted also, because what

19      Bill did was he had her phones, you know, copies of her phones,

20      and he was able to delete them out of the cloud, I guess.

21              But you will also see direct communications, long

22      communications between Bill Stone and Casi Thompson.

23              You know, this was the year she was arrested.  108

24      phone calls between them.  81 of those phone calls was Casi

25      calling Bill, okay?  And, I mean, one of those, like 78 minutes

1  long.

2          In the time when they're really, really maximizing

3  their time on the phone, his is the first voice she hears in

4  the morning and the last voice she hears at night.  And they

5  talk literally up to three hours a day.

6          2015, they have 182 phone calls together.  This

7  doesn't have anything to do with Joe.  This is independent of

8  Joe.  Now, you'll see that there was a lot of stuff they kept

9  from Joe.

10          You know the dates.  Casi's grandmother dies, her

11  funeral, meeting at Casi's house, and the secret probation

12  happens in December sometime.

13          And this is what Bill told both of them, that there

14  is new allegations.  And this stemmed from, like, Enterprise

15  Rent-A-Car not wanting to rent her a car and Joe -- Joe told

16  Bill because Joe was supposed to be giving all this information

17  to Bill, you know, because they are trying to keep Casi out of

18  trouble.  And so he says, you know, Enterprise Rent-A-Car

19  denied her a rental, and then that kind of turned into a deal.

20  All of a sudden there's these allegations that have come up,

21  and Casi believed it and Joe believed it.

22          Casi could go away for 50 years.  They both believed

23  it.  And you will hear a story when this was communicated to

24  Casi, it was done so in a way that it was, like, maximized the

25  fear and being upset.  Well, it worked on Joe also.  He walked

```
 1    over and threw up next to the wall.  And they both talk about
 2    it.  Both Casi and Joe talk about that incident.  It made an
 3    impact.
 4              Casi would lose her children, which was her greatest
 5    fear, lose her children.  And Bill was able somehow to get her
 6    new cases resolved.  There's going to be some conditions.  She
 7    would be on secret probation for six years.  She was going to
 8    be overseen by a Judge Anderson in Austin.  Judge Anderson
 9    imposed many conditions.  And Joe needed to help out and be
10    kind of her local probation officer.  And this was a deal
11    where -- Joe, are you prepared to do this?
12              Yes, sir.
13              You will see an e-mail exchange at one point.  It
14    says, Joe, are you ready to take your supervision to the next
15    level?  Can you do it, you know?
16              And Joe's like, yes, sir, I can make time.  I have
17    got a manager at my restaurant.  I can make the time to do it.
18              You know, it's -- it shines a light into this
19    relationship.  It was so much trust from Joe to Bill that
20    literally, I mean, this would be like finding out that your
21    father had another family or something.  I mean, this is
22    really, really existential to Joe.
23              Judge required Bill to travel to Austin and check in,
24    and Casi owed restitution to Enterprise Rent-A-Car, right?
25              $15,000.00, a pickup and secrets.
```

1          That $50,000.00 that the Government mentioned at the

2   beginning when they were reading the indictment is made up of

3   two numbers, $15,000.00 and $37,000.00, which is how much Joe

4   received when he sold that pickup truck to CarMax, okay, a few

5   months after it was given to him.  $15,000.00 is a check on

6   January 29, 2016 that Casi gives to Joe.

7          Now, you know, you have got what they say -- "they."

8   We have heard that word a lot, haven't we?  Every time we hear

9   the word "they "coming from them, it is meant to try to put

10  these folks so close together.  But you are going to see the

11  simple timeline defeats that.

12         This is what Joe DeLeon saw.  Casi sends him on

13  January 28, 2016 a text message that says if you want to come

14  pick up your check, I have it here.

15         They don't get to see each other that day.  They go

16  the 29th.

17         And Casi texts him and says, you want to have lunch

18  today, I'm in Fort Worth.

19         And he said, I'm working at a hostage negotiations

20  class right now, but when I'm done, yes.

21         So they go to a seafood restaurant in Fort Worth.

22  And Casi obviously gives her -- gives him the $15,000.00 check,

23  okay?

24         This was in January 2016.  This was a month after

25  this insurance money paid.

1           That very day, I love you, Joe, and am grateful for

2    our friendship.

3           Now, what Joe DeLeon did not know until much, much

4    later was that Casi Thompson was told not to talk to Joe about

5    the financial part of it.  Don't tell Joe about any of the

6    money.  All right?

