1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
     UNITED STATES OF AMERICA,     )    3:21-CR-236-E(2)
5                                  )
          GOVERNMENT,              )
6                                  )
     V.                           )    DALLAS, TEXAS
7                                  )
     WILLIAM ROY STONE, JOSEPH     )
8    DELEON                        )
                                   )
9         DEFENDANTS.              )    JULY 26, 2023

10

11

12

13

14

15            ------------------------------

16                     TRANSCRIPT OF

17                      JURY TRIAL

18                      VOLUME 2A

19         BEFORE THE HONORABLE ADA E. BROWN

20           UNITED STATES DISTRICT JUDGE

21            ------------------------------

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE GOVERNMENT:

 3        Jenna Danelle Rudoff
          US Department of Justice
 4        1100 Commerce St
          3rd Floor
 5        Dallas, TX 75242
          214-659-8600
 6        Fax: 214-659-8500
          Email: Jenna.rudoff@usdoj.gov
 7
          Donna S Max
 8        US Attorney's office for Northern
          District of Texas
 9        1100 Commerce Street
          Third Floor
10        Dallas, TX 75242-1699
          214-659-8664
11        Email: Donna.max@usdoj.gov

12        Marcus J Busch
          US Attorney's Office
13        1100 Commerce St
          Suite 300
14        Dallas, TX 75242
          214-659-8642
15        Fax: 214-659-8809
          Email: Marcus.busch@usdoj.gov
16

17   FOR THE DEFENDANT WILLIAM ROY STONE:

18        Gregg Gallian
          Gallian Firm
19        Parkside Tower
          3500 Maple Ave
20        Suite 720
          Dallas, TX 75219
21        214-432-8860
          Email: Gregg@gallianfirm.com
22
          Jaclyn Annette Gallian
23        Bryan Cave Leighton Paisner
          2200 Ross Avenue
24        Ste 4200w
          Dallas, TX 75201
25        214-721-8058
          Email: Jaclyn.gallian@bclplaw.com
```

```
1    FOR THE DEFENDANT JOSEPH DELEON:

2         Greg Westfall
          Westfall Sellers
3         1612 Summit Avenue
          Suite 200
4         Fort Worth, TX 76102
          817-928-4222
5         Fax: 817-385-6715
          Email: Greg@westfallsellers.com
6
          Frank Sellers
7         Westfall Sellers
          1612 Summit Avenue
8         Suite 200
          Fort Worth, TX 76102
9         817-928-4222
          Fax: 817-385-6715
10        Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C H R O N O L O G I C A L   I N D E X

July 26, 2023                                              PAGE

Appearances...........................................2

Proceedings...........................................5

W I T N E S S   I N D E X

| GOVERNMENT | DIRECT | VOIR DIRE | CROSS |
|---|---|---|---|
| Daralyn Crites | 11, 68 | -- | 49, 63 |
| Penny Weisend | 72 | -- | 107, 113 |
| Casi Thompson | 121 | -- | -- |

Court in Recess.....................................146

Reporter's Certificate..............................147

E X H I B I T   I N D E X

COURT:

NO.   DESCRIPTION                         OFFERED/ADMITTED

1    Jencks Material...........................93/93

GOVERNMENT:

NO.   DESCRIPTION                         OFFERED/ADMITTED

163  Power of Attorney to Care for Child.......30/31

* * * * *

 1                    (P R O C E E D I N G S)

 2                 (Witness enters the courtroom.)

 3                 MR. GALLIAN:  Outside the presence of jury, we'd

 4     like to invoke the Rule.

 5                 THE COURT:  Both sides -- all of the parties are

 6     invoking the rule of sequestration.  What you need to know

 7     about that is, what that means for you is you cannot talk about

 8     your testimony with any other witness.

 9                 THE WITNESS:  Yes.

10                 THE COURT:  Okay.  And so don't discuss what

11     you've said, don't ask what they've said.  You guys can talk

12     about anything you want other than the case.

13                 Any questions?

14                 THE WITNESS:  No.

15                 THE COURT:  All right.  Glad to have you here

16     today.  Thank you.

17                 (Witness excused.)

18                 THE COURT:  So I'll read the stipulation and I

19     think we're ready to go.

20                 MR. GALLIAN:  Your Honor, I also believe that

21     Brian Luley will testify on behalf of the government.  He was

22     in the room.  We also have our investigator who I believe might

23     testify, obviously essential to our case, if need be.  They

24     will follow the Rule as well.  I know I can speak on Jeff's

25     behalf.

 1                    THE COURT:  And I'm assuming law enforcement

 2     knows what the rule of sequestration is, sir?  There's no need

 3     to explain any of that?

 4                    MR. GALLIAN:  Yes.

 5                    MS. RUDOFF:  And also, he is our case agent as

 6     well, so...

 7                    THE COURT:  Great.  And so it's my

 8     understanding, traditionally they are allowed to stay in the

 9     courtroom.  So -- but obviously just don't discuss any

10     testimony with any other witnesses.  But glad to have you-all

11     here.

12                    MR. GALLIAN:  Yes, Your Honor, thank you.

13                    THE COURT:  Yes.

14                    (Brief recess.)

15                    THE COURT:  Any questions?

16                    Let's bring them in.

17                    (Jurors enter courtroom.)

18                    THE COURT:  Thank you for coming back.

19                    I'm going to read two stipulations.  And a

20     stipulation is where the parties have come together and agreed

21     that certain things are true.  So I have two short stipulations

22     I'm going to read to you and then we are going proceed into

23     live testimony.

24                    So the first is a stipulations of fact.  The

25     undersigned agree that the following facts are true and

1   correct.

2              Throughout the course of this investigation,

3   federal and state law enforcement officers seized and examined

4   several digital devices containing evidence related to this

5   case.  Each device was forensically imaged and the data was

6   extracted/copied from each device using acceptable forensic

7   tools.  All parties received copies of and/or access to the

8   following exhibits retrieved from the below-described devices.

9   The parties agreed that the following devices were seized and

10  accurately forensically examined.  And here is the list.

11             Apple iPhone 6S, and the serial number is IMEI

12  353300072374744, associated with telephone number

13  (817) 313-7611, belonging to DeLeon.  And it references in

14  parentheses, Government's Exhibit 26 and DeLeon Exhibit 71.

15             The next item on the list, Apple iPhone 8 Plus.

16  IMEI 35671208049965, associated with telephone number

17  (202) 697-2932, belonging to Stone.  And in parentheses it

18  says, Government's Exhibit 107.

19             The next thing on the list is Apple iPhone X.

20  IMEI 353054096588231, associated with telephone number

21  (214) 422-2863, belonging to Stone.  And in parentheses it

22  says, Government's Exhibit 108.

23             The next thing on the list is Apple iMac A1419,

24  serial number C02TKIZJJIGH, belonging to Stone.  And in

25  parentheses it says, Government's Exhibit 27.

1          The next thing on the list is an Olympus VN-541

2    PC 4.0 gigabyte digital recorder.  Serial number 100648315,

3    belonging to Stone.  And in parentheses it says, Government's

4    Exhibit 120.

5          The next thing on the list is an Apple iPhone

6    MS, IMEI 013967000516372, belonging to C.T.  In parentheses it

7    says, Government's Exhibit 121.

8          Apple iPhone 6S Plus is the next on the list.

9    And IMEI 353297073695418, belonging to C.T.  In parentheses it

10   says, Government's Exhibit 122.

11         And the last item on the list is an Apple iPhone

12   XS Max, parentheses A1921, IMEI 357277093843863, belonging to

13   P. Weisend.  It says, in parentheses, Government's Exhibit 110.

14         The parties further agree that the above

15   exhibits will only be admitted for record purposes.  Each party

16   has identified exhibits derived from the extractions listed

17   above; therefore, no party will object to the authenticity of

18   an exhibit derived from the extractions.

19         Agreed to by all parties, as evidenced by the

20   signatures below, on the 21st day of July, 2023.  And it is

21   signed by an attorney from the government and an attorney for

22   each of the defendants.

23         The second stipulation is a stipulation

24   regarding interstate commerce.  To expedite the presentation of

25   evidence in this trial, and to shorten the time necessary for

1   trial, the defendants and their counsel and the United States

2   hereby agree to stipulate to the following.  And "stipulate"

3   means not contest.

4              Interstate commerce, Number 1.  The parties

5   hereby stipulate and agree that the specified financial

6   transactions alleged in Counts 1 through 8 of the superseding

7   indictment transmitted or caused to be transmitted by means of

8   wire communications and interstate commerce; that is writings,

9   signs, signals, pictures, and sounds, between financial

10  institutions in the state of Texas and out-of-state financial

11  institutions, and these transactions affected interstate

12  commerce.

13             Specifically, the parties stipulate that if the

14  named representations of the financial institutions were called

15  to testify, they could testify that the financial transactions

16  alleged in Counts 1 through 8 respectfully were transacted by

17  means of interstate wire communications between their local

18  branches in the state of Texas by network servers located in

19  various states outside of the state of Texas as follows:

20             As to Count 1 and 8, the financial institution

21  and witness are Wells Fargo, Heidi Dovin.  The server location

22  is Shoreview, Minnesota, and Birmingham, Alabama.

23             As to Counts 1, 2, 3, 4, 5, 6 and 7, the

24  financial institution and witness are JP Morgan Chase, and the

25  witness is William Sullivan.  The server location for this is

1    the state of Delaware.

2              And as to Count 1, the financial institution and

3    witness are the Navy Federal Credit Union.  The witness is

4    Enrique Quisbert.  And there are three server locations for

5    this financial institution.  The first is Vienna, Virginia,

6    Pensacola, Florida, and finally Winchester, Virginia.

7              Further, the parties hereby stipulate and agree,

8    as alleged in Count 8 of the superseding indictment, that the

9    purchase -- that the purchase of a cashier's check is a

10   monetary transaction as defined in the law found at 18 United

11   States Code Section 1957(f).  The parties also hereby stipulate

12   and agree that Wells Fargo is a financial institution, as

13   referenced in the law found at 18 United States Code

14   Section 1957(f)(1).  And as defined in the law found at 18

15   United States Code Section 1956(c)(6).

16             Additionally, the monetary transaction in

17   Count 8 of the superseding indictment meets the definition of a

18   financial transaction described at the law found in 18 United

19   States Code Section 1957(f)(1) and as defined in the law found

20   at 18 United States Code Section 1956(c)(4).

21             Interstate commerce means commerce or travel

22   between one state, territory or possession of the United States

23   and another state, territory or possession of the United

24   States, including the District of Columbia.

25             The parties further agree that these

 1  stipulations will be read to the jury and that this document

 2  will be admitted as evidence.

 3              Further, this stipulation does not prevent any

 4  party from offering evidence otherwise admissible that touches

 5  upon a stipulated fact.

 6              So stipulated to, this the 21st day of July,

 7  2023.  And it is signed by the government and lawyers for each

 8  defendant.

 9              And that concludes the reading of the

10  stipulations.

11              Government, are you ready?

12              MS. MAX:  Yes, Your Honor.

13              THE COURT:  Please call your first witness to

14  the stand.

15              MS. MAX:  The government calls Daralyn Crites.

16              (Witness sworn.)

17              THE COURT:  Your witness.

18                       DARALYN CRITES,

19  having been first duly sworn, testified as follows:

20                     DIRECT EXAMINATION

21  BY MS. MAX:

22      Q.   Will you please state and spell your name for the

23  record?

24      A.   Daralyn Crites, D-A-R-A-L-Y-N, C-R-I-T-E-S.

25      Q.   Ms. Crites, what do you do for a living?

1      A.    I'm a salon owner and hair stylist.

2      Q.    And how long have you been doing that?

3      A.    Oh, 20 years.

4      Q.    And where do you live?

5      A.    Granbury.

6      Q.    And where is your salon?

7      A.    In Acton.  It's right outside of Granbury.

8      Q.    And how long have you had your salon?

9      A.    Oh, 15 years.

10      Q.    And how long have you been a hairdresser?

11      A.    20.

12      Q.    Has that been your whole career as an adult?

13      A.    Yes.

14      Q.    Okay.  Do you know Casi Thompson?

15      A.    Yes, very well.

16      Q.    Tell the jury, how do you know her?

17      A.    We've been friends for 25 years.  When we were 17, is

18 when we met.

19      Q.    Okay.  So take us back.  Is that high school?

20      A.    Yes, junior year.

21      Q.    Okay.  So tell the jury a little bit about how you

22 met Casi and what your friendship was like in those early

23 years.

24      A.    It was really kind of random.  I was driving -- we

25 live in a small town.  I was driving by, and I thought -- I

1    went to Granbury High School, and I thought it was a group of

2    friends from Granbury.  So I pulled over and it was a few

3    friends from Tolar.  And my -- that friend was friends with

4    Casi, and she introduced us.

5                    And we just hit it off.  We started hanging out.

6    We just became really fast sisters.  Really close.

7         Q.   So when you use the word "fast sisters" like that, I

8    mean, what does that mean to you?

9         A.   We clicked.  I mean we were just alike.  We had a lot

10   in common and had a lot of fun together.

11                   THE COURT:  Let me pause you for just a moment.

12                   You've probably never been in court before, but

13   it's -- in normal conversation we talk over each other.  Which

14   is okay.  But since the court reporter has to take you down, if

15   you don't mind slowing it down just a little bit.  Leave a

16   little space between the question and the answer.  Thank you.

17                   THE WITNESS:  Yes, ma'am.

18                   (Off-the-record discussion.)

19        Q.   I'm going to just back you up just a second.  So you

20   said -- you've said sisters --

21        A.   Yes.

22        Q.   -- is how you described your friendship.

23        A.   Yes.

24        Q.   Explain to the jury what that means to you.

25        A.   Family.  Very close.  Her family was my family, I

```
 1   felt.

 2        Q.   Okay.  So y'all both graduated from different high

 3   schools?

 4        A.   We did.  But they are very close proximity.  Maybe

 5   ten miles, so.

 6        Q.   Okay.  And I'm going to go ahead -- on the same note

 7   as the court reporter's writing everything down, she can't

 8   really write an "uh-huh."

 9        A.   I'm sorry, yeah.

10             THE COURT:  That's okay.  Nobody in real life

11   talks like we do in court, so.

12             THE WITNESS:  Thank you.

13             THE COURT:  You'd have no reason to know, and

14   you're doing great.

15        Q.   So -- and what high school did Casi graduate from?

16        A.   She went to Tolar High School.

17        Q.   And y'all graduated the same year?

18        A.   Yes.

19        Q.   What happened after high school for each of you?

20        A.   She went off to Tech and I went to A&M Corpus, so we

21   kind of went our separate ways.  So we lost touch a little bit,

22   you know, but just stayed in contact and met up, you know, if

23   we came home or in the summertimes.

24        Q.   Okay.  You mentioned being close to her family.  How

25   close was that?
```

```
 1        A.    I actually worked for her grandparents' company in

 2   one summer that I was home from college.

 3        Q.    And what was her grandparents' company?

 4        A.    Pal-Con.

 5              (Reporter instruction.)

 6              THE COURT:  You are doing great.

 7        Q.    So I'm going to repeat that again.  What was the

 8   grandparents' company?

 9        A.    Pal-Con.

10        Q.    And what did that company do?

11        A.    They refurbished regenerators.

12        Q.    Regenerators.  Do you know for what specific --

13        A.    I believe it was for like the pipeline-type stuff.  I

14   just answered the phone.  I was just a receptionist.

15        Q.    So it was a summer college job for you?

16        A.    Yes.

17        Q.    But you got to know her family well?

18        A.    Yes.  And we were such good friends that we would --

19   I would go to family functions and -- you know, so I got to

20   know her family really well.

21        Q.    And when you are talking about her family, are you

22   referring to her maternal grandparents?

23        A.    Yes.

24        Q.    As well as her mother?

25        A.    Yes.
```

1      Q.   And then did she have one brother?

2      A.   Yes.

3      Q.   Okay.  And is that the family you are talking about?

4      A.   Yes.

5      Q.   Okay.  So throughout college, it sounds like y'all

6  are in different places?

7      A.   Yes.

8      Q.   But keeping up contact?

9      A.   Yes.

10     Q.   Is she a friend, that if you lose touch over time,

11  the friendship fades?

12     A.   No.

13     Q.   Okay.  Can you explain that a little bit?

14     A.   We just never miss a beat.  We get back together and

15  it's like we're happy to see each other.  And we catch up and

16  then -- but we still remain close.  There's just a bond and a

17  love there between us.

18     Q.   So I'm going to fast-forward you, then.  Would 2004

19  be about the time y'all are getting out of college, starting

20  your lives?

21     A.   Yes.

22     Q.   Okay.  Had Casi had a child at that point?

23     A.   Yes.

24     Q.   And describe what you observed of her as a mother?

25     A.   When I was there, she was a good mom.

1           MR. GALLIAN:  May we approach?

2           (Off-the-record discussion.)

3      Q.    So, Daralyn, we were talking about the 2004 time

4  period.  Casi was a young mom.  How old were y'all at that

5  time, approximately?

6      A.    You are going to make me do math.

7      Q.    What year did you graduate?

8      A.    2000.

9      Q.    You graduated high school in 2000?

10     A.    Yes, yes.

11     Q.    So 2004, Casi has a child at that point?

12     A.    Yes.

13     Q.    What did you observe of her as a young mom?

14     A.    She was a good mom, that I saw.

15     Q.    Okay.  At some point did you come to learn that Casi

16  had a drug problem?

17     A.    Yes.

18     Q.    Describe to the jury how that came about.

19     A.    So we had gone to dinner, and she was letting me know

20  that she was going to a rehab facility.

21          MR. GALLIAN:  Objection, Your Honor.  Hearsay.

22          THE COURT:  I'll sustain.

23          (Off-the-record discussion.)

24          THE COURT:  It was a hearsay objection.  I'll

25  sustain it as to saying what she said.

```
 1        Q.    Based on that, Daralyn, did you learn -- did you come
 2   to know that Casi was going to rehab?
 3        A.    Yes.
 4        Q.    Was that surprising news to you?
 5        A.    Yes.
 6        Q.    Had you not known before that time that she was
 7   abusing drugs?
 8        A.    No, I did not.
 9        Q.    How did that make you feel to hear that news?
10        A.    I was devastated.
11        Q.    Was it surprising?
12        A.    It was.
13        Q.    Was that the Casi that you knew?
14        A.    Huh-uh.
15        Q.    Is that a no?
16        A.    No, ma'am.  I'm sorry.
17        Q.    Did you come to learn what was the impetus for the
18   drug abuse to start?
19        A.    Yes.
20              MR. GALLIAN:  Objection; hearsay.
21              THE COURT:  I'll overrule.
22              MS. MAX:  I'm sorry, Your Honor.  Was that
23   overruled?
24              THE COURT:  It was overruled.
25        Q.    Did you come to learn the reason that Casi started
```

1    taking drugs?

2         A.   Yes.  I believe it -- she would make comments about

3    her weight, how it bothered her, and body image.  So I -- I

4    knew it was for that reason.

5         Q.   Did you know weight to be an issue for Casi already,

6    going back to high school?

7                   MR. SELLERS:  Object to lack of personal

8    knowledge.  This is all necessarily based on hearsay.

