1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF TEXAS

3                     DALLAS DIVISION

4
    UNITED STATES OF AMERICA,      )      3:21-CR-236-E
5              Government,         )
                                   )
6                                  )
    VS.                            )      DALLAS, TEXAS
7                                  )
                                   )
8   WILLIAM ROY STONE, JR.,        )
    JOSEPH EVENTINO DELEON,        )
9              Defendants.         )      July 26, 2023

10

11          TRANSCRIPT OF JURY TRIAL, VOLUME 2B

12          BEFORE THE HONORABLE ADA E. BROWN

13             UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:          MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664



```
1                                 MR. MARCUS J. BUSCH
                                  UNITED STATES DEPARTMENT OF JUSTICE
2                                 NORTHERN DISTRICT OF TEXAS
                                  U.S. Courthouse, Third Floor
3                                 1100 Commerce Street
                                  Dallas, Texas  75242
4                                 marcus.busch@usdoj.gov
                                  (214) 659-8642
5

6   FOR THE DEFENDANT,            MR. GREGG GALLIAN
    WILLIAM ROY STONE, JR.:       Gallian Firm
7                                 Parkside Tower
                                  3500 Maple Avenue
8                                 Suite 720
                                  Dallas, Texas  75219
9                                 gregg@GallianDefenseFirm.com
                                  (214) 432-8860
10

11                                MS. JACLYN ANNETTE GALLIAN
                                  Bryan Cave Leighton Paisner
12                                2200 Ross Avenue
                                  Suite 4200
13                                Dallas, Texas  75201
                                  jaclyn.gallian@bclplaw.com
14                                (214) 721-8058

15

16  FOR THE DEFENDANT,            MR. GREG WESTFALL
    JOSEPH EVENTINO DELEON:       Westfall Sellers
17                                1701 River Run
                                  Suite 801
18                                Fort Worth, Texas  76107
                                  greg@westfallsellers.com
19                                (817) 928-4222

20                                MR. FRANK SELLERS
                                  Westfall Sellers
21                                1701 River Run
                                  Suite 801
22                                Fort Worth, Texas  76107
                                  frank@westfallsellers.com
23                                (817) 928-4222

24

25
```

Todd Anderson, RMR, CRR        (214) 753-2170



1   COURT REPORTER:                    MR.  TODD  ANDERSON,  RMR,  CRR
                                      United States Court Reporter
2                                     1100 Commerce St., Rm. 1625
                                      Dallas, Texas  75242
3                                     (214) 753-2170

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25

1          JURY TRIAL VOLUME 2B - JULY 26, 2023

2                    P R O C E E D I N G S

3          THE COURT:  Please be seated.

4          Outside the presence of the jury panel, the Court

5   wants to wrap up the sub rosa hearing we had regarding Jencks

6   materials.  And so the Court has Court's Exhibit 1.  I have

7   reviewed it over lunch.  I also reviewed what the Court

8   believes applicable binding case law.

9          The case before the Court is United States of America

10  versus Newton, N-E-W-T-O-N, Wilkerson Anderson.  The citation

11  is 574 F.2d 1347, a Fifth Circuit case from June 15, 1978.

12  Shepardized this case, and it appears to still be good binding

13  law.

14          And I will call your attention to page 5,

15  subsection (a), and I will just read a -- on appeal initially

16  Anderson contends that the Government did not timely disclose

17  the information in Rose's grand jury testimony, which suggested

18  that Frank -- that the Defendant may have been an unindicted

19  co-conspirator involved or implicated in the theft of two

20  Cadillac automobiles.  I'm jumping a little bit.

21          Simpson and Rose were both called as witnesses on the

22  second day of the trial.  The Government complied with the

23  agreement to provide Jencks, J-E-N-C-K-S, Jencks Act material

24  for any given witness at the conclusion of the proceedings on

25  the day before a particular witness was to be called and

1    provided defense counsel with Rose's grand jury testimony.

2              Thus -- skipping, thus the Government complied with

3    the discovery agreement and the Jencks Act.  And the last part

4    I'll read into the record:  We need not decide whether the

5    Rhodes grand jury testimony was required to be disclosed under

6    the Brady doctrine.  Even assuming for the sake of argument

7    that the Rose grand jury testimony suggesting Simpson's

8    complicity in the theft of the two leased Cadillacs was Brady

9    material, it was nonetheless timely provided to defense

10   counsel.

11             It was timely provided for Jencks Act purposes.  And

12   when alleged Brady material is contained in Jencks Act

13   material, disclosures -- disclosure is generally timely if the

14   Government complies with the Jencks Act.

15             And so in conclusion, skipping over the string cites,

16   since the Government timely complied with the disclosure

17   requirements of the discovery agreement, the Jencks Act and the

18   Brady doctrine, we cannot accept Anderson's argument that the

19   district court abused its discretion in denying the defense

20   motion to dismiss the indictment.

21             And I'm sorry, I should have talked about the

22   procedural posture at the front.

23             Based on this Court's review of Court's Exhibit

24   Number 1 and review of the applicable scheduling order, it does

25   appear that the agreement between the parties was that Jencks

 1     Act material would be provided the night before.

 2              So Defense counsel --

 3              And, Government, I will allow you an opportunity to

 4     respond.

 5              But have you anything further to add, defense

 6     counsel, or any contrary authority that you need to call the

 7     Court's attention to?

 8              MR. GALLIAN:  Your Honor, may I?

 9              THE COURT:  Of course, please.

10              MR. GALLIAN:  Trial is an interesting animal.  It's

11     amazing how quickly we can all turn into children on the

12     playground yelling at one another.  And I'm more guilty than

13     anybody at times.

14              I think that we have reviewed the relevant case law.

15     I think that there is a jump cite there where it talks about

16     how the reasonable, prudent prosecutor should act.

17              It's surprising that a case from 1978 is still good

18     and binding law.  But based on that, I do believe that the

19     information was Brady.  I do believe that it's exculpatory in

20     nature; however, at this point I'm withdrawing an allegation

21     that it was a Brady violation.

22              I told the prosecutors I would review it and do that

23     on the record so we're all very clear of that.  And I think

24     that's all I have to say at this point.

25              THE COURT:  Okay.  Sounds good.  Well, I have said

1    off the record and I think if you spank someone public, you

2    apologize in public.  I came off half-cocked, and I apologize

3    for that.  The law has been complied with.  And I got the

4    switch out and switched the Government's tail in public, so I

5    apologize to them in public.

6            The law is on their side, and I got it wrong.  So now

7    I got it right.

8            So with that being said, I appreciate the grace, and

9    we're all doing the best we can.  So I appreciate you guys.

10           Please don't hesitate, all of you, to call anything

11   to my attention that you need, and I will try to do a better

12   job of listening to all sides of the story before I get the

13   switch out.

14           And that being said, anything further from any of the

15   parties?

16           MR. WESTFALL:  No, Your Honor.

17           MR. SELLERS:  I do have one thing, Your Honor.

18   Sorry, Greg.

19           In the exhibit that the Court has before it, there's

20   a mention of a summary PowerPoint that I guess was an

21   attachment or referenced somewhere.  I haven't seen a summary

22   PowerPoint provided.  So if we could ask for that.  It was

23   referenced in the e-mail.

24           THE COURT:  Let me see.  Is that something you have,

25   Government?

1          MR. BUSCH:  Judge, we will put it up.

2          THE COURT:  Okay.  All right.  And I do want to talk

3     before -- the jury is ready to come in, they're chomping at the

4     bit -- let's try not to have speaking objections, please.

5          And what else was I going to bring up, Taylor?  I

6     think that's it.  Okay.

7          Oh, and if you're going to object, this is -- this is

8     for you, Mr. DeLeon's counsel.  My court reporter is having a

9     hard time hearing you from -- I know you have to move.  Oh,

10    gotcha.  You got your mic on.  We should be good.

11         Okay.  Anything, Government, that I need to take up?

12         MS. RUDOFF:  Not right now, Judge.

13         THE COURT:  Okay.  Anything else, Mr. Stone?

14         MR. GALLIAN:  No, Your Honor.  Thank you.

15         THE COURT:  Sure.  Absolutely.  Mr. DeLeon?

16         MR. SELLERS:  No, Your Honor.

17         THE COURT:  Mr. Stone, Mr. DeLeon, understand

18    everything happening?  Okay.

19         DEFENDANT STONE:  Yes, ma'am.

20         THE COURT:  All right.  You too?

21         DEFENDANT DELEON:  Yes, ma'am.

22         THE COURT:  Great.  If you-all need anything, please

23    let me know.  I think your lawyers are doing fine jobs, both of

24    them.

25         Okay.  Fantastic.  Let's bring them in.

```
 1              If everybody will check their phones, make sure you
 2    have got them on silent.  I will do mine first.  Okay.
 3              (Pause)
 4              SECURITY OFFICER:  All rise.
 5              (Jury in)
 6              THE COURT:  All right.  Everyone, please be seated.
 7              And so members of the jury, I worked during lunch and
 8    didn't get a chance to eat, so it's bad form, but you will see
 9    me eating a little Lean Cuisine while I'm up here.  I'll try
10    not to smack.
11              Anything anybody needs before we jump in?
12              Okay.  I'll be asking you maybe every hour if you
13    need a break.  But if you need one before then, if you will
14    flag me or flag him up here.
15              We will plan to take a 3:00 recess.  We'll take a
16    3:00 break for about a half and hour.  Other than that, we will
17    take it from there.
18              With that said, ma'am, come on back down, please.
19              How was your lunch?
20              THE WITNESS:  It was good.
21              THE COURT:  Good.
22              MS. RUDOFF:  Judge, are you okay if the witness has
23    water at the stand?
24              THE COURT:  Oh, sure.  Absolutely.  Absolutely.  And
25    this is my courtroom, so if somebody needs -- I don't know
```

1    about anybody else, but I've got to have caffeine.  So if

2    anybody else needs caffeine, that's all right.

3                MR. WESTFALL:  Your Honor?

4                THE COURT:  Yes, sir.

5                MR. WESTFALL:  Is there some way we could move the

6    microphone closer to the witness?

7                THE COURT:  Certainly.

8                MR. WESTFALL:  It is hard --

9                THE COURT:  Absolutely.  And I'll tell you what,

10   let's do a sound check.  I appreciate you letting me know that.

11   So let's do a sound check, ma'am.  And if you will just tell us

12   where you're from.

13               THE WITNESS:  Granbury.

14               THE COURT:  Is that better?

15               MR. WESTFALL:  I heard that.

16               THE COURT:  If we need to adapt that, please let me

17   know.

18               You've seen the -- it's kind of a mother-may-I, the

19   lawyers always ask if they can move or approach a witness.

20   Because we've got -- I have a tiny courtroom, it's obviously

21   really important for the lawyers to see everything, and so I

22   have given them permission if they need to move into the

23   audience to do that.  So I don't want anybody thinking they are

24   breaking the rules if they do that without asking.

25               So I'm giving you-all blanket permission to move

```
 1    about as you need to to be able to see the witness and so
 2    forth.  So they're not being rude if that happens.
 3              Okay.  Everybody check your phones.
 4              And with that said, ma'am, your witness.
 5              MS. RUDOFF:  Thank you, Your Honor.
 6              THE COURT:  Thank you.
 7         CASI THOMPSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 8                    DIRECT EXAMINATION CONTINUED
 9    BY MS. RUDOFF:
10    Q.   Casi, before we took a break, we were talking about when
11    you ran into a high school friend.  And I believe it was 2004
12    you said; is that correct?
13    A.   Yes.
14    Q.   Okay.  And that high school friend ultimately came to your
15    house and brought meth with him, correct?
16    A.   Yes.
17    Q.   Okay.  Just reminding everybody where we're at.
18              So going from there, you did not ask this individual
19    to bring meth to you, correct?
20    A.   Correct.
21    Q.   Okay.  When you realized that you did -- that he did, how
22    did you feel about it?
23    A.   I was unsure about it.  It made me feel a little
24    uncomfortable.
25    Q.   Why did it make you feel uncomfortable?
```

```
 1    A.    Because I wasn't ever around drugs before.

 2    Q.    Anything else about it make you uncomfortable?

 3    A.    Just having it there was uncomfortable.

 4    Q.    Did you know other people or hang around other people who

 5    engaged in drug use?

 6    A.    No.

 7    Q.    And to be clear, you yourself had never tried drugs by

 8    this point in time?

 9    A.    Right.

10    Q.    What did you decide to do when he brought you meth?

11    A.    I tried it.

12    Q.    Why did you decide to try it?

13    A.    Because he said it would make me lose weight, and I had

14    known people to use it and they lost weight.  Like I had known

15    of them.

16    Q.    And so for you, this was something that you were hoping

17    would help with your weight loss, right?

18    A.    Yes.

19    Q.    And at the time your weight loss was also affecting your

20    depression too?

21    A.    Yes.

22    Q.    So did you start or did you try meth that day?

23    A.    I did.

24    Q.    In the beginning, how much did you use when it came to

25    methamphetamine?
```

```
 1   A.   It was kind of like a pill.  I would it do in the morning.
 2   Q.   And was that every day?
 3   A.   Yes.
 4   Q.   Why were you doing it?
 5   A.   To lose weight.
 6   Q.   Was it helping?
 7   A.   It did.
 8   Q.   Were you noticing significant weight loss?
 9   A.   Yes, I was.
10   Q.   Did anyone else notice the change in your appearance?
11   A.   I had several people tell me that I looked skinny.
12   Q.   How did that make you feel?
13   A.   Good.
14   Q.   How did that make you feel about continuing to use meth?
15   A.   I -- to be skinny I did it.
16   Q.   When you said several people noticed you looked skinny,
17   who were those people that you remember?
18   A.   My brother was the first person to tell me I looked
19   skinny.
20   Q.   Did that make you feel a little happy?
21   A.   It did.  It made me think wow, it works.
22   Q.   Besides your brother, anyone else in your family notice
23   you were slimming down?
24   A.   Over time.
25   Q.   Who else?
```

```
 1   A.   My grandparents and my mom.

 2   Q.   What did they say?

 3   A.   They asked me what I was doing.

 4   Q.   Did they seem like they were excited that your physical

 5   appearance was changing or worried?

 6   A.   A little worried.

 7   Q.   Okay.  Why do you think they were worried, if you know?

 8   A.   Because I was looking unhealthy.

 9   Q.   You were getting really skinny?

10   A.   Yes.

11   Q.   You understood at the time that using and possessing

12   methamphetamines was illegal, right?

13   A.   Yes.

14   Q.   How did that make you feel knowing you were doing

15   something illegal?

16   A.   Not very good.

17   Q.   Had you ever done anything illegal before?

18   A.   Drug related, no.

19   Q.   Were you worried about the fact you were breaking the law?

20   A.   I -- I didn't really feel like anyone knew I was doing it,

21   but it -- it did affect me a little.

22   Q.   What do you mean by affect you?  I just want the jury to

23   understand how you were feeling at the time.

24   A.   Well, I just obviously didn't want to be doing it, but I

25   started.  I had no idea what I was getting myself into.
```

```
 1   Q.   Were you ashamed that you were using drugs?
 2   A.   Yes.
 3   Q.   Were you embarrassed?
 4   A.   Yes.
 5   Q.   Did anyone know at the time?
 6   A.   No.
 7   Q.   Why were you keeping it a secret?
 8   A.   Because it was wrong.
 9   Q.   How did it make you feel about yourself, the person you
10   were?
11   A.   I didn't feel good about myself.
12   Q.   You said that your family started to notice you were
13   getting maybe unhealthy skinny, right?
14   A.   Yes.
15   Q.   Did they notice anything about -- else at the time about
16   your behavior or any changes they saw?
17   A.   They noticed change in behavior, yes.
18   Q.   What kinds of behavior changes?
19   A.   I didn't leave very often.  I wasn't going to class and --
20   because at this point I was taking full-time college classes.
21   I wasn't going to class.  And --
22   Q.   What about with your son?  Were there changes in your
23   interaction with your son?
24   A.   Well, they were having to watch him more often.
25   Q.   And who's they?
```

```
 1   A.    My grandparents.
 2   Q.    Why were they having to watch him more often?
 3   A.    Because I was not home as often.
 4   Q.    Where were you?
 5   A.    Usually going to get drugs.
 6   Q.    How did that make you feel as a mother?
 7   A.    Terrible.
 8   Q.    At that point in time were you using more meth?
 9   A.    It increased over time.
10   Q.    Did you feel like you could stop?
11   A.    I hadn't really tried at this point.
12   Q.    How did your family respond noticing these changes in
13   behavior?
14   A.    They sent me to rehab.
15   Q.    When you say they, who are you talking about?
16   A.    My grandparents.
17   Q.    How did the whole conversation of rehab come about, do you
18   remember?
19   A.    They had watched a special on TV over a drug addict going
20   to treatment and noticed similarities in my characteristics and
21   confronted me.  And they took my car and said I couldn't get it
22   back unless I went to rehab.
23   Q.    So they again used a financial situation to control you
24   and send you to rehab, right?
25   A.    Yes.
```

```
 1   Q.   How did that make you feel that your grandparents now knew
 2   you were using drugs and sent you to rehab?
 3   A.   Mortified, terrible, embarrassed.
 4   Q.   Did you still at that point see them as, like, parents?
 5   A.   Yes.
 6   Q.   Did that affect your relationship at the time?
 7   A.   They were just wanting me to get better.  They were
 8   hopeful.  And I was grateful.
 9   Q.   And to be fair, this is around 2005?
10   A.   Yes.
11   Q.   Okay.  So about 18 years ago?
12   A.   Yes.
13   Q.   Okay.  Did your grandparents share with friends, family
14   that you were in rehab?
15   A.   They told people that I was at an eating disorder clinic.
16   Q.   And were you at an eating disorder clinic?
17   A.   No.
18   Q.   Do you know why you or your grandparents lied about where
19   you were?
20   A.   Because of our family name.
21   Q.   Explain that to the jury.
22   A.   It -- they would be embarrassed for other people to know
23   that I was using drugs.
24   Q.   So it's essentially your grandparents were embarrassed of
25   you at that point in your life, right?
```

