1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF TEXAS

3               DALLAS DIVISION

4

   UNITED STATES OF AMERICA,      )    3:21-CR-236-E(2)
5                                  )
        GOVERNMENT,                )
6                                  )
   V.                             )    DALLAS, TEXAS
7                                  )
   WILLIAM ROY STONE, JOSEPH      )
8   DELEON                         )
                                  )
9       DEFENDANTS.               )    JULY 27, 2023

10

11

12

13

14

15        ------------------------------

16               TRANSCRIPT OF

17                JURY TRIAL

18                VOLUME 3B

19    BEFORE THE HONORABLE ADA E. BROWN

20       UNITED STATES DISTRICT JUDGE

21        ------------------------------

22

23

24

25

```
 1                    A P P E A R A N C E S

 2    FOR THE GOVERNMENT:

 3         Jenna Danelle Rudoff
           US Department of Justice
 4         1100 Commerce St
           3rd Floor
 5         Dallas, TX 75242
           214-659-8600
 6         Fax: 214-659-8500
           Email: Jenna.rudoff@usdoj.gov
 7
           Donna S Max
 8         US Attorney's office for Northern
           District of Texas
 9         1100 Commerce Street
           Third Floor
10         Dallas, TX 75242-1699
           214-659-8664
11         Email: Donna.max@usdoj.gov

12         Marcus J Busch
           US Attorney's Office
13         1100 Commerce St
           Suite 300
14         Dallas, TX 75242
           214-659-8642
15         Fax: 214-659-8809
           Email: Marcus.busch@usdoj.gov
16

17    FOR THE DEFENDANT WILLIAM ROY STONE:

18         Gregg Gallian
           Gallian Firm
19         Parkside Tower
           3500 Maple Ave
20         Suite 720
           Dallas, TX 75219
21         214-432-8860
           Email: Gregg@gallianfirm.com
22
           Jaclyn Annette Gallian
23         Bryan Cave Leighton Paisner
           2200 Ross Avenue
24         Ste 4200w
           Dallas, TX 75201
25         214-721-8058
           Email: Jaclyn.gallian@bclplaw.com
```

1   FOR THE DEFENDANT JOSEPH DELEON:

2        Greg Westfall
         Westfall Sellers
3        1612 Summit Avenue
         Suite 200
4        Fort Worth, TX 76102
         817-928-4222
5        Fax: 817-385-6715
         Email: Greg@westfallsellers.com
6
         Frank Sellers
7        Westfall Sellers
         1612 Summit Avenue
8        Suite 200
         Fort Worth, TX 76102
9        817-928-4222
         Fax: 817-385-6715
10       Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C H R O N O L O G I C A L   I N D E X

July 27, 2023                                              PAGE

Appearances.........................................2

Proceedings.........................................5

W I T N E S S   I N D E X

| GOVERNMENT | DIRECT | VOIR DIRE | CROSS |
|---|---|---|---|
| Casi Thompson | 5 | -- | -- |

Court in Recess....................................79

Reporter's Certificate.............................80

E X H I B I T   I N D E X

GOVERNMENT:

| NO. | DESCRIPTION | OFFERED/ADMITTED |
|---|---|---|
| 56 | Recording...............................77/78 |
| 57 | Transcript of Recording..................77/78 |

* * * * *

```
 1                    (P R O C E E D I N G S)

 2                    (Jurors enter courtroom.)

 3                    THE COURT:  Your witness.

 4                    MS. RUDOFF:  Thank you, Your Honor.

 5                          CASI THOMPSON,

 6   having been first duly sworn, testified as follows:

 7                    CONTINUED DIRECT EXAMINATION

 8   BY MS. RUDOFF:

 9        Q.   Casi, before we took a break, I think we were talking

10   about the kitchen remodel of Bill Stone's house.  Do you

11   remember that?

12        A.   Yes.

13        Q.   And you -- I think when we ended you had said that

14   you paid Bill Stone at least 50,000 for that remodel, right?

15        A.   At least.

16        Q.   Okay.  And all of these financial transactions we

17   just went over, that's all within the first year you're on this

18   secret probation, right?

19        A.   Yes.

20        Q.   Were there other instances that you had to pay either

21   Bill or Joe as it related to their service on your probation

22   and the other legal issues they told you that you were having

23   during this same time frame, besides the one we've gone over?

24        A.   Besides all of the ones that we've gone over?

25        Q.   Yes.  Were there other instances?
```

1       A.    Not to my knowledge.

2       Q.    And let me clarify.  We talked about the $5,000 cash

3   payment to Bill Stone back in December of 2015?

4       A.    Yes.

5       Q.    You told us that was for Bill Stone's travel expenses

6   for Austin, right?

7       A.    Yes, for Austin or for any time he flew in from D.C.

8   to handle other business regarding legal or CPS.

9       Q.    For you?

10      A.    For me.

11      Q.    Okay.  And but that wasn't the only instance of you

12  withdrawing $5,000 in cash for that reason and giving it to

13  Bill Stone, right?

14      A.    Right.

15      Q.    There were a lot of other times that you did that

16  same thing?

17      A.    Several travel expenses.

18      Q.    And those $5,000 withdrawals that we see in your bank

19  records, those are all related to what you gave Bill Stone,

20  right?

21      A.    Yes.

22      Q.    When you would make those cash withdrawals, was there

23  any particular bank location you would go to?

24      A.    I would go to the Navy Federal Credit Union.

25      Q.    Where is that located?

1      A.    There's -- the specific -- well, there's one in Fort
2   Worth and one in Arlington.
3      Q.    Okay.  Fort Worth, Texas, and Arlington, Texas?
4      A.    Yes.
5      Q.    And what about when you would go to Chase to get the
6   cashier's check to pay -- cashier's check or the regular checks
7   that you paid Joe DeLeon or Bill Stone, what location or branch
8   would you go to?
9      A.    The Chase Bank was in I believe Grapevine.
10  Grapevine.
11     Q.    Grapevine, Texas?
12     A.    Yes.
13     Q.    Okay.  Before ever is there an instance in which you
14  gave cash -- or I'm sorry, was there ever an instance where you
15  gave cash to Joe DeLeon for his service as your probation
16  officer that we haven't already talked about?
17     A.    There was a time that I gave him $5,000 cash as well.
18     Q.    And what was the reason you gave him $5,000 cash?
19     A.    For his payroll, at his -- he needed payroll -- he
20  was short money for his payroll, and so I -- Bill told me to
21  give him money for -- to help him out.
22     Q.    Okay.  And when you say "he was short for his
23  payroll," who are you referring to?
24     A.    Joe.
25     Q.    And when you say Joe DeLeon was short for his

1    payroll, what business was that?

2        A.   His restaurant.

3        Q.   And Bill Stone told you to do that?

4        A.   Yes.

5        Q.   Why did you do that?

6        A.   Because I was told to.

7        Q.   Did you understand why you needed to pay Joe DeLeon's

8    payroll taxes, though?

9        A.   Yes, because of all of the time that he had missed

10   from work spending his time with me.

11       Q.   And the time he was spending with you, what was the

12   purpose of the time he spent with you?

13       A.   It was a condition of my probation.

14            MS. RUDOFF:  Your Honor, may the government

15   publish what's already been admitted as Government's

16   Exhibit 38?

17            THE COURT:  You may.

18            MS. RUDOFF:  And if we could go to page 553.

19   And if we could first highlight the fifth message down on the

20   left that's blue.

21       Q.   Casi, who is this message written by?

22       A.   It's written by me.

23       Q.   And you are listed -- you're the 8559 number?

24       A.   Yes.

25       Q.   Listed as Project Number 2?

1    A.    Yes.

2    Q.    Can you tell us the date of this text message?

3    A.    January 8th, 2016.

4    Q.    What does the text message say?

5    A.    I'm getting money now, so you can do what you want

6  with the money I gave you.

7    Q.    And what is this text message referring to?

8    A.    The money that I gave Joe.

9    Q.    Is that the 5,000 for payroll taxes we were just

10 talking about?

11   A.    Yes.

12          MS. RUDOFF:  And can we zoom in on the green

13 message in response.

14   Q.    Casi, who is this green message from?

15   A.    Joseph DeLeon.

16   Q.    Is that the number we see ending in 7611?

17   A.    Yes.

18   Q.    Is this on the same date, January 8th, 2016?

19   A.    Yes.

20   Q.    And what did the message from Joe in response to you

21 say?

22   A.    I will deposit it in my restaurant bank account

23 tomorrow morning.  Thank you.  I'm just now getting to Sam's.

24   Q.    And so based on this conversation on January 8th,

25 2016, is it clear to you that Joe DeLeon accepted that 5,000 in

1  cash from you?

2      A.   Yes.

3      Q.   Did he ever offer to pay that money back to you?

4      A.   No.

5      Q.   Earlier you testified when I asked you about this

6  being a lot of money in the first year of your secret

7  probation, you said you didn't care about the money at all at

8  this point.  Is that how you are in general when it comes to

9  money?

10     A.   No.

11     Q.   So why was it specific -- why was that your sentiment

12  specific to this scenario?

13     A.   It was unbelievable what all was happening within

14  that time frame.  It was something every single day.  I was in

15  fear.  And honestly, I didn't even realize how much money was

16  being put out during that time.  I was just wanting to -- I was

17  just grateful that I wasn't in prison and I was with my kids at

18  home.

19     Q.   So is it fair to say that when it comes to your kids

20  and your freedom, no amount of money mattered at that point?

21          MR. SELLERS:  Object to leading, Your Honor.

22          THE COURT:  Sustained.

23          Don't lead.

24     Q.   At the time that this was all happening, did you feel

25  like the money you were paying them was worth it?

1          MR. SELLERS:  Object to leading again.

2          THE COURT:  Sustained.

3          Don't lead the witness.

4     Q.    I want to talk about some other things that happened

5  within the first year of your secret probation, okay?

6     A.    Uh-huh.

7     Q.    You mentioned several times about dealing with a CPS

8  case at this time.  Who told you there was a CPS case that you

9  were involved in?

10    A.    The information came from Bill, but I was told by

11 Joe.  And we would speak about -- all three of us would speak

12 about it when we would meet.  It was from the -- being

13 negligent to my child.

14    Q.    And when they told you that there was an accusation

15 investigation by CPS, did you believe it?

