1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
  UNITED STATES OF AMERICA,      )        3:21-CR-236-E
5               Government,       )
                                 )
6                                 )
  VS.                            )        DALLAS, TEXAS
7                                 )
                                 )
8  WILLIAM ROY STONE, JR.,       )
   JOSEPH EVENTINO DELEON,        )
9               Defendants.       )        July 27, 2023

10

11           TRANSCRIPT OF JURY TRIAL, VOLUME 3A

12           BEFORE THE HONORABLE ADA E. BROWN

13              UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:          MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664

```
 1                                    MR. MARCUS J. BUSCH
                                      UNITED STATES DEPARTMENT OF JUSTICE
 2                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 3                                    1100 Commerce Street
                                      Dallas, Texas  75242
 4                                    marcus.busch@usdoj.gov
                                      (214) 659-8642
 5

 6   FOR THE DEFENDANT,              MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:         Gallian Firm
 7                                    Parkside Tower
                                      3500 Maple Avenue
 8                                    Suite 720
                                      Dallas, Texas  75219
 9                                    gregg@GallianDefenseFirm.com
                                      (214) 432-8860
10

11                                    MS. JACLYN ANNETTE GALLIAN
                                      Bryan Cave Leighton Paisner
12                                    2200 Ross Avenue
                                      Suite 4200
13                                    Dallas, Texas  75201
                                      jaclyn.gallian@bclplaw.com
14                                    (214) 721-8058

15
     FOR THE DEFENDANT,              MR. GREG WESTFALL
16   JOSEPH EVENTINO DELEON:         Westfall Sellers
                                      1701 River Run
17                                    Suite 801
                                      Fort Worth, Texas  76107
18                                    greg@westfallsellers.com
                                      (817) 928-4222
19

20                                    MR. FRANK SELLERS
                                      Westfall Sellers
21                                    1701 River Run
                                      Suite 801
22                                    Fort Worth, Texas  76107
                                      frank@westfallsellers.com
23                                    (817) 928-4222

24

25
```

```
1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
2                                1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
3                                (214) 753-2170

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                    JURY TRIAL VOLUME 3A - JULY 27, 2023
 2                    P R O C E E D I N G S
 3           THE COURT:  Good morning.  So I want to chat with you
 4   before we bring the jury out.
 5           Off the record.
 6           (Discussion off the record)
 7           SECURITY OFFICER:  All rise.
 8           THE COURT:  Please be seated.  If everybody will
 9   check their phones, please.
10           (Pause)
11           SECURITY OFFICER:  All rise for the jury.
12           (Jury in)
13           THE COURT:  Everyone please be seated.
14           Good morning.  We are so glad to have you back.  This
15   is your first doughnut-free day, and you are still bright-eyed
16   and bushy-tailed.
17           Glad to have you here.  The lawyers are ready to go.
18   We appreciate you guys being on time.  We're going to get it
19   popping.
20           We will break at 10:00 for half an hour.  If we need
21   to break before that, I'll be asking you periodically.  Let me
22   know.  But if you break before then, not a problem, just -- I
23   try to look at you guys quite a bit.
24           I take notes, but if you will let him know or me know
25   if you need a break.  We don't ask any questions.  We don't
```

```
 1    need any details.  If you want a break, we get one.
 2             Lawyers and clients, same thing, and your staff, if
 3    we need to take a break, happy to do that.
 4             So with that said --
 5             MR. WESTFALL:  May we approach briefly?
 6             THE COURT:  Of course.
 7             (Bench Conference held off the record)
 8             THE COURT:  Everybody please check your phones.  I
 9    just did.
10             MS. RUDOFF:  Your Honor, may I have the witness take
11    the stand?
12             THE COURT:  Yes.  Of course, please.
13             (Pause)
14             THE COURT:  Good morning.
15             THE WITNESS:  Good morning.
16             THE COURT:  How are you?
17             THE WITNESS:  Good.
18             THE COURT:  Good.  We're glad to have you back.
19             THE WITNESS:  Thank you.
20             THE COURT:  So we'll do a quick check sound.  Please
21    get seated and be comfortable and let us know if you need
22    anything.  You did a great job yesterday.
23             THE WITNESS:  Thank you.
24             THE COURT:  Court is weird because we have to write
25    each other down one at a time, so if you would please just
```

```
 1    pause for a moment.  I know that's not how we talk in real life
 2    and so I will remind you, but I'm not trying to get onto you.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Everybody so far has done a great job --
 5    lawyers, staff, and witnesses too.
 6              So with that said, ma'am, your witness.
 7              MS. RUDOFF:  Thank you, Your Honor.
 8       CASI THOMPSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 9                    DIRECT EXAMINATION CONTINUED
10    BY MS. RUDOFF:
11    Q.   Good morning, Casi.
12    A.   Good morning.
13    Q.   Yesterday, just to let you know and remind you and the
14    jury where we left off, you had told us that it was December
15    2015 and you had just been informed by Bill Stone about being
16    put on federal secret probation.  Do you recall that?
17    A.   Yes.
18    Q.   Okay.  Had you ever heard of a secret probation before?
19    A.   No.
20    Q.   In your 2014 Hood County case, did you have to go before
21    the judge to be put on probation?
22    A.   Yes, I did.
23    Q.   Were you told you would have to do the same thing here?
24    A.   To be put on secret probation?
25    Q.   Correct.
```

```
 1   A.    No.
 2   Q.    What did you think about that?
 3   A.    I -- I just thought it was a personal favor from the judge
 4   to Bill for me.
 5   Q.    And when you say personal favor, what do you mean?
 6   A.    He would -- I was under the impression he could get favors
 7   from the judge or had a personal relationship with prosecutors
 8   or the judges of different counties and Austin as well.
 9   Q.    Was that because of who Bill Stone was as a person or what
10   he did for a living?
11   A.    What he did for a living.
12   Q.    And what is it you understood he did for a living at that
13   time?
14   A.    A federal agent.
15   Q.    For who?
16   A.    The FBI.
17   Q.    So I want to talk about the secret part of it, okay?
18   A.    Okay.
19   Q.    Why did you understand it had to be secret?
20   A.    It could revoke my Hood County probation.
21   Q.    How could a federal probation if found out about ruin your
22   Hood County real probation?
23   A.    It -- I was under the impression that I wasn't allowed to
24   have any more charges against me while on probation at Hood
25   County.
```

```
 1   Q.   And what would happen if there were additional charges
 2   against you while on Hood County probation?
 3   A.   It would revoke my probation and I would have to, I guess,
 4   go to prison.  I'm not sure.
 5   Q.   And who told you that?
 6   A.   That's what they told me, and that was also my belief.
 7   Q.   I want to understand who "they" is.
 8   A.   Oh, I'm sorry.  Bill and Joe.
 9   Q.   Okay.  So I want to -- were you then told the conditions
10   of the secret probation?
11   A.   Yes.
12   Q.   Okay.  Let's talk about those.
13   A.   Okay.
14   Q.   Tell me with regards to school or job, were there any
15   conditions?
16   A.   I was to go to school full-time and make a 4.0.
17   Q.   And to be clear, who are -- who is the person telling you
18   that these are your conditions?
19           MR. SELLERS:  Object to asked and answered.
20           THE COURT:  Overruled.
21   A.   Bill.
22   Q.   Okay.  So other than school, what kind of things did you
23   need to do on a daily bases that were conditions of the secret
24   probation?
25   A.   I -- so I had to present to the judge that I was actively
```

1   trying to buy real estate.

2   Q.   And why were you told that was necessary as a condition?

3   A.   Because to -- he -- Bill told the judge that I was

4   salvageable, I was worth more out here, and I had things that I

5   needed to do, and that was one of the things he had told the

6   judge that I was actively doing.

7   Q.   Okay.  When you are saying he had told the judge this --

8   A.   I'm sorry.

9   Q.   -- was this Bill Stone's conversation to get you this

10  probation, or when did this conversation happen that you're

11  referring to?

12  A.   Yes.  He needed leverage for the judge to believe I was

13  salvageable and that I was worth more out of prison than in

14  prison.

15  Q.   Okay.  And so to prove that, there was something to do

16  with you being involved in real estate?

17  A.   Right.

18  Q.   What about accounting for your time on a daily basis?

19  A.   I had to write down on an index card, which he referred

20  to -- Bill referred to as a 3x5, what I did all day in regards

21  to the estate and just on a daily basis, school, working on the

22  estate.  And I had to send those in to Joe every day.

23  Q.   Okay.  What about spending time with other people?  Was

24  that a part of any of your conditions?

25  A.   Yes.  I was supposed to -- I had a certain number of hours

```
 1    of phone time and in-person time that I was required to spend
 2    time with Joe.
 3    Q.   And why was it Joe that you were required to spend this
 4    allotted time with?
 5    A.   Because Joe said that he would step in as my probation
 6    officer, handler.
 7    Q.   And was Joe being your probation officer on the secret
 8    probation also one of those conditions?
 9    A.   Yes, because Bill was in Washington, D.C. working, so I
10    had to -- I was grateful that Joe stood in for that position.
11    Q.   And when you say Bill was in Washington, D.C. working, is
12    that what you were told?
13    A.   That is what I was told.
14    Q.   Okay.  You never went to D.C. and saw Bill working there,
15    right?
16    A.   I never saw him.  I never went to D.C.
17    Q.   Okay.  When you say working, what was your understanding
18    of who he was working for?
19    A.   He -- I was told he was fourth down from the top of the
20    federal -- of being a federal agent of the FBI.
21    Q.   Okay.  Other than spending this allotted time with Joe
22    DeLeon, did you have any other restrictions as to how else you
23    could spend your time?
24    A.   I had a lot of restrictions.  I was -- if I wanted to date
25    somebody, I had to have Bill vet them and make sure they didn't
```

 1   have any criminal background.  I wasn't --
 2   Q.   What about friends?  Were there any restrictions on
 3   friends?
 4   A.   I wasn't allowed to talk to anybody.  He -- he made me
 5   believe that nobody was my true friend anyways.
 6   Q.   How did Bill Stone make you believe that no one was your
 7   true friend?
 8   A.   He would tell me that his analysts have -- his analysts
 9   were looking into text messages and he would tell me all
10   negative things that they were saying about me behind my back
11   if I ever was in person with him.
12   Q.   And when you say analysts, who are you referring to?
13   A.   Bill had a team of analysts in Washington, D.C. that
14   monitored me.
15   Q.   And that's what he told you, right?
16   A.   Yes.
17   Q.   You never met any of these analysts, correct?
18   A.   I never met them in person, no.
19   Q.   And who -- where -- what agency did his analysts work for,
20   from what you were told?
21   A.   FBI.
22   Q.   And you said these analysts could read text messages.  How
23   is it you were told these analysts could read text messages?
24   A.   I was just told that they could.  And not just that, but
25   they could listen in on phone conversations.

```
 1   Q.   Did you believe that?
 2   A.   I did, because Bill -- I would hear Bill give the code to
 3   them to allow them for a 30-second inter -- to intervene on
 4   phone calls and listen.  It was just for a short period of
 5   time, but he could hear.
 6   Q.   Okay.  So when you say you could hear Bill giving a code,
 7   what -- what do you mean?  So Bill is on the phone talking to
 8   somebody?
 9   A.   He's allowing one of his analysts to listen in on a phone
10   conversation, so he would give a code of -- to let them, I
11   guess, type in to listen.  He gave them -- since he was their
12   boss, he allowed that.
13   Q.   Okay.  So this is what Bill Stone is telling you he can do
14   to make them able to listen?
15   A.   Yes.
16   Q.   Okay.  What about travel?
17   A.   I couldn't travel without a permission slip to get from
18   the -- from the judge to leave.
19   Q.   Okay.
20   A.   Which was similar to my Hood County probation.
21   Q.   Okay.  Was there any other requirement besides a
22   permission slip from the judge allowing you to travel?
23   A.   The -- well, one of the requirements one time was to allow
24   him to go with us.  He had to go.
25   Q.   Who?
```

```
 1    A.    I'm sorry.  Bill.
 2    Q.    There was a time when, for you to travel, you were told
 3    Bill had to travel with you?
 4    A.    Yes.
 5    Q.    And that that was the judge's requirement?
 6    A.    Yes.
 7    Q.    Okay.  What about any kind of fees, expenses, payments
 8    related to this probation and the services of Bill Stone and
 9    Joe DeLeon?  Were there requirements that you were told for
10    that?
11          MR. SELLERS:  Your Honor, I'm going to object to
12    vague, because --
13          THE COURT:  I don't want a because.  Vague.
14    Overruled.
15    BY MS. RUDOFF:
16    Q.    Let me clarify.  In the very beginning were you told that
17    there was cost or fees directly associated with Bill Stone's
18    setting up and handling this federal secret probation?
19    A.    Initially the only payment that was given initially was
20    his travel expenses from D.C. to here or to other -- or to
21    Austin.
22    Q.    Okay.  When you say his travel expenses, tell the jury who
23    that is.
24    A.    Bill.
25    Q.    And these travel expenses, why was he traveling?  Why were
```

1  you told he was traveling?

2  A.   He was traveling from Washington, D.C., here to help me

3  with my criminal cases that were pending.

4  Q.   And is that what relates to the secret probation?

5  A.   That relates to the secret probation and then the other

6  four cases that he said that he was helping me with in other

7  counties.

8  Q.   Okay.  Because that's what we talked about yesterday, that

9  he had brought to your attention there were other potential

10  state and county charges that you were possibly facing.

11  A.   It was one after another.  It was back to back.

12  Q.   Okay.  So the travel expenses related to both then?

13  A.   Yes.

14  Q.   Okay.  Once you were told these conditions, what did you

15  think about your requirement to follow them?

16  A.   I felt like my freedom was on the line and I had to abide

17  by what was -- exactly what was told I had to do.

18  Q.   Was it the same understanding you had in the Hood County

19  real probation?

20  A.   Yes, but it seemed more extreme.

21  Q.   Why is that?

22  A.   It was 50 years and a federal case.  And by this time he

23  had flown in to assist on several other county charges that he

24  said I was facing.  And it -- I just couldn't believe what I

25  was feeling.  It's really hard to actually describe the amount

```
 1    of fear that I was under.
 2    Q.   Okay.  After you were told these conditions of probation,
 3    were you then asked to meet with Stone and DeLeon to discuss a
 4    little further?
 5    A.   They would require me to meet them at a Cracker Barrel,
 6    was where we often met to discuss the details of Bill's
 7    findings for the day of whichever case he was working, of my
 8    cases he was working at the time that he had flown in.
 9    Q.   And did you -- do you recall when that first meeting at
10    Cracker Barrel happened?  Was it soon after you received the
11    conditions?
12    A.   Yes.
13    Q.   Okay.  Were you told to bring anything with you to that
14    initial meeting at Cracker Barrel?
15    A.   Yes.  I was told to bring Bill his money for travel
16    expenses.
17    Q.   And were you told what form that money needed to be in?
18    A.   It needed to be in cash.
19    Q.   Did Bill Stone say why it needed to be in cash?
20    A.   He said for there not to be a paper trail on my part.
21    Q.   What do you -- what did you understand that to mean?
22    A.   Where it doesn't look like he is getting paid for helping
23    me.
24    Q.   Okay.
25              MS. RUDOFF:  Your Honor, may I approach the witness?
```

```
 1              THE COURT:  You may.

 2              (Pause)

 3              MS. RUDOFF:  Your Honor, at this time the Government

 4    would move to admit -- to offer Government's 9 and 10.  They

 5    are bank records from Navy Federal Credit Union and J.P. Morgan

 6    Chase, which we have all agreed under the stipulation would be

 7    admissible.

 8              THE COURT:  All right.  Any objection from defense

 9    counsel for Mr. Stone?  And if you need a moment, let me know.

10              MR. GALLIAN:  No objection, Judge.

11              THE COURT:  And the --

12              MR. SELLERS:  No, Your Honor.

13              THE COURT:  All right.  It's admitted.

14              (Government's Exhibit Nos. 9 and 10 received)

15              MS. RUDOFF:  Thank you, Your Honor.

16              THE COURT:  You're welcome.

17    BY MS. RUDOFF:

18    Q.   So when you were told that you had to bring cash, did you

19    do it?

20    A.   Yes.

21    Q.   Why?

22    A.   Because I was told to.

23    Q.   Did you feel like you could say no?

24    A.   No.

25              MS. RUDOFF:  Your Honor, may I approach the witness?
```

```
 1                    THE COURT:  You may.

 2                    (Pause)

 3   BY MS. RUDOFF:

 4   Q.   I'm showing you what's been previously marked as

 5   Government's Exhibit Number 14.  Can you look at that document?

 6   A.   Yes.

 7   Q.   Do you recognize it?

 8   A.   Yes.

 9   Q.   What are they?

10   A.   It's my bank statement.

11   Q.   And what bank is it from?

12   A.   Navy Federal Credit Union.

13                    MS. RUDOFF:  At this time the Government moves to

14   admit Government's Exhibit 14.

15                    THE COURT:  Any objection?

16                    MR. GALLIAN:  No objection.

17                    THE COURT:  Any objection?

18                    MR. SELLERS:  No objection, Your Honor.

19                    THE COURT:  It's admitted.

20                    (Government's Exhibit No. 14 received)

21                    MS. RUDOFF:  May I publish Government's Exhibit 14?

22                    THE COURT:  You may, ma'am.

23   BY MS. RUDOFF:

24   Q.   Casi, is this -- you said this is your bank account with

25   Navy Federal Credit Union, right?
```

```
 1   A.   Yes.
 2   Q.   Okay.  And --
 3          MS. RUDOFF:  Can we go to page 2 of this document?
 4   BY MS. RUDOFF:
 5   Q.   What is the date range of this statement?
 6   A.   November 22nd through December 21st.
 7   Q.   Okay.  And do we see at some point in this statement a
 8   cash withdrawal?
 9   A.   Yes.
10   Q.   And what date do we see that cash withdrawal on?
11   A.   December 18th.
12   Q.   Okay.  And do we see one prior to that?
13   A.   Oh, right.  December 16th.
14   Q.   Okay.  And so on the 16th and the 18th, you withdraw
15   $1,000.00 and then $5,000.00 in cash.  Why did you do that?
16   A.   I -- the $5,000.00 was for Bill's travel expenses.
17   Q.   Okay.  Was the $1,000.00 related to that?
18   A.   I would assume so.
19   Q.   But you can't recall for sure?
20   A.   I can't recall for sure.
21   Q.   Okay.  And so if you withdrew $5,000.00 cash on December
22   18th, would that have been in anticipation of a meeting?
23   A.   Yes.
24   Q.   Okay.  After this initial meeting, did your secret
25   probation conditions then begin?
```

