1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )      3:21-CR-236-E
5              Government,         )
                                   )
6                                  )
   VS.                            )      DALLAS, TEXAS
7                                  )
                                   )
8  WILLIAM ROY STONE, JR.,        )
   JOSEPH EVENTINO DELEON,        )
9              Defendants.         )      July 28, 2023

10

11            TRANSCRIPT OF JURY TRIAL, VOLUME 4

12           BEFORE THE HONORABLE ADA E. BROWN

13              UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:         MS. JENNA DANELLE RUDOFF
                                UNITED STATES DEPARTMENT OF JUSTICE
18                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
19                              1100 Commerce Street
                                Dallas, Texas  75242
20                              jenna.rudoff@usdoj.gov
                                (214) 659-8600
21

22                              MS. DONNA S. MAX
                                UNITED STATES DEPARTMENT OF JUSTICE
23                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
24                              1100 Commerce Street
                                Dallas, Texas  75242
25                              donna.max@usdoj.gov
                                (214) 659-8664

```
 1                                MR. MARCUS J. BUSCH
                                  UNITED STATES DEPARTMENT OF JUSTICE
 2                                NORTHERN DISTRICT OF TEXAS
                                  U.S. Courthouse, Third Floor
 3                                1100 Commerce Street
                                  Dallas, Texas  75242
 4                                marcus.busch@usdoj.gov
                                  (214) 659-8642
 5

 6  FOR THE DEFENDANT,           MR. GREGG GALLIAN
    WILLIAM ROY STONE, JR.:      Gallian Firm
 7                                Parkside Tower
                                  3500 Maple Avenue
 8                                Suite 720
                                  Dallas, Texas  75219
 9                                gregg@GallianDefenseFirm.com
                                  (214) 432-8860
10

11                                MS. JACLYN ANNETTE GALLIAN
                                  Bryan Cave Leighton Paisner
12                                2200 Ross Avenue
                                  Suite 4200
13                                Dallas, Texas  75201
                                  jaclyn.gallian@bclplaw.com
14                                (214) 721-8058

15
    FOR THE DEFENDANT,           MR. GREG WESTFALL
16  JOSEPH EVENTINO DELEON:      Westfall Sellers
                                  1701 River Run
17                                Suite 801
                                  Fort Worth, Texas  76107
18                                greg@westfallsellers.com
                                  (817) 928-4222
19
                                  MR. FRANK SELLERS
20                                Westfall Sellers
                                  1701 River Run
21                                Suite 801
                                  Fort Worth, Texas  76107
22                                frank@westfallsellers.com
                                  (817) 928-4222
23

24

25
```

```
 1   COURT REPORTER:              MR.  TODD  ANDERSON,  RMR,  CRR
                                 United States Court Reporter
 2                               1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
 3                               (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                JURY TRIAL VOLUME 4 - JULY 28, 2023
 2                    P R O C E E D I N G S
 3           THE COURT:  Good morning.  Please be seated.
 4           Off the record.
 5           (Discussion off the record)
 6           THE COURT:  Let's stack them up and bring them in.
 7           (Pause)
 8           SECURITY OFFICER:  All rise for the jury.
 9           (Jury in)
10           THE COURT:  Please be seated.
11           Sorry, I told you the wrong time.
12           How are we doing this morning?  Everybody good?
13   Remember you can bring caffeine.
14           So with that said, your witness, ma'am.
15           MS. RUDOFF:  Yes, Your Honor.
16           (Pause)
17           THE COURT:  If everybody will check their phones, I
18   just did myself, to make sure they're off.  I don't want to
19   hear vibrate or ring tones.
20           MS. RUDOFF:  May I proceed, Your Honor?
21           THE COURT:  You may.
22      CASI THOMPSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
23                   DIRECT EXAMINATION CONTINUED
24   BY MS. RUDOFF:
25   Q.   Good morning, Casi.
```

```
 1    A.    Good morning.
 2    Q.    Yesterday, before we adjourned, we played Government
 3    Exhibit Number 56, which was a recorded call.  Do you recall
 4    that?
 5    A.    Yes.
 6    Q.    I want to talk a little bit about some of the things that
 7    were on the call, okay?
 8    A.    Okay.
 9    Q.    Whose voice did you hear on that recording?
10    A.    Bill Stone.
11    Q.    Anyone else?
12    A.    No.
13    Q.    Was your voice on it?
14    A.    Yes.
15    Q.    At any point did you hear another individual that was
16    Judge Anderson?
17    A.    No.
18    Q.    Who did you understand was speaking for Judge Anderson?
19    A.    Bill.
20    Q.    Was the way we heard it in the recording, is that how it
21    would happen in instances of other calls that you described
22    with, like, the analysts?
23    A.    Yes.
24    Q.    What were you -- what was your understanding of who all
25    was in that room during the recording, who you were told was in
```

1    that room?

2    A.    It was Judge Anderson, Jerry and Steve, who were state

3    troopers who were also assisting Bill in watching me.

4    Q.    And when you were told that, did you believe all those

5    individuals were truly in that room?

6    A.    Yes.

7    Q.    Why?

8    A.    Because that's how the last two years had gone or three

9    years had gone.

10   Q.    And to clarify so we know time frame -- and we talked

11   about this yesterday -- the date of that call was June 18,

12   2019, right?

13   A.    Yes.

14   Q.    Okay.  On the call we heard Bill discussing something

15   about you pulling into a drug user's driveway?

16   A.    Yes.

17   Q.    Do you recall that?

18   A.    I do.

19   Q.    Can you explain what that was about?

20   A.    I had left.  It was -- I believe it was Valentine's Day.

21   I'm not sure.  And I had left his house, and he -- I was just a

22   little frustrated and driving through Fort Worth and drove in

23   there, sat in the driveway for what I felt like 30 seconds, and

24   I left and then called Bill.

25   Q.    What was your intention in -- at that time in making that

1   stop?

2   A.    I wasn't even really sure.  I was just trying to, I guess,

3   deescalate.  I was just driving.

4   Q.    And to be clear, at that point in time you were not using

5   any kind of drugs, right?

6   A.    No.

7   Q.    And were you, in fact, still sober?

8   A.    Yes.

9   Q.    And at that point in time, how long had you been sober?

10  A.    Since 2014, September.

11  Q.    And currently how long have you been sober?

12  A.    Nine years.

13  Q.    On the call we hear reference to two individuals named

14  Dorothy and Tyler.  Who are they?

15  A.    They were nicknames that Bill had given my mom and my

16  youngest son.

17  Q.    So Dorothy being what Bill called your mother?

18  A.    Yes.

19  Q.    And then Tyler being what Bill called Slayter, your

20  youngest son?

21  A.    Yes.  He at one point was trying to get me to do a name

22  change for my youngest son.

23  Q.    Did he tell you why he wanted to change your younger's

24  son's name?

25  A.    Because he didn't want his dad to find him.

```
 1   Q.   Bill -- when you say he, Bill didn't want Slayter's dad to
 2   find Slayter?
 3   A.   Yes.
 4   Q.   Do you know why Bill called your mom Dorothy?
 5   A.   I'm not sure.
 6   Q.   Also during the call there was a reference made to
 7   nondisclosure documents that you signed?
 8   A.   Yes.
 9   Q.   Were you aware of any nondisclosure documents at the time?
10   A.   I was aware I was to not speak about it, but I had never
11   seen any documents.
12   Q.   Had you signed any documents?
13   A.   I didn't.
14   Q.   Had you heard about there being any documents prior to
15   that call?
16   A.   No.
17   Q.   Also during the call, Bill Stone referenced you
18   interacting with or having conversations with a few men, and
19   there were several names that were given.
20           Do you know who those individuals were?
21   A.   Yes.
22   Q.   Who were they?
23   A.   A few of them were friends from high school who are then
24   my clients now.  One was a client who wanted to date me, and
25   basically that.
```

```
 1  Q.   Had you told Bill that you had conversations with these
 2  individuals recently?
 3  A.   No.  He -- he had known.  He would call after having, I
 4  guess, been notified that I had been talking to somebody that
 5  had a history, a criminal history.
 6  Q.   So you didn't tell Bill Stone that you had spoken to these
 7  people?
 8  A.   Right.
 9  Q.   How had you spoken to these individuals?  Was it in
10  person?  Via text?  Call?  Do you recall?
11  A.   It was probably both.
12  Q.   Both being what?
13  A.   Text and call.
14  Q.   But somehow Bill Stone was aware of it, right?
15  A.   Yes.
16  Q.   And when you said that you were told those individuals
17  then had a criminal record --
18  A.   Yes.
19  Q.   -- who told you that?
20  A.   Bill.
21  Q.   And when did he tell you that in relation to when you told
22  him you had interacted with these people?
23  A.   Right afterwards.
24  Q.   Other than Bill Stone telling you that information about
25  their criminal history, did you have any other knowledge of
```

1   their criminal past?

2   A.   No.

3   Q.   Did you ever see any documentation supporting what Bill

4   Stone was saying about their criminal past?

5   A.   No.

6   Q.   Going back to reference of the documents that we heard

7   about in the call, at any point in time on this secret

8   probation were you ever showed any documents?

9   A.   No.

10  Q.   Did you ever sign any documents?

11  A.   I did not.

12  Q.   Had documents ever been discussed at this point in time?

13  A.   No.

14  Q.   Also on the call there was a reference that when you were

15  in Florida you went to see a psychic?

16  A.   Yes.

17  Q.   Can you explain what that was about?

18  A.   I -- when Bill was acting upset and mad, I kind of got

19  hysterical and was having a massive anxiety attack.  And when

20  we drove down to Key West, I -- we were walking and I saw a

21  psychic, and my anxiety of the unknown was so strong that I ran

22  into the psychic place, because I just couldn't handle not

23  knowing what was going to happen.

24  Q.   And that was during your Florida trip, right?

25  A.   Yes.

```
 1    Q.    The same trip that we spoke about earlier?
 2    A.    Yes.
 3    Q.    Did Bill go with you?
 4    A.    Yes.
 5    Q.    To you, was seeing a psychic a problem?
 6    A.    It was.
 7    Q.    Why?
 8    A.    I felt like it was going against my faith.
 9    Q.    Was it an issue as it related to your secret probation,
10    though?
11    A.    Oh, no.  I -- I just ran in there, and I just wanted to
12    know.  I didn't stay in there very long.  I had anxiety there
13    too, so I just left.  But no, I don't think it was a problem
14    with the probation.
15    Q.    So did you understand why it was being brought up with
16    Bill and supposedly Judge Anderson during the call?
17    A.    It didn't -- it didn't seem odd or out of place, because
18    it seemed like every single thing that I ever did was brought
19    up to a judge at some point.
20    Q.    And when you said it was brought up to a judge at some
21    point, who brought it up to a judge?
22    A.    Bill.
23    Q.    On the call we also heard conversation about a video that
24    supposedly Judge Anderson was viewing.  Do you recall that?
25    A.    Yes.
```

1    Q.   Do you know what video Bill Stone was referring to?

2    A.   He said there were two gentlemen at the strip club that

3    had -- that were undercover videoing the two brothers who were

4    known terrorists, and somehow that video got on the desk of

5    Judge Anderson.

6    Q.   Okay.  And I want to make sure we're clear on what you

7    just described.

8              So when you said at the strip club, let's take a step

9    back.

10   A.   Okay.

11   Q.   In Florida that night that you and Bill got into an

12   argument, where did that night begin?  Where were you guys?

13   A.   On the beach having dinner.

14   Q.   And then after you had dinner on the beach, where did you

15   guys go?

16   A.   We went to a strip club.

17   Q.   When you say "we," who do you mean?

18   A.   Bill and I and the friends that I made there.

19   Q.   And the friends that you made there, are those the females

20   that we hear being referred to in the video or the audio,

21   sorry?

22   A.   Yes.

23   Q.   Whose idea was that to go to a strip club?

24   A.   The ladies there.

25   Q.   When you got to the strip club, who else was there that

1    you knew?

2    A.    Bill and those women and the wait staff.

3    Q.    So when you said that there was supposedly a video or

4    someone recording a video at the time, are you saying that it

5    was happening there at the strip club when you were there with

6    those individuals?

7    A.    Yes.

8    Q.    From your recollection was there dancing going on?

9    A.    Yes.

10   Q.    Lap dances?

11   A.    Yes.

12   Q.    In your group who got a lap dance?

13   A.    Bill got a lap dance and I got a lap dance.

14   Q.    We also heard other things saying that you were holding a

15   man's crotch at the time.  Do you recall that ever happening?

16   A.    I did not grab any man's crotch.

17   Q.    And what about -- I think we heard in the call licking

18   somebody's cheek.  Do you recall that ever happening?

19   A.    I did not lick someone's cheek.

20   Q.    And who told you this video existed?

21   A.    Bill.

22   Q.    Did you ever see it yourself?

23   A.    No.

24   Q.    In the call we hear that -- these details being described

25   by Bill Stone, right?  Do you remember that?

```
 1   A.   Yes.
 2   Q.   If those details were inaccurate, why didn't you correct
 3   Bill?
 4   A.   I -- it wasn't Bill who was telling me in the phone call.
 5   It was the judge.
 6   Q.   And so understanding that it was the judge saying it, why
 7   didn't you correct the judge?
 8   A.   I feel like I did.  I said I didn't grab anyone's crotch
 9   and I don't recall licking someone's face.
10   Q.   Okay.
11   A.   Or -- no.  I think I said okay.  I just didn't want to
12   argue.
13   Q.   Okay.  You just testified that Bill was, in fact, at the
14   strip club with you, right?
15   A.   Yes.
16   Q.   Did you ever mention that anywhere on the recording?
17   A.   No.  He wasn't -- we weren't supposed to be dating, and so
18   he wasn't -- he didn't go with me.  It was a secret that he
19   even went with me.  He wasn't supposed to be there.
20   Q.   Okay.  So when you say he didn't go with you --
21   A.   Right.
22   Q.   -- that was what you were told you had to say?
23   A.   Well, I was told -- that is what I was told, he couldn't
24   go.  So I just never mentioned it, that he was there.
25   Q.   At the time of this Florida trip, how old were you?
```

```
 1   A.   Late 30s.  I don't know.  37.
 2   Q.   Old enough to legally enter a strip club?
 3   A.   Yes.
 4   Q.   From your understanding, was there any reason you couldn't
 5   go to a strip club with friends if you wanted to?
 6   A.   Well, I guess being on probation it just looks bad for you
 7   to go into a strip club.  I'm not sure.  I mean --
 8   Q.   Did somebody tell you that?
 9   A.   That's just kind of what I gathered from the phone call.
10   Q.   So you were made to feel on the phone call by who that it
11   was a bad thing for you, a grown woman, to go into a strip
12   club?
13   A.   By Judge Anderson.
14   Q.   And so we're clear and the record is clear, when we're
15   referring to Judge Anderson in this line of questioning, we all
16   understand that Judge Anderson is not a real person, right?
17   A.   I know that now.
18   Q.   Okay.  And at the time -- well -- and that Bill Stone is
19   actually the person who was pretending to be this Judge
20   Anderson, right?
21   A.   Yes.
22   Q.   And you know that now?
23   A.   I know that now.
24   Q.   That was not your understanding at the time of the call?
25   A.   Right.
```

```
 1   Q.   Earlier you testified about other instances when Bill

 2   would tell you there was video evidence of you doing something

 3   that was wrong.  Do you recall that?

 4   A.   Yes.

 5   Q.   When Bill would refer or explain those other videos to

 6   you, was it similar to the way we heard in the call?

 7   A.   Yes.

 8   Q.   With that kind of detail?

 9   A.   Yes.

10   Q.   I want to talk about one of those other videos that while

11   you were on secret probation Bill told you there was a

12   recording of you doing something.

13   A.   Okay.

14   Q.   Was there a point in time in which Bill told you that he

15   reviewed a video that an individual named Eric Gomez took of

16   you?

17   A.   Yes.

18   Q.   And is -- did we hear the name Eric Gomez come up in

19   actually this recording that we just listened to?

20   A.   Yes.

21   Q.   Who's Eric Gomez?

22   A.   He is my latest ex-boyfriend prior to this.

23   Q.   Approximately what years were you in a relationship with

24   him?

25   A.   2000 -- off and on from 2006 to -- or 2007, around that
```

 1  time, to 2014.

 2  Q.   During that timeframe, was that when you were still using

 3  methamphetamine?

 4  A.   Yes.

 5  Q.   I think you testified earlier about the kind of

 6  relationship you had with Eric Gomez, right?

 7  A.   Yes.

 8  Q.   Can you kind of just briefly redescribe for the jury's

 9  reference what type of relationship that was?

10  A.   Okay.  Say that again, I'm sorry.

11  Q.   Can you just tell the jury what kind of relationship that

12  was?

13  A.   Oh, it was a very manipulative, abusive relationship.

14  Toxic.

15  Q.   Did Bill know that your prior relationship with Eric Gomez

16  was abusive?

17  A.   Yes.

18  Q.   So at what point in time while you're on secret probation

19  does Bill bring up the fact that he's viewed a video that Eric

20  Gomez has made of you?

21  A.   You asked at what point in time?

22  Q.   Do you recall when he did?

23  A.   It was sometime probably in 2017-ish.  He and Dr. Brian

24  were on the phone.  Well, he later put Dr. Brian on the phone.

25  But he found a laptop at Eric's house when they were doing a

1    house search, because he was also in trouble for the Green Dot

2    MasterCard fraud case, and so him and Jerry were doing a house

3    search and found a laptop.

4          And when they ran it through -- when they sent it to

5    D.C. and his analysts ran through it, they found videos of me

6    getting raped.

7    Q.   Now, everything you just said, that's what Bill Stone told

8    you, right?

9    A.   Yes.

10   Q.   Okay.  And so Bill Stone told you that for an

11   investigation he was handling, he was in Eric Gomez's house?

12   A.   Yes.

13   Q.   Okay.  I just want to clarify the hes and the hims so we

14   understand.

15   A.   I'm sorry.

16   Q.   That's okay.

17         And so when Bill Stone -- Bill Stone tells you he's

18   in Eric Gomez's house related to a criminal investigation,

19   right?

20   A.   Yes.

21   Q.   And what did Bill say he retrieved from Eric Gomez's

22   house?

23   A.   A laptop with videos on it.

24   Q.   Okay.  And then what did Bill Stone tell you he did with

25   that laptop?

1    A.   He sent it to Washington and had his analysts look into

2    it, and they found videos of me.

3    Q.   When Bill told you about this video of you, how did he

4    describe it?  Just generally that it was a video?

5    A.   No.  He went into full detail of describing everything

6    that happened to me from the time I was drugged until -- with

7    multiple people at the time taking their turn on me in detail.

8    Q.   So he described this video as, in fact, you being raped by

9    multiple people at a time?

10   A.   Yes.

11   Q.   And you said that you were -- how did he describe your

12   state of consciousness?

13   A.   I was unconscious.  I was lifeless.

14   Q.   And that's what Bill Stone told you?

15   A.   Yes.

16   Q.   When Bill Stone told you he reviewed a video of you being

17   raped that was recorded by Eric Gomez, did this make sense to

18   you?

19   A.   It didn't.  I couldn't understand, because Eric was a very

20   possessive boyfriend.  I couldn't imagine him allowing that to

21   happen.  But since he was telling me he was watching it and in

22   detail, I -- I believed what he said.  And it affected me so

23   much that I had to hang up the phone.

