1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                         DALLAS DIVISION

4
    UNITED STATES OF AMERICA,      )        3:21-CR-236-E
5                 Government,      )
                                    )
6                                   )
    VS.                            )        DALLAS, TEXAS
7                                   )
                                    )
8    WILLIAM ROY STONE, JR.,        )
     JOSEPH EVENTINO DELEON,        )
9                 Defendants.      )        July 31, 2023

10

11              TRANSCRIPT OF JURY TRIAL, VOLUME 5A

12              BEFORE THE HONORABLE ADA E. BROWN

13                 UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:         MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664

```
 1                                    MR. MARCUS J. BUSCH
                                      UNITED STATES DEPARTMENT OF JUSTICE
 2                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 3                                    1100 Commerce Street
                                      Dallas, Texas  75242
 4                                    marcus.busch@usdoj.gov
                                      (214) 659-8642
 5

 6  FOR THE DEFENDANT,               MR. GREGG GALLIAN
    WILLIAM ROY STONE, JR.:          Gallian Firm
 7                                    Parkside Tower
                                      3500 Maple Avenue
 8                                    Suite 720
                                      Dallas, Texas  75219
 9                                    gregg@GallianDefenseFirm.com
                                      (214) 432-8860
10

11                                    MS. JACLYN ANNETTE GALLIAN
                                      Bryan Cave Leighton Paisner
12                                    2200 Ross Avenue
                                      Suite 4200
13                                    Dallas, Texas  75201
                                      jaclyn.gallian@bclplaw.com
14                                    (214) 721-8058

15
    FOR THE DEFENDANT,               MR. GREG WESTFALL
16  JOSEPH EVENTINO DELEON:          Westfall Sellers
                                      1701 River Run
17                                    Suite 801
                                      Fort Worth, Texas  76107
18                                    greg@westfallsellers.com
                                      (817) 928-4222
19
                                      MR. FRANK SELLERS
20                                    Westfall Sellers
                                      1701 River Run
21                                    Suite 801
                                      Fort Worth, Texas  76107
22                                    frank@westfallsellers.com
                                      (817) 928-4222
23

24

25
```



```
 1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                   JURY TRIAL VOLUME 5A - JULY 31, 2023
 2                       P R O C E E D I N G S
 3              SECURITY OFFICER:  All rise.
 4              THE COURT:  Please be seated.
 5              Good morning.  How is everybody doing?  Is there
 6     anything we need to take up outside the presence of the jury?
 7              Please be seated everybody.
 8              Government, is there anything we need to take up from
 9     your perspective before we bring in the jury?
10              MS. RUDOFF:  Not right now, Your Honor.  Thank you.
11              THE COURT:  No?
12              Mr. Gallian, anything we need on your team before we
13     bring in the jury?
14              MR. GALLIAN:  Good morning, and no.
15              THE COURT:  Good morning.  Okay.  Fantastic.
16              MR. SELLERS:  Good morning.  And A/C maybe?  That's
17     the only thing.
18              THE COURT:  Yeah.  Well, we'll work on that.
19              MR. SELLERS:  All right.
20              THE COURT:  But nothing we need to take outside of
21     the presence?
22              MR. SELLERS:  No, ma'am.
23              THE COURT:  All right.  Let's bring them in.
24              Appreciate everybody being here on time.
25              (Pause)
```

 1          THE COURT:  And if you will check your phones.  I'm

 2  checking mine too.

 3          (Pause)

 4          SECURITY OFFICER:  All rise for the jury.

 5          (Jury in)

 6          THE COURT:  And we're all standing for you, so please

 7  feel free to sit when you're there.

 8          (Pause)

 9          THE COURT:  Good morning, members of the jury.  I'm

10  so proud everybody came back.  Glad to have you.

11          And when we left, Mr. Gallian was getting into his

12  cross-examination.  If everybody in the audience would please,

13  as a courtesy to the Court, make sure your phones are off.

14          And with that said, Mr. Gallian, your witness.

15          MR. GALLIAN:  Thank you, Your Honor.

16          THE COURT:  You're welcome.

17     CASI THOMPSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

18                  CROSS-EXAMINATION CONTINUED

19  BY MR. GALLIAN:

20  Q.   Good morning, Casi.

21  A.   Good morning.

22  Q.   Before we get into the substantive timeframe of 2015, I

23  have some questions for you.

24  A.   Okay.

25          MR. GALLIAN:  Carly, if we could pull up Government's

1    Exhibit 38, please, page 44.

2    BY MR. GALLIAN:

3    Q.   All right, Casi.  I want to direct your attention to the

4    bottom left corner text -- that whole portion, yes.

5             Can you see that on the screen in front of you?

6    A.   Yes.

7    Q.   Okay.  Ms. Rudoff, one of the U.S. Attorneys went through

8    your text message numbers that changed over certain period of

9    time.  Do you remember that line of questioning?

10   A.   Say that again.

11   Q.   Ms. Rudoff, when she was asking you about all your numbers

12   and texts with Joe DeLeon, this was the number you had in

13   August 2014; is that right?

14   A.   Yes.

15   Q.   817-879-9815?

16   A.   Yes.

17   Q.   And we also know that you left for rehab in September of

18   2014; is that right?

19   A.   Yes.

20   Q.   Okay.  This is a text message from you to Joe DeLeon, do

21   we agree?

22   A.   Yes.

23   Q.   There's a text down here from you to Joe DeLeon

24   approximately a month before you leave for rehab saying, "Any

25   word from Bill?"

```
 1                Did I read that appropriately?
 2   A.   Yes.
 3   Q.   What did you mean by that?
 4   A.   I'm sure it had something to do with my Hood County drug
 5   charge.
 6   Q.   You were wanting Bill to help out with that case?
 7   A.   No.  He -- Joe would act as though he was reaching out to
 8   Bill in my -- for me, without me actually ever asking, and so
 9   he started the initiation of the conversation, so I was just
10   asking if he had heard from him.
11   Q.   Okay.  We don't see any text messages above this one, do
12   we?
13   A.   I'm not sure.  I can't see.
14   Q.   Well, I mean, this is -- this is the start time, August 5,
15   2014, at 12:12, you send the first text, do you not?
16   A.   I'm not sure what you're saying.  I'm only seeing one text
17   right now.
18                MR. GALLIAN:  Carly, if we can go to the next page,
19   please.
20                And if we scroll up those -- I'm sorry, pull up those
21   top two text messages.
22   BY MR. GALLIAN:
23   Q.   All right.  This is in 2014.  Joe is responding to your
24   text message, saying, "Yes, he just called me this morning.  He
25   is alive and well."  Is that right?
```

```
1    A.   Okay.  It was because he was in Benghazi.  He said he was
2    in Benghazi.  That's what the text was for.
3    Q.   Okay.
4         MR. GALLIAN:  Carly, if we could jump to page 47,
5    please.  Middle of the page -- right there.
6    BY MR. GALLIAN:
7    Q.   You again initiated the conversation by saying, "Any word
8    from our friend."  Is that right?
9    A.   Yes.  This is because he was in Benghazi supposedly during
10   this time.
11   Q.   Okay.  This has nothing to do with the fact that you have
12   a Hood County case pending against you?
13   A.   No.
14   Q.   You weren't looking for Bill's help at all?
15   A.   No.
16   Q.   Okay.  You had not left -- you had not yet left for rehab;
17   is that right?
18   A.   Right.
19   Q.   And you know that Bill had helped you in previous cases,
20   right?
21   A.   I was under the impression that he helped me in 2007.
22   Q.   Okay.  Well, in 2007, when you were arrested --
23        MR. GALLIAN:  Thank you, Carly.
24   BY MR. GALLIAN:
25   Q.   When you were arrested in Irving, you did reach out to
```

1  Bill, didn't you?

2  A.   I did not.

3  Q.   You had Joe reach out to Bill for you?

4  A.   No, I didn't.

5  Q.   Charles -- Go ahead.

6  A.   I called Charles.

7  Q.   Okay.

8  A.   And he reached out to Bill.

9  Q.   At your request?

10  A.   No.  I was asking for his advice, and I told him what the

11  Irving police officer had told me, and he took it upon himself

12  to reach out to Bill.

13  Q.   Okay.  And at that point in time you knew that Bill had

14  been a police officer at Irving Police Department; is that

15  right?

16  A.   I had just learned that from the Irving Police Department.

17  I barely knew Bill, so I was not comfortable reaching out to

18  him.  Usually it was Charles.

19  Q.   Okay.  Ms. Rudoff talked about the salary that you make as

20  a hairstylist.  Do you recall that portion of the testimony?

21  A.   Yes.

22  Q.   Saying that you said you make anywhere from $35,000.00 to

23  $65,000.00 a year.  Is that accurate?

24  A.   It varies, yes.

25  Q.   Of course.  Some years can be better and some years can be

1   worse?

2   A.   Yes.

3   Q.   Okay.  What they didn't ask was the other income that you

4   have.  You have other sources of income, don't you?

5   A.   Yes.

6   Q.   Okay.  And I had no intention of going into this, but the

7   jury is left thinking you make $35,000.00 a year.  That's not

8   true, is it?

9   A.   No.  And I'm happy to tell you my other income.

10  Q.   Okay.  How much do you pay yourself for being the trustee

11  of the trust?

12  A.   I get paid a ranch payment.  The -- it's $6,000.00.

13  Q.   Per month?

14  A.   To maintain the estate.

15  Q.   Per month?

16  A.   Yes.

17  Q.   Do you also make royalties off of the oil and gas and

18  mineral rights?

19  A.   I do, but right now it's not very much.

20  Q.   Okay.  Can you guess for me how much it is per month?

21  A.   The checks that I get in the mail are about $100.00.

22  Q.   How many rental properties do you have at this point?

23  A.   I have three.

24  Q.   Okay.  Generally speaking, after you deduct expenses,

25  property taxes, all that sort of stuff, how much money are you

1   making per month from those rental properties?

2   A.   About 1,000.

3   Q.   And we noticed in the collection of assets that you listed

4   that there are a number of individuals that Myrna provided

5   loans to; is that right?

6   A.   Yes.

7   Q.   Okay.  When those individuals make payments on their

8   loans, do you get that money?

9   A.   It goes into the trust.

10  Q.   Okay.  The trust that you and your sons are the

11  beneficiary of; is that right?

12  A.   The trust that I am the beneficiary of.

13  Q.   Okay.  All right.  I want to fast-forward to July 2019 and

14  go through the times that you sat down with the agents in this

15  case.  Is that fair?

16  A.   Sure.

17  Q.   Okay.  The first time that you sat down with Ranger Briley

18  was July 29, 2019; is that right?

19  A.   Yes.  I'm not sure of the exact date.  Sounds right.

20  Q.   August 1, 2019, you sat down with Ranger Briley again.

21  Does that sound right?

22  A.   I'm not sure of the exact date.

23  Q.   Okay.  August 16, 2019.  Any reason to dispute that?

24  A.   I'm not sure of the exact date.

25  Q.   August 21, 2019?

```
 1   A.   I'm not sure of the dates.
 2   Q.   What about September 3, 2019?
 3   A.   Could have been.  I don't know what actual date I met with
 4   Danny.
 5   Q.   September 19, 2019?
 6   A.   Could have been.  I don't know for sure.
 7   Q.   October 2, 2019?
 8   A.   Could have been.
 9   Q.   October 24, 2019, you sat down with Ranger Briley and
10   Investigator Barton.  Do you recall her?
11   A.   From Hood County?
12   Q.   Yes, ma'am.
13   A.   Yes.
14   Q.   Does October 24, 2019 sound about right?
15   A.   I believe she was there most of the time that I met, so --
16   Q.   December 19, 2019?
17   A.   Say this again.  Are we into September?
18   Q.   No, ma'am.  I'm sorry.  December 9, 2019.
19   A.   December of 2019?  I don't know.
20   Q.   Okay.  Obviously it was around Christmas 2019.  You don't
21   remember that one?
22   A.   No, but -- Okay.
23   Q.   And then in May 2020, specifically May 5, 2020, you sit
24   down with Ranger Briley, Brian Luley, Ivan Martinez, and Andrew
25   Latham.  Do you recall that one?
```

```
 1   A.   What was the date?
 2   Q.   May 5, 2020.
 3   A.   I -- I'm not sure what the date was, but --
 4   Q.   That was a really long meeting.  That was like two hours.
 5   You did it at the Hood County D.A.'s office, if I recall.
 6   A.   Okay.
 7   Q.   Does that sound about right?
 8   A.   I believe we were at the courthouse.
 9   Q.   Okay.  Up until this point, every meeting that you had
10   with law enforcement was audio recorded, was it not?
11   A.   Yes.
12   Q.   Okay.  Were any of your meetings after that May 5, 2020
13   meeting, were any of them recorded?
14   A.   I felt like every meeting was recorded.
15   Q.   Okay.  Let's talk about the meetings that happened after
16   May 5, 2020.
17        July 6, 2020, does that sound familiar?
18   A.   I have no idea what date it was.
19   Q.   Well, fast-forward to 2022.  June 24, 2022, only a year
20   ago, do you remember that one?
21   A.   And where were we meeting?
22   Q.   This one I think you met up here.
23   A.   Okay.  I thought we were still talking about Danny.  Okay.
24   Yes.
25   Q.   July 22, 2022?
```

```
 1   A.   Yes.

 2   Q.   January 23, 2022, before our last trial setting?

 3   A.   I guess.

 4   Q.   Excuse me.

 5            MR. GALLIAN:  Sorry, Todd.

 6   BY MR. GALLIAN:

 7   Q.   2023?

 8   A.   Okay.

 9   Q.   June 2023, before this trial setting?

10   A.   I'm not sure of the dates, but okay.

11   Q.   Okay.  In preparation for your testimony, how many times

12   did you sit down with the prosecutors in this case?

13   A.   This is probably the fourth time this court has been

14   extended, and so -- or roughly, and so I'm not sure.

15   Q.   Okay.  Ms. Rudoff was the one that was asking you

16   questions, right, on --

17   A.   Yes.

18   Q.   -- over the last couple of days?

19            How many times did you meet with Ms. Rudoff and

20   discuss the questions?

21   A.   We just went over -- I believe it's called trial prep.  So

22   I don't know.  I don't know.

23   Q.   How many times did you meet with Ms. Rudoff?

24   A.   I'm not sure.  I would say four times.

25   Q.   Four times?
```

1  A.   Or three.  I'm not -- I can't -- I don't know.

2  Q.   And you're aware that Ms. Rudoff was not one of the

3  attorneys on the case earlier this year, right?

4  A.   Yes.

5  Q.   Okay.  So that's four times in the last few months that

6  you met with Ms. Rudoff?

7  A.   Yes.

8  Q.   Did you meet with the Government any time over this

9  weekend?

10  A.   No.

11  Q.   By my count, that's approximately 21 different sit-downs

12  with law enforcement during this case.  Does that sound right?

13  A.   I don't know how many times.

14  Q.   Okay.  Do you have any reason to dispute my dates or that

15  number?

16  A.   This has -- I -- I mean, it sounds right, but this is

17  something that's been going on since 2019.

18  Q.   When you sat down with Ms. Rudoff for the trial prep, did

19  you and Ms. Rudoff go through those exact questions that she

20  asked you on the stand?

