1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                       DALLAS DIVISION

4

   UNITED STATES OF AMERICA,      )    3:21-CR-236-E(2)
5                                  )
        GOVERNMENT,                )
6                                  )
   V.                             )    DALLAS, TEXAS
7                                  )
   WILLIAM ROY STONE, JOSEPH       )
8  DELEON                          )
                                   )
9      DEFENDANTS.                 )    JULY 31, 2023

10

11

12

13

14

15            ------------------------------

16                     TRANSCRIPT OF

17                      JURY TRIAL

18                      VOLUME 5B

19         BEFORE THE HONORABLE ADA E. BROWN

20            UNITED STATES DISTRICT JUDGE

21            ------------------------------

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE GOVERNMENT:

 3         Jenna Danelle Rudoff
           US Department of Justice
 4         1100 Commerce St
           3rd Floor
 5         Dallas, TX 75242
           214-659-8600
 6         Fax: 214-659-8500
           Email: Jenna.rudoff@usdoj.gov
 7
           Donna S Max
 8         US Attorney's office for Northern
           District of Texas
 9         1100 Commerce Street
           Third Floor
10         Dallas, TX 75242-1699
           214-659-8664
11         Email: Donna.max@usdoj.gov

12         Marcus J Busch
           US Attorney's Office
13         1100 Commerce St
           Suite 300
14         Dallas, TX 75242
           214-659-8642
15         Fax: 214-659-8809
           Email: Marcus.busch@usdoj.gov
16

17   FOR THE DEFENDANT WILLIAM ROY STONE:

18         Gregg Gallian
           Gallian Firm
19         Parkside Tower
           3500 Maple Ave
20         Suite 720
           Dallas, TX 75219
21         214-432-8860
           Email: Gregg@gallianfirm.com
22
           Jaclyn Annette Gallian
23         Bryan Cave Leighton Paisner
           2200 Ross Avenue
24         Ste 4200w
           Dallas, TX 75201
25         214-721-8058
           Email: Jaclyn.gallian@bclplaw.com
```

```
 1   FOR THE DEFENDANT JOSEPH DELEON:

 2         Greg Westfall
           Westfall Sellers
 3         1612 Summit Avenue
           Suite 200
 4         Fort Worth, TX 76102
           817-928-4222
 5         Fax: 817-385-6715
           Email: Greg@westfallsellers.com
 6
           Frank Sellers
 7         Westfall Sellers
           1612 Summit Avenue
 8         Suite 200
           Fort Worth, TX 76102
 9         817-928-4222
           Fax: 817-385-6715
10         Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  C H R O N O L O G I C A L   I N D E X

 2    July 31, 2023                                      PAGE

 3    Appearances.........................................2

 4    Proceedings.........................................5

 5                      W I T N E S S   I N D E X

 6    GOVERNMENT          DIRECT          VOIR DIRE        CROSS

 7    Casi Thompson          4               --             --

 8

 9    Proceedings adjourned...............................114

10    Reporter's Certificate..............................115

11
                          E X H I B I T   I N D E X
12
      COURT:
13
      NO.   DESCRIPTION                          OFFERED/ADMITTED
14
      25    Video...................................83/83
15    55    Text Message Excerpt....................72/72
      57    Text Message Excerpt....................64/64
16    59    Identification Photograph...............32/32
      77    Audio Clip..............................26/27
17    88    Audio Clip..............................82/82
      97    Audio Clip..............................25/25
18    98    Audio Clip..............................82/82
      132   3x5 Cards...............................87/88
19    135   Photograph..............................18/19
      136   Rodeo Photograph........................86/87
20    137   Front Yard Photograph...................102/103
      138   Yellow Pad Photograph...................103/104
21    139   Text Message Excerpt....................105/106
      140   Text Message Excerpt....................107/107
22    141   E-mail from Candiss to Casi.............108/108

23                          *  *  *  *  *

24

25
```

```
 1                    (P R O C E E D I N G S)

 2                    (Jurors enter courtroom.)

 3                    THE COURT:  Counsel for Mr. DeLeon, your

 4   witness.

 5                    MR. SELLERS:  Thank you, Your Honor.

 6                        CASI THOMPSON,

 7   having been previously sworn, testified as follows:

 8                       CROSS-EXAMINATION

 9   BY MR. SELLERS:

10       Q.   Good afternoon.

11       A.   Good afternoon.

12       Q.   Casi, I too would like to start off by saying I'm

13   sorry for what's happened to you and us having to be here

14   today.

15       A.   Thank you.

16       Q.   You can understand that on behalf of Joe, that I've

17   been thinking about this a long time, can't you?

18       A.   Yes.

19       Q.   And I've been provided a ton of your records; you

20   know that, don't you?

21       A.   Sure.

22       Q.   Bank records, yes?

23       A.   Yes.

24       Q.   Counseling records, yes?

25       A.   Yes.
```

1      Q.    Phone records?

2      A.    Yes.

3      Q.    Text messages?

4      A.    Yes.

5      Q.    Recorded phone calls?

6      A.    Yes.

7      Q.    And there is a lot information in there, right?

8      A.    Yes.

9      Q.    Have you been provided a copy of your text messages

10   to look over?

11     A.    No.

12     Q.    So you haven't seen some of the stuff you and Joe

13   talked about, dating back to 2010?

14     A.    No.

15     Q.    Okay.  Let me start here.  Are you aware that -- and

16   I'll tell you, I really don't want to have to get into all this

17   with you; is that fair?

18     A.    Okay.

19     Q.    And did you know that Bill's lawyer got up and told

20   the jury that Joe knew nothing about this probation being fake?

21     A.    No.

22     Q.    You don't know that?

23     A.    No.

24     Q.    They didn't tell you that?

25     A.    That Joe knew nothing about it?

1      Q.    That Bill's lawyer says, on behalf of Bill, that Joe

2 knew nothing about it?

3      A.    I -- I don't know what you are saying.  What are you

4 saying?

5      Q.    I'm asking you if anybody told you that, at the

6 beginning of this trial, Bill's lawyer stood up and told this

7 jury that Joe did not know the probation was fake?

8      A.    I -- I understand that Joe believes that it was real

9 as well.

10     Q.    Right.  So you understand that Joe believed the

11 probation was real, right?

12     A.    That's what he told me.

13     Q.    Right.  And so now are you aware that Bill also has

14 told the jury that Joe didn't know the probation wasn't real?

15     A.    I'm not aware of that, no.

16     Q.    Okay.  Does that surprise you?

17     A.    This whole thing is -- surprises me.

18     Q.    Does it surprise you what Bill's lawyer told the

19 jury?

20     A.    I never heard Bill's attorney tell the jury that Joe

21 didn't -- or that Bill didn't -- sorry.  I am unaware that

22 Bill's attorney told the jury that Joe didn't know it was fake.

23     Q.    All right.  And so my question to you, though, was,

24 are you surprised about that?

25     A.    Yes.

1    Q.    You are surprised?

2    A.    It is surprising that -- yes.

3    Q.    All right.  I want to -- to ask you this, because

4  I've got a lot of material to go through with you.

5    A.    Right.

6    Q.    We can do it the long way or the short way.  So let

7  me just ask you point blank.  Can you rule out the possibility

8  that Joe truly believed, like you, that Bill was in the FBI

9  during '17, '18 and '19?

10             THE COURT:  And wait to answer that if you

11  would, please, ma'am.

12             Do you have an objection?

13             MS. RUDOFF:  Objection as to asking this witness

14  for a legal conclusion and also speculation as to what

15  Mr. DeLeon might think or know.

16             THE COURT:  Can you rephrase your question?

17             MR. SELLERS:  I sure can.

18    Q.    Let me ask you point blank.  Can you rule out the

19  possibility that maybe Joe believed that Bill was in the FBI

20  too?

21             MS. RUDOFF:  Reurge the same objection, Your

22  Honor.

23             THE COURT:  Overruled.

24    A.    I was made to believe that he believed that Bill was

25  currently working.

1      Q.    And you spent a lot of time with Bill, right?

2      A.    Who did?

3      Q.    You did?

4      A.    In what year?

5      Q.    Throughout the whole '14, '15, '16, '17, '18, '19,

6  '20, throughout the whole time?

7      A.    I spent -- in '15 and '16, I spent more time with

8  Joe.  In '17, at the end of '17, beginning of '18, and '19,

9  Bill.

10      Q.    Right.  And you've also spent time with Bill and Joe

11  together?

12      A.    Yes.

13      Q.    And when you spend time with Bill and Joe together,

14  it's clear that Bill is the leader and Joe the follower; is

15  that fair?

16      A.    Yes.

17      Q.    And so during your time together, I mean, you know

18  that Joe loves -- he loves three things.  He loves -- for

19  example, he loves to be a U.S. citizen, right?

20      A.    I'm -- sure.

21      Q.    Y'all would exchange political text messages, would

22  you not?

23      A.    Yes.

24      Q.    You'd exchange pictures of every time you went to

25  vote, would you not?

1     A.   I exchanged -- yes.

2     Q.   So you know that Joe loves to be an American, don't

3  you?

4     A.   Yes.

5     Q.   You know also that Joe loves the Hispanic community;

6  you know that too, don't you?

7     A.   Yes.

8     Q.   And third, you know that Joe loves, almost more than

9  any of those other things, law enforcement, don't you?

10    A.   I would say he likes all of those three, yes.

11    Q.   A lot.  Right, he likes those a lot?

12    A.   Right.

13    Q.   And so in your time together, I mean, you could see

14  how Joe, who loves the United States and law enforcement, could

15  have quite a blind admiration for somebody who's not only a

16  police officer, but a federal agent; you could see that, right?

17    A.   Absolutely.

18    Q.   And you saw that in Joe, it was almost like he had

19  stars in his eyes, wasn't it?

20    A.   Yes.

21    Q.   And so you could see how Joe might also be duped into

22  believing that Bill was still in the FBI when he wasn't,

23  couldn't you?

24    A.   Yes.

25    Q.   I'm asking you, do you think it's possible, right?

1    A.   I could see that.

2    Q.   And this is possible based on the time that you spent

3  with both Joe and Bill together and separately, right?

4    A.   Right.

5    Q.   And so you also can't rule out the possibility that

6  perhaps Joe, like you, was duped into believing the probation

7  was real, right?

8              MS. RUDOFF:  I'd object to the legal conclusion.

9  This goes to account.

10              THE COURT:  I'll overrule.

11    Q.   You can't rule out the possibility that Joe also

12  believed the probation was real?

13    A.   At this point, it's hard to believe otherwise.

14    Q.   Okay.

15    A.   Or to believe that.  I -- I don't -- it's hard to

16  know what to believe and what he believes.  And it's hard to

17  believe that he would follow through with something like that,

18  to me.

19    Q.   What you mean is, follow through with something like

20  that and -- and lie to you, right?  It's hard to believe Joe

21  would lie to you based on what you know from him?

22    A.   It was hard to believe.

23    Q.   That Joe would lie to you?

24    A.   And hurtful.

25    Q.   That Joe would hurt you?

1     A.    Right.

2     Q.    Those both yeses?

3     A.    Yes.

4     Q.    And that is based on the character you've known of

5  Joe since, I think you said, '06 or '07, in your direct

6  testimony; could have been as early as '03, couldn't it?

7     A.    No.

8     Q.    No?

9     A.    No.

10    Q.    Are you sure?

11    A.    100 percent.

12    Q.    Okay.  So I'm going to give you one more chance

13 before I dive into the long way.  Can you rule out the

14 possibility that maybe Joe believed the probation was real?

15 The possibility.

16              MS. RUDOFF:  Objection, asked and answered.

17              THE COURT:  Sustained.  Move on.

18    Q.    All right.

19              THE COURT:  Counsel, can I see the lawyers over

20 here?

21              (Sidebar conference; off the record.)

22    Q.    Can you see this over here?

23    A.    Yes, sir.

24    Q.    All right.  I've put a "B" here for Bill; is that

25 fair?

1    A.   Yes.

2    Q.   And a "J" here for Joe?

3    A.   Yes.

4    Q.   Right.  And what I'm going to do is I'm going to list

5    things that happened and things that were told to you, and

6    we're going to ferret out the separation between Bill and Joe,

7    okay?

8    A.   Okay.

9    Q.   Fair?

10   A.   Yes.

11   Q.   And we're going to keep this just as a running list

12   as we go.

13            So let's start with a few things you said on

14   direct.  Ms. Thompson, you have been to -- I'd like to first

15   talk about this addiction date -- or this sobriety date of

16   September of 2014.

17   A.   Yes.

18   Q.   How many AA meetings would you say you've been to in

19   your lifetime?

20   A.   Several.

21   Q.   Several.  More than five?

22   A.   I go to a Alcoholics Anonymous.

23   Q.   More than five?

24   A.   Yes.

25   Q.   More than ten?

```
 1        A.   Yes.

 2        Q.   More than 20?

 3        A.   It's -- I only go to AA.

 4        Q.   Is it more than 20?

 5        A.   Yes.

 6        Q.   More than 30?

 7        A.   Yes.

 8        Q.   All right.  And so you understand -- and you've also

 9   been to, you'd agree with me, some of the most -- the finest

10   treatment facilities in the country, right?

11        A.   Yes.

12        Q.   In Utah, for example, yeah?

13        A.   Yes.

14        Q.   California?

15        A.   Yes.

16        Q.   Oregon, did I read that?

17        A.   No.

18        Q.   Where else have you been?

19        A.   Michigan.

20        Q.   Michigan.  And these were not cheap rehabs.  I mean,

21   some of them were upwards of 30-, 40-, $50,000, weren't they?

