1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF TEXAS

3                       DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )      3:21-CR-236-E
5               Government,       )
                                  )
6                                 )
   VS.                            )      DALLAS, TEXAS
7                                 )
                                  )
8  WILLIAM ROY STONE, JR.,        )
   JOSEPH EVENTINO DELEON,        )
9               Defendants.       )      August 1, 2023

10

11            TRANSCRIPT OF JURY TRIAL, VOLUME 6A

12            BEFORE THE HONORABLE ADA E. BROWN

13               UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:         MS. JENNA DANELLE RUDOFF
                                UNITED STATES DEPARTMENT OF JUSTICE
18                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
19                              1100 Commerce Street
                                Dallas, Texas  75242
20                              jenna.rudoff@usdoj.gov
                                (214) 659-8600
21

22                              MS. DONNA S. MAX
                                UNITED STATES DEPARTMENT OF JUSTICE
23                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
24                              1100 Commerce Street
                                Dallas, Texas  75242
25                              donna.max@usdoj.gov
                                (214) 659-8664

```
 1                                    MR. MARCUS J. BUSCH
                                      UNITED STATES DEPARTMENT OF JUSTICE
 2                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 3                                    1100 Commerce Street
                                      Dallas, Texas  75242
 4                                    marcus.busch@usdoj.gov
                                      (214) 659-8642
 5

 6    FOR THE DEFENDANT,             MR. GREGG GALLIAN
      WILLIAM ROY STONE, JR.:        Gallian Firm
 7                                    Parkside Tower
                                      3500 Maple Avenue
 8                                    Suite 720
                                      Dallas, Texas  75219
 9                                    gregg@GallianDefenseFirm.com
                                      (214) 432-8860
10

11                                    MS. JACLYN ANNETTE GALLIAN
                                      Bryan Cave Leighton Paisner
12                                    2200 Ross Avenue
                                      Suite 4200
13                                    Dallas, Texas  75201
                                      jaclyn.gallian@bclplaw.com
14                                    (214) 721-8058

15
      FOR THE DEFENDANT,             MR. GREG WESTFALL
16    JOSEPH EVENTINO DELEON:        Westfall Sellers
                                      1701 River Run
17                                    Suite 801
                                      Fort Worth, Texas  76107
18                                    greg@westfallsellers.com
                                      (817) 928-4222
19

20                                    MR. FRANK SELLERS
                                      Westfall Sellers
21                                    1701 River Run
                                      Suite 801
22                                    Fort Worth, Texas  76107
                                      frank@westfallsellers.com
23                                    (817) 928-4222

24

25
```



```
 1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                  JURY TRIAL VOLUME 6A - AUGUST 1, 2023
 2                    P R O C E E D I N G S
 3           THE COURT:  Good morning.  Everybody please be
 4   seated.
 5           Do we need to take anything up outside the presence
 6   of the jury?
 7           Government?  No?
 8           MR. SELLERS:  No, ma'am.
 9           (Discussion off the record)
10           THE COURT:  The jury is coming in.
11           (Jury in)
12           THE COURT:  Good morning, members of the jury.  Glad
13   to have you here.
14           You are allowed to bring doughnuts and cronuts and
15   kolaches out if you choose to.
16           If everybody would please, in the audience and
17   everyone, make sure your phones are off.  I just checked mine.
18           And with that said, sir, your witness.
19           (Discussion off the record)
20           THE COURT:  I'll see if I can get some air put on
21   here.
22           MR. SELLERS:  Good to go?
23           THE COURT:  You're good to go.
24
25
```

```
 1        CASI THOMPSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 2                     CROSS-EXAMINATION CONTINUED
 3    BY MR. SELLERS:
 4    Q.   Good morning, Ms. Thompson.
 5    A.   Good morning.
 6    Q.   Did you go home last night, or did you have to stay here?
 7    A.   Stayed here.
 8    Q.   Have you been staying here throughout the trial?
 9    A.   Yes.
10    Q.   Okay.  Well, let's hope we can get through this today and
11    get you home, okay?
12    A.   Yes.
13    Q.   All right.  I spent the night going through and cutting
14    out a lot of things, so hopefully we can get through this in an
15    hour or less.  That's our goal.
16    A.   Okay.
17    Q.   Deal?
18    A.   Deal.
19    Q.   All right.  One of the things I forgot to talk about
20    yesterday was in early 2016 you went and got a new Lexus and
21    everybody kind of got new cars.  Do you remember that?
22    A.   Yes.
23    Q.   All right.  And do you recall the day after you got your
24    new Lexus Joe being at your house?
25    A.   I don't recall that, but there's a high chance that he was
```

```
 1   there.
 2   Q.   Right.
 3         Do you recall backing your new Lexus into his
 4   Mercedes, Joe's Mercedes?
 5   A.   No.
 6   Q.   You don't recall backing your new car into his car?
 7   A.   No, I do not.
 8   Q.   And that he refused to make an insurance claim because he
 9   didn't want to mess up your insurance?
10   A.   No.  I remember something about his car, but I don't
11   recall backing into it.
12   Q.   Okay.  Do you recall wrecking into it?
13   A.   No, I do not.
14   Q.   Hitting it in any way?
15   A.   No, I do not.
16   Q.   If I showed you pictures, would that refresh your
17   recollection?
18   A.   Possibly.
19   Q.   Okay.  Well, I'll search for those and we'll come back to
20   it.
21         Let's talk now, if we could, about your relationship
22   with Bill.  You told the jury on direct examination that
23   Bill -- or Joe was the one who introduced you to Bill.  Do you
24   recall that?
25   A.   Yes.
```

```
 1   Q.   Let's talk about memory for a moment.  You would agree
 2   with me that a memory works best when it's -- when you are
 3   recalling things closer in time, right?
 4   A.   Yes.
 5   Q.   Because when time goes on, memories can fade, memories can
 6   change; is that right?
 7   A.   I have a very clear memory of the first time I met Bill.
 8   Q.   All right.  And do you have a clear memory of one of your
 9   meetings with Ranger Briley talking about who introduced you to
10   Bill?
11   A.   Yes.
12   Q.   Okay.  And so I want to show you here -- before I offer, I
13   want to be sure.
14          MR. SELLERS:  We would like to offer at this time,
15   Your Honor, DeLeon Exhibit Number 79.
16          THE COURT:  Any objection to DeLeon's 79?
17          MS. RUDOFF:  No objection, Your Honor.
18          MR. GALLIAN:  No objection.
19          THE COURT:  It's admitted.
20          (Defendant DeLeon's Exhibit No. 79 received)
21   BY MR. SELLERS:
22   Q.   I'm going to show you a transcript here.  This is you
23   speaking with Ranger Briley.  I'll read this.  You tell me if
24   I'm reading right.
25          Said, I saw that you know Bill Stone because I had
```

1   that folder -- I mean, that telephone book kind of deal.

2            THE COURT:  Slow down.

3            MR. SELLERS:  Yes, ma'am.

4   BY MR. SELLERS:

5   Q.   And he goes, You might want to give him a call.  I was

6   like okay.  So I ended up not giving him a call.  I ended up

7   going to Charles, which was a person that I -- that introduced

8   me to Bill to begin with and Charles called Bill.

9            Do you have a clear memory of that conversation?

10  A.   I do.  That was -- the whole reason I even know Joe is

11  through Charles.

12  Q.   Right.  But --

13  A.   And so Charles was my initial -- like my initial, I guess,

14  friend who then introduced me to Joe, but my initial meeting

15  Bill was through Joe.

16  Q.   But you told Ranger Briley that Bill introduced -- Charles

17  introduced you to Bill to begin with, didn't you?

18  A.   That isn't -- I guess I misspoke there.  But this was a

19  different timeframe.  What he's referring to -- what I'm

20  referring to in this was in 2007, the Irving charge.

21  Q.   Okay.  You would agree with me that during your time with

22  Joe there was a lot of things going on with the estate and

23  selling houses, moving, those kind of things, right?

24  A.   Yes.

25  Q.   And your grandmother and grandfather had accumulated a lot

```
 1   of different stuff over the years.  Is that a fair statement?
 2   A.   Yes.
 3   Q.   For example, do you recall trying to give Joe a zero-turn
 4   lawn mower?
 5   A.   No, I do not.
 6   Q.   Do you recall trying to give him the Good Time van?
 7   A.   The -- I know -- no, I do not.
 8   Q.   Do you recall trying to give him some of your
 9   grandparents' wheelchairs?
10   A.   My grandparents didn't have wheelchairs.
11   Q.   So the picture of your wheelchairs in y'all's texts, whose
12   wheelchairs are those?  Or whose wheelchair is that?
13   A.   That was probably the wheelchair that my grandmother --
14   well, actually no, there was no wheelchair.
15   Q.   Okay.
16   A.   She never had a wheelchair.
17   Q.   How about electrical scooters?
18   A.   She did have an electric scooter.
19   Q.   Four or five of them?
20   A.   She had, I believe, two.
21   Q.   All right.  And you tried to give one to Joe, did you not?
22   A.   I did not.
23   Q.   And then Joe suggested you go over to Magnolia by the Fort
24   Worth hospital district in Fort Worth to sell them.  Do you
25   recall that?
```

1    A.   I actually got them fixed to put together to sell myself

2    personally.

3    Q.   And then you did sell them, didn't you?

4    A.   I don't believe I did during that time.

5    Q.   Okay.  You ultimately did sell them, didn't you?

6    A.   After my mom came back into my life, her and I sold them

7    together.

8    Q.   All right.

9            MR. SELLERS:  Your Honor, at this time I would move

10   to admit for record purposes Government's Exhibit Number 149

11   and specifically move to admit for all purposes 12:37 through

12   12:53 elapsed.

13           THE COURT:  Any objection, Government?

14           MS. RUDOFF:  Can you tell me again?  Your 149 for

15   what purpose?

16           MR. SELLERS:  Your 149.

17           MS. RUDOFF:  My 149.

18           MR. SELLERS:  To discuss, I mean, things that Joe did

19   not know.

20           MS. RUDOFF:  But for all purposes?

21           MR. SELLERS:  Just this clip purposes.

22           MS. RUDOFF:  Your Honor, we would just ask that 149

23   be admitted.  It's a recording for all purposes.  But defense

24   counsel can play whatever clips he wants.

25           And then also that the --

1          Are you doing the transcript?

2          MR. SELLERS:  I don't -- if you want to admit the

3     transcript, that's fine.

4          THE COURT:  Okay.  So I need either objections or --

5     but I don't want to have conversation here.  So are you

6     objecting or not?

7          MS. RUDOFF:  Your Honor, we're not objecting to the

8     admission of 149.  We would just ask that it be admitted for

9     all purposes.

10          THE COURT:  Okay.  Well, what are you admitting it

11     for?  Record purposes?

12          MR. SELLERS:  I'm admitting 149 -- I don't mind to

13     move for all purposes, but I'm sure that --

14          THE COURT:  Okay.  Well --

15          MR. SELLERS:  All I want is the clip, but she wants

16     everything.

17          THE COURT:  I'm not having a conversation, so --

18          Members of the jury, step out for a minute, would

19     you?

20          SECURITY OFFICER:  All rise for the jury.

21          (Jury out)

22          THE COURT:  Okay.  So he can admit it for whatever

23     purpose he wants.  You guys can admit it for your purpose when

24     you're done, but this back and forth conversation, no more.

