1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
   UNITED STATES OF AMERICA,    )    3:21-CR-236-E(2)
5                                )
        GOVERNMENT,              )
6                                )
   V.                           )    DALLAS, TEXAS
7                                )
   WILLIAM ROY STONE, JOSEPH    )
8  DELEON                       )
                                )
9      DEFENDANTS.              )    AUGUST 1, 2023

10

11

12

13

14

15              ------------------------------

16                    TRANSCRIPT OF

17                     JURY TRIAL

18                     VOLUME 6B

19         BEFORE THE HONORABLE ADA E. BROWN

20           UNITED STATES DISTRICT JUDGE

21              ------------------------------

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE GOVERNMENT:

 3        Jenna Danelle Rudoff
          US Department of Justice
 4        1100 Commerce St
          3rd Floor
 5        Dallas, TX 75242
          214-659-8600
 6        Fax: 214-659-8500
          Email: Jenna.rudoff@usdoj.gov
 7
          Donna S Max
 8        US Attorney's office for Northern
          District of Texas
 9        1100 Commerce Street
          Third Floor
10        Dallas, TX 75242-1699
          214-659-8664
11        Email: Donna.max@usdoj.gov

12        Marcus J Busch
          US Attorney's Office
13        1100 Commerce St
          Suite 300
14        Dallas, TX 75242
          214-659-8642
15        Fax: 214-659-8809
          Email: Marcus.busch@usdoj.gov
16

17   FOR THE DEFENDANT WILLIAM ROY STONE:

18        Gregg Gallian
          Gallian Firm
19        Parkside Tower
          3500 Maple Ave
20        Suite 720
          Dallas, TX 75219
21        214-432-8860
          Email: Gregg@gallianfirm.com
22
          Jaclyn Annette Gallian
23        Bryan Cave Leighton Paisner
          2200 Ross Avenue
24        Ste 4200w
          Dallas, TX 75201
25        214-721-8058
          Email: Jaclyn.gallian@bclplaw.com
```

```
 1   FOR THE DEFENDANT JOSEPH DELEON:

 2        Greg Westfall
          Westfall Sellers
 3        1612 Summit Avenue
          Suite 200
 4        Fort Worth, TX 76102
          817-928-4222
 5        Fax: 817-385-6715
          Email: Greg@westfallsellers.com
 6
          Frank Sellers
 7        Westfall Sellers
          1612 Summit Avenue
 8        Suite 200
          Fort Worth, TX 76102
 9        817-928-4222
          Fax: 817-385-6715
10        Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C H R O N O L O G I C A L   I N D E X
 2    August 1, 2023                                  PAGE
```

```
 3    Appearances.......................................2
 4    Proceedings.......................................5
```

```
 5                 W I T N E S S   I N D E X
 6    GOVERNMENT          DIRECT          VOIR DIRE       CROSS
 7    Casi Thompson       8               --             15, 20
 8    Timothy Bell        26              --             35
 9    James Marcano       37              --             --
10    Timothy Gray        56, 72          --             65, 68
11    Don Stoner          78              --             --
12
```

```
13    Proceedings adjourned...............................94
14    Reporter's Certificate..............................95
```

```
15
16                 E X H I B I T   I N D E X
17    GOVERNMENT:
18    NO.   DESCRIPTION                        OFFERED/ADMITTED
```

```
19    1     SF-50 Form...............................32/32
20    35    Verizon Wireless Billing Records.........57/57
21    59    Inventory................................93/--
22    61    SpoofCard Records........................42/42
23    89    Photographs..............................82/83
24    165   Verizon Wireless Billing Records.........57/57
```

```
                        * * * * *
25
```

```
 1                    (P R O C E E D I N G S)

 2              THE COURT:  Outside the presence of the jury,

 3    the lawyers have asked to talk with the Court.  And the Court

 4    is listening.

 5              MR. SELLERS:  Your Honor, before we broke, there

 6    was an implication through text message that Joseph DeLeon had

 7    some sort of sexual motivation to be doing any of this stuff to

 8    Casi.  Parties had agreed we would not -- Casi had sent a lot

 9    of rather explicit photos to Joe, and we had agreed that we

10    would not go into any of that stuff.  But now since that's been

11    the implication left before the jury, I think we're going to

12    have to show the jury that she was actively participating in

13    this sort of flirtatious relationship that they had.

14              And so I think that I'm going to have to offer

15    it just to show that it's not quite what they're making it out

16    to be and to clear up that implication.  I just wanted to raise

17    that before -- so that we can keep the thing moving when we

18    start.

19              THE COURT:  Sure.  Okay.  And what is it that

20    you believe raised it?  I -- something about a bubble bath; is

21    that what we're talking about?

22              MR. SELLERS:  Yes, Your Honor.

23              THE COURT:  Okay.  Government, what's your

24    response?

25              MS. RUDOFF:  Your Honor, Government's
```

1    Exhibit 38, which are all the text messages between Casi

2    Thompson and Joe DeLeon, which is where the message that I

3    referred to is located.  There are other text messages in there

4    that have been admitted that relate to this back-and-forth

5    between Casi Thompson and Joe DeLeon.  The only thing that had

6    been redacted out and that wouldn't go to the jury were the

7    physical nude photos themselves.  But the conversations about

8    them were not.

9              Additionally, the conversations relate to her

10   body, working out, losing weight, in that regard.

11             THE COURT:  So let's go off the record for a

12   second.

13             (Off-the-record discussion.)

14             THE COURT:  Outside the presence of the jury,

15   the Court has discussed off the record how best to deal with

16   this.

17             Defense counsel, if the government gets up and

18   you guys can come up with something written to close that door

19   and correct any impression the jury may have that there was

20   either romantic longing by your client or romantic relationship

21   with your client and Ms. Thompson, will that suffice to resolve

22   your issues?

23             MR. SELLERS:  It would suffice to maybe -- so we

24   wouldn't have to put the nudes in, yes, ma'am.

25             THE COURT:  Okay.  Gotcha.  It'll quell your

 1    concerns about misrepresentations and implications.

 2                    MR. SELLERS:  I think so.

 3                    THE COURT:  Okay.  Government, are you willing

 4    to do that?

 5                    MS. RUDOFF:  Absolutely, Your Honor.

 6                    THE COURT:  All right.  So why don't we

 7    front-load that.

 8                    What say you, Counsel for Mr. Stone?

 9                    MR. GALLIAN:  I agree that it was left with the

10    impression with the jury, I think, that Joe was hitting on her

11    and being very inappropriate, and honestly kind of creepy.  So

12    I do think that it needs to be cleared up.  I also agree that

13    we do not need to go into nudie land, because we would be there

14    for a very, very long time.

15                    THE COURT:  Yeah, I think that's best.  So are

16    you all right with this resolution?

17                    MR. GALLIAN:  I am, Your Honor.

18                    THE COURT:  Okay.  Great.

19                    Off the record.

20                    (Off-the-record discussion.)

21                    (Brief recess.)

22                    (Jurors enter courtroom.)

23                    THE COURT:  Government, your witness.

24                          CASI THOMPSON,

25    having been previously sworn, testified as follows:

1              REDIRECT EXAMINATION

2    BY MS. RUDOFF:

3        Q.    Casi, I want to clarify and make sure that we are

4    clear about the relationship you had with Joe DeLeon and the

5    relationship Joe DeLeon had with you, okay?

6        A.    Okay.

7        Q.    There was never any point in time when you and

8    Joe DeLeon were anything other than friends, right?

9        A.    Right.

10       Q.    And while both of you may have sent funny or

11   flirtatious text messages back and forth, that was no

12   indication of a sexual relationship, right?

13       A.    Right.

14       Q.    On either side?

15       A.    Right.

16       Q.    And there was never a romantic relationship between

17   you and Joe DeLeon, correct?

18       A.    Correct.

19       Q.    And that you weren't interested in a sexual or

20   romantic relationship with Joe DeLeon at any time, right?

21       A.    Right.

22       Q.    And that in the same way, Joe DeLeon was not

23   interested in a sexual or romantic relationship with you,

24   right?

25       A.    Right.

1      Q.    I want to turn to your relationship with Bill Stone.
2    And we're just going to quickly create a timeline to make sure
3    we're clear, okay?
4      A.    Okay.
5                  THE COURT:  Just pause for a second.
6                  (Off-the-record discussion.)
7      Q.    Casi, Mr. Gallian, on cross-examination, he went
8    through with you and talked about all the hours on the phone in
9    2015 between you and Bill Stone.  Do you recall that?
10     A.    Yes.
11     Q.    Okay.  So I'd like to start our timeline in 2015; is
12   that okay?
13     A.    Yes.
14     Q.    And for ease and quickness purposes, Ms. Max is going
15   to do my writing.  But please let me know if something is
16   incorrect, okay?
17     A.    Okay.
18     Q.    So in 2015, is it fair to say you spent time talking
19   on the phone with Bill Stone?
20     A.    Yes.
21     Q.    And that time, it was indicated in the exhibit that
22   Mr. Gallian created with you, right?
23     A.    Yes.
24     Q.    At that point in time, how often did you see Bill
25   Stone in person?

 1    A.    I believe during that time frame, it was probably

 2  twice.

 3    Q.    So just a couple times?

 4    A.    Right.

 5    Q.    And where did you understand that, at the time, Bill

 6  Stone lived?

 7    A.    Washington, D.C.

 8    Q.    So in 2015, at any point was Bill Stone your

 9  boyfriend?

10    A.    No.

11    Q.    Once the secret probation began at the end of 2015,

12  was Bill Stone your boyfriend?

13    A.    No.

14    Q.    In 2015, once on secret probation, did you have to

15  provide financial payments to Bill Stone related to your secret

16  probation?

17    A.    Yes.

18    Q.    I want to move on to 2016.  Mr. Gallian, during his

19  cross-examination, insisted to you that you were in a

20  relationship; you were -- Bill Stone was your boyfriend.  Do

21  you recall that?

22    A.    Yes.

23    Q.    Where were you told Bill Stone was living in 2016,

24  before the house in Colleyville was purchased?

25    A.    Washington, D.C.

1    Q.   Being that you were told he lived in Washington,

2    D.C., how often would you see Bill Stone before he moved into

3    that house in Colleyville?

4    A.   It was every time he flew in to take care of some

5    sort of criminal case.

6    Q.   Is it fair to say that's more regularly than 2015?

7    A.   Yes.

8    Q.   Was anyone else with you the majority of the times

9    you were with Bill Stone in 2016?

10   A.   Yes.

11   Q.   Who would be with you?

12   A.   Joe.

13   Q.   In 2016, did you ever tell anyone that Bill Stone was

14   your boyfriend?

15   A.   No.

16   Q.   As far as you know, did Bill Stone tell anyone that

17   in 2016 he was your boyfriend?

18   A.   No.

19          MS. RUDOFF:   Can we republish Stone's

20   Exhibit 156?

21   Q.   Now, Casi, Mr. Gallian admitted this exhibit with you

22   on cross-examination, and he referred to the bottom portion of

23   it.  Do you recognize this?

24   A.   Yes.

25   Q.   So I want to talk about another portion of this

```
 1   document, okay?
 2        A.   Okay.
 3        Q.   And Mr. Gallian told you that this was a document
 4   that was a part of the purchase agreement for the Mercedes that
 5   you bought Bill Stone in 2016?
 6        A.   Yes.
 7        Q.   Did you fill out this document yourself?
 8        A.   No.
 9        Q.   What is the only portion of the document that is in
10   your handwriting?
11        A.   The signature.
12        Q.   Who was involved in the filling out of the documents
13   for the Mercedes purchase?
14        A.   I would assume it was the salesman.  I'm not sure.
15   I -- I don't know.
16        Q.   Was Bill Stone involved in it?
17        A.   Yes.
18             MS. RUDOFF:  Can we highlight the portion in the
19   middle that says, "my relationship to the individual buying the
20   vehicle is."
21        Q.   Casi, what does it say -- what does the text say at
22   the top of this portion?
23        A.   It says, "my relationship to the individual buying
24   the vehicle is."
25        Q.   And what is written in where it says "describe
```