7           So she didn't say anything to him.

8           And importantly, later on when she is recording

9    conversations with him, she never confronts him about the

10   money.  She never confronts him about the pickup truck.  And

11   she does know how to confront, because you hear her confronting

12   Bill a lot in those telephone conversations.

13          The pickup truck, it was an F-150 that was the

14   property of the estate.  And she, on the 16th of February,

15   2016, gives Joe that pickup truck, all right?  And here is what

16   it looked like to Joe.  Joe sends a text that says, OMG, this

17   truck is sweet, I love it, thank you.

18          Her response:  I hope you like it.  It's top of the

19   line.

20          It was a nice pickup truck.

21          And then Joe says, I meant to say I know that you are

22   at Celebrating Recovery and that I should leave you alone, but

23   I love this truck, thank you so much.

24          What Joe didn't know and much later on we find out

25   that Bill told her to give him the truck and don't tell her

1    that I told you to do it.  That's what we heard.  And we heard
2    it coming out of her own mouth on tape.  You will hear it,
3    okay?
4            You know, one thing I just want to just mention, go
5    back to, see how nice this is?  I meant to -- you're at
6    Celebrating Recovery and I shouldn't bother you.  When you're
7    looking at Joe's text messages to Casi, just -- I mean, the
8    encouragement that he gives her on a continuous basis, you
9    know, just cheerleading her on her school, cheerleading her on
10   staying sober, and it's we all love you so much and we want to,
11   you know -- he -- he loves her.  He wants to support her.  I
12   mean, he is talking to her like she's his daughter.
13           And he does that all the way back to 2014 when she
14   goes to treatment.  She's texting with him and he's texting
15   with her, and he's talking about how it's so good that you're
16   getting sober, you know, we're behind you.  And, I mean, you
17   just don't carry that on if that's not really you.
18           If it's not really you to be encouraging, you don't
19   fake it for years.  I mean, it's crazy.  It's like this idea
20   that they knew ten years before the grandmother died that Casi
21   was going to take under the estate.
22           You know, there's a level of confirmation bias that
23   just gets crazy.  That's why we have you-all, because you're
24   going to look at the evidence.
25           What Joe DeLeon did not know was that Bill told Casi

1    Thompson to give Joe the truck and don't tell her Joe told

2    her to do it -- Bill told her to do it.

3           But then here's a lot of other stuff that Joe didn't

4    know, okay, had no clue.  Casi was giving Bill $5,000.00.  Some

5    of these $5,000.00 payments would be made, like, in envelopes

6    like you get from the bank when the three of them would go the

7    Cracker Barrel and eat, okay?  But that didn't tell Joe how

8    often those payments were being made, and there's no

9    correspondence between Bill and Joe where they talk about it.

10          But apparently every time Bill was quote, unquote

11   flying into town from Colleyville, he -- he said it cost

12   $5,000.00.  And Casi was giving him $5,000.00 every time.  And

13   I think every time he had to go to Austin it was $5,000.00.

14   Casi was paying him $5,000.00 every time.  Joe didn't know

15   anything about any of this.

16          And Joe didn't know that Casi bought Bill a Rolex

17   watch, and Joe didn't know that Casi paid Bill $250,000.00 for

18   Enterprise Rent-a-Car restitution.  And he didn't know that

19   Casi bought Bill a Mercedes Benz.

20          He didn't know that Casi bought Bill a Tacoma pickup.

21   He didn't know that Casi paid for the improvements to Bill's

22   house.  And he didn't know that sometime in 2016 Bill and Casi

23   started an intimate relationship.

24          And Joe -- Bill still had Joe for a time running over

25   there and doing stuff to make sure that Casi's house was safe,

1   make sure the guy with the underwear doesn't come over to her

2   yard again.  I mean, it's craziness.  And Bill had Joe doing

3   that even though they were romantically involved.

4          Time and time again you see this running joke where

5   Bill is -- Bill is telling Joe, she's your fiancee, she's your

6   fiancee, she's your woman.  The whole time, you know, they're

7   boyfriend and girlfriend.  It's goofy.

8          Bill and Casi took vacations.  Bill and Casi had

9   become engaged.  Joe didn't know any of that.

10          2017, Casi Thompson graduates from college, and Joe

11   DeLeon is excused, okay?  They're talking about 2018, 2019.

12   Here.  Here's 2018, 2019.  You see these phone calls, 2016.

13   The gray ones are calls from Bill to Casi or vice versa.  The

14   orange ones are calls from Joe to Casi or vice versa.  And the

15   blue ones are calls from Stone to DeLeon and vice versa.