9                   THE COURT:  I will -- if you can establish how

10   she would know that.

11        Q.   Okay.  How do you have the knowledge that Casi had

12   dealt with weight-loss issues?

13        A.   Because we had spoke about it just through our

14   friendship.

15        Q.   Okay.  Did you observe the -- these weight-loss

16   issues were something that Casi's whole family talked about?

17                   MR. SELLERS:  Again, that's hearsay.  Objection.

18                   THE COURT:  I'll give you some latitude.

19        A.   Yes.  Her family did have some weight issues, yes.

20        Q.   Was it specifically something that her grandmother

21   and her mother and Casi all talked about?

22        A.   Yes.

23        Q.   Did you know Casi's grandmother pretty well?

24        A.   Yes.

25        Q.   Were you aware that her grandparents had some amount

1   of wealth?

2        A.   Yes.

3        Q.   Did you observe how her grandparents used that wealth

4   with family members?

5        A.   Yes.

6        Q.   Explain to the jury what you saw.

7        A.   I would see -- they bought her a car, her first car.

8   And if she didn't follow their rules, there was a threat that

9   the car would be taken away, for example.

10       Q.   Okay.  Would you deem it as control?

11       A.   Yes.

12       Q.   Would you call it money with strings attached?

13       A.   Yes, definitely.

14       Q.   Did you see that on one occasion or multiple

15   occasions?

16       A.   Multiple.

17       Q.   Was it during just one time period or was it during

18   the entire time you observed their relationship?

19       A.   It was during the entire time that we were friends.

20       Q.   So tell me, is it safe to characterize that Grandma

21   would give you money if you do what Grandma wanted?

22       A.   Yes, definitely.

23       Q.   Did you see that Casi usually complied with that?

24       A.   Yes.

25       Q.   Did you see her push back on her grandma?

```
 1        A.    No.
 2        Q.    We've talked about now there was a period that you
 3   became aware that Casi was doing drugs and struggling, going to
 4   rehab?
 5        A.    Yes.
 6        Q.    Was that a period that lasted a short time or a long
 7   time?
 8        A.    It seemed long to me.
 9        Q.    And we're talking years --
10        A.    Yes.
11        Q.    -- long?
12        A.    Yes.
13        Q.    And during that time period, describe what your
14   friendship was like with Casi.
15        A.    So we went -- we kind of went our separate ways once
16   I found out she was going to rehab.  Um -- I -- sorry, I don't
17   mean to say "um."  I was starting my life.  I met my husband
18   and got married.  Had my first child.  Had another child.
19   Bought a business.
20              So I was very preoccupied with what I had going
21   on that it was -- our friendship, it had a space there.  But
22   again, anytime she called or was in town and we talked, it was
23   just like, you know, right back to where we were, so.
24        Q.    And you are -- and all those life events that you
25   talked about, those are all things happening to you in your mid
```

1    20s, correct?

2         A.   Yes.

3         Q.   And when you did see Casi during that period, you

4    said, from time to time, where would you normally see her?

5         A.   She would pop in the shop, because I would be

6    working.

7         Q.   Okay.  And would you do her hair?

8         A.   Yes, from time to time, I would.

9         Q.   Okay.  Is that how busy you were; that if a friend

10   wanted to see you, they had to come and get their hair done?

11        A.   I'm still that way, yes.

12        Q.   Okay.  Were there things that you noticed during that

13   time period physically with Casi?

14        A.   Yes.  There were times that she would come in much

15   thinner than normal.  And of course I naturally was concerned.

16        Q.   What did you equate that to?

17        A.   Possibly getting back on drugs.

18        Q.   How did you handle this period as a friend, knowing

19   that she was a drug addict?

20        A.   I -- I feel I should have probably stepped in a

21   little bit more.  But, you know, I had two small, young

22   children, and I'm working.  And I think that's hard, because

23   you wish you could have been there a little sooner.

24        Q.   Did it cause you stress?

25        A.   It did.

1    Q.   And how did you learn to cope with the stress of

2    worrying about your friend?

3    A.   So to explain how close she was to me, I had --

4    psychologically I had to tell myself she was dead, because I

5    couldn't cope with not talking to her and seeing her.  It was

6    difficult.  It was hard.

7    Q.   Around 2008, 2009, did your friendship get a little

8    more rekindled?

9    A.   Yes.

10   Q.   Okay.  Tell the jury what were the circumstances of

11   what was going on at that time?

12   A.   She came in my shop and she said --

13             MR. GALLIAN:  Objection, Your Honor.  Hearsay.

14             THE COURT:  I'll allow a little latitude.

15   Overruled.

16   Q.   Go ahead.

17   A.   She came in my shop and she looked great and she

18   said, I'm doing really well.  I'm going to church; I just

19   completed a rehab.  And I could just tell, looking at her, that

20   this was time -- that this was the time that she was going to

21   be good forever.

22   Q.   Okay.  And backing up, I had first asked you a

23   question about the 2008-2009 period.  The event that you --

24   just occurred, did that happen more recently than that?

25   A.   Oh, yes.  I would -- yes, I'm sorry.  I'm terrible at

1    years.

2        Q.    Okay.  But what you just described, so would that be

3    more like in the 2015 time frame?

4        A.    Yes.  I apologize, yes, that was.

5        Q.    No need to apologize at all, Ms. Crites.  So to

6    clarify, she came into your shop; and how did she look to you?

7        A.    She looked good.  She looked really good.  She looked

8    healthy, she looked together and focused.

9        Q.    Had you seen your friend that way in the past ten

10   years?

11       A.    No.

12       Q.    Did you feel like you got the old Casi back?

13       A.    I did.  I felt like she was ready to get her life

14   back together and be the person she always needed and wanted to

15   be.

16       Q.    So you are telling this jury you could actually see

17   that difference?

18       A.    Yes, yes.

19       Q.    Did you believe at that point, yes, she is sober?

20       A.    I knew it was -- yes, it was time.  She was doing it.

21       Q.    And I'm sorry, can you say again, what did -- what

22   was she basing it on, her strength?

23       A.    She had started going to church and she had a strong

24   faith.  And she was -- she was on a -- a mission to just get

25   her life back together and focus on God and...

1      Q.    And you believed that from what you saw?

2      A.    Yes, definitely.

3      Q.    And has that actually proven true?

4      A.    Yes.

5      Q.    Have you met Joe DeLeon before?

6      A.    Yes.

7      Q.    Tell the jury about the first time you met him.

8      A.    The first time I met him was at Casi's grandmother's

9   funeral.

10      Q.    Okay.  Were you introduced to him?

11      A.    Yes.

12      Q.    And who introduced you?

13      A.    Casi.

14      Q.    How were you introduced?  Were you explained who he

15   was?

16      A.    No, I think the circumstances of being in the -- you

17   know, we were at a funeral.  Everybody's upset.  So it was just

18   a quick introduce -- introducing at that time.

19      Q.    Okay.  Did you leave that encounter with any sort of

20   impression?

21      A.    No, I -- no, I -- I felt like I was just meeting

22   another person in the room, you know.  I didn't feel anything.

23      Q.    Okay.  Did you ever see Joe DeLeon again?

24      A.    Yes.

25      Q.    Okay.  Explain to the jury when that was.

1        A.    I met or saw him at a basketball game.  Both of our

2   boys played basketball together, and I saw him sitting by her.

3        Q.    And to clarify, when you talk about both of the boys,

4   describe to the jury who you are talking about?

5        A.    My son, who was 14, and Casi's 14-year-old, they were

6   both playing basketball together.

7        Q.    They were on the same team?

8        A.    Yes.

9        Q.    Do they go to the same school?

10       A.    Yes.

11       Q.    And so at this basketball game, Joe DeLeon was there?

12       A.    Yes.

13       Q.    Okay.  Walk the jury through what happened at the

14   game.

15       A.    So I walked up and Casi was sitting there.  And Joe

16   was sitting next to her.  And I thought it was strange, because

17   he's much older than her.  I've been around her family for many

18   years.  I'd never seen him at a family function.  I didn't know

19   who he was.

20             And I asked her, I said, who is that?  And she

21   said --

22             MR. SELLERS:  Objection; hearsay.

23             THE COURT:  Overruled.

24       Q.    Go ahead.

25       A.    I said, who is that?  And she said, oh, that's Joe.

1   And I said, who is that?  And she said, my -- a mentor.

2        Q.   Okay.  What was your kind of takeaway from this

3   situation?

4        A.   I really didn't ask a whole lot of questions; just --

5   and I don't know why.  I thought it was very strange.

6        Q.   Okay.

7        A.   I mean, but, again, she's on this -- she's focused on

8   this.  Maybe she needed a mentor to help her --

9             MR. SELLERS:  Objection; nonresponsive at this

10  point.

11            THE COURT:  No speaking objections.

12            Overruled.

13       Q.   You can finish your thought.

14       A.   I just was saying that I didn't ask her any

15  questions, but I thought maybe she had -- you know, had this

16  mentor in her life, and I kind of thought maybe he was part of

17  her grandmother's church.  Like someone that -- you know, that

18  she knew, that was just guiding her in her life moving forward.

19  That's what I really thought he was.

20       Q.   Do you recall if this basketball game was after her

21  grandmother's death?

22       A.   It was -- oh, man, I'm trying -- it was very close in

23  that time frame, I believe.

24       Q.   Okay.  I'm going to refer you to some events that

25  happened right around that time period of her grandmother's

1    death, November 2015.  That semester, that fall semester,

2    was -- were you aware if Casi was going to school?

3         A.    Yes.

4         Q.    And where was she going to?

5         A.    Tarleton.

6         Q.    And explain to the jury how you knew she was going to

7    school.

8         A.    She had contacted me and told me.  And she had asked

9    if we would pick Slayter up from school -- because my son went

10   to school with Slayter -- because she was going to be taking

11   night classes.

12        Q.    And to clarify, Slayter is Casi's son?

13        A.    Yes.

14        Q.    Okay.  How often were you going to have to pick him

15   up from school?

16        A.    It was just a few nights a week.  My husband mainly

17   was the one that picked him up because, again, I was working

18   all the time.  So he would be the one to have to pick the

19   boys up.

20        Q.    So Casi's asked you to pick her son up from school,

21   along with your son, a few nights a week for the entire

22   semester?

23        A.    Yes.

24        Q.    Okay.  So this started at the beginning of the fall

25   2015 semester?

```
 1        A.    Yes.

 2        Q.    Okay.  And is that -- did you accept the job?

 3        A.    Yes.

 4        Q.    And is that consistently what y'all did every week?

 5        A.    Yes.

 6        Q.    And would Casi consistently come over and pick up her

 7   son at the end of the night?

 8        A.    Yes.

 9        Q.    Never forgot and left him at your house, didn't show

10   up?

11        A.    Never.

12        Q.    Okay.  And so you said that started with the

13   beginning of the fall semester of 2015?

14        A.    Yes.

15        Q.    Okay.  So now let's move forward a few months.  It's

16   November 2015, and you are in that situation where she's coming

17   over in the evenings to pick her son up because she's been at

18   night school.

19        A.    Yes.

20        Q.    One night did she show up, and it sticks out in your

21   memory?

22        A.    Yes.

23        Q.    Okay.  Tell the jury what happened.

24        A.    She showed up to pick Slayter up.  And she just

25   seemed -- her demeanor seemed like just concerned.  And she
```

1    pulled out this piece of paper and said, I want you --

2                    MR. GALLIAN:  Objection, Your Honor.  Hearsay.

3                    THE COURT:  Sustained.

4         Q.   Okay.  So she pulled out a piece of paper.  Now, have

5    you reviewed Government's Exhibit 163 prior to coming to court

6    today?

7         A.   Yes.

8         Q.   Okay.  And is it the piece of paper that we're going

9    to reference?

10        A.   Yes.

11                   MS. MAX:  Your Honor, at this time Government

12   moves to admit Government's Exhibit 163.

13                   THE COURT:  Any objection from Mr. Stone?  If

14   you need a moment, let me know.

15                   MR. GALLIAN:  Brief moment, Judge.

16                   THE COURT:  Sure.

17                   (Off-the-record discussion.)

18                   MR. SELLERS:  Mr. DeLeon has no objection.

19                   THE COURT:  No objection from Mr. DeLeon.

20                   Take your time, Mr. Gallian.

21                   MR. GALLIAN:  You know, at this time we don't

22   believe that the foundation has been laid for personal

23   knowledge, so we object.

24                   THE COURT:  Okay.

25                   MS. MAX:  I can ask her a few more questions.

1     Q.   Ms. Crites, were you asked by federal agents if you

2  had a -- if you had Government 163 in your possession?

3     A.   No.

4     Q.   No -- were you asked -- the document that we're

5  referring to as Government's 163, at some point were you asked

6  by federal agents if you had that document in your possession?

7     A.   Oh, yes, yes.  I'm sorry, I misunderstood you.

8     Q.   And did you in fact have it in your possession?

9     A.   Yes, I did.

10    Q.   And did you in fact turn it over to federal agents?

11    A.   Yes.

12    Q.   And having reviewed Government's 163, is that the

13  same document that you had turned over to federal agents?

14    A.   Yes.

15              MR. GALLIAN:  No objection.

16              THE COURT:  It shall be admitted.

17              MS. MAX:  Permission to publish, Your Honor?

18              THE COURT:  Granted.

19    Q.   So, Ms. Crites, what did Casi present you with that

20  night when she came to your house?

21    A.   This right here, this paper.

22              MS. MAX:  If you could zoom in on just the top

23  paragraph.

24    Q.   Government 163, the heading says, Power of Attorney

25  to Care for a Child.  Can you read that paragraph?

1          THE COURT:  Pause for just a moment.  This is

2    our first time kind of throwing something up.

3          Members of the jury, can everyone see that

4    clearly?

5          All right, you may proceed.

6    A.   I, Casi Carnell Thompson, date of birth March 26th,

7    1982, mother of Slayter Alexander Thompson, who was born on

8    August 6th, 2009, in Stephenville, Texas, hereby give to my

9    friend, Daralyn Crites, phone number (817) 578-9606, power of

10   attorney to care for my child and give her the following

11   rights.

12   Q.   So Casi comes to your house in a concerned state?

13   A.   Yes.

14   Q.   And she presents you with that document?

15   A.   Uh-huh, yes.

16   Q.   What does she ask of you?

17   A.   She asked me, she said, if anything happens to me,

18   please take care of Slayter.

19   Q.   And did she present you with this document at that

20   point?

21   A.   Yes.

22   Q.   What did you understand that to mean?

23   A.   It scared me at first, because I didn't know why she

24   was giving this to me.

25   Q.   Did -- were you worried that she was on drugs?

 1      A.    No.

 2      Q.    That didn't concern -- cross your mind?

 3      A.    No, not at all.  I just didn't know why she was

 4  giving to it me, and why she seemed so concerned and adamant

 5  about me taking it and taking care of him.

 6      Q.    Did you come to learn what the concern was?

 7      A.    I asked her, I said, why are you giving me this?  She

 8  said, if something happens.

 9            MR. GALLIAN:  Objection, Your Honor.  Hearsay.

10            THE COURT:  Sustained.

11      Q.    Were you given an impression of why you needed the

12  document?

13      A.    Yes.

14      Q.    And was that impression that you may need to be

15  Slayter's guardian if Casi went to jail?

16      A.    Yes.

17      Q.    How strongly was that impression made on you?

18      A.    Very strong.

19      Q.    In fact, when investigators asked you to find this

20  power of attorney, where did you find it?

21      A.    In my wallet.

22      Q.    And why was it in your wallet?

23      A.    In case I needed it at any emergency time.

24      Q.    So let's say you are at work and you get a call that

25  Casi's been arrested.

```
 1        A.   Yes.

 2        Q.   You wanted to have that document?

 3        A.   Yes.

 4        Q.   Middle of the night, you wanted to know where to find

 5   it?

 6        A.   Yes.

 7        Q.   You wanted to have it on your person at all times?

 8        A.   Yes.

 9        Q.   So that is how strongly Casi made the impression on

10   you that something could happen to her, correct?

11        A.   Yes.

12        Q.   That she could be arrested?

13        A.   Yes.

14        Q.   And she was worried about her child?

15        A.   Yes.

16        Q.   And she asked you -- out of everyone in the world,

17   she chose you to take care of Slayter?

18        A.   Yes.

19        Q.   Were you surprised that she chose you?

20        A.   I wasn't.

21        Q.   Okay.  Did you feel Casi looked at you as a

22   responsible person?

23        A.   Yes.

24        Q.   Did you have any -- first of all, did you accept?

25        A.   Yes, definitely.
```

1    Q.    Did she show you this piece of paper that night?

2    A.    Yes.

3    Q.    When she showed it to you, and you actually saw the

4    document itself, what thoughts did you have?

5    A.    My first concern was, I have three children of my

6    own.  And financially, I -- I didn't -- I didn't know how we

7    were doing it if this happens.  So I asked her, what do you

8    need me to do and how do I care for him?  And she said, I will

9    make sure that you have -- you have access to what you need.

10   And I said, okay.  I said, whatever you need me to do, I will

11   do.

12   Q.    Okay.  And when you say "access to what you need,"

13   did you take that as financially?

14   A.    Yes, for Slayter.

15   Q.    Did that seem to be a big concern for Casi, to make

16   sure her child was taken care of?

17   A.    Yes, yes.  That was the first thing.

18   Q.    And you say "first thing," do you mean like that's

19   her --

20   A.    First priority.

21   Q.    Okay.  When you saw the document and she presented it

22   to you, did it already -- it already had your name and your

23   phone number inserted in there?

24   A.    Yes.

25   Q.    But at the time she gave you the document, she had

1  not yet even asked you if you would do this, correct?

2     A.   Never spoke with me about it; just showed up at my

3  house with it.

4     Q.   Did that leave any sort of impression on you that she

5  had already filled your name and gone to -- gotten somebody to

6  draw up this document?

7     A.   Yes.

8     Q.   And what was that impression?

9     A.   That she was sure that -- that she wanted me to take

10  care of him and that she wanted it to be secured, and that it

11  was going to -- he was going to be handled and taken care of.

12     Q.   In fact, did you know that she had actually gone to a

13  lawyer to get this document created?

14     A.   Yes.

15     Q.   And when you say that "she wanted it to be secured,"

16  what do you mean by that?

17     A.   She wanted to have peace of mind that he was going to

18  be taken care of, no matter what was going to happen.

19     Q.   So did it seem urgent to you; that this document

20  needed to be taken care of and you needed to accept?

21     A.   Yes.

22     Q.   Okay.  After she gave the document to you that night,

23  did y'all discuss it very often after that, or at all?

24     A.   No.

25     Q.   That night when she came over, you said that her

1  demeanor seemed concerned.  Was there anything else that she

2  was doing that evening that was different than what you had

3  observed before?

4       A.   Yes.

5       Q.   Explain to the jury.

6       A.   She would not speak very loudly if she was around her

7  phone, which I thought was strange.

8       Q.   Had you ever observed her to do that behavior before?

9       A.   Never.

10      Q.   Did she offer an explanation to you as to why she was

11 doing it?

12      A.   She explained to me that people could hear through

13 her phone if she spoke.  And I thought that was weird, too.