1   A.   It was just unheard of for anyone in our family to do that
2   at the time.
3   Q.   The first time in rehab, and this is around 2005, how long
4   did you stay?
5   A.   45 days.
6   Q.   Was that long enough?
7   A.   At the time I thought so.
8   Q.   And because you thought so, what did you do after 45 days?
9   A.   I came home.
10  Q.   What happened when you came home?
11  A.   I relapsed.
12  Q.   Was it pretty quickly, or did you stay sober for a little
13  bit of time?
14  A.   It was fairly quickly.
15  Q.   How did your family react to that?
16  A.   They went and picked up my -- they got a temporary custody
17  order on my son.
18  Q.   Okay.  So let's talk about that.
19       You're home from rehab.  You quickly relapse.  So
20  does that mean Cade is in your custody at the time?
21  A.   He was.
22  Q.   Okay.  And so -- but you are still using drugs, right?
23  A.   Yes.
24  Q.   How did you find out that your family had filed and
25  received a temporary restraining order against you for your

```
 1   son?
 2   A.    I went to pick him up from daycare and they had a
 3   restraining order for me.
 4   Q.    Who is they?
 5   A.    The daycare supervisor.
 6   Q.    So you walk into daycare to pick up your son, and they
 7   tell you, here is a piece of paper and it is a restraining
 8   order?
 9   A.    Yes.  And they said I wasn't allowed to come back up
10   there.  And my mom had my son, and she told me what happened
11   with the temporary custody order.
12   Q.    Did you have any advance notice that that was going to
13   happen?
14   A.    No.
15   Q.    So when you took your son to daycare that morning, you
16   expected to see him in the afternoon, right?
17   A.    Yes.
18   Q.    How did that feel?
19   A.    That was worst feeling in my life.
20   Q.    Why?
21   A.    Because he was the one thing that I thought maybe they
22   couldn't take from me.
23   Q.    Did you come to understand why your mom did that to you?
24   A.    Yes.
25   Q.    What was your understanding of why your mom did that?
```

```
 1    A.    She said that if she took my son that hopefully then I
 2    would stop.
 3    Q.    Stop using meth?
 4    A.    Stop using meth.
 5    Q.    In addition to taking your son from you, did your family
 6    respond in any way with regards to finances at that time?
 7    A.    I was cut off financially.
 8    Q.    By who?
 9    A.    My grandparents.
10    Q.    What did that mean for you if you were cut off by your
11    grandparents?  Did you have other money, sources of income?
12    A.    At the time I did not.
13    Q.    So how were you able to support yourself?
14    A.    After this moment?
15    Q.    Yes.  So they've taken Cade away, you're cut off
16    financially --
17    A.    Yes.
18    Q.    -- you have to figure out how to live?
19    A.    Right.
20    Q.    What do you do?
21    A.    I sold my house so that I could hire an attorney.
22    Q.    Hire an attorney for what?
23    A.    To get my son back for custody.
24    Q.    So you were in a legal battle now with your family to get
25    your son Cade back, right?
```

```
 1   A.   Yes.
 2   Q.   The money from your house you said you used to hire an
 3   attorney.  Did you use it for anything else?
 4   A.   I then put a year's lease down at a place to live.
 5   Q.   Was it an apartment?
 6   A.   It was an apartment.
 7   Q.   Okay.  What about transportation?  Did they take your car
 8   from you as well?
 9   A.   They did.
10   Q.   Your grandparents did?
11   A.   Yes.
12   Q.   So what did you do about transportation?
13   A.   I bought a car.
14   Q.   Was that also from the money from your house sale?
15   A.   Yes.
16   Q.   Did you then have to get a job as a waitress?
17   A.   Yes.
18   Q.   Were you able to continue school?
19   A.   No.
20   Q.   Why not?
21   A.   I was not funded.  I had no way of doing school.
22   Q.   So you've lost your son, family not talking to you, you're
23   financially completely cut off to the point you have to sell
24   your house and your belongings in order to live?
25   A.   Yes.
```

```
 1   Q.   How did you feel about all of this at the time?
 2   A.   At the time I felt like I was going to try to do it on my
 3   own and be self-supportive and get my son back.
 4   Q.   When you say do it on your own, what are you referring to?
 5   A.   Without the financial help from my grandparents.
 6   Q.   So just to live as a person independently?
 7   A.   Just to live independently.
 8   Q.   Okay.  Were you still using meth, though?
 9   A.   Yes.
10   Q.   How did you cope with all of this turmoil happening at the
11   same time?
12   A.   I -- at that point, when I started using drugs, I used it
13   to numb out my feelings.  The pain from losing my son was too
14   much to handle.
15   Q.   So it led to more meth use, right?
16   A.   Yes.
17   Q.   How did you feel at the time towards your family?  What
18   were your emotions to them?
19   A.   I felt very betrayed, and I was angry.  They not only cut
20   me off financially, they cut me off 100 percent.  They wouldn't
21   talk to me, answer the phone.  I was completely cut off from
22   them.  So I felt alone and angry and betrayed mainly.
23   Q.   And without your family, did you have another support
24   system to turn to at the time?
25   A.   I did not.
```

```
 1   Q.   What about your friends from high school or, like,
 2   Daralyn?
 3   A.   I did not want to involve any of my friends in my chaos.
 4   Q.   Why not?
 5   A.   Because they aren't used to that kind of drama.
 6   Q.   Did they know you were using drugs?
 7   A.   I'm sure, but they -- I never really spoke too much about
 8   it.
 9   Q.   Were you embarrassed at that part of your life?
10   A.   100 percent, yes.
11   Q.   And so did you kind of find other friends?
12   A.   I did.
13   Q.   What kind of friends were those?
14   A.   Friends in the city, Fort Worth area.
15   Q.   How did you know these people?
16   A.   Drugs.
17   Q.   And so --
18   A.   Or work.
19   Q.   Your only -- your only friends at the time started to be
20   other drug users, right?
21   A.   Right.
22   Q.   At some point through these friends did you meet an
23   individual named Charles Tangney?
24   A.   Yes.
25   Q.   Who was Charles?
```

1  A.   He was somebody that I met at an apartment, and I started

2  speaking to him because he had dated a mother -- my cheerleader

3  friend from school, her mom.  They dated, so --

4  Q.   So there was mutual connection?

5  A.   There was a mutual connection.

6  Q.   And how was he introduced to you?  Like, did you know what

7  he did, where he lived?

8  A.   I had another mutual friend introduce him as he was

9  someone good to know.  In case you get in trouble, he can help

10  you.

11  Q.   Go ahead.

12  A.   He just told me that he was someone who would be good to

13  know if -- in case I was to get in trouble.  I wasn't sure at

14  that time exactly what that meant 100 percent, but we connected

15  through that.

16  Q.   Okay.  And did he -- did you come to find out whether or

17  not he ever worked in law enforcement?

18  A.   Yes.

19  Q.   What did you learn about his past?

20  A.   He was a police officer, I believe in Burleson, and he

21  worked with some -- like the drug -- doing -- I'm not sure

22  exactly.  I guess the task force or something for them and then

23  got fired.

24  Q.   Okay.  So at the time you met him, he was not law

25  enforcement, correct?

```
 1   A.   He was not.

 2   Q.   Okay.

 3   A.   He -- yeah.

 4   Q.   Go ahead.

 5   A.   He was a private investigator.

 6   Q.   Was he someone who was also doing drugs?

 7   A.   Yes.

 8   Q.   And did you do drugs with him?

 9   A.   Yes.

10   Q.   And so through that did you guys develop more of a

11   friendship?

12   A.   Yes.

13   Q.   At some point did you become, at least for at the time,

14   pretty good friends with Charles?

15   A.   Yes.

16   Q.   Is it fair to say that you trusted him?

17   A.   I did.

18   Q.   At this point you're using drugs pretty regularly, right?

19   A.   Yes.

20   Q.   And as a result of that drug use, what kind of legal

21   issues were you having?  Was it just the family?

22   A.   Just the family.

23   Q.   Okay.  And you continued to use drugs for another ten

24   years or so, right?

25   A.   Yes.
```

```
 1    Q.   Throughout that timeframe, did you have other legal

 2    issues?

 3    A.   I did.

 4    Q.   I'm going to talk about that in just a second.

 5         Shortly after you met Charles, who's a former police

 6    officer but now using meth with you, right --

 7    A.   Yes.

 8    Q.   -- were you still estranged from your family?

 9    A.   Yes.

10    Q.   Still financially cut off?

11    A.   Yes.

12    Q.   Did Charles introduce you to a person named Joe DeLeon?

13    A.   Yes.

14    Q.   Do you remember about when that was, what year?

15    A.   I would say 2005.  At the end of '05 or beginning of '06.

16    Q.   Okay.  And how did you first come to be introduced to Joe

17    DeLeon?

18    A.   Through Charles.

19    Q.   But where is the first place you met him with Charles?

20    A.   At his burrito restaurant, at Benito's.

21    Q.   When you say his restaurant, who are you referring to?

22    A.   Joe.

23    Q.   Do you recognize the person you know to be Joe DeLeon in

24    the courtroom today?

25    A.   Yes.
```

```
 1   Q.   Can you identify him by an article of clothing and where
 2   he is sitting?
 3   A.   He is sitting to the right of me wearing a red tie.
 4           MS. RUDOFF:  Your Honor, may the record reflect the
 5   witness has identified the Defendant, Joe DeLeon, as being in
 6   the courtroom today?
 7           THE COURT:  It shall so reflect.
 8   BY MS. RUDOFF:
 9   Q.   So you said that the first time you met Joe DeLeon you're
10   with Charles and it was at a restaurant owned by Joe DeLeon,
11   right?
12   A.   Yes.
13   Q.   Besides owning a restaurant, what else did you understand
14   Joe did for a living?
15   A.   I -- he was -- he did work for the Fort Worth Police
16   Department, and he was an interpreter for the FBI.
17   Q.   And who told you that?
18   A.   Joe.
19   Q.   Did Charles confirm it?
20   A.   And Charles confirmed it.
21   Q.   Did you understand at that point that it meant that Joe
22   DeLeon was also law enforcement?
23   A.   Yes.
24   Q.   Did Charles and DeLeon seem to be pretty good friends?
25   A.   Yes.
```

```
 1   Q.   Did the fact that DeLeon worked in law enforcement for
 2   Fort Worth PD as far as you were told, did that make you trust
 3   him more than maybe the average person?
 4   A.   Yes.
 5   Q.   Why?
 6   A.   I respect law enforcement, and I figured that he was safe.
 7   Q.   When you say safe, what do you mean?
 8   A.   Just someone who was honest and would look out for the
 9   peoples' best interest.
10   Q.   Did you have a lot of people like that in your life at the
11   time?
12   A.   No.
13   Q.   After interacting with DeLeon a couple of times when
14   you're with Charles and at the restaurant, at some point did
15   DeLeon reach out to you and invite you to meet without Charles?
16   A.   Yes.
17   Q.   And were you nervous about going to meet with him?
18   A.   I wasn't really nervous to meet with Joe, no.
19   Q.   Okay.  What did you understand the purpose of the meeting
20   was?
21   A.   I was not sure.  He wanted to meet with me, so we met.
22   Q.   Did you feel like it was okay or a safe thing to do?
23   A.   I did.
24   Q.   Why?
25   A.   Because him and Charles were -- Charles knew that I was
```

 1  going to meet him, so I just kind of felt comfortable.

 2  Q.   Okay.

 3  A.   And Charles told me to, so --

 4  Q.   Where did y'all meet the first time when it was just you

 5  and DeLeon?

 6  A.   I want to say we met at an IHOP.

 7  Q.   Where was that?

 8  A.   In Lake Worth.

 9  Q.   Fort Worth area?

10  A.   Fort Worth area.

11  Q.   Do you remember when Joe DeLeon got there what he was

12  dressed like?

13  A.   He was dressed in a suit.

14  Q.   Did that seem odd to you, to meet at an IHOP in a suit?

15  A.   Yes.  It didn't -- well, no, because he always dressed

16  like that, in some sort of jacket when I saw him, or a tie,

17  stuff like that.

18  Q.   Okay.  So he was dressed professionally, and that was

19  normal for you?

20  A.   Right.

21  Q.   Did DeLeon -- when you met with him at that IHOP, did --

22  were you still under the impression that DeLeon worked for Fort

23  Worth PD?

24  A.   Yes.

25  Q.   And that he was law enforcement?

```
 1   A.   Yes.
 2   Q.   Did anything happen at that meeting with Joe DeLeon that
 3   furthered your belief that he was law enforcement?
 4   A.   Yes.  He showed me some form of ID, government -- and it
 5   appears to be a government-issued ID and told me that any time
 6   I ever met with law enforcement I need to ensure that they show
 7   me some form of ID like he did.
 8   Q.   Was that just like a driver's license like everyone has?
 9   A.   No.
10   Q.   What did you -- what impression did you have from that?
11   A.   It appears to be a -- some sort of law enforcement ID of
12   some kind.
13   Q.   And throughout your relationship, were there other things
14   that he would do or say that would make you think he was --
15   confirmed the belief that he was law enforcement?
16   A.   He would always refer to different places that he was
17   going to assist in cases, or he would tell me about his day
18   or -- and it would be -- just -- he seemed pretty busy doing
19   the Fort Worth Police Department stuff in the background of his
20   restaurant.
21   Q.   Okay.  And understanding that he was law enforcement, did
22   that change the way you felt about him?
23   A.   It made me feel -- trust him.
24   Q.   Why did you trust him because you thought he was in law
25   enforcement?
```

```
 1   A.   I just felt like he -- that law enforcement should be
 2   trustworthy.  That is how I was raised to believe.
 3   Q.   And to be clear, you weren't physically scared of Joe
 4   DeLeon when you met him, right?
 5   A.   No.
 6   Q.   There's nothing about his demeanor or his size that made
 7   you uncomfortable?
 8   A.   No.
 9   Q.   But did you believe as law enforcement he did have some
10   kind of authority?
11   A.   He had some -- something.  Authority, pull, or something
12   like that.
13   Q.   And that's because that's how you felt about it, right?
14            MR. SELLERS:  Objection.  Asked and answered, Your
15   Honor.
16            THE COURT:  Overruled.
17   BY MS. RUDOFF:
18   Q.   After that, how would you describe the progression or
19   ongoing of the nature of your relationship with DeLeon soon
20   after your first time meeting him alone?
21   A.   It just went back to when he would -- he and Charles would
22   speak or I would, you know, see him through Charles, which
23   wasn't very often.
24   Q.   So would you call it a casual relationship?
25            MR. SELLERS:  Object to leading, Your Honor.
```

```
 1                  THE COURT:  Sustained.
 2    BY MS. RUDOFF:
 3    Q.    How would you characterize the relationship at the time
 4    you had with Joe DeLeon?
 5    A.    It was -- we didn't really have -- I wouldn't even say we
 6    had one during the time of -- it was rare in the beginning.
 7    Q.    Okay.  But at some point in the beginning, did you share
 8    any personal things about yourself with Joe DeLeon?
 9    A.    We spoke about me and trying to get my son back, because
10    Charles was also trying to get custody, having custody issues
11    with his daughter.
12    Q.    So he knew what was going on with your family?
13    A.    He did.
14    Q.    Did he know anything about your drug use?
15    A.    He did.
16    Q.    How did he know about that?
17    A.    I'm sure through Charles, but he knew.
18    Q.    Soon after you met Joe DeLeon, did Joe DeLeon mention a
19    friend of his named Bill Stone that he wanted you to meet?
20    A.    Yes.
21    Q.    And when was that, do you recall?
22    A.    In like the end of -- probably the beginning of 2006.
23    Q.    What was your understanding about why Joe DeLeon wanted
24    you to meet Bill Stone?
25                  MR. SELLERS:  I'm going to object to speculation,
```

```
 1   Your Honor.
 2            THE COURT:  If you could establish that.
 3   BY MS. RUDOFF:
 4   Q.   Were you aware of why Joe DeLeon wanted you to meet with
 5   Joe Stone?
 6   A.   No.
 7   Q.   Did Joe DeLeon tell you what Bill Stone did for a living
 8   at the time?
 9   A.   Yes.
10   Q.   What did he say?
11   A.   He worked for the FBI.
12   Q.   Did anything about an FBI agent wanting to meet with you
13   cause you concern?
14   A.   It did.
15   Q.   Why?
16   A.   It's not typical for an FBI agent to want to set up a
17   meeting with you, and it scared me.
18   Q.   Why did it scare you?
19   A.   Because I was using drugs.
20   Q.   Did you discuss those concerns with anybody?
21   A.   I did.
22   Q.   Who?
23   A.   I called Charles, and he told me that --
24            MR. SELLERS:  Object to hearsay.
25            THE COURT:  Sustained.
```

```
 1   BY MS. RUDOFF:
 2   Q.   So you called Charles?
 3   A.   I did.
 4   Q.   Did you tell anyone else?
 5   A.   I did.
 6   Q.   Who?
 7   A.   I called my attorney.
 8   Q.   Okay.  And what did -- did you share your concerns with
 9   Joe DeLeon?
10   A.   I did.
11   Q.   What did he say?
12   A.   He said it would be fine and I needed to meet him.
13   Q.   So did Charles and Joe DeLeon saying it's okay, you should
14   meet him, how did that affect your decision?
15   A.   I was very apprehensive, and I didn't go.
16   Q.   So the first time you had a scheduled meeting you don't
17   go?
18   A.   I did not go.
19   Q.   Why did you decide not to go?
20   A.   Because my attorney told me not to.
21   Q.   At some point in time was there another potential meeting
22   with Bill Stone?
23   A.   Yes.
24   Q.   Was that around the same timeframe?
25   A.   Very close to.
```

```
 1   Q.   Okay.  What happened in that situation?

 2   A.   He -- I -- when the meeting was set up, I called the

 3   Dallas FBI agency, and -- the FBI agency in Dallas and told

 4   them that a federal agent was trying to meet me and I just

 5   wanted to verify who he was.

 6   Q.   Why did you decide to do that?

 7   A.   Just because I wanted to make sure I wasn't -- that he was

 8   who he was, that I was verifying his -- that he was a federal

 9   agent.

10   Q.   Okay.  And when you found out -- how did the office

11   confirm it to you?

12   A.   They switchboarded him over to me, so he directly -- he

13   was then on the phone.

14   Q.   So did that confirm to you by the FBI here in Dallas that

15   Bill Stone at the time was, in fact, an FBI agent?

16   A.   Yes.

17   Q.   How did that confirmation make you feel about the meeting?

18   A.   I was still apprehensive, but I went ahead and went.

19   Q.   Was there any encouragement from DeLeon?

20   A.   Yes.  I felt -- he said it was okay.  He always told me it

21   was okay to go, and, you know, so I went.

22   Q.   So where was that first meeting that -- or that first time

23   that you met Bill Stone?

24   A.   It was at a Denny's in Grand Prairie.

25   Q.   Did you go alone?
```

```
1    A.   I did not.

2    Q.   Who went as well?

3    A.   Joe.

4    Q.   DeLeon?

5    A.   Joseph DeLeon met me there.

6    Q.   When you say he met you there, do you mean like you came

7    in separate cars, or how did that happen?

8    A.   We came in separate cars.

9    Q.   Did you still have any apprehension going into that

10   meeting?

11   A.   I was nervous.  I wasn't sure what -- what was going on.

12   Q.   When you got to the Grand -- to the meeting place, did you

13   get there before Joe DeLeon did?

14   A.   We got there around the same time.

15   Q.   Okay.  What did you observe DeLeon do when he arrived in

16   the parking lot?

17   A.   He circled the parking lot.

18   Q.   In his vehicle?

19   A.   In his vehicle.

20   Q.   Was that odd to you?

21   A.   And the building.

22        I thought it was what police do, like just kind of --

23   it was suspicious.  It was odd.

24   Q.   Did he tell you why he was doing it?

25   A.   That they always do that, check the surroundings.
```

```
 1    Q.   What do you mean by they always do that?
 2    A.   That it's part of their protocol for, like, police work.
 3    Q.   Once at Denny's, did Bill Stone then walk in?
 4    A.   Yes.
 5    Q.   Do you recognize an individual in the courtroom today as
 6    Bill Stone?
 7    A.   Yes.
 8    Q.   Can you describe an article of clothing he is wearing and
 9    where he is sitting?
10    A.   He's sitting to the right of his attorney, and he's
11    wearing a green tie.  I can't see it from here.  Green tie.
12             MS. RUDOFF:  Your Honor, may the record reflect that
13    the witness has accurately --
14             THE COURT:  I think she made reference to him
15    sitting, so you need to re-ask your question.
16             THE WITNESS:  I'm sorry.  He is standing next to his
17    attorney.
18             THE COURT:  The record shall so reflect.
19             MS. RUDOFF:  Thank you, Your Honor.
20    BY MS. RUDOFF:
21    Q.   When Bill Stone arrived that day, what was his demeanor
22    like?
23    A.   Authoritative.
24    Q.   What do you mean by that?
25    A.   Just -- I guess a dominance, authoritative.
```

```
 1   Q.   Did it make you feel like this was some type of
 2   professional meeting or a personal fun thing?
 3   A.   I wasn't really sure.  It was definitely a professional
 4   meeting.
 5   Q.   How did you feel once you were there and met this FBI
 6   agent?
 7   A.   I can't really remember exactly how I was feeling at the
 8   time.
 9   Q.   Had you ever met a federal agent before?
10   A.   No.
11   Q.   Had you ever met someone who had worked for the FBI?
12   A.   No.
13   Q.   At some point during the meeting did Bill Stone tell you
14   why he wanted to meet with you?
15   A.   Yes.
16   Q.   What did he say?
17   A.   He had told me that my car had been seen passing by known
18   drug houses that he was monitoring and he just wanted to see
19   and kind of check out, like, who I was and what I was doing at
20   these houses.
21   Q.   Did that make sense to you?
22   A.   I was thinking, well, maybe, but --
23   Q.   Why did you think, well, maybe?
24   A.   Well, I was using drugs and it's probably likely that my
25   car was seen in front of a drug house.
```

```
 1    Q.    And being that he was an FBI agent, is this the type of
 2    information you believed he would know?
 3    A.    Yes.
 4    Q.    When he told you that's why he wanted to meet with you,
 5    where did it go from there?  What did you tell him?
 6    A.    I -- he basically told me that I needed to go home to
 7    Stephenville and get out of where I was and -- is that what you
 8    asked?
 9          I'm sorry.  Can you repeat the question?
10    Q.    What happened during the meeting?  What was the result of
11    the meeting?
12    A.    Well, he was just basically, I guess, making sure I was
13    the drug user, not the drug dealer or -- I'm not sure.  That
14    was just an assumption.  But he told me I needed to, you know,
15    get out of there.
16    Q.    And by that --
17    A.    It was unsafe.
18    Q.    Denny's?  Get out of the Denny's?
19    A.    I'm sorry.  Just the drug world.
20    Q.    Okay.  Did you share information about yourself personally
21    with Bill Stone at this time?
22    A.    I did.
23    Q.    What types of things did you share with him about
24    yourself?
25    A.    I was telling him that I was trying to maintain sobriety
```

```
 1   and be independent from my family and get my son back.
 2   Q.   And so was he aware at that time that you were having --
 3   that you were estranged from your family and your son?
 4   A.   Yes.
 5   Q.   Okay.  And then how did the meeting finally end?
 6   A.   It -- it just kind of -- we just kind of parted ways,
 7   everybody.
 8   Q.   Okay.  Did he give you his telephone number or a business
 9   card or anything?
10   A.   I wrote his number down in a spiral.
11   Q.   Why did you do that?
12   A.   I just -- I want to say he may have given me a business
13   card and then I wrote it down so I didn't have any evidence of
14   a federal agent's business card in my possession.
15   Q.   Why were you worried about having that in your possession?
16   A.   That would have been -- could have been dangerous for the
17   life I was living.
18   Q.   What do you mean by that?
19   A.   For me.  Somebody could have assumed I was working for
20   them or something like that.
21   Q.   So you didn't want anyone to assume you were an informant
22   for a federal law enforcement as it pertained to drugs?
23   A.   Right.
24   Q.   Were you at the time a federal confidential informant?
25   A.   No.
```

```
 1   Q.   Were you ever a confidential informant?
 2   A.   No.
 3   Q.   After that meeting, did you initially reach out to Bill
 4   Stone?
 5   A.   I did not, no.
 6   Q.   Okay.  Did you maintain a connection with Joe DeLeon,
 7   though?
 8   A.   Yes.
 9   Q.   I want to fast-forward a little bit to 2007, several
10   months after you met Bill Stone for the first time.
11   A.   Uh-huh.
12   Q.   Did you have a run-in with law enforcement?
13   A.   I did.
14   Q.   Who?
15   A.   Irving PD.
16   Q.   Police department?
17   A.   Police department.
18   Q.   Was that in about September 2007?
19   A.   Yes.
20   Q.   What happened?
21   A.   I --
22   Q.   Let me ask a better question.
23   A.   Okay.
24   Q.   What were you doing that night when you came into contact
25   with Irving Police Department?
```

```
 1   A.   I was pulling out of a parking lot of a hotel, and a
 2   police -- a police officer across the street -- I think I had a
 3   headlight out or something.  And so when I saw the police
 4   officer across the street, I turned back into the hotel and ran
 5   into the hotel.
 6   Q.   Let me stop you there.  Were you alone?
 7   A.   No.  I had two people with me.
 8   Q.   Who were those people?
 9   A.   I believe their names were Katherine and Brian.
10   Q.   What were you and these two people doing at that motel?
11   A.   We were getting drugs.
12   Q.   So you were going to buy drugs from somebody else?
13   A.   We were going to buy.
14   Q.   Okay.  So you said you see a police officer and you pull
15   back into the parking lot.  Then what happened?
16   A.   We ran into the hotel.
17   Q.   Why did you run into the hotel?
18   A.   To try to act like we weren't just in the car.  I'm not
19   sure.  Just to get away from the police.
20   Q.   Were you scared?
21   A.   I was.
22   Q.   Then after you tried to run into the hotel, did the police
23   officer actually catch up to you?
24   A.   Yes.
25   Q.   What did he tell you about why he was there?
```

```
 1   A.   He thought we looked suspicious and was wondering what we
 2   were doing.
 3   Q.   Did you tell him what you were doing?
 4   A.   I -- we did.
 5   Q.   Okay.  So what happened after you told him what you were
 6   doing?
 7   A.   He asked if he could search my car.  And I didn't have any
 8   drugs on me, so I told him yes.  He said if he could search my
 9   car he would let me go if he didn't find anything.
10   Q.   Did he show you a warrant?
11   A.   No.
12   Q.   But you gave him permission, right?
13   A.   Yes.
14   Q.   Why did you give this police officer without a warrant
15   permission to search your car?
16   A.   Because I -- he asked to search it, so I did, so I let
17   him.
18   Q.   What happened when he searched your car?
19   A.   He found paraphernalia.
20   Q.   What kind of paraphernalia?
21   A.   It was a bong.
22   Q.   So drug paraphernalia?
23   A.   Drug paraphernalia.
24   Q.   Okay.  What happened when -- after he found drug
25   paraphernalia in your vehicle?
```