16    A.    I thought maybe, because they had evidence -- I was

17 asked if I had sent my mom any pictures of Slayter lately and I

18 said yes.  And he had just lost his two front teeth.  And Bill

19 and Joe told me that my mom was telling CPS that I knocked his

20 teeth out.

21    Q.    Okay.

22         MS. RUDOFF:  Your Honor, may I republish

23 Government 38?

24         THE COURT:  You may.

25         MS. RUDOFF:  And if we could go to page 603.

1    Q.   Casi, how did you feel learning that there was a

2    potential CPS case where you could lose your children again?

3    A.   I couldn't believe it.  And at first I was angry with

4    my mother.  And then I feared -- later I found out from Bill

5    and Joe that it could affect my probation on both ends because

6    I was supposed to take care of my children due to a -- my

7    probation requirements.

8         MS. RUDOFF:  Can we zoom in on the second green

9    message down.

10   Q.   Casi, who is this green message from that we see on

11   the screen?

12   A.   Joseph DeLeon.

13   Q.   That's the number ending in 7611?

14   A.   Yes.

15   Q.   What's the date of this text message?

16   A.   January 24th, 2016.

17   Q.   Can you read Joe DeLeon's text message?

18   A.   Believe me, I feel horrible that you and your son are

19   going through this.  It breaks me heart that they're messing

20   with your son.  That part of it is bullshit.  He doesn't have

21   it coming to him.  They need to freaking back off of him.  Just

22   put the alarm on, say your prayers and we'll do our part.

23   Q.   So what is Joe talking about in this message as it

24   relates to your son?

25   A.   My family trying to take him from me.

1      Q.   And so these are the kind of conversations you guys

2  would have?

3                MR. SELLERS:  Object to leading.

4                THE COURT:  I'll give you a little latitude.

5      Q.   Were these the kind of conversations you and Joe

6  would have about the CPS situation?

7      A.   Yes.

8      Q.   Earlier you said something about a CPS visit.  Do you

9  recall that when you --

10     A.   Yes.

11     Q.   Did CPS ever come and visit your home?

12     A.   No.

13     Q.   Do you know why they never came?

14                MR. SELLERS:  Object to speculation.

15                THE COURT:  Overruled.

16     A.   I was told because Bill and Joe were handling it.

17     Q.   Who told you that CPS was going to come for a visit?

18     A.   Joe.

19     Q.   What did Joe say?

20     A.   He told me -- he called me in the middle of the

21  night, told me I needed to get up and get my house ready for a

22  home visit in case CPS was to show up and look -- and look at

23  the house, that Bill was dealing with the case manager, and

24  because I had so many hours spent with Joe and we could prove

25  that, he was watching me very closely, they ended up not

1    coming.

2        Q.   Did you get up and clean the house?

3        A.   I did.

4        Q.   Other than keep the house clean, was there anything

5    else you were told you had to do for this CPS investigation?

6        A.   I had to take pictures of the food that we were

7    eating, and I had to take pictures of any bruises or marks that

8    were found on Slayter's body and send to Joe.

9        Q.   And what -- were you told why you needed to take

10   photos of these kinds of things?

11       A.   I had to -- so that he would have record of it in

12   case the CPS -- in case CPS was involved again.

13            MS. RUDOFF:  Your Honor, may I republish

14   Government 38?

15            THE COURT:  You may.

16            MS. RUDOFF:  And if we could go to page 617.

17   Can we zoom in on the third blue message down on the page.

18       Q.   Casi, who is this text message from?

19       A.   Me.

20       Q.   The 8559 number?

21       A.   Yes.

22       Q.   Is that you?

23       A.   Yes.

24       Q.   And who are you sending this message to?

25       A.   Joe.

1    Q.    What is the date of this text message?

2    A.    January 28th, 2016.

3    Q.    And what does the text message say?

4    A.    This was on Slayter this morning.

5    Q.    And is there a photo included?

6    A.    Yes.

7    Q.    What's the photo of?

8    A.    Some red marks on his body.

9    Q.    Why did you take this photo and send it to Joe?

10   A.    To have documentation of his -- of marks on his body.

11   Q.    So help me understand why you were having to document

12   any marks on your child's body.

13             MR. SELLERS:  Object to asked and answered.

14             THE COURT:  Overruled.

15   Q.    You can answer.  I'm just trying to understand why

16   taking a photo and sending it to Joe would somehow help you if

17   there was a CPS case.

18   A.    So in case somebody else was to see it on his body,

19   then he could verify that it was already sent to him and he

20   would know that it wasn't from me.

21   Q.    Did you have to provide any other documentation as it

22   related to any marks on your child's body?

23   A.    I did.  I had to go to a dentist outside of family

24   and have them write a note saying that his teeth fell out

25   organically and not knocked out.

 1      Q.    Did you do that?

 2      A.    I did.

 3      Q.    Were there any other letters or documentations that

 4  you were told you had to obtain as it related to your child for

 5  CPS purposes?

 6      A.    Any time he -- there was any incident at school, I

 7  had to have them write a -- write a note of how it happened, an

 8  incident report.

 9      Q.    And when you say "I had to have them write a note,"

10  who is that?

11      A.    The school or the teacher.

12      Q.    And would you in fact go do that?

13      A.    I did.

14      Q.    And who did you have to provide that documentation

15  back to?

16      A.    I would send it to Joe.

17      Q.    During this time of your secret probation, was there

18  anything you were told you had to do physically as it related

19  to tattoos on your body?

20      A.    Yes.  I had -- I was instructed to get my tattoos

21  removed that were dandelions.

22      Q.    Who told you that?

23      A.    Bill.

24      Q.    Did Bill say why you needed to have your tattoos

25  removed that were dandelions?

1      A.   He said there was some -- they had something to do

2 with meth, they meant -- in jail, there was an -- some sort of

3 a -- a meth attachment to a dandelion.

4      Q.   And so I just want to make sure I understand.  So

5 Bill Stone told you that your tattoos had another meaning?

6      A.   Yes.

7      Q.   Why did you believe that?

8      A.   I -- I didn't know it.  I believed it because he told

9 me.

10     Q.   And why would he know what a tattoo means in prison?

11     A.   Because of his job title in law enforcement.

12     Q.   Which was what, that you were told?

13     A.   FBI agent.

14          MS. RUDOFF:  Can we republish 38, please, and go

15 to page 47?

16          THE COURT:  Yes.

17     Q.   Casi, when you were told that you had to get your

18 tattoos removed, did you do it?

19     A.   I did.

20     Q.   Why did you do it?

21     A.   Because I was told to.

22     Q.   And what were you told that it mattered that you had

23 a tattoo that had a meaning related to drugs?

24          MR. SELLERS:  Object to asked and answered, Your

25 Honor.

1          THE COURT:  Overruled.

2     A.   Can you repeat the question?

3     Q.   What was -- from what you were told, why did it

4  matter if you had a tattoo on your body of a dandelion that had

5  an alternative meaning related to drugs?

6     A.   I'm not really sure.

7     Q.   Okay.

8          MS. RUDOFF:  Can we zoom in on the first blue

9  message at the top.

10    Q.   Casi, who is this text message from?

11    A.   It's from me.

12    Q.   And who is -- what's the telephone number associated?

13    A.   3550.

14    Q.   What's the date of this text message?

15    A.   December 17th, 2015.

16    Q.   And so would this be after you were told you were on

17  secret probation?

18    A.   Yes.

19    Q.   What does your text message say?

20    A.   It said, I have -- I have to schedule an appointment

21  for tomorrow, with a sad face.  I was hoping to get started

22  today on removing my tattoo.

23          MS. RUDOFF:  Can we zoom out, please.

24    Q.   And who were you sending this message to?

25    A.   Joe.

1          MS. RUDOFF:  And can we go to page 458.  Can we

2     zoom in on the third blue message.

3          Q.    Casi, who is this text message from?

4          A.    Me.

5          Q.    And it's the number ending in 3550?

6          A.    Yes.

7          Q.    And there's no text in this message.  Is there a

8     photo?

9          A.    Yes.

10         Q.    What's that photo of?

11         A.    It's a picture of my tattoo removal after the first

12    treatment, I believe.

13         Q.    Why would you send that photo to Joe?

14         A.    To show him I was getting it removed and what it

15    looked like.

16         Q.    How many treatments do you remember that you had to

17    go through to get the tattoos removed?

18         A.    About 12.

19         Q.    Was it a painful process?

20         A.    Yes.

21         Q.    Was it an expensive process?

22         A.    Yes.

23         Q.    Was there any other -- but for being told you had to,

24    did you have a personal reason why you wanted to get the

25    tattoos removed?

1      A.    No.

2      Q.    What did the tattoos mean to you?

3      A.    Hope.

4      Q.    Is that why you got them originally?

5      A.    Yes.

6      Q.    As a part of your secret probation, were you required

7   to hand over any of your cell phones?

8      A.    Yes.

9      Q.    Who were you required to hand over your phones to?

10     A.    Bill.

11     Q.    And who told you you had to do that?

12     A.    He did.

13     Q.    What phones did you hand over to Bill Stone?

14     A.    Two of my old phones, Apple phones.

15     Q.    And why did you hand over -- why was it necessary

16  that you hand over two old iPhones of yours?

17     A.    He said he -- as he -- while he was cleaning up my

18  criminal history, he wanted to go ahead and send his phones in

19  to Ainsley and Avery, which were two of his analysts who -- so

20  they could analyze both of my phones to ensure there wasn't

21  anything criminal on them.

22     Q.    And when did you get those phones over to Bill Stone?

23     A.    I don't remember.  It was in the beginning times

24  of -- of this secret probation.

25     Q.    Did you ever get those phones back?

1        A.    No.

2        Q.    And were those phones that you had at the time been

3   using or were they from before?

4        A.    They were from before.

5        Q.    And later did you learn where those phones ended up?

6        A.    Oh -- yes.

7        Q.    And did you learn that they were not in D.C.?

8        A.    Yes.

9        Q.    Later when you found out where those phones -- well,

10  how did you find out where those phones were?

11       A.    Later I logged in to one of my social media apps and

12  it showed that my old phones were logged in at his house.

13       Q.    So the social media app told you that information?

14       A.    Yes.

15       Q.    How did you know that the login location was Bill

16  Stone's house?

17       A.    Because it showed -- it showed the location if you

18  click on it.