1    A.    They began the second that Bill got back from Austin.

2    Q.    Okay.  And so did you start having to spend more time with

3    Joe DeLeon?

4    A.    Yes.

5    Q.    How did that work in the very beginning?

6    A.    It was very difficult.  He was a very busy man with his

7    restaurant, so I was very grateful for him to take the time to

8    drive down to Granbury to spend the required hours with me in

9    person, and we just fit it in.

10         We kind of teamed up together to make it work to

11   accommodate my requirements for the judge.

12   Q.    When you say required hours, what kind of hours are we

13   talking about?

14   A.    I had a certain amount of weekly time spent that I had to

15   have with Bill -- I mean not Bill -- Joe in person and on the

16   phone.  I don't remember the required amount, but I had to

17   document them.

18   Q.    Okay.

19         MS. RUDOFF:  Your Honor, may I publish Government's

20   Exhibit 38, which was admitted yesterday?

21         THE COURT:  You may.

22         MS. RUDOFF:  And I'll be going to page 460 of

23   Government's Exhibit 38.

24         THE COURT:  I'm sorry, can you see?

25         MR. WESTFALL:  Our monitor is not on.

```
 1                THE COURT:  Let's take a moment.
 2                MR. WESTFALL:  Just a two-minute break.
 3                THE COURT:  Let's take just a quick break.
 4                Members of the jury, I'll try to get you back out in
 5       five minutes.  Do not hold this against any lawyers.  It's my
 6       technology.  So we'll take a quick stretch break.
 7                And if you'll call IT, Taylor, please, and we'll get
 8       popping as soon as we can.  Thank you for your patience.
 9                SECURITY OFFICER:  All rise for the jury.
10                (Jury out)
11                (Recess)
12                SECURITY OFFICER:  All rise for the jury.
13                (Jury in)
14                THE COURT:  All right.  Everybody please be seated.
15                Thank you for your patience.  Again, please do not
16       hold it against the Government, the defense.  It is my old
17       courtroom, and we got it all going.
18                So with that said, your witness, ma'am.
19                MS. RUDOFF:  Thank you, Your Honor.
20                THE COURT:  You're welcome.
21       BY MS. RUDOFF:
22       Q.   Before we took a break, Casi, you said that Joe DeLeon was
23       coming to your house to spend the required time with you,
24       right?
25       A.   Yes.
```

```
1          MS. RUDOFF:  And, Your Honor, I had asked that
2   Government 38 be republished.
3          THE COURT:  That's right.  And I think there was no
4   objection to that; or, actually, it had already been admitted,
5   so that no -- you may publish.
6          MS. RUDOFF:  Okay.  And can we highlight the second
7   green text?
8   BY MS. RUDOFF:
9   Q.   Casi, do you see this text on your screen in front of you?
10  A.   Yes.
11  Q.   And who is the text from?
12  A.   Joseph DeLeon.
13  Q.   And do you see a date on it?
14  A.   Yes.
15  Q.   What is the date?
16  A.   December 18, 2015.
17  Q.   And so that's the same date as the $5,000.00 withdrawal,
18  right?
19  A.   Yes.
20  Q.   Can you read what the text message says?
21  A.   It says, "Taking screenshots of all the time that we spent
22  on the phone together to prove my dedication to the court."
23  Q.   And so was this part of your understanding of how
24  information was communicated back to the court?
25          MR. SELLERS:  Object to leading, Your Honor.
```

```
 1              THE COURT:  Sustained.
 2   BY MS. RUDOFF:
 3   Q.   What did you understand this text message to mean?
 4   A.   That he was taking screenshots of the time to show the
 5   court that we are seeing each other or being together.
 6              MS. RUDOFF:  Okay.  And can we zoom out?
 7              Can you zoom in on the third blue message on the
 8   same --
 9   BY MS. RUDOFF:
10   Q.   Casi, this is a blowup of a message in this same text
11   trail, right?
12   A.   Yes.
13   Q.   And what is the number, phone number, the last four of the
14   phone number on this text?
15   A.   3550.
16   Q.   And what is the name saved in the text?
17   A.   "Casi Thompson 2014 new cell."
18   Q.   Okay.  And so -- and what's the date on this as well?
19   A.   December 18, 2015.
20   Q.   Okay.  So this was your response to Joe DeLeon at that
21   same timeframe, right?
22   A.   Yes.
23   Q.   And from your understanding, this is coming from Joe
24   DeLeon's cell phone, right?
25   A.   This text --
```

```
 1   Q.   Yes.
 2   A.   This specific text?
 3   Q.   This text string.
 4   A.   Oh, yes.
 5   Q.   Okay.
 6            MS. RUDOFF:  Can we go to page 1 of Government's
 7   Exhibit 38?
 8            And can you zoom in on the white square and the first
 9   blue message below it together?
10   BY MS. RUDOFF:
11   Q.   Casi, do you see the start time in the upper left-hand
12   corner of this text string?
13   A.   Yes.
14   Q.   Can you tell me the date on that?
15   A.   August 23, 2012.
16   Q.   And who are the two participants in this text?
17   A.   Me and Joe.
18   Q.   Okay.  Now, we see a number at the top ending in 7611.
19   Whose number was that?
20   A.   At the top?
21   Q.   Under participants.
22   A.   Oh, Joseph DeLeon.
23   Q.   And below that, we see a telephone number ending in 5211.
24   Who is that?
25   A.   I believe that's one of my old phone numbers.
```

```
 1   Q.   Okay.  And the text below that, what does it say?
 2   A.   "Hey Joe!  It's Casi, how are you?"
 3   Q.   So was that text message from you?
 4   A.   Yes.
 5   Q.   And when did you send that text message?
 6   A.   August 23, 2012.
 7   Q.   And is your number, as far as you can tell, saved in this
 8   phone as anything?
 9   A.   No.
10        MS. RUDOFF:  Can we go to Government's Exhibit 38,
11   page 6?
12        And can we zoom in on the second white box?
13   BY MS. RUDOFF:
14   Q.   Casi, can you tell us the start time or the date on this
15   white box?
16   A.   June 3, 2014.
17   Q.   And under participants, do you see two individuals that
18   are participating in this text conversation?
19   A.   Yes.
20   Q.   And who does the first phone number belong to ending in
21   7611?
22   A.   Joseph DeLeon.
23   Q.   And who does the second number belong to ending in 0286?
24   A.   It's an old number of mine.
25   Q.   And what is your number saved as at this time in this
```

1    conversation?

2    A.    "Kasy Thompson old number."

3    Q.    Is that how you spell your name?

4    A.    No.

5    Q.    And the last activity at the top, when is -- what is the

6    date of the last activity for this text conversation?

7    A.    August 3, 2014.

8              MS. RUDOFF:  Can we go to page 44 of Government's 38?

9              And can we highlight the white box?

10   BY MS. RUDOFF:

11   Q.    Casi, in this white box, can you tell us what the start

12   time for this series of text messages is between you and Joe

13   DeLeon?

14   A.    August 5, 2014.

15   Q.    And until when?

16   A.    September 12, 2014.

17   Q.    And there are two participants listed, right?

18   A.    Yes.

19   Q.    The top number ending in 9815, who did that number belong

20   to?

21   A.    It is one of my old numbers.

22   Q.    And the number below, ending in 7611, who did that

23   belong to?

24   A.    Joseph DeLeon.

25   Q.    And how were you saved at this timeframe in Joe DeLeon's

```
 1    phone?
 2             MR. SELLERS:  Your Honor, I'm going to object to
 3    relevance.
 4             THE COURT:  Overruled.
 5    BY MS. RUDOFF:
 6    Q.   How are you saved?
 7    A.   "Kaysey Thompson new 2014."
 8    Q.   Thank you.
 9             MS. RUDOFF:  Can we go to page 51, please, of
10    Government's 38?
11             Can we highlight the white text?
12    BY MS. RUDOFF:
13    Q.   Casi, can you tell us the start time of this text string
14    between you and Joe DeLeon?
15    A.   November 17, 2014.
16    Q.   And what is the end timeframe?
17    A.   September 27, 2015.
18    Q.   And do you see two participants in this conversation?
19    A.   Yes.
20    Q.   And the first number ending in 7611, who does that
21    belong to?
22    A.   Joseph DeLeon.
23    Q.   And the second participant number ending in 6930, who does
24    that belong to?
25    A.   It's -- it belonged to me, one of my old phones.
```

```
 1   Q.   And how are you saved at this timeframe in Joe DeLeon's
 2   phone number?
 3   A.   "Casi Thompson 2014 new cell."
 4   Q.   Is that the way your name is correctly spelled?
 5   A.   Yes.
 6             MS. RUDOFF:  Can we please bring up page 88?
 7             Sorry.  523.  Page 523.
 8   BY MS. RUDOFF:
 9   Q.   Casi, do you see this white box for the text message
10   string on the screen?
11   A.   Yes.
12   Q.   What is the start date of this text string?
13   A.   December 30, 2015.
14   Q.   And when does it end?
15   A.   September 5, 2019.
16   Q.   At this time are you on this secret probation?
17   A.   Yes.
18   Q.   Any other dates we have read for text messages before,
19   were you on the secret probation?
20   A.   No.
21   Q.   Who -- I want to talk about the two participant numbers.
22             Who does first number ending in 7611 belong to?
23   A.   Joseph DeLeon.
24   Q.   Who does the second number ending in 8559 belong to?
25   A.   That is my current phone number.
```

```
 1   Q.   What are you saved in at this time during the secret
 2   probation in Joe DeLeon's phone number?
 3   A.   Project Number 2.
 4   Q.   Did you know that you were referred to during the secret
 5   probation as Project Number 2?
 6   A.   Yes.
 7   Q.   How did you know that?
 8   A.   They would call me Project.
 9   Q.   Who's they?
10   A.   Bill and Joe.
11   Q.   And so then at this timeframe would it make sense that you
12   are now saved as Project Number 2 in Joe DeLeon's phone?
13   A.   Yes.
14   Q.   Thank you.  I want to move on to -- because we were just
15   in December of 2015.  I want to move on into 2016.
16        So in the beginning of January 2016, are you still on
17   the secret probation?
18   A.   Yes.
19   Q.   At some point in that early timeframe, did you have to
20   provide a power of attorney as it related to your probation?
21   A.   Yes.
22   Q.   Who did you have to provide that power of attorney to?
23   A.   I had to provide it to Joe -- my power -- I had to get a
24   power of attorney where he took power of attorney in case
25   something was to happen to me.
```

```
1    Q.   And you said you --
2    A.   Over my estate.
3    Q.   And you said you had to get it.  Who told you you had to
4    get it?
5    A.   I was made to believe that there were so many different
6    things going on behind the scenes that there was a chance
7    that I --
8            MR. SELLERS:  Object to nonresponsive, Your Honor.
9            THE COURT:  Overruled.
10   A.   That there were so many things going on behind the scenes
11   relating to criminal and with CPS that I needed to have
12   somebody be able to take care of the estate and me and it
13   shouldn't -- and it couldn't be anybody in my family and it had
14   to be Joe.  Joe said he would take care of it for me.
15   Q.   And --
16   A.   And Bill told me to go and get it done.
17   Q.   And did you do that?
18   A.   Yes.
19   Q.   Why?
20   A.   Because I was scared, and I just was doing what I was
21   told.
22           MS. RUDOFF:  Sorry, Your Honor.
23           THE COURT:  That's all right.  If you need a few
24   moments, that's okay.
25           (Pause)
```

```
 1           MS. RUDOFF:  Your Honor, may I approach the witness?

 2           THE COURT:  You may.

 3           (Pause)

 4    BY MS. RUDOFF:

 5    Q.   Casi, I just handed you what's been previously marked as

 6    Government's Exhibit 8.  Can you take a look at it?

 7    A.   Yes.

 8    Q.   Do you recognize it?

 9    A.   Yes.

10    Q.   What is it?

11    A.   A statutory durable power of attorney.

12    Q.   Is that the power of attorney that you were told you must

13    get?

14    A.   Yes.

15           MS. RUDOFF:  Your Honor, the Government moves to

16    admit Government's Exhibit Number 8.

17           THE COURT:  Any objection?

18           MR. GALLIAN:  No objection.

19           MR. SELLERS:  No objection.

20           THE COURT:  It's admitted.

21              (Government's Exhibit No. 8 received)

22           MS. RUDOFF:  Permission to publish, Your Honor?

23           THE COURT:  Granted.

24    BY MS. RUDOFF:

25    Q.   Casi, is this the power of attorney that you were told by
```

 1   Bill Stone that you had to get as it related -- because you

 2   were on this probation?

 3   A.   Yes.

 4   Q.   Okay.

 5            MS. RUDOFF:  Can we go to the next page?

 6            And page 3?

 7   BY MS. RUDOFF:

 8   Q.   Do you see a date on this?

 9   A.   Yes.

10   Q.   What is the date?

11   A.   January 13, 2016.

12   Q.   So do you recall that's when you went and had this

13   document taken care of?

14   A.   Yes.

15            MS. RUDOFF:  Can we go back to page 1?

16            Can you zoom in on the powers withheld, the middle of

17   the page?

18   BY MS. RUDOFF:

19   Q.   Casi, what is this a list of?

20   A.   It is a list of everything that Joe would take over if I

21   was not able to, if I was in jail.