24   Q.   When you say it affected you, what do you mean?

25   A.   It -- I -- it made me feel dirty.  It made me feel like it

```
 1    had happened.  And so --
 2    Q.   When you were dating Eric Gomez, was cameras or video
 3    recordings or surveillance recordings around his house
 4    something he had?
 5    A.   He did.
 6    Q.   So did that factor play into your ability to understand
 7    how there would be a video?
 8    A.   Yes.
 9    Q.   You said that you then had to talk to Dr. B about that.
10    Can you explain what you mean by that?
11    A.   I -- when I hung up the phone, Bill called back with
12    Dr. Brian on the phone, and Dr. Brian was a psychiatrist, and
13    so he was trying to calm me down.
14            THE COURT:  Can we pause for just a moment?  I'm
15    having a little difficulty.
16            Members of the jury, let's take a quick five-minute
17    break.  I'm not able to log onto my screen and follow along.
18            SECURITY OFFICER:  All rise for the jury.
19            (Jury out)
20            (Recess)
21            SECURITY OFFICER:  All rise for the jury.
22            (Jury in)
23            THE COURT:  All right.  Everyone please be seated.
24            Thank you so much for your patience and your grace.
25    This truly was my computer doing something strange.  It's still
```

 1    doing something strange, so I will work on fixing it during the

 2    break.  But don't hold it against any of the lawyers or the

 3    clients.  It's my old antiquated technology, and I don't know

 4    how to work anything.  So that is my fault.

 5           So with that said, if everybody will check their

 6    phones, make sure your phones are off, I will do the same.

 7           And your witness, ma'am.

 8           MS. RUDOFF:  Thank you, Your Honor.

 9           THE COURT:  You're welcome.

10    BY MS. RUDOFF:

11    Q.   Casi, turning back to the recorded call we heard

12    yesterday, how did you feel after that call was over?

13    A.   I felt powerless, and I felt like the air was let out of

14    me at the end of that phone call.

15    Q.   What do you mean the air was let out of you?

16    A.   I just -- I felt like I had just -- felt like we had

17    gone -- excuse me.  I felt like I had reached -- gone back to

18    the very beginning of how it was at the very beginning of the

19    probation, the secret probation.

20           I had to go back to doing my 3x5s, telling, you know,

21    my client list.  It just seemed like I had went all the way

22    back as far as the amount of restrictions that I -- that I had

23    again, so --

24    Q.   Did you have concerns about being able to successfully

25    complete the secret probation?

1   A.   No, I had no concerns.  I was willing to do it, and I just

2   kind of felt -- I was really hoping to get a probation officer

3   in Austin, and I was -- I hated the fact that he was going to

4   have to report back to Bill as often, because I was trying to

5   get out of that relationship.

6   Q.   And when you say out of that relationship, which

7   relationship do you mean?  With Bill as your probation officer

8   or with Bill as your boyfriend?

9   A.   I was trying to get rid of both, but the romantic

10  relationship.  I felt like I then had to go back to just the

11  constant contact with Bill.

12  Q.   After this call that we heard took place, did you reach

13  out to anyone to talk about what was going on or how you were

14  feeling?

15  A.   I did.

16  Q.   Who?

17  A.   I talked to my mom.

18  Q.   Had you ever told anyone about this secret probation

19  before?

20  A.   No.

21  Q.   How did you tell your mom about this?  Was it in person?

22  On the phone?

23  A.   It was in person.  I had moved her into one of my rental

24  properties, and I went over there in person to tell her,

25  because I knew he would hear or see text or could hear the

```
 1   phone call.  So I went in person to talk to her about it so
 2   that nobody could hear.
 3   Q.   And when you say he could hear your -- what was on the
 4   phone or text, who were you referring to?
 5   A.   Bill or his analysts.
 6   Q.   Because at that time you were still under the impression
 7   that they were surveilling you, right?
 8   A.   Yes.
 9   Q.   Why did you feel like at that point in time you could tell
10   your mom what was going on?
11   A.   I -- I feel like in a time like that when you feel
12   defeated and deflated that you -- you want your mom.  And even
13   though I had problems trusting her, I needed to share that with
14   her.  It was my mom.  I didn't tell her everything.  I gave her
15   some Cliff Notes on the situation or the probation.
16   Q.   The secret probation?
17   A.   The secret probation.
18   Q.   Were you afraid what could happen if your mom told anyone
19   that you told her about the secret probation?
20   A.   Yes.  I was -- I had just talked to the judge about
21   nondisclosure, and so I would go to prison and lose my kids.
22   Q.   So why were you willing to run that risk now?
23   A.   I needed to tell her why I was so upset, and I asked her
24   to please not tell anybody.
25   Q.   Did you see Bill once he told you he was back from Austin?
```

```
 1   A.   Yes.
 2   Q.   Why did you see him again after that call?
 3   A.   I believe after that when I saw him was when he asked me
 4   to go to dinner.
 5   Q.   Was that a couple of days after this recording, or had
 6   weeks in time passed?  What was sort of the --
 7   A.   You know, I'm not real sure about the time lapse from that
 8   time to when we went to dinner.  I can't --
 9   Q.   And at this point in time are you still reporting to him,
10   though, and engaging with him also because he's your secret
11   probation officer?
12   A.   Yes.
13   Q.   And you told us how you were feeling about those two
14   relationships at the time.  Did you express your concerns to
15   Bill when you guys went to dinner?
16   A.   Yes.
17   Q.   What did you tell him?
18   A.   I had -- I had -- the same thing I had told him in
19   Florida, that I wanted it to be separate.  It puts too much of
20   a strain on a relationship when you are authoritative in one
21   way and there was -- I can't explain it.  I -- you know, love
22   and respect for him for everything he did, but I wasn't in love
23   with him.  But I was on this probation.  It was just confusing
24   and conflicting.
25              But, anyway, I decided we were going to go ahead and
```

```
 1    stay dating, and I just surrendered to it.
 2    Q.   How did he react to it?
 3    A.   I mean, he was happy.
 4    Q.   About a week after this recording that we just heard with
 5    Judge Anderson, were you played another recording, a voicemail
 6    from a DEA agent named Jordan Green?
 7    A.   Yes.
 8    Q.   And who played that voicemail for you?
 9    A.   Bill.
10    Q.   Did Bill tell you who Jordan Green was?
11    A.   He -- no, he didn't.
12    Q.   And you remember hearing that voicemail?
13    A.   Yes.
14              MS. RUDOFF:  Your Honor, at this time the Government
15    would move to admit Government's Exhibit Number 90, the
16    recorded voicemail.  This exhibit comes from Government's
17    Exhibit Number 27, which has already been admitted for record
18    purposes only.
19              And the Government would also move to admit
20    Government's Exhibit 91, which is a transcript of that
21    recording.
22              THE COURT:  Gotcha.
23              And is this the one that is short or long?
24              MS. RUDOFF:  Short.
25              THE COURT:  Any objection?
```

```
 1              MR. GALLIAN:  No objection to 90 or 91, Your Honor.
 2              MR. SELLERS:  Same, Your Honor.
 3              THE COURT:  All right.  It's admitted.  Both are
 4   admitted.
 5                   (Government's Exhibit Nos. 90 and 91 received)
 6              MS. RUDOFF:  Your Honor, permission to publish
 7   Government's Exhibit Number 90?
 8              THE COURT:  You may.
 9              (Audio played)
10   BY MS. RUDOFF:
11   Q.   Where were you when Bill Stone played this recording for
12   you?
13   A.   I was in his truck.
14   Q.   And what were you guys discussing or doing in his truck?
15   A.   We were probably -- I mean, we were just driving.  I don't
16   know where we were.
17   Q.   Before he played you this voicemail, did he explain
18   anything about the voicemail?
19   A.   No.  That was a common -- this was the first time I
20   actually heard somebody's voice on the other end of the phone.
21   That was a common phone call that he had received as far as
22   intel goes throughout the entire four years.
23   Q.   So is this an example of one of those, like, another
24   crisis that Bill would tell you had come up that he then had to
25   handle for you?
```

```
 1    A.    Yes.  This was more on the lighter side.
 2    Q.    What do you mean on the lighter side?
 3    A.    This is in regards to somebody else, not me.  It involved
 4    me, but it wasn't me in a drug deal.
 5    Q.    Okay.  And it referenced Shawn Gomez.  Who is Shawn Gomez?
 6    A.    My ex-husband.
 7    Q.    When you heard this recording, how did that make you feel?
 8    A.    I -- it -- it made me believe that I was under some
 9    criminal umbrella under Bill's -- under Bill's name, I guess,
10    and made me believe if my name was ran he did get notified.
11          And it also, I guess -- I mean, it just made me feel
12    like everything was -- he knew everything about me, so -- or
13    notified about everything.
14    Q.    When you say "he," are you talking about Bill Stone?
15    A.    Bill.
16    Q.    In the next several weeks after this recording was played
17    for you, how -- how were things going between you and Bill as
18    far as your romantic relationship?
19    A.    We didn't really have -- well, that would be un-intimate.
20    We didn't have much of an intimate relationship.  It was -- I
21    mean, I guess it was going as good as it could.  I mean, it was
22    just a general -- more, you know -- I don't know.  I can't --
23    it was really --
24    Q.    Okay.  Sometime in July of 2019, did Bill ask if he could
25    take you on a date?
```

```
 1   A.   Yes.
 2   Q.   And for this particular date, did Bill make it sound like
 3   this was a special or important date?
 4   A.   He just said to wear something nice.
 5   Q.   And when was this, do you recall?
 6   A.   I want to say July 2019.
 7   Q.   Do you know the date?
 8   A.   I don't.
 9   Q.   Okay.  And where were you told to go?
10   A.   I was told to meet him at some helicopter place in Fort
11   Worth.
12   Q.   And did you?
13   A.   Yes.
14   Q.   What were you thinking when you were headed to a
15   helicopter place in Fort Worth?
16   A.   I thought, man, he's really stepping it up.
17   Q.   And what do you mean by that?
18   A.   That we had never -- I mean, he really -- there was never
19   really a romantic side of him ever.
20   Q.   When you got to the helicopter location, what happened?
21   A.   We got on a helicopter and rode to the Reunion Tower.
22   Q.   And the Reunion Tower, is that downtown Dallas?
23   A.   Yes.
24   Q.   And how was the helicopter ride?
25   A.   It was fun.  It was pretty cool.
```

```
 1   Q.   When you got to Reunion Tower, did you guys go inside?
 2   A.   Yes.
 3   Q.   Where did you go?
 4   A.   We went to the restaurant.
 5   Q.   Did you have dinner?
 6   A.   We did.  It was great.  It was a great meal.
 7   Q.   Did you enjoy it?
 8   A.   I did.
 9   Q.   What happened after dinner?
10   A.   We went to the -- there is an area where you can step
11   outside, and he then proposed.
12   Q.   He being Bill Stone?
13   A.   Bill proposed.
14   Q.   How did that proposal happen?  Was it -- did he get down
15   on a knee?  Can you kind of describe where you guys were and
16   how it occurred?
17   A.   Yes.  He -- basically, we were just looking out at Dallas,
18   and he turned to me.  And I think he knows I don't like a whole
19   lot of attention, and so he then pulled out the ring and said I
20   make him very happy or the happiest man in the world or
21   something of that nature.  And I -- I said yes.
22   Q.   How were you feeling in that moment?
23   A.   I wasn't real sure.  It felt a little forced, and I
24   reluctantly said yes, but I felt like I had to say yes.
25   Q.   Why did you feel like you had to say yes?
```

```
 1   A.   I didn't want to embarrass him and -- because I cared
 2   about him, you know.  He had done so much for me.  But I
 3   didn't -- I wasn't -- I wasn't sure if that was what I wanted,
 4   but I said yes anyways.
 5   Q.   Okay.  So after this engagement happens, did you guys have
 6   an opportunity to celebrate?
 7   A.   We drove back.  I want to say -- no, we didn't celebrate.
 8   I can't remember exactly what happened right after that, but
 9   there was no celebration.  We got back on the -- did we get
10   back on the helicopter?  I don't remember.
11   Q.   Okay.
12   A.   Yeah.  I'm not sure.
13   Q.   And then where did you stay that night?
14   A.   My house.
15   Q.   Was Bill with you at your house?
16   A.   No.
17   Q.   Why not?
18   A.   He never stayed at my house.
19   Q.   So it's the night you guys get engaged and you don't spend
20   the night together?
21   A.   Right.
22   Q.   Was that unusual to you?
23   A.   No, because we -- he had never stayed at my house.
24   Q.   What about you staying at his house?
25   A.   It just didn't -- it wasn't brought up.
```

```
 1   Q.   And at that point in time approximately how many times
 2   would you say you ever spent the night at Bill Stone's house
 3   while you were on this secret probation?
 4   A.   I would say two or three.
 5   Q.   Even when you two were in a relationship as boyfriend and
 6   girlfriend?
 7   A.   Yes.
 8   Q.   After the engagement happened -- let me back up.
 9        What happened a few days later, after you got
10   engaged?
11   A.   A few days later he called me one morning and told me he
12   was going to Austin to tell Judge Anderson that he was in love
13   with me and we got engaged, and he tried to get me off
14   probation.
15   Q.   Did he tell you why he needed to go tell -- go to Austin
16   and tell Judge Anderson that you two were engaged?
17   A.   He did not tell me why.  He was hoping to get me off
18   probation.  And I got real upset when he did that, because we
19   weren't supposed to be in a relationship.  And so I immediately
20   felt fear and anxiety, anger.  I couldn't believe he was doing
21   it.  I -- it was, in my mind a -- you know, a 50/50 chance he
22   is either going to be okay with it or, you know, put me in
23   jail.
24   Q.   He being Judge Anderson?
25   A.   Judge Anderson.
```

```
 1   Q.   Did you express this to Bill?
 2   A.   I did.
 3   Q.   And how did he respond?
 4   A.   He said to trust him.
 5   Q.   So did you?
 6   A.   I did.
 7   Q.   And then what happened?
 8   A.   He asked me to send him a picture of me wearing the
 9   engagement ring.
10   Q.   Did you do that?
11   A.   I reluctantly sent it.
12   Q.   Did Bill then tell you what happened when he met with
13   Judge Anderson?
14   A.   Yes.
15   Q.   What did he say?
16   A.   He said that the judge was happy for us and the -- you
17   know, as long as I was engaged to him, and he knew that I would
18   do great in life and he wished us the best, and that, yes, I
19   could get off probation.
20   Q.   And so did you get off probation that day?
21   A.   No.
22   Q.   Other than Judge Anderson, did you and Bill share the news
23   of your engagement with other people?
24   A.   I told a few friends and family.
25   Q.   And how did they react?
```

```
 1   A.   I mean, not a whole lot of -- not a whole lot of people
 2   knew who Bill was, but they were, I guess, happy for me if I
 3   was happy.
 4   Q.   What happened shortly after Bill told you he was back from
 5   Austin and his meeting with the judge with regards to your
 6   relationship?
 7   A.   It kind of fizzled out.
 8   Q.   What do you mean?
 9   A.   I did not feel good wearing the ring knowing that's not
10   what I wanted.  I called -- I called it off.  I said, I
11   can't -- I can't marry you.
12   Q.   Did you tell him why?
13   A.   I told him it's just not there for me.  You know, I love
14   him, but I'm not in love with him.  And I am grateful for him.
15   And I didn't want to hurt him, but I just wasn't there
16   romantically with him.
17   Q.   How did he respond?
18   A.   He didn't like it.  He --
19   Q.   Did he say that?  Did he do something?  What happened?
20   A.   Yeah.  We -- he first questioned if the ring I gave him
21   back was the actual engagement ring that he put on my finger,
22   as if I had swapped it out or something, which --
23   Q.   Had you?
24   A.   No, I did not.  And so -- and then he proceeded to track
25   down my son outside of my neighborhood as he was coming home
```

```
 1    from school to tell him that, you know, your mom is -- your mom
 2    is going backwards, she doesn't want to be with me, you know, I
 3    really need you to help me get her to get back with me.
 4            And I believe at the time my oldest son was 16.  He
 5    told her -- he told him that I was hanging out with the wrong
 6    people, I was backsliding, digressing.
 7    Q.   When you say he told him, Bill Stone told your oldest son
 8    this?
 9    A.   Yes.
10    Q.   And this is right after you broke off the engagement?
11    A.   Yes.
12    Q.   Okay.  Sorry.  I interrupted you.  Continue.
13    A.   And then he went on to -- I guess he met with my brother,
14    told my brother that I was digressing, that, you know, that I
15    was going backwards and I needed him and -- I believe he called
16    my mom a few times after that wanting to get back, you know, in
17    good graces with me and -- you know, but when he left the
18    house, I was -- I was done at that point.
19    Q.   When you say you were done, are you referring to the
20    romantic relationship?
21    A.   Yes.
22    Q.   Were you worried about how that would affect your secret
23    probation and your relationship with Bill Stone as a probation
24    officer?
25    A.   Yes.
```

```
1    Q.   What were you worried about?
2    A.   I was just worried that he would no longer be the
3    probation officer part of my secret probation.
4    Q.   Now, we heard you say and testify before that you had that
5    same concern and didn't do anything about it.  Why this time
6    did you stand firm and break off the romantic relationship even
7    though you had those fears?
8    A.   After speaking to my mom, she put a little doubt in my
9    mind that I was -- that there is a -- that I might not be on
10   probation, that it sounds really odd to her.  And so I started
11   pushing back and just seeing -- I always believed it was real.
12   I just was taking a chance at it not being real.
13   Q.   You mean by pushing back you were taking a chance that it
14   wasn't real?
15   A.   Yes.
16   Q.   After you broke off the engagement, were you still
17   communicating with Bill Stone?
18   A.   Yes.
19   Q.   What were you guys communicating about?
20   A.   My probation.  And my sister was getting married in
21   August, and I needed a travel slip from the judge.  And he -- I
22   kept asking to get a travel slip and permission to fly, and he
23   told me that he got the permission for me to go, and I just
24   needed to give him -- give him my flight and hotel information.
25   Q.   And when he told you you had permission to go, did you
```

```
 1   question that?
 2   A.   I -- I did, because I didn't have my permission slip to
 3   fly to New Mexico, so I thought maybe he was just upset that I
 4   had broke off the engagement and he was going to let me fly
 5   over there and possibly get arrested.
 6   Q.   Now, you mentioned your sister.  I don't think we've heard
 7   about a sister before.  Who is the sister?
 8   A.   It's my dad's daughter.  So it's my half-sister.
 9   Q.   And she lived in New Mexico, right?
10   A.   Yes.
11   Q.   So you didn't grow up with her?
12   A.   Right.
13   Q.   Did you express your concerns to Bill about not having
14   this permission slip?
15   A.   I did.
16   Q.   How did he respond?
17   A.   He told me to go.  He was frustrated.  He just said
18   just go.
19            MS. RUDOFF:  May I have one second, Your Honor?
20            THE COURT:  You may.
21            (Pause)
22   BY MS. RUDOFF:
23   Q.   At this point in time did Bill tell you anything that
24   happened with Dr. Brian?
25   A.   Yes.
```

```
 1   Q.   What did he say?
 2   A.   He said that -- that Dr. Brian heard of me -- of our
 3   breakup, and was on the -- was on the Peloton and fell off and
 4   had a heart attack and died.
 5   Q.   And that is what Bill Stone told you?
 6   A.   Yes.
 7   Q.   How did that make you feel?
 8   A.   I found it to be a little odd that if, in fact, he did die
 9   then -- it was common for Dr. Brian to be on the Peloton,
10   because that's stories we shared together, because I have a
11   Peloton, so -- but I found that to be a little strange.  But if
12   he did, in fact, have a heart attack and die, that was very
13   sad, and it was unfortunate.
14   Q.   And did Bill tell you if he went to a funeral?
15   A.   Yes.
16   Q.   What did he say about that?
17   A.   He said that they were flying Dr. Brian's body in from
18   Tuscany and -- to Virginia and that he was going up there for
19   the funeral.
20   Q.   Did -- when he was at the funeral, did he send you any
21   texts or photos related to the funeral?
22   A.   Yes, he did.
23   Q.   And do you recall receiving those texts?
24   A.   Yes.
25            MS. RUDOFF:  Your Honor, the Government would move to
```

1   admit Government's Exhibit 118, which is derived from

2   Government's Exhibit 27 which has already been admitted into

3   for record purposes.