21  A.   Yes.

22  Q.   Did you rehearse your answers?

23  A.   No, I did not.

24  Q.   Okay.  All right.  I want to talk about some of the

25  allegations that you've made that don't quite add up in my

```
 1   mind.
 2           You stated that Joe and Bill made you compile a list
 3   of assets.  Tell me more about that.
 4   A.    Okay.  So the reason behind it was Bill wanted the judge
 5   to understand that I was worth more out here than inside
 6   prison.  That was his words verbatim.
 7   Q.    Okay.  So what did you do?
 8   A.    I reluctantly made up a list of my assets.
 9   Q.    Did those assets include your personal assets?
10   A.    I didn't have any assets.
11   Q.    Okay.  You didn't have any bank accounts at the time?
12   A.    I had a bank -- I believe I listed my trust account.
13   Q.    Okay.  And after they made you compile that list, let me
14   make this unequivocally clear, Bill and Joe did not you
15   transfer any assets into their names, did you -- or did they?
16   A.    I was told to take the trust accounts and put them all
17   into my name to make it easier for my kids when I pass away.
18   Q.    Okay.  So back to my question.  Did Bill or Joe make you
19   put any of those assets in their name?
20   A.    No.
21   Q.    Okay.
22           MR. GALLIAN:  Carly, if we could pull up Government's
23   Exhibit 6.  It's already been admitted.
24           Permission to publish, Judge?
25           THE COURT:  Granted.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Is this the list?
 3   A.   Yes.
 4   Q.   Is this the list that you compiled?
 5   A.   This -- yes.
 6   Q.   Okay.  This is the list that Joe and Bill made you do; is
 7   that right?
 8   A.   It was a list that they told me was necessary to prove my
 9   worth to the judge.
10   Q.   Okay.  You and I can agree that as we look through this
11   list it doesn't have your bank account on it, does it?
12   A.   No, it doesn't.
13   Q.   Okay.
14   A.   I didn't have much.
15   Q.   That's fine.  But you said it was a list of your assets.
16   And no matter how big or how small, your personal assets are
17   not on this, do we agree?
18   A.   The house that I was living in is on this.
19   Q.   I understand.  But that was in Myrna's trust, right?
20   A.   My son's trust.
21   Q.   Okay.  And that's on this sheet?
22   A.   Yes.
23   Q.   But your personal assets, anything that you own, whether
24   it was a dollar or 10 million, not on this, is it?
25   A.   I didn't have any assets.
```

```
 1    Q.    Okay.  And let me get to the crux of why I'm doing this.

 2             MR. GALLIAN:  Your Honor, with permission at this

 3    time I would like to admit DeLeon Exhibit Number 99.

 4             THE COURT:  Any objection?

 5             MS. MAX:  Just a moment.

 6             THE COURT:  Sure.

 7             (Pause)

 8             THE COURT:  Which one is this?  I'm sorry.

 9             MR. GALLIAN:  DeLeon Exhibit Number 99.

10             THE COURT:  Okay.

11             MS. RUDOFF:  No objections, Your Honor.

12             THE COURT:  All right.  And I assume no objections

13    since it's yours?

14             MR. SELLERS:  We join in that.

15             THE COURT:  All right.  Sounds great.  It's admitted.

16             (Defendant DeLeon's Exhibit No. 99 received)

17             MR. GALLIAN:  Thank you, Your Honor.

18    BY MR. GALLIAN:

19    Q.    A few questions before we go through this.

20             Who was the attorney that helped you through all of

21    the probate and will stuff --

22    A.    Andrew.

23    Q.    Ottaway?

24    A.    Ottaway.

25    Q.    Part of the probate process is that there is an actual
```

```
 1    case assigned to the probate, correct?
 2    A.   Yes.
 3    Q.   And part of that process is that you have to take the
 4    assets that are in the -- that are in the trust or are owned by
 5    Myrna at that time and you had to file an inventory with the
 6    Court.  Is that right?
 7    A.   Yes.
 8    Q.   And you did that in this case?
 9    A.   Yes.  And this is the document that was made up for that,
10    so I just copied it and sent it.
11    Q.   So Bill and Joe didn't make you create this?
12    A.   This was a list written up by Andrew.
13    Q.   You said you wrote it up?
14    A.   I had to send it to Bill -- or to Joe and then Joe to
15    Bill.
16    Q.   But first you made it for Andrew Ottaway, right?
17    A.   I did not.  He had it there.
18    Q.   Where is there?
19    A.   At his office.
20    Q.   Okay.  So Andrew created this?
21    A.   It was at his office, yes.  My grandmother did this
22    before, had written it out with him.
23    Q.   And then Andrew gave it to you?
24    A.   Honestly, I'm not really sure if this was the exact one or
25    if this -- I'm not sure which paper this is.  One of the two.
```

1  There was a list of assets that was created for probate, but

2  there was also a list of assets that I had to send over to Bill

3  and Joe.

4  Q.   But that's why I started the questioning off by asking if

5  this was the list.

6  A.   Okay.  Well, if it wasn't this one, it was very similar,

7  if it isn't this one.

8       MR. GALLIAN:  Carly, if we can publish DeLeon Exhibit

9  Number 99, page 10, please.

10 BY MR. GALLIAN:

11 Q.   Okay.  This is the inventory that I was discussing.  This

12 list, the inventory and appraisement and all of the list of

13 claims.  Can you see that?

14 A.   Okay.  Yes.

15      MR. GALLIAN:  Carly, if we can zoom in on the middle

16 portion.

17 BY MR. GALLIAN:

18 Q.   It lists the real property, the vehicles and equipment and

19 the miscellaneous property, $443,000.00.  Do we agree?

20 A.   Yes.

21 Q.   Okay.

22      MR. GALLIAN:  Carly, if we can do the next block,

23 please.

24 BY MS. RUDOFF:

25 Q.   These there loans you had out to certain individuals:

```
 1   Justin Mund and Jerod Mund.  Those are family members, right?
 2   A.   Yes.
 3   Q.   Have both of them paid off their loan at this point?
 4   A.   At that given time?
 5   Q.   Today.
 6   A.   One of them has.
 7   Q.   Who?
 8   A.   Jerod.
 9   Q.   The $308,000.00 note?
10   A.   Yes.
11        MR. GALLIAN:  Carly, if we could jump to page 12,
12   please.
13   BY MR. GALLIAN:
14   Q.   We see here on the schedule of real estate that it talks
15   about the properties that your grandma had in Johnson County,
16   San Juan County, New Mexico; is that right?
17   A.   Yes.
18   Q.   And then it talks about the homestead, which is the Stoney
19   Creek house that you were living in at the time she passed, do
20   we agree?
21   A.   Yes.
22        MR. GALLIAN:  Next page, Carly.
23   BY MS. RUDOFF:
24   Q.   All right.  Schedule B, vehicles and equipment.
25        MR. GALLIAN:  Carly, if we could zoom in on that
```

 1  portion, please, since the jury is 100 yards away.

 2  BY MR. GALLIAN:

 3  Q.   2014 RX350.  That's your grandma's Lexus, correct?

 4  A.   Yes.

 5  Q.   Valued at $25,000.00?

 6  A.   Yes.

 7  Q.   2014 F-150 pickup valued at $20,000.00?

 8  A.   Yes.

 9  Q.   Okay.  2008 Chevy van valued at $8,425.00?

10  A.   Yes.

11  Q.   And a flatbed trailer valued at $500.00; is that right?

12  A.   Yes.

13  Q.   All right.

14       MR. GALLIAN:  Carly, if you can go to the last page,

15  please.

16  BY MR. GALLIAN:

17  Q.   And this shows in June 20, 2016, this claim -- I'm sorry,

18  the inventory was approved by the Court, right?

19  A.   Yes.

20  Q.   Okay.  So suffice it to say, the list that Joe and Bill

21  made you create is the same list or a near identical list of

22  what Andrew Ottaway gave you?

23  A.   Yes.  I'm not sure which one.  It's been a long time since

24  I've seen these lists.

25  Q.   I understand that.

```
 1                And, again, Joe and Bill did not make you transfer
 2    any of those assets into their name?
 3    A.   No.
 4    Q.   All right.  We talked about this power of attorney that
 5    you gave to Daralyn in 2015.  Do you recall that?
 6    A.   Yes.
 7    Q.   And you said on direct that you gave that power of
 8    attorney to Daralyn out of fear for what may happen with your
 9    children; is that right?
10    A.   Yes.
11    Q.   I asked you last week when you started the probation.  You
12    said December 2015.  Do we agree?
13    A.   Yes.
14    Q.   But you gave Daralyn that power of attorney in
15    mid-November 2015?
16    A.   Yes.
17                MR. GALLIAN:  Carly, if we can pull up Government's
18    Exhibit 163.
19                Permission to publish, Judge?
20                THE COURT:  Granted.
21                MR. GALLIAN:  Do you want me to ask that every time?
22                THE COURT:  I'm happy to give both sides permission
23    to publish once things are admitted.
24                MR. GALLIAN:  Thank you, Your Honor.
25                THE COURT:  You're welcome.
```

```
 1    BY MR. GALLIAN:
 2    Q.   We say -- see here on the dated portion --
 3              MR. GALLIAN:  Carly, if you could blow that up.
 4    BY MR. GALLIAN:
 5    Q.   -- dated the 30th day of November, 2015, right?
 6    A.   Yes.
 7    Q.   And, again, if we back out, it looks like Andrew Ottaway,
 8    your trusted attorney, executed this as well; is that right?
 9    A.   That was my grandmother's trusted attorney at this point,
10    but, yes, he -- yes.
11    Q.   Okay.  Well, I mean, at this point Myrna had passed away,
12    right?
13    A.   Right.
14    Q.   And you were still using Andrew Ottaway?
15    A.   Yes.
16    Q.   And even into the summer of 2016 you were still using
17    Andrew Ottaway?
18    A.   Yes.
19    Q.   All right.  In the years preceding when you had issues
20    with custody, Kent had Cade your oldest, right?
21    A.   Yes.
22    Q.   And when CPS got involved, then your mom, or Cutter, your
23    brother, would take Slayter, right?
24    A.   My mom would.
25    Q.   Okay.  So your mom would take Slayter, right?
```

```
 1   A.   Yes.
 2   Q.   And in all of this that is going on, we agree that
 3   November 30, 2015 is a mere few weeks after Myrna had just
 4   passed away?
 5   A.   Yes.
 6   Q.   Yes.  And you didn't put the power of attorney in your
 7   mom's name, did you?
 8   A.   No, sir, I did not.
 9   Q.   That's all I needed.  Thank you.
10           Let's talk about your bank accounts.
11           You have a Chase bank account that opened, it looks
12   like, in March of 2016.  Does that sound about right?
13   A.   Yes.
14   Q.   Okay.  Then you had a Navy Federal.  When did you open
15   that account?
16   A.   When I went into the Navy in 2007.
17   Q.   So that account was opened from 2007 -- is it still opened
18   today?
19   A.   Yes, it is.
20   Q.   Talk to me about First Financial account.
21   A.   That's the bank that our whole family uses and where our
22   trusts are.
23   Q.   Okay.  That's where all the money is?
24   A.   Was.
25   Q.   Okay.  When your life insurance -- when Myrna's life
```

1   insurance paid out, where did that money go?

2   A.   I don't recall.

3   Q.   Okay.

4   A.   I believe it went into Chase.

5   Q.   If it didn't go into Chase, where would it have gone?

6   A.   It went into the Navy Federal Credit Union.  Bill told me

7   to get a real bank, so that's why I even had a Chase account.

8   Q.   Okay.  If it didn't go into Navy Federal, where did it go?

9   A.   There is no other bank.

10  Q.   Did it go into First Financial?

11  A.   No, it did not.

12  Q.   How much was the life insurance benefit?

13  A.   $1 million.

14  Q.   And that's what you were paid?

15  A.   Yes.

16  Q.   And so we should be able to see from your bank accounts

17  either from Chase or Navy Federal some deposit in February 2015

18  for $1 million?

19  A.   No, because I split it with my kids.

20  Q.   Okay.  So where did the other $500,000.00 go?

21  A.   The $500,000.00 was deposited.

22  Q.   The one that --

23  A.   I'm sorry.  I invested it into the stock market.

24  Q.   So you got $1 million paid out.  Half a million went to

25  the stock market?

```
 1   A.   Yes.  And the other half went to -- you know, I'm sorry.
 2   I can't say these for sure, because there was a lot of money
 3   transactions going on and --
 4   Q.   Yes.
 5   A.   So I'm not sure.  I can't say.  I don't remember.
 6   Q.   Okay.  Now, are you aware that we do not have your First
 7   Financial bank records?
 8   A.   No.
 9   Q.   Okay.  That's not entirely true, is it?  Do you remember
10   when we served you with a subpoena for First Financial bank
11   records?
12   A.   No.
13   Q.   And then you hired an attorney, Matt Smid?
14   A.   Yes.
15   Q.   Then you guys filed a motion to quash our subpoena?
16   A.   Absolutely.
17   Q.   And our subpoena was quashed, right?
18   A.   Yes.
19   Q.   We did not get access to your First Financial bank
20   records?
21   A.   Good.
22   Q.   We agree?
23   A.   Yes.
24   Q.   Okay.  But that's where all the money was in the trust,
25   right?
```

```
 1   A.   That's where our family banks.
 2   Q.   Okay.  All right.  Let's move on to 2015.
 3            When we were talking -- I'm sorry, when you were
 4   talking with the prosecutors, you mentioned a meeting that you
 5   had with Bill in March of 2015.  Do you recall that?
 6   A.   I don't recall any specific dates.
 7   Q.   Okay.  You said that it was right after you had just found
 8   out you were going to inherit all of Myrna's assets, wills and
 9   everything, right?
10   A.   I believe your date is wrong.
11   Q.   No, ma'am.  What you talked about was March 2015, you and
12   Bill Stone had a meeting, did you not?
13   A.   I'm sorry, I was thinking we were into 2016.  Okay.  Sure.
14   Q.   Do you remember that meeting?
15   A.   I'm not sure if it was in March or not, but, yes, I do
16   recall the meeting.
17   Q.   Okay.  Do you know when it was?
18   A.   It was -- it wasn't to discuss anything about my
19   grandmother's inheritance.  It was to show him that I was doing
20   well and to thank him for helping me in 2007 and showing him
21   how well I was doing, because he had flown in from Washington
22   and had just left Benghazi.
23   Q.   So when your -- so your testimony now is that that meeting
24   that you had with Bill in 2015 you did not discuss the assets
25   of your grandma?
```

```
 1   A.   We did not discuss the assets of my grandmother in that
 2   meeting.
 3   Q.   Okay.  So when you mentioned with the prosecutors and
 4   shared with the jury that that's when you relayed that
 5   information to Bill, that's not accurate?
 6   A.   I don't think you're wording it correctly.  I showed him
 7   myself and how well I was doing and thanking him; and not just
 8   that, that I had gotten back in good graces with my
 9   grandmother, and I mentioned being added to the life insurance
10   policy.
11   Q.   Okay.  Set the scene for us.  Where were you guys?
12   A.   I believe we were at a Mexican food restaurant.
13   Q.   Who was there?
14   A.   Just Bill.
15   Q.   Okay.  How long was it?
16   A.   I would say an hour.
17   Q.   Okay.  Breakfast, lunch, or dinner?
18   A.   Dinner.
19   Q.   Did you guys have anything to drink?
20   A.   No.
21   Q.   Who paid the tab?
22   A.   I don't remember.
23   Q.   Was it a date?
24   A.   No.
25   Q.   Unequivocally?
```

```
 1   A.   Absolutely not a date.

 2   Q.   Okay.  Can we agree that it was March 2015?

 3   A.   I can't agree for the date, because I'm not sure what

 4   date.

 5   Q.   Would you agree --

 6   A.   I mean the date.

 7   Q.   That's fine.  I won't give you a specific date.  What if I

 8   said March-ish?

 9   A.   I still wouldn't remember.  It was not -- it wasn't

10   significant to me.

11   Q.   Okay.  I mean, if you told the prosecutors it was March

12   2015, you're changing that now?

13   A.   I'm just saying I'm not sure what date it was.

14   Q.   I don't need a specific date.  Just give me -- you tell

15   me.  Give me a ballpark.

16            MS. RUDOFF:  Objection, asked and answered at this

17   point.

18            THE COURT:  Overruled.

19   A.   I'm not sure of the date.  It could have been March.  It

20   could have been March.

21   Q.   Okay.  If I wrote on here could have been March, are you

22   okay with that?

23   A.   That's fine.

24   Q.   2015?

25   A.   Yes.
```

```
 1   Q.   What would you call that?  If it wasn't a date, what would
 2   you call it?
 3   A.   Him flying in and me meeting him for dinner, a person that
 4   I barely knew that had helped me, and I was showing
 5   appreciation.
 6   Q.   So a meeting?
 7   A.   It was the third time I had ever seen him in person.
 8   Q.   Okay.  Are you okay if I term it "meeting"?
 9   A.   Meeting would be good.  More just dinner.
10   Q.   I'll write "dinner."  Are you okay with that?
11   A.   That's fine.
12   Q.   How often were you and Bill Stone talking before the
13   dinner?
14   A.   I'm not sure.
15   Q.   A lot?  A little?
16   A.   If he'd text, I would text back.
17   Q.   Did you guys ever talk on the phone?
18   A.   I would say maybe.
19   Q.   Okay.  Maybe tends to suggest to me that that's maybe a
20   couple of minutes here and there.  Is that fair?
21   A.   I'm not sure.
22   Q.   Okay.
23   A.   I'm not sure if we actually ever spoke before on the
24   phone.  Could have.
25   Q.   Okay.  Would you say that you guys talked a lot on the
```

```
 1  phone?
 2  A.   No.
 3  Q.   Okay.  When I say a lot, what's in your mind so that we're
 4  on the same page?
 5  A.   A lot is the 12 hours a day that I used to have to talk to
 6  him on the phone.
 7  Q.   Okay.  But if we go back to 2015, before the fake
 8  probation, how often were you guys talking on the phone?
 9  A.   I can't say for sure.
10  Q.   Okay.
11          MR. GALLIAN:  Permission to approach, Your Honor?
12          THE COURT:  You may.
13          (Pause)
14          MR. GALLIAN:  Your Honor, at this time we move to
15  admit Stone's Exhibit 165, Verizon call records.
16          THE COURT:  Any objection from the Government once
17  you have a chance to look at it?
18          MS. RUDOFF:  No objection, Your Honor.
19          THE COURT:  Admitted.
20             (Defendant Stone's Exhibit No. 165 received)
21          THE COURT:  I assume no objection from counsel for
22  DeLeon?
23          MR. SELLERS:  No, ma'am.
24          MR. GALLIAN:  Carly, if we could publish the --
25          Permission to publish, Your Honor?
```

```
 1                THE COURT:  Granted.
 2                MR. GALLIAN:  Carly, if we could publish the first
 3    page of Stone Exhibit 165, please.
 4    BY MR. GALLIAN:
 5    Q.   All right.  Casi, if we look up here at the top where it
 6    has the page count -- I'm sorry -- on your screen, not on the
 7    paper.  You see where it says page 1 of 640?
 8    A.   Yes.
 9    Q.   Okay.  Now, in 2015, specifically around the time of
10    dinner, you recall that Bill Stone had a different number,
11    right?
12    A.   He had two phones.
13    Q.   Okay.  And one was his FBI phone number, right?
14    A.   Yes.
15    Q.   Okay.  And you guys would talk quite often on that FBI
16    number, right?
17    A.   I'm not sure which number it was that I was talking on.
18    Q.   Okay.  Now, what I want you to do is look at the second
19    page of what I have handed you.  Do you see the billing
20    invoice?
21    A.   February 23rd of 2015, is that what you're --
22    Q.   Yep.
23                MR. GALLIAN:  Carly, if we could jump to page 591,
24    please.  I hope that's right.
25                Okay.  Carly, bottom right corner has the date.
```

```
 1    BY MR. GALLIAN:
 2    Q.   Now, right here it has the bill date of February 23, 2015.
 3    Did I read that appropriately?
 4    A.   Yes.
 5    Q.   Okay.  Now, to be unequivocally clear, what was your phone
 6    number during that time?  Was it 817-219-3550?
 7    A.   Yes.
 8            MR. GALLIAN:  Permission to approach, Your Honor?
 9            THE COURT:  You may.
10            (Pause)
11    BY MR. GALLIAN:
12    Q.   All right, Casi.  This is going to take some multitasking
13    between you and I, but we'll get through it together.
14    A.   Okay.
15            MR. GALLIAN:  Carly, if we could start on the 2015
16    calls, please.
17    BY MR. GALLIAN:
18    Q.   Now, if we start with this first call, February 11,
19    2015 -- again, these are Bill Stone's call records.
20    817-219-3550.  That's your number?
21    A.   Yes, it is.
22    Q.   Okay.  As we go across we can see that it is an incoming
23    call, right?
24    A.   Yes.
25    Q.   And because these are Bill Stone's records, that means
```