22        A.   Yes.

23        Q.   Your grandma paid for all those, didn't she?

24        A.   Yes.

25        Q.   And you weren't -- well, you weren't defrauding your
```

1    grandma when she gave you money to go to rehab, were you?

2         A.    No.

3         Q.    Okay.  Because a gift of money or a gift of a thing

4    is a gift, right; it's not fraud, is it?

5         A.    It --

6         Q.    When your grandma gave you a car when you were

7    18 years old, was that a gift or was that a fraud that you were

8    committing on your grandma?

9         A.    That was a gift.

10        Q.    Right.  Because you see the difference between a gift

11   and a fraud?

12        A.    Yes.

13        Q.    All right.  And these treatment facilities you have

14   been to, either seven or eight; is that right?

15        A.    Around that.

16        Q.    Okay.  And you know the importance of a sobriety

17   date, don't you?

18        A.    I do.

19        Q.    And you know that if you even have a drink, that's

20   what we call, what; what do you call that?

21        A.    So --

22        Q.    Excuse me, what do you call it?

23        A.    I misspoke.  I should have said clean, not sober.  I

24   have drank since.

25        Q.    But yet you have told the jury that your clean date

1    or your sobriety date was in September of 2014?

2         A.    Yes.

3         Q.    That was dishonest, wasn't it?

4         A.    No.

5         Q.    Well, that's not dishonest to yourself and your

6    sobriety?

7         A.    That was the day that I chose to turn my will in life

8    over to the care of God.

9         Q.    And the day you decided not to use drugs or alcohol

10   too?

11        A.    Yes.

12        Q.    But you've continued to use at least alcohol, have

13   you not?

14        A.    I occasionally will drink.

15        Q.    And then when you come into court and take an oath,

16   you tell the jury that you've been sober since September

17   of '14?

18        A.    And I misspoke.  I should have said clean.

19        Q.    You understand, ma'am, the words you say from that

20   witness stand matter, don't you?

21        A.    Yes, sir.

22        Q.    Well, let's just go to the next thing.

23               MR. SELLERS:  May I approach the witness, Your

24   Honor?

25               THE COURT:  You may.

1    Q.   Yesterday we saw a picture -- I think it was

2  Government's Exhibit Number 4.

3              MR. SELLERS:  Permission to publish Government's

4  Exhibit 4, Your Honor?

5              THE COURT:  Is it already admitted?

6              MR. SELLERS:  It has.

7              THE COURT:  Granted.

8              MR. SELLERS:  Thank you.

9              THE COURT:  You're welcome.

10              MR. SELLERS:  May I approach the witness?

11              THE COURT:  You may.

12    Q.   I'm showing you what's been admitted as a portion of

13  Government's Exhibit 122.  Do you recognize that picture?

14    A.   Yes.

15    Q.   Is that the same picture that we see in

16  Government's 4?

17    A.   Yes.

18    Q.   A true and accurate copy?

19    A.   Yes.

20    Q.   I'm showing you now this portion of Government's 122.

21  Who is the lady to the left of Myrna there?

22    A.   It is my mother.

23    Q.   Who cut your mom out of this Mother's Day picture?

24    A.   I have no idea.

25    Q.   You didn't do that?

1      A.    I did not do that.

2                  MS. RUDOFF:  Your Honor, may I clarify something

3      for the record, as this is not Government's Exhibit 122?

4                  THE COURT:  Is it not?  What is it?

5                  MR. SELLERS:  Is it 121?

6                  MS. RUDOFF:  Are you saying --

7                  THE COURT:  Let me see the lawyers up here.

8                  (Sidebar conference, off the record.)

9                  THE COURT:  Okay, the lawyers are -- we circled

10     the wagons on the mechanics.  We got our plan; we're good to

11     go.

12                 (Off-the-record discussion.)

13                 MR. SELLERS:  May I approach the witness again,

14     Your Honor?

15                 THE COURT:  You may.

16     Q.    Just for record purposes, is this Defendant's 135,

17     DeLeon, the same as the picture I just showed you?

18     A.    Yes.

19     Q.    Okay.

20                 MR. SELLERS:  We'd offer for the record

21     DeLeon 135.

22                 THE COURT:  All right.  Any objection to

23     DeLeon 135?

24                 MS. RUDOFF:  Nothing from the government, Your

25     Honor.

1                    MR. GALLIAN:  No, Your Honor.

2                    THE COURT:  All right, it's --

3                    MR. SELLERS:  For all purposes.  I don't know

4   why I said record purposes, but for all purposes.

5                    THE COURT:  Any objection for all purposes,

6   Government?

7                    MS. RUDOFF:  No, Your Honor.

8                    THE COURT:  Defense?

9                    MR. GALLIAN:  No, Your Honor.

10                   THE COURT:  Admitted for all purposes.  And I

11  assume it's for all purposes unless someone says it's for

12  limited purposes.

13                   MR. SELLERS:  Yes, ma'am.

14       Q.   So you don't know who cut your mom out of this

15  picture?

16       A.   No.

17       Q.   All right.  I'd like to next talk to you about some

18  of the therapy that you had in this case.  You would agree with

19  me, ma'am, that you are --

20                   THE COURT:  May I see the lawyers for just a

21  second?

22                   (Sidebar conference, off the record.)

23                   THE COURT:  Let's have the jury step out for

24  just a couple minutes.

25                   (Jurors exit courtroom.)

1            THE COURT:  This Court will not allow its

2   motions in limine to be violated.  I have not allowed the

3   government to go into any therapy records; and now the defense

4   counsel wants to do that.

5            MR. SELLERS:  I'm -- for the record --

6            THE COURT:  Go ahead.  Explain it.

7            MR. SELLERS:  Thank you, Your Honor.  What I'd

8   like to do is have a question-and-answer with her that she had

9   22 sessions in which she never mentioned Joe DeLeon.  Then she

10  meets with Marcus and Mr. Luley, and for the first time ever

11  she mentions Joe DeLeon in her therapy.  And that's it.  That's

12  all I want do.  But there are 22.  And until these folks

13  reminded her of Joe, she never thought Joe was a defendant or

14  had anything -- done anything wrong to her.  And so that is

15  our -- what we'd like to put on.

16           We believe it's relevant under 806, I believe,

17  is lack of a statement.  We also believe it's relevant to show

18  that she -- at least to show her memory issues, if not

19  altogether to show that Joe, in her mind, was not a defendant.

20  And so with that, we believe that we're being deprived of our

21  right to present a defense and to due process on behalf of

22  Joe DeLeon.

23           THE COURT:  All right.  This Court will let the

24  appellate record speak for itself.  But I have liminied out

25  this issue and not allowed the government to get it into, and

 1    I'm not about to start that now.

 2                    MR. SELLERS:  Yes, ma'am.

 3                    THE COURT:  So we're not doing that.  And I'll

 4    tell you --

 5                    Tell the jury to take a ten-minute break.

 6                    In light of that, I mean, I thought if there was

 7    something -- I thought I was real clear that if we thought we

 8    were going to go into something that was covered by a motion in

 9    limine, that the parties would do the Court the courtesy of

10    approaching.  And that has not happened.  So before we go on

11    with further cross-examination, are there any other areas into

12    which the Court needs to inquire before you kick the door open?

13                    MR. SELLERS:  No, Your Honor.

14                    THE COURT:  What else -- but what other -- take

15    a look at the motions in limine.  Go look at them.

16                    MR. SELLERS:  I know exactly what they say, Your

17    Honor.  And I apologize, this was something added at the last

18    minute.

19                    THE COURT:  Okay.

20                    MR. SELLERS:  I'll take the fall for it, that's

21    fine.

22                    THE COURT:  Okay.  Well, are you planning on --

23    because I've got to tell you --

24                    MR. SELLERS:  The only thing that deals with

25    anything in the motion in limine, the only thing.

```
 1                    THE COURT:  Okay.

 2                    MR. SELLERS:  Just the fact that they reminded

 3      her of Joe DeLeon.

 4                    THE COURT:  Well, that -- that didn't bring up

 5      therapy records.  So --

 6                    MR. SELLERS:  Okay.

 7                    THE COURT:  -- is there anything else you think

 8      you should get into?

 9                    MR. SELLERS:  Nothing.

10                    THE COURT:  I'm not trying to -- Mr. DeLeon, I'm

11      not trying to chill your defense.  I want him to be aggressive

12      and zealous.  This case takes a whole new turn if you bring

13      that up, and it's a whole new can of worms we're not getting

14      into.

15                    MR. SELLERS:  Yes, ma'am.

16                    THE COURT:  So if you -- if you come dancing up

17      to my line called motion in limine before, give this Court the

18      courtesy of letting me know.

19                    MR. SELLERS:  I will, Your Honor.

20                    THE COURT:  But that said, keep doing your

21      excellent presentation.  I'm not trying to chill you or spank

22      your tail; just get on the same page.

23                    MR. SELLERS:  Since we have a break, have we

24      gotten IT here?  Because I'm about to get into text messages.