25          MR. SELLERS:  Yes, ma'am.

```
 1              THE COURT:  Object or don't, and like one or two
 2   words; but the chatter, no.
 3              So if you -- you can admit it for zippity-doo-da
 4   purposes if you want to.  You tell me.  But let's not have
 5   conversations, okay?
 6              Let's get them.
 7              SECURITY OFFICER:  All rise for the jury.
 8              (Jury in)
 9              THE COURT:  Everyone please be seated.
10              So thanks for indulging me.  My first IT crisis this
11   morning.  I'm trying to work on the jury charge, and my screen
12   is frozen.  You will see IT kind of slip up here.  I don't want
13   to take a break for them to do that.
14              I'm going to scoot over while they fix it.  But don't
15   hold it against anybody here.  All my technology.
16              With that said, your witness, sir.
17              MR. SELLERS:  Thank you, Your Honor.
18              THE COURT:  You're welcome.
19   BY MR. SELLERS:
20   Q.   Casi, I would like to talk to you now about some of the
21   things that Joe did not know.
22              MR. SELLERS:  And I'm moving to admit Government's
23   Exhibit 149 for record purposes and just the clip I mentioned
24   for all purposes.
25              THE COURT:  Any objection from Government?
```

```
 1              MS. RUDOFF:  No objection, Your Honor.
 2              MR. GALLIAN:  No objection.
 3              THE COURT:  Admitted.
 4                  (Government's Exhibit No. 149 received)
 5   BY MR. SELLERS:
 6   Q.   All right.  Casi, I want to take you back to August of
 7   2019.  Do you recall that by that time you had met, you know,
 8   at least for a few times with Ranger Briley?
 9   A.   Yes.
10   Q.   At that point, Mr. Luley, right there, was not involved,
11   correct?
12   A.   I'm not sure when he got involved as far as the dates go.
13   Q.   All right.  And Ranger Briley came to you and -- or you
14   came to him, rather, and y'all had quite a few lengthy
15   discussions.  Is that fair?
16   A.   Who?
17   Q.   Ranger Briley.
18   A.   Yes.
19   Q.   And at the conclusion of that, Ranger Briley and you kind
20   of -- or during the middle, I suppose, y'all talked about how
21   it would be best not to tell anyone that this investigation is
22   going on; is that right?
23   A.   Right.
24   Q.   And so he kind of told you, you know, if you call Bill, we
25   want you to record it, right?
```

```
 1   A.   Yes.
 2   Q.   All right.  And so during those calls, you would -- I
 3   mean, it would be a fair statement that you would confront Bill
 4   about things, right?
 5   A.   It was any conversation with Bill I needed to record --
 6   Q.   All right.
 7   A.   -- not just --
 8   Q.   Sure.
 9   A.   -- my initiation.
10   Q.   But during that, I mean, you would confront Bill during
11   those conversations, right?
12   A.   I would be inquisitive.
13   Q.   And you would confront him about why did you tell me to do
14   this, why did you make me do that, right?
15   A.   I guess so, yes.
16   Q.   Okay.  I'm going to play this clip from Government's 149
17   for you.
18             (Audio played)
19   BY MR. SELLERS:
20   Q.   Who is Dr. Brian?
21   A.   Dr. Brian is a psychiatrist -- I was made to believe that
22   Dr. Brian was a psychiatrist that was in his unit at the
23   federal building in Washington, D.C.
24   Q.   All right.  And Dr. Brian was somebody that only Bill
25   could communicate with.  Is that fair?
```

```
 1    A.    Joe would talk to him as well.
 2    Q.    When did you ever see Joe talk to Dr. Brian without Bill?
 3    A.    It was about the same kind of conversation, but Joe would
 4    call --
 5    Q.    Bill?
 6    A.    -- Bill and ask Bill to get with Dr. Brian about
 7    medications or other types of stuff.
 8    Q.    And you've now learned that Dr. Brian is not real?
 9    A.    Correct.
10    Q.    And Dr. Brian would, through Bill, give both you medical
11    advice, right?
12    A.    Yes.
13    Q.    And Joe medical advice?
14    A.    Yes.  And medical advice for my children.
15    Q.    All right.  And this was somebody that only Bill could
16    talk to directly.  Is that fair?
17    A.    Due to security and privacy reasons, yes.
18    Q.    All right.  I'm going to put Dr. B there.  Is that kind of
19    how y'all knew him?
20    A.    Yes.
21    Q.    All right.  Fast-forward to May of 2020, and you were
22    having interviews with Brian Luley sitting back there, right?
23    A.    Yes.
24    Q.    All right.  I'm going play this clip from DeLeon's 88.
25    For the record, it's from 58:25 to 58:40.
```

```
 1              (Audio played)
 2   BY MR. SELLERS:
 3   Q.   The "we" that you refer to there, who is the "we"?
 4   A.   Me and Joe.
 5   Q.   You and Joe could not believe the things that you were
 6   hearing about your probation, right?
 7   A.   It wasn't just probation.  It was -- it was probably eight
 8   to ten different charges that were coming all at one time.
 9   Q.   Not only that, but just drama, right?
10   A.   Drama and trauma.
11   Q.   Drama and trauma, right?
12   A.   Yes.
13   Q.   And it was traumatic for you, right?
14   A.   Extremely.
15   Q.   And it was traumatic for Joe too, wasn't it?
16   A.   He appeared so.
17   Q.   Bill didn't appear to suffer any trauma, did he?
18   A.   No.
19   Q.   All right.  I'm showing you now DeLeon's Exhibit 55.  This
20   is a text from October 6th of 2017 from you to Joe.  Can you
21   read the text for us?
22   A.   Hey, Joe.  Dr. B wanted me to let you know that Bill's
23   surgery went well.  It was worse than they thought.  He ended
24   up having to be put completely under and they put a rod and
25   screws in.
```

```
 1            THE COURT:  If we're going to read those, I need to
 2    go much slower for my court reporter.
 3            THE WITNESS:  I'm sorry.
 4            THE COURT:  That's okay, ma'am.  That's how we speak
 5    in real life, so you haven't done anything wrong.
 6    BY MR. SELLERS:
 7    Q.   Were you present for the surgery?
 8    A.   I am not sure.  I don't know if -- I'm not sure how this
 9    text came.
10    Q.   All right.  But nevertheless, this is you talking to Joe,
11    relaying a message from a doctor that is not real that only
12    Bill can communicate with; is that right?
13    A.   Correct.
14    Q.   All right.  Let's talk now about some of these other
15    folks.
16            Who is Avery?
17    A.   Avery was his top analyst.
18    Q.   Who could communicate with Avery?
19    A.   Bill.
20    Q.   Could Joe?
21    A.   Well, we -- I communicated through Bill to her, and I
22    believe Joe did as well.
23    Q.   Let me ask a better question.
24            Who is the only person who could hear Avery's voice?
25    A.   Bill.
```

```
 1   Q.   How about Jerry?
 2   A.   Jerry was a state trooper who was helping Bill do
 3   surveillance on me.
 4   Q.   Did you ever meet Jerry?
 5   A.   I never met Jerry.
 6   Q.   Who is the only person who could ever hear Jerry's voice?
 7   A.   Bill.
 8   Q.   Ainsley?
 9   A.   Ainsley was another analyst for Bill.
10   Q.   Who is the only person who could hear Ainsley's voice?
11   A.   Bill.
12   Q.   How about Bianca?
13   A.   I'm not sure if Bianca was an analyst that came later with
14   the Houston or Dallas unit, but that doesn't -- that doesn't
15   sound familiar to me.
16   Q.   How about Chet?
17   A.   Chet is an analyst in Washington, D.C.
18   Q.   Only person who could hear Chet's voice?
19   A.   Bill.
20   Q.   Judge Anderson?
21   A.   And Judge Anderson was obviously the judge that was the
22   federal judge in Austin.
23   Q.   Only person who could hear Judge Anderson's voice?
24   A.   Bill.
25   Q.   How about Linda?
```

```
 1   A.   I don't recall a Linda.  I don't know if it was the court
 2   coordinator's name or --
 3   Q.   How about Toby?
 4   A.   Toby does not ring a bell at all.
 5   Q.   How about Dr. S?
 6   A.   Dr. Suzanne was Dr. Brian's wife.
 7   Q.   And since we call her Dr. Suzanne, what kind of doctor was
 8   she supposed to be?
 9   A.   She was a neurosurgeon.
10   Q.   And did Dr. S give you medical advice too?
11   A.   Yes, she did.
12   Q.   Through who?
13   A.   Bill.
14   Q.   Did Dr. S give Joe medical advice?
15   A.   I believe so.
16   Q.   Through who?
17   A.   Bill.
18   Q.   How about Steve?
19   A.   Steve was another state trooper that was also running
20   surveillance.
21   Q.   The only person that could hear Steve's voice?
22   A.   Bill.
23   Q.   How about Lindsey?
24   A.   Lindsey was the estate attorney in Dallas that was giving
25   Bill information on what my mom was supposedly doing.  Yeah.
```

```
 1    Q.    Legal advice?
 2    A.    Legal advice.
 3    Q.    Only person who ever talked to Lindsey?
 4    A.    Bill.
 5    Q.    So if I write "analysts" up here, it would be fair to say
 6    that only Bill was able to talk to the analysts, right?
 7    A.    Yes.
 8    Q.    Another secret that was kept from Joe was the fact you and
 9    Bill eventually started a sexual relationship, right?
10    A.    Yes.
11    Q.    And an intimate relationship, right?
12    A.    I wouldn't say intimate.
13    Q.    When you got engaged, you never told Joe, did you?
14    A.    Bill had kind of turned me against Joe at this point.
15    Q.    Right.  And so I guess the answer would be yes, that you
16    never told Joe because you had been turned against him?
17    A.    Right.
18    Q.    Bill instructed you not to tell Joe about the financial
19    part of it; is that right?
20    A.    Yes.
21    Q.    Not -- and if you were to -- if he told you to give him
22    money, you're supposed to do it.  If Bill told you to give Joe
23    money, you're supposed to do it, right?
24    A.    Yes.
25    Q.    And not talk about the financial part of it?
```

```
 1   A.   Correct.
 2   Q.   Certainly not talk about the benefits and financial gains
 3   that Bill was getting, right?
 4   A.   Yes.
 5   Q.   All right.  And then I think we touched on this yesterday.
 6   The Key West trip, Joe had no idea, right?
 7   A.   I don't believe so.
 8   Q.   And when Joe was watching your dogs while you were in
 9   Hawaii with Bill and your son, he had no idea about that
10   either, did he?
11   A.   I believe he did know.
12   Q.   You believe he knew that y'all were in Hawaii together?
13   A.   Yes.
14   Q.   All right.  If the text reflects otherwise, that would
15   just be perhaps a mistake?
16   A.   Correct.
17   Q.   All right.  So let's now go back to the summer of 2019.
18   This is when -- I mean, this is when you got off probation,
19   right?
20   A.   The fake probation?
21   Q.   The real one.  Sorry.
22   A.   I got off the real probation in 2018.
23   Q.   End of 2018?
24   A.   I'm not sure what date -- what month it was.
25   Q.   And I have a question about that.  You had to hire a
```

1    lawyer to get the plea deal that you got, right?

2    A.   I did.

3    Q.   You hired Tim Evans, right?

4    A.   Yes.

5    Q.   One of the best lawyers in Fort Worth at that time?

6    A.   Yes.

7    Q.   Represented the CEO of Mrs. Baird's Bread, didn't he?

8    A.   I don't know that.

9    Q.   Great guy.  You made a good choice, I'll tell you that.

10        But let's talk about getting off probation.  Usually

11   you have to file a motion to get off probation.  Did you know

12   that?

13   A.   No.

14   Q.   You hired another lawyer to file that?

15   A.   I was on a deferred program.  I'm not sure how that -- I

16   don't know how that works, obviously.

17   Q.   I do, okay?

18   A.   Okay.

19   Q.   And usually you have to file a motion.  You didn't have to

20   do that?

21   A.   No.

22   Q.   All right.  Summer of 2019, you decide, you know what,

23   things are not going right, I want to separate from Bill,

24   right?  I don't want to be engaged.

25   A.   Correct.

```
 1   Q.   And you start to realize maybe some things are not right?
 2   A.   Correct.
 3   Q.   So you -- we know now you reached out to Penny, you had
 4   some meetings with Briley, correct?
 5   A.   Yes.
 6   Q.   And at the end of those meetings, and Briley tells you not
 7   to tell anyone, he also tells you to record all your calls with
 8   Joe too, doesn't he?
 9   A.   If speaking to one of the two, yes, I needed to record
10   them.
11   Q.   All right.  And you recorded four phone calls with Joe,
12   right?
13   A.   I couldn't say the number.
14   Q.   Let me ask you this.  You recorded all telephone contact
15   you had with Joe, right?
16   A.   Yes.
17   Q.   You did not record all telephone contact you had
18   with Bill?
19   A.   All but one.
20   Q.   Could have been more?
21   A.   No.
22   Q.   Okay.  Well, let's go through some of the calls you had
23   with Joe.
24        MR. SELLERS:  Your Honor, at this time I'm going to
25   offer DeLeon's Exhibit Number 27 for all purposes.
```

```
 1              MS. RUDOFF:  No objection, Your Honor.
 2              MR. GALLIAN:  No objection.
 3              THE COURT:  Admitted.
 4                  (Defendant DeLeon's Exhibit No. 27 received)
 5    BY MR. SELLERS:
 6    Q.   All right.  The first call was the longest, right?  It was
 7    about 20-plus minutes, give or take?
 8    A.   I don't know the length of the phone call.
 9    Q.   Let me ask you, after you recorded the phone calls, have
10    you ever gone back to listen to them?
11    A.   No.
12    Q.   Okay.  Well, I have made this one into like four clips, so
13    we're going to go through them, all right?
14              THE COURT:  If you're going to read them, please go
15    very slow.
16              MR. SELLERS:  No, it is just audio, ma'am.
17              THE COURT:  All right.
18    BY MR. SELLERS:
19    Q.   Here is Clip Number 1.  This is on September the 3rd of
20    2019.  So at this point you've been meeting with Briley since
21    like July, right?
22    A.   Yes.
23    Q.   All right.  But this is the first time you actually
24    reached out and called Joe?
25    A.   I don't know if this was the first one, but --
```

```
 1   Q.   Okay.  Well, let's just go through them here.
 2             (Audio played)
 3   BY MR. SELLERS:
 4   Q.   Play the second clip for you.  This one is a little bit
 5   longer.
 6             And that was Joe's initial reaction to being told,
 7   hey, what if this wasn't real, right?
 8   A.   Yes.
 9             (Audio played)
10   BY MR. SELLERS:
11   Q.   Sure sounds a little bit surprised, kind of like you,
12   doesn't he?
13   A.   Yes.
14   Q.   All right.  Here's the third clip.
15             (Audio played)
16   BY MR. SELLERS:
17   Q.   The person they are referring to in the driveway was about
18   your mom, right?
19   A.   I believe so.
20   Q.   It was like a night or maybe more than one that she was
21   sleeping in the driveway or --
22   A.   She was wanting to come over and see my kids, and I wasn't
23   allowed to have her in the house.  So she didn't have anywhere
24   to go, and she slept in her car.
25   Q.   In your driveway?
```

```
 1   A.   In my -- in -- yes.
 2   Q.   Okay.  Here's the last clip, I think.
 3             (Audio played)
 4   BY MR. SELLERS:
 5   Q.   At some point, I guess like characters in a book, some of
 6   these analysts and people started dying off, right?
 7   A.   Yes.
 8   Q.   One got -- I mean, there was, I think, two of the analysts
 9   had a baby that got sudden death infant syndrome, is that
10   right, what you were told?
11   A.   Yes.
12   Q.   All right.  And then Dr. B died, and Ainsley or Avery got
13   COVID and was in the hospital.  Does that ring a bell?
14   A.   No.  Ainsley ended up having a hysterectomy or something,
15   not being able to work for the Government anymore and then
16   turned into a flight attendant, and Avery transferred to
17   London.
18   Q.   Pretty elaborate stories, right?
19   A.   Yes.
20   Q.   And here Joe is telling you about when Bill called him and
21   Dr. B died and Bill was crying like a baby?
22   A.   Yes.
23   Q.   Kind of seems like you and Joe are in the same boat here,
24   doesn't it?
25   A.   It seems that way.
```

1   Q.   All right.  I'm sorry, this the last clip.  Let's hear

2   this.

3              (Audio played)

4   BY MR. SELLERS:

5   Q.   Before he gets off into his ailments, Joe says a few

6   things.  One of them was that he -- who would keep something

7   like this up for four years, right?

8   A.   Yes.

9   Q.   That that's just crazy stuff, right?

10  A.   For lack of a better word, yes.

11  Q.   All right.  Let's go to a few days later.  Let's see.

12  That's nine days later, September the 12th.

13             There we go.

14             Were you aware that in between that call and this

15  call that Ranger Briley went and had a few visits with Joe?

16  A.   No.

17  Q.   So you didn't know that Joe knew that this was all not

18  true at that point and he didn't know that you knew that it was

19  all not true, is that fair, on this call?

20  A.   I don't -- I can't say what he knew, but I know that I

21  didn't know.

22  Q.   All right.  Just listen to this call.  I'm going to play

23  this one in full.