```
 1  relationship"?
 2       A.    Nothing.
 3       Q.    So you didn't write in girlfriend, right?
 4       A.    Right.
 5       Q.    Fair to say neither did Bill Stone?
 6       A.    Right.
 7       Q.    And earlier we talked about texts that were deleted
 8  from your phone.  Do you recall that?
 9       A.    Yes.
10       Q.    Were the texts that were deleted in 2016?
11       A.    Yes.
12       Q.    So would you -- would your testimony still be that in
13  2016 Bill Stone was not your boyfriend?
14       A.    Yes.
15       Q.    Okay.  In 2016, were the rest of the financial
16  transactions that you had to give Bill Stone and Joe DeLeon for
17  your secret probation during that year?
18       A.    Yes.
19       Q.    Now, I want to move on to 2017 through 2019.  Where
20  was Bill Stone living at this time?
21       A.    In Colleyville.
22       Q.    And how often would you and Bill Stone spend time
23  together?
24       A.    I would say -- I don't know, maybe twice a week, or
25  three times.  It's hard to say.
```

1      Q.    It's fair to say more often than before?

2      A.    Yes.

3      Q.    And would that often be alone?

4      A.    It was beginning to be more time alone, yes.

5      Q.    And so at some point in that time frame, did Bill

6   Stone become your boyfriend?

7      A.    Yes.

8      Q.    Would you tell people he was your boyfriend?

9      A.    I started to.  That was closer to the end of 2017.

10  So it was when I actually was -- I was around people when I

11  started working in 2018, is when I would have -- when I would

12  refer to him as my boyfriend.

13     Q.    And in fact, you testified you did

14  boyfriend-girlfriend-type things like go on vacation together

15  during that time frame, right?

16     A.    Yes.

17     Q.    At any point between 2017 and 2019, did you have to

18  pay or engage in any financial transactions related to your

19  secret probation?

20     A.    No.

21     Q.    So, Casi, for purposes of the record, I'm going to go

22  over what, based on your testimony, we've put on this piece of

23  paper.  So from 2015, Bill Stone was not your boyfriend, right?

24     A.    Right.

25     Q.    And below it, it says "yes," and a dollar sign for

1  money; is that correct?

2       A.   Yes.

3       Q.   And in 2016, the piece of paper says "not boyfriend,"

4  right?

5       A.   Right.

6       Q.   And below it, it says "yes," dollar sign for money?

7       A.   Yes.

8       Q.   And from 2017 to 2019, it says "boyfriend," right?

9       A.   Right.

10      Q.   And below it, it says "no," dollar sign for money,

11  right?

12      A.   Right.

13      Q.   If there had not -- if you had not believed you were

14  on secret probation, would Bill Stone have been your boyfriend?

15      A.   No.

16      Q.   If you had not believed you were on secret probation,

17  would you have ever given Bill Stone more than 700,000 in cash,

18  property and vehicles?

19      A.   No.

20           MS. RUDOFF:  Pass the witness.

21           THE COURT:  All right.  Everybody doing okay,

22  members of the jury?

23           (Respond affirmatively.)

24           THE COURT:  All right.

25                    RECROSS-EXAMINATION

1    BY MR. GALLIAN:

2         Q.   Casi, I really didn't want to have to ask you any

3    questions, but I do have to clean up some things, okay?

4         A.   Okay.

5         Q.   Last chance, you want to change anything about that

6    timeline?

7         A.   No.

8         Q.   Are you sure?

9         A.   100 percent.

10        Q.   Okay.  This ring purchase --

11        A.   Uh-huh.

12        Q.   -- that you bought from Bill, you mentioned it in our

13   cross-examination that you thought it could be the $9,000

14   payment, right?

15        A.   I wasn't sure.

16        Q.   Okay.  You met with agents in 2019, 2020, 2021 and

17   2022, right, to investigate this case?

18        A.   As far as -- I met with them several times.

19        Q.   You understand that this case, before we started this

20   trial, it was actually supposed to be scheduled to go to trial

21   in February, right?

22        A.   Yes.

23        Q.   And it was continued at the last second?

24        A.   Yes.

25        Q.   Okay.  In June, June 27th to be specific, of this

1  year, you sat down with the agent Brian Luley in this case,

2  didn't you?

3      A.   I don't know the exact date.

4      Q.   Okay.  Well, that's when you guys talked about the

5  ring for the first time ever.  How did that conversation start?

6      A.   I'm not sure.

7      Q.   Can I take a guess?

8      A.   If you would like.

9      Q.   In February, we filed all of our exhibits for this

10  trial.  And we obviously went through a lot of the exhibits

11  that I went through with you showing the ring pictures, right?

12      A.   Okay.

13      Q.   When you sat down with Brian Luley, did he show you a

14  picture of the ring?

15      A.   I don't think so.

16      Q.   So you guys just randomly met in June 2023, and you

17  just happened to bring up the ring?

18      A.   I -- I'm not sure how it got brought up.

19      Q.   That's the only thing that was on the report for that

20  day, was that you discussed the ring.  You don't remember that

21  meeting?  It was only a month ago.

22      A.   I've had several meetings.  I'm not sure how the ring

23  got brought up.

24      Q.   Okay.  Do you recall Brian Luley showing you a bunch

25  of pictures of rings?

```
 1      A.    I recall seeing pictures of rings.

 2      Q.    Okay.  And after seeing those pictures of rings,

 3   that's when you told them that you bought a ring from Bill

 4   Stone; is that right?

 5      A.    No.

 6            MR. GALLIAN:  May I approach the witness, Your

 7   Honor?

 8            THE COURT:  You may.

 9            (Documents tendered.)

10      Q.    Have you had a chance to review it?

11      A.    Yes, I remember that day.

12      Q.    Okay.  Let's talk about that day.

13      A.    Okay.

14      Q.    How did the ring come up?

15      A.    Bill said he had a friend --

16      Q.    No, no, no.  June 27th, 2023, how did the ring come

17   up?

18      A.    I -- I don't know how it was first brought up.

19      Q.    Okay.  You remember seeing pictures, though, right?

20      A.    I don't -- I don't recall any of -- exactly how the

21   ring was brought up.  All I recall is how the ring was put in

22   my possession.

23      Q.    How did you remember how much you paid for the ring?

24      A.    I was -- I don't remember.

25      Q.    Were you going to say you were shown bank records?
```

```
 1          A.   No, I was going to say I was giving a rough estimate.

 2          Q.   Okay.  Yesterday during my cross I talked to you

 3     about the amount of the cashier's check that you gave for

 4     y'all's house in Colleyville.

 5          A.   Uh-huh.

 6          Q.   And you said it was 130-something-thousand.  Do you

 7     remember that?

 8          A.   Right.

 9          Q.   But somehow you miraculously remember to the penny

10     that you paid $7,490 for that ring?

11          A.   Yes.

12          Q.   How did you and Bill Stone arrive at that number?

13          A.   He told -- that was -- it was for his friend.  He was

14     selling it for his friend.

15          Q.   How did you get to the number?

16          A.   He told me the number.

17          Q.   Did he start at 8,000 and you said 7,000?

18          A.   No.

19          Q.   And then he said 7,500?

20          A.   I don't recall that.  He told me the number.  I got

21     the -- and I paid for it.

22          Q.   Okay.  That's different from what you told the agents

23     in June 2023, isn't it?

24          A.   I don't think so.

25          Q.   Read the paper.
```

1        A.    Yes.

2        Q.    Okay.  What you told the agents was that you withdrew

3   $7,490.  You had that cash and then gave it to Bill Stone for

4   the ring, right?

5        A.    What it says here is that he told me how much and

6   then I went and withdrew the money.

7        Q.    Is it your testimony that during that sit-down with

8   Brian Luley, he did not show you one single bank record?

9        A.    I believe we were discussing different purchases or

10  withdrawals.

11       Q.    So he provided a list of withdrawals to you?

12       A.    No, he didn't provide me anything.

13       Q.    Okay.  So when I asked about the ring yesterday, why

14  didn't you mention $7,490 to me?

15       A.    Because I wasn't sure of the amount.

16            MR. GALLIAN:  Brief moment, Judge.

17            (Sotto voce discussion.)

18            MR. GALLIAN:  Your Honor, I'll pass the witness.

19            Thank you, Ms. Thompson.

20            THE COURT:  All right.

21                    RECROSS-EXAMINATION

22  BY MR. SELLERS:

23       Q.    Casi, I too was not going to ask you any more

24  questions; but you would agree with me you are easily

25  influenced, wouldn't you?

```
 1                    MS. RUDOFF:  Objection, Your Honor, to the
 2       sidebar.
 3                    MR. SELLERS:  That's what this case --
 4                    THE COURT:  Sustained.
 5                    Ask a question.
 6            Q.   You're easily influenced into what other people
 7       think, are you not?  That's why we're here, isn't it?
 8            A.   I feel I -- when based on fear, I believe I was
 9       influenced easily, yes.
10            Q.   All right.  Ms. Rudoff asked you a question on direct
11       about that second call.  And there's four of them.  And for
12       time, I'm not going through them.  But in the second call,
13       where Joe is asking you about a 3x5 card, do you remember that?
14            A.   Yes.
15            Q.   That Bill told him that he's doing your 3x5 cards,
16       yes?
17            A.   Yes.
18            Q.   And remember we talked about how you were told not to
19       tell anybody and Joe was told not to tell anybody by
20       Ranger Briley; you knew that, didn't you?
21            A.   During the secret probation or after --
22                    THE COURT:  One at a time.
23            Q.   When you're talking to Briley, you've been convinced
24       at that point that there is no secret probation, right?
25            A.   Yes.
```

1        Q.    All right.  And Joe has been convinced that there is
2   no secret probation.  And you two are talking on the phone,
3   right?
4        A.    I had no idea that he hadn't -- that he was talking
5   to Dan Briley.
6        Q.    And that he was told to stay in character and not
7   tell anybody about it; you didn't know that either?
8        A.    I did not.
9        Q.    Huh.  Ms. Thompson, it seems like every time we go on
10  a break you come back and it all of a sudden becomes Bill and
11  Joe again.  So let me break this down, okay?  Let's talk about
12  this drug dog Queenie.  You never saw a drug dog, did you?
13       A.    No.
14       Q.    You never saw Joe looking in your car for any pills
15  or anything like that, did you?
16       A.    I did.
17       Q.    You saw Joe in your car holding a pill that he found?
18       A.    Him and Bill were both looking in my car.
19       Q.    Who told you something was found?
20       A.    Bill.
21       Q.    Bill, right?
22       A.    Yes.
23       Q.    Not Joe?
24       A.    Right.
25       Q.    Who knew about the drug dog Queenie?

```
 1       A.    Bill.

 2       Q.    Not Joe?

 3       A.    I think he was aware that Bill was taking it in to

 4  get looked at by Queenie.

 5       Q.    Right.  Joe never told you he'd ever seen Queenie,

 6  had he?

 7       A.    I don't recall.

 8       Q.    Again, the source of Queenie, the source of this

 9  story about the drugs in your car came from Bill, didn't it?

10       A.    Yes.

11       Q.    And not Joe, right?

12       A.    Correct.

13       Q.    Casi, do you remember yesterday when we talked about

14  the text you sent Joe, where you said, Are you sure you don't

15  want to come over?  Do you remember that one?

16       A.    I don't remember the context.

17       Q.    Okay.  So you don't remember all the bras and panties

18  and stuff that you sent to Joe?

19       A.    The Victoria's Secret?

20       Q.    Uh-huh.  Yes.

21       A.    It was -- yes.

22       Q.    Joe never made any sort of inappropriate pass at you,

23  did he?