16          Let me tell you what.  There are days where, I mean,

17   the amount of time on the phone is just mind bending, all

18   right?  But look at 2016.  Look at 2017.  That number drops

19   from 1773 to 251.  2018, the number drops to seven.  Seven

20   times over the course of the year Casi and Joe spoke on the

21   phone or tried to call each other, and six times in the next

22   year.  Joe was out of here in 2017 at some point, all right?

23          And what we're talking about in terms of this

24   $15,000.00 and this truck, that was all over with by

25   mid-February 2016.  2016.  2018, 2019, we are not around.

1          So the investigation.  And, yeah, it went to Briley

2    and then went to the FBI.  Casi Thompson on the 3rd of

3    September 2019 records a phone call with Joe DeLeon.  You will

4    get to hear that.

5          And she breaks it -- the first time to Joe that the

6    whole thing was fake.  Joe is like, no way.  No way.  Which is

7    pretty much exactly the way Casi had been before.

8          But, see, before Casi got to Briley, she had

9    already -- her mom had already filed a complaint with the --

10   with the FBI.  And, you know, that deal was going before then.

11   But even with Briley, you can still hear some resistance to

12   really getting her mind around what had happened to her.  And

13   that's natural when you are profoundly betrayed.  It takes

14   awhile for it to fully sink in.  It takes awhile to process.

15   And it took awhile to process for Joe too.  And you can see the

16   evolution of it.

17         In this telephone call with Casi, he's like, no way,

18   there is just no way.

19         Casi meets with Ranger Briley, and they talk about

20   it.  And that talk with her made her, like, have a flashback,

21   says, you know, I'm back to thinking, you know, is it real, is

22   it real, is it not real.

23         And then the 5th, Ranger Briley just shows up at

24   Joe's house.  And I suspect Ranger Briley is going to say that

25   Joe was extremely polite, extremely deferential, and truly

1   likes law enforcement, okay, because he cooperated with

2   everything that was ever asked of him by the FBI, by the Texas

3   Rangers without even bucking.  And he went out of his way to

4   cooperate more.

5          Ranger Briley says, will you come up to the Fort

6   Worth Police Department so we can talk?

7          Joe says, of course I will.

8          Three and a half hours they talk.  And Joe is like, I

9   just don't see it.  I can't see that happening.  I can't.

10          But there is a point where Ranger Briley gets

11   through, and you can hear it.  You can hear it.  Joe, let me

12   just ask you a hypothetical.  Let's just assume that this

13   probation is fake.

14          Joe says, okay.

15          And if the probation is fake, that would be a crime,

16   wouldn't it?

17          And Joe starts to cry and asks Briley, is this really

18   what you are thinking?

19          Briley says, yes.

20          Within hours Joe is making a phone call to Bill Stone

21   under the direction of Ranger Briley and recording it.  And you

22   will hear that.  And it is profound.  Profound.

23          Casi Thompson records another phone call with Joe.

24   This time Joe knows the deal, but Ranger Briley has asked him

25   not to discuss it with anybody, so he never discusses it with

1    Casi.  So Casi doesn't know that he knows.  He doesn't know

2    that Casi knows or something.  But the -- the talk that they

3    have there, that's when Casi first tells him about the

4    $250,000.00, about the Mercedes, about the house, about --

5    and -- and, you know, you can hear his reaction.  It's just --

6    it's amazing.

7           Joe DeLeon tells Ranger Briley that Bill is coming in

8    to go get a surgery at the hospital.  He had a deviated septum.

9    And he offers to do something.  They arrive at a plan for Joe

10   to wear a secret recording device and go pick up -- pick up

11   Bill at his house that Joe didn't even know where it was until,

12   like, hours before he went there, and they recorded this all

13   the way down, Bill just talking and Joe asking him questions.

14   And, I mean, you hear all the same stuff, Dr. S, Dr. B, Avery,

15   everything.  And, of course, he gives it to Ranger Briley, and

16   they talk about him doing it again.

17          He spends a lot of time with Ranger Briley.  Ranger

18   Briley is a nice guy.

19          Casi Thompson records two more phone conversations

20   with Joe DeLeon on the 27th and the 28th.

21          And then the next time anything happens is in 2020

22   when Brian Luley gets involved, when the FBI gets involved.

23          Joe gives yet another sworn statement.  Joe agrees to

24   yet another phone recorded phone call, and he does it.  Joe

25   agrees to another recorded phone call on the 11th and another

1   one on the 12th and then two recorded phone calls on the 13th.

2          By the end he's done some six recorded phone calls,

3   two statements, interrogations that are approximately seven

4   hours total.  He's been recorded four other times, and he's

5   worn a wire from Colleyville to downtown Fort Worth without

6   Bill's knowledge to try to capture his words to give to the

7   police.  He's done all of that.