14      Q.   Did you press for more answers?

15      A.   No.  Actually, after she left, I looked up on my

16 phone if people -- because it made me -- I thought, oh, my

17 goodness, I didn't even know that was a thing.

18      Q.   So she expressed this concern to you in such a way

19 that you actually believed it would be possible?

20      A.   Yes.

21      Q.   Okay.  So that's how much you felt she believed what

22 was happening?

23      A.   Yes.

24      Q.   And I'm sorry, Ms. Crites, you are going to have to

25 wait for me to finish the question.

     1        A.    I'm sorry.

     2        Q.    Perfectly fine.  Did you attend -- did Casi end up

     3   graduating from college?

     4        A.    Yes.

     5        Q.    And that was Tarleton, correct?

     6        A.    Yes.

     7        Q.    And would that be in December of 2017?

     8        A.    Yes.

     9        Q.    Did you attend her graduation?

    10        A.    I did.

    11        Q.    Who went with you?

    12        A.    My mom.

    13        Q.    And tell the jury, just walk through what happened on

    14   graduation day.

    15        A.    We went to graduation.  We parked.  Casi said that

    16   Bill and Joe were arriving.  We met them around the side of the

    17   building.  That was the first time I had met Bill.  And we went

    18   into the graduation.  And they went -- Bill and Joe went their

    19   separate way and we went our separate way.  And my mom and I

    20   sat together.

    21        Q.    Had you ever heard of Bill Stone before?

    22        A.    I had heard Casi throw his name out here and there.

    23        Q.    So that day when you met Joe and Bill at the

    24   graduation, what did you believe the relationship to be among

    25   the three?

1      A.    Mentors.

2      Q.    Okay.  And that is because who -- who told you that?

3      A.    Casi.

4      Q.    Okay.  Did Joe DeLeon or Bill Stone introduce

5 themselves in any way to you that day?

6      A.    No.  We walked up and I shook their hand and

7 introduced myself, and that was it.

8      Q.    Did you throw a dinner for Casi for her graduation?

9      A.    Yes.

10     Q.    And where was that?

11     A.    It was at Farina's.

12     Q.    Is that a restaurant?

13     A.    Yes, in Granbury.

14     Q.    Okay.  And who attended?

15     A.    Casi's family.  Her aunt, uncle, mom -- wait, her mom

16 might not have been there.  I don't think her mom was there.

17 But her aunt and uncle and her other aunt, my mom, myself.  Joe

18 and Bill were there.

19     Q.    Okay.  Now we've kind of moved up.  We've gone from

20 November 2015, we've gone up through 2017.  During this time

21 period, the -- the issue with the phone, her being worried

22 about people listening, did you see her exhibit that behavior

23 again during that time period?

24     A.    I personally didn't see her do that again, no.

25     Q.    Not like that first night?

      1          A.    No, no.
      2          Q.    Okay.  At some point did you tell Casi that you had
      3    an issue with the IRS?
      4          A.    Yes.
      5          Q.    Okay.  What was the issue?
      6          A.    I had got behind on my taxes before I realized it.
      7    So being a friend, I'm calling her and saying, oh, my gosh, you
      8    are not going believe what happened to me.  And so we just
      9    talked about it and that was really it.
     10          Q.    And how far behind were you?
     11          A.    I was $40,000 behind.
     12          Q.    Was this a very stressful thing for you and your
     13    life?
     14          A.    Yes.
     15          Q.    Okay.  Do you and your husband have $40,000 laying
     16    around?
     17          A.    No, ma'am.
     18          Q.    Would Casi have known that?
     19          A.    I don't think so.
     20          Q.    Would she have known that y'all have to work hard for
     21    your money?
     22          A.    Definitely.
     23          Q.    Would she have known that you don't have extra money
     24    to blow?
     25          A.    Yes.

1    Q.    And she knew that you needed $40,000 because you were

2    having a problem with the IRS?

3    A.    Yes.

4    Q.    Did you ask Casi for the money?

5    A.    No.

6    Q.    Did she offer to help you?

7    A.    No.

8    Q.    Why didn't you ask Casi for the money?

9    A.    Because I'm not that kind of person.

10   Q.    Okay.  So you are not that kind of person; can you

11   explain what that means?

12   A.    I work hard for my money.  I don't ask people for

13   money.

14   Q.    Do you feel Casi's the kind of person that would have

15   given you $40,000 if you asked?

16   A.    No.

17   Q.    And tell the jury why.

18            MR. SELLERS:  I'm going to object to

19   speculation.

20            THE COURT:  If you can establish how she would

21   know.

22   Q.    How long have you known Casi?

23   A.    25 years.

24   Q.    Tell the jury what gifts you've received from Casi

25   Thompson.

1    A.    For my 30th birthday she took me to MAC, and we got

2  makeovers and she gifted me with makeup from MAC.

3    Q.    Okay.  What's next?

4    A.    Nothing.  She never gave me anything after that.

5    Q.    So your best friend, your sister-friend for 25 years,

6  correct?

7    A.    Yes.

8    Q.    That entrusts you with caring for her child, correct?

9    A.    Yes.

10    Q.    Who knows you've got some major money issues --

11    A.    Yes.

12    Q.    -- correct?  You are telling the jury, throughout all

13  of this, the only gift that you recall Casi ever giving you is

14  some makeup?

15    A.    Yes.

16    Q.    Do you have an opinion as to whether Casi is

17  financially generous?

18    A.    No.

19    Q.    No, you don't have an opinion or --

20    A.    Oh, I do have an opinion, yes.

21    Q.    And what is that opinion?

22    A.    That she's not financially generous.

23    Q.    During that time period when you were having problems

24  with the IRS, were you also trying to get passports for your

25  family?

1     A.    Yes.

2     Q.    Did Casi know that you were trying to do that as

3  well?

4     A.    Yes.

5     Q.    At some point, were you left with the impression by

6  Casi that Bill Stone had somehow --

7                MR. GALLIAN:   Objection, Your Honor.   Hearsay.

8                THE COURT:   Overruled.

9     Q.    At some point, were you left with the impression

10  that -- from Casi, that Bill Stone had somehow helped your

11  passports to appear?

12     A.    Yes.

13     Q.    Were you left with the impression by Casi, from Bill

14  Stone, that otherwise you would have had a problem with your

15  passports because you have this IRS problem?

16     A.    Yes.

17     Q.    Okay.   But you don't ever know that to be true; is

18  that correct?

19     A.    Correct.

20     Q.    You just went through the normal passport process and

21  got your passports?

22     A.    Yes.

23     Q.    But Casi gave you the impression that Bill Stone had

24  somehow greased the wheels and got your passports?

25     A.    Yes.

1     Q.   At some point did you -- did you come to learn or did

2  Casi come to call Bill Stone as a boyfriend or say they were in

3  a relationship?

4     A.   At some point, you're asking me?

5     Q.   Yes.

6     A.   I found out when they were engaged.

7     Q.   Okay.  So up until that point when they were engaged,

8  you had no idea that they were in a romantic relationship?

9     A.   No.

10     Q.   Casi had not told you that Bill Stone is her

11  boyfriend?

12     A.   No.

13     Q.   You had not seen them together as a couple?

14     A.   No.

15     Q.   Explain to the jury how you found out she was engaged

16  to Bill Stone?

17     A.   It was at my mom's house after my dad's funeral.  She

18  showed me the ring on her hand.

19     Q.   Were you surprised?

20     A.   Yes.

21     Q.   Were you confused?

22     A.   Little bit.

23     Q.   Have you seen Casi in love before?

24     A.   I have.

25     Q.   Describe to the jury what kind of person Casi is when

1   she's in love.

2        A.   Just happy, giddy, excited.  It's all she talks

3   about.

4        Q.   Is she an affectionate person?

5        A.   Yes.

6        Q.   Is she affectionate with her friends?

7        A.   Yes.

8        Q.   Have you seen her to be affectionate with her

9   partners?

10       A.   Yes.

11       Q.   So she's not somebody that gets embarrassed to talk

12   about love?

13       A.   No.

14       Q.   Sounds like she enjoys sharing those things with

15   others?

16       A.   She does.

17       Q.   Did you see any of that with her and Bill Stone?

18       A.   No.

19       Q.   Was -- when she explained to you that she was

20   engaged, walk the jury through exactly how she did it and your

21   impression.

22       A.   She just put her hand out.  And of course my natural

23   reaction is to be excited for her, even though I -- it caught

24   me off guard.  You know, I just asked when was the wedding and

25   how exciting it was.  And she just was like, you know, like it

 1  wasn't what she really wanted.

 2      Q.   Okay.  And just for the record, you kind of shrugged

 3  your shoulders and tipped your head to the side.

 4      A.   It was kind of like, eh.  I mean, I don't know how to

 5  explain it other than that.  Just like she was unsure.

 6      Q.   Is that reaction consistent with any other time that

 7  you've seen Casi in a relationship?

 8      A.   No.

 9      Q.   How did that make you feel, observing that?

10      A.   I just was thinking, are you sure?

11      Q.   Okay.  Did you -- did you pressure your friend or

12  question her?

13      A.   No.

14      Q.   Was that close around the time -- was that July 2019,

15  your father's funeral?

16      A.   Yes.

17      Q.   Shortly thereafter, did Casi come over to your house

18  one Friday night?

19      A.   Yes.

20      Q.   What was her demeanor when she came over?

21      A.   Concerned.

22      Q.   Had you seen her in this kind of state before?

23      A.   No.

24      Q.   That night did you come to learn about a secret

25  probation?

1    A.    Yes.

2    Q.    When Casi was telling you about the secret probation,

3    was she open with you about it?  Or kind of explain to the jury

4    how the conversation went.

5    A.    She was very protected about it.  She just kept

6    saying I need to find --

7              MR. GALLIAN:  Objection, Your Honor.  Hearsay.

8              THE COURT:  Overruled.

9    Q.    You can go ahead.

10   A.    She kept saying, I need to find out if I'm on this

11   secret probation -- or this probation, this probation.  She

12   kept saying that.  And she was just adamant about finding out,

13   and worried.  And I said, I -- you need to talk to my mom.  I

14   don't know how to help you, but my mom may.

15   Q.    Okay.  Because what does your mother do for a living?

16   A.    My mom is the court administrator for the district

17   judge in Hood County.

18   Q.    Okay.  Is she worried about her phone that night?

19   A.    Yes.

20   Q.    Explain to the jury how.

21   A.    My mom had to give her her phone to use to call,

22   because she wouldn't use her own phone.

23   Q.    And why wouldn't she use her own phone?

24   A.    She was afraid that they would hear what she was

25   saying.

1   Q.   Did you understand who "they" was?

2   A.   Whoever she was afraid of hiding from.

3   Q.   So it sounds like she's telling you things, correct?

4   A.   Yes.

5   Q.   Were you left with the impression, though, that she's

6   also holding back?

7   A.   Yes.

8   Q.   Did you get an impression of why she was holding

9   back?

10   A.   No.

11   Q.   Did she seem scared?

12   A.   Yes.

13   Q.   Did she mention fears about going to jail?

14        MR. SELLERS:   Object to hearsay; lack of

15   personal knowledge.

16        THE COURT:   Overruled.

17   Q.   Did she mention fears about going to jail?

18   A.   Yes.

19   Q.   Did you in fact get your mother involved at that

20   point?

21   A.   I did.

22   Q.   That's the best way you knew how to help your friend?

23   A.   Yes.

24        MS. MAX:   Can you bring up Government's

25   Exhibit 163?

1      Q.   And, Ms. Crites, I'm going to show you Government's

2   Exhibit 163 one last time.  We had talked about it being in

3   November 2015.  I'm going to take you to the middle of the

4   page, where it says, Dated.  What does it say is the date of

5   this document?

6      A.   The 30th day of November, 2015.

7      Q.   Okay.  And you had testified earlier that your

8   impression was that this was an urgent thing; your name's

9   already filled in and she hasn't even talked to you, right?

10      A.   Yes.

11      Q.   So would that date be consistent with around the time

12   period when she presented this document to you?

13      A.   Yes.

14              MS. MAX:  Pass the witness.

15              THE COURT:  Members of the jury, do we need a

16   break?  Doing okay?

17              Your witness, sir.

18                      CROSS-EXAMINATION

19   BY MR. GALLIAN:

20      Q.   Good morning, Ms. Crites.  How are you?

21      A.   Good.

22      Q.   My name is Gregg Gallian.  I'm one of the attorneys

23   representing Bill Stone.  I have some questions for you.

24      A.   Yes, sir.

25      Q.   If at any point I ask a bad question, confusing

1  question, or anything you need me to rephrase, just let me

2  know, okay?

3       A.   Thank you.

4       Q.   Now, for the members of the jury, you and I, we've

5  never met before, right?

6       A.   Right.

7       Q.   Today's the first time that you and I have ever

8  talked?

9       A.   Yes, sir.

10      Q.   In helping the government with their case, you spoke

11  with law enforcement in this case on behalf of Casi, didn't

12  you?

13      A.   Yes.

14      Q.   Okay.  And that conversation, you spoke with

15  Ranger Briley, on June 29th, 2022; is that right?

16      A.   Yes.

17      Q.   How many -- how many other times have you sat down

18  with law enforcement in this case?

19      A.   It was just for pretrial meetings.

20      Q.   Yeah.  How many was that?

21      A.   We have sat down twice.

22      Q.   Twice in addition to that meeting -- or the phone

23  call that you had with Ranger Briley?

24      A.   Yes.

25      Q.   Okay.  Do you remember meeting an individual named

 1   Jeff Daniel Clark?

 2        A.   No.

 3        Q.   Okay.  Jeff is the --

 4        A.   Oh, yes, yes.

 5        Q.   You've seen him before, right?

 6        A.   Yes, I have; yes.

 7        Q.   And you've seen him, because in February 2023,

 8   earlier this year, he stopped by your salon, didn't he?

 9        A.   Yes.

10        Q.   And he identified himself as an investigator working

11   on behalf of Mr. Stone?

12        A.   Yes.

13        Q.   And are you aware of the fact that Mr. Clark had just

14   talked with your mother, Ms. Weisend?

15        A.   No.

16        Q.   You weren't aware of that?

17        A.   No, sir.

18        Q.   So when he showed up at your salon, you had no idea

19   that he was coming?

20        A.   No, sir.

21        Q.   But after Mr. Clark identified himself as an

22   investigator for Mr. Stone, you told him you did not want to

23   speak with him.

24        A.   Right.

25        Q.   Okay.  You didn't want to answer our questions, you

1    didn't want to tell us anything that you had to say; is that

2    fair?

3         A.   Yes.

4         Q.   Okay.  But you did help the government in their case?

5         A.   Yes.

6         Q.   You talked about Casi's kids.  Casi has two kids,

7    right?

8         A.   Yes.

9         Q.   She has Cade, who is the oldest?

10        A.   Yes.

11        Q.   And then she has Slayter?

12        A.   Yes.

13        Q.   Now, when you said in 2004 that she had a child, that

14   was Cade?

15        A.   Yes.

16        Q.   Okay.  Who did she have a child with?

17        A.   Kent Barnes.

18        Q.   Who is Kent Barnes?

19        A.   Cade's father.

20        Q.   Okay.  How did they meet?

21        A.   Just friends from being in a small town.

22        Q.   Okay.  How long were they together?

23        A.   Oh, I'm not a 100 percent sure on that.

24        Q.   Okay.

25        A.   Maybe a year.  I'm guessing.  I don't remember

1   exactly.  It wasn't a long-term relationship.

2        Q.   Okay.  But out of that relationship came Cade?

3        A.   Yes.

4        Q.   Did Casi love Kent?

5        A.   Yes.

6        Q.   Okay.  Who else did Casi love?

7        A.   A guy from high school named Jeff, a long time ago.

8        Q.   Okay.  How long were Casi and Kent together; you said

9   about a year?

10       A.   Yes.

11       Q.   When did that relationship end?

12       A.   I would say -- I'm terrible at years.  But if I had

13  to guess, maybe around 2006-ish.

14       Q.   Okay.  Are you aware of, if ever, Casi's been

15  arrested?

16       A.   No.

17       Q.   She never told you she was arrested?

18       A.   No, sir.

19       Q.   You weren't aware that she was arrested in 2007 by

20  Irving Police Department?

21       A.   No, sir.

22       Q.   You weren't aware that she was arrested in 2010 by

23  Hood County?

24       A.   No, sir.

25       Q.   2014, Hood County?

```
 1        A.    No, sir.

 2        Q.    When did she have Slayter, what year?

 3        A.    2009.

 4        Q.    You defined Casi as a good mom.  Are you aware of the

 5   custody arrangement Kent and Casi had?

 6        A.    In a way, a little bit.

 7        Q.    Kent had custody of Cade, didn't he?

 8        A.    Yes, sir.

 9        Q.    Okay.  And as -- until 2016, '17, Casi was on

10   supervised visitation; is that right?

11        A.    Yes.

12        Q.    What about Slayter, what was the custody arrangement

13   with Slayter?

14        A.    I believe she had full custody of Slayter -- oh, let

15   me back up.  I think her mom ended up getting custody of

16   Slayter.

17        Q.    How many times?

18        A.    Once, that I know of.

19        Q.    Okay.  Would three surprise you?

20        A.    Yes, that would surprise me.

21        Q.    She didn't tell you that?

22        A.    No, sir.

23        Q.    If Casi didn't tell you about her Hood County arrests

24   in 2014, did she ever tell you that she was on probation?

25        A.    Yes.
```

1     Q.    Okay.  What did she tell you?

2     A.    When she was speaking about the probation she was

3  worried about.

4     Q.    Tell me more.

5     A.    The conversation that I had earlier about when she

6  was trying to find out if she was on that probation.  That's

7  the probation I heard about.

8     Q.    The secret probation?

9     A.    Yes, sir.

10     Q.    Okay.  She didn't tell you about the actual probation

11  she was on?

12     A.    No, sir.  We did not discuss that.

13     Q.    You -- at any point, your lifelong friend of 25 years

14  never told you she was on actual probation in Hood County?

15     A.    No, sir.

16     Q.    Are you aware that that probation started in 2015?

17     A.    No, sir.

18     Q.    And that it was discharged in 2018?

19     A.    No, sir.

20     Q.    She never mentioned meeting with her probation

21  officers during that time?

22     A.    She did, I believe so, yes.  It is so hard for me to

23  remember everything.

24     Q.    I understand.  But she didn't -- here's the problem.

25  You got up and you said Casi's been a lifelong friend of yours

1    for 25 years, correct?

2        A.   Yes, sir.

3        Q.   She didn't tell you about the times that she was

4    arrested, right?

5        A.   Right.

6        Q.   She didn't tell you about the -- not the fake one --

7    she didn't tell you about the actual probation that she was on?

8        A.   Can I speak?

9        Q.   Yeah, sure.

10       A.   She would talk about her probation officer, but it

11   wasn't like a conversation we ever sat down and had.  And I

12   don't know why -- how to explain that.

13       Q.   Sure.  When did Casi and Bill start their

14   relationship?

15       A.   Again, I had heard her throw his name around.  I

16   didn't recall it as a relationship, I would say.  She never

17   mentioned it as a relationship.  She just mentioned his name

18   here and there; Bill said, Bill said, or whatever.