1   A.   He took me to jail.

2   Q.   So you were arrested?

3   A.   I was arrested.

4   Q.   And once you were taken to the jail, did you learn if the

5   officer found anything else in your car?

6   A.   Yes.

7   Q.   What did you learn?

8   A.   I was in the holding cell, and he said they did a drug dog

9   search on my vehicle and found drugs.

10  Q.   Okay.  Did he say he found anything else?

11  A.   Yes.  He was looking in my belongings and found my spiral

12  that had Bill Stone's number in it.

13  Q.   What did the officer then say was going to happen next

14  with this case for you?  Were you going to be released?

15  A.   I was going to be booked for a felony drug charge.

16  Q.   And at the time had you been charged with anything?

17  A.   No.  Prior to?  Is that what you're asking?

18  Q.   Yes.

19  A.   Right.

20  Q.   Okay.  And so were you -- did that officer go ahead and

21  then book you on felony drug charges?

22  A.   Yes.

23  Q.   And then were you released --

24  A.   I --

25  Q.   -- from jail?

```
 1   A.   I was -- the -- so -- was I released?

 2   Q.   Did you stay in jail that night?

 3   A.   I did.

 4   Q.   Okay.  Did you get out the next day?

 5   A.   Yes.

 6   Q.   How?

 7   A.   I was initially supposed to -- if they do -- give me just

 8   a second, please.

 9           THE COURT:  Feel free to take a moment, ma'am.

10           THE WITNESS:  Okay.

11   A.   So I knew that my grandparents would not spend any of

12   their hard-earned money on any type of drug-related charges, so

13   I felt as though my only option in getting out was to go ahead

14   and tell the police officer that I would work for them as an

15   informant.

16   Q.   Is it something you offered or the police officer offered

17   you?

18   A.   They offered it to me.

19   Q.   So it was their idea?

20   A.   It was their idea.

21   Q.   And you agreed?

22   A.   I did agree --

23   Q.   Okay.

24   A.   -- reluctantly.

25   Q.   And as a result of that agreement, did you get released
```

1    from jail?

2    A.    I did.

3    Q.    Did you ever act as an informant for that, for Irving PD?

4    A.    No.

5    Q.    What happened when you were released from Irving PD?  Did

6    you tell anyone about this incident?

7    A.    Yes.  The arresting officer told me that Bill Stone would

8    be a good person to reach out to because he was an Irving

9    police officer.  And so I forwarded that information to

10   Charles, and then as -- and then Charles reached out to Bill,

11   and they both met me, met up with me after that.

12   Q.    Okay.  And it was your understanding, I think you said --

13   I just want to clarify -- that Bill Stone was former Irving PD,

14   right?

15   A.    Former, yes.

16   Q.    So that is how he knew the officer?

17   A.    That is how he knew the officer.

18   Q.    Okay.  So you met with Charles and Stone.  What happened

19   when you met with them?

20   A.    They came to the apartment I was staying at, and Bill just

21   got onto me and asked if I wanted to be in prison when my

22   grandparents died and kind of -- he made me cry.  And I told

23   him that I would do whatever I needed to do, you know.  I just

24   knew I couldn't tell on three people.  I would end up dead.  My

25   family would be dead.  I couldn't be an informant.  I was

```
 1   crying.
 2   Q.   When you say he got onto you, you mean he was just
 3   verbally speaking to you, right?
 4   A.   Authoritatively, yes.
 5   Q.   And that resulted in you crying?
 6   A.   Yes.
 7   Q.   How were you feeling at the time?
 8   A.   Scared.
 9   Q.   What were you scared of?
10   A.   I didn't know what I needed to do at that point.  I -- I
11   was scared of going to jail.  I was scared of having to tell on
12   three people.  I had just gotten a phone call from the guy that
13   released me saying if I hadn't -- if I didn't call him by the
14   end of the day I would have a felony warrant out for my arrest.
15   Q.   So what happened as a result of your meeting with Bill
16   Stone and Charles?
17   A.   He told me that he would take care of it.
18   Q.   Who is he?
19   A.   Oh, Bill.
20   Q.   So Bill Stone said, I'll take care of it?
21   A.   Yes.
22   Q.   You understood -- did he say exactly what that meant?
23   A.   I didn't know what he meant.  I just trusted that --
24   trusted in him whatever he said.
25   Q.   Were you ultimately ever charged with or arrested by
```

1    Irving PD after that?

2    A.    No.

3    Q.    Did anyone tell you or give you a reason to believe that

4    it had to do with Bill Stone?

5    A.    Yes.

6    Q.    Who told you that?

7    A.    Charles, Joe, and Bill.

8    Q.    But you never had any, like, documentation or proof of

9    that?

10   A.    I never saw any documentation.

11   Q.    But you just believed what they told you?

12   A.    Right.

13   Q.    Why?

14   A.    Because of their job positions.

15   Q.    What about their job positions?

16   A.    They were law enforcement.  I figured they knew what they

17   were talking about.

18   Q.    Did it make you believe they had power to do those kinds

19   of things?

20   A.    Yes.  I was told because the federal supersedes state, and

21   I just assumed that was what happened with that charge, the

22   drug charge.

23   Q.    Who told you that federal supersedes state?

24   A.    I believe Charles.

25   Q.    Okay.  And what did you understand that to mean?

```
 1   A.   That maybe they have more power in the courtroom or --
 2   Q.   Who's they?
 3   A.   Like, federal agents have more power in the courtroom and
 4   maybe a better -- I wasn't sure.  I had never -- I didn't
 5   really know anything about federal agents at the time.
 6   Q.   Because Bill Stone was the only one you knew, right?
 7   A.   Right.
 8   Q.   Okay.  After this arrest in 2007, were there other
 9   criminal-related issues you had, other arrests?
10   A.   After?
11   Q.   Yes.
12   A.   Yes.
13   Q.   And were some of those situations also ones in which you
14   were told Bill Stone made them go away?
15   A.   The -- I had a DWI on my record that my -- when --
16   Q.   Let me stop you there.
17   A.   Right.
18   Q.   Generally speaking --
19   A.   Right.
20   Q.   -- were there other instances related to your criminal
21   arrests after that that you were told Bill Stone made go away?
22        MR. SELLERS:  Your Honor, I'm going to object to
23   misleading.  I can explain.
24        THE COURT:  What's your legal objection?
25        MR. SELLERS:  403, misleading.
```

```
 1                 THE COURT:  Overruled.
 2                 MR. SELLERS:  It's not clear whose --
 3                 THE COURT:  Overruled.
 4                 MR. SELLERS:  Okay.
 5    BY MS. RUDOFF:
 6    Q.   At any point between 2007 and 2014, while you were still
 7    on drugs --
 8    A.   Right.
 9    Q.   -- were there any situations involving your criminal
10    history or charges or arrests that you were told Bill Stone
11    handled?
12    A.   Right.  Gosh, I'm like -- the DWI that got taken off my
13    record?
14    Q.   So, yes.
15    A.   Yes.
16    Q.   Okay.  After that arrest, did you really want to get your
17    life together?
18    A.   Yes.
19    Q.   Did that arrest scare you?
20    A.   Yes.
21    Q.   Did you have Cade back yet?
22    A.   No.
23    Q.   How was it with your family at the time?
24    A.   It was estranged.
25    Q.   Did you have an income?
```

```
 1   A.    No.
 2   Q.    So what did you decide to do shortly after that arrest in
 3   2007?
 4   A.    I decided to enlist with the Navy.
 5   Q.    Why did you decide to do that?
 6   A.    I wanted to grow my independence.
 7   Q.    I'm sorry, I didn't hear you.
 8   A.    I wanted to grow my independence.
 9   Q.    What do you mean by that?
10   A.    I wanted to be independent from my family, and I wanted to
11   get sober.
12   Q.    As a part of your recruitment with the Navy, were you
13   asked by the recruitment officer anything about whether or not
14   you had criminal convictions in your past?
15   A.    Yes.
16   Q.    What did you tell them?
17   A.    I told him I had a DWI.
18   Q.    And when was that DWI you told him about?
19   A.    Was in 2002, 2001, sometime around that time.
20   Q.    So you voluntarily disclosed that information, right?
21   A.    Yes.
22   Q.    Did that prevent you from being able to enlist in the
23   Navy?
24   A.    He wasn't sure, but I wasn't sure.  I just shared that
25   with him.
```

```
1    Q.   Okay.  So were you ultimately able to enroll in the Navy?
2    A.   Yes.
3    Q.   And did you then go to boot camp?
4    A.   I did.
5    Q.   When did you go to boot camp?
6    A.   2008.  2007 or '08.
7    Q.   How long were you in boot camp?  A long time?  Short time?
8    A.   It was short.
9    Q.   Were you sent home?
10   A.   Yes.
11   Q.   Why?
12   A.   I didn't get a waiver from surgery -- from my surgeon for
13   a surgery I had.
14   Q.   So there was some physical medical reason you had to be
15   sent home, right?
16   A.   Yes.
17   Q.   Nothing to do with your drug use?
18   A.   No.
19   Q.   Nothing to do with your criminal history?
20   A.   No.
21   Q.   When you returned home from the Navy, how did you feel?
22   What were you returning to?
23   A.   I felt lost.  I didn't really have anything to come back
24   home to at the time.
25   Q.   Did you have a place to live?
```

```
 1   A.   No.
 2   Q.   Did you have a job?
 3   A.   No.
 4   Q.   Did you have any family support?
 5   A.   No.
 6   Q.   Friends?
 7   A.   Barely.
 8   Q.   Did you start using drugs again?
 9   A.   Yes.
10   Q.   What drugs were you using?
11   A.   Meth.
12   Q.   Did you have to go to rehab again around that same
13   timeframe?
14   A.   I did.
15   Q.   And when you came home from rehab, did you -- was that in
16   like 2008?
17   A.   Yes.
18   Q.   And did you at some point in 2008 become pregnant?
19   A.   Yes.
20   Q.   And did you end up having that child?
21   A.   Yes.
22   Q.   And which child is that?
23   A.   Slayter.
24   Q.   When you went to rehab between -- before you were pregnant
25   with Slayter in 2008, who paid for the rehab?
```

```
 1    A.    My grandparents.

 2    Q.    How did you get them to pay for the rehab?

 3    A.    They were just wanting to help.

 4    Q.    Were there any conditions along with it?

 5    A.    I just had to stay sober.

 6    Q.    Okay.  When you were pregnant with Slayter, were you

 7    sober?

 8    A.    Yes.

 9    Q.    And who is the father of Slayter?

10    A.    His name is Chapin Lopez.

11    Q.    Were you dating this individual at the time?

12    A.    No.

13    Q.    Did you end up dating this individual at the time?

14    A.    No.

15    Q.    Did you end up actually dating somebody else?

16    A.    Yes.

17    Q.    Who is that?

18    A.    His name is Shawn Gomez.

19    Q.    How did you know Shawn Gomez?

20    A.    I just met him out.

21    Q.    Okay.  And so you were pregnant with Slayter, and you and

22    Shawn are dating, right?

23    A.    Right.

24    Q.    How did your family or your grandmother respond to this?

25    A.    They wanted us to -- they were grateful for that, and they
```

```
 1    wanted us to get married before living with each other.
 2    Q.    Okay.  So grandma and grandpa want you and Shawn Gomez to
 3    get married?
 4    A.    Yes.
 5    Q.    Did you get married?
 6    A.    Yes.
 7    Q.    Why did you get married?
 8    A.    So that we could live together.
 9    Q.    Where did you guys live?
10    A.    In Granbury.
11    Q.    In a house?
12    A.    Yes.
13    Q.    Whose house?
14    A.    Mine.
15    Q.    How did you all of a sudden come up with a house?
16    A.    My grandparents gave it to us.
17    Q.    Was there a condition related to them giving you that
18    house?
19    A.    We had to go and visit them and do some work for them on
20    the weekends and just maintain sobriety.
21    Q.    Did they also make it a requirement that you guys get
22    married?
23    A.    Yes, they did, to live there.
24    Q.    When was Slayter born?
25    A.    August 6, 2009.
```

```
 1   Q.   And when did you marry Shawn Gomez?
 2   A.   I want to say it was -- I was about seven months pregnant.
 3   October of 2000 --
 4   Q.   Was it just a few months before you had your child?
 5   A.   It was, yes.
 6   Q.   And is that because it was a condition for you guys to
 7   live together?
 8   A.   Yes.
 9   Q.   When Slayter was born, who did you list as the father on
10   the birth certificated?
11   A.   Shawn.
12   Q.   Why?
13   A.   My grandmother told me to put him on there as the father.
14   Q.   Did you protest or tell her no --
15   A.   I did not.
16   Q.   -- that it was not the real father?
17   A.   No, I didn't.
18   Q.   You just did what she said?
19   A.   I did.
20   Q.   You're married, you have a newborn baby, you're sober.
21        Are you getting financial support from grandma
22   besides the house?
23   A.   Yes.
24   Q.   Like what?
25   A.   Just living expenses.  I was going to hair school.
```

```
 1    Q.   Who was paying for hair school?
 2    A.   I was.
 3    Q.   What about Cade?  Were you still in a custody battle, or
 4    was he back with you?
 5    A.   We -- I got him on -- I was granted every other weekend,
 6    so I was able to have him every other weekend.
 7    Q.   So things in your life are getting a little bit better
 8    it's fair to say?
 9    A.   Yes.
10    Q.   Okay.  And within that first year of marriage, did
11    something happen with your relationship with Shawn?
12    A.   Yes.
13    Q.   What happened?
14    A.   He had an affair.
15    Q.   Did that break up your relationship?
16    A.   Yes.
17    Q.   Did he stay living in the house?
18    A.   No.
19    Q.   When your grandmother found out that your marriage was
20    ending, how did she respond?
21    A.   She was accepting of it, after I told her why.
22    Q.   Did she ask you to do anything regarding Slayter's birth
23    certificate?
24    A.   To take him off the birth certificate.
25    Q.   So she asked you to take Shawn Gomez's name off the birth
```

```
 1   certificate?
 2   A.   Yes.
 3   Q.   Why?
 4   A.   Because he was no longer his dad.
 5   Q.   Because grandma told you to do it?
 6   A.   Yes.
 7   Q.   Okay.  What did you end up putting Slayter's name as, last
 8   name?
 9   A.   I switched.  I changed it back to Thompson.
10   Q.   After that did you and Shawn Gomez ever end updating again
11   or getting back together?
12   A.   We tried.
13   Q.   Was Shawn Gomez a drug user as well?
14   A.   Yes.
15   Q.   And how was it trying to have a relationship with him
16   again once your son was born?
17   A.   It -- it was not -- it was hard.
18   Q.   Why?
19   A.   Because I didn't want that lifestyle for Slayter.
20   Q.   By lifestyle, you mean drug use?
21   A.   Drug use.
22   Q.   Okay.  Was Shawn Gomez using drugs at the time?
23   A.   Yes.
24   Q.   Did you start using drugs?
25   A.   I eventually did.
```

```
 1   Q.   Did you let your family know that you had let him back in
 2   your life?
 3   A.   No.
 4   Q.   Why not?
 5   A.   Because I wasn't supposed to be associating with him.
 6   Q.   What would happen or what did you believe would happen if
 7   they found out?
 8   A.   I wasn't -- I wasn't sure.  I wasn't sure.
 9              THE COURT:  Let's pause there for just a moment.
10              Members of the jury, we have been going about an
11   hour.  Do you need to take a break?  Do you want to keep
12   trucking?  Anybody need a break?  Lawyers?  Everybody okay?
13              All right.  Nobody.  All right.  We'll keep going.
14              MS. RUDOFF:  Thank you, Your Honor.
15              THE COURT:  Your witness.
16   BY MS. RUDOFF:
17   Q.   In -- about a year later, August 2010, did you have
18   another run-in with police officers?
19   A.   I did.
20   Q.   Who were those police officers?  What county?
21   A.   Hood County.
22   Q.   Were they Sheriff's Office?
23   A.   Yes.
24   Q.   How did you come in -- to run into a situation with Hood
25   County Sheriff's Office that August?
```

```
 1   A.   My brother let them in my house with a key to -- because
 2   he knew that Shawn was there.
 3   Q.   Okay.  So let's back up.
 4   A.   Okay.
 5   Q.   Are you at the house?
 6   A.   I'm at the house.
 7   Q.   Does somebody come in your home?
 8   A.   Right.  Yes.
 9   Q.   Who?
10   A.   My brother.  The police.
11   Q.   What were you doing when the police entered your home?
12   A.   I was in bed.
13   Q.   Were you sleeping?
14   A.   I was asleep.
15   Q.   Was Shawn there?
16   A.   Uh-huh.
17   Q.   Is that a "yes"?
18   A.   Yes.
19   Q.   Who else was there?  Anyone?
20   A.   Shawn and Slayter.
21   Q.   So your son?
22   A.   Yes.
23   Q.   What happened when the police entered your home?
24   A.   They came up to our bedroom door and opened it.
25   Q.   Then what happened?
```

```
 1   A.   And they found drugs on Shawn and took us both to jail.
 2   Q.   So you were arrested?
 3   A.   Yes.
 4   Q.   When you were walked out of your home in handcuffs, was
 5   anyone else there standing outside?
 6   A.   My brother and my mother.
 7   Q.   Did you talk to them?
 8   A.   No.
 9   Q.   Did you learn anything about why they were there?
10   A.   Yes.
11   Q.   What did you learn?
12   A.   That my brother had let them in because he had told them
13   that he lived there.
14   Q.   So your brother called the police on you?
15   A.   Yes.
16   Q.   And that's why you got arrested?
17   A.   Yes.
18   Q.   What happened to Slayter?
19   A.   He went with my mother.
20   Q.   When you say went with your mother, what do you mean?
21   Just like left that night with your mom?
22   A.   CPS gave him to my mom.
23   Q.   So now you've lost your second son?
24   A.   Yes.
25   Q.   How did you feel being taken to jail and your mother and
```