19       Q.    To provide like an address or --

20       A.    It showed -- I can't remember what it was, I just --

21  I could tell it was his house.

22       Q.    Did you ask Bill Stone why the phones were at his

23  house?

24       A.    I did.

25       Q.    What did he say?

1       A.   He said he -- they -- they were -- were supposed to

2   be sending them back to him, and they must have gotten there

3   without him knowing.

4       Q.   You say they were supposed to send the phones back.

5   Who's "they"?

6       A.   His analysts.

7       Q.   And so when you -- he did acknowledge that the phones

8   must be, then, back at his house?

9       A.   Yes.

10      Q.   We talked about -- you testified about a lot of

11  crises or emergency situations that would come up throughout

12  this secret probation, right?

13      A.   Yes.

14      Q.   How would the crisis be brought to Bill Stone's

15  attention from what you were told?

16      A.   I had -- he had -- had my name flagged.  And any time

17  anything would pop up in relation to me regardless, traffic

18  violation, anything, he was notified.

19      Q.   And who notified him?

20      A.   I guess a database at his job.

21      Q.   Okay.  And you said at one point that he had a team

22  of analysts that were helping with your legal issues and secret

23  probation?

24      A.   Yes.

25      Q.   I want to talk a little bit about this analyst.

1       A.    Okay.

2       Q.    What were the names of some of the analysts that Bill

3  Stone would tell you about often?

4       A.    Avery, Ainsley, Allen -- there were several others,

5  but those were the main ones.  And then -- yeah, that was...

6       Q.    Okay.  And these are FBI analysts from what you were

7  told?

8       A.    Yes.

9       Q.    Were you ever there when one of these analysts would

10 call Bill Stone?

11      A.    Yes.

12      Q.    What would happen when he would get a call from them?

13      A.    He -- he would answer.

14      Q.    And how would you know he was talking to one of the

15 analysts?

16      A.    He would usually repeat back stuff they were saying.

17      Q.    Would you hear his phone ring?

18      A.    I would not.

19      Q.    Did you ask him why his phone wouldn't ring?

20      A.    I once asked Joe why his phone didn't ring.

21      Q.    And what did Joe say?

22      A.    He said that there -- he had a Bluetooth device that

23 connected a vibrating -- something in his pocket that it was

24 connected through Bluetooth and he would get a vibration.  And

25 then answer the phone.

1        Q.    And Joe told you that about Bill Stone's phone,

2    right?

3        A.    Yes.

4        Q.    And so what would happen, then, when Bill Stone was

5    on the phone with an analyst, would he walk away, would he have

6    the conversation in front of you?

7        A.    In the beginning, he would walk away.

8        Q.    And then after that?

9        A.    Later on in this ordeal, he then would speak to them

10   around me.

11       Q.    What kind of conversations would you hear him have

12   with them?

13       A.    He -- in the beginning, it was -- it was all about me

14   and what they had -- were watching my family do in the -- in

15   the background.  And basically just giving him what they --

16   their findings and I guess their searches for me.

17                   And also, they would talk about his work with

18   the North Korea unit.  And documents that had to get put on the

19   president's desk in the morning.

20       Q.    And when you say "North Korea unit," is that with the

21   FBI?

22       A.    Yes.

23       Q.    And that's what you were told?

24       A.    Yes.

25       Q.    Did you ever speak to one of these analysts yourself?

1       A.    I did not speak directly to them.

2       Q.    Did you speak to them another way?

3       A.    I did.

4       Q.    How's that?

5       A.    So he had a satellite phone.  And I would be talking

6  to him on the phone.  And they would call him.  And he would be

7  talking to them.  And they could hear me, but I could not hear

8  them.  So he would speak for them to me, so I was speaking

9  directly to them through -- they could hear what I was saying,

10 and he would speak for them to me.

11      Q.    Okay.  We're going to have to break this down.

12 That's confusing.

13      A.    It's confusing, yes.

14      Q.    Okay.  Did Bill Stone have more than one phone?

15      A.    Yes.

16      Q.    Okay.  And so in the situation you just described,

17 did that involve two phones?

18      A.    I'm not sure how it happened, because I was not there

19 when this kind of thing happened.

20      Q.    Okay.  So this is an example of a situation when you

21 weren't in the room with Bill Stone?

22      A.    Right.  It was when I was on the phone.

23      Q.    Okay.  And so your understanding is that when you

24 were on the phone with Bill Stone, there was some mechanism

25 that the analysts could also hear the conversation?

1     A.    Yes, because it was a satellite phone.

2     Q.    And who told you that?

3     A.    Bill.

4     Q.    Before Bill told you it was a satellite phone, had

5  you ever heard of a satellite phone?

6     A.    I had not.

7     Q.    Do you know what a satellite phone is?

8     A.    No.

9     Q.    Do you know how a satellite phone works?

10    A.    No.

11    Q.    Did you believe Bill Stone when he said that there

12 were analysts involved in the conversation between you and

13 Bill?

14    A.    Yes, because he would speak for them to me.

15    Q.    And why did this make sense to you?

16    A.    He made -- he told me that he had some training where

17 he could speak verbatim for somebody else at the same time as

18 they were speaking.

19    Q.    What do you mean by "some training"?  Like who

20 trained him?

21    A.    With the FBI.

22    Q.    So this was a part of his work training?

23    A.    Yes.

24    Q.    Okay.  Did you question him on it?

25    A.    No.

1      Q.    Did it seem a little odd to you?

2      A.    It seemed very odd.

3      Q.    So why didn't you question him?

4      A.    I just thought -- I just believed him.  He was a

5  federal agent.

6      Q.    You said in the beginning that the -- he would --

7  Bill would tell you the analysts were calling about

8  circumstances related to your probation and legal issues, but

9  does that mean they would call about other things later in the

10 secret probation?

11     A.    Yes, they would call about everything.  A lot of

12 tracking of my family, what they were doing, reading text

13 messages from other people.  Bill would say they were

14 sharpening their skills.

15     Q.    Did they ever talk about personal things?

16     A.    Yes.  I eventually got pretty close with them talking

17 about their personal lives.

18     Q.    What kinds of things in their personal lives?

19     A.    Avery, I would reach out and ask for her fashion

20 advice because I was told she was really into fashion.  And he

21 really lifted her up and made her seem like a really great

22 girl.

23     Q.    "He" being?

24     A.    Bill.

25                Ainsley had a serious surgery.  We were

1  concerned with her.  And we -- and then she turned into a

2  flight attendant.  I don't know.  We -- I just got really close

3  with them.  He gave me a social circle with his female

4  analysts.

5      Q.   So he -- all these things you're saying that were

6  happening to Avery and Ainsley, that's what Bill Stone told you

7  was happening in their lives, right?

8      A.   Right.

9      Q.   And you believed these were real people?

10     A.   Yes.

11     Q.   Did you ultimately feel like you did become friends

12  with these analysts?

13     A.   Yes.

14     Q.   How did that make you feel?

15     A.   It made me feel really good.

16     Q.   Why?

17     A.   I felt protected.  I felt like I had a good quality

18  group of people watching out for me, looking out for me.

19     Q.   Did you have any other friends you were allowed to

20  talk to at the time?

21     A.   I did not.  I didn't have any friends that I could

22  trust, they -- I was made to believe I couldn't trust anyone.

23  And so I wasn't allowed to -- even if I wanted to tell the

24  story or share it to anyone, I couldn't trust that they

25  wouldn't then text or call someone else to tell them.  And then

1   Bill and his analysts would know that I said something to

2   somebody.

3       Q.   Okay.  You said they would call somebody else to tell

4   them.  So you're saying you were afraid if you told a friend --

5   and you said about the situation, what are you referring to?

6       A.   My secret probation.

7       Q.   Okay.  So if you told a friend about your secret

8   probation, then what were you afraid that friend would do?

9       A.   Share that information with somebody else through a

10  text or phone call.

11      Q.   And why did that sharing of the information concern

12  you?

13      A.   Because I wasn't allowed to tell anybody, and Bill

14  made me believe that he could read not only my text messages,

15  but other people's texts and phone calls.

16      Q.   Did you ultimately find out that none of these

17  analysts were real?

18      A.   Yes.

19      Q.   How did you feel when you were told that these were

20  fake people?

21      A.   It was mind-blowing.  I couldn't really believe it.

22      Q.   Why?

23      A.   Because it was such a real part of my life for four

24  years.  On a daily, every day.  These people were real to me.

25      Q.   Who was it that made them seem so real to you?

```
 1        A.    Bill and Joe.

 2        Q.    How did Joe make them seem real to you?

 3        A.    Joe would call Bill and ask questions about if he

 4  could have Avery look into this or ask Dr. Bryan if he could do

 5  this.  So Joe would enforce the -- they're real people.

 6        Q.    So it wasn't just you thinking they were real people,

 7  right?

 8        A.    Right.

 9              MR. SELLERS:  Object to leading, Your Honor.

10              THE COURT:  Sustained.

11              Don't lead the witness.

12        Q.    You mentioned just a second ago somebody by the name

13  of Dr. B.?

14        A.    Yes.

15        Q.    Or I'm sorry.  Dr. Bryan, is that what you said?

16        A.    Yes.

17        Q.    Who is Dr. Bryan?

18        A.    It was the psychiatrist or psychologist in

19  Washington, D.C.  In Bill's office unit.

20        Q.    Who did this psychologist work for?

21        A.    The FBI.

22        Q.    And who told you that Dr. Bryan was this FBI

23  psychologist?

24        A.    Bill.

25        Q.    Were there times that you would talk to Dr. Bryan?
```

```
 1        A.    Yes.

 2        Q.    How would you talk to Dr. Bryan?

 3        A.    Through Bill.

 4        Q.    Explain that to us.  How would that happen?

 5        A.    He would be on the phone with Bill, and I would be on

 6   the phone with Bill.  And I would speak to Dr. Bryan and Bill

 7   would speak for Dr. Bryan to me.

 8        Q.    So it was the same situation as you described with

 9   the analysts?

10        A.    Yes, and I wasn't allowed to hear their voice for

11   security purposes.

12        Q.    Who told you that?

13        A.    Bill.

14        Q.    So was that your understanding as to why you

15   couldn't -- why Bill had to speak for them?

16        A.    Yes.

17        Q.    Did you also become close to Dr. Bryan?

18        A.    I did.

19        Q.    Would you talk to Dr. Bryan often?

20        A.    I did.

21        Q.    What kinds of things would you talk to Dr. Bryan

22   about?

23        A.    We would -- we would talk about our Peleton rides.

24   We would talk about medical advice for Slayter, medical advice

25   in general.  He would ask me -- he would kind of try to be my
```

1  therapist.