22   Q.   I'm sorry, go ahead.

23   A.   If I was in jail.

24   Q.   And does this list include finances and investments and

25   assets?

```
 1    A.   Yes.
 2    Q.   And you had said that you were told it couldn't be someone
 3    in your family.  Who told you that?
 4    A.   Bill and Joe made me believe that my family were out to
 5    get my kids and take over the estate somehow.
 6    Q.   And so because of that, is that why you were told that the
 7    power of attorney could not be a member of your family?
 8    A.   Yes.  They made me believe that my family were unfit and
 9    crazy and out to get me and not looking out for my best
10    interest.
11    Q.   How did getting this power of attorney make you feel at
12    the time?
13             MR. SELLERS:  Object to relevance.
14             THE COURT:  Overruled.
15    A.   Honestly, at the time I felt that I needed somebody to
16    take care of it, because I felt helpless.  I didn't -- I didn't
17    really understand, like, exactly what was going on, and I put
18    full trust in Bill and Joe at this time.  I thought they were
19    looking out for what was best for me.
20    Q.   And why did you think Bill and Joe would be the ones
21    looking out for what's best for you?
22    A.   Because they were working tirelessly day and night against
23    legal and family problems.  I was made to believe that.
24    Q.   Your legal and family?
25    A.   My legal and family problems.
```

```
 1   Q.   Okay.  Now, earlier you said you had to document your
 2   daily activities on an index card, right?
 3   A.   Yes.
 4   Q.   And you said that Bill called them something.  What did
 5   Bill call them?
 6   A.   He referred to them as 3x5s.
 7            MS. RUDOFF:  Your Honor, may I approach the witness?
 8            THE COURT:  You may, ma'am.
 9            (Pause)
10   BY MS. RUDOFF:
11   Q.   Casi, I just handed you what's been previously marked as
12   Government's Exhibit 28.  Can you please take a look at it?
13   A.   Yes.
14   Q.   Do you recognize it?
15   A.   Yes.
16   Q.   What are those photos of?
17   A.   These are pictures of my 3x5s.
18   Q.   And those are the index cards, correct?
19   A.   The index cards.
20            MS. RUDOFF:  Your Honor, the Government moves to
21   admit Government's Exhibit Number 28.
22            THE COURT:  Any objection?
23            MR. GALLIAN:  No objection.
24            MR. SELLERS:  No objection.
25            THE COURT:  It's admitted.
```

```
 1                  (Government's Exhibit No. 28 received)
 2              MS. RUDOFF:   Permission to publish?
 3              THE COURT:   Granted.
 4              MS. RUDOFF:   Can we go to page 2 of Government's
 5    Exhibit 28?
 6              And can we zoom in on just the card itself?
 7    BY MS. RUDOFF:
 8    Q.   Casi, this is -- is this an example of one of those 3x5
 9    cards that you were required to keep and provide to Joe DeLeon
10    and Bill Stone for the secret probation?
11    A.   Yes.
12    Q.   Can you explain to us kind of what some of the logged
13    things on here are?
14    A.   So I had to log my community service hours for my Hood
15    County probation.
16    Q.   Is that what we see as CS?
17    A.   Yes.
18    Q.   Okay.
19    A.   And there are the remaining -- how much I had left.
20    Q.   So is that in the upper right-hand side where it says
21    "REM"?
22    A.   Yes.
23              And the bottom it says, "Joe:  3."  That meant I
24    spent three hours with Joe.
25    Q.   What kind of other things do we see on this 3x5?
```

```
 1   A.   Everything that I did in my day.

 2   Q.   We see "Looked at three houses."

 3   A.   Yes.

 4   Q.   What is that?

 5   A.   I was logging that I was doing real estate, looking at

 6   investment properties.

 7   Q.   So that's how you documented it in your 3x5 card?

 8   A.   Yes.

 9   Q.   And that was also related to the secret probation, right?

10   A.   Yes.

11           MS. RUDOFF:  You can zoom out, please.

12           Can we go to page 6?

13           Can we zoom in on the card?

14   BY MS. RUDOFF:

15   Q.   Casi, this another example of a date of one of your 3x5

16   cards?

17   A.   Yes.

18   Q.   What is the date on here?

19   A.   July 15th.

20   Q.   And would that have been during the time of the secret

21   probation?

22   A.   Yes.

23   Q.   And tell me some of the things that we see on here.  For

24   example, let's go to "Met Joe to look at Logan Circle

25   property."  What is that?
```

```
 1    A.   That was the -- the investment property that I -- that I
 2    ended up purchasing.
 3    Q.   Okay.  What does "Update amortization docs on installment
 4    payments" mean?  Do you recall?
 5    A.   I can't remember.  I can't remember.  There are several
 6    loans that I had amortization files for.  Sorry.
 7    Q.   It's okay.  When you say loans, were these loans you had
 8    taken out and you owed payments on?
 9    A.   Oh, I'm sorry.  No.  They were loans from the estate that
10    were supposed to be paid back to the estate that my grandmother
11    had given out personal loans.
12    Q.   And why was it necessary that you do that?
13    A.   I just had to document everything that I was doing per
14    business, to make it look like I was having a business.
15    Q.   And the last line, "CR 7-8," what does that mean?
16    A.   Celebrate Recovery was the 12-step program that I had to
17    complete with my Hood County probation.
18    Q.   And in the bottom right-hand corner, can you explain those
19    different numbers?
20    A.   So Joe is -- those are my in-person and phone hours
21    with Joe.
22    Q.   And you said earlier that --
23             THE COURT:  Let's stop.  What is that sound?
24             Okay.  Everybody check to make sure your phones are
25    off.  Thank you.
```

```
 1              You may proceed.  Sorry.
 2              MS. RUDOFF:  Thank you, Your Honor.
 3              THE COURT:  Okay.
 4              (Pause)
 5    BY MS. RUDOFF:
 6    Q.   And you said that you had to text pictures of these cards
 7    to Joe DeLeon, right?
 8    A.   Yes.
 9    Q.   And then what was your understanding -- or what were you
10    told Joe DeLeon then did with the texted photos of these 3x5s?
11    A.   He sent them to Bill, and then Bill would send them to the
12    judge coordinator in Austin.  He would do a report, a weekly or
13    a monthly report after.
14    Q.   Who is he?
15    A.   I'm sorry.  Bill.
16    Q.   Okay.  And is this just an example of some of the things
17    you had to do on a daily basis for the secret probation?
18    A.   Yes.
19    Q.   I want to move on and talk about some of the financial
20    requirements related to your secret probation and the other
21    legal cases that Bill Stone and Joe DeLeon told you they were
22    working on for you, okay?
23    A.   Okay.
24    Q.   At any point in this secret probation did you have to
25    provide a list of all your assets?
```

```
 1   A.   I did.

 2   Q.   And why did you have to do that?

 3   A.   I had to prove to -- Bill asked for them, but I had to

 4   prove that I was worth more out here than in jail, so I wrote

 5   up a list of the assets.

 6   Q.   Prove to who?

 7   A.   The judge.

 8   Q.   Who told you you needed to do that?

 9            MR. SELLERS:  Object to asked and answered.

10            THE COURT:  Overruled.

11   BY MS. RUDOFF:

12   Q.   Sorry.  You can answer.

13   A.   Bill.

14   Q.   And did you provide that list of assets?

15   A.   Yes.

16            MS. RUDOFF:  Your Honor, may I republish Government's

17   Exhibit 6, which was admitted yesterday?

18            THE COURT:  You may.

19   BY MS. RUDOFF:

20   Q.   Is this a list of those assets that you -- Bill Stone told

21   you you had to provide him?

22   A.   Yes.

23            MS. RUDOFF:  Can we zoom in on the first bullet

24   section?

25   BY MS. RUDOFF:
```

```
 1   Q.   Casi, what do we see these personal loan listings on the
 2   screen here?
 3   A.   The personal loans I was just referring to.
 4   Q.   Explain that for the jury.
 5   A.   What the amortization schedule -- these were -- this is
 6   what I was referring to with the personal loans out from the
 7   estate that were coming back in.
 8   Q.   And so when you say personal loans out, who loaned this
 9   money out originally?
10   A.   My grandmother.
11   Q.   And then now as executor of the estate, how did that
12   pertain to you?
13   A.   I had to ensure they were getting -- the estate was
14   getting paid and it's now my responsibility.
15   Q.   And was this additional money that over time was coming
16   back to you in the estate?
17   A.   Yes.
18   Q.   And so was this amount, this additional amortization and
19   payment back over time, was this considered in the total value
20   of the estate?
21   A.   This was.
22   Q.   So that's included in the 3 million?
23   A.   Yes.
24   Q.   Okay.
25   A.   Can I add that when writing this up, my grandmother was a
```

```
 1    very private woman.  This killed me to --
 2              MR. SELLERS:  Object to nonresponsive, Your Honor.
 3              THE COURT:  Sustained.  Question and answer.
 4    BY MS. RUDOFF:
 5    Q.   Was there anything about providing this specific type of
 6    information to Bill Stone that made it hard for you?
 7    A.   It was extremely hard.  I won't share --
 8              MR. SELLERS:  Object to relevance.
 9              THE COURT:  I will give you a little latitude, but --
10    BY MS. RUDOFF:
11    Q.   You can answer.  Why was this hard?
12    A.   It was hard because this is my grandmother's hard work and
13    private information.
14    Q.   But did you provide it?
15    A.   I provided it.
16    Q.   Okay.
17              MS. RUDOFF:  Can we zoom out?
18              Can we zoom in to the middle three bullets?
19    BY MS. RUDOFF:
20    Q.   What are these assets that we're looking at here?
21    A.   These are my kids' trust accounts and my grandmother's old
22    trust.
23    Q.   Okay.  So were these all considered in the full $3 million
24    valuation?
25    A.   Yes.
```

```
 1   Q.   Okay.
 2            MS. RUDOFF:  Can we zoom out?
 3            And can we go to the bottom bullets?
 4   BY MS. RUDOFF:
 5   Q.   These mineral rights and gas wells, can you explain what
 6   that is?
 7   A.   These are the mineral rights and gas wells that my
 8   grandmother and grandfather owned.
 9   Q.   Why did you have to include this on your list of assets?
10   A.   I was told to.
11   Q.   By who?
12   A.   Joe.  And Bill told Joe.
13   Q.   Okay.  So Bill told Joe, and then Joe told you?
14   A.   Yes.
15   Q.   Okay.  And did you understand why you needed to list gas
16   well and mineral rights?
17   A.   I was supposed to list everything with a capital
18   everything.
19   Q.   Okay.  And with regards to your finances, were there any
20   restrictions on how and when you could spend money for your
21   secret probation purposes?
22   A.   In order to make a big purchase, I had to run it by Bill,
23   and then he had to get permission from the judge.
24   Q.   And who told you that was required?
25   A.   Bill.
```

```
 1   Q.   Did you do that?

 2   A.   Yes.

 3   Q.   Earlier you talked about that initial 5,000 withdrawal

 4   December 18th of 2015, right?

 5   A.   Yes.

 6   Q.   Did those 5,000 withdrawals continue in 2016?

 7   A.   Yes.

 8   Q.   How often would those $5,000.00 cash payments to Bill

 9   Stone happen?

10   A.   In the very beginning, very often.  I can't -- I'm not

11   sure.  Like -- it seemed like every other day, but it could

12   have -- I mean, twice a month, three -- three times a month.

13   And then it eventually got less.

14   Q.   And were these 5,000 withdrawals all for what you were

15   told were the same reason?

16   A.   Yes.

17        MS. RUDOFF:  Your Honor, may I approach the witness?

18        THE COURT:  You may.

19   BY MS. RUDOFF:

20   Q.   Casi, I just handed you what's been previously marked as

21   Government's Exhibit 46.  Can you take a look at that?

22   A.   Yes.

23   Q.   What is it?

24   A.   My bank statement.

25   Q.   What bank?
```

```
 1   A.   Chase.

 2   Q.   What's the timeframe for that statement?

 3   A.   May 13, 2016, to June 13, 2016.

 4            MS. RUDOFF:  Your Honor, at this time the Government

 5   moves to admit Government Exhibit 46.

 6            THE COURT:  Any objection?

 7            MR. GALLIAN:  No objection.

 8            MR. SELLERS:  No objection.

 9            THE COURT:  It's admitted.

10               (Government's Exhibit No. 46 received)

11            MS. RUDOFF:  Permission to publish?

12            THE COURT:  Granted.

13            MS. RUDOFF:  Can we go to the second page of this

14   document?

15   BY MS. RUDOFF:

16   Q.   Casi, do you see one of those 5,000 withdrawals?

17   A.   Yes.

18   Q.   Where do you see it on this document?

19   A.   On what date?

20   Q.   Yes.

21   A.   5-25.  May 25th.

22   Q.   What year?

23   A.   2016.

24            MS. RUDOFF:  Can you zoom out, please?

25   BY MS. RUDOFF:
```

```
 1   Q.   So this $5,000.00 withdrawal, was that part of your
 2   payment to Bill Stone?
 3   A.   Yes.
 4   Q.   And was it for the same travel expenses?
 5   A.   Yes.
 6   Q.   Now, before we were looking at Navy Federal Credit Union
 7   records, right?
 8   A.   Yes.
 9   Q.   And here we see Chase records?
10   A.   Right.
11   Q.   Did you always have those two accounts?
12   A.   I had the Navy Federal Credit Union account, but I
13   didn't -- I never have had a Chase account prior to.
14   Q.   When did you open a Chase banking account?
15   A.   I opened it when Bill told me I needed to put my money in
16   a real bank.
17   Q.   What did that mean?
18   A.   He wanted me to take my money out of the First Financial.
19   It was associated with my family.  And he made me believe that
20   my mom was talking to my banker at our First Financial Bank.
21   Q.   So First Financial Bank is a bank?
22   A.   Right.  It is.  Yes.  Sorry.
23   Q.   Okay.  And so because of what Bill Stone told you --
24   A.   Right.
25   Q.   -- you moved the money to Chase?
```

1    A.   Yes.

2    Q.   Did you believe that was necessary?

3    A.   I wasn't sure what to believe at this point, but I just

4    was doing what I was told.

5              MS. RUDOFF:  Your Honor, may I approach the witness?

6              THE COURT:  You may.

7    BY MS. RUDOFF:

8    Q.   Casi, I just handed you what's been previously marked as

9    Government's Exhibit 39.  Can you take a look at that?

10   A.   Yes.

11   Q.   Do you recognize it?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is my Chase Bank account.

15   Q.   And can you tell me the date range of that?

16   A.   May 13, 2016, to June 13, 2016.

17             MS. RUDOFF:  At this time the Government moves to

18   admit Government's Exhibit 39.

19             THE COURT:  Any objection?

20             MR. GALLIAN:  No objection.  Sorry.

21             MR. SELLERS:  No objection.

22             THE COURT:  Admitted.

23             (Government's Exhibit No. 39 received)