4            THE COURT:  Any objection from Mr. Stone's counsel?

5            MR. GALLIAN:  No objection.

6            MR. SELLERS:  No, Your Honor.

7            THE COURT:  And hearing none from Mr. DeLeon's

8   counsel, it is admitted.

9                (Government's Exhibit No. 118 received)

10           MS. RUDOFF:  Permission to publish?

11           THE COURT:  Yes.  Granted.

12           MS. RUDOFF:  Can we zoom in on just the three photos

13  and the text at the bottom?

14  BY MS. RUDOFF:

15  Q.   Casi, can you see this blown-up version of Government 118

16  on your screen?

17  A.   Yes.

18  Q.   And at the top on the right-hand corner, what is the date

19  of the first message?

20  A.   July 22, 2019.

21  Q.   And under sender, do you see who it says?

22  A.   The sender is -- it's Bill.

23  Q.   Okay.  And how do you know that to be Bill?

24  A.   The -- well, I see my phone number.  I really don't see

25  his.  But I just know he sent this to me.

```
 1   Q.   And there is an e-mail address as far as the sender goes,
 2   right?
 3   A.   Yes.
 4   Q.   And what is this first three photos we see?
 5   A.   It's photos from Dr. Brian's funeral.
 6   Q.   And are these photos that Bill Stone sent to you saying he
 7   was at the funeral?
 8   A.   Yes.
 9   Q.   And you said that you see your number listed.  Is that the
10   number 8559?
11   A.   Yes.
12   Q.   And from this text can you see how Bill Stone had you
13   saved in his phone at the time?
14   A.   Yes.
15   Q.   And can you tell us how you were saved?
16   A.   Project 2.
17   Q.   Can you read the text at the bottom that accompanied these
18   photos?
19   A.   "Here are some photos you requested.  His son and his
20   family, oldest granddaughter and A," meaning Avery.
21   Q.   What did you think when you got this text and these
22   photos?
23   A.   I thought they looked a little odd.
24   Q.   What do you mean?
25   A.   They didn't look real.
```

```
1   Q.   What did you do?
2   A.   So I clicked on it, and it happened to be a live photo,
3   and it -- there was no movement, and it was a picture of a
4   picture.
5   Q.   What did that make you think?
6   A.   That he made -- that he made it up; that he was not there;
7   this was not real, these pictures.
8   Q.   And at this point in time did you -- were you still under
9   the belief otherwise that Bill Stone was still working with
10  Dr. B?
11  A.   Yes.  In this timeframe?
12  Q.   Yes.
13  A.   They were still friends.
14  Q.   Okay.  Does that mean they weren't working together any
15  more?
16  A.   I -- there was a -- there was a time at the very end that
17  Bill finally retired in 2019.
18  Q.   Okay.  And who told you that Bill retired in 2019?
19  A.   He did.
20  Q.   And when Bill told you that he retired, who did he say he
21  retired from?
22  A.   The FBI.
23  Q.   And did he tell you that he was no longer working at all
24  or he was just no longer working for the FBI?
25  A.   He was still -- he was contracted out.  He had to contract
```

```
 1   out and work for them on the side because he took over two new
 2   units, one in Houston and one in Dallas.
 3   Q.   Did he make reference to also working for any other
 4   federal agency?
 5   A.   Yes, the CIA.
 6   Q.   And was that at this same time?
 7   A.   Yes.
 8   Q.   And so although he told you that he retired, it was still
 9   your understanding that he was a federal agent?
10   A.   Yes.
11   Q.   And did you understand from what he told you he was
12   continuing to do the same type of work he had done before?
13   A.   Yes.
14   Q.   So at this point in time you said you are starting to
15   question whether or not this secret probation was real, right?
16   A.   Yes.
17   Q.   Did you ultimately end up going to talk to someone other
18   than your mother about your concerns?
19   A.   Yes.
20   Q.   Who?
21   A.   I went and -- so I went and spoke with my friend Daralyn's
22   mom, Penny, at Daralyn's house.
23   Q.   And why did you choose to speak to Daralyn's mom, Penny,
24   about this?
25   A.   Because she worked with the judge that I was on Hood
```

1  County probation for, and -- yeah, she was his assistant or --

2  I'm not even sure what she does for him, but --

3  Q.   So what about her working for the Hood County judge that

4  oversaw your real probation made you think she was a good

5  person to speak to?

6  A.   Because I just wanted her to look into my file to see why

7  I got off probation in Hood County, because I was under the

8  impression that it was because Judge Anderson got me off.  And

9  so I asked her if she could -- I mean, is she allowed to look

10  in my file.  And so she looked to see why I was taken off

11  probation.  It was because of just good behavior, completion.

12  Q.   So understanding that, what did that make you think as it

13  related to your secret probation?

14  A.   Well, I then -- I was in disbelief, so I then opened up to

15  them about what -- about why, about why I was even inquiring.

16  And then I was directed to speak with Danny Briley, the Texas

17  Ranger.

18  Q.   So after this conversation with Penny Weisend, you were

19  told to go speak with someone in law enforcement, right?

20  A.   Yes.

21  Q.   And to be clear, real law enforcement?

22  A.   Yes.

23  Q.   And did you go and speak with a Texas Ranger named Danny

24  Briley?

25  A.   Yes.

```
 1   Q.   Do you remember what date you first met with him?
 2   A.   I don't.
 3   Q.   And when you went to go meet with Texas Ranger Danny
 4   Briley, what from your perspective was your purpose in meeting
 5   with him?
 6   A.   Well, the whole -- the whole reason that I was even
 7   curious to know why or if I was on probation was because I
 8   needed a travel slip to fly to New Mexico to get to my sister's
 9   wedding.  And so that was what initiated the whole question --
10   or just -- I just needed to know.  And so I initially went to
11   Danny to ask if he could tell me if I was on probation, because
12   I needed a travel slip.
13   Q.   And what did he tell you about whether or not you were on
14   secret probation?
15   A.   He -- he didn't -- he acted like he wasn't sure what I was
16   even talking about.  But I told him a little of the
17   information, and -- or I tried to give him as much information.
18   But I still was a little reluctant and hesitant, because I felt
19   like I was doing something wrong, that I was going to mess up
20   everything that Bill had been working hard for me for that --
21   for those four years.
22   Q.   What do you mean by mess up everything?  How would talking
23   to Danny Briley mess up anything, and what are you referring to
24   when you say everything?
25   A.   So I was under the impression that all of the --
```

1   initially, right after my grandmother's passing, all of the

2   drug charges that had reached statute of limitations, I was

3   under the impression that Bill had really gone to bat for me

4   and got me off of a bunch of -- several charges.  I would say

5   like seven or eight.  And he was also flying in to seal them in

6   Austin.

7           So I had a bunch of sealed files that I thought might

8   get reopened.  And then also I was worried at the time that he

9   might get in trouble that I might be blowing the whole --

10  messing up everything.

11  Q.   And why were you concerned about Bill Stone getting in

12  trouble?

13  A.   Because if he did what he said he did and all of that, I

14  felt like I was telling on a good friend, someone who had gone

15  to bat to me and risked his career to help me.

16  Q.   When you said you were afraid you would get in trouble for

17  doing all he had done, what are you referring?

18  A.   All of the back and forth, all of the talking to -- all of

19  the favors that he had to ask, all of the travel from D.C. to

20  DFW to Austin.  There was so much of that that went on in the

21  first six, seven months after my grandmother's passing, it's

22  hard to even pin down.

23  Q.   And had Bill told you that if the FBI had found out he was

24  working for your -- on your cases, your criminal cases on the

25  side, that he would get in trouble with the FBI?

1    A.   Yes.  Not only that, his analysts would get in trouble as

2    well.  It wasn't just him.

3    Q.   And that was your concern if this secret probation was, in

4    fact, real, right?

5    A.   Yes.  And then I would then lose those favors and go to

6    prison.  I wasn't sure what the end result could be, but I

7    feared it.

8    Q.   Did you have any fears if the -- if you found out the

9    secret probation wasn't real?

10   A.   I had been through so much that -- up to this point that

11   it -- I had -- there was a lot of -- I was -- I really believed

12   that it was real.  It took a lot of convincing and time and

13   therapy for me to really wrap my mind around the fact that it

14   was not real.

15   Q.   So it's fair to say when you went to meet with Ranger

16   Briley you weren't necessarily there to report a crime, right?

17   A.   Right.

18   Q.   At some point after your meeting with Danny Briley, did

19   you learn whether or not -- or I'm sorry.  Were you told

20   whether or not the secret probation was real?

21   A.   He said he was going to look into it and later told me I

22   was not on probation, that it was fine to travel to go see my

23   sister get married.

24   Q.   Who's "he"?

25   A.   Danny Briley.

1    Q.   And I think you just testified that you didn't believe

2    that at first, right?

3    A.   I did not.

4    Q.   How did you feel when you were starting to try and

5    comprehend the fact that the secret probation and anything you

6    lived through the last four years wasn't real?

7    A.   Okay.  Say that one more time.

8    Q.   How were you feeling as you were starting to hear the

9    information and learn the possibility that this entire secret

10   probation and the last four years wasn't real?

11   A.   I was hurt, angry.  I still had a really hard time

12   believing that it wasn't.  I was still on the fence for a

13   while.  And disgusted.

14        THE COURT:  Let me pause you there for just a moment.

15        Members of the jury, do we need to take a break?  Do

16   you want to push on until 10:00?

17        I'm hearing a little bit of feedback in the audience,

18   and so no eating in the audience, please.

19        And with that said, your witness.

20   BY MS. RUDOFF:

21   Q.   When you say disgusted, were you disgusted at yourself, or

22   who were you disgusted at?

23   A.   At Bill.

24   Q.   Anyone else?

25   A.   And Joe.

```
 1   Q.   And why?
 2   A.   Because of the amount of terror and sadness and fear and
 3   the amount of time that they took away from my youngest son.
 4   My attention was -- could have been solely on him.  I never got
 5   to mourn my grandmother's death.  Time I could have been
 6   dating.  I could possibly have been married.  I -- I mean, I
 7   just felt like I had already lost ten years to my drug
 8   addiction, and then I just lost, you know, an extra four years
 9   spending all of my time with two men.
10            THE COURT:  Let me pause you there for just a moment.
11            Can I see counsel off to the side for just a second?
12   Just a technical question.
13            (Bench Conference held off the record)
14            THE COURT:  Your witness, ma'am.
15            MS. RUDOFF:  Thank you, Your Honor.
16   BY MS. RUDOFF:
17   Q.   Did you -- at the time that you were trying to process
18   this, why didn't you trust what Danny Briley as law enforcement
19   was telling you?
20   A.   Because I -- everything I had lived had been so real, and
21   Bill said that my files had been sealed, and so the only person
22   that could really look into it is him, or reopen it is him.  So
23   I thought, well, maybe it's hidden or they can't find it.
24   Q.   And in addition to the feelings you just described you
25   were having as you were learning that none of this was real,
```

 1  did you think about the money?

 2  A.   I did.

 3  Q.   What did you think about that?

 4  A.   I -- I couldn't believe it.  I paid Bill and Joe to help

 5  me in all of these legal, you know, get out of -- you know, all

 6  of these charges.  I mean, it was one after the other.  It was

 7  so many things and then so much money.  But I was willing to do

 8  that for my freedom, you know.  And then to find out it wasn't

 9  real and I just gave these two men all of that money, it was --

10  made me sick.

11  Q.   Had there not been a secret probation, would you have

12  given them -- Joe and Bill that money?

13  A.   No.

14  Q.   What about the vehicles?

15  A.   No.

16  Q.   Would you have spent that much time with them over a

17  four-year period?

18  A.   No.  I probably wouldn't have ever spoken to Bill again,

19  and I would have probably continued talking to Joe periodically

20  as I had prior to.

21  Q.   And why do you think that?

22  A.   That has just been how it was.  I rarely spoke to Bill.

23  And Joe and I, I thought, were friends from prior -- prior

24  life.

25  Q.   At some point did you reach out to Bill Stone about the

 1    ongoing status of your secret probation?
 2    A.    Yes.
 3    Q.    And did you -- were you told to do that by Texas Ranger
 4    Briley?
 5    A.    Was I told to reach out?
 6    Q.    Yes.
 7    A.    I was told that, you know, I had to record any
 8    conversation.  I wasn't -- I don't know that I was told to
 9    reach out.
10    Q.    And so Ranger Briley told you if you do have a
11    conversation with Bill Stone to record it?
12    A.    Yes.
13    Q.    And did you do that?
14    A.    I did.
15    Q.    One time?  Many times?  Do you recall?
16    A.    Many times.
17    Q.    And why were you wanting to reach out to Bill Stone at the
18    time?
19    A.    I was trying to get my travel slip for my sister's
20    wedding, and I also was trying to prove that I wasn't crazy,
21    that this is really what happened to me.
22    Q.    What do you mean?  Who are you trying to prove you're not
23    crazy to?
24    A.    Well, just that I was on a probation, that I was trying to
25    show like I am on probation, this is the situation, this is my

```
 1   situation.
 2   Q.   And why were you feeling crazy?
 3   A.   Because if they're telling me it's not real but I had
 4   lived a four-year secret probation, very hands on, very
 5   watched -- I mean, I was -- I felt like there is no way that my
 6   last four years of life have all been not real.
 7            MS. RUDOFF:  Your Honor, I'm going to go into a
 8   recording that's about 30 minutes.
 9            THE COURT:  Okay.  So members of the jury, we have
10   about a half-hour recording.  Do you want to go ahead and start
11   on that?
12            All right.  Sound good.
13            And defense counsel, if you need to move to be able
14   to see anything.
15            Please remember my instruction about the transcript,
16   that is there to aid you in hearing everything -- or aid you in
17   seeing who is speaking and what they are saying.  But if there
18   is a conflict between what's written on the screen and the
19   transcript and what you hear, go with what you hear, all right?
20            With that said --
21   BY MS. RUDOFF:
22   Q.   Casi, do you remember making a recorded -- or a call to
23   Bill Stone on August 15, 2019, that you recorded?
24   A.   Yes.
25   Q.   And was the purpose of the call what you just described to
```

```
 1   us?
 2   A.   Yes.
 3   Q.   So it was the permission slip you still felt like you
 4   needed, right?
 5   A.   Yes.
 6   Q.   And also to figure out if you were truly on a secret
 7   probation?
 8   A.   Yes.
 9        MS. RUDOFF:  Your Honor, at this time the Government
10   would move to admit Government's Exhibit 172, which is a
11   recorded telephone call that was extracted from Government's
12   Exhibit 110.  Government's Exhibit 110 has already been
13   admitted for record purposes only.
14        The Government would also admit Government's
15   Exhibit 173, which is a transcript of this recorded call.
16        THE COURT:  All right.  Any objections from counsel
17   for Mr. Stone?
18        MR. GALLIAN:  Brief moment, Judge.
19        THE COURT:  Certainly.  Let me know when you're
20   ready.
21        (Pause)
22        MS. RUDOFF:  Judge, I misspoke on the transcript.
23        THE COURT:  Okay.  If you need to scratch that and go
24   back, you can do it.
25        MS. RUDOFF:  I think I had my numbers wrong.
```

```
 1              THE COURT:  That's okay.  It's so many numbers, we'll
 2   all do that.
 3              (Pause)
 4              MS. RUDOFF:  Judge, my apologies.  Government still
 5   moves to admit Exhibit 172, which is the recorded call, but as
 6   to 173 the Government is not moving to admit that at this time.
 7   Instead, the Government would move to admit Government's
 8   Exhibit 155, which would be the transcript of that recorded
 9   call.
10              THE COURT:  All right.  Sounds good.  So scratch
11   earlier as to these exhibits.
12              Counsel for Mr. Stone, if you will take a moment and
13   then let me know if you have any objections.
14              MR. GALLIAN:  Will do.  Thank you, Judge.
15              THE COURT:  Sure.
16              (Pause)
17              MR. GALLIAN:  Your Honor, on behalf of Mr. Stone, we
18   have no objection.
19              THE COURT:  All right.  And --
20              MR. SELLERS:  No objection.
21              THE COURT:  Hearing no objections from either
22   counsel, they are both admitted.
23                  (Government's Exhibit Nos. 155 and 172 received)
24              MS. RUDOFF:  Thank you, Your Honor.
25              Permission to publish Government's Exhibit
```

```
 1   Number 172?
 2            THE COURT:  Is granted.
 3            MS. RUDOFF:  And just for purposes of the record, I'm
 4   going to play from the beginning until approximately 29 minutes
 5   and 13 seconds on the counter of the recording.
 6            THE COURT:  Okay.  And so before we start, if you
 7   will hold off a minute.
 8            That will have us going to probably at 10:10.  Is
 9   that okay with everybody?
10            Okay.  And if you decide you need a break before
11   then, just flag the gentleman there or let me know.
12            And with that said -- and if you-all would when you
13   first hear it, if you'll give me a thumbs up if you can hear it
14   okay.
15            (Audio played)
16            THE COURT:  Is that the conclusion of our audio?
17            MS. RUDOFF:  Just for the record I stopped at
18   29 minutes and 21 seconds.
19            And I'm going to play clips towards the end, but they
20   are shorter.  So if now is time to take a break, that's fine.
21            THE COURT:  Let's take a break.
22            We will bring you back at 10:40.
23            All rise for the jury.
24            (Jury out)
25            THE COURT:  Okay.  We will break here in just a
```

```
 1   minute.
 2            (Discussion off the record)
 3            THE COURT:  All right.  Anything we need to take up
 4   before break?
 5            MR. GALLIAN:  No, Your Honor.
 6            THE COURT:  Okay.  I'll come back a couple minutes
 7   early.
 8            Court's in recess.
 9            (Recess)
10            THE COURT:  Okay.  If everybody will check your
11   phones.
12            Okay.  We ready?
13            Anything we need -- are we good?
14            MS. RUDOFF:  Yes.
15            SECURITY OFFICER:  All rise for the jury.
16            (Jury in)
17            THE COURT:  All right.  Everyone please be seated.
18            So, members of the jury, I have heard that we want to
19   push through till noon, is that right?  Sounds good.
20            Do we still want our half-hour lunch?  Okay.
21   Fantastic.
22            Everybody is in agreement.
23            And your witness, ma'am.
24            MS. RUDOFF:  Thank you, Judge.
25   BY MS. RUDOFF:
```

```
 1   Q.   Casi, right before we took a break, we listened to about
 2   30 minutes of a recorded call that you made to Bill Stone.  Do
 3   you recall that?
 4   A.   Yes.
 5   Q.   And did you recognize both voices on that call?
 6   A.   Yes.
 7   Q.   Who were they?
 8   A.   Mine and Bill's.
 9   Q.   When you made that recording, were you with Ranger Briley?
10   A.   No.
11   Q.   Where were you?
12   A.   I was at my house.
13   Q.   Were you told what to say in the call?
14   A.   No.
15   Q.   And is what we heard in the call the way you were feeling
16   that day?
17   A.   Yes.
18   Q.   In the call you continually referenced when speaking to
19   Bill that you made payments for legal stuff.  Can you tell us
20   what you were referring to when you said legal stuff?
21   A.   It was -- I was referring to all the cases that were
22   coming through, the first -- right after my grandmother's
23   passing, all of the favors that he had to fly in for, his
24   flights, all of my criminal charges that were coming up on
25   statute of limitations.
```

```
 1    Q.   And did that -- so you're referring to the time during
 2    your -- when you were on secret probation, right?
 3    A.   Yes.
 4    Q.   And so those other criminal charges and how it related to
 5    your secret probation?
 6    A.   Yes.
 7    Q.   A couple of times you referred to an amount being half a
 8    million dollars or 500,000 that you paid Bill and Joe as it
 9    related to your legal stuff and secret probation.
10         What were you taking into account with that 500,000?
11    A.   I was taking into account the house, the remodel, the
12    travel expenses, and the car.
13    Q.   Which car?
14    A.   The Mercedes and the truck.
15    Q.   Which truck?
16    A.   I'm sorry.  His Toyota Tacoma.
17    Q.   What about the King Ranch F-150?  Was that considered in
18    what you were talking about?
19    A.   No.
20    Q.   Why not?
21    A.   It was separate.  It was for Joe.
22    Q.   Okay.  So when you said 500,000, were you just referring
23    to Bill, what you paid Bill?
24    A.   Yes.
25    Q.   Okay.  So you weren't talking about the money that you
```

1    paid Joe DeLeon for his assistance in the secret probation?