1    that you called him February 11, 2015?

2    A.    Okay.

3    Q.    Do you agree?

4    A.    Yes.

5    Q.    Okay.  Now, this is where the multitasking is going to

6    come in.  I'm sorry.  I handed you a sheet that you and I are

7    going to go through together.  I have it marked as Stone's

8    Exhibit 182.  182.  And we're going to walk through this

9    together, okay?

10   A.    Okay.

11   Q.    The first entry on this chart that I handed you says

12   February 11, 2015, 8:00 p.m., your phone number.  The phone was

13   initiated by you.  And the length was 78 minutes.  Is that

14   right?

15   A.    That's what it says, yes.

16   Q.    Okay.  And that's correct on the chart too, right?

17   A.    Yes.

18   Q.    Okay.  Now, with your cooperation, I will make this go as

19   quickly and painlessly as possible, okay?

20   A.    Okay.

21   Q.    No tricks, I promise.

22         MR. GALLIAN:  Carly, if we could X out of this and

23   take up those last three entries.

24   BY MR. GALLIAN:

25   Q.    February 15, 6:13 p.m., your number, incoming call, two

```
 1   minutes.  Same page?
 2   A.   Yes.
 3   Q.   February 18, 10:16 p.m., your number, shows an outgoing
 4   call, 49 minutes.  Agree?
 5   A.   Yes.
 6   Q.   February 19, 10:38 p.m., your number, incoming call, 37
 7   minutes.  Agree?
 8   A.   Yes.
 9         MR. GALLIAN:  Carly, next page, please.
10   BY MR. GALLIAN:
11   Q.   February 25, 10:51 p.m., your number, incoming call, 26
12   minutes.  Do we agree?
13   A.   Yes.
14   Q.   Same day, 11:46 p.m., your number, incoming call, 70
15   minutes.  Do we agree?
16   A.   Yes.
17   Q.   And if we summarize all of these calls, before I have you
18   flip to that next page, we know there is a total of 262 minutes
19   in February.  Agree?
20   A.   Yes.
21         MR. GALLIAN:  Carly, next block, please, the 3-1.
22   BY MR. GALLIAN:
23   Q.   March 1, 2015, 4:12 p.m., incoming call, your number,
24   three minutes.  Agree?
25   A.   Yes.
```

```
 1    Q.   March 1, 8:53, your number, incoming call, 41 minutes.
 2    Agree?
 3    A.   Yes.
 4             MR. GALLIAN:  Next page, Carly.
 5    BY MR. GALLIAN:
 6    Q.   All right.  March 5, 9:30, your number, incoming call, 39
 7    minutes, agree?
 8    A.   Yes.
 9    Q.   March 7, 7:27 p.m., your number, incoming, 13 minutes,
10    agree?
11    A.   Yes.
12    Q.   March 9, 8:16 p.m., your number, outgoing, 14 minutes.
13    Agree?
14    A.   Yes.
15             MR. GALLIAN:  Next page, Carly.  Thank you.
16    BY MR. GALLIAN:
17    Q.   March 13, 7:19 p.m., your number, incoming call, one
18    minute.  Yes?
19    A.   Yes.
20    Q.   March 13, 7:22, your number, outgoing, seven minutes?
21    A.   Yes.
22    Q.   3-13, 7:29 p.m., your number, outgoing, three minutes?
23    A.   Yes.
24    Q.   3-14, 7:35 p.m., your number, incoming call, 28 minutes?
25    A.   Yes.
```

```
1   Q.   Same date, 8:02, your number, outgoing, one minute?  Yes?

2   A.   Yes.

3   Q.   3-15, 9:54 p.m., incoming call, 38 minutes?

4   A.   Yes.

5   Q.   Next page.  Oh, I was incorrect.  3-20, 10:28 p.m.,

6   outgoing call, your number, six minutes?

7   A.   Yes.

8   Q.   3-21, your number, 5:03 p.m., incoming call, five minutes?

9   A.   Yes.

10  Q.   3-21, 7:13 p.m., your number, outgoing, one minute?

11  A.   Yes.

12  Q.   3-21, your number, incoming call, two minutes?

13  A.   Yes.

14  Q.   3-21, your number, incoming call, 25 minutes?

15  A.   Yes.

16  Q.   3-21, your number, incoming call, one minute?

17  A.   Yes.

18  Q.   3-23, your number, incoming call, 21 minutes?

19  A.   Yes.

20  Q.   3-23, your number, incoming call, 31 minutes?

21  A.   Yes.

22  Q.   3-24, your number, outgoing, one minute?

23  A.   Yes.

24  Q.   3-24, your number, outgoing, three minutes?

25  A.   Yes.
```

1    Q.   3-24, your number, incoming, 14 minutes?

2    A.   Yes.

3    Q.   3-24, your number, incoming, eight minutes?

4    A.   Yes.

5    Q.   3-25, your number, incoming call, 31 minutes?

6    A.   Yes.

7    Q.   3-26, your number, outgoing, one minute?

8    A.   Yes.

9    Q.   3-26, your number, incoming, 18 minutes?

10   A.   Yes.

11   Q.   That's your birthday?

12   A.   Yes, it is.

13   Q.   3-27, your number, incoming call, 37 minutes?

14   A.   Yes.

15   Q.   3-29, your number, incoming call, ten minutes?

16   A.   Yes.

17   Q.   3-29, your number, incoming call, 15 minutes?

18   A.   Yes.

19   Q.   Okay.  Before we turn to the page, that chart totals it

20   for time talking in March 2015 at 418 minutes.  Do you agree?

21   A.   Yes.

22   Q.   April 2015.

23            April 3rd, your number, outgoing, 26 minutes?

24   A.   Yes.

25   Q.   April 4th, your number, incoming, five minutes?

```
 1    A.    Yes.

 2    Q.    April 4th, your number, outgoing, one minute?

 3    A.    Yes.

 4    Q.    April 4th, your number, outgoing, 22 minutes?

 5    A.    Yes.

 6    Q.    April 5th, your number, incoming, 17 minutes?

 7    A.    Yes.

 8    Q.    The 5th, your number, incoming, six minutes?

 9    A.    Yes.

10    Q.    April 8th, your number, incoming, ten minutes?

11    A.    Yes.

12    Q.    April 10th, your number, incoming, 24 minutes?

13    A.    Yes.

14    Q.    April 10th, your number, incoming, 49 minutes?

15    A.    Yes.

16    Q.    April 11th, your number, incoming, 26 minutes?

17    A.    Yes.

18    Q.    Lost myself.

19          4-12, your number, incoming, 21 minutes?

20    A.    Yes.

21    Q.    4-14, your number, incoming, 26 minutes?

22    A.    Yes.

23    Q.    4-16, your number, incoming, 47 minutes?

24    A.    Yes.

25    Q.    4-17, your number, incoming call, 27 minutes?
```

```
 1   A.   Yes.

 2   Q.   4-21, your number, incoming, 38 minutes?

 3   A.   Yes.

 4   Q.   4-22, your number, incoming, 35 minutes?

 5   A.   Yes.

 6   Q.   4-29 -- sorry.  4-29, your number, outgoing, two minutes?

 7   A.   Yes.

 8   Q.   4-29, your number, incoming, 20 minutes?

 9   A.   Yes.

10   Q.   4-30, your number, incoming, 62 minutes?

11   A.   Yes.

12   Q.   Before we turn the page, that says April 2015, 418

13   minutes.  Agree?

14   A.   Yes.

15   Q.   May 3rd, your number, incoming, 48?

16   A.   Yes.

17   Q.   May 4th, your number, incoming, 27?

18   A.   Yes.

19   Q.   May 8th, your number, outgoing, 11?

20   A.   Yes.

21   Q.   May 9th, your number, outgoing, seven?

22   A.   Yes.

23   Q.   May 9th, your number, outgoing, two?

24   A.   Yes.

25   Q.   May 9th, your number, outgoing, ten?
```

```
 1   A.    Yes.

 2   Q.    May 10th, your number, incoming, 27?

 3   A.    Yes.

 4   Q.    We're rolling now.

 5         May 12th, your number, outgoing, 12?

 6   A.    Yes.

 7   Q.    May 12th, your number, incoming, eight?

 8   A.    Yes.

 9   Q.    Last one for May.  May 25th, your number --

10         MR. GALLIAN:  I don't know how you are going to type

11   that.

12   BY MR. GALLIAN:

13   Q.    -- incoming, 49 minutes?

14   A.    Yes.

15   Q.    Okay.  Before we turn the page, you guys talk for 201

16   minutes in May 2015.  Do we agree?

17   A.    Yes.

18   Q.    All right.  June.

19         6-8-2015, your number, outgoing, 62 minutes?

20   A.    Yes.

21   Q.    Next one, 6-13, your number, incoming, 22?

22   A.    Yes.

23   Q.    6-20, your number, incoming, 43?

24   A.    Yes.

25   Q.    6-22, your number, incoming, 23?
```

```
 1    A.   Yes.

 2    Q.   Last one for June.  June 26, your number, incoming, 35?

 3    A.   Yes.

 4    Q.   And before we go to the chart, 185 minutes in June 2015.

 5    Agree?

 6    A.   Yes.

 7    Q.   July 4th, your number, incoming, 40?

 8    A.   Yes.

 9    Q.   July 9th, your number, incoming, 13?

10    A.   Yes.

11    Q.   July 9th, your number, outgoing, six?

12    A.   Yes.

13    Q.   July 17, your number, incoming, 53?

14    A.   Yes.

15    Q.   July 20th, your number, incoming, 50?

16    A.   Yes.

17    Q.   July 21st, your number, incoming, 17?

18    A.   Yes.

19    Q.   July 21st, your number, incoming, five?

20    A.   Yes.

21    Q.   July 23rd, your number, incoming, 15?

22    A.   Yes.

23    Q.   July 30th, your number, outgoing -- ingoing, one?

24    A.   Yes.

25    Q.   July 30th, your number, incoming, one?
```

```
 1   A.   Yes.

 2   Q.   July 30th, your number, outgoing, four?

 3   A.   Yes.

 4   Q.   Total for July 2015, 206.  Agree?

 5   A.   Yes.

 6   Q.   August 1, 2015, your number, incoming call, 19?

 7   A.   Yes.

 8   Q.   August 2nd, your number, outgoing, 21?

 9   A.   Yes.

10   Q.   August 2nd, your number, incoming, 36?

11   A.   Yes.

12   Q.   August 4th, your number, incoming, 40?

13   A.   Yes.

14   Q.   August 5th, your number, incoming, 15?

15   A.   Yes.

16   Q.   We're close.

17             August 15, your number, outgoing, 23?

18   A.   Yes.

19   Q.   August 24th, your number, incoming, 12?

20   A.   Yes.

21   Q.   August 25th, your number, incoming, 30?

22   A.   Yes.

23   Q.   Total number of minutes in August 2015, 196?

24   A.   Yes.

25   Q.   September 2nd, your number, outgoing, one?
```

```
 1   A.   Yes.

 2   Q.   September 2nd, your number, outgoing, one?

 3   A.   Yes.

 4   Q.   September 9th, outgoing -- I'm sorry.  September 9th, your

 5   number, incoming, 11?

 6   A.   Yes.

 7   Q.   September 11th, your number, incoming, one?

 8   A.   Yes.

 9   Q.   11th, your number, incoming, two?

10   A.   Yes.

11   Q.   11th, your number, incoming, three?

12   A.   Yes.

13   Q.   13th, your number, incoming, five?

14   A.   Yes.

15   Q.   13th, your number, incoming, 40?

16   A.   Yes.

17   Q.   14th, your number, incoming, 22?

18   A.   Yes.

19   Q.   September 18th, your number, incoming, 24?

20   A.   Yes.

21   Q.   September 20th, your number, incoming, 24?

22   A.   Yes.

23   Q.   September 20th, your number, incoming, 17?

24   A.   Yes.

25   Q.   And last one for September, September 28th, your number,
```

```
 1   incoming, ten?
 2   A.   Yes.
 3   Q.   Total number of minutes September, 161.
 4   A.   Yes.
 5   Q.   Last month, October --
 6              THE COURT:  Can I pause you there for just a moment?
 7              MR. GALLIAN:  Yes, Your Honor.
 8              THE COURT:  Members of the jury, are we doing okay?
 9   Do we need a break, or do you want to push on till 10:00?  Are
10   we okay?  Anybody need a break?
11              All right.  Lawyers doing okay?  Staff?  Clients?
12              Okay.  Great.
13              Your witness, Mr. Gallian.
14              MR. GALLIAN:  Thank you, Your Honor.
15              THE COURT:  Thank you.
16   BY MR. GALLIAN:
17   Q.   October 2nd, your number, incoming, 32.
18   A.   Yes.
19   Q.   October 5th, your number, incoming, 43.
20   A.   Yes.
21   Q.   October 10th, your number, incoming, 47?
22   A.   Yes.
23   Q.   And when I say "incoming," that means you are calling
24   Bill, correct?  Did you say anything?
25   A.   I said right.
```

```
 1   Q.   Oh, okay.  I'm sorry.
 2            October 14th, your number, incoming, 24?
 3   A.   Yes.
 4   Q.   October 20th, your number, incoming, 14?
 5   A.   Yes.
 6   Q.   10-23, your number, incoming, 52?
 7   A.   Yes.
 8   Q.   October -- October 24th, your number, incoming, 58?
 9   A.   Okay.
10   Q.   Yes?
11   A.   Yes.
12   Q.   Okay.  We agree that the number of minutes in October
13   2015, 270?
14   A.   Yes.
15   Q.   Okay.
16            MR. GALLIAN:  Your Honor, at this time we move to
17   admit Stone's Exhibit 182, which is the summary chart that I
18   just went through with Ms. Thompson.
19            THE COURT:  Any objection?
20            MS. RUDOFF:  No objection, Your Honor.
21            THE COURT:  Any from --
22            MR. SELLERS:  No, Your Honor.
23            THE COURT:  Admitted.
24            (Defendant Stone's Exhibit No. 182 received)
25   BY MR. GALLIAN:
```

```
 1    Q.   Okay.  Bill retires from the FBI October 31, 2015.  You
 2    now know that?
 3    A.   I know that now.
 4    Q.   Myrna passed away November 4, 2015, right?
 5    A.   No, sir.
 6    Q.   3rd?
 7    A.   6th.
 8    Q.   6th.  I apologize.  November 6, 2015.
 9             All of the calls that you just went through were
10    before Bill retired and before Myrna passed away, do we agree?
11    A.   Yes.
12    Q.   What were you guys talking about?
13    A.   I would like to think we were -- I don't know for sure,
14    but we were probably talking about my upcoming case that I had.
15    I think I went to court for it in August.  And when I got home
16    in January, February -- I'm unsure -- I mean, we just were
17    talking about regular stuff.
18             I looked at him as a superior to me.  You have got to
19    remember where I was in life.  I had just gotten out of
20    treatment.  I was like a baby deer learning to walk in a way,
21    in the sense of coming home to like a new beginning.  And the
22    only people really safe to really talk to were like, say, Joe
23    or -- you know, they were the only people that I knew here that
24    I had a relationship with that, you know, were good people.
25    Q.   Okay.  It was your decision to talk with Bill and Joe in
```

1    2015, right?