25                    (Brief recess.)
```

1           THE COURT:  Outside the presence of the jury.

2           The Court has had a discussion with Defense

3   counsel about the appropriateness of getting into the victim's

4   therapy records.  This Court believes that that -- that

5   testimony would be substantially more prejudicial than it would

6   be probative on this point.  And so I am, at this time,

7   disallowing that.

8           Anything further?

9           MR. SELLERS:  No, ma'am.

10          THE COURT:  If there is anybody else -- believe

11  me, I'm not trying to switch tails.  Don't want mistrials.  So

12  if anybody thinks they should get into something we've

13  carefully not discussed, just let me know and we'll kick out

14  the jury and discuss it.

15          (Jurors enter courtroom.)

16          THE COURT:  Defense counsel, your witness.

17          MR. SELLERS:  Thank you, Your Honor.

18   Q.   Ms. Thompson, before we get into how you met Joe, I

19  want to talk to you about some of your impressions of Joe,

20  okay?

21   A.   Okay.

22   Q.   Back in July of 2019, you had a meeting with a Texas

23  ranger --

24   A.   Okay.

25   Q.   -- is that right?

1      A.   Yes.

2      Q.   You had multiple meetings, right?

3      A.   Yes.

4      Q.   And they would ask you about, you know, how did Joe

5  and Bill kind of interact with each other, right?

6      A.   Right.

7      Q.   And, you know, they asked you a lot of questions?

8      A.   Yes.

9      Q.   You gave them a lot of answers?

10      A.   Yes.

11      Q.   And one of the questions they asked was, how did Bill

12  and Joe interact with each other.  Do you remember what your

13  answer was?

14      A.   I would assume I said probably Joe was a sheep.

15      Q.   Joe was a sheep?

16      A.   I would assume.  Like, he followed -- he would do

17  whatever Bill said.

18      Q.   You said Joe was a sheep.  What do you mean by that?

19      A.   Well, just he seemed to idolize Bill.

20      Q.   Idolize Bill.  And if I told you that "sheep" was not

21  the word you used to describe Joe, do you have another guess?

22      A.   Follower.

23      Q.   Follower.  In other words, tell us what you mean by

24  "follower"?

25      A.   He would do as Joe -- as Bill said.

 1       Q.   Would do as Bill said.  I'm going to bail you out

 2  here.

 3               MR. SELLERS:  Your Honor, at this time, for

 4  record purposes, we would offer all of Defendant DeLeon's

 5  Number 97.  And then for purposes of the jury -- and I'll have

 6  the clips to give -- I'll be playing from 17 minutes to

 7  17 minutes and 11 seconds.

 8               THE COURT:  Okay.  And I'm sorry, the clips, are

 9  those all part of that same exhibit?

10               MR. SELLERS:  I'm just playing one clip.

11               THE COURT:  Gotcha.  And are you moving for

12  admission on it?

13               MR. SELLERS:  Yes, I am.

14               THE COURT:  Any objection from -- and which

15  number is this, I'm sorry?

16               MR. SELLERS:  DeLeon 97.

17               THE COURT:  Any objection to DeLeon 97?

18               MS. RUDOFF:  No objections, Your Honor.

19               MR. GALLIAN:  No objection.

20               THE COURT:  It is admitted.

21               And so how long is this?

22               MR. SELLERS:  11 seconds.

23               (Audio playing.)

24       Q.   All right, did you hear that?

25       A.   Yes, I did.

1     Q.    What was the word you used there to describe Joe?

2     A.    Puppet.

3     Q.    Puppet.  All right, we've got a good list going.  So

4 here we've got sheep, follower and puppet --

5     A.    Yes.

6     Q.    -- yes?

7     A.    Yes.

8     Q.    Okay.

9           MR. SELLERS:  Next, Your Honor, I'd offer

10 DeLeon's 97 for record purposes -- 97 for record purposes --

11 I'm sorry, 77 for record purposes.  All of it.  And then I'll

12 be playing 8:56 through 9:53.

13           THE COURT:  Any objection to DeLeon 77,

14 Government?  And let me know if you need a minute.

15           MS. RUDOFF:  Your Honor, with regards to 77,

16 just for clarification purposes, you are offering the entire

17 recording for what purpose?

18           MR. SELLERS:  For record purposes.  And then I

19 thought our agreement was we would clip relevant portions to go

20 back with the jury.  And I'm offering the clip for all

21 purposes.

22           THE COURT:  Okay.

23           MR. SELLERS:  And that is from 8:56 to 9:53.

24           THE COURT:  All right.  Any objection to that?

25           MS. RUDOFF:  For optional completeness purposes,

1   Your Honor, I would just ask that the recording -- the entire

2   recording go -- have the opportunity to go back, should it be

3   needed and necessary, for the jury -- to aid the jury.

4                    THE COURT:  Well, you-all can offer the

5   remainder of it in your case if you choose to.  So overruled on

6   that.

7                    And -- I'm sorry?

8                    MR. GALLIAN:  No objection.

9                    THE COURT:  All right, thank you.

10                   Admitted.  And you may play it.

11                   MR. SELLERS:  Thank you, Your Honor.

12                   THE COURT:  You're welcome.

13                   (Audio playing.)

14      Q.    Did you hear that?

15      A.    Yes.

16      Q.    Okay.  And so I don't know if -- what you meant to

17   imply on direct.  I really don't.  But it seemed to me that you

18   meant to imply that Joe was not really affiliated at all with

19   the Fort Worth PD; is that right?

20      A.    That is what my understanding was.  He -- during this

21   time, in July.

22      Q.    What was your understanding in July?

23      A.    Was that he exactly -- what I just said; that he was

24   an interpreter for the police department.

25      Q.    Uh-huh.

1          A.   And would take civilian -- and again, I'm not sure if

2     he ever did this.  This is what he was claiming to be doing,

3     doing federal FBI stuff in Dallas.  Like a training of some

4     kind.

5          Q.   Right.  Like the citizens academy?

6          A.   And he would wear a jacket -- I'm not sure what it

7     was called.

8          Q.   Okay.  And so let me ask you this.  Outside of this

9     scenario here, can you name one time Joe DeLeon has ever told

10    you a lie?

11         A.   I'm sure.

12         Q.   Can you name one?

13         A.   I doubt -- I don't know -- if -- how would I know it

14    was a lie?

15         Q.   Well, let's just take Bill for example.  You caught

16    Bill in a ton of lies, didn't you?

17         A.   I -- I did after I found out that I was not on

18    probation.

19         Q.   Right.  And so outside of this situation, have you

20    ever once caught Joe DeLeon in a lie, where you know it was

21    false?

22         A.   I don't know.  I -- if he lied to me and I didn't --

23    no, I guess your -- I don't know.

24         Q.   Okay.

25         A.   If he lied to me, I wouldn't remember, oh, he lied to

1  me, because I wouldn't know.

2      Q.   So certainly you can say he's never lied to you about

3  anything important, other than what happened in this scenario,

4  right?

5      A.   I don't know.

6      Q.   In other words, you can't point to one time, right?

7  Fair?

8      A.   I can't think of a time right off the top of my head.

9      Q.   I'd like to talk to you now about how you and Joe

10 met; do you understand?

11     A.   Yes.

12          MR. SELLERS:  May I approach the witness?

13          THE COURT:  You may.

14     Q.   I'm showing you now -- well, you know what that is,

15 don't you?

16     A.   Okay.

17     Q.   You know what it is, don't you?

18     A.   It's a name tag.

19     Q.   I'm just asking, do you know what it is; yes or no?

20     A.   Yes.

21     Q.   Okay.  And you know because you've seen it before,

22 right?

23     A.   I have not seen that one in particular, no.

24     Q.   You haven't -- you've never seen this one?

25     A.   No -- well, I don't know if that is the one I've ever

1   seen or -- I don't believe I've seen that one, no.

2        Q.   Let me ask you this.  What's the issue date on that

3   one?

4        A.   I can't tell.  I need glasses to see that number at

5   the very end.

6        Q.   2010 look right?

7        A.   Okay.  Yeah, I couldn't tell if it was 18 or 10.

8        Q.   And this is a -- a badge of Joe DeLeon, right?

9        A.   It appears to be, yes.

10       Q.   If you haven't seen this exact one, you've seen one

11   just like it?

12            THE COURT:  Counsel, if you are going to

13   question her, if you'll go back to the podium.

14       Q.   If you haven't seen this exact one, you've seen one

15   exactly like it, right?

16       A.   I -- can you tell me what you are referring to?

17       Q.   Well, you said on direct examination that Joe showed

18   you a badge and it made you believe that he was law

19   enforcement, even though now it was apparently one big lie?

20       A.   No.  It was in 2006, and we were at an IHOP.  And it

21   was a completely different identification card.

22       Q.   All right.  But either way, you've said that you

23   don't believe now that Joe was ever affiliated with Fort Worth

24   PD, right?

25       A.   He liked to -- I found out later that he was -- or

1    according to Bill, he was an impersonator.

2        Q.   An impersonator?

3        A.   He told me that Joe has gotten -- Bill told me that

4    Joe has gotten in trouble before trying to impersonate.

5        Q.   All right.

6             MR. SELLERS:  We'd offer --

7        A.   This is just what I've been told, I'm sorry.

8        Q.   By Bill?

9        A.   By Bill.

10       Q.   Anyone else?

11       A.   No.

12       Q.   All right.  I've written up here, Said Joe got in

13   trouble with Fort Worth PD.  That was only told to you by Bill,

14   right?

15       A.   Yes.

16       Q.   Joe never told you anything like that, did he?

17       A.   No.

18       Q.   In fact, the things that Joe was telling you were

19   that he would have to go to a scene where they had hostages,

20   right?

21       A.   Yes.

22       Q.   Where they had Spanish-speaking people being held

23   hostage, right?

24       A.   Yes.

25       Q.   And he'd have to go interpret for the Fort Worth PD,

1   right?

2       A.   Yes.

3                   MR. SELLERS:   And at this time we'd offer

4   Defendant's Exhibit 9.

5                   (Off-the-record discussion.)

6                   MR. SELLERS:   It's DeLeon 59, Your Honor.

7                   THE COURT:   All right.

8                   MS. RUDOFF:   Your Honor, the government would

9   object based on lack of personal knowledge with this particular

10  witness.

11                  THE COURT:   Okay.   And which one is this,

12  DeLeon 59?

13                  MR. SELLERS:   Yes, ma'am.

14                  THE COURT:   Let me look that up.

15                  Defense counsel for Stone?

16                  MR. GALLIAN:   No objection, Judge.

17                  THE COURT:   All right.

18                  MR. GALLIAN:   Thank you.

19                  THE COURT:   And which one was that, 59?   One

20  moment.   Appreciate your patience.

21                  Overruled.

22                  MR. SELLERS:   May I show the jury, Your Honor?

23                  THE COURT:   You may.   That's admitted.

24      Q.   Can you see that, Casi?

25      A.   Yes.

1      Q.    Is that a little better than before?

2      A.    Yes.

3      Q.    Okay.  Why don't you read for me from the top left to

4  bottom?

5      A.    Police department:  Fort Worth.  Joseph DeLeon:

6  Volunteer Spanish interpreter, Fort Worth PD.  Access:

7  Anywhere.  Date issued:  April 29, 2010.

8      Q.    Looks like a signature there?

9      A.    Signature, chief of police.

10      Q.    Would it be fair to say that you had been around Joe

11  and in his restaurant many times?

12      A.    A handful.

13      Q.    There were times that you were living in Fort Worth

14  and you really didn't have a place to stay; is that true?

15      A.    There was a time.

16      Q.    Living out of one of your cars?

17      A.    I did live in my car, yes.

18      Q.    And you would go to Joe's restaurant?

19      A.    I would -- during those times, the only time I would

20  go up to Joe's restaurant would be with Charles.  And we would

21  usually eat a burrito.

22      Q.    And there were also times you went there with Cade?

23      A.    No.

24      Q.    Slayter?

25      A.    No.

1    Q.    You never went to Joe's with Slayter?

2    A.    During the time I was living in my car on drugs, I

3    didn't have my kids.

4    Q.    Nevertheless, when you fled to Joe's, he knew you

5    were homeless; you told him; you talked to him about those

6    things, right?

7    A.    Homeless is a strong word.

8    Q.    You were living in your car?

9    A.    I was choosing to live that way.  I had a home and it

10   was at my grandparents' house.  I was just in Fort Worth.

11   Q.    Because you didn't want to be at your grandparents'

12   house, right?

13   A.    It was a very sad time.

14   Q.    Because you didn't want to be at your grandparents'

15   house, right?

16   A.    I guess.

17   Q.    Because Grandma's not going to let you do drugs,

18   right?

19   A.    I kept that away -- that lifestyle apart from my

20   friends that -- and family that I loved.

21   Q.    Hence why you were living in your car?

22   A.    Yes.

23   Q.    And when you'd go see Joe in his restaurant, he'd

24   provide you a hot meal, wouldn't he?

25   A.    He would give me a burrito.

1      Q.    And he wouldn't make you pay for it, would he?

2      A.    No.

3      Q.    Is that a gift or is that a fraud?

4      A.    It was a gift, a nice gesture.

5      Q.    All right.  I'd like to show you now, from

6    Government's Exhibit 38, the spreadsheet that the government

7    has put in.  And I'd like to go through and I want to just

8    go -- take you back to 2010.  And let's really talk about what

9    was going on between you and Joe back then, okay?  Fair?

10     A.    Sure.

11     Q.    All right.  I -- the -- the spreadsheet goes

12    backwards, so we're going to have to be creative here.  But I'm

13    going to blow them up real big for you, okay?

14           MR. SELLERS:  Oh, for the record, this is the

15    SMS, the spreadsheet.

16     Q.    All right.  Do you see where your name is in here;

17    Casi Thompson, right?

18     A.    Yes.

19     Q.    And you can see there in the middle column, Incoming,

20    Outgoing?

21     A.    Yes.

22     Q.    And let me make this clear for the jury.  All these

23    text messages we've been looking at, did you know they came

24    from Joe's phone?

25     A.    No.

1        Q.    Did you know that your phones had had many, many

2   texts deleted?

3        A.    The -- this phone currently that is on here was in

4   Bill's -- I can't think of the word.

5        Q.    Possession?

6        A.    Possession.

7        Q.    And so your phones, you know now, had had stuff

8   deleted from them, right?

9        A.    I did not know that.

10       Q.    Okay.  And so we know that Bill deleted stuff from

11  his phone, don't we?

12       A.    I personally don't know that.

13       Q.    All right.  Here's what we do know; that Joe did not

14  delete any messages, right, because we're looking at 2010

15  messages?

16       A.    Okay.

17       Q.    Fair?  All right.  I'll be Joe, you be Casi, fair?

18       A.    Yes.

19       Q.    Here we go.  Outgoing:  I'm sorry, I'm at a voting

20  poll.  I'm one of the election interpreters and I can't be on

21  the phone, but are you okay?

22              And this is in November of 2010.  What did you

23  respond?

24       A.    I said, Yes, me and Slayter are in town.

25       Q.    I'm so sorry I'm stuck doing this election.  I'm in

1    Mansfield until 7:00 p.m.  Very top.

2         A.    Oh, we're going up; is that what we're doing?

3         Q.    Yes, ma'am.  It goes in reverse on this spreadsheet.

4         A.    How did it go today?

5         Q.    Right.  Let's go to Page 73 of the spreadsheet.

6               (Court instruction.)

7         Q.    All right.  So here we are.  The date would be

8    December 17th of 2010; is that right?

9         A.    Okay.

10        Q.    And incoming would be from you.  So go ahead and

11   start from the bottom, and I'll be Joe and you be Casi.

12        A.    Okay.  Say that again?  What -- okay.  I'm starting

13   from the bottom?  You are wanting me to read this, correct?

14        Q.    Yes, ma'am.

15        A.    Hey, Slayter goes to bed at 8:00, so I'm probably

16   going to leave at 7:30 or 7:45.

17        Q.    And then on 12/18, the next day, you have another

18   text you sent.  Begins with, Hey, sorry.

19        A.    Hey, sorry I never called you back last night.  My

20   mom came over and then I went to bed.  I worked all day.  Now

21   I'm tired, so I'm going to bed.  Church at 9:30 and then

22   Christmas shopping with my little family.  I'll call you when I

23   go into town to take Tatum her Christmas gift.

24        Q.    Who is Tatum?

25        A.    That is Charles' daughter.

1      Q.   All right.  And then Joe says to you, same day, Thank

2   you for texting me, and I understand.  Have a good night and

3   sweet --

4                THE COURT:  Slower.

5      Q.   -- dreams.  May -- may good -- I'm guessing that's

6   God -- keep you and your son safe.  And God keep you safe

7   and -- not good.  What do you say?

8      A.   Merry Christmas.

9      Q.   And also -- just read the text word for word.

10      A.   Okay.

11      Q.   Starts with, You too, and a smiley face.

12      A.   You too, Joe.  Talk to you soon.

13      Q.   And then Joe says, Merry Christmas and Happy New Year

14   to your family, J. DeLeon.  Is that right?

15      A.   Yes.

16      Q.   This is back in 2010, right?

17      A.   That was obviously during one of my sobriety stints.

18      Q.   All right.  Here we are in 2011, 1/12 of '11.  If you

19   could read the bottom one that looks like that was -- no, this

20   is from Joe, 1/12 of 2011:  I wanted to say more, but I didn't

21   know who all was around you.  You look awesome.  When do I get

22   to see you again?

23                And what did you say?

24      A.   I said, My flex -- my schedule is flexible.

25      Q.   No, I need you to read word for word, please.