24             MR. SELLERS:  And we would offer at this time, Your

25  Honor, DeLeon Exhibit Number 28 for all purposes.

```
 1              THE COURT:  Any objection?

 2              MS. RUDOFF:  No objections, Your Honor.

 3              MR. GALLIAN:  No objections.  Sorry.  Numbers got

 4    confused.

 5              THE COURT:  Okay.  Admitted.

 6              (Defendant DeLeon's Exhibit No. 28 received)

 7              (Audio played)

 8    BY MR. SELLERS:

 9    Q.   "Oh, my God.  Wow."  That is what he said, right?

10    A.   Yes.

11    Q.   He was in shock about learning these things, wasn't he?

12    A.   Yes.

13    Q.   Sure seemed like, again, y'all were in the same boat,

14    doesn't it?

15    A.   Appeared to be that way.

16    Q.   And we hear a lot about going to talk to friends and

17    family.  You know, when things started to get rocky between you

18    and Bill, you started learning that your mother was being

19    contacted, your brother, and your in-laws, right?

20    A.   My in-laws?

21    Q.   Right.  Cutter's mother-in-law.

22    A.   Oh, right.

23    Q.   Do you remember that?

24    A.   (Indicating in the affirmative)

25    Q.   That was Bill doing that, not Joe, right, reaching out to
```

 1   friends and family in '19 and '20 to try to --

 2   A.   In desperation.

 3   Q.   Desperation.  We can call it that.

 4          THE COURT:  Counsel, how much longer do you have to

 5   go?  We're about to push up on a break.

 6          MR. SELLERS:  Less than 30 minutes.

 7          THE COURT:  Let's go ahead and take a break.

 8          SECURITY OFFICER:  All rise for the jury.

 9          (Jury out)

10          THE COURT:  All right.  Please be seated.

11          We have been going about an hour.  You told the jury

12   it would be an hour.  So now it's another half hour?

13          MR. SELLERS:  I'm trying, Your Honor.

14          THE COURT:  Okay.

15          MR. SELLERS:  Just a lot of very important material I

16   have to get through.

17          THE COURT:  Okay.  So here's what we're going to do.

18   I have not been chalking people's cross times up.  Your guy is

19   charged with one count, so -- I mean, this is taking as long as

20   the whole direct was.

21          MR. SELLERS:  Judge, they had her on direct for two

22   full days.

23          THE COURT:  I know.  We're -- we're butting up on

24   that.  How long do you -- how long have you been crossing?

25          MR. SELLERS:  I got her after lunch yesterday.

```
 1              THE COURT:  Okay.  I mean, you're wandering off
 2   into -- crosses are supposed to be responsive to direct.  And
 3   so would you focus, please, on -- all right.
 4              Let's take a 10-minute recess.
 5              SECURITY OFFICER:  All rise.
 6              THE COURT:  Court is in recess for ten minutes.
 7              (Recess)
 8              SECURITY OFFICER:  All rise.
 9              THE COURT:  Before we bring in the jury, if you'll
10   stack them up.
11              Mr. DeLeon, I owe you an apology.  I got your
12   lawyer's tail and shouldn't have.  He was just the guy standing
13   up here when I got fussy about time.  And he's doing a great
14   job, and I told him don't stop doing that, because if it's my
15   life on the line, I want exactly that to happen.  And we took
16   our time in direct, and we're going to take our time in cross.
17   So I apologize for being short.
18              Mr. Sellers, I want to apologize to him.  There you
19   go.  We were just talking about you.
20              MR. SELLERS:  I was washing my hands.
21              THE COURT:  Yeah.  Good.
22              So I apologize that I was short with you.  You're
23   doing a cross-examination, and I don't want you to feel rushed.
24   We all sat down in there and talked about timing for the rest
25   of the trial, and I think we're all on pace, but he happened to
```

1   be the guy standing up when I got fussy, And I'm sorry about
2   that.
3        MR. SELLERS:  Thank you, Your Honor.
4        THE COURT:  Going forward, if I have any scheduling
5   issues, I'll call everybody back in chambers and I'll have a
6   sugar doughnut ready for all of us, so -- but you're doing a
7   good job, Mr. Sellers.  Keep doing it.
8        MR. SELLERS:  Thank you, Your Honor.
9        THE COURT:  You're welcome.  And I apologize.
10        All right.  With that said, are we ready to bring
11   them back in?  Do we need to take anything up outside their
12   presence?
13        MR. SELLERS:  No, not from us.
14        THE COURT:  All right.
15        MR. GALLIAN:  No, Your Honor.
16        THE COURT:  Appreciate your grace.
17        All right.  All rise for the jury.
18        (Jury in)
19        THE COURT:  All right.  Everybody please be seated.
20        So members of the jury, I have some good news to
21   report.  Aside from eating a doughnut, I got with the lawyers
22   and we got -- we're getting the paperwork together.  So you're
23   going to see me up here typing on the jury charge.
24        I had the lawyers back.  We did some agreements on
25   what the paperwork is going to be, so I can be working on that.

1   If you hear me tap, tap, tapping, I don't want you to think I'm

2   on eBay.  But the long break was to help me so I can be working

3   on paperwork.  So we did that in your absence.  Please don't

4   hold that against anybody here.

5          We took our time when the Government was putting on

6   their case, and we're going to take our time when defense puts

7   on their case too.

8          So if I came across as short, please don't hold that

9   against the parties.  He's doing an excellent job, and all the

10  lawyers are doing an excellent job.  I've had them all here

11  before, and it's a pleasure to have them.

12         So we're going to keep it moving.

13         And with that said, Mr. Sellers, your witness.

14         And, members of the jury, if everybody will check

15  their phones.

16         And the Government has done a good job too.

17  Mr. Sellers has done a good job.  Mr. Westfall has done a good

18  job.  Mr. Gallian, Ms. Gallian have done a good job.

19  Everybody's done a good job, so --

20         MR. SELLERS:  As has Your Honor.

21         THE COURT:  Thank you.

22         MR. SELLERS:  You're welcome.

23         THE COURT:  We'll see if the court of appeals agrees.

24         All right.  Your witness, sir.

25         MR. SELLERS:  Thank you, ma'am.

```
 1   BY MR. SELLERS:
 2   Q.   Casi, before we broke, you said something that just kind
 3   of flew over my head.  You said, Bill had kind of turned me
 4   against Joe at that point.
 5   A.   Yes.
 6   Q.   Walk us through that, if you would.
 7   A.   I mean, he just was telling me negative things about Joe
 8   and would refer to him as greedy and basically tried to tell me
 9   Joe was like an imposter, wannabe police officer, would say all
10   kinds of stuff about him negatively.
11   Q.   So when we heard in one of the Government's exhibits
12   yesterday that you say to Bill, you know it's in Joe's DNA to
13   be shady, that would be from the influence of Bill?
14   A.   Right.
15   Q.   Not anything you have seen yourself, though, right?
16   A.   You know, when he quit on me, on the probation, it caused
17   me to have -- to see him a little different, because we needed
18   him in my -- what I was made to believe.
19   Q.   Right.
20   A.   And I -- I thought that he was quitting because he wasn't
21   getting any financial gain from it at the end there.
22   Q.   Right.
23        So let me ask you, we heard it in the recording that
24   there was a time y'all were out to eat with your son, right?
25   A.   Yes.
```

```
 1  Q.    Where you had to help Joe actually physically into the
 2  car?
 3  A.    Yes.
 4  Q.    I mean, his health was really deteriorating at that point,
 5  was it not?
 6  A.    Again, it was off and on.
 7  Q.    Right.  And his mom was dying also?
 8  A.    Unfortunately.
 9  Q.    And you actually attended his mother's funeral, didn't
10  you?
11  A.    I did.
12  Q.    Did Bill go with you?
13  A.    I believe Bill -- we all met there.
14  Q.    All right.  Anything else that you can think of that Bill
15  did to turn you against Joe?
16  A.    Not that I can think of right off the top of my head.
17  Q.    All right.  Let me just see if I can streamline some of
18  this.  I have a lot of recordings, a lot of text messages about
19  the truck.
20          You would agree with me that to Bill's -- or to Joe's
21  eyes the truck was a gift, right?  You gave him the truck?
22  A.    It was a form of payment for the time and effort he was
23  putting into my probation and other criminal charges that had
24  been going on.
25  Q.    And Bill had told you not to tell him about the financial
```

```
 1   part of it, right?
 2   A.   About the financial part in respect of him and what he was
 3   paid.
 4   Q.   Okay.  And so that's why -- I mean, Bill told you to give
 5   Joe the truck, right?
 6   A.   Bill did tell me to give Joe the truck.
 7   Q.   And you never once asked for the truck back from Joe, did
 8   you?
 9   A.   I reluctantly gave the truck to Joe.  I did not want to.
10   Q.   All right.  But you never told Joe you didn't want to give
11   him the truck, did you?  Told Joe?
12   A.   I don't believe so.  I don't know for sure, because it's
13   been so long.
14   Q.   It was an F-150, right?
15   A.   Yes.
16   Q.   All right.  Let's now kind of go through some of your
17   messages from DeLeon's Exhibit 55, also Government's
18   Exhibit 38.
19        When you were interviewed four, five times, you were
20   asked about the truck.  Do you remember all those times?
21   A.   I don't recall what interviews had what information.
22   Q.   Okay.  But you remember being asked about the truck.  I'm
23   not asking you to name which interviews, I'm just trying not to
24   have to play them all.
25   A.   Okay.  I do recall talking about the truck.
```

```
1   Q.   All right.  And so when you talked about the truck, it was
2   very clear in your interviews that to Joe the truck was a gift,
3   right?
4   A.   I don't know -- I haven't heard back the interview.
5   Q.   Okay.  How about as you sit here today, it's -- you know
6   that in your mind that Joe believed that truck was a gift,
7   right?
8   A.   I believe in my mind -- I can only speak for myself -- it
9   was a form of payment for his time.
10  Q.   And that's what Bill told you?
11  A.   It's what it was.
12  Q.   You know that Joe was a business owner, right?
13  A.   Yes.
14  Q.   Joe didn't have, you know, an alimony or settlement
15  payment to an ex-wife coming up, did he?  He drove a Mercedes
16  already.  Like, he didn't need your money.  You know that,
17  don't you?
18  A.   His business at the time was not doing well.  I believe he
19  actually changed ownership at some point.
20  Q.   Right.  Because he was spending so much time in Granbury
21  with you.
22  A.   Yes.  That was the point.
23  Q.   So I'm going to show you now from DeLeon's Exhibit
24  Number 55 --
25           MR. SELLERS:  Actually, first I would like to offer
```

1    DeLeon Exhibit Number 89.  It's a transcript from the May 5,
2    2020 interview between Casi and Brian Luley.
3            THE COURT:  All right.  Government, if you will let
4    me know if you have any objections, and Mr. Stone's counsel.
5            MR. SELLERS:  Specifically pages 92 and 127.
6            MS. RUDOFF:  No objection, Your Honor.
7            MR. GALLIAN:  No objection.
8            THE COURT:  It's admitted.
9            (Defendant DeLeon's Exhibit No. 89 received)
10   BY MR. SELLERS:
11   Q.   This is a transcript of your interview with Luley.  And
12   you can see here in 89 that Bill is like, just give it to Joe.
13   And I did.  Again, I did everything he told me to do, I'm not
14   sure exactly why now at this point.  I guess it was just like,
15   he's like give it to Joe.  And so I gave it to Joe.  And then
16   Joe went and sold it at CarMax.
17           Is that right?
18   A.   Yes.
19   Q.   Gave it to Joe like a gift, right?
20   A.   That is not how I would describe it.
21   Q.   All right.  And then on 127 you again tell him -- tell
22   Mr. Luley that, Bill just told me to give him the truck.  He
23   just said to give him the truck.
24           Do you remember that?
25   A.   Yes.

```
 1   Q.   And then we went through some of the texts, but here are
 2   the others.  These are all the texts after the truck.
 3            First one he sends you is, OMG.  This truck is sweet.
 4   I love it.  Thank you.
 5            That's on the day you give him the truck, right?
 6   A.   I'm not sure the date.
 7   Q.   Okay.  And then you don't respond by saying, hey, Joe, I
 8   really didn't want to give that to him, do you?
 9   A.   I didn't -- in this text, no, I did not.
10   Q.   In fact, to Joe what you said was, I hope you like it.
11   It's top of the line.  Right?
12   A.   I felt like I was hoping he would appreciate it.  I did
13   not -- I reluctantly gave it to him.
14   Q.   I understand now you're saying reluctantly.  But he didn't
15   know your reluctance, did he?
16   A.   I needed him to continue to help me in my probation.
17   Q.   But he didn't know your reluctance, did he?
18   A.   I think he knew.
19   Q.   What made you -- did you tell him?
20   A.   We spent a lot of time in person --
21   Q.   Did you tell him?
22   A.   -- together.
23   Q.   Did you tell him?
24   A.   I may have.  I don't know for sure.
25   Q.   I meant to say I know that you are at Celebrating Recovery
```

```
 1   and I should leave you alone, but I love this truck.  Thank you
 2   so much.
 3           Do you remember that?
 4   A.   I don't remember that.
 5   Q.   And then, please tell Slayter I said good night and sweet
 6   dreams.
 7           And that's your son, right?
 8   A.   Yes.
 9   Q.   And then actually you and Joe had a lot of talk about the
10   weather, didn't you, on the screenshots about rain and stuff
11   like that?  Do you recall?
12   A.   I -- we spoke about a lot of things, but I see now that
13   we're talking about -- he's referring to a snowstorm.
14   Q.   And then you asked him, did it hail on your truck?  Right?
15   A.   At this point it was his truck.
16   Q.   And at this point you never had expressed that reluctance
17   to -- or even asked him to give it back, did you?
18   A.   What good would that have done?
19           THE COURT:  Ma'am?
20           THE WITNESS:  I'm sorry.
21           THE COURT:  Please don't ask questions.
22           THE WITNESS:  Yes.  I just realized that.  Sorry.
23   BY MR. SELLERS:
24   Q.   And here Joe says, no, that is why I have been up all
25   night long.  I got in the truck and went and parked it
```

1    underneath the bridge.  Right?

2    A.   I see that.

3    Q.   And then actually that picture that you put in of what you

4    now call the family truck, that's a picture that Joe took,

5    isn't it?

6    A.   What are you talking about?

7    Q.   Remember the picture of the truck the Government offered?

8    Do you recall that?

9    A.   The picture of the F-150?

10   Q.   Yes, ma'am.

11   A.   Yes.

12   Q.   That is sitting outside Joe's house, isn't it?

13   A.   Yes.

14   Q.   It is a picture that Joe took and sent to you, isn't it?

15   A.   Yes.

16   Q.   He was proud of the truck, wasn't he?

17   A.   He appeared to like the truck.

18   Q.   All right.  I'm going to ask you this question.  Casi, you

19   would agree with me that you gave the truck to Joe, right?