24                  THE COURT:  Hold on just a moment.

25                  MS. RUDOFF:  Objection, Your Honor, as to the
```

1    relevance.

2              THE COURT:  Let's take a stretch break for just

3    a moment, jury.

4              (Jurors exit courtroom.)

5              (Off-the-record discussion.)

6              (Jurors enter courtroom.)

7              THE COURT:  Your witness.

8       Q.   Fair to say that you and Joe had a flirtatious

9    relationship in exchange of text messages, yes?

10      A.   It was flirty sometimes.

11      Q.   And Joe is older than Bill, right; clearly?

12      A.   Right.

13      Q.   And Bill was too old for you, right?

14      A.   Right.

15      Q.   And nevertheless, you were sending Joe pictures of

16   your bras and stuff that you bought, right?

17      A.   It was a Victoria's Secret purchase.

18      Q.   You were sending pictures of your bras, right?

19      A.   They were laid out on my bed.

20      Q.   Did you or did you not send your bras to Joe?

21      A.   I sent pictures of what I just went and bought.

22      Q.   You'd also sent pictures of yourself on the toilet;

23   do you recall that?

24      A.   I don't.

25      Q.   You've also sent other pictures to Joe, right?

1      A.   I've sent several pictures to Joe.

2      Q.   But you never -- Joe never made any sort of

3 unthwarted advances to you, did he?

4      A.   I -- can you rephrase it?

5      Q.   Sure.  Joe never made any sort of actual serious

6 advance on you sexually, did he?

7      A.   No.

8      Q.   Just seemed like you were trying to imply that

9 earlier, so I wanted to clear that up.

10          The last thing I want to talk to you about is --

11 we talked on redirect about you and Joe's friendship, how Joe

12 misspelled your name in his phone.  You know that Joe's first

13 language is not English, right?

14      A.   I didn't know that.

15      Q.   Joseph DeLeon; you didn't know that?  You've heard

16 Joe speak Spanish before, haven't you?

17      A.   I have heard him speak Spanish before.

18      Q.   And he goes to Mexico frequently; you knew that too,

19 right?

20      A.   I did not.

21      Q.   All this stuff, all this time on redirect, I didn't

22 hear a single question about whether or not -- and maybe I

23 missed it; and you tell me if I'm wrong -- whether you've

24 become more sure or less on the fence about whether or not Joe

25 believed Bill was in the FBI and the probation was real.  I

1    didn't hear any questions about that, did you?  From her, did

2    you?

3        A.   I don't know what he thinks or what he believes.

4    You'll have to ask him.

5        Q.   Right.

6              MR. SELLERS:  Pass the witness.

7              THE COURT:  All right.

8              MS. RUDOFF:  Nothing further from the

9    government, Your Honor.  May this witness be excused?

10              THE COURT:  Any objection?

11              MR. SELLERS:  Subject to recall, Your Honor.

12              THE COURT:  Subject to recall?

13              MR. GALLIAN:  Yes, Your Honor.

14              THE COURT:  All right.

15              So, ma'am, you are excused.  You may step down.

16    Thank you.

17              MS. MAX:  Government calls Timothy Bell.

18              THE COURT:  All right.

19              (Witness sworn.)

20              THE COURT:  Your witness, ma'am.

21                        TIMOTHY BELL,

22    having been first duly sworn, testified as follows:

23                     DIRECT EXAMINATION

24    BY MS. MAX:

25        Q.   Mr. Bell, what do you do for a living?

1      A.    I am an investigator for ethics compliance division.

2    I'm from one of the big four accounting firms.

3      Q.    And how long have you had that job?

4      A.    Just under two years.

5      Q.    And what did you do prior to that?

6      A.    I was an FBI agent.

7      Q.    For how long?

8      A.    22 years.

9      Q.    And were you ever based out of the D.C. office?

10      A.    Yes.

11      Q.    Okay.  Tell the jury what you were doing at the D.C.

12    office.

13      A.    I did a number of things in the D.C. office, but I

14    worked in counterterrorism division starting in 2010.  And I

15    worked on the National Joint Terrorism Task Force for a number

16    of those years.

17      Q.    Were you -- did you end your career as a supervisory

18    special agent with the FBI?

19      A.    Yes, I retired in the criminal investigative division

20    in October 31st of 2021.

21      Q.    Were you working at the D.C. office -- D.C. FBI

22    office in 2014 and 2015?

23      A.    Yes.

24      Q.    During that time, did Bill Stone come under your

25    supervision?

1     A.    Yes, I was the acting unit chief for periods -- for
2     about 22 months during that time.
3     Q.    So explain to the jury what role Bill Stone was in.
4     A.    So Bill Stone was selected for an 18-month
5     temporary-duty position to be transferred from Dallas to the
6     National Joint Terrorism Task Force, which is under the
7     counterterrorism division.  And he was assigned as a
8     supervisory special agent to be a program manager of the FBI's
9     civil aviation security program.
10     Q.    What -- just briefly tell the jury what is the civil
11     aviation program.
12     A.    So the Civil Aviation Security Program is a program
13     that maintains the airport liaison agents.  So the FBI has
14     agents at all major airports, and so we want to make sure that
15     the FBI is in a position and has the -- either people assigned
16     to those airports or relationships with those airports.  So the
17     liaison part of that is having those relationships and managing
18     the hundreds of agents that are serving as airport liaison
19     agents.
20     Q.    And when you say that the defendant was in the Dallas
21     office and then came to the D.C. office for -- and was that
22     just for an 18-month period he was meant to be there?
23     A.    Yes.
24     Q.    And that kind of -- did you call it a detail?
25     A.    It's called a TDY, temporary duty.

1     Q.   Okay.  So is the 18-month temporary duty assignment,

2   is that something common within the FBI?

3     A.   It's very common.  You have the option -- a lot of

4   times a lot of those positions you have the option of taking it

5   to 18-month temporary-duty assignment or getting a permanent

6   relocation, a permanent transfer.

7     Q.   So do you know, did Bill Stone come to D.C. with that

8   temporary-duty assignment in 2014?

9     A.   Yes.

10    Q.   And once he was there, do you know if Bill Stone was

11  interested in getting one of those permanent assignments at the

12  D.C. office?

13    A.   Yes.

14    Q.   Did he specifically bring up the topic with you?

15    A.   Yes.

16    Q.   Was he offered a permanent position in the D.C.

17  office?

18    A.   No.

19    Q.   Okay.  And would this have been in 2015 that you're

20  having this conversation with Mr. Stone?

21    A.   Yes.

22    Q.   Just to clarify, when you had mentioned that he was

23  in the aviation unit, does that unit have anything to do with

24  North Korea?

25    A.   No.

1    Q.    Hillary Clinton's e-mails?

2    A.    No.

3    Q.    Benghazi?

4    A.    No.

5    Q.    Talking to detainees at Guantanamo Bay?

6    A.    No.

7    Q.    Okay.  While Mr. Stone was in D.C., was he nearing

8    mandatory retirement age with the FBI?

9    A.    Yes.

10   Q.    Explain to the jury what mandatory retirement within

11   the FBI is.

12   A.    So special agents in the FBI are required to retire

13   at age 57.  So you have to have -- also have 20 years of

14   service.  So you can't be hired being older than 37 because

15   you're required to have those 20 years of service and required

16   to retire by 57.

17   Q.    And was Mr. Stone someone who is eligible for that

18   mandatory retirement?

19   A.    Yes.

20   Q.    So he was nearing age 57 and had the 20 years of

21   experience?

22   A.    Yes.

23   Q.    When it says mandatory, is that the only option for

24   retirement within the FBI?

25   A.    No.  There -- you can apply for waivers, one year of

1    waivers.  And you get approved one year at a time to stay on

2    for up to an additional three years.

3         Q.   Okay.  So you could ask for up to three years to put

4    off your retirement?

5         A.   Yes, in one-year increments.

6         Q.   Did you talk to Mr. Stone about whether he wanted to

7    take the mandatory retirement or whether he wished to extend it

8    and put it off?

9         A.   I did have a conversation at the same time when we

10   spoke about him wanting to become a permanent assignee to

11   headquarters.  I had that same -- in that same conversation,

12   he -- he did mention wanting to possibly apply for an

13   extension.

14        Q.   Okay.  And do you know, did Mr. Stone receive an

15   extension on his retirement?

16        A.   I don't know that he applied for them, but he did not

17   receive one.

18        Q.   And have you had an opportunity to review

19   Government's Exhibit Number 1?

20        A.   Can I --

21             MS. MAX:  Your Honor, may I approach?

22             THE COURT:  You may.

23             (Documents tendered.)

24        A.   Yes, I have.

25        Q.   And you're familiar with the information related to

```
 1  this form, correct?

 2       A.   Yes.

 3       Q.   Okay.

 4            MS. MAX:  At this time, Government moves to

 5  admit Government Exhibit Number 1.

 6            MS. GALLIAN:  No objection.

 7            MR. SELLERS:  No objection.

 8            THE COURT:  Admitted.

 9            MS. MAX:  Permission to publish, Your Honor?

10            THE COURT:  Granted.

11       Q.   Okay.  Explain to the jury what is this form we're

12  looking at in Government Exhibit 1.

13       A.   This is a standard Form 50, or also known as an SF

14  50.

15       Q.   Okay.  And what is it titled?

16       A.   It's a Notification of Personnel Action.

17       Q.   And is this a form that you have seen many times in

18  your FBI career?

19       A.   Yes.

20       Q.   And explain to the jury what information is being

21  conveyed in this type of form.

22       A.   So any time you're promoted or your pay scale

23  increases, you would get a notification -- this form would be

24  filled out.  So if you were promoted to a higher level or if

25  you got an annual step increase, you'd get a notification that
```

1  your position or salary has changed.

2      Q.    And what about if you're retiring?

3      A.    You would also get one when you retire.

4      Q.    And is Government Exhibit 1 the Notification of

5  Personnel Action form for William Roy Stone?

6      A.    Yes, it is.

7      Q.    And what does it list as the effective date of his

8  retirement?

9      A.    October 31st, 2015.

10     Q.    And what is the nature of the action on the form?

11     A.    Retirement mandatory.

12     Q.    Once Mr. Stone knew that he was not going to have a

13  permanent position in D.C., and was not going to have extended

14  retirement, did you ever have a conversation with him about

15  what he would do post-retirement?

16     A.    I -- at some point, yes, I had conversations with him

17  as he approached retirement about looking for retirement

18  employment.

19     Q.    Was it your understanding that he was looking for

20  jobs post-retirement?

21     A.    Yes, it was.

22     Q.    When an agent retires, does the FBI have any sort of

23  pension program?

24     A.    Yes, it does.

25     Q.    Just briefly explain to the jury how that's set out,

1    without getting into a lot of numbers and percentages.

2         A.    Well, you get 1.7 percent a year for your first

3    20 years.  Ultimately, after 20 years of service, you're

4    entitled to a 34 percent -- 34 percent of your top three -- of

5    your highest three years of salary.

6         Q.    Okay.  So is the pension based on years of service?

7         A.    Yes.

8         Q.    And your highest three salaries?

9         A.    Yes.

10        Q.    And they do some sort of percentage calculation and

11   spit out a number to you?

12        A.    Yes.

13        Q.    Once you go on retirement, do those monthly pension

14   benefits immediately kick in?

15        A.    They start about a month after you retire.  And you

16   get a partial payment.

17        Q.    Okay.  So does that mean that you -- you don't skip?

18   Like you retire, and the next month you're already getting your

19   pension payments from here on out?

20        A.    Yes, initially you get a reduced payment.  It takes

21   them some period of time for the office of personnel management

22   and the national finance folks to finalize what your exact

23   amount will be.  So that takes a -- a -- it's advertised as 2

24   to 4 months.

25        Q.    Okay.  So you're saying the office of personnel

1   management advertises that it's going to take 2 to 4 months for

2   you to start receiving your monthly -- is it a monthly benefit?

3      A.   Yes.

4      Q.   -- your monthly pension benefit?

5      A.   Yes.

6      Q.   Generally, what is the experience of individuals of

7   how long it takes?

8      A.   Takes much longer.  In my case, it took over nine

9   months before they finalized my -- before I received the full

10  benefit.

11     Q.   So is it common that once you retire, there's

12  actually a lag before you start getting your pension payments?

13     A.   Yes, it's known that you can't rely on the -- what

14  they tell you it will be.

15          MS. MAX:  Pass the witness.

16                    CROSS-EXAMINATION

17  BY MS. GALLIAN:

18     Q.   Good afternoon, Mr. Bell.  My name is Jaclyn Gallian.

19  I'm one of the attorneys representing Bill Stone.  I only have

20  a few questions for you today.

21     A.   Okay.  Thank you.

22     Q.   Right off the bat, so you said you retired

23  October 31st, 2021?

24     A.   Yes.

25     Q.   Was that mandatory retirement for you?

1          A.   No, it was not.

2          Q.   Okay.  It's just interesting, because that's when

3    Bill Stone retired, October 31st; and it was his mandatory

4    birthday retirement.  I didn't know if you shared the same

5    birthday.

6          A.   No.

7          Q.   Okay.  Now, you spoke about possibly getting an

8    extension from the mandatory retirement.  I believe I wrote

9    down that you did not know if he applied for one; is that true?

10         A.   I don't know that he applied for one, no.  It's -- I

11   don't know that.

12         Q.   Okay.  With respect to the extension, is there -- is

13   there any type of testing, like a physical fitness test or any

14   type of qualifier for the extension?

15         A.   There's a -- there's an application process.  And

16   I -- I think it has requirements with firearms and that, but I

17   don't know if it's anything beyond what all agents have.  You

18   basically have to maintain the standard in order to get an

19   extension.  That's my understanding.

20         Q.   Okay.

21         A.   If there's a formal application process, I believe it

22   has to be approved by the director of the FBI.  So they're not

23   that common.

24         Q.   Okay.  So you said "not that common."  Is it common

25   for agents, once they reach the mandatory requirement age, to