8          And so after all these efforts to help with the

9   investigation, fill in the blank.  Joe gets, A, thanked for his

10  service in helping build a case against Bill Stone or indicted

11  and charged with a felony offense.  And getting to the bottom

12  of this is what we're going to ask you-all to do, because this

13  is not right.

14         This is an instruction that you're going to be given.

15  And it's common sense, and it's fair, and it makes sense that a

16  person who has no knowledge of a conspiracy, but who happens to

17  act in a way which advances some purpose of the conspiracy,

18  does not thereby become a conspirator.

19         Look at all the evidence.  There's no way that they

20  are going to be able to rule out the possibility that Joe

21  didn't really know what was going on.  There is no way.  And

22  when they fail to do that, we ask you to acquit Joe DeLeon.

23  Not guilty.  Not guilty.

24         THE COURT:  Thank you, sir.

25         MR. WESTFALL:  Thank you, Your Honor.

```
 1              THE COURT:  May I see the lawyers over here for just
 2    a moment please?
 3              Off the record.
 4              (Bench conference held off the record)
 5              THE COURT:  On the record.
 6              So, members of the jury, I'm just going to stand up
 7    so you-all can see me.  The good news is we have crossed the
 8    finish line for today, day one.  And so we're going to excuse
 9    you for the rest of the day.
10              I am going to meet you back there to talk a little
11    bit about housekeeping, set a time to come in tomorrow, talk to
12    you about the rhythm of that.
13              Then I need to take up a matter in chambers.
14              I'm going to come back out and do some very small
15    housekeeping stuff with the lawyers.  The good news is you guys
16    can hit the road and don't have to be here.
17              So I do need to give you an admonition.  Remember my
18    preliminary instructions where I talked about not going on the
19    Internet, not doing any independent research, not chatting with
20    your friends about this case, not even chatting with each other
21    about the case.  You can talk about everything under the sun,
22    who on TMZ is not wearing their underwear today, you know, all
23    that good stuff, what the housewives are doing, grandchildren,
24    pets.  Just not this case until you have heard it all and it is
25    time for you to deliberate.
```

1          So I have no concerns about you-all following the

2     rules.  We do appreciate you.

3          I'm going to bring you even better, more delicious

4     doughnuts tomorrow, so come hungry.

5          I'm not allowed to walk you through security every

6     morning.  And so if you'll plan to get here early, we would

7     like to start at 9:00.  I'll talk to you about that in just a

8     minute back there.  But if we start at 9:00, you probably want

9     to get here like at 8:30.  In a pinch I can probably come down,

10    but other judges are complaining that all my people get to cut

11    to the front.

12         So with that said, the attorneys thank you.  The

13    parties thank you.  You guys have paid attention and done

14    everything we could ask.

15         So if you will, please rise and go back.  I will talk

16    to you for just a minute, and then we'll let you go.

17         We appreciate having you here.

18         All rise for the jury.

19         And court will be in recess until tomorrow.

20         Lawyers, if you don't mind hanging out for ten

21    minutes, I'll come back and take care of things.

22         Thank you.

23         (Recess)

24         THE COURT:  Outside the presence of the jury.

25         The Court has visited with the parties in chambers.

```
 1    It's the Court's understanding that -- what number is he,
 2    Number 1?  Juror panel Number 1, who is also Juror Number 1,
 3    who had been empaneled in this jury, the parties -- I have
 4    shared with them the gentleman had concerns about a financial
 5    hardship if he serves on the jury.  And it's my understanding
 6    that all of the parties have agreed to excuse him.
 7              Is that correct, Government?
 8              MS. RUDOFF:  Yes, Your Honor.  That's correct.
 9              THE COURT:  And counsel for Mr. Stone?
10              MR. GALLIAN:  That's correct.
11              THE COURT:  And counsel for Mr. DeLeon?
12              MR. WESTFALL:  Yes, Your Honor.
13              THE COURT:  All right.  So this Court will excuse him
14    from further service by agreement of the parties.
15              Off the record.
16              (Recess)
17
18
19
20
21
22
23
24
25
```

1                              INDEX

2     Preliminary Jury Instructions............................ 6

3     Indictment read......................................... 13

4     Not-Guilty Pleas received............................... 22

5     OPENING STATEMENT:  Ms. Rudoff.......................... 23

6     OPENING STATEMENT:  Mr. Gallian........................ 44

7     OPENING STATEMENT:  Mr. Westfall....................... 57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 25th day of July, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25