19       Q.   Sure.  But when -- I know you are horrible with

20   years, and I am too.  You're going to have to use milestones in

21   your life.  But the earliest possible time you remember

22   thinking that Bill was -- I'm sorry -- Casi was in some sort of

23   relationship with Bill, when would that have been?

24       A.   I'm not sure.  I don't know.

25       Q.   Okay.  2014, 2015?

1      A.   I'm trying to think.  So her grandmother passed away

2  in 2015.  And I did not hear about Bill until after that.  I

3  didn't know Bill was even involved.

4      Q.   Okay.  When Casi brought that paperwork over to your

5  house, the power of attorney for Slayter, she didn't mention

6  Bill at that time?

7      A.   No.

8      Q.   Casi and Candiss didn't have a great relationship at

9  that point in time; do you recall that?

10     A.   I can't be sure on that.

11     Q.   Okay.  Did Casi ever tell you that she resented her

12  mother for taking Slayter from her?

13     A.   Yes.

14     Q.   And she took Slayter from him -- her in 2010, '12 and

15  '14, but you didn't know that?

16     A.   I did know that she had attempted to take Slayter

17  from her, yes.  I knew there was a period; but to be specific

18  on the years, I am so bad.

19     Q.   Sure.  Are you -- by chance are you referencing the

20  time that Candiss threatened CPS in 2016?

21     A.   I don't recall her threatening CPS.

22     Q.   Okay.  Can we agree that there's some stuff you are

23  finding out for the first time today?

24     A.   Maybe a little.

25     Q.   Okay.  Did it surprise you to learn that Casi had

1    been arrested three separate times?

2        A.    Yes, sir.

3        Q.    Where was Casi from September 2014 to February 2015?

4        A.    I don't know.

5        Q.    Okay.  Well, earlier in your testimony you mentioned

6    that she came to you in 2008, 2009, you had this firm belief

7    that she had just finished rehab, right?

8                 MS. MAX:  Objection, Your Honor.  That is a

9    mischaracterization of the testimony.

10                 THE COURT:  Okay.  Members of the jury, you will

11    recall the testimony as you have heard it.

12                 Overruled.

13        A.    Can you repeat that?

14        Q.    If I mischaracterized it, I apologize.

15        A.    Thank you.

16        Q.    But came to you sometime 2008, 2009.  Maybe I wrote

17    it down wrong.  But 2008, 2009, saying that she had just

18    finished rehab, right?

19        A.    She came to me at one point and said she had finished

20    rehab.  But I can't be -- I mean, I probably -- I can't be

21    specific on the year.  It's so hard to remember the year.

22        Q.    Let me ask you this.  Was it before she had Slayter

23    or after she had Slayter?

24        A.    I don't know.  I feel terrible.  I can't remember the

25    years.  I don't know.

1     Q.    Back to my question.  Do you know where Casi was from

2     September 2014 to February 2015?

3     A.    I believe she was in rehab -- she had finished rehab,

4     I believe.

5     Q.    Where was the rehab at?

6     A.    I don't know.  She didn't tell me.  She had

7     completed -- by the time she came to me, she was done.

8     Q.    She didn't tell you where the rehab was?

9     A.    No, sir.

10    Q.    Okay.  Your understanding of Myrna, you spoke about

11    how Casi -- how Myrna would buy Casi -- bought Casi a car?

12    A.    Yes.

13    Q.    Are you aware of any other purchases that Myrna made

14    for Casi?

15    A.    She bought her a house.

16    Q.    Okay.  What house?

17    A.    It was a house in Granbury.

18    Q.    Stoney Creek?

19    A.    Yes.

20    Q.    Okay.  Any other houses?

21    A.    I believe she bought her a house -- I can't remember

22    the neighborhood, but it is in the same neighborhood as the

23    house that I first -- when we first met that her mom had; it

24    was just on another street.

25    Q.    Off of Elkton?

1      A.    Possibly.  That sounds familiar.

2      Q.    Okay.  So she had that house as well?

3      A.    Yes.

4      Q.    And when you say Myrna bought the house, I mean,

5  you're saying Myrna bought the house totally, completely, no

6  mortgage?

7      A.    I believe so, yes.

8      Q.    From the time that you've known her, the 25 years,

9  how many cars did Myrna buy Casi?

10     A.    Two, possibly, that I knew of.

11     Q.    Okay.  That you know of?

12     A.    That I know of.

13           MR. GALLIAN:  Brief moment, Judge.

14           (Sotto voce discussion.)

15     Q.    Brief follow-up.  When you spoke with Ranger Briley

16  in June or July 2022, that was a phone call, right?  Or was it

17  in person?

18     A.    In person.

19     Q.    Okay.  So that was an in-person meeting with you and

20  Ranger Briley?

21     A.    Oh, my gosh.

22     Q.    I don't know; I'm asking you.

23     A.    I know you are.

24     Q.    I only have the recording.

25     A.    I understand.  The only time I've seen Ranger Briley

1   is when he subpoenas me and then tells me I needed to meet with

2   him initially.  That's what I recall.

3        Q.   Okay.  At some point you guys had a conversation

4   about the document that Casi gave you, the power of attorney,

5   right, you and Ranger Briley?

6        A.   No, I'm trying -- I don't remember.

7        Q.   Okay.  If I showed you a copy of that transcript,

8   would that help refresh your memory?

9        A.   Yes, please.

10            MR. GALLIAN:  May I approach, Your Honor?

11            THE COURT:  You may.

12            (Documents tendered.)

13       Q.   Ma'am, if you would look up at the top, it will give

14   the date, June 2022.  And then if you look down at the bottom,

15   read it to yourself and then I'll ask you some questions.

16       A.   Okay, thank you.

17       Q.   Uh-huh.

18            (Brief pause.)

19       Q.   I'm not trying to rush you, but I think if you've

20   read that -- I'm not going to pop quiz you on anything.

21       A.   Yes, go ahead.

22       Q.   That conversation with Ranger Briley, do you recall

23   now by reading it, was it in person?

24       A.   I believe this was over the phone.

25       Q.   Okay.  So in that phone conversation that you had

1  with Ranger Briley in June 2022, he asked you about the power

2  of attorney, didn't he?

3       A.   Yes.

4       Q.   And you said that you went through your purse, but

5  you couldn't find it?

6       A.   Right.

7       Q.   But you told the prosecutors that you found that

8  piece of paperwork in your purse?

9       A.   Yes.

10       Q.   How big is your purse?

11       A.   I change purses.

12       Q.   Okay.  So it was just in a different purse?

13       A.   Yes, sir.

14       Q.   I just wanted to know where you found it.

15       A.   Yes, I apologize.

16       Q.   That's okay.

17            MR. GALLIAN:  May I approach the witness to

18  retrieve the transcript?

19            THE COURT:  You may, yes, sir.

20            (Documents tendered.)

21            MR. GALLIAN:  Your Honor, at this time I'll pass

22  the witness.

23            THE COURT:  All right.  So now the attorney for

24  Mr. DeLeon will have an opportunity to ask questions.

25            Is everyone here okay?

1          Proceed.

2                     CROSS-EXAMINATION

3    BY MR. SELLERS:

4          Q.   Good morning, Ms. Crites.

5          A.   Hi.

6          Q.   Hi.  How are you?

7          A.   I'm good.

8          Q.   How was your drive in this morning?

9          A.   Long.

10         Q.   Long, right?  It's a long way from Dallas to

11   Granbury, isn't it?

12         A.   Yes.

13         Q.   What part do you live in?

14         A.   In Acton.

15         Q.   Acton, okay.  I'm reading in the same transcript here

16   that you live in a gated community?

17         A.   I did at the time.  I no longer do.  But at the time

18   I did.

19         Q.   Okay.  All right.  Let's talk about some of the

20   things that you said.  Just in terms of timing, Casi's

21   grandmother died at the beginning of November 2015; is that

22   right?

23         A.   Yes.

24         Q.   All right.  And you are aware that pretty shortly

25   thereafter, Casi was appointed the executor of her will?

```
 1        A.    Yes.
 2        Q.    And you know that they were dealing with a lawyer to
 3   probate the will, right?
 4        A.    I guess so.  I just -- yes, I guess so.
 5        Q.    Right.  Your mom works at the courthouse --
 6        A.    -- would have to.  Okay.
 7        Q.    -- right?  And would it surprise you that the same
 8   month that they probated the will is the same month that that
 9   power of attorney to her children was prepared?
10        A.    Okay.
11        Q.    Would that surprise you?
12        A.    Yes.
13        Q.    It would surprise you?
14        A.    Yes.
15        Q.    Okay.  Would it surprise you that it was the same
16   lawyer who prepared that?
17        A.    I did not know the lawyer for the probate -- for the
18   will.  I -- she didn't tell me that, and I never asked.
19        Q.    Andrew Ottaway is the one who was on the power of
20   attorney, right?
21        A.    Yes, sir.
22        Q.    And if it comes out later that it's he who probated
23   the will, then -- do you know Andrew Ottaway, just by chance?
24        A.    I do not.
25        Q.    I'm sure your mom does, right?
```

1        A.    I don't know, you'd have to ask her.  Probably.  She

2   knows everybody.

3        Q.    Fair enough.  What was the date of that -- I think it

4   was 153, 163 -- November 30th, 2015.  Does that sound right to

5   you?

6        A.    Yes.

7        Q.    Okay.  And would it surprise you that that date is

8   before -- well, first, it's before Christmas, right?

9        A.    Yes.

10       Q.    And so if Casi talks about the first time Bill Stone

11  or anyone told her she was on a second probation, that

12  Christmas presents were under the tree and it was in December,

13  that would mean necessarily that she gave that document, power

14  of attorney, to you before she was even on that secret

15  probation, right?

16              MS. MAX:  Objection; calls for speculation.

17              THE COURT:  Overruled.

18       Q.    Right?

19       A.    Can you repeat that again so I can understand you

20  fully?

21       Q.    If Casi didn't go onto the double-secret probation

22  until December of 2015 --

23       A.    Okay, right.

24       Q.    -- and you got that document in November of 2015,

25  that would mean she did this all prior to even being subjected

```
 1    to this double-secret probation, right?
 2         A.   So I wasn't aware at the time that she went on the
 3    secret probation.
 4         Q.   You weren't aware she was on any probation --
 5         A.   Right.
 6         Q.   -- right?  And so what I'm saying is, in terms of
 7    time line, that would have been before, if that happened?
 8         A.   Okay, right.
 9         Q.   Right.  Okay.  You said that you've met Joe DeLeon --
10              MR. SELLERS:  Joe, come over here so she can see
11    you.
12         Q.   -- twice; is that right?
13         A.   Yes.
14         Q.   Was he polite to you?
15         A.   Yes.  Actually three times I've seen him.
16         Q.   Okay.
17         A.   Yes.
18         Q.   Casi didn't seem scared of him, did she?
19         A.   No, not at all.
20         Q.   Look at this guy, right?  Who is going to be scared
21    of this guy.
22              MS. MAX:  Objection, Your Honor.  Sidebar.
23              THE COURT:  Sustained.
24              Stick to questions and answers.
25              MR. SELLERS:  Yes, ma'am.
```

1     Q.   Casi never told you, I guess, about the times that

2 she was homeless, did she?

3     A.   No.

4     Q.   You never knew that there was a time that Casi was

5 living out of one of the cars that Myrna bought her?

6     A.   No.

7     Q.   You never knew that Casi would park her car outside

8 of Joe's restaurant to get a hot meal from Joe when she was

9 homeless --

10     A.   No, I didn't know that.

11     Q.   -- to feed her child?  It's almost biblical, isn't

12 it?

13               MS. MAX:  Objection, Your Honor.  Calls for

14 speculation.

15               THE COURT:  Sustained.  Let's move on.

16     Q.   So y'all are friends 25 years.  She never told you

17 about being homeless?

18     A.   No.

19     Q.   I'm going to talk to you now about -- well, let me

20 just say this.  Would it be fair to say there are a lot of

21 things that you don't know about some of Casi's relationships?

22     A.   Yes.

23     Q.   Thank you for being here.

24               MR. SELLERS:  I'll pass the witness.

25               MS. MAX:  Your Honor, brief rebuttal.

1                           <u>REDIRECT EXAMINATION</u>

2     <u>BY MS. MAX:</u>

3          Q.   Ms. Crites, does it hurt you to hear about what your

4     friend may have gone through while she was addicted to drugs?

5          A.   Yes.

6          Q.   Are you realizing right now there is even more pain

7     that you've never known about?

8          A.   Yes.

9          Q.   Are you mad at Casi because she didn't tell you about

10    that pain?

11         A.   I'm not mad at her.  I think she was trying to

12    protect me.

13         Q.   So her drug use wasn't something she wanted to share

14    with you, was it?

15         A.   No.  She knew how I felt about those things.

16         Q.   How do you feel about those things?

17         A.   That they are wrong and they ruin your life.

18         Q.   Okay.  Did she know that it would hurt you?

19         A.   Yes.

20         Q.   So she didn't share that side of her life with you?

21         A.   No.

22         Q.   And it's hurting you today to hear it, right?

23         A.   (Witness nods.)

24         Q.   Is that a yes?

25         A.   Yes.

1       Q.    Did you ever press her for any details about that

2    part of her life?

3       A.    No.

4       Q.    Why not?

5       A.    I wish I had now, but I don't know why I didn't.  I

6    don't know if I was just wrapped up in so much that I had going

7    on; having kids and working.  And I think maybe a part of me

8    didn't want to know.

9       Q.    Do you have feelings about the kind of friend you

10   were for her, about -- with her drug use?

11      A.    Yes.  I had told her mom a long time ago, I said,

12   when she's ready to get her life together, I will be there with

13   open arms; all she has to do is call me.

14      Q.    So you were going to be there for her on the back

15   end?

16      A.    No matter what.

17      Q.    But it sounds like you didn't want to be a friend --

18   you weren't going to support the addiction?

19      A.    No, ma'am.

20      Q.    You weren't going to be there with her in it?

21      A.    No.

22      Q.    But when she was ready to be the old Casi, you were

23   going be there?

24      A.    Yes.

25                  MR. GALLIAN:  Your Honor, at this point I object

1    to leading.

2                    THE COURT:  Sustained.

3        Q.   To clean up the timeline a little bit, when you've

4    described that Casi showed up at your salon and you could

5    just -- you knew it was different this time?

6        A.   Yes.

7        Q.   Okay.  Was it the kind of that moment where you are

8    there now with open arms?

9        A.   Yes.

10       Q.   Since that time period, have you seen Casi relapse?

11       A.   No.

12       Q.   Since that time period, have you known Casi to do

13   drugs?

14       A.   No.

15       Q.   Okay.  So when we're talking about when she showed up

16   at your salon and things were different, to your knowledge,

17   that was after the last rehab?

18       A.   Yes, ma'am.

19       Q.   Okay.  And you had mentioned with the defense counsel

20   a house that Casi's grandmother had bought for her?

21       A.   Yes.

22       Q.   Do you know if there were any strings attached to

23   that house?

24       A.   I can't recall any, no.

25       Q.   Okay.

1                    MS. MAX:  Pass the witness.

2                    THE COURT:  Anything further, Mr. Gallian?

3                    MR. GALLIAN:  No, Your Honor, thank you.

4                    THE COURT:  Anything further, counsel for

5     Mr. Stone [sic]?

6                    MR. SELLERS:  Nothing further, Your Honor.

7                    THE COURT:  All right.  Thank you.

8                    Any objection to this witness stepping down?

9                    MR. GALLIAN:  No objection.

10                   THE COURT:  All right.  You may step down.

11    Thank you so much for being here today, ma'am.  I appreciate

12    you.

13                   MS. MAX:  Your Honor, may the witness be

14    released?

15                   THE COURT:  Any objections, Defense Counsel?

16                   MR. GALLIAN:  No objection.

17                   THE COURT:  You may go.  Thank you.  We

18    appreciate you coming today.

19                   (Witness excused.)

20                   THE COURT:  Members of the jury, we planned to

21    take a 10 o'clock break.  Do you want to keep trucking?

22                   (Off-the-record discussion.)

23                   THE COURT:  Call your next witness.

24                   MS. MAX:  The government calls Priscilla

25    Weisend.

1              (Witness sworn.)

2              THE COURT:  Your witness, ma'am.

3                        PENNY WEISEND,

4    having been first duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MS. MAX:

7       Q.   Will you please state and spell your name for the

8    record?

9       A.   Penny Weisend, P-E-N-N-Y W-E-I-S-E-N-D.

10      Q.   Ms. Weisend, what do you do for a living?

11      A.   I'm a court administrator for the 355th District

12   Court in Hood County.

13      Q.   And how long have you had that job?

14      A.   Oh, 23, 24 years.

15      Q.   So is a courtroom setting pretty familiar to you?

16      A.   It is, but this is a different position.

17      Q.   Do you usually find yourself just a few chairs over?

18      A.   Absolutely.

19      Q.   Okay.  So you work for one judge?

20      A.   Yes, ma'am.

21      Q.   And what city is that located in?

22      A.   It is in Granbury, Texas.

23      Q.   And how many state court judges does Hood County

24   have?

25      A.   We have one district court general jurisdiction.

```
 1        Q.    Okay.  And so you are the court administrator for
 2   that one judge?
 3        A.    Yes, ma'am.
 4        Q.    Okay.  Is Daralyn Crites your daughter?
 5        A.    Yes, ma'am.
 6        Q.    Do you know Casi Thompson?
 7        A.    Yes, ma'am.
 8        Q.    Have you known her over the course of her friendship
 9   with your daughter since high school?
10        A.    Yes.
11        Q.    Have you known over the years about her drug
12   addiction?
13        A.    Yes.
14        Q.    Have you actually kind of seen it firsthand in some
15   instances?
16        A.    Absolutely.
17        Q.    Explain to the jury -- not drug usage, but the
18   effects of her drug addiction?
19        A.    Her case came through our court.  It's the only
20   district court.  And so her case came through our court, and I
21   handled it just as any other case.
22        Q.    Okay.  So you had awareness that she was arrested?
23        A.    Yes, ma'am.
24        Q.    Did you also come at some point to learn that Casi
25   had become clean and sober?
```

1        A.    Yes.

2        Q.    Is that something that you wanted to support in any

3   way that you could?

4        A.    Yes.  Once she became clean and sober, absolutely.

5        Q.    And in fact, did you attend her college graduation at

6   Tarleton?

7        A.    Yes, I did.

8        Q.    Was that in December of 2017?

9        A.    Yes, it was.

10        Q.    And who did you meet at that graduation?

11        A.    It -- well, of course, Casi and me and Daralyn, and

12   Mr. Stone and Joe.

13        Q.    Would that be Joe DeLeon?

14        A.    Joe DeLeon, yes, ma'am.

15        Q.    Is that the first time you met the individuals?

16        A.    Yes, it was.

17        Q.    Okay.  And how were you -- what was your

18   understanding of who they were in Casi's life at that point?

19        A.    That he was an FBI agent, and there to -- he was like

20   to help her, you know, through things.

21        Q.    Okay.  So -- I'm sorry, I didn't mean to cut you off.

22              After the graduation, did you attend a

23   graduation dinner that your daughter through for Casi at

24   Fontina's [sic]?

25        A.    Yes.

 1        Q.    Okay.  At that graduation dinner, did you have an

 2   opportunity to have a conversation with Bill Stone?