 1   brother standing there outside watching it?

 2   A.   Angry.

 3   Q.   Anything else?

 4   A.   Betrayed, upset.

 5   Q.   Were you scared?

 6   A.   Just -- I was scared, but I was more confused.  I wasn't

 7   sure what was even -- what was happening.

 8   Q.   So you were taken to jail, right?

 9   A.   Yes.

10   Q.   Were you released soon after?

11   A.   The next morning.

12   Q.   Do you know if Bill Stone was told about your arrest in

13   August 2010?

14   A.   Yes.

15   Q.   And did Bill Stone say anything about it?

16   A.   I was on the phone with Joe, and he said -- Bill said,

17   you're on your own on this one.

18   Q.   So you were on the phone with Joe DeLeon.  Did you tell

19   Joe DeLeon you were arrested?

20   A.   Yes.

21   Q.   Why did you tell Joe DeLeon you were arrested?

22   A.   Because that would be something I would talk to him about.

23   Q.   So the -- so as part of your friendship?

24   A.   Right, for his -- he had -- for his legal advice.

25   Q.   Why would you ask Joe DeLeon for legal advice?

```
 1   A.   Because he seemed to know a lot about the -- about laws
 2   and was Fort Worth -- he worked for Fort Worth Police
 3   Department.
 4   Q.   So when you heard that Bill Stone said, you're on your own
 5   with this one, what did you understand that to mean?
 6   A.   I figured he wasn't -- which I wasn't going to ask, but he
 7   wasn't going to help me get out of it.
 8   Q.   Were charges ever filed on you for that case in Hood
 9   County?
10   A.   No.
11   Q.   You never went to court on that case?
12   A.   It never went to court.
13   Q.   Okay.  Did you stay on bond on that case?
14   A.   I did have bond for a while until -- until my attorney
15   said it was getting dropped.
16   Q.   Okay.  So you hired a lawyer?
17   A.   Yes, I hired a lawyer.
18   Q.   So you had to be on bond conditions.  You hired a lawyer.
19   And then your lawyer says the case is being dismissed, right?
20   A.   Yes.
21   Q.   Did your lawyer tell you why it was dismissed?
22   A.   Yes.
23   Q.   What did he say?
24             MR. SELLERS:  Objection.  Hearsay, Your Honor.
25             THE COURT:  Sustained.
```

```
 1   BY MS. RUDOFF:
 2   Q.   Did you learn whether or not Bill Stone had anything to do
 3   with your case being dismissed?
 4   A.   Yes.  He did not.
 5   Q.   So Bill Stone didn't have anything to do with it, right?
 6        MR. SELLERS:  Object to asked and answered.
 7        THE COURT:  Sustained.
 8   BY MS. RUDOFF:
 9   Q.   Was this the first time since you met Joe DeLeon and Bill
10   Stone that you had been arrested for a criminal situation?
11   A.   No.
12   Q.   Okay.  Was this the first time since you met Joe DeLeon
13   and Bill Stone that an arrest actually turned into further
14   criminal action?
15   A.   Yes.
16   Q.   And that was a case that Stone said he couldn't use his
17   connections with, right?
18   A.   Yes.
19        MR. SELLERS:  Objection.  Asked and answered.
20        THE COURT:  Sustained.  Let's cover some new
21   territory.
22   BY MS. RUDOFF:
23   Q.   After this arrest, did you continue using drugs?
24   A.   Yes.
25   Q.   So if we're talking around 2012, were you using drugs
```

1    then?

2    A.    Yes.

3    Q.    Had you gone to rehab more?

4    A.    I had.

5    Q.    Once?  Several times?  How many?

6    A.    Probably three times in that time.

7    Q.    Okay.  And between August 2012 and August 2014, about how

8    many times would you say you went to rehab then?

9    A.    Name the dates again.

10   Q.    August 2012 -- I'm sorry.  Between 2012 and 2014.  Did you

11   say several times?

12   A.    Several times.

13   Q.    Who paid for those rehabs?

14   A.    My grandparents.

15   Q.    When you weren't in rehab, where did you live?

16   A.    I lived in Fort Worth.

17   Q.    Who were you living with?

18   A.    Myself.

19   Q.    Were you speaking with your mom or your brother at the

20   time?

21   A.    Can you tell me which rehab you're talking about when you

22   said when you're home from rehab?

23   Q.    I'm talking about from between 2012 --

24   A.    Okay.

25   Q.    -- and the summer of 2014.

```
 1   A.   Okay.  Yes.
 2   Q.   So where were you living when you came home from rehab
 3   during that timeframe?
 4   A.   I had -- I was living with my grandmother.
 5   Q.   Okay.  And were you speaking to your mother, brother at
 6   the time?
 7   A.   Rarely.
 8   Q.   Did you -- were you still dealing with custody issues with
 9   your children?
10   A.   I was still able to have visitation at my mom's house for
11   my oldest and my youngest as well.
12   Q.   But they weren't with you full-time, right?
13   A.   Right.
14   Q.   You didn't have custody back?
15   A.   Right.
16   Q.   In 2012, I think you said your grandfather died, right?
17   A.   Yes.
18   Q.   How was that for you?
19   A.   It was emotional and very hard.
20   Q.   Why is that?
21   A.   He was like a father figure to me.  He was a great man.
22   Q.   Did you -- did your mom have a health issue around the
23   same time?
24   A.   She did.
25   Q.   What happened?
```

```
 1    A.    She got breast cancer.

 2    Q.    When was she diagnosed with breast cancer?

 3    A.    2013-ish, around that time.

 4    Q.    How was that for you learning that your mother was

 5    diagnosed with breast cancer?

 6    A.    It was hard to hear, hard to understand.

 7    Q.    Were you dating anyone at the time?

 8    A.    I was.

 9    Q.    Who were you dating?

10    A.    I -- a guy named Eric Gomez.

11    Q.    How was the relationship with Eric Gomez at that time?

12    A.    Abusive.

13    Q.    In what way?

14    A.    He was -- during that time he was verbal, physical -- it

15    eventually got physical, controlling.

16    Q.    So with no family, your grandfather is gone, who did you

17    turn to for advice and support at the time?

18    A.    During the physical abuse, the harder times I would reach

19    out to and talk to Joe.

20    Q.    DeLeon?

21    A.    Joseph DeLeon.

22    Q.    Why?

23    A.    Because he seemed to give me really good advice.

24    Q.    Was it helpful having Joe DeLeon there to turn to?

25    A.    It seemed like I had a constant person to talk to.
```

1   Q.   How did that make you feel having somebody?

2   A.   It made me feel good, secure.

3   Q.   Did you guys talk about more personal stuff or just keep

4   it professional?

5   A.   It was a little mixture of both.

6   Q.   What types of things would you talk about?

7   A.   My kids.  He would talk about his work life, things like

8   that.

9   Q.   When you say work life, what kinds of things about it?

10  A.   He would let me know when he was working a case or a

11  situation or have to deal with being an interpreter and --

12  Q.   Criminal case?

13  A.   Criminal cases or criminal -- or just legal stuff through

14  the -- through the Fort Worth PD or leading a class.  He would

15  talk about stuff like that.

16  Q.   What type of classes did he say he was leading?

17  A.   He did a lot of stuff -- he spoke a lot about human

18  trafficking and helping -- I want to say it was like battered

19  women or something.

20  Q.   So law enforcement stuff?

21  A.   Yes.

22  Q.   Okay.  In 2014, were you arrested again?

23  A.   Yes.

24  Q.   When in 2014?

25  A.   I -- it was in May of 2014.

```
 1   Q.   And who were you arrested by?
 2   A.   Hood County.
 3   Q.   And what were you doing when you came into contact with
 4   Hood County officers?
 5   A.   I was driving without a license.
 6   Q.   Why were you pulled over?
 7   A.   I was pulled over because I had a fog lamp out.
 8   Q.   Once pulled over, did the officer tell you why he pulled
 9   you over?
10   A.   He pulled me over because I had one of my fog lamps were
11   not -- weren't working.
12   Q.   What happened after that?
13   A.   He noticed that I had a -- he asked for my driver's
14   license, and it was expired -- or I was -- I had driving
15   without a license.  I needed to pay my surcharge.
16   Q.   What happened once he figured out your license was
17   suspended?
18   A.   I was arrested.
19   Q.   Why were you arrested?
20   A.   For driving without a license.
21   Q.   Okay.  What happened after you were arrested?
22   A.   He asked if there was anything illegal in the car.
23   Q.   What did you say?
24   A.   Yes.
25   Q.   Why did you say yes?
```

```
 1  A.   I told him -- well, because I knew he was going to find
 2  something, so -- and he's law enforcement, and I never thought
 3  to say no, so --
 4  Q.   Never thought to say no because he was law enforcement?
 5  A.   Right.
 6           MR. SELLERS:  Object to leading, Your Honor.
 7           MS. RUDOFF:  Your Honor, I was just clarifying.
 8           THE COURT:  Sustained.  Sustained.
 9           Don't lead.
10  BY MS. RUDOFF:
11  Q.   Did you tell him where the drugs were located?
12  A.   I did.
13  Q.   What happened after that?
14  A.   He searched the center console and found the drugs that I
15  had in the car.
16  Q.   What happened after he found the drugs in your car?
17  A.   He -- we went to the jail.  I got arrested for possession
18  of a controlled substance.
19  Q.   Once you were arrested, were you released eventually?
20  A.   Yes.
21  Q.   Were you placed on any kind of bond?
22  A.   I was on bond UAs.
23  Q.   What are UAs?
24  A.   A urinalysis, a drug test.  I had to do it every other
25  Monday.
```

```
 1   Q.   Is that like a condition of your bond?
 2   A.   It is a condition.
 3   Q.   Okay.  So you were arrested again, and you're out on bond?
 4   A.   Yes.
 5   Q.   What is your relationship like with your family?
 6   A.   Estranged, just -- I was -- I mean, they had just accepted
 7   the fact that that is who I was, and they gave up.  So they
 8   just -- it wasn't -- it wasn't terrible.  We still spoke, but
 9   it wasn't any -- it wasn't great.
10   Q.   Were you still dating Eric?
11   A.   Yes.
12   Q.   How was your grandmother responding to all this?
13   A.   She just told me she --
14             MR. SELLERS:  Object to hearsay, Your Honor.
15   A.   Oh, well.
16             THE COURT:  I'll overrule.
17   BY MS. RUDOFF:
18   Q.   You can answer.
19   A.   She -- she was just -- she told me she gave me to God and
20   she had to let go and she was going to love me from afar.
21   Q.   How did that make you feel?
22   A.   Not good.  I didn't want to be -- I didn't want them to
23   lose hope in me, but everyone had lost hope in me.
24   Q.   Would you say this was the worst you had felt?
25             MR. SELLERS:  Object to leading.
```

```
 1                THE COURT:  Sustained.
 2   BY MS. RUDOFF:
 3   Q.   Had you ever felt like this before?
 4   A.   I had never felt like this before.
 5   Q.   What did you decide to do?
 6   A.   I -- I decided to take it upon myself to reach out to the
 7   treatment center and ask if they would take me back and -- so I
 8   initiated the -- hold on just one second.  I have to -- this is
 9   a terrible time for me.
10                THE COURT:  If you need a moment --
11                THE WITNESS:  Okay.
12                THE COURT:  -- feel free to take one.
13                THE WITNESS:  Okay.
14                MS. RUDOFF:  Your Honor, can we take a quick break?
15                THE COURT:  We can.  Let's take a 10-minute break.
16                All rise for the jury.
17                (Jury out)
18                MS. RUDOFF:  Your Honor, may the witness step down
19   and use the restroom --
20                THE COURT:  Certainly.  Absolutely.
21                MS. RUDOFF:  -- and sort of decompress?
22                THE COURT:  Feel free to step down and -- we are
23   getting leading objections, and you-all are welcome to make
24   them.  Let me give you my general philosophy so everybody can
25   be on the same page.  Do, did, does, and woulds are
```

1    technically -- technically leading.  If they are transitional

2    questions, or they aren't critical matters, I'm giving both

3    sides some latitude on those.

4              And so obviously if they're -- you know, if you ask

5    ten of them in a row, I will probably sustain it.  But I'm

6    going to give each side some latitude on that.

7              So you get a few did, do, does.  I don't want a whole

8    direct of it.  But just to let you know on that.

9              And sort of generally speaking on hearsay, you know,

10   in critical matters, but what I don't want to do is tick off

11   our jury and lay a predicate for every single sentence that's

12   ever been done.

13             So if it's big matter, object on it.  If it's

14   something not that big -- you know, I'm going do goose and

15   gander for both sides.

16             And so I suspect that you guys are going to want to

17   bring up some statements on cross.  And so just remember when

18   you're objecting they're going to object to you too.

19             So that's just sort of my general philosophy, the

20   objections you can make versus the objections -- you know, I

21   don't know that you want your jury having to listen to a whole

22   bunch of predicate.

23             So that's sort of the spirit.  I'm not trying to

24   quell any -- or have any chilling effect.  You guys make all

25   objections you want.  But that's just sort of a guiding

```
 1   philosophy.
 2            MR. SELLERS:  Thank you, Your Honor.
 3            THE COURT:  Sure.  Sure.  But I will try to goose and
 4   gander for both sides.
 5            So with that said, let's take a 10-minute recess, and
 6   we'll come back.
 7            (Recess)
 8            THE COURT:  All rise.  And just stay standing, not
 9   for me, but we'll bring the jury in.
10            MR. SELLERS:  Your Honor, can I have a moment?  I
11   have been sitting here, and Marcus is telling me I can't sit
12   here anymore, so I can see the witness.
13            THE COURT:  Okay.  So let me step down here.  Tell
14   the jury just to cool their heels a minute or two.
15            (Discussion off the record)
16            THE COURT:  Okay.  Ready.
17            (Pause)
18            THE COURT:  All rise for the jury.
19            (Jury in)
20            THE COURT:  All right.  Everybody, please be seated.
21            So thank you for your patience.  I am -- you are in
22   the oldest -- I think cutest, but oldest courtroom.  And so we
23   had a little technical difficulty.  That's my fault.  Do not
24   hold it against any of the parties.  Sometimes we'll have
25   little hiccups, and it's on me.  So I appreciate the grace.
```

```
1              With that said, your witness.

2              MS. RUDOFF:  Thank you, Your Honor.

3              And, Your Honor, at this time the Government would

4    like to admit for record purposes only Government's Exhibit 26,

5    which is the digital extraction from Mr. DeLeon's phone;

6    Government's Exhibit 27, which is the digital extraction from

7    the iMac computer; Government 110, the extraction from the

8    iPhone 10 belonging to Ms. Weisend; Government 121, extraction

9    of evidence from iPhone 5S; and Government Exhibit 122, digital

10   extraction from iPhone 6s.

11             THE COURT:  Any objection for record purposes?

12             MR. GALLIAN:  No objection, Your Honor.

13             MR. WESTFALL:  No objection, Your Honor.

14             THE COURT:  It will be admitted for record purposes.

15                  (Government's Exhibit Nos. 26, 27, 110, 121, and

16                  122 received)

17             MS. RUDOFF:  Thank you, Your Honor.

18             THE COURT:  And just a refresher, members of the

19   jury, the lawyers are all very polite.  They've been in front

20   of me before.  Everybody is very professional.  I have said,

21   though, so that we don't have to interrupt proceedings, we've

22   got a row back there so that defense counsel can see what is

23   going on.  I have given them permission to come and go without

24   asking permission.  So please don't think anyone is being rude

25   if they rearrange themselves.  I just don't want to stop
```

1    affairs.