2      Q.   When you say he would be your therapist, like what do

3  you mean?

4      A.   If I was having any problems over any of the

5  information that I was being told, he would calm me down.

6      Q.   How would he calm you down?  Would you share the

7  information with him?

8      A.   I would share a lot of information with him.  But it

9  was awkward because Bill could hear exactly what I was saying

10 as well.  So it was uncomfortable sometimes.

11     Q.   And you later found out that there is no such real

12 person as Dr. Bryan, psychologist with the FBI, right?

13     A.   Yes.

14     Q.   Prior to learning that Dr. Bryan wasn't real, were

15 you told something happened to Dr. Bryan?

16     A.   Yes.

17     Q.   What were you told?

18     A.   I was told that when I broke off the engagement, that

19 he had passed.

20     Q.   And when you're talking about engagement, that's

21 something that happened later, right?

22     A.   Way later.

23     Q.   And we'll talk about that in just a second.

24          So at some point you're told Dr. Bryan died.

25     A.   He died.

1    Q.    Other than being told that your text messages and

2    calls could be heard, were you told of any other physical

3    surveillance that was being done on you?

4    A.    I had constant surveillance.  There were -- there

5    were times that I was told my mother had hired a private

6    investigator to follow me around.

7    Q.    Who told you that?

8    A.    Bill and Joe.

9    Q.    Okay.  What other physical surveillance?

10   A.    I had a state trooper named Jerry who would drive by

11   my house.

12   Q.    Who told you that Jerry would drive by your house?

13   A.    Bill.

14   Q.    Did you believe that?

15   A.    I did.

16   Q.    Why?

17   A.    Because he would talk about my dogs.

18   Q.    Who would?

19   A.    Jerry would talk about how pretty my dogs were, and

20   he could see them through the fence.

21   Q.    So you believed that if he knew that information,

22   must be real?

23   A.    That's what I was told.

24   Q.    How did it make you feel being that you were told you

25   were under constant physical and electronic surveillance?

1     A.   I felt like I was in a snow globe.  I felt like I was

2 constantly being watched and monitored, but, you know, I really

3 didn't mind it because I was with my kids.  I was free.  I was

4 not in prison.  I was out of prison.

5     Q.   Did the surveillance only happen during a portion of

6 the secret probation or was it for the entirety, as far as you

7 were told?

8     A.   For the entirety.

9     Q.   So about four years?

10    A.   Yes.

11    Q.   And we talked a lot about the money that you paid Joe

12 and Bill between 20- -- end of 2015 and the end of 2016.

13 During the same time frame, were there instances in which you

14 gave Bill an item or a gift that wasn't as a payment for his

15 services as it related to the probation?

16    A.   Yes.

17    Q.   Tell me about one of those instances.

18    A.   There was an instance where he flew in to help me on

19 a criminal case.  And shared with me that his Rolex watch had

20 been stolen when he got back to D.C.

21    Q.   And who's "he"?

22    A.   Bill.

23    Q.   So Bill tells you that his Rolex watch was stolen.

24 How did you respond?

25    A.   I felt bad because he was down here helping me.  So I

1  bought him a Rolex.

2       Q.   And that was from your perspective a gift, right?

3       A.   It was a gift.

4       Q.   You -- would you consider that a expensive gift?

5       A.   Yes.

6       Q.   Why would you give Bill Stone a gift like that?

7       A.   I felt like he -- I was grateful for everything he

8  had done for me and had he not been down here helping me, he --

9  his -- his watch wouldn't have gotten stolen and -- in his

10 apartment.

11      Q.   And so in that instance, it was out of the generosity

12 of your heart?

13      A.   Yes.

14      Q.   Was there ever any other item or gift that you gave

15 Bill Stone that was not in payment for his services related to

16 this secret probation and your legal issues?

17      A.   Yes.

18      Q.   What was that?

19      A.   I got him a Louis Vuitton travel bag.

20      Q.   Why did you get him a Louis Vuitton travel bag?

21      A.   He and I were together, and I was excited that -- at

22 this point, he was allowing me to go into Louis Vuitton.  And

23 so I bought -- I thought I would be more apt to be able to buy

24 me one if I bought him one as well.

25      Q.   You said he was allowing you to go into Louis Vuitton

1    by this point.  What do you mean?

2          A.    Before the only shopping that was allowed really

3    because that was the only place we met were -- was at a outlet

4    mall.

5          Q.    And you say the only shopping allowed.  Who said you

6    have restrictions on shopping?

7          A.    The judge.

8          Q.    The judge in your Hood County probation?

9          A.    The judge in Austin.

10         Q.    So your secret probation?

11         A.    Yes.

12         Q.    So that was a condition of your probation?

13         A.    Yes.

14         Q.    What was the condition itself or the restriction that

15   you were told?

16         A.    Any big purchases I had to run through Judge

17   Anderson.

18         Q.    How would you run a big purchase through Judge

19   Anderson?

20         A.    I had to -- Bill would get permission from him.

21         Q.    Were there times when you were told no by the -- Bill

22   from the Court?

23         A.    Not really.

24         Q.    So then how was it that your shopping was restricted?

25         A.    We just never really had an opportunity to -- in the

1   beginning, it was -- that's not what -- there was no -- I don't

2   know how to explain it.  Time for it.  There was no time for

3   leisurely shopping.

4       Q.   Okay.  And so you're at the Louis Vuitton store, and

5   what did you purchase for yourself?

6       A.   I bought myself a travel bag, a Louis Vuitton travel

7   bag.

8       Q.   And then you said you bought what for Bill Stone?

9       A.   I bought him one as well.

10      Q.   Did you give it to Bill Stone?

11      A.   I did.

12      Q.   Other than what you said, it made your ability to

13  purchase it easier, is there any other reason you gave it to

14  Bill Stone?

15      A.   Not really.  Other than that.  And I mean, again, I

16  was grateful for his efforts in helping me.

17      Q.   So would you call it a gift?

18      A.   I would call it a gift.

19      Q.   Do you know about how much it was?

20      A.   About -- I want to say it was around 1500.

21      Q.   Would you consider that an expensive gift?

22      A.   That's expensive.

23      Q.   So why did you buy it and give it to Bill?

24      A.   I -- again, was grateful for his efforts in flying in

25  and helping me, taking time and caring -- caring about me.

1    Q.    Was Bill appreciative when you gave him those gifts?

2    A.    I really can't tell if he's appreciative or not of

3  anything.

4    Q.    Okay.  But he received them, right?

5    A.    He received them.

6    Q.    How did it make you feel being able to give those

7  gifts to Bill Stone?

8    A.    It made me feel good.

9    Q.    Why?

10    A.    Just to show my gratitude for him.

11    Q.    I want to fast-forward a little bit to the end of

12  2017, okay?

13    A.    Uh-huh.

14    Q.    Throughout 2017, are we -- are you still being told

15  to provide a bunch of these financial payments for your secret

16  probation?

17    A.    Say that one more time.

18    Q.    Starting in 2017, are you still having to provide

19  more financial payment to Bill and Joe for their services on

20  your secret probation?

21    A.    If -- if there was travel, then yes.  I was still in

22  school, and I wouldn't -- never mind.  I'm sorry.  Go ahead.

23    Q.    Was it starting to slow down financially for you a

24  little bit?

25    A.    Yes.

1          Q.    And by that I mean having to pay Bill and Joe for

2    your -- their work on your secret probation?

3          A.    Yes.

4          Q.    How did that make you feel?

5          A.    Like things were lightening up a little, getting

6    better.

7          Q.    Now, this time are you still on Hood County

8    probation, your real probation?

9          A.    Yes.

10         Q.    How is that probation going, the real one?

11         A.    It's going really good, really well.

12         Q.    Was that probation also starting to slow down a

13   little bit?

14         A.    Yes.

15         Q.    Why was the real probation starting to slow down a

16   little bit?

17         A.    Because I had completed my community service hours

18   and my 12-step program.  And I guess I was just doing really

19   well.

20         Q.    So did you feel like you had a little bit more

21   freedom in your real probation?

22         A.    Yes.

23         Q.    Is it fair to say around 2017 you felt like you had a

24   little bit more freedom in your secret probation?

25         A.    Yes.

1    Q.    So that makes sense to you?

2    A.    Yes.

3    Q.    At some point in 2017, maybe 2018, did Joe DeLeon

4    stop being your probation officer?

5    A.    Yes.

6    Q.    Do you remember about when that was?

7    A.    I don't remember.

8    Q.    Do you recall why that happened?

9    A.    Yes.  He got really sick and was having problems with

10   his -- he could barely walk or get out of bed.  So he was going

11   to have to pull back.  He wasn't able to continue on with the

12   probation.

13   Q.    And I just want to clarify for the record.  When you

14   say "he," who are you referring to?

15   A.    Joe.

16   Q.    And this is what Joe was telling you, right?

17   A.    Yes.

18   Q.    How did you feel about Joe telling you he could no

19   longer be your probation officer?

20   A.    I -- I was scared because I didn't know what I could

21   do.  I needed him out here, and I was scared.