24             MS. RUDOFF:  May I publish?

25             THE COURT:  You may.

```
 1    BY MS. RUDOFF:
 2    Q.   Casi, here on the screen we have your Chase Bank account,
 3    and you said it was the timeframe up until June 13, 2016,
 4    right?
 5    A.   Yes.
 6    Q.   Do we see a withdrawal in June of $9,000.00?
 7    A.   Yes.
 8    Q.   What date was that?
 9    A.   June 3rd.
10    Q.   And why did you make a $9,000.00 cash withdrawal on that
11    date?
12    A.   I'm not 100 percent sure.  I'm not sure.
13    Q.   Okay.  Was there a particular purpose -- or purchase you
14    remember making with cash?
15    A.   No.
16    Q.   Okay.
17         MS. RUDOFF:  You can take this down.
18    BY MS. RUDOFF:
19    Q.   In the beginning were there any other initial payments you
20    had to make to Joe DeLeon as it related to his service as your
21    probation officer?
22    A.   Say that one more time.  I'm sorry.
23    Q.   In the very beginning -- we're still in the beginning of
24    2016.
25    A.   Okay.
```

```
 1    Q.   Of your secret probation.

 2    A.   Okay.

 3    Q.   Did you have to make any payment to Joe DeLeon because of

 4    his service as your probation officer?

 5    A.   Not in the very beginning.

 6    Q.   At some point did you?

 7    A.   Yes.

 8    Q.   And do you recall about when that was?

 9    A.   The --

10    Q.   Well, do you just recall the timeframe?  Do you recall

11    when that was?

12    A.   During the very beginning the timeframes are hard to

13    really pin down, but it was during a time -- the initial time

14    that I paid Joe was for when he needed -- he had spent so much

15    time with me and away from his restaurant, he was going broke.

16    He needed money, and he would complain often.  And so I was

17    told to pay Joe.

18    Q.   And when you say he was spending so much time with you,

19    what do you -- why was he spending so much time with you?

20    A.   It was court ordered.

21    Q.   That's what you were told?

22    A.   That's what I was told.

23    Q.   So you said you were told to pay Joe.  Who told you to pay

24    Joe?

25    A.   Bill.
```

```
 1              MS. RUDOFF:  Your Honor, may I approach the witness?
 2              THE COURT:  You may.
 3   BY MS. RUDOFF:
 4   Q.  Casi, I just handed you what's previously been marked as
 5   Government's Exhibit 20.  Can you take a look at it, please?
 6   A.  Yes.
 7   Q.  Do you recognize it?
 8   A.  Yes.
 9   Q.  What is it?
10   A.  It is one of my checks.
11   Q.  And from which bank account?
12   A.  Navy Federal Credit Union.
13              MS. RUDOFF:  At this time, Your Honor, the Government
14   moves to admit Government's Exhibit 20.
15              THE COURT:  Any objection?
16              MR. SELLERS:  No objection from Mr. DeLeon.
17              THE COURT:  Any objection?
18              MR. GALLIAN:  No objection.
19              THE COURT:  Admitted.
20                  (Government's Exhibit No. 48 received)
21              MS. RUDOFF:  Permission to publish?
22              THE COURT:  Granted.
23   BY MS. RUDOFF:
24   Q.  Casi, you said this is a copy of one of your checks,
25   right?
```

```
 1    A.   Yes.
 2              MS. RUDOFF:   Can we zoom in on the check portion?
 3    BY MS. RUDOFF:
 4    Q.   Can you tell me the date of this check?
 5    A.   January 29th of 2016.
 6    Q.   And who is this check written out to?
 7    A.   Joseph DeLeon.
 8    Q.   What is the total amount it is written for?
 9    A.   15,000.
10    Q.   And is this the check you were referring to that Bill told
11    you you had to pay Joe?
12    A.   Yes.
13    Q.   Had you ever had to pay Joe before for his support and
14    help?
15    A.   No.  Before, it was just advice.  This was him actually
16    working as my probation officer.
17    Q.   That's what you were told to believe?
18    A.   That's what I was told to believe.
19    Q.   Who did you give this check to?
20    A.   Joseph DeLeon.
21    Q.   And at some point did that check clear out of your bank
22    account?
23    A.   Yes.
24    Q.   Did you ever have to give any electronic device or devices
25    to Joe so he could assist with your probation?
```

```
 1   A.   Yes.

 2   Q.   What did you have to give him?

 3   A.   I needed him to have a working phone, and he claimed his

 4   phone was not working.  He was having problems with it.  And so

 5   I bought him a new phone so that we could continue our

 6   communication per required from the court.

 7   Q.   Anything else for your communication purposes?

 8   A.   A laptop for him to e-mail.

 9            MS. RUDOFF:  Your Honor, permission to publish

10   Government's Exhibit 38 again?

11            THE COURT:  Granted.

12            MS. RUDOFF:  Page 623, please.

13            Can we zoom in on the first green message on the

14   right?

15   BY MS. RUDOFF:

16   Q.   Casi, what's the date on this green message at the bottom

17   right-hand corner?

18   A.   January 29, 2016.

19   Q.   Okay.  Is that the same date as you wrote that $15,000.00

20   check to Joe DeLeon?

21   A.   Yes.

22   Q.   And whose message is this that we're seeing?

23   A.   It is Joseph's message to me.

24   Q.   And can you tell us what his message said?

25   A.   "Casi, thank you so much!!!!  I wanted to do this no
```

 1    matter what and I did.  You are awesome, you have made my life
 2    so much easier and better.  I just needed to take the time to
 3    get it up and running and I'm starting to build the shortcuts
 4    now."
 5            MS. RUDOFF:  And can we zoom in on Casi's response,
 6    which is the blue message following?
 7    BY MS. RUDOFF:
 8    Q.  Casi, can you tell us the date on this message?
 9    A.  January 30, 2016.
10    Q.  And who is this message from?
11    A.  Me.
12    Q.  What does it say?
13    A.  "Yea!  You got your computer running!  I fell asleep last
14    night on the couch."
15    Q.  So was this the timeframe in which you also were told you
16    had to buy Joe DeLeon a computer so he could be your probation
17    officer for secret probation?
18    A.  Yes.
19    Q.  When you were told to write the $15,000.00 check to Joe
20    DeLeon, did you say no?
21    A.  No.
22    Q.  Why not?
23    A.  I was just doing what I was told to do.
24    Q.  But why were you doing what you were told to do?
25    A.  I needed him.  I needed him to continue his role as my

1  probation officer.

2  Q.   Why?  What if Joe DeLeon did not continue his role as your

3  federal secret probation officer?

4  A.   Then I did -- I don't know what would happen, but I

5  needed -- that was the agreement on the judge.  And if he quit,

6  then I would go to jail or prison.  I wasn't sure what the next

7  step would be, but that was my fear and belief.

8  Q.   So is that why you wrote a $15,000.00 check?

9  A.   Yes.

10 Q.   Had you ever paid your Hood County probation officer any

11 kind of money?

12 A.   No.  I did pay for fines.

13 Q.   You mean as it related to your Hood County probation?

14 A.   As it -- yes.

15 Q.   Okay.  So did it seem odd to you that in this situation

16 you were having to pay your secret federal probation officer?

17 A.   I just felt like it was -- I had to because he was going

18 through financial burden and because of his time away from the

19 restaurant.  He was helping me, and gas, and I just -- and I

20 was just doing what I was told.  But -- I was just doing what I

21 was told.

22 Q.   So had you not been on this secret probation, would you

23 have written Joe a $15,000.00 check?

24 A.   No.

25 Q.   On your Hood County probation, you said you had to pay

 1   fines, right?

 2   A.    Right.

 3   Q.    Did you -- who did you give those payments to on your Hood

 4   County probation?

 5   A.    The Probation Office.

 6   Q.    Okay.  And who -- how did you pay those fines?

 7   A.    Each month, once a month.

 8   Q.    Was it cash?  Check?  Credit?

 9   A.    You know, I can't remember.  Probably check.  I'm not

10   sure.

11   Q.    Okay.  But you said it was a probation office, right?

12   A.    Yes.

13   Q.    Was it ever directly to your probation officer?

14   A.    No.

15   Q.    And so in this instance -- I'll move on from that.

16         So we've talked about the $5,000.00 often payments to

17   Bill Stone for his travel, the laptop, the $15,000.00 check to

18   Joe DeLeon.  And this is all in the beginning of your secret

19   probation, right?

20   A.    Yes.

21   Q.    Was there also a point in time in which you had to give

22   both Joe DeLeon and Bill Stone vehicles?

23   A.    Yes.

24   Q.    Okay.  Let's talk about that.

25         What vehicle were you told you had to give to Joe

```
 1   DeLeon?
 2   A.   I -- we had -- I say we as a family -- had a ranch, and so
 3   we had a ranch truck that was left at the house.  And I was
 4   told to give Joe the F-150 King Ranch.
 5   Q.   Who told you to give Joe an F-150 King Ranch?
 6   A.   Bill.
 7   Q.   Why did Bill say you had to do that?
 8   A.   Because Joe was acting kind of childish and acting as
 9   though he was going to quit on us.  And I say us, because at
10   this point I felt like we were a team together.
11   Q.   And when you say quit on us, what do you mean?
12   A.   He was going to not do his duty as my probation officer.
13   He was -- and I needed him here to do it, because Bill was in
14   Washington, D.C., and nobody else knew about -- about the
15   secret probation.  I had to have Joe here to see me in person.
16   Q.   And what would happen if Joe didn't, as far as you were
17   told?
18   A.   Right.  I would go to prison or -- I'm not sure.  And lose
19   my kids.
20            MS. RUDOFF:  Your Honor, may I approach the witness?
21            THE COURT:  You may.
22            (Pause)
23   BY MS. RUDOFF:
24   Q.   Casi, I just handed you what's previously been marked as
25   Government Exhibit 21.  Can you take a look at that?
```

```
 1   A.    Yes.

 2   Q.    What is that?

 3   A.    This is the registration on the vehicle.

 4   Q.    What vehicle?

 5   A.    The Ford F-150.

 6   Q.    Is that the one that you were referring to you were told

 7   to give to Joe DeLeon?

 8   A.    Yes.

 9         MS. RUDOFF:  Your Honor, Government moves to admit

10   Government's Exhibit 21.

11         THE COURT:  Any objection?

12         MR. GALLIAN:  No objection.

13         MR. SELLERS:  No objection, Your Honor.

14         THE COURT:  Admitted.

15            (Government's Exhibit No. 21 received)

16         MS. RUDOFF:  Permission to publish?

17         THE COURT:  Granted.

18         MS. RUDOFF:  Can we go to page 6 of this document,

19   please?

20         And can we zoom on the top certificate of title,

21   where it says -- yeah.

22   BY MS. RUDOFF:

23   Q.    Casi, at the top, what vehicle is this?

24   A.    This is the 2014 Ford F-150 King Ranch.

25   Q.    And is this a copy of the title for it?
```

```
1   A.   Yes.
2   Q.   And what is the date on the right-hand side of this title
3   being issued?
4   A.   February 25th of 2016.
5   Q.   And who does this title list as the previous owner?
6   A.   My grandmother's trust.
7   Q.   And who does it now list as the new owner?
8   A.   Joseph DeLeon.
9   Q.   So is this the date -- does this document show the date of
10  which you gave this F-150 to Joe DeLeon?
11  A.   Yes.
12  Q.   And was that during your secret probation?
13  A.   Yes.
14  Q.   Can you tell me on the right-hand side what the odometer
15  reading was on that truck?
16  A.   10,000 miles.
17  Q.   So this was 2014, right?
18  A.   Yes.
19  Q.   And so it was about two years old?
20  A.   Right.
21  Q.   And only had 10,000 miles on it?
22  A.   Yes.
23  Q.   Was it otherwise in good condition?
24  A.   Excellent.
25  Q.   How did you feel about having to give over this truck to
```

```
 1   Joe DeLeon?
 2   A.   I did not want to give the truck to -- I did not want to
 3   give the truck to Joseph DeLeon.  Did not.
 4   Q.   Why not?
 5   A.   That was our truck.
 6   Q.   Who's "our"?
 7   A.   My family's.
 8   Q.   So why did that bother you?
 9   A.   It bothered me because I felt like I had to, because Bill
10   told me to.
11   Q.   So why did you do it?
12   A.   I didn't want to.  I just was doing it because I felt like
13   I had to.
14   Q.   Why did you feel like you had to?
15            MR. SELLERS:  Object to asked and answered.
16            THE COURT:  Overruled.
17   A.   In order to keep Joe on -- as my probation officer.
18   Q.   And so did you trust Bill when he told you that this is
19   what you had to do?
20   A.   Yes.
21            MS. RUDOFF:  Your Honor, may I approach the witness?
22            THE COURT:  You may.
23            As you are doing that, members of the jury, are we
24   doing okay?  Does anybody need a break?  All right.  Okay.
25            (Pause)
```

```
 1   BY MS. RUDOFF:
 2   Q.   Casi, I just handed you what's been previously marked as
 3   Government's Exhibit 22.  Can you please take a look at that?
 4   A.   Yes.
 5   Q.   What is it?
 6   A.   It's the truck.
 7   Q.   What truck?
 8   A.   The Ford F-150 that was given to Joe.
 9           MS. RUDOFF:  Your Honor, permission to publish
10   Government's Exhibit 22 -- I'm sorry -- admit.
11           THE COURT:  Admit.
12           Any objection?
13           MR. GALLIAN:  No, Your Honor.
14           MR. SELLERS:  No objection.
15           THE COURT:  Admitted.
16               (Government's Exhibit No. 22 received)
17           MS. RUDOFF:  Permission to publish?
18           THE COURT:  Granted.
19   BY MS. RUDOFF:
20   Q.   Is this a photo of that truck, Casi?
21   A.   Yes.
22   Q.   Now, I want to talk about how the transaction took place
23   for this truck.
24   A.   Okay.
25   Q.   Did you just hand over title and that was it?
```

1   A.   No.

2   Q.   What happened?

3   A.   I was told to meet Joe at the DMV in Fort Worth, and he

4   guided me in how to transfer title over.  I wasn't sure.  So he

5   went in and said that he wanted to make it appear as though he

6   bought the truck in case my family said anything and said he

7   would write me a check and I would then write him one back in

8   the same amount.

9   Q.   When you say "he," who are you referring to?

10  A.   Joe.

11  Q.   So this was Joe's plan?

12  A.   This was Joe.

13  Q.   Okay.  And did he tell you the exact amount to write --

14  that he would write you a check for?

15  A.   He -- he said he would write the check, and then I would

16  just write him back the check.  I didn't know what to put on

17  the -- on the space where it said how much did he buy it for,

18  because he was being -- it was given to him, so he told me what

19  to write there.

20  Q.   Okay.  And did you do what he told you to do?

21  A.   I did.

22  Q.   How did you feel about having to do this fake transaction

23  with him?

24          MR. SELLERS:  Your Honor, object to relevance.

25          THE COURT:  Overruled.

```
 1    A.    It felt extremely uncomfortable.

 2    Q.    Why?

 3    A.    I felt like it was wrong.  I didn't feel like he deserved

 4    to be given a truck.

 5    Q.    And what about the fact that you had to -- he was going to

 6    write a check to you and you were going to write one back?

 7    A.    At this point I was getting very frustrated with

 8    everything.  I just agreed.

 9    Q.    So did you believe him when he told you there -- had to

10    make it look like a sale?

11    A.    Yes.

12          Initially, I was hoping he would turn down the offer

13    of that, of the truck from when Bill told me to give it to him,

14    but he accepted it and -- so all of this was just really

15    frustrating, because I started to feel as though I was being

16    taken advantage of.

17    Q.    Why did you feel like you were being taken advantage of?

18    A.    Because I felt like it was a little overkill.

19    Q.    What do you mean by overkill?

20    A.    Just a lot of -- a lot of things going out at this time.

21    Q.    I don't understand what you --

22    A.    I'm sorry.  A lot of money going out at this time.

23    Q.    Okay.

24          MS. RUDOFF:  Your Honor, may I approach the witness?

25          THE COURT:  You may.
```

```
 1              (Pause)
 2    BY MS. RUDOFF:
 3    Q.   Casi, I just -- Casi, I just handed you what's previously
 4    been marked as Government's Exhibit 24 and 25.  Can you take a
 5    look at them, please?
 6    A.   Yes.
 7    Q.   Let's start with Government's Exhibit 24.
 8    A.   Okay.
 9    Q.   Do you recognize that?
10    A.   Yes.
11    Q.   What is it?
12    A.   That is the check written to me for the Ford truck.
13    Q.   And who wrote that check?
14    A.   Joseph DeLeon.
15         MS. RUDOFF:  Your Honor, permission -- I'm sorry
16    Government moves to admit Government's Exhibit 24.
17         THE COURT:  Any objection?
18         MR. GALLIAN:  No objection.
19         MR. SELLERS:  No objection.
20         THE COURT:  Admitted.
21           (Government's Exhibit No. 24 received)
22    BY MS. RUDOFF:
23    Q.   Casi, can you take a look at Government's Exhibit 25?
24    A.   Yes.
25    Q.   What is Government's Exhibit 25?
```

```
 1   A.   A check that I wrote back to Joe DeLeon.
 2          MS. RUDOFF:  Your Honor, at this time the Government
 3   moves to admit Government's Exhibit 25.
 4          THE COURT:  Any objection?
 5          MR. GALLIAN:  No objection.
 6          MR. SELLERS:  No objection.
 7          THE COURT:  Admitted.
 8             (Government's Exhibit No. 25 received)
 9          MS. RUDOFF:  May I publish sequentially?
10          THE COURT:  Yes, ma'am.
11          MS. RUDOFF:  Can we please go to Government's
12   Exhibit 24 first?
13             And can we zoom in on the check portion?
14   BY MS. RUDOFF:
15   Q.   Casi, who is this check to?
16   A.   To Casi.  To me.  Sorry.
17   Q.   And who's it written by?
18   A.   Joseph DeLeon.
19   Q.   In the memo line at the bottom left-hand corner, what does
20   it say it's for?
21   A.   A 2014 Ford truck.
22   Q.   And then does it provide a VIN number above that?
23   A.   Yes.
24   Q.   Is that the same Ford truck that you were told you had to
25   give to Joe DeLeon?
```

```
 1   A.   Yes.
 2   Q.   What is the date of this check?
 3   A.   February 17, 2016.
 4           MS. RUDOFF:  And can we publish Government's
 5   Exhibit 25?
 6           And can we zoom in on the check portion, please?
 7   BY MS. RUDOFF:
 8   Q.   Casi, who is this check written to?
 9   A.   This is written to Joe DeLeon.
10   Q.   And who is it written by?
11   A.   Me.
12   Q.   And what is the date on this?
13   A.   It's March 2, 2016.
14   Q.   And what is the amount it's for?
15   A.   20,100.
16   Q.   And who decided that amount?
17   A.   Joe.
18   Q.   And is that the same amount on the check that he wrote
19   you?
20   A.   Yes.
21   Q.   Did Joseph DeLeon keep that truck?
22   A.   He did not.
23   Q.   What did he do with it?
24   A.   He ended up selling it.
25   Q.   When did that happen, do you know?
```

```
 1    A.    I'm not sure.  Not too long after he had it.  I mean, it
 2    was a couple of months.
 3    Q.    Were you told why he sold it?
 4    A.    Yes.
 5    Q.    What were you told?
 6    A.    So Bill had an estate attorney friend in Dallas that he
 7    made me believe my mom was talking to, so he had some inside
 8    information to stay one step ahead of what my mother was up to.
 9    And supposedly, I was told, that our ranch foreman was trying
10    to say that he was -- he was supposed to be given the ranch
11    truck upon my grandmother's death.
12          So to avoid my family getting involved, Joe wanted to
13    get rid of the truck.
14    Q.    Okay.  And so Bill told you there was, in fact, a
15    situation in which your family was trying to get involved with
16    taking the truck?
17    A.    Yes.
18    Q.    Did you believe that to be true?
19    A.    I did.
20    Q.    Why?
21    A.    Because Bill -- I felt I could trust anything Bill said.
22    He was a federal agent.
23    Q.    Did you have a choice in whether or not Joe DeLeon sold
24    that truck?
25    A.    No.
```

```
 1   Q.   How did you feel about Joe DeLeon selling that truck?
 2              MR. SELLERS:  Object to relevance, Your Honor.
 3              THE COURT:  Overruled.
 4   A.   I was upset that he sold our family truck.
 5   Q.   Do you know how much he received for that truck?
 6   A.   I do, but I don't remember the amount.  I think roughly
 7   about $30,000.00.
 8   Q.   Okay.  So if it's about $30,000.00, did you get that cash
 9   once Joe sold the truck?
10   A.   No.
11   Q.   Where did it go?
12   A.   He kept it.
13   Q.   Who's "he"?
14   A.   Joe.
15   Q.   Did you ask for it back, the money?
16   A.   No.
17   Q.   Why not?
18   A.   Because I didn't feel like I had a say-so in it.
19   Q.   Why?
20   A.   Because it was given to him because he was working as my
21   probation officer.
22   Q.   And so that happened in February of 2016, right?
23   A.   Yes.
24   Q.   And so in just the first two months or so of your federal
25   secret probation, about how much cash have you been made to pay
```

1  Joe DeLeon alone?

2  A.   About 35 -- probably $40,000.00, if you include the truck.

3  Q.   And all that payment, that was related to his service as

4  your probation officer, right?