2    A.   Right.

3    Q.   Were you considering the restitution payment to Enterprise

4    that we heard about yesterday?

5    A.   Say that again.

6    Q.   When you were talking about the 500,000, were you also

7    accounting for the $250,000.00 restitution check to Enterprise

8    that you told us about yesterday?

9    A.   No, I wasn't.

10   Q.   Why not?

11   A.   Because it was supposed to have been paid for restitution.

12   Q.   And at that point in time that you made this call, were

13   you still under the belief that it was, in fact, paid to

14   Enterprise?

15   A.   Yes.

16   Q.   And that $500,000.00 number, was that a number you came up

17   with by adding up documents, or was that just a ballpark?

18   A.   It was a ballpark in the conversation.

19   Q.   You said several times that you felt like Joe and Bill

20   took advantage of you.  Can you explain what you mean by that?

21   A.   I felt like the amount of money that was paid was a

22   little -- was a lot for what situation -- it was just a lot,

23   way more than -- because in the very beginning I was scared and

24   I was fearing, and I didn't -- I didn't really know how much

25   money was going out, and I was almost in a fog and in

1  disbelief, and I was just willing to do whatever it was that I

2  had to do to stay -- to keep them happy and then also to stay

3  out of jail.

4         Over time, by the time I made this recording, I had

5  more years of sobriety.  I was more clearheaded.  And looking

6  back I realize that that was a lot of money, and I don't -- I

7  had more time of living sober and in a normal life that I

8  realized that, oh, my gosh, like that was so much money and --

9  but -- and that's why I mentioned I felt like they took

10 advantage of me, because it was way too much money to be given

11 somebody just to stay out of jail.

12 Q.   And so those feelings and the way you were expressing

13 them, that was all predicated on the fact that the secret

14 probation was real, right?

15 A.   Right.

16 Q.   And so at the time of this call, you -- everything you

17 said within the call was predicated on your belief at the time

18 that this probation was still potentially real?

19             MR. SELLERS:  Object to leading.

20             THE COURT:  Overruled.

21 BY MS. RUDOFF:

22 Q.   You can answer.

23 A.   I -- yes.  I was still believing that there is a chance

24 that this probation is real, so -- but then I was also thinking

25 that it might not be.  I wasn't sure.

```
 1   Q.   We heard Bill talk about seeing you eating a burger and
 2   hanging out with -- I think he named a few people.  Do you know
 3   what he was referring to?
 4   A.   Yes.  He would let me know -- or he would -- that was very
 5   typical of him to do if I ever hung out with anybody outside of
 6   him.  He would tell me that my friends were talking about me
 7   behind my back or sending pictures of me eating food to each
 8   other.
 9   Q.   And why would he -- what was the relevance to pictures of
10   you eating food?
11   A.   I think he -- well, I'm not sure what the relevance is of
12   why he would claim it was food all the time, but in my opinion
13   I thought maybe it was because of my eating disorder and my
14   issues with food and also to prove that my friends don't --
15   aren't my friends, that they -- I can't trust them.  Nobody --
16   I couldn't trust anybody or hang out with anyone, they weren't
17   my real friends.
18   Q.   And at the time was the people he said he knew you hung
19   out with and the burger you eating, were those real events that
20   occurred?
21   A.   Yes.
22   Q.   Had you told him that -- about that?
23   A.   No.
24   Q.   Do you know how he knew that you hung out with those
25   people or that you went and had a burger?
```

```
 1   A.   I assumed he knew just based on his analysts giving him
 2   the information.
 3   Q.   And so you believe at that time there was still
 4   surveillance on you?
 5   A.   Yes.
 6   Q.   Just so the jury understands, we heard a reference to
 7   someone in the video or, I'm sorry, audio named FHD?
 8   A.   Uh-huh.
 9   Q.   And we don't need to know what it stands for, but who were
10   you and Bill referring to?
11   A.   Eric Gomez.
12   Q.   And that's the same Eric Gomez we talked about you having
13   a prior relationship with, right?
14   A.   Yes.
15   Q.   Okay.  And was FHD just a nickname?
16   A.   It was one of his nicknames that Bill had given him.
17          MS. RUDOFF:  Okay.  If we could republish
18   Government's 172 and start it at 44 minutes and 10 seconds on
19   the counter.  And we can stop at 47 minutes and 5 seconds.
20          (Audio played)
21   BY MS. RUDOFF:
22   Q.   Casi, what we just heard there, that was a continuation of
23   the portion of the phone call on August 15, 2019, right?
24   A.   Yes.
25   Q.   We heard you talk a little about family issues and
```

1    your mom.

2         What were you referring to specifically?

3    A.   What was I referring to?

4    Q.   Or maybe Bill mentioned it, but what was being talked

5    about as it related to your mom and your family issues?

6    A.   He was referring to working with CPS and -- or my mom

7    trying to take my son away from me and him helping me with CPS

8    to avoid that happening.

9    Q.   Is that something you were told occurred within the

10   timeframe you were on secret probation?

11   A.   Yes.

12   Q.   Do you know now if your mom ever reported you during that

13   timeframe for a CPS case?

14   A.   I was told no.

15   Q.   And at any point during the timeframe of the secret

16   probation, did anyone in your family ever do anything like

17   procedurally or legally to contest the will?

18   A.   No.

19   Q.   Did anyone in your family try to take money from the

20   estate away from you?

21   A.   No.

22   Q.   After you found out that those things that Bill and Joe

23   told you were going on with your family didn't actually happen,

24   were you able to start reestablishing a relationship with your

25   brother and your mom?

1  A.   Yes.

2  Q.   And since then do you have a better relationship with

3  them?

4  A.   Yes.

5       MS. RUDOFF:  If we could republish Government 172 and

6  start at minute 53 and 48 seconds and play to 55 and 50

7  seconds.

8       (Audio played)

9       MS. RUDOFF:  And if we could finally publish on

10 Government's 172 starting at minute 58 and going through

11 the end.

12      (Audio played)

13      MS. RUDOFF:  You can stop there.

14      And for purposes of the record, that's at 59:57.

15 BY MS. RUDOFF:

16 Q.   Casi, at portions of the call we heard Bill say repeatedly

17 that he had been with you for five years.

18      When did you and Bill start dating?

19 A.   Dating?

20 Q.   Yes.

21 A.   It was -- it was either right before my -- in the end of

22 2017 or the beginning of 2018.

23 Q.   And so if this call is in August 2019, would y'all have

24 been together for five years?

25 A.   No.

```
 1   Q.   And so prior to you dating around the time that you just
 2   referenced in 2017, how would you have characterized your
 3   relationship?
 4   A.   It was kind of like a group relationship at the beginning.
 5   It was like Charles, Joe, Bill.  I never spoke to Bill.  He was
 6   always working.  It was never -- I mean, we would speak
 7   sometimes, but as far as a relationship goes, it was -- I mean,
 8   we didn't really even know each other very well.
 9   Q.   And what you're referring to, is that before you're on
10   secret probation in 2015?
11   A.   Oh, yes.
12   Q.   Okay.  So then once you're on secret probation in 2015
13   until you start dating at the end of the 2017, how would you
14   characterize the nature of your relationship then?
15   A.   Very similar in that way.  It was like Joe was more my
16   friend, and Bill was Joe's friend.
17   Q.   Well, you would communicate with Bill Stone between 2015
18   and 2017, right?
19   A.   We did.
20   Q.   And you would spend time together?
21   A.   Oh, yes.  Well, I still looked at him as a superior, I
22   guess would be a good way to say it.
23   Q.   Okay.  And so from 2015 to 2017, would you tell him about
24   how much you appreciated his actions he was doing regarding
25   your probation?
```

```
 1   A.   Oh, of course, yes.
 2   Q.   And would you show or -- and would you express love and
 3   appreciation for that?
 4   A.   I did.
 5   Q.   Would you also express from 2015 to 2019 love and
 6   appreciation for Joe?
 7   A.   Yes.
 8   Q.   And would you tell Joe that you loved him?
 9   A.   Yes.
10   Q.   But were you in a relationship with Joe even though you
11   told him you loved him?
12   A.   No.
13   Q.   Casi, do you remember making another call to Bill Stone on
14   August 18, 2019, that was recorded?
15   A.   Yes.
16   Q.   It's fair to say you made a lot of phone calls to Bill
17   that were recorded, right?
18   A.   Yes.
19   Q.   And before I go there, on the call we just heard, we heard
20   Bill talk about several times a life insurance policy?
21   A.   Yes.
22   Q.   Did you know what he was talking about?
23   A.   He had claimed he had put me on his life insurance policy.
24   Q.   Bill told you that?
25   A.   He had told me that.
```

```
 1   Q.   Did you ever see any documentation?
 2   A.   No.
 3   Q.   In the -- while you were on secret probation and then also
 4   ultimately in a relationship with Bill Stone, did Bill ever
 5   take over any of your financial responsibilities for you?
 6   A.   No.
 7   Q.   Did he ever financially support you in any way?
 8   A.   No.
 9   Q.   And so when we hear on the call that he is saying that
10   that's what he is doing, were you aware of what he was talking
11   about?
12   A.   When he said taking care of me, I thought he was referring
13   to ensuring my legal stuff.
14   Q.   Okay.  And then when he was talking about taking care of
15   you moving forward, what did you understand him to talk about?
16   A.   Taking care of me moving forward, I'm not sure what that
17   would even look like.
18   Q.   We also heard Bill talk a lot about a book or book
19   rights --
20   A.   Uh-huh.
21   Q.   -- I believe during that call.
22            Did you know what he was referring to?
23   A.   Yes.  He had started writing a book.
24   Q.   Is that what he told you?
25   A.   That's what he told me.
```

```
1    Q.   Did he tell you what the book was about?
2    A.   Yes.
3    Q.   What did he tell you it was about?
4    A.   His -- some of his past cases when he -- but he had to get
5    clearance from a lot of them, so -- beforehand, to be able to
6    write about them, but kind of like a Joe Kenda type thing.
7    Q.   So when you say his past cases, are you talking about when
8    he was an FBI agent?
9    A.   I didn't know what he was talking about.  Just past
10   experience.
11   Q.   Okay.  Did you ever read any of the book?
12   A.   No.
13   Q.   Did he ever read any of the book to you?
14   A.   He tried reading me a page out of the book.
15   Q.   Is that all?
16   A.   Yes.
17   Q.   So other than what you -- he told you, you didn't have any
18   knowledge beyond that?
19   A.   No.
20   Q.   Casi, you said that there was another recorded call on
21   August 18, 2019.  Do you recall telling Bill that you were
22   going to go to Austin to meet with Judge Anderson?
23   A.   Yes.
24        MS. RUDOFF:  At this time the Government moves to
25   admit Government Exhibit 151, which is a recorded call between
```

```
 1    Casi and Bill Stone, and it comes from Government Exhibit 110,
 2    which has previously been admitted for record purposes.
 3             And we would also offer Government 152, which is the
 4    transcript associated with this call.
 5             THE COURT:  All right.  Any objection?
 6             MR. GALLIAN:  No objection.
 7             MR. SELLERS:  No objection.
 8             THE COURT:  It's admitted.
 9                 (Government's Exhibit Nos. 151 and 152 received)
10             MS. RUDOFF:  May I publish Government's Exhibit 151,
11    Your Honor?
12             THE COURT:  Sure.
13             Would you give the jury some idea of how long it is?
14             MS. RUDOFF:  A minute and a half.
15             THE COURT:  Okay.  Gotcha.  Just let us know if it's
16    a long one.
17             MS. RUDOFF:  Uh-huh.
18             THE COURT:  Great.  Thank you.
19             (Audio played)
20             MS. RUDOFF:  For the record I stopped at 3 minutes
21    and 34 seconds.
22    BY MS. RUDOFF:
23    Q.   Casi, on that call you said something to the effect of I
24    don't know where to go.  Why didn't you know what courthouse to
25    go to?
```

1    A.   I knew to go to the Austin federal courthouse, but I
2    didn't know where to go inside.
3    Q.   Okay.  And you referenced a location from when he called
4    you at the courthouse before.  What were you talking about?
5    A.   It was the -- are you -- can you repeat that?
6    Q.   You said at one point, all I know is when you called me
7    that day from the courthouse, I have that location.
8             What call were you referring to?
9    A.   The phone call that we had with the judge.
10   Q.   Is that the one we listened to yesterday?
11   A.   Yes.
12   Q.   Okay.  And so when that call came through, something about
13   it gave you a location?
14   A.   No.  Later after the fact, when I was told that I wasn't
15   on probation, I later went back to Google the number, and it
16   said the courthouse in Austin.
17   Q.   So the number that showed up on your phone that day
18   actually went back to the federal -- to the courthouse?
19   A.   Yes.
20   Q.   Why did you decide to tell Bill that you were going down
21   to Austin to the federal courthouse to meet with Judge
22   Anderson?
23   A.   I was trying to get him to tell me -- I was still trying
24   to figure out honestly if I was on probation or not.  I was
25   told I wasn't, but I was -- I needed to hear it from him.

1  Q.   You say you were told you weren't.  Who told you that?

2  A.   Danny Briley told me --

3  Q.   Law enforcement?

4  A.   Law enforcement told me I wasn't.

5  Q.   Okay.  At some point towards the end Bill said something

6  about, when I get home I'm going to get this handled.  Do you

7  know where he was?

8  A.   Out of the country.

9  Q.   How did you know that?

10  A.   He told me.

11  Q.   Did he say why he was out of the country?

12  A.   Working.

13  Q.   Did he say what kind of work?

14  A.   He was doing Guantanamo, I think, is where he was

15  interrogating somebody.

16  Q.   Something to do with his position as a federal agent?

17  A.   Yes.

18  Q.   So in August of 2019, he is saying he is still traveling

19  for work?

20  A.   Yes.

21  Q.   Do you remember making a call to Bill Stone on August 30,

22  2019, that was recorded?

23  A.   Yes.

24  Q.   And then in that call you also remember telling him you

25  were going to go speak with Judge Anderson again?

1    A.    Yes.

2    Q.    In between those two timeframes, did you, in fact, drive

3    to Austin and try to meet with a Judge Anderson?

4    A.    Say that again.  I'm sorry.

5    Q.    During the timeframe between these two calls, August 18,

6    2019, and August 30, 2019, did you, in fact, go to Austin and

7    try to meet with a Judge Anderson?

8    A.    No.  I -- when I Googled his name there wasn't a Judge

9    Anderson in Austin.

10   Q.    Is this the first time you had looked into the fact of

11   whether there was a Judge Anderson or not?

12   A.    Yes, because I was told that Bill and his analysts could

13   look at my Google history and my search history as well, so --

14   Q.    And why did the fact that they could -- that Bill said him

15   and his analysts could look at your search history prevent you

16   from looking up Judge Anderson before?

17   A.    I just didn't want to question it.  I didn't -- well, I

18   never thought to question it, but I just -- this was the first

19   time I felt comfortable or even curious to question it.

20          MS. RUDOFF:  Your Honor, at this time the Government

21   would move to admit Government's Exhibit 67.  It's a recorded

22   call between Casi and Bill Stone on August 30, 2019.  It is

23   derived from Government Exhibit 110, which is already in for

24   record purposes.

25          And also offer Government's Exhibit Number 68, which

```
 1   is the transcript to that call.

 2            THE COURT:  Any objection?

 3            MR. GALLIAN:  No objection.

 4            MR. SELLERS:  No objection.

 5            THE COURT:  It's admitted.

 6               (Government's Exhibit Nos. 67 and 68 received)

 7            MS. RUDOFF:  Permission to publish Government's 67

 8   starting at 6 minutes.

 9            THE COURT:  Granted.

10            MS. RUDOFF:  Thank you.

11            (Audio played)

12   BY MS. RUDOFF:

13   Q.   Casi, how are you feeling in this call?

14   A.   Kind of how I feel right now.

15   Q.   Can you explain that?

16   A.   Angry, frustrated, irritated.  I was very irritated with

17   how he always beats around the bush about every question that I

18   try to ask directly involving my probation, and so I'm

19   frustrated and hearing it back, because I feel like I'm in that

20   position again.

21   Q.   It's fair to say that during that call you were pushing

22   back a lot on Bill Stone, right?

23   A.   Yes.

24   Q.   And why at this point in time did you feel comfortable

25   doing that?
```

1   A.    Because I knew it was -- I knew he was lying.  I knew

2   everything was not true.  My probation was not true.  It was

3   made up.

4   Q.    In the beginning of the call you said you wanted your cell

5   phones back.  What cell phones were you referring to?

6   A.    The cell phones that he supposedly had sent to

7   Washington, D.C., to get looked at.

8   Q.    And then what did you find out about those phones?

9   A.    They were at his house.

10  Q.    And how did you find that out?

11  A.    I logged into a -- one of my social media apps, and they

12  were logged in at his house.

13  Q.    And did he acknowledge that when you told him that you

14  knew that your phones were at his house?

15  A.    Yes.

16  Q.    Did you get those cell phones back?

17  A.    No.

18  Q.    At one point in the call you said that you felt like he

19  took advantage of you based upon who he was in society.  What

20  did you mean by that?