2    A.    Yes.

3    Q.    And a large number of those phone calls are you calling

4    Bill Stone, do we agree?

5    A.    Yes.

6    Q.    Bill Stone at this point in time was in the FBI, we can

7    agree?

8    A.    Yes.

9    Q.    Okay.  Bill Stone would come back from his assignment

10   every two weeks or so.  Do you remember that?

11   A.    No, I do not.

12   Q.    Well, you saw him for dinner in March of 2015.  How many

13   more times did you see him through the year?

14   A.    I feel like I saw him in October.  I'm not sure.  It's

15   hard to remember that far ago -- long -- it was a long time

16   ago.

17   Q.    I understand.

18         So how often would you see him from March 2015

19   through October 2015?

20   A.    I couldn't even remember the phone conversations that we

21   had, so I have no idea how often I saw him.  I would like to

22   say -- like I said, that one meeting was the third time I had

23   ever seen him, and then I probably saw him one more time, if

24   that.  I'm not sure.  I can't say.

25   Q.    Okay.  But what happens is you guys see each other in

1    March for dinner, and then you talk through October 2015 for

2    approximately 40 hours on the phone?

3    A.    Do you know how interesting his job is?  He was working

4    the Hillary Clinton e-mails, supposedly.  I was very interested

5    in his line of work.

6    Q.    Okay.  There was no romantic interests in Bill Stone at

7    that time?

8    A.    There was never any romantic interest in Bill Stone.

9    Q.    Okay.  We talked about this already.

10   A.    Uh-huh.

11   Q.    But when you sat down with the agents in May of 2020, you

12   told them on your own --

13   A.    Yes.

14   Q.    -- that you found Bill Stone attractive?

15   A.    I did not find Bill attractive.  I found his occupation

16   and, like, superior -- the way he made himself out.  He was the

17   fourth down in his command chain.  This makes me sound

18   terrible, I'm sure.  But I found it to be mysterious and

19   interesting.  Did I ever think that I would date him?  Never.

20   Q.    Okay.  We talked about this relationship.  December 2017,

21   by your own definition?

22   A.    Yes.

23   Q.    That's when you're saying we're boyfriend-girlfriend?

24   A.    I was coerced into that relationship.

25   Q.    That is not my question, Casi.

```
 1          This is when you said that you guys were in a
 2   relationship, right?
 3   A.   It was a scam relationship.
 4          THE COURT:  Ma'am, if you will just please answer the
 5   question asked.  Thank you.
 6          THE WITNESS:  Yes, ma'am.
 7          THE COURT:  Please don't ask questions back.
 8          THE WITNESS:  Repeat the question.
 9   BY MR. GALLIAN:
10   Q.   December 2017, you guys are in a relationship, scam,
11   fraud, fake, coerced --
12   A.   Yes.
13   Q.   -- whatever you want to call it?
14   A.   Yes.
15   Q.   Okay.  When is the first time that you and Bill Stone were
16   intimate with one another?
17   A.   I can't remember the first time.
18   Q.   Okay.  2015?
19   A.   Yes.
20   Q.   In the 20 sit-downs that you had with law enforcement in
21   this case, in zero of the recorded ones did you ever say that
22   Bill Stone was holding himself out as an FBI agent?  Do you
23   recall that?
24   A.   Describe what you mean in holding himself out as an FBI
25   agent.
```

```
 1   Q.   When asked directly by the agents in this case,
 2   specifically Ivan Martinez, when he asked you directly
 3   point-blank where Bill Stone -- sounded weird -- where Bill
 4   Stone was working around the time of your grandma's funeral --
 5   A.   Uh-huh.
 6   Q.   -- you said the CIA, didn't you?
 7   A.   It was -- I want to say I said -- I'm not sure what I
 8   said.
 9   Q.   Okay.  If I showed you a transcript from that
10   conversation, would that help refresh your memory?
11   A.   Yes.
12   Q.   Okay.
13             (Pause)
14             MR. GALLIAN:  Sorry, Judge.  Brief moment.
15             THE COURT:  Sure.
16             (Pause)
17             MR. GALLIAN:  May I approach?
18             THE COURT:  You may.
19             (Pause)
20   BY MR. GALLIAN:
21   Q.   All right.  What I just handed you is a transcript from
22   your sit-down with Brian Luley, Danny Briley, Ivan Martinez,
23   and Andrew Latham from May 5, 2020.  Do you agree?
24   A.   Yes.
25   Q.   If you could jump to page 33.
```

```
 1    A.   Okay.
 2    Q.   There should be a tab on it.  Ivan Martinez asks you a
 3    question that I want you -- about Bill's employment status.
 4    Can you please review that?
 5              (Pause)
 6    A.   Yes.
 7              MR. GALLIAN:  May I approach, Your Honor?
 8              THE COURT:  You may.
 9              (Pause)
10    BY MR. GALLIAN:
11    Q.   Ivan Martinez, one of the agents in this case, asked you
12    point-blank, "Like when you met him at the funeral, did he
13    share anything about his job, his job status, or his
14    employment?"  What did you answer to that question?
15    A.   I said the CIA.
16    Q.   And, in fact, that's what you said in every meeting that
17    you had with law enforcement until they were no longer recorded
18    in May of 2020, right?
19    A.   No.
20    Q.   Okay.
21    A.   Well, can you repeat the question?
22    Q.   Sure.
23    A.   You looked frustrated.
24    Q.   I just don't want to go through a thousand transcripts.
25              So every time you were asked about his employment
```

1    status, prior to May 5, 2020, you always unequivocally said

2    that he was in the CIA and contracted out.

3    A.    I can't say that I unequivocally said CIA.

4    Q.    Okay.

5    A.    He -- that is where he ended.  He worked for the FBI and

6    then CIA at the end.

7    Q.    Okay.  And what you just told Luley was -- I'm sorry,

8    Martinez was at the time of grandma's funeral, CIA, correct?

9    A.    Yes.

10          MR. GALLIAN:  May I approach, Your Honor?

11          THE COURT:  You may.

12          (Pause)

13   BY MR. GALLIAN:

14   Q.    You sat down with Danny Briley July 29, 2019, right?

15   A.    Yes.

16   Q.    And I just handed you a transcript from that time?

17   A.    Yes.

18   Q.    If you could turn to page 57 of the transcript, please.

19   A.    Okay.

20   Q.    Okay.  Have you had a chance to refresh that?

21   A.    Yes.

22          MR. GALLIAN:  May I approach, Your Honor?

23          THE COURT:  You may.

24          (Pause)