```
 1        A.    Oh, well, where does it start?  I'm sorry, this is a
 2   little difficult to read.
 3        Q.    Whenever.
 4        A.    Whenever.  Maybe this weekend.
 5        Q.    All right.  Just call me.  Maybe we can have lunch
 6   and for [sic] dinner.  My schedule is flexible over the
 7   weekend.
 8        A.    Does it start with, Sorry?
 9        Q.    Yes, ma'am.
10        A.    Sorry, I was at dinner with my brother and his
11   family, so it took a while to reply.  But yes, I will let you
12   know.  I work 9:00 to 5:00 Saturday.
13        Q.    Where were you working at that time?
14        A.    I was -- in 2010?  I'm not sure.
15        Q.    Okay.  I --
16        A.    I just remembered.  I was cutting hair.
17        Q.    Cutting hair back then?
18        A.    I was doing hair.
19        Q.    Here we are in January of 2011, still.  And I'll
20   start with -- I'm going to skip the -- the CNN and Fox News
21   "please circulate" text.  But on 1/24/11, Joe says, My, I
22   didn't know you had an older son.  He is a handsome young man.
23   Awesome pic.
24              What did you say?
25        A.    Long day, is that where we're starting?
```

1    Q.    Thanks, Joe.

2    A.    Okay.  Thanks, Joe.  How have you been?

3    Q.    All right.  And then, I'm sorry, I was at the rehab

4    with my parents.  Long day now.  I'm on my way back to the

5    restaurant to close up at 9:00.

6              And you say?

7    A.    Oh, you are sweet.  You are devoted to your parents.

8    That's sweet.

9    Q.    And then you sent the next text; what was it?

10   A.    Joe, it's Casi.  My new cell.

11   Q.    All right.  And the next two or three are from you.

12   Just got a taxi.  This goes back to, if you want something done

13   you have to do it yourself, right?

14   A.    That is what I said?

15   Q.    Yes.  It's -- see there in boxes?

16   A.    I'm sorry, it's just kind of hard to see.

17   Q.    I can --

18   A.    I don't have boxes on mine.

19             (Off-the-record discussion.)

20   Q.    Okay.  All right, let's go to Page 71.  I'm going to

21   do a few more of these and then we're going to skip up to 2014.

22             Oh, perfect, we're already there.

23             All right.  And then did you know that there

24   were quite a few texts that y'all exchanged after that?

25   A.    We -- we spoke quite often.

1    Q.   All right.  All right.

2         MR. SELLERS:  Permission to publish the PDF

3    Government's Exhibit 38?

4         THE COURT:  Has that already been admitted?

5         MR. SELLERS:  Yes, ma'am.

6         THE COURT:  Granted.

7    Q.   Now it should get a little easier.

8    A.   Yes.

9    Q.   You are in blue and Joe's in green.  Let's just keep

10   going, okay?

11   A.   Okay.

12   Q.   And this is in 2012, right?

13   A.   Okay.

14   Q.   Go ahead.

15   A.   Hey, Joe, it's Casi.  How are you?  I'm fine.  Just

16   working away.  Haven't heard from you in a long time.  How are

17   you doing?

18        THE COURT:  Slow down just a little bit more.

19        MR. SELLERS:  Yes, ma'am.

20   A.   I'm doing okay.  Will you be up around 10:00?  I'm

21   doing laundry and almost done and I need to ask you a question.

22   Q.   Yes.  Feel free to call.  Not a problem.

23   A.   Did you find out who she was?

24   Q.   All right.  Do you recall telling the jury that you

25   were never a confidential informant to Bill or to Joe, and to

1  anyone?

2       A.   Yes.  And I still stand behind that 100 percent.

3       Q.   Good.  Let's go through these messages.

4            Not yet.  I got a message into Bill.  I don't

5  know if he is in the country.  As soon as I hear from him, I

6  will let you know.  Thanks.

7            What did you say?

8       A.   Okay.  When is your party?

9       Q.   It's been going on most of the day.  I'm about to

10 have to go check on my mother.  I'm inable [sic] to come back

11 in about an hour and a half.

12           And then you said?

13      A.   So it's a daytime party?

14      Q.   And then he talks about how it's for the kids and

15 that maybe y'all can get together.

16           Let's go to the next page.  This is Page 3.

17 What do you say?

18      A.   Yes, that would be fun.  Interesting and fun.  Would

19 having her phone number help you?

20      Q.   Yes.  I can forward to SA Bill Stone or leave it with

21 his office.

22      A.   K.  This --

23      Q.   Just read the text.

24      A.   2124 Hayes Drive, Apartment D, Arlington, Texas.

25      Q.   Okay.  The next text?

1      A.    I dropped her off at her address.  That's her

2   boyfriend's brother's place.

3      Q.    The next text?

4      A.    A phone number.

5      Q.    Uh-huh.  And you say?

6      A.    That is one of her numbers.

7      Q.    And then?

8      A.    With all due respect, just because I'm giving a

9   person's number and address doesn't mean I'm being an informant

10  or turning them in.

11     Q.    So whose number was it?

12     A.    I'm trying to find out information for myself.

13     Q.    Whose number was it?

14     A.    I have no idea.

15     Q.    So how do you know you were trying to figure out

16  information for yourself?

17     A.    Because I would never be an informant and turn

18  anybody in.  I was just trying to find out information for

19  myself.

20     Q.    Uh-huh.  And Joe says, I will forward this

21  information to Bill immediately.  Did you ever get a last name

22  to see that we can run her to see if she's even wanted?  Can

23  you call SA Bill Stone's office?  And gives the phone numbers.

24          Now, what you are telling this jury is that that

25  number that you were sending to Joe to send to Bill was not you

1    informing on somebody confidentially; is that what you are

2    telling this jury?

3         A.    100 percent, 100 percent.

4         Q.    Okay.  And then we see you actually give the name

5    Mary Renee Kashay Walton Slack; is that correct?

6         A.    I have no idea who that person is, but apparently,

7    yes, that is a name.

8         Q.    Why were you giving that name, address and two phone

9    numbers to Joe?

10              MS. RUDOFF:  Objection, Your Honor, asked and

11   answered.

12              THE COURT:  Overruled.

13        A.    I was trying to figure out who she was.  I'm sure it

14   had something to do with my ex-boyfriend and a female.

15        Q.    But you don't know for sure?

16        A.    I -- I know one thing for sure; that I was not

17   sending information being a confidential informant.

18        Q.    And then when Joe says, up here, Well, did you get

19   her last name to see if she was ever wanted, did you think you

20   maybe ought to clear up this confusion?  Like, hey, she's not

21   wanted.  This is a girlfriend of my ex-boyfriend.  You didn't

22   say anything like that, did you?

23        A.    No, I'm sure it was just me trying to figure out who

24   this person was in relation to my ex-boyfriend.

25        Q.    And how did your ex-boyfriend know Mary Renee Kashay

1    Slack?

2         A.   That is what I'm saying.  I'm not sure exactly.  This

3    was in 2012.  But I was inquiring about somebody.

4         Q.   Okay.  Let's keep going.  On page -- I'll be Joe

5    again.

6              Casi, were you able to -- wear [sic] you able to

7    get ahold of Bill Stone?  Next message on August 30th of

8    2012 -- and you'd agree this is at least three years plus a few

9    months before your secret probation ever started, right?

10        A.   Yes.

11        Q.   August of 2012:  Casi, Special Agent Stone text me

12   back stating he was in a very important meeting, but as soon as

13   he gets out, it is the first thing he's going to look into

14   thoroughly.  Thank you so much for your help in this.  Be sure

15   and delete all messages in reference to this.

16             And then you said?

17        A.   I said, Yes, sir, I already do.  I'm not a dummy.

18        Q.   I knew that you did, but I have to do this every

19   single time.  They call it standard operating procedure.  We

20   are made to do this reminder.

21             You say?

22        A.   I know, I was playing with you.

23        Q.   Joe says, Just going by the book.

24             And you say?

25        A.   Any news?

1    Q.    Now I'm going to jump ahead to June of 2014.  Go

2    ahead and read the Casi Thompson old part.  And just so we're

3    clear, has Joe spelled your name right one time in all of the

4    different iterations we've seen?

5    A.    No.

6    Q.    Joe is not a very smart guy, is he?  Let's just say

7    that; is that fair?

8    A.    I don't think I was important really enough for him

9    to care to put my name in spelled correctly.

10    Q.    He would just give you free meals, text you to see

11    how you were doing and provide information you gave him to a

12    federal agent.  He just didn't care about you, though?

13    A.    I mean, I don't think it really mattered to him how

14    he spelled my name.

15    Q.    Do you have people in your phone that -- whose names

16    you have misspelled?

17    A.    Maybe.

18    Q.    Right.  Doesn't mean you have feelings one way or the

19    other about them, does it?

20    A.    Okay.

21    Q.    They've made it out to be some sinister thing.  I'm

22    asking, is it because you have feelings for them one way or the

23    other, or maybe just not a good speller?

24    A.    I mean, usually if I know that person, I'll have

25    their name spelled correctly.  But I don't think he is a great

1  speller, probably.  I don't know.

2      Q.   Yeah.  Here in June of 2014, you and Joe are talking

3  about, I guess, a picture he kept of you that you had sent him;

4  is that right?

5      A.   I guess.

6      Q.   Where you had some weight on you?

7      A.   Probably.

8      Q.   And, Thank you for keeping that picture.  It means a

9  lot to me.  It means a lot because it is not the best of

10 pictures, so it shows me you really do care.

11           Go ahead and read the rest for us.

12     A.   Which I've known.  But it really shows in this

13 because it's obvious you care about me, not my outward

14 appearance.

15           And I -- okay.  Never mind.

16     Q.   And he said, You look gorgeous then and you sure look

17 gorgeous now.  Is that right?

18     A.   Yes.

19     Q.   And there we see you sending Joe some pictures,

20 right?

21     A.   Yes.

22     Q.   And is that you and -- let me see if I can get

23 this -- is that you and Cade or Slayter?

24     A.   Slayter.

25     Q.   Slayter.  And that's just -- is that you right there?

1      A.    Yes.

2      Q.    Okay.  And just skip down here.  Joe says to you,

3   same day, You have so much going for you.  You are a good

4   person inside and out.  You just need the right people around

5   you.  Is that right?

6      A.    Yes.

7      Q.    Does it sound like somebody who doesn't really care

8   about you?

9      A.    It sounds like advice.

10      Q.    And so you sent him a few more; is that right?  That

11   is you and Slayter again?

12      A.    Yes.

13      Q.    There you go.  That is Slayter, my son.  Right?

14      A.    Yes.

15      Q.    And hard to tell what that is.  I think that's

16   Slayter at a school function; does that look right?

17      A.    I can't tell.

18      Q.    Yeah, that's hard.  And then who is this?

19      A.    Slayter.

20      Q.    Slayter again.  Awesome picture of you and your son.

21   You have so much to live for.

22             That is true, isn't it?

23      A.    Yes.

24      Q.    I'm sorry, I could only see a little bit of his face.

25   How old is he now?

1          Go ahead and read this June 3rd text, if you

2   would.

3        A.   I know, I do.  I really do.  Last night I thought

4   about --

5               THE COURT:  You are going to have to go way

6   slower than that if you want my court reporter to take this

7   down.

8               THE WITNESS:  Okay.

9        A.   I know, I do.  I really do.  Last night I thought

10  about all the selfish and, in some ways, selfless acts that

11  have kept me from being the person I truly am.  And that person

12  is a mom.  God gave me two incredible children, and I need to

13  be proactive in getting both of them back.  It's not too late,

14  I hope.  I want to be a mom, that's it.  They are where it's

15  at.  True happiness.

16              And at the end of the day, I will then be

17  guilt-free.  Nothing hurts more than going to bed feeling the

18  pain you've caused your family, friends and oneself.  I hope

19  that one day I can go to bed with a clear, guilt-free head to

20  lay on the pillow.  I'm praying about it.  I'm going to lean on

21  God and have faith in him that he will bring me through this.

22              THE COURT:  Thank you for reading that so

23  slowly, I appreciate it.

24              THE WITNESS:  You're welcome.

25       Q.   And Joe says to you, in response -- and then you send

1    a number 4.  Typo maybe?

2                I can make you a straight-up promise -- this is

3    June 3rd at 11:59 p.m. -- I will keep you in my prayers and you

4    will always have a friend you can call on day or night, is what

5    Joe said to you, right?

6        A.   Uh-huh.

7        Q.   Is that a yes?

8        A.   Yes.

9        Q.   Now, what did you say here?

10       A.   He will be five in August.  I was supposed to take

11   him to Disney World June 11th, but had to cancel because of

12   this situation.  I told him that he was going to get to ride on

13   a plane this summer, but maybe he has forgotten.  I never told

14   him where we were going; I just told him it was a surprise.

15   So --

16               (Witness crying.)

17               THE COURT:  If you need to take a moment, it's

18   okay.

19               (Brief pause.)

20       A.   I never told him where we were going; I just told him

21   it was a surprise.  So maybe I can figure out another way to

22   surprise him.  He loves me so much and thinks I hung the moon.

23   Him and I are so close and share a special bond.  It almost

24   hurts me when I think about how much he loves me, because I

25   know I have made a huge life-altering mistake that has extreme

1    consequences.

2         Q.    You'd agree with me that you are confiding in Joe

3    here?

4         A.    Yes.

5         Q.    You are leaning on him too?

6         A.    Yes.

7         Q.    And he told you you could do that anytime, right?

8         A.    I was at -- yes.

9         Q.    And keep reading.  This is June 3rd, 2014, 12:06.

10        A.    Thank you, Joe.  I appreciate you.  You have always

11   been so nice to me and you really care.  Thank you for not

12   giving up on me.  I have made up my mind.  I'm going to block

13   out any distractions that interfere with my journey to getting

14   back on track.  I know what I need to do and I'm going to do

15   it.  I want to make you, Charles and Bill proud of me, and I

16   want to show how much I appreciate the effort put into me and

17   my future.  And I think the only way y'all will feel gratitude

18   is when y'all see me happy and with my kids and living life.  I

19   know I can do it.  I know that I want it, and I'm going to put

20   my all into achieving it.

21        Q.    You have to take care of one thing at a time.  One

22   data [sic] at a time.  One foot in front of the other.  Asking

23   God get you through life.  You can reach your goal, and I would

24   love to be there at the end.  I want to see you happy.  And I

25   truly believe with the support of your friends and God on your

1   side you can reach it.

2                 And you responded?

3        A.   Me too.  I'm trying to stay positive as I can.

4                 THE COURT:  Can we slow down a little bit?  And

5   do we need -- let's go off the record -- or pause for just a

6   second.  Does she need to type all of these out?

7                 MR. SELLERS:  Not necessary, no.

8                 (Off-the-record discussion.)

9                 THE COURT:  Your witness.  Thank you, sir.

10       Q.   Go ahead and read that, ma'am.

11       A.   Me too.  I'm trying to stay as positive as I can.  My

12   oldest's dad is having a heyday with this.  And my picture is

13   going to be in the paper.  How do they expect me to do anything

14   in Hood County if they put my picture in the paper?  It kind of

15   puts me on blast.  The salon I was planning on working at

16   doesn't want me to work there because it will reflect on the

17   salon.  It's my best friend that owns it.  This whole thing is

18   like a domino effect.

19       Q.   Again, you are talking about -- would that be

20   Daralyn?

21       A.   Yes.

22       Q.   Next text says what?

23       A.   What a nightmare.  I'm not allowing this to continue.

24   I'm going to act as if the people of my past never existed.

25   I'm going to set a goal and reach it.

1      Q.   You may have to lean on your family for a while.  I'm

2    going to try to get my pool working after this massive wreck.

3    You can come hang out and lay out by the pool.  It's been

4    nearly two years and he's still going to court.

5                 And you say?

6      A.   Dang.  Yes, I'd love that.  I'm a tanning fiend.  I

7    love the sun.

8      Q.   Let's just do a couple more and then we'll be done.

9    Go ahead.

10     A.   Wow, that's terrible.  Okay.  I'd love to have your

11   job.  Never a dull moment.  Be safe.

12     Q.   And then Joe says -- and this is all the same day,

13   right?  All these we've been reading are June 3rd, '14?

14     A.   I have not been looking at the dates.

15     Q.   Fair enough.

16                I got to get back to work.  We have a triple

17   homicide this morning involving a Hispanic family at 500 West

18   Felix Street, and I have to return several calls.  But stay in

19   touch and call me anytime.  I will have an awesome afternoon,

20   and remember I'm just a phone call away and all the hugs you'll

21   ever want.

22                What do you say?

23     A.   Smiley face.

24     Q.   Good morning.  How are you doing today?  And thank

25   you for the awesome pic of you and your son.

1          A.   Good morning.  I'm good.  Just finishing up moving.

2     I have so many boxes still to go through.

3          Q.   One more page and then I'll skip to something else.

4     Go ahead, 6/4 of '14, at the top.

5          A.   How is your day going?

6          Q.   I'm doing good.  I'm sorry, I was at the bank.  I'm

7     just now getting out and I have to come back and make a second

8     deposit.  You are a little bit later -- latter -- but

9     everything is going good.  How about you?  Hope you had an

10    awesome day.

11               And you said?

12         A.   I have a dinner with my -- I have dinner with my

13    oldest tonight, so I'll take a picture and send it to you.

14    Here is the most recent of my boys.

15         Q.   And Joe says -- and again, misspells your name,

16    That's awesome, Kaysey.  This is exactly what life is about,

17    your family and your friends.  Keep God in your life and

18    everything will work out great.

19               That's what he said, right?

20         A.   Uh-huh.

21         Q.   Sounds like somebody who really cares about you,

22    doesn't it?

23         A.   He seemed nice.  And like he cared.

24         Q.   And you just don't believe that anymore, do you?

25         A.   It's hard to believe.

1      Q.   Okay.  All right.  Joe didn't have to do any of these

2   things, did he?

3      A.   That was the Joe I remembered.

4      Q.   And the Joe you remembered never changed.  What did

5   change, though, is Bill telling you all these bad things about

6   Joe; isn't that true?

7      A.   It played a part.

8      Q.   And Marcus saying bad things about Joe, too?

9      A.   No, sir.

10     Q.   Brian Luley saying bad things about Joe, too, didn't

11  he?

12     A.   No, sir.

13     Q.   Because you know Briley never said a single bad word

14  about Joe to you, did he, Ranger Briley?

15     A.   I don't recall.

16     Q.   Okay.  Let me skip ahead here.

17          MR. SELLERS:  Publishing again Government's

18  Exhibit 38, which has been admitted.

19          THE COURT:  Any objection -- I'm sorry, are you

20  publishing this?

21          MR. SELLERS:  Yes, Your Honor.  May I show the

22  jury?

23          THE COURT:  It's already been admitted, correct?

24          MR. SELLERS:  Yes.

25          THE COURT:  Yes, you may.

1          MR. SELLERS:  It's page 333 in the PDF or

2    page 3996 in this Bates Stamp.

3          MS. RUDOFF:  First page?

4          (Sotto voce discussion.)

5    Q.   Here we are in November of 2015.  I'm going to do the

6    same thing as we were doing before.  I want to go through six

7    pages here before I get off this.

8               I will just close the restaurant, finishing up

9    the cleanup.  I will send you a text when I finally get home

10   after my mother's.

11              And same day, same minute:  Thank you so much

12   for checking on me.  That is so sweet of you.

13              And then Joe sends you a message that says --

14   this looks to be an hour and four minutes later.  Does that

15   look right?  Can you see?

16              Hi, honey, I'm home.  I've always wanted to say

17   that to you.  All kidding aside, and I am delirious, I am just

18   walking through the door.  I will take a shower and I'm going

19   to crawl under the covers and not wake up until tomorrow

20   afternoon, God willing.

21              And then you say?

22   A.   Mimi is in the hospital.  She was coughing up blood.

23   I'm home now so Slayter could get to bed.

24   Q.   Joe says, Good night and sweet dreams.

25              And you say?  Can you read?

1        A.    Okay.  I sure will.  Just pray for her.  I'm not

2   ready for her to leave me.

3        Q.    And then I'll read for you.

4              Okay, thank you.  Okay, I'm about to go to bed.

5   I'll call you in the morning.

6              And then Joe says, Why, what happened?  Do you

7   need me to come over to the hospital?  Not good at all.  Please

8   let me know if you need anything.

9              And that is the Joe you remember, right?

10       A.    Yes.

11       Q.    And you say?

12       A.    Okay.

13       Q.    And Joe:  I know, honey.  I will pray for her.  If

14  you need to talk, I don't care if it's the middle of the night,

15  you're welcome to call me.  Or if you need me to come over,

16  I'll be glad to do so.  Okay.  We [sic] dreams.

17             Good morning, Casi.  How is Mimi doing today?

18             And you say?

19       A.    Good morning.  Not good.  Moving her to -- can you

20  please read it?

21       Q.    Yes, ma'am.

22             Good morning.  Not good.  Moving her to ICU.  On

23  life support.  Her pneumonia is really bad.  This is what my

24  mom told me this morning.  My mom said to skip class, but my

25  brother said to go to class and come after 12:00.  So I'm going

1  to do what my brother said, because last night Mimi told me,

2  quote, don't miss class.  We need to get that finished.

3           So anyway, I'm just going to pray.  Doctor told

4  Cutter it's going to get worse before it gets better.  If it

5  gets better.

6           Okay.  Thank you.  Hugs.

7           Joe says in response, I'm so sorry to hear that

8  she is not doing well.  I will have already prayed for her this

9  morning.  I will keep praying for her.  And Mimi and your

10 brother are right to go to school there.  You can do -- the

11 doctors are taking wonderful care of her, I'm sure.  Casi, I

12 love you.  If there is anything I can do, please let me know.

13          Casi, please let me know when you're getting

14 near the hospital and I will meet you there.  Love you.

15          Which of your other friends showed up at the

16 hospital for you?

17 A.    Daralyn did.

18 Q.    And that is it?

19 A.    And my family.  I didn't have a lot of friends.

20 Q.    But Joe was one of your friends?

21 A.    He was willing.  And yes, I thought.

22 Q.    Three more pages.  Joe asked, Are you back?

23          And you said --

24 A.    Oh, my God.  Seriously?  This is really tough for me.

25 Q.    I'm sorry, ma'am.  But this is very tough for Joe,

1    and so I need to ask you these questions.

2              Go ahead.

3        A.   Can you please read it?  This is one of the worst

4    days of my life.

5        Q.   No, not at this point.

6              THE COURT:  Let's take a break.

7              THE WITNESS:  Yeah, thanks.

8              (Jurors exit courtroom.)

9              (Off-the-record discussion.)

10             (Jurors enter courtroom.)

11             THE COURT:  Everybody please be seated.

12             Your witness, sir.

13             MR. SELLERS:  Thank you, Your Honor.

14       Q.   Ms. Thompson, let me say this.  I'm sorry that we

15   have to go through some of these things, okay?  But you

16   understand you've made some very serious allegations against

17   Joe, right?

18       A.   Yes.

19       Q.   And so you understand that I have to ask you some

20   questions, right?

21       A.   Yes.

22       Q.   I'm going to read to you so you don't have to read

23   anymore.

24             Joe tells you he'll pray for you and your

25   family.  And then it appears that, the following day, early in

1    the morning, you let Joe know that your grandmother has passed.

2                      Twelve minutes later, Joe responds and says,

3    Casi, I am so sorry for your loss.  At least she is not

4    suffering anymore.  She is resting comfortably and with God.

5                      Do you recall telling the jury on direct that

6    Joe had to go with you to the funeral to escort you?

7        A.    Yes.

8        Q.    And do you recall telling the jury that after the

9    funeral, that Bill and Joe came to your house to start telling

10   you there were other charges; do you remember that?

11       A.    Yes.

12       Q.    And you stand by that?

13       A.    Yes.

14       Q.    All right.  Well, let's talk about it.

15                     Very next text between you and Joe is you

16   telling Joe when the viewing is and when the funeral is; is

17   that right?

18       A.    Yes.

19       Q.    And then you say -- he says, Casi, I am keeping you

20   in my prayers.  And then the next day Joe sends, Casi, I'm so

21   sorry I missed your call.  I had the phone on the charger at

22   the other end of the house.  Call me back when you get a

23   chance.  I called, but it went straight to voicemail.  Please

24   call me back when you have a moment.

25                     And then Joe says, Casi, are you okay?  And you

1    say, Good afternoon.  And then you send what looks like to be

2    an attachment or a location of the Stephenville funeral home.

3    Is that where your grandmother's funeral was?

4         A.   Uh-huh.

5         Q.   Is that a yes?

6         A.   Yes.

7         Q.   And then Joe says, Good morning; is that right?

8         A.   Yes.

9         Q.   All right.  Last page here.  And he says, I meant to

10   say good afternoon.  He says, do you have the address to the

11   funeral home by chance?  Thank you so much.

12             And then you say to Joe, You're welcome, Joe.  I

13   love you.  And then Joe tells you he'll be on his way in about

14   15 minutes.  Asks to see if you need anything.  Says he's

15   parked at the Panda Express.

16             And you say, Okay, I'm headed that way.

17             This would be the date of the funeral; is that

18   right?

19        A.   Yes.

20        Q.   Okay, perfect.  No rush.  And then later that night

21   you send, Thank you, Joe, for coming.  Good night.

22        A.   Yes.

23        Q.   And a blank text, and then, Good night and sweet

24   dreams.  God willing I will be there for you tomorrow and don't

25   have to come back to work early.  You said, Good morning.  Joe

1  tells you he's on his way.  You say, Okay.  And then he says,

2  Casi, I'm already in Granbury, on my way to Stephenville.  If

3  you need me for anything, that is why I came early.

4              So it looks like the 9th is the day of the

5  funeral; is that right?  Viewing would have been the day

6  before?

7      A.   Right.

8      Q.   Joe came for the viewing and for the funeral?

9      A.   I'm not sure if he came for the viewing.

10     Q.   11/10:  Casi, I didn't want to bother you this

11  morning.  I know you have a lot on your plate.  Just wanted to

12  let you know I'm keeping you in my prayers, and I'm just a

13  phone call away if you need anything.  I love you, my friend.

14  You are going to be fine.  You are a very strong woman.

15             Casi -- this is seven hours later -- Casi, just

16  wanted to say hello and see how your day went, God willing

17  everything went well.  I know you were busy with your school,

18  so I did not want to bother you and take away from the time you

19  had to study.  Let me know if you need anything.

20             And you said, Thank you, Joe.  I'm okay.  And

21  then y'all talk about you'll see each other tomorrow; is that

22  right?

23     A.   Yes.

24     Q.   At least from the messages, ma'am, you would agree

25  with me that it appears you invited Joe to that funeral?

1      A.    I let him know about the funeral arrangements.

2      Q.    Because you just told the jury he was one of your

3  only friends at the time, right?

4      A.    Acted as a friend.

5      Q.    He was your only friend at the time?

6      A.    He was one of my only friends, yes.

7      Q.    Joe didn't have to go to your grandmother's funeral,

8  did he?

9      A.    Yes, he did.

10      Q.    Joe didn't -- there was no legal obligation that he

11  go to your grandmother's funeral?

12      A.    He absolutely told me in person that that's what it

13  was.

14      Q.    Joe DeLeon told you?

15      A.    He said --

16      Q.    That Bill said.

17      A.    Right.

18      Q.    So you see the genesis of a lot of these things that

19  Joe told you came from Bill, right?

20      A.    Yes.

21      Q.    And so if Joe trusted Bill and you trusted Joe, that

22  would mean Bill lied to both of you, right?

23      A.    It could mean that.

24      Q.    Okay.

25              MR. SELLERS:  Permission -- or at this point I

1    think it's a -- well, it's a different exhibit, Your Honor.  We

2    move to admit DeLeon's Exhibit Number 57.

3                    THE COURT:  When both sides have had a chance to

4    look at it, please let me know if you have any objections.

5                    (Brief pause.)

6                    MS. RUDOFF:  No objection, Your Honor.

7                    THE COURT:  Any objection?

8                    MR. GALLIAN:  No objection.

9                    THE COURT:  Admitted.

10   Q.    I don't know why it is only showing part of it.  But

11   this would be a -- an excerpt from your text messages between

12   you and Joe DeLeon in August of 2014; is that right?

13   A.    Yes.

14   Q.    And it starts with, Hey, Joe.  I leave September 8th

15   for Utah.  Going back to rehab to get my life back on track.

16   I'm looking forward to going because I need the counseling and

17   I need the distance.  Plus I think it will help my situation,

18   Cas.  I want to see you before I go, though, so let me know

19   when you have free time.  Is that right?

20   A.    Right.

21   Q.    Now I'm going to show you some other texts from

22   Government's Exhibit 26, which I show has already been admitted

23   also.

24                    MR. SELLERS:  Is that okay, Your Honor?

25                    THE COURT:  Yes.

1            MR. SELLERS:  Okay.

2       Q.   In November of '14, Joe is telling you, I got to

3  sleep about four hours last night.  I talked to Bill Stone --

4  SA Bill Stone for a long time.  He asked about you, of course,

5  and I told him you were doing great.

6            And then there's actually a message between you

7  and Joe, where Joe asks if he can send a picture of you that

8  you have sent to Joe to Bill.  Is that right, do you remember

9  that one?

10      A.   Not sure.

11      Q.   All right.  Would it surprise you if this was your

12  response?

13            Sure, go right ahead.

14      A.   It wouldn't surprise me.

15      Q.   Okay.  And then Joe is sending you messages while you

16  are in rehab.  Because you were in rehab until when?

17      A.   January or February of 2015.

18      Q.   And so in December of '14 -- you were there for 90

19  days or longer?

20      A.   It was about four or five months or five or

21  six months.

22      Q.   Right.  And Joe kept up with you the whole time you

23  were out there, didn't he?

24      A.   He did.

25      Q.   And this was before the will had been changed, right?

1          A.    Right.

2          Q.    Right.  I mean, you were not going to take anything

3    under your grandmother's will when he's messaging you while you

4    are in rehab; is that right?

5          A.    Right.

6          Q.    As far as he knew, you were just going to come back

7    and just be the same old Casi, hopefully, but clean and off

8    drugs, without any money, right?

9          A.    Right.

10         Q.    As far as Joe knew at this point, there was nothing

11   to gain from you, was there?

12         A.    No.

13         Q.    And he says he's so glad that you took yourself off

14   Facebook.  You need to keep your eyes on the price [sic], which

15   is to be an awesome mother and an awesome daughter and an

16   awesome friend to those who really care for you.  Keep doing

17   the right thing and the right things happen.  Right?

18         A.    Right.

19         Q.    And then you say to Joe, That's the plan, Joe.  And

20   that's a smiley face, I suppose.  Again, I'm blessed to have

21   you in my life.  Right?

22         A.    Right.

23         Q.    Nothing to gain from that?

24         A.    Right.

25         Q.    Awesome.  Another step in the right direction.

1  That's great.  I'm so proud of you.  Just keep going.

2            This is on New Year's Eve, isn't it?

3       A.   Yes.

4       Q.   I mean, y'all might have a little get-together or

5  mixer or something at where you were up in Utah, right?

6       A.   Yes.

7       Q.   Joe's at home, out in the free world, and still

8  keeping up with you, right?

9       A.   Yes.  I was in California.

10      Q.   Same day, you say that, You -- they had mentioned

11 finishing my degree in marketing and doing some marketing for

12 them since I have been to so many other styles of treatment,

13 and how dealing with my eating disorder, my core issue, is what

14 sets Safe Harbor apart from the others.

15            Is that the name of the rehab facility?

16      A.   Yes.

17      Q.   They even mentioned that after providing my sobriety

18 after a -- after proving my sobriety, after a year or so, I

19 could possibly go on the Dr. Phil show to help some others get

20 the help they need.

21            And four emojies after that, right?

22      A.   Yes.

23      Q.   And then same day you tell him that you are going to

24 be moving into sober living on Monday; is that right?

25      A.   Yes.

1      Q.   Again, Thanks, Joe, for your support and words of

2   encouragement.  It means a lot.

3                 And you see Joe over here?

4      A.   (Witness nods.)

5      Q.    Crying like a baby, isn't he?

6      A.   (Witness nods.)

7      Q.   Sound like someone who's just a fake friend?

8      A.   I don't know.

9      Q.   All right.  Let's talk now about the things that Joe

10   did for --

11                 THE COURT:  Is there an objection?

12                 MS. RUDOFF:  Just a clarification, Your Honor,

13   for the record.  The text messages that were just shown were

14   marked as Government's Exhibit 26.  And just for clarification,

15   those text messages come from Government's Exhibit 38, which

16   was already admitted.

17                 THE COURT:  Okay.

18                 MS. RUDOFF:  And that Government's 38 is derived

19   from Government's Exhibit 26.

20                 THE COURT:  Okay.  Thank you for clarifying that

21   for the record.  I appreciate you.

22                 Your witness.

23                 MR. SELLERS:  Thank you, Your Honor.

24                 THE COURT:  You're welcome.

25      Q.   Let's talk now about the things that Joe did for