20   True?

21   A.   I was told to give the truck to Joe.

22   Q.   And you followed what you were told and you gave it to

23   Joe?

24   A.   Yes.

25   Q.   Bill told you to give Joe the truck, didn't he?

```
 1   A.   Yes.
 2   Q.   True?
 3   A.   True.
 4   Q.   Bill told you to give Joe the truck for free, didn't he?
 5   Not to accept any money for it.
 6   A.   He was told to look as though he paid for it, so he wrote
 7   me a check and then I wrote him back.
 8   Q.   We're going to get there, ma'am.  Bill told you to give
 9   the truck for free, didn't he?
10   A.   Essentially.
11   Q.   So that's true?
12   A.   True.
13   Q.   Casi, you never asked for Joe to give the truck back, did
14   you?
15   A.   True.
16   Q.   And, Casi, you also, after you learned Joe sold the truck,
17   or at any point, you never asked Joe to give you any of the
18   money back from the sale of the truck, did you?
19   A.   Right.
20   Q.   True?
21   A.   True.
22   Q.   All right.  Let's talk now about what's been admitted as
23   DeLeon's Exhibit Number 99.  Do you recall that?
24   A.   Yes.
25   Q.   All right.  And this is the inventory and appraisement
```

```
 1   list of claims for your -- from Myrna's estate, right?
 2   A.   Yes.
 3   Q.   Okay.  And do you recall that you had to actually go under
 4   oath to sign this in front of Mr. Ottaway?
 5   A.   Yes.
 6   Q.   You had to swear that everything was true and correct,
 7   right?
 8   A.   Yes.
 9   Q.   Because you knew the probate judge would rely upon the
10   things you put in there, right?  That's how they probate a
11   will.  They have to rely upon what you swear is true, right?
12   A.   I just signed the -- well, assuming that the information
13   listed above was correct.
14   Q.   You didn't read it?
15   A.   I didn't know a whole lot about my grandmother's estate as
16   far as all of this goes, so I was relying that Andrew was
17   correct in all of his listings above.
18   Q.   All right.  And you swore that it was all true, correct?
19   A.   I was signing a document.
20   Q.   And stating on your oath, the same oath you took in front
21   of this jury.  You know that, right?
22   A.   Correct.
23   Q.   And you swore at that time that that F-150 was worth how
24   much?
25   A.   These aren't my numbers.
```

```
1    Q.   You swore at that time the F-150 was worth how much?
2    A.   20,000.
3    Q.   All right.  And so the day after getting the truck, Joe
4    writes you this check; is that right?
5    A.   Yes.
6    Q.   And it was for $20,100.00; is that correct?
7    A.   Yes.
8    Q.   You see the VIN number down there for the 2014 Ford truck?
9    A.   Yes.
10   Q.   And this has been remarked as 134, but this letter from
11   Ottaway is February 1, 2016, written to the trust account; is
12   that right?  Written to the -- to the life insurance account?
13   A.   Yes.
14   Q.   All right.  On 3-2 of '16, you open that Chase account.
15   Do you remember that?
16   A.   Yes.
17   Q.   Put in two deposits.  One for 200,000, right?
18   A.   It appears to be.
19   Q.   Another for 300,000, right?
20   A.   Yes.
21   Q.   So it appears that the letter worked and the life
22   insurance money came through, right?
23   A.   Yes.
24   Q.   All right.  And the same day you opened that account, you
25   also moved quite a bit of money from that account into your
```

 1  Navy Federal; is that correct?

 2  A.   I'm not sure.

 3  Q.   All right.  And so you wrote Joe a check back the same day

 4  that you put a million -- or 500 -- $1 million into the bank,

 5  essentially, and wrote Joe a check back that same day for

 6  $20,100.00; is that right?

 7  A.   Yes.

 8  Q.   Okay.  So the timeline is 2-16-16, he gets the truck.

 9            2-17-16, title transferred to Joe.

10            And Joe and you went to the tax assessor/collector's

11  office together, didn't you?

12  A.   I met him there.

13  Q.   And somebody had to write a check for the tax, title, and

14  license, didn't they?

15  A.   I'm not sure.  I just remember Joe writing the check to

16  me.

17  Q.   To you and then also somebody had to pay for the title

18  transfer.  You know that, right?  And if it's not in your

19  records, somebody did it?

20  A.   I have never transferred title, so I don't know.

21  Q.   Fair enough.

22            So you don't know that there is also a presumptive

23  value for a 2014 Ford F-150 from the tax assessor's office?

24  A.   I wasn't sure how any of that worked.

25  Q.   Would it surprise you that the presumed value that's

1   actually in the forms that you signed to transfer title was
2   $20,500.00?
3   A.   I'm not sure.
4   Q.   2-19-16, you get your new Lexus.
5          And then 3-2, you opened 500,000 and write a check
6   for 20,000.
7          Is that right?
8   A.   I was writing a check to Joe for -- to pay him back for
9   the truck.
10  Q.   Okay.  Because Bill had told you no financials to Joe,
11  right?  We don't want Joe to have --
12  A.   Bill said pay for the truck and she'll write you a check
13  back.
14  Q.   Okay.
15  A.   Or something along those lines.
16  Q.   All right.  Let's talk now about the $15,000.00, the check
17  that you wrote to Joe.  Again, this is something that Bill told
18  you to do; is that right?
19  A.   Correct.
20  Q.   And you never told Joe, hey, I don't want to give you a
21  check for 15,000, did you?
22  A.   I thought it was necessary for him to continue to help me.
23  His business was failing.
24  Q.   And so you never told Joe that you didn't want to give him
25  that check, did you?

```
 1   A.   I don't know.
 2   Q.   Okay.
 3        MR. SELLERS:  Permission to show the jury
 4   Government's Exhibit 38?
 5        THE COURT:  Has that previously been admitted, sir?
 6        MR. SELLERS:  It has, Your Honor.
 7        THE COURT:  All right.  Granted.
 8        MR. SELLERS:  And I'm starting with the little red
 9   right Number 237.
10        THE COURT:  And members of the jury, if you will let
11   us know if you have any problems seeing that, please.  Thank
12   you.
13        MR. SELLERS:  All right.
14        THE COURT:  Mr. Sellers, if you have any IT problems,
15   let me know.
16        MR. SELLERS:  I think I've got it.
17        THE COURT:  Okay.  Great.
18   BY MR. SELLERS:
19   Q.   Okay.  Here we are.  We see on January 28th a text from
20   you to Joe:  When you want to come pick up your check, I have
21   it here.  Is that right?
22   A.   Yes.
23   Q.   And then Joe sends back:  Just checking to see if you got
24   home safe with your son Cascade.  Let me know so I can go to
25   sleep.  Right?
```

```
 1   A.   Yes.

 2   Q.   143, what does that stand for?

 3   A.   I love you.

 4   Q.   And you say, Aww.  Is that right?

 5   A.   Yes.

 6   Q.   Okay.  It looks like some either blank texts or photos

 7   were sent there.

 8        Then 1-28-16, you can make it happen, something blank

 9   was sent, and then, yes, you can from Joe, right?  More

10   encouraging stuff from Joe?

11   A.   I couldn't -- it's blinking on my screen.  It wasn't

12   clear, so I can't -- it was jumping off screen.

13   Q.   Can you see it now?

14   A.   The ones previous to it.

15   Q.   Blank?

16   A.   Okay.

17   Q.   And he sends to you, Casi, have a wonderful day.

18        And you say, you too.

19        And I just woke up, 6:54 a.m., on the 29th.

20        See -- and you say, can I call you real quick?

21        Is that right?

22   A.   Yes.

23   Q.   And Joe of course says yes.

24        Let me ask you this before I move on from this

25   15,000.
```

```
 1              Was there ever a time you asked Joe to do something
 2    for you and he said no?
 3    A.   I don't know.
 4    Q.   Can you think of one?
 5    A.   Not right off the top of my head.
 6    Q.   Okay.  You would agree with me no texts on the day of, the
 7    day after saying, Joe, I really didn't want to give you that
 8    money?  Nothing like that, right?
 9    A.   There wasn't a whole lot of extra time for thinking during
10    this time.  It was very chaotic.  All kinds of stuff going on.
11    All I was really concerned with -- my priorities were my
12    freedom, being a mom, going to school, and doing all of the
13    things that I was required to do from the judge.
14    Q.   All right.  Here we go.  1-29, you to Joe:  I love you,
15    Joe, and I'm grateful for our friendship.
16              Do you see that?
17    A.   Yes.
18    Q.   And he says, you're so sweet.  I'm so happy to help.  I
19    feel horrible for what you're going through.  You shouldn't
20    have to be going through any of this.  Life is not supposed to
21    be this way at all.  I appreciate your friendship.
22              Do you remember that?
23    A.   Yes.  This -- yes.
24    Q.   And then you tell him you're not trying to bother him, but
25    you're in town killing time until y'all can have lunch.  Don't
```

```
 1   feel obligated.
 2             Do you see that?
 3   A.   I see that.
 4   Q.   Okay.  And Joe tells you he's teaching a hostage
 5   negotiations class and will be out at 2:00 or 2:30.
 6             Do you see that?
 7   A.   Yes.
 8   Q.   And then you say you thought it was 12:00 or 1:00, and he
 9   says if he gets out sooner he'll let you know.
10             And then y'all meet at the -- ultimately eat at --
11   I'm guessing that's the Flying Fish on Montgomery?
12   A.   Yes.
13   Q.   Good place, right?
14   A.   Yes.
15   Q.   And he says, just pulled up.  You here yet?
16             I guess y'all go in and have a late lunch and just
17   trying to get through this.
18             But that's when you gave him the check ultimately was
19   at the Flying Fish; is that right?
20   A.   I'm not sure.
21   Q.   Okay.  Fair enough.
22             But, again, nothing surrounding that that would lead
23   Joe, you know, from these messages to believe, hey, she doesn't
24   want to give me this check, is there?
25   A.   Not based on these text messages.
```

```
 1    Q.   Let me ask you this.  Joe never asked you for money,
 2    did he?
 3    A.   No.
 4    Q.   So that's true?
 5    A.   True.
 6    Q.   You never asked Joe to give you any money back, did you?
 7    A.   Correct.
 8    Q.   True?
 9    A.   True.
10    Q.   And you did do that with Bill.  We've heard it, right?
11    A.   I was -- I was okay with giving this money as long as it
12    was going to keep me with my kids and free.
13    Q.   All right.  I'm -- we're almost done, I promise you.
14              The computer, the laptop computer, you would agree
15    with me that you bought Joe -- I think you bought yourself one,
16    Bill -- did -- well, you bought Joe a laptop computer, right?
17    A.   I did.
18    Q.   And it was a gift, right?  It was a Christmas gift?
19    A.   I bought him a laptop and cell phone so he could do his
20    reports on me.
21    Q.   Right.
22    A.   For Bill.
23    Q.   I mean, Joe never did reports on you, right?  You gave him
24    3x5s.  He gave those to Bill.  That was kind of the procedure?
25    A.   Right.  But I think there was other things he was doing
```

```
 1   for CPS and -- in regards to that.
 2   Q.   According to Bill?
 3   A.   According to the situation.
 4   Q.   Bill?
 5   A.   According to Joe and Bill.
 6   Q.   Okay.  The computer was a gift, was it not?
 7   A.   I mean, personally, it was -- it was -- it was for so that
 8   he could do work for my case.
 9   Q.   Okay.
10        MR. SELLERS:  I'm going to republish Government's 38.
11   BY MR. SELLERS:
12   Q.   All right.  Here at the very bottom we can see you to Joe,
13   have you used your computer yet?  On January 10th of 2016.  Is
14   that right?
15   A.   Yes.
16   Q.   And then on January 10th, he says, yes, I'm still adding
17   some of the sites that I need for my sales tax and 941 tax.
18   That's what I was doing the other day, but ended up on the
19   phone all day in my pajamas.
20        And you say, okay, just checking.  Do you like it?
21        Right?
22   A.   Yes.
23   Q.   So the text he tells you he's doing stuff is for his
24   restaurant; is that right?
25   A.   Repeat the -- what you just said.
```

```
 1   Q.   The sales tax and 941 tax, those are things he did for his
 2   restaurant, right?  He wasn't doing those for you?
 3   A.   I'm sure he was combining the two.
 4   Q.   You didn't say, hey, that is not for you to use on your
 5   restaurant.  That is for you to use only on my stuff.  You
 6   didn't say anything like that, did you?
 7   A.   I did not.
 8   Q.   Instead you say, you know, do you like it, right?
 9   A.   Yes.
10   Q.   Let's jump forward a few weeks.
11            Casi, thank you so much.  I wanted to do this no
12   matter what and I did.  You are awesome, you've made my life so
13   much easier and better.  I just needed to take the time to get
14   it up and running and build the shortcuts.
15            Do you see that?
16   A.   Yes.
17   Q.   Yay!  You got your computer running!
18            Do you see that from you?
19   A.   Yes.
20   Q.   Just to spare everybody from having to go through, there's
21   no text message where you say, hey, that computer is for my
22   probation, is there?
23   A.   No, I wouldn't say that.
24   Q.   You gave him the computer right after -- right around
25   Christmas or at Christmas, didn't you?
```

```
 1   A.   It seems that way.
 2   Q.   And so you can understand how somebody might think that
 3   was a gift, right?
 4   A.   That was right around the time of the probation starting.
 5   Q.   Again, though, to Joe it seemed like a gift, didn't it?
 6   A.   I don't know how he perceived receiving the laptop.
 7   Q.   Okay.  Let's keep moving.
 8            Casi, you have interviewed for hours upon hours upon
 9   hours with law enforcement.  You know that, right?
10   A.   Yes.
11   Q.   And did you know that -- I mean, we have interviews
12   that -- binders, probably like five of them this full of
13   transcripts front and back with you talking to law enforcement.
14   Do you know that?
15   A.   I didn't know that.
16   Q.   And did you know that nowhere, not a single time -- and
17   these guys told you it's important to tell us everything you
18   know, right?
19   A.   Yes.
20   Q.   And it's important not to leave out any important detail,
21   right?
22   A.   Right.
23   Q.   You knew all that.
24   A.   I was just telling the story.
25   Q.   Right.  And the story that you told over five binders
```

1    worth of transcripts never once mentioned this 5,000 cash you

2    say you gave Joe now on direct examination.

3    A.   I don't believe so.  I believe it did.  That was part of

4    my experience.

5    Q.   Okay.  So Mr. Luley is in here.  He can clear that up, I

6    guess, before he comes to testify.  But if it's not in there,

7    would that surprise you?