```
 1   get the extension?
 2        A.   I've known of some.  But it's not -- I've also known
 3   of some very high-qualified people who didn't get the
 4   extension.
 5        Q.   Okay.
 6                  MS. GALLIAN:  Thank you, Mr. Bell.
 7                  Pass the witness.
 8                  MR. WESTFALL:  No questions, Your Honor.
 9                  THE COURT:  All right.
10                  MS. MAX:  Your Honor, may we release this
11   witness?
12                  THE COURT:  Any objection to me releasing this
13   witness?
14                  MR. WESTFALL:  No, Your Honor.
15                  MS. GALLIAN:  No, Your Honor.
16                  THE COURT:  All right.  Thank you.
17                  MS. MAX:  The government calls James Marcano.
18                          JAMES MARCANO,
19   having been first duly sworn, testified as follows:
20                       DIRECT EXAMINATION
21   BY MS. MAX:
22        Q.   Mr. Marcano, can you please spell your last name for
23   the record.
24        A.   M-A-R-C-A-N-O.
25        Q.   And, Mr. Marcano, what do you do for a living?
```

 1      A.   I do tech support, lead for my company SpoofCard, or
 2  Momentum.
 3      Q.   I'm sorry, you said -- you're going to have to --
 4  you're a fast-talker like me, Mr. Marcano.  So for the court
 5  reporter's sake right there, we're going to have to slow down
 6  just a little bit.
 7      A.   No worries, okay.
 8      Q.   So you do tech support for SpoofCard; is that what
 9  you said?
10      A.   Yes.
11      Q.   And how long have you been in that position?
12      A.   I've been in that position for four years.
13           THE COURT:  Can I pause you for just a moment.
14           (Court instruction.)
15      Q.   Mr. Marcano, explain to the jury what is SpoofCard.
16      A.   SpoofCard is a app that we've created that kind of
17  helps to mask caller ID for privacy purposes.
18      Q.   So you say it's an app that -- is that what goes on
19  your phone or computer?
20      A.   Yes.
21      Q.   Okay.  How long has it been around?
22      A.   It's been around for quite a while.  Ten-plus years.
23      Q.   Okay.  And where can a user get the app and put the
24  app on their device?
25      A.   Yeah, so you can either go onto our website,

```
 1   spoofcard.com, or you can download it right onto your phone;
 2   Google or Android or iPhone.
 3       Q.   And does it actually have like a little -- you'll get
 4   like a little app icon --
 5       A.   Yes.
 6       Q.   -- with SpoofCard?  Okay.  Explain to the jurors
 7   exactly what the customers of SpoofCard are coming to your app
 8   or website to be able to do.
 9       A.   Yeah, so mainly what the app was designed for was
10   privacy purposes.  So, like, let's say if you're a doctor
11   trying to call your patient to give them like test results or
12   anything, and they don't want to hand out their personal cell
13   phone, they can use SpoofCard to mask their caller ID and call
14   their patient.
15       Q.   Okay.  So is the main function of SpoofCard to mask a
16   phone number?
17       A.   Yes.
18       Q.   Okay.  Is there anything else that users of SpoofCard
19   could do?
20       A.   Yes.  We have features like call recording, voice
21   changer, straight to voicemail, background noise.  They can
22   also text from SpoofCard as well.
23              THE COURT:  Can you slow down just a little bit
24   slower.
25       Q.   And to be clear, I should clarify, when you say that
```

1  they can mask a number, are you talking about like your

2  customer going onto SpoofCard and being able to mask their own

3  phone number?

4      A.   Yes.

5      Q.   From somebody else who's going to receive a call from

6  them?

7      A.   Yes.

8      Q.   And are you also saying that they are able to mask --

9  you can mask your phone number so that a person who's receiving

10  a text message from you would not see your real phone number?

11      A.   Yes.

12      Q.   When you say mask the number, does that mean that the

13  person who's receiving the phone call or receiving the text

14  message would see no phone number at all?

15      A.   No, they will see the phone number that was chosen to

16  show up on their caller ID.

17      Q.   And who would choose the phone number that was --

18  that shows up on their caller ID?

19      A.   The user that is -- that has the app downloaded.

20      Q.   Okay.  So the user can pick a phone number and make

21  that phone number appear on a person's phone when they're

22  calling that phone?

23      A.   Yes.

24      Q.   Same thing, they can pick a phone number and make

25  that phone number appear when they're texting another person?

1      A.   Yes.

2      Q.   And then let's go through again.  You said the other

3    features -- let's go through one by one.  What were the other

4    features SpoofCard can do?

5      A.   They are voice changer; meaning you can change your

6    voice from male or female.  Background noise.  There's a --

7    multiple ones.  We have casino, airport, I think -- there's a

8    lot --

9      Q.   You create background noises?

10     A.   Yes.

11     Q.   Okay.

12          (Court instruction.)

13     Q.   What is the feature after background noises, what's

14   another feature SpoofCard has?

15     A.   Another feature SpoofCard has is call recording.

16   Also, the last feature that we will have would be straight to

17   voicemail.

18     Q.   Okay.  So the call recording, is that where somebody

19   can record the call that they're placing through the SpoofCard

20   app?

21     A.   Yes.

22     Q.   And then you said the last feature was straight to

23   voicemail.  Can you explain what that means?

24     A.   If -- once you activate or enable that feature, what

25   it does is -- it kind of does what it says; it goes straight to

1    voicemail.  It will not ring to the other party, but it will go

2    straight to the other party's voicemail.

3        Q.   And have you had an opportunity to review

4    Government's 61, the SpoofCard records associated with this

5    case?

6        A.   Yes.

7             MS. MAX:  At this time, Government moves to

8    admit Government 61.

9             MR. GALLIAN:  No objection.

10            MR. WESTFALL:  No objection, Your Honor.

11            THE COURT:  Admitted.

12            MS. MAX:  Permission to publish?

13            THE COURT:  Granted.

14       Q.   Unfortunately, Mr. Marcano, we can't do -- the nature

15   of this, but -- we can't blow it up any larger.  But on the

16   Account section, where it says "e-mail address," do you see an

17   e-mail address entered?

18       A.   Yes, I do.

19       Q.   And is that airsig@yahoo.com?

20       A.   Yes.

21       Q.   Explain to the jury how that e-mail address gets in

22   this account information.

23       A.   So that e-mail address is put into -- upon -- when

24   you sign up from the website.  So that's the e-mail they choose

25   to input.

1    Q.    When you sign up from the website, do you have to

2    sign up on a desktop or laptop computer or can you also sign up

3    through your phone?

4    A.    No, it -- you can sign up through your phone as well.

5    Q.    Okay.  What is that explaining under the Member Since

6    box?

7    A.    That Member Since box is the day they signed up for

8    SpoofCard.

9    Q.    And is that reflected June 18th, 2019?

10    A.    Yes.

11    Q.    And then under Credentials, Credential Type:  Phone,

12    what does that mean?

13    A.    It means they signed up with their phone, like on

14    their phone.

15    Q.    Meaning they accessed SpoofCard on their phone?

16    A.    Yes.

17    Q.    Do you know if that means they did it through the

18    website or they did it through the app?

19    A.    They -- in --

20    Q.    Or can you tell?

21    A.    For credentials, I wouldn't be able to tell.

22    Q.    Okay.  And then under Identifier, it looks like

23    there's a phone number.  What does that mean?

24    A.    That phone number is the phone number that they chose

25    to sign up with.

1      Q.    So is that the -- the -- usually the user's real

2   phone number?

3      A.    It can be.  But they can choose whatever phone number

4   they would like.

5      Q.    And for the record, the phone number reflected under

6   Identifier in Government Exhibit 61 is 2863; is that correct?

7      A.    Yes.

8      Q.    Okay.  And "is active," what does that mean?

9      A.    That means the credential's still active on the

10   account.

11      Q.    And is it indicated "yes" on this one?

12      A.    Yes.

13      Q.    And then "date created" on that credential, what does

14   that mean?

15      A.    That is the date the credential was created.  Same

16   thing as the -- as the account.

17      Q.    Now, this says June 18th, 2019, at 2:00 p.m.  Do you

18   know what time zone these records were in for this portion?

19      A.    Yes, it will be in the time zone they created the

20   account.

21      Q.    Moving down to -- can you move down to where we see

22   Access Tokens?  And if we look down here under Access Tokens,

23   what does Provider Type mean?

24      A.    Provider Type is where they -- is where they logged

25   in.

1      Q.   Okay.  And Application Name?

2      A.   Is the application that they used to log in.

3      Q.   Okay.  So does this indicate, then, that this user

4 was logged in under -- using a phone, logged into the website?

5      A.   Yes.

6      Q.   Okay.  And what does the Date Created box mean?

7      A.   The Date Created box is the date and time that they

8 logged in.

9      Q.   Okay.  And is this like the first log in, the last

10 log in --

11      A.   It would be their last log in.

12      Q.   The last log in for this account?

13      A.   Yes.

14      Q.   So for this account, the airsig account, it's

15 July 20th, 2020; is that correct?

16      A.   Yes.

17      Q.   Okay.  Now, let's go under the Call portion.  And it

18 looks like the dates actually -- we need to start at the

19 bottom, right, to then move up.

20      A.   Yes.

21      Q.   You agree?  Okay.  So looking at the very last line

22 under Calls, we see the first column is Access Number.  Explain

23 to the jury what that means.

24      A.   Sure.  The access number is a number that we provide.

25 That way they can dial in to use the SpoofCard service.

1        Q.    Okay.  So let's walk through with the jury if

2    somebody wants to use SpoofCard.

3        A.    Uh-huh.

4        Q.    Let's say to use the function of calling and changing

5    their phone number, okay?  So how -- walk us through the steps

6    that a person would do to -- to do that.

7        A.    Okay.  Well, once you're logged in -- specifically

8    since this account was done through the website, I'll go

9    through the website process.  Once you're logged in, you're

10   brought to your main dashboard where you can input the number

11   that you want to call.  And then right after that, you can put

12   in the -- your -- the number that you want to show on the -- on

13   their caller ID.

14               Once that's done, you'll get a green button that

15   says "make a call."  And you'll have to click it in order to

16   get the access number that is used to dial in and use the

17   SpoofCard service.

18       Q.    Okay.  So under that first column, then, from what

19   you've just explained, if I'm using the SpoofCard app, when I

20   want to make the spoof call, I'm going to call that access

21   number?

22       A.    Yes.

23       Q.    Okay.  That's the number that's given to me to call

24   in?

25       A.    Yes.

1     Q.    Okay.  What is under the real caller ID column?

2     A.    The real caller ID column is the phone number, or the

3  phone that's being used to call into the access number.

4     Q.    Okay.  So it's like the real phone number of the

5  person that's making this spoof call?

6     A.    Yes.

7     Q.    Okay.  And would you agree with me that for

8  June 18th, June 18th, June 18th and June 18th, on

9  Government 61, the phone number ends in 2863?

10    A.    Yes.

11    Q.    Okay.  The next column is Spoof Number.  Explain what

12  that is.

13    A.    The spoof number would be the number that gets shown

14  on the recipient's caller ID; meaning the person that's

15  receiving the call.

16              (Court instruction.)

17    Q.    So this is the phone number that the recipient sees?

18    A.    Yes.

19    Q.    And can the user of SpoofCard choose any number --

20  any phone number they want?

21    A.    Yes.

22    Q.    So for the June 18th calls reflected on this record,

23  is the phone number starting with an area code 512?

24    A.    Yes.

25    Q.    And is the number (512) 854-9244?

1        A.    Yes.

2        Q.    And column Destination Number, what does that mean?

3        A.    The destination number would be the person that

4    received the call.

5        Q.    And for the June 18th, the bottom three June 18th

6    calls, is that a phone number ending in 2932?

7        A.    Yes.

8        Q.    And under the Status column, what does "completed"

9    mean?

10       A.    Completed means the call went through to the

11   destination number.

12       Q.    And under the Recording column, explain what we see

13   here.

14       A.    The Recording column would show if the call was

15   recorded or not.  So in this case, there's two calls here that

16   are recorded.  Under the recording, it says "yes."

17       Q.    Okay.  Going to -- let's just start now with the

18   Start Time column.  And the very bottom line, June 18th, 2019,

19   at 2- -- 10:04 a.m.  First of all, is that -- 10:04, is that

20   the local time for the user?

21       A.    Yes.

22       Q.    Was the voice changer function used on this call?

23       A.    Yes, it was.

24       Q.    And it says "man."  Explain to the jury exactly what

25   that means.

1      A.    That means that they chose the male voice changer

2  upon setting up their call.

3      Q.    And how long was that phone call where they were

4  trying out the voice changer man?

5      A.    That phone call lasted 39 seconds.

6      Q.    Okay.  Moving up to the next line, June 18th, 2019,

7  at 10:06 a.m., again, was the voice changer man used?

8      A.    Yes.

9      Q.    And how long was that call?

10     A.    30 seconds.

11     Q.    Now, when I -- if you were the user of the SpoofCard,

12 and I'm doing the voice changer, as I'm talking into the phone

13 using the voice changer function, can I hear what my voice

14 sounds like changed?

15     A.    No, only the recipient of the phone call can.

16     Q.    Okay.

17     A.    If they had recorded the call and used voice changer,

18 they would be able to hear the male voice changer.

19     Q.    Okay.  So moving up to the -- to the next line, then,

20 the line there in the middle, June 18th, 2019, at 10:07 a.m.,

21 we see there was a recording with this call, correct?

22     A.    Yes.

23     Q.    And then we see that voice changer man was used,

24 correct?

25     A.    Yes.

1    Q.   And so is this an example of what you were just

2  describing; that if you wanted to use the voice changer, you

3  would also have to record to be able to hear what the voice

4  changer sounded like?

5    A.   Yes.

6    Q.   Okay.  And that was done here with this call at

7  10:07, correct?

8    A.   Yes.

9    Q.   And how long did this call last?

10   A.   This call lasted 23 seconds.

11   Q.   Moving on up in the line, then.  Let's go to -- we've

12  got June 18th, 2019, at 10:06 -- 10:16, I'm sorry, a.m.  Again,

13  what is the real caller ID under that line?

14   A.   The real caller ID is (214) 422-2863.

15   Q.   And what is the -- is the spoof number

16  (512) 854-9244?

17   A.   Yes.

18   Q.   And the destination number, is it ending in 8559?

19   A.   Yes.

20   Q.   And was that call completed?

21   A.   Yes.

22   Q.   Was the recording made of that call?

23   A.   Yes.

24   Q.   And the duration of that call was 5,653 seconds?

25   A.   Yes.

1          Q.   Mr. Marcano, would you agree with me that that

2     roughly -- that many seconds equals 94 minutes?

3          A.   Yes.

4          Q.   Okay.  How does one -- well, first of all, does it

5     cost to use SpoofCard?

6          A.   Yes, it does.  You have to purchase credits in order

7     to make a call.

8          Q.   And what is roughly the rate for the SpoofCard?

9          A.   So our lowest package will start at 9.95 for 45

10    credits.  We have another package that is 19.95 for 100

11    credits.  We have another package that's 29.95 for 160 credits.

12    Another package that's 49.95 for 280 credits.  And the biggest

13    package would be 99.95 for 600 credits.

14         Q.   And is there anything that you can get free with the

15    SpoofCard?

16         A.   You can get five credits free if you sign up on the

17    app.

18         Q.   Okay.  And that comes immediately to you?

19         A.   Yes.

20         Q.   And then does the voice changer function cost?

21         A.   The voice changer will cost nothing extra.

22         Q.   Okay.  Does recording the call cost extra?

23         A.   Yes, it will cost you one credit extra.

24         Q.   Okay.  For this SpoofCard account, this airsig

25    account, with all of this, do you -- so you're buying in

1    advance; is that correct?

2         A.   Yes.

3         Q.   Okay.  So you -- you've paid up front and then you

4    get to use down your credits?

5         A.   Yes.

6         Q.   So how much was paid by airsig for this SpoofCard

7    account?

8         A.   For this SpoofCard account, it was 29.95.  So they

9    purchased 160 credits.

10        Q.   Okay.  And do we see on the credit card transactions

11   at the bottom, is the credit card that's used ending in 3292?

12        A.   Yes.

13        Q.   And does it look like the first credit card

14   transaction did not go through?

15        A.   Yes.

16        Q.   Did the second credit card transaction go through?

17        A.   Yes, the second one did go through.

18        Q.   And was that on June 18th, 2019, at 10:13 a.m.?

19        A.   Yes.

20        Q.   Okay.  Now, when I showed you the chart, just prior

21   to going through some of those calls, you would agree with me

22   that there were the -- the very short calls, the 30-second

23   calls, those were made before 10:13 on that same date, correct?

24        A.   Yes.

25        Q.   Is that an example of where somebody would possibly

1   be using the free credits that they would get to sign up?

2       A.   Yes.

3       Q.   Okay.  But then at 10:13 is when the payment was

4   made?

5       A.   Yes.

6       Q.   And just -- and again, that -- and again, the

7   94-minute call occurred at 10:16 on June 18th, correct?

8       A.   Yes.

9       Q.   When you use SpoofCard, you've made it clear that the

10  recipient of the call is seeing the phone number -- the spoof

11  number that's put in, right?

12      A.   Yes.

13      Q.   What shows up on the phone records of the recipient?

14      A.   Ideally the spoof number will show up on -- you know,

15  on the records.

16      Q.   So you're saying ideally the 512 number will show up

17  on the phone records of the person?

18      A.   Yes.

19      Q.   So the -- the recipient of the call, they're none the

20  wiser, right?  They got a phone call and it's showing a 512

21  number?

22      A.   Yes.

23      Q.   And then once they get their phone records, it's also

24  going to show that 512 number?

25      A.   Yes.

1    Q.    Okay.  So the deception is complete, right?

2    A.    Yes.

3    Q.    Okay.  What shows up on the phone records of the

4  SpoofCard user, the customer?

5    A.    It would be the access number that they dialed in to.

6  So in this case, it would be the (989) 256-0246.

7    Q.    Okay.  So that's what shows up on the customer's

8  phone records?

9    A.    Yes.

10   Q.    How long does SpoofCard maintain their recordings, if

11  you've chosen the recording function?

12   A.    We retain the recordings for up to a year.

13   Q.    And when somebody chooses the record function,

14  explain what they're getting in return.

15   A.    So they'll just -- once they log in to their account,

16  as long as it's not anything not past the one-year mark,

17  they'll be able to listen to the call.

18   Q.    So the recording is accessible to them through this

19  SpoofCard account?

20   A.    Yes.

21   Q.    Either a website or app?

22   A.    Yes.

23   Q.    Do they also have the option of downloading that

24  file?

25   A.    Yes.

 1      Q.   And so what happens when they exercise that download
 2 option?
 3      A.   They have the choice of keeping it on their computer
 4 or hard drive, or they can delete it.
 5      Q.   Okay.  So they're getting a file that they can then
 6 save anywhere outside of the SpoofCard website or app?
 7      A.   Yes.
 8              MS. MAX:  Pass the witness.
 9              THE COURT:  Members of the jury, how are we
10 doing as far as do we need a break?  We're doing good?  Okay,
11 great.
12              Your witness.
13              MR. GALLIAN:  Your Honor, I have so, so many
14 questions, but nothing related to this case.  So we'll pass the
15 witness.
16              THE COURT:  I think you just made a fan of the
17 jury.
18              MR. WESTFALL:  No questions, Your Honor.
19              THE COURT:  All right.  Thank you.
20              Thank you so much for coming.
21              MS. MAX:  Your Honor, may this witness be
22 excused?
23              THE COURT:  Any objection?
24              MR. GALLIAN:  No objection.
25              MR. WESTFALL:  No objection.