 3        A.    Yes, him and Joe both.  They were standing next to

 4   each other and I was standing there talking to him.  Talked to

 5   them for a little bit.

 6        Q.    Did Bill Stone tell you what role he played in Casi's

 7   life?

 8        A.    That he was -- he was the FBI agent that was helping

 9   her.  He said he helped her write a business plan.  Trying to

10   just guide her, give her some guidance.

11        Q.    Okay.

12        A.    That's what I understood is the role.

13        Q.    Did he explain why she needed that?

14        A.    I thought -- not really.  I -- I couldn't understand

15   why he was hanging on or doing that role.  But, you know, I

16   don't know.

17        Q.    Okay.  How did you come exactly to know that he was

18   an FBI agent?

19        A.    Well, I believe probably Daralyn had said something

20   at one time.  But that was her saying.  But at the -- at --

21   while I was standing there talking to him, he pulls out a -- a

22   badge.  And he shows me this badge and he had said he's an --

23   I'm an FBI agent, and he pulls it out and shows me this badge.

24   And I -- I don't know.  I felt that was rather showy.

25        Q.    Do you see a lot of badges in your career?

1     A.   I -- no, I -- I talk to a lot of detectives and

2  different ones, but none of them have ever come out and said,

3  you know, here is my badge.  I --

4     Q.   And that would have been at the graduation dinner?

5     A.   Yes, it was.

6     Q.   I'm sorry, Ms. Weisend --

7     A.   Okay.

8     Q.   -- I don't want to speak over you.

9           That would have been at the graduation dinner in

10 December of 2017 that he's pulling out and showing you the

11 badge?

12    A.   A badge, and just quickly flipped it out and then,

13 you know, put it away.

14    Q.   And it is to your recollection that he represented

15 that he was an FBI agent?

16    A.   Oh, absolutely.

17    Q.   You know what that means, correct?

18    A.   Yes.

19    Q.   You know all the different law enforcement entities?

20    A.   Yes, yes, yes.

21    Q.   Okay.  You wouldn't have confused it with anything

22 else?

23    A.   No.

24    Q.   I'm going to fast-forward.  Did your husband pass in

25 the summer of 2019?

```
 1      A.    Yes, June 2019.

 2      Q.    Okay.  And when did you have a memorial service for

 3   him?

 4      A.    July 13th.

 5      Q.    Of 2019?

 6      A.    Correct.

 7      Q.    At that point, did you learn anything about Casi's

 8   relationship status?

 9      A.    Well, at that point, you know, there -- after the

10   service at -- at my home, she came up and told me that she was

11   engaged.  And she -- she showed me her ring, but -- but it

12   was -- it was strange.  Because when she told me, it was like

13   mechanical.  She just did not seem like it was a -- excited,

14   you know.

15      Q.    Is --

16      A.    It was just kind of mechanical, is the best word that

17   I can use to explain.

18      Q.    So it's mechanical when she is telling you she's now

19   engaged to --

20      A.    Yeah, I'm engaged and -- yeah.

21      Q.    Is mechanical a word that you would ever use to

22   describe Casi's personality otherwise?

23      A.    No, no.

24      Q.    Okay.  What words would you use to describe her

25   personality in that effect?
```

1      A.    Bubbly.  You know, she's always smiling.  You know,

2  just outgoing, very nice, very caring person.

3      Q.    Backing up a second, when Bill Stone flashed the

4  badge to you in December 2017, and said he was an FBI agent,

5  did he at any point say retired?

6      A.    No, no, he was working.

7      Q.    Okay.  You were left with a clear impression he was

8  working?

9      A.    Absolutely, yes.

10      Q.    And you said your husband's memorial was on

11  July 13th, 2019?

12      A.    Yes.

13      Q.    And that is when Casi was mechanical in telling you

14  she's engaged?

15      A.    Yes, yes.  But, you know, it was during his memorial,

16  and, you know, was -- had people at the house.  But she was

17  just -- that's the best I could explain it, was just

18  mechanical.  Was not --

19      Q.    Let me ask you the next question.

20              THE COURT:  Can I pause you for just a moment?

21              You are doing such a good job.  I -- if you

22  don't mind just giving just a moment after the question before

23  you answer.  That's how we talk in real life, and so it's fine

24  in real life.  But my court reporter's got to take it down, so

25  it's unusual.  But you are doing a fantastic job.  I appreciate

1  you.

2                    Back to you.

3       Q.    Ms. Weisend, so you are saying even from the midst of

4  dealing with your husband's death, in this the middle of his

5  memorial service, you still have the clear recollection that it

6  struck you odd, Casi's behavior, when she showed you the

7  engagement ring?

8       A.    Yes, ma'am.

9       Q.    Later on that month, in July of 2019, were you headed

10  to your daughter Daralyn's house on Friday night?

11      A.    Yes.

12      Q.    Okay.  Did you get a call from Daralyn?

13      A.    Yes.

14      Q.    Did you -- did she indicate that Casi was at her

15  house?

16                    MR. SELLERS:  Object to leading.

17                    THE COURT:  Overruled.

18      A.    Yes, ma'am.

19      Q.    Okay.  Based on a call that you got from Daralyn,

20  what did you do?

21      A.    I continued on to her house.  I was --

22      Q.    Okay.  And when you got to the house, who was there?

23      A.    Casi and Daralyn.

24      Q.    And what did you come -- did Casi tell you some

25  things that night that you didn't know before?

1      A.    Yes.

2      Q.    Were they things that caused you great concern?

3      A.    Yes.

4      Q.    Were they things that you immediately took action

5 upon?

6      A.    Yes.

7      Q.    What were the things that you learned from Casi?

8      A.    Well, I learned that --

9            MR. GALLIAN:  Objection, Your Honor.  Hearsay.

10           THE COURT:  Sustained.

11     Q.    Based on what Casi told you, did you come to learn of

12 the existence of a secret probation?

13           MR. SELLERS:  Objection to hearsay; lack of

14 personal knowledge.

15           MS. MAX:  Your Honor, this goes to effect on --

16           THE COURT:  If I need a response, I'll let you

17 know.

18           I'll overrule.

19     A.    Yes, she told me she was on secret probation.

20     Q.    Now, you've worked in the court system for, what,

21 almost 30 years?

22     A.    Yes.

23     Q.    So when you heard the words "secret probation," what

24 went off in your head?

25     A.    Alarms.

1     Q.   Explain why.

2     A.   Because there's no such thing as a secret probation.

3     Q.   Okay.  How did it make -- that alarm, how did it make

4  you feel?  Did this seem minor, serious, what?

5     A.   Serious.

6     Q.   Okay.  Did your come to learn about some details

7  about the secret probation?

8     A.   Yes.

9     Q.   Did you learn of a detail of Casi talking to a judge

10  over the phone?

11     A.   She did not -- my conversation with her, she -- in

12  it, I'm not aware of her talking to the judge.  It was always

13  Bill Stone talking to the judge and then relaying the message

14  to her.  That was my understanding.

15     Q.   So did you come to learn --

16           THE COURT:  Of -- let me pause you for just a

17  moment.

18           There was a leading objection before.  I'll give

19  you some latitude, but I'm going to kind of sustain it out of

20  time.

21           MR. SELLERS:  Object to double hearsay on those

22  answers.

23           THE COURT:  Okay.  I'll overrule you as to that.

24     Q.   Ms. Weisend, in your career, have you ever been aware

25  of a court hearing being conducted over a phone?

 1       A.   No.

 2       Q.   How did -- does that cause you alarm to hear about

 3   such things like that?

 4       A.   Yes.

 5       Q.   Does that seem like something that's not real?

 6       A.   Absolutely.

 7       Q.   Based upon what you learned from Casi that night, did

 8   you have concerns for her?

 9       A.   Yes; yes, I did.

10       Q.   On a scale of how serious it was in your mind, what

11   did you think?

12       A.   Well, giving how frantic she was, and what I was

13   told, I would say a 9, at least a 9.

14       Q.   So let's talk about her demeanor.  You said it was

15   frantic?

16       A.   Yes.

17       Q.   Did she seem forthcoming with the information?

18       A.   I had to ask questions.  When I asked questions

19   and -- then she would -- you know, she would answer them.

20   Because I'd ask her about the -- I explained to her that there

21   is no such thing as a secret probation.  You know, if you -- if

22   a judge orders a defendant to do something, they -- you know,

23   order the defendant.  They don't go through someone else.

24       Q.   Were you left with the impression that Casi was

25   scared to tell you this information?

1    A.    Yes, she was, for fear that her probation would be

2    revoked and she would go to jail and lose her kids.

3    Q.    Did you kind of have to drag it out of her?

4    A.    Yes, yes.

5    Q.    Did you also come to learn that night that there was

6    money involved with this secret probation?

7    A.    Yes, I did.

8              MR. SELLERS:   Object; lack of personal

9    knowledge; hearsay; double hearsay.

10              THE COURT:   Overruled.

11    Q.    I'm sorry, the answer to your question was?

12    A.    Yes, I did learn of --

13    Q.    Just -- I'll move on to the next question.

14              So you came to learn that money was involved

15    with the secret probation.  Did that cause you concern?

16    A.    Yes.

17    Q.    Was that something that was inconsistent with

18    everything you know about probation?

19    A.    Right.  Even though there's probation fees, you pay

20    Probation; you don't pay your probation officer or your agent

21    or anything.

22    Q.    But the issue -- the fact that there was money

23    involved with this probation is a fact that you learned that

24    night at your daughter Daralyn's house?

25    A.    Yes, it is; yes.

1    Q.   Based on what you learned from Casi at your daughter
2    Daralyn's house, what did you do next?
3    A.   I called our local district attorney.  I have his
4    number, so I called him.
5    Q.   Okay.  When did you do that?
6    A.   I think it was around -- I'm going to say 9:00, maybe
7    9:30 at the latest, something like that.
8    Q.   This is at -- at nighttime?
9    A.   At nighttime, yes.
10   Q.   On that Friday night?
11   A.   Yes.
12   Q.   You are calling the district attorney of Hood County?
13   A.   Yes.
14   Q.   Now, I -- it's probably a safe assumption, given your
15   job, you have a relationship with him, right?
16   A.   Exactly, exactly.
17   Q.   But would you normally call him at 9:30 on a Friday
18   night?
19   A.   No.
20   Q.   So why did you do it this time?
21   A.   Because of the urgency.  I -- she needed -- she
22   needed help.
23   Q.   So it was a very urgent matter in your mind?
24   A.   I felt it was.
25   Q.   Okay.  And did you have a conversation with the

1    district attorney?

2         A.    Yes.

3         Q.    And based on your conversation with him, what did you

4    do next?

5         A.    He told us to just hang on; that he'd make a call.

6    And that Ranger Briley may be giving us call or he'd call us --

7    Brian would call us back.

8         Q.    Do you know who Ranger Briley is?

9         A.    Yes.

10        Q.    Have you dealt with him in the course of your job

11   before?

12        A.    Yes.

13        Q.    Is he somebody that you have a relationship with

14   outside of the professional working environment?

15        A.    No, not really.  Just -- just mainly within work.

16        Q.    Seeing him at the courthouse?

17        A.    Seeing him at courthouse or, you know...

18        Q.    Is the district attorney of Hood County somebody that

19   you have a personal relationship with outside of the

20   courthouse?

21        A.    No, not really.  Just mainly there at work and -- but

22   you see him -- them more than you see your family sometimes,

23   so.

24        Q.    Did you end up speaking with Ranger Briley that

25   night?

```
 1        A.   Yes, I did.

 2        Q.   So this is late on a Friday night.  And --

 3        A.   Yes.

 4        Q.   -- you've got ahold of Ranger Briley?

 5        A.   Uh-huh, yes, ma'am.

 6        Q.   Did you feel like -- so we've established it's clear

 7   you have the connections to be able to access these people late

 8   on a Friday night, correct?

 9        A.   Yes.

10        Q.   Did you feel like you were pulling any favors by

11   giving them a phone call?

12        A.   No.

13        Q.   Did you feel like you were reporting something that

14   needed to be reported to law enforcement?

15        A.   Oh, yeah.

16        Q.   And you clearly felt like you had a sense of urgency,

17   you needed to do it?

18        A.   Yes.

19        Q.   Based on your phone call with Ranger Briley, was

20   there a meeting set up for the next Monday morning?

21        A.   Yes, there was.

22        Q.   And who was going to attend that meeting?

23        A.   Casi.

24        Q.   And who else?

25        A.   Well, her mother and -- and I went.
```

1      Q.   Okay.  Why did you attend the meeting?

2      A.   Well, because I believe it was over the weekend I got

3 a call from Casi's mother, and she said that Casi was real

4 nervous and real upset.  And she said that she was afraid that

5 Casi wouldn't go.

6            So I -- I told her, I said, well, you know -- I

7 believe I called Casi, but the message got relayed to Casi that

8 I would go with her, I would go in there with her.

9      Q.   Did you get the impression that Casi was reluctant to

10 report this information to Ranger Briley?

11     A.   She was afraid.

12     Q.   In fact, when you called the district attorney on

13 Friday night, was that something that Casi was encouraging you

14 to do?

15     A.   No, she was afraid.  She was afraid of losing her

16 probation, but I told her it would be all right.

17     Q.   So it's something you had to convince her of?

18            THE COURT:  I'm sorry, let me pause you for just

19 a moment.

20            (Off-the-record discussion.)

21     Q.   So you were saying the call that you made to the

22 district attorney, to law enforcement, that was not something

23 that Casi was encouraging you to do?

24     A.   Not really.  I had to convince her that -- that it --

25 that it would be okay and...

1    Q.    So you had to do the convincing?

2    A.    Because she was afraid.

3    Q.    Is that a yes, ma'am?  I saw you nodding your head.

4    A.    Yes.

5    Q.    That Friday night, after making those phone calls and

6    setting up the meeting, is there anything else that happened

7    significant that night?

8    A.    I -- she was -- she was afraid to -- to talk to

9    Ranger Briley.  And so I -- I gave her my phone.  My -- my

10   husband had just passed away, and I'd just bought him a

11   brand-new iPhone and I gave that to her.  I said, here, take

12   this.  He doesn't know me.  You know, he doesn't know Kerry.

13   Take my phone.  Because she was afraid that he had her phone

14   bugged, he had all of her information, he knew everything.

15              So I told her, I said, he doesn't know me,

16   doesn't know anything, so take this phone; it's -- you're fine.

17   Q.    So you gave her a safe phone?

18   A.    Yes, I did.

19   Q.    And what is your deceased husband's name?

20   A.    Kerry.

21   Q.    Have you seen that phone since?

22   A.    No, I haven't.

23   Q.    Okay.  Did that seem like the only solution to you,

24   based upon the fears that Casi had?

25   A.    Yes.  I -- it -- she -- I think at that point she

1    felt she had a way to communicate safely.

2         Q.    Okay.  On that Monday morning, you had explained over

3    the weekend that you had been asked to attend the meeting with

4    Casi and Ranger Briley --

5         A.    Yes.

6         Q.    -- correct?

7         A.    Yes.

8         Q.    Did you attend the meeting?

9         A.    Yes.

10        Q.    And how long did you stay in the meeting?

11        A.    Not very long.  Ten minutes maybe, 10, 15 tops, I

12   would say.

13        Q.    Why didn't you stay longer?

14        A.    Well, it was me, Casi and Casi's mom in the meeting.

15   And as Casi talked, her mom would talk and try and say

16   something.  And, you know, it's, Mom, you know.  So I just -- I

17   just -- finally I told her mom, I said, hey, I said, why don't

18   you and I just go.  Because she seemed to be able to talk to

19   Ranger Briley.  So I -- I suggested to her that her and I just

20   go sit outside.  So that is what we did.

21        Q.    So you got the sense that at that point Casi did not

22   need the support of her mother or you anymore to be able to

23   talk to Ranger Briley?

24        A.    To be able to talk to him, I -- I felt like she --

25   she was okay.

1        Q.    Okay.

2                    MS. MAX:  Pass the witness.

3                    THE COURT:  All right.  So, members of the jury,

4     we're going to take a break.  I need to remind you of an

5     instruction I gave you yesterday.  You've now heard some

6     testimony.  But all of you are -- most of you-all are parents;

7     you know there's at least two sides to every story, sometimes

8     three or four.  So I don't want you to talk about the case

9     until you've heard absolutely everything.  And I'll let you

10    know when it's time to do that.

11                   Please don't talk about anything except this

12    case and I'll also instruct you not to get on the internet or

13    do any independent research.  And with that said, we're going

14    to take a half-hour recess.  We'll bring you back at 10:35.

15                   (Jurors exit courtroom.)

16                   MR. GALLIAN:  May I proceed?

17                   THE COURT:  You may.

18                   MR. GALLIAN:  Judge, I think we got ourselves a

19    good old-fashioned Brady violation.

20                   THE COURT:  Uh-oh.

21                   MR. GALLIAN:  As you well know, Bill Stone is

22    charged in this case with impersonating an FBI agent.  We were

23    handed Jencks material last night.  And by my count, there's

24    four separate instances where one of the main investigators in

25    this case says over and over and over again that Bill Stone is

1    holding himself out as a CIA agent.  I know what you are

2    thinking: They're both bad.  But one he's charged with and one

3    he's not.

4              And I don't know if it's a constructive

5    amendment that they are going to try and get through.  But

6    insofar as he's charged with impersonating an FBI agent,

7    statements from the ranger saying that he's holding out as CIA,

8    it's material and it's exculpatory.  It's exculpatory because

9    it's less likely that he held himself out as an FBI agent.

10             And this, as you will see, is consistent with

11   the testimony from the victim.

12             THE COURT:  I'm looking at Count 9, false

13   impersonation of a -- this is from the superseding indictment

14   Document Number 26.

15             Count 9: False impersonation of a federal

16   officer or employee, violation of 18 United States Code

17   Section 912, Paragraph 16: The grand jury realleges and

18   incorporates by reference the allegation contained in

19   paragraphs 1 through 15 of this superseding indictment as if

20   fully set forth herein.

21             Paragraph 17: From in or around November 2015

22   through in or around 2019, in the Northern District of Texas,

23   the defendant, William Roy Stone, Jr., falsely assumed and

24   pretended to be an officer and employee acting under the

25   authority of the United States or any department, agency or

1    office thereof, that is a special agent of the Federal Bureau

2    of Investigation.  And acted as such and in such assumed and

3    pretended character -- I'm sorry -- and in such assumed and

4    pretended character, knowingly with intent to defraud, demanded

5    and obtained money and other things of value totaling

6    approximately $700,000 from the victim, C.T., in violation of

7    18 United States Code Section 912.

8             So I have a question for you.  So had you ever

9    seen this information before?

10             MR. GALLIAN:  No, ma'am.

11             THE COURT:  And when was this tendered and how?

12             MR. GALLIAN:  Last night, via USAfx, at -- when

13    we got back to the office --

14             THE COURT:  And have --

15             MR. GALLIAN:  -- 7:00-ish.

16             THE COURT:  -- does it have dates?  Can you tell

17    from the paperwork -- and, Government, obviously I'll let you

18    be heard in a moment.

19             But can you tell, was this newly generated when

20    this was created and how long it existed?