2              So with that said, your witness, ma'am.

3              MS. RUDOFF:  Thank you, Your Honor.

4    BY MS. RUDOFF:

5    Q.   Casi, before the break we were talking about after you

6    were arrested in 2014, so we're in the summer of 2014, okay?

7    A.   Yes.

8    Q.   You -- before we took a break, just to clarify, you said

9    you had never felt like this before, right?

10   A.   Right.

11   Q.   What do you mean?

12   A.   I was tired of being tired, and I felt alone.

13   Q.   Were you afraid of what might happen with the case you

14   were just arrested on?

15   A.   I was.  I was.  I didn't know -- I didn't want to go to

16   prison, so I -- and I was in an abusive relationship.  And in

17   order to get out of both of positions that I was in, I went to

18   rehab.

19   Q.   Why did you think you were going to go to prison at the

20   time?

21   A.   I had a drug charge that I was on bond for, and I wasn't

22   sure -- I want to ensure my sobriety and success and staying

23   sober.

24   Q.   Okay.  So when you say you were afraid of prison, it's

25   like that you would be sentenced to prison or something?

```
 1   A.   I would be sentenced to prison.  I was -- I didn't want to
 2   go to prison.
 3   Q.   Okay.  What would happen to your children if you went to
 4   prison?
 5   A.   They would be left without their mom, and they would be
 6   with their -- they wouldn't be with me.  They wouldn't be able
 7   to see me.
 8   Q.   How does the thought of that make you feel?
 9   A.   Terrible.
10   Q.   Was that a hard thought to experience at the time?
11            MR. SELLERS:  Object to leading.
12   A.   To envision them grown --
13            THE COURT:  Don't lead.
14            MS. RUDOFF:  I'm sorry, Judge.  I didn't hear you.
15            THE COURT:  Don't lead, please.  Sustained.
16   BY MS. RUDOFF:
17   Q.   I'm going to ask a different question.
18            Were you able to express these concerns with anybody?
19   A.   I spoke a lot to Joe prior to leaving to go to rehab.
20   Q.   What kind of things would you talk about?
21   A.   My kids, my situation, my situation with my kids, my legal
22   situation that I was in with my Hood County arrest, and my
23   family.
24   Q.   Would you talk often?
25   A.   More often.
```

```
 1   Q.   How would you guys communicate?
 2   A.    Through texting.
 3              MS. RUDOFF:  Your Honor, at this time the Government
 4   moves to admit Government 38, which is an exhibit that is
 5   derived from Government 26, which has been admitted already for
 6   record purposes.
 7              THE COURT:  All right.  Any objection, counsel for
 8   Mr. Stone?
 9              MR. GALLIAN:  I'm sorry, Judge.  I'm checking my --
10              THE COURT:  Sure.  Take your time.
11              Was that 37?
12              MR. GALLIAN:  38.
13              MS. RUDOFF:  38, Judge.
14              THE COURT:  38.
15              MS. RUDOFF:  It's text messages between Mr. DeLeon
16   and Ms. Thompson.
17              MR. GALLIAN:  No objection, Judge.
18              THE COURT:  All right.
19              MR. SELLERS:  No objection either.
20              THE COURT:  All right.  It shall be admitted.
21                  (Government's Exhibit No. 38 received)
22              MS. RUDOFF:  Your Honor, permission to publish 38 to
23   the jury?
24              THE COURT:  Granted.
25              Members of the jury, let us know if you can't see,
```

```
 1   please.
 2           MS. RUDOFF:  And for purposes -- can we go to page 10
 3   of Government Exhibit 38 that's now on the screen?
 4           THE COURT:  Okay.  You-all see that?  It's small on
 5   my screen.  It's probably teenincy on yours.  Can you pinch it?
 6   Make it bigger?  It works on an iPhone.  I don't know about
 7   other technology.
 8           MS. RUDOFF:  Can we highlight the text message --
 9   yeah.  Perfect.
10   BY MS. RUDOFF:
11   Q.   Okay.  Casi, here on the screen we have a close-up of
12   page 10 on Government Exhibit 38.  The texts in green, can you
13   see that on your screen?
14   A.   Yes.
15   Q.   Whose phone number or whose text does the green ones
16   belong to on the right-hand side?
17   A.   Joseph DeLeon.
18           MR. GALLIAN:  Your Honor, it looks like maybe some of
19   the members of the jury can't read it.
20           THE COURT:  Okay.
21           MS. RUDOFF:  I'm going to have her read it, if that
22   will help.
23           THE COURT:  Let's pause for just a second.  Is Taylor
24   still here?
25           Do you all know which exhibit -- I'm happy to run
```

```
 1   some quick photocopies while you're talking if that would be
 2   helpful.
 3           MS. RUDOFF:  Could we maybe move the screen a little
 4   bit closer?
 5           THE COURT:  Okay.
 6           MS. RUDOFF:  Would that help.
 7           THE COURT:  Okay.  Let's try that.
 8           Let's go off the record for a second, see what we can
 9   do.
10           (Discussion off the record)
11           (Jury out)
12           THE COURT:  Please be seated.
13           (Pause)
14           SECURITY OFFICER:  All rise for the jury.
15           (Jury in)
16           THE COURT:  Please be seated.
17           Thank you, members of the jury, for your patience.
18           So your judge is a klutz, and I stepped on the HMDI
19   cord.  So we had to do a little fix, but it's fixed.  So thank
20   you for the grace.
21           And with that said, your witness.
22           MS. RUDOFF:  Thank you, Your Honor.
23   BY MS. RUDOFF:
24   Q.   Casi, before we took the break, we were looking at what's
25   been admitted as Government Exhibit Number 38.  I believe it
```

 1    was page 9.
 2            Let me know when you see that.  Do you see it on your
 3    screen?
 4    A.   Yes.
 5    Q.   Okay.
 6            MS. RUDOFF:  Can you please zoom in to the first
 7    green text message?
 8            THE COURT:  And if you don't mind, let's slow roll
 9    this.
10            And members of the jury, can you see it?
11            JURORS:  Yes.
12            THE COURT:  Awesome.  Let us know if you can't.
13            MS. RUDOFF:  Thank you, Judge.
14            THE COURT:  You're welcome.
15    BY MS. RUDOFF:
16    Q.   Casi, looking at the first green message on the screen,
17    whose telephone number is this?
18    A.   Joseph DeLeon.
19    Q.   And the bottom right-hand corner, do you see the date?
20    A.   Yes.
21    Q.   What's the date?
22    A.   June 3, 2014.
23    Q.   Okay.  So this would have been after your Hood County
24    arrest, right?
25    A.   Right.  Yes.

```
 1   Q.   The timeframe that we were just talking about?
 2   A.   Yes.
 3   Q.   Okay.
 4            MS. RUDOFF:  Can you zoom out, please?
 5            Can you go to the first blue message on the left and
 6   zoom in, please?
 7   BY MS. RUDOFF:
 8   Q.   Casi, do you see this blue message text message?
 9   A.   Yes.
10   Q.   And what is the phone number for that text?
11   A.   It's my phone number.
12   Q.   Your phone number?
13   A.   My phone number.
14   Q.   And you recognize it as yours?
15   A.   Yes.
16   Q.   Also, this is June 3, 2014, right?
17   A.   Yes.
18   Q.   So is this text messages you sent Joe DeLeon at the time?
19   A.   Yes.
20   Q.   Can you read this text message for me?
21   A.   "I know I do, I really do.  Last night I thought about all
22   the selfish, and in some ways, selfless acts that have kept me
23   from being the person I truly am and that person is a mom.  God
24   gave me two incredible children and I need to be proactive in
25   getting both of them back.  It's not too late (I hope).  I want
```

1    to be a mom, that's it, they are where it's at.  True

2    happiness.  And at the end of the day I will then be guilt

3    free.  Nothing hurts more than going to bed feeling the pain

4    you've caused your family, friends and one's self.  I hope that

5    one day I can go to bed with a clear guilt free head to lay on

6    the pillow.  I'm praying about it.  I'm going to lean on God

7    and have faith in Him that He will bring me through this."

8              MS. RUDOFF:  Thank you.  You can zoom out.

9    BY MS. RUDOFF:

10   Q.   This blue message that you read, is that how you were

11   feeling at the time, given your situation with your criminal

12   case, drugs, and your family?

13   A.   Yes.

14   Q.   How did Joe DeLeon respond?

15             MS. RUDOFF:  Can you zoom in on the third green

16   message on the screen?

17   BY MS. RUDOFF:

18   Q.   Can you read that for us?

19   A.   Yes.  It says, "I can make you a straight up promise.  I

20   will keep you in my prayers and you'll always have a friend

21   that you can call on day or night."

22             MS. RUDOFF:  You can zoom out.

23   BY MS. RUDOFF:

24   Q.   So were those the kind of conversations you and Joe DeLeon

25   were having at the time?

```
 1    A.   Yes.
 2    Q.   And how did it feel having his responses like that?
 3    A.   Comforting and knowing that he cared.
 4    Q.   Did you feel like he genuinely cared?
 5    A.   I felt like he genuinely cared, yes.
 6            MS. RUDOFF:  Can you go to page 11?  You can stop on
 7    page 11.
 8            Actually it's page 10, then.
 9            Can you zoom in on the green message, the first green
10    message?
11    BY MS. RUDOFF:
12    Q.   Is this another message in response to your conversation
13    from Joe DeLeon that we see here on the screen?
14    A.   Yes.
15    Q.   And was that also consistent with the support he was
16    trying to give you?
17    A.   Yes.
18    Q.   At the time that he is giving you this support, did Joe
19    DeLeon ever ask you for any money?
20    A.   No.
21    Q.   Did his text messages ever say that to be available
22    twenty -- any day or night for you that it required you to pay
23    him money?
24    A.   No.
25    Q.   At this time did you ever offer him money or gifts for
```

1    providing the support and comfort to you?

2    A.   No.

3    Q.   What about the guidance he was giving?

4    A.   No.

5             MS. RUDOFF:  You can zoom out.

6             Can you go to page 13?  That's a different exhibit.

7    BY MS. RUDOFF:

8    Q.   Did you also discuss in detail with Joe DeLeon your fears

9    about going to prison and your children?

10   A.   Yes.

11            MS. RUDOFF:  Can you scroll in on the first and

12   second message?

13            Start with the first, the blue.

14   BY MS. RUDOFF:

15   Q.   Casi, what does your message on the top say?

16   A.   "I hope so!  These guys in Hood County don't mess around.

17   They gave a guy 18 years for the same charge as me."

18   Q.   What are you referring to in this?

19   A.   My Hood County drug charge.

20   Q.   Is that what you believed could potentially happen to you?

21   A.   Yes.

22   Q.   How did that make you feel?

23   A.   Scared.

24   Q.   Is that what you were sharing with Joe DeLeon?

25   A.   Yes.

```
 1   Q.   Can you read the second message on the screen that you
 2   sent?
 3   A.   "My oldest has a dad, but my youngest only has me and my
 4   mom and if my mom doesn't improve all he will have is me.  So
 5   I'm more nervous for Slayter than I am myself because he
 6   deserves to be happy and with his mom and I would die if he had
 7   to get put into foster care."
 8   Q.   Can you read the dates of these messages?
 9   A.   June 5th of 2014.
10   Q.   So this is two days after the previous messages, right?
11   A.   Yes.
12   Q.   But you are still continuing to talk about your children
13   and your fear of prison?
14            MR. SELLERS:  Object to leading.
15   A.   Yes.
16            THE COURT:  If there's an objection, wait for me to
17   rule.  That's okay.
18            Overruled.
19   BY MS. RUDOFF:
20   Q.   You can answer.
21   A.   Yes.
22   Q.   So it's fair to say you talked about this a lot at the
23   time?
24            MR. SELLERS:  Object to leading.
25            THE COURT:  Sustained.
```

```
 1  BY MS. RUDOFF:
 2  Q.   What else did you guys talk about?
 3           MS. RUDOFF:  You can zoom out.
 4  A.   Really we only talked about him -- my legal situation, my
 5  kids, my family situation, or his mom's situation and illness.
 6  We talked about family a lot.
 7  Q.   Okay.
 8           MS. RUDOFF:  Can you go to page 13?  Oh, thank you.
 9           Can you go to page 17?
10           Can you please go to the next page?
11  BY MS. RUDOFF:
12  Q.   Do you see here the second blue message on the left?
13  A.   Yes.
14  Q.   What is that a message referring to?
15  A.   I -- what is it referring to?
16  Q.   Yeah.  What are you talking about in it?  When you say,
17  did you ever hear back from Bill, are you asking Joe that?
18  A.   Yes.
19  Q.   Would you communicate yourself very often with Bill Stone
20  at the time?
21  A.   No.
22  Q.   How would you communicate with him mostly?
23  A.   Through Joe or Charles.
24           MS. RUDOFF:  You can zoom out.
25           Can you go to 25, please?
```

```
 1              26, please?
 2     BY MS. RUDOFF:
 3     Q.   Can you see the messages here in 26, page 26?
 4     A.   Yes.
 5     Q.   Is Joe continuing to be concerned for you?
 6     A.   Yes.
 7     Q.   So you said ultimately you decided to go to treatment,
 8     right?
 9     A.   Yes.
10              MS. RUDOFF:  You can take down 38, please.
11     BY MS. RUDOFF:
12     Q.   Why now?  Why was this different?
13     A.   I was terrified of going to prison, and this time was also
14     very different because I was tired of everything.  I was ready.
15     I was ready.
16     Q.   Did you find a treatment facility for you to go to?
17     A.   I did.
18     Q.   Did you go?
19     A.   I did.
20     Q.   Did you stay in the relationship with your boyfriend at
21     the time?
22     A.   No.
23     Q.   What happened with that?
24     A.   I left.
25     Q.   Were you still on bond conditions in the Hood County case
```

1  at this time?

2  A.   Yes.

3  Q.   Did you have to do anything with regards to your Hood

4  County pretrial officer in order to be able to go to this

5  facility?

6  A.   I had to agree to do drug testing while in treatment.

7  Q.   Why did you have to do that?

8  A.   For my bond conditions, my -- for being out on bond.

9  Q.   Okay.  And where was the facility located?

10 A.   The first one was in -- because I originally got a

11 scholarship to Cirque Lodge, and then they decided I needed

12 go to dual diagnosis treatment center in California for my

13 eating disorder and drug use.

14 Q.   So where -- you said the first one you got a scholarship

15 to?

16 A.   I called and asked if I could get a scholarship to go.

17 Q.   Why did you do that?

18 A.   Because I didn't want to ask my grandmother for any more

19 money, nor would she give it.

20 Q.   And you were able to get that money?

21 A.   Yes.

22 Q.   And where was that facility located?

23 A.   In Utah.  Provo, Utah.

24 Q.   So what happened when you got there that made you then go

25 to California?

```
 1   A.   I was needing to go to dual diagnosis treatment center.

 2   Q.   Is that what the professionals there told you?

 3   A.   Yes.

 4   Q.   So you went to California?

 5   A.   Yes.

 6   Q.   Did you have to square any of this away with your Hood

 7   County pretrial officer?

 8   A.   Yes.

 9   Q.   Why?

10   A.   Because I was on bond probation.

11   Q.   What about your bond conditions meant that you had to get

12   approval from your pretrial supervision officer or the Court?

13   A.   I had to check in with them to relocate due to my being on

14   bond.

15   Q.   So to leave the state of Texas?

16   A.   Right, to leave the state of Texas or to move facilities.

17   Q.   Okay.  And did the Court ultimately give you approval to

18   do that?

19   A.   Yes.

20   Q.   When did you start this rehab?

21   A.   September 8, 2014.

22   Q.   You remember that day pretty clear?

23   A.   Yes.

24   Q.   Why do you remember it so clear?

25   A.   It was the day I changed my life for the better.
```

```
 1   Q.   Have you been off drugs since then?
 2   A.   Yes.
 3   Q.   How long were you there?
 4   A.   I was there for four months, five months.
 5   Q.   How was it for you at this facility?
 6   A.   It was really good.
 7   Q.   What about it?
 8   A.   It was life changing.  I learned how to function.  I
 9   learned how to eat.  We got to have a job and cook our own food
10   and just learn how to live.
11   Q.   How were you feeling when you were there?
12   A.   Empowered and good, great.
13   Q.   Were you able to communicate with your family while you
14   were there?
15   A.   I was.
16   Q.   How was that?
17   A.   I was allowed to talk to them on my cell phone.  We were
18   allowed to have our cell phones.
19   Q.   How was it, though, being able to talk to them?  Was it a
20   good situation?
21   A.   Oh, it was great.  Yes, it was good.  They -- my mom came
22   up for Christmas and brought my son, so that was wonderful,
23   so --
24   Q.   What about the relationship with your grandma while you
25   were at this facility?
```

```
 1   A.   She was regaining hope in me, and our relationship got
 2   stronger.
 3   Q.   Is there anything else about this facility or this
 4   treatment that was different for you and that has helped you?
 5   A.   At this treatment I was willing to do the work.  I wanted
 6   to -- I was willing to let go of everything that I ever knew in
 7   my past and change everything about my life.  And I didn't
 8   expect any help from anybody.  I wanted to do it myself.
 9   Q.   Were you able to successfully complete it?
10   A.   Yes.
11   Q.   During the time you were in this rehab facility, are you
12   still communicating with Joe DeLeon?
13   A.   Yes.
14   Q.   How were you guys communicating?
15   A.   Through text.
16   Q.   What would you guys talk about?
17   A.   We would continue talking about my progress and treatment.
18   Q.   How did he respond?
19   A.   He was proud of me.
20   Q.   How did that make you feel?
21   A.   It made me feel good.
22   Q.   Do you know if Bill Stone was made aware of your progress
23   while you were in treatment?
24   A.   I was told through Joe that he was telling Bill that I was
25   doing good.
```

```
 1   Q.   Did Joe tell you how Bill responded?
 2   A.   That he was proud of me.
 3   Q.   How did that make you feel?
 4   A.   Good.
 5   Q.   Why did their opinion of your progress matter to you?
 6   A.   Because to me I felt like they really were looking out for
 7   my best interest and they wanted what was best for me.
 8   Q.   When Joe DeLeon was communicating with you when you were
 9   in rehab, did he ask for anything in return for his support?
10   A.   No.
11   Q.   Did you give him any kind of gifts as a result?
12   A.   No.
13   Q.   At some point did DeLeon, while you were at the facility,
14   ask you for the name of your rehab facility?
15   A.   Yes.  He knew where I was.
16   Q.   Did he ask you for information from your case manager?
17   A.   Yes.
18   Q.   Do you know why?
19   A.   He needed that information for Bill.
20   Q.   That's what he told you?
21   A.   That's what he told me.
22   Q.   Okay.
23            MS. RUDOFF:  Can you bring up Government Exhibit 38,
24   page 78?
25   BY MS. RUDOFF:
```

1  Q.   Did Joe DeLeon tell you why Stone wanted this information?

2         MR. SELLERS:  Object to asked and answered.

3         THE COURT:  Overruled.

4  A.   Can you repeat it?

5  Q.   Did Joe DeLeon tell you why Bill Stone wanted this

6  information?