22   Q.    So what ultimately happened?

23   A.    So Bill had told me not to worry about it, that he

24   was going to try to go speak directly to Judge Anderson and see

25   if he could take over as my probation officer.

```
 1        Q.    So did Bill tell you that he did in fact speak to
 2   Judge Anderson about that?
 3        A.    Yes.
 4        Q.    And what did Bill say that Judge Anderson said?
 5        A.    He said that he could.
 6        Q.    And so at some point did Bill Stone step in as your
 7   probation officer?
 8        A.    Yes.
 9        Q.    As your probation officer, were you then spending
10   more time with Bill Stone?
11        A.    Yes.
12        Q.    What about Joe DeLeon?
13        A.    No.
14        Q.    And prior to this, who did you physically spend more
15   time with, Joe or Bill?
16        A.    Joe.
17              THE COURT:  And when we reach kind of a natural
18   breaking point in the next couple of minutes, it's time for us
19   to take a quick stretch break.
20              MS. RUDOFF:  Thank you, Judge.
21        Q.    At this time, from what you were told, is Bill Stone
22   still in D.C.?
23        A.    What year are we at?
24        Q.    This would have been 2017 when Bill Stone said he
25   could take over as your probation officer.
```

```
 1        A.    No, I don't think so, no.

 2        Q.    So where was Bill Stone?

 3        A.    He was living in his house in Colleyville.

 4        Q.    So at this time were you living in the house in

 5   Colleyville?

 6        A.    No.

 7        Q.    Where did you live?

 8        A.    I lived in the same house I'm at right now.

 9        Q.    Where's that?

10        A.    At -- in Granbury.

11              MS. RUDOFF:  Your Honor, we can take a break.

12              THE COURT:  All right.  Members of the jury,

13   let's take a ten-minute break.

14              (Court instruction.)

15              (Jurors exit courtroom.)

16              (Recess taken.)

17              THE COURT:  With that said, your witness, ma'am.

18        Q.    Casi, right before the break, we talked about that

19   Joe was no longer going to be your probation officer for the

20   secret probation?

21        A.    Yes.

22        Q.    Okay.  Talking about Joe for a second.

23              MS. RUDOFF:  Your Honor, may I republish

24   Government's 38?

25              THE COURT:  Yes, ma'am, you may.
```

1       Q.    You had said previously when you testified that your

2   understanding was that Joe DeLeon was law enforcement, right?

3       A.    Yes.

4       Q.    And you already told us some of those reasons.  Do

5   you recall that yesterday?

6       A.    Yes.

7       Q.    When Joe was your probation officer, and he would

8   come to your house, would he have a gun on him?

9       A.    Yes.

10      Q.    How often?

11      A.    Very -- every time.

12      Q.    How did you know he had a gun on him?

13      A.    He would set it on the table.

14      Q.    When he came in your home?

15      A.    When he came in the house.

16      Q.    And before he sat it on the table, was it in a bag,

17  on his person, where was it?

18      A.    It was on his hip, on his belt.

19      Q.    Okay.

20            MS. RUDOFF:  Can we go to page 3 of Government

21  38, please.

22      Q.    Casi, I just want to give you some context.  Can you

23  read to yourself these text messages?

24            (Witness complies.)

25      A.    Okay.

```
 1              MS. RUDOFF:  And then can we zoom in on the

 2   second blue message on the left and the green response.

 3       Q.   What's the date of these text messages?

 4       A.   August 28th of 2012.

 5       Q.   And whose number is the 5211 number?

 6       A.   It's a previous number of mine.

 7       Q.   And then whose number ends in 7611?

 8       A.   Joseph DeLeon.

 9       Q.   Based on reading this -- these text messages, what

10   were you talking about with Joe DeLeon at the time?

11       A.   I'm not sure.

12       Q.   Okay.

13              MS. RUDOFF:  Can we zoom out.  Can we go to

14   page 4.  Can we zoom in on the first two green messages.

15       Q.   Who are these messages from?

16       A.   Joe.

17       Q.   And what's the date of these messages?

18       A.   August 28th of 2012.

19       Q.   Can you read the second message on the screen from

20   Joe DeLeon?

21       A.   Did you ever get a last name to see so that we can

22   run her to see if she's even wanted?

23       Q.   What did you understand this message to mean?

24              MR. SELLERS:  I'm going to object to speculation

25   on this.
```

1          THE COURT:  If you can establish how she knows,

2    overruled.

3          Q.    Casi, did you understand what this message meant?

4          A.    I didn't.

5          Q.    Okay.

6                MS. RUDOFF:  Can we go to page 5, please.  Can

7    we enlarge this second green message on the right and the

8    third -- the first blue message on the left together.

9          Q.    What's the date of this message?

10         A.    August 30th, 2012.

11         Q.    And can you read the message from Joe DeLeon, 7611?

12         A.    Casi, Special Agent Stone text me back stating he was

13   in a very important meeting, but as soon as he gets out, it is

14   the first thing he's going to do to look into it thoroughly.

15   Thank you so much for your help in this.  Be sure and delete

16   all messages in reference to this.

17         Q.    What do you respond?

18         A.    Yes, sir, I already do.  I'm not a dummy.

19         Q.    Do you recall what you were talking about in this

20   conversation?

21         A.    I do not.

22               MS. RUDOFF:  Can we zoom out.

23         Q.    Did you understand what he meant by "be sure and

24   delete all messages in reference to this"?

25         A.    Yes.

1    Q.   What did you understand that to mean?

2    A.   Just to delete any messages relating to Bill and I

3  guess whatever this was.

4    Q.   Why were you supposed to delete any messages related

5  to Bill?

6              MR. SELLERS:  Object to speculation, Your Honor.

7              THE COURT:  You'll have to establish she knows

8  it before she can answer.

9    Q.   First of all, did someone tell you to make sure --

10 besides this text prior to it, had someone told you to make

11 sure you delete all text messages you had related to Bill?

12   A.   I wasn't -- I usually did delete text messages from

13 Bill.

14   Q.   So that was a decision you made?

15   A.   Yes.

16   Q.   During this time frame?

17   A.   Yes.

18   Q.   Why?

19   A.   During this time frame?

20   Q.   Yeah.

21   A.   I -- because he was a federal agent.  I'm not really

22 sure exactly, if I'm being honest, what I was thinking in this

23 time frame in 2012.

24   Q.   Was this time frame when you were on drugs?

25   A.   I was actively using, yes.

1          MS. RUDOFF:  Can we -- no, actually.  Can we

2    blow up Joe's -- the third green text messages.

3        Q.   Can you read this message from Joe DeLeon?

4        A.   Yes.  It said, I knew that you did, but I have to do

5    this every single time.  They call it standard operating

6    procedure.  We are made to do this.

7        Q.   Could you understand this text message?

8        A.   I -- I did.

9        Q.   What did you understand this text message to mean?

10          MR. SELLERS:  Object to speculation, Your Honor.

11          THE COURT:  You'll have to establish that she

12    knows.

13        A.   I --

14        Q.   Let me -- hold on.

15        A.   Sorry.

16        Q.   Did you know what this text message meant?

17        A.   I assumed he was --

18          MR. SELLERS:  Object to speculation.

19          THE COURT:  I'll allow it.

20        Q.   Go ahead.

21        A.   I assumed he was giving me a term -- a terminology of

22    some legal term.

23        Q.   Okay.  Why did you assume he was giving you a legal

24    term?

25        A.   He was giving me advice to delete text messages from

1  Bill, and he referred to it as standard operating procedure to
2  tell me to delete it.
3      Q.   Okay.
4           MS. RUDOFF:  Can we go to page 12 of
5  Government's 38.  Sorry.  Can we go to page 11, then.  And can
6  we highlight the first green message on the right.
7      Q.   Who is this green message from?
8      A.   Joe DeLeon.
9      Q.   That's the number ending in 7611?
10     A.   Yes.
11     Q.   What's the date of this message?
12     A.   July 31st, 2014.
13     Q.   So actually, is that the day it was read?  What was
14  the day --
15     A.   Delivered -- okay.  So June 3rd, 2014.
16     Q.   What does this text message say?
17     A.   It says, I got to get back to work.  We have a triple
18  homicide this morning involving a Hispanic family at 500 West
19  Felix Street, and I have to return several calls, but stay in
20  touch and call me anytime.
21          MS. RUDOFF:  Can we zoom out.  And can we zoom
22  in on the first blue message on this page -- actually, can we
23  go back to the green so I can establish the timing, please, the
24  previous message.
25     Q.   Casi, what's the timing that this was delivered?

1    Does it provide a time?

2          A.   12:28.

3          Q.   Okay.  On June 3rd, 2014?

4          A.   Yes.

5          Q.   Okay.

6                    MS. RUDOFF:   And then can we go to the first

7    blue message.

8          Q.   Who is this message from?

9          A.   Me.

10         Q.   And can you tell me the timing of this message,

11   what's the date and time?

12         A.   Of the read?  12:27 or 12:29.

13         Q.   The read?

14         A.   Oh, 12:29.

15         Q.   And what does your message say?

16         A.   Wow, that's terrible.  Okay.  I'd love to have your

17   job, never a dull moment.

18         Q.   When you said "job," what are you referring to?

19         A.   His -- his -- what he did with the Fort Worth Police

20   Department.

21         Q.   And so is this message in response to the green

22   message we just read?

23         A.   Yes.

24         Q.   You had earlier testified -- you had earlier

25   testified that there were reasons that made you believe

1    Joe DeLeon was law enforcement, right?

2        A.   Yes.

3        Q.   Were text messages like this part of that reason?

4        A.   Yes.

5        Q.   Have you ever known someone who isn't in law

6    enforcement to talk like this?

7                 MR. SELLERS:  Object to relevance, Your Honor.

8                 THE COURT:  Sustained.

9                 MS. RUDOFF:  Can we go to page 612.  And can we,

10   please, blow up the green message on the right.

11       Q.   Who is this message from?

12       A.   Joseph DeLeon.

13       Q.   So number ending in 7611?

14       A.   Yes.

15       Q.   What's the date of this message?

16       A.   January 27th, 2016.

17       Q.   And what did it say?

18       A.   I have a SWAT hostage negotiator's class I am

19   teaching Thursday and Friday.

20                 MS. RUDOFF:  Can we go to page 614.  Can we

21   highlight the last green message and blow it up on the screen.