5  A.   Yes.

6  Q.   Was there at a point also in February where you were told

7  you had to give a vehicle to Bill Stone?

8  A.   Yes.

9  Q.   What vehicle was that?

10 A.   It was my -- my current vehicle that I was driving.

11 Q.   What kind of vehicle was that?

12 A.   It was a Lexus SUV.

13 Q.   Were you given a reason as to why you had to give over

14 your own vehicle to Bill Stone?

15 A.   It was a form of payment so there wasn't any monetary

16 exchange for his efforts in helping me.

17 Q.   What do you -- can you explain that?

18 A.   So there wasn't a paper trail.

19 Q.   Why couldn't -- who told you there couldn't be a paper

20 trail?

21 A.   Bill.

22 Q.   Did he say why there couldn't be a paper trail?

23 A.   Several reasons.  So that my Hood County probation didn't

24 find out anything, so that my family didn't know anything, and

25 then it was also a secret -- my paying him was also a secret

```
 1   from the federal probation.
 2   Q.   And why did Bill Stone need a new vehicle?  Did he?
 3   A.   No.  I mean, no, I don't know.  I don't know what he
 4   needed.
 5   Q.   So he just told you you needed to give him the vehicle?
 6           MR. SELLERS:  Object to leading.
 7           THE COURT:  Sustained.  Don't lead.
 8   A.   He had -- oh, I'm sorry.
 9           THE COURT:  That's okay.
10           THE WITNESS:  Sorry.
11           THE COURT:  That's okay.
12   BY MS. RUDOFF:
13   Q.   What did you do with the Lexus?
14   A.   I gave it to Bill.
15   Q.   Why?
16   A.   For payment of his -- him flying in and his efforts in
17   getting me all these deals, because Joe several times told me
18   that I was the luckiest girl in the world and there was no
19   attorney in -- that I could have ever hired or paid any amount
20   of money for that could get me what Bill got me in this deal.
21   Q.   Did you believe him?
22   A.   I believed him.
23   Q.   Did you believe Bill Stone?
24   A.   I did.
25   Q.   And did you give him the Lexus?
```

```
 1   A.   Yes.
 2   Q.   Did you then have to get a new vehicle?
 3   A.   I then had my grandmother's vehicle that I drove.
 4   Q.   What kind of car was that?
 5   A.   It was another Lexus.
 6   Q.   Okay.  At some point did Bill do something with the Lexus
 7   other than keep it for himself?
 8   A.   Yes.
 9   Q.   What did he do?
10   A.   He traded it in.
11   Q.   And where did he trade it in?
12   A.   Mercedes.
13   Q.   So did he trade it in for a Mercedes?
14   A.   Yes.
15   Q.   I want to talk about that.
16   A.   Okay.
17   Q.   When you gave him the Lexus, do you recall about when it
18   was?
19   A.   I really don't.  I don't know.  I can't remember.
20   Q.   Okay.  And then do you recall going to the Mercedes
21   dealership in June 2016?
22   A.   Yes.  He called me one day and -- in the morning and said
23   meet me at the Mercedes dealership.
24   Q.   And who's "he"?
25   A.   Bill.
```

```
 1   Q.   Did you know why you were being told to meet at the
 2   Mercedes dealership?
 3   A.   I -- he had been talking about -- he wanted a Porsche, and
 4   I felt like, okay.  So it was more of the dollar amount of the
 5   vehicle that was most important for his efforts in payment, and
 6   so for him to say meet me at Mercedes was a little odd.
 7   Q.   So did you know that Bill Stone had been looking at other
 8   vehicles?
 9   A.   Yes.
10   Q.   Is that something you did with him?
11   A.   We shared it a little bit here and there.  He -- sorry.
12   Q.   That's okay.
13   A.   Sorry.
14   Q.   So when you got to the Mercedes dealership, were you told
15   to bring anything with you?
16   A.   I'm not sure.
17   Q.   Okay.  What happened when you arrived at the Mercedes
18   dealership?
19   A.   I was looking at vehicles with Bill.
20   Q.   At some point was a vehicle purchased?
21   A.   Yes.
22   Q.   What vehicle was purchased?
23   A.   The -- I can't even -- SLK, CLK.  I'm not sure.  It was a
24   Mercedes.
25   Q.   Sedan?
```

```
 1   A.   Yes.
 2   Q.   How was that vehicle paid for?
 3   A.   It was -- I paid for it, and with the trade-in of my
 4   Lexus.
 5   Q.   When you say trade-in of your Lexus, do you mean the one
 6   you're currently driving that was your grandmother's?
 7   A.   No.  It was the car that I had previously owned.
 8   Q.   So the one you gave Bill Stone?
 9   A.   Yes.  Yes.
10   Q.   Was it an even trade monetarily?
11   A.   No.
12   Q.   Did an additional payment have to be provided?
13   A.   Yes.
14   Q.   Who provided that additional payment?
15   A.   I did.
16   Q.   How did you pay for that?
17   A.   I -- with a cashier's check.
18   Q.   Was this vehicle purchased for you?
19   A.   No.
20   Q.   Were you aware that there was ever an intention for you to
21   also drive the vehicle?
22   A.   No.
23   Q.   Who told you to get a cashier's check to cover the
24   difference?
25   A.   Bill.
```

```
 1              MS. RUDOFF:  Your Honor, may I approach the witness?
 2              THE COURT:  You may.
 3              (Pause)
 4     BY MS. RUDOFF:
 5     Q.   Casi, I just handed you what's previously been marked as
 6     Government's Exhibit 41.  Can you please take a look at it?
 7     A.   Yes.
 8     Q.   What is it?
 9     A.   It's a cashier's check to Park Place.
10     Q.   Park Place who?
11     A.   Mercedes.
12     Q.   Who is it written by?
13     A.   My -- me.  My Chase account.
14              MS. RUDOFF:  At this time the Government moves to
15     admit Government's Exhibit 41.
16              THE COURT:  Any objection?
17              MR. GALLIAN:  No objection.
18              MR. SELLERS:  No objection, Your Honor.
19              THE COURT:  Admitted.
20                  (Government's Exhibit No. 41 received)
21              MS. RUDOFF:  Permission to publish, Your Honor?
22              THE COURT:  Granted.
23              MS. RUDOFF:  Can we highlight the portion of the
24     check?
25     BY MS. RUDOFF:
```

```
 1   Q.   Casi, is this the cashier's check that Bill Stone told you
 2   to get for the Mercedes?
 3   A.   Yes.
 4   Q.   And is it actually written out by you?
 5   A.   Yes.
 6   Q.   And who is it paid to?
 7   A.   Park Place Mercedes.
 8   Q.   Do you see a date on it?
 9   A.   Yes.
10   Q.   What's the date?
11   A.   June 17, 2016.
12   Q.   And what is the total amount for the cashier's check?
13   A.   $76,816.90.
14   Q.   And so this amount was in addition to your Lexus trade-in,
15   right?
16   A.   Yes.
17   Q.   What kind of Lexus -- what type of Lexus was it that was
18   also being traded in?
19   A.   It was a -- I believe it was a 2015 LX.  I'm not sure.  I
20   didn't even get to have it very long.  My grandmother had just
21   bought it for me, so --
22   Q.   Was it an SUV?
23   A.   Yes, it was an SUV.
24   Q.   Okay.  So the value of a brand-new SUV plus this check.
25   About how much was the Mercedes -- did the Mercedes cost?
```

```
1    A.   I feel like it was a little over $100,000.00.

2    Q.   And you paid for that?

3    A.   Yes.

4    Q.   Why?

5    A.   For Bill's -- for Bill helping me endlessly, tirelessly

6    for my legal and for my probation.

7    Q.   When you say endlessly and tirelessly, where are you

8    getting that impression from?

9    A.   He was working full-time during the day and taking care of

10   my stuff at night.  He would complain sometimes of having no

11   sleep.  Him and Joe were working around the clock trying to

12   keep off -- keep CPS away from me, because my family were --

13   they were out to -- they were trying to accuse me of different

14   things that he was doing.  So they were -- they were just

15   all -- one thing after another, helping me endlessly and

16   tirelessly, is how they portrayed it.

17   Q.   Okay.  So everything you just said is what Bill Stone and

18   Joe DeLeon told you?

19   A.   Yes.

20   Q.   And how it made you feel?

21   A.   Yes.

22   Q.   Do you agree this is a lot of money?

23   A.   Yes.

24   Q.   Had you ever given anyone a $100,000.00 item before?

25   A.   Never.
```

```
 1   Q.   Why did you believe that you needed to give this car to
 2   Bill?
 3   A.   So in my past I knew of someone who had to pay their
 4   attorney $100,000.00 and still got five years on one drug
 5   charge.  And I had probably eight that he made me believe
 6   popped up that he got to go away.
 7   Q.   When you say eight, eight what?
 8   A.   Eight separate charges.
 9   Q.   When you say he got to go away, who is "he"?
10   A.   Bill.
11   Q.   When you say "go away," what do you mean?
12   A.   Disappear, not get indicted for.
13   Q.   And who told you that this was the number of cases and
14   what happened to them?
15   A.   Bill and Joe.
16   Q.   And were these cases won during your secret probation?
17   A.   Yes.
18   Q.   And so Bill told you to give him the car?
19   A.   Yes.
20   Q.   So at this point in time, we're just in June 2016, would
21   you say this was a lot of money you've given to Bill Stone and
22   Joe DeLeon?
23            MR. SELLERS:  Object to leading and asked and asked.
24            THE COURT:  Overruled as to asked and answered, but
25   don't lead.
```

```
 1   BY MS. RUDOFF:
 2   Q.   About how much money had you given at this point in time
 3   to Bill Stone and Joe DeLeon between vehicles and cash
 4   payments?
 5   A.   Together?
 6   Q.   Yes.
 7   A.   Oh, gosh.  I would say probably close to $200,000.00.
 8   Q.   Was that a lot of money?
 9   A.   Yes.
10   Q.   How did you feel about that?
11   A.   I -- I was just -- I was just grateful that I was out with
12   my kids.  I honestly didn't really look at too much into the
13   dollar amount.  I was just doing what I was told.
14            I personally, honestly, did not care.  I just wanted
15   to be out with my kids, and I was just extremely grateful for
16   these two men to take the time and initiative to make sure that
17   I am, you know, just in me.  I felt just grateful for my
18   opportunity.  Sorry.
19   Q.   I didn't hear that thing you said.  You said "in me"?
20   A.   They -- well, I was grateful for their help, for them
21   helping me, them -- their time and efforts.  And at the -- I
22   wasn't really looking at a dollar amount in this -- at this
23   point.
24   Q.   Okay.  And when you say help you, are you referring to the
25   probation in the other criminal cases Bill Stone and Joe DeLeon
```

```
 1  told you existed?
 2  A.   Yes.  I was grateful for Joe agreeing to spend all the
 3  time.  I can't even express the amount of person -- in-person
 4  hours and time I had to spend with Joseph DeLeon, the amount of
 5  time.  He was the only person I was even allowed to talk to
 6  during this time.
 7  Q.   And if this hadn't been going on, would you have given
 8  $200,000.00 to Bill Stone and Joe DeLeon?
 9  A.   No.
10  Q.   Was there a time -- you can take a minute.
11  A.   Sorry.
12          MS. RUDOFF:  Judge, could we take a break?
13          THE COURT:  Yeah, let's take a five-minute recess.
14          All rise for the jury.
15          (Jury out)
16          THE COURT:  Okay.  Everybody please be seated.
17          And you may step down, ma'am.
18          Anything we need to take up before the break?  We're
19  good?  Okay.
20          MR. SELLERS:  Your Honor, I have something.
21          THE COURT:  Come on up.  Come on up.  Don't holler
22  from back there.
23          Does this need to be on the record?
24          MR. SELLERS:  Yes, please.
25          I have objected to vague, I have objected to
```