21  A.    By his position in the FBI.

22  Q.    And at one point you asked him who you were passed on to.

23  What were you referring to?

24  A.    Who was then watching over me if he wasn't there.

25  Q.    What do you mean by watching over you?

```
 1   A.   I was on probation, and I was -- typically I would have
 2   somebody watching over me if he couldn't.
 3   Q.   Because that's what Bill told you?
 4   A.   Yes.
 5   Q.   So even in that call is Bill Stone telling you you're
 6   still on secret probation?
 7   A.   He's implying that, yes.
 8   Q.   At any point in time in your calls that you made with Bill
 9   Stone and that were recorded, did Bill Stone acknowledge and
10   admit to you that the secret probation was fake?
11   A.   No.
12   Q.   At some point in time did you also reach out to Joe DeLeon
13   once you found out -- once you spoke with law enforcement and
14   found out that this probation was fake?
15   A.   Yes.
16   Q.   And did you have a few phone calls with Joe DeLeon as
17   well?
18   A.   I did.
19   Q.   Do you recall making a call to Joe DeLeon in the beginning
20   of September 2019?
21   A.   Yes.
22   Q.   And do you recall actually telling Joe DeLeon that you had
23   found out that the probation was not real?
24   A.   Yes.
25   Q.   How did Joe DeLeon respond when you shared that
```

```
 1   information?
 2           MR. SELLERS:  Your Honor, I'm going to object.  The
 3   recording is the best evidence.
 4           THE COURT:  Overruled.
 5           MR. SELLERS:  If I could just have a running
 6   objection on this line.
 7           THE COURT:  Okay.
 8           MR. SELLERS:  Thank you.
 9           THE COURT:  Overruled.
10           Actually, no, I'm not going to do a running
11   objection.  So if you think best evidence is appropriate,
12   reassert it.
13           MR. SELLERS:  Yes, ma'am.
14   BY MS. RUDOFF:
15   Q.   How did Joe DeLeon respond when you told him that you
16   found out the secret probation was fake?
17   A.   He couldn't believe it either.
18   Q.   So he seemed surprised?
19   A.   Yes, seemed surprised.
20   Q.   And did you tell him more information about what you had
21   learned?
22   A.   Yes.
23   Q.   What did you tell him?
24   A.   I told him that everything in the last four years had been
25   made up and not true, and he couldn't believe it.
```

```
 1    Q.   Did he ultimately believe you when you told him that?
 2    A.   No.
 3    Q.   And about a week later did you receive actually a call
 4    back from Joe DeLeon?
 5    A.   Yes.
 6    Q.   And during that conversation, do you remember telling him
 7    specifically about the money you had given Bill?
 8    A.   Yes.
 9    Q.   And what did you tell him that you had given Bill money
10    for?  What type of items?
11    A.   The truck -- the truck, the car, and the house.  And I
12    believe he knew about the restitution, but -- yeah, because he
13    didn't know I wasn't supposed to share what I had given Bill
14    with Joe.
15    Q.   So how did Joe DeLeon react to you telling him about the
16    money you had given Bill Stone?
17    A.   He couldn't believe it.
18    Q.   And at that point in time you had already told Joe DeLeon
19    the secret probation was not real, right?
20    A.   Yes.
21    Q.   Did Joe DeLeon call you back a couple of weeks after that
22    to tell you something about your secret probation?
23    A.   Yes.
24    Q.   What did he tell you about the secret probation?
25    A.   He --
```

1          MR. SELLERS:  Again, Your Honor, I'm going to reurge
2    best evidence.  These are all recorded.
3          THE COURT:  Okay.  Overruled.
4    BY MS. RUDOFF:
5    Q.   You can answer.  Sorry.
6    A.   He said -- he said that Bill had called him and told him
7    that there were some papers to sign to get me off probation.
8    Q.   And did he say whether or not you were going to get off
9    probation?  Did Joe say?
10   A.   He acted a little -- just as confused as I was, because at
11   this point I knew it wasn't real, and I had told him it wasn't
12   real, so it was just kind of an awkward conversation to have
13   with somebody.
14          So I guess Bill had called him to tell me, because
15   Bill was no longer speaking to me, I guess, that I had these
16   papers I needed to sign to get -- to sign off on my probation
17   in Austin.
18   Q.   So did it make sense to you that Joe DeLeon would tell you
19   you needed to sign secret probation papers after you had told
20   him it's not real?
21   A.   He -- I thought it was odd, but I think he thought it was
22   just as odd, because I had just told him it wasn't real.  So I
23   just remember it being kind of like, oh, really, okay, that's
24   weird kind of a moment.
25   Q.   Did you -- were you ever presented with any papers that

```
 1   you were asked to sign to get off secret probation?
 2   A.    Yes.
 3   Q.    Who presented those papers to you?
 4   A.    Bill.
 5   Q.    Do you remember about when he presented those papers to
 6   you?
 7   A.    I don't.  I just remember where.
 8   Q.    Was it in 2019?
 9   A.    Yes.
10   Q.    And was it after you-all were -- broke off the engagement,
11   or were you guys still together?
12   A.    It was after.
13   Q.    Okay.  And you said you remember where.  Where was it that
14   Bill Stone asked you to meet him?
15   A.    It was at the Hulen Mall.
16   Q.    And what happened when you got there?
17   A.    He asked me to get in his truck, and I did.  And he showed
18   me these -- he said he had been in Dallas all day getting these
19   papers written up.  And as I looked over them, nothing was
20   accurate.  The days I had been on probation were wrong.  All of
21   the information on each front page was not accurate.  And the
22   signature page was on the last page of the packet.  And I told
23   him I wasn't signing these papers.
24   Q.    And why did you say you weren't going to sign the papers?
25   A.    Because of the inaccuracy of everything that was written.
```

1  Q.   And was this, in fact, the first time you had ever been
2  given any documents related to secret probation?
3  A.   Yes.
4  Q.   Did you -- was it odd to you that it was happening at that
5  point in time?
6  A.   I thought he had just, I guess, given up and -- I wasn't
7  sure.  The whole thing was very odd at this time.  I wasn't
8  sure exactly.  I was just, okay, yeah.  The first time I ever
9  seen papers that had any relation to this.
10 Q.   And so it's fair to say you didn't sign those documents?
11 A.   I did not sign the documents.
12 Q.   Casi, I want to just ask you a couple of follow-up
13 questions regarding some of the financial transactions we went
14 over yesterday.
15 A.   Okay.
16         MS. RUDOFF:  Can we publish Government's Exhibit
17 Number 39?
18         And can we zoom in on the withdrawal in the top half
19 portion of page 1?
20 BY MS. RUDOFF:
21 Q.   Casi, what's before you is Government's Exhibit Number 39
22 which has already been admitted into evidence.
23         Can you tell us what we are looking at in this
24 document?
25 A.   My bank statement from Chase.

1  Q.   And do you see a $5,000.00 withdrawal on this bank

2  statement?

3  A.   Yes.

4  Q.   What date was that?

5  A.   May 25th.

6  Q.   What year?

7  A.   2016.

8  Q.   Is this the same withdrawal we talked about yesterday?

9  A.   Yes.

10  Q.   And what would this withdrawal have been for?

11  A.   Bill's travel expense for handling my legal criminal

12  charges.

13  Q.   And why do you have the recollection that that's what the

14  $5,000.00 withdrawal would be for?

15  A.   Because that's how much it cost every time he flew in to

16  help me.

17  Q.   And do you know -- was this withdrawal done by check or

18  cash?

19  A.   Cash.

20  Q.   What bank location or where would you have gone to get

21  this cash?

22  A.   At this location -- on this time -- it depends if it was

23  the Grapevine -- the Chase Grapevine or Granbury Chase.

24  Q.   So there were two Chase locations you would go to withdraw

25  cash?

```
 1   A.   Yes.

 2   Q.   One was in Grapevine, Texas?

 3   A.   Yes.

 4   Q.   And the other would have been where?

 5   A.   In Granbury.

 6          MS. RUDOFF:  Okay.  Can we republish Government's

 7   Exhibit Number 41?

 8          And can we zoom in on this cashier's check?

 9   BY MS. RUDOFF:

10   Q.   Casi, is this the cashier's check we looked at yesterday

11   that you wrote to pay for Bill Stone's Mercedes?

12   A.   Yes.

13   Q.   And what bank was this cashier's check -- or what bank did

14   you go to get this cashier's check?

15   A.   The Chase Bank in Grapevine.

16   Q.   That's Grapevine, Texas?

17   A.   Grapevine, Texas.

18   Q.   Okay.

19          MS. RUDOFF:  Can we republish Government's

20   Exhibit 46?

21          And can we go to page 2, please?

22          And can we zoom in on the transaction?

23   BY MS. RUDOFF:

24   Q.   And, Casi, on this transaction, we've already looked at

25   the withdrawal for 5,000 on May 25th, right?
```

```
 1   A.   Yes.
 2   Q.   And do you see a withdrawal on June 3rd as well?
 3   A.   Yes.
 4   Q.   And how much was that for?
 5   A.   9,000.
 6   Q.   And you said yesterday you weren't exactly sure what this
 7   was for, right?
 8   A.   Right.
 9   Q.   Was there anything else around this time that you were
10   withdrawing cash for to purchase?
11   A.   No.
12   Q.   And so when you were withdrawing cash, what was it
13   typically for?
14   A.   For either Bill or Joe.
15   Q.   As it related to your probation?
16   A.   As it related to my secret probation or other criminal
17   charges.
18   Q.   And you said that if you made a withdrawal at Chase it
19   would have been one of two locations, right?
20   A.   Yes.
21   Q.   Where were those located?
22   A.   The Grapevine or Granbury.
23             MS. RUDOFF:  Can we republish Government's
24   Exhibit 47?
25             Can we go to page 6, please?
```

```
 1   BY MS. RUDOFF:
 2   Q.   Casi, do you see here in front of you a copy of the
 3   cashier's check that you wrote to Toyota of Grapevine?
 4   A.   Yes.
 5   Q.   And was this for the truck we talked about yesterday?
 6   A.   Yes.
 7   Q.   And where would you have gotten this cashier's check from?
 8   A.   At the Chase Bank in Grapevine.
 9   Q.   Grapevine, Texas?
10   A.   Yes.
11         MS. RUDOFF:  Okay.  And can we republish Government
12   Exhibit Number 50?
13         And can we go to page 10, please?
14   BY MS. RUDOFF:
15   Q.   Casi, is this the cashier's check that you purchased for
16   Bill Stone's house?
17   A.   Yes.
18   Q.   And where would you have purchased this cashier's check
19   from?  What location?
20   A.   I don't remember on this specific one.  I want to say the
21   one in Grapevine.
22   Q.   Okay.  And if it wasn't the one in Grapevine, was there --
23   was it another location you went to?
24   A.   Or Granbury.
25   Q.   Other than Grapevine or Granbury, was there any other
```

1   Chase location that you went to?

2   A.   No, not to my knowledge.

3   Q.   Okay.

4        MS. RUDOFF:  And can we republish Government's

5   Exhibit 55?

6   BY MS. RUDOFF:

7   Q.   Casi, do you see on Government's Exhibit 55 a check you

8   wrote?

9   A.   Yes.

10  Q.   And was this the first payment check you wrote for Bill

11  Stone's kitchen remodel?

12  A.   Yes.

13  Q.   And where would you -- the house that was located where

14  that you were doing the remodel for?

15  A.   In Colleyville, Texas.

16  Q.   Okay.  And so is that where you would have taken this

17  check to, to have the -- to provide to the contractor?

18  A.   Yes.

19        MS. RUDOFF:  Can we go to page 2?

20  BY MS. RUDOFF:

21  Q.   What is this check?

22  A.   It is the second payment for the remodel.

23  Q.   Okay.  And, again, this was the remodel for the house in

24  Colleyville, Texas?

25  A.   Yes.

```
 1    Q.   Okay.
 2              MS. RUDOFF:   And can we go to page 3?
 3    BY MS. RUDOFF:
 4    Q.   What is this?
 5    A.   The third payment for the remodel.
 6    Q.   And was this also for the remodel in Colleyville, Texas?
 7    A.   Yes.
 8    Q.   And seeing all these three checks, I believe two for
 9    25,000 and one for 20,000, about how much would you have paid
10    for Bill Stone's remodel in Colleyville, Texas?
11    A.   About 70,000.
12    Q.   Once you became executor of your grandmother's estate in
13    2015, how much of the estate did you have access to in liquid
14    cash from between December 2015 and December 2016?  Do you
15    know?
16    A.   Yes.
17    Q.   How much?
18    A.   I had -- I had a million dollars.
19    Q.   So in that same timeframe, from December 2015 to December
20    2016, about how much do you believe you gave to Joe DeLeon and
21    Bill Stone?
22    A.   Between what years?
23    Q.   The first year you were on probation.
24    A.   Together or separate?
25    Q.   Together.
```

1         MR. SELLERS:  Your Honor, I'm -- objection under 403

2    for the clarification she just asked for.

3         THE COURT:  Okay.  What's your -- 403 and just --

4         MR. SELLERS:  Confusion of the issues, vague, lumping

5    them together.

6         THE COURT:  All right.  Overruled.

7    BY MS. RUDOFF:

8    Q.   You can answer.

9    A.   About 725,000, something like that.

10   Q.   Okay.  Was that a significant portion of the inheritance

11   you received that first year?

12   A.   Yes.

13   Q.   And at the time in that first year you were on secret

14   probation, were you working?

15   A.   No.

16   Q.   What were you doing?

17   A.   I was going to school full-time.

18   Q.   That first year you were on secret probation, besides

19   paying Bill and Joe for their role in your secret probation,

20   including the vehicles and the house, did you make any big

21   purchases for yourself?

22   A.   I did.

23   Q.   What did you buy?

24   A.   I had bought a car or two.

25   Q.   Why did you buy a car in 2016 for yourself?

```
 1   A.   I traded in my grandmother's car.
 2   Q.   Okay.  So the car you were driving, had that been given to
 3   you by your grandmother?
 4   A.   It was just in her estate.  So I had given my car that I
 5   was driving to Bill, and I took her car and traded it in.
 6   Q.   Okay.  So when you traded in that car, did you have to
 7   spend significant more cash to get the new car?
 8   A.   Not too much.
 9   Q.   But some?
10   A.   Some.
11   Q.   Okay.  And then you said you made another car purchase
12   that year?
13   A.   I think it was that year, yes.
14   Q.   Okay.  What did you buy?
15   A.   I traded the Lexus in for a Mercedes.
16   Q.   Okay.  And, again, was there -- did you just have to pay
17   the difference between the trade-in and the new vehicle?
18   A.   Yes.
19   Q.   That first year -- I think you mentioned previously that
20   you had -- you sold your house and bought a new one as well?
21   A.   Yes.
22   Q.   What house were you living in originally in 2016?
23   A.   I was in my Stoney Creek house.  It was in Granbury.  My
24   house.
25   Q.   And why did you sell that house in the first year you were
```

```
 1   on secret probation?
 2   A.   I was told I had to put it up for sale to show the judge I
 3   was actively trying to engage in real estate.
 4   Q.   Who had bought you that house?
 5   A.   My grandmother.
 6   Q.   So when you sold it, did you have a mortgage?
 7   A.   I did not.
 8   Q.   So what money did you use to buy the new house?
 9   A.   The same money, from the house.
10   Q.   Other than those purchases we talked about in that first
11   year on secret probation and the first year you received money
12   from the estate, did you make any other big purchases?
13   A.   In the first year?
14   Q.   Yeah.
15   A.   No.
16   Q.   Currently you said you work as a hairstylist, right?
17   A.   Yes.
18   Q.   Where do you work as a hairstylist?
19   A.   I have a suite in Granbury.
20   Q.   How many days a week do you work?
21   A.   I work -- well, I will just say Tuesday, Wednesday,
22   Thursday, every other Friday and every other Saturday.
23   Q.   So a majority of the week?
24   A.   Yes.
25   Q.   And about how much roughly do you make per year as a
```

```
 1   stylist?
 2   A.   It varies.  Probably 65,000.  It can be anywhere from 35
 3   to 65.  It just depends on what year.
 4   Q.   Other than the income you bring in, does anyone else help
 5   support you financially?
 6   A.   No.
 7            MR. SELLERS:  Object to relevance, Your Honor.
 8            THE COURT:  Overruled.
 9   BY MS. RUDOFF:
10   Q.   And are you the only person -- or who supports your
11   children financially?
12   A.   I do.
13   Q.   Do you have assistance from anyone else?
14   A.   No.
15            MS. RUDOFF:  Your Honor, at this time I pass the
16   witness.
17            THE COURT:  All right.  So members of the jury, I'm
18   happy to have us go until noon, but now is actually probably a
19   really good breaking point.
20            We will -- she has passed the witness, and so
21   cross-examination would begin.  And so rather than do 15
22   minutes of cross-examination, would you like to have lunch a
23   little early?
24            Okay.  Is that okay with lawyers?
25            MR. GALLIAN:  The only issue is we pushed lunches
```

```
 1    back to 12:00.
 2            THE COURT:  Oh, gotcha.  Okay.  Well, do you want to
 3    go ahead and start?  Do you want to proceed, and we can break
 4    at lunch?  Okay.
 5            MR. WESTFALL:  45-minute long lunch.
 6            THE COURT:  Fantastic.  Yeah.  Okay.  Sounds good.
 7            Well, let's go ahead and let them proceed, and we'll
 8    plan to break at noon.
 9            Off the record.
10            (Discussion off the record)
11                      CROSS-EXAMINATION
12    BY MR. GALLIAN:
13    Q.   Good morning, Ms. Thomas.
14    A.   Good morning.
15    Q.   How are you?
16    A.   Good.  How are you?
17    Q.   I'm good.  My name is Gregg Gallian.  We never talked
18    before, have we?
19    A.   Never.
20    Q.   Today is the first time we are meeting?
21    A.   Yes.
22    Q.   I'm one of the attorneys that is representing Bill Stone.
23    I have quite a few questions for you, as I'm sure you can
24    understand.
25    A.   Yes.
```

```
 1   Q.   Off the jump, you know that the probation that Bill had
 2   you on was fake?
 3   A.   I know that now.
 4   Q.   Yes, ma'am.  I'm not going to ask any questions about the
 5   probation.  You know now just like after you knew with Ranger
 6   Briley when he told you that the probation was, in fact, made
 7   up, right?
 8   A.   I know now that the probation is made up.
 9   Q.   Okay.  Yesterday we all heard the chambers phone call.
10   It's a horrible phone call, wasn't it?
11   A.   It was.
12   Q.   It was messed up, right?
13   A.   Yes.
14   Q.   I think for me as a human, person to person, I'm truly
15   sorry you had to go through that.  I know it must have been
16   hard.
17   A.   Thank you.
18   Q.   Bill went to great lengths in that phone call to scare
19   you, did he not?
20   A.   Yes.
21   Q.   We now know, and you've heard after the fact, that Bill
22   bought a spoof number to pretend like he was calling from
23   Austin, right?
24   A.   Yes.
25   Q.   He had never done that before, right?
```

```
 1   A.   Say that again.
 2   Q.   He had never done that before?  He had never called you
 3   like he was acting like he was in judge's chambers?
 4   A.   Yes, he had.
 5   Q.   With a spoof number?
 6   A.   He has called me from the judge's chamber.
 7   Q.   I know, but what I'm saying is the spoof number.  So when
 8   I say spoof number, I'm talking about the 512 area code, the
 9   number you looked up.
10   A.   Right.  Me, he had never used a 51 -- a number, period.
11   Q.   Now, let's go back to that timeframe in y'all's
12   relationship.
13        You guys were, in fact, in a relationship in June of
14   2019, right?
15   A.   Yes.
16   Q.   And based on your testimony yesterday, some of the stuff
17   I'm finding out for the first time, you guys went down to
18   Florida in 2016 as a couple; is that right?
19   A.   In what year?
20   Q.   I'm sorry.  2019.
21   A.   Yes.
22   Q.   Slayter did not go with you, your son?
23   A.   No, he did not.
24   Q.   Just you and Bill?
25   A.   Just Bill and I.
```

```
 1   Q.   And you spoke yesterday that while you guys were out there
 2   was a bartender that you kissed?
 3   A.   Yes.
 4   Q.   And that upset Bill?
 5   A.   Yes.
 6   Q.   He was very frustrated with you, right?
 7   A.   Yes.
 8   Q.   And Bill was, I think you said, up and kind of like pacing
 9   around the room; is that right?
10   A.   Yes.
11   Q.   And that he wanted to leave?
12   A.   Yes.
13   Q.   But you wanted him to stay?
14   A.   Right.
15   Q.   And after you took some reflection time, you realized very
16   early on -- not early on, but you realized during that time
17   frame that this really wasn't a relationship you wanted to be
18   in anymore.  Is that fair?
19   A.   Yes.
20   Q.   Because after that trip, you had told him you didn't want
21   to be in a relationship with him anymore?
22   A.   Right.
23   Q.   Bill didn't like that, did he?
24   A.   No.
25   Q.   And so Bill turned up the heat.  The week you guys got
```