25   BY MR. GALLIAN:

```
 1   Q.   All right.  So in July 2019, you sat down with Ranger
 2   Briley in Hood County, Texas, right?
 3   A.   Yes.
 4   Q.   And Briley asked you about Bill, and at that time you said
 5   Bill was -- is a CIA?
 6   A.   Yes.
 7   Q.   And then Briley said, "He's former FBI and now he's saying
 8   CIA?"
 9           And you say, "Yes."
10   A.   Yes.
11   Q.   Okay.  July 2019 with Ranger Briley, you say CIA agent,
12   right?
13   A.   Yes.
14   Q.   May 5, 2020, with all of the case agents, you say CIA
15   agent, right?
16   A.   Yes.
17   Q.   And now you're saying FBI agent?
18   A.   No.
19   Q.   Okay.  2015, 2016, 2017, 2018, 2019, after Myrna's
20   funeral, who did Bill work for?
21   A.   He began -- he started off FBI and later was CIA.
22   Q.   Okay.  And, again, to rehash this, when Ivan Martinez
23   asked about the time of the funeral --
24           MS. RUDOFF:  Objection, asked and answered.
25           THE COURT:  Overruled.
```

```
 1   BY MR. GALLIAN:
 2   Q.   You said the time of the funeral he was what?
 3   A.   Say that again.  At the time of the funeral?  In the
 4   transcript I said CIA.
 5   Q.   Thank you.
 6          MR. GALLIAN:  May I approach the witness, Your Honor?
 7          THE COURT:  You may.
 8          (Pause)
 9   BY MR. GALLIAN:
10   Q.   I handed you what's been marked for identification as
11   Defendant's Exhibits 43 through 60, with the exception of 56.
12   If you could review those real quick, please.
13          THE COURT:  Did you say Stone 43 through 60 or
14   DeLeon?
15          MR. GALLIAN:  I think I said Stone, but it is Stone.
16          THE COURT:  Okay.  Thanks.
17          (Pause)
18   BY MR. GALLIAN:
19   Q.   Have you had a chance to review them?
20   A.   Yes.
21   Q.   Okay.  All of those pictures are pictures of your hand
22   with a ring on the ring finger, correct?
23   A.   Yes.
24   Q.   Okay.
25          MR. GALLIAN:  May I approach, Your Honor?
```

```
 1                THE COURT:  You may.

 2                (Pause)

 3                MR. GALLIAN:  Permission to publish these exhibits?

 4                THE COURT:  Granted.

 5                MR. GALLIAN:  I'm sorry.  Cart before the horse.

 6                THE COURT:  Oh --

 7                MR. GALLIAN:  I move to admit --

 8                THE COURT:  -- be sure to admit them.

 9                MR. GALLIAN:  43, 44, 45, 46, 47, 48, 49, 50, 51, 52,

10       53, 54, 55, 57, 58, 59, and 60.

11                THE COURT:  I put the cart before the horse too.

12                Any objection?

13                MS. RUDOFF:  No objection, Your Honor.

14                MR. SELLERS:  No objection.

15                THE COURT:  Admitted.

16                    (Defendant Stone's Exhibit Nos. 43, 44, 45, 46,

17                    47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59,

18                    and 60 received)

19                THE COURT:  And you may publish.

20                MR. GALLIAN:  Thank you, Your Honor.

21                Carly, if we could publish Stone 43, please.

22       BY MR. GALLIAN:

23       Q.   Okay.  Casi, what is this a picture of?

24       A.   That is a picture of a ring I bought from Bill.

25       Q.   We'll talk more about that.
```

```
 1              When did you buy it?
 2   A.   I'm not sure.  He said his friend had caught his wife
 3   having an affair and was needing money and was selling his
 4   friend's engagement ring.
 5   Q.   Okay.  When did you buy it?
 6   A.   I don't know.
 7   Q.   Approximately?
 8   A.   I can't even tell you.
 9   Q.   2015?  2016?  2017?
10   A.   I would say probably 2016.
11   Q.   How much did you pay for it?
12   A.   I don't remember.
13   Q.   Ballpark?
14   A.   I'm not sure.  Maybe 8,000.  That's a ballpark.
15   Q.   You paid 8,000 for that ring?
16   A.   (Indicating in the affirmative)
17   Q.   Okay.  Let's look at some more pictures of it.
18            MR. GALLIAN:  Carly, if we could do 44, please.
19   BY MR. GALLIAN:
20   Q.   Same ring?
21   A.   Yes.
22   Q.   45, please.  Same ring?
23   A.   Yes.
24   Q.   46, same ring?
25   A.   Yes.
```

```
 1   Q.   47, same ring?
 2   A.   Appears to be.
 3   Q.   Okay.  I know you like cars.  Can you tell by the interior
 4   of this car what timeframe we're talking about?  I know it is a
 5   Mercedes.  Was it the orange one?
 6   A.   I can't tell.
 7   Q.   Okay.  48, please?  That's a nice ring, would you agree?
 8   A.   Yes.
 9   Q.   Real diamond?
10   A.   I never got it looked at.
11   Q.   Diamonds on the side?
12   A.   Yes.
13   Q.   49, same ring?
14   A.   Yes.
15   Q.   And we'll just run through these real quick with the
16   Court's permission.
17             MR. GALLIAN:  Carly, if we could do 51 -- I'm sorry,
18   50.
19   A.   That one is not the ring.
20   Q.   Tell me about that ring.
21   A.   That is my grandmother's ring.
22   Q.   Okay.  You got that from her after she passed?
23   A.   Yes.
24   Q.   Okay.  51, whose is that?
25   A.   That's the other ring, the one I bought.
```

```
 1   Q.   Okay.  52, please?  53?  54?  Grandma's?
 2   A.   Yes.
 3   Q.   55?  57?
 4   A.   Yes.
 5   Q.   58?  59?  And 60?
 6              All right.  Questions.  Why are you wearing a ring on
 7   your wedding finger?
 8   A.   So I at times even to this day will wear a ring on my
 9   wedding finger.  It is my smallest finger.  And B, I wear it
10   to, I guess, not get asked out, to make people think I'm
11   married.
12   Q.   Okay.  When did you start wearing it on your wedding
13   finger?
14   A.   I have always wore rings on my wedding finger.
15   Q.   Are you wearing one right now?
16   A.   Yes.
17   Q.   A diamond ring?
18   A.   Well, it's a cross ring.
19   Q.   So not a diamond ring?
20   A.   I -- no.
21   Q.   Okay.  So you don't always wear it, right?
22   A.   Right.
23   Q.   The ring that you say you bought from Bill Stone, you
24   can't recall when you bought it?
25   A.   I do not recall when I bought the ring.
```

```
 1   Q.   How did you pay for it?
 2   A.   I'm sure I paid it cash.
 3   Q.   Okay.  But on direct examination, you said the only reason
 4   you pulled out cash was to pay Joe and Bill for travel
 5   expenses.  So that's not true?
 6   A.   All money given to Bill had to be paid in cash.
 7   Q.   Okay.  Not the cashier's checks, though, right?
 8   A.   Right.  The -- it was the -- the cashier's checks came
 9   later, and he specifically told me to make them out to him.
10   Otherwise, it was cash.
11   Q.   Okay.  So which cash withdrawal was for this ring?
12   A.   I'm not sure.
13   Q.   You have no idea?
14   A.   (Indicating in the negative)
15   Q.   Was it 5,000?
16   A.   The ring?
17   Q.   Yes, ma'am.
18   A.   No, it was not.
19   Q.   Was it the $9,000.00 cash withdrawal?
20   A.   It could have been.  I don't know.  It could have been.
21   Q.   There's a $9,000.00 cash withdrawal from June 3, 2016.
22   Was it that transaction?
23   A.   I'm not sure.
24   Q.   Okay.
25            MR. GALLIAN:  Carly, if we could pull up 43.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Have you ever bought a diamond ring before?
 3   A.   No, I have not.
 4   Q.   Okay.  That's a nice ring, do we agree?
 5   A.   It's pretty.
 6   Q.   Okay.  It's a pretty big diamond?
 7   A.   I'm not -- it's -- it's really not.  I guess I can get it
 8   sized, but it doesn't -- it's not as big as it looks in the
 9   picture.
10   Q.   Okay.  What about all of the pictures?
11   A.   Right.
12   Q.   It's a nice -- it's a nice ring.  We agree, right?
13   A.   Yeah, it's nice.
14   Q.   Okay.  So at this point in time, you believe that you
15   bought it sometime in 2016.  Do we agree there?
16   A.   I would say so.
17   Q.   Okay.  So at this point in 2016, Bill Stone is absolutely
18   pumping you for as much money as possible, right?
19   A.   Yes.
20   Q.   He's taking everything that he can from you, right?
21   A.   Yes.
22   Q.   If you'll give it to him, he'll take it?
23   A.   No.  I don't know what you're saying in that -- that's --
24   Q.   It wasn't a trick.
25   A.   Okay.  Well --
```

```
1    Q.    You give him the money, he would take it, right?
2    A.    He asked for the money, and I gave it to him.
3    Q.    Is it your testimony that this ring that you say you gave
4    him, whether it was 6,000, 7,000, 8,000 or $9,000.00, do you
5    think that was a fair price for this ring?
6    A.    I'm not sure.  I have never bought a diamond before.
7    Q.    Okay.  If this ring would appraise at three times that
8    value, would that surprise you?
9    A.    Yes.
10   Q.    You would wear -- tell me some places you would wear the
11   ring.
12   A.    To school.
13   Q.    Okay.  While you were working?
14   A.    I don't -- when I'm working, doing hair, I usually don't
15   wear a ring in case it would go down the sink.
16   Q.    And your main reason for wearing a ring was so that people
17   wouldn't ask you out?
18   A.    Well, that and because some of the rings that I own only
19   fit on that finger.
20   Q.    Would you have ever held yourself out as engaged to Bill
21   Stone prior to 2019?
22   A.    No.
23   Q.    Would you have ever introduced yourself as someone who was
24   engaged to Bill Stone?
25   A.    No.
```

```
 1    Q.   100 percent certainty?
 2    A.   I am -- it's hard to -- 99 percent sure I have never said
 3    I was engaged to Bill Stone.
 4    Q.   Let's take it year by year.
 5              2015, you didn't have this ring yet, right?
 6    A.   No.
 7    Q.   2016, did you ever hold yourself out as engaged to Bill
 8    Stone?
 9    A.   No.
10    Q.   Hand on the Bible, swear to God, 100 percent certainty?
11              MS. RUDOFF:  Objection, asked and answered.
12              THE COURT:  Overruled.
13    A.   I would never say that I was engaged to Bill Stone in
14    2016.
15    Q.   Perfect.  Thank you.
16              Do you still have the ring?
17    A.   Yes.
18              MR. GALLIAN:  May I approach, Your Honor?
19              THE COURT:  You may.
20              (Pause)
21    BY MR. GALLIAN:
22    Q.   If you could take a minute and look through those
23    pictures, please.
24              I'm sorry.  Are you done?
25    A.   Yes.
```

```
 1   Q.   Okay.  All those pictures I handed to you are pictures of
 2   you and Bill Stone together.  Is that fair?
 3   A.   Yes.
 4   Q.   Those are pictures that you guys took at different times,
 5   but they are all of you and Bill Stone, right?
 6   A.   Yes.
 7              MR. GALLIAN:  May I approach, Your Honor?
 8              THE COURT:  You may.
 9              (Pause)
10              MR. GALLIAN:  Your Honor, at this time we move to
11   admit Stone's Exhibit 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
12   22, 23, 24, 25, 91, and 92.
13              THE COURT:  Government, after you have had a chance
14   to look, if you'll let me know if you have any objections.
15              MS. RUDOFF:  May I have one moment, Your Honor?
16              THE COURT:  Certainly.
17              MR. SELLERS:  12 through 91?
18              MR. GALLIAN:  And 92.
19              (Pause)
20              MS. RUDOFF:  No objection from the Government, Your
21   Honor.
22              THE COURT:  All right.
23              MR. SELLERS:  Same.
24              THE COURT:  Admitted.
25                   (Defendant Stone's Exhibit Nos. 12, 13, 14, 15,
```

```
 1                 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 91,
 2                 and 92 received)
 3             MR. GALLIAN:  Permission to publish?
 4             THE COURT:  Granted.
 5             MR. GALLIAN:  Carly, if we could pull up Stone's
 6    Number 12.
 7    BY MR. GALLIAN:
 8    Q.   What is this a picture of, Casi?
 9    A.   We are at the Gaylord Ice.
10    Q.   The ice sculpture that they do during Christmastime?
11    A.   Yes.
12    Q.   Stone 13?  This is one of those filters, pictures of you
13    and Bill?
14    A.   Yes.
15    Q.   Looks like probably and hopefully around Christmastime?
16    A.   Yes.
17             MR. GALLIAN:  14, please, Carly.
18    BY MR. GALLIAN:
19    Q.   Again, a picture of you and Bill?
20    A.   Yes.
21    Q.   15?  You and Bill celebrating New Year's Eve 2019?
22    A.   Yes.
23    Q.   16, please?
24             Slayter?  That's your son Slayter in this picture?
25    A.   Yes.
```

```
 1   Q.   He was with you guys for the New Year's Eve party?

 2   A.   Yes.

 3   Q.   17, please?

 4            Do you know where you were on this one?

 5   A.   Yes.

 6   Q.   Where?

 7   A.   Joe T. Garcia's.

 8   Q.   Okay.  Little date night?

 9   A.   No.  I think my brother was getting remarried.

10   Q.   When was that?

11   A.   I don't know.

12   Q.   You don't remember when he got remarried?

13   A.   I don't.

14   Q.   18?

15   A.   I don't know.

16   Q.   Maybe a concert or something?  Movie?

17   A.   New Kids on the Block concert.

18   Q.   Do you know when that was?

19   A.   No.

20   Q.   Okay.  '19?

21   A.   Probably 2019.

22   Q.   The same concert?

23   A.   Same concert.

24   Q.   20, please.

25            Okay.  Where is this at?
```

```
 1   A.   This is in Key West.

 2   Q.   The trip you guys took in 2019?

 3   A.   Yes.

 4   Q.   21, where is this at?

 5   A.   Same trip.

 6   Q.   22, please?  The same trip?

 7   A.   Yes.

 8   Q.   23?  24?  25?  The same trip?

 9   A.   Yes.

10   Q.   91, please.

11          Where is this?

12   A.   Florida?

13   Q.   Same trip?

14   A.   Same trip.

15   Q.   92, please?  The same trip?

16   A.   Yes.

17          MR. GALLIAN:  May I approach, Your Honor?

18          THE COURT:  You may.

19          (Pause)

20   BY MR. GALLIAN:

21   Q.   For record purposes, I just handed you Stone's Exhibit 6,

22   7, 8, 9, 10, and 11.  If you could review those and let me know

23   when you're done, please.

24          (Pause)

25   A.   Okay.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Those are pictures from the night you guys got engaged?
 3   A.   Yes.
 4   Q.   July 2019?
 5   A.   Yes.
 6   Q.   Fairly and accurately depict photos from that time?
 7   A.   Yes.
 8            MR. GALLIAN:  Your Honor, at this time we move to
 9   admit Stone's Exhibit 6, 7, 8, 9, 10, and 11.
10            THE COURT:  Any objection?
11            MS. RUDOFF:  No objection.
12            THE COURT:  Any objection?
13            MR. SELLERS:  No objection, Your Honor.
14            THE COURT:  Admitted.
15                (Defendant Stone's Exhibit Nos. 6, 7, 8, 9, 10,
16                and 11 received)
17            MR. GALLIAN:  Permission to publish?
18            THE COURT:  Granted.  Although I'll tell you, I think
19   it -- I'd like to take our break a little bit early today, if
20   that's all right.
21            MR. GALLIAN:  Sure.
22            THE COURT:  Okay.  If everyone will rise for the
23   jury.  And we will be in session until -- we'll give you have
24   an extra ten minutes.  We'll bring you back out at 10:30, if
25   that works, get things all taken care of.
```

1          All rise for the jury.

2          (Jury out)

3          THE COURT:  All right.  Please be seated everybody.

4          Is there anything we need to take up privately

5   outside the presence of the jury before we break?

6          MS. RUDOFF:  No, Your Honor.

7          MR. GALLIAN:  Nothing from us, Judge.

8          MR. SELLERS:  No.

9          THE COURT:  Okay.  Fantastic.  I just -- it was time

10  for me to take a break, so judge's prerogative.

11         (Recess)

12         SECURITY OFFICER:  All rise.

13         THE COURT:  Please be seated.

14         Anything we need to take up before we bring them in?

15         MS. RUDOFF:  No.

16         THE COURT:  No?

17         MR. GALLIAN:  No, Your Honor.

18         THE COURT:  All right.

19         (Discussion off the record)

20         SECURITY OFFICER:  All rise for the jury.

21         (Jury in)

22         THE COURT:  All right.  Please be seated.

23         Mr. Gallian, your witness.

24         MR. GALLIAN:  Thank you, Your Honor.

25         THE COURT:  You're welcome.

```
 1            MR. GALLIAN:  Permission to publish Stone's 6
 2   through 11?
 3            THE COURT:  Granted.
 4            If everybody will check their phones, and I'll do the
 5   same.  Make sure they're off, please.
 6            MR. GALLIAN:  May I proceed, Your Honor?
 7            THE COURT:  You may.
 8   BY MR. GALLIAN:
 9   Q.  Casi, this is a picture of you and Bill Stone when you
10   guys engaged in 2019; is that right?
11   A.  Yes.
12   Q.  And the helicopter ride that you guys took to Reunion
13   Tower?
14   A.  Yes.
15            MR. GALLIAN:  Go to Number 7, please, Carly.
16   BY MR. GALLIAN:
17   Q.  A picture of y'all on the helicopter?
18   A.  Yes.
19            MR. GALLIAN:  Number 8, please?
20   BY MR. GALLIAN:
21   Q.  A framed photo of you guys from Reunion Tower?
22   A.  Yes.
23            MR. GALLIAN:  9, please.
24   BY MR. GALLIAN:
25   Q.  A picture of the ring that he proposed with?
```

```
 1    A.   Yes.

 2    Q.   Do you happen to know the value of that ring?

 3    A.   I don't.

 4    Q.   Okay.

 5              MR. GALLIAN:   10?

 6    BY MR. GALLIAN:

 7    Q.   Another picture of the ring, correct?

 8    A.   Yes.

 9              MR. GALLIAN:   And Number 11?

10    BY MR. GALLIAN:

11    Q.   These are pictures that you took with your phone, right?

12    A.   Yes.

13    Q.   Pictures that you took while you're on Reunion Tower; is

14    that right?

15    A.   Yes.

16    Q.   Did you know that that was a Tiffany's engagement ring?

17    A.   I -- yes.

18              MR. GALLIAN:   May I approach, Your Honor?

19              THE COURT:   You may.

20              (Pause)

21    BY MR. GALLIAN:

22    Q.   I have handed you Stone's Exhibit 135 through 141.  If you

23    could please look through those and let me know when you're

24    done.

25              (Pause)
```

1   BY MR. GALLIAN:

2   Q.   Done?

3   A.   Yes.

4   Q.   I just handed you screenshots of a floor plan for a

5   builder out in Granbury -- not sure how to pronounce it --

6   Couto Homes?

7   A.   Couto.

8   Q.   Couto Homes?

9   A.   Yes.

10  Q.   And those are screenshots that you have seen before,

11  correct?

12  A.   Yes.

13          MR. GALLIAN:  Your Honor, at this time we move to

14  admit Defendant Stone's 135 through 141.

15          THE COURT:  Government, after you've had a chance to

16  look, if you will let me know if you have any objection, and

17  also co-counsel or counsel for Mr. DeLeon too.

18          MS. RUDOFF:  No objections, Your Honor.

19          THE COURT:  Thank you.

20          MR. SELLERS:  No objection, Your Honor.

21          THE COURT:  Admitted.

22              (Defendant Stone's Exhibit Nos. 135, 136, 137,

23               138, 139, 140, and 141 received)