```
 1   Casi.  More from Government's Exhibit 38.  Joe sends a message
 2   to you, says, You touched my heart.  You are awesome.  You just
 3   don't give yourself enough credit.  In this life, God
 4   assurances [sic] that our needs will be met, and here is the
 5   Bible verse.
 6                   And then -- this is something that you and Joe
 7   would do quite a bit.  You'd send each other -- looks like you
 8   have like a devotion -- daily devotional book?
 9        A.   Yes.
10        Q.   And you'd send him your daily devotional?
11        A.   Yes.
12        Q.   He would send you back Bible verses?
13        A.   Yes.
14        Q.   Right.  Again, from 38, you tell Joe -- this is in
15   July of 2015; is that right?
16        A.   Yes.
17        Q.   Grandma still alive.  Right?
18        A.   Yes.
19        Q.   She hadn't fallen at that point?
20        A.   Huh-uh.
21        Q.   Hadn't broken her shoulder at that point?
22        A.   Right.
23        Q.   And you told Joe what?
24        A.   You are my best friend.  Because he cared.
25        Q.   And then he says back to you, Have a good night.
```

1    Sweet dreams.  I hope you have a fantastic week.

2             You mentioned earlier that you -- at the

3    funeral, for example, that you would refer to, you know -- you

4    would awkwardly introduce Joe to people and you'd introduce him

5    as your mentor, because that is what they told you to call him,

6    right?

7    A.   Yes.

8    Q.   That was during your probation?

9    A.   That wasn't during the funeral.  It wasn't the

10   funeral.

11   Q.   It wasn't the funeral?

12   A.   Huh-uh.

13   Q.   But during the probation, that's when you were told

14   to -- I guess to -- by Bill, to call them your mentors, right?

15   A.   They referred to themselves sometimes as that.

16   Q.   Right.  And you didn't refer to them as that?

17   A.   I don't know that I was ever really in a situation

18   where I, in person, had to tell anyone they were my mentor.

19   Q.   Showing you Government's Exhibit 38.  And this is

20   from the .TXT file dash 71.  It is six pages.

21           And I'm going to read this to you.  Here in this

22   message we have your number and Bill Stone's number, right?

23   A.   Uh-huh.

24   Q.   Is that a yes?

25   A.   Yes.

1    Q.    Sorry, she can't take down the "uh-huhs."  They look

2    the same when you read it.

3    A.    Right.

4    Q.    And this is from Joe's phone, so we know it was a

5    group chat.  And you say to them, on June 18th of 2015, again,

6    at -- at least six months before the probation starts, right?

7    A.    Say that again?

8    Q.    At least six months before your probation starts,

9    right?

10   A.    Yes.

11   Q.    You refer to them and you say this:  I don't tell you

12   this enough, but I am truly grateful to have you in my life and

13   I appreciate everything you have done for me to allow me to

14   have a second chance at life and being a mom to my kids.  I am

15   so blessed to have you and Joe as my mentors and to lead me in

16   the right direction and keep me on track to my goals.

17              That's you writing that, isn't it?

18   A.    Right, directly -- directing it to what appears to be

19   Bill in this text.

20   Q.    But talking also about Joe?

21   A.    Yes.

22   Q.    All right.  Here we are in December of 2015.  You say

23   to Joe, I love you, Joe.  I hate that you work so hard and give

24   so much of your time to other people and neglect yourself.  I

25   really want you to slow down and let me help you as you helped

1   me.  I love and care for you and want you happy and I want you

2   to live for you.

3                  You said that to Joe, right?

4       A.   Right.

5       Q.   Here we are in --

6                  MR. SELLERS:  Your Honor, at this point we'd

7   offer DeLeon 55, which should be an exact copy of Government's

8   Exhibit 38.

9                  THE COURT:  All right.  Any objections from the

10  government?

11                 MS. RUDOFF:  You know, no objection to DeLeon

12  Exhibit 55.  I would just clarify for the record that it is not

13  the exact duplicate of Government 38.  There are some portions

14  of Government 38 which is not included in DeLeon 55.

15                 MR. SELLERS:  That is true.  Their extraction

16  was of better quality.

17                 THE COURT:  Okay.  Sounds good.  Thank you for

18  clarifying.

19                 Any objection from --

20                 MR. GALLIAN:  No objection.

21                 THE COURT:  All right.  It's in.

22      Q.   Here we are in February of 2016.  And around this

23  time is when things were really kicking into gear with your

24  fake probation, right?

25      A.   Yes.

1          Q.    Or they were already there --

2          A.    Right.

3          Q.    -- right?  And you're telling Joe, You too.  I'm

4    excited about our sleep-over tonight.  You are still coming,

5    right?

6          A.    Right.

7          Q.    And then you send him, Are you sure you don't want to

8    come over?  Is that right?

9          A.    Is that on the same day?

10          Q.    Yes, ma'am.

11          A.    Okay.

12          Q.    Or, I'm sorry, five days later; 3/1 of '16.

13          A.    Okay.  Can we start over?

14          Q.    Sure.  Joe was spending the night a lot back at that

15    time, wasn't he?

16          A.    He -- there was a time or two that he had to for CPS

17    purposes.

18          Q.    Had to according to?

19          A.    Bill.

20          Q.    So everything you knew about the CPS case came from

21    Bill; is that right?

22          A.    Yes.

23          Q.    And I've written here, Threatened CPS case.  That was

24    a hell of a threat, right?

25          A.    Yes.

1    Q.   And that was particularly alarming to you because, as

2    we've heard, you have had dealings with CPS before, right?

3    A.   Yes.

4    Q.   And they can be kind of difficult to deal with,

5    right?

6    A.   And it would have broke my real probation.

7    Q.   Right.  Could have caused you real problems in Hood

8    County?

9    A.   Yes.

10   Q.   All right.  Joe never came up with -- on his own

11   about CPS, did he?

12   A.   No.  I was on a three-way call with the two of

13   them -- or with -- it kind of all runs together.  But I was on

14   the phone with Joe at 2:00 a.m., with him telling me to clean

15   my house.  Now, who told him to tell me that, I -- I assume it

16   to be Bill.

17   Q.   Right.

18   A.   From what he said.

19   Q.   Right.  And then on March 1st you say --

20            MR. SELLERS:  If I could have just one moment,

21   Your Honor?

22            THE COURT:  Sure, of course.

23            (Sotto voce discussion.)

24   Q.   And then I'm not going to show it, but at this time

25   you sent Joe a picture of a bunch of lingerie you purchased at

1    Victoria's Secret; is that correct?

2         A.   Yes.

3         Q.   And that would have been shortly after you got the

4    life insurance payout, right; like March -- yeah, March of

5    2016?

6         A.   I'm not sure.

7         Q.   Do you know when that money hit?

8         A.   I don't know the exact date.

9         Q.   If you put $500,000 into Chase Bank on March the 2nd,

10   would that help you gauge?

11        A.   Okay.  Well, then yes.

12        Q.   So shortly after getting a million dollars into the

13   bank, you went to Victoria's Secret and spent upwards of a

14   thousand dollars; is that fair?

15        A.   I think it was about 800.

16        Q.   About 800?  Fair enough.  Large amount, right?

17        A.   Yes.

18        Q.   All right.  Let's go to 3/3 of '16, again in

19   DeLeon's 55.  This is Page 478.  You -- you say to Joe, I love

20   my kids.  Hopefully God allows me to spend the rest of my life

21   being a mom and raise my kids.  That is all I have ever wanted;

22   just didn't know how to do it.  Now that God got me this far, I

23   pray that I get to keep it.

24             That is you to Joe, March 3rd of '16, right?

25        A.   Yes.

1        Q.    Few days later, March 6th of '16, you send to Joe,
2    Thinking of you.  Hope your evening is going well.  Right?
3        A.    Yes.
4        Q.    Same night:  Good night, Joe.  Hope you didn't work
5    too hard.  I love you.  Stay safe.  Right?
6        A.    Yes.
7        Q.    On the 8th you send a text saying you will pay for
8    y'all's tickets.  Do you recall what the tickets were for?
9        A.    I'm not sure, but I would assume it was a movie.
10       Q.    A movie.  Possibly a rodeo or a stock show?
11       A.    Could have been.
12       Q.    And, again, when you pay for these tickets, I mean --
13       A.    I may have been referring to I'll pay for our
14   tickets, talking about me and my kids.
15       Q.    All right.  Or you could have been talking about
16   Joe's too, right?
17       A.    I met him there.
18       Q.    All right.  Here in March 12th of '16:  Good night,
19   Joe.  You have been distant today, but I understand.  Love ya.
20   Right?
21       A.    Yes, this -- yes.
22       Q.    And then your follow-up text is, Yeah, I know it's
23   because you want me to spend time with my kiddos.  Thank you
24   again for everything.  Right?
25       A.    Yes.

1    Q.   And then the next day:  You're welcome.  I appreciate

2  you so much.  Is that right?

3    A.   I was expressing gratitude probably almost every day.

4    Q.   I think the texts support that.

5              Thank you, Joe, for your friendship.  Is that

6  right?

7    A.   Yes.

8    Q.   And then here you say -- this is March the 16th:  If

9  I paid you, do you think you could come check on my kids while

10 I'm at school?  I have to leave them for three hours and it

11 scares me.  Unless you think they'll be fine.  My fear is that

12 my mom might come by while they are here alone.  It may just be

13 a fear, but you never know.

14             Is that right?

15   A.   Yes, I was willing to pay for his gas.  And I believe

16 I did when he came down to stay with Slayter while I went to

17 school.

18   Q.   And there was a lot of times that he would just come

19 over to your house and relieve you so you could go run errands;

20 is that fair?

21   A.   No.

22   Q.   So you -- Joe wouldn't stay with your children, like,

23 in the evenings while you would go and run a few errands at

24 night?

25   A.   Not run errands; go to class.

1      Q.    Okay.

2      A.    But he was literally at my house almost every single

3  day.

4      Q.    Uh-huh.  And to your knowledge, he wasn't getting

5  paid for any of that, right?

6      A.    Correct.

7      Q.    He just thought he was helping Bill Stone, the

8  federal agent, didn't he?

9      A.    Yes.

10      Q.    And he loved to do that, didn't he?

11      A.    Yes.

12      Q.    And he also loved to help you, didn't he?

13      A.    He -- eventually he quit.

14      Q.    And we're going to get there.  But he -- he did like

15  to help you, didn't he?

16      A.    He -- I felt that way.

17      Q.    Week later:  Sorry for being so uptight today.  I'm

18  so grateful for you and the time you have spent keeping me and

19  my kids together.  I'm going to get this done one way or

20  another.  I may -- I will not fail.  I may not do it

21  gracefully, but by God, literally, I will get this done.

22            Is what you sent to him, right?

23      A.    Okay, yes.

24      Q.    March 24th:  I feel like I always put you behind.

25  But just so you know, I really appreciate you and your time

1    spent with me.  Is that right?

2         A.   Yes.

3         Q.   How about this one, March 25th, '16:  Thank you so

4    much for caring so much about me and my son Tyler.

5              Who is your son Tyler?

6         A.   That is the nickname that Joe and -- well, Bill came

7    up with for Slayter.

8         Q.   And while we're on this topic, let me just ask you,

9    there were made-up names for Cade, right?

10        A.   Yes.

11        Q.   Cascade?

12        A.   Yes.

13        Q.   Tyler was for Slayter?

14        A.   Yes.

15        Q.   Who was Dorothy?

16        A.   My mom.

17        Q.   What other names were made up for friends or family

18   members?

19        A.   Joe was Gator Arms.

20        Q.   Gator Arms?

21        A.   Yes.

22        Q.   Like the GEICO commercial?

23        A.   Yes.

24        Q.   Okay.

25        A.   And my brother -- I would get into it, but it's kind

1    of inappropriate what he named my family members.

2         Q.   Fair enough.  The made-up names were not from Joe;

3    they were from Bill?

4         A.   Yes.

5         Q.   And it would be fair to say that you made up -- or he

6    made up these names for anyone you regularly had contact with,

7    right?

8         A.   Yes.

9         Q.   March 25th:  You have truly been a blessing to me and

10   to him, and we love you both very, very much -- we both love

11   you very, very much.  Is that right?

12        A.   Yes.

13        Q.   During the time that -- before Joe got sick and was

14   unable to continue helping you, he did a number of other things

15   for you, right?  For example, he picked your kids up from

16   school, correct?

17        A.   During the times that I was possibly getting

18   arrested, he would then go pick up Slayter from school for me,

19   yes.

20        Q.   All right.  This is a -- a photograph from

21   Government's Exhibit 38.  Which of your houses is this?

22        A.   That is the house I was moving out of.

23        Q.   And he -- some of the things he helped you do is he

24   helped you move twice, did he not?

25        A.   Nobody helped me move, sir.

1    Q.    Joe didn't help you clean up that kitchen?

2    A.    I did it all.

3    Q.    Joe was never there to help take out trash and do

4  anything for you?

5    A.    He came over one time to help me with the water

6  heater.

7    Q.    Okay.  Let's go through this list.  Took care of your

8  dogs, didn't he?

9    A.    Yes.

10   Q.    A lot?

11   A.    Twice.

12   Q.    For example, he took care of your dogs when you went

13 traveling with Bill, didn't he?

14   A.    And when I went to San Antonio with my kids, yes.

15   Q.    Right.  And when you took -- when Joe took care of

16 your dogs while you were traveling with Bill, y'all didn't tell

17 him you were going on a trip together, did you?

18   A.    Which one are you referring to?

19   Q.    Well, Key West.  Joe had no idea you were going to

20 Key West, did he?

21   A.    I don't believe Joe watched my dogs on that trip.

22   Q.    All right.  How about Hawaii?

23   A.    I couldn't say for sure.  But, yeah, Joe didn't know.

24   Q.    Joe had no idea, right?

25   A.    It was a secret.

1        Q.    It was all a secret from Joe, wasn't it; the trip,

2    yes?

3        A.    The -- the Florida trip?

4        Q.    Yes.

5        A.    Yes.

6        Q.    The intimacy between you and Bill, right?

7        A.    Right.

8        Q.    And Bill told you you weren't allowed to tell Joe

9    about, quote, the financial part of it?

10        A.    Correct.

11              MR. SELLERS:  Your Honor, at this time, I'd like

12    to offer DeLeon Exhibit Number 88 and DeLeon Exhibit Number 98

13    for record purposes.  And then on 88, I'm going to offer a clip

14    that goes from 57:50 to 58:11.

15              THE COURT:  All right.  Government, take a look

16    at that and let me know if you have any objection, as well as

17    counsel for Mr. Stone.

18              MS. RUDOFF:  No objection, Your Honor.

19              MR. GALLIAN:  No objection.

20              THE COURT:  It's admitted.

21              MR. SELLERS:  For the record, 57:50 to 58:11 of

22    the elapsed time of DeLeon Exhibit 88.

23              (Audio playing.)

24        Q.    And that's the part we've already covered, but Bill

25    would make Joe stay the night for CPS, right?