8    A.   I'm not sure what you're referring to.  Which interview?

9    Which time?

10   Q.   All of them.  Not once do you mention giving 5,000 cash to

11   Joe ever.  Did you know that?

12   A.   I have mentioned it.

13   Q.   Okay.

14   A.   I remember.

15   Q.   Let's talk about the money.  Is it possible you're

16   mistaken about who you gave that money to?

17   A.   No.

18   Q.   Okay.

19          MR. SELLERS:  Permission to publish again

20   Government's Exhibit 38.

21          THE COURT:  Already admitted, I believe.  Correct?

22          MR. SELLERS:  Yes, ma'am.

23          THE COURT:  You may publish.

24   BY MR. SELLERS:

25   Q.   Here we are on January 9th of 2016.  Okay, well, what

```
 1   happened -- oh, just got off the phone with B.
 2            Okay.  What happened?
 3            My mom wants me to record Slayter playing and send it
 4   to her.
 5            These are conversations between you and Joe; is that
 6   right?
 7   A.   Yes.
 8   Q.   And you say I haven't answered it.
 9            Do you see that?
10   A.   Yes.
11   Q.   And then I guess your mom asked you to Facetime.  Do you
12   see that down there?
13   A.   Yes.
14   Q.   Okay.  That's the very end.
15            So up here at the top -- oh, here we are, 1-7.  Okay.
16   That was after.  You and Joe are talking about a workout you're
17   about to do.  Do you see that?
18   A.   Yes.
19   Q.   And you tell him you need to talk to him and that your mom
20   has just text you.  Do you see that?
21   A.   Yes.
22   Q.   Then he texts you back -- this is on January 7th -- you
23   have one minute to talk before you go.
24            Do you see that?
25   A.   Yes.
```

```
 1   Q.   And then you send Joe a screenshot of something.  I won't
 2   even try to pull it up.  And say, should I let her?  I say no,
 3   but I don't know.
 4             Do you see that there?
 5   A.   I do see that.
 6   Q.   Okay.  Maybe -- and then Joe tells you, maybe next time.
 7   He's grounded for talking in class.  I have him reading a book
 8   and he's going to bed at 8:30.  We have structure in our house.
 9             Do you see that?
10   A.   Yes.  That was the response he was wanting to give back to
11   my mom.
12   Q.   Okay.  Did you do it?
13   A.   I don't know if I did that or not, but this was during the
14   time that they were trying to keep me away from my mom.
15   Q.   All right.  Are you at work? you ask.
16             And then he says, Casi, SA Stone called you and spoke
17   with you yet tonight?  If not, he calls you -- will you please
18   call -- after he calls you, will you please call me?
19             SA stands for special agent, does it not?
20   A.   Yes.
21   Q.   Okay.  Let's jump down to your text.
22             Good morning.  This is on the 8th.  I feel better.  I
23   love you, Joe.  Thank you for everything.  My 3x5 is full for
24   the day.  I'll call you when I get done with my workout,
25   discuss my plan for the day.  God is good.  Hope you finally
```

```
 1    got some rest.

 2              Do you see that?

 3    A.   Yes.

 4    Q.   And then screenshot, blank text.

 5              Do I need to meet up with you or wait till later?

 6    I'm getting money now so you can do with the money -- do what

 7    you want with the money I gave you.

 8              Do you see that one?

 9    A.   I do.

10    Q.   All right.  And then Joe says, I will deposit it in my

11    restaurant bank account tomorrow morning.  Thank you.  I am

12    just now getting to the bank.

13              Did you know that the only deposit that you -- or

14    withdrawal you made during that timeframe was actually on

15    the 8th after this text message with Joe?  Did you know that?

16    A.   I don't know.

17    Q.   Possibly you were mistaken about that $5,000.00 and that

18    maybe you gave Joe a different amount the day before?

19    A.   I don't recall.

20    Q.   You can't rule out that possibility, can you?

21    A.   I'm not sure.  I don't have all the information that I

22    need to answer that question.

23    Q.   Okay.  Let's keep going.

24              Then we get back into a familiar territory we've

25    already seen.  Do you need anything from Sam's?
```

1              Trash bags.

2              Okay.  I can't sleep.

3              And he comes over at 3:00 in the morning, right?

4    A.   Yes, he did.

5    Q.   Possible that you were just mistaken about where that

6    money went?

7    A.   I don't -- I'm sorry, I don't feel like that has anything

8    to do with the money statement.

9    Q.   All right.  And no matter what, though, at the heart of

10   this, you didn't just give the money to Joe because he asked

11   you, because he never asked you for money, right?

12   A.   It was specifically for trying to help him when he -- his

13   business was failing because of all the time he was required to

14   spend with me for my probation and --

15   Q.   According to --

16   A.   According to Bill.

17   Q.   So you -- when you gave Joe the money, told him, here, do

18   what you want with this money, right?

19   A.   Correct.

20   Q.   Again, to Joe looks like a gift, correct?

21   A.   I can't speak for him.

22   Q.   If you were to receive that money and nobody said a word

23   to you about it, you would think that was a gift, wouldn't you?

24   A.   I'm not sure I would.  I'm not sure.  I can't answer that.

25   Q.   Well, let me ask you this.  Your grandma has given you a

 1  lot of things over the years, right?

 2  A.   Yes.

 3  Q.   And you accepted those things, right?

 4  A.   It was family, and she was my main source of income for a

 5  while.

 6  Q.   She didn't have to give you anything.  They were gifts.

 7  You know that.

 8  A.   It was more of a salary I was given from her.

 9  Q.   Okay.  You understand the difference between a gift,

10  though, and a fraud, right?

11  A.   I guess, yes, I do.

12          THE COURT:  Counsel, when you reach a good breaking

13  point, we will take our morning break.

14          MR. SELLERS:  Believe it or not, it's my last

15  question.

16          THE COURT:  Perfect.

17  BY MR. SELLERS:

18  Q.   All right.  We started here and I want to end here.  Now

19  having heard everything, had a few nights to sleep on it, I'm

20  going to ask you again, can you rule out the possibility that

21  maybe, like you, Joe believed that Bill was in the FBI the

22  entire time?

23          MS. RUDOFF:  Objection, Your Honor.  This calls for

24  speculation.

25          THE COURT:  Overruled.

```
 1   A.   I can't say for sure.
 2   Q.   But you can't rule out that possibility, can you?  True?
 3   A.   I'm on the fence.
 4   Q.   You have a reasonable doubt about whether that's true or
 5   not, don't you?
 6            MS. RUDOFF:  Objection, calls for a legal conclusion.
 7            THE COURT:  Sustained.
 8            MR. SELLERS:  Pass the witness, Your Honor.
 9            THE COURT:  All right.  Okay.  Members of the jury,
10   let's take our morning break.
11            All rise for the jury, please.  See you in about half
12   an hour.  Thank you for your time and attention.
13            (Jury out)
14            THE COURT:  All right.  Everyone please be seated.
15            Taylor, I'm going to e-mail you something to print,
16   if you don't mind.
17            Do we need to take anything up before our break?  No?
18            All right.  Going once, twice, three times.  Great.
19            Let's have a break, and you guys let me know if you
20   need something.
21            Got some extra kolaches, just saying.
22            You guys please be seated.
23            (Discussion off the record)
24            THE COURT:  Court is in recess for a little while.
25            MR. GALLIAN:  Thank you.
```

```
 1                    THE COURT:  Thank you.
 2                    (Recess)
 3                    SECURITY OFFICER:  All rise.
 4                    THE COURT:  Jury is ready, so stack them up and bring
 5       them in.
 6                    Anything we need to take up before we bring them in?
 7                    MR. GALLIAN:  No, Your Honor.
 8                    (Discussion off the record)
 9                    SECURITY OFFICER:  All rise for the jury.
10                    (Jury in)
11                    THE COURT:  All right.  Please be seated.
12                    And if everybody will check their phones.  Make sure
13       they are off.
14                    And with that said, your witness, ma'am.
15                    MS. RUDOFF:  Thank you, Your Honor.
16                    THE COURT:  You're welcome.
17                             REDIRECT EXAMINATION
18       BY MS. RUDOFF:
19       Q.   Casi, I just want to go over some things that I think are
20       important for us to clarify for the jury, okay?
21       A.   Okay.
22       Q.   Defense counsel talked about your grandparents buying
23       houses for you.  Do you recall that?
24       A.   Yes.
25       Q.   Who lived at those houses?
```

```
 1    A.   Me and my kids.
 2    Q.   Did you tell your grandparents to buy those houses for
 3    you?
 4    A.   No.
 5    Q.   At the time your grandparents bought those houses, as far
 6    as you know, were they under any threat when they purchased
 7    them for you?
 8    A.   No.
 9    Q.   Were they in fear of going to prison?
10    A.   No.
11    Q.   Mr. Gallian talked -- and Mr. Sellers talked a lot about
12    your meetings with law enforcement, right?
13              MR. SELLERS:  Excuse me, I can't hear.
14              MS. RUDOFF:  Sorry.
15              THE COURT:  Members of the jury, can you hear okay?
16    Yeah.  And let me know.  Why don't we just do a quick sound
17    check -- and off the record for just a second.
18              (Discussion off the record)
19              THE COURT:  Your witness, ma'am.
20              And if you guys have problems hearing, let me know.
21    Thank you.
22              MS. RUDOFF:  Thank you, Judge.
23    BY MS. RUDOFF:
24    Q.   Defense counsel talked about your meetings with law
25    enforcement between 2019 and 2021.  Do you recall that?
```

```
 1   A.   Yes.
 2   Q.   Would you say there were a lot of instances that you had
 3   meetings with them?
 4   A.   There were several meetings.
 5   Q.   And from your understanding, what were the purposes of
 6   those meetings?
 7   A.   To tell my story and I guess for them to hear my
 8   experience.
 9   Q.   Were you providing them documents or recordings as well?
10   A.   I did.
11   Q.   And when you would meet with them, would they ask you
12   questions?
13   A.   Yes.
14   Q.   Would you answer those questions?
15   A.   Yes.
16   Q.   Defense counsel, Mr. Gallian, mentioned that the first
17   time you met and had an interview with Ranger Briley that you
18   stated you believed Bill Stone was a CIA agent.  Do you recall
19   that?
20   A.   I do.
21   Q.   And that your response to Mr. Gallian was that that was
22   not, in fact, accurate, right?
23   A.   Right.
24          MS. RUDOFF:  Your Honor, may I approach the witness?
25          THE COURT:  You may.
```

```
 1              (Pause)
 2    BY MS. RUDOFF:
 3    Q.   Casi, I just handed you a transcript of your first meeting
 4    with Ranger Briley on July 29, 2019.  Do you see that there?
 5    A.   Yes.
 6    Q.   And on the first page of the transcript, when the
 7    interview starts, can you please read what Ranger Briley said
 8    he understood you were there about?  It's a highlighted
 9    portion.
10    A.   He said -- I read it?
11    Q.   Yes.
12    A.   "So the only thing I know essentially is I guess there's
13    some FBI agent you are engaged to or were."
14    Q.   And what is your response?
15    A.   "Yeah."
16    Q.   Can you turn to the second tabbed page of that same
17    interview on July 29, 2019?  And can you tell me the page of
18    the highlighted text?
19    A.   38.
20    Q.   And can you please read the highlighted text from that
21    page slowly?
22    A.   "So he was at the FBI and then he was CIA, and then his
23    unit is North Korea, and he also then took over -- when he
24    retired, he then had to take over three others.  So it was
25    Dallas, Houston, and D.C.  But they have, like, South Africa
```

1    and North Korea, like, different things like that supposedly.

2    But right now he's contracted out, but during that time he was

3    still in the CIA is all I know about that."

4    Q.    And who's speaking?  Whose words are those that you

5    described?

6    A.    Those are my words.

7    Q.    And so is that where you're explaining how you understood

8    Bill Stone to go from an FBI agent to a CIA agent?

9    A.    Yes.

10   Q.    Casi, I want to talk about just for a second --

11   Mr. Gallian talked about your grandmother's will.

12            MS. RUDOFF:  If we could republish DeLeon Exhibit

13   Number 99.

14            THE COURT:  And that's already been admitted?

15            MS. RUDOFF:  Yes, Your Honor.

16            THE COURT:  All right.  Permission to publish is

17   granted.

18            MS. RUDOFF:  Page 3, if you don't mind, Nicole.

19            THE COURT:  Members of the jury, can you see that

20   okay?  No?  Okay.

21            MS. RUDOFF:  I'll blow it up.

22            THE COURT:  All right.

23            MS. RUDOFF:  Can you blow up the paragraph II on page

24   3?