```
 1                    THE COURT:  Thank you, sir.

 2                    MR. BUSCH:  Your Honor, the government will call

 3  Timothy Gray.

 4                         TIMOTHY GRAY,

 5  having been first duly sworn, testified as follows:

 6                       DIRECT EXAMINATION

 7  BY MR. BUSCH:

 8      Q.   Sir, would you state your name for the record?

 9      A.   Yes, Timothy Gray.

10      Q.   How are you employed?

11      A.   Verizon Wireless.

12      Q.   How long have you been so employed?

13      A.   Coming up on 25 years in two weeks.

14      Q.   Are you stationed in Texas or elsewhere?

15      A.   I'm in Tampa, Florida.

16      Q.   Okay.  What are your duties at Verizon?

17      A.    It's kind of three-fold.  I do small claims cases.  I

18  do government agency work with the Better Business Bureau, the

19  FCC and a few others.  And then I do custody of records work,

20  providing testimony whenever Verizon's records are utilized.

21      Q.   Okay.  So we have two sets of records that I'm going

22  to ask you about; Government's Exhibit 35 and Government's

23  Exhibit 165.  Both sets of records deal with William Stone's

24  two telephones.  Are you aware of those records?

25      A.   Yes, sir.
```

```
1              MR. BUSCH:  Your Honor, at this time the
2    government will offer Government's Exhibits 35 and 165 --
3    actually, 165 is a duplicate of Defendant Stone's 165, I
4    believe.  It was already admitted.
5              THE COURT:  Great.  Thank you.
6              Any objection?
7              MR. GALLIAN:  No objection.
8              MR. WESTFALL:  No objection, Your Honor.
9              THE COURT:  They are admitted.
10   Q.    If we would pull up Government's 35 and go to page 2,
11   please.
12             Mr. Gray, do you see the record before you?
13   A.    Yes, sir.
14   Q.    And these records reflect which account?
15   A.    William Stone's account.
16   Q.    Okay.  And the phone number ending in -- in court,
17   generally we just do the last four digits -- ending in the
18   2932.  Do you see that?
19   A.    Yes, sir.
20   Q.    All right.  And if you would look at -- pull up
21   page 108, please.  And looking at that record, do you see that
22   it reflects records regarding a different phone number ending
23   in 2863?
24   A.    That's correct, yes, sir.
25   Q.    Okay.  And now if we go to Government's Exhibit 165.
```

1   And let's start with page 23, please.

2               Okay.  Do you see the record that I'm showing

3   you?

4        A.    Yes, sir.

5        Q.    Okay.  Is this record similar to the other records

6   that we've already looked at?

7        A.    Yes, sir.

8        Q.    This is the way Verizon generates its records.  What

9   are the things that are reflected on the typical phone record,

10  and specifically about the records that you see before you, if

11  you just start from the left column and move your way across?

12       A.    Okay.  Basically on a typical bill we provide the

13  date, the time, phone number that a call was made to or coming

14  from.  We list out some billing aspects, in terms of the Rate

15  and the Usage Type column.  And then we do a destination -- or

16  an Origination and a Destination column.  And then a Duration

17  column.

18       Q.    Okay.  The time, is that the -- how is that item

19  added to these bills; what time zone is used?

20       A.    The way it's configured is basically it goes off the

21  billing address for the account.  Since the account was out of

22  the Central time zone, then it's Central time zone.

23       Q.    So if someone uses that phone in the Eastern time

24  zone, it would still reflect the Central time zone?

25       A.    Correct.

1      Q.    Okay.  And the Origination, what does that column

2  tell us?

3      A.    Basically Origination column is a generalization on

4  where the device was when a call was made or received.

5      Q.    Okay.  So if we look at the very first line entry, it

6  appears that a call was made in the Washington, D.C. area?

7      A.    Correct.

8      Q.    Okay.  And if we move down, we see McLean, Virginia,

9  Reston, Virginia; suburbs of Washington, D.C.?

10      A.    Correct.

11      Q.    Okay.  All right.  Let me direct your attention now

12  to page 23.

13            And if we would begin -- the bottom half of the

14  page, please.  What is the date that begins on this page?

15      A.    On this page?  October 28th.

16      Q.    All right.  And this is October 28th, 2015, or do you

17  want me to go back to the -- the first billing.

18            If we could go back to -- scroll back to the --

19  okay.

20            (Brief interruption.)

21      Q.    Okay.  Do you see there's a due date that we now see

22  on the top of this page; it says September 14th, 2015?

23      A.    Correct, yes, sir.

24      Q.    And it says it's page 6 of 8.  Okay.  If we scroll

25  down -- let's just scroll down page by page.

 1            Okay.  And looking at this page, we see a due

 2    date of October 14, 2015.  So if we look at the Date column on

 3    the left, and it says September 8th for the first one, would

 4    that be September 8th of 2015?

 5        A.   That would be correct, yes, sir.

 6        Q.   And if we go back to page 23, please.  And start

 7    about halfway down the page.  I'm going to direct your

 8    attention to -- beginning around 10:20 a.m. on October 29th.

 9    Do you see that line?

10        A.   10/29?

11        Q.   Yes, sir.

12        A.   Yes.

13        Q.   Okay.  And what's the origination for that first call

14    at -- at 10:20 a.m.?

15        A.   10:20 a.m.  The origination is Salem, Virginia.

16        Q.   And the call below it?

17        A.   Christians, Virginia.

18        Q.   Okay.  And then the call below that?

19        A.   Gary -- or Gray, Tennessee.

20        Q.   Does it appear that the person using that phone is on

21    the move?

22        A.   I would surmise, yes.

23        Q.   Okay.  And so it's approximately from Christians,

24    Virginia, to Gray, Tennessee.  So it's about three hours that

25    had elapsed, if we look at the time on the left, right?

```
 1        A.    From the calls, yes.

 2        Q.    Okay.  And then the -- the next call at 2:49, that's

 3   in -- what's the origination of that call?

 4        A.    Knoxville, Tennessee.

 5        Q.    Okay.  And if we continue on down, we see other areas

 6   in Tennessee.  And then we get down to Wheatley, Arizona.  So

 7   does it look like someone -- does this appear -- with the time

 8   lapse from these calls, does it appear that someone's actually

 9   driving their car from the Washington, D.C. area, down to the

10   very last one here that we see on this page is Quinlan, Texas?