21             MR. GALLIAN:  The first -- I'm not sure if this

22    is chronological, so I'll just -- in the order that I have it.

23    July 30th, 2020, is the first mention.  April 23rd, 2020;

24    July 29th, 2019; and August 17th, 2020.  So this is

25    correspondence, Ranger Briley, with other agents, and Mr. Busch

```
 1   in this case.
 2                THE COURT:  All right.  And so we're clear, are
 3   you joining in this?  Do you have anything separate you need to
 4   illustrate?
 5                MR. SELLERS:  No, Your Honor.  We'll join.
 6                THE COURT:  Okay.  If you all would -- Taylor --
 7                If we can pause for a moment.
 8                (Off-the-record discussion.)
 9                THE COURT:  Government, I'll let you be heard
10   here in just a moment.
11                And I assume the yellow flags that you've given
12   me are the most pertinent information?
13                MR. GALLIAN:  Yes, Your Honor.  I think it's
14   38 pages.  We wanted to obviously streamline it and draw our
15   attention to the ones that we noticed.
16                THE COURT:  Sure.
17                So we'll make this Court Exhibit 1.
18                THE COURT:  So I've got Court's Exhibit
19   Number 1.  I've hand-numbered these, and so you-all need to --
20   to make sure I'm on the same page with you.  But when I look at
21   Page 10, it is a July 30th, 2020, 5:09 p.m. e-mail from Danny
22   Briley of DPS.  The signature block says he's with Texas
23   Rangers, Company B, out of Stephenville.  From Mr. Briley to
24   Jason Hester, in DPS.  And he makes reference to, in
25   Paragraph 2:  I've attached the identification information of
```

1   the former agent.  And you can -- I'm assuming that is making

2   reference to -- it says Thompson investigation.  It doesn't say

3   the defendant's names, but it says he has been -- I've attached

4   the identification information of the former agent.  He has

5   been passing himself off as a CIA agent for several years now.

6   The case we have against him is wire fraud and impersonating a

7   federal officer.  Any help you can provide in this regard would

8   help.

9                    And the next page that Defense counsel called my

10  attention to I've hand-numbered number Page 11.  It is from

11  Danny Briley to Mr. Marcus Busch.  It was sent, assuming this

12  is all correctly time-stamped, Thursday April 23rd, 2020, at

13  3:22 p.m.

14                   The subject line is, AUSA and Texas Ranger

15  restricted, and it has an importance category of high.  And the

16  salutation is: Marcus, here is some more info about the case.

17  Cliff notes.  In the first paragraph, it does make reference

18  to: I have information that in 2007, Federal Bureau of

19  Investigation (FBI) Special Agent (SA) William Roy Stone,

20  Jr. -- I'll skip down, then, to the fifth paragraph on Page 11,

21  the bottom paragraph.  And that's been highlighted by Defense

22  counsel.

23                   And that paragraph reads, I found upon SA

24  Stone's retirement from the FBI he continued to deceive

25  Thompson and others (DeLeon and Thompson) through the same

1  scheme and conduct, and claims to be working for, quote, the

2  agency, closed quotes, or Central Intelligence Agency (CIA)

3  where SA Stone has the same law enforcement connections and

4  capabilities to influence Judge Anderson.

5           I'll skip, then, to the next flagged e-mail,

6  which is hand-numbered 19.

7           MR. GALLIAN:  Your Honor, briefly?

8           THE COURT:  Oh, yes.

9           MR. GALLIAN:  Can Ms. Weisend be excused?

10          THE COURT:  Oh, I am so sorry.

11          MR. GALLIAN:  I don't want any of this to --

12          THE COURT:  I am so sorry.  I did not realize

13  any of this.

14          Yes, ma'am, if you don't mind stepping down.

15          (Off-the-record discussion.)

16          THE COURT:  And if there this is anyone else

17  who, other than your case agents, may be testifying in this

18  case, in an abundance of caution, if they will exit the

19  courtroom.  Thank you.

20          Okay.  Page 19, from Danny Briley, sent Monday,

21  July 19th -- I'm sorry, Monday, July 29th of 2019, at

22  11:44 a.m., to a Heidi Prather, P-R-A-T-H-E-R, another DPS

23  employee.  Subject line, Extortion: Heidi, I have a possible

24  extortion case I'm working, and the victim's name is Casi

25  Thompson.  Skipping down, it makes reference to both defendants

1    with their ages.  The paragraph -- the pertinent paragraph

2    reads: Could someone do complete workups on all the above,

3    making reference to both defendants and the complaining witness

4    in this case.  And I need to confirm whether Casi is on

5    probation or not.  Casi's very wealthy, and it appears Stone

6    and DeLeon have extorted money from her.  Stone represents

7    himself as a former FBI agent and current contractor for the

8    CIA.  DeLeon represents himself as a go-between between the

9    probation officer for top-secret probation.

10              And then the last e-mail that's flagged is an

11   August 17th, 2020 -- Monday, August 17th, 2020, 1:26 p.m.

12   e-mail from Danny Briley, a DPS employee, to William Kasper,

13   another DPS employee; and a courtesy copy has the e-mail sent

14   to a Jason Bobo, B-O-B-O.  And Kasper was William Kasper, with

15   a K.

16              The subject line is, Quick summary.  The

17   salutation is, Major.  The pertinent paragraph says -- it's the

18   second paragraph: On October 31st, 2015, Bill Stone retired

19   from the FBI, and soon afterwards, he imposed a, quote,

20   fictitious top-secret probation, closed quote, on a female who

21   was inheriting a large amount of money and assets.  Stone

22   engaged in criminal conduct, extorting money from the original

23   victim, parentheses, see PowerPoint sum, as in summary

24   shortened, closed quote, and we continued to interview other

25   victims.  Stone was purporting himself to be a contractor and

1    CIA agent after retirement.

2                   So, Mr. Gallian, anything you want to

3    illuminate?

4                   MR. GALLIAN:  Yes, Your Honor.  So to the

5    Court's previous question, there were two docket entries;

6    Docket Number 57 -- you will remember that this case was very

7    much continued at the last second.  And Docket Entry 57, the

8    Brady disclosure deadline was January 11th, 2023.  Case was not

9    continued until late February.  So that was the first Brady

10   violation.  All of the correspondence in the attachment

11   predated that.  The government did not produce this information

12   at that time.

13                  More recently, Documents 114, which is the

14   current scheduling order that we've all been operating under;

15   Brady deadline June 7th, 2023, we are obviously well past that.

16                  THE COURT:  And you received this yesterday?

17                  MR. GALLIAN:  Yes, ma'am.

18                  THE COURT:  All right.  Government, response?

19                  MS. RUDOFF:  Your Honor, first, with regards to

20   the fact that whether or not this is Brady and, in fact,

21   exculpatory information, this fact is actually inculpatory

22   information.  The fact that Bill Stone was carrying on

23   throughout this entire -- 2015 to 2019 as an FBI agent.  At

24   points, as you heard during our 404(b) hearing, he was

25   representing he could make someone's immigration status happen.

1    Therefore, that could be potentially that he's an immigration

2    customs officer.

3              So the fact that he is lying about his work is

4    completely part of this entire investigation.  And in no way

5    does lying about being a CIA agent mutually exclude the fact

6    that he's lying about being an FBI agent.

7              THE COURT:  I don't think that's the issue.  I

8    think the issue is he's indicted -- looking at Count 9 --

9    for -- he's indicted for false impersonation of a federal

10   officer or employee.  And of course the purpose of the

11   indictment is to put Defense counsel and the defendant on

12   notice of the charges against him.

13             And in your indictment, it says that he falsely

14   assumed and pretended to be an officer and employee, acting

15   under the authority of the United States, or any department,

16   agency or office thereof, that is a special agent of the

17   Federal Bureau of Investigation.  And so if you have not

18   tendered e-mails that in fact he purported to be a CIA agent,

19   that is pertinent.

20             Now, you can respectfully disagree, but you put

21   him on notice that he held himself out to be an FBI agent.

22             And so, Mr. Gallian, my question to you and

23   Mr. DeLeon's counsel, did you-all know that he ever said

24   anything about being CIA?

25             MR. GALLIAN:  So, Your Honor -- and Luley's in

1    here, so I'm not going to give away too much.  Agent Luley is

2    in the courtroom right here.

3                    I've always been very confused by the

4    indictment.  Because the victim herself never says FBI agent.

5    And I don't want to give it away; I'm sure the prosecution is

6    going to bolster that up, but she's never said it.  In any

7    recording anywhere ever has she said FBI agent.  I've been

8    scratching my head.  She always said former FBI, CIA; former

9    FBI, CIA.  And I was always wondering, I can't wait to figure

10   out where the FBI comes in.

11                   THE COURT:  Have you ever had any documentation

12   of that, about the CIA, before this?

13                   MR. GALLIAN:  Not -- that documentation?  Only

14   what the victim had said.  Nothing from the agents.

15                   THE COURT:  But you didn't have -- you did not

16   know about the existence of these e-mails?

17                   MR. GALLIAN:  No, no.

18                   THE COURT:  Okay.

19                   MS. RUDOFF:  Judge, may I respond to that?

20   Because that is inaccurate.

21                   THE COURT:  Okay.

22                   MS. RUDOFF:  While Mr. Gallian may not have

23   known about those particular e-mails, I understand.  But the

24   reality is, Mr. Gallian was made aware.  And I can give you the

25   exact dates and what exactly was said.

1           THE COURT:  Let's -- here's what -- let me take

2   it a higher level.  How he generally knew things is not the

3   issue before the Court right now.  What's the issue -- I

4   understand he knew about some CIA.  He's entitled to have

5   documents.  We do not do trial by ambush in this Court.

6           And so if there are documents that say that he

7   was holding himself out as CIA, his defense counsel is entitled

8   to know that, prepare for it, cross-examine people on it.  And

9   if they were not aware of these documents, and you knew about

10  them since, on their face, 2020, and this court has a deadline

11  in its scheduling order for when you have to turn over

12  information so they can be prepared and answer the accusations

13  against them, generalities are -- are not at issue.  They are

14  entitled to know about your evidence, prepare for it and

15  respond to it.  And so I need to know from you-all why this

16  wasn't turned over timely.

17          And now here's what I don't want to get into,

18  whether or not they -- whether or not it's important or whether

19  or not it's helpful, that is not before the Court.  That is not

20  the issue.  If there are documents that say things like this,

21  they are entitled to have them timely.  That is the whole

22  purpose of a scheduling order, is so that people are not

23  sitting in the middle of their trial, having to figure out,

24  scrambling.  This is what we don't do.

25          So explain to me why they didn't get these.

1              MS. RUDOFF:  Your Honor, in an MLI that was

2   provided to Defense counsel on June 21st, 2021, as a part of

3   discovery, it's an MLI with Darla Bell, who is a witness in

4   this case.  In that MLI it says, specifically, Bell stated that

5   Stone told her he had been contracted back to his old agency,

6   FBI, and that he was contracted to the agency which Bill --

7   Bell interpreted as the CIA.

8              THE COURT:  Okay.  So let me talk.  I'm not

9   asking you when they generally found out about things.  That is

10  not what I'm interested in.  They're not going -- they knew

11  that there was something about the CIA.  My scheduling order

12  says they have to have documentation, but you cannot ambush

13  somebody in the middle of their trial with important evidence

14  like this.  And so I don't care about your MOU [sic] and when

15  you generated agreements about things.

16             MS. RUDOFF:  No --

17             THE COURT:  Don't talk over me.  Don't talk over

18  me.  I'll let you talk in a moment.

19             What's before the Court -- I don't want to hear

20  about MOUs; I don't want to hear about what they did and what's

21  inculpatory or exculpatory.  They are entitled to prepare their

22  defense.  This man's life is on the line, and so is his.  And I

23  am -- I do not like this.  I don't like that the first time

24  hearing about a different allegation is in the middle of their

25  trial.  That is not how we do business.  And the whole purpose

1    of a scheduling order and requiring information like this to be

2    turned over is so that exactly this does not happen.

3              And so what I need to know from you is not about

4    an MOU and generalities.  What I need to know is why is it, in

5    the middle of these gentlemen's trial for their life, that they

6    are, for the first time, getting documentation that existed in

7    2020?  Why did they not have that?  Why did they get that last

8    night, when this trial had already begun?  That is not how we

9    do business.  Explain that to me.

10             MS. RUDOFF:  Yes, Your Honor.  I understand your

11   concerns.

12             I did not -- I want to clarify for the record

13   and for your knowledge.  I did not say MOU.  I said --

14             THE COURT:  Yeah, I tell you what.  Listen, I

15   don't want to get into the MOU.  Your agreements with other

16   people don't have anything to do -- you-all have an obligation

17   as professionals before this the Court to tender evidence.

18   Everyone in here is -- nobody in here is a rookie.  Nobody's

19   bar card is wet.  Everybody does this for a profession, which

20   is why I expect you to be professionals.  And the fact that two

21   people are on trial for their life, and they have no idea about

22   these e-mails that existed for years, when I have a deadline

23   requiring it to be turned over, needs to be explained.

24             And I don't want to hear about agreements with

25   people or who didn't do what.  I want to know, why is it last

1    night that -- if this was you on trial, you would have wanted

2    to see this six months ago, or whenever my deadline was.  This

3    deadline has been violated.  And I'm not getting into whether

4    it was important or not.  I can tell you, if I'm on trial, I

5    want to know about all of this.  And I want my lawyer to know

6    about all of it, and I want to be able to cross-examine

7    witnesses on all of it.

8              And so why on earth, in the middle of the night,

9    are they getting evidence in the middle of their trial?  I have

10   a scheduling order so that this won't happen.  Why did that

11   happen?

12             MS. RUDOFF:  Your Honor, this exact

13   information -- this information --

14             THE COURT:  And here -- let me pause you for a

15   second and then I'll let you talk.  Here's what will not move

16   the needle for me: Hearing that this is duplicative of some

17   other general chatter.  I want to know why they -- they are

18   entitled to have these specific documents.  So explain to me

19   why they did not have these specific e-mails until last night.

20   That is all I want to hear from you.

21             MS. RUDOFF:  Yes, Your Honor.  Those specific

22   e-mails are Jencks statements.  Jencks statements don't have to

23   be turned over until the day before -- until right before

24   someone testifies.  So our understanding was to turn them over

25   at that point in time.

1              The information itself has already been

2    provided.  It's in Danny Briley's report, Texas Ranger Danny

3    Briley's report, Page 3, which was handed over back in 2021 to

4    Defense.  It says, SA Stone --

5              THE COURT:  I don't need you to read it.  Stop

6    for a moment.  So I'm giving you an opportunity to explain

7    this, because you are not answering my question.  So let me ask

8    it more pointed, more tight.  I hate to have to cross-examine a

9    prosecutor.

10             My question to you is, why did that not -- not

11   what else they got some other way.  Why is it they did not get

12   these documents, that are yellow flagged, that I Bates numbered

13   myself, why did they not get these until right now?  And

14   whether it's Jencks or Brady or whatever, professionals do not

15   ambush people on trial.

16             If he's on trial for being an FBI agent, and we

17   have evidence that some people -- some people were saying CIA,

18   they should've had these to consider.  This could have changed

19   their whole defense.

20             So why is it you didn't hand these over?

21             MS. RUDOFF:  Your Honor, we didn't hand those

22   over -- can I answer in two parts?

23             THE COURT:  Yes.

24             MS. RUDOFF:  Thank you.  We didn't hand those

25   particular e-mails over because we deemed them Jencks material.

1    As Jencks material, Danny Briley is not set to take the stand

2    today, and probably not even tomorrow.

3                    THE COURT:  And so let me pause you for a second

4    before we get into a three-part answer, and I'm going to ask

5    you a very pointed question.  When did my scheduling order say

6    Jencks material was due?

7                    MR. BUSCH:  The day before they were scheduled

8    to testify.

9                    THE COURT:  Let's pull it up.

10                   Do we have that in the scheduling order?

11                   MR. GALLIAN:  Is it the day before a witness

12   testifies.  But obviously we take the position that Brady

13   supersedes any Jencks.

14                   THE COURT:  Well, I'm looking at a -- I'll need

15   to print this case, a Fifth Circuit case.  And I'll read it

16   during our break and come back.  And I'll let everybody

17   respond.  And I will allow you to respond; I just needed to ask

18   some pointed questions.

19                   I've got just a snapshot from my smart lawyer

20   here, U.S. v. Anderson: When alleged Brady material is

21   contained in Jencks material, Jencks Act material disclosure is

22   generally timely if the government complies with the Jencks

23   Act.

24                   And so let me give you the citation on this.

25   It's United States v. Anderson, 574 F.2d, 1347-1352.

1                    So before I chew anybody's tail too hard I need

2          to brush up on the law here.  So let me look at that, look at

3          the e-mails.  Court will be in recess until -- we weren't going

4          to get into this at this moment.

5                    Government, I have excoriated you.  I need to

6          pull the law and give you an opportunity to be heard, in

7          fairness.  And so if the scheduling order said the night

8          before, and this is all copacetic, then I will dial this way

9          back.

10                    Defense counsel, if you guys will look at the

11         law, too.  And why don't we take this up after lunch?

12                    MR. WESTFALL:  May I supplement the record, Your

13         Honor?

14                    THE COURT:  Sure.

15                    MR. WESTFALL:  Those are the 35 pages of Danny

16         Briley e-mails.

17                    THE COURT:  Yes.

18                    MR. WESTFALL:  Contained in there, also, is an

19         e-mail where Danny Briley is referring to Joe as a victim.  And

20         we received them the same time everyone else did.  And

21         there's -- his mental process is in there that --

22                    THE COURT:  Okay.

23                    MR. WESTFALL:  -- and we had no evidence of any

24         of that.

25                    THE COURT:  Okay.

1              MR. WESTFALL:  Thank you.

2              THE COURT:  I'll take that up.  And -- I need to

3    dial this down.  I -- I went off half-cocked assuming that the

4    deadline was different.  And so if the deadline in the

5    scheduling order was the night before, I'm sorry.

6              And so let me take a look at that.  Let me

7    took -- I thought we had a week or so out.  But if it is the

8    night before, then I need to look at that.  And so let's wipe

9    the slate clean; let me look at the law, look at the evidence,

10   and then I'll come back before anybody gets into it.  Let me

11   take a look at that.

12             Okay.  All right.  With that said, bring them

13   in, please.

14             (Jurors enter courtroom.)

15             THE COURT:  The witness will now be

16   cross-examined by Mr. Gallian.

17             MR. GALLIAN:  Thank you, Your Honor.  May I

18   proceed?

19             THE COURT:  You may.

20                   <u>CROSS-EXAMINATION</u>

21   <u>BY MR. GALLIAN:</u>

22        Q.   Ms. Weisend, my name is Gregg Gallian.  I'm one of

23   the attorneys representing Mr. Stone.  How are you?

24        A.   I'm fine.  How are you?

25        Q.   Good.  We've never met before, have we?

1      A.    No, sir.

2      Q.    This is the first time we're talking?

3      A.    Yes, sir.

4      Q.    Okay.  I have just a few questions for you.  You

5  first met Bill Stone in 2017; is that right?