7  A.   I was under the impression he needed it for something to

8  do with my Hood County case.

9  Q.   Okay.  What did that -- how did you understand that?

10  A.   I wasn't -- I wasn't really sure what to understand.  I

11  was just giving him the information as he asked for it.

12         MS. RUDOFF:  Can you zoom in on the second green

13  message down?

14  BY MS. RUDOFF:

15  Q.   Is this kind of how the conversation went about getting

16  your information to Bill Stone?

17  A.   Yes.

18  Q.   Did it make sense to you why Bill Stone needed to know

19  what was going on at the facility for any reason?

20  A.   No, it did not.

21  Q.   Did you ask him at the time to do anything with regards to

22  your Hood County case?

23  A.   I did not.

24  Q.   Based on this message were you under the understanding,

25  though, that that's what him and Joe DeLeon were doing?

```
 1                 MR. SELLERS:  Object to leading, Your Honor.
 2                 THE COURT:  I will give you a little latitude.
 3   BY MS. RUDOFF:
 4   Q.   You can answer.
 5   A.   Oh, okay.  I was under -- I wasn't real sure what -- I
 6   felt like Joe was trying to be helpful, but I didn't ask for
 7   any assistance in this case.
 8   Q.   Can you read the second sentence on this text?
 9   A.   "Thank you in advance.  P.S., I've already let him know
10   that you signed documents with the facility for him to get info
11   on you in case he needed it for helping you so he can convince
12   the Judge to some stuff."
13   Q.   So what was your understanding about convince the Judge to
14   some stuff?
15                 MR. SELLERS:  I'm going to object to speculation,
16   Your Honor.
17                 THE COURT:  All right.  If you can establish how she
18   knows it.
19   BY MS. RUDOFF:
20   Q.   Did you have an impression about what this meant?
21                 MR. SELLERS:  Same objection.
22                 MS. RUDOFF:  Your Honor, I'm asking her impression,
23   not --
24                 THE COURT:  Okay.  If I want a response, I'll tell
25   you.
```

```
 1                    Sustained.
 2                    MS. RUDOFF:  You can zoom out.
 3   BY MS. RUDOFF:
 4   Q.   At the time while you were in rehab, did you learn
 5   something happened with your Hood County case?
 6   A.   I was getting indicted for it.
 7   Q.   And at that time was that the only situation -- criminal
 8   situation involving a judge that you were dealing with?
 9   A.   Yes.
10   Q.   And did you relay the information that you were indicted
11   to Joe DeLeon?
12   A.   Yes.
13   Q.   Why did you share it with him?
14   A.   I thought maybe he could maybe give me some maybe
15   information on the process.  And just letting him know that
16   information.  Just letting him know.
17   Q.   Did DeLeon tell you if he shared it with Stone?
18   A.   I'm not sure.  I'm sure he did.
19   Q.   When did you return home from the facility?
20   A.   End of January 2015.
21   Q.   How did you feel coming home that time?
22   A.   I felt great.  I felt really good.
23   Q.   How was it when you got home with your children?
24   A.   It was wonderful.
25   Q.   Were you living with them?
```

```
 1    A.    I was living with my mom and my son, yes.

 2    Q.    When was the last time you had the ability to live with

 3    your child?

 4    A.    Since 2 -- it had been a few years.

 5    Q.    Were you working?

 6    A.    Yes.

 7    Q.    Where were you working?

 8    A.    I was working as a hairstylist in Fort Worth.

 9    Q.    Were you staying clean?

10    A.    Yes.

11    Q.    When you were working as a hairstylist in Fort Worth,

12    about how much money were you making at the time?

13    A.    Not very much.  I was just doing men's haircuts.

14    Q.    So take-home per week?

15    A.    It was probably 300.

16    Q.    And that's the way you were financially supporting

17    yourself, right?

18    A.    Yes.

19    Q.    How was your relationship with your grandmother when you

20    returned?

21    A.    I -- it was good.  We hung out together.  We would go to

22    church.  We would -- it just -- it just grew back to where it

23    was, and she gained trust and hope in me again.  It was great.

24    Q.    How did that make you feel?

25    A.    It made me feel really good.
```

```
 1   Q.   Did her opinion still matter to you?

 2   A.   Of course, yes.

 3   Q.   Once you were home, did you have to then appear in court

 4   on your Hood County charges?

 5   A.   I did.

 6   Q.   Did you have to hire a lawyer?

 7   A.   Yes.

 8   Q.   And did you continue to meet with your pretrial bond

 9   officer?

10   A.   Yes.

11   Q.   And were you continuing to be successful with that?

12   A.   Yes.

13   Q.   You said you were spending a lot of time with your

14   grandmother, right?

15   A.   Yes.

16           MS. RUDOFF:  Your Honor, may I approach the witness?

17           THE COURT:  You may.

18           (Pause)

19   BY MS. RUDOFF:

20   Q.   Casi, I'm showing you what's been previously marked as

21   Government Exhibit 4.  Can you take a look at that?  Do you

22   recognize it?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's a picture of me and my grandmother on Mother's Day.
```

```
 1   Q.   Does the photo fairly and accurately depict you and your
 2   grandmother on that day?
 3   A.   Yes.
 4            MS. RUDOFF:  Your Honor, at this time the Government
 5   moves to admit Government's Exhibit Number 4.
 6            MR. GALLIAN:  No objection.
 7            MR. SELLERS:  One second, Your Honor.
 8            (Pause)
 9            MR. SELLERS:  No objection, Your Honor.
10            THE COURT:  It's admitted.
11               (Government's Exhibit No. 4 received)
12            MS. RUDOFF:  Permission to publish, Your Honor?
13            THE COURT:  Granted.
14   BY MS. RUDOFF:
15   Q.   Casi, on the screen we see what's been marked as
16   Government's Exhibit 4.  Who all is in this photo?
17   A.   Me and my mom and my grandmother.  In this photo, me and
18   my grandmother.
19   Q.   And where were you guys when this photo was taken?
20   A.   We were eating at a restaurant on Mother's Day in
21   Glen Rose.
22   Q.   So if it was Mother's Day, it would have been 2015 or
23   later?
24   A.   2015.
25   Q.   Okay.  Was this a good day?
```

```
 1   A.   It was a great day.

 2   Q.   Were your kids with you?

 3   A.   I had both of my kids and my mom and my grandmother.

 4   Q.   At some point around this time did your grandmother take

 5   you to meet with a lawyer?

 6   A.   Yes.

 7   Q.   What was she taking you to meet with a lawyer for?

 8             MS. RUDOFF:  You can take down 4.

 9   A.   She wanted to adjust her will and trust.

10   Q.   Did you go with her?

11   A.   I did.

12   Q.   Do you remember approximately when that was?

13   A.   February of 2015.

14   Q.   Okay.

15   A.   Around.  Maybe.  I'm not sure.

16   Q.   And what was your -- what was your understanding of why

17   you needed to be there?

18   A.   Well, I was just with her, and she -- I feel like -- I'm

19   not sure why we both needed to be there.  I was just with her.

20   But she also had her assistant there to sign on it.

21   Q.   What happened when you were at the meeting?

22   A.   She added me to her will and changed her beneficiary.

23   Q.   Who did she change it to?

24   A.   Me and my kids.

25   Q.   How did you feel about that?
```

```
 1   A.   I quite honestly felt a little guilty.  I felt honored.  I
 2   felt -- I guess honored would be a really -- would be a better
 3   word, a great word.
 4   Q.   Why did you feel honored?
 5   A.   Because before, I had been taken out of everything.
 6   Q.   When you say taken out of everything, what do you mean?
 7   A.   Let go.  I didn't have any -- she had taken me -- wrote me
 8   off of her will.
 9   Q.   Was anyone else in -- listed in this will at the time?
10   A.   Repeat the question.
11   Q.   Let me ask a different question.
12        You said you felt guilty?
13   A.   Yes.
14   Q.   Why did you feel guilty?
15   A.   I felt like it was a huge responsibility, and I also
16   wished that it was split between me and my brother and my mom.
17   Q.   Did you understand why your mom and your brother weren't
18   in there?
19   A.   I did.
20   Q.   What was your understanding?
21   A.   Do I have to answer that?
22   Q.   Yeah.  Let me do a better question.
23        Did your grandmother remove them from the will?
24   A.   Yes.
25   Q.   Was it for reasons related to their relationship with her?
```

```
 1   A.   Yes.
 2   Q.   Was that typical of your grandmother to do something like
 3   that?
 4   A.   Yes.
 5   Q.   How so?  Why would you call that typical?
 6   A.   She was -- she was really quick to give and then take
 7   back.
 8   Q.   And was it -- what was it typically in response to?
 9   A.   Not doing what she wants you to do.
10   Q.   At the meeting with the lawyer, did you see the documents
11   that were drafted and signed?
12   A.   Yes.
13           MS. RUDOFF:  Your Honor, may I approach the witness?
14           THE COURT:  You may.
15   BY MS. RUDOFF:
16   Q.   I'm showing --
17           THE COURT:  I'm sorry.  Not to interrupt, but we will
18   need to take a break in a couple of minutes, so when you reach
19   a wrapping point.
20           MS. RUDOFF:  Thank you, Your Honor.
21           THE COURT:  Sure.
22           MS. RUDOFF:  I'm going to hand the witness what's
23   previously been marked as Government's Exhibit 2.
24   BY MS. RUDOFF:
25   Q.   Can you take a look at that document, Casi?  Do you
```

```
 1   recognize it?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   It's my grandmother's -- it's my grandmother's trust

 5   papers.

 6   Q.   Is it the same document you reviewed at that meeting that

 7   day?

 8   A.   Yes.

 9            MS. RUDOFF:  At this time the Government moves to

10   admit Government's Exhibit Number 2.

11            THE COURT:  Any objection from Mr. Stone's counsel?

12   If you need a moment.

13            MR. GALLIAN:  Sorry, Judge.  There's a lot.  No

14   objection.

15            THE COURT:  And if you need a moment, it's okay.

16            MR. SELLERS:  No objection.

17            THE COURT:  No objection.  It's admitted.

18            (Government's Exhibit No. 2 received)

19            THE COURT:  Before we publish it, why don't we go on

20   our break.

21            MS. RUDOFF:  Perfect, Judge.

22            THE COURT:  All right.  So we're going to have a

23   half-hour break.

24            Members of the jury, we will rise for you.

25            Everybody else, if you will be back at 3:30, we'll
```

```
 1    resume.
 2              Everybody needs to stand up for the jury.  Everybody.
 3    That's all of you.
 4              (Jury out)
 5              THE COURT:  All right.  Please be seated.  I run an
 6    informal courtroom, but we do need to rise for the jury.
 7    Please be seated.
 8              Do we need to take anything up before break?  No?
 9    I'll come back a couple minutes early in case we do.
10              Court's in recess.
11              MR. WESTFALL:  Thank you, Judge.
12              (Recess)
13              SECURITY OFFICER:  All rise for the jury.
14              (Jury in)
15              THE COURT:  All right.  Everybody please be seated.
16              So members of the jury, I visited with the lawyers
17    and told them we would like to have a set schedule going
18    forward and that the jury would like to go from 8:00 to 4:00,
19    is that right?  So that is what we're going to do.
20              I told them also we wanted to have kind of an early
21    lunch, 11:30-ish.  I don't know that we nailed this down, but
22    do you want to bring your lunches tomorrow?  Okay.  Sounds
23    good.  We will do the same.
24              Y'all want to go till about 4:30 today?  Okay.
25    Sounds great.
```

1          Your witness, ma'am.

2          Everybody make sure your phones are off, please.

3          MS. RUDOFF:  Thank you, Judge.

4          THE COURT:  You're welcome.

5     BY MS. RUDOFF:

6     Q.   Casi, right before we took a break, I had admitted

7     Government Exhibit Number 2.

8          MS. RUDOFF:  Your Honor, may I publish Government's

9     Exhibit Number 2?

10         THE COURT:  You may.  Yes, ma'am.

11    BY MS. RUDOFF:

12    Q.   And this exhibit has three pages.  Do you recognize it?

13    A.   Yes.

14    Q.   What is it?

15    A.   It is my grandmother's trust.

16    Q.   Is this the document you were showed at that meeting with

17    the lawyer in February of 2015?

18    A.   Yes.

19    Q.   Do you see up at the top, does it say anything in

20    handwriting?

21    A.   Updated in 2015.

22         MS. RUDOFF:  Can you go to the third page, please?

23    BY MS. RUDOFF:

24    Q.   Is this also part of that document?

25    A.   Yes.

```
 1   Q.   What does this page of the document show?

 2   A.   This is the Schedule A of her belongings.

 3   Q.   What does this list here include?

 4   A.   Her assets.

 5   Q.   Okay.  Do you see a date at the bottom?

 6   A.   Yes.

 7   Q.   What's the date?

 8   A.   February 10th.

 9   Q.   What year?

10   A.   2015.

11   Q.   Okay.  And so as a result of this document, you understood

12   that you were now going to be executor of her estate, right?

13   A.   Yes.

14   Q.   At the time of this meeting, were you aware of the value

15   of the estate?

16   A.   Not at this time.

17   Q.   Did you have any idea of what it potentially was worth?

18   A.   I did not.

19   Q.   Did the value of it matter to you?

20   A.   No.

21   Q.   Why not?

22   A.   Because it was her things, and I didn't -- it didn't

23   matter to me at all, the intent of the true value of the

24   estate.

25   Q.   What about this day and this meeting did matter to you?
```

```
 1    A.   Just the fact that I was included in her life.
 2    Q.   Did you share the fact that your grandmother had decided
 3    to leave her estate to you with Joe DeLeon?
 4    A.   Yes, I did.
 5    Q.   Did you share that with Bill Stone?
 6    A.   I did.
 7    Q.   Around this same timeframe?
 8    A.   Joe -- it was a little later, I believe.
 9    Q.   Okay.  How did you share that with them?
10    A.   I -- how did I?
11    Q.   Yes.
12    A.   Through text or -- yeah.  I -- well, I just reached out to
13    Joe, and I asked him, I said, my grandmother has left me a huge
14    duty of being executor and -- of her estate, and I might need
15    your help whenever it comes time for -- because I didn't know
16    how to do probate or anything like that.
17    Q.   Okay.  Did you, in March of 2015, have a meeting with --
18    or a dinner with Bill Stone and Joe DeLeon?
19    A.   I had a meeting with Bill.
20    Q.   Did you share this information with him then?
21    A.   I did.
22    Q.   So he was also aware at that point?
23    A.   Yes.
24              MR. SELLERS:  Object to leading.
25              THE COURT:  Sustained.
```

```
 1                    Don't lead.
 2              MS. RUDOFF:  You can remove the document.
 3    BY MS. RUDOFF:
 4    Q.   Fast-forward a little bit.  In August of 2015, what was
 5    going on with your Hood County case?
 6    A.   I was -- I had court.
 7    Q.   And what did you have court for?
 8    A.   For my drug possession charge.
 9    Q.   What were you doing at that court date?
10    A.   What was I doing?
11    Q.   Why were you going to court?
12    A.   For -- I got called into court.  It was my court date for
13    my drug charge.
14    Q.   What happened at that court date?
15    A.   So I was given a deferred probational -- probation period
16    of six years.
17    Q.   So did you plead guilty to the charges that day?
18    A.   I did plead guilty, yes.
19    Q.   Showing you what has previously been marked as
20    Government's Exhibit 164.
21              Take a look at that document for me, please.
22    A.   (Indicating in the affirmative)
23    Q.   Do you recognize it?
24    A.   Yes.
25    Q.   What is it?
```

```
1   A.   It's my guilty plea -- it's my probation stipulations and

2   agreement.

3   Q.   And that's for Hood County, right?

4   A.   Yes.

5           MS. RUDOFF:  Your Honor, permission to admit -- or

6   Government moves to admit Government Exhibit 164.

7           THE COURT:  Any objection?

8           MR. GALLIAN:  No objection.

9           MR. SELLERS:  No objection.

10          THE COURT:  It's admitted.

11              (Government's Exhibit No. 164 received)

12          MS. RUDOFF:  May I publish to the jury?

13          THE COURT:  You may.

14  BY MS. RUDOFF:

15  Q.   Casi, on your screen you should see page 1 of

16  Government 164.

17          You said this was your plea agreement in your Hood

18  County case, right?

19  A.   Yes.

20  Q.   What level felony does it say that you pled guilty to?

21  A.   A third degree felony.

22  Q.   And was this the same felony you were charged with?

23  A.   Yes.

24  Q.   There was no reduction or anything like that?

25  A.   No.
```

```
1   Q.   Okay.  Looking at page 8, do you see this document in
2   front of you?  Can you tell us what the title of this document
3   is?
4   A.   My order of deferred adjudication.
5   Q.   And you said that you were granted a deferred
6   adjudication, right?
7   A.   Yes.
8   Q.   How long was your deferred adjudication?
9   A.   It was six years.
10  Q.   Did your deferred adjudication include certain conditions
11  you had to abide by?
12  A.   Yes.
13        MS. RUDOFF:  Can you go to page 9?
14  BY MS. RUDOFF:
15  Q.   Here at the bottom you see standard conditions, right?
16  A.   Yes.
17  Q.   And were those the conditions that you were told you had
18  to abide by?
19  A.   Yes.
20  Q.   Okay.  And did they include, as we can see here on the
21  screen, working and maintaining employment?
22  A.   Yes.
23  Q.   Reporting any changes to your employment to your probation
24  officer?
25  A.   Yes.
```

```
 1   Q.   To allow home visits?
 2   A.   Yes.
 3   Q.   To not travel out of county or state unless you had
 4   permission?
 5   A.   Yes.
 6   Q.   To support your children?
 7   A.   Yes.
 8   Q.   To report a change in your residence?
 9   A.   Yes.
10   Q.   To have drug tests?
11   A.   Yes.
12   Q.   Community service?
13   A.   Yes.
14   Q.   To avoid bad people and places?
15   A.   Yes.
16   Q.   Did you also have to pay restitution?
17   A.   Yes.
18   Q.   And did you have to pay court costs and fine?
19   A.   I did.
20   Q.   And did you also have to complete a 12-step program as
21   well?
22   A.   Yes.
23   Q.   And these were the conditions that from that day forward
24   you understood you had to abide by?
25   A.   Yes.
```

```
 1   Q.   So there is no special treatment as far as you know that
 2   was given to you?
 3            MR. SELLERS:  Object to leading.
 4            THE COURT:  Sustained.  Don't lead the witness.
 5   BY MS. RUDOFF:
 6   Q.   Were you clear -- did you understand what would happen if
 7   you messed up any of these conditions?
 8   A.   Yes.
 9   Q.   And what was your understanding?
10   A.   I would go to prison.
11   Q.   And what did you do in response to that?  How did you
12   handle it?
13   A.   I did my probation.  I completed it.
14   Q.   Okay.  And this is signed and documented --
15            MS. RUDOFF:  If we can go to the last page.  Page
16   right before.  No.  No.
17            Can you go to her signature page?
18            (Pause)
19            MS. RUDOFF:  The page right before this one that
20   you're on.  It's page -- I can't tell what page it is.
21   Page 11.
22   BY MS. RUDOFF:
23   Q.   Do you see the date on this?
24   A.   Yes.
25   Q.   What day is that?
```

```
 1    A.    August 25, 2015.
 2    Q.    And what date did all those conditions we just went over
 3    begin?
 4    A.    August 25, 2015.
 5    Q.    So from the moment you signed this document, did you stay
 6    in compliance with these conditions?
 7    A.    Yes.
 8    Q.    Was there any that you had any issue with?
 9    A.    No.
10    Q.    So after you're on this probation, did you decide what to
11    do about work or school?
12    A.    I decided I was going to -- I was working at this time,
13    but then I decided to go back to school.
14    Q.    Who made that decision?
15    A.    I did.
16    Q.    Did anyone tell you to?
17    A.    No.
18    Q.    Did Joe DeLeon tell you to?
19    A.    No.
20    Q.    Did Bill Stone tell you to?
21    A.    No.
22          MR. SELLERS:  Object to asked and answered.
23          THE COURT:  Overruled.
24    BY MS. RUDOFF:
25    Q.    Where did you decide to go?
```

```
 1   A.   I went to Tarleton State University.

 2   Q.   And where is Tarleton located?

 3   A.   It's in Stephenville, Texas.

 4   Q.   So the Dallas-Fort Worth area?

 5   A.   Yes.

 6   Q.   What degree were you pursuing?

 7   A.   Marketing and business.

 8   Q.   When did your classes start?

 9   A.   In August of 2015.

10   Q.   How were your grades when you started?

11   A.   Good.  Great.

12   Q.   How did that semester go?

13   A.   Very well.

14   Q.   What was your GPA at the end of that semester?

15   A.   I want to say it was close to 4.0.

16   Q.   And you said you were working before you decided to go

17   back to school.  What were you doing for work?

18   A.   I was doing hair, and then while I was going to school I

19   was working for my grandmother.

20   Q.   In that fall, did your grandmother start to have some

21   health issues?

22   A.   Yes.

23   Q.   What happened?

24   A.   She fell and broke her shoulder.

25   Q.   And after she broke her shoulder, did she have more health
```

1    issues?