22       Q.   Who is this message from?

23       A.   Joe DeLeon.

24       Q.   What's the -- is that the number ending in 7611?

25       A.   Yes.

```
 1        Q.    What's the date of this message?
 2        A.    January 27th, 2016.
 3        Q.    What does it say?
 4        A.    A SWAT callout supercedes pretty much anything
 5   because it involves life and death.
 6              MS. RUDOFF:  Can we zoom out.  Can we go to
 7   page 615.  Can we highlight the first green message.
 8        Q.    Who is this message from?
 9        A.    Joe DeLeon.
10        Q.    Is that the number ending in 7611?
11        A.    Yes.
12        Q.    Is this conversation continuing on the same date?
13        A.    Yes.
14        Q.    What does it say?
15        A.    When I get a SWAT callout, I have to stop eating,
16   having sex, taking a shower, anything and take off immediately.
17        Q.    What did you understand -- or, no.  Scratch that
18   question.
19              MS. RUDOFF:  Can we go to page 621.  Can we
20   highlight the second green message.
21        Q.    Who is this message from?
22        A.    It's from Joe DeLeon.
23        Q.    Is that the telephone number ending in 7611?
24        A.    Yes.
25        Q.    What's the date of it?
```

```
 1        A.    January 29th, 2016.

 2        Q.    What does it say?

 3        A.    I'm teaching hostage negotiations class, will be out

 4   at about 2:00 or 2:30.

 5        Q.    Through all of these text messages we've just gone

 6   through from Joe DeLeon, in any of the ones I've highlighted,

 7   did Joe DeLeon say he was interpreting?

 8        A.    No.

 9              MS. RUDOFF:  We can take down 38.

10        Q.    So in 2017, Bill Stone is now your probation officer,

11   right?

12        A.    Right.

13        Q.    Other than Bill Stone, were you spending time with

14   anyone else at this time?

15        A.    No.

16        Q.    Why not?

17        A.    I was just going to school, being a mom, and that was

18   all I was really allowed to do.

19        Q.    You said you were going to school.  Did you graduate

20   from college sometime in 2017?

21        A.    Yes.

22        Q.    When was that?

23        A.    December of 2017.

24        Q.    How were your grades?

25        A.    Good, excellent.
```

1    Q.   How did it feel to graduate college, finally?

2    A.   It --

3            MR. SELLERS:  Objection; relevance, Your Honor.

4            THE COURT:  I'll allow it.

5    Q.   How did it feel to graduate from college, finally?

6    A.   It felt really good.  I felt proud of myself, because

7  I did that.  I did it.  Nobody helped me do it.  I got my

8  degree myself.

9    Q.   Did you have an opportunity to celebrate?

10   A.   I did.

11   Q.   With friends and family, right?

12   A.   Yes.

13   Q.   Was Joe DeLeon and Bill Stone at your graduation

14  celebrations?

15   A.   Yes.

16   Q.   Having now graduated from college, how did you feel

17  about your future?

18           MR. SELLERS:  Object to relevance, Your Honor.

19           THE COURT:  Sustain.

20           Let's move on.

21   Q.   At this point in time, had you had a relationship

22  with anyone since coming home from rehab?

23   A.   No.

24   Q.   And around this time, did you become romantically

25  involved with Bill Stone?

1      A.    Yes.

2      Q.    Do you recall when about you became and what you

3   deemed a relationship with Bill Stone?

4      A.    It was sometime after graduation.

5      Q.    From your perspective, how did your relationship with

6   your probation officer evolve into a boyfriend?

7      A.    Okay.  Say that one more time.

8      Q.    Explain to the jury how your relationship with Bill

9   Stone -- who was your probation officer at the time, right?

10     A.    Yes.

11     Q.    -- evolved into becoming a romantic relationship.

12     A.    There -- there was a time where he came -- he

13  softened and he was not the authoritative, arrogant, cocky,

14  rude person that he initially was.  He softened and would speak

15  to me on a like -- on a level of friendship at first.  And it

16  made me feel really good that, you know, maybe he was softening

17  up and seeing that I was doing well.  And he would compliment

18  me and tell me I was doing good, congratulate me.  And it just

19  felt really good.  And over time it just kind of went into

20  us -- he -- we spent so much time together that it just kind of

21  turned into that.

22          And also, I  -- I wasn't allowed to date anybody

23  else.  Any time I tried, any guy that I had him run had some

24  sort of sexual abuse background on -- or pornography or

25  pedophilia, some sexual crime or background.

1    Q.   And that's what Bill Stone told you about those

2    individuals, right?

3    A.   Yes.

4    Q.   Why would you -- why would Bill Stone have to run an

5    individual you wanted to go on a date with?

6    A.   He was told to do so from the judge.

7    Q.   So was that a condition of your probation?

8    A.   It was a condition of my probation, yes.

9    Q.   Just to be clear, the secret probation, right?

10   A.   Secret probation.

11   Q.   And so because of those individuals past, you weren't

12   allowed to hang out with them, right?

13   A.   Right.

14   Q.   You said that Bill Stone started to soften.  Did that

15   cause you to develop feelings for him?

16   A.   I did.

17   Q.   What kind of feelings were those?

18   A.   I'm trying to give an accurate statement on that.  So

19   I felt safe with him.  I -- I thought I needed him.  I felt

20   protected by him.  I had love for him because of everything he

21   had done for me and was still doing for me.  And I've never had

22   anybody take that much interest in me and also be accepting of

23   my past and still be rooting for me.  He knew everything about

24   me, and I found that to be rare, that he still cared.

25   Q.   Okay.  Makes sense.

 1      A.   Uh-huh.

 2      Q.   Now, prior to this time frame -- well, let me ask you

 3  this, with those feelings, would you at this point in time

 4  introduce him to people as your boyfriend?

 5      A.   I eventually started calling him my boyfriend.

 6      Q.   And that was something you did openly, right?

 7      A.   Yes.

 8      Q.   And no one told you you had to do that, right?

 9      A.   Right.

10      Q.   Prior to him -- prior to you guys being in a romantic

11  relationship that you just described --

12      A.   Yes.

13      Q.   -- was there instances prior where you guys had had a

14  sexual relationship?

15      A.   Yes.

16      Q.   Can you tell me what year you recall that first

17  instance of a sexual interaction with Bill Stone?

18      A.   I want to say it was in 2016.

19      Q.   Okay.  So this is earlier in the probation, right?

20      A.   Right.  Or the end of '15.  I'm not sure.

21      Q.   Do you remember a specific instance in 2016?

22      A.   There was a time where -- do I need to describe it?

23      Q.   I'm just asking -- it's a yes or no.

24      A.   Yes.

25      Q.   How did that -- how did a sexual instance come about

1  at that point in the probation with you and Bill Stone?

2      A.   He'd come over for a house check.

3      Q.   Was that related to your probation?

4      A.   It was related to my probation.

5      Q.   Okay.  And then what happened?

6      A.   I was -- it was unexpected.  And we had sex.

7      Q.   Was there any conversation about having sex before

8  it?

9      A.   No.

10      Q.   Was there any conversation about having sex after it?

11      A.   No.

12      Q.   From your perspective, why did you have sex with him,

13  then?

14      A.   At that time, he appeared to me as this powerful

15  federal agent who wanted to have sex with me.  And I did it.  I

16  had sex with him.

17      Q.   So we fast -- and is it fair to say that that

18  happened more than once between 2016 and when you deem yourself

19  in a relationship with Bill Stone?

20      A.   Yes.

21      Q.   Why did you not talk to Bill Stone about those sexual

22  instances?

23      A.   It usually happened on a rare occasion when he would

24  want it.

25      Q.   But you personally made the decision not to discuss

1    it after the fact, right?

2        A.    Right.  Well, yeah, we just didn't.

3        Q.    Okay.  Now, when you're in a romantic relationship,

4    what kinds of things would you and Bill do together?

5        A.    We -- on a daily basis?

6        Q.    Just as a couple in generally.

7        A.    We would eat and go to movies.  Usually he would join

8    me and my kids if we went to the movies or went out to eat.

9        Q.    Would he come over and spend the night at your house?

10       A.    No.

11       Q.    Why not?

12       A.    I was still on probation.  And it -- we weren't

13   allowed -- we had to semi-pretend that we weren't in a

14   relationship.

15       Q.    Who told you you had to pretend you weren't in a

16   relationship?

17       A.    Bill, until he retired.

18       Q.    Did Bill tell you why he couldn't -- you guys

19   couldn't really share that you were in a relationship until he

20   retired?

21       A.    He was also my probation officer, and it wasn't

22   allowed through Austin, through the judge.

23       Q.    Who told you that?

24       A.    Bill.

25       Q.    So when he said until he retired, where did you

1    understand him to still be working?

2         A.    At the FBI -- the Federal Bureau of Investigations.

3         Q.    When he was your boyfriend, would you spend the night

4    at his house?

5         A.    I did a couple of times.

6         Q.    Was it on a regular basis?

7         A.    No, it was twice.

8         Q.    Even though you weren't staying there, would you --

9    were some of your things at his house?

10        A.    No.

11        Q.    Why not?

12        A.    I didn't have anything there.

13        Q.    Not in the bathroom or bedroom?

14        A.    No.

15        Q.    What about your son, did your son keep things at

16   Bill's house?

17        A.    No.

18        Q.    Did your son have a room at Bill's house?

19        A.    No.

20        Q.    Other than going out together and calling him your

21   boyfriend, when you guys talked, would it be clear from the

22   conversation you guys were in a relationship?

23        A.    Yes.

24        Q.    Does that include text messages?

25        A.    Yes.

1      Q.    Was there instances where you took Bill Stone with

2   you to family events as your boyfriend?

3      A.    Yes.

4      Q.    At some point did you and Bill Stone go on a trip

5   together in the summer of 2018?

6      A.    Yes.

7      Q.    Where did you go?

8      A.    We went to Florida.

9      Q.    2018?

10      A.    Oh, was that -- Hawaii, we went to Hawaii.

11      Q.    Who all went to Hawaii?

12      A.    Me, Bill and Slayter.

13      Q.    And Slayter's your son, right?

14      A.    Yes.

15      Q.    Whose idea was it to take the trip to Hawaii?

16      A.    It was my idea.

17      Q.    Was it for any particular purpose or just a trip?

18      A.    It was my first summer not having to take summer

19   classes.  And I wanted to take a trip, and so I asked for

20   permission if I could get a trip to -- or go on vacation.

21      Q.    When you say you asked permission, who did you ask

22   permission from?

23      A.    I asked Bill and he had to got it approved by the

24   judge.

25      Q.    The judge -- and the judge being Judge Anderson in

1  Austin, right?

2      A.   Yes.

3      Q.   And that's your secret probation?

4      A.   Yes.

5      Q.   Did Judge Anderson approve it?

6      A.   Yes.

7      Q.   Who told you that?

8      A.   Bill.

9      Q.   Were you given any documentation so that you could --

10 to show that you had approval from the Court?