 1   misleading, but this blending of Joseph and Bill -- I mean,
 2   she's done a little bit better job today saying who spoke to
 3   her about which conversation, but they can't both be speaking
 4   in unison to her.
 5            So if we could, for 403 confusion of the issues and
 6   for Joe's due process, ask her to be a little more clear about
 7   who's saying what and when instead of Bill and Joe like they
 8   are a choir speaking together, because it's clear from her
 9   testimony there's many, many, many times that it's just Bill
10   and not Joe.  And I feel like the jury is getting confused
11   about that.
12            THE COURT:  Okay.
13            MR. SELLERS:  And that's, you know, a due process
14   issue for Joe.
15            THE COURT:  Okay.
16            MR. SELLERS:  So I just want to ask --
17            THE COURT:  Fair enough.
18            So as going forward, if you will help try to
19   delineate, that would be great.
20            MS. RUDOFF:  And, Judge, to that point, may I lead a
21   little bit to get -- to make sure who exactly --
22            THE COURT:  Yeah.
23            MR. SELLERS:  "Did Bill and Joe tell you that?"
24            THE COURT:  Okay.  So amp it down.  Amp it down.
25   Listen, you raised a concern.  I'm trying to make her aware of

```
 1   it.  So she may have to ask was that Bill or was that whatever.
 2   So you don't object to leading on those.
 3              MR. SELLERS:  That's fine.
 4              THE COURT:  Okay.  All right.
 5              MR. SELLERS:  As long as it's not both in one.
 6              THE COURT:  Okay.  Well, you know, all of this --
 7   tone it down.
 8              MR. SELLERS:  Yes, ma'am.
 9              THE COURT:  It's a valid concern.  I want you to try
10   your case aggressively and be zealous, and you're doing a great
11   job.  So let's just amp it down a little bit.
12              Everybody, this is high stakes.  And everybody is
13   doing a good job.  So take a breather.
14              MR. SELLERS:  Yes, ma'am.
15              THE COURT:  All right.  Doing good.
16              MS. RUDOFF:  I am happy to make that delineation as
17   we move forward.
18              THE COURT:  Okay.  Sounds good.
19              MS. MAX:  10:20?
20              THE COURT:  Yeah.  How about 10:25?  And if there's
21   something we need to take up outside the presence, we will.
22              All right.  With that said, I'm not angry at anybody.
23   I'm not trying to get on anybody's tail.
24              So everybody have a good break.  And I'll come back
25   five minutes early in case we need to take anything up.
```

```
 1              All right.  Court is in recess.
 2              SECURITY OFFICER:  All rise.
 3              (Recess)
 4              THE COURT:  Please be seated.
 5              So anything we need to take up before we bring them
 6    in?  No?
 7              MR. SELLERS:  No, Your Honor.
 8              THE COURT:  All right.  Everybody is playing well?
 9              MR. GALLIAN:  Yes.
10              THE COURT:  All right.
11              (Discussion off the record)
12              SECURITY OFFICER:  All rise for the jury.
13              (Jury in)
14              THE COURT:  Please be seated.
15              And please check to make sure your phones are off, no
16    vibrate, no ring tones.
17              Members of the jury, how long would you-all like for
18    lunch?  I told them we were going to break at 11:30.
19              JURORS:  (Indicating in the affirmative)
20              THE COURT:  Is that enough time?  All right.  We'll
21    take a 30-minute lunch.
22              With that said, I'll check my phone too.
23              And then your witness, ma'am.
24              MS. RUDOFF:  Thank you, Judge.
25              THE COURT:  You're welcome.
```

```
 1   BY MS. RUDOFF:
 2   Q.   Casi, before we took a break, I just showed you the
 3   cashier's check to Park Place Mercedes.  Do you recall?
 4   A.   Yes.
 5   Q.   And that was a check for a Mercedes for Bill Stone, right?
 6   A.   Yes.
 7   Q.   Okay.  After that car -- let me ask you this.  Who was on
 8   the title to the new Mercedes?
 9   A.   Bill Stone.
10   Q.   Were you?
11   A.   No.
12   Q.   Why not?
13   A.   It was his car.
14   Q.   Whose car?
15   A.   It was Bill's car.
16   Q.   Did you ever intend it for -- to be a car you shared with
17   Bill Stone?
18   A.   No.
19   Q.   Did you ever intend it to be a car you drove?
20   A.   No.
21   Q.   Was there ever a time when you drove it?
22   A.   No.
23   Q.   Did you ever ask to drive it?
24   A.   No.
25   Q.   Why not?
```

```
 1   A.   It wasn't -- I never had an opportunity to drive it.  It
 2   was his car.
 3   Q.   Was there a time soon after this that you were told by
 4   Bill Stone you had to purchase another vehicle for him?
 5   A.   Yes.
 6   Q.   What car was that?
 7   A.   It was a Toyota Tacoma.
 8   Q.   Is that a truck?
 9   A.   It's a truck.
10   Q.   Do you recall approximately when that was?
11   A.   I'm not sure.
12   Q.   Does August 2016 sound about right?
13   A.   Yes.
14   Q.   And the Mercedes was June 2016, right?
15   A.   Yes.
16   Q.   Why were you told by Bill Stone that you needed to buy him
17   a truck in August of 2016?
18   A.   He was in town trading his current truck in and needed me
19   to pay the remaining balance.
20   Q.   Okay.  When you say he was in town, you're referring to
21   Bill Stone, right?
22   A.   Yes.
23   Q.   And when you say Bill Stone was in town, what do you mean
24   by that?
25   A.   He was in town from Washington, D.C.
```

```
 1   Q.   And that's what Bill Stone told you?
 2   A.   Yes.
 3   Q.   And at this point in time is -- what you've been told is
 4   that Bill lives permanently in Washington, D.C.?
 5   A.   Yes.
 6   Q.   And still working for the FBI?
 7   A.   Yes.
 8   Q.   Do you know where the Mercedes was being kept then while
 9   he was in D.C.?
10   A.   Yes.  He had an old residence in McKinney that he used to
11   live in that he gifted to his niece who was a nurse who was
12   currently living in it.  So when he would fly in, that is where
13   he would stay.
14   Q.   That's what he told you, right?
15   A.   That's what he told me.
16   Q.   You never went to McKinney and saw this place?
17   A.   No.
18   Q.   So with regards to the truck, before you were told you
19   needed to purchase it, had you been told anything about a
20   potential truck being purchased?
21   A.   I did not.  Sorry.
22   Q.   And what was the first you heard of it?
23   A.   When he was at the dealership and asked me to bring a
24   cashier's check for the remaining balance.
25   Q.   And I just want to clarify.  Who's "he"?
```

```
 1   A.   Bill.

 2           MS. RUDOFF:  Your Honor, may I approach the witness?

 3           THE COURT:  You may.

 4           (Pause)

 5   BY MS. RUDOFF:

 6   Q.   Casi, I just handed you what's been marked as Government's

 7   Exhibit Number 47.  Can you please take a look at it?

 8           Do you recognize it?

 9   A.   Yes.

10   Q.   What is it?

11   A.   It's a bank statement from my Chase account.

12   Q.   What's the relevant time period?

13   A.   August 12, 2016, through September 14, 2016.

14   Q.   Thank you.

15           MS. RUDOFF:  Your Honor, the Government moves to

16   admit Government's Exhibit 47.

17           THE COURT:  Any objection?

18           MR. GALLIAN:  No objection, Judge.

19           MR. SELLERS:  No objection, Your Honor.

20           THE COURT:  Admitted.

21              (Government's Exhibit No. 47 received)

22           MS. RUDOFF:  Permission to publish?

23           THE COURT:  Granted.

24           MS. RUDOFF:  Could we go to the last page of the

25   exhibit?
```

```
 1              And can we zoom in -- or no, I'm sorry, the
 2    second-to-last page.
 3              Thank you.  No.  One before.
 4              Can we go to the cashier's check?  Page 6.
 5    BY MS. RUDOFF:
 6    Q.   Casi, who is this cashier's check paid by?
 7    A.   It's paid by me.
 8    Q.   And who is it made out to?
 9    A.   Texas Toyota of Grapevine.
10    Q.   What is the amount of the check?
11    A.   $24,003.47.
12    Q.   What's the date on the check?
13    A.   September 1, 2016.
14    Q.   Is this the check that you were referring to that Bill
15    Stone told you to bring to the Toyota dealership?
16    A.   Yes.
17    Q.   When he told you to bring this specific amount cashier's
18    check, did you know what it was for?
19    A.   I assumed for a truck.
20    Q.   Why did you submit and bring him this check?
21    A.   He told me to.
22    Q.   And why did you do it?
23    A.   I did it because he told me to.  I didn't tell him no.
24    Q.   Why not?
25    A.   I wish I had.  He -- during the time from the purchase of
```

1    the other car to this time, there were several events that

2    happened that he had to fly into town to take care of

3    regarding, I believe, in this timeframe it was a lot to do with

4    my mom and CPS cases.  And so this was a form of payment for

5    his assistance in helping me in that.

6    Q.   And when you say with regards to your mom and CPS, did

7    someone tell you that there was a CPS issue related to your

8    mom?

9    A.   Yes.

10   Q.   Who told you that?

11   A.   Bill and Joe.

12   Q.   And when you say Bill and Joe, I kind of want to clarify

13   this to make sure the jury understands.

14         Was it a situation in which Bill and Joe were sitting

15   together and shared this information, or was it a situation in

16   which both of them separately told you?  Can you kind of

17   explain?

18   A.   I will.  So most of the time during this timeframe Joe

19   would call me to inform me of different things that Bill and

20   his analyst had found out.  And so when I say Bill and Joe,

21   it's because Joe told -- Bill told Joe, and then Joe forwarded

22   the information to me.

23         And Joe would say him and Bill would stay up all

24   night.

25         One example, they woke me up at 2:00 a.m. telling me

```
 1    to prepare my house for a house visit, for a CPS lady to come
 2    and check my house.  So I had to get up at 2:00 a.m. to clean
 3    the house.  Just things like that.
 4    Q.   Okay.  So it was information -- in a lot of instances it
 5    was information coming from Bill?
 6    A.   Yes.
 7    Q.   Relayed to Joe?
 8    A.   Yes.
 9    Q.   And Joe is the person that said it to you?
10    A.   Yes.
11    Q.   And when Joe would say it to you, would he make it clear
12    who the information was coming from?
13    A.   Yes.
14    Q.   And so if it was from --
15    A.   Very urgent.  With a very urgent tone.
16    Q.   And so when it was coming from Bill Stone, would Joe tell
17    you that's who the information was coming from?
18    A.   Yes.
19    Q.   And so if it was coming from just Joe DeLeon, would Joe
20    DeLeon make that part clear?
21    A.   Yes.
22    Q.   Okay.  And so at this time you said there was a lot of --
23    I think CPS and legal issues, that essentially Bill Stone
24    delivered the information that was happening?
25    A.   Yes.
```

```
 1   Q.   And that information came through Joe DeLeon?
 2   A.   Yes.
 3   Q.   Did you believe that those things were happening?
 4   A.   Yes.
 5   Q.   Why?
 6   A.   Because it was coming from Bill, who was a federal agent
 7   and had a team of analysts working for me.
 8   Q.   Did the fact that your mom had called CPS and was trying
 9   to intervene with your children, did that sound like something
10   that could possibly happen to you?
11   A.   It did.
12   Q.   Why?
13   A.   Because it had happened before.
14   Q.   What do you mean by that?
15   A.   Previously, in my past, she has called CPS.  I've had a
16   CPS case.
17   Q.   When you say "she," who are you referring to?
18   A.   My mother.
19   Q.   So was that on the time when you were engaging in
20   drug use?
21   A.   Yes.
22   Q.   Okay.  Was Joe DeLeon or Bill Stone aware that there had
23   been an instance in the past where your mom called CPS on you?
24   A.   Yes.
25   Q.   How did they know that?
```

```
 1   A.   They -- because I told them.

 2   Q.   Would you have told them back when it was happening?

 3   A.   Yes.

 4   Q.   So this Toyota truck, who was on the title for this

 5   vehicle?

 6   A.   Bill.

 7   Q.   Were you on the title?

 8   A.   No.

 9   Q.   Was this supposed to be your truck to drive as well?

10   A.   No.

11   Q.   Did you ever drive the truck?

12   A.   No.

13   Q.   Why didn't you tell him no at this point?

14   A.   I just didn't feel like I could tell him no.  I felt I

15   needed him to continue helping me.  I was under the impression

16   that there was a lot of moving parts, a lot of people against

17   me.

18          These two guys were -- Bill and Joe were the only

19   people that I had in my life.  They made me believe they were

20   the only ones that were actually for me and cared about me.

21   Q.   I just want to make sure we're clear.  There was nothing,

22   like, physically about Bill Stone, like, that made you think

23   you couldn't say no, right?

24   A.   Right.

25   Q.   You didn't have, like, physical fear?
```

```
 1   A.   I actually did have a physical fear of him.
 2   Q.   Okay.  After the cashier's check -- I'm sorry.  Not after
 3   the cashier's check, but going along the line of financial
 4   transactions, was there a point in time during your federal --
 5   secret federal probation where you were made aware that you
 6   owed some kind of restitution?
 7   A.   Yes.
 8   Q.   And did you find out about that in approximately
 9   March 2016?
10   A.   Yes.
11   Q.   Okay.  What's the first thing that happened that made you
12   believe that there was some issue with you and Enterprise
13   Rent-A-Car?
14   A.   Say that one more time.  I'm sorry.
15   Q.   What was the first incident that happened that made you
16   think there was some situation between you and Enterprise
17   Rent-A-Car?
18   A.   I was taking my car to get serviced or repaired, and I was
19   trying to get a rental, and they use Enterprise.  And they said
20   there was a problem -- there was a problem getting me a car.
21   Q.   Who said there was a problem getting you a car?
22   A.   The gentleman behind the front desk of the rental -- the
23   rental -- the Enterprise company was just acting really weird,
24   and mentioned something about me not being able to rent -- to
25   get a loaner car.
```

```
1   Q.   And what happened after the person at Rent-A-Car said
2   there was an issue with getting you a rental as it pertains to
3   you and the rental person that day?
4   A.   After a period of time I ended up getting a rental car.
5   Q.   Did the person at the rental car -- I assume Enterprise --
6   tell you why there was some delay or issue?
7   A.   I can't remember exactly.  I just remember something to do
8   with I wasn't allowed to -- to get the car in the beginning is
9   why.
10  Q.   Okay.  But you ultimately were able to, right?
11  A.   Yes.
12  Q.   Did you tell Bill or Joe DeLeon about that experience?
13  A.   I did.
14  Q.   Who did you tell?
15  A.   I reached out to Joe.
16  Q.   And what did you tell Joe?
17  A.   And I told him that there was a problem with me getting
18  the car, and he told me that he was going to have Bill look
19  into it.
20  Q.   Why did you call and tell Joe that?
21  A.   Because he was the person that I reached out to.  I felt
22  like there was a problem, so I reached out to him.
23  Q.   What kind of problem or issue did you think there was, or
24  did you know?
25  A.   I wasn't sure.
```

```
 1   Q.   Okay.  So what happened after you told Joe about that
 2   information as it related to that situation?
 3   A.   He, I guess, talked to Bill about it.
 4   Q.   Okay.  And why do you think Joe talked to Bill about it?
 5   A.   He said that he -- because then later I guess Bill took
 6   care of it, and that's why I was able to rent the car.
 7   Q.   Okay.  Did you receive a voicemail from Joe DeLeon about
 8   the fact that he had relayed to Bill that there was a potential
 9   situation?
10   A.   I believe so.
11   Q.   Have you listened to that voicemail prior to today?
12   A.   Yes.
13   Q.   And when you listened to that voicemail, did it -- was it
14   the same information contained in the voicemail we showed to
15   you that you heard on your phone on that particular day?
16   A.   Yes.
17           MS. RUDOFF:  Your Honor, the Government would move to
18   admit Government's Exhibit 124, which is a recording that is
19   derived from Government's Exhibit 122, which has already been
20   admitted for record purposes only.
21           THE COURT:  All right.  Any objection?
22           MR. GALLIAN:  Brief moment, Judge.
23           THE COURT:  Sure.
24           MR. GALLIAN:  No objection.
25           MR. SELLERS:  No objection, Your Honor.
```

```
 1              THE COURT:  It's admitted.
 2                  (Government's Exhibit No. 124 received)
 3              MS. RUDOFF:  Permission to publish, Your Honor?
 4              THE COURT:  Yes.
 5              And members of our jury, this is our first audio
 6     recording, so please let us know if you have trouble hearing
 7     it.
 8              Thank you.
 9              (Pause)
10              (Audio played)
11              MS. RUDOFF:  Let me know if you can't hear, please.
12              (Audio played)
13              THE COURT:  Can we pause that for just a moment?
14              I'm having trouble hearing.
15              Are you-all having trouble hearing it too?  Yeah, I
16     think we need it significantly louder.  Can we crank it up?
17              (Pause)
18              THE COURT:  Okay.  I'll tell you what.  Members of
19     the jury, if you'll step out for less than five minutes, we'll
20     get this fixed.
21              No point in you watching us -- me trying to tweak a
22     TV.  I'll be embarrassed.  It's my technology, I'll fix it here
23     in just a minute.  We'll bring you right back in.
24              SECURITY OFFICER:  All rise for the jury.
25              THE COURT:  Thank you.
```

```
 1                    (Jury out)
 2               SECURITY OFFICER:  All rise for the jury.
 3                    (Jury in)
 4               THE COURT:  Appreciate your patience.  Please be
 5     seated everybody.
 6               And, again, do not hold it against the lawyers my
 7     sound system.  My fault.
 8               Your witness, ma'am.
 9               MS. RUDOFF:  Thank you, Judge.
10               THE COURT:  You're welcome.
11               MS. RUDOFF:  Right before we took a technical break,
12     I was going to publish to the jury Government Exhibit 124.  May
13     I do that now?
14               THE COURT:  You may.  Yes, ma'am.
15                    (Audio played)
16     BY MS. RUDOFF:
17     Q.   Casi, is that the voicemail you remember getting from Joe
18     DeLeon after you told him about the situation with Enterprise?
19     A.   Yes.
20     Q.   And he says that Bill is talking to MasterCard.
21               What did MasterCard -- what were you told MasterCard
22     had anything to do with Enterprise Rent-A-Car?
23     A.   I later was told that it was because I had used a
24     fraudulent card in a previous purchase of a loaner car at
25     Enterprise.
```

```
 1    Q.    And who told you that?
 2    A.    Bill and Joe in a meeting.
 3    Q.    So this was an in-person conversation?
 4    A.    In-person.
 5    Q.    Okay.  And when you were told that you had used a
 6    fraudulent MasterCard when renting with Enterprise, what did
 7    you think about that?
 8    A.    I thought back to the last time I had rented from a
 9    Enterprise, and it was during a time that my current boyfriend
10    had decided to pay for it with his card, and I thought it could
11    have been a fraudulent card.  And since it was for me and he
12    was referring to me on tape as his fiancee, I was included in
13    this fraud case.
14    Q.    Okay.  I want to make sense of that.
15    A.    Okay.
16    Q.    Was what you just described the information you were told
17    by someone?
18    A.    Yes.
19    Q.    Okay.  And who told you that part?
20    A.    This is what Bill had found out.
21    Q.    Okay.  So Bill is telling you that there is an instance
22    where your ex-boyfriend used a fraudulent card?
23    A.    Yes.
24    Q.    But then you said something about you being on a video?
25    A.    Yes.  He had watched a tape, a videotape of what they were
```

```
 1   referring to.
 2   Q.   Who is "he"?
 3   A.   I'm sorry.  Bill.
 4   Q.   And when Bill says he watched a videotape, how did he tell
 5   you he was able to watch this videotape?  Where did he get the
 6   video from?
 7   A.   He went into the headquarters of whoever it was he was
 8   dealing with with the conversation -- with the phone call he
 9   got and watched the video.
10   Q.   And that's what Bill Stone told you, right?
11   A.   That's what he told me.
12   Q.   Okay.  And so at this point it makes sense to you that --
13   why there may be an issue with MasterCard?
14   A.   Yes.
15   Q.   Did you review the video?
16   A.   I did not get a chance to see any video.
17   Q.   Did you ask to?
18   A.   I did.
19   Q.   What were you told?
20   A.   I'm not allowed to see evidence before it goes through
21   grand jury.
22   Q.   So when you say grand jury, were you told then that there
23   was -- this was a situation where there was another potential
24   criminal charge coming against you?
25   A.   Yes.
```

1    Q.   And who told you that?

2    A.   Bill.

3    Q.   We heard on Joe's voicemail him say that Bill Stone talked

4    to MasterCard and was trying to figure out the criminal side

5    of it.