1   back from the trip, that's when he called you from chambers,
2   right?
3   A.   Yes.
4   Q.   And if that wasn't psychotic enough, he had you listen to
5   a voicemail the week after from a friend of his pretending to
6   be a DEA agent, right?
7   A.   Right.
8   Q.   You heard that phone call?
9   A.   I heard the voicemail on his phone.
10  Q.   Scared you, right?
11  A.   Yes.
12  Q.   And the phone call from chambers, it scared you, right?
13  A.   Yes.
14  Q.   We heard you crying at the end of the phone call, and
15  rightfully so, right?
16  A.   Yes.
17  Q.   Bill's tactics worked, because at the end of that phone
18  call what did Bill get?
19  A.   Control over me.
20  Q.   Yes, ma'am.  You guys got back into a relationship, didn't
21  you?
22  A.   Yes.
23  Q.   And after the DEA phone call, a couple of weeks after that
24  phone call you guys got engaged; is that right?
25  A.   Yes.

```
 1   Q.   Within a week or so of the engagement, you call off the
 2   engagement; is that right?
 3   A.   Yes.
 4   Q.   And then shortly thereafter, that's when you sit down with
 5   Ms. Weisend and Ranger Briley; is that right?
 6   A.   It's around that time, yes.
 7   Q.   So from the time that you guys are in Key West to the time
 8   you are sitting down with Ranger Briley, all of that happens in
 9   about a month.  Is that about right?
10   A.   About.
11   Q.   Okay.  You called off the engagement, and now you are
12   speaking with law enforcement about everything that had
13   happened over the last couple of years, and that was Ranger
14   Briley, correct?
15   A.   Yes.
16   Q.   Now, when -- you understand what Bill is on trial for,
17   correct?
18   A.   Yes.
19   Q.   It's defrauding you of money and property.  Do you
20   understand that?
21   A.   Right.  That's part of it.
22   Q.   Okay.  Well, those are the charges.
23   A.   Oh, well, yeah.
24   Q.   Okay.  Bill called you pretending to be in judge's
25   chambers in Austin in July -- I'm sorry, in June 2019 from that
```

```
 1   chambers phone call, right?
 2   A.   Yes.
 3   Q.   You thought he was in Austin?
 4   A.   Yes, I did.
 5   Q.   Bill didn't ask for any travel money when he was in
 6   Austin, did he?
 7   A.   He didn't have to fly in.  And I had already given him
 8   every -- all the other money.  He did that on his own.
 9   Q.   Bill didn't ask you for any travel money, did he?
10   A.   At this point we were in a relationship.
11   Q.   I'm going to ask you the same question again.  Bill did
12   not ask you for any travel money, did he?
13   A.   No.
14   Q.   When Bill went back after you guys got engaged, you
15   understand -- and, again, I didn't know that until today --
16   that Bill went back down to Judge Anderson to tell him you guys
17   got engaged?
18   A.   Yes.
19   Q.   Bill didn't ask for any travel money, did he?
20   A.   We were in a relationship.
21   Q.   Bill did not ask for any money, right?
22   A.   No.
23   Q.   Okay.  You keep saying, we were in a relationship.  Does
24   that mean something to you?
25   A.   It does.
```

```
 1   Q.   Okay.  But you weren't in a relationship in 2015?

 2   A.   Right.

 3   Q.   You weren't in a relationship in 2016?

 4   A.   Correct.

 5   Q.   No relationship at all?

 6   A.   We were not in a common relationship or what I would call

 7   a relationship.

 8   Q.   We'll come back to that.

 9             THE COURT:  Do you want to break there?

10             MR. GALLIAN:  Sure.  Sounds great.

11             THE COURT:  Why don't we break there?  Just a minute

12   or two.

13             All rise for the jury, please.

14             Members of the jury, I'm going to make it -- you know

15   the instructions, so I'm going to do it quick, quick.  Don't

16   talk about the case.  Don't do any independent research.  Don't

17   post anything on social media.  Have a great lunch.

18             See you back in half an hour.  Thank you.

19             (Jury out)

20             THE COURT:  Anything we need to take up before lunch?

21   No?  Okay.

22             MR. BUSCH:  Judge, did you say 12:30?

23             THE COURT:  Yes.

24             MR. BUSCH:  I'm sorry, I missed it.

25             THE COURT:  Yeah.  Do you guys need a couple extra
```

```
 1    minutes?  Is 12:30 good?
 2              Okay.  Well, feel free to microwave here.  Yeah, I'll
 3    give you a couple of extra minutes.  Yeah.
 4              MR. BUSCH:  Thank you, Your Honor.
 5              THE COURT:  So why don't we plan, like, 12:35?  Is
 6    that good?  Okay.
 7              (Discussion off the record)
 8              (Recess)
 9              SECURITY OFFICER:  All rise.
10              THE COURT:  Don't worry, we're still on break.
11    Please be seated.
12              (Discussion off the record)
13              SECURITY OFFICER:  All rise for the jury.
14              (Jury in)
15              THE COURT:  All right.  Everyone please be seated.
16              Members of the jury, did you have a good lunch?
17              Okay.  Fantastic.  Well, I've told the parties that
18    right now the plan is to stop at 2:00.  If you guys decide you
19    want to alter that up or down, just let us know.  We'll plan to
20    wrap at 2:00.
21              And with that said, your witness, sir.
22              MR. GALLIAN:  Thank you, Your Honor.
23              THE COURT:  You're welcome.
24    BY MR. GALLIAN:
25    Q.   Ms. Thompson, I've been working on this case for a while,
```

```
 1    and I would like your permission.  Is it okay to call you Casi?
 2    A.   Yes.
 3    Q.   Okay.  I've just said Casi so many times, I don't want to
 4    accidentally say it without your permission.
 5              I think it would be helpful for you and for the jury
 6    as we go through things to go through a timeline.  Is that all
 7    right?
 8    A.   That's fine.
 9    Q.   See here on my old-fashioned paper I wrote timeline; is
10    that right?
11    A.   Yes.
12    Q.   Okay.  Not a trick.  I know I'm a defense attorney.  It's
13    not a trick.
14              If I told you that Bill Stone retired from the FBI on
15    October 31, 2015, do you have any reason to dispute that?
16    A.   I know that now.
17    Q.   Okay.  Would you agree with me on that date, though?
18    A.   I don't know.
19    Q.   So do you have any reason to dispute that he retired from
20    the FBI on 10-31-15?
21    A.   I personally was unaware of that.
22    Q.   The date that I wrote on there, 10-31-15, right?
23    A.   Yes.
24    Q.   Okay.  When did your fake probation start, month and year?
25    A.   The -- December -- the end of December of 2015, at the
```

1  beginning of 2016, right in that time frame.

2  Q.  So if I wrote 12-2015, is that close enough?

3  A.  Yes.

4  Q.  When in your mind did the fake probation end?

5  A.  Now or then?

6  Q.  Well, we know there wasn't a probation, so --

7  A.  Right.

8  Q.  I'm just asking, when did you think you were off

9  probation?  What's that date and time?

10  A.  I would say the end of 2019-10.  2000 -- probably, or 9.

11  Q.  Did I write 10-2019?

12  A.  Yeah.  I mean, I would -- I would guess that.  I'm not

13  sure.  I'm not 100 percent sure.

14  Q.  That's fine.

15          And then when would you say to the earliest of your

16  recollection that you and Bill Stone were in a relationship?

17  A.  Around 12-2017 to -- around that time.

18  Q.  So on the timeline here next to 10-31-15, I wrote

19  "retire"; is that right?

20  A.  Yes.

21  Q.  Okay.  12-2015, that's approximately when the fake

22  probation started?

23  A.  Yes.

24  Q.  12-2017 is approximately when your relationship with Bill

25  Stone started?

```
 1  A.   Yes.
 2  Q.   And -- I'm not going to hold you to it.  It was fake.
    October, September-ish 2019 is when the probation ended?
 3
 4  A.   Yes.
 5  Q.   Okay.  I have a lot that I want to discuss with you, and
 6  so I'm going to do it kind of in categories, so I will keep
 7  them in categories for you.
 8           First, I want to talk about your grandma, Myrna
 9  Thompson.
10           MR. GALLIAN:  May I approach the witness, Your Honor?
11           THE COURT:  You may.
12           (Pause)
13  BY MR. GALLIAN:
14  Q.   I just handed you what's been marked as Defendant Stone
15  Exhibit 67.  That's a picture of your grandma, Myrna, isn't it?
16  A.   Yes.
17  Q.   And your son Slayter is in that picture as well?
18  A.   Yes.
19  Q.   And who's the younger female?  I don't know who that is.
20  A.   It's my second cousin.
21  Q.   Okay.  And that's a picture that accurately represents the
22  three of them?
23  A.   Yes.
24  Q.   And that was taken probably 2014, maybe 2015?
25  A.   It was on Easter.
```

```
 1    Q.   Of which year?
 2    A.   You know, I'm not -- I'm not real sure.
 3    Q.   Okay.
 4              MR. GALLIAN:  Your Honor, at this time we move to
 5    admit Defendant Stone Exhibit 67.
 6              THE COURT:  Any objection?
 7              MS. RUDOFF:  No objections, Your Honor.
 8              MR. SELLERS:  No objection.
 9              THE COURT:  Admitted.
10              (Defendant Stone's Exhibit No. 67 received)
11              MR. GALLIAN:  At this time I move to publish
12    Defendant Stone Exhibit 67.
13              THE COURT:  You may.
14    BY MR. GALLIAN:
15    Q.   And this is the picture you have up there with you, Casi?
16    A.   Yes.
17    Q.   Okay.  Myrna was very much the rock of the Thompson
18    family.  Is that fair?
19    A.   Yes.
20    Q.   Especially for her age at the time, she was a very, very,
21    very intelligent woman, wasn't she?
22    A.   Yes.
23    Q.   Very business savvy, right?
24    A.   Yes.
25    Q.   She was also a -- you know, very successful in terms of
```

1    financially, very successful business woman; is that right?

2    A.   Yes.

3    Q.   And your grandpa, his name was O'Farrell, but he went by

4    Pal; is that right?

5    A.   Yes.

6    Q.   He passed away in 2012?

7    A.   Yes.

8    Q.   Okay.  Would you describe Myrna as like the matriarch of

9    the family?

10   A.   Yes.

11   Q.   Myrna would buy and do a lot of things for you guys in the

12   family.  Is that fair?

13   A.   When you say "you guys," who are you talking about?

14   Q.   Great question.  I'm talking about you; Cutter, your

15   brother; and Candiss, your mother.

16   A.   Yes.

17   Q.   And let's talk about Cutter first.

18        As Cutter was growing up alongside you, Myrna

19   purchased a lot of very big ticket items for Cutter, didn't

20   she?

21   A.   What are you referring to?

22   Q.   Cars.

23   A.   I think she bought him two cars.

24   Q.   What about houses?  Did she buy him any houses?

25   A.   I'm not sure who purchased his homes.

```
 1   Q.   Why don't you tell the members of the jury about Cutter's
 2   business.
 3   A.   His past business?
 4   Q.   Yes, ma'am.
 5   A.   He owned and -- he ran Joe's Pizza Pasta in Granbury.
 6   Q.   Who financially funded that business for Cutter?
 7   A.   My grandmother.
 8   Q.   Myrna?
 9   A.   Myrna.
10   Q.   Do you have any idea approximately how much money she put
11   into that business?
12   A.   I do not.
13   Q.   Okay.  Do you know if it was more than 500,000?
14   A.   I'm not sure.
15   Q.   Okay.  Moving on to your mom, Candiss, Candiss is the
16   daughter of Myrna; is that right?
17   A.   Yes.
18            MR. GALLIAN:  Carly, you can take this down.
19   BY MR. GALLIAN:
20   Q.   Over the years, Myrna bought Candiss, her daughter,
21   multiple houses and cars as well, right?
22   A.   I'm not sure about vehicles, but she did purchase a couple
23   of homes.
24   Q.   Okay.  Now, when Myrna would purchase those homes for your
25   mom, Myrna -- it would be the purchase of the house would be
```