24          MR. GALLIAN:  Permission to publish?

25          THE COURT:  Granted.

```
 1              MR. GALLIAN:  Let's start with -- you're good, Carly,
 2   thank you.
 3   BY MR. GALLIAN:
 4   Q.   If we look at 135, this is a screenshot of the Couto
 5   Homes.  How do you say it again, I'm sorry?
 6   A.   Couto.
 7   Q.   Couto.
 8              These were screenshots that you were sending Bill
 9   Stone in 2019; is that right?
10   A.   Yes.
11   Q.   In 2019, you and Bill discussed possibly building a house
12   and living together in Granbury; is that right?
13   A.   I was looking to purchase land to build on in a new
14   development out in Granbury.
15   Q.   And it was your intention for you and Bill to live in
16   those houses together, right?
17   A.   I entertained the idea.
18   Q.   Is that a "yes"?
19   A.   Yes.
20              MR. GALLIAN:  Let's go to 136, please.
21              137, 138, 139, 140, and 141.
22   BY MR. GALLIAN:
23   Q.   Now, the plan was that Bill was going to sell the
24   Colleyville house and help with that house, correct?
25   A.   I don't know.
```

```
 1   Q.   Okay.  Well, if you guys were going to live together, then
 2   odds are Bill was not going to continue living in the
 3   Colleyville house, right?
 4   A.   I don't know what he had planned on doing with his house.
 5   Q.   You guys didn't talk about that?
 6   A.   I am not sure.
 7   Q.   All right.  I could be mistaken, but when you were
 8   answering questions from Ms. Rudoff, she asked you about a time
 9   in which you and Bill Stone were talking about having a child
10   together; is that right?
11   A.   Yes.
12   Q.   And I think you described it as like a brief fleeting
13   moment, right?
14   A.   Yes.
15   Q.   Okay.  It was more than that, wasn't it?
16   A.   No.
17   Q.   Okay.  Did you and Bill Stone ever have conversations
18   about ovulation dates?
19   A.   For whatever reason, they -- Joe and Bill had it in their
20   phone when I started my period and ovulated, both of them.
21   Q.   Okay.  Did you and Bill Stone talk about ovulation dates
22   for the purpose of conceiving a child?
23   A.   I'm not sure.
24   Q.   Okay.  Take it a step further.  Did you remove your birth
25   control that you had at that time?
```

```
 1   A.   I have not been on birth control.

 2   Q.   Is that a no?

 3   A.   No, I don't recall being on birth control.

 4   Q.   IUD?

 5   A.   I do remember having an IUD, but it wasn't really for the

 6   purpose of birth control, it was for my period.

 7   Q.   Who's Royce, the guy you were talking to, 2020?

 8   A.   I'm not sure.

 9        MR. GALLIAN:  May I approach the witness, Your Honor?

10        THE COURT:  You may.

11        (Pause)

12   BY MR. GALLIAN:

13   Q.   Just handed you text messages between you and Royce.  If

14   you could read that and see if it refreshes your memory.

15        MS. RUDOFF:  Objection as to relevance.

16        THE COURT:  Overruled.

17        (Pause)

18   BY MR. GALLIAN:

19   Q.   I'm sorry, have you reviewed it?

20   A.   Yes.

21   Q.   Okay.

22        MR. GALLIAN:  May I approach, Your Honor?

23        THE COURT:  You may.

24        (Pause)

25   BY MR. GALLIAN:
```

```
 1   Q.   In 2020, you told an individual named Royce that you and
 2   your last boyfriend were considering having another baby, so
 3   you took your IUD out; is that right?
 4   A.   That's what it says on the text.
 5   Q.   Okay.  Were you lying to Royce?
 6   A.   I feel like that was an -- a surface level conversation,
 7   like, just small talk.
 8   Q.   Okay.  But you and I agree that you told Royce you took
 9   your IUD out because you and your last boyfriend, Bill, were
10   considering having another baby, right?
11   A.   Yes.
12           MR. GALLIAN:  May I approach, Your Honor?
13           THE COURT:  You may.
14           (Pause)
15   BY MR. GALLIAN:
16   Q.   I just handed you what's been marked as Stone's
17   Exhibit 159.  It's part of an extraction that was done.  Those
18   are text messages between you and Bill Stone; is that right?
19   A.   I just see my number on here.
20   Q.   Okay.  Well, when the prosecution was asking you about the
21   e-mail associated with Bill Stone, you said that it was the
22   Airsig e-mail, right?
23   A.   Oh, yes, I see that now.  I never knew his e-mail address.
24   Q.   Okay.  But you know that those are text messages between
25   you and Bill Stone?
```

```
 1   A.   Yes.

 2   Q.   Okay.

 3            MR. GALLIAN:  Your Honor, at this time we move to

 4   admit Stone's Exhibit 159.

 5            THE COURT:  Any objection from the Government?  And

 6   if you need a moment to look, that's fine.

 7            No objection from you, I'm assuming?

 8            MR. SELLERS:  No, ma'am.

 9            THE COURT:  Thank you.  Appreciate it.

10            MR. SELLERS:  Yes, ma'am.

11            THE COURT:  Government, take your time.

12            MS. RUDOFF:  Thank you, Your Honor.

13            THE COURT:  Sure.

14            (Pause)

15            MS. RUDOFF:  No objection, Your Honor.

16            THE COURT:  All right.  Admitted.

17                (Defendant Stone's Exhibit No. 159 received)

18            MR. GALLIAN:  Permission to publish?

19            THE COURT:  Granted.

20   BY MR. GALLIAN:

21   Q.   We look down here, text message January 21, 2019.  Text

22   from you, Project 2, to Airsig, which is Bill Stone.  It says

23   February 6 -- 5th, 6th, and amp, semicolon, 7 are pregnancy

24   days.

25            Did I read that appropriately?
```

```
 1   A.   You did.
 2   Q.   And that's information that you shared with Bill Stone?
 3   A.   Yes.
 4             MR. GALLIAN:  May I approach, Your Honor?
 5             THE COURT:  You may.
 6             MR. GALLIAN:  Thank you, Carly.
 7   BY MR. GALLIAN:
 8   Q.   All right.  Let's talk about this restitution.
 9   $250,000.00 in restitution, right?
10   A.   Yes.
11   Q.   Okay.  There's a couple problems with what you've said,
12   and I'll take them one by one.  Starting with --
13             MR. GALLIAN:  Carly, if we could publish Government's
14   Exhibit 38, jump page 477.
15             And if we could get the first blue text all the way
16   to the third blue text, please.
17             Can you read that?  No?
18             Okay.  If we can just do it in segments, Carly.  I
19   apologize.
20   BY MR. GALLIAN:
21   Q.   Okay.  This is a text message from you to Joe DeLeon
22   saying, "I'm on the do not rent list at Enterprise."  Correct?
23   A.   Yes.
24   Q.   And that was December 22, 2015, agree?
25   A.   Right.
```

```
 1   Q.   All right.
 2            MR. GALLIAN:  Thank you, Carly.
 3   BY MR. GALLIAN:
 4   Q.   And if we can go down to the third blue text message.  On
 5   that same day, a text message from you to Joe DeLeon, "I called
 6   and talked to Enterprise cooperate," but I think it's
 7   corporate.  "They said balance has been paid and I'm able to
 8   rent.  So we're headed back.  We were almost home."
 9            Did I read that right?
10   A.   Yes.
11   Q.   December 22, 2015?
12   A.   Yes.
13   Q.   Okay.  On this date you resolved your issue with
14   Enterprise, didn't you?
15   A.   I was told that -- by Joe that Bill was handling it.  And
16   I'm not sure.  Somehow or another I ended up getting a rental
17   that day.
18   Q.   Because you paid the balance, right?
19   A.   I did not pay the balance.  It had been paid.
20   Q.   Okay.  You didn't pay anything that day?
21   A.   No, I did not.
22   Q.   Okay.  But, again, this is December 22, 2015, right?
23   A.   Yes.
24   Q.   Three months before this restitution payment to Bill
25   Stone?
```

```
 1   A.   Yes.
 2   Q.   In terms of the stories that you've told law enforcement
 3   in this case, you did not originally say that this restitution
 4   was $250,000.00, did you?
 5   A.   No.
 6   Q.   You said first that it was $125,000.00, didn't you?
 7   A.   That was on the voice recording that I was making with
 8   Bill, and I was -- it had happened so many years prior that I
 9   wasn't quite sure what the amount was until later I saw the
10   cashier's check.
11   Q.   Okay.  So, yes, you said $125,000.00?
12   A.   I'm not -- I thought it was $120,000.00 on the recording.
13   Q.   Yes.  So September 3, 2019, you say 125,000.  October 2,
14   2019, you say 120,000.  Does that sound about right?
15   A.   I was guessing.
16   Q.   Okay.  That's a pretty bad guess, do you agree?
17   A.   I'm pretty sure that it was my portion of the restitution.
18   The other half of the restitution was for Eric Gomez.
19   Q.   Okay.  Did Eric Gomez pay any of this restitution?
20   A.   No.  I had to pay it for him to -- in order for Bill to --
21   in order for me to get out of it, Bill had to take care of me
22   and him.
23   Q.   Okay.  In May 2020, you said it was $21,000.00, didn't
24   you?
25   A.   I don't recall.  I don't believe so.
```

```
 1   Q.   If I showed you a transcript from that interview with
 2   agents, would that help refresh your recollection?
 3   A.   Sure.
 4           MR. GALLIAN:  May I approach?
 5           THE COURT:  You may.
 6           (Pause)
 7   BY MR. GALLIAN:
 8   Q.   Casi, I just handed you from a transcript with a meeting
 9   you had with agents on May 5, 2020.  The relevant portion that
10   I want you to read is, I believe, on page 78 going to page 79.
11           (Pause)
12   BY MR. GALLIAN:
13   Q.   You done?
14   A.   Yes.
15           MR. GALLIAN:  May I approach, Your Honor?
16           THE COURT:  You may.
17           (Pause)
18   BY MR. GALLIAN:
19   Q.   So when originally asked about the restitution, you said
20   it was like $21,000.00 or something crazy like that.  Do you
21   remember saying that?
22   A.   I feel like I misspoke, but -- I don't recall saying that,
23   but I just read that.
24   Q.   Okay.  And then Brian Luley and Danny Briley, as you read,
25   said wasn't it 120,000?  And then you agreed with that,
```

1    correct?

2    A.   Yes.

3    Q.   Okay.  At no point from when you found out that this

4    probation was fake in July -- you found out that the probation

5    was fake in the summer of 2019.  At no point before your

6    sit-down with law enforcement in May of 2020 did you look up

7    the records to see what the actual amount was?

8    A.   Say that again.

9    Q.   You never looked up the amount.  Once you found out the

10   probation was fake, you never went back into your records to

11   look at the amount?

12   A.   I was trying to go through all of my records and -- but I

13   was just stating -- I didn't even know -- I was just trying to

14   get to my sister's wedding in August, so --

15   Q.   Okay.

16   A.   That was the main purpose in going.

17   Q.   120,000 is not even close to $250,000.00.  Would you agree

18   with me?

19   A.   I agree with you.

20   Q.   Now, let's talk about what that money was actually for.

21   A.   Okay.

22   Q.   You knew that Bill Stone had reached a settlement with his

23   wife, did you not?

24   A.   I did not.

25   Q.   You didn't know that Bill Stone had reached a settlement

1    with his wife for $230,000.00?

2    A.   I did not.

3    Q.   That Bill Stone had to pay his ex-wife $230,000.00 for the

4    retirement account?

5    A.   I did not.

6    Q.   Okay.  So Bill Stone pays his wife $230,000.00, and a

7    couple of days later you pay him $250,000.00?

8    A.   I had no idea.  He never spoke about his wife to me.

9    Ex-wife.

10   Q.   Okay.  I wrote $230,000.00 on the board, did I not?

11   A.   Yes.

12   Q.   Okay.  The check that you gave -- the cashier's check that

13   you gave to Bill Stone was how much?

14   A.   250,000.

15   Q.   And it's your testimony you knew absolutely nothing about

16   the settlement with his ex-wife?

17   A.   I knew absolutely nothing about the settlement of his

18   wife.

19   Q.   What is the difference between 230,000 and 250,000?

20   A.   20,000.

21   Q.   Bill Stone never forgot that additional $20,000.00, did

22   he?

23   A.   I have no idea.

24        MR. GALLIAN:  May I approach the witness, Your Honor?

25        THE COURT:  You may.

1              (Pause)

2    BY MR. GALLIAN:

3    Q.   I'm handing you what's been marked for identification as

4    Government's Exhibit 52.  If you could go to page 19.  Are you

5    there?

6    A.   Yes.

7    Q.   Okay.  These are the closing documents from the house in

8    Colleyville.  Were you aware of that?

9    A.   I'm seeing that.

10   Q.   Okay.  Had you seen these before?

11   A.   I have not.

12   Q.   Okay.

13          MR. GALLIAN:  Your Honor, at this time we move to

14   admit Government's Exhibit 52.

15          THE COURT:  And, Government, when you have a moment,

16   please let me know if you have an objection.

17          (Pause)

18          THE COURT:  Counsel for DeLeon, any objection?

19          MR. SELLERS:  No, ma'am.  No objection.

20          THE COURT:  All right.  Thank you.

21          MS. RUDOFF:  No objections, Your Honor.

22          THE COURT:  All right.  It's admitted.

23              (Government's Exhibit No. 52 received)

24          MR. GALLIAN:  Carly, if we could publish Government's

25   Exhibit 52, please.  And if we could jump to page 19.

```
 1            Carly, Line Item 2 -- yikes.  Where it says total
 2   paid for by borrower, bottom left corner.  Yes, that whole
 3   section, please.
 4   BY MR. GALLIAN:
 5   Q.   These are the closing documents from the Colleyville house
 6   showing that the cash from the borrower was $349,803.49.  Did I
 7   read that correctly?
 8   A.   Yes.
 9   Q.   Okay.  So we've gone over this.  Bill Stone owed his wife
10   restitution for $230,000.00.  You gave him a check for
11   $250,000.00, right?
12   A.   Yes.
13   Q.   We agree that there is a difference of $20,000.00 there,
14   right?
15   A.   Yes.
16   Q.   Okay.  If I told you that $349,803.49 divided by two is
17   $174,901.75, if you round up, would you agree with me?
18   A.   Can you say that one more time?
19   Q.   $349,803.49 divided by two, $174,000.00 -- $174,901.75.
20   Any reason to dispute that?
21   A.   I guess it sounds right.
22   Q.   I used a calculator.
23   A.   Okay.
24   Q.   Okay.  We agree $174,901.75 is half of the cost of the
25   house?  Yes?
```

1  A.    Yes.

2  Q.    Okay.  When Bill Stone had you do a money -- a cashier's

3  check for the house, how much did you give him?

4  A.    I don't remember.  136?  154?  I have no -- I don't

5  remember what the cashier's check's was actually written for.

6  Q.    154-5?

7  A.    I don't remember.  I mean, if you're saying that's what it

8  is, then sure.  I mean --

9  Q.    Okay.  It's one of the counts in the indictment.  So if I

10  told you 154-5, do you have any reason to dispute that?

11  A.    Okay.  That sounds right.

12  Q.    Why 154-5?

13  A.    It's because that's what he said to write the cashier's

14  check for.  I didn't know any of this other stuff.

15  Q.    When you take into consideration the additional 20,000

16  that you gave him, the total for your half on that house,

17  174,500.

18  A.    Why would I be paying half of his house?

19  Q.    It was half of y'all's house.

20  A.    It was not.

21  Q.    Okay.  This math that just happens to be within a couple

22  hundred dollars of each other is pure coincidence?

23  A.    I was told what to write the check for.  I never even knew

24  how much the house was.

25         MR. GALLIAN:  May I approach the witness, Your Honor?

```
 1                THE COURT:  You may.

 2                (Pause)

 3    BY MR. GALLIAN:

 4    Q.   I just handed you what's been marked as Stone's Exhibit

 5    102 through 131.  I know that's a lot.  If you could take a

 6    second to look through those photos, please.

 7                (Pause)

 8    A.   Okay.

 9    Q.   Those are pictures of the Colleyville house, some before

10    the remodel and some after.  Yes?

11    A.   Yes.

12                MR. GALLIAN:  Your Honor, at this time we move to

13    admit Stone's Exhibit 102 to 131.

14                MS. RUDOFF:  No objection from the Government.

15                MR. SELLERS:  No objection.

16                THE COURT:  Admitted.

17                (Defendant Stone's Exhibit Nos. 102-131 received)

18    BY MR. GALLIAN:

19    Q.   We'll go through just a few of the pictures.

20                MR. GALLIAN:  Carly, if we could publish 102, please.

21    BY MR. GALLIAN:

22    Q.   All right.  So this was the house when it was purchased,

23    right?

24    A.   Yes.

25    Q.   Okay.
```

```
 1              MR. GALLIAN:  Go to 103.
 2   BY MR. GALLIAN:
 3   Q.   The kitchen area, correct?
 4   A.   Yes.
 5              MR. GALLIAN:  104?  And 105.  106, please.  107.
 6   108.
 7   BY MR. GALLIAN:
 8   Q.   That's the exterior of the house?
 9   A.   Yes.
10              MR. GALLIAN:  109.  110.  111, please.
11   BY MR. GALLIAN:
12   Q.   Ah-ha.  You remember these pink walls, right?
13   A.   I do.
14   Q.   Bright as heck.  Y'all didn't keep it pink, did you?
15   A.   He referred to it as Pepto-Bismol walls, and he wanted to
16   change it.
17   Q.   Okay.  I understand your position.  I'll ask you some very
18   clear questions on that.
19              MR. GALLIAN:  Carly, if we could jump to 126, please.
20   BY MR. GALLIAN:
21   Q.   Those are the paint swatches that y'all picked, right?
22   A.   I don't remember what color was chosen.
23   Q.   Okay.
24              MR. GALLIAN:  127, please.
25   BY MR. GALLIAN:
```

```
 1   Q.   Knocked down that wall that was between the kitchen and
 2   the living room area, right?
 3   A.   That was part of the remodel.
 4   Q.   Okay.
 5            MR. GALLIAN:  128, please.
 6   BY MR. GALLIAN:
 7   Q.   There's the wall being taken down, right?
 8   A.   Yes.
 9            MR. GALLIAN:  129.
10   BY MR. GALLIAN:
11   Q.   That's the remodeled kitchen, right?
12   A.   Yes.
13   Q.   Okay.  What did you pick out in this kitchen?
14   A.   He picked everything out in the kitchen.
15   Q.   Okay.  On direct you said that you were helping with the
16   redesign.  Is that not true?
17   A.   No, I was helping.
18   Q.   Okay.  So what did you pick out?
19   A.   I was just there while he was in D.C. working.  I was
20   helping work -- I was working directly with the kitchen and
21   bath remodeling company.
22   Q.   Okay.
23            MR. GALLIAN:  Carly, if we could do 130, please.
24   BY MR. GALLIAN:
25   Q.   Redid the fireplace, right?
```

```
 1    A.    Yes.
 2              MR. GALLIAN:  131.
 3    BY MR. GALLIAN:
 4    Q.    And the master bath was redone as well, correct?
 5    A.    Yes.
 6    Q.    All right.  So how often were you at the house with this
 7    remodel?
 8    A.    I don't know.
 9    Q.    Take a guess.
10    A.    I guess when I had some free time, but I really don't
11    know.  I don't even know a ballpark.
12    Q.    Once a week?  Once a month?  Once every three months?
13    A.    Time was running --
14              THE COURT:  I'm sorry?
15              MS. RUDOFF:  Asked and answered, Your Honor.
16              THE COURT:  Overruled.
17    A.    Time was all running together during this time.  It was
18    very stressful.  But I -- I don't know.
19    Q.    There's --
20    A.    I really -- I couldn't tell you.  It could be --
21    Q.    Let's do it this way, then.  The remodel went from October
22    to January-ish 2017; is that right?
23    A.    I'm not sure.
24    Q.    Okay.  Can you tell me just approximately?  Take a wild
25    guess how many times you went to the house during the remodel.
```

```
 1              MS. RUDOFF:  Objection, Your Honor, asked and
 2    answered.
 3              THE COURT:  Overruled.
 4    A.   I don't know.
 5    Q.   More than ten?
 6    A.   I would say between -- I don't know.  Ten sound good.
 7    Q.   Great.
 8              When you were there, was Bill ever there?
 9    A.   He came a few times that I can remember.
10    Q.   Okay.  Did you guys ever go to a Floor & Decor or a
11    Daltile or anything together to help pick out the finishes?
12    A.   I did.
13    Q.   You didn't go with Bill?
14    A.   I specifically remember being with the designer myself,
15    just her and I.
16    Q.   Okay.  You're sure of that?
17    A.   The time that sticks out in my mind is that specific time.
18    Q.   Okay.  This was not your house, right?
19    A.   Right.
20    Q.   You had no intention of ever living there?
21    A.   I wasn't even allowed in the master bathroom.
22    Q.   Okay.  You had no intention of your son Slayter moving
23    into that room?
24    A.   No.
25    Q.   You were not in a relationship with Bill Stone at this
```