```
 1        A.   Yes.

 2              MR. SELLERS:  I'd now like to offer, Your Honor,

 3   DeLeon Exhibit Number 25.

 4              THE COURT:  Counselor for Mr. Stone, have you

 5   any objection?

 6              MR. GALLIAN:  No objection, Your Honor.

 7              THE COURT:  All right.

 8              MR. GALLIAN:  Thank you.

 9              MS. RUDOFF:  No objection, Your Honor.

10              THE COURT:  All right, it's admitted.

11        Q.   One of the things Joe would do is help you with your

12   schoolwork, right?

13        A.   Yes.

14        Q.   You are smiling because you know what I'm about to

15   play, right?

16        A.   My -- my presentation?

17        Q.   I don't know what it is.  What class would you have

18   made a presentation for?

19        A.   Marketing.

20        Q.   Marketing?

21        A.   A marketing class.

22        Q.   Helped you with your marketing homework?

23        A.   Yes, I -- yes, I was selling medical supplies to a

24   doctor, in the video that I'm thinking of.

25        Q.   And who played the doctor?
```

1     A.    Joe.

2             (Video playing.)

3     Q.    Ms. Rudoff was just reminding me, we couldn't figure

4 out a date for this.  When did you take marketing?  What

5 semester?

6     A.    I -- my major was marketing, so I took it --

7     Q.    All throughout?

8     A.    Yeah.  So I don't remember.  I would assume this was

9 at the end.  So 2017, probably spring semester.

10    Q.    Okay.  And I'm going to try to unplug this and plug

11 it back in and see if we can't get the whole screen back.

12            (Technical interruption.)

13            (Video playing.)

14            MR. SELLERS:  I'm going to skip ahead just a

15 little bit.

16            (Video playing.)

17    Q.    Casi, is this something you had to turn in for a

18 grade?

19    A.    Yes, unfortunately.

20    Q.    Fair enough.  You just look like a Myrna in the

21 making right there, don't you?

22    A.    Absolutely.

23    Q.    Absolutely.  This is during the time you mentioned to

24 the jury that you were in total isolation, right?

25    A.    Yes -- well, I mean, considering -- I mean,

1    considering I -- what are you -- sorry, go ahead.

2        Q.   I guess my question is, you turned this in with Joe

3    in the video to a professor, I presume?

4        A.   Right.

5        Q.   And so at least in Joe's mind and your mind, it

6    wasn't supposed to be any secret that Joe was helping you out

7    and being your mentor, I guess, right?

8        A.   Right.

9        Q.   And then you'd agree with me that there are -- and

10   I'll spare the jury -- there is also another marketing video

11   for a homemade shake, it seems?

12       A.   Or something.

13       Q.   Like a smoothie?

14       A.   A juice cleanse.

15       Q.   A juice cleanse.  Who was holding the camera?

16       A.   I was, during that.

17       Q.   Was Joe there with you?

18       A.   I don't think so for that one.

19       Q.   Not for that one.  Okay, I didn't know.  But

20   definitely here for this one for what you turned in, right?

21       A.   Yes.

22       Q.   Did you get an A?

23       A.   Yes.

24            MR. SELLERS:  Nikki, I'm about publish 88, 11:15

25   through 11:25.

```
 1        Q.    You'd agree with me that you told Bill and Joe

 2   separately about what you were going to get from your

 3   grandmother, right?

 4        A.    Okay, yes.

 5        Q.    Yes?

 6        A.    Yes.

 7        Q.    And the truth is, you told Bill before you told Joe;

 8   is that right?