25            THE COURT:  And defense counsel, if anybody from your

```
 1    teams need to move, I've got that row for you.
 2              MR. SELLERS:  Thank you.
 3              THE COURT:  You're welcome.  Feel free to move about.
 4    You don't need my permission to move up.
 5    BY MS. RUDOFF:
 6    Q.   Casi, you recognize this document as the documents related
 7    to your grandmother's will, correct?
 8    A.   Yes.
 9    Q.   Can you tell us here in paragraph 2, what percentage of
10    the will did you personally inherit?
11    A.   50 percent.
12    Q.   Is that what this document here says?
13    A.   Yes.
14    Q.   Who did the rest go to?
15    A.   My kids.
16    Q.   And what does this document say the division of that is?
17    A.   25 percent per kid.
18    Q.   Thank you.
19              Defense counsel also asked whether or not you
20    transferred any assets from your name or from the estate into
21    the Defendants' name, right?
22    A.   Yes.
23    Q.   And I believe when asked the question you said that you
24    did not do that?
25    A.   Right.
```

```
 1   Q.   What about the F-150, the truck?  Was that transferred
 2   into -- out of the estate name and into one of the defendants'
 3   names?
 4   A.   Yes.
 5            MS. RUDOFF:  Can we republish Government's Exhibit
 6   Number 21, page 4?
 7            THE COURT:  Permission granted.
 8            MS. RUDOFF:  And can we highlight -- I'm sorry.
 9            THE COURT:  That's all right.
10            MS. RUDOFF:  Page 6.
11            Can we highlight the top portion of the certificate
12   of title?
13   BY MS. RUDOFF:
14   Q.   Casi, do you recognize this as the title for the F-150
15   that was your grandmother's?
16   A.   Yes.
17   Q.   And who does it say is the previous owner?
18   A.   The trust, my grandmother's trust.
19   Q.   And who does it say it was then transferred to ownership
20   of?
21   A.   Joseph DeLeon.
22   Q.   And what about the Lexus that you had to give Bill Stone?
23            MS. RUDOFF:  Can we put up Government -- republish
24   Government Exhibit 136?
25            THE COURT:  You may.
```

```
 1                MS. RUDOFF:  Actually, before we do that -- I'm
 2    sorry, Your Honor.  Can we go back to Government's Exhibit 21,
 3    the F-150?
 4                THE COURT:  I'm assuming all this has already been
 5    admitted, so tell me if it's not.
 6                MS. RUDOFF:  Yes, Your Honor.
 7                THE COURT:  All right.
 8                MS. RUDOFF:  And can we jump to page 10?
 9                And can we highlight the bottom portion starting with
10    Section 33?
11    BY MS. RUDOFF:
12    Q.   Casi, do you see at the top here where Section 33 is, what
13    is part (a)?  What does it say?
14    A.   It says the sales price.
15    Q.   And what is that price that's written in?
16    A.   $20,100.00.
17    Q.   And did you give the truck to Joe DeLeon or sell it to
18    him?
19    A.   I was told to give it to him.
20    Q.   Did Joe DeLeon, in fact, pay you for the truck?
21    A.   On this day.
22    Q.   Okay.  And how much did he give you a check for?
23    A.   He wrote a check for $20,100.00.
24    Q.   And then did you write him a check back?
25    A.   Yes.
```

```
 1    Q.   For how much?
 2    A.   The same amount, $20,100.00.
 3    Q.   After you wrote him that check back, is it true that Joe
 4    DeLeon had actually paid for the truck?
 5    A.   No.
 6    Q.   And why was it necessary to create this fake paper trail?
 7    A.   To appear as though he bought the truck if my -- anyone in
 8    my family questioned him having the truck.
 9              MS. RUDOFF:  If we could zoom out on this page.
10    BY MS. RUDOFF:
11    Q.   Casi, the information we see written -- handwritten in the
12    top, is that your handwriting?
13    A.   No.
14    Q.   So you did not fill this document out, right?
15    A.   No.
16    Q.   But that is your signature?
17    A.   Yes.
18    Q.   And so you wouldn't have been the one to fill in
19    the 20,100?
20    A.   Right.
21    Q.   Now I want to talk about the Lexus that you gave to Bill
22    Stone as payment.
23              MS. RUDOFF:  Can we republish Government Exhibit 136,
24    please?
25              THE COURT:  Yes.
```

```
 1              MS. RUDOFF:  And can we go to page 8?
 2              THE COURT:  And just for ease of -- once something is
 3    admitted, you need not ask permission to publish.  I'll grant
 4    permission to publish.
 5              MS. RUDOFF:  Can we zoom in on the top portion?
 6    BY MS. RUDOFF:
 7    Q.   Casi, is this the Lexus that was discussed earlier you
 8    gave to Bill Stone as a result of your secret probation?
 9    A.   Yes.
10    Q.   And who does it list as the previous owner?
11    A.   Me.
12    Q.   And who does it list at this point in time as the current
13    owner?
14    A.   William Roy Stone, Jr.
15    Q.   So based on this document, is it true, in fact, that you
16    did transfer assets into -- from your name or the estate's name
17    to DeLeon and Stone's?
18    A.   Yes.
19              MS. RUDOFF:  Can we go to page 13 of Government 136?
20    Nicole, do you mind?
21    BY MS. RUDOFF:
22    Q.   Casi, I want to go into a little more detail that we
23    haven't talked about as to how the transaction with your Lexus
24    came about, okay?
25    A.   (Indicating in the affirmative)
```

```
1   Q.   Do you recall being told about a video and a neighbor that
2   related to your Lexus?
3   A.   Yes.
4   Q.   What were you told?
5   A.   I was told that my neighbor had put oxycodone under the
6   floor mat of my car.
7   Q.   Which car?
8   A.   This Lexus.  And it just so happened to be the person
9   living in my mom's house, so my mom's tenant.
10  Q.   Who told you this?
11  A.   Bill.
12  Q.   And did he tell you there was a video recording showing
13  that that occurred?
14  A.   Yes.
15  Q.   What happened after -- what did Bill tell you he needed to
16  do after he said this video existed of someone putting drugs in
17  your vehicle?
18  A.   He took it to Dallas to have the drug dog, Queenie, look
19  through it to ensure there wasn't any more drugs in the
20  vehicle.
21  Q.   Prior to Bill Stone saying he needed it to take it to
22  Dallas Police Department to have a drug dog go through it, did
23  Bill Stone and Joe DeLeon, while you were standing there, look
24  through the vehicle themselves?
25  A.   Yes.
```

```
1    Q.   What happened when they looked through the vehicle
2    themselves?
3    A.   They found oxycodone underneath the floor mat of the
4    driver's seat.
5    Q.   When you say "they," who was in the vehicle when these
6    drugs were found?
7    A.   Bill and Joe.
8    Q.   And were you in the vehicle when the drugs were found?
9    A.   No.
10   Q.   Did you see the drugs themselves?
11   A.   No, I didn't.
12   Q.   Once Bill and Joe tell you while you're standing there
13   that they've now found drugs in your vehicle, what did you want
14   to happen with the vehicle?
15   A.   I was -- I didn't want to drive the vehicle.
16   Q.   Why not?
17   A.   I was scared that someone had planted drugs in there.
18   Q.   Why did the fact that someone who had planted drugs in
19   there scare you?
20   A.   If I had gotten pulled over, it would have revoked my Hood
21   County probation.
22   Q.   And so then is that why Bill Stone told you he would take
23   it to DPD, Dallas Police Department, and have their drug dogs
24   check it out?
25   A.   Yes.
```

```
 1   Q.   Were you told that Bill, in fact, did that?
 2   A.   Yes.
 3   Q.   Did Bill tell you the result of that?
 4   A.   Yes.
 5   Q.   What did he say?
 6   A.   There were more oxycodone underneath the area where my son
 7   sat.
 8   Q.   Once you were told that, did you want the car back?
 9   A.   No.
10   Q.   What then -- what's the next thing that happened with the
11   car?
12   A.   He then took it -- he -- he kept it and drove it down and
13   did a transfer of owner -- or title, brought up the paper for
14   me to transfer it to him, and that was the payment that I
15   thought was good enough for what he had done so far in
16   helping me.
17   Q.   To be really clear, what you just discussed, when you say
18   "he," who are you referring to?
19   A.   Bill.
20   Q.   And I want you to take a look at what's shown here on the
21   screen.
22          MS. RUDOFF:  This is republishing Government's
23   Exhibit 136, page 13.
24   BY MS. RUDOFF:
25   Q.   Is this the document that Bill Stone brought you?
```

```
 1   A.   Yes.
 2   Q.   And did you fill out any of the top portion of it?
 3   A.   No.
 4   Q.   Other than your signature, did you fill out anything in
 5   the bottom portion of it?
 6   A.   No.
 7           MS. RUDOFF:  For purposes of the jury, can we
 8   highlight Section 33 and below?
 9   BY MS. RUDOFF:
10   Q.   Casi, do you see here Section 33?  What does it that say
11   under (a)?
12   A.   20,100.
13   Q.   What does it say that number is in reference to?
14   A.   The sales price.
15   Q.   Did you sell this vehicle to Bill Stone?
16   A.   No.
17   Q.   And what is the listed sales price in that column?
18   A.   $36,200.00.
19   Q.   No, I'm sorry.  That's the taxable amount.
20   A.   Oh.
21   Q.   So under (a), what is the listed sales price?
22   A.   I'm sorry.  $20,100.00.
23   Q.   Is that the exact same price of the F-150 that you had to
24   give to Joe DeLeon?
25   A.   Yes.
```

```
 1   Q.   And is that your signature?
 2   A.   Yes.
 3   Q.   When is the next time you saw this vehicle?
 4   A.   At the Mercedes place for when -- it was the trade-in for
 5   the purchase of the Mercedes.
 6   Q.   Mr. Gallian talked a lot about your phone that you handed
 7   over to law enforcement when you met with them, the one you had
 8   in your possession still.  Do you recall that?
 9   A.   Yes.
10   Q.   And Mr. Gallian, I believe we all recall, set up stacks
11   and stacks of paper that he stated was the extraction from your
12   phone, right?
13   A.   Yes.
14   Q.   I think he said it was 99,000 pages.  Do you recall that?
15   A.   I recall that, yes.
16   Q.   Would it surprise you to know that of those 99,000 pages,
17   only 19,000 of them were your text messages?
18   A.   Could have been, yes.
19   Q.   And so those were all your messages from 2015 to 2019,
20   right?
21   A.   Yes.
22   Q.   And Mr. Gallian said there was texts with your friend
23   Daralyn, right?
24   A.   Yes.
25   Q.   And your church people, right?
```

```
 1   A.    Yes.
 2   Q.    If those are the texts from your phone from 2015 through
 3   2019, would you expect there to be texts between you and Joe
 4   DeLeon in that phone?
 5   A.    Yes.
 6   Q.    A lot of texts or a little bit of texts?
 7   A.    A lot of texts.
 8   Q.    Would you expect there to be texts between you and Bill
 9   Stone?
10   A.    Yes.
11   Q.    A lot of texts or a little bit of texts?
12   A.    A lot.
13   Q.    Casi, would you be surprised to know that there are less
14   than 300 pages of texts between you and Joe DeLeon that were
15   recovered from your phone for the entire four-year period?
16   A.    That would be surprising.
17   Q.    Would you also be surprised to know that there were less
18   than 400 pages of texts between you and Bill Stone left in that
19   phone when you handed it over to law enforcement?
20   A.    Yes.
21             MS. RUDOFF:  Your Honor, may I approach?
22             THE COURT:  You may.
23             (Pause)
24   BY MS. RUDOFF:
25   Q.    Casi, I have handed you those pages that were extracted by
```

1    law enforcement from your phone and the text messages we just

2    discussed.

3          Looking at the messages between you and Joe DeLeon,

4    on the front, can you tell me what the first earliest date of

5    the text messages is?

6    A.   January 13th of 2017.

7    Q.   And turning now to the stack I handed you with regards to

8    your text messages between you and Bill Stone, can you tell me

9    what the first date of the first text is on that?

10   A.   March 31st of 2019.

11   Q.   Between 2015 and 2019, did anyone other than you have any

12   kind of access to your phone?

13   A.   Yes.

14   Q.   Who?

15   A.   Bill.

16   Q.   And how do you know beyond just that he told you that Bill

17   Stone had access to your phone?

18   A.   I saw that it was logged in at his house.

19   Q.   And did this access exist up until the point in which you

20   handed your phone over to law enforcement?

21   A.   Yes.

22   Q.   So I think as Mr. Sellers stated, it would be fair to say

23   there's a lot of text messages deleted from your phone as it

24   pertained to Joe DeLeon and Bill Stone during that time period,

25   right?

```
 1   A.   Yes.
 2   Q.   Casi, did you delete all of those text messages between
 3   you and DeLeon and you and Bill Stone?
 4   A.   I did not.
 5   Q.   And is it -- never mind.
 6             We discussed and it was brought up again on cross
 7   about the requirement that you had to give Bill Stone money for
 8   travel expenses.  Do you recall that?
 9   A.   Yes.
10   Q.   And how much did you say that amount would be each time
11   generally?
12   A.   $5,000.00.
13   Q.   Were there ever times where you had to pay for multiple
14   trips at once?
15   A.   Could have been.
16   Q.   And so when you were withdrawing that cash for him, would
17   it always be a large round number?
18   A.   Yes.
19   Q.   Mr. Gallian asked you about buying a diamond ring from
20   Bill Stone.  Do you recall that?
21   A.   Yes.
22   Q.   And that was a ring that Bill Stone told you his friend
23   needed to sell or something like that?
24   A.   Yes.
25   Q.   Do you recall telling me about that diamond ring when we
```

 1 | met on June 27, 2023?

 2 | A.   Yes.

 3 | Q.   Do you recall telling me at that time how much you paid

 4 | for that ring?

 5 | A.   Yes.

 6 |         MS. RUDOFF:  Your Honor, may I approach?

 7 |         THE COURT:  You may.

 8 |         MS. RUDOFF:  Let me ask one question first.  I'm

 9 | sorry.

10 |         THE COURT:  Sure.

11 | BY MS. RUDOFF:

12 | Q.   Sitting here today, do you recall how much you told me on

13 | that day the ring cost?

14 | A.   I really don't remember exactly how much it cost.

15 |         MS. RUDOFF:  Your Honor, may I approach the witness?

16 |         THE COURT:  You may.

17 |         (Pause)

18 | BY MS. RUDOFF:

19 | Q.   Casi, I have handed you a copy of a memorandum of

20 | investigation for the time in which you and I met on June 27,

21 | 2023.  Is that what's in front of you?

22 | A.   Yes.

23 | Q.   Can you please read this to yourself and see if this

24 | refreshes your recollection as to the conversation about that

25 | diamond ring?

```
 1   A.   Yes.
 2            (Pause)
 3   A.   Yes.
 4   Q.   Does that refresh your memory?
 5   A.   Yes.
 6   Q.   How much did you tell me that you paid Bill Stone for that
 7   particular diamond ring?
 8   A.   7,490.
 9            MS. RUDOFF:  Nicole, can you please republish
10   Government's Exhibit 10, page 13?
11            (Pause)
12            MS. RUDOFF:  It may be 14.  I apologize.
13            Can we go back to 13?
14            Okay.  Can we highlight transaction detail on
15   page 13?
16   BY MS. RUDOFF:
17   Q.   Casi, looking at this document, do you see a cash
18   withdrawal from your bank account on the date showing May 9th?
19   A.   Yes.
20   Q.   And how much was that withdrawal for?
21   A.   $7,490.00.
22   Q.   So would that withdrawal have been the cash you paid Bill
23   Stone for the ring?
24   A.   Yes.
25            MS. RUDOFF:  Can we zoom out, please?
```

```
 1              Can we zoom in at the top, with the date?
 2    BY MS. RUDOFF:
 3    Q.   What is the date here on the top of this document?
 4    A.   April 14, 2016, through May 12, 2016.
 5    Q.   And so if the withdrawal showed in May for $7,490.00, what
 6    year would that have been?
 7    A.   2016.
 8    Q.   Mr. Gallian talked about your relationship with your
 9    brother, Cutter, when you were on the secret probation.  Do you
10    recall that?
11    A.   Yes.
12    Q.   And what did you say Bill Stone told you about having a
13    relationship with Cutter at the time, whether you should do it
14    or not?
15    A.   Right after my grandmother passed, my brother was
16    hospitalized for an infection, and he wanted me to come up
17    there and see him and do -- so I asked if I could.
18    Q.   Who did you ask?
19    A.   Bill and -- Bill and Joe.
20    Q.   And what did they tell you?
21    A.   They said that Avery, the analyst, had looked into the
22    medical computers and he wasn't in there for any type of
23    infection, he was in there because he had been on meth.
24    Q.   Did you go visit your brother when he was in the hospital?
25    A.   No.  I wasn't allowed to go.
```

1    Q.   And how did that affect your relationship with your

2    brother at that point in time?