11        A.    Correct.

12        Q.    Okay.  So that's one way to just see where somebody

13   is as they're moving, right?

14        A.    Yes.

15        Q.    Okay.  If we go to the next page.  And so then we see

16   some addresses here.  Some originations in the -- what we call

17   the Dallas/Fort Worth area.  Do you see that Rockwall, Texas?

18        A.    Yes, sir.

19        Q.    And then you see Southlake, Irving, Texas, all on

20   October 30th at this point?

21        A.    Correct, yes, sir.

22        Q.    Okay.  All right.  Now, I'm going to direct your

23   attention to Government's 165, page 428.  All right.  I'm going

24   to direct your attention to the -- the bottom third of the

25   page, please.  All right.  Starting at -- on June 18th -- and
```

1  again, I'll represent to you that -- well, let's go up and

2  we'll see what -- the date we see on these bills.

3          Do you see the billing period at the top of this

4  part of the exhibit?

5      A.   Yes, sir.

6      Q.   Okay.  Would you tell us what that is?

7      A.   May 20th, 2019, to June 19, 2019.

8      Q.   Okay.  And if we go back to page 428.  So on the left

9  side, if we see "June," we're talking about June of 2019?

10     A.   That's correct.

11     Q.   Yeah, 2019, right?

12     A.   Yes, sir.

13     Q.   Okay.  And if we highlight it again, I just want to

14 direct your attention to four calls starting at 9:04 a.m.

15     A.   Yes, sir.

16     Q.   And what number appears to be the number that was

17 called?

18     A.   (989) 256-0246.

19     Q.   And what is the origination or the location of the

20 person making those calls on that phone?

21     A.   I guess it's pronounced Colleyville, Texas.

22     Q.   Right.  Okay.  And the next column, Destination, what

23 does that column tell us?

24     A.   Basically the Destination column is just derived from

25 the first six digits of the phone number that was dialed.  So

1    either it will say "incoming," like some of the rows above it;

2    meaning it was an incoming call from someone else to the phone.

3    In this particular case, it says Gladwin, Michigan.  It's

4    derived from the first six digits of the phone number that was

5    dialed.  So that (989) 256 apparently resides out of Gladwin,

6    Michigan.

7         Q.   Does that mean that that number or whoever was on the

8    other end, if there was somebody, was at that location, or it

9    could be anywhere?

10        A.   Correct, it could be anywhere.  It's just derived

11   from the phone number itself.

12        Q.   Okay.  So that destination doesn't tell us the actual

13   destination of a call; it just refers to the first six digits

14   of the call?

15        A.   Correct.

16        Q.   Okay.  Of the call number, okay.  And so the -- the

17   first three calls there that were highlighted, of those four,

18   they appear to be one minute in duration; is that right?

19        A.   Correct.

20        Q.   Okay.  And then the fourth one on June the 18th at

21   9:16 a.m., appears to be a 95-minute call?

22        A.   Correct.

23        Q.   Am I reading that right?

24        A.   Yes, sir.

25        Q.   Okay.  And they all -- the number that was called all

1    ends in that 248 -- 0246?

2         A.    Correct.

3         Q.    Okay.  Okay.  So if -- I want to direct your

4    attention now to page 460, if I could, of the same exhibit.

5                   And if we just look at the top first.  Would you

6    tell us the billing period for this page and the pages that

7    immediately follow?

8         A.    Yes, sir.  August 20th, 2019.  September 19, 2019.

9         Q.    Okay.  And if we just highlight the top third of this

10   page.  I'm going to direct your attention to one of the calls

11   specifically.  It's August 30th.  And again, this was 2019,

12   right?

13        A.    Correct.

14        Q.    Okay.  At 4:46 p.m.  Do you see that?

15        A.    Yes, sir.

16        Q.    And it was a -- it was a call made to a number ending

17   in 8559?

18        A.    Yes, sir.

19        Q.    Okay.  What is the origination of that call?

20        A.    Colleyville, Texas.

21        Q.    Is it possible that the person making that call was

22   in fact in Benghazi, Libya, at the time?

23        A.    No, not based on the records that we have.

24        Q.    Okay.

25                   MR. BUSCH:  Nothing else, Your Honor.  Thank

 1   you.  No further questions.

 2                       CROSS-EXAMINATION

 3   BY MR. GALLIAN:

 4        Q.   Mr. Gray, my name is Gregg Gallian.  I've got some

 5   questions for you, okay?

 6        A.   Yes, sir.

 7        Q.   In preparation for your testimony today, the exhibits

 8   that Mr. Busch just went through the exhibit numbers with you,

 9   did you review those exhibits in their entirety?

10        A.   The exhibits, no.  My -- the records that Verizon

11   produced, yes.

12        Q.   Okay, great.  I'd like to pull up Stone's 165.  And

13   we can jump to page 638, please.

14                  All right.  So -- perfect.  What we see here in

15   these Verizon records is that the mailing address for this bill

16   summary is the Federal Bureau of Investigation in Washington,

17   D.C.; is that right?

18        A.   Can you do a little zoom in?  It's a little --

19        Q.   Sure.  Yep, perfect.

20        A.   Yes, sir.

21        Q.   Okay.  And if we back out of that and we go to the

22   top right where it says quick bill summary, and then it gives a

23   date range after that.

24                  And so what this summary says is that we're

25   going to show all of the call entries from October 24th through

1    November 23rd; is that right?

2        A.   Correct.

3        Q.   Okay.  Is there anything -- oh, here we go.  One more

4    time, I'm sorry.  If we look down at the bill date on that

5    bottom fold line.  Right there.

6                 And it's common for Verizon customers to have

7    the bill date being that last day of the call records; is that

8    fair?

9        A.   Correct.

10       Q.   Okay.  Now, if we go from this to page 640.  Now, we

11   know that the bill date was November 23rd.  We agree on that,

12   right?

13       A.   Correct.

14       Q.   And if we subpoenaed all call records relating to

15   this number, but the call entries stop on October 27th, 2015,

16   is that consistent with a number that's no longer in service?

17       A.   Not necessarily.

18       Q.   Okay.  What would be the reasoning for the call

19   records to stop?

20       A.   Could be various.  If there's no calls made, then

21   there's no records.

22       Q.   Okay.  Well, there's plenty of space underneath for

23   more additional records on the 28th, 29th and 30th on this

24   page, right?

25       A.   It would also come down to the day range of the

1    subpoena, in terms of the information that we would provide.

2        Q.   Sure.  If I represent to you that the date range for

3    the subpoena was 2015 to 2020, and the records stopped here,

4    would that be consistent with the number that's no longer in

5    service?

6        A.   Yeah, I don't -- the records right here don't reflect

7    that, so I wouldn't be able to properly determine that.

8        Q.   Okay.  But if there are no records, then you and I

9    can't ever confirm one way or another whether that number is

10   still in service, right?

11       A.   I don't have anything to show that it's not in

12   service, no.

13       Q.   Okay.  The call summary that was sent to the FBI for

14   the date range of November 20th -- or November -- 23rd, if the

15   billing entries or the call entries stop on the 27th, something

16   happened to that phone, right?

17       A.   Not necessarily.  I mean, it's calls.  So if someone

18   doesn't use a phone, then there's no calls.

19       Q.   Okay.  So what we can agree on then if I understand

20   you correctly, is that there are no more calls from this number

21   for the rest of the billing time?

22       A.   At least on this particular bill.  If there is no

23   others, then I would gather so.

24       Q.   Okay.

25            MR. GALLIAN:  Thank you very much.  Appreciate

```
 1   it.
 2                  I'll pass the witness.
 3                  MR. WESTFALL:  May I have just a moment?
 4                  THE COURT:  Certainly.
 5                  (Sotto voce discussion.)
 6                        CROSS-EXAMINATION
 7   BY MR. WESTFALL:
 8        Q.   Tell me your name again.
 9        A.   Timothy Gray.
10        Q.   Timothy?
11        A.   Yes.
12        Q.   I'm Greg Westfall.  Good to meet you.  Where did you
13   come from?
14        A.   Tampa, Florida.
15        Q.   All right.  Very good.  I want to make sure I
16   understand how these records work, okay?
17        A.   Sure.
18        Q.   Now, the origination, you say that is the person
19   using the phone, that's where that phone is located?
20        A.   For that phone number, yes.
21        Q.   Okay.  Generally?
22        A.   Yes.
23        Q.   So it -- is that like the switch that gets used or is
24   that an identification of how we get into the system?  I mean,
25   what -- why does it pick up our -- our place?
```

1        A.   It's off of the cell towers in that location, in that

2   area.

3        Q.   Okay.  And so McLean, Virginia, the phone might have

4   been in some little town right next to McLean, Virginia, do you

5   think?

6        A.   It technically can, yes.

7        Q.   Okay.  I can't hear you very well.

8        A.   It technically can, yes.

9        Q.   Okay.  So if you were in Texas, though, you would

10   never be calling through McLean, Virginia, would you?

11        A.   That's correct, you would not.

12        Q.   So if you're in Austin, Texas, you are -- it's going

13   to say, Origination:  Austin, Texas?

14        A.   That, or whatever the surrounding area is labeled,

15   yes.

16        Q.   Yeah, so you're from Tampa?

17        A.   Correct, yes, sir.

18        Q.   And now, Tampa's about 55 miles north of Sarasota,

19   right?

20        A.   Yeah.

21        Q.   And so if I'm in Tampa and I make a phone call, if --

22   with a Verizon, is -- is it going to say that I made that call

23   from Sarasota?

24        A.   I live in Tampa, and I frequent Sarasota a lot.  So

25   it would say Sarasota.

1    Q.    Okay.  But if I'm in Tampa, will it go through a

2    Sarasota switch?

3    A.    No, we don't have a switch in Sarasota.

4    Q.    Okay.  So the origination -- this thing can

5    distinguish between an origination in one town versus an

6    origination in another town unless those towns are right next

7    to each or very close; isn't that true?

8    A.    Well, it's based off of where the cell tower is.

9    Q.    Right.  But isn't it true -- I mean, it's the largest

10   5G network in the world, right?

11   A.    So wherever the tower is, then it would base off of

12   that.

13   Q.    Right.  But there's lots of towers?

14   A.    Correct.

15   Q.    And they interlock?

16   A.    Uh-huh.

17   Q.    So there's tons of towers.  And then for -- for all

18   those towers, there's going to be fewer switches, where all the

19   phone -- all the signals go in and go out over the wire?

20   A.    Correct, the switch determines all of that, yes.

21   Q.    But if we're in Tampa, we're not going to be using a

22   Sarasota switch; we're going to be using a Tampa switch.

23   A.    We do a Tampa switch, but does not necessarily mean

24   that you're not using a cell tower in Sarasota.

25   Q.    I'm not talking about a cell tower.  Because the

1    person getting the call might be in Sarasota, right?

2         A.   Correct, they could be anywhere.

3         Q.   And then you would use that cell tower?

4         A.   You would use a tower of where your device is at.

5         Q.   Right.  But these are billing records, these aren't

6    tower records?

7         A.   That's correct, there's a difference.

8         Q.   And so if I'm in Austin, Texas, the likelihood that

9    this is going to say McLean, Virginia, is like zero, right?

10        A.   Correct.

11        Q.   And if I'm in Washington, D.C., the likelihood that

12   this is going to say, you know, somewhere in the Dallas/Fort

13   Worth Metroplex is pretty much zero, correct?

14        A.   Correct.

15        Q.   And you say Austin, Texas, let's say that's about

16   from Tampa to Jacksonville, okay?  The chances that I'm in

17   Tampa and I get a Jacksonville origination are going to be

18   pretty much zero, right?

19        A.   Correct.

20        Q.   Okay.

21             MR. WESTFALL:  Could we go down just a little

22   bit.

23        Q.   Now, this incoming call, so this means that the phone

24   is in McLean, Virginia, right?

25        A.   Correct.

1      Q.    And it's receiving a telephone call?

2      A.    Correct.

3      Q.    And then in order to figure out kind of where that

4  number comes from, you would have to look over here at the area

5  code information?

6      A.    Correct.

7      Q.    And that's the way it -- that's the way an incoming

8  call's going to look on this?

9      A.    Correct.

10     Q.    Okay.

11           MR. WESTFALL:  I think that's all.  Thank you

12  very much.

13           THE COURT:  Okay.

14                   REDIRECT EXAMINATION

15  BY MR. BUSCH:

16     Q.    Mr. Gray, I just Googled the distance between

17  Colleyville, Texas, and Austin, Texas.  I know you're not

18  familiar with the area here, but it's over 200 miles.

19     A.    Okay.

20     Q.    And I'll represent there a number of cities in

21  between.

22     A.    I would gather so.

23     Q.    Some bigger and some smaller.  Is there any chance

24  whatsoever that a call originating -- if the bill says

25  Colleyville would be actually in Austin, Texas, over 200 miles

1  away with all the towers in between?

2      A.   Based on you telling me it's 200 miles, no.

3               MR. BUSCH:  All right.  No further questions.

4               THE COURT:  Anything further from Mr. Stone's

5  team?

6               MR. GALLIAN:  No, Your Honor.

7               MR. WESTFALL:  No, Your Honor.

8               THE COURT:  Any objection to me excusing this

9  witness?

10              MR. GALLIAN:  No objection.

11              MR. WESTFALL:  No objection.

12              (Witness excused.)

13              (Jurors exit courtroom.)

14              THE COURT:  Okay.  So outside the presence of

15  the jury, the Court's taken a quick stretch break.  The jury's

16  not present.  Defense counsel and the prosecutor and the Court

17  have briefly gone over the admission of some calendars; is that

18  right?

19              MS. MAX:  Yes, Your Honor.

20              THE COURT:  Okay.  If you don't mind laying out

21  for the record what they are, that would be awesome.

22              MS. MAX:  With this next witness, Don Stoner,

23  the Government will be moving to introduce for record purposes

24  Government Exhibit 92, 93, 94, 95, 96, 97 and 98.  They are day

25  planners spanning 2015, 2016, 2017, 2018, 2019, and then two

1  for 2020.  The day planners search was executed on June 18th,

2  2020, at the home of Bill Stone.  This witness recovered the

3  calendars from various locations within the home.

4            THE COURT:  Okay.  And so, Defense counsel,

5  again we're outside the presence of the jury, this Court, based

6  on the representations of officers of the court off the record

7  believes that this is a witness who can get them over the

8  authentication hurdle; say it is what we think it is.  And so

9  I'm prepared to allow them to conditionally admit them and not

10  publish them, so that the parties can get together this evening

11  and see what you guys can resolve.  And then what you can't

12  resolve, the Court is happy to tee up in the morning and

13  referee and make a final ruling on.

14            Is that acceptable to you?  Or if you have any

15  objection, please feel free to lay it out.  And you can have a

16  speaking objection because the jury's not here.  You can get it

17  all out.

18            MR. GALLIAN:  Thank you, Your Honor.  So we

19  object globally for two reasons.  The first reason that we

20  object is under authenticity grounds.  The evidence will show

21  that these were planners that were seized during a search

22  warrant at our client Bill Stone's house.  Some of the planners

23  were found under a trash can liner; other planners were found

24  in other areas of the home.

25            I don't believe that the government can meet the

1   threshold, though low.  I don't believe that they can meet the

2   threshold as required to authenticate that they are indeed Bill

3   Stone's planner.  They don't have handwriting samples; they

4   don't have an agent who's familiar with Bill Stone's

5   handwriting.  And so on those grounds, we object.

6              The other objection that we have is to

7   relevance.  I think that we've come together and got a good

8   list of redactions that isn't inappropriate 404(b).  Also isn't

9   irrelevant or inflammatory information.  But two of the

10  planners, as Ms. Max just pointed to, are from 2020.  That's

11  outside the indictment time frame.  We don't think that they

12  have any relevance in this case.  And, therefore, we object on

13  those grounds as well for the planners, two of them,

14  Exhibits 97 and 98, which are planners from 2020.

15             THE COURT:  All right.  Do you join in this

16  objection?

17             MR. WESTFALL:  We have no objection.

18             THE COURT:  All right.  So I think what I will

19  do is allow the government to conditionally -- I mean, we're

20  just marking them for the record today.  So allow it to be

21  conditionally admitted for record purposes.  I do have some

22  concerns about 404(b) and being outside of the indictment time

23  frame.  So if you guys will see if you can reach an agreement

24  tonight.  If not, I'm happy to rush that up in the morning

25  before the jury comes in.

1           And so if we can get up to before that point,

2    and not mention the 2020 stuff, then I'll take a look at that

3    in the morning, if you guys can't agree.

4           Does that sound good?

5           MR. GALLIAN:  One further thing.  I am not an

6    appellate attorney.  I am not smart enough to be in that realm.

7    However, I need to renew my objections all the way through.

8    And so at the time that it's admitted for record purposes I

9    will object.  I suspect you will overrule that, but that's why

10   I want to object.

11          THE COURT:  And actually I will save you from

12   doing that.  I will give you a running objection on this one so

13   that you don't have to object in front of the jury since I

14   think it will come in.  And then you don't --

15          MR. WESTFALL:  I don't like the way that you're

16   leaning, but...

17          THE COURT:  Gotcha.  And so well -- so I'll give

18   you a running objection.  This is timely for any appellate

19   purposes as to authentication and relevance.  And I'm going to

20   carry your relevance objection and rule on that in the morning

21   when I look at it.

22          MR. GALLIAN:  Okay.

23          THE COURT:  Does that sound good?

24          MR. GALLIAN:  Yeah.

25          THE COURT:  All right.