6      A.    Yes, sir.

7      Q.    At the graduation party?

8      A.    At the graduation itself.

9      Q.    At the actual graduation ceremony?

10     A.    Yes, sir.

11     Q.    What was your -- going back to this -- I know you

12  touched on it briefly -- what was your understanding of Bill

13  Stone being there?

14     A.    A -- he was a -- a friend of Casi's.  A -- a FBI

15  friend.

16     Q.    Okay.  And that was it?

17     A.    That was it.  That's --

18     Q.    Okay.  Did you think that the two were romantically

19  involved at that point?

20     A.    No, sir.

21     Q.    Okay.

22     A.    No.

23     Q.    Did Casi share with you that the two had been in a

24  relationship prior to that?

25     A.    No, sir.

```
 1       Q.   Okay.  Were you at the -- when you were at the
 2   ceremony, did you also go to the graduation party afterwards?
 3       A.   Yes, sir.
 4       Q.   Did Casi, at the graduation party, did she give out
 5   any certificates of appreciation to anyone?
 6       A.   Not that I'm aware of.
 7       Q.   Okay.  That didn't happen at the party?
 8       A.   Not that I'm aware of.
 9       Q.   Okay.  Going back to when you said you saw a badge,
10   when was that?
11       A.   That was at the graduation party.
12       Q.   In 2017?
13       A.   Yes.
14       Q.   Okay.  And you said that in your line of work, people
15   don't show you badges all that often?
16       A.   No.
17       Q.   Was it kind of weird?
18       A.   I thought it was showy.
19       Q.   Okay.  How about -- how did that come up?
20       A.   Oh, we were -- we were just talking, and -- and I
21   knew of Casi's history, the -- the drug history.  And, you
22   know, basically, you know, what do you think; how do you think
23   she's doing?  You know, oh, yeah, well, I'm a -- the FBI, and
24   he showed me the -- said he was FBI and showed me the badge.
25       Q.   What did him saying he was FBI have to do with Casi
```

```
 1   at that point?
 2        A.   That he was there, they were helping her.
 3        Q.   In what way?
 4        A.   He seemed to take credit for helping her get through
 5   college and --
 6        Q.   Okay.
 7        A.   -- and write a business plan.  I do remember him
 8   talking about a business plan.
 9        Q.   Anything else jump out at you?
10        A.   I -- not that I can recall.
11        Q.   When Bill Stone showed this badge, what did the badge
12   look like?
13        A.   It looked -- looked like a -- a legit badge with, you
14   know, the -- the -- it was in a wallet.
15        Q.   Okay.
16        A.   Wasn't -- it was very quick; just out badge; in, you
17   know, just right away.
18        Q.   Okay.  Did the badge have a shield on it?
19        A.   I don't recall.
20        Q.   Was it just an ID?
21        A.   No, it was -- it was a badge, badge.
22        Q.   When I say "shield," I mean like a -- a badge, like
23   the shield like the -- the -- I don't know, the --
24        A.   Well, it wasn't a star, like the rangers have the
25   star.
```

1    Q.    Sure.  Was there any metal, the badge part that's --

2    A.    It was a -- brass, gold-type.

3    Q.    Okay.  Did you see in the wallet as well that

4  additional part that had the identification?

5    A.    No, I did not.  It was --

6    Q.    Okay.

7    A.    -- it was -- it was quick.  You know, just here it

8  is.

9    Q.    Sure.

10   A.    Close it up and put it away.

11   Q.    And who was around when he did that?

12   A.    Joe.

13   Q.    Joe.  Anyone else?

14   A.    No.

15   Q.    He just said, I'm an FBI agent?

16   A.    Yes.

17   Q.    In front of you and Joe?

18   A.    Yes.

19   Q.    Okay.  Casi shared with you about this super-secret

20  probation, right?

21   A.    After the graduation party.

22   Q.    Okay.  But at that point, Bill Stone was representing

23  himself as an FBI agent to you?

24   A.    Yes, sir.

25   Q.    Did he say anything about the probation that she was

1    on, or anything that he was helping her with, aside from the

2    business plan?

3          A.    The business plan -- didn't really, no.

4          Q.    When Bill Stone showed you the badge, the ID that --

5    I know you can't really remember on it -- did it have a picture

6    of Bill Stone with a mullet?

7          A.    There was no picture.

8          Q.    There was no picture?

9          A.    I didn't see a picture.

10         Q.    Got it.  So there was no credentials with it; it was

11   just the actual metal part?

12         A.    Correct, that's all -- all I saw was the metal -- the

13   metal part.  I remember my eyes hitting the metal part and --

14         Q.    Did Casi introduce Bill Stone as an FBI agent?

15         A.    I don't remember.  I don't remember that.

16         Q.    How did Casi introduce Bill?

17         A.    This is Bill, Bill Stone, and Joe DeLeon.

18         Q.    And that was it?

19         A.    Yeah.

20         Q.    No --

21         A.    I don't -- I don't remember her saying they're my FBI

22   agent friends.  I -- I just -- you know, it was a graduation,

23   so, hi.

24         Q.    So at that point, in 2017 at the graduation, Casi did

25   not introduce Bill Stone as an FBI agent; is that fair?

1    A.   I don't believe she did.

2    Q.   Okay.

3             MR. GALLIAN:   Thank you, Ms. Weisend, for your

4    time.  I appreciate it.

5             I'll pass the witness.

6             THE COURT:   All right, thank you.

7                         CROSS-EXAMINATION

8    BY MR. SELLERS:

9    Q.   Hello, Ms. Weisend.  How are you?

10   A.   I'm good.  How are you?

11   Q.   You have a new boss these days, don't you?

12   A.   Yes, I do.

13   Q.   After a long time?

14   A.   Yes.

15   Q.   Yeah.

16   A.   It's exciting.

17   Q.   Exciting?

18   A.   Yes.

19   Q.   Are things -- I won't even say it.

20            Let me talk to you about a few things.  When --

21   how long have you known Casi's mother?

22   A.   Her mother?

23   Q.   Yes, ma'am.

24   A.   First time I met her was the -- the girls were still

25   in high school.

 1       Q.    All right.  Describe for the jury your impressions of

 2  Casi's mother.

 3       A.    Oh, she's -- she's caring.  You know, she -- just

 4  like any mother, she loves her daughter.

 5       Q.    Uh-huh.  Were there times, to your knowledge, where

 6  you knew that Casi and her mother just didn't get along?

 7       A.    Yes, sir.

 8       Q.    All right.  And we -- we -- I guess we heard a little

 9  bit of that in the meeting that you arranged with

10  Ranger Briley, right?

11       A.    Yes.

12       Q.    Where her mom kind of starts to interject herself,

13  right?

14       A.    Yes.

15       Q.    Talk over Casi?

16       A.    Trying to -- to -- yeah, to talk and say things

17  and --

18       Q.    And it was clear to you that Casi didn't want for her

19  mom to be giving any input, right?

20       A.    I would say probably -- not -- not any input, but,

21  you know, hey, I'm trying to have this conversation, so.

22       Q.    Right.

23       A.    Just the --

24       Q.    Kind of like, I'm an adult; I can handle this?

25       A.    Probably.

 1      Q.    So would it be a fair assessment that you actually

 2  escorted her mom out of the room and took her somewhere else

 3  while Casi talked to Ranger Briley?

 4      A.    Yeah.  I just told her that, you know, let's step out

 5  and let them talk.  I felt that at that point Casi was

 6  comfortable with Ranger Briley, so she -- she'd be all right.

 7      Q.    She'd be all right to open up to him?

 8      A.    Yes.

 9      Q.    All right.  You are familiar with a lot of lawyers

10  who come into Granbury and represent people on cases, right?

11      A.    Yes, sir.

12      Q.    Both -- you know, defense attorneys that are local in

13  Granbury?

14      A.    Uh-huh.

15      Q.    And then others who are in Fort Worth, right?

16      A.    Yes.

17      Q.    And Casi's lawyer was a man by the name of Tim Evans;

18  is that right?

19      A.    Yes.

20      Q.    Do you remember Tim?

21      A.    Oh, yeah, I know Tim.

22      Q.    Good man?

23      A.    Absolutely.

24      Q.    Good lawyer?

25      A.    Yes.

1      Q.   In fact, one of -- one might argue, back at that

2   time, one of the best lawyers in Fort Worth?

3      A.   I would say, yeah, he was a good lawyer.

4      Q.   One of the better ones that people talked about,

5   respected?

6      A.   Could be, yeah.

7      Q.   Okay.

8      A.   Yeah.

9      Q.   To your knowledge, did you ever see Casi's mother

10   come to court with her for her court case?

11      A.   She may have been in there once, I don't know.  I

12   don't -- I'm usually doing other things and don't -- I don't go

13   in the courtroom.

14      Q.   Sure.

15      A.   I -- so I don't -- didn't see it.

16      Q.   Would it be fair to say that Casi probably herself

17   didn't have the money to tire Tim Evans back at that time?

18      A.   I would say --

19           MS. MAX:  Objection, Your Honor.  Speculation.

20           THE COURT:  If you can establish if she knows.

21      Q.   You are familiar with the finances generally of, you

22   know, Casi?  She's best friends with your daughter, apparently?

23      A.   Yes.

24      Q.   I mean, she -- her job was cutting hair for a little

25   bit, right?

1      A.    Uh-huh.

2      Q.    Casi --

3      A.    Yes.

4      Q.    -- yes?  And Tim Evans was one of the more expensive

5    lawyers, right?

6      A.    I would say so, yeah.

7      Q.    Right.  And so either she paid for it or she had some

8    help with it, right?

9      A.    Yes, sir.

10     Q.    All right.  Let me talk with you now about the party

11   at -- is it Farina's?

12     A.    Yes, sir.

13     Q.    That is the one that is kind of on the corner, the

14   square in Granbury?

15     A.    Yes.

16     Q.    It's got the old wood bar and stone walls --

17     A.    Yes.

18     Q.    -- right?  One of the nicer places to go in Granbury;

19   would you agree?

20     A.    Yes.

21     Q.    Your daughter says that she threw the party for Casi?

22     A.    Yes.

23     Q.    When she says "threw the party," did you see who paid

24   for everything at the end?

25     A.    I didn't -- no, I didn't see that.  I -- I don't --

1    you know, no, I wasn't there when money was exchanged or checks

2    were written, no.

3        Q.   I guess I'm just trying to get at, your daughter told

4    the jury that she had 40,000 in IRS debt, but yet she's

5    throwing a party at the most expensive place in Granbury.

6            MS. MAX:  Objection; argumentive.

7        Q.   I'm just trying to --

8            THE COURT:  Oh.  Oh, I'm sorry.  I thought you

9    were talking to me.

10       Q.   -- I'm just trying to square the two.  You know, they

11   made a big deal about how they didn't -- never asked Casi for

12   money, but it seems like she was holding herself out as still

13   having money, even though she was in debt?

14       A.   Yeah.

15       Q.   Would that be fair?

16       A.   Yeah, that is her.

17       Q.   Okay.

18           MR. SELLERS:  I'll pass the witness.

19           MS. MAX:  Nothing further for this witness.

20           MR. SELLERS:  I forgot one thing.

21       Q.   When you met Joe DeLeon, he was polite to you, right?

22       A.   Yes, he was.

23       Q.   He was -- Casi didn't seem afraid of him in any way,

24   did she?

25       A.   No.

1    Q.   Okay.  Joe seemed to genuinely care about her and her

2  future?

3    A.   Joe didn't -- didn't say a whole lot.  The -- my main

4  impression of Joe was that he was -- he was more with -- there

5  with Bill, you know, is --

6    Q.   Okay.  And obviously when you are there talking, and

7  Bill pulls out his badge and his ID, Joe's standing right

8  there?

9    A.   Yes, he was right there.

10    Q.   And Joe seemed to --

11    A.   Go along with it, yes.

12    Q.   -- go along with it.  Good.

13    A.   Yes.

14    Q.   Seemed to have a lot of admiration for that badge and

15  for Bill?

16    A.   Yes.

17    Q.   Almost like a kid and a dad?

18    A.   I -- I don't know that -- that -- just another person

19  standing there, but...

20    Q.   Sure.  But Bill was obviously in charge?

21            MS. MAX:  Objection, Your Honor.  Asked and

22  answered.

23            THE COURT:  Sustained.

24            MR. SELLERS:  Bill was in charge?

25            THE COURT:  Sustained.

```
 1        Q.    Okay.  Joe wasn't in charge?

 2                   MS. MAX:  Objection, Your Honor.  Asked and

 3   answered.

 4                   THE COURT:  I'll allow it.

 5        Q.    Joe wasn't in charge, was he?

 6        A.    No, my conversation was with Bill --

 7        Q.    All right.

 8        A.    -- at that time.

 9                   MR. SELLERS:  I'll pass the witness.

10                   THE COURT:  Any objection to this witness being

11   excused?

12                   MS. MAX:  No, Your Honor.

13                   MR. GALLIAN:  No, Your Honor.

14                   MR. SELLERS:  No, Your Honor.

15                   THE COURT:  All right.  Thank you so much for

16   coming, ma'am.  We appreciate you.

17                   (Witness excused.)

18                   THE COURT:  Government, call your next witness,

19   please.

20                   MS. RUDOFF:  Yes, Your Honor.  The government

21   calls Casi Thompson.

22                   (Witness sworn.)

23                   THE COURT:  You may proceed.

24                        CASI THOMPSON,

25   having been first duly sworn, testified as follows:
```

1          <u>DIRECT EXAMINATION</u>

2    <u>BY MS. RUDOFF:</u>

3        Q.    Good morning.  Can you please state your name for the

4    record?

5        A.    Casi Thompson.

6        Q.    And, Casi, are you the same Casi Thompson that's

7    identified in the indictment in this case as initial C.T.?

8        A.    Yes.

9        Q.    Okay.  And for purposes of today, is it okay if I

10   call you Casi?

11       A.    Yes.

12       Q.    Casi, how old are you?

13       A.    41.

14       Q.    And where do you currently live?

15       A.    In Granbury, Texas.

16       Q.    What do you do for a living?

17       A.    I'm a hair stylist.

18       Q.    Are you married?

19       A.    No.

20       Q.    Do you have any children?

21       A.    Yes.

22       Q.    How many?

23       A.    Two.

24       Q.    How old are they?

25       A.    They are 20 and almost 14.

1    Q.    Boys or girls?

2    A.    Boys.

3    Q.    What are their names?

4    A.    Cade and Slayter.

5    Q.    And which one is Cade?

6    A.    Cade is the 20-year-old.

7    Q.    Okay.  And Slayter?

8    A.    Is the 14-year-old.

9    Q.    Do they currently live with you?

10   A.    Yes.  Well, the oldest one is at college.

11   Q.    Okay.  And so Cade is the older one, right?

12   A.    Uh-huh.

13   Q.    Okay.  And so just for today, we're going to have to

14   make sure we answer "yes" or "no," okay?

15   A.    Yeah.

16   Q.    Okay.  So Cade is the older one?  Right now it's

17   summertime; is he at home with you because it's summertime?

18   A.    Yes.

19   Q.    And so once the summer is over, where does Cade live?

20   A.    He lives in Lubbock, Texas.

21   Q.    And is he attending college there?

22   A.    Yes.

23   Q.    What about your immediate family -- let's talk first

24   about your parents.

25   A.    Okay.

1        Q.    Where do your parents live?

2        A.    My dad lives in New Mexico and my mom lives in

3   Granbury.

4        Q.    And being that they live in two different places,

5   does that mean that they are no longer married?

6        A.    Yes.

7        Q.    When did they get divorced?

8        A.    When I was two.

9        Q.    Where were y'all living when they got divorced?

10       A.    In New Mexico.

11       Q.    So you are two years old and they decide to get a

12   divorce.   Where did you go?

13       A.    We moved back to Texas.

14       Q.    When you say "we," who are you referring to?

15       A.    My mom and my brother and I.

16       Q.    And so then your dad stayed in New Mexico?

17       A.    Yes.

18       Q.    Since moving away from your dad when you were two

19   years old and leaving New Mexico, did you see him often growing

20   up?

21       A.    No.

22       Q.    Did you have much of relationship with your father

23   growing up?

24       A.    No.

25       Q.    So you moved back to Texas.   And it's you, your mom,

1    and you said your brother, right?

2        A.    Right.

3        Q.    What is your brother's name?

4        A.    Cutter Thompson.  He is 43.

5        Q.    So older than you?

6        A.    Yes.

7        Q.    Okay.  Once you and Cutter and your mom -- and to be

8    clear, what is your mother's name?

9        A.    Candiss.

10       Q.    Once you and your brother and your mom moved back to

11   Texas, where did you guys mostly live?

12       A.    In Stephenville.  Well, growing up.  And then other

13   places.

14       Q.    Were those places in the Dallas/Fort Worth area?

15       A.    Yes.

16       Q.    Or somewhere else?

17       A.    Dallas/Fort Worth.

18       Q.    Growing up with a single mom, was she gone a lot,

19   working?

20       A.    She was.

21       Q.    And as a result, did you have anyone else in your

22   life that often and very much stepped in as sort of your parent

23   role?

24       A.    Yes, my grandparents both took the father role on

25   together.

```
 1        Q.    And what were your grandparents' names?

 2        A.    Pal and Myrna Thompson.

 3        Q.    Are they still living?

 4        A.    No, they are not.

 5        Q.    And when did they pass?

 6        A.    My grandpa passed in 2012 and my grandmother passed

 7   in 2015.

 8        Q.    Up until -- growing up, you said that your

 9   grandmother and grandfather took the role of the father in your

10   life?

11        A.    Yes.

12        Q.    So what was your relationship like with them?

13        A.    We had a very close relationship.  We would go to

14   them and spend summers, and they helped my mom financially

15   where she couldn't help.  She was a single mom working, so.

16        Q.    And you said they filled sort of a father role; what

17   do you consider a father role?

18        A.    They --

19        Q.    Were they the disciplinarian?

20        A.    -- they were a lot of the disciplinarian, yes.

21        Q.    So they were the ones that set the rules of your

22   life, kind of?

23        A.    Basically, yes.

24        Q.    Okay.  And then you also said that they served the

25   role of financially supporting?
```

1     A.    Right.

2     Q.    Were they pretty strict with their rules?

3     A.    They were.

4     Q.    And what kinds of things were they strict about?

5     A.    We just had different things that we had to do in

6  order to have the things that they offered.

7     Q.    Can you give me an example?

8     A.    So when I got my car when I turned 16, I was required

9  to go to church on Sundays with them, which required me to

10  drive about an hour to them every Sunday.

11    Q.    What would happen if you did not drive the hour to

12  them on Sunday and go to church?

13    A.    I would lose my car.

14    Q.    So is it fair to say they used finances to sort of

15  control you guys?

16    A.    Yes.

17    Q.    And were they pretty quick to pull that financial

18  support if they didn't like what you were doing?

19    A.    Yes.

20    Q.    Would you say that they were pretty authoritative

21  figures then?

22    A.    Very much so.

23    Q.    Between the two of them, who was the lead on the

24  authoritative side?

25    A.    My grandmother.

1     Q.    And that is Myrna Thompson, correct?

2     A.    Myrna (enunciating).

3     Q.    But despite this relationship and the controlling,

4     you felt very close with them, right?

5     A.    Yes.

6     Q.    Okay.  At some point did your grandparents start a

7     family business?