2    A.   She did.

3    Q.   What happened?

4    A.   She ended up having -- getting pneumonia from laying down

5    for a long time, so --

6    Q.   What happened when she got pneumonia?

7    A.   She then passed.

8    Q.   Was she in the hospital?

9    A.   She was.

10   Q.   Was anyone with her in the hospital while she was sick?

11   A.   Me, our family, yes.

12   Q.   I just want to go back.  You said working for your

13   grandmother just before going back to school.  What does that

14   mean?  What were you doing?

15   A.   I was just helping her.  Her personal assistant had quit,

16   and she needed somebody.  And so I was just helping her do her

17   daily things, daily activities, cleaning, things that she

18   needed done around the house.

19   Q.   Okay.  And you said that unfortunately your grandmother

20   passed away, right?

21   A.   Yes.

22   Q.   What date was that?

23   A.   It was November 6, 2015.

24   Q.   How did losing your grandmother feel at the time?

25            MR. SELLERS:  Your Honor, I'm going to object to

```
 1    relevance.  I'm not sure --
 2             THE COURT:  Sustained.  Let's move on.
 3    BY MS. RUDOFF:
 4    Q.  Did you have to do anything immediately following your
 5    grandmother's death?
 6    A.  Immediately following?  I had to plan her funeral.
 7    Q.  Okay.  Did you plan her funeral?
 8    A.  Yes.
 9    Q.  Did anyone help you with it?
10    A.  She helped me with it.
11    Q.  How?
12    A.  She had pretty much planned her own funeral going in.  She
13    picked out her clothes, the songs that she wanted, the pictures
14    that she wanted.
15    Q.  At the time what was your relationship like with your
16    family?
17    A.  They were good, just a little -- a little different than
18    normal, but, I mean, they were getting better.
19    Q.  Okay.  Who were you still relying on for your support at
20    this time?
21    A.  I was relying a lot on Joe.  We shared -- my grandmother
22    was sick around the same time his mother was sick, so we would
23    share that, our feelings about each other's family member
24    that's sick.
25    Q.  Was he supportive?
```

```
 1   A.   He was.

 2   Q.   Did he ever ask you for money during that time?

 3   A.   No.

 4   Q.   The day of the funeral, was Joe DeLeon there?

 5   A.   Yes.

 6   Q.   Why was Joe DeLeon there?

 7   A.   I was told --

 8            MR. SELLERS:  Object to hearsay.

 9            THE COURT:  Sustained.

10   A.   Joe came --

11            THE COURT:  No, don't answer.

12            THE WITNESS:  Oh, okay.

13            THE COURT:  I sustained that.

14            THE WITNESS:  Oh, I'm sorry.

15            THE COURT:  I don't want to hear a response.

16   Move on.

17   BY MS. RUDOFF:

18   Q.   Did you invite Joe DeLeon to the funeral?

19   A.   No, I didn't.

20   Q.   When Joe DeLeon got there, did Joe DeLeon tell you why he

21   was there?

22   A.   Yes.

23   Q.   What did Joe DeLeon say?

24   A.   He told me that he was told -- instructed by Bill to watch

25   me while -- he was told -- he was instructed by Bill to keep
```

```
 1   eyes on me, because Bill had flown into town from D.C., and he
 2   was working on something for me, and that's all he could say.
 3   Q.   Did any of that make sense to you?
 4   A.   I had no idea what he was talking about.
 5   Q.   What did Joe DeLeon do then while you were attending the
 6   funeral?
 7   A.   He stood off in a corner.
 8   Q.   Doing what?
 9   A.   Just watching me.
10   Q.   Did you see him engage with people?
11   A.   Not really.
12   Q.   Did you introduce him to anyone?
13   A.   If he was standing next to me and somebody approached me,
14   I acknowledged him being there.
15   Q.   How would you introduce him?
16   A.   I had someone ask if he was a friend of my grandmother's,
17   and I said, no, he's a friend of mine.
18   Q.   Okay.  Hearing that Joe needs to be there for your
19   protection, how do you feel about that?
20   A.   I was not sure what he was talking about.  It freaked me
21   out.  But I had just lost my grandmother, and I was supposed to
22   be -- I had to read -- I had to stand up and talk about my
23   grandmother in the funeral.  And it was very uncomfortable.  I
24   wasn't sure -- extremely uncomfortable situation.
25   Q.   After the funeral, did you get a chance to speak with Joe
```

1    DeLeon?

2    A.   Yes.

3    Q.   Did he give you any further information about him and Bill

4    Stone needing to meet with you?

5    A.   He -- he then came back to my house after the funeral and

6    shared with me a little bit that Bill was in town helping me

7    with some cases that had popped up.

8    Q.   At the time did you know what cases he was referring to?

9    A.   I did not know what cases he was talking about.

10   Q.   Did you have any cases other than your Hood County case at

11   the time?

12   A.   I did not.

13   Q.   You said you were at your house.  Where were you living at

14   the time?

15   A.   I had a house in Granbury.

16   Q.   And who was living with you?

17   A.   Slayter.

18   Q.   And Granbury, do you know what county that's in?

19   A.   Hood County.

20   Q.   And is that in the Northern District of Texas?

21   A.   It is.

22   Q.   When Joe DeLeon was at your house that evening, did Bill

23   Stone call?

24   A.   Yes.

25   Q.   What did Bill Stone say?

```
 1   A.   He called Joe and said he was on his way, and he came
 2   over.
 3   Q.   What were you thinking might be happening at this point?
 4   A.   I had no idea.
 5   Q.   What were you feeling?
 6   A.   I was terrified.
 7   Q.   Why?
 8   A.   Because I had just gotten my deferred adjudication
 9   probation to do.  I just lost my grandmother.  I just had -- I
10   had all this responsibility to carry out her wishes with her
11   estate, and I just wasn't sure what was going on.
12   Q.   At the time what did you understand -- when you said Bill
13   was coming in, did you understand -- did you know where Bill
14   was coming from?
15   A.   I had no idea.  I did not know where he was coming from.
16   Q.   Did you know where he was working at the time?
17   A.   I do.
18   Q.   And where did you understand he was working at the time?
19   A.   He was working in Washington, D.C.
20   Q.   For who?
21   A.   The FBI.
22   Q.   Okay.  So this is November 2015, right?
23   A.   Yes.
24   Q.   Did Bill Stone eventually make it to your house that
25   night?
```

1    A.   Yes.

2    Q.   Did he say more about why he was there?

3    A.   Yes, he did.

4    Q.   What did he say?

5    A.   He said that there were some papers that were coming

6    across the desks of Tarrant County -- goodness.  What is the --

7    statute of limitations were coming up, and -- on some cases

8    that were on the -- on the desks of Fort Worth PD.  Drug cases.

9         There were some drug case that were coming up that I

10   was involved with that he had to handle, and he came down to

11   handle them before they went to the grand jury, is what I was

12   told.

13   Q.   Did Bill Stone tell you how he knew this?

14   A.   He had my name flagged in the system.

15   Q.   Did he explain to you what that was?

16   A.   He was alerted anytime my name was brought up, is what I

17   was told.

18        THE COURT:  Pause for just a moment.  If you will

19   just pause after she gives you a question just so we don't talk

20   over each other.

21        THE WITNESS:  I'm sorry.

22        THE COURT:  That's okay.  In real life we talk that

23   way, so I'm not trying to get onto you.

24        THE WITNESS:  Okay.  Thank you.

25   BY MS. RUDOFF:

```
 1   Q.   You said -- can you just repeat your answer?  You said
 2   something about being flagged?
 3   A.   Right.  My name was flagged in his system.  If my name was
 4   ran over the system, he would get alerted.
 5   Q.   And that's based on what Bill Stone told you?
 6   A.   That is based on what he told me.
 7   Q.   Did you understand what the system was?
 8   A.   I hadn't -- I just figured it was a system, a database.
 9   Q.   What kind of database?
10   A.   A criminal.
11   Q.   Okay.  You said there was some charges with SOL?  What's
12   SOL?
13   A.   Statute of limitation.
14   Q.   Okay.  And what -- did you know what that meant at the
15   time?
16   A.   I do know what statute of limitations are.  I did not know
17   what charges he was talking about.
18   Q.   Okay.  Did he give any further explanation about them?
19   A.   He -- when I asked to see evidence, he told me I would
20   have to go in front of the judge before ever seeing the
21   evidence, and he -- then I would have to be tried.
22   Q.   Okay.  And so why didn't you do that?
23   A.   He told me that it would affect my Granbury probation.
24   Q.   How?
25   A.   It would be another offense.
```

```
 1   Q.   That's what he told you?
 2   A.   Well, that -- yes.
 3   Q.   Did he say what the charges were exactly?
 4   A.   In this particular night it was a -- it was like -- it was
 5   a group of us that he was saying, like, my whole circle of
 6   friends were getting arrested.  And so it was just a drug ring
 7   bust.
 8   Q.   Did it make sense to you that your name would come up in
 9   this drug ring bust?
10   A.   It didn't make sense to me at the time, because I was
11   sober.  But I had heard of people getting their life together
12   and things from their past coming back up, and I thought, well,
13   might be possible.
14   Q.   Okay.  Did you call your lawyer?
15   A.   I didn't.
16   Q.   Why?
17   A.   I was told that I wasn't allowed to tell anybody.
18   Q.   Who told you that?
19   A.   Bill and Joe.
20   Q.   Did you believe them?
21   A.   Yes.
22   Q.   Why?
23   A.   Because they were law enforcement and they were looking
24   out for me.
25   Q.   Did they tell you what would happen if Hood County
```

```
 1    probation found out about a new charge?
 2    A.    It would revoke my probation.
 3    Q.    What would that mean?
 4    A.    I would go to prison and lose my kids.
 5    Q.    How did that make you feel?
 6    A.    Scared.
 7    Q.    Did you tell your family about any of this?
 8    A.    I did not.
 9    Q.    Why not?
10    A.    He -- I was told that they would use it against me and
11    come after the estate.
12    Q.    Who told you that?
13    A.    Bill and Joe.
14    Q.    And when you say they would come after me, who are you
15    referring to?
16    A.    My mom and my brother.
17    Q.    Did you believe them?
18    A.    I thought it might be possible.
19    Q.    Why?
20    A.    Because it's happened before.
21    Q.    Did DeLeon or Stone tell you anything else you needed to
22    do at the time in that night?
23              MR. SELLERS:  Your Honor, I'm going to object to
24    confusing the issues with the two.
25              THE COURT:  Overruled.
```

```
1    BY MS. RUDOFF:
2    Q.   That night while you're still meeting with Bill Stone and
3    Joe DeLeon, what did they tell you to do moving forward?
4    A.   That I needed to just keep going and doing what I was
5    doing until I heard back further from him.
6    Q.   Did you do that?
7    A.   I did.
8    Q.   Did he tell you anything else about your current situation
9    related to your family?
10   A.   During -- are you referring to the same night?
11   Q.   Yeah.
12   A.   Okay.  Just that his -- in regard to my family, they were
13   just telling me I needed to watch out and get cameras put up.
14   Q.   Why did you need to get -- why did you need to get cameras
15   up?
16   A.   Because I needed -- because they were conspiring to hurt
17   me in the background of all of this.
18   Q.   When you say they --
19   A.   My family.
20   Q.   Who told you that?
21   A.   Bill and Joe.
22   Q.   Did you put cameras up?
23   A.   I did.
24   Q.   Why?
25   A.   To watch my properties, because I was in my grandmother's
```

1   house and my house.

2   Q.   Shortly after learning this information, did you go about

3   your business as told?

4   A.   I did.

5   Q.   How was it in those days until you heard back from Bill

6   Stone and Joe DeLeon?

7   A.   I was instructed that the only person I could talk to

8   about it was Joe, and so I spoke with Joe quite often, most

9   every day if I was not in school or with my kids.  And then

10  even later it was with -- but I -- I was uneasy.  I wasn't sure

11  what was even going on.  I was just trusting in them.

12  Q.   Did you have any concerns about your children?

13  A.   I was scared that if what was being told to me was true I

14  would lose my kids, yes.

15  Q.   Did you do anything specific about it related to your

16  children?

17  A.   The -- well, in this circumstance?

18  Q.   At the time.

19  A.   At the time.  I was --

20          Okay.  Can you repeat the question?  I'm sorry.

21  Q.   At the time --

22  A.   Right.

23  Q.   -- did you do anything with regards to your children

24  because you were worried about losing them?

25  A.   Well, I was sober, and I --

```
 1   Q.   Did you go see a lawyer?
 2   A.   I did.  I did.  I went to see a lawyer, and I --
 3            MR. SELLERS:  Object to nonresponsive.
 4            THE COURT:  Overruled.
 5   BY MS. RUDOFF:
 6   Q.   You can answer.
 7   A.   Okay.  So I was concerned with the safety of my youngest
 8   son, because I was told nobody in my family were fit to take
 9   over my kids if I went to prison.  So I had an attorney -- I
10   went behind their back and had an attorney write over the power
11   of attorney for my kids or for custody if something was to
12   happen to me.
13   Q.   When you said they told you no one in your family was fit,
14   who is they?
15   A.   Bill and Joe.
16   Q.   And you said behind their back.  Who is their back?
17   A.   I went behind Joe and Bill's back and got the power of
18   attorney over my children or my son written up.
19   Q.   Why do you call it behind their back?
20   A.   Because I wasn't supposed to be doing that.  Bill had told
21   me later that he had a person to adopt my son in Houston set
22   up.
23   Q.   How did that make you feel?
24   A.   Terrible.  I didn't -- that was probably the worst
25   experience ever, thinking my son is going to go live with
```

1    some -- he just gets his mom back, loses his grandmother, my

2    other mom, you know, my mom isn't doing well, and he has to go

3    live in Houston.  I just couldn't -- couldn't take it.

4    Q.   And you went and saw this lawyer.  Did you tell the lawyer

5    what was going on?

6    A.   No, I did not.

7    Q.   Why not?

8    A.   I wasn't supposed -- I wasn't allowed to tell anybody.

9    Q.   I would like to show you what's already been admitted as

10   Government Exhibit 163.

11             MS. RUDOFF:  Your Honor, may I publish 163?

12             THE COURT:  It's already been admitted.  Yes, you

13   may.