11     A.   My approval was with as long as he could go.

12     Q.   Who told you that?

13     A.   He had to go and I guess chaperone.

14     Q.   Who told you that?

15     A.   That's what Bill said the judge said.

16     Q.   So did Bill go with you to Hawaii, then?

17     A.   He did.

18     Q.   When you guys were in Hawaii, did all of you share a

19 room together?

20     A.   Yes.

21     Q.   And what was the sleeping situation with you and

22 Bill?

23     A.   We had -- it was a big suite.  And so we had -- we

24 stayed in the same room.

25     Q.   Okay.  When was the last time you had been able to

1  take a trip at that point?

2      A.   I -- the last one was taking my kids to San Antonio

3  for July 4th.  Maybe in 2017 or '16.  I'm not sure when it was.

4      Q.   Were you excited to be able to take a trip?

5           MR. SELLERS:  Object to relevance, Your Honor.

6           THE COURT:  Overruled.

7      A.   I was.

8      Q.   Did you enjoy the trip?

9      A.   I did.

10     Q.   And being that Bill was your boyfriend at the time

11 when you were on this trip, is it fair to say that there were

12 physical and sexual relationship -- relations in Hawaii as

13 well?

14     A.   Yes.

15     Q.   Sometime in 2018, were you released from your Hood

16 County probation?

17     A.   Yes.

18     Q.   When was that?

19     A.   I'm not sure of -- of the month, but it was in 2018.

20     Q.   And was -- how long had you been on your Hood County

21 probation at this point?

22     A.   I believe three years.

23     Q.   So was that the full term of your probation at that

24 point?

25     A.   No, I got dismissed early.

```
 1        Q.   How -- how did you get dismissed early?

 2        A.   I originally thought it was for good behavior, but

 3   when I told Bill that I had gotten off probation early, he said

 4   you're welcome.

 5        Q.   Did you know what he meant?

 6        A.   I didn't.  He said that Judge Anderson --

 7                  MR. SELLERS:  Object.  Sorry to -- speculations.

 8                  THE COURT:  Overruled.

 9        Q.   Did Bill Stone tell you what he meant?

10        A.   Yes.  He had the judge in Austin write a letter

11   stating I was helping them with a steroid case.  And I deserved

12   to be off probation.

13        Q.   You said Bill Stone used -- you said you were helping

14   them.  Who is "them"?

15        A.   The -- at this time he had said he was working with

16   some steroid case out of Dallas.  Bill.

17        Q.   I'm trying to understand.  Who is Bill working for at

18   the time?

19        A.   Oh, he's working for the bureau, the federal -- FBI.

20        Q.   Okay.  How did it feel being off your Hood County

21   probation?

22        A.   It felt really good.

23        Q.   Did you have any issues at all when you were on your

24   Hood County probation?

25        A.   I didn't.
```

1    Q.    But you were still on the secret probation, right?

2    A.    Right.

3    Q.    At that time did you know how long the secret

4    probation was supposed to last?

5    A.    Six years.

6    Q.    That's what you were told, right?

7    A.    What I was told.

8    Q.    Were you told if there was an opportunity for you to

9    also get off the secret probation early, was there a way that

10   could happen?

11   A.    Yes.

12   Q.    Okay.  But at this point that hasn't happened yet,

13   right?

14   A.    It had happened already.

15   Q.    You could get off secret probation at this point

16   already?

17   A.    I was told that I -- there was a possibility I could

18   get off my secret probation when I graduated college.

19   Q.    Okay.  And you graduated in December 2017?

20   A.    Yes.

21   Q.    When you graduated college, did you get off secret

22   probation?

23   A.    No.  I was told that I had to do a little bit more

24   work on my grandmother's assets and her oil and gas and mineral

25   rights.  I had to get everything out of the trust and into my

```
 1   name.
 2       Q.    Who told you that was necessary?
 3       A.    Bill told me that's what Judge Anderson wanted to see
 4   because he wanted to make it easier for my kids if something
 5   were to happen to me.
 6       Q.    So moving into 2019, you're still on secret probation
 7   then as well, right?
 8       A.    Yes.
 9       Q.    And are you still in a relationship with Bill Stone?
10       A.    Yes.
11       Q.    Being that you're continuing in a -- or being that
12   you're in a relationship with Bill Stone, how was it working
13   with your daily probation conditions?  Were you still doing
14   those as well?
15       A.    He was still doing it.  I was not -- since we spoke
16   90 percent of the day, he -- he knew what I was doing, so he
17   could write up my reports for the judge.
18       Q.    How did you know Bill Stone was still writing reports
19   about you to the judge?
20       A.    Because he would tell me.
21       Q.    Were you working at the time?
22       A.    I was.
23       Q.    What were you doing for work?
24       A.    I was doing hair, as a hair stylist.
25       Q.    How much were you making at the time as a hair
```

1  stylist?

2      A.   At the time, I was just starting to build a clientele

3  in Granbury, so not very much.

4      Q.   How many hours a week would you work around this

5  time?

6      A.   I spent a lot of time in going back and forth to --

7  to Colleyville on the days I didn't have clients.  But I would

8  try to book at least three days a week.

9      Q.   And when you say "going back and forth to

10  Colleyville," what's in Colleyville?

11      A.   Bill.  We would go have lunch or dinner to discuss

12  everything that was still going on.

13      Q.   Okay.  So you would drive to where Bill was living at

14  the time?

15      A.   Yes.

16      Q.   In 2019, did you and Bill decide to go on a trip

17  together?

18      A.   In what year?

19      Q.   2019.

20      A.   Yes.

21      Q.   Actually, let me back up.

22           At this point in your and Bill's relationship,

23  before the Florida trip, had you two ever discussed getting

24  married?

25      A.   No.

1    Q.    Did you guys discuss the future of your relationship?

2    A.    No.

3    Q.    Did you want to discuss the future of your

4    relationship?

5    A.    It didn't matter to me either way.  I -- it just was

6    never brought up.

7    Q.    Did you ever talk to him at that time about having a

8    family together?

9    A.    I did.

10    Q.    Tell me about that.

11    A.    I at one point had mentioned there was a filter of

12    what a baby would look like if I was to have a baby.  And I

13    shared it with him originally joking, but then it became a

14    serious topic of, well, maybe we could have a baby.

15    Q.    I just want to make sure I understand.  When you say

16    a filter of something, can you explain what you're talking

17    about?

18    A.    It was just a filter that could take a picture and

19    change it into what your baby would look like if you had one.

20    Q.    Oh, on like a app or something?

21    A.    On an app.

22    Q.    Okay.  And so the point in which it developed into a

23    serious conversation, tell me about that kind of conversation.

24    A.    I just would send it to him.  He was the only person

25    I spoke to really at the time.  And so he was my best friend as

1  well.  And so I would share everything with him.  And so I

2  showed him a picture of what my baby would look like and then

3  it just kind of got, well, you know, I started thinking, maybe

4  I do want a baby, maybe to take my focus off of everything

5  that's going in my life, maybe I can start over and have, you

6  know, a family.

7       Q.   Did that bring you kind of excitement at the time?

8       A.   It was just something -- it was a quick thought.

9       Q.   But it's something you shared with Bill, right?

10      A.   It was something I shared with him.

11      Q.   How did Bill respond to it?

12      A.   I think he was just kind of going along with it.

13      Q.   But he didn't tell you no or anything like that?

14      A.   He didn't tell me no.

15      Q.   Okay.  So you guys decide to go on a trip to Florida,

16  right, you and Bill?

17      A.   Yes.

18      Q.   And when was that?

19      A.   In June of '19.

20      Q.   And what -- was this trip for any particular reason?

21      A.   This was just for a summer vacation.

22      Q.   Who all went?

23      A.   Just me and Bill.

24      Q.   Did you have to get permission from the Court again,

25  from the secret probation court to go on this trip?

1      A.    Yes.

2      Q.    And how did that permission work?

3      A.    Bill told -- Bill -- I guess Bill told the judge, and

4  the judge gave permission that this time Bill was not allowed

5  to go, he -- I was just given permission.  But I guess not --

6  not allowed; just wasn't told to attend -- was -- wasn't told

7  to go.

8      Q.    Okay.  But Bill did go?

9      A.    He did go.

10      Q.    But he wasn't there because he had to supervise you,

11  is what you're saying?

12      A.    Right.  But he -- yes.

13      Q.    Were you provided any documentation, though, from the

14  Court saying that you could go?

15      A.    He had received my permission slip.  So on the plane

16  over, he showed me just like a corner of a piece of paper in

17  his briefcase showing me that was my permission slip to be

18  traveling.

19      Q.    And who is "he"?

20      A.    Bill.

21      Q.    And when you were in Florida together, was there a

22  night where you guys had a big fight or blowup?

23      A.    Yes.

24      Q.    And can you explain why -- or what led to this fight

25  and blowup between you and Bill Stone?

1    A.   I -- there were -- there was a waiter there that I

2  found attractive and I -- we kissed and Bill saw me kiss him.

3    Q.   Okay.  So you're in Florida with your boyfriend,

4  right, Bill Stone?

5    A.   Right.

6    Q.   And Bill Stone saw you kiss this waiter?

7    A.   Right.

8    Q.   What happened after that?

9    A.   We went to the room and I woke up to him storming

10  around 3:00 a.m., going to leave.  And leave me there.  And

11  it -- and I was like, you can't leave me here, what am I going

12  to do.

13    Q.   What do you mean -- why did you -- why were you

14  worried if he left you there?

15    A.   I -- I felt like I wanted him to be there.  I -- I

16  didn't know what he was going to do when he left.  I didn't

17  know if it was going to affect my probation or what was going

18  to happen.

19    Q.   Why would you think Bill Stone leaving you in Florida

20  would affect your secret probation?

21    A.   I thought he was upset with me, and I didn't know

22  what he could do or what he would do if he left.

23    Q.   Well, what were you afraid of him doing?  I just

24  don't know what you're referring to.

25    A.   I didn't know if he would call or talk to the judge

1    and tell him -- you know, I didn't know.  I was scared what

2    he -- he was upset and mad.  And so I was scared of him, and

3    scared in that moment.

4         Q.   Okay.  Did you guys end up while in Florida coming to

5    some kind of resolution?