6    A.   Right.

7    Q.   Did you believe that's what Joe was referring to?  When

8    you said Bill Stone was worried about a potential criminal

9    charge out of the situation, was that what you believed Joe was

10   referring to in his voicemail?

11   A.   Yes.

12   Q.   In Joe's voicemail he said something about being up since

13   7:30 a.m.  Is that the kind of information that was relayed to

14   you when you were speaking earlier about them working

15   tirelessly?

16   A.   Yes.

17   Q.   And is this kind of call or urgency the type of thing that

18   happened throughout the secret probation to you?

19   A.   Yes.

20   Q.   This is not the only specific instance?

21   A.   Right.

22        MS. RUDOFF:  Your Honor, may the Government republish

23   Government 38?

24        THE COURT:  Yes, ma'am.

25        MS. RUDOFF:  Page 477.

```
 1              If we could highlight the bottom two texts -- I'm
 2   sorry, the bottom -- no.  First blue on the left at the top.
 3   BY MS. RUDOFF:
 4   Q.   Casi, is the text we're looking at here, is this text from
 5   you?
 6   A.   Yes.
 7   Q.   And what is the date of it?
 8   A.   December 22, 2015.
 9   Q.   And so would this have been around the time you were on
10   the secret probation?
11   A.   Yes.
12   Q.   And what does your text message say?
13   A.   "I'm on the do not rent list at Enterprise."
14              MS. RUDOFF:  You can zoom out.
15   BY MS. RUDOFF:
16   Q.   Is this -- who are you having a conversation with about
17   this?
18   A.   Joe.
19              MS. RUDOFF:  And can we zoom in on the blue and green
20   text messages together in the middle?
21   BY MS. RUDOFF:
22   Q.   Casi, what does your text message say on the left?
23   A.   "A past rental."
24   Q.   And what Joe does respond?
25   A.   "Then you're going to have to go home and get a car from
```

```
 1    your estate and then drive back with the other one to get it
 2    fixed."
 3    Q.   What is this situation referring to?
 4    A.   Me not being able to get my car.
 5            MS. RUDOFF:  Can we zoom out?
 6            And can we highlight the last two blue texts on the
 7    bottom?
 8    BY MS. RUDOFF:
 9    Q.   Casi, can you read your message?
10    A.   "I called and talked to Enterprise corporate.  They said
11    balance has been paid and I'm able to rent.  So we're headed
12    back.  We were almost home.  They put me in a Challenger."
13            MS. RUDOFF:  Can you zoom out?
14    BY MS. RUDOFF:
15    Q.   Are those your texts in response to this Enterprise
16    situation?
17    A.   Yes.
18    Q.   And when you say they said the balance has been paid, who
19    told you that information?
20    A.   The person behind the desk.
21    Q.   So at that point in time were you under the understanding
22    that everything was resolved?
23    A.   Yes.
24    Q.   Okay.  But then later there's an issue brought up to you
25    with Enterprise and MasterCard, right?
```

```
 1   A.   Yes.
 2   Q.   After Bill -- you told us your meeting with Bill and Joe
 3   when Bill was explaining what the situation is with Enterprise,
 4   right?
 5   A.   Right.
 6   Q.   After you're told about the video evidence that Bill told
 7   you he reviewed, what did he say needed to happen next?  He
 8   meaning Bill.
 9   A.   He -- Bill said to resolve the issue with the Green Dot
10   card, the Green Dot MasterCard, that he would have to fly to --
11   directly to them and hand them a check, but I would have to pay
12   restitution for me and my boyfriend at the time, because if he
13   had to get me off, he then had to get him off.
14   Q.   Okay.  I want to make sure I'm understanding your
15   sentence.
16        So Bill Stone tells you there's a possible resolution
17   to this situation with Enterprise, right?
18   A.   Yes.
19   Q.   Was that situation to avoid a potential criminal case?
20   A.   Yes.
21   Q.   And why was it important for you -- why were you told it's
22   important for you not to have a new criminal case?
23   A.   Because I could get my probation revoked on both sides, my
24   federal probation and my Hood County probation.
25   Q.   So did Bill Stone make you think he once again could
```

1   somehow go make this criminal charge go away?

2   A.   Yes.

3   Q.   To protect your current secret probation?

4   A.   Yes.

5   Q.   And what was your understanding of what needed to be done

6   to prevent Enterprise from pursuing a criminal charge?

7   A.   I had to pay restitution.

8   Q.   And were you told the amount of restitution you had to

9   pay?

10  A.   Yes.

11  Q.   Who told you that amount?

12  A.   Bill.

13  Q.   What was that amount?

14  A.   $250,000.00.

15  Q.   Did that seem like a lot of money to you?

16  A.   It seemed like a lot of money.  At this point I was

17  willing to do anything or pay anything to -- I worked so hard

18  to get to where I had been, and I just -- I was willing to do

19  whatever it took to stay with my kids and keep going.

20  Q.   Earlier you said something about it had to cover you and

21  another person?

22  A.   Yes.

23  Q.   Explain why you thought this restitution had to cover you

24  and another individual.

25  A.   Because he -- in order to get me off of the line, he had

```
 1   to get him off of the line.
 2   Q.   Okay.  There's a lot of hes and hims --
 3   A.   I'm so sorry.  So my boyfriend at the time, we were
 4   getting charged together, because we had claimed to be fiances
 5   in the video.  And so in order to help me, he had to help him.
 6   Q.   Okay.  When you say --
 7   A.   Eric Gomez, my boyfriend.
 8   Q.   Hold on.  Let me clarify, because I want the record to be
 9   clear.
10   A.   Okay.
11   Q.   When you say he had to help, who is "he"?
12   A.   Bill.
13   Q.   And so Bill had to help you and who?
14   A.   My boyfriend at that time, Eric Gomez.
15   Q.   And when you say at that time, you're referring to the
16   time you rented the car with Enterprise, correct?
17   A.   Yes.
18   Q.   And that's before 2016?
19   A.   Yes.
20   Q.   Okay.  And so was that the explanation as to why it was a
21   larger amount of money?
22   A.   Yes.
23   Q.   When you were told you could pay $250,000.00 restitution
24   in order to make a criminal charge not come up, what did
25   you do?
```

```
 1   A.   I went and got a cashier's check.

 2   Q.   And who did you give that cashier's check to?

 3   A.   Bill Stone.

 4        MS. RUDOFF:  Your Honor, may I approach the witness?

 5        THE COURT:  You may.

 6        (Pause)

 7   BY MS. RUDOFF:

 8   Q.   Casi, I just handed you what's previously been marked as

 9   Government's Exhibit 33.  Can you take a look at it?

10   A.   Yes.

11   Q.   What is it?

12   A.   It's my bank statement from Chase.

13   Q.   What's the relevant time period for those records?

14   A.   March 2nd through March 11th.

15   Q.   What year?

16   A.   2016.

17        MS. RUDOFF:  Your Honor, at this time the Government

18   moves to admit Government Exhibit 33.

19        THE COURT:  Any objection?

20        MR. GALLIAN:  No objection.

21        MR. SELLERS:  No objection.

22        THE COURT:  It's admitted.

23            (Government's Exhibit No. 33 received)

24        MS. RUDOFF:  Thank you.

25        Permission to publish?
```

```
 1                    THE COURT:  Granted.
 2                    MS. RUDOFF:  Can we go to the page with the cashier's
 3     check?
 4     BY MS. RUDOFF:
 5     Q.   Casi, up on the screen is a zoomed-in version of a
 6     cashier's check.
 7                    Who is the person paying this cashier's check?
 8     A.   Me.
 9     Q.   And who is it made out to?
10     A.   Bill Stone.
11     Q.   What is the dollar amount?
12     A.   $250,000.00.
13     Q.   What's the date?
14     A.   March 2nd.
15     Q.   Of what year?
16     A.   2016.
17     Q.   And so was this the cashier's check you gave Bill Stone
18     believing it was restitution for Enterprise?
19     A.   Yes.
20     Q.   When Bill Stone told you there was an issue and concern
21     with Enterprise, did that make sense to you given your
22     experience renting a car recently?
23     A.   Yes.
24     Q.   Is that also a part of why you believed it?
25     A.   Yes.
```

1    Q.   Were you concerned at all that you were making this

2    cashier's check out to Bill Stone and not Enterprise?

3    A.   I was actually glad that he allowed me to put his name on

4    something, on this cashier's check, so that there was -- in

5    case something -- I wasn't sure what -- went wrong in my

6    federal probation, I could prove that I was paying him

7    something to help me.

8    Q.   Okay.

9    A.   So -- so, no.  But the reason it was made out to him

10   originally or was made out to him was because he didn't want a

11   paper trail for anyone to find out, as far as my family, my

12   probation, in either county or federal.

13   Q.   Okay.  And your first comment was you were glad he allowed

14   you to put his name on something.  Who is "he"?

15   A.   Bill.

16   Q.   Why do you say you're glad that he allowed you to?

17   A.   I was -- everything had been a secret, so I was really

18   grateful that I could put his name, his actual name on a

19   document.  I still was fearful of him at this time.

20   Q.   So up unto this point, how had most of your prior payments

21   to Bill Stone related to the probation been made?

22   A.   Either cash or vehicles.

23   Q.   Okay.  And so this is the first time it's an actual check

24   to Bill Stone?

25   A.   From my bank, yes.

```
 1   Q.   Okay.  And you said you were afraid if something happened
 2   to you there would be a paper trail.  Can you tell me what you
 3   mean by that?
 4   A.   I feared that if along down the road I maybe didn't do as
 5   he said or said no to him or -- that he would quit helping me
 6   or get me arrested.  I wasn't sure.  I wasn't sure.
 7   Q.   Okay.  After you gave this check to Bill Stone for
 8   restitution, do you know what happened to it?
 9   A.   He flew it to the headquarters of the credit card company
10   and dealt with their fraud agent -- or their fraud department.
11   Q.   Is that what you were told?
12   A.   That's what I was told.
13   Q.   Who told you that?
14   A.   Bill.
15   Q.   Was your understanding that paying this restitution was
16   necessary for your, like, probation obligations?
17   A.   It was necessary for me to remain on probation.
18   Q.   Okay.  And so did having a record of that help you as
19   well?
20   A.   Yes.
21   Q.   After you were told Bill Stone flew the cashier's check
22   directly to Enterprise, did you have any issue after the fact
23   with Enterprise or MasterCard?
24   A.   No.
25   Q.   Were any criminal charges brought related to that
```

```
 1   instance?
 2   A.   No.
 3   Q.   So as far as you were concerned, Bill Stone had resolved
 4   the situation for you?
 5   A.   Yes.
 6   Q.   At some point in 2016, did you learn Bill Stone was
 7   deciding to buy a house in the Dallas area?
 8   A.   Yes.
 9   Q.   Do you remember approximately when you found that out?
10   A.   I don't.
11   Q.   How did you find out for the first time that Bill Stone
12   was buying a house?
13   A.   He had told me that he had been looking to move down here
14   if they would allow him to work remotely, and he had said he
15   had found a house.
16   Q.   When you said Bill Stone said he would move down here if
17   they would allow him to work remotely, who is "they"?
18   A.   The federal government -- the bureau, FBI agency in
19   Washington, D.C.
20   Q.   Okay.  So Bill Stone relayed that he was at that time
21   going to be able to work remotely for FBI rather than in D.C.?
22   A.   Yes.
23   Q.   When he told you this information, did you go looking for
24   houses with him?
25   A.   No, I did not.
```

```
 1   Q.   At some point did you see a house that he bought?
 2   A.   Yes.
 3   Q.   Did you have any involvement in picking this house?
 4   A.   I did not.
 5   Q.   And the first time you were made aware that he was buying
 6   a house, had it already been purchased?
 7   A.   It had -- he had already found the house.
 8   Q.   Okay.  And so tell me about your first involvement with
 9   the house.  What happened?
10   A.   He had called and said that he found a house in
11   Colleyville that he liked and he was unable to get a mortgage.
12   He had partial payment, and his money -- his money was put up
13   in a silent trust until he retired, so he wasn't able to get
14   that.  So he asked if I could pay the remainder of the balance
15   of the house.
16   Q.   I want to be clear.  When you are saying "he" in this
17   instance, who are you referring to?
18   A.   Bill.
19   Q.   So Bill asked you for money to put toward this house
20   because -- help me understand what he told you was wrong with
21   his money.
22   A.   He had money put up in a trust that he was unable to get
23   until retirement, and so he had partial payment for the house
24   and he needed the remainder.
25   Q.   When you say he couldn't access the money until
```

```
 1   retirement, retirement from what?
 2   A.    The FBI.
 3   Q.    What did you think -- how did you feel about giving him
 4   the remaining money for the house?
 5   A.    I did not want to.
 6   Q.    When he asked you for this money, was it an understanding
 7   of being like a loan, or what was the understanding?
 8   A.    It was -- it was for payment of what he was doing for me,
 9   and he -- he asked, and so I said yes.
10   Q.    Did you feel like you had to say yes?
11   A.    I felt like I had to say yes.
12   Q.    Why?
13   A.    He was who -- in my opinion, like high up on the -- he had
14   done so much for me.  He made me believe I needed him and Joe.
15   I was scared to lose both of them.
16   Q.    When you say needed them, like needed them as friends and
17   confidants, or what do you mean, needed them?
18   A.    Needed them in keeping me -- it sounds wild.  Keeping me
19   safe from my family and from legal problems.
20   Q.    When you say legal problems, did that include the secret
21   probation?
22   A.    Yes.
23   Q.    Approximately how much did Bill ask you for in payment for
24   the house, do you recall?
25   A.    It was quite a -- like 130,000.
```

```
1            MS. RUDOFF:  Your Honor, may I approach the witness?
2            THE COURT:  You may.
3            (Pause)
4   BY MS. RUDOFF:
5   Q.   Casi, I just handed you what's previously been marked as
6   Government Exhibit 50.  Can you take a look at it?
7   A.   Yes.
8   Q.   What is it?
9   A.   It's my Chase Bank statement.
10  Q.   What is the relevant time period?
11  A.   August 12, 2016, through September 14, 2016.
12           MS. RUDOFF:  At this time the Government moves to
13  admit Government's Exhibit 50.
14           THE COURT:  Any objection?
15           MR. GALLIAN:  No objection.
16           MR. SELLERS:  No objection.
17           THE COURT:  Admitted.
18              (Government's Exhibit No. 50 received)
19           MS. RUDOFF:  Permission to publish?
20           THE COURT:  Granted.
21           MS. RUDOFF:  If you could please go to page 10 of
22  this exhibit.
23           And can we zoom in on the cashier's check?
24  BY MS. RUDOFF:
25  Q.   Casi, who is this cashier's check written by?
```

```
 1   A.   It's written by me.
 2   Q.   Who is it made out to?
 3   A.   Bill Stone.
 4   Q.   What's the amount it's made out for?
 5   A.   $154,500.00.
 6   Q.   What is the date on this?
 7   A.   September 13, 2016.
 8   Q.   So is this a cashier's check that you gave to Bill Stone
 9   that he used to purchase a house?
10   A.   Yes.
11   Q.   Once you gave this check to him, what happened with the
12   house?
13   A.   He purchased it.
14   Q.   Were you there during the sale transaction?
15   A.   No.
16   Q.   Were you asked to sign any documents related to the sale
17   transaction?
18   A.   No.
19   Q.   Had you ever seen the house at this point in time?
20   A.   No.
21           MS. RUDOFF:  Your Honor, may I approach the witness?
22           THE COURT:  You may.
23           (Pause)
24   BY MS. RUDOFF:
25   Q.   Casi, I just handed you Government's -- what's been marked
```

1   as Government's Exhibit 54.  Do you recognize it?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's Bill's house.