 1    free and clear, correct?  She would buy the whole house?
 2    A.   Growing up we would live in their house, because my
 3    grandfather traveled for work, so we would live in their home.
 4    But later -- I'm not sure who purchased, as I got older, who
 5    purchased my mom's home.
 6    Q.   Okay.  Well, in terms of you, when you had vehicles and
 7    things growing up, was your mom ever helping with that
 8    financially?
 9    A.   Say that again.
10    Q.   Did your mom help buy some of your cars growing up?
11    A.   No.  The cars that I eventually drove were hand-me-downs
12    from my grandmother.
13    Q.   Okay.  So in terms of the vehicles that I was able to find
14    that are attached to your name, I'd like to go through them
15    briefly.  And you can tell me if Myrna gave them to you or if
16    you purchased them on your own, okay?
17    A.   Okay.
18    Q.   A 2006 Honda Accord, was that a vehicle of yours?
19    A.   Yes.
20    Q.   Okay.  How did you get that car?
21    A.   I bought it.
22    Q.   A 2006 Chrysler Sebring, was that your car?
23    A.   That --
24    Q.   It was in approximately 2007.
25    A.   That was me trying to get a car.  I was trying to get a

```
 1   car.  It went back.
 2   Q.   So you didn't keep that car?
 3   A.   I did not keep that car.
 4   Q.   What about the 1998 Mercedes 230?
 5   A.   1998?
 6   Q.   1998 Mercedes.
 7   A.   That was at a tote-the-note place.  I was trying to get a
 8   car.
 9   Q.   What do you mean "trying to get a car"?
10   A.   I did not have a vehicle, so I was trying to get a car.
11   Q.   Got it.
12            2005 Nissan Sentra?
13   A.   My grandparents bought me that car.
14   Q.   2010 Mercedes C?  It was a gray color.
15   A.   The gray -- what year?
16   Q.   2000 -- it looks like you had it in 2013, but it was a
17   2010 Mercedes.
18   A.   I don't remember the silver -- a silver Mercedes.
19   Q.   Was there a black one in 2013?
20   A.   Yes.
21   Q.   Okay.  How did you get that car?
22   A.   I bought it.
23   Q.   How did you buy it?
24   A.   I sold a home.
25   Q.   Okay.  That's one of the homes that Myrna purchased for
```

```
 1   you?
 2   A.   Yes.
 3   Q.   Okay.  We'll talk about that.
 4            In 2000 -- sorry.  In 2014, it looks like Myrna
 5   purchased you a 2012 Lexus; is that right?
 6   A.   Yes.
 7   Q.   Is that the car that you later gave -- oh, no, it wasn't.
 8   Okay.  I apologize.
 9            Did you have a Jeep Wrangler at one point?
10   A.   Yes.
11   Q.   How did you get that car?
12   A.   I went to CarMax, and I had bad credit.  I was trying to
13   get it.  It went back.
14   Q.   Oh, you're saying it went back?
15   A.   It went back to the dealership.
16   Q.   Okay.
17   A.   I didn't --
18   Q.   There was -- in 2014, there was a 2012 Infiniti G37x blue.
19   Was that your car?
20   A.   Yes.
21   Q.   Okay.  How did you get that car?
22   A.   I bought it.
23   Q.   How?
24   A.   On credit.
25   Q.   Okay.  How long did you keep that car?
```

```
 1   A.   I believe I kept it for two years.  I'm not sure.

 2   Q.   Now, in 2015, Myrna purchased you a 2015 Lexus GX, right?

 3   A.   Yes.

 4   Q.   That was the white one?

 5   A.   Yes.

 6   Q.   And that's the one you ended up giving to Bill?

 7   A.   Yes.

 8   Q.   Okay.  Any cars that you had after the fact were not

 9   purchased by Myrna, as she passed away later in 2015, right?

10   A.   Yes.

11   Q.   Okay.  To shore up the timeline of the vehicles that you

12   had, in 2015, when Myrna purchased the Lexus for you, after she

13   passed, you took the Lexus that she had, traded it in and

14   bought a new Lexus in 2016; is that right?

15   A.   I'm not sure what year that was that I did that, but, yes,

16   I traded it in.

17   Q.   Okay.  And that's the one that you were talking about with

18   the prosecutors that you purchased in March of '16?

19   A.   I'm not sure of the date, but I did trade in her car for a

20   new one.

21   Q.   Let's talk about houses.

22            3208 Crockett Street in Granbury, is that a house of

23   yours?

24   A.   Say the address again.

25   Q.   3208 Crockett.
```

```
 1  A.   A house of mine?  No.

 2  Q.   Yes, ma'am.

 3            Okay.  3203 Bowie?

 4  A.   Yes.

 5  Q.   Okay.  It looks like it was bought in 2003; is that right?

 6  A.   I -- yes.

 7  Q.   And then it was sold in 2005?

 8  A.   Yes.

 9  Q.   Now, did Myrna buy you that house?

10  A.   My grandparents both did.

11  Q.   Okay.  And when they bought you that house, was their name

12  on the deed as well?

13  A.   No.

14  Q.   When you sold the house in 2005, did you give your

15  grandparents back the money they put into it?

16  A.   No.

17  Q.   6407 Sonora, Granbury, Texas.  It looks like it was a

18  house that was purchased maybe in 2010?

19  A.   Yes.

20  Q.   Did your grandparents purchase that for you?

21  A.   Yes.

22  Q.   Was their name on the deed?

23  A.   No.

24  Q.   It looks like the house was sold in 2013; is that right?

25  A.   Yes.
```

```
 1   Q.   When you sold the house, did you give your grandparents
 2   back any of the money?
 3   A.   No.
 4   Q.   9657 Minton Drive, was that a house that you had?
 5   A.   Yes.
 6   Q.   Was that house purchased for you?
 7   A.   Yes.
 8   Q.   Who purchased that house?
 9   A.   My grandmother, or actually I did with the sale of my
10   previous house, so technically my grandmother.
11   Q.   The Minton Drive address, that didn't have your parents on
12   the deed -- I'm sorry, your grandparents on the deed?
13   A.   No.
14   Q.   But that changed when Myrna bought you a house in 2015,
15   right?
16   A.   Yes.
17   Q.   On that time, 4712 Stoney Creek.  It's the one that's
18   on -- right around from Elkton right there, right?
19   A.   Yes.
20   Q.   They did put their name -- Myrna put her name and her
21   trust on that one, didn't she?
22   A.   It's in my son's trust.
23   Q.   That was a house that she bought for you, like I said, in
24   2015?
25   A.   Yes.
```

```
 1   Q.   Now, you talked about it with the prosecution a little
 2   bit.  This house, Stoney Creek, you made some allegations that
 3   Bill and Joe made you sell the house?
 4   A.   Yes.
 5   Q.   Why?
 6   A.   I was told to put it up for sale.
 7   Q.   Okay.  So what happened when you put it up for sale?
 8   A.   They were -- they had told me that the tenants that my mom
 9   had in the house next door were spying on me and Slayter, so
10   that was, like, kind of a reason as well to put it up, but it
11   was to show the judge that I was doing real estate.
12   Q.   Okay.  So -- and correct me if I'm wrong.  When you sold
13   the house, it was in May of 2016; is that right?
14   A.   Yes.
15   Q.   When you sold the house in May of 2016, you sold the
16   Stoney Creek house, the one that was in the trust for you and
17   your kids, right?
18   A.   Yes.
19   Q.   Okay.  That is actually located right around the corner
20   from where your grandma was living prior to her death; is that
21   right?
22   A.   Yes.
23   Q.   I mean, it's literally -- it's on the end of the
24   cul-de-sac, right?
25   A.   Uh-huh.
```

```
 1   Q.   Yes?
 2   A.   Yes.
 3   Q.   So when you sold the Stoney Creek house, you moved across
 4   the street into Myrna's house, right?
 5   A.   I did.
 6   Q.   Is that the house that you're still living in right now?
 7   A.   Yes.
 8   Q.   Okay.  So when you sold the house in May of 2016, what did
 9   you do with the money?
10   A.   I put it into another house.
11   Q.   Okay.  And so you bought another house?
12   A.   I -- yes, so that I could show the judge that I purchased
13   another home.
14   Q.   Do you still have that other home?
15   A.   Yes.
16   Q.   To make it unequivocally clear, Joe and Bill derived no
17   benefit from the sale of that house; is that right?
18   A.   It was for Judge Anderson.
19   Q.   I know.  But I'm asking you, like, Joe and Bill, they
20   didn't get any cut of the money, did they?
21   A.   No, they did not.
22   Q.   Okay.  So Joe and Bill told you to sell a house to then
23   turn around and buy another house?
24   A.   Yes.
25   Q.   And Joe and Bill got no financial proceeds from the sale
```

```
 1  of that property, right?
 2  A.   From the sale of the property?
 3  Q.   From the sale of Stoney Creek, they didn't get any money,
 4  did they?
 5  A.   No.  Why would they?
 6  Q.   It's a financial fraud case.  You're saying they made you
 7  sell the house.  I'm wondering why they made you sell it.
 8  That's what I'm trying to figure out.
 9  A.   I was told that I had to put my house up for sale, and I
10  had to have it put up for sale by a certain date to show the
11  judge -- and have it cleared out to show the judge that I was
12  doing real estate, because that was what Bill told the judge
13  that I was out here doing.
14  Q.   Okay.  So you bought the house -- is it Old Granbury Road?
15  A.   It's near there.
16  Q.   Is it 3501 Old Granbury Road?
17  A.   No.
18  Q.   Okay.  What's the address on that house?
19  A.   4312 Logan Circle.
20  Q.   Is that in the Ashley Oak subdivision?
21  A.   Yes.
22  Q.   Okay.  You moved into that house.  So you sold Stoney
23  Creek, moved into grandma's, purchased Logan Circle, and then
24  moved into that one; is that right?
25  A.   I did.  Yes.
```

```
1   Q.   Okay.  What did you do with grandma's house, 3102 Elkton,
2   while you were living in the Logan Circle house?
3   A.   I was getting it ready to possibly sell, but I -- it
4   didn't make sense to sell it, so I went ahead and leased out my
5   house, the Ashley Oaks, and moved into my grandmother's.
6   Q.   Before we move on from Myrna, you were married to Shawn
7   Gomez; is that right?
8   A.   Yes.
9   Q.   Okay.  When you were married with Shawn Gomez, did Myrna
10  also financially help Shawn start a business?
11  A.   She did.
12  Q.   What business was that?
13  A.   Pest control.
14  Q.   Do you know how much money she put into the pest control
15  business?
16  A.   I don't know for sure.
17  Q.   As we go through the number of cars and the number of
18  houses that Myrna purchased for you, for your brother, and for
19  your mom, it's safe to say that Myrna -- I mean, she spoiled
20  y'all.  Would you agree with that?
21  A.   I guess.
22  Q.   She bought you like three houses and like six cars.  You
23  don't think that that's getting spoiled?
24  A.   If that's what you want to call it.
25  Q.   All right.  I want to talk about people that you know who
```

```
 1    happen to be in law enforcement.
 2              When you spoke with the prosecution on direct
 3    examination, you talked about Charles Tangney?
 4    A.    Yes.
 5    Q.    As a reminder, who is Charles Tangney?
 6    A.    He is a private investigator.
 7    Q.    Okay.  What did he do before becoming a private
 8    investigator?
 9    A.    He was a Burleson police officer.  He did something with
10    drug enforcement.  I'm not sure.
11    Q.    And the way you were introduced to him is that he is,
12    quote, a good person to know, get you out of trouble if you
13    need it, right?
14    A.    Yes.
15    Q.    You hired Charles Tangney as an investigator in 2010,
16    didn't you?
17    A.    No, I did not.
18    Q.    You didn't?
19    A.    No.
20    Q.    Okay.  In 2010, you had an active CPS case going against
21    Slayter, didn't you?
22    A.    I never hired -- Charles was just a friend.
23    Q.    Did you have an active investigation with CPS going in
24    2010?
25    A.    I'm not sure.
```

```
 1   Q.   It's protocol in a CPS investigation that they have

 2   reports and otherwise that are disclosed in their

 3   investigation; is that right?

 4   A.   Say that again.

 5   Q.   CPS creates and compiles reports during their

 6   investigation, don't they?

 7            MS. RUDOFF:  Objection, Your Honor, as to

 8   speculation.

 9            THE COURT:  If you will establish how she knows it.

10   BY MR. GALLIAN:

11   Q.   Are you aware that CPS compiles reports in their

12   investigation when they're working a claim?

13   A.   Yes.

14            MR. GALLIAN:  May I approach the witness, Your Honor?

15            THE COURT:  You may.

16            (Pause)

17   BY MR. GALLIAN:

18   Q.   Now, ma'am, what I'd like you to do is just for record

19   purposes -- I'm not going to read from it -- it's a CPS

20   investigation report from 2010; is that right?

21   A.   Yes.

22   Q.   Okay.  What I'd like you to do is turn to the blue tab I

23   pointed out to you.

24   A.   Uh-huh.

25   Q.   Read that portion regarding Charles Tangney and see if it
```

```
 1   refreshes your recollection.
 2            THE COURT:  Do you have an objection?
 3            MS. RUDOFF:  Yes, Your Honor.  Is this being put into
 4   evidence?
 5            MR. GALLIAN:  No.
 6            MS. RUDOFF:  This document?
 7            MR. GALLIAN:  It's a memory refresh, Judge.
 8            THE COURT:  Oh.
 9            MR. GALLIAN:  See if she --
10            THE COURT:  Refreshing her recollection.
11            (Pause)
12            THE COURT:  If it's a transcript -- are we refreshing
13   with a transcript?
14            MR. GALLIAN:  No, Your Honor.
15            THE COURT:  Okay.
16            (Pause)
17   BY MR. GALLIAN:
18   Q.   Have you had a chance to review that portion with
19   Mr. Tangney?
20   A.   Yes, I did.
21   Q.   Okay.  I'll ask you again, did you hire Charles Tangney in
22   2010 to act as your investigator?
23   A.   I did not hire Charles Tangney at all, ever.
24            MR. GALLIAN:  May I approach the witness, Your Honor?
25            THE COURT:  You may.
```

```
 1              (Pause)
 2  BY MR. GALLIAN:
 3  Q.   Are you aware that Charles Tangney contacted CPS on your
 4  behalf acting as an investigator?
 5  A.   No, I'm not.
 6  Q.   He just did that on his own?
 7  A.   I can't speak for him.
 8  Q.   Who's Kent Barnes?
 9  A.   It's my oldest son's father.
10  Q.   Cade's dad?
11  A.   Yes.
12  Q.   Where does Kent work?
13  A.   In Granbury, Texas.
14  Q.   Where specifically?  Who is his employer?
15  A.   The police department.
16  Q.   Joseph DeLeon, you met him in approximately 2000 -- when
17  again?
18  A.   '6.
19              MR. GALLIAN:  May I approach the witness, Your Honor?
20              THE COURT:  You may.
21              (Pause)
22  BY MR. GALLIAN:
23  Q.   I'm handing you Stone's Exhibit 68.  Do you recognize that
24  person?
25  A.   Yes.
```

```
 1   Q.   That's Joseph DeLeon?

 2   A.   Yes.

 3   Q.   That's what Joe looked like around approximately the time

 4   you would have met him?

 5   A.   I don't know what he looked like.  This is what he always

 6   looks like.

 7   Q.   Okay.

 8            MR. GALLIAN:  Your Honor, at this time we move to

 9   admit Stone Exhibit 68.

10            THE COURT:  Any objection?

11            MS. RUDOFF:  No objection, Your Honor.

12            MR. GALLIAN:  Permission to publish?  Oh.

13            MR. SELLERS:  No objection.

14            THE COURT:  Granted.  Admitted and granted.

15                (Defendant Stone's Exhibit No. 68 received)

16            MR. GALLIAN:  Sorry, Judge.

17            THE COURT:  That's all right.

18            MR. GALLIAN:  Permission to publish?

19            THE COURT:  It's granted.

20   BY MR. GALLIAN:

21   Q.   This is the picture I was just showing you, correct?

22   A.   Yes.

23   Q.   Okay.  That's Joe DeLeon when you -- well, you said he

24   looks the same, which is funny.  But this is a picture of Joe

25   DeLeon, right?
```

```
 1   A.   Yes.
 2   Q.   And Joe DeLeon, when you met him, was an interpreter for
 3   the Fort Worth Police Department, correct?
 4   A.    For the Fort Worth police -- he -- he worked in hostage
 5   negotiation.  He was an interpreter for the Fort Worth Police
 6   Department and the FBI.
 7   Q.   Okay.  Law enforcement?
 8   A.   Yes.
 9   Q.   Involved in law enforcement?
10   A.   Yes.
11   Q.   Okay.
12          MR. GALLIAN:  Thank you, Carly.
13   BY MR. GALLIAN:
14   Q.   Who's Mitch Galvan?
15   A.   It's one of my tenants.
16   Q.   Okay.  What does Mitch Galvan do for a living?
17   A.   He's a police officer.
18   Q.   Going to make me ask it?
19          MS. RUDOFF:  Objection to sidebar, Your Honor.
20          THE COURT:  Okay.  Sustained.
21   BY MR. GALLIAN:
22   Q.   He is not just a police officer.  Can you please tell the
23   jury who he is with the Granbury Police Department?
24   A.   He is the chief of police.
25   Q.   And he rents your Logan Circle address house, doesn't he?
```

```
 1    A.    He does.
 2    Q.    And Bill Stone.  We all know Bill Stone.  Bill Stone, when
 3    you met him back in 2005, was an FBI agent, correct?
 4    A.    It wasn't 2005, but he was an FBI agent.
 5    Q.    2006?
 6    A.    I want to say it was that, yeah.
 7    Q.    Okay.  In this case you've sat down with the case agents
 8    who are investigating this case.  You've sat down with them a
 9    couple of times; is that right?
10    A.    Yes.
11    Q.    And one time was in May of 2020?
12    A.    I'm not sure.
13    Q.    Okay.  You trust me on it, or do you want to see a
14    transcript?
15    A.    I have no -- now, who are you talking about?
16    Q.    You sat down in an interview May 5, 2020, with Danny
17    Briley, Brian Luley, and Ivan Martinez.
18    A.    Okay.
19    Q.    Do you recall that time?
20    A.    I recall meeting with them.  I don't know the date.
21    Q.    Okay.  And as the investigators in this case, they were
22    asking you a whole host of questions about what had happened in
23    this probation, this secret probation, and all of that,
24    correct?
25    A.    Yes.
```

```
 1   Q.   That was the purpose of that meeting, was to collect some
 2   information from you, right?
 3   A.   I'm not sure what the purpose of the meeting is -- was,
 4   but I guess so.
 5   Q.   Okay.  Now, in that meeting, when you sat down with the
 6   agents, you confessed to the agents that you thought that it
 7   was attractive that Bill Stone was an FBI agent, did you not?
 8   A.   I -- I mean, I feel like that is -- yeah, that's true.
 9   Q.   Okay.  You find law enforcement attractive?
10   A.   I wouldn't go that far.
11   Q.   Now, I had no intention of going into the custody issues,
12   but I think the jury was left with some impressions, so I had
13   some follow-up questions for you.
14        When did you lose custody of Cade?  What year?
15   A.   2005.
16   Q.   2005.  In 2005, he went into the custody of -- of his
17   father, Kent Barnes, correct?
18   A.   Yes.
19   Q.   Did you ever regain custody?
20   A.   I did.
21   Q.   Okay.  When did that happen?
22   A.   Well, what do you mean, "regain"?
23   Q.   So you did not have any custody of him until approximately
24   when?  2015?
25   A.   I got -- I got my -- yeah, it was about 2015, but during
```

1  the -- prior to I would still get my weekend visits.

2  Q.  Okay.  Were those weekend visits -- prior to that were

3  those weekend visits supervised visitation only?

4  A.  Yes.

5  Q.  Meaning you had to have someone else there with you and

6  Cade?

7  A.  Yes.

8  Q.  When you got your custody back in 2015, you did not get

9  primary custody.  Is that fair?

10  A.  Yes.

11  Q.  Kent had primary custody.  Was it all the way through

12  until Cade turned 18?

13  A.  We had 50/50.

14  Q.  When did that happen?

15  A.  I'm not sure.  It was an agreement between the two of us.

16  Q.  Okay.  Do you know approximately the year or anything?

17  A.  I don't.  It was -- I want to say -- I'm not sure.  I -- I

18  would say maybe -- I can't -- I don't know the date.

19  Q.  Okay.  When was Slayter born?

20  A.  2009.

21  Q.  Prosecution asked you a question about whether or not you

22  used meth while pregnant with Slayter.  Did you use meth while

23  pregnant with Slayter?

24  A.  Once finding out I was pregnant, I quit using.

25  Q.  When did you find out you were pregnant?

```
 1    A.    It was about three and a half months in.
 2    Q.    There were a number of CPS cases that were initiated over
 3    the years.  Is that fair?
 4    A.    I believe there were -- I'm not sure how many there were.
 5    Q.    Okay.  Three or four?
 6    A.    I would say more so -- two.
 7    Q.    In 2010, a CPS case was started when Myrna was worried
 8    about your use of meth; is that right?
 9    A.    My grandmother?
10    Q.    Yes, ma'am.
11    A.    No.
12    Q.    In August of 2010, that's when you and Shawn were arrested
13    for possession of methamphetamine; is that right?
14    A.    Yes.
15    Q.    And that case was dismissed on a legal technicality; is
16    that right?
17    A.    Yes.
18    Q.    Basically, Cutter let the police officers into the
19    house -- Cutter, your brother, let the police into the house,
20    right?
21    A.    Yes.
22    Q.    Okay.  And the police didn't have that authority.  They
23    didn't have you or Shawn's permission, and so the case was
24    thrown out, right?
25    A.    Yes.
```

```
1    Q.   Now, a case that you didn't mention was -- were you
2    arrested in 2011 for illegal window tint?
3    A.   Yes.
4    Q.   Okay.  That was the day before you had a custody hearing
5    in CPS; is that right?
6    A.   No, it was when my ex-husband was getting his name taken
7    off the birth certificate.
8    Q.   Okay.  But you had a hearing the next day?
9    A.   I did.
10   Q.   And you were arrested?
11   A.   Yes.
12   Q.   And you were taken to the hospital?
13   A.   Yes.
14   Q.   Why were you taken to the hospital?
15   A.   I had ingested drugs, and I was overdosing.
16   Q.   Okay.  You got pulled over, and rather than being caught
17   with the methamphetamine, you swallowed it, right?
18   A.   Yes.
19   Q.   From 2005 to 2014, how many different rehab facilities do
20   you think that you went to?
21   A.   I don't know for sure.  Several.
22   Q.   Is several like three or four or like eight or nine?
23   A.   I don't know the number.  I would say closer to seven.
24   Q.   Okay.
25   A.   Or eight.
```

```
 1   Q.   Every time you were in rehab, who would take care of
 2   Slayter?
 3   A.   My mom.
 4   Q.   Okay.  When you were in rehab in 2014, did she take care
 5   of Slayter?
 6   A.   Yes.
 7   Q.   So you started out at rehab in Utah; is that right?
 8   A.   Yes.
 9   Q.   And you went there in approximately September of 2014?
10   A.   September 8, 2014.
11   Q.   Okay.  You mentioned on direct examination -- if not, then
12   correct me, please -- that the arrest in May was your last
13   arrest for possession of methamphetamine; is that right?  May
14   of 2014?
15   A.   Yes.
16   Q.   Okay.  And that something changed in you, you realized you
17   needed to change, right?
18   A.   Say that again.
19   Q.   Well, so you talked about this -- this arrest in May of
20   2014 in Hood County, right?  That's the one you had the
21   probation case on?
22   A.   Yes.
23   Q.   That case is what prompted you to finally make a change in
24   your life; is that right?
25   A.   Yes.
```

```
 1   Q.   Okay.  So what happened was you were arrested in May,
 2   right?
 3   A.   Uh-huh.  Yes.
 4   Q.   And then a couple of days go by -- so you bond out, right?
 5   A.   Yes.
 6   Q.   Paid money, you are released from custody?
 7   A.   Yes.
 8   Q.   And then they bring you back in about a week later and do
 9   a random drug test, and you test positive for methamphetamine,
10   don't you?
11   A.   No.
12   Q.   You weren't rearrested?
13   A.   No.
14   Q.   You don't recall in 2014 when you were rearrested for like
15   nine days?
16   A.   That was not for a failed UA.
17   Q.   What was it for?
18   A.   I overslept on a UA.
19   Q.   And then Hood County kept you in custody for ten days?
20   A.   Yes, because the judge was out of town.
21   Q.   So that was in June of 2014 when you got released, but you
22   keep saying your sobriety date is September 8th.  Did you
23   continue using until you left for rehab?
24   A.   I did.
25   Q.   Did you use the day you left for rehab?
```

```
 1   A.   No.
 2   Q.   All right.  I'd like to talk about kind of the family
 3   issues between you and your mom, okay, and your brother.
 4        Your family was not happy that they were cut out of
 5   the will.  Would you agree with me?
 6   A.   I can't speak for them.
 7   Q.   Okay.  Do you know why they were cut out of the will?
 8   A.   I -- I do.
 9   Q.   Okay.  Can you share with us why Cutter was cut out of the
10   will?
11        MS. RUDOFF:  Objection, Your Honor, as to relevance.
12        THE COURT:  Overruled.
13   A.   He had gotten his inheritance through his -- the
14   restaurant.
15   Q.   Okay.  Myrna put like a million dollars into Joe T's,
16   didn't she?
17   A.   I'm not sure the dollar amount.
18   Q.   Okay.  But your grandma believed that he had gotten his
19   fair share; is that right?
20   A.   She was upset that he was getting back with his ex-wife.
21   Q.   Okay.  And who's his ex-wife?
22   A.   Well, now it's -- her name's Heather.
23   Q.   Are they still married?
24   A.   Yes.
25   Q.   Why did your mom get cut out of the will?
```

1    A.   She wasn't cut out.  I was supposed to help my mom to

2    ensure she doesn't spend it -- overspend it.

3    Q.   Okay.  Was that a concern of Myrna's?

4    A.   Yes.

5    Q.   So much so that she cut your mom out completely, out of

6    the will?

7    A.   Yes.

8    Q.   Okay.  When you got back from rehab in -- I think you said

9    on direct examination you got back from rehab in the end of

10   January 2015; is that right?

11   A.   Around that time.

12   Q.   Okay.  And then we saw on the Government's exhibit that

13   Myrna changed her will about two weeks later; is that right?

14   A.   Yes.

15   Q.   Okay.  So up until this point, as you mentioned on direct

16   examination, Myrna was very frustrated with you, wasn't she?

17   A.   I wouldn't say she was very frustrated with me.

18   Q.   She had started to lose hope in you, though, right?

19   A.   She still loved me.  She just let go and, in her words,

20   gave me to God.

21   Q.   Okay.  And then you got back from rehab, and within two

22   weeks of that she makes you the sole beneficiary of the will?