 1    time?
 2    A.   No.
 3    Q.   Bill Stone was rarely, if ever, there with you?
 4    A.   A few times he was there.
 5             MR. GALLIAN:  May I approach, Your Honor?
 6             THE COURT:  You may.
 7             (Pause)
 8    BY MR. GALLIAN:
 9    Q.   I just handed you what's been marked as Stone's 142.  Have
10    you seen that before?
11    A.   Yes.
12    Q.   That's the quote that y'all got from Viking?
13    A.   Yes.
14    Q.   Okay.
15             MR. GALLIAN:  Permission to publish Stone's 142?
16             Ah.  Gosh.  I'm sorry.  It's been a long morning.  We
17    move to admit Stone's 142.
18             THE COURT:  Any objection?
19             MS. RUDOFF:  No objection, Your Honor.
20             MR. SELLERS:  No, Your Honor.
21             THE COURT:  It's admitted.
22                 (Defendant Stone's Exhibit No. 142 received)
23             MR. GALLIAN:  Permission to publish?
24             THE COURT:  Granted.
25    BY MR. GALLIAN:

```
 1    Q.   If we look up at the top, it says "Quote For."  Who does
 2    it say the quote is for?
 3    A.   Bill and Casi Thompson.
 4    Q.   And if we go just below that, it has a date.  October 10,
 5    2016.
 6    A.   Yes.
 7    Q.   Okay.  Even though this quote was made out to you and
 8    Bill, you had no intention of ever living in that house?
 9    A.   Never -- no intention of living in the house.
10    Q.   Okay.  Do you recall if you and Bill met with the Viking
11    rep by yourself or separately?  By yourself or together?
12    A.   It was together.  It was an introduction.
13    Q.   All right.
14              MR. GALLIAN:  May I approach, Your Honor?
15              THE COURT:  You may.
16              (Pause)
17    BY MR. GALLIAN:
18    Q.   I just handed you what's been marked as Stone's
19    Exhibit 79.  Do you recognize that?
20    A.   Yes.
21    Q.   What is it?
22    A.   It's my grandmother's Rolex.
23    Q.   Okay.
24              MR. GALLIAN:  Your Honor, at this time we move to
25    admit Stone's 79.
```

```
 1                THE COURT:  Any objection?

 2                MR. SELLERS:  Did you say 79?

 3                MR. GALLIAN:  79.

 4                MS. RUDOFF:  No objection from the Government.

 5                THE COURT:  Thank you.

 6                MR. SELLERS:  No objection, Your Honor.

 7                THE COURT:  Admitted.

 8                     (Defendant Stone's Exhibit No. 79 received)

 9                MR. GALLIAN:  Permission to publish?

10                THE COURT:  Granted.

11     BY MR. GALLIAN:

12     Q.   This is the ring that you got from Myrna, right?

13     A.   It's the Rolex.

14     Q.   That you -- oh, I'm losing it.  My apologies.

15          This is the Rolex that you got from Myrna, right?

16     A.   Yes.

17     Q.   Okay.  Myrna left this to you in the will, all of her

18     personal belongings, correct?

19     A.   Yes.

20     Q.   And at some point you went and got it resized and fixed so

21     that you could start wearing it?

22     A.   Yes.

23     Q.   Do you recall when that was?

24     A.   Sometime at the beginning of 2016.

25     Q.   Okay.
```

```
 1              MR. GALLIAN:  Your Honor, may I approach?
 2              THE COURT:  You may.
 3              (Pause)
 4              THE COURT:  And while you're doing that, members of
 5    the jury, I have us going for about another 15 minutes.  Does
 6    that sound like a plan?  And we'll break for lunch.  If we need
 7    to break a little earlier, let me know.
 8              MR. GALLIAN:  Actually, I might get done.
 9              THE COURT:  Okay.
10              MR. GALLIAN:  But we we'll see.
11              THE COURT:  Okay.  Sounds good.
12              MR. GALLIAN:  Thank you.
13              THE COURT:  Uh-huh.
14    BY MR. GALLIAN:
15    Q.   I just handed you 75, 76, and 77.  Do you recognize those?
16    A.   Yes.
17    Q.   Those are the pictures of the Rolex that you bought for
18    Bill Stone, right?
19    A.   One of these.
20    Q.   Okay.
21              MR. GALLIAN:  Your Honor, at this time we move to
22    admit 75, 76, and 77.
23              THE COURT:  Any objections?
24              MR. SELLERS:  No, ma'am.
25              THE COURT:  All right.
```

```
 1              MS. RUDOFF:  No objection, Your Honor.

 2              THE COURT:  Admitted.

 3                  (Defendant Stone's Exhibit Nos. 75, 76, and 77

 4                  received)

 5              MR. GALLIAN:  Permission to publish?

 6              THE COURT:  Granted.

 7              We'll start with 75.  Thank you, Carly.

 8   BY MR. GALLIAN:

 9   Q.   Two Rolexes here.  Do you recall which one you bought him?

10   A.   I don't recall.  No, I don't.

11              MR. GALLIAN:  If we can go to 76, please.

12   BY MR. GALLIAN:

13   Q.   Now do you recall?

14   A.   I do not.

15   Q.   Okay.  77?  Is that the one?

16   A.   I believe so.

17   Q.   Okay.

18              MR. GALLIAN:  Your Honor, may I approach?

19              THE COURT:  You may.

20   BY MR. GALLIAN:

21   Q.   Well, first -- never mind.

22              (Pause)

23   BY MR. GALLIAN:

24   Q.   I just handed you Stone 78.  Do you recognize that?

25   A.   Yes.
```

```
 1   Q.   You recognize that as the receipt from Haltom's Jewelry?
 2   A.   Yes.
 3            MR. GALLIAN:  Your Honor, at this time we move to
 4   admit Stone's 78.
 5            THE COURT:  Objections?
 6            MR. SELLERS:  No, ma'am.  No objection.
 7            MS. RUDOFF:  No objection.
 8            THE COURT:  Admitted.
 9               (Defendant Stone's Exhibit No. 78 received)
10            MR. GALLIAN:  Permission to publish?
11            THE COURT:  Granted.
12   BY MR. GALLIAN:
13   Q.   So you went that day -- we can see here at the top --
14            MR. GALLIAN:  Carly, if you could highlight that, the
15   name and the date.
16   BY MR. GALLIAN:
17   Q.   You went February 12, 2016, to buy that Rolex, right?
18   A.   Yes.
19   Q.   On that same date you took Myrna's Rolex, you had it
20   resized and you got it fixed so that you could have it, right?
21   A.   Yes.
22   Q.   You left that day with a Rolex that you could wear, right?
23   A.   Yes.
24   Q.   And you left that day with a Rolex for Bill Stone, right?
25   A.   Yes.
```

```
 1   Q.   What is two days after February 12, 2016?  It's a holiday.
 2   A.   Valentine's Day.
 3            MR. GALLIAN:  Thank you, Carly.
 4   BY MR. GALLIAN:
 5   Q.   When Myrna passed, you got her 2014 Lexus, right?
 6   A.   Yes.
 7   Q.   On direct examination it was implied or maybe directly
 8   said that you gave Bill Stone your Lexus and then you were
 9   forced to drive Myrna's car.  Do you recall that?
10   A.   Yes.
11   Q.   Okay.  I want to be unequivocally clear about this.  In
12   February 2016, did you get a new Lexus first, or did you give
13   Bill your Lexus first?
14   A.   Wait.  Say that one more time.
15   Q.   There were two Lexuses, the one that Myrna bought you in
16   2015, right?
17   A.   Right.
18   Q.   And then there was the one that she gave you after she
19   passed?
20   A.   Right.
21   Q.   Right?
22            You took the one that she gave you when she passed,
23   and you used that as a trade-in for a new Lexus, right?
24   A.   I ended up trading that Lexus in, but I don't recall if it
25   was before or after giving the -- my Lexus that my grandmother
```

```
 1   bought me to him.
 2   Q.   But that's not what you said.  Because on direct
 3   examination you said that you were forced to drive Myrna's car.
 4   So I'm asking you, did you trade in Myrna's car and buy your
 5   new Lexus, or did you give the Lexus to Bill first?  Which one
 6   happened first?
 7   A.   I don't believe I would say forced, but if I did, that's
 8   not what I meant to say was forced.  I was then -- I was then
 9   driving her car.  The Lexus that was given to Bill, I'm not
10   sure what happened first.
11          If you only knew the events that were going on during
12   that timeframe, it's very hard to understand, like, what was
13   happening when in the chronological order.
14   Q.   I understand.  But if you have two Lexuses, right --
15   A.   Right.
16   Q.   -- and you take one and you trade it in --
17   A.   Uh-huh.
18   Q.   -- for the Lexus that you actually want, you then start
19   driving a new Lexus?
20   A.   Right.
21   Q.   You were well within your power to trade in both Lexuses
22   if you wanted, right?
23   A.   Right.
24   Q.   Okay.
25          MR. GALLIAN:  If we could pull up Government's
```

1   Exhibit 9, already admitted.  Jump page 260, please.

2   BY MR. GALLIAN:

3   Q.   This is a check you wrote Sewell Lexus for your new Lexus

4   February 19, 2016.  we agree?

5   A.   Yes.

6   Q.   Okay.  You took --

7   A.   I can answer your question now.

8   Q.   I haven't asked a question yet.

9        You took Myrna's car and you traded it in and paid

10  the difference for the new Lexus, right?

11  A.   Yes.

12        MR. GALLIAN:  May I approach, Your Honor?

13        THE COURT:  You may.

14        (Pause)

15  BY MR. GALLIAN:

16  Q.   That's the title for -- I'm sorry.  I handed you what's

17  been marked for identification as Government's Exhibit 136.

18  That's the title for the Lexus that Myrna gave you -- I'm

19  sorry, bought you in 2015.

20  A.   Okay.

21  Q.   Okay.  Do you agree with me?

22  A.   Yes.

23        MR. GALLIAN:  Your Honor, at this time we move to

24  admit Government's Exhibit 136.