 9        A.    I don't think so.

10        Q.    During your dinner in '16, you didn't tell Bill that?

11        A.    I told Joe specifically because I might need his help

12   as executor, you know, as executor.

13        Q.    Okay --

14        A.    So I don't remember who I told first.

15        Q.    And Joe's advice to you was to put everything in an

16   annuity; is that correct?

17        A.    I don't believe so.  I don't think we really went

18   that far.

19        Q.    Okay.  Fair enough.

20              MR. SELLERS:  If I could have just one moment,

21   Your Honor?

22              THE COURT:  Sure.

23              MR. SELLERS:  Your Honor, at this time I'd like

24   to offer DeLeon's Exhibit Number 136, which is derived from

25   Government's Exhibit 122.
```

1          MS. RUDOFF:  No objections, Your Honor.

2          THE COURT:  Any objections from --

3          MR. GALLIAN:  I'm sorry, Judge, no objection.

4          THE COURT:  It's admitted.

5     Q.    Who do we see here in this picture?

6     A.    That is Joe.  And I'm not sure who those kids are.

7  And Slayter.

8     Q.    Slayter's the little one?

9     A.    Yes.

10    Q.    All right.  Missing the tooth?

11    A.    Yes.

12    Q.    All right.  Do you recall -- I happened upon this

13 last night.  Do you recall when that happened, texting with Joe

14 to let him know about that, Slayter losing a tooth?

15    A.    I'm sure.

16    Q.    And Joe asking, Do you need me to bring you some

17 money to pay the tooth fairy?  Do you remember that?

18    A.    I don't remember that part.

19    Q.    Sounds like Joe, doesn't it?

20    A.    Maybe.

21    Q.    Yeah.  All right.  Let's talk now about these 3x5

22 cards.  I'm going to show you what's been admitted as

23 Government's Exhibit 29, and then I would move to admit

24 DeLeon's Exhibit 132, just for the flow of it.

25          MS. RUDOFF:  No objections, Your Honor.

1              MR. GALLIAN:  No objection.

2              THE COURT:  Admitted.

3      Q.   All right.  At some point Bill told you and Joe that

4  you needed to keep track of all the time that Joe spent over

5  there; is that right?

6      A.   Yes.

7      Q.   And the way you were supposed to do it was on your

8  3x5 card, or another 3x5 card or a journal, whatever, right?

9      A.   Yes.

10     Q.   And so because Bill told you to do that, you and Joe

11 did it, did you not?

12     A.   Yes.

13     Q.   All right.  Let's have a look at some of these.

14              You see here, this one is 4/12 of '16.  And this

15 is Government's Exhibit 29, Page 37.  8:30, Joe left.  Do you

16 see that on the far right?

17     A.   Yes.

18     Q.   And then you see the 6:30 to 8:00, maybe -- I can't

19 tell -- role play, take two, Joe role play, take two?

20     A.   That is, I'm assuming, what we just saw.

21     Q.   Okay.  So did we see take one or did we see take two?

22     A.   I'm not sure.

23     Q.   That was a 17-minute video.  If you did another take,

24 it's fair to assume that that took another 15, 17 minutes, too,

25 as well, right?

        A.   Yes.

        Q.   All right.  Here we are on 6/12.  And it looks like
between the phone and in person, Joe spent 60.5 hours with you?

        A.   Yes.

        Q.   And that was normal, wasn't it?

        A.   Very.

        Q.   Again, 132, this would be Page 2 of 132.  How many
hours did Joe spend with you on this day?

        A.   Three.

        Q.   The 23rd?

        A.   Three hours.

        Q.   Three hours.  Friday, June 24th, how many hours in
person?

        A.   Six.

        Q.   How many hours on the phone?

        A.   Two.

        Q.   So you would actually spend two hours on the phone
with Joe?

        A.   It was added up.

        Q.   Just 30 minutes here, ten minutes there?

        A.   Yes.

        Q.   Okay.  June 13th, how many hours?

        A.   Six hours.

        Q.   On the phone?

        A.   Yes.

1     Q.   Let me ask you this.  June 13th, call attorney about

2  will and mediation.  What were -- what were you mediating in

3  June of -- I'm guessing this would have been '16.  So what was

4  going on then, do you remember?

5     A.   I'm not sure.  I don't know if it was my will or --

6  or -- my grandmother's will.

7     Q.   By this time, Grandmother's will was already done

8  being probated?

9     A.   Right.  But Bill was trying to get me to change some

10  things from his trust attorney.  So I'm not sure if it had

11  anything to do with that or not.  So I don't know what I'm

12  referring to in this index card right here.

13     Q.   So the only person who tried to get you to change

14  your will or your grandmother's trusts, I guess, was Bill; is

15  that right?

16     A.   Yes.

17     Q.   Again, not Joe?

18     A.   I would get -- no.

19     Q.   June 14th, how many hours was Joe there in person?

20     A.   16.

21     Q.   How many did you spend with him on the phone?

22     A.   Three.

23     Q.   There in the middle you have lunch/call with Stephen.

24  Who is Stephen?

25     A.   Oh, I believe that is my accountant.

1      Q.   All right.  Here, let's see, Thursday, June the 9th,

2  how many hours was Joe there?

3      A.   Two and a half hours.

4      Q.   And you'd agree that sometimes Joe would call you --

5  I mean, he runs a restaurant.  It's hard to leave a restaurant

6  during dinner time, right?

7      A.   Right.

8      Q.   But sometimes he'd be at your place during dinner

9  time, right?

10      A.   Yes.

11      Q.   And occasionally he would call and ask, Hey, have the

12  kids eaten, or do you want me to bring some food, right?

13      A.   Right.

14      Q.   And he would bring food to feed you and your kids,

15  right?

16      A.   It happened twice, yes.

17      Q.   All right.  Let's see here.  Friday, June the 10th,

18  Joe was there three and a half hours and on the phone two

19  hours; is that right?

20      A.   Yes.  At the top you'll --

21      Q.   I'm sorry?

22      A.   -- that's the doctor that -- when I had to take

23  Slayter to get a slip from the dentist to prove that his teeth

24  fell out organically.

25      Q.   Right.  And, you know, that sounds kind of crazy,

 1  doesn't it?

 2       A.   Yes.

 3       Q.   But the truth is, you and your mom had been not on

 4  the best terms; would that be a fair statement?

 5       A.   I was wanting to rekindle, but we had some history.

 6       Q.   And it is a legitimate fear you had, because it had

 7  happened before that she tried to take your kids, right?

 8       A.   Right.  And it was enforced through Bill and his

 9  analysts.

10       Q.   Right.  And so, you know, it's not exactly totally

11  out-there stupid to document what's going on, in case somebody

12  does make an allegation against you, right?

13       A.   Correct.

14       Q.   I mean, you see kind of why they did that, right?

15       A.   Right.

16       Q.   All right.  May, we've got a full month of hours

17  here.  Total hours in May:  232 hours; is that right?

18       A.   Where?

19       Q.   Do you see there at the bottom, Total:  232?

20       A.   Yes.

21       Q.   And the average for that week would have been

22  52 hours?

23       A.   Yes.

24       Q.   And to put this in context, not only was Joe trying

25  to run his business, help you with this probation that Bill had

1    you on, he was also trying to take care of his sick mother,

2    wasn't he?

3         A.    Yes.

4         Q.    So y'all kind of had that sort of kindred thing in

5    common?

6         A.    Yes.

7         Q.    And, in fact, his mom died, you know, shortly after

8    he stopped being able to help you, right?

9         A.    Right.

10         Q.    June 21st, Joe's there in person nine hours and on

11    the phone for two hours, right?

12         A.    Right.

13         Q.    And then I'm not sure why this one is in here.

14              Here in DeLeon's 132, there is a text that has

15    a -- a note card in it.  But there's also a text between you

16    and Joe.  The text from you says, Just saw a text from realtor

17    on Mimi's phone.  The buyers are wanting fridge, washer and

18    dryer in lieu of repairs.  And Joe responds, No, no, but hell

19    no, you don't have to sell the house.  Is that right?

20         A.    Correct.  I listed the house for -- I got asking

21    price for -- when I listed the house.  And Joe and Bill were

22    trying to convince me not to take asking price; that I should

23    be in some sort of bidding war with the buyers.  And the

24    realtor was a family friend, and so I couldn't back out.  I

25    got --

1        Q.    Let me back up.

2        A.    Right, okay.

3        Q.    You lump them together a bunch.  Separate it out.

4   Was it Bill that said this and told Joe to tell you that or was

5   this Joe's idea?

6        A.    It was both Bill and Joe trying to get me to back out

7   of the contract for the house.

8        Q.    Okay.

9        A.    When I took the offer.

10        Q.    But you didn't, right?

11        A.    Right.  And --

12        Q.    Followed through with it?

13        A.    -- it was terrifying.

14        Q.    Followed through with the sale?

15        A.    Yes.

16        Q.    Right?  Got the money?

17        A.    Yes.

18        Q.    Right?

19        A.    Yes.

20        Q.    And your realtor was kind of upset with you, right?

21   Like, Hey, it doesn't get any better than this.  No

22   concessions; full price offer, right?

23        A.    Right.

24        Q.    Good deal?

25        A.    Yes.

1       Q.    And then I think this is our last one, Sunday,

2  June 19th, you put up there:  Situation.  What was that?

3       A.    That is what we all referred to as my period.

4       Q.    And there's texts between you and Joe where you say

5  stuff like, Aunt Flo's coming; and Joe's like, Ha, ha, ha.

6  What is that?  Doesn't know, right?

7       A.    Right.

8       Q.    Bill told you to put this on there, didn't he?  Joe

9  didn't care about your situation.  Bill told you to do that,

10 didn't he?

11      A.    I'm really not sure that anyone told me to put that

12 on there.

13      Q.    You just did it yourself?

14      A.    Maybe.

15      Q.    And shared with two old guys?

16      A.    I mean, at this point, I had no secrets.  Everything

17 was -- I had no privacy.

18      Q.    All right.  But, again, Joe wasn't interested in your

19 situation like Bill was, was he?

20      A.    Yeah, he was.

21      Q.    Why?

22      A.    I don't know.  He would just make -- it's a very

23 rough time for me, and --

24      Q.    What do you mean by that?

25      A.    I'm extremely moody.  I eat a lot.  And Joe acted as

 1   though he was like my best friend.  He was the only person I

 2   spoke to, so he was like a girlfriend in a way.

 3        Q.   Fair enough.  I guess we've got one more.  June 20th,

 4   Joe there five hours; is that right?

 5        A.   Yes.

 6        Q.   All right.  I'm going to play a portion of -- it's

 7   DeLeon's Exhibit 88.  The government has already admitted it as

 8   a different exhibit.  But it's been admitted so I'm going to

 9   play from 40 minutes to 42 minutes, as soon as Nikki gives me a

10   thumbs up.

11             THE COURT:  Then it will be time to take a

12   break, unless you're --

13             MR. SELLERS:  Perfect.  That's a great time.

14             (Audio playing.)

15             THE COURT:  Let's take our break.

16             (Jurors exit courtroom.)

17             (Brief recess.)

18             (Jurors enter courtroom.)

19             THE COURT:  Everyone please be seated.

20             Your witness.

21        Q.   Before we broke, we listened to an interview of you

22   describing basically you and Joe learning of the probation for

23   the first time, right?

24        A.   Yes.

25        Q.   Joe was already at your house when Bill showed up?

1      A.    Yes.

2      Q.    Bill arrived and came inside, right?

3      A.    On the patio.

4      Q.    And then he went out to the back porch?

5      A.    I think he came in through the back gate.

6      Q.    Okay.  And you said he kicked his feet up, I believe?

7      A.    Yes.

8      Q.    Let me just get to the point.  Bill was cool, calm

9    and collected, wasn't he, telling you about this?

10     A.    Yeah -- yes, it --

11     Q.    By contrast, Joe was over puking by the fence?

12     A.    He walked away and appeared to be throwing up.

13     Q.    Are you saying that he did not throw up now?

14     A.    I'm just saying he did -- I mean, he appear -- that

15   is what I saw -- that's what I saw.

16     Q.    You saw Joe throw up?

17     A.    I saw him appear to be throwing up.

18     Q.    I'm not trying to split hairs with you, but appeared

19   to be and did is different; you understand that?

20     A.    What I'm saying is I never saw any throw-up actually

21   hit the ground.

22     Q.    Okay.  This is the first you've ever said that to

23   anyone, right?  And you've talked about this quite a few times,

24   haven't you?

25     A.    Well, I'm just stating that I never saw any throw-up

1    actually hit the ground.

2         Q.   Let me ask you this way.  Joe was not cool, was he?

3         A.   No, he seemed very upset.

4         Q.   He was not calm?

5         A.   No.

6         Q.   He was not collected?

7         A.   No.

8         Q.   From the same exhibit, I'm now going to play

9    30 minutes and 18 seconds to 31:50, whenever Nikki says it is

10   okay.

11                  (Audio playing.)

12        Q.   He had a guy set up in Houston.  Who's the he?

13        A.   Bill said there was a doctor in Houston, ready to

14   adopt Slayter.

15        Q.   Good man?

16        A.   A good man.  He went as far as saying they would ride

17   four-wheelers together.

18        Q.   Bill, not Joe?

19        A.   Correct.

20        Q.   I'm going to go through a series of texts.  It is all

21   from January 8th of 2016.  And do you recall that the date that

22   you -- well, do you recall going through that date with the

23   government, January 8th of '16, 9th?

24        A.   Say that again?

25        Q.   January 8th and 9th of '16?

 1      A.   I --

 2      Q.   Here, I'm just going to show you Government's 38

 3  here.  These are from January 8th of 2016.

 4           THE COURT:  And just to remind you, because it's

 5  been a minute, if either of you need to read the text contents,

 6  or she needs to, please go nice and slow for my court reporter.

 7           MR. SELLERS:  Yes, ma'am.

 8           THE COURT:  Thank you.

 9      Q.   And I'll summarize just to make it go quickly.  Joe

10  is asking do you need anything from Sam's, right?

11      A.   Right.

12      Q.   And you say, Trash bags, yes?

13      A.   Yes.

14      Q.   And then fast-forward to 2:39 a.m. on January

15  the 9th.  You send a text to Joe that says, I can't sleep.  Is

16  that right?

17      A.   Yes.

18      Q.   And then apparently there's a phone call in there.

19  The next message is, Are you really coming?

20      A.   I remember this night.

21      Q.   Yeah.  If so, call when you get here and I'll open

22  the garage.  This is 3:15 a.m., right?

23      A.   Yes.

24      Q.   And Joe says, Yes.  And here in there you say, I'm

25  looking at video.  I was right.

1          What were you concerned about that you called

2    Joe to come over and stay with you?

3          A.   This was the night that I had security footage that

4    my mom was in my backyard.

5          Q.   Uninvited?

6          A.   Uninvited.  Concerned probably for her daughter, so

7    she was curious to know what was going on.  But at the time,

8    and after hearing everything from Bill and his analysts that

9    she was trying to do, this put fear in me.

10         Q.   And so you called Joe to come over, right?

11         A.   I believe so.  He was the only one I could call.

12         Q.   Just passed Crescent, Texas.  Almost there.

13              Probably meant Cresson, right?

14         A.   Yes.

15         Q.   And just so the jury knows; I think most of these

16   folks are from Dallas.  How far is Joe's house in the -- you

17   know, South Main area of Fort Worth to where you lived in

18   Granbury?  About 45 minutes?

19         A.   I would say.

20         Q.   Fair?  Okay.  You say okay.  He tells you he's

21   basically there.  And you say that you'll go ahead and open the

22   garage; is that right?

23         A.   Yes.

24         Q.   And then Joe says, Okay, and he'll be there in one to

25   two minutes.

1            Fast-forward now to January 29th of '16.  Just a
2    few more of these.  I love you, Joe, and am grateful for our
3    friendship.
4            That is from you to Joe, January 29th; is that
5    right?
6        A.   Yes.
7        Q.   Here you tell him you got him something for
8    Valentine's Day.  What was it you got him for Valentine's Day?
9        A.   I would assume it's like a cake.
10        Q.   A cake?
11        A.   Or something like that.
12        Q.   Okay.  And later we move forward to October of 2017.
13    This is kind of the beginning of the end of Joe; is that -- or
14    the end of the -- end of Joe; fair to say, October of '17?
15    Never heard you -- heard from you last night.  Did you make it
16    home.  Right?
17        A.   I believe it may have been coming to the end.  But
18    I -- I was -- I graduated that year in December.
19        Q.   Okay.  Backing up again, you talk about, I'll pay for
20    your gas and stuff next time I see you.  I'm sorry I forgot
21    today.  Is that right?
22        A.   Yes, in reference to, I'm sure, my night class.
23        Q.   All right.  Let's now talk just for a moment about
24    your mother and some of the things that had happened in 2014
25    through '16.  You've already told the jury, you know, that when