3    A.   Well, you know, he was not on drugs.  He didn't do and

4    doesn't do drugs.  And so he didn't understand why I didn't

5    come up there.  And he got really upset and offended that I

6    wasn't there to -- while he was ill.

7    Q.   At some point while you were on the secret probation did

8    Cutter reach out to you and ask you for a loan?

9    A.   He did.

10   Q.   What was that loan for?

11   A.   I believe it was for a new air-conditioning unit.

12   Q.   For his house or what?

13   A.   For his house.

14   Q.   Did he ask you for a loan for anything for his business?

15   A.   I can't remember.  I know he asked me three or four times

16   for a loan.

17   Q.   While you were on the secret probation?

18   A.   Yes.

19   Q.   Did you provide him that loan or any of that money?

20   A.   No.  I was told that if I did they would quit helping me.

21   His analyst, even his -- they were telling me his net worth and

22   making me believe that he had more money than he was implying.

23   And Avery, the top analyst, said tell Casi that if she -- if I

24   find out she gives any money to them, then I'm going to quit

25   helping her.

```
 1   Q.   And was that information transferred to you through Bill
 2   Stone?
 3   A.   Yes.
 4   Q.   And was the amount that your brother was asking for, was
 5   that, would you say, more than $15,000.00?
 6   A.   No.
 7   Q.   Less than?
 8   A.   Less than.
 9   Q.   Do you know about how much?
10   A.   I don't.
11   Q.   And so you weren't comfortable giving it to Cutter, right?
12   A.   I -- I wanted to.  I just wasn't allowed to.
13   Q.   I want to turn and talk to the house that you paid for for
14   Bill Stone in Colleyville, Texas.
15           Do you recall Mr. Gallian talking to you about that?
16   A.   Yes.
17   Q.   And during his cross-examination, Mr. Gallian asked you
18   about the $154,500.00 cashier's check that you gave to Bill
19   Stone for the house.  Do you recall that?
20   A.   Yes.
21   Q.   And do you recall Mr. Gallian saying -- doing a bunch of
22   math on the easel and saying that would be half the payment for
23   the house?
24   A.   Yes.
25   Q.   So I want to clarify that for the jury.
```

```
 1            While discussing that with you, Mr. Gallian also told
 2   you that on March 1st, Bill Stone found out that he had to pay
 3   his ex-wife $230,000.00.  Do you recall Mr. Gallian telling you
 4   that?
 5   A.   Yes.
 6   Q.   Had you ever heard about that before?
 7   A.   I had never heard about that before.
 8   Q.   Throughout the investigation were you ever told about
 9   that?
10   A.   I was later told.
11   Q.   And on March 2, 2016, when Bill Stone told you he needed a
12   cashier's check, how much did he say that cashier's check
13   needed to be?
14   A.   250,000.
15   Q.   And what did he say that cashier's check was for?
16   A.   For my restitution.
17   Q.   To who?
18   A.   To -- for the Green Dot MasterCard.
19   Q.   Related to what situation?
20   A.   Related to my Enterprise case.
21   Q.   Okay.  For purposes of the record, I wrote on the easel
22   $250,000.00.  And it was from Casi, right?
23   A.   Yes.
24   Q.   I want to fast-forward.  On September 13, 2016, do you
25   recall Bill Stone telling you to bring a cashier's check to him
```

1    for the purchase of the house in Colleyville?

2    A.   Yes.

3    Q.   Do you recall how much that was?

4    A.   The 154,000 -- you just said it, and I can't think of it.

5    The $154,000.00 --

6    Q.   And that is a cashier's check that the Government has

7    already published and presented to you, right?

8    A.   Yes.

9    Q.   So for purposes of the record, you see on the paper I have

10   now written a plus sign and $154,500.00 that was also given to

11   Bill Stone by you?

12   A.   Yes.

13   Q.   I hate to ask, because I'm terrible at math, but can you

14   tell me how much those two numbers total?

15   A.   Oh, yikes.

16        THE COURT:  I have a calculator if anybody needs one.

17   A.   4 -- you know, I can't see it, so --

18        (Pause)

19        THE COURT:  Let the record reflect the Court has

20   passed a calculator.  The Court was not a math major either.

21        MS. RUDOFF:  Neither was I, Your Honor.  I apologize

22   for that.

23        (Pause)

24   BY MS. RUDOFF:

25   Q.   Thank you for sticking with me.

```
1            Casi, in adding those two numbers together, the
2    $250,000.00 cashier's check and the $154,500.00 cashier's
3    check, both of which you gave to Bill Stone, what is the total?
4    A.    $404,500.00.
5    Q.    And so that's the total you gave Bill Stone between
6    March 1, 2016, and September 13, 2016, right?
7    A.    Yes.
8            MS. RUDOFF:  Can we republish Government Exhibit 52
9    and turn to page 19?
10           (Pause)
11           MS. RUDOFF:  I know this is small.  Can we go to the
12    very bottom section where it says 230 -- or total paid for by
13    borrower, and blow that portion up?
14           You can go across the whole way.
15    BY MS. RUDOFF:
16    Q.    And, Casi, Government's 52, which has already been
17    admitted, these documents are the purchase and closing
18    documents for Bill Stone's house in Colleyville in September
19    2016.
20           Can you please tell me at the bottom what the total
21    cash brought by the borrower was?
22    A.    $349,803.49.
23    Q.    Would you agree that the total cost of that house that you
24    just read is less than $404,500.00?
25    A.    Yes.
```

```
 1   Q.   And $404,500.00 is the total of the two cashier's checks
 2   that you gave to Bill Stone, correct?
 3   A.   Yes.
 4   Q.   So Casi, based on our math, who paid for the entire house
 5   for Bill Stone?
 6   A.   I did.
 7   Q.   So for purposes of the record, I wrote on the pad that the
 8   entire house was, in fact, paid for by Casi, right?
 9   A.   Yes.
10   Q.   So there was no you pay half, Bill Stone pays half, right?
11   A.   Right.
12   Q.   And this is a house that you never lived in?
13   A.   Right.
14   Q.   And I think you said something on cross-examination about
15   being -- not allowed being in the bathroom.  Can you explain
16   that?
17   A.   Yes.  The few times, you know, that I stayed over there,
18   the two times, I wasn't allowed in his bathroom.  He kept it
19   shut along with his office.  He kept that door shut.  And if I
20   would go to the bathroom that's for guests, he would follow me
21   there.
22   Q.   And to be clear for the record, who is the "he" that
23   you're referring to?
24   A.   Bill.
25   Q.   And so not only did you pay for the entire house, but
```

1    there was never any indication that you were to live there?

2    A.    Correct.

3    Q.    And have you ever lived there?

4    A.    No.

5    Q.    Have you ever asked to live there?

6    A.    No.

7    Q.    Has Bill Stone ever told you to live there?

8    A.    No.

9         MS. RUDOFF:   If we could republish DeLeon Exhibit

10   Number 59.

11        (Pause)

12   BY MS. RUDOFF:

13   Q.    Mr. Sellers showed you this photo as DeLeon Exhibit

14   Number 59.  Do you recall that?

15   A.    Yes.

16   Q.    Prior to Mr. Sellers showing you this, had you ever seen

17   this ID before?

18   A.    No.

19   Q.    Was this the same ID you were talking about DeLeon showed

20   you when you met him initially at the restaurant?

21   A.    Can I go back on my answer about seeing this ID?

22   Q.    Sure.

23   A.    I know that he had an ID.  I have never looked at it like

24   this, but I have seen it in his vehicle.

25   Q.    So it's fair to say you have seen this before?

```
 1   A.   Yes.
 2   Q.   Is this the ID that Joe DeLeon showed you when you met him
 3   at the restaurant?
 4   A.   No.
 5   Q.   And that ID, what did he tell you about it?
 6   A.   He showed me an ID and said that if I ever met with law
 7   enforcement to be sure they show me some sort of ID to verify
 8   who they were.
 9   Q.   Mr. Sellers talked about one of Joe DeLeon's biggest loves
10   was law enforcement.  Do you recall that?
11   A.   Yes.
12   Q.   And from what you know, did Joe DeLeon seem to have a lot
13   of friends in law enforcement?
14   A.   Yes.
15   Q.   Did he seem to have a lot of knowledge about how law
16   enforcement worked?
17   A.   Yes.
18   Q.   What about how criminal cases were handled?
19   A.   Yes.
20   Q.   And if he didn't know the answer to something, did he
21   seem, as far as he presented to you, that he could have -- he
22   had somebody he could call and ask in law enforcement?
23   A.   Yes.
24           MS. RUDOFF:  Can we republish Government Exhibit 38,
25   page 136?
```

```
 1              And if we could highlight the first green message,
 2    the top.
 3    BY MS. RUDOFF:
 4    Q.    This is a message written by Joseph DeLeon, right?
 5    A.    Yes.
 6    Q.    Can you read this message out loud and slowly?
 7    A.    "Okay, sounds good to me.  I have an important meeting
 8    with the chief of police for Fort Worth at 11:30 for lunch and
 9    it might take about an hour and a half at the most.  After that
10    I'll be free."
11    Q.    And what is the date of this message?
12    A.    March 18, 2015.
13    Q.    And on that date Joe DeLeon tells you he's meeting with
14    the chief of police, right?
15    A.    Yes.
16    Q.    And Mr. Gallian asked you about individuals you knew in
17    law enforcement.  Do you recall that?
18    A.    Yes.
19    Q.    And specifically he asked you about the father of --
20    Cade's father, Kent Barnes.  Do you recall that?
21    A.    Yes.
22    Q.    Where does Kent Barnes work?
23    A.    At the Granbury Police Department.
24    Q.    What does Kent Barnes do for the Granbury Police
25    Department?
```

```
 1   A.   He does IT work.

 2   Q.   Is Kent Barnes a police officer?

 3   A.   No.

 4   Q.   Is he a federal agent?

 5   A.   No.

 6   Q.   He's just an IT guy?

 7   A.   Yes.

 8   Q.   Speaking of texts, Mr. Sellers showed you some texts and

 9   talked about what happened right after the funeral ended in

10   November of 2015.  Do you recall that?

11   A.   Yes.

12            MS. RUDOFF:  Can we republish Government 38,

13   page 339?

14   BY MS. RUDOFF:

15   Q.   You told us on direct and cross-examination the date of

16   the funeral.  Do you recall what that date was?

17   A.   I want to say November 9th, maybe.

18   Q.   Okay.

19            MS. RUDOFF:  Can we blow up the last green message on

20   page 339?

21   BY MS. RUDOFF:

22   Q.   Is this the message that Mr. Sellers told you Joe sent you

23   before the funeral started?

24   A.   Yes.

25   Q.   And what is the time and date on this message?
```

```
 1   A.   12:20.  Oh, I'm sorry.  November 9, 2015, 12:22.

 2   Q.   So that would have been noon, correct?

 3   A.   Correct.

 4            MS. RUDOFF:  Can we go to the next page?

 5            Can we zoom in on the top green message?

 6   BY MS. RUDOFF:

 7   Q.   So, Casi, it's fair to say you did not get another message

 8   from Joe DeLeon until this one that's up on the screen, right?

 9   A.   Yes.

10   Q.   And what is the date and time for this next text message?

11   A.   November 10, 2015, at 12:41.

12   Q.   So from the moment the funeral starts on November 9th

13   until the next morning, you don't get a single text from Joe

14   DeLeon, right?

15   A.   Right.

16   Q.   Where was Joe DeLeon after the funeral the evening of

17   the 9th?

18   A.   My house.

19   Q.   Would you text Joe DeLeon if he is standing next to you at

20   your house?

21   A.   No.

22   Q.   Mr. Sellers talked a lot about DeLeon coming to your house

23   and staying with your kids, right?

24   A.   Right.

25   Q.   Why did you believe that Joe DeLeon needed to be the
```

```
 1   person to do that?
 2   A.   Are you referring to when he watched them at night when I
 3   went to school?
 4   Q.   Yes.
 5   A.   He was the only person that I was made to believe that I
 6   could trust at that time, and he was watching me.
 7   Q.   Were you appreciative of all of that?
 8   A.   I was appreciative of him investing his time and keeping
 9   me with my kids and out of jail, yes.
10   Q.   And you were told by Bill Stone that DeLeon needed to be
11   compensated for his time and services as it related to your
12   cases and your secret probation, right?
13   A.   Yes.
14           MS. RUDOFF:  Can we republish Government Exhibit 20?
15           Page 4.  Or this works too.  No, I'm sorry.  Page 4.
16   Yeah.
17   BY MS. RUDOFF:
18   Q.   Casi, is this one of the ways you paid Joe DeLeon for his
19   services related to your secret probation and the other legal
20   issues?
21   A.   Yes.
22   Q.   What is the date on this check?
23   A.   January 29th of 2016.
24   Q.   And how much is it written for?
25   A.   $15,000.00.
```

```
 1   Q.   At this point in time, approximately how long had you been
 2   on secret probation?
 3   A.   Around a month.
 4   Q.   So Joe DeLeon was compensated $15,000.00 for 30 days of
 5   work, correct?
 6   A.   Yes.
 7   Q.   Do you consider that a lot of money?
 8   A.   A lot.
 9   Q.   When you gave this to Joe DeLeon, did he say it was too
10   much to give him?
11   A.   No.
12   Q.   Did he offer the check back?
13   A.   No.
14   Q.   Did he ever offer any of the money back?
15   A.   No.
16        MS. RUDOFF:  If we could republish Government
17   Exhibit 21, page 4.
18   BY MS. RUDOFF:
19   Q.   Soon after that, you were told you needed to give Joe
20   DeLeon the F-150 also as payment for his services as it related
21   to your secret probation, right?
22   A.   Yes.
23        MS. RUDOFF:  Page 6.  I apologize.
24   BY MS. RUDOFF:
25   Q.   Casi --
```

1          MS. RUDOFF:  And can we zoom in on the date of the

2     title?

3     BY MS. RUDOFF:

4     Q.   Casi, what is the date that this title was issued for you

5     to give Joe DeLeon the Ford F-150?

6     A.   February 25th of 2016.

7     Q.   So at this point how long had you been on secret

8     probation?