```
 1              MS. MAX:  And, Your Honor, in the morning is the
 2    time we can present case law to you about the 2020 relevance --
 3              THE COURT:  Absolutely, yeah.  I just figure
 4    everybody's in the trenches right now, you're getting the
 5    bullets that are flying at your face.  And so, yeah, I'm happy
 6    to take that up in the morning, when everybody's nice and fresh
 7    and had a chance to look at the case law.  And really, truly,
 8    I'm not trying to lean on you both to reach an agreement.  Some
 9    things you got to have a ref to call, and I'm happy to do it.
10    But if we can just leave that on the cutting room floor today
11    and -- off the record.
12              (Off-the-record discussion.)
13              MS. MAX:  For the record, since I'm not going to
14    reference the -- I mean, the way I was going to reference these
15    calendars on the record with this witness was by the date.
16              THE COURT:  Okay.
17              MS. MAX:  Since you've asked me not to reference
18    the two 2020 calendars, for the record, the two 2020 calendars,
19    the black 2020 calendar, for purposes of today, will just be
20    referenced as planner A, and the blue 2020 calendar will be
21    referenced as planner B.
22              THE COURT:  Okay.  That sounds good to me.
23              (Brief recess.)
24              THE COURT:  Outside the presence of the jury,
25    the Court has been notified that the prosecution -- that
```

1  you-all are -- instead of go by -- instead of mentioning that

2  it's a calendar, you're going to call it 96 and 97; is that

3  right?

4           MS. MAX:  97 and 98.

5           THE COURT:  97 and 98.  And just to make clear,

6  Defense counsel has laid down -- Defense counsel of Mr. Stone

7  has laid down an objection to relevance and to authentication.

8  The Court is going to carry both of those objections and rule

9  on them tomorrow.  And deal specifically with the issue of

10  relevance, those are timely and preserved, even if he doesn't

11  reurge them in the presence of the jury.

12           MR. GALLIAN:  That's perfect, Your Honor.  Thank

13  you so much.

14           THE COURT:  You're welcome.

15           (Jurors enter courtroom.)

16           THE COURT:  Your witness, Ms. Max.

17                    <u>DON STONER,</u>

18  having been first duly sworn, testified as follows:

19                <u>DIRECT EXAMINATION</u>

20  <u>BY MS. MAX:</u>

21     Q.    Ranger Stone, why don't you introduce yourself to the

22  jury.  What do you do for a living?

23     A.    I'm currently employed by the Texas Department of

24  Public Safety.  I'm a lieutenant with the Texas Ranger

25  Division, stationed in Weslaco, Texas.

1      Q.    And how long have you been a Texas ranger?

2      A.    Almost 14 years with the rangers.  I've been with the

3  department of public safety a little over 28 years.

4      Q.    Briefly tell the jury what are some of your duties as

5  a Texas ranger.

6      A.    As a Texas ranger, your primary responsibility is to

7  assist local law enforcement with major crimes:  Homicide,

8  sexual assaults, corruption cases.  We're the primary

9  investigators on a lot of officer-involved shootings.  And any

10  time where we're called in by the state or local officials to

11  assist with major crimes.

12      Q.    And back in 2020, where were you stationed for the

13  Texas rangers?

14      A.    I was stationed in Cleburne, Texas, at the time.

15      Q.    And what were some of your duties or assignments at

16  that time?

17      A.    Primarily to function as a Texas ranger, working a

18  case load.  I was also on the major crime investigation group;

19  worked crime scenes, mass casualty events.  Anywhere in the

20  state where we had a mass casualty event, I'd be called to

21  assist with that.

22      Q.    Were you a team leader for hostage negotiations?

23      A.    Yes, for hostage negotiation and assistant team

24  leader for the crime scene team.

25      Q.    Explain to the jury what it means to be on the crime

1   scene team.

2        A.   So the -- we have the state crime scene team composed

3   of individuals who had some specialized training.  Every

4   ranger's trained in crime scene investigation; however, to be

5   on the major crime scene team, we are sent to Knoxville,

6   Tennessee, to the National Forensics Academy, a ten-week

7   comprehensive criminal investigation, forensic investigation

8   school to -- kind of hits on all areas of forensic science for

9   criminal investigations.

10       Q.   And were you involved in a search of the residence of

11  Bill Stone at 6812 Kennedy Drive, Colleyville, Texas, on

12  June 18th, 2020?

13       A.   Yes, ma'am, I was.

14       Q.   And were you involved with that search because of

15  your role on the crime scene team?

16       A.   Yes, ma'am.

17       Q.   Just tell the jury a little bit about when you're

18  going to execute a search warrant on a residence.  What do you

19  do to prepare, what does the crime scene do to prepare -- crime

20  scene team do to prepare?

21       A.   Generally we get with whatever case agent -- in this

22  case we had a lead ranger that was in charge of the -- this

23  particular investigation, to get -- get --

24                 (Brief interruption.)

25       Q.   I'm sorry, we were talking about how do you -- how

1  does the crime scene team prepare for the execution of a search

2  warrant on a residence like Mr. Stone's?

3      A.   Like I was saying, we get with the lead ranger or

4  case agent, whoever we're assisting, get some details of what

5  type of investigation we're executing the search warrant on.

6  We're going to review the search warrant to see what type of

7  evidence we're looking for and then the -- we're going to

8  execute that search warrant.  Generally we'll do a walk-through

9  video of the residence ahead of time to just show the residence

10  as we saw it when we walked in.  That's generally in acts of

11  homicidal violence, stuff like that.  And then we'll slow down

12  and start taking pictures room to room to show the scene as we

13  found it.  And then we'll start doing our evidentiary

14  photographs, midrange photographs, close-up photographs and do

15  the crime scene search.

16      Q.   So for the search of Bill Stone's residence, were you

17  responsible for taking photographs of the scene?

18      A.   Yes, ma'am, I was.

19      Q.   Were you also responsible for seizing physical

20  evidence that would be in line with what y'all were authorized

21  to do via the search warrant?

22      A.   Yes, ma'am.

23      Q.   Okay.  When you seize a piece of evidence, what's the

24  process that you go through to do that?

25      A.   First, we're going to mark the piece of evidence,

1    we'll photograph the piece of evidence.  Generally where we

2    find it.  We will collect the evidence.  Place it in some type

3    of packaging, depending on what type of evidence it is.  Some

4    evidence has to be in -- biological evidence will need to be in

5    paper.  We can put in it plastic or what have you.

6                   And then we will seal that evidence and mark it

7    for future reference usually with time date and initials.

8         Q.   When you arrived at the Stone residence on June 18th,

9    were you the first Texas ranger there?

10        A.   No, ma'am, I was not.

11        Q.   Okay.  Had any searching occurred yet when you

12   arrived?

13        A.   No.

14        Q.   Now, you took many photographs from the search; is

15   that correct?

16        A.   That is correct.

17        Q.   And you've reviewed those as Government's Exhibit 89?

18        A.   That's correct.

19        Q.   And do those photographs fairly and accurately depict

20   the residence and the items that you saw on that day?

21        A.   Yes, they do.

22                   MS. MAX:  Government moves to admit Government

23   Exhibit 89.

24                   MS. GALLIAN:  No objection.

25                   MR. WESTFALL:  No objection, Your Honor.

1        THE COURT:  Admitted.

2      Q.  So we're looking at 89-1.  What is this first photo

3   of?

4      A.  It's a -- a photo placard.  I use these a lot of

5   times out in the field.  I may be called to one case and then

6   immediately get called to another case, an officer involved

7   shooting, homicide or whatever.  So these kind of break up the

8   series of photographs on my digital camera.  It also gives me

9   a -- a -- the time and date of when I started the photograph

10  process.

11     Q.  So does this photo ID card reflect that you are at --

12  these are photos of 6812 Kennedy Drive, Colleyville, Texas?

13     A.  Yes.

14     Q.  And what is the date and time that you started your

15  photography?

16     A.  6/18 of 2020.  It -- I originally wrote 8:45 and

17  realized my time was off.  And I wrote 8:30 at the bottom.

18     Q.  8:30 a.m.?

19     A.  Yes, ma'am.

20     Q.  Let's go to page 2.  What is this a photograph of?

21     A.  That is a photograph of the front of the residence.

22     Q.  Page 5.  Tell the jury what we're seeing here.

23     A.  Looking at the front of the residence, this would be

24  around the corner on the right side.  This was a picture of the

25  garage.

1    Q.    Okay.  And what do we see located inside the garage?

2    A.    Two vehicles.  One appears to be a Mercedes sedan and

3    a Toyota pickup.

4    Q.    Can we go to page 6.  Is this a close-up of the

5    Mercedes?

6    A.    Yes, it is.

7    Q.    And can we go to 7.  Is that the Tacoma?

8    A.    It is.

9    Q.    And let's go to page 10.  And what is this a picture

10   of?

11   A.    That is a picture inside I believe the Tacoma.

12   Q.    And why do you photograph the inside of the vehicle?

13   A.    Again -- well, this -- before we search a vehicle, we

14   take overall photographs inside how we found it.  These

15   vehicles were going to be taken away from the scene, so I

16   wanted to document those before they were taken away so I knew

17   what they looked like before they were taken.

18   Q.    Are you also documenting what was in the vehicle at

19   the time that it was seized?

20   A.    Yes.

21   Q.    Page 11.  What is this?

22   A.    I'm opening the console just to -- so I can document

23   the items as -- as they were left so I know if there was any

24   items before that search was conducted, and I know exactly how

25   that was found.  And I can go back in my photographs and look

1  to see what it look like.

2       Q.   And page 17.  What is this a photograph of?

3       A.   The interior of the Mercedes.

4       Q.   Page 24.  Is this a photograph of the outside of the

5  house?

6       A.   Yes.

7       Q.   Why did you take this photograph?

8       A.   There was indications that it took a little time for

9  Mr. Stone to respond to the commands of the officers when they

10 arrived.  And I documented that there was a video camera system

11 on the outside of the residence.

12      Q.   Is that what we see above the window there?

13      A.   Yes.

14      Q.   And page 25.  And why did you document the front

15 door?

16      A.   For the same purposes, there's a Ring camera at the

17 front of the door.

18      Q.   Page 26.  What are we seeing here?

19      A.   This is a -- the beginning of the walk-through

20 photographs.  This is just standing at the front door taking a