8     A.    They did.

9     Q.    And where did they start that business?

10     A.    At -- it was in Godley, Texas.

11     Q.    And where -- for those of us that aren't familiar

12     with the Dallas/Fort Worth area, can you kind of tell us where

13     Godley is?

14     A.    It is west of Fort Worth.

15     Q.    Okay.  What was the name of that company?

16     A.    Pal-Con, Ltd.

17     Q.    And what did Pal-Con do?

18     A.    We rebuilt and refurbished regenerators for natural

19     gas plants, and rebuilt our own Pal-Tex regenerator.

20     Q.    About how old were you, or where were you in school

21     when they started Pal-Con?

22     A.    I believe I was probably 13, 14.

23     Q.    So teenage years?

24     A.    Teenage years.

25     Q.    Was the business successful pretty quickly?

1      A.    Yes.

2      Q.    And did that result in more financial wealth for your

3   grandparents?

4      A.    Yes.

5      Q.    And did that somehow play a role into your

6   relationship with then -- with them moving forward?

7      A.    It did.  A little.

8      Q.    How so?

9      A.    We were just able to have, I guess, nice cars and

10  things like that.

11     Q.    So when you talked about them buying your first car

12  when you were 16, that was after the business had started?

13     A.    Right.

14     Q.    Okay.  I want to talk about -- since we're at the

15  high school stage now, where did you go to high school?

16     A.    I went to Springtown High School for a while.  And

17  then I graduated from Tolar High School.

18     Q.    And what type of student were you in high school?

19     A.    I was A/B honor roll.

20     Q.    So you'd say a pretty good student?

21     A.    Pretty good.

22     Q.    Did you enjoy school?

23     A.    I did.

24     Q.    What about friends, did you have a lot of friends in

25  school?

1      A.    I did.  I had a lot of friends.

2      Q.    Did you play sports?

3      A.    I did.

4      Q.    What did you they?

5      A.    I did volleyball, basketball, track and cheerleading.

6      Q.    So it's fair to say you were pretty athletic?

7      A.    Yes.

8      Q.    And pretty active?

9      A.    Yes.

10     Q.    Can you describe to the jury kind of what you looked

11     like physically, like your height, your weight, your body type?

12     A.    I was -- I was about the same height now, 5'2", 5'3",

13     145, 155.

14     Q.    So an active and athletic teenage girl?

15     A.    Yes.

16     Q.    Okay.  I'd like to show you Government's Exhibit 109.

17     It's a photo of you in high school.  Have you seen that photo

18     before?

19     A.    Where is it?

20     Q.    Can you turn to Exhibit 109, please?  Have you seen

21     this exhibit before?

22     A.    I -- just this page right here?

23     Q.    Is there a photo?

24     A.    There is not a photo.

25     Q.    Okay.  Did you provide -- did you provide the

1  government with a photo of you from when you were in high

2  school?

3       A.    I did.

4       Q.    And have you seen that photo before?

5       A.    Yes.

6       Q.    And when was that photo taken?

7       A.    My senior year, 2000.

8       Q.    And what were you wearing in that photo?

9       A.    I was wearing red pants with a black top.

10      Q.    Did that fairly and accurately represent how you

11  looked on that day?

12      A.    Yes.

13      Q.    Okay.  During this time in high school, did you start

14  to struggle a little bit with body image or how you looked?

15      A.    Yes.

16      Q.    What were you struggling with?

17      A.    Just my weight in general.  I was bigger than

18  everybody else.

19      Q.    And is that what people told you or how you felt?

20      A.    That is how I felt.

21      Q.    How did that affect you in high school?

22      A.    Made me self-conscious of myself, my body image.

23      Q.    And are those things, your insecurities, you'd share

24  with friends or your family?

25      A.    I would.

1    Q.    Who would you share them with?

2    A.    I -- well, my family; my mom, my grandmother.

3    Q.    Okay.

4    A.    Not really my friends.  Maybe I did, I don't know.

5    But it was just a known thing that I was self-conscious

6    and worried about my weight.

7    Q.    Okay.  And you said you shared your insecurity and

8    struggle with it with your mom and grandmother, right?

9    A.    Uh-huh, yes.

10   Q.    What did your grandmother say at the time about your

11   weight?

12   A.    My grandmother was, I feel like, more honest with me

13   about my weight.  More -- or I felt it.  If I was getting a

14   little heavier, then she would let me know.  If I was

15   overeating, or if she noticed that I was getting more chunky,

16   she would tell me.  My mother would be the one that would say

17   that I looked fine, so.

18   Q.    How did your grandmother pointing out that you were

19   overeating or were becoming chunky make you feel?

20   A.    Her -- I -- I agreed with her.  I agreed with her.

21   So it -- but it did make me feel a little insecure.

22   Q.    Okay.  And as a result of this weight struggle, did

23   you and your grandmother do anything about it?

24   A.    We did.  We would go to diet doctors.

25   Q.    And who would take you to a diet doctor?

1     A.    We would go all together.  It would be like an office

2  thing with the women.  We would all go and try to lose weight.

3     Q.    And this was when you were in high school?

4     A.    Yes.

5     Q.    Okay.  So you are teenager in high school and your

6  grandma's telling you you are overweight, and so she's taking

7  you to a diet doctor?

8     A.    Right.

9     Q.    Okay.  What did the doctor do or say when you went to

10  him?

11     A.    I was technically overweight because of my height.

12  And so I just -- we got on a -- a fat-loss pill and a -- and

13  some fat trappers.

14     Q.    Okay.  So the doctor prescribed you fat-loss pills

15  when you were a teenager, right?

16     A.    Yes.

17     Q.    Okay.  And did those fat-loss pills help you lose

18  weight?

19     A.    No, not really.

20     Q.    Did they make you feel any kind of way?

21          MR. SELLERS:  Object to relevance, Your Honor.

22          THE COURT:  Overruled.

23     A.    Repeat the question?

24     Q.    No problem.  Did those pills make you physically feel

25  any kind of way?

1    A.    Like I was losing weight, maybe, at first.  But I
2    was -- it didn't really work.
3    Q.    Okay.  So there was no loss of appetite or --
4    A.    It did decrease my appetite, yes.
5                THE COURT:  Pause you for just a moment.  You
6    are doing a really good job.
7                (Court instruction.)
8    Q.    So you were saying that the pills didn't work, but
9    they did suppress your appetite?
10   A.    Yes.
11   Q.    Or at least make you feel that way?
12   A.    Yes.
13   Q.    What year did you graduate from high school?
14   A.    2000.
15   Q.    What did you do after high school?
16   A.    I went to college at Texas Tech.
17   Q.    Did you go that summer or did you start from the
18   fall?
19   A.    I went in the summer, right after school.
20   Q.    How were you grades that first summer?
21   A.    I made a 4.0.
22   Q.    So you continued to be a good student?
23   A.    Yes.
24   Q.    What about that first semester in the fall, how were
25   your grades then?

1     A.    They were decent, but not great.

2     Q.    Okay.

3     A.    Yeah.

4     Q.    Who at the time was paying for your college?

5     A.    My grandparents.

6     Q.    What about your sophomore year, what happened with

7 your grades?

8     A.    They did -- they were not well.  They did not -- I

9 did not do well that year.

10    Q.    Okay.  What would you say, like 2.2 --

11    A.    2.0.

12    Q.    Okay.  And so that wasn't normal for you, right?

13    A.    Right.

14    Q.    But you weren't failing out?

15    A.    Right.

16    Q.    Did something happen your sophomore year that made

17 you have to leave Texas Tech and go home?

18    A.    Yes.

19    Q.    What happened?

20    A.    I -- my grandpa called me one day in the parking lot

21 and said, it's time to go home, Babe.  He had the horse trailer

22 and everything ready to go.  I didn't even have time to think

23 about it.

24    Q.    And what was your understanding of why you were going

25 home that day?

1    A.    Because I was not doing well in school, so there was

2    no reason for me to be there.

3    Q.    And did you have any advance notice of this?

4    A.    I did not.

5    Q.    And were you able to protest or talk back and

6    convince them to let you stay?

7    A.    No.

8    Q.    Was that ever a thing you could do with your -- when

9    your grandparents gave you a direction?

10    A.    No.

11    Q.    So what happened?

12    A.    So I moved back home and started working for them.

13    Q.    Okay.  And so they pull you out of school because you

14    have a 2.0, which is not good enough for them, right?

15    A.    Right.

16    Q.    What did you do when you got home and worked for

17    them?

18    A.    I was -- I took night classes.

19    Q.    Okay.  So in addition to working for your family

20    company, you are also taking night classes?

21    A.    You asked if -- what I was doing for their company?

22    Q.    Yes.

23    A.    I was doing office work.

24    Q.    And you mentioned that you were also going to school?

25    A.    Yes.

1 Q. Where were you going to school?

2 A. Weatherford College.

3 Q. And when you were at Weatherford College, how was

4 your grades?

5 A. Pretty good.

6 Q. So they got better?

7 A. They got better.

8 Q. Were they happy about that?

9 A. Yes.

10 Q. Where were you living at the time?

11 A. In Granbury, at my mom's house.

12 Q. Was Cutter there?

13 A. No.

14 Q. Where was Cutter?

15 A. I -- he was in the military, I believe.

16 Q. Okay.  So Cutter had enlisted into the military?

17 A. Yes.

18 Q. Was that a choice he made?

19 A. Yes.

20 Q. Why did he decide to go, if you know?

21 A. I'm not 100 percent sure.

22 Q. Okay.  But Cutter's out of Granbury at the time?

23 A. Yes.

24 Q. How did it feel for you having to come back to your

25 small town after not finishing college at Tech?

```
 1        A.    It didn't feel good, but I -- it was okay.

 2        Q.    While you were back home and working, did you end up

 3   dating and falling in love with a man?

 4        A.    I did.

 5        Q.    And what is that man's name?

 6        A.    Kent.

 7        Q.    Last name?

 8        A.    Barnes.

 9        Q.    How did you meet Kent Barnes?

10        A.    Through a mutual friend.

11        Q.    And about when did you and Kent Barnes start dating?

12        A.    2003 -- 2002, I'm sorry.

13        Q.    Okay.  So early 2000s?

14        A.    Yes.

15        Q.    And at some point in your relationship, did you and

16   Kent end up getting pregnant?

17        A.    Yes.

18        Q.    And when about was that?

19        A.    August, September of -- I had him in May of 2003.

20        Q.    Okay.  So you had a son that was born in May of 2003?

21        A.    Yes.

22        Q.    When you and Kent found out you were pregnant, were

23   you excited?

24        A.    Yes.

25        Q.    Was Ken excited?
```

1      A.    Well, I -- I take that back.  I was scared to death.
2  I was young.  No, he was not excited.
3      Q.    Okay.  Because how old would you have been at the
4  time?
5      A.    I was 20 and he was 22.
6      Q.    Okay.  Was Kent -- did he have his own place or was
7  he living with family as well?
8      A.    He had his own place.
9      Q.    Okay.  But you are still living with family, right?
10      A.    Right.
11      Q.    Were you guys married at the time?
12      A.    No.
13      Q.    So once your family finds out that you and Kent are
14  pregnant, were they supportive?
15      A.    No.
16      Q.    Why not?
17      A.    We weren't married.  We were young.  They didn't
18  think we should have a baby.
19      Q.    Okay.  So is this something that didn't -- wasn't
20  allowed to happen in the Thompson family?
21      A.    Right.
22      Q.    Okay.  And who made that most known to you?
23      A.    His parents.
24      Q.    Okay.  So Kent's family was not supportive?
25      A.    Right, yes.

1      Q.    Okay.  But was your family?

2      A.    Yes, they were very supportive.

3      Q.    Okay.  So maybe I misspoke.  So Kent's family is not

4  supportive, right?

5      A.    Right.

6      Q.    And that was because you guys were young, not

7  married?

8      A.    Right.

9      Q.    Your family, the Thompson family, was supportive?

10      A.    Yes.

11      Q.    Okay.  How did your family react to Kent's family not

12  being on board?

13      A.    They -- they weren't very happy with it.

14      Q.    Did they express their disappointment in it?

15      A.    Yes.  They were hoping that we would have gotten

16  married and had a baby together as a married couple.

17      Q.    Okay.  And did you -- did Grandma do or say anything

18  about the fact that she didn't like -- that Kent's family

19  wasn't supportive?

20      A.    Right, yes.  I was not supposed to put him on the

21  birth certificate.

22      Q.    So when Cade was born in 2003, at that time your

23  grandmother told you not to put Kent on the birth certificate

24  as the father, right?

25      A.    Yes.

1    Q.    But he was the father?

2    A.    Right.

3    Q.    So what did you do?

4    A.    I did not put him on the birth certificate.

5    Q.    Why not?

6    A.    I was told not to.

7    Q.    And again, was your grandmother someone you pushed

8    back on?

9    A.    No.

10   Q.    Okay.  Did she also provide you financial support --

11   A.    Yes.

12   Q.    -- at the time for the baby?

13   A.    Yes.

14   Q.    And so was it even more important then to do what she

15   said?

16   A.    Yes.

17   Q.    Okay.  So when Cade was born in 2003, how old were

18   you?

19   A.    21.

20   Q.    Was Kent involved with Cade's life when he was born?

21   A.    Eventually.

22   Q.    And would you say that Kent's a good dad?

23   A.    Yes.

24   Q.    Could you guys co-parent well?

25   A.    We did.

1    Q.    Did you guys ever get back together?

2    A.    No.

3    Q.    From your perspective, why not?

4    A.    He got into a relationship and got married.

5    Q.    Did you want to get back together?

6    A.    I always wanted to have a family, yes.

7    Q.    But did you want to get back with Kent?

8    A.    Yes.

9    Q.    Okay.  So you still loved him?

10    A.    Right.

11    Q.    Right.  After you have Cade, how quickly did y'all's

12 relationship kind of end?

13    A.    Pretty quickly on.  He -- he did not approve of my

14 grandmother.  He didn't like her.

15    Q.    Okay.  And so was Cade still a baby --

16    A.    Yes.

17    Q.    -- when you guys broke up?

18    A.    Yes.

19    Q.    Okay.  So within the first year of Cade being born?

20    A.    Yes.

21    Q.    How did you handle that breakup?  You're a new mom,

22 and the person you thought you wanted to marry is now breaking

23 up with you; how did you handle that?

24    A.    It was depressing.  It was sad.

25    Q.    And how did you sort of cope with that sadness and

 1    depression?

 2         A.   I -- is there --

 3         Q.   Did you just go about life as normal?

 4         A.   I did.  I -- yeah, I had to.

 5         Q.   Okay.  At any point did that breakup and being

 6    postpartum play into how you felt about your body physically?

 7         A.   Yes.

 8         Q.   What --

 9         A.   I -- I thought that it was because of my body image

10    at the time.  I had a hard time losing the baby weight, and so

11    I thought maybe it was because I was fat, is why that didn't

12    work out.

13         Q.   Okay.  And I think you said, the last part, so you

14    thought that Kent broke up with you because you were fat and

15    you hadn't lost the baby weight?

16         A.   Right.

17         Q.   And so how did that affect you?

18         A.   It made me want to lose the baby weight.  It was

19    really hard to hear.  I had postpartum depression pretty bad

20    after that.

21         Q.   Okay.  Did you develop any kind of eating disorder as

22    a result?

23         A.   I did.  I started acting in bulimia and restricting.

24         Q.   And this was happening throughout 2004, right?

25         A.   Yes.

1    Q.    Okay.  Despite the fact that you were dealing with

2  postpartum depression and now an eating disorder, were you

3  still taking care of Cade?

4    A.    Yes.

5    Q.    And were you mostly his full-time caregiver?

6    A.    Yes.

7    Q.    Were you also working at the time?

8    A.    Yes, I was.

9    Q.    Where were you working?

10    A.    At Pal-Con, at our grandparents' place.

11    Q.    Is that full-time, part-time?

12    A.    It was full-time.

13    Q.    What were you doing for them?

14    A.    I did their accounts payable and receivable and

15  payroll.

16    Q.    Where were you living, or you and Cade?

17    A.    We -- my grandparents bought us a house in Granbury.

18    Q.    And so your grandparents bought you the house for you

19  and the baby, but you were responsible for paying your bills?

20    A.    Yes.

21    Q.    And did you manage to do that?

22    A.    Yes.

23    Q.    Were you also in school at the time?

24    A.    Yes.

25    Q.    How -- were you still going to Weatherford?

1        A.    I was doing night classes.

2        Q.    About how many hours?

3        A.    During that time, it was like one class, three hours.

4        Q.    Okay.  So part-time?

5        A.    Uh-huh, yes.

6        Q.    Were you a good student then?

7        A.    Yes.

8        Q.    Were you successful in losing any of the weight when

9    you were battling the eating disorder and depression?

10       A.    Somewhat.

11       Q.    Okay.  Around this same time in 2004, did you happen

12   to run into an old friend from high school?

13       A.    I did.

14       Q.    And when you ran into that friend, did you share with

15   them your frustration and your weight loss struggles?

16       A.    Yes.

17       Q.    What kinds of things did you tell them?

18       A.    I just wanted to lose weight.  I think we were going

19   on a cruise, and I just wanted to be skinny for it at the time.

20       Q.    Okay.  And during that conversation, was there any

21   mention of any kind of drugs?

22       A.    Yes.  He had mentioned that he -- he had a friend

23   that could bring me some drugs that could do it.

24       Q.    When you say "that could do it," that could bring you

25   drugs?

```
 1        A.    That would make me lose weight.
 2        Q.    Okay.  Is this something you asked this friend for,
 3   for drugs?
 4        A.    No.
 5        Q.    But it's something they brought?
 6        A.    Yes.
 7        Q.    Had you ever done any drugs before?
 8        A.    No.
 9        Q.    Had you ever wanted to do drugs before?
10        A.    No.
11        Q.    How did you feel about when he brought that up?
12        A.    I thought it was a crazy idea.
13        Q.    And did you see that friend soon after that
14   conversation?
15        A.    I did.
16        Q.    Where did you guys see each other again?
17        A.    He came over to my house.
18        Q.    Did he bring anything with him?
19        A.    He did.
20        Q.    What did he bring?
21        A.    Meth.
22        Q.    Did you ask him to bring it?
23        A.    I did not.  No, I did not.
24              THE COURT:  Pause you for a moment.  When you
25   can reach a natural break here in the next minute or two,
```

1    couple of minutes, let me know, we'll break for lunch.

2                    MS. RUDOFF:  We can break here, Judge.

3                    (Court instruction to jurors.)

4                    (Jurors exit courtroom.)

5                    (End of morning session.)

```
 1                  I, BROOKE N. BARR, United States Court Reporter

 2   for the United States District Court in and for the Northern

 3   District of Texas, Dallas Division, hereby certify that the

 4   above and foregoing contains a true and correct transcription

 5   of all proceedings in the above-styled and -numbered cause.

 6

 7                  WITNESS MY OFFICIAL HAND this the 26th day of

 8   July, 2023.

 9

10

11                            /S/ BROOKE N. BARR
                              BROOKE N. BARR, CSR NO. 6521
12                            CSR Expiration Date:  7/31/24
                              United States Court Reporter
13                            1100 Commerce Street
                              Room 1376
14                            Dallas, Texas 75252
                              (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25
```