14             MS. RUDOFF:  Thank you.

15   BY MS. RUDOFF:

16   Q.   Casi, do you recognize Government Exhibit 163?

17   A.   Yes.

18   Q.   What is it?

19   A.   That is the power of attorney to care for a child.

20   Q.   Whose signature is on it?

21   A.   Mine and Andrew Ottaway, the attorney.

22   Q.   What is the date it was prepared?

23   A.   Okay.  I'm sorry.  The 30th day of November, 2015.

24   Q.   And who does this power of attorney go to?

25   A.   He -- it goes to Daralyn Crites.

```
 1   Q.    Who is Daralyn Crites?
 2   A.    She is one of my best friends from childhood.
 3   Q.    Why did you decide to make Daralyn Crites the power of
 4   attorney?
 5   A.    I felt she was best fit to take over my position if I was
 6   no longer able.
 7   Q.    Did you take this document to her?
 8   A.    I did.
 9   Q.    Where did you meet her when you took it?
10   A.    I took it to her house.  Took it to her house.
11   Q.    When you were at her house, did you tell her why you were
12   doing this?
13   A.    No, I did not.
14   Q.    Why?
15   A.    Because I wasn't allowed to tell anybody.  I wasn't
16   allowed to tell anybody.
17   Q.    And to be clear, Joe DeLeon and Bill Stone weren't with
18   you at Daralyn's house, right?
19   A.    Right.
20   Q.    How would they know?
21   A.    I was -- I was told that they could listen in on my phone
22   and read my text messages and listen to my phone calls.
23   Q.    Who told you that?
24   A.    Bill and Joe.
25   Q.    How were you acting when you gave this document to
```

```
 1  Daralyn?
 2  A.   Very suspicious.
 3  Q.   What do you mean by that?
 4  A.   I had it folded, and I just told her to -- I said, I can't
 5  tell you why I'm giving you this, but I need you to keep it in
 6  case something happens to me, and that's all I can say.  That's
 7  what I told her.
 8  Q.   And then you said you were acting suspicious.  Other than
 9  that, was there any other physical actions you were doing?
10  A.   Yes.  I said it in a really low voice.
11  Q.   Why?
12  A.   Because I thought maybe that he could hear me, Bill or
13  his -- Bill's analysts could hear me over the phone.
14  Q.   Bill's analysts.  Who is that?
15  A.   He had a team -- I was told he had a team of analysts in
16  Washington, D.C. --
17  Q.   Who told you that?
18  A.   -- that were monitoring me.
19  Q.   Who told you that?
20  A.   Bill and Joe.
21  Q.   So when you're told that Bill has a team of analysts -- is
22  that what you said?
23  A.   Yes.
24  Q.   Who do these analysts work for, from what you were told?
25  A.   The FBI.
```

```
 1    Q.   Were you told what their job was as it related to you?
 2    A.   They were sharpening their skills in relation to me, but
 3    their main job was the North Korea unit.
 4    Q.   Who told you that?
 5    A.   Bill.
 6    Q.   Did you know any of their names?
 7    A.   I did.
 8    Q.   Who told you their names?
 9    A.   Bill.
10    Q.   At this point in time it is November 2015, you're almost
11    done for your first semester of school, right?
12    A.   Yes.
13    Q.   What did you end up graduating -- or not graduating, I'm
14    sorry -- finishing that semester with?
15    A.   A 4.0.
16    Q.   And as all this is going on, are you still taking care of
17    your children?
18    A.   Yes.
19    Q.   Were you following the conditions of your Hood County
20    probation?
21    A.   Yes, I was.
22    Q.   Were you sober?
23    A.   I was.
24    Q.   What did you do next with regards to your grandmother's
25    will and trust?
```

```
 1   A.    Say that one more time, I'm sorry.
 2   Q.    What was your next step in handling your grandmother's
 3   trust?
 4   A.    I had to set up a probate court date.
 5   Q.    Did you do that?
 6   A.    I did.
 7   Q.    Why did you do that if you had all this other stuff going
 8   on?
 9   A.    I was doing -- I was doing my job as executor of the will.
10   Q.    When you went to court for the will and the probate
11   hearing, did you go alone?
12   A.    No, I did not.
13   Q.    Who went with you?
14   A.    Joseph DeLeon.
15   Q.    Why did Joe go?
16   A.    Bill told Joe to go with me.
17   Q.    Were you told why?
18   A.    I was not sure.  I guess just to -- in case my family
19   showed up or something.  That was what I thought.
20   Q.    Okay.  And did Joe go with you?
21   A.    He did.
22   Q.    At that hearing, did you receive any documents?
23   A.    I did.
24   Q.    What kind of documents did you receive?
25   A.    The letter of testamentary and the probate order.
```

```
 1              MS. RUDOFF:  Your Honor, may I approach the witness?
 2              THE COURT:  You may.
 3              (Pause)
 4    BY MS. RUDOFF:
 5    Q.   Casi, I have handed you two documents.  The first one is
 6    marked as Government Exhibit Number 5.  Do you recognize that?
 7    A.   Yes.
 8    Q.   What is it?
 9    A.   It's the letters of testamentary.
10    Q.   Is that the same document you received in court at the
11    probate hearing?
12    A.   Yes.
13              MS. RUDOFF:  At this time the Government moves to
14    admit Government's Exhibit Number 5.
15              THE COURT:  Any objection?
16              MR. GALLIAN:  No objection, Judge.
17              MR. SELLERS:  Just one second, Your Honor.
18              THE COURT:  All right.  Take a moment.
19              (Pause)
20              MR. SELLERS:  No objection.
21              THE COURT:  It shall be admitted.
22                  (Government's Exhibit No. 5 received)
23              MS. RUDOFF:  Permission to publish?
24              THE COURT:  Granted.
25    BY MS. RUDOFF:
```

```
 1   Q.   Casi, what's the date on this document?
 2   A.   December 14, 2015.
 3   Q.   And what does this document basically do once filed?
 4   A.   It qualifies me as the independent executor of my
 5   grandmother's estate.
 6   Q.   Can you take a look at Government's Exhibit Number 6 that
 7   I handed you?
 8            (Pause)
 9   BY MS. RUDOFF:
10   Q.   Do you recognize that?
11   A.   Yes.
12   Q.   What is it?
13   A.   A list of assets and responsibilities.
14   Q.   For what?
15   A.   For my grandmother's estate.
16   Q.   Is that the document you were provided after the probate
17   hearing?
18   A.   Yes.
19            MS. RUDOFF:  Government moves to admit Government's
20   Exhibit Number 6.
21            THE COURT:  Any objection?
22            MR. GALLIAN:  No objection.
23            MR. SELLERS:  Same, Your Honor.
24            THE COURT:  It's admitted.
25                (Government's Exhibit No. 6 received)
```

```
 1                MS. RUDOFF:  Permission to publish to the jury?
 2                THE COURT:  Granted.
 3     BY MS. RUDOFF:
 4     Q.   Casi, is this -- when you were at the probate hearing
 5     December 14, 2015, is this the first time you're seeing this
 6     document?
 7     A.   No.
 8     Q.   When had you seen it before?
 9     A.   I had seen it in my grandmother's documents and at the
10     attorney's office.
11     Q.   Was this document also provided at the court hearing that
12     day?
13     A.   Oh, yes.  This -- this also looks -- it might be the same
14     one -- about the list of assets that I was required to give to
15     Bill and Joe.
16     Q.   Okay.  And so what is this a list of?
17     A.   All of my assets.
18     Q.   Since becoming executor, right?
19     A.   Yes.
20     Q.   About how much was the estate worth based on this
21     document?
22     A.   Around 2 million, plus the life insurance would be
23     3 million.
24     Q.   So you're now aware that you've inherited about
25     $3 million, right?
```

```
1    A.    Yes.
2    Q.    Who else knew that?
3    A.    Bill and Joe.
4    Q.    How did Bill and Joe know it?
5    A.    They -- they knew -- they knew that I was inheriting the
6    life insurance, and it wasn't until later when Bill asked for a
7    list of all of my assets to give to the judge that he knew the
8    rest.
9    Q.    Okay.  In court that day was everything related to the
10   will and the assets explained to you?
11   A.    It was a very quick -- very quick trial, probate.
12   Q.    Okay.  After you get this document in that probate
13   hearing, did you have a meeting with Bill Stone and Joe DeLeon?
14   A.    Yes.
15   Q.    Was it a long time after?  Soon after?
16   A.    It was in December of 2015.
17   Q.    Okay.
18   A.    Near Christmas.
19   Q.    Okay.  Why did you meet with Bill Stone and Joe DeLeon?
20   A.    I had met Joe at my house, and he -- we were waiting on
21   Bill to get there from traveling from Austin.  I had a --
22   sorry.
23         So Bill was coming from Austin to let me know that
24   what he had been working on down there on a federal charge, a
25   federal drug case that I had coming.
```

```
 1   Q.   Who told you this?

 2   A.   Bill and Joe.

 3   Q.   How did that make you feel hearing now a federal charge?

 4   A.   I wasn't sure what federal charge.  I didn't have any

 5   details about it.  Joe and I were just waiting for Bill to come

 6   and fill us in on what he had been working on all day,

 7   tirelessly, night and day.

 8   Q.   And this is the first you heard about it?

 9   A.   Yes.

10   Q.   How did you feel that night?

11          MR. SELLERS:  I'm going to object to asked and

12   answered and relevance.

13          THE COURT:  Overruled.

14   BY MS. RUDOFF:

15   Q.   How did you feel that night waiting on Bill?

16   A.   So anxious, scared, fearful, like couldn't believe I made

17   it this far and something -- something like this was going to

18   take me out, because I didn't remember doing what he accused me

19   of doing in Austin.

20   Q.   You said he accused you.  Who are you talking about?

21   A.   I guess Judge Anderson was accusing me of doing it, but

22   Bill was telling me I was being accused of it.

23   Q.   Okay.  So does Bill Stone get to your house that night?

24   A.   Yes.

25   Q.   And when Bill Stone got there, what did Bill Stone tell
```

```
 1  you?
 2  A.    He -- he walked in, sat down on the -- my back porch, very
 3  arrogantly, authoritatively, kicked back, rocked back and
 4  forth, and said that I'm one lucky kid.  And --
 5  Q.    Did he explain what he meant by that?
 6  A.    And then he told me that I was looking at 50 years in
 7  prison and my son would not go to anybody in my family and that
 8  I would be taken in that day and I wouldn't get to see my kids.
 9  Q.    Did he say why -- why these things happened?
10  A.    No.  Because I was -- I took drugs across state line.  And
11  I told him that I don't recall doing that.
12  Q.    Okay.  I want to stop you there, because I want to kind of
13  try and make sense of this.
14  A.    Okay.
15  Q.    You said that Bill told you you took drugs across state
16  line?
17  A.    Right.  I was being accused of taking drugs across state
18  line.
19  Q.    Okay.  How did Bill Stone say he knew this information?
20  A.    He was at the courthouse all day and watched a video.
21  Q.    Why was he at the courthouse all day?
22  A.    He had been -- I had been flagged, and so he flew in
23  from D.C. and worked on my case all day.
24  Q.    That's what he told you?
25  A.    That's what he told me.
```

```
 1   Q.   What courthouse did he say he was at?
 2   A.   Austin courthouse, a courthouse in Austin, a federal
 3   building, a federal judge.
 4   Q.   What did he say happened when he was at the courthouse
 5   that day?
 6   A.   That he had to get it before it went through grand jury
 7   and he had a discussion with the judge about it.
 8   Q.   And you said that he reviewed a video?
 9   A.   He reviewed some video of me or my car.  It was -- I
10   wasn't driving.  It was me in the passenger seat driving in
11   Austin doing a drug deal.
12   Q.   I want to be clear.  This is what Bill Stone told you the
13   video showed, right?
14   A.   Yes.
15   Q.   Okay.  Did you ask to see the video?
16   A.   I did.  I said I never left DFW, I don't ever recall going
17   to Austin.  And he said in order for me to see the video, I
18   would have to show up in court and I would go to jail.
19   Q.   Were you willing to go show up in court?
20   A.   I was not willing to do that.
21   Q.   Why?
22   A.   I would have been willing to do it if I had remembered to
23   do it, but he said if I was to hire an attorney then I would --
24   there's -- I wouldn't get off, there is no way I would get off.
25   Q.   Okay.
```

```
 1    A.    Yeah.
 2    Q.    So you -- I just want to make clear.  Bill Stone says you
 3    can't go to Austin?
 4    A.    Right, to see it.
 5    Q.    Okay.
 6    A.    It would affect my probation in Granbury as well.
 7    Q.    That is what Bill Stone told you?
 8    A.    Yes.
 9    Q.    Did he say how you going to Austin to see a video would
10    affect your probation in Granbury?
11    A.    He didn't really give me the option of seeing the video.
12    He just talked me out of wanting to see the video.
13    Q.    Did you want to call an attorney?
14    A.    I -- I thought about it.  And Joe said no, there's no
15    attorney -- there's no amount of money that I could pay an
16    attorney to get for me to get what Bill could do for me.
17    Q.    Did you believe him?
18    A.    I did.
19    Q.    Did Bill Stone say the same thing?
20    A.    Yes.
21    Q.    What else did Bill Stone tell you about his visit about
22    this judge in Austin?
23    A.    After -- so after building up everything, all of the
24    things that could happen to me, he then looked at me and said
25    Merry Christmas -- or the judge said Merry Christmas, and I got
```

```
 1    a -- I want to say it was -- I got put on probation and it was
 2    a secret probation that he had to manage.
 3    Q.   Okay.  You said after he built up all the things that
 4    could happen to you?
 5    A.   Right.  He scared me.
 6    Q.   That's Bill Stone you're saying?
 7    A.   Yes.
 8    Q.   What things did Bill Stone say could happen to you that
 9    scared you?
10    A.   I would go to prison for 50 years and my son would be
11    adopted or fostered -- fostered out or adopted out of Granbury,
12    and I would go to prison --
13    Q.   Did you --
14    A.   -- and lose my kids.
15    Q.   Did you feel like you had any other option?
16    A.   I didn't feel like I had an option, no.
17    Q.   Now, when you say that someone said Merry Christmas --
18    A.   Right.  The judge, Anderson.  Sorry.
19    Q.   Okay.  Bill Stone told you, right?
20    A.   Yes.
21    Q.   That that's what the judge said?
22    A.   Yes.
23    Q.   Did Bill Stone tell you the name of that judge?
24    A.   Yes.
25    Q.   What was the name of that judge?
```

```
 1    A.    Judge Anderson.
 2    Q.    What was your understanding initially of that secret
 3    probation?  What did it entail?
 4    A.    It entailed that I had a lot of the same guidelines as my
 5    probation in Hood County, but Joe had to agree to be my
 6    probation officer, which required him to spend a lot of time
 7    with me.
 8    Q.    Okay.  And you learned that that night, right?
 9    A.    Yes.
10    Q.    That night did you learn any other conditions that would
11    be applied to you because of this probation?
12    A.    There was -- there was several.  I had to do 3x5s of my
13    whole entire day, meaning index cards.  I had to fill out an
14    index card from 8:00 to whenever, listing everything I did,
15    send them in to Joe.
16          And then I had to complete my community service
17    hours.  I had to act like I was interested -- or doing real
18    estate, because that's what he told the judge.  So I had to
19    complete everything, make a 4.0 at school, take full-time hour
20    credits, if not more than full-time.
21    Q.    Okay.  Were you told why it had to be a secret?
22    A.    Yes.  Because I -- he was helping -- he was working for
23    the feds and --
24    Q.    I want to stop you, because I want to understand who
25    "he" is.
```

```
 1   A.   Okay.  I'm sorry.  So Bill was flying down here on his own
 2   personal time helping me privately, and he was still currently
 3   working for the bureau, the FBI.
 4   Q.   Who told you this?
 5   A.   Bill and Joe --
 6   Q.   Okay.
 7   A.   -- told me.  So it had to be a secret on their end,
 8   because he was helping me, like, on the side.  I just was not
 9   allowed to tell anybody in my family, because they could use
10   that against me.  And then most importantly, like I was not
11   allowed to have another crime going during my Hood County
12   probation.
13   Q.   When you said he was going to get in trouble, who are you
14   talking about?
15   A.   I figured he would -- he being Bill would get in trouble
16   flying down helping me with all of my cases.
17   Q.   Why would Bill Stone get in trouble for helping you?
18   A.   Because he was working.  He was working.  I don't know.
19   Q.   Did he tell you he would get in trouble, or is that what
20   you just assumed?
21   A.   I just assumed that part, uh-huh.
22   Q.   Okay.  And as it relates to your Hood County probation,
23   you were told it had to be a secret from them as well, right?
24   A.   Right.
25   Q.   Who told you that?
```

```
1    A.    Bill and Joe.

2    Q.    Did they say why it had to be a secret?

3    A.    Yes.  It would revoke my probation.

4    Q.    What about the fact that you hadn't been arrested, gone to

5    court, any of that in this instance?  Was that odd to you?

6    A.    It wasn't odd to me, because it had -- he had taken care

7    of that Irving -- my Irving charge, and I just thought he could

8    do things behind the scenes.

9              THE COURT:  Let's stop there.

10             So members of the jury, I think we're at a good

11   stopping point for the day.

12             I want to admonish you really briefly about a couple

13   of things before I discharge you for the day.

14             Please do not discuss this case among yourselves

15   until I have instructed you on the law and you have gone to the

16   jury room to make your decision at the very end of the trial.

17   Otherwise, without realizing, it you may start forming opinions

18   before the trial is over.  It's important that you wait until

19   all the evidence is received and you've heard my instructions

20   on the rules of law before you deliberate amongst yourselves.

21             Second, you must decide the case based solely on

22   evidence presented here in the four corners of the -- the four

23   walls of this courtroom.  So please do not conduct any

24   independent research about this case, the matters that you've

25   heard, or the people involved.
```

1          And finally, we all use technology to communicate

2     with each other, but please do not talk to anybody about this

3     case or use technology to communicate with anybody about this

4     case.

5          So by that I mean e-mail, text, Twitter, cell phones,

6     websites, Instagram, Snapchat.  I'm not up on the latest stuff.

7     And also in person.  You may go home and have a curious spouse

8     or friend, you can talk about anything except this case.  Once

9     it's all resolved, you can talk till you are blue in the face.

10          And, also, please do not mention this case on social

11     media or discuss it on social media.

12          I know you will follow these instructions as you have

13     before.

14          We look forward to having you back tomorrow.  We will

15     get you started fresh.  If you-all will be here ready to go,

16     we'll get you brought in at 8:00.

17          I've discharged my doughnut duty, so you bring your

18     own food.  But I have told the lawyers that you-all would like

19     to have an abbreviated lunch tomorrow, so we will all be

20     bringing our lunch too.

21          We're going to make good use of your time.  We

22     appreciate you guys being here.  Everybody has been awake and

23     paying attention, and we are so thankful for that.

24          Do y'all have anything you need to ask me before I

25     send you home for the day?

```
 1              All right.  Well, we really appreciate you being
 2    here.
 3              All rise for the jury.
 4              (Jury out)
 5              THE COURT:  Everybody, please be seated.
 6              And I meant to thank you, lawyers, everybody for
 7    being accommodating to the schedule of the mom and the hours
 8    that they'd like to work.  I appreciate that.
 9              MS. RUDOFF:  May the witness step down, Your Honor?
10              THE COURT:  Oh, please.  Yes, ma'am.  Absolutely.
11              Is there anything we need to take up outside the
12    jury's presence right now, or can it wait until in the morning?
13              MS. RUDOFF:  Nothing from the Government, Your Honor.
14              THE COURT:  Nothing from the Government?
15              All right.  Anything from Mr. Stone?
16              MR. GALLIAN:  No, Your Honor.
17              THE COURT:  No?
18              Anything from Mr. DeLeon?
19              Oh, yes, sir?
20              MR. WESTFALL:  Are we still doing a 30-minute break
21    in the morning?
22              THE COURT:  Yes.
23              MR. WESTFALL:  I'm presuming the one in the afternoon
24    goes away?
25              THE COURT:  I'm sorry?
```

1          MR. WESTFALL:  Are we still doing that in the

2    afternoon also?

3          THE COURT:  Yes, we are.  So the mom has to express

4    her milk in the morning and the afternoon for half an hour, and

5    so, yeah, we'll need to do that.

6          MR. WESTFALL:  That helps us to plan around.  Thank

7    you.

8          THE COURT:  Yes.  Absolutely.  Absolutely.

9          And I appreciate everybody being accommodating.

10          I'll be here nice and early tomorrow.  And so I'll

11    hop on the bench, and if there's anything we need to take up in

12    the morning, please let me know.

13          Appreciate y'all playing well with others.  It's an

14    interesting case.  It's an honor to preside.  And I look

15    forward to seeing you in the morning.

16          Court's in recess.

17          SECURITY OFFICER:  All rise.

18          (Recess)

19

20

21

22

23

24

25

```
 1                              INDEX
                                                      Further
 2                  Direct  Cross  Redirect  Recross  Redirect

 3   WITNESS FOR THE
     GOVERNMENT
 4
     CASI THOMPSON        11
 5

 6   GOVERNMENT'S EXHIBITS                            Received

 7      2   Myrna Thompson Revocable Trust dated         103
            February 10, 2015
 8
        4   Photo of Myrna Thompson                       99
 9
        5   Letters Testamentary in Estate of Myrna      133
10          Thompson dated December 14, 2015

11      6   List of Myrna Thompson assets                134

12     26   Digital extraction from Mr. DeLeon's phone    75

13     27   Digital extraction from the iMac computer     75

14     38   Digital extraction from Apple iPhone 6S       78

15    110   Extraction from the iPhone 10 belonging       75
            to Ms. Weisend
16
      121   Extraction of evidence from iPhone 5S         75
17
      122   Digital extraction from iPhone 6s            75
18
      164   CT Hood County Court case records           109
19

20

21

22

23

24

25
```

1    I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 26th day of July, 2023.

7

8

9
                                    /s/Todd Anderson
10                                  TODD ANDERSON, RMR, CRR
                                    United States Court Reporter
11                                  1100 Commerce St., Rm. 1625
                                    Dallas, Texas  75242
12                                  (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25