6         A.   Yes.

7         Q.   What was that?

8         A.   Originally I told him I can't do this anymore, I

9    don't want to be in a relationship with you.  I want to -- my

10   own probation officer separate from you, and he said I didn't

11   mean that.  And we ended up coming to an agreement that I would

12   consider getting back dating -- in a dating situation with him.

13        Q.   Why did you say you wanted a different probation

14   officer?

15        A.   I did not feel safe having my freedom in his hands.

16        Q.   As your boyfriend or as a probation officer?

17        A.   As a probation officer.  The relationship and the

18   probation were -- were opposite, but they had no connection.

19        Q.   Well, if they had no connection, then why are you

20   worried about them affecting each other?

21        A.   He was first my probation officer and second was this

22   romantic situation that ended up following suit.  It was --

23   they were separate.

24        Q.   Okay.  When you asked him if you could change

25   probation officers, did he -- did you get an answer?

```
 1        A.   I did.

 2        Q.   What did he say?

 3        A.   He said no.  I had asked him before.  He said that I

 4   wouldn't be able to do that because I would have to physically

 5   go to Austin if that was the case.

 6        Q.   Were you willing to go to Austin?

 7        A.   I was willing to go to Austin.

 8        Q.   Did you tell him that?

 9        A.   I did.

10        Q.   What did he say?

11        A.   He said, no.  He said, no, I'm not going to have you

12   do that.  And he was doing me -- he seemed as though he was

13   doing me a favor.

14        Q.   How did it feel when you were told you couldn't have

15   a different probation officer?

16        A.   I felt stuck, I guess, with this.  I was fine with

17   it -- I mean, I just wanted it to be different.

18        Q.   Once you get back from Florida, did Bill tell you

19   anything -- any trip he needed to make as it related to your

20   secret probation?

21        A.   Yes.

22        Q.   What did he tell you?

23        A.   He had to go to Austin because the -- there was a

24   video of me in Florida that landed on the judge's desk.

25        Q.   When you saw video of you in Florida, meaning from
```

 1   your vacation you just got back from?

 2       A.    From the trip that I had just taken.

 3       Q.    Did Bill describe to you what this was a video of?

 4       A.    There -- it was a video of me on my vacation.

 5       Q.    And was there something about this video that Bill

 6   said caused concern?

 7       A.    He said that the two -- the two waiters that we were

 8   with were terrorists.

 9       Q.    Bill Stone said that?

10       A.    Yes.

11       Q.    Why was that an issue?

12       A.    I -- I guess they -- they were on a terrorist watch

13   list, and I just so happened to be in the video.

14       Q.    Did you watch this video?

15       A.    I did not.

16       Q.    Did you ask to see the video?

17       A.    I did not.

18       Q.    So does Bill Stone, then, go to Austin?

19       A.    Yes.

20       Q.    How were you feeling when Bill Stone is headed back

21   to Austin to meet with the judge in your secret probation?

22       A.    I -- I was -- I wasn't sure how to feel at this

23   point.  It was -- it was a familiar feeling of what it used to

24   feel like when he was doing this all the time.

25       Q.    What do you mean, doing what all the time?

1    A.    Going to Austin or back and forth from the first two

2  years of the secret probation.

3    Q.    What -- what feeling was familiar?  What were you

4  actually feeling?

5    A.    It was a feeling of agony, fear, just un- -- of the

6  unknown.  The fear of like -- like what now, like what now.

7    Q.    So did Bill Stone make it seem like you could be in

8  trouble?

9    A.    Oh, yes.

10   Q.    Okay.  Now, when Bill Stone was in Austin, did he

11  reach out to you on a phone call?

12   A.    Yes.

13   Q.    When he called you, who did he tell you he was with?

14   A.    He said he was with Judge Anderson.

15   Q.    And that's the judge in -- that's over -- that you've

16  been told is overseeing your secret probation?

17   A.    Yes, in Austin.

18   Q.    Did he say where they were?

19   A.    They were at the federal courthouse in Austin.

20   Q.    And did he tell you what they were all there talking

21  about?

22            MR. SELLERS:  Your Honor, I'm going to object to

23  best evidence.

24            THE COURT:  Overruled.

25   Q.    Did he explain to you what they were talking about as

1  it related to your secret probation?

2      A.   Yes, they were discussing the -- the video that had

3  shown up on Judge Anderson's desk that morning.

4      Q.   And so when Bill Stone called you during this

5  interaction with the judge, were you able to answer the phone?

6      A.   Yes.

7      Q.   And then did you proceed to be involved in a

8  conversation with Bill Stone and what you believed to be

9  Judge Anderson?

10     A.   Yes.

11     Q.   Did you later find out that that call was recorded?

12     A.   Yes.

13     Q.   To be clear, you didn't record it, did you?

14     A.   No.

15     Q.   Have you heard a copy of that call?

16     A.   Yes.

17     Q.   And the recording you heard, did that fairly and

18  accurately represent the call you actually had back in 2019?

19     A.   Yes.

20          MS. RUDOFF:  Your Honor, at this time the

21  government would move to admit Government's 56 and 57.

22          THE COURT:  Any objection?

23          MR. GALLIAN:  Can we have a brief, brief bench

24  conference, please?

25          MR. SELLERS:  Agreed.

1                    THE COURT:  Sure.

2                    (Off the record bench conference.)

3                    THE COURT:  We need to talk about some mechanics

4    on how we're going to present something to you.  Court will be

5    in recess for 10 minutes.

6                    (Recess taken.)

7                    THE COURT:  On the record.  The Court has

8    outside the presence of the jury discussed the language to be

9    read in advance of publishing the tape-recorded conversation

10   and the transcript that will appear on the screen.  This Court

11   has read from the adapted pattern jury -- pattern criminal Jury

12   Instruction 1.48.

13                   Government, the Court has read this earlier.

14   Are you satisfied with what the Court has prepared?

15                   MS. RUDOFF:  Yes, Your Honor.

16                   THE COURT:  And Defense counsel for Mr. Stone?

17                   MS. GALLIAN:  Yes, Your Honor.

18                   THE COURT:  And Defense counsel for Mr. DeLeon?

19                   MR. SELLERS:  Yes, Your Honor.

20                   THE COURT:  All right.  We all agree, and so

21   that's what we'll do.

22                   (Jurors enter courtroom.)

23                   THE COURT:  Members of the jury, we are going to

24   play -- you are about to see a transcript and hear an audio

25   recording of a tape recording.  Now, it's 90 minutes, so this

1  will probably take us pretty much to the -- not maybe to the

2  end of the day, but pretty close, pretty darn close, so I'll

3  ask you at the end of it if you want to continue.

4          If you need a break, 90 minutes is a long time,

5  so I expect that you will need a break.  If you will, will you

6  just kind of let me know when you're ready.  I'll just ask you

7  periodically.  I do need to read something for you.

8          You will see the transcript of the oral

9  conversation which can be heard on the tape recording.  The

10  transcript also purports to identify the speakers engaged in

11  such conversation.  I have admitted the transcript for the

12  limited and secondary purpose of aiding you in following the

13  content of the conversation as you listen to the tape recording

14  and also to aid you in identifying the speakers.

15          If you should determine that the transcript is

16  in any respect incorrect or unreliable, you should disregard it

17  to that extent.  It is what you hear on the tape that is

18  evidence, not the transcripts.

19          Good to go?  So I'll look at you guys and you

20  let me know when you're ready for a break.

21          And with that said, your witness.

22          MS. RUDOFF:  Your Honor, shortly before the

23  break I -- the government moved to admit Government Exhibit 56,

24  which is the recording itself, and Government Exhibit 57, which

25  is a transcript of that recording.  And would follow under the

1    instruction that you just provided.

2              THE COURT:  Okay.  Any objection to that?

3              MR. GALLIAN:  No objection to 56 or 57.

4              MR. SELLERS:  No objection, Your Honor.

5              THE COURT:  Those are admitted.

6              MS. RUDOFF:  Thank you, Your Honor.

7         Q.   Casi, when this call came in, did it come from a

8    number you recognized?

9         A.   No.

10        Q.   So it didn't come from Bill's number?

11        A.   No.

12             MS. RUDOFF:  Your Honor, permission to publish

13   Government's Exhibit 56?

14             THE COURT:  You may.

15             (Recording playing.)

16             THE COURT:  I'm going to read you my three

17   instructions again, just to refresh everybody, and then I'll

18   send you on your way.  Appreciate you-all staying a few minutes

19   late.

20             Please don't discuss this case amongst

21   yourselves until I've instructed you on the law and you have

22   gone into the jury room to make your decision at the end of the

23   trial.  Otherwise, without realizing it, you may start forming

24   opinions before the trial is over.  It's important that you

25   wait until all the evidence is received and you've heard my

1   instructions on the rules of law before you deliberate amongst

2   yourselves.

3                  Second rule, you must decide this case based

4   solely on the evidence presented here within the four walls of

5   this courtroom.  So you must not conduct any independent

6   research about this case, the matters in this case, and the

7   individuals involved in this case.

8                  And finally, we all use technology to

9   communicate with others, but do not talk to anyone at any time

10  about this case or use technology to communicate electronically

11  with anyone about this case.  So this includes cell phones,

12  e-mail, texts, Twitter, websites, Instagrams, Snapchat,

13  anything else you can think of.

14                 So please don't mention or discuss this case on

15  social media.  I know that you-all will respect that as you

16  have so far.  We appreciate you-all.  You're paying attention

17  and we are all deeply grateful to you.  So you are court

18  ordered to have a wonderful, wonderful evening, and we will see

19  you at 8 o'clock in the morning.

20                 All rise for the jury.

21                 (Jurors exit the courtroom.)

22                 (Court adjourned for the evening.)

23

24

25

1           I, BROOKE N. BARR, United States Court Reporter

2   for the United States District Court in and for the Northern

3   District of Texas, Dallas Division, hereby certify that the

4   above and foregoing contains a true and correct transcription

5   of all proceedings in the above-styled and -numbered cause.

6

7           WITNESS MY OFFICIAL HAND this the 27th day of

8   July, 2023.

9

10

11                      /S/ BROOKE N. BARR
                        BROOKE N. BARR, CSR NO. 6521
12                      CSR Expiration Date:  7/31/24
                        United States Court Reporter
13                      1100 Commerce Street
                        Room 1376
14                      Dallas, Texas 75252
                        (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25