5   Q.   Is it a photo of it?

6   A.   Yes.

7           MS. RUDOFF:  Government moves to admit Government's

8   Exhibit 54.

9           THE COURT:  Any objection?

10          MR. GALLIAN:  No objection.

11          MR. SELLERS:  No, Your Honor.

12          THE COURT:  Admitted.

13              (Government's Exhibit No. 54 received)

14          MS. RUDOFF:  Permission to publish?

15          THE COURT:  Granted.

16   BY MS. RUDOFF:

17   Q.   Casi, you said this is a picture of the house that Bill

18   Stone purchased, right?

19   A.   Yes.

20   Q.   Were you ever -- was there ever a plan for you to move

21   into the house?

22   A.   No.

23   Q.   Did you ever ask to move into the house?

24   A.   No.

25   Q.   Did you ever -- did you often stay at the house?

```
 1    A.    No.
 2    Q.    Now, why did you believe Bill Stone's money was tied up in
 3    this blind trust?
 4    A.    He told me it was.  Bill told me his money was in a blind
 5    trust.
 6    Q.    Why did you believe it?
 7    A.    I believed -- why would he lie about that?  I believed him
 8    because of his profession.  He was an agent.
 9    Q.    So after Bill purchases this house with the money you paid
10    him, did he move into the house immediately?
11    A.    No.
12    Q.    Why not?
13    A.    He was still living in Washington, D.C.
14    Q.    Is that what he told you?
15    A.    That's what he told me.
16    Q.    And so did he tell you what -- when his plan was to move
17    into this house?
18    A.    He was going -- I didn't know a plan.  He just wanted it
19    to be remodeled first.
20    Q.    Okay.  Were you at any point ever put on the title or the
21    deed for this house?
22    A.    No.
23    Q.    Now, you mentioned that he wanted to remodel the home
24    first?
25    A.    Yes.
```

```
 1   Q.   Is that what Bill Stone told you?
 2   A.   Yes.
 3   Q.   Were you in any way involved in the remodel of this house?
 4   A.   I was.
 5   Q.   Let's talk about that.
 6   A.   Okay.
 7   Q.   In what way were you involved in the remodel of this
 8   house?
 9   A.   While he was in Washington, D.C. working, I was working
10   with the remodel company.
11   Q.   What do you mean you were working with the remodel
12   company?
13   A.   He asked if I would assist him in remodeling his house.
14   Q.   When you say "he," that's Bill Stone?
15   A.   Yes.
16   Q.   What did you think when Bill Stone asked you to help him
17   with the remodeling of his house?
18   A.   I felt honored.  I felt like he was treating me more of an
19   equal than this -- I don't know -- like a druggie, drug addict,
20   a person that needed help.  I felt like he was giving me some
21   sort of job for him.
22   Q.   And why did you feel like this kind of job made him look
23   at you like an equal?
24   A.   I felt like he had some confidence in me that I could get
25   the job done.
```

```
 1   Q.   And when you said he asked you to help with the remodel,
 2   what exactly did your help entail?  What kind of things would
 3   you do?
 4   A.   I would reach out to the remodel company and help pick
 5   out -- just help remodel the home.
 6   Q.   To be fair, you weren't doing the physical remodeling,
 7   right?
 8   A.   Right.  So he was picking out just like -- it was mainly
 9   the kitchen.  So just kitchen remodel.
10   Q.   Okay.  So would you communicate with contractors?
11   A.   Yes.
12   Q.   And the designers?
13   A.   Yes.
14   Q.   Would you help make decisions about choices for the
15   remodel?
16   A.   Yes.
17   Q.   Would you ever meet in person with some of the
18   contractors?
19   A.   Yes.
20   Q.   Why would you do that?
21   A.   Because Bill was not there to meet them.
22   Q.   Was there ever a time where you did meet with Bill and the
23   contractors?
24   A.   Yes.
25   Q.   Why would you do that?
```

```
 1   A.   Because he would have been in town to look at how -- the
 2   progress of the remodel.
 3   Q.   But why would you need to go with him, then, if Bill Stone
 4   is now in town?
 5   A.   Because I had been doing the majority of the -- of it.
 6   Q.   Of what?
 7   A.   Of his remodel.  And I was -- we did it together.
 8   Q.   Okay.  So I need to understand what you mean by -- when
 9   you say you did it together.
10   A.   Okay.
11   Q.   Well, tell me what you mean, you did it together.
12   A.   So I initially had the contacts, and he would go work in
13   Washington, D.C.  And then when he would come home, he would
14   see what me and the remodel company and the contractors had
15   been doing, just showing our work.
16   Q.   Okay.  So when you say you were doing it together, you
17   were managing this remodel project together?
18   A.   Yes.
19   Q.   Okay.  And when you would speak with these contractors or
20   meet with them in person with Bill Stone, what would you tell
21   these people your role in this remodel was, or would you tell
22   them what your role was?
23   A.   I'm not sure I ever mentioned what my role was in the
24   remodel.
25   Q.   And so when you would sit down and make decisions, you and
```

```
 1  Bill, would you make any reference to at that time your
 2  relationship status with Bill Stone?
 3  A.   He would -- he related to himself to people that were -- I
 4  would call them normal people outside of what was going on with
 5  Bill, Joe and I, that he was my mentor.  That's how he would
 6  introduce himself.
 7  Q.   So -- but why -- do you know why he would introduce
 8  himself that way?
 9  A.   I mean, I feel like it was probably kind of funny seeing
10  him and I together.
11  Q.   Why do you say that?
12  A.   It just -- it just looked kind of different, not the norm,
13  in my opinion.
14  Q.   Okay.  Why would it not be the norm?
15  A.   I felt like he was, like -- it just didn't -- it -- he's
16  like my dad's age, so --
17  Q.   Okay.
18  A.   It was uncomfortable.  I felt a little uncomfortable
19  for -- if somebody implied it otherwise.  But there were times
20  that that did happen, and I went along with it.
21  Q.   You said implied it otherwise.  What do you mean?
22  A.   Implied that maybe we were together.
23  Q.   You and Bill?
24  A.   Bill and I, yes.
25  Q.   Okay.  And so there were times where that happened, right?
```

```
 1   A.   Yes.

 2   Q.   Including with these contractors, right?

 3   A.   Yes.

 4   Q.   But at that point in time, you and Bill were not in a

 5   boyfriend-girlfriend relationship?

 6   A.   No.

 7   Q.   Now, you're helping make choices.  You're helping choose

 8   and manage this remodel, right?

 9   A.   Yes.

10   Q.   Were any of the decisions based on your wants and needs

11   for a house for you to live in?

12   A.   No.

13   Q.   What were they based on?

14   A.   His -- what he wanted it to look like, with my input.

15   Q.   Who's "he"?

16   A.   What Bill wanted it to look like, with my input, along

17   with the designers.

18   Q.   So with this remodel, this was not your intention to live

19   in this home?

20   A.   No.

21   Q.   At some point did you have to pay, yourself, any of these

22   expenses for the remodel?

23   A.   I did.

24   Q.   Why did you have to pay for some of the remodeling

25   expenses?
```

```
1   A.   Because Bill was out of town in D.C. working.

2   Q.   So he's not physically there, but why were you told Bill

3   Stone could not make the financial transaction even from D.C.?

4   A.   I was sent the invoice.  His money was in a blind trust,

5   is why he didn't -- couldn't afford it.

6   Q.   That's what Bill Stone told you?

7   A.   Yes.

8   Q.   Okay.  So why did you agree to make those payments for him

9   at this time?

10  A.   I didn't know how to tell him no.

11  Q.   Why were you afraid -- why were you unable to tell him no

12  at this time?

13  A.   I wasn't sure what would happen if I told him no.

14  Q.   What do you mean by that?

15  A.   I didn't know if he would quit helping me and I would end

16  up -- he wouldn't be part of my probation anymore.

17  Q.   And in your mind, if he backed out of maintaining your

18  secret probation, what could potentially happen to you?

19  A.   I could go to prison.

20  Q.   At this time that you're assisting with the remodel, is

21  your house for sale?

22  A.   There was a time I put my house up for sale.  I'm not sure

23  if it was the same time or not.

24  Q.   But at this point in time you still had your own home?

25  A.   Yes.
```

```
 1    Q.   One that you intended on living in?
 2    A.   Yes.
 3              MS. RUDOFF:  Your Honor, may I approach the witness?
 4              THE COURT:  You may.
 5              (Pause)
 6              THE COURT:  And when you reach a natural breaking
 7    point, it's about time for lunch.
 8              MS. RUDOFF:  Yes, Your Honor.  Just after this
 9    exhibit would be great.
10              THE COURT:  All right.
11              MS. RUDOFF:  Thank you.
12              THE COURT:  Sounds good.
13    BY MS. RUDOFF:
14    Q.   Casi, I just handed you what's been previously marked as
15    Government's Exhibit 55.  Can you look at it?
16    A.   Yes.
17    Q.   Do you recognize it?
18    A.   Yes.
19    Q.   What is it?
20    A.   It's the first payment -- it's a check written from me,
21    and it is first payment of the remodel.
22              MS. RUDOFF:  At this time the Government moves to
23    admit Government's Exhibit 55.
24              THE COURT:  Any objection?
25              MR. GALLIAN:  No objection.
```

```
 1                 MR. SELLERS:  None, Your Honor.

 2                 THE COURT:  Admitted.

 3                     (Government's Exhibit No. 55 received)

 4                 MS. RUDOFF:  Permission to publish?

 5                 THE COURT:  Granted.

 6                 MS. RUDOFF:  If we could zoom in on this check.

 7    BY MS. RUDOFF:

 8    Q.   Casi, you said this check was written by you, right?

 9    A.   Yes.

10    Q.   And who is it made out to?

11    A.   Bath Kitchen Design Center.

12    Q.   What's the date on this?

13    A.   October 18, 2016.

14    Q.   And approximately how much was this check written out for?

15    A.   25,000.

16    Q.   And what makes you believe it's a first payment?

17    A.   The memo says "first payment."

18    Q.   Do you recall making additional payments to Bath Kitchen

19    Design Center as well?

20    A.   Yes.

21    Q.   How many additional payments do you recall making?

22    A.   I -- I'm not sure.

23    Q.   Would they be in your bank records?

24    A.   Yes.

25    Q.   Do you remember about what the total amount you paid for
```

```
 1   for the remodel was?
 2   A.   I want to say it was 50,000, something like that.
 3   Q.   Okay.  So at least 50,000 that you can recall?
 4   A.   Yes, at least.
 5   Q.   Okay.
 6   A.   At least.
 7             MS. RUDOFF:  Your Honor?
 8             THE COURT:  Yes.
 9             MS. RUDOFF:  Good stopping point.
10             THE COURT:  All right.  This is a good stopping
11   point.
12             Let me blow through real quick instructions.
13             Please don't discuss the case until we finish.  And
14   please don't do any independent research.  I know you won't.
15   Please don't use any technology to communicate about this case
16   or even communicate about this case without technology.
17             With that being said, do you-all want to come back at
18   noon?  Is that good?
19             All right.  We're going to have a half hour lunch,
20   and I'll come get you.
21             All rise for the jury.
22             (Jury out)
23             THE COURT:  All right.  Everyone can be seated.
24             So this is our first -- this is our first kind of
25   quick lunch.
```

```
 1                    I'm sorry?
 2              MS. RUDOFF:  May the witness step down?
 3              THE COURT:  Oh, yes.  You may step down.  Sorry.
 4              This is our first quick lunch, so feel free to just
 5    camp out here if you would like to.  I'm going to microwave up
 6    something here.  If you want to go, you can.  But I'll be
 7    around here, so you can leave your stuff if you'd like.
 8              MS. MAX:  Your Honor?
 9              THE COURT:  Yes.
10              MS. MAX:  Did you visit the Friday question?
11              THE COURT:  I did, yes.  Thank you for reminding me.
12    They would like to leave at 2:00 on Friday.
13              MS. MAX:  So 8:00 to 2:00?
14              THE COURT:  8:00 to 2:00.
15              We're going to meet the foreign exchange student, and
16    we bumped it back to the afternoon.  So they want to get a
17    little bit of afternoon in.  So if we could plan on that.
18              Does that sound good to everybody?
19              MR. SELLERS:  Yes, ma'am.
20              MR. GALLIAN:  Yes, ma'am.
21              THE COURT:  All right.  Thanks for reminding me.
22              All right.  Court is in recess for a half hour.  And
23    like I said, feel free to camp out here.  I know that's not
24    much time.
25              MS. MAX:  Did they mention with the 8:00 to 2:00 they
```

```
 1    want a short lunch break tomorrow?
 2              THE COURT:  I didn't ask them.  I assume that, but I
 3    will double-check.  And if you'll remind me when we come back.
 4              MS. MAX:  We're just lining up for the --
 5              THE COURT:  Absolutely.  Not a problem.  Yeah, I'll
 6    ask them then.
 7              MS. MAX:  Thank you, Your Honor.
 8              THE COURT:  You're welcome.
 9              Court is in recess.  See you guys after lunch.
10              SECURITY OFFICER:  All rise.
11              (Recess)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                                   INDEX

 2                                                        Further
                         Direct  Cross  Redirect  Recross  Redirect
 3
     WITNESS FOR THE
 4   GOVERNMENT

 5   CASI THOMPSON          6

 6
     GOVERNEMNT'S EXHIBITS                                    Received
 7
         8   Power of Attorney to DeLeon                      30
 8
         9   CT's Navy Federal bank accounts                  16
 9
        10   CT's J.P. Morgan Chase accounts                  16
10
        14   CT's $1,000 withdrawal from Navy Federal         17
11
        20   CT's check, dated January 29, 2016, for $15,000  48
12           To DeLeon from Navy Federal

13      21   Titles to CT's 2014 Ford F-150                   55

14      22   Photo of 2014 Ford F-15 pickup                   58

15      24   DeLeon's check, dated February 17, 2016, to CT   61
             for $20,100 from Wells Fargo
16
        25   CT's check, dated March 2, 2016, to DeLeon for   62
17           $20,100 from Navy Federal

18      28   CT's 3x5 cards                                   34

19      33   CT's cashier's check, dated March 2, 2016, to    102
             Stone for $250,000
20
        39   CT's cash withdrawal, dated June 3, 2016, of     45
21           $9,000 from J.P. Morgan Chase

22      41   CT's cashier check, dated June 17, 2016, to      71
             Park Place Mercedes in the amount of $76,816.90
23
        46   CT's cash withdrawal, dated May 25, 2016, of     43
24           $5,000 from J.P. Morgan Chase

25      47   CT's cashier's check dated September 1, 2016,    83
             to Texas Toyota of Grapevine for $24,003.47
```

1     50   CT's cashier's check, dated September 13, 2016,      109
           To Stone for $154,500
2
      54   Photo of Stone's house on Kennedy Dr.,              111
3          Colleyville, Texas

4     55   CT's checks, dated October 18, November 11, and     120
           November 28, 2016, to Bath Kitchen Design Center
5
     124   Voice message of DeLeon to CT extracted from         92
6          Apple iPhone 6s Plus

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 27th day of July, 2023.

7

8

9
                                /s/Todd Anderson
10                              TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25