23   A.   Yes.

24   Q.   Okay.  When that happened in February 2015, did you tell

25   your brother?

```
 1    A.   I don't believe so.
 2    Q.   When that happened in February 2015, did you tell your
 3    mom?
 4    A.   I'm not sure.
 5    Q.   Well, you would know.
 6    A.   I don't -- I don't know if I told my mom or not.
 7    Q.   Okay.  Let me ask it a different way.
 8              Did they find out once Myrna passed?
 9    A.   Yes.
10    Q.   Is that how they found out?
11    A.   I believe she shared with them.  She told them prior to.
12    Q.   Okay.  Cutter was not happy with that, was he?
13    A.   I don't think he -- he was hurt.  I wouldn't say he was
14    not happy.  His feelings were hurt.
15    Q.   Okay.  So right around this time of the probation
16    starting, in December of 2015, we agree that's when your
17    probation started, right?
18    A.   Yes.
19    Q.   Okay.  There was a lot of stuff going on with Cutter that
20    had you very concerned, did it not?
21    A.   What stuff are you referring to?
22    Q.   Cutter was specifically telling you that he was going to
23    air the dirty laundry of the family, right?
24    A.   No.
25              MR. GALLIAN:  May I approach the witness, Your Honor?
```

```
 1                    THE COURT:  You may.
 2                    (Pause)
 3    BY MR. GALLIAN:
 4    Q.   I'm handing you some text messages between you, your mom,
 5    and Cutter.  If you would turn to the next page and read those
 6    to yourself, please.
 7                    (Pause)
 8    Q.   Have you had a chance to review them?
 9    A.   Yes.
10    Q.   Okay.  So we see in these text messages that there's three
11    numbers associated with the text chain.  817-312-0882.  Who's
12    that number?
13    A.   That's my mother.
14    Q.   817-219-3550.  Who's that number?
15    A.   Say that one more time.  The 355 -- it's my number.
16    Q.   And who's the 5812 number?
17    A.   It's my brother's number.
18    Q.   When you were looking at these text messages, were you
19    able to see the date on those text messages?
20    A.   Yes.
21    Q.   Okay.  December 2015, right?
22    A.   Yes.
23    Q.   Okay.  Cutter was sending some very scary text messages to
24    you and your mom, right?
25    A.   Yes.
```

```
 1   Q.   About how he was going to air the family dirty laundry,
 2   right?
 3   A.   I wouldn't call them scary.  Out of character, maybe.
 4   Q.   Okay.  Said he was going to take the story to news
 5   stations?
 6   A.   He -- I'm not sure what he was referring to.
 7   Q.   These text messages were concerning enough to your mom
 8   that she told you to stay away from him; is that right?
 9   A.   Say that one more time.
10   Q.   These texts concerned your mom so much that your mom told
11   you to stay away from Cutter.
12   A.   I didn't read that part.  Let me find it.
13            MR. GALLIAN:  May I approach the witness, Your Honor?
14            THE COURT:  You may.
15            (Pause)
16            THE WITNESS:  Found it.
17            MS. RUDOFF:  Your Honor, I would object that this
18   question calls for hearsay.
19            THE COURT:  Overruled.
20            (Pause)
21   BY MR. GALLIAN:
22   Q.   Have you had a chance to review it?
23   A.   Yes.
24   Q.   Okay.  Your mom was telling you to stay away from Cutter,
25   right?
```

```
 1    A.    She did.
 2    Q.    Okay.  And that greed and jealousy had got the best of
 3    him?
 4    A.    Yes.
 5    Q.    Okay.  This was not a great time for you and Cutter as a
 6    brother-sister relationship.  Is that fair?
 7    A.    I want to say this was after the time he had went to the
 8    hospital that I wasn't allowed to go visit him, so he was
 9    upset.
10    Q.    I understand.  But it's important, because it's right
11    around the time that Cutter presumably just found out about the
12    will and that he was cut out, correct?
13    A.    Say that one more time.
14    Q.    You and Cutter did not have a good relationship during
15    this time.  Is that fair?
16    A.    In these texts.
17    Q.    Okay.  When did you and Cutter reestablish your
18    relationship?
19    A.    It took a while.  I wasn't allowed to engage with my
20    family during the secret probation often.
21    Q.    Okay.  We'll talk more about that.
22               MR. GALLIAN:  May I approach the witness, Your Honor?
23               THE COURT:  You may.
24               (Pause)
25    BY MR. GALLIAN:
```

```
 1    Q.   Have you had a chance to review that page yet?
 2    A.   I did.
 3    Q.   You did?
 4    A.   Oh, the highlighted page?
 5    Q.   No, that last page I handed you.
 6    A.   Yes.
 7    Q.   Okay.  The text messages on the right side come from a
 8    number 817-219-3550, right?
 9    A.   Yes.
10    Q.   And that's your number?
11    A.   Right.
12    Q.   At this point in time, you're telling your mom that Cutter
13    is a nut, right?
14    A.   That's what it says.
15    Q.   "I can't understand him now, nor have I ever.  He is no
16    longer my family."
17              MS. RUDOFF:  Objection, Your Honor.
18              THE COURT:  What's your objection?
19              MS. RUDOFF:  Document not in evidence.
20              THE COURT:  Overruled.
21    BY MR. GALLIAN:
22    Q.   Did you say that?
23    A.   I did.
24    Q.   Moving on to Candiss.  Candiss in 2016 was doing some
25    things that were also concerning to you, was she not?
```

1   A.   In 2016?

2   Q.   Yes, ma'am.

3   A.   The only things that I was concerned with my mom doing

4   were things I was told by Joe and Bill.

5   Q.   Okay.  Let's take those together, then.

6            First, let's reach an agreement.  Did Joe or Bill

7   have any control over Candiss?

8   A.   Not to my knowledge.

9   Q.   Okay.  You're not telling this jury that Joe or Bill told

10  Candiss to say or do certain things, right?

11  A.   Right.

12  Q.   In fact, it's your belief that a lot of the things that

13  Candiss was doing were manufactured or created by Bill and Joe;

14  is that right?

15  A.   I'm not sure.  It would depend on what you were referring

16  to.

17  Q.   Okay.  What about the time she showed up in your driveway

18  in the middle of the night.  Do you remember that?

19  A.   I do.

20  Q.   Okay.  What happened there?

21  A.   She drove -- pulled up in my driveway and sat there, and

22  she said she was wanting to see me and Slayter.

23  Q.   And you didn't want that to happen?

24  A.   I wasn't allowed to go out there.

25  Q.   You went out there and talked to you -- talked to her,

```
 1   didn't you?
 2   A.   There's been a couple of times, but Joe had to come over
 3   before I could come out.
 4   Q.   Okay.
 5   A.   Or I had to record it.
 6   Q.   And your mom was out there, and she was urinating in the
 7   front yard; is that right?
 8   A.   No.  I don't recall her urinating in my front yard.  I'm
 9   sorry.
10   Q.   Okay.  We'll find that.
11           In 2016, again, within that same time period,
12   Candiss, at no fault of Bill or Joe, threatened CPS against
13   you, didn't she?
14   A.   She did not.
15           MR. GALLIAN:  May I approach?
16           THE COURT:  You may.
17           (Pause)
18   A.   She's not threatening CPS.  She is saying that --
19   Q.   Can I ask a question?
20   A.   Go ahead.  Sorry.
21   Q.   So the text messages that I just showed you were from your
22   mom's number at the time; is that right?
23   A.   No.
24   Q.   Well, your mom was using your grandma's phone?
25   A.   Which -- I don't recall her doing that, but yes.
```

```
 1   Q.   Well, I'm not trying to be mean about it, but this is in
 2   September 9th of 2016, so we know it wasn't Myrna.
 3   A.   Right.  I just don't recall her ever having the phone.
 4   Q.   Okay.  So you're not saying it wasn't Candiss?
 5   A.   Right.
 6   Q.   Gotcha.
 7        Okay.  After reading this, why do you say she wasn't
 8   threatening CPS on you?
 9   A.   Because she was just trying to come and see my son, and
10   she was saying, well, I'm going to get with CPS because they
11   know what's best.  They allowed -- basically saying they
12   allowed her to have him.  And she's not wanting custody.  She
13   just wants to be able to see him.
14   Q.   Okay.  She specifically told you, "We will have Child
15   Services look at the situation."
16        MS. RUDOFF:  Objection, Your Honor.  This is hearsay.
17        THE COURT:  Overruled.
18   BY MR. GALLIAN:
19   Q.   Did she not?
20   A.   Say that again.
21   Q.   She specifically said, "We will have Child Services look
22   at the situation who put him in my care for his protection."
23        MS. RUDOFF:  Your Honor, I object to a document not
24   in evidence that he's reading from.
25        THE COURT:  Overruled.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Is that what it says?
 3   A.   We -- she's basically saying she's good enough for CPS.  I
 4   did not take from that what you said to mean what you're saying
 5   it said.
 6   Q.   Okay.  When she says "Child Services," who is she talking
 7   about?
 8   A.   She was talking about prior to this event when she had
 9   custody of Slayter through Child Services, that she was good
10   enough for visitation.
11   Q.   When someone says "we will," is that an action that's
12   going to happen or an action that has already happened?
13            MS. RUDOFF:  Objection.  Speculation, Your Honor.
14            THE COURT:  Overruled.
15   A.   She was saying --
16            THE COURT:  Let's take a break for a minute.  Let me
17   see the lawyers over here.
18            (Bench Conference held off the record)
19   BY MR. GALLIAN:
20   Q.   Candiss told you, "We will have Child Services look at the
21   situation," right?
22   A.   She says that, but her intentions mean she wants to be --
23            MR. SELLERS:  Object to speculation, Your Honor.
24            THE COURT:  Overruled.
25   A.   She was not able to see Slayter during this time.  She was
```

1   saying she's good enough to have custody through CPS and let's

2   get with them and see if I -- she was -- she was just

3   aggressively saying she was good enough to see Slayter.  She

4   wasn't saying she was calling -- she was just going to get

5   their opinion if she was good enough.

6   BY MR. GALLIAN:

7   Q.   Okay.  Casi, in our discovery, which is the information we

8   get in a criminal case, are you aware that we had an extraction

9   report of your phone?

10   A.   Yes.

11   Q.   Okay.

12   A.   Well, no.

13   Q.   From 2015 to 2019, what was the main phone number that you

14   used?

15   A.   219-8559.

16   Q.   Did you -- were you provided a copy of the report, the

17   extraction report that they did on your phone?

18   A.   No.

19   Q.   Okay.  Are you -- were you told that that report was

20   98,000 pages in length?

21   A.   I'm sure it was.

22   Q.   Okay.  Now, an allegation that you have made over and over

23   and over again was that Bill and Joe isolated you; is that

24   right?

25   A.   Yes.

```
 1   Q.   You were not allowed to talk to your friends, right?
 2   A.   I wasn't -- I -- I chose to -- every time that I did
 3   interact with any friend, I was told they weren't good for me
 4   or talking about me behind my back, so I chose then not to.
 5            I did go to class, and I did talk to a few people,
 6   but it wasn't like I am now.
 7   Q.   Sure.
 8            Bill and Joe would not let you talk to Cutter and
 9   Candiss; is that right?
10   A.   I spoke to them, but I wasn't really allowed to see them
11   without one of the two of them.
12   Q.   Okay.  So they didn't cut you off.  You were able to talk
13   to Cutter and Candiss; is that right?
14   A.   It depends on what year you're talking about.
15   Q.   2015 to 2019.
16   A.   There was -- it was -- there was -- it would -- I would
17   need to know what year you were talking about.
18   Q.   2015 to 2019.
19   A.   Okay.  Then ask the question again.
20   Q.   You were on fake probation through Bill Stone from 2015
21   through 2019.  Do we agree?
22   A.   Yes.
23   Q.   Okay.  From 2015 through 2019, did Bill and Joe control
24   who you talked to?
25   A.   Did they control who I talked to?
```

```
 1   Q.   I'm just -- yes, ma'am.
 2   A.   They knew who I was speaking to.
 3   Q.   Okay.  But you said even earlier in our questions that
 4   they didn't like you talking with Cutter and Candiss; is that
 5   right?
 6   A.   They said they were after me, out to get me.  They -- his
 7   analysts were telling me all kinds of stories about my mom and
 8   my brother.
 9   Q.   Okay.  And because of that, you didn't talk with them?
10   A.   Correct.
11   Q.   You tried to minimize all contact with Cutter and Candiss,
12   right, keep it as small as possible?
13   A.   Unless I was told to reach out or if they reached out.
14   Q.   Because of -- because of what Joe and Bill put in your
15   head; is that right?
16   A.   I'm not sure what you're saying.
17   Q.   Who is Heather?
18   A.   It's my sister-in-law.
19   Q.   Okay.  In that report from 2015 to 2019, how many pages of
20   text messages do you think there are with Heather?
21   A.   Between Heather and I?
22   Q.   Yeah.
23   A.   From 2000 and --
24   Q.   Well, specifically, December 24, 2017, through May 5,
25   2020.
```

```
 1   A.   Okay.  2020?

 2   Q.   Yes, ma'am.

 3   A.   I thought we were doing to 2019.

 4   Q.   The report is to 2020.

 5   A.   Okay.

 6   Q.   How many pages?

 7   A.   In 2017, my probation started lifting, and I was talking

 8   more to family.  That's why I asked you which year.

 9   Q.   How many pages?

10   A.   I have no idea.

11   Q.   Would 50 sound about right?

12   A.   I have -- I wouldn't know that information.

13   Q.   Who are Barb, Nancy, Stacy, and LeAnne?

14   A.   That is my 12 Steps Celebrate Recovery Bible group.

15   Q.   Okay.  You were able to talk to them, weren't you?

16   A.   It was about our Bible study.

17   Q.   138 pages' worth of communication sound about right?

18   A.   I'm not sure.

19   Q.   Who's Marie?

20   A.   Marie?

21   Q.   Marie.  Marie McGloun?  McGloun?

22   A.   I believe that was a student in one of my classes when I

23   was at Tarleton.

24   Q.   Okay.  You talked to her from July 2017 through

25   February 2018.  Do you have any reason to dispute 173 pages of
```

```
 1   text messages?
 2   A.   We were in a class together at school.
 3   Q.   And you graduated in December of 2017, right?
 4   A.   I did.
 5   Q.   Very common for you guys to have a conversation, a group
 6   chat -- you, Cutter, and Candiss; is that fair?
 7   A.   I wouldn't -- I don't know about common, but --
 8   Q.   Okay.  Do you have any reason to dispute 197 text
 9   messages -- pages?
10   A.   I don't know.
11   Q.   What about text messages with just Cutter, a person you
12   weren't allowed to talk to?
13   A.   I misspoke.  I was allowed to talk to people.  I just
14   wasn't allowed to talk about my reality of life, where -- what
15   was going on.
16   Q.   Okay.  I've got that.  264 pages.  Any reason to dispute
17   that?
18   A.   I don't -- I mean, I guess -- I guess I'd have to look at
19   it to dispute it.
20   Q.   Who's Daralyn Crites?
21   A.   It's one of my childhood friends from high school.
22   Q.   Any guess on the number of pages from May 18, 2016,
23   through August 6, 2019?
24   A.   Say that one more time.
25   Q.   May 2016 through August 2019.
```

```
 1   A.   Yeah, we spoke.
 2   Q.   561 pages?
 3   A.   She did watch my son while I was at school.
 4   Q.   Who's Dorothy?
 5   A.   Candiss.
 6   Q.   The person that Joe and Bill led you to believe was
 7   after -- was attacking you, all of those things, right?
 8   A.   Yes.
 9   Q.   How many times, pages of text messages, did you and
10   Candiss talk from 2015 -- oh, this is perfect -- December 2015
11   through August 1, 2019?
12        Any guess on the number of pages?
13   A.   I'm sure there -- that's my mom.  Like I said, if they --
14   if she reached out, I would respond.
15   Q.   I understand that.  But you get on the stand and you say
16   that Joe and Bill manipulated you and didn't let you talk to
17   people in your family.  That's not true, is it?
18   A.   I was allowed to speak to them, and they would speak back,
19   but I had to report back to them what was said.
20   Q.   So out of the 1,364 pages of text messages, every single
21   time you communicated with your mom, you told Bill or Joe about
22   it?
23   A.   I -- Bill already knew about it.  I would reach out and
24   tell Joe.  I mean, I -- I was communicating with people.  I
25   just wasn't -- I was being nice.  I wasn't isolated in my
```

```
 1   house.  I was still communicating with people.  I just wasn't
 2   allowed to go out and communicate with people and be who I am.
 3   Q.   Okay.  I think you said it best.  You weren't isolated; is
 4   that right?
 5   A.   I was -- it was more like a house arrest.
 6   Q.   From August 2015 through August 2018, you were on Hood
 7   County probation; is that right?
 8   A.   Say those dates again.
 9   Q.   August 2015 through August 2018; is that right?
10   A.   Sounds right.
11   Q.   Okay.  That was not a fake probation?
12   A.   Correct.
13   Q.   That was a real probation?
14   A.   Yes.
15   Q.   There were no prohibitions on who you could talk to about
16   that probation; is that right?
17   A.   Right.
18   Q.   You could tell anybody you wanted that you were on
19   probation in Hood County, Texas, right?
20   A.   Right.
21   Q.   Wasn't a secret?
22   A.   Correct.
23   Q.   You weren't going to be thrown in jail if you told
24   somebody?
25   A.   Correct.
```

```
 1   Q.   How many times in the 98,000-page report did you mention
 2   the word "probation"?
 3   A.   I have no idea.
 4   Q.   Who's Melissa Stewart?
 5   A.   That is my friend.
 6   Q.   She is the one friend that you told you were on probation;
 7   is that right?
 8   A.   I -- I don't know.  I'm sure people knew I was on
 9   probation.
10   Q.   Well, we had your childhood best friend in here a couple
11   of days ago, Daralyn Crites.  Did you tell Daralyn you were on
12   probation?
13   A.   I'm not sure.
14          MR. GALLIAN:  Your Honor, just based on the time, I
15   think I'm about to get into kind of the next segment.
16          THE COURT:  All right.
17          MR. GALLIAN:  I can keep going or -- I just know that
18   we're close to the stop time.
19          THE COURT:  Do y'all want to stick to our 2:00?
20   Okay.
21          All right.  Well, I think now is a great time to have
22   a recess.  So before you leave, let me read you my little
23   blurb.  If everyone will please be seated a minute.
24          Okay.  So we're about to have our first lengthy
25   break, so I'll just go back over what we've said before.
```

```
 1              Please don't do any independent investigation.
 2    You're going to have a long weekend.  I want all of the
 3    evidence you hear in this case to come from the four walls
 4    here.  So I'm going to ask you not to do any research on the
 5    people, the parties, the legal issues, anything connected to
 6    this case.  We're going to provide you everything you need to
 7    make your decision right here in this courtroom.
 8              Please don't discuss this case on social media or
 9    with anybody.  It's natural that your family members are
10    curious to know what you've been doing, and you can tell them
11    all about it when the case is resolved, but until then please
12    don't.  You-all have been picked because you can be fair and
13    impartial, and when we start telling people about the case,
14    they start talking back to you and that jury box gets awfully
15    full.  So if you-all will please do that for me.
16              And then, finally, when you're together, y'all can
17    talk about kids and TMZ and celebrities and everything but not
18    this case until you've heard everything there is to hear,
19    please.
20              And so with those instructions, are there any
21    questions before I let you go?
22              I'm assuming we all want to start 8:00 Monday, and
23    we'll do our short lunch break.
24              All right.  We'll take good care of you.  And I tell
25    you what, I'll bring doughnuts for Monday.  How about that?
```

 1            So with that said, we're going to all rise for the
 2      jury.
 3            Court will be in recess until Monday.
 4            You are court ordered to have a fabulous weekend and
 5      no calories count.
 6            Thank you for your service.
 7            (Jury out)
 8            THE COURT:  All right.  If everyone will please be
 9      seated, we'll just do a little housekeeping, and then I'll let
10      everybody go.
11            Is there anything we need to take up before we break
12      for the weekend?  I'm happy to discuss anything we've got.
13            I know this goes without saying, but just as a
14      reminder, we've now heard multiple witnesses testifying.
15      Remember that the rule has been invoked, and so please make
16      sure you instruct your witnesses that should they bump into one
17      another not to discuss testimony.
18            Is there anything else?  Do you guys need anything
19      from me before you go?  It's been a long week.  You guys have
20      worked hard.
21            MR. GALLIAN:  No, Your Honor.
22            THE COURT:  Okay.
23            MR. WESTFALL:  No, Your Honor.
24            THE COURT:  All right.  Fantastic.
25            Well, court is going to be in recess.  You guys are

1    ordered to have a great weekend too.

2              And thanks for your hard work on this.  It's an

3    interesting case.  It's being well tried.  And it's an honor

4    and my pleasure to preside over it.

5              So have a great weekend, and we'll see you Monday.

6              SECURITY OFFICER:  All rise.

7              (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                INDEX

                                                    Further
                       Direct  Cross  Redirect  Recross  Redirect

WITNESS FOR THE
GOVERNMENT

CASI THOMPSON           4       89
```

GOVERNMENT'S EXHIBITS                                    Received

  67  Recorded call between CT and Stone,            71
      August 30, 2019

  68  Transcript of August 30, 2019 call             71

  90  "DEA-Jordan Green" voice messages, dated       26
      June 29, 2019

  91  Transcript of "DEA-Jordan Green" spoof voice   26
      messages, dated June 20, 2019

 118  Text messages between Stone and CT with        38
      "Dr. Bryan funeral" photos sent to CT

 151  Recorded call between CT and Stone,            67
      August 18, 2019

 152  Transcript of August 18, 2019 call             67

 155  Transcript of August 16, 2019 call and         52
      interview

 172  Recorded call between CT and Stone,            52
      August 15, 2019


DEFENDANT STONE'S EXHIBITS                              Received

  67  Photo of CT's mom                              101

  68  Photo of CT's grandma                          118

1     I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6     WITNESS MY HAND on this 28th day of July, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25