25        MS. RUDOFF:  No objections, Your Honor.

```
 1              THE COURT:  All right.

 2              MR. SELLERS:  If I could have just one second.

 3              You said 136?

 4              MR. GALLIAN:  Yes.

 5              MR. SELLERS:  No objection.  No objection.

 6              THE COURT:  Admitted.

 7                  (Government's Exhibit No. 136 received)

 8              MR. GALLIAN:  Permission to publish?

 9              THE COURT:  Granted.

10              MR. GALLIAN:  Could we jump to page 8?

11    BY MR. GALLIAN:

12    Q.   Top right corner, it says "Date title acquired."  Right

13    there.  "Date title issued, 3-1-2016."

14              You and I agree March 1, 2016, is after

15    February 2016?

16    A.   Yes.

17    Q.   So this is not a situation -- and let me back up.

18              This --

19              MR. GALLIAN:  Carly, if we could clear this out.

20    BY MR. GALLIAN:

21    Q.   This shows that you gave the title to Bill Stone on that

22    day, correct?

23    A.   I'm not sure -- that's when it said it was processed.

24    Q.   Okay.

25    A.   It isn't necessarily when I signed it over when he came
```

```
 1   over to my house and brought the transfer of title document to
 2   me.
 3   Q.   Okay.  That was February 22nd, wasn't it?
 4   A.   I'm not sure.
 5   Q.   Okay.  So what I'm trying to show is that you bought a car
 6   that you wanted yourself February 19, 2016.  Do we agree?
 7   A.   Yes.
 8   Q.   You then gave Bill a Lexus right after that, didn't you?
 9   A.   Yes.
10   Q.   All right.  Moving on, in Count Three of the indictment
11   the Government alleges that you paid Park Place $76,816.90 for
12   Bill's Mercedes.  Do you remember that?
13   A.   Yes.
14   Q.   Okay.  You did not discuss with the prosecution what else
15   you bought that day.
16   A.   What was that?
17   Q.   Didn't you get a car for yourself?
18   A.   That was -- can I explain?
19   Q.   Sure.  I asked the question.
20   A.   So there -- if this is the time I'm thinking of, there was
21   the -- a burnt orange/red --
22   Q.   Yes, ma'am.
23   A.   -- SUV on showroom floor.  And during this time Joe shows
24   up.  And while we're waiting for the -- but I don't feel --
25   actually, I don't feel like this happened on the same day, but
```

```
 1   if it did, the reason I drove off with a car was because I was
 2   told to -- that I was allowed to by the judge.
 3   Q.   Okay.  So backing up, it was not a situation where Bill
 4   Stone said, meet me at the Mercedes dealership and buy my car,
 5   is it?
 6   A.   Yes, it was.
 7   Q.   Okay.  So you're saying that, but you show up and all --
 8   and you and Bill both leave that day with Mercedes; is that
 9   right?
10   A.   Yes.
11            MR. GALLIAN:  May I approach, Your Honor?
12            THE COURT:  You may.
13            (Pause)
14   BY MR. GALLIAN:
15   Q.   Have you seen that before?
16   A.   No.
17   Q.   You signed it.  Those are the instructions to Park Place
18   Mercedes, right?
19   A.   Well, I guess I signed it, but I don't recall ever seeing
20   this before.
21   Q.   Okay.  That is your signature at the bottom, isn't it?
22   A.   Yes.
23   Q.   Okay.
24            MR. GALLIAN:  Your Honor, at this time we move to
25   admit the Stone Exhibit 156.
```

```
 1            THE COURT:  Any objection?
 2            MR. SELLERS:  No objection from DeLeon.
 3            THE COURT:  All right.  Thank you.
 4            MS. RUDOFF:  No objection from the Government.
 5            THE COURT:  Admitted.
 6                 (Defendant Stone's Exhibit No. 156 received)
 7    BY MR. GALLIAN:
 8    Q.   When you go into a dealership and you buy a car for
 9    somebody else, that concerns a dealership, doesn't it?
10    A.   I have never bought a car for somebody else.
11    Q.   Well, you did on this day.
12    A.   First time ever.
13    Q.   Okay.  But that day they made you sign a form, didn't
14    they?
15    A.   It appears so.
16    Q.   Okay.
17            MR. GALLIAN:  If we could publish 156, please.  And
18    down at the bottom if we get that signature and the last
19    sentence.
20    BY MR. GALLIAN:
21    Q.   "I also certify that this is not a loan and there is no
22    obligation for repayment," signed Casi Thompson, June 17, 2016.
23            Did I read that right?
24    A.   Yes.
25    Q.   This is not a loan and there is no obligation for
```

```
 1   repayment.
 2   A.    I guess I should have read what it said.
 3   Q.    Bill Stone didn't make you buy him a car, did he?
 4   A.    My freedom was on the line.
 5   Q.    You say that, but did Bill Stone say, buy me this car or
 6   else?
 7   A.    It was for payment.  It was supposed to -- equivalent to
 8   $100,000.00.
 9   Q.    Okay.  But you had already given him $250,000.00 for the
10   restitution for his wife, right?
11   A.    No, I don't think yet.  No.
12   Q.    That was in March 2016.  So you had.
13   A.    The -- it wasn't to -- I paid restitution.  I didn't pay
14   him.  I paid a corporation.
15   Q.    You never got a receipt from that corporation that you
16   paid the, quote, restitution for, did you?
17   A.    Bill said he -- the reason we were doing it that way is to
18   have no paper trail.
19   Q.    Okay.  You didn't get a receipt, did you?
20   A.    I got a cashier's check receipt.
21   Q.    From the business, Casi.
22   A.    I didn't get any proof of any receipt of anything that he
23   was supposedly doing against -- for my criminal charges.
24         MR. GALLIAN:  Your Honor, I believe I have about five
25   minutes and then I'm done.
```

```
 1                    THE COURT:  Okay.

 2                    MR. GALLIAN:  With your permission, I would like to

 3     finish, or I guess we can ask the jury.

 4                    THE COURT:  Members of the jury, are we okay?

 5            All right.  Let's do it.

 6                    MR. GALLIAN:  May I approach, Your Honor?

 7                    THE COURT:  You may.

 8                    (Pause)

 9     BY MR. GALLIAN:

10     Q.   I handed you what's been marked as Stone's Exhibits 80

11     through 87.  If you could look through those for me.

12                    (Pause)

13     BY MR. GALLIAN:

14     Q.   Have you looked through them?

15     A.   Yes.

16     Q.   Okay.  Great.

17                    Looking at those pictures, you recognize all the

18     objects in those pictures, right?

19     A.   Yes.

20     Q.   Okay.

21                    MR. GALLIAN:  Your Honor, at this time we move to

22     admit Stone's Exhibit 80 through 87.

23                    MR. SELLERS:  No objection.

24                    THE COURT:  All right.

25                    MS. RUDOFF:  No objection.
```

```
 1              THE COURT:  Admitted.
 2                   (Defendant Stone's Exhibit Nos. 80-87 received)
 3   BY MR. GALLIAN:
 4   Q.   Beginning with --
 5              MR. GALLIAN:  Permission to publish, Your Honor.
 6              THE COURT:  Granted.
 7   BY MR. GALLIAN:
 8   Q.   Beginning with the Government -- I'm sorry -- Stone's
 9   Exhibit 80, this is a mockup that you had made so that you and
10   Bill could have matching cups; is that right?
11   A.   This was one of -- yes.
12   Q.   Okay.
13              MR. GALLIAN:  If we go to 81.
14   BY MR. GALLIAN:
15   Q.   That's the actual cup when the rendering was done, right?
16   One side of it?
17   A.   Yes.
18              MR. GALLIAN:  If we could go to 82.
19   BY MR. GALLIAN:
20   Q.   That's the other side of it?
21   A.   Yes.
22   Q.   Bill Stone, Casi Thompson.  We agree?
23   A.   Yes.
24              MR. GALLIAN:  Go to 83.
25   BY MR. GALLIAN:
```

```
 1    Q.   Again, both cups, matching Bill and Casi cups; is that
 2    right?
 3    A.   Yes.
 4              MR. GALLIAN:  84.
 5    BY MR. GALLIAN:
 6    Q.   A close-up of one of the cups, right?
 7    A.   Yes.
 8    Q.   Now, if we go to 85, please tell the jury what 85 is.
 9    A.   Those are the travel -- the Louis Vuitton bags.
10    Q.   Okay.
11              MR. GALLIAN:  Go to 86.
12    BY MR. GALLIAN:
13    Q.   This is the receipt.  If we zoom in on the bottom right
14    corner, we can see that for those two bags you spent
15    approximately -- well, exactly $3,983.60; is that right?
16    A.   Yes.
17              MR. GALLIAN:  And if we could go to 87, please.
18    BY MR. GALLIAN:
19    Q.   And one more picture of the bag; is that right?
20    A.   Yes.
21    Q.   Okay.
22              MR. GALLIAN:  Thank you, Carly.
23    BY MR. GALLIAN:
24    Q.   In 2016, you left Haltom's Jewelry with his and her
25    Rolexes, did you not?
```

```
 1   A.   No.
 2   Q.   In March 2016, when you gave Lexus -- or you gave Bill
 3   your Lexus, you had his and her Lexuses, did you not?
 4   A.   No.
 5   Q.   When you went to Park Place Mercedes and you bought a car
 6   for Bill and you bought a car for yourself, you had his and her
 7   Mercedes, didn't you?
 8   A.   No.
 9   Q.   And, finally, these bags, you had his and her Louis -- I
10   always mess it up -- Vuitton bags, correct?
11   A.   No.
12   Q.   Two more questions.
13           Very early on in this case, Ranger Briley told you
14   that if you're going to talk with Bill Stone, make sure you
15   record each and every phone call, right?
16   A.   Yes.
17   Q.   Because it would look bad to the jury if you didn't,
18   right?
19   A.   I don't think he said it would look bad to the jury.
20   Q.   Okay.
21   A.   I'm not sure.  I was just supposed to.
22   Q.   Here's my question.  Did you record every single phone
23   call with Bill Stone?
24   A.   No.
25           MR. GALLIAN:  Pass the witness.
```

```
 1              THE COURT:  All right.  Members of the jury, that
 2   ends the cross-examination.  I think let's -- it's a great time
 3   to take a lunch break.
 4              It is 11:33, so let's plan to come back at 12:05.  Is
 5   that good?  All right.  Fantastic.
 6              All rise for the jury.
 7              Appreciate your attention.
 8              (Jury out)
 9              THE COURT:  All right.  Everyone please be seated.
10              And we'll recess here in just a moment.  Is there
11   anything we need to -- anything we need to take up outside the
12   presence of the jury before our lunch break?
13              From DeLeon?
14              MR. SELLERS:  No.
15              THE COURT:  All right.
16              MR. GALLIAN:  No, Your Honor.
17              THE COURT:  All right.
18              MS. MAX:  I have a quick question.  How long do you
19   think you'll be?
20              MR. SELLERS:  I have a short version and a long
21   version, so it could be --
22              MS. MAX:  Short as possible versus --
23              MR. SELLERS:  Short as possible, 20 minutes; as long
24   as possible, all afternoon.
25              MS. MAX:  So, Your Honor, there is an issue that we
```

 1   need to take up before the next witness, so we didn't know if

 2   we wanted -- you know, when that would fall.

 3           THE COURT:  Gotcha.  So can you give me kind of a

 4   sneak preview of what we think it is?

 5           MS. MAX:  Oh, it's just -- there's exhibits.  As you

 6   can see, we've agreed on a lot of exhibits.

 7           THE COURT:  Gotcha.  Oh, okay.  Gotcha.

 8           MS. MAX:  This is the exhibit that we could not be in

 9   agreement on, and it's probably something that it's going to be

10   a lengthier --

11           THE COURT:  A lengthier thingamabob?

12           MS. MAX:  -- presentation than in front of a -- that

13   would need to be in front of the jury.

14           THE COURT:  Gotcha.

15           MS. MAX:  Yes, we've discussed it with defense

16   counsel.  They've given us the redactions that they would want.

17   So I don't know exactly what the status is now, but I didn't

18   want it to jump up in front of the jury.

19           THE COURT:  I appreciate that.  Thank you.

20           Why don't we, when we come back -- if you guys come

21   back maybe five minutes early, I'll see if it's something I can

22   knock out easily.  If not, then we'll kick them out for the

23   afternoon break and take it up then.  Does that sound good?

24           MS. MAX:  Yeah.

25           THE COURT:  And I guess it depends on how long your

```
 1   cross is as to where we'd be.
 2           Is there another witness you could -- I don't want to
 3   mess up your -- I'm truly just asking this.  Is there another
 4   witness you could call so we could resolve that, or do we need
 5   to resolve it?  Yeah, I don't want to mess up your game plan.
 6           MS. MAX:  Sorry, Your Honor.  We --
 7           THE COURT:  Oh, no.  I mean --
 8           MS. MAX:  We're just reaching where we have
 9   witnesses --
10           THE COURT:  Oh, sure.
11           MS. MAX:  -- who are out of town and whatnot, so --
12           THE COURT:  Absolutely.  No problem.  I tell you
13   what, let's talk about it when we get back.  If it's something
14   we can knock out quickly, great.  If not, we'll give them a
15   couple of extra minutes and we'll get it done.
16           MS. MAX:  Thank you, Your Honor.
17           THE COURT:  Okay.  Fantastic.
18           Feel free to eat here.  Members of the audience,
19   unfortunately, it's not a movie theater, you're not allowed to
20   eat, but the lawyers can.
21           Feel free to stay here and leave your things here.
22           And if you'll just come back a couple minutes early,
23   maybe a couple, three, four minutes.  Okay.
24           MS. MAX:  What would that time be?
25           THE COURT:  How about if you guys will come back like
```

```
 1   12:30.  Is that good?  A couple -- I know that's -- we're
 2   having extremely short lunch breaks.
 3           Yes, sir?  Oh, I'm sorry.  I'm sorry.  No.  I got
 4   that wrong.  My brain still thinks -- you can tell I need lunch
 5   too.  That would be 12:05.  If you come back noon-ish, a couple
 6   minutes around noon.
 7           Okay.  Sounds good.
 8           Thank you.
 9           SECURITY OFFICER:  All rise.
10           THE COURT:  Court is in recess.
11           MR. GALLIAN:  Thank you.
12           THE COURT:  Uh-huh.  Welcome.
13           (Recess)
14
15
16
17
18
19
20
21
22
23
24
25
```

1                                INDEX

2                                                      Further
                     Direct   Cross   Redirect   Recross   Redirect
3
     WITNESS FOR THE
4    GOVERNMENT

5    CASI THOMPSON          5

6    GOVERNMENT'S EXHIBITS                                    Received

7      52  Republic Title records of Stone's purchase of      85
           Kennedy Dr., Colleyville, Texas residence on
8          September 23, 2016

9     136  Titles for CT's 2015 Lexus GX4                     102

10
     DEFENDANT STONE'S EXHIBITS                          Received
11
       6   Photo of Bill Stone and CT in front of           69
12         helicopter

13     7   Photo of Bill Stone and CT in front of           69
           helicopter (engagement)
14
       8   Power of Attorney to DeLeon                       69
15
       9   Photo of CT's hand with engagement ring from     69
16         Bill Stone

17    10   Photo of CT's hand with engagement ring from     69
           Bill Stone at Reunion Tower
18
      11   Photo of CT's hand with engagement ring from     69
19         Bill Stone at Reunion Tower (2)

20    12   Photo of Bill Stone and CT in beanies            65

21    13   Selfie of Bill Stone and CT with Christmas       65
           filter
22
      14   Selfie of Bill Stone and CT with Christmas       65
23         filter (2)

24    15   Selfie of Bill Stone and CT with 2019 filter     65

25    16   Selfie of Bill Stone, CT, and ST with 2019 filter 65


                  Todd Anderson, RMR, CRR      (214) 753-2170

| | | | |
|---|---|---|---|
| 1 | 17 | Selfie of Bill Stone and CT in parking lot | 65 |
| 2 | 18 | Selfie of Bill Stone and CT at event | 65 |
| 3 | 19 | Selfie of Bill Stone and CT at event (2) | 65 |
| 4 | 20 | Selfie of Bill Stone and CT | 65 |
| 5 | 21 | Photo of Bill Stone and CT at sunset | 65 |
| 6 | 22 | Photo of Bill Stone and CT on a boat | 65 |
| 7 | 23 | Photo of Bill Stone and CT on boat with others | 65 |
| 8 | 24 | Photo of Bill Stone and CT at the Southernmost Point of Continental U.S.A. | 65 |
| 9 10 | 25 | Photo of Bill Stone and CT in front of Abuelas Bodega Gift Shop | 65 |
| 11 | 43 | Photo of CT's hand and ring in car | 57 |
| 12 | 44 | Photo of CT's hand and ring in car (2) | 57 |
| 13 | 45 | Photo of CT's hand with ring in car (3) | 57 |
| 14 | 46 | Photo of CT's hand and ring in car (4) | 57 |
| 15 | 47 | Photo of CT's hand and ring in car (5) | 57 |
| 16 | 48 | Photo of CT's hand and ring in car (6) | 57 |
| 17 | 49 | Photo of CT's hand and ring in car (7) | 57 |
| 18 | 50 | Photo of CT's hand with ring in car (8) | 57 |
| 19 | 51 | Photo of CT's hand with ring in car (9) | 57 |
| 20 | 52 | Photo of CT's hand with ring in car (10) | 57 |
| 21 | 53 | Photo of CT's hand with ring by trash can | 57 |
| 22 | 54 | Photo of CT's hand with ring on jeans | 57 |
| 23 | 55 | Photo of CT's hand with ring on jeans (2) | 57 |
| 24 | 57 | Photo of CT's hand with ring on counter | 57 |
| 25 | 58 | Photo of CT's hand with ring on counter (2) | 57 |

```
 1    59   Photo of CT's hand with ring on counter (3)        57

 2    60   Photo of CT's hand with ring on counter (4)        57

 3    75   Photo of Blue and Black Rolexes being held         97
           side by side
 4
      76   Photo of Blue and Black Rolexes side by side       97
 5
      77   Black Rolex in box                                 97
 6
      78   Rolex receipt dated 02/12/2016                     98
 7
      79   Photo of CT wearing Gold Rolex                     95
 8
      80   C+B design                                        108
 9
      81   Photo of cup with heart                           108
10
      82   Photo of completed cup with "Bill + [C]" in       108
11         heart

12    83   Gift (completed cup set) from CT to Bill Stone    108

13    84   Gift (completed cup set) from CT to Bill Stone    108
           (2)
14
      85   Photo of his and her Louis Vuitton bags at the    108
15         store

16    86   Louis Vuitton receipt for his and her bags        108

17    87   Louis Vuitton bag (his)                           108

18    91   Photo of Bill Stone and CT on lawn chair           65

19    92   Photo of Bill Stone and CT on boat at sunset       65

20   102   Photo of Bill Stone's kitchen before renovation    88

21   103   Photo of Bill Stone's kitchen before renovation    88
           (2)
22
     104   Photo of Bill Stone's kitchen before renovation    88
23         (3)

24   105   Photo of Bill Stone's kitchen before renovation    88
           (4)
25
```

```
 1      106  Photo of Bill Stone's breakfast nook before      88
             renovation
 2
        107  Photo of Bill Sone's living room before          88
 3           renovation

 4      108  Photo of Bill Stone's house before renovation    88

 5      109  Photo of Bill Stone's living room before         88
             renovation (2)
 6
        110  Photo of Bill Stone's living room before         88
 7           renovation (3)

 8      111  Photo of Bill Stone's dining room before         88
             renovation
 9
        112  Photo of Bill Stone's dining room before         88
10           renovation (2)

11      113  Photo of Bill Stone's dining room and            88
             sitting room before renovation
12
        114  Photo of Bill Stone's sitting room before        88
13           renovation

14      115  Photo of Bill Stone's sitting room before        88
             renovation (2)
15
        116  Photo of Bill Stone's sitting room before        88
16           renovation (3)

17      117  Photo of Bill Stone's living room and breakfast  88
             nook before renovation
18
        118  Photo of Bill Stone's office before renovation   88
19
        119  Photo of Bill Stone's guest bathroom before      88
20           renovation

21      120  Photo of Bill Stone's guest bedroom before       88
             renovation
22
        121  Photo of Bill Stone's guest bedroom before       88
23           renovation (2)

24      122  Photo of Bill Stone's master bedroom before      88
             renovation
25
```

123  Photo of Bill Stone's master bedroom before        88
     renovation (2)

124  Photo of Bill Stone's master bathroom before        88
     renovation

125  Photo of Bill Stone's master bathroom before        88
     renovation (2)

126  Photo of paint samples at Bill Stone's house        88

127  Photo of construction at Bill Stone's house         88

128  Photo of construction at Bill Stone's house (2)     88

129  Photo of Kitchen                                    88

130  Photo of Fireplace                                  88

131  Photo of Master Bathroom                            88

135  Cape May Model - Couto Homes Signature Series       73

136  Bodega Model - Couto Homes Signature Series         73

137  Bodega Model - Couto Homes Standard Options         73

138  Couto Homes Floorplan                               73

139  Floorplan                                           73

140  Landscape pricing                                   73

141  Landscape pricing (2)                               73

142  Appliance quote addressed to Bill and CT            93
     from Viking dated 10/10/2016

156  Instructions to Park Place                         105

159  Texts between Bill Stone and CT regarding           78
     ovulation days

165  Bill Stone's Verizon Records                        32

182  Summary Chart                                       47

| | DEFENDANT DELEON'S EXHIBITS | Received |
|---|---|---|
| 1 | | |
| 2 | 99   Case No. P07898 - In Re the Estate of | 18 |
| 3 | Myrna Thompson (2) | |

1       I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6       WITNESS MY HAND on this 31st day of July, 2023.

7

8

9
                                /s/Todd Anderson
10                              TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25