```
 1    you suffered from your addiction for a period of time --
 2         A.   Yes.
 3         Q.   -- that your mom came in and took primary custody of
 4    Slayter?
 5         A.   Yes.
 6         Q.   And Kent Barnes, who is the father of Cade, already
 7    had primary custody?
 8         A.   Yes.
 9         Q.   And so you were having to fight both your mom and
10    your father's -- the father of your first child to try to get
11    custody back; is that right?
12         A.   Yes.
13         Q.   And then when you did get it back, you wanted to keep
14    it, didn't you?
15         A.   Yes.
16         Q.   You didn't want to lose custody again, did you?
17         A.   Right.
18         Q.   Right.  I'm going to show you a -- a picture.  And
19    I'll mark this as a new exhibit.  I think we're on 136.  137?
20              I'm going to show you -- this is from
21    Exhibit 55, DeLeon's -- well, sorry.  Government's extraction,
22    122.  And this is now 137, but this is a photograph that you
23    sent to Joe.  I'd like to show it to you here.
24              MR. SELLERS:  We'd offer 137 at this time, Your
25    Honor.
```

```
 1                    THE COURT:  Any objection?

 2                    MS. RUDOFF:  No objection, Your Honor.

 3                    MR. GALLIAN:  No objection.

 4                    THE COURT:  Admitted.

 5        Q.    This is a picture you sent to Joe.  It appears to be

 6   from your surveillance camera?

 7        A.    Yes.

 8        Q.    Is that your mother?

 9        A.    No, that's my nephew.

10        Q.    That is your nephew?

11        A.    Yes.

12        Q.    Which one?

13        A.    I believe it's my brother's oldest son.

14        Q.    What -- what was concerning about this to you?

15        A.    Just that my mom had sent him over to see if Slayter

16   would come out.

17        Q.    I mean, so there was a lot of drama underneath the

18   surface.  Regardless of what was being told to you, there

19   actually was a little bit of drama happening, right?

20        A.    Well, odd things.  But I was acting odd.  I wasn't

21   being myself.  They were concerned.

22                    MR. SELLERS:  Okay.  I'm going to mark this one

23   as 138.  And, again, this is from 55 -- I'm sorry, Government's

24   122.  And if y'all want to look, we're going to offer DeLeon

25   Exhibit Number 135 -- I'm sorry, 138.
```

1           MR. GALLIAN:  We have no objection.

2           THE COURT:  What's the correct number, 138?

3           MR. SELLERS:  Yes, ma'am.

4           THE COURT:  Any objection from Government?

5           MS. RUDOFF:  No objection, Your Honor.

6           THE COURT:  It's admitted.

7           MR. SELLERS:  May I show the jury?

8           THE COURT:  You may.

9      Q.   All right.  This is a piece of paper that you took a

10    picture of and sent to Joe.  Just context clues tell me that

11    this is probably about your mother; is that true?

12     A.   Yes.

13     Q.   Whose handwriting is this?

14     A.   My grandmother's.

15     Q.   This is your grandmother's, Myrna's?

16     A.   Yes.

17     Q.   And -- wow.  So your grandmother here is writing

18    about how your mother has a gambling problem, yes?

19     A.   Yes.

20     Q.   Had jewelry missing, yes?

21     A.   Yes.

22     Q.   Wrote a check out of your mother's account.  So money

23    missing, yes?

24     A.   Yes.

25     Q.   All right.  Panic attacks almost daily; is that

```
 1  right?
 2      A.   That's what it says.
 3      Q.   And she would get angry and tell you off, up in the
 4  top-right corner?
 5      A.   I'm assuming to her.
 6      Q.   Okay.  Bathes once a week?
 7      A.   What is it?
 8      Q.   Bathes once a week.  And that may just be the -- the
 9  child.
10      A.   I don't know.
11      Q.   Okay.  Fair enough.
12      A.   I -- I didn't write this, so.
13      Q.   But, again, these are -- these are Myrna's
14  descriptions of her daughter, right?
15      A.   Uh-huh.
16      Q.   Yes?
17      A.   I mean, I'm not sure exactly.  I'm not my
18  grandmother, so I can't say exactly what all she meant by this
19  paper.
20      Q.   Okay.  Here in -- this is one of the screenshots --
21  thumbnails you can see in 55, but I'm going to mark this 139,
22  just to be safe.
23           MR. SELLERS:  Again, this is derived from
24  Government's 122, and we're going to offer 139.
25           MR. GALLIAN:  No objection from Stone, Judge.
```

1          THE COURT:  Any objection, Government?

2          MS. RUDOFF:  No objections, Your Honor.

3          THE COURT:  All right.  Admitted.

4          MR. SELLERS:  We'd offer 139, which has been

5  admitted.

6     Q.   What are we seeing here, Casi?

7     A.   I'm -- it looks like a text from my mom.

8     Q.   From your mom to you, right?

9     A.   Is there a date on here?

10     Q.   I'll get the date for you when we break for the

11  evening, I promise you.

12     A.   Okay.

13     Q.   All right.  But let me just ask some questions.

14  You'd agree with me that for a time you had your grandmother's

15  phone, right?

16     A.   I think maybe for a short time.

17     Q.   And then you got a new phone, right?

18     A.   Right.

19     Q.   And we've kind of heard the evolution of some of the

20  phone numbers you've had?

21     A.   Right.

22     Q.   And this is a text from your mother to you talking

23  about Slayter; is that right?

24     A.   Yes.

25     Q.   And you get -- I mean, to be fair, you get like a lot

1    of these kind of text messages, right?  Insecure kind of

2    messages, like, why are you mad at me, what I have done to you,

3    those kind of things?

4        A.   A lot more often than I did during this time frame.

5        Q.   Right.

6             MR. SELLERS:  I'm going to call this one 140.

7    And this is derived, again, from 122 of the Government's

8    exhibits.

9             MR. GALLIAN:  No objection.

10            MS. RUDOFF:  No objection, Your Honor.

11            THE COURT:  Admitted.

12       Q.   And, Casi, we see here, this must be a text that

13   happened sometime in 2016; is that right?

14       A.   Right, uh-huh.

15       Q.   You and your mother are talking about who's going to

16   get to claim Slayter as a dependent, right?

17       A.   Right.

18       Q.   And your mom was wanting to claim him and you were

19   also wanting to claim him, correct?

20       A.   Yes.

21       Q.   And so CPS says that's your kid, you claim him,

22   right?

23       A.   Yes.

24       Q.   And your mom is kind of giving you a hard time about

25   it; would that be fair?

 1        A.    She was -- I -- I don't know if that was -- if she

 2   was giving me a hard time.  She was just telling me that she

 3   would get in trouble for claiming him as well.

 4        Q.    Right.  And then here, this is in DeLeon's 55.

 5   There's a few texts kind of like this:  So don't respond to my

 6   mom's texts.  That's February 26th of '16, right?

 7        A.    Yes.

 8        Q.    From you to Joe?

 9        A.    Right.

10        Q.    2/28 of '16, you text Joe, My mom called four or five

11   times.  She's saying you better call me now, five exclamation

12   points.

13        A.    Right.

14        Q.    You to Joe?

15        A.    Yes.

16        Q.    3/11 of '16, you send Joe an attachment; is that

17   right?

18        A.    It looks that way.

19              MR. SELLERS:  And let me make sure I get this

20   right.  141, just to be fair.  I'm going to offer that

21   attachment as DeLeon Exhibit 141.

22              THE COURT:  Any objection?

23              MR. GALLIAN:  No objection, Judge.

24              MS. RUDOFF:  No objection, Your Honor.

25              THE COURT:  All right.  It's admitted.

1    Q.   And then here we have a screenshot of basically an

2    e-mail from your mother to you; is that right?

3    A.   Yes.  And that's sad.

4    Q.   It is sad.

5         Do you hate me?  And if so, why?  Sent from My

6    iPhone Candiss, right?

7    A.   Yes.

8    Q.   And to be fair, you come home from rehab, you said,

9    in January of '15, right?

10   A.   Yes.

11   Q.   Less than 45 days later, your mother is no longer in

12   her own parents' will, right?

13   A.   Right.

14   Q.   And that alone was reason to cause you concern, was

15   it not?

16   A.   I was a little concerned.

17   Q.   Right.  I'm going to play you a portion of DeLeon's

18   Exhibit 88.

19        MR. SELLERS:  For the record, this is from 25:22

20   to 25:34 elapsed.

21        (Audio playing.)

22   Q.   Again, he, he, he is Bill, right?

23   A.   Yes.

24   Q.   Bill is trying to convince you your mother was trying

25   to take your inheritance, right?

1          A.    My kids' inheritance, yes.

2          Q.    And, again, to the extent that Joe ever told you

3     that, that would have been it's because what Bill told him,

4     right?

5          A.    Yes.

6          Q.    Let's talk now briefly about the end of Joe.  I'm

7     going to publish a few more texts, and this should take us to

8     the end of the day.

9                Yesterday you told the jury that essentially at

10    the end of 2016, Joe was kind of out of the picture, right?

11         A.    I'm not sure exactly when it was.  I thought it was

12    closer to the end of 2017.

13         Q.    Sure.  Let me ask you this.  By summer of '17, Joe

14    was no longer with you every day, was he?

15         A.    I'm not sure.  It all kind of runs together.  I'm not

16    sure when he fell off or quit, or how that -- you know...

17         Q.    Right.  And so I'm going to publish part of DeLeon

18    Number 55.  Beginning in June of '17 we start to see messages

19    like this:  Hey, Joe.  Haven't heard from you in three days.

20    Everything okay?  Is that right?

21         A.    Uh-huh.

22         Q.    That's you -- you to Joe?

23         A.    I believe there was something going on in his life

24    that he was unable to come.

25         Q.    And then the next one is July 5th of '17, you are

1    sending him, Are you alive?  Is that right?

2         A.   Yes.

3         Q.   And then on this one he does respond:  Yes, I will

4    call later.  Right?

5         A.   Right.

6         Q.   July 11th of '17, Are you doing okay?  Haven't heard

7    from you again in a couple days.  Hope all is well.  Is that

8    right?

9         A.   Yes.

10        Q.   Couple weeks later, July 14th:  Wanted to check on

11   you.  You feeling better?  You can't be dying on me now.

12   Right?

13        A.   Right.

14        Q.   I mean, Joe was sick, wasn't he?

15        A.   I think he was, yes.

16        Q.   You've seen him walking around the halls here.  It

17   was just like that when y'all were together a few years back,

18   wasn't it?

19        A.   It would come and go.

20        Q.   He had sciatica -- has sciatica?

21        A.   Yes.

22        Q.   Which causes him to have pains throughout his entire

23   body; is that right?

24        A.   I've never had the -- the pain, but I --

25        Q.   You --

1      A.    -- it is uncomfortable.

2      Q.    -- Joe can't help but talk about his ailments

3   sometimes, fair?

4      A.    Fair.

5      Q.    A lot?

6      A.    Right.

7      Q.    And he told you how it felt, didn't he?

8      A.    Yes.

9      Q.    All right.  And then finally, we see this in October

10  of 2017:  Hey, Joe.  Just wanted to check on you and see how

11  you are feeling.  Slayter is starting tag football, so you

12  won't need to come on Wednesdays anymore.  He'll be going home

13  with Daralyn's husband and they will be -- he will be taking

14  the boys to practice.

15            Thank you so much for your time in coming out.

16  I really, really appreciate it.  Please call me if you ever

17  need to talk.  I'm always here for you as you were for me -- or

18  you were me.

19            You'd agree with me that the night after you

20  sent Joe this message, you spent the night at Bill's house?

21     A.    I don't believe so.  I'm not sure.  I can't tell you

22  when I would stay the night somewhere.

23     Q.    Right.  But we certainly know from your testimony

24  now, that as early as 2015, y'all were having intimate

25  relations, right?

1        A.    We -- wait, repeat your question.

2        Q.    We now know that as early as 2015, you and Joe -- you

3   and Bill, sorry, were having intimate relations?  At least

4   once.

5        A.    Sex.

6        Q.    Sex, yes.  I wasn't going to say it.  So you and Bill

7   had had sex in 2015?

8        A.    Yes.

9        Q.    Never told Joe about that?

10       A.    I don't believe so.

11       Q.    Even though y'all were best girlfriends?

12       A.    It wasn't a big deal.

13       Q.    And by '17, we know that you and Bill were having sex

14  at least a little more often; is that fair?

15       A.    I wouldn't -- maybe.  I don't remember every time

16  I've had sex.

17       Q.    Fair enough.

18             THE COURT:  Let's stop there.

19             MR. SELLERS:  Yes, ma'am.

20             THE COURT:  Okay.  Members of the jury, thank

21  you so much for your time and your attention.  I will not let

22  you down and forget donuts, so I will come bearing gifts

23  tomorrow morning.  We'll see you tomorrow at 8 o'clock.  I've

24  let the parties know that I've talked to you about having a

25  dentist appointment, and so we're going to wrap tomorrow at

1    3:00.  We appreciate your time and your attention.

2              With that said, everyone, all rise for the jury.

3    And Court's in recess.

4              (Jurors exit courtroom.)

5              (Proceedings adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              I, BROOKE N. BARR, United States Court Reporter

 2    for the United States District Court in and for the Northern

 3    District of Texas, Dallas Division, hereby certify that the

 4    above and foregoing contains a true and correct transcription

 5    of all proceedings in the above-styled and -numbered cause.

 6

 7              WITNESS MY OFFICIAL HAND this the 31st day of

 8    July, 2023.

 9

10

11                         /S/ BROOKE N. BARR
                           BROOKE N. BARR, CSR NO. 6521
12                         CSR Expiration Date:  7/31/24
                           United States Court Reporter
13                         1100 Commerce Street
                           Room 1376
14                         Dallas, Texas 75252
                           (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25
```