9     A.   Two months.

10    Q.   And when you learned that Joe DeLeon sold that truck,

11    he told -- you learned how much that truck was sold for, right?

12    A.   Yes.

13    Q.   It was almost $40,000.00; is that correct?

14    A.   Yes.

15    Q.   So in two months' time, for two months of work, Joe DeLeon

16    is paid over $50,000.00?

17    A.   Yes.

18    Q.   Did that seem like a lot?

19    A.   Yes.

20    Q.   Did Joe DeLeon refuse to accept any of it?

21    A.   No.

22    Q.   Did he ever offer to give it back?

23    A.   No.

24    Q.   You testified that at some point in time later Joe DeLeon

25    started to kind of complain about having to spend so much time

```
 1    working on your secret probation, right?
 2    A.   Yes.
 3    Q.   But that was only after -- or was that before or after he
 4    received over $50,000.00 for 60 days of work?
 5    A.   It was after.
 6    Q.   As far as you know, was there a reason Joe DeLeon was not
 7    allowed to tell anyone that you were on secret probation?
 8    A.   As far as I know, I don't -- I don't know.  Repeat the
 9    question.
10    Q.   As far as you know, was there a specific reason Joe DeLeon
11    wasn't allowed to tell anyone that you were on secret
12    probation?
13    A.   I didn't -- no, not to my knowledge.
14    Q.   Joe DeLeon wasn't on any kind of real probation, right?
15    A.   Right.
16    Q.   Wasn't in fear of going to prison?
17              MR. SELLERS:  Object to leading, Your Honor.
18              THE COURT:  Sustained.  Don't lead.
19    BY MS. RUDOFF:
20    Q.   As far as you know or were told, were DeLeon's texts also
21    being monitored like yours?
22    A.   Yes.
23    Q.   As far as you know, was DeLeon's physical location also
24    being monitored?
25    A.   Yes.
```

```
 1   Q.   And why was that?
 2   A.   It was not just Joe, but anyone that communicated with me.
 3   Their locations and texts were monitored.
 4   Q.   With Mr. Sellers you talked about calling Joe on
 5   September 3rd of 2019.  Do you recall that?
 6   A.   Sorry?
 7   Q.   September 3, 2019, a recorded call with Joe DeLeon.
 8   A.   Yes.
 9   Q.   And that was after -- was that before or after you were
10   told by real law enforcement that the probation was fake?
11   A.   It was after.
12   Q.   And during that call we heard, you told Joe probation
13   isn't real, right?
14   A.   Right.
15   Q.   In that call did Joe DeLeon mention anything about you
16   having to pay restitution?
17   A.   I believe he mentioned it in one of the calls.  I'm not
18   sure if it was this specific one you are referring to.
19   Q.   And when he mentioned the restitution, what did he say the
20   restitution was for?
21   A.   The restitution was for the Green Dot MasterCard for
22   Enterprise.
23   Q.   Was there ever a time Joe DeLeon mentioned that the
24   restitution was to pay Bill Stone's ex-wife?
25   A.   No.
```

1    Q.   Mr. Sellers then also played another call that you
2    recorded with Joe DeLeon on September 12, 2019.  Do you recall
3    that?
4    A.   Yes.
5    Q.   And Mr. Sellers told you that at this point in time law
6    enforcement had ever told -- had already told Joe DeLeon that
7    the probation was fake?
8    A.   Yes.
9    Q.   Right?
10   A.   Right.
11   Q.   And you had already done the same thing?
12   A.   Yes.
13   Q.   In that call what did Joe say Bill was continuing to do
14   with regards to your probation?
15   A.   He was still filling out my 3x5 index cards to send to the
16   judge.
17   Q.   Did it make sense to you that Joe DeLeon was continuing to
18   talk about your secret probation at this point in time?
19   A.   No.
20   Q.   At this point in time after law enforcement and you have
21   told Joe DeLeon that the probation is fake, in any of your
22   recorded calls with Joe DeLeon did he offer to give you any of
23   the money back?
24   A.   No.
25   Q.   Did he offer to give you the truck back?

```
 1   A.   No.
 2   Q.   In any of your calls with Bill Stone that were recorded,
 3   did Bill Stone offer to give you the money back?
 4   A.   No.
 5   Q.   What about the vehicles?
 6   A.   No.
 7   Q.   And lastly, I want to go over --
 8           MS. RUDOFF:  Your Honor, I think it will just be a
 9   few more minutes.  I know we are pushing up on lunch.
10           THE COURT:  Sure.
11           MS. RUDOFF:  Is it okay to continue?
12           THE COURT:  Absolutely.
13           MS. RUDOFF:  Okay.  And then I'll --
14           THE COURT:  Members of the jury, are you okay to
15   pushing through to wrap this part up?
16           Okay.  Thank you for letting me know.
17   BY MS. RUDOFF:
18   Q.   I want to talk about the evolution of the relationships
19   between you and Joe DeLeon and you and Bill Stone separately,
20   okay?
21   A.   Yes.
22   Q.   And so if it's okay, I'm going to take a page out of
23   defense counsel's book and write a timeline on this easel,
24   okay?
25   A.   Yes.
```

```
 1   Q.   Okay.  I would like to talk about you and Joe DeLeon
 2   first, okay?
 3            All I've written on the pad is your name and DeLeon,
 4   correct?
 5   A.   Yes.
 6   Q.   When you met Joe DeLeon in approximately 2005, 2006, how
 7   would you characterize that relationship?
 8   A.   It was an acquaintance.
 9            MS. RUDOFF:  Can we republish Government 38, page 1?
10            And can we highlight the white box and the first blue
11   text?
12   BY MS. RUDOFF:
13   Q.   Between 2006 and 2012, did you continue to grow and
14   maintain that acquaintanceship with Joe DeLeon?
15   A.   It grew into a stronger acquaintance, I would say.
16   Q.   Okay.  In looking here at the blown-up page 1 of
17   Government's 38, what is the date at the top?
18   A.   August 23, 2012.
19   Q.   And is this you texting Joe DeLeon?
20   A.   Yes.
21   Q.   And is your number saved as anything at this point in time
22   in Joe DeLeon's phone?
23   A.   No.
24   Q.   So, Casi, I wrote 2006, Joe DeLeon was your acquaintance,
25   right?
```

```
 1    A.    Yes.
 2    Q.    And based on this text and what you just told us, 2012, it
 3    was a stronger acquaintance, right?
 4    A.    Right.
 5          MS. RUDOFF:  Can we go to page 6 of Government's 38?
 6    BY MS. RUDOFF:
 7    Q.    Now, from 2012 to 2014, would you say your relationship
 8    with Joe DeLeon grew?
 9    A.    Yes.
10          MS. RUDOFF:  And can we highlight the white box in
11    the middle?
12    BY MS. RUDOFF:
13    Q.    What is the date of this text message exchange?
14    A.    June 3, 2014.
15    Q.    And what does Joe DeLeon have you saved in his phone as?
16          MR. SELLERS:  Objection to relevance, Your Honor.
17          THE COURT:  Overruled.
18          MR. SELLERS:  Asked and answered also.
19          THE COURT:  Overruled.
20          Let's go ahead and break.  Or are you close to where
21    you're -- a good breaking point?
22          MS. RUDOFF:  I would say ten minutes max, Your Honor.
23          THE COURT:  Okay.  Till you reach a breaking point or
24    till you're done?
25          MS. RUDOFF:  Oh, I'm sorry.  Till I was done.
```

```
 1              THE COURT:  Okay.  What do you want to do?  Do you
 2    want to push on?
 3              All right.  Let's push on.
 4              MS. RUDOFF:  Okay.  Thank you, Your Honor.
 5              THE COURT:  You're welcome.
 6    BY MS. RUDOFF:
 7    Q.   I think my last question was, what is your number saved at
 8    in Joe DeLeon's phone in June of 2014?
 9    A.   "Kasy Thopson old number."
10    Q.   Okay.  And I'm going to have you spell how it was spelled.
11    A.   Right now?  K-A-S-Y, T-H-O-P-S-O-N, O-L-D, number sign.
12    Q.   And how would you characterize your friendship at this
13    point in time?
14    A.   We could have been close -- more like friends.  We shared
15    a mutual friend as well, so --
16    Q.   So you call him a friend?
17    A.   Right.
18              MS. RUDOFF:  Now, can we go to page 44, please?
19              And can we highlight this?
20    BY MS. RUDOFF:
21    Q.   Casi, what timeframe were these text messages from?
22    A.   August 5, 2014.
23    Q.   And this is, in fact, when you were headed into your final
24    rehab, right?
25    A.   Yes.
```

```
 1   Q.   How would you characterize the strength and growth of the
 2   relationship at this time with Joe DeLeon?
 3   A.   It probably stayed just like a basic friendship or someone
 4   I would call like, you know, for advice.
 5   Q.   And we saw those texts.  You talked to him a lot at this
 6   point in time, right?
 7   A.   Yes.
 8   Q.   Okay.  So it's a stronger, better friend?
 9   A.   Right.
10   Q.   Can you tell me how your number was saved at this point?
11   A.   K-A-Y-S-E-Y, Thompson, or T-H-O-M-P-S-O-N, N-E-W, 2014.
12           MS. RUDOFF:  And can we go to page 51?
13   BY MS. RUDOFF:
14   Q.   And what is this timeframe?
15   A.   November 17, 2014.
16   Q.   And what are you saved as?
17   A.   "Casi Thompson, 2014, new cell."
18   Q.   Is your name spelled correctly here?
19   A.   Yes.
20   Q.   What would you say about your friendship with Joe DeLeon
21   throughout this timeframe?
22   A.   He was a good friend.
23   Q.   Okay.
24           MS. RUDOFF:  And can we go to page 88?
25           I'm sorry.  Go back to 51.
```

```
 1   BY MS. RUDOFF:
 2   Q.   And I have written on the piece of paper for purposes of
 3   the record between 2014 until 2015, better friend, and Casi
 4   Thompson spelled correctly, right?
 5   A.   Yes.
 6           MS. RUDOFF:  Now can we go to page 523?
 7           Can we highlight the text?
 8   BY MS. RUDOFF:
 9   Q.   When does this text string start?
10   A.   December 30, 2015.
11   Q.   And it goes till when?
12   A.   September 5, 2019.
13   Q.   During this timeframe, how close and good of a friend
14   would you characterize Joe DeLeon?
15   A.   Very good friend.  Only -- yeah.  Good friend.  But it
16   varied throughout the years.
17   Q.   And prior to this December 30, 2015 date, had you just
18   been put on secret probation?
19   A.   Yes.
20   Q.   And what does Joe DeLeon change your number to in his
21   phone?
22   A.   Project Number 2.
23   Q.   What did you understand project Number 2 to refer to?
24   A.   I was their project, because they had already -- they
25   spoke a lot about Project Number 1.
```

```
 1    Q.   I just want to talk about you.
 2    A.   Okay.
 3    Q.   If no secret probation, would you have ever spent 52 hours
 4    a week with Joe DeLeon?
 5    A.   No.
 6    Q.   As far as you know, if there was no secret probation,
 7    would DeLeon have minded spending time with you?
 8    A.   I'm not sure.
 9              MS. RUDOFF:  Can we go to page 120 of Government 38?
10              And can we highlight the second and third -- I'm
11    sorry, all the green messages, the top two green messages.
12    BY MS. RUDOFF:
13    Q.   Casi, what date are these text messages from?
14    A.   March 3, 2015.
15    Q.   And who are they from?
16    A.   Joseph DeLeon.
17    Q.   Who are they to?
18    A.   Me.
19    Q.   What is Joseph DeLeon telling you he wants to do in the
20    first text message.
21    A.   Do you want me to read it?
22    Q.   Yes.
23    A.   "I will have your bath water drawn for you, some rose
24    petals, some candles on the side of the bathtub and some bubble
25    bath in it.  Calgon, take you away."
```

```
 1   Q.   And what does the next text message from Joe DeLeon say?

 2   A.   "I would say and a couple of glasses for that champagne,

 3   but we can't do that just yet, it's just wishful thinking right

 4   now, but the day will come when you can do that."

 5   Q.   When he says the day will come when you can do that, is he

 6   referring to the champagne or to you getting into the bath with

 7   him?

 8           MR. SELLERS:  Object to speculation, Your Honor.

 9           THE COURT:  Sustained.

10   BY MS. RUDOFF:

11   Q.   Was there ever a point in time when you had a romantic

12   interest in Joe DeLeon?

13   A.   No.

14   Q.   Did you relay to him a romantic interest?

15   A.   No.

16           MS. RUDOFF:  Can we zoom out?

17   BY MS. RUDOFF:

18   Q.   In this text, do you ever acknowledge or respond those

19   two -- to the messages regarding a bath and champagne?

20   A.   No.

21   Q.   I want to talk lastly about your -- the evolution of your

22   relationship with Bill Stone.

23           (Pause)

24           MS. RUDOFF:  Can we just do this -- would you like to

25   do this after lunch, Your Honor?
```

1          THE COURT:  I think so.  If it's not just a couple
2     more minutes, I think we should.
3          MS. RUDOFF:  I don't want to make a promise.
4          THE COURT:  Why don't we go ahead and break.  And
5     let's tack on an extra ten minutes.  So what's that?  12:10.
6     12:10, is that enough time for you guys?  That's a half hour.
7     Is that plenty?
8          Okay.  We'll bring you back at 12:10.
9          All rise for the jury.
10          We'll be in recess until 12:10.
11          (Jury out)
12          THE COURT:  Okay.  Anything we need to take up prior
13     to lunch, our incredibly quick lunch that we have?
14          Okay.  I appreciate you guys.
15          (Discussion off the record)
16          (Recess)
17
18
19
20
21
22
23
24
25

```
 1                              INDEX

 2                                                    Further
                     Direct  Cross  Redirect  Recross  Redirect
 3
      WITNESS FOR THE
 4    GOVERNMENT

 5    CASI THOMPSON              5          61

 6
      GOVERNMENT'S EXHIBITS                            Received
 7
          149  Recorded call between CT and Stone,      13
 8             August 12, 2019

 9
      DEFENDANT DELEON'S EXHIBITS                      Received
10
          27   9-3-19 Phone call from Casi to Joe       24
11
          28   9-12-19 Phone call from Casi to Joe      28
12
          79   8-16-19 -- Briley interview with Casi Thompson  7
13
          89   5-5-20 OIG Interview with Casi, Luley, Martinez  37
14

15

16

17

18

19

20

21

22

23

24

25
```

1    I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6    WITNESS MY HAND on this 1st day of August, 2023.

7

8

9
                                /s/Todd Anderson
10                              _____
                                TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25