21 picture inside the residence.

22      Q.   Page 27.  And what is this a photograph of?

23      A.   This is turning slightly to the right, where you can

24 see into the kitchen.

25      Q.   So to orient us to the house, are you standing at the

1    front door right now?

2         A.   Yes, just inside the front door.

3         Q.   Okay.  And page 29.  Where are you standing to take

4    this photograph?

5         A.   I'm back -- if you were in that kitchen against that

6    back wall, I'm back towards that back wall taking a picture

7    back towards the front door area.  So you can see the little

8    dining area off to the side.

9         Q.   Page 30.

10        A.   That's just moving to another corner to try to get

11   overall photographs of everything.

12        Q.   And page 80.  Is this the kitchen?

13        A.   Yes, that's the kitchen area.

14        Q.   81.  What do we see here?

15        A.   So the picture where I was standing looking at the

16   front door, this is just turned back to the left taking a

17   picture through the kitchen towards I guess a living room area.

18        Q.   And to clarify we see a -- a gun propped up in the

19   corner on this picture.  Do you know is that something that was

20   brought in by the rangers that day or was that present at the

21   home?

22        A.   No, that was present at the home.

23        Q.   And 88.  Is this standing inside the kitchen looking

24   back at the living area?

25        A.   Yes, it is.

1    Q.   89.   Is this a picture of the back living area?

2    A.   Yes.

3    Q.   Let's go to 35.   Did the home have three bedrooms?

4    A.   It was -- I would guess would be considered a

5    three-bedroom house.   One room was set up as an office.

6    Q.   Okay.   So looking at 35, is this one of the bedrooms?

7    A.   Yes, as you entered the residence, from that front

8    door, there's a small hallway to the left.   And immediately to

9    the -- take another left there was -- at the front of the

10   residence, there's a bedroom there.

11   Q.   And 39.   What is this a photograph of?

12   A.   This is the bathroom connected with that residence --

13   I'm sorry, with that -- with that bedroom.

14   Q.   And 50.   What is this a picture of?

15   A.   This is the -- a middle bedroom.

16   Q.   And -- go ahead.

17   A.   So the one to the -- the very front of the house

18   there was a bedroom.   You walked down the hallway just a short

19   distance there was another bedroom -- or what would be a

20   bedroom.   And it just had storage in that bedroom.   And then at

21   the very end of that hallway, would have -- is the office.

22   Q.   Now, to be clear, with this bedroom, is this a

23   photograph that has been taken before any searching has been

24   done?

25   A.   That's correct.

1      Q.    Okay.  So this is the state that the bedroom was in

2  prior to any officers searching?

3      A.    Correct.

4      Q.    And why is it important for you to capture

5  photographs prior to you searching the residence?

6      A.    Well, there's several reasons.  I mean, to -- if

7  there's claims of damage to property or whatever, we want to

8  document that.  We want to document the -- the conditions of

9  evidence before it's handled by officers.  So there's several

10 reasons why we do that, but we want to document everything

11 before and after the seizure.

12     Q.    Can we see 54.  Is this another view of that bedroom?

13     A.    It is.

14     Q.    And again, no searching has been done at this point?

15     A.    Not at this point.

16     Q.    And 60.  What is this a photograph of?

17     A.    This is another bedroom -- I'm sorry, bathroom.  On

18 that -- just on that hallway.

19     Q.    Now, we see the doors open and the toilet seat up.

20 Is that something that officers did or is that the state it was

21 found?

22     A.    I don't know about the toilet seat.  But the -- the

23 cabinets were opened up just to document what was inside the

24 cabinets.  These were overall photographs, so rather than

25 taking five photographs of -- just took one.

1    Q.    Okay.  98.  What is this a photograph of?

2    A.    This would be the master suite.  So from the kitchen,

3  you go into that living room area, and then just off that

4  living room area was an entrance to the master bedroom.

5    Q.    And 99.  This is another picture of the bedroom?

6    A.    It is.

7    Q.    And 101.  Is this the bedroom from a different

8  viewpoint?

9    A.    Yes, it is.

10    Q.    105.  What is this a picture of?

11    A.    The bathroom just off the master suite.

12    Q.    107.  What is this a photograph of?

13    A.    This would be the closet that is attached to that

14  master bathroom.

15    Q.    And again, no searching has been done at this point?

16    A.    Not at this point, no.

17    Q.    109.  Is this another angle of that same closet?

18    A.    Yes, it was kind of hard to get in there, just trying

19  to take pictures of the entire closet, so...

20    Q.    Why was it hard to get in the closet?

21    A.    It was kind of in disarray.

22    Q.    Was it full?

23    A.    It was pretty full, yes.

24    Q.    110.  Same closet?

25    A.    Yes, it is.

 1    Q.    115.  Is this the floor of the closet?

 2    A.    It is.

 3    Q.    And 116.  Same closet?

 4    A.    Yes.

 5    Q.    Let's go to 65.  Tell us about this room.

 6    A.    So the -- the hallway to the left side from the

 7  entrance, this is looking all the way down and this is the

 8  office.

 9    Q.    And again, this photograph no searching has been done

10  at this point, correct?

11    A.    That is correct.

12    Q.    66.  Closer view of the office?

13    A.    Yes, just stepping just inside the doorway.

14    Q.    And 67.  What is this a picture of?

15    A.    It's a wooden plaque kind of frame.  It was up on the

16  bookshelf behind the desk.

17    Q.    Are you able to read the writing on it?

18    A.    Let me get back a little bit.  Better is poor man who

19  walks in his integrity than a rich man who is crooked in his

20  ways.

21    Q.    Okay.  Is there a reason you photographed this plaque

22  in particular?

23    A.    I took pictures of that, and I -- given the nature of

24  the case, I -- I thought that was unique.

25    Q.    Okay.  69.  I still have the office here in 73?

1       A.   Yes.

2       Q.   At this point are you starting to conduct a search?

3       A.   No, it was just taking photographs of the items on

4  the desk.

5       Q.   Okay.  And what do we see in the left-hand corner

6  here on the screen?

7       A.   The bottom left-hand corner is some type of calendar.

8       Q.   Some type of calendar, okay.  Let's go to 74.  Is

9  this just more of the desk?

10       A.   More of the desk, yes.

11       Q.   Let's go to 135.  Tell the jury what we're looking at

12  here.

13       A.   So this is the closet attached to that office, the --

14  what would be a bedroom closet, and there was a safe inside

15  that closet.

16       Q.   Was the safe open?

17       A.   It was not opened at the -- the time of the search --

18  when we entered our overall photographs, there was no -- the

19  safe was closed.

20       Q.   And when you say it was closed, does that mean it was

21  locked?

22       A.   It was locked, yes.

23       Q.   So how did you gain entry to the safe?

24       A.   Mr. Stone opened the safe.

25       Q.   Okay.  What else are we seeing in this photograph as

1  far as the pictures that we see there, the number 4 and the

2  number 5?

3      A.   Yeah, our crime scene markers, for demonstrative

4  purpose, showing what item numbers are inside that safe that we

5  are going to be seizing.

6      Q.   Let's go to 138.  Is this marking -- what are we

7  seeing here?

8      A.   So those were the items that we were marking.  Two

9  cellular telephones.  I took them out of the safe, placed them

10 on the ground next to the marker so you could see what item

11 numbers they were.

12     Q.   So let's go back to 136 real quick.  So in 136, are

13 the phones actually still there in the safe?

14     A.   Yes, they are.

15     Q.   And then in 138, you've removed them?

16     A.   That's correct.

17     Q.   Okay.  So at this point are you seizing evidence?

18     A.   At -- well, I'm -- documenting evidence.  I hadn't

19 seized anything at this point.  Just marking and taking

20 photographs of the evidence.

21     Q.   Explain to the jury, once you seize physical

22 evidence, how do you keep track of it all, how do you organize

23 it?

24     A.   In this particular search, we actually had another

25 ranger with a computer that was logging in all the evidence we

1   seized.  And created a crime scene seizure form.

2        Q.   So you ended up creating an inventory; is that

3   correct?

4        A.   That is correct.

5        Q.   And you've reviewed Government's Exhibit 59, which is

6   the inventory that you created that day at Bill Stone's

7   residence; is that right?

8        A.   Yes, ma'am.

9             MS. MAX:  At this time, Government moves to

10   introduce Government Exhibit 59.

11             MS. GALLIAN:  Judge, we object.  And I think we

12   probably need to discuss something outside the presence of the

13   jury.

14             THE COURT:  All right.

15             Members of the jury, why don't we wrap up an

16   extra 15 minutes early; how does that sound?  We'll get you out

17   by 3 o'clock.

18             (Off-the-record discussion.)

19             (Jurors exit courtroom.)

20             THE COURT:  Please be seated.  Outside the

21   presence of the jury, yes, ma'am.

22             MS. MAX:  Your Honor, speaking with Defense

23   counsel, there is a redaction that needed to be made from

24   Government's 59, as well as the fact that there is reference to

25   the not-yet-admitted calendars.  So my suggestion to Defense

1  counsel was, as long as my witness can use this as reference

2  while he's on the stand, I will just admit it after the

3  calendars are admitted.

4          THE COURT:  Redacted.  Okay.

5          MS. GALLIAN:  With the redactions.

6          MS. MAX:  With the redactions, yes.

7          THE COURT:  If that's acceptable, that sounds

8  good to me.

9          Are there any objections to the evidence by

10  Mr. DeLeon?

11          MR. WESTFALL:  No, Your Honor.

12          THE COURT:  Sounds good.  I think we can break.

13  Everybody looks a little tired.

14          (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                    I, BROOKE N. BARR, United States Court Reporter

2    for the United States District Court in and for the Northern

3    District of Texas, Dallas Division, hereby certify that the

4    above and foregoing contains a true and correct transcription

5    of all proceedings in the above-styled and -numbered cause.

6

7                    WITNESS MY OFFICIAL HAND this the 1st day of

8    August, 2023.

9

10

11                              /S/ BROOKE N. BARR
                                BROOKE N. BARR, CSR NO. 6521
12                              CSR Expiration Date:  7/31/24
                                United States Court Reporter
13                              1100 Commerce Street
                                Room 1376
14                              Dallas, Texas 75252
                                (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25