```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF TEXAS

 3                            DALLAS DIVISION

 4
     UNITED STATES OF AMERICA,      )       3:21-CR-236-E
 5               Government,         )
                                    )
 6                                  )
     VS.                            )       DALLAS, TEXAS
 7                                  )
                                    )
 8   WILLIAM ROY STONE, JR.,        )
     JOSEPH EVENTINO DELEON,        )
 9               Defendants.        )       August 2, 2023

10

11              TRANSCRIPT OF JURY TRIAL, VOLUME 7A

12              BEFORE THE HONORABLE ADA E. BROWN

13                 UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:         MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664
```

```
 1                                    MR. MARCUS J. BUSCH
                                      UNITED STATES DEPARTMENT OF JUSTICE
 2                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 3                                    1100 Commerce Street
                                      Dallas, Texas  75242
 4                                    marcus.busch@usdoj.gov
                                      (214) 659-8642
 5

 6      FOR THE DEFENDANT,            MR. GREGG GALLIAN
        WILLIAM ROY STONE, JR.:       Gallian Firm
 7                                    Parkside Tower
                                      3500 Maple Avenue
 8                                    Suite 720
                                      Dallas, Texas  75219
 9                                    gregg@GallianDefenseFirm.com
                                      (214) 432-8860
10

11                                    MS. JACLYN ANNETTE GALLIAN
                                      Bryan Cave Leighton Paisner
12                                    2200 Ross Avenue
                                      Suite 4200
13                                    Dallas, Texas  75201
                                      jaclyn.gallian@bclplaw.com
14                                    (214) 721-8058

15
        FOR THE DEFENDANT,            MR. GREG WESTFALL
16      JOSEPH EVENTINO DELEON:       Westfall Sellers
                                      1701 River Run
17                                    Suite 801
                                      Fort Worth, Texas  76107
18                                    greg@westfallsellers.com
                                      (817) 928-4222
19

20                                    MR. FRANK SELLERS
                                      Westfall Sellers
21                                    1701 River Run
                                      Suite 801
22                                    Fort Worth, Texas  76107
                                      frank@westfallsellers.com
23                                    (817) 928-4222

24

25
```

```
 1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                  JURY TRIAL VOLUME 7A - AUGUST 2, 2023
 2                    P R O C E E D I N G S
 3            SECURITY OFFICER:  All rise.
 4            THE COURT:  Okay.  Off the record.
 5            (Discussion off the record)
 6            THE COURT:  Let's go on the record.
 7            Outside the presence of the jury, the parties have --
 8    actually, let me just throw out there, okay, the parties have
 9    talked about redacting some potential exhibits.
10            Government, if you don't mind talking about your
11    exhibits that you would like to admit.
12            And then, defense, we'll get your objections on the
13    record and take it from there.
14            MS. MAX:  Yes, Your Honor.
15            THE COURT:  Please be seated.
16            MS. MAX:  Would you like me at the podium?
17            THE COURT:  That would be great, if you don't mind.
18    Thank you.
19            MS. MAX:  Your Honor, Government would like to admit
20    Government's Exhibit 92 through 98.  They are yearly planners
21    that were recovered from the Defendant's home during the search
22    of his home on June 18, 2020.
23            The Government feels they have a highly extrinsic
24    value to this case.
25            We have discussed with defense counsel.  Defense
```

```
 1    counsel has proposed redactions across all of the calendars,
 2    across all the exhibits.  I'll just speak of the exhibits
 3    collectively.
 4              THE COURT:  Sure.
 5              MS. MAX:  They vary by year, but what's good for one
 6    is good for all.
 7              We have discussed redactions with defense counsel
 8    along the vein of things that are in the calendar that would
 9    fall within 404(b) evidence, and the Government has agreed to
10    all of the redactions that defense counsel has proposed with
11    that.
12              What we have not been in agreement on is the
13    redaction from anything after August 2019.  So that would
14    include the end of the 2019 calendar, and then there are
15    actually two 2020 calendars.
16              Would you like me to go ahead and speak on that, Your
17    Honor?
18              THE COURT:  Yes.
19              MS. MAX:  Okay.
20              THE COURT:  And just so we're on the same page, I'm
21    looking at the superseding indictment, and I just want to walk
22    through for the record here.
23              Just looking at the general information, the
24    introduction section, I'm looking at Document 26, the
25    superseding indictment.  That's the most -- that's the pleading
```

1    document, right?

2            MS. MAX:  Yes, Your Honor.

3            THE COURT:  Okay.  Great.

4            And so looking at the introduction, paragraph 3 talks

5    from in or around November 2015 to in or around August 2019.

6            And paragraph 5 of the introduction talks about

7    December 2015 to in or around 2019.

8            Looking at Count One, paragraph 8 talks about

9    starting in or about November 2015 until in or about August

10   2019.  And that's for the Count One, conspiracy to commit wire

11   fraud.

12           Looking at page 7, Counts Two through Seven, wire

13   fraud.

14           Paragraph 13 talks about from in or about November

15   2015 and continuing in -- until or in or about August 2019.

16           And then looking at Count Eight, the engaging in

17   monetary transactions and property derived from specified

18   unlawful activity.

19           Paragraph 15 talks about in or about September 23,

20   2016.

21           And finally, the last count of the superseding

22   indictment deals with false impersonation of a federal officer

23   or employee.

24           And paragraph 17 discusses from in or about November

25   of 2015 through in or around 2019.

```
 1              And so if you would speak to why we would get into --
 2    how it would be relevant and pertinent to go past the timeframe
 3    of the indictment.
 4              MS. MAX:  Yes, Your Honor.
 5              First of all, the 2019 calendar, well, hits upon
 6    many -- well, let me back up and give you the law on that, and
 7    I will give some other things that are from the calendar.
 8              THE COURT:  Sure.
 9              MS. MAX:  We believe the evidence outside the
10    timeframe alleged in the indictment should be admissible if
11    it's probative and it's extrinsic to the charged offenses.
12              We've provided the Court with three cases on that
13    point standing for the principle that evidence outside the
14    timeframe of the indictment can be evidence of the crime within
15    the timeframe and noting that time of the offense is not an
16    essential element of the indictment.  That's United States v.
17    Jones, 833 Federal Appendix 528.
18              THE COURT:  I'm looking at that right now.
19              MS. MAX:  And then United States v. Setser points out
20    that extrinsic evidence is usually admissible in order to give
21    a complete explanation of the crime.  That's addressing
22    evidence that's outside of the timeframe.
23              THE COURT:  Can I pause you for just a second?
24              MS. MAX:  Sure.
25              THE COURT:  Tell the jury it will be another ten
```

```
 1   minutes.
 2           Okay.  Go ahead.  I'm listening.
 3           MS. MAX:  Yeah.  So -- and then also in United States
 4   v. Nwoko, I believe, 222 Westlaw 2205470, the Defendant argued
 5   that the evidence was of scant probative value because it
 6   depicted events which occurred outside the time period, and it
 7   does not show -- Your Honor, may I step away one second?
 8           THE COURT:  Of course you may.
 9           And when you come back -- so I'm looking at Jones,
10   and I'm on page 539.  And I'm reading -- it appears -- and the
11   citation talks about in United States versus Girod, G-I-R-O-D,
12   we held that evidence showing that a false statement was made
13   four months before the date alleged in the indictment was
14   evidence of the crime charged in the indictment.
15           Do you have any cases -- I'm just looking at these as
16   real-time --
17           MS. MAX:  I'm sorry, what was the footnote on that,
18   Your Honor?
19           THE COURT:  It's page 539 in Jones, 833.  And I'm
20   just reading the -- I'll read it here.
21           The fact that the California evidence was discovered
22   on or shortly after July -- June 13, 2018, does not mean it
23   couldn't relate to conspiracy that covered -- that occurred
24   up -- up to, on, or about June 9, 2008.
25           So it was discovered a week, but looking back in
```

1    time.

2           And the next sentence says, in United States versus

3    Girod, we held that evidence showing that a false statement was

4    made four months before the date alleged in the indictment was

5    evidence of the crime charged in the indictment.  We explain

6    that in this circuit an allegation as to the time of the

7    offense is not an essential element of the offense charged in

8    the indictment and, within reasonable limits, proof of any date

9    before the return of the indictment within the statute of

10   limitations is sufficient.

11          Do you have anything backward looking?

12          MS. MAX:  Do we have -- I'm sorry, do we have

13   anything --

14          THE COURT:  Yeah.  It's talking about proof of a date

15   before the return of the indictment.

16          And this indictment -- let me make sure I've got the

17   date that it was returned.  Okay.  The superseding indictment

18   was returned the 21st day of December, 2001.

19          So I guess if you can speak to why anything after

20   2019 is probative.

21          MS. MAX:  Sorry, Your Honor.  If you look at United

22   States v. Nwoko, I think that is standing for the fact that she

23   is -- it is -- it is challenging evidence of events that

24   occurred after the time period alleged in the indictment.

25          THE COURT:  Okay.

1          MS. MAX:  And the Court found that it did serve a

2    probative value in providing context regarding the operation of

3    the conspiracy and the Defendant's role in that conspiracy.

4          I believe Nwoko may be answering your question on

5    evidence that's occurring after the indicted timeframe.

6          THE COURT:  Okay.  And I'm looking at the law, but

7    specific to your case, what --

8          MS. MAX:  Oh.

9          THE COURT:  Yeah.

10          MS. MAX:  You would like to here about what's in the

11    calendars?

12          THE COURT:  Yes, please.

13          MS. MAX:  Okay.  Well, starting with -- obviously the

14    jury has heard a lot about controlled call -- we've heard

15    already controlled calls that occur in September.  We're going

16    to hear controlled calls that are occurring at different points

17    from September up through May of 2020.

18          Some of the -- and some of these calls are recorded

19    in the calendars as well as the fact that the Defendant is

20    still in 2019 recording his activity with the victim.

21          In the 2020 calendars in particular, he is noting

22    some of the calls that are our controlled calls as well.  For

23    example, we have a call on March 2, 2020, a controlled call.

24    He notes it in his calendar, Casi called about answers.

25          In April of 2020, he has noted in his calendar when

1    Casi is on Facebook and then when she is no longer on Facebook.

2    He notes one day where Casi is on Facebook; he notes another

3    date Casi is off Facebook.

4              THE COURT:  This is outside of the indicted time?

5              MS. MAX:  Yes.

6              THE COURT:  Okay.

7              MS. MAX:  And in May 2020, there is an entire week

8    where it appears that he is surveilling whether her car is

9    present at her home in Granbury.

10             And then I think of most interest and note is the

11   fact that the first week May 2020, Joe DeLeon makes controlled

12   calls to the Defendant.  And in these two controlled calls, Joe

13   DeLeon tells the Defendant that, the DOJ-OIG agents have

14   visited my home.

15             The real -- I will refer to them as real and fake.

16   The real 2020 calendar notes that the very next day Joe and the

17   Defendant meet in person.  And then what we see is -- that's

18   where we see a real and a fake calendar occur.

19             So we have the real calendar that the Defendant had

20   been keeping up until May 8, 2020, and then what you see is a

21   fake calendar that he starts keeping after May 8th.

22             And so the Government would argue that he is starting

23   to maintain a fake calendar because at that point he now

24   realizes that the Department of Justice-OIG is conducting an

25   investigation on him.  So he's really -- it's almost like

1    maintaining two sets of records at the point that he realizes

2    that this investigation is occurring.

3              THE COURT:  Okay.

4              MS. MAX:  And that is the first controlled call that

5    he has made known of the involvement of the Department of

6    Justice with the OIG investigation.

7              So we feel that those calendars have very highly

8    probative value; that once he find out that there is an

9    investigation, he literally starts maintaining a separate set

10   of books.

11             THE COURT:  Okay.  Got it.

12             Defense, response, please?

13             MS. MAX:  Can I add one more thing to that, Your

14   Honor?

15             THE COURT:  Certainly.

16             MS. MAX:  Because we haven't -- I don't believe you

17   are aware of this fact, because we haven't moved into it yet.

18             The calendars during the time of the search -- the

19   calendars during the time of the search were found in various

20   places, but in particular, three of the calendars were found in

21   a trash can that the Defendant had in his office closet.  And

22   it was -- there's the liner of the trash can.  It's a large

23   industrial size -- not -- I wouldn't say industrial size, but

24   it's not a regular office trash can.  It's larger than that.

25   But within the trash bag liner.

```
 1              As Ranger Stoner will testify, when he picked up the
 2    trash can, he noticed there was -- it was heavier than it
 3    should be.  And so he peeled away the trash bag liner, and
 4    there underneath the liner were three of these calendars, one
 5    of them being the real 2020 calendar as well as the 2019
 6    calendar.
 7              Yesterday we had already moved into pictures of what
 8    the desk area had looked like at the time of the search.  And
 9    at the time of the search, on the desk laying open was the fake
10    2020 calendar, so leading to the argument that he is -- he is
11    secreting away the 2019 and the real 2020 calendar, hiding them
12    in a trash can, and the fake 2020 calendar is out exposed in
13    his desk.
14              Again, I think all this goes to a very highly
15    probative value, at least from the Defendant's perspective, I
16    believe.
17              THE COURT:  Okay.  Thank you.
18              MR. GALLIAN:  Good morning.
19              THE COURT:  Good morning.
20              MR. GALLIAN:  So to just kind of back up real brief,
21    we object to all planners, all planners based on authenticity.
22    We spoke about this briefly yesterday.  You gave us a running
23    objection, which I appreciate.
24              In addition to that, we object to the 2020 --
25    anything after the indictment period, because it's not
```

1     relevant.

2           And I think what you got was a preview from Ms. Max

3     that not only is this cumulative evidence, but it does not go

4     to the actual offenses that he's charged with.  It doesn't go

5     to wire fraud.  It doesn't go to impersonation.  He's keeping

6     tabs on a woman that he was in a relationship with.  All it's

7     going to do is reflect on his character and make him look like

8     he's creepy.  It doesn't go to the elements of the case.  It's

9     none of that.

10          And I think that that's the issue here, is it's -- we

11    have all of these controlled calls that we're not disputing.

12    We haven't objected to any of them.  And all of those

13    controlled calls are in 2019, 2020, which is after the

14    indictment timeframe.  But the relevance of those call is that

15    they're talking about the charged conduct.  So I would be a

16    fool to stand up and say object to relevance when they are

17    clearly talking about the fake probation.

18          But in this situation it's a planner where he's

19    noting contact with his ex-fiancee, where he is notating when

20    he saw her, when he talked with her, when he saw Joe or when he

21    talked with Joe.  It doesn't go to the facts.  It doesn't go to

22    the elements of the offense, and it's inflammatory.  It's not

23    relevant.

24          And we think that, in addition -- first of all, we

25    would love it if no planners came in.  In the alternative, we

```
 1    think that anything past the indictment timeframe is nothing
 2    but inflammatory and irrelevant.
 3                THE COURT:  Okay.  Thank you.
 4                What say you counsel for Mr. DeLeon?
 5                MR. WESTFALL:  We don't have a position on this, Your
 6    Honor.
 7                THE COURT:  All right.  Appreciate it.  Thank you.
 8                All right.  I'm going to allow it in with the
 9    redactions, and I will conditionally admit it with the
10    understanding that you'll have appropriate witnesses to
11    authenticate it when the time is right and the witnesses are
12    brought up.
13                MS. MAX:  And, Your Honor, can I just get
14    clarification since we talked about two sets of redactions,
15    which --
16                THE COURT:  Certainly.  Yes.  And so I'm going to
17    allow in all of the planners, including past the indictment,
18    but with the redactions that the parties have agreed to.
19                Your objection is timely preserved for appellate
20    purposes, and I'm giving you, again, a running objection so you
21    don't have to assert it in the presence of the jury and have
22    any prejudice there.
23                So I'm going to find that it is not -- that the
24    probative value is not substantially outweighed by the
25    prejudicial information contained therein.
```

1          And I'm assuming with the redactions that there's no
2     404(b) like we've already --
3          Okay.  We carved all that out.
4          Okay.  Good deal.
5          Anything else you want to lay down for the record?
6          MR. GALLIAN:  No, Your Honor.  I mean, again, our
7     objections -- are you then overruling our authenticity
8     objection as well?
9          THE COURT:  No.  What I'm doing is carrying that.  I
10    am going to conditionally admit it with the understanding that
11    they will -- it sounds like it might be more than one witness
12    to authenticate it.
13         But if as an officer of the court you're representing
14    that you have somebody that will say it is what it purports to
15    be -- I don't hear that they've got somebody who can say that
16    it's his handwriting, but if what we've got -- you know, that
17    this Court's understanding of the rules of evidence is that
18    authenticity is a relatively small hurdle in the sense that if
19    there is reliable evidence that the item is what it purports to
20    be and no evidence to the contrary that it isn't, that that --
21    that basically satisfies the threshold inquiry.
22         If there is any evidence that it's fraudulent, I
23    certainly would entertain that if you've got it.  But if it's
24    not, and, you know, you can all show it was the stuff that was
25    seized from his house, I feel confident they've met the

 1   incredibly not -- not particularly high authentication

 2   threshold.  And so if you've got testimony that will shore that

 3   up, then I'll allow it in.

 4            Yes, ma'am?

 5            Anything further on that point?

 6            MR. GALLIAN:  One clarification.

 7            THE COURT:  Yes.

 8            MR. GALLIAN:  The redactions that we agreed to in

 9   2020, those are -- all those are still redacted, correct?

10            MS. MAX:  Yes.

11            MR. GALLIAN:  Okay.  I just wanted to make sure.

12            All right.  I think I've said all of my objections,

13   so I will sit down.

14            THE COURT:  Okay.

15            MR. GALLIAN:  And we have a running objection on

16   this?

17            THE COURT:  You have a running objection on this

18   and --

19            MR. GALLIAN:  And so we'll say no further objection?

20            THE COURT:  That's right.  No further objection will

21   be fine.

22            And it's my understanding you're not waiving anything

23   by agreeing to the redactions.  It's not that you're saying

24   that you should -- they should be admitted, it's just that

25   that's a -- kind of a mitigation of damages in light of this

```
 1    Court's ruling that you disagree with.
 2              MR. GALLIAN:  Yes, Your Honor.
 3              THE COURT:  Sound good?
 4              MR. GALLIAN:  Thank you.
 5              THE COURT:  Okay.  Great.
 6              Yes, ma'am?
 7              MS. MAX:  On the note of the attribution of the
 8    calendars, I do believe there is many facts that have already
 9    come into the court -- the trial that the Court is aware of, so
10    if I could go ahead and proffer the attribution qualities --
11              THE COURT:  Certainly.
12              MS. MAX:  -- that exist, the Court may be able to
13    already make a decision on that without --
14              THE COURT:  Okay.  That sounds good.
15              MS. MAX:  For Government's Exhibit 92 through 98,
16    when viewed you can see that they are all in the same
17    handwriting as well as they're recorded in the same style.  So
18    I won't -- I won't bore -- I won't hit on every single year
19    that these things are in.  I believe if you can see, the
20    attribution for one will go across the others in terms of the
21    style and type of handwriting.
22              But the calendars do note the retirement date of
23    October 31, 2015.
24              A calendar entry for September 6, 2015 notes hired by
25    FBI first time today, 1983.
```

1          There's also a notation in 2015 for mandatory

2    retirement.

3          12-21-20015 notes dinner, Project and Joe.

4          February 16, 2016, looked at new cars with

5    Project/Joe.

6          February 16, 2016, Joe gets Project 2 truck.

7          January 1, 2017, Project Tyler, Great Wolf Lodge.

8    There's been evidence of the nicknames that the Defendant had

9    for the victim's children, Tyler being one.

10          August 22, 2017, bought new Tacoma.

11          January 3, 2018, Dave and Buster's Project/Cascade,

12    another nickname we heard.

13          THE COURT:  I think you can pause there.

14          MS. MAX:  Okay.

15          THE COURT:  I've heard sufficient indicia of

16    reliability.  Unless there's any evidence to the contrary that

17    it isn't what it purports to be, then I'm going to find that

18    they -- that based on the officer of the court's proffer, that

19    these are going to be properly authenticated.

20          You certainly still have an objection.  That's not

21    waived.  And by agreeing to the redactions, you haven't in any

22    way compromised your appellate objection.  But I'm going to let

23    them in.

24          Ready to go?  Stack them up, get them in.

25          Yes, ma'am?

```
1              MS. MAX:  Can we go to the restroom real quick?
2              THE COURT:  Of course.  Of course.  Yes, yes, yes.
3              MS. MAX:  I'm sorry.
4              THE COURT:  No, no.  Hey, you're a human being.
5              Okay.  Tell the jury we'll have them out in six
6    seconds or two minutes.
7              Please be seated.
8              Thanks for your patience today.
9              (Pause)
10             THE COURT:  Can I see the lawyers over here for a
11   second?
12             You can go ahead and bring them in.
13             (Bench Conference held off the record)
14             SECURITY OFFICER:  All rise for the jury.
15             (Jury in)
16             THE COURT:  All right.  Thank you for your patience.
17             Please be seated.
18             As is always the case, it is the Court being slow
19   today.  I had some stuff I had to take up and some matters.  We
20   were doing some catchup here.  So I appreciate your time.  I
21   really hate to keep you waiting, but it was my fault.
22             The only downside to being a trial judge is when
23   you're in trial other things have to wait, and so I had to do
24   some other things that are not connected to this case, and I
25   appreciate everybody's patience in letting me do it.  So thank
```

```
 1   you.  But please do not hold it against the parties.  They have
 2   been ready to go since this morning, bright-eyed and
 3   bushy-tailed -- clients, lawyers, and everybody.
 4            And so I will shamelessly bribe you with an apology
 5   tomorrow with more doughnuts.  So that's -- that will be my
 6   penance for having kept you waiting an hour.  But I had to get
 7   done other stuff, so please don't hold it against them.  And
 8   kolaches on me.
 9            So with that said, your witness, Government.
10            Ranger, good to have you back.
11            THE WITNESS:  Thank you.
12            THE COURT:  How are you today?
13            THE WITNESS:  Doing well.  Thank you.
14            THE COURT:  Good.  And I hope it doesn't make you
15   feel like a dog when I just call you Ranger.
16            THE WITNESS:  No, that's okay.
17            THE COURT:  Okay.  Good.
18            All right.  I think we can hear you just fine.
19            Todd, can you everything?
20            Members of the jury, you hear all right?
21            All right.  Thank you.
22            Your witness.
23
24
25
```

```
 1              DON STONER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 2                        DIRECT EXAMINATION CONTINUED
 3    BY MS. MAX:
 4    Q.   Good morning, Ranger Stoner.
 5    A.   Good morning.
 6              MS. MAX:  Your Honor, I believe we left with
 7    Government had moved to admit Government's Exhibit 59, the DPS
 8    search inventory.  And defense counsel --
 9              (Pause)
10              MS. GALLIAN:  No objection.
11              THE COURT:  All right.  Any objection?
12              MR. WESTFALL:  No objections, Your Honor.
13              THE COURT:  All right.  That's admitted.
14                  (Government's Exhibit No. 59 received)
15              MS. MAX:  Thank you.  Permission to publish?
16              THE COURT:  Granted.
17              And members of the jury, you know I forgot Monday.
18    So remind me before we go tonight that I promised you doughnuts
19    tomorrow so nobody's starving.
20              All right.  Your witness.
21    BY MS. MAX:
22    Q.   Ranger Stoner, we were talking about -- we had just moved
23    into talking about how you collect physical evidence when you
24    are conducting a search, and you had said that you actually
25    have someone there with you, correct, that's making this chart
```

```
 1   as you go through the house?
 2   A.   That is correct.
 3   Q.   Okay.  Let's go to the second page of Government's
 4   Exhibit 59.
 5        Yesterday when we had left off you had shown -- we
 6   looked at a picture that had shown two phones that were found
 7   in the safe in the office; is that right?
 8   A.   That is correct.
 9   Q.   Okay.  And you had those phones labeled as Number 4 and
10   Number 5, correct?
11   A.   Yes, ma'am.
12   Q.   Okay.  And is that what we then see here on your evidence
13   log, the collection of those two phones?
14   A.   That is correct.
15   Q.   Okay.
16        MS. MAX:  Can with we go to Government's 89?
17        142.
18   BY MS. MAX:
19   Q.   Tell the jury, what is this a picture of?
20   A.   This is the back of the office, credenza, bookshelf,
21   whatever.
22   Q.   Okay.  And are we seeing multiple of those evidence tags
23   for different items that you're seizing?
24   A.   Yes.
25   Q.   Okay.  And you found a lot of thumb drives in this search;
```

```
 1   is that correct?
 2   A.   That's correct.
 3   Q.   Okay.  And is it every location where you find a thumb
 4   drive you have to put an evidence tag down?
 5   A.   Correct.
 6   Q.   Okay.  Is that what we're seeing on the top of this
 7   credenza?
 8   A.   Yes.  On the top, yes.
 9   Q.   Okay.
10        MS. MAX:  And then let's go to 144.
11   BY MS. MAX:
12   Q.   Tell the jury what they are seeing with the evidence
13   tag 1.
14   A.   That's a standalone, I guess, Mac computer.
15   Q.   And did you seize it?
16   A.   Yes.
17        MS. MAX:  And 147.
18   BY MS. MAX:
19   Q.   Explain to the jury what this is.
20   A.   That's a small camera.  I don't recall the name of it.
21   It's -- it's -- kind of a hidden camera.  I think it's maybe
22   Copwatch or something like that.  A lot of people install them
23   inside their vehicles.  I think it's called Copwatch.  I'm not
24   100 percent sure.  But it's just a small cube, self-contained
25   camera.
```

```
 1              MS. MAX:  Go to 148.
 2   BY MS. MAX:
 3   Q.   And what is this?
 4   A.   It's a bank bag with U.S. currency in it.
 5              MS. MAX:  And 71.
 6   BY MS. MAX:
 7   Q.   Now, point out to the jury, what are we seeing here?
 8   First of all, where is this closet located?
 9   A.   This closet is in the office area, in the back of the
10   office.
11   Q.   And explain to the jury what we are seeing down at the
12   bottom of the closet.
13   A.   This was -- again, these were photographs taken before --
14   before the search.  This is inside the closet.  There was kind
15   of a large floor safe that was closed, and then to the right of
16   that is a large -- like garage or like kitchen trash can with a
17   liner, and it's just kind of thrown in there.
18              MS. MAX:  72.
19   BY MS. MAX:
20   Q.   Can we see the trash can with the liner a little better
21   there?
22   A.   Yes.
23   Q.   Okay.  Explain to the jury, did you touch this trash can?
24   A.   Eventually.  I moved it out of there.
25   Q.   Okay.  Tell the jury what happened when you went to move
```

```
 1    the trash can.
 2    A.   When I moved it, I felt something fall down, you know, in
 3    the trash can.  And inside the -- inside the actual trash bag
 4    there was just a few pieces of paper, so it felt like something
 5    was inside the liner, if that makes sense.
 6    Q.   Okay.  So what did you do?
 7    A.   So I pulled the liner back.  I used to be a narcotics
 8    agent, and whenever we would search homes trash cans were full
 9    of pretty good evidence.  People, when we would arrive, would
10    secret things in the trash cans thinking we wouldn't look in
11    the trash cans.  And even beyond that, if they wanted to keep
12    those items and not disturb them by the roughage that's in the
13    trash can, they would put them under the liner, so, first of
14    all, law enforcement wouldn't look in the trash can much less
15    look beyond it.  So I pulled back the trash can and found some
16    items.
17             MS. MAX:  Let's go to 150.
18    BY MS. MAX:
19    Q.   What is this a picture of?
20    A.   This is where I pulled the actual trash bag away from the
21    trash can where I could see the items that were below.
22             MS. MAX:  And 151.
23    BY MS. MAX:
24    Q.   And what were the items?  Explain to the jury.
25    A.   They were like yearly calendars, planners or
```

1    what-have-you.

2              MS. MAX:  Let's go to 152.

3    BY MS. MAX:

4    Q.   What's this?  Is this a picture of the planners that were

5    in the trash can?

6    A.   Yes.  That's after I have taken them out of the trash can

7    and placed them on the floor so I could get a photograph of

8    what was actually being depicted in the previous photograph.

9    Q.   And are those three planners for the year 2016, 2019, and

10   2020?

11   A.   Yes, they are.

12             MS. MAX:  Your Honor, at this time Government moves

13   to introduce Government's Exhibit 93, 96, and 97 for record

14   purposes only.

15             THE COURT:  Any objection?

16             MS. GALLIAN:  No further objection, Your Honor.

17             THE COURT:  All right.  Any objection from counsel

18   for Mr. DeLeon?

19             MR. WESTFALL:  No, Your Honor.

20             THE COURT:  All right.  It's admitted.

21                 (Government's Exhibit Nos. 93, 96, and 97

22                 received)

23             MS. MAX:  And let's go to 154.

24   BY MS. MAX:

25   Q.   Is that then you putting the evidence tags on the

1    calendars?

2    A.    Yes.  Those are evidence tags, again, for demonstrative

3    purposes to later reflect in the evidence log what those items

4    are.

5    Q.    Is that a better view of the trash can that these were

6    underneath the liner in?

7    A.    Yes, it is.

8    Q.    Moving through office, let's go to 163.  Is that a white

9    binder with photographs?

10   A.    Yes, it is.

11   Q.    Okay.

12            MS. MAX:  And 165.

13   BY MS. MAX:

14   Q.    Up here on the corner I'm going to draw your attention to

15   the papers that have evidence tag 21 marked on them.

16            MS. MAX:  Let's go to 176.

17   BY MS. MAX:

18   Q.    So were these documents -- evidence tag 21, were these

19   documents laying on the desk?

20   A.    They were on the desk, yes.

21   Q.    Now, at this point is it safe to assume looking at the

22   pictures that you've moved things around as you're searching on

23   the desk?

24   A.    Yeah.  The desk was in disarray.  It's kind of -- stuff

25   was stacked up, so we were having to go through the paperwork

```
 1   to see if anything was of evidentiary value.
 2   Q.   Okay.
 3           MS. MAX:  Let's go to 177.
 4   BY MS. MAX:
 5   Q.   This is a close-up of the papers, 21, that you found on
 6   the desk.
 7           Can you just read what the title was on those
 8   documents?
 9   A.   "What's the difference between a target and a subject and
10   a witness in a white collar investigation?"
11   Q.   Okay.
12           MS. MAX:  Let's go to 167.
13   BY MS. MAX:
14   Q.   Did you find paperwork that related to Defendant Stone's
15   divorce decree?
16   A.   Yes, I did.
17           MS. MAX:  Let's go to 172.
18   Q.   And do we also see here -- I'm drawing your attention --
19   we see the divorce decree, but I'm drawing your attention to
20   the left of the divorce decree.
21           Is this another planner that was found on the desk?
22   A.   Yes, it is.
23           MS. MAX:  And then let's go to 173.
24   BY MS. MAX:
25   Q.   Is this a close-up of the divorce decree that you found on
```

1  the desk?

2  A.   Yes, it is.

3  Q.   Would you mind reading, starting with "It is ordered"?

4  A.   "It is ordered that William R. Stone, Jr., shall tender to

5  Stacey F. Stone the sum of $230,000.00 on or before March 4,

6  2016, in the form of a cashier's check payable to Stacey F.

7  Stone.  It is further ordered that as of March 1, 2016, Stacey

8  F. Stone relinquishes any and all interests she has or may have

9  in William R. Stone's civil service retirement system benefits.

10  Stacey F. Stone, by her signature herein below, acknowledges

11  full receipt of said sum referenced in this paragraph."

12          MS. MAX:  Okay.  Let's go to 169.

13  BY MS. MAX:

14  Q.   And looking in the far left corner down by the number

15  marker 20, is that another calendar that you found?

16  A.   Yes, it is.

17  Q.   Okay.

18          MS. MAX:  Let's go to 180.

19  BY MS. MAX:

20  Q.   And what is this a picture of?

21  A.   The desk with the calendars.

22          MS. MAX:  At this time the Government moves to admit

23  Government Exhibit 94, 95, and 98 for record purposes only,

24  Your Honor.

25          MS. GALLIAN:  No further objection, Your Honor.

```
 1              MR. WESTFALL:  No objection.
 2              THE COURT:  All right.  Admitted.
 3                  (Government's Exhibit Nos. 94, 95, and 98
 4                  received)
 5              MS. MAX:  Let's go to 186.
 6  BY MS. MAX:
 7  Q.   What is the evidence tag 26 for?  Which item there on the
 8  desk?  Is it the recorder?
 9  A.   Yes, it's the digital recorder.
10  Q.   Okay.  So that's off to the left of the evidence tag 26?
11  A.   That is correct.
12  Q.   Okay.  And that was found on the desk?
13  A.   Yes.
14              MS. MAX:  Let's go to 187.
15  BY MS. MAX:
16  Q.   Is that a close-up of the recorder?
17  A.   Yes, it is.
18              MS. MAX:  And 188.
19  BY MS. MAX:
20  Q.   And what is this?
21  A.   I believe that's a phone.
22  Q.   Okay.
23              MS. MAX:  And 194.
24  BY MS. MAX:
25  Q.   Tell the jury what this is and where you found it.
```

```
 1   A.   Again, that was found on the desk.  It's a parking
 2   placard.
 3   Q.   For what organization?
 4   A.   For the Federal Bureau of Investigation.
 5   Q.   Okay.  Do you know -- do you carry a placard as a Texas
 6   Ranger?
 7   A.   Yes.
 8   Q.   Under what circumstances do you use it?
 9   A.   Under official business, to park in parking that is
10   designated for law enforcement parking.
11   Q.   And where do you put the placard?
12   A.   On the dashboard usually.
13            MS. MAX:  Let's go to 198.
14   BY MS. MAX:
15   Q.   And what do we see here on top of the safe?  Is it the two
16   cameras?
17   A.   Yeah.  There's a digital camera inside of a -- like a
18   turquoise bag.
19            MS. MAX:  And 200.
20   BY MS. MAX:
21   Q.   Is that a close-up of the camera?
22   A.   Yes, it is.
23            MS. MAX:  Let's go to 204.
24            And if we could zoom in on this.
25   BY MS. MAX:
```

1   Q.   Is this paperwork you found in the office?

2   A.   Yes, it is.

3        MS. MAX:  Zoom in on the top half of the document.

4   BY MS. MAX:

5   Q.   Is this dated July of 2015?

6   A.   Yes, it is.

7   Q.   And was this a cover letter that William Stone had written

8   to the Texas State Board of Pharmacy looking for employment?

9   A.   Yes, to be an investigator.

10  Q.   Okay.

11       MS. MAX:  Let's go to 206.

12  BY MS. MAX:

13  Q.   And what do we have here?

14  A.   Vehicle titles.

15       MS. MAX:  207.

16  BY MS. MAX:

17  Q.   Is that a close-up of a title for a Mercedes?

18  A.   Yes, for a 2016 Mercedes, four-door.

19       MS. MAX:  And 208.

20  BY MS. MAX:

21  Q.   Is that a close-up of a title for a Toyota vehicle?

22  A.   Pickup, yes.

23  Q.   Okay.

24       MS. MAX:  209.

25  Q.   Is this title paperwork you found in the office?

```
 1   A.   Yes.
 2            MS. MAX:   211.
 3            And let's zoom in to 212.
 4   BY MS. MAX:
 5   Q.   Tell the jury, what is this?
 6   A.   That's an identification card for William Stone.
 7   Q.   For what organization?
 8   A.   For the Federal Bureau of Investigation.
 9   Q.   Okay.  Does it list a separation date on there?
10   A.   Yes.  Separation date, 10-31-2015.
11   Q.   Okay.
12            MS. MAX:   213.
13   BY MS. MAX:
14   Q.   Did you find various guns in the residence?
15   A.   A few inside the residence, in the safe and then outside
16   in the garage area.
17   Q.   Okay.  So is 213 a gun you found in the safe?
18   A.   Yes, it is.
19            MS. MAX:   And 214.
20   BY MS. MAX:
21   Q.   Also a gun from the safe?
22   A.   It's the same weapon taken out of the holster.
23   Q.   Same weapon?
24            MS. MAX:   216.
25   BY MS. MAX:
```

1    Q.   Is that a gun from the safe?

2    A.   Yes, it is.

3            MS. MAX:   And 217.

4    A.   Again, the same weapon taken out of the holster.

5            MS. MAX:   And let's go to 219.

6    BY MS. MAX:

7    Q.   Ranger Stoner, what room are we in now?

8    A.   So this is back to that middle room, kind of a junk room

9    or storage room.

10   Q.   And is this a room that was meant to be used as -- I mean

11   built as a bedroom?

12   A.   Yes.

13   Q.   Moving throughout the house, did you get any indication

14   that anyone lived there besides William Stone?

15   A.   Oh, absolutely not.

16   Q.   And why not?

17   A.   Every room had personal belongings -- belongings -- it

18   was -- it was kind of odd.  Everything was really plain in all

19   the living area, the kitchen, the dining area.  It was -- there

20   was no personal items.  It was kind of like a bachelor pad, you

21   know.  And then the office was completely -- everything was in

22   Mr. Stone's name.

23            This room in the middle, kind of the junk room, also

24   everything appeared to belong to Mr. Stone.  And then the

25   bedroom itself, as you saw -- the closet area had most of

```
 1   everything in it, and it was all men's clothing and, you know,
 2   everything.  There did not appear to be any toiletries or any
 3   other items that belonged to anybody else.
 4   Q.   Okay.
 5           MS. MAX:  Let's show 227.
 6   BY MS. MAX:
 7   Q.   Is this a bin that was in the storage room?
 8   A.   Yes, it is.
 9   Q.   And you have an evidence tag 40 hanging out of it?
10   A.   Yes.
11   Q.   Okay.
12           MS. MAX:  Let's move to 229.
13   BY MS. MAX:
14   Q.   Is this another calendar that you found in that storage
15   bin in that bedroom?
16   A.   Yes, it is.
17           MS. MAX:  The Government at this time moves to admit
18   for record purposes Government Exhibit 92.
19           MS. GALLIAN:  No further objection.
20           MR. WESTFALL:  No objection, Your Honor.
21           THE COURT:  It's admitted.
22              (Government's Exhibit No. 92 received)
23           MS. MAX:  Let's go to 230.
24   BY MS. MAX:
25   Q.   Is this a dresser in the bedroom?
```

```
 1    A.   Yes.  Back to the master bedroom, against the back wall, a
 2    chest of drawers, I guess.
 3    Q.   And you have another evidence tag.
 4              MS. MAX:  Let's go to 231.
 5    BY MS. MAX:
 6    Q.   And tell the jury what this is.
 7    A.   It's -- I believe it's a Rolex watch.
 8    Q.   Okay.  That was found in the dresser?
 9    A.   Yes, in the dresser -- on the side there were two drawers
10    that pulled out from the side rather than the top, and it was
11    on the left side.
12              MS. MAX:  Let's go to 118.
13    BY MS. MAX:
14    Q.   Is this a photograph of the garage now?
15    A.   Yes, after the vehicles were removed.
16    Q.   Okay.
17              MS. MAX:  119.  120.  123.  129.
18    BY MS. MAX:
19    Q.   All these were pictures of the garage, the numbers I just
20    read off, correct?
21    A.   That is correct.
22              MS. MAX:  Let's go to 233.
23    BY MS. MAX:
24    Q.   Is this one of the box -- boxes of guns that you
25    referenced earlier?
```

```
 1   A.   Yes.
 2              MS. MAX:  And 236.
 3   BY MS. MAX:
 4   Q.   And what is this?
 5   A.   That was a -- like a large Pelican case.  It was off to
 6   the side in the garage where the black sedan was.  It was off
 7   to the side.
 8              MS. MAX:  And 245?
 9   BY MS. MAX:
10   Q.   Is this -- is this a safe in the garage?
11   A.   Yes, it is.
12   Q.   And let's first talk about the large outer black safe.
13   Was that closed when you began your search?
14   A.   It was.
15   Q.   Was it locked?
16   A.   Yes.
17   Q.   How did you gain access to it?
18   A.   Mr. Stone opened the safe.
19   Q.   Okay.  And then inside we see a smaller blue safe.  Was
20   that located inside the larger black safe?
21   A.   Yes, it was.
22   Q.   And was that locked?
23   A.   I believe it was, yes.
24   Q.   And how did you get access to that?
25   A.   Mr. Stone.
```

```
 1              MS. MAX:  Let's move to 248.
 2    BY MS. MAX:
 3    Q.   Explain to the jury what we see here.
 4    A.   I have now taken the smaller blue safe out of the larger
 5    safe, opened it up, and these are two identification cards or
 6    credential cards for Mr. Stone.
 7    Q.   Okay.
 8              MS. MAX:  Let's go to 249.
 9    BY MS. MAX:
10    Q.   Is that a close-up of the cards that were in the safe?
11    A.   Yes.
12              MS. MAX:  And let's go to --
13    BY MS. MAX:
14    Q.   And we're actually seeing three -- three credentials in
15    this photograph, right?  There is one lurking underneath?
16    A.   Yes.  That is correct.
17    Q.   Okay.
18              MS. MAX:  And 252.
19              Can we go back to 250?
20    BY MS. MAX:
21    Q.   Okay.  Is that another -- is that a photograph of all
22    three credentials that were in the safe?
23    A.   Yes, with the yellow marker for demonstrative purposes,
24    identifying those as three items that we were going to take.
25              MS. MAX:  Your Honor, at this time the Government
```

```
 1    moves to introduce Government's Exhibit 99, which we have the
 2    three credentials which we have individually marked as 99-A, B,
 3    and C for the record, as well as the envelope in which they are
 4    contained.
 5              THE COURT:  Any objection?
 6              MS. GALLIAN:  No objection.
 7              MR. WESTFALL:  No objection, Your Honor.
 8              THE COURT:  Admitted.
 9              (Government's Exhibit Nos. 99, 99-A, 99-B, 99-C
10              received)
11    BY MS. MAX:
12    Q.   Ranger Stoner, as you were moving throughout the
13    residence, did you see Defendant Stone throughout the course of
14    the morning?
15    A.   Yes.
16    Q.   Okay.  Was there anything that he had in his possession
17    throughout the search?
18    A.   Yeah.  He was carrying a big binder.
19    Q.   Okay.  Did you find out what that -- what that binder was
20    being referred to as?
21    A.   A book or a --
22    Q.   Like a manuscript?
23    A.   Yeah, something to that -- I don't recall what they
24    referred to it as, but yes.
25    Q.   Okay.  But you are saying during the course of the search
```

```
 1    Defendant Stone is present at the home and he is carrying
 2    around a binder?
 3    A.   Correct.
 4    Q.   Okay.
 5            MS. MAX:  Can we go to 256?
 6    BY MS. MAX:
 7    Q.   Is this -- the white binder with evidence tag 45, is this
 8    the binder that you were referencing?
 9    A.   Yes.
10    Q.   So did you end up seizing it?
11    A.   Yes, I did.
12            MS. MAX:  And 257.
13    BY MS. MAX:
14    Q.   Is that a close-up of the binder?
15    A.   Yes.
16            MS. MAX:  Let's go to 259.
17    BY MS. MAX:
18    Q.   Is that a copy of the inventory that you created while
19    there at the scene?
20    A.   Yes, it is.
21            MS. MAX:  And let's go to 261.
22    BY MS. MAX:
23    Q.   And what is that a picture of?
24    A.   That's a blurry picture of my wrist showing the time we
25    were done with the search.
```

```
 1   Q.   Okay.  Is that 12:38 p.m.?
 2   A.   Correct.
 3   Q.   So you were there for roughly four hours?
 4   A.   Roughly.
 5   Q.   Okay.  Once you seized the items, did you maintain custody
 6   of them?
 7   A.   No.  They were turned over at the scene.  At the
 8   completion of the evidence log everything was turned over.
 9   Q.   To what agency?
10   A.   The Office of Inspector General.  I think a Scott Bray is
11   who I turned everything over to.
12   Q.   Okay.  The Department of Justice Office of Inspector
13   General who actually took physical possession of the items you
14   seized?
15   A.   Yes, everything that I seized was turned -- turned over to
16   him.
17           MS. MAX:  Pass the witness.
18           MS. GALLIAN:  May I proceed, Your Honor?
19           THE COURT:  You may.
20                     CROSS-EXAMINATION
21   BY MS. GALLIAN:
22   Q.   Good morning, Ranger Stoner.  My name is Jaclyn Gallian,
23   I'm one of the attorneys representing Bill Stone.  How are you
24   doing today?
25   A.   I'm doing well.
```

1   Q.   Right off the bat the Government had showed you a picture

2   and there was a camera on the house.  And I think the

3   implication was that you took a picture of it because you said

4   it took Bill Stone a little while to come out of the house.  Do

5   you remember that?

6   A.   Yes, absolutely.

7   Q.   Okay.  Now, this was not just a simple knock on the door,

8   you have a couple of people there to do a search warrant,

9   correct?

10  A.   No.

11  Q.   Can you set the scene for us?  Whenever you arrived --

12  well, were you the first one that arrived?

13  A.   No.  I was staged away from the area.

14  Q.   Okay.  So set the scene for me.  Who was there and what

15  happened?

16  A.   I don't -- I don't recall who all was there.  I believe

17  DPS SRT, they do what we call a surround and call-out.  I

18  believe -- don't quote me on that.  I don't recall.  But I

19  think that they announced their presence, asking for him to

20  come out of the residence.

21         And, again, I was told that it took a long time for

22  him to come out of the residence with all those people present,

23  so I felt like the camera was important.

24  Q.   Do you know about what time you arrived?

25  A.   Shortly -- I mean, it was probably between 8:15 and 8:30.

```
 1    I don't know exactly.  Again, I was staged down the -- in a
 2    different location.  It was in a residential area.  There
 3    wasn't a lot of room for a lot cars, so we stayed away.
 4    Q.   Yes, sir.  And that was 8:15 a.m. approximately?
 5    A.   That's correct.
 6    Q.   Okay.  Do you know about what time everyone else got there
 7    when --
 8    A.   I have no idea.
 9    Q.   All right.  Was it before 8:15 a.m.?
10    A.   It was.
11    Q.   Okay.  Was SWAT there?
12    A.   Our SRT -- or special response team -- I don't know -- DPS
13    SWAT wasn't there.
14    Q.   Okay.  Was there a tank there?
15    A.   A tank?
16    Q.   Armored tank?
17    A.   We don't own a tank.
18    Q.   Did you see an armored tank there?
19    A.   I did not.
20    Q.   You didn't see an armored tank parked on the yard at all?
21    A.   No.  When I got there, it was DPS, like another ranger,
22    the -- the Department of Justice individuals there.  So if --
23    if there was any armored personnel there, that was gone before
24    I arrived.
25    Q.   Okay.  Were you present when Mr. Stone actually came out
```

1   of the house?

2   A.   No.  When I -- when I showed -- when I arrived, Mr. Stone

3   was inside the house with Texas Ranger Danny Briley and other

4   individuals inside the house.

5   Q.   So around 8:15, 8:30 people are inside the house?

6   A.   Around -- well, Mr. Stone was -- I can't -- to be honest

7   with you, I can't remember if he was outside or inside the

8   house, because when I'm taking the pictures, they're standing

9   in the kitchen area waiting, no search or anything being

10  conducted.  But I think -- if I recall correctly, I think they

11  were standing in the kitchen.

12  Q.   Okay.  So you had said it took him a while to come out.

13  About how long did it take him --

14  A.   I have no --

15  Q.   Or to answer the door?

16  A.   No, I have -- I couldn't speak to that.  They just told me

17  it took a long time for him to come out.

18  Q.   Do you know what he was wearing when he came out?

19  A.   I have no idea.  I assume the same clothes that he was

20  wearing if he was in any of those pictures.

21  Q.   Is it reasonable to assume that a retired individual at

22  8:00 a.m. could possibly be in bed?

23  A.   Absolutely.

24  Q.   Now, you were shown a photo of a gun that was leaning up,

25  I believe, in the dining/living room area.  Just to confirm, it

1    looked to me like it was a BB gun.  Was that your impression?

2    A.    Yeah, it was a BB gun, pellet gun, something to that

3    nature.

4    Q.    Okay.  How many guns do you personally own?

5    A.    I don't know.

6    Q.    Is it a lot?

7    A.    It is a lot.

8    Q.    More than ten?

9    A.    Yes.

10   Q.    Probably more than 20?

11   A.    Probably.

12   Q.    Okay.  It's not uncommon for former law enforcement to

13   have a lot of guns in their house, correct?

14   A.    No.

15   Q.    Okay.  Regarding the safe -- I know we looked at three

16   different safes.  We had a medium-sized one in the house.  We

17   had a large one in the garage.  And then a small one that was

18   in the large one in the garage, correct?

19   A.    Yes, ma'am.

20   Q.    Bill Stone opened all those for you voluntarly, correct?

21   A.    That is correct.

22   Q.    Was he required to?

23   A.    Well, he wasn't required to, but we had a search warrant,

24   so we would have ended up having to find other means into the

25   safes.

```
 1   Q.   But he made it easy for you.  He did it himself.
 2   A.   That's correct.
 3   Q.   Okay.  We saw a photo of cash.  Did you seize any cash?
 4   A.   No.
 5   Q.   You seized both vehicles, though, correct?
 6   A.   Actually, those were not part of my seizure.  Those were
 7   taken before -- I mean, I took pictures of them.  And they were
 8   taken, I assume, by the Office of Inspector General.  I just
 9   took pictures because I knew they were going to be taken away
10   and seized.
11   Q.   Okay.  So that is probably why they're not on your
12   inventory list, correct?
13   A.   That is correct.
14   Q.   Okay.  But safe to say they were both seized that day.
15   Bill hasn't had possession of either vehicles since June 18,
16   2020, correct?
17   A.   I just know they were taken that day.  What happened to
18   them, I couldn't speak to.
19   Q.   Okay.  Now, you said, I believe, the 2015 calendar, that
20   one was found in a large bin in that kind of spare room,
21   correct?
22   A.   In the trash can, in the -- oh, I'm sorry.  The 2015, yes,
23   in that spare room.
24   Q.   Okay.  Now, you discussed a little bit about the parking
25   placard.  That was found in his office, not in either vehicle,
```

```
 1   correct?
 2   A.   Correct.
 3   Q.   So you have no reason to assume he was using the parking
 4   placard?
 5   A.   I have no reason to assume that.
 6   Q.   All right.  Thank you, Ranger Stoner.
 7            MS. GALLIAN:  Pass the witness.
 8            THE COURT:  Thank you, ma'am.
 9                       CROSS-EXAMINATION
10   BY MR. WESTFALL:
11   Q.   Ranger Stoner, I'm Greg Westfall.
12   A.   Good to meet you.
13   Q.   I represent Joe DeLeon.
14   A.   Okay.
15   Q.   Do you see him over there?
16   A.   I do now.
17   Q.   Okay.  You've never seen him before, have you?
18   A.   I did not.
19   Q.   And he definitely wasn't there that day?
20   A.   That's correct.
21   Q.   Inside this house -- do you know what a conference
22   room is?
23   A.   A conference room?
24   Q.   Yes.
25   A.   Yes.
```

```
1   Q.   Of course.  You have conferences rooms, right?
2   A.   Correct.
3   Q.   With conference tables?
4   A.   Yes.
5   Q.   Chairs and telephones.  They're used for the purpose of
6   meeting or to get privacy, right?
7   A.   Generally.
8   Q.   And I saw your inventory.  And it seemed like the house
9   had a kitchen, the house had three bedrooms, one of which was
10  just kind of a junk room?
11  A.   Yes.
12  Q.   Had a living room?
13  A.   (Indicating in the affirmative)
14  Q.   Had a garage.  But it didn't seem to have a conference
15  room, did it?
16  A.   Not a -- nothing that was set up as a conference room.  I
17  guess you could set up any room as a conference room if you
18  wanted to.
19  Q.   You could.  But if I'm telling you that we're going to
20  meet in my conference room, do you expect to come into a room
21  with just junk on the floor?
22  A.   No, I do not.
23  Q.   You expect to come into a real conference room, right?
24  A.   Correct.
25  Q.   All right.
```

```
 1            MR. WESTFALL:  Thank you very much.
 2            MS. MAX:  Your Honor, just one follow-up question.
 3            THE COURT:  Certainly.
 4                       REDIRECT EXAMINATION
 5  BY MS. MAX:
 6  Q.   Detective Stoner, your inventory, your evidence log also
 7  notes that you took possession of item Number 27, a black cell
 8  phone; item Number 39, another black cell phone, Verizon LG;
 9  item 42, a black and silver Motorola flip phone; as well as
10  various thumb drives; as well as item Number 30, a stack of
11  miscellaneous tax records from the office area.  Is that
12  correct?
13  A.   Correct.
14            MS. MAX:  Nothing further, Your Honor.
15            THE COURT:  All right.
16            MS. GALLIAN:  No more questions, Your Honor.
17            MR. WESTFALL:  No more questions, Your Honor.
18            THE COURT:  Good news is we get to release you.
19            Any objection to me releasing this witness?
20            MS. GALLIAN:  No, Your Honor.
21            THE COURT:  All right.  Thank you so much for coming,
22  Ranger.
23            THE WITNESS:  Thank you.
24            THE COURT:  We appreciate you.
25            Members of the jury, you good to keep churning?
```

```
 1   Okay.
 2             MS. RUDOFF:  Your Honor, the Government calls
 3   Courtney Calloway.
 4             THE COURT:  All right.
 5             (Pause)
 6             THE COURT:  Hello.  How are you today?
 7             THE WITNESS:  I'm good.  How are you?
 8             THE COURT:  Good.  If you will come on in and have a
 9   seat.  Glad to have you as our guest.
10             THE WITNESS:  Thank you.
11             THE COURT:  You look pretty in pink.
12             THE WITNESS:  Thank you.
13             THE COURT:  And let's do a quick sound check with
14   your mic.
15             THE WITNESS:  Okay.
16             THE COURT:  I have a spotty sound system.  So if you
17   don't mind just saying your name.
18             THE WITNESS:  Courtney Calloway.
19             THE COURT:  Everybody hear okay?  Okay.  Great.
20             And my court reporter will swear you in.
21             THE WITNESS:  Okay.
22             (Witness sworn)
23             THE COURT:  Glad to have you here.
24             Your witness, ma'am.
25             MS. RUDOFF:  Thank you, Judge.
```

```
 1                THE COURT:  You're welcome.
 2            COURTNEY CALLOWAY, GOVERNMENT'S WITNESS, SWORN
 3                      DIRECT EXAMINATION
 4  BY MS. RUDOFF:
 5  Q.   Good morning, Ms. Calloway.
 6  A.   Good morning.
 7  Q.   Can you spell your name -- or introduce yourself and spell
 8  your name, your last name for the record?
 9  A.   Okay.  My name is Courtney Calloway.  Last name is
10  C-A-L-L-O-W-A-Y.
11  Q.   And thank you for being here.  Is it okay to refer to you
12  as Ms. Calloway?
13  A.   That's fine.
14  Q.   Okay.  How are you currently employed?
15  A.   I'm sorry?
16  Q.   How are you currently employed?
17  A.   I'm employed by the FBI.
18  Q.   And what is your role as the FB -- with the FBI?
19  A.   Currently I work in emergency maintenance [sic], but
20  previously I was working in the credential office.
21  Q.   And are you also considered to be an agent with the FBI or
22  are you just an employee?
23  A.   I'm just an employee.
24  Q.   And you said your current title is with maintenance?
25  A.   It's with emergency management.
```

```
 1   Q.   I'm sorry, I absolutely butchered that.
 2   A.   That's okay.
 3   Q.   Emergency management?
 4   A.   Yes.
 5   Q.   And what do you do with emergency management?
 6   A.   So we work on the continuity of operation.  In case the
 7   building becomes inoperable, we have a plan for people that
 8   still have to continue to work.
 9   Q.   And how long have you been in that role?
10   A.   About a year and a half.
11   Q.   And where do you work out of, which office?
12   A.   I work in D.C. at headquarters.
13   Q.   FBI headquarters?
14   A.   FBI headquarters.
15   Q.   Prior to your position in emergency management, you said
16   you held a position before that with FBI?
17   A.   Correct.
18   Q.   What was that?
19   A.   I was a management and program analyst, and I worked in
20   the FBI's credential office.
21   Q.   How long did you have that role?
22   A.   About seven years.
23   Q.   And where were you located when you were serving in that
24   role?
25   A.   I was still in D.C. at FBI headquarters.
```

```
 1   Q.   Thank you for flying down to Dallas.
 2   A.   No problem.
 3   Q.   In your position with -- as a management and program
 4   analyst and credential specialist, what were your general
 5   duties?
 6   A.   So we would process credentials for the entire bureau.
 7   The office that I worked in, we provided credentials for the
 8   entire bureau, including the field offices and the LEGATS.
 9   Q.   And in federal law enforcement we have a bad habit of
10   using a lot of acronyms and short terms for words.
11   A.   Okay.
12   Q.   And so I think you used one right at the end.  Can you
13   repeat that and explain to the jury what that is?
14   A.   So LEGATS are people that work abroad in places other than
15   the United States, so foreign countries.
16   Q.   And is that an acronym that you just said?
17   A.   I'm not sure what it stands for.  That's just what we call
18   it, LEGATS.
19   Q.   Okay.  I just want to make sure for the record we're
20   spelling it correctly.
21   A.   Okay.
22   Q.   How long in total have you been with the FBI?
23   A.   Eight and a half years.
24   Q.   Where did you go to college?
25   A.   George Mason University.
```

```
 1   Q.   And when did you graduate?
 2   A.   2012.
 3   Q.   And with a bachelor's degree?
 4   A.   Yes, ma'am.
 5   Q.   Since your graduation, have you then solely worked for the
 6   FBI?
 7   A.   About a year and a half I worked in the local court in my
 8   hometown.  I was a district court -- I worked in the district
 9   court in my hometown for about a year and a half, and then I've
10   worked at the FBI ever since.
11   Q.   Okay.  I want to talk about your role when you were
12   serving as an analyst in management and program and as it
13   relates specifically to the handling and processing of FBI
14   credentials.
15   A.   Okay.
16   Q.   What is -- can you explain to the jury, what is an FBI
17   credential?
18   A.   An FBI credential is an official identification on -- it's
19   something that we provide to everyone that works in the FBI.
20   So it just gives you a photo and a title of that individual and
21   identifies them as working for the FBI.
22   Q.   And as a part of your job, were you involved in the
23   process of distributing and maintaining FBI credentials and
24   records related to them?
25   A.   Yes.
```

1   Q.   Why is a credential important for someone who works for

2   the FBI to have?

3   A.   Because it identifies you as working for the FBI, so that

4   it's like a legitimate form of identification.  It also lists

5   your title, and it shows a photo of you so that it's

6   legitimate.

7   Q.   And when do individuals who work for the FBI receive these

8   credentials?

9   A.   So they receive them as soon as they join the bureau.

10  They have to submit a request, and we will process it.  And

11  then throughout their career we update those credentials based

12  on different reasons.

13  Q.   Okay.  And you said there may be a change of credentials

14  throughout their career for different reasons?

15  A.   Correct.

16  Q.   What about when they retire?

17  A.   When you retire, you do receive your retirement

18  credential.

19  Q.   Okay.  And we'll talk about that in just a second.

20  A.   Okay.

21  Q.   What kinds of things do active agents use FBI credentials

22  for?

23  A.   Identifying themselves as being special agents.  I know

24  they use them if they are testifying in court, if they are

25  interviewing witnesses, traveling.  They will also show them

1    for those purposes.

2    Q.   So it is fair to say that it's for official FBI business

3    only?

4    A.   It is.

5    Q.   What kinds of things are active agents not allowed to use

6    the credentials for?

7    A.   Well, we typically tell people don't use them, you know,

8    to get out of speeding tickets or things like that or -- only

9    use them for official purposes.

10   Q.   So they shouldn't be used for any personal reason, right?

11   A.   Correct.

12   Q.   Or any business unrelated to the FBI?

13   A.   Correct.

14   Q.   You said earlier that an agent would receive a credential

15   as soon as they joined the FBI, correct?

16   A.   Correct.  When they graduate from Quantico as an agent,

17   that's when we process their initial credential.

18   Q.   Do individuals who work for the FBI who aren't agents also

19   get credentials?

20   A.   Yes.

21   Q.   Do they look the same?

22   A.   The verbiage is different, and the make of the credential

23   is a little bit different.

24   Q.   You said that during someone's career there might be a

25   reason for them to get a new credential?

```
 1   A.   Yes.

 2   Q.   What would be an example of that?

 3   A.   A name change, title change, drastic change of appearance.

 4   Those are the typical reasons a credential is processed again.

 5   Q.   And I want to talk about the process.

 6   A.   Okay.

 7   Q.   You said that when an agent starts with the bureau,

 8   graduates from Quantico, they submit a request, correct?

 9   A.   Correct.

10   Q.   And then they are issued credentials?

11   A.   Yes.

12   Q.   How does that process work?

13   A.   So for agents specifically graduating from Quantico, there

14   will be a mass request with the entire graduating class with

15   their information so that we can process those credentials.  So

16   we'll create credentials for the entire group once they

17   graduate.

18   Q.   And then how does the agent receive them?

19   A.   So if they're at Quantico specifically, they will be

20   handed to them by -- there's a point of contact that we

21   typically work with if the person does not work out of

22   headquarters, because they are processed at headquarters.  So

23   if you are outside of headquarters, we have a point of contact

24   at each location that will pass those along to the person.

25   Q.   But the entire process is otherwise managed by FBI
```

1    headquarters, correct?

2    A.    Yes.

3    Q.    And specifically the group that you were in?

4    A.    Yes.

5    Q.    What if someone who is an active agent needs to have a

6    change in their credentials for one of the reasons you

7    mentioned, a change in title, a change of appearance?  So

8    what's the process for that?

9    A.    They will submit a credential request.  If they are at

10   headquarters, they will usually come into the office.  And

11   before we give them the updated credential, we do take back the

12   active one so that -- they are only supposed to have one at a

13   time.

14        So if they are anywhere outside of the FBI

15   headquarters location, we do have a point of contact that we

16   will send the credential to.  It's like a middleman.  And they

17   will typically collect that active credential that was outdated

18   and pass along the updated credential.  And then they will send

19   the outdated credential back to our office.

20   Q.    And as a part of the process, are there supposed to be

21   records maintained to ensure that the process is followed?

22   A.    Yes.

23   Q.    You mentioned that the old active credentials must be sent

24   back so that an agent doesn't maintain two sets of credentials?

25   A.    Yes.

```
 1   Q.   Why is this necessary?
 2   A.   We do that for accountability purposes.  We consider the
 3   credentials as FBI property.  So before we issue out another
 4   credential, we will collect that -- the one that needs to be
 5   updated.
 6   Q.   And is there any legitimate business reason an agent would
 7   need two active set of credentials?
 8   A.   No.
 9   Q.   Is that also part of why they're supposed to send the
10   active credential back before getting a new one?
11   A.   Correct.
12   Q.   When you send out a new credential, what is different
13   about that credential than the one they sent back?
14   A.   So it depends on what they're requesting to be changed.
15   So if they have a title change, we'll update the title.
16   Marriage or divorce, we will change that last name, purposes
17   like that.
18        So whatever it is they're requesting to change is
19   what will be changed on the actual credential.
20   Q.   And the new credential, does it have like a date of
21   issuance, similar to what we lay people kind of think of of
22   getting a new driver's license?  It says the date that the new
23   license was issued.  Is there anything like that on the new
24   credential?
25   A.   No, the credential does not show the date of issue.  I
```

```
 1   don't know -- if I could speak on the retirement credential,
 2   that does list the date of retirement on it, but no credential
 3   lists the dates of issue.
 4   Q.   And so how would the FBI know that a credential in an
 5   agent's possession is maybe a new one?
 6   A.   Well, we have a spreadsheet in the credential office where
 7   we track that type of information.  Like, we'll track when the
 8   request was received, when it was processed, and when it was
 9   mailed out -- in the instance they are not at headquarters,
10   when it was mailed out to the field office that they work from.
11   Q.   And so if you came across an agent who had an old
12   credential that was shown to you and your records indicated
13   that that credential should have been sent back, you would be
14   able to know that because of your position in the records?
15   A.   Correct.
16   Q.   And that shouldn't happen theoretically, right?
17   A.   It should not happen.
18   Q.   Okay.  I want to talk about what happens with credentials
19   once an agent retires.
20   A.   Okay.
21   Q.   Once an agent enters their retirement date, what is the --
22   what are they supposed to do with their current active
23   credentials?
24   A.   So when an agent retires, what they'll do is typically
25   they will send their credential back to us, because we do offer
```

1    to have that credential mounted on a retirement plaque.  And
2    then once that happens, we'll also issue out a retirement
3    credential.
4            So the credential that they carry throughout their
5    career will be mounted and actually stamped "retired" on a
6    plaque, and then a retirement credential will be issued.  And,
7    again, that does have their date of retirement on their
8    credential.
9    Q.   Is there anything else on the retirement credential that's
10   not mounted that indicates it's a retirement credential besides
11   showing the date of retirement?
12   A.   So the retirement credential does have "retired" across it
13   in red, in red font.  And we pretty much tell retirement --
14   people that retire that it's a memento.  We consider it a
15   memento.
16   Q.   And so when you say you consider it a memento, what do you
17   mean by that?
18   A.   It's not to be used for any official purpose.
19   Q.   Talking about all the different types of credentials we
20   just covered, are these credentials marked with insignia or any
21   kind of features to ensure their authenticity?
22   A.   Yes.  So if you actually look at the credential, the
23   bottom portion that has their photo, typically -- or it's
24   supposed to have the FBI seal on the bottom portion.
25   Q.   Is there any other holograms or the way they are laminated

1   or anything like that that makes someone like you know whether

2   a credential is authentic?

3   A.   So that's for the active credentials.  For the retired

4   credentials, like I said, it will have the red font, but it

5   will have a retired -- it will say "retired."  It's laminated.

6   The verbiage is laminated on that as well.

7   Q.   Is there a situation in which credentials, whether active

8   or retired, can be purchased from like an employee -- FBI

9   employee shop or any other way an FBI employee could get a

10  credential lawfully without going through your office?

11  A.   No.

12  Q.   Have you reviewed the FBI credentials seized from William

13  Stone's house in June 2020 that relate to this case?

14  A.   Yes.

15  Q.   And what was the reason you were asked to review these

16  credentials?

17  A.   Well, there were multiple credentials in his possession,

18  and there was just, I guess, a question of legitimacy for those

19  credentials.

20  Q.   You said there were multiple.  Would there have been three

21  that you reviewed?

22  A.   Yes.

23  Q.   And I want to talk through each of those --

24  A.   Okay.

25  Q.   -- if you don't mind.

```
 1              MS. RUDOFF:  Your Honor, at this time may I publish
 2    Government 99, the FBI credentials, the envelope which contains
 3    Government Exhibit 99-A, 99-B, and 99-C?
 4              THE COURT:  And it's my recollection those were all
 5    admitted without objection; is that correct?
 6              MR. GALLIAN:  Yes, Your Honor.
 7              THE COURT:  Correct?
 8              MS. SELLERS:  Yes, ma'am.  Sorry.
 9              THE COURT:  Then you may, yes.
10              MS. RUDOFF:  And for presentations purposes, can we
11    republish Government 89, page 250, please?
12    BY MS. RUDOFF:
13    Q.   I want to first draw your attention to --
14              MS. RUDOFF:  If we could zoom in on the credential
15    that has "retired" on it, please.
16    BY MS. RUDOFF:
17    Q.   This is marked as 99-A, which I have placed on the
18    banister, along with 99-B and 99-C for the jury -- to be
19    published to the jury.  But for my questions, I'm going to have
20    you, Ms. Calloway, look at these photos, okay?
21    A.   Okay.
22    Q.   What do we see here in the photograph of 99-A?
23    A.   It looks like a retirement credential.
24    Q.   And how can you tell?
25    A.   So first thing on -- at the top right-hand corner,
```

1    credential number, we do typically put an R in front of that

2    retirement credential once we process it.  Also, the "retired"

3    verbiage in red.

4    Q.   On the top portion?

5    A.   On the top portion.  And the bottom portion as well.  That

6    will identify it as a retirement credential.

7    Q.   And one thing we can't see on this photo, but I will show

8    you in the physical credential --

9             MS. RUDOFF:  Your Honor, may I approach?

10            THE COURT:  You may.

11            (Pause)

12   BY MS. RUDOFF:

13   Q.   You testified earlier that there would be a date of

14   retirement or an issue date on a retired credential.  Is that

15   located on 99-A?

16   A.   Yes.

17   Q.   And what does it say?

18   A.   10-31-2015.

19   Q.   And in looking at 99-A, is there anything else about that

20   credential that we can't quite see in this photo that indicates

21   to you it's retired?

22   A.   Well, there should be -- on the bottom section where the

23   photo is, there should be a "retired" laminate on that.

24   Q.   Do you see that there in 99-A?

25   A.   I do not.

```
 1   Q.   What does that indicate to you?
 2   A.   There should be a laminate on that bottom section that
 3   says "retired."
 4   Q.   And when you say laminate, like, what does it look like?
 5   A.   It's kind of like a -- certain angles you can see it.
 6   It's -- I don't know how to explain it.
 7   Q.   Is it kind of like a hologram?
 8   A.   Kind of like a hologram, yes.
 9   Q.   Okay.
10        MS. RUDOFF:  May I approach, Your Honor?
11        THE COURT:  You may.
12        (Pause)
13        MS. RUDOFF:  I want to talk now about Government's
14   Exhibit 99-B, which I have handed the witness to take a look
15   at.
16        And if we could zoom in on the photo, the bottom
17   right credential.
18   BY MS. RUDOFF:
19   Q.   And, Ms. Calloway, what we see here is a photo of
20   Government Exhibit 99-B.  And you have that credential in your
21   hand, correct?
22   A.   Yes.
23   Q.   What -- explain this credential to the jury.
24   A.   So this is what you would typically see for a credential.
25   It does have that credential number at the top right-hand
```

1    corner, identifies him as a special agent.  And then at the

2    bottom you do see that hologram, the FBI seal on this one.

3    Q.   And we see -- what position do we see that these creds

4    were issued for?

5    A.   As a special agent.

6    Q.   And based on your review of these records, at what point

7    in the Defendant's career would these credentials have been

8    issued to him?

9    A.   Probably earlier on in his career.

10   Q.   And so if he was provided a different credential later,

11   should these credentials still be in his possession?

12   A.   No.

13   Q.   What should have happened to them?

14   A.   This should have been returned before receiving the next

15   credential.

16   Q.   And should an agent who is retired have that credential in

17   his possession for any reason?

18   A.   No.  The only credential that typically they retire with

19   is mounted on a plaque.

20   Q.   I want to move on and talk about Government 99-C, the

21   credential on the left side of the picture.

22        MS. RUDOFF:  If we could zoom in.

23        And if I may approach, Your Honor?

24        THE COURT:  You may.

25        (Pause)

```
 1    BY MS. RUDOFF:
 2    Q.   Ms. Calloway, I just handed you Government 99-C, which is
 3    the credential that we see here on the photo.  Tell me about
 4    this credential.  What do you notice about it?
 5    A.   So I notice these are two different types of credentials.
 6    I know that this bottom one is one that was issued in the '90s,
 7    and at that point there was a year that was typically put on
 8    that credential, whereas the top section of this credential is
 9    more of the newer updated credential backing that we would use.
10    So it looks kind of mish-mashed.
11    Q.   So the top portion -- so if it was issued legitimately
12    from your office, this top portion we see here would never be
13    included with that bottom portion?
14    A.   Correct.  And also that credential number on the top
15    right-hand corner, that R makes it seems like this would have
16    been a retirement credential, because we only put an R in the
17    instance that it's a retirement credential.  So if this was an
18    active credential, it should have just had that number without
19    the R in front.
20    Q.   Okay.  And in the active credential, Government 99-B that
21    I previously showed you, which you said shouldn't have been in
22    the possession, but it was a real credential, right?
23    A.   Yes.
24    Q.   Did it have that R in front of the number?
25    A.   No.
```

```
 1   Q.   Okay.  And because it has that R number -- R that comes
 2   before the number, which -- what does the R stand for?
 3   A.   We use that to symbolize retirement.
 4   Q.   Okay.  And because there is an R in front of the number,
 5   what else would you expect to see on that top portion?
 6   A.   If there was an R in front of the number, there should
 7   also be that red "retired" verbiage in the background of
 8   that -- that top section of that credential.
 9   Q.   And we don't see that here, correct?
10   A.   Correct.
11   Q.   Now, I want to talk about the bottom portion that we see
12   here in 99-C.  What about the bottom portion, besides the fact
13   that it doesn't match the top -- is there anything about the
14   bottom portion that makes you think this is not something
15   legitimately issued by the FBI?
16   A.   It just looks like an older version of the credential that
17   we used to use.  So, again, that's something that should no
18   longer be in their possession.
19              I've seen older credentials like this, because in the
20   '90s they did put that -- that date in the bottom left-hand
21   corner -- the year, I mean.  So it does appear to be
22   legitimate, but it does not appear to be -- that it should have
23   still been with him.
24   Q.   Okay.  And is there anything else about the bottom
25   portion, either it's -- the paper it's on, the quality of it,
```

 1   that causes you concern or question?
 2   A.   It is a different paper than we use currently.
 3   Q.   And what do you mean?
 4   A.   The paper that we use now, as you can see on the top
 5   section, it's much -- it's brighter.  This is more -- the
 6   bottom section is more like a beige, darker color, whereas the
 7   top is more bright.
 8            And then -- and I only probably know this from
 9   dealing with it, but like the feel of the paper is a little bit
10   different as well.  It's more of a glossy finish with the
11   bottom than the top one.
12   Q.   And when you turn that piece of paper over, does it say
13   anything on the back?
14   A.   Kodak professional paper.
15   Q.   Is that Kodak paper typically what the FBI uses to issue
16   credentials?
17   A.   I'm not sure what paper was used in the '90s.
18   Q.   Being that this would have come from the '90s, is there
19   anything about the condition of that piece of paper that causes
20   you concern?
21   A.   It does appear to be in good condition to be an older
22   credential.
23   Q.   Is there anything about the cardboard that it's on that
24   you analyzed or reviewed?
25   A.   Typically, once a credential -- once the actual paper is

1    removed from the credential back, you will notice tearing on
2    this credential.
3    Q.   So do we see that there?
4    A.   I do not.
5    Q.   What about the weight of that credential?  Is that
6    consistent with what would be issued?
7    A.   It seems consistent.  The credential back seems
8    consistent.
9    Q.   Okay.
10          THE COURT:  And when you reach a natural breaking
11   point, if you would let us know.
12          MS. RUDOFF:  Okay.
13   BY MS. RUDOFF:
14   Q.   And just going back to this top portion again, being that
15   there is no red "retired," yet there's an R number in front of
16   that number, is there any way that this top portion was
17   legitimately issued?
18   A.   It doesn't appear so.
19   Q.   You also spoke about there needing to be a hologram on the
20   bottom portion --
21   A.   Yes.
22   Q.   -- to show authenticity?
23   A.   Yes.
24   Q.   Do we see any kind of hologram on the lower portion that
25   would indicate the bottom half was legitimately issued?

```
 1   A.   There's no hologram.
 2   Q.   And so collectively looking at this cred or credential, do
 3   you -- can you say whether or not as is this was legitimately
 4   issued by the FBI?
 5   A.   This does not appear to be legitimately issued by the FBI.
 6           MS. RUDOFF:  Your Honor, at this time I would pass
 7   the witness.
 8           THE COURT:  Okay.  Is now a good time to take a quick
 9   break?
10           MR. GALLIAN:  Defer to you, Judge.
11           THE COURT:  All right.  We will take our 10:00 break.
12           Members of the jury, thanks for your time and
13   attention.
14           All rise for the jury.
15           Court will be in recess for half an hour, and then
16   we'll resume.
17           (Jury out)
18           THE COURT:  And if I can borrow the lawyers for just
19   a moment in chambers just to brainstorm for just a minute, I
20   would be most grateful once we have the jury.
21           Thank you.
22           (Recess)
23           THE COURT:  All right.  Anything we need to bring up
24   before we bring them in, for Defendant Stone?
25           MR. GALLIAN:  No, Your Honor.
```

1          THE COURT:  Anything from the Government?

2          MS. RUDOFF:  No, Your Honor.

3          THE COURT:  All right.  Let's get them in.

4          So I've asked them to work on getting the temperature

5   better.  We're down to 74.  So hopefully you don't feel like

6   you're repenting for quite as many sins.  We will continue to

7   keep trying to cool it down.

8          (Pause)

9          SECURITY OFFICER:  All rise for the jury.

10         (Jury in)

11         THE COURT:  All right.  If everyone will please be

12  seated.

13         And as a courtesy to the Court -- I will do it too --

14  if everybody will check and make sure their phones off.

15         And with that said, we just passed for

16  cross-examination.

17         Your witness, Mr. Gallian.

18         MR. GALLIAN:  Thank you, Your Honor.

19         THE COURT:  You're welcome.

20         MR. GALLIAN:  May I proceed?

21         THE COURT:  You may.

22                    CROSS-EXAMINATION

23  BY MR. GALLIAN:

24  Q.   Ms. Calloway, I just introduced myself to you out in the

25  hallway, didn't I?

```
 1   A.    Yes.
 2   Q.    Okay.  I'm one of the attorneys that represents Bill
 3   Stone, and I have just a few questions for you.
 4   A.    Okay.
 5   Q.    If at any point I ask a bad question, just let me know and
 6   I'll happily rephrase, okay?
 7   A.    Okay.
 8   Q.    So we went through the three badges that you just went
 9   through with Ms. Rudoff, right, these three badges right here?
10   A.    Yes.
11   Q.    Okay.  Now, what I would like to get on the same page is
12   that you are not making the opinion that this badge with this
13   cred, you are not saying they went together, correct?
14   A.    Correct.
15   Q.    So this could have been from a different badge, a previous
16   badge, or somewhere else, right?
17   A.    It could have been.
18   Q.    Okay.  Now, when we were out in the hallway, I asked you
19   about the spreadsheet that the FBI maintains at the cred
20   office, right?
21   A.    Yes.
22   Q.    Okay.  Is it -- just out of curiosity, is it like an Excel
23   spreadsheet, or is it more complex than that?
24   A.    It's a little bit more complex than that.
25   Q.    Is it in Excel?
```

```
 1   A.   It's not in Excel.
 2   Q.   Okay.  I was just thinking Excel spreadsheet, and I
 3   thought the FBI could surely do better than that.
 4        Okay.  So as it relates to your testimony in this
 5   case, on this occasion or on previous occasions were you ever
 6   asked to look into the spreadsheet that is not in Excel as it
 7   relates to Bill Stone?
 8   A.   Yes.
 9   Q.   Okay.  And what information did that have about the creds
10   that Bill Stone should have in his possession?
11   A.   So I think when I looked at the spreadsheet it only went
12   back as far as 2015, so the only request that was in the
13   spreadsheet was for that retirement credential.
14   Q.   And all the information prior to 2015 had been lost?
15   A.   I'm not sure where it went.  When I looked in the
16   spreadsheet, it only went back as far as 2015.  So any request
17   prior to that was not on that spreadsheet.
18   Q.   And how long have you been working with the FBI?
19   A.   About eight and a half years.
20   Q.   Rough math, when would you have started, month and year?
21   A.   January 2015.
22   Q.   Okay.  So you looked at the system, and it said that Bill
23   Stone should only be in possession of this badge right here,
24   correct?
25   A.   That was the only request that I saw on the spreadsheet.
```

 1   Q.   Okay.  But there was also no information from the

 2   preceding years because of that data loss or whatever it would

 3   have been?

 4   A.   Correct.

 5   Q.   When I say "this one," just for record purposes I'm

 6   talking about 99-A.

 7            MR. GALLIAN:  May I approach, Your Honor?

 8            THE COURT:  You may.

 9            (Pause)

10   BY MR. GALLIAN:

11   Q.   Ms. Calloway, I will represent to you -- well, I just

12   handed you for record purposes 99-B and 99-C.

13            Prior to today, have you ever met Bill Stone?

14   A.   No.

15   Q.   Okay.

16            MR. GALLIAN:  Bill, if I could have you stand up,

17   please.

18   BY MR. GALLIAN:

19   Q.   I'll represent to you that's my client, Bill Stone.

20   A.   Okay.

21   Q.   In the nicest and kindest way possible, Bill Stone looks

22   nothing like he did back in the '90s, right?

23   A.   He looks different.

24   Q.   Yeah.  He's aged a little bit, do we agree?

25   A.   A little.

```
 1    Q.   He no longer has a mullet?

 2    A.   Right.

 3    Q.   And his hair has lightened a little bit.  Do we agree?

 4    A.   Yes.

 5    Q.   Okay.  So the only badge that's -- that you've been asked

 6    to review that looks somewhat like Bill Stone presently is this

 7    retired badge?

 8    A.   Correct.

 9              MR. GALLIAN:  I'll pass the witness.  Thank you so

10    much.

11              THE COURT:  All right.

12                         CROSS-EXAMINATION

13    BY MR. SELLERS:

14    Q.   Hello, Ms. Calloway.

15    A.   Hello.

16    Q.   How long have you been here?

17    A.   Since 7:00 this morning.

18    Q.   You landed at 7:00 this morning?

19    A.   Oh, no, no.  I've been here since Sunday.

20    Q.   Oh, since Sunday?

21    A.   Yes.

22    Q.   Okay.  All right.  Well, we're going to get you out of

23    here.

24              MR. SELLERS:  May I approach, Your Honor?

25              THE COURT:  You may.
```

```
 1              (Pause)
 2   BY MR. SELLERS:
 3   Q.   Now, it seems to me the suggestion was that this was not
 4   real, correct?
 5   A.   I'm not sure if that was a suggestion.
 6   Q.   Is this something the FBI makes and gives out to its
 7   agents?
 8   A.   That looks like similar to the one that was issued in the
 9   '90s.
10   Q.   In the '90s.  Okay.
11   A.   They are a bit different now.
12   Q.   But you would agree with me this one is not stamped
13   "retired," right?
14   A.   Correct.
15   Q.   And if put with this one, for example, that doesn't have
16   the R number in front of it, right?
17   A.   Correct.
18   Q.   And this were shown to someone, it sure could make them
19   believe that they are still an active agent, right?
20   A.   Yes.
21   Q.   And that's a big problem, because we don't want to have
22   people impersonating active agents when they retire, correct?
23   A.   Right.
24   Q.   And so you could see how somebody who's shown something
25   like this might be fooled to think that this person is still an
```

```
 1   active agent, right?
 2   A.   Correct.
 3           MR. SELLERS:  Pass the witness.
 4           MS. RUDOFF:  Just briefly, Your Honor.
 5           THE COURT:  Certainly.
 6                        REDIRECT EXAMINATION
 7   BY MS. RUDOFF:
 8   Q.   Ms. Calloway, do you have any reason to believe that the
 9   individual represented in Government A, B, or C is not Bill
10   Stone?
11   A.   No.
12   Q.   And is there any reason that you are aware of that an
13   agent who's retired should have more than one credential in his
14   possession?
15   A.   No.
16   Q.   Is there any reason you're aware of that an agent who's
17   active should have more than one credential in his possession?
18   A.   No.
19           MS. RUDOFF:  Your Honor, I pass the witness.
20           THE COURT:  Anything further from either side?
21           Certainly.
22                        RECROSS-EXAMINATION
23   BY MR. GALLIAN:
24   Q.   Headquarters is not supposed to issue new creds until they
25   receive the old ones, correct?
```

1    A.   Correct.  Well, typically, like I said, if it's out -- if

2    it's in the field, we will send the credential to that point of

3    contact.  They will collect the active credential and then give

4    them the updated credential, and then they will mail us back

5    that outdated credential.

6    Q.   Okay.  So either the cred is supposed to be turned in at

7    headquarters, right?

8    A.   Uh-huh.  Yes.

9    Q.   Or the individual that it was mailed to is supposed to

10   collect the creds at that point, right?

11   A.   Correct.

12   Q.   So if either of those fail, then an agent can have more

13   than one cred in their possession, right?

14   A.   Yes.

15            MR. GALLIAN:  Thank you, Ms. Calloway.  I'm actually

16   done now.

17            Thank you, Judge.

18            MR. SELLERS:  I'm actually done as well, Your Honor.

19            THE COURT:  All right.  Any objection to me releasing

20   this witness?

21            MS. RUDOFF:  No objection, Your Honor.

22            MR. GALLIAN:  No objection.

23            MR. SELLERS:  No.

24            THE COURT:  Thank you so much for coming today.  We

25   appreciate you staying.

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Thank you.  Have a great day.

 3                    (Pause)

 4                    MR. BUSCH:  Your Honor, the Government calls Aaron

 5      Sullivan.

 6                    THE COURT:  All right.  Mr. Sullivan, come on down to

 7      meet us.

 8                    How are you today?

 9                    THE WITNESS:  Good, ma'am.  Yourself?

10                    THE COURT:  Good.

11                    Let's go off the record for a sec.  We'll do a sound

12      check.

13                    (Discussion off the record)

14                    THE COURT:  If you don't mind saying your name, and

15      we'll make sure the jurors can hear you.

16                    THE WITNESS:  Aaron Sullivan.

17                    THE COURT:  Everybody good?

18                    All right.  And my court reporter will swear you in.

19                    THE WITNESS:  Okay.

20                    (Witness sworn)

21                    THE COURT:  Your witness, Mr. Busch.

22                    MR. BUSCH:  Thank you, Your Honor.

23                    THE COURT:  You're welcome.

24                    MR. BUSCH:  May I proceed?

25                    THE COURT:  You may.
```

```
 1              MR. BUSCH:  Thank you.
 2           AARON SULLIVAN, GOVERNMENT'S WITNESS, SWORN
 3                     DIRECT EXAMINATION
 4  BY MR. BUSCH:
 5  Q.    Mr. Sullivan, how are you employed?
 6  A.    With U.S. Customs and Border Protection.
 7  Q.    And how long have you been with U.S. Customs and Border
 8  Protection?
 9  A.    This coming February it will be 16 years.
10  Q.    And what is your role or your duties with -- I'll just
11  refer to it as CBP.
12  A.    So currently I'm a supervisory Customs and Border
13  Protection officer.  I'm a supervisor over a team of 12.  It's
14  called the Tactical Terrorism Response Team.  Essentially, we
15  work in plainclothes at the airport, and we deal with national
16  security and related inspections, counterterrorism,
17  counterintelligence.
18  Q.    Is the United States Customs and Border Protection part of
19  a larger agency of the U.S. Government?
20  A.    Department of Homeland Security.
21  Q.    Okay.  And was it always part of the Department of
22  Homeland Security, or was it part of another department before?
23  A.    Well, in 2003 it came together.  Kind of -- they brought
24  together Agriculture, Immigration, and Customs.
25  Q.    Oh, all under the umbrella of DHS?
```

```
 1   A.   Correct.
 2   Q.   Okay.  All right.  Prior to your federal service, were you
 3   a member of the military?
 4   A.   I was.
 5   Q.   What branch?
 6   A.   U.S. Marines.
 7   Q.   And did you deploy?
 8   A.   I did.
 9   Q.   Where?
10   A.   Afghanistan, 2001.
11   Q.   All right.  Let me direct your attention to this case.
12          Are you aware of a search that was done and have you
13   looked at records regarding a William Roy Stone?
14   A.   I have.
15   Q.   Okay.  And what kind of search did you engage in or did
16   you look at?
17   A.   I would call it advance passenger information system data.
18   It's basically a travel history of -- international travel
19   history of a passenger.
20   Q.   Okay.  And so are those records maintained by Customs and
21   Border Protection?
22   A.   Yes.
23   Q.   Okay.  Have you looked at Government's Exhibit 106, which
24   appears to be a search that was conducted for a William Stone?
25   A.   Yes.
```

```
 1   Q.   A birth date of 10-31-58?
 2   A.   Yes, sir.
 3            MR. BUSCH:  Your Honor, at this time the Government
 4   would offer Government's Exhibit 106.
 5            THE COURT:  Any objection?
 6            MR. GALLIAN:  No objection.
 7            MR. WESTFALL:  No objection, Your Honor.
 8            THE COURT:  Admitted.
 9                (Government's Exhibit No. 106 received)
10            MR. BUSCH:  Permission to publish, Your Honor.
11            THE COURT:  Granted.
12   BY MR. BUSCH:
13   Q.   So tell us, Mr. Sullivan, what do you see here?
14   A.   This is a -- what I would call APIS data provided that
15   shows the international travel between January 1, 2015, and
16   July 15, 2020.
17   Q.   Okay.  So that's the date range of this particular
18   document?
19   A.   That's correct.
20            MR. BUSCH:  If we could just look at the top third of
21   it, please.
22   BY MR. BUSCH:
23   Q.   And who was the individual that was queried in the system?
24   A.   William Stone.
25   Q.   And is there a birth date?
```

1    A.    October 31, 1958.

2    Q.    Okay.  So this document reflects a search for a date range

3    of January 2015 through July of 2020 roughly?

4    A.    That's correct.

5    Q.    For this individual William Stone?

6    A.    Yes, sir.

7    Q.    Okay.

8          MR. BUSCH:  If we could expand out, please.

9    BY MR. BUSCH:

10   Q.    Before we go into the details of this search, if somebody

11   leaves the United States by air, flies on an airline leaving

12   the United States, is that information entered into this

13   system?

14   A.    So when you -- when you book an international trip -- or

15   domestic, but in this case if you book an international trip,

16   once it's booked it comes out as PNR, passenger name record.

17         Before that person departs or enters the United

18   States, it's shared with CBP, because we run checks on

19   passengers coming in and out of the country.

20         But it goes into what's called the Advance Passenger

21   Information System.  It allows us to see who's going in and out

22   of the country.

23   Q.    Okay.  So during the relevant timeframe of this search, if

24   anybody jumped on an airplane and flew oversees to another

25   country, that information would be reflected in the system?

```
 1    A.    That's correct.
 2    Q.    Okay.  And that's for commercial airlines like American
 3    Airlines, Delta, British Airways, whatever somebody gets on; is
 4    that right?
 5    A.    That's correct.
 6    Q.    What would -- what records would there be generated for
 7    somebody who, let's say, flew on a military flight?
 8    A.    So travel internationally with a military flight should
 9    be -- there should be a database system with that information,
10    the APIS data.
11    Q.    All right.  So if I was in the military, I flew on a
12    military aircraft from Texas to, let's say, London, that would
13    be also reflected in this database?
14    A.    That's correct.
15          So CBP also cross-trains with U.S. military for
16    military customs, and they would -- yes.
17    Q.    Okay.  How about if I drove across the border, the Rio
18    Grande, I drove across into Mexico?
19    A.    There would be a -- well, there would be a record, yes,
20    because the camera would capture the license plate going out of
21    the country or across the border, and it would capture it
22    coming back in.
23    Q.    And into Canada too?
24    A.    Correct.
25    Q.    Okay.  So it captures the license plate, not the person
```

```
 1   individually, or there's a photograph or --
 2   A.    Yeah.  So it depends on if they're doing outbound
 3   enforcement on the border.  Sometimes they may stop that car
 4   and identify that person for whatever reason.  It could be a
 5   variety of reasons.  But then that person will be checked when
 6   they come back into the country.
 7   Q.    All right.  So that's more of a tangent, though.
 8              But for purposes of my questioning, if someone flew
 9   internationally from the United States to Europe or the Middle
10   East or someplace, that information is logged into the system?
11   A.    Yes.
12   Q.    Okay.  So the record check that was done, Government's
13   Exhibit 106 --
14              MR. BUSCH:  If we could look at the middle third of
15   the document, Nicole.
16   BY MR. BUSCH:
17   Q.    So for the time range of this, which was January 1, 2015,
18   through, I think, July 15 of 2020, what do the records reveal
19   for Mr. Stone?
20   A.    So if I'm looking at this record, it shows that he
21   departed DFW Airport to arrive in Cabo on February 17, 2020,
22   and it shows onboard.
23   Q.    And does it show return?
24   A.    It does.  It shows that he returned on February 20 -- or
25   February 20, 2020, and he utilized the Global Entry Kiosk.
```

```
 1   Q.   Okay.  And there's a line above the 2020.  What does that
 2   line reflect?
 3   A.   So it looks like the original travel reservation, they
 4   were coming back on the 21st, however they came back on the
 5   20th.
 6   Q.   So the system is that sophisticated that it has the travel
 7   plans, but it has the actual departure and the actual arrival
 8   if it changes?
 9   A.   Correct.
10   Q.   Okay.  So based on the search that you conducted, can you
11   tell this jury whether or not Mr. Stone left the United States
12   during that timeframe of about five years on any other trips
13   other than the one that's reflected in Government's
14   Exhibit 106?
15   A.   Can you repeat that one more time?
16   Q.   Yes.  So based on the search that was done, is this the
17   only record of international travel by Mr. Stone during the
18   date range of the search?
19   A.   For that date range, yes.
20   Q.   Okay.  And, again, would that include people who are
21   traveling on behalf of the United States for official business?
22   Are they also entered in the system?
23   A.   Correct.
24   Q.   Okay.  So agents, members of the military -- if I travel
25   on behalf of DOJ, that would all be entered in the system?
```

```
 1   A.   Correct.
 2   Q.   Okay.  And then finally, what about people who leave on
 3   charter aircraft, private aircraft, on somebody's Gulfstream?
 4   A.   So at DFW we have corporate aviation where private jets
 5   enter and leave.  We have Addison, we have Meacham, McKinney,
 6   Midland.  There are several outer ports where private planes
 7   depart and come back, or chartered flights.  Yes.
 8   Q.   And so is that passenger manifest also input in the
 9   system?
10   A.   It is, yes.
11   Q.   And not just the airports you mentioned here, but
12   nationwide?
13   A.   Correct.
14            So the way I would search is if I was to log into the
15   text, I would sort it by private aircraft instead of
16   commercial, and then I would be able to search for that
17   departure airport.
18   Q.   Okay.
19   A.   Or arrival airport.
20   Q.   Okay.  All right.
21            MR. BUSCH:  I believe that's all.  Thank you.
22            Pass the witness, Your Honor.
23            THE COURT:  All right.
24            MR. GALLIAN:  No questions, Judge.
25            THE COURT:  All right.
```

```
 1              MR. WESTFALL:  No questions, Your Honor.
 2              THE COURT:  All right.  Thank you so much for coming.
 3    We appreciate you.
 4              THE WITNESS:  Thank you, ma'am.
 5              MR. BUSCH:  Your Honor, may this witness be excused?
 6              THE COURT:  Any objection to this witness being
 7    excused?
 8              THE DEFENDANT:  No objection.
 9              MR. WESTFALL:  No objection, Your Honor.
10              THE COURT:  All right.  Appreciate you coming.  Thank
11    you again.
12              THE WITNESS:  Thank you.
13              (Pause)
14              MS. RUDOFF:  At this time the Government calls Tim
15    Knapp.
16              THE COURT:  Tim Knapp.  Okay.  Great.
17              (Pause)
18              THE COURT:  Come on down, Mr. Knapp.  How are you?
19              THE WITNESS:  Good.  Yourself?
20              THE COURT:  Good.  Glad to have you here.
21              Members of the jury, how is the temperature?  I asked
22    them to bring them down a little bit.  I think we're down to
23    74.  We're getting there.
24              All right.  Please have a seat.
25              THE WITNESS:  Thank you.
```

```
1              THE COURT:  And we'll do a quick sound check.  We're
2    glad to have you here.
3              THE WITNESS:  Thank you.
4              THE COURT:  We're going to take good care of you.
5              THE WITNESS:  Appreciate it.
6              THE COURT:  Now, get comfortable.  And if you will,
7    whenever you're seated comfortably, if you don't mind saying
8    your name in the microphone, we'll do a little sound check.
9              THE WITNESS:  Timothy Knapp.
10             THE COURT:  Everybody hear okay?
11             Great.  All right.
12             My court reporter will swear you in.
13             (Witness sworn)
14             THE COURT:  And just before you start, members of the
15   jury, are we okay to keep trucking on?  Okay, great.
16             Parties and jury, let me know if you need anything.
17             Your witness, ma'am.
18             MS. RUDOFF:  Thank you, Your Honor.
19             THE COURT:  You're welcome.
20          TIMOTHY KNAPP, GOVERNMENT'S WITNESS, SWORN
21                     DIRECT EXAMINATION
22   BY MS. RUDOFF:
23   Q.  Good morning.
24   A.  Good morning.
25   Q.  Can you please introduce yourself to the jury?
```

```
 1    A.    My name is Timothy Knapp.
 2    Q.    And is it okay if I call you Mr. Knapp?
 3    A.    Sure.
 4    Q.    Mr. Knapp, who do you work for?
 5    A.    EAN Holdings.
 6    Q.    And EAN Holdings, who are they?
 7    A.    Enterprise Rent-a-Car, Alamo Rental Car, National Rental
 8    Car.
 9    Q.    So is it fair to say EAN Holdings is the parent company
10    for the companies you just --
11    A.    Yes, ma'am.
12    Q.    -- described?
13          What is your role for Enterprise?
14    A.    I am the group risk manager.
15    Q.    How long have you been the group risk manager?
16    A.    A little over two and a half years.
17    Q.    Were you in a management position prior to that with
18    Enterprise?
19    A.    Yes, ma'am.
20    Q.    And how long have you been in a management position?
21    A.    Over the last 10 to 12 years.
22    Q.    Other than your 10 to 12 years in management position with
23    Enterprise, how long have you been with Enterprise in total?
24    A.    20.  20 years.
25    Q.    And have you always been employed on the risk management
```

```
 1    side of the company?
 2    A.    No, ma'am.
 3    Q.    How long have you been on the risk management side of the
 4    company?
 5    A.    Give or take six -- six and a half years.
 6    Q.    What about your educational background?  Did you graduate
 7    from college?
 8    A.    Yes, ma'am.
 9    Q.    Where did you go?
10    A.    Saint Thomas Aquinas in New York.
11    Q.    What's your degree in?
12    A.    Finance.
13    Q.    Can you just briefly describe what your role or duties are
14    as the group risk manager?
15    A.    Sure.  I oversee about -- over a hundred locations in the
16    DFW Metroplex.  And my team and sub-team is responsible for,
17    you know, the brand compliance and security of our assets.
18    Q.    And when you refer to assets, as it relates to Enterprise,
19    what are you referring?
20    A.    The vehicles that we rent or sell.
21    Q.    And you said that you're in charge of the security and the
22    compliance for those assets.  What types of things does that
23    entail on a day-to-day basis?
24    A.    Basic camera work, you know, making sure our cameras are
25    being functional, the locking of our doors and keys and
```

1    securing the vehicles at night, compliance, internal compliance
2    in how we rent our vehicles.
3    Q.   Does that also include procedures for when vehicles are
4    returned and documenting their condition?
5    A.   Yes, ma'am.
6    Q.   As well as ensuring that payment has been complied with?
7    A.   Yes, ma'am.
8    Q.   Does Enterprise and your group specifically maintain a
9    database of records related to their rentals and their
10   customers?
11   A.   Yes.
12   Q.   What type of information does that database maintain?
13   A.   The information that is provided to us by the customer at
14   the time of the rental.
15   Q.   Which -- to give us an example --
16   A.   Driver's license information, address where they work,
17   contact information, phone numbers, e-mails.
18   Q.   Does it also include information about their rental
19   reservations?
20   A.   Yes, ma'am.
21   Q.   What kind of information?
22   A.   Same information.  When they're picking up, what size car
23   they're picking up, how long they're going to keep the car for,
24   and then their personal information as well.
25   Q.   And do those records for each rental also include the

```
 1   condition of the vehicle when rented and when returned?
 2   A.   Yes.
 3   Q.   So if there was any kind of issue with either payment or
 4   that -- or the condition of the vehicle, that would be
 5   maintained in those records?
 6   A.   Yeah.
 7   Q.   Does your group also deal with instances where there may
 8   be potential fraud related to a car rental situation?
 9   A.   Yes.
10   Q.   And can you kind of give an example of what that might be?
11   A.   We just -- we just, you know, do a further investigation
12   if there are signs of fraud.  And if we determine that, we do
13   have an outside company that we refer to, a private eye
14   company.
15   Q.   And so then is your group responsible for providing that
16   information to the individuals that further investigate that
17   fraud?
18   A.   Yes, ma'am.
19   Q.   And then is it another part of the company that handles
20   pursuit of that fraud claim?
21   A.   Yes.
22   Q.   If an individual -- what's the process for if an
23   individual did owe Enterprise for unpaid rental fees or had
24   some issue where they needed to reconcile maybe damages to a
25   car?
```

1  A.   They would be notified by that department via e-mail and
2  postal mail of an invoice.
3  Q.   And who would that information go to?  The person renting?
4  A.   The renter at first, yes.
5  Q.   And then what would be the process for that renter to
6  reconcile whatever outstanding payment or damage payment there
7  was?
8  A.   We have third-party websites that we use for payment --
9  payment -- to address payment.
10  Q.   And is there any other way other than a website that that
11  payment can be paid?
12  A.   You can pay with credit card, if you go to a local branch,
13  in the renter's name.
14  Q.   What about any kind of cashier's check?
15  A.   We would -- we would accept that, but, you know, that
16  doesn't happen often.
17  Q.   And if it were some type of check or cashier's check, who
18  would it have to be made out to for it to substantiate the
19  records you maintain?
20  A.   The rental car company that they rented from, so
21  Enterprise Rent-a-Car or National or Alamo.
22  Q.   And the process you just described, was that the same
23  process in 2016 that Enterprise used?
24  A.   Yes, ma'am.
25  Q.   And would that be the same in 2015 as well?

```
 1   A.   Yes, ma'am.
 2   Q.   Turning to the specifics of this case, those records we
 3   discussed, are you able to look up specific individuals and
 4   gather any records that Enterprise has on them?
 5   A.   Yes, ma'am.
 6   Q.   Did you in this case have an opportunity to search the
 7   database for an individual named Casi Thompson?
 8   A.   Yes.
 9   Q.   And what information returned when you made that search?
10   A.   She's rented from us before.  We have a rental agreement
11   for her.
12   Q.   And did it indicate on one occasion, multiple occasions?
13   A.   To my knowledge, at least once.
14   Q.   And do you recall what year that was?
15   A.   Give or take '14 or '15.  2014 or '15.
16   Q.   And I'm just going to make it clear for the record.  Did
17   you say 2014 or 2015?
18   A.   Yes, ma'am.
19   Q.   Okay.  And is there anything in the record that indicated
20   there was any issue with payment regarding that rental?
21   A.   No.
22   Q.   Is there anything in the record that indicated there was
23   any concern of fraud?
24   A.   No.
25   Q.   And was there anything in that record that indicated there
```

```
 1   was any concern of damage to the vehicle?
 2   A.    No.
 3   Q.    In addition, when you looked up the records for Casi
 4   Thompson, did you find any type of information or referral from
 5   your group to an investigative group within Enterprise?
 6   A.    No.
 7   Q.    Or what about -- you said an outside third party?
 8   A.    No.
 9   Q.    Did you see in the file anything regarding communication
10   about Ms. Thompson's rental record with any kind of
11   investigator or law enforcement?
12   A.    No.
13   Q.    Did the records include any notation or indication that a
14   payment had been made for Casi Thompson for restitution?
15   A.    No.
16   Q.    If someone were to pay, let's say, a restitution payment
17   to Enterprise for something, would the amount of $250,000.00 be
18   within the kind of realm that Enterprise is looking for for --
19   A.    No, that's a dollar amount that I have not encountered,
20   no.
21   Q.    And the face you're giving me, why is that?  Is that --
22   A.    That's an extremely high dollar amount for a rental car.
23   Q.    And would that be because the restitution payment would be
24   for damages to the car itself?
25   A.    Pretty much, yeah.  Yes.
```

```
 1   Q.   Or even replacing a car?
 2   A.   Or replacing a car, correct, or a balance owed, yeah.
 3   Q.   So your cars don't reach the level of $250,000.00?
 4   A.   No.
 5   Q.   Did you have an opportunity to search the same database
 6   for any records pertaining to William Stone?
 7   A.   Yes.
 8   Q.   What did you find?
 9   A.   Nothing.  No records.
10   Q.   So no records that William Stone has ever rented with
11   Enterprise or one of your companies?
12   A.   Correct.
13   Q.   Was there any record indicating that William Stone made a
14   payment to restitution -- or I'm sorry -- to Enterprise for any
15   kind of amount owed?
16   A.   No.
17   Q.   Any record that William Stone handed over $250,000.00 in
18   the form of a check to Enterprise to satisfy an amount owed?
19   A.   No.
20              THE COURT:  Let's pause for just a moment.
21              Counsel, do you have an objection?
22              MR. GALLIAN:  I am so sorry.
23              THE COURT:  Oh, that's okay.
24              MR. GALLIAN:  I didn't mean to distract you.
25              THE COURT:  Oh, not at all.  Not at all.  I just
```

```
 1    wanted to make sure there was something I needed --
 2              MR. GALLIAN:  No, Your Honor.
 3              THE COURT:  Didn't mean to call attention.  Back in
 4    the game.
 5              Sorry about that there.
 6    BY MS. RUDOFF:
 7    Q.   Was there any record or documentation of any kind of,
 8    like, legal battle or lawsuit referred over related to a renter
 9    William Stone?
10    A.   No.
11    Q.   And what about with regards to a referral to law
12    enforcement for investigative purposes?
13    A.   No.
14    Q.   Generally speaking, are there instances where law
15    enforcement does contact Enterprise and specifically your group
16    seeking information?
17    A.   Yes.
18    Q.   And do you document when and how law enforcement makes
19    contact?
20    A.   Yes.
21    Q.   Was there any documentation that William Stone had as law
22    enforcement contacted Enterprise to receive or obtain
23    information related to an issue with a rental car?
24    A.   No.
25    Q.   Did you have an opportunity to check and see if there were
```

1    any records for an individual named Eric Gomez?

2    A.    Yes.

3    Q.    What did you find?

4    A.    No records.

5    Q.    And so based on the individuals I just named, you were

6    able to determine that there was no outstanding balance on any

7    of the three, correct?

8    A.    Correct.

9    Q.    And as you know to this day, there's no request or demand

10   for payment or restitution for those people?

11   A.    Correct.

12   Q.    And finally, that no payment has been received?

13   A.    Correct.

14            MS. RUDOFF:  Pass the witness, Your Honor.

15                     CROSS-EXAMINATION

16   BY MR. GALLIAN:

17   Q.    Good morning.  How are you?

18   A.    Good, sir.  How are you?

19   Q.    Good.

20            My name is Gregg Gallian, I'm one of the attorneys

21   representing Bill Stone.  I've some questions for you, okay?

22   A.    Okay.

23            MR. GALLIAN:  Your Honor, at this time I would like

24   to publish Government's Exhibit 38, jump page 477.

25            THE COURT:  Okay.  Has that previously been admitted?

```
 1              MR. GALLIAN:  Yes, Your Honor.
 2              THE COURT:  All right.  Permission granted.
 3              MR. GALLIAN:  Zoom in on the first blue text, please,
 4    Carly.
 5    BY MR. GALLIAN:
 6    Q.   All right.  Before you read that -- don't spoil the
 7    ending.  Before you read that, you don't know any of the
 8    individuals in this case, right?
 9    A.   Correct.
10    Q.   You don't know Bill Stone from Casi Thompson, right?
11    A.   Correct.  No.
12    Q.   Joe DeLeon or anyone else?
13    A.   No.
14    Q.   All right.  Now, before I ruined your fun, this is a text
15    message that's been admitted as evidence in this case.
16              Is there something at Enterprise called the
17    do-not-rent list?
18    A.   Yes, sir.
19    Q.   Okay.  So what happens there?
20    A.   This is a list for renters that fail to pay their balance
21    in full or fail to pay damages to a vehicle or have committed
22    some kind of assault on an employee or something to where we
23    don't feel comfortable renting to them again.
24    Q.   If it is damage to a vehicle or nonpayment of fees or
25    anything like that, is there a way that someone can get removed
```

1  off the do-not-rent list?

2  A.   Yes.

3  Q.   How is that?

4  A.   By paying the balance owed or the money owed towards the

5  damage of the vehicle.

6  Q.   So if I walk into an Enterprise, then -- and I walk up to

7  the counter to try and get a car, if you run my name, Gregg

8  Gallian, and it says that I'm on the do-not-rent list --

9  A.   Uh-huh.

10  Q.   -- I cannot drive away with a vehicle until I'm off that

11  list.  Is that fair?

12  A.   Correct.

13  Q.   Now, if I get there and they say, "Mr. Gallian, you're on

14  to do-not-rent list," and they tell me that I owe them fees, is

15  that something I can handle right then and there?

16  A.   Depending on the severity of the fee, I guess, or the

17  amount of the fee, yes.

18  Q.   And it would just be a quick credit card payment?

19  A.   Correct.

20  Q.   Okay.  Who does that payment go to?  Can I hand a card to

21  the teller at the Enterprise?

22  A.   Yes.

23  Q.   Okay.  Is there also times where an individual at

24  Enterprise will direct them to a corporate number to handle

25  that?

1    A.   Yes, sir.

2    Q.   Okay.

3         MR. GALLIAN:  Carly, if we could back out, please,

4    and go to the third blue text.

5    BY MR. GALLIAN:

6    Q.   This says, "I called and talked to Enterprise

7    cooperate" -- I think it means corporate.  "They said balance

8    has been paid and I'm able to rent.  So we're headed back."

9         Is that consistent with how things are done at

10   Enterprise?

11   A.   Yes.

12   Q.   Okay.  So if you're not on the do-not-rent list, you call,

13   you make payment right then and there, and then I can leave

14   with a car, right?

15   A.   Usually there's a 24-hour process to where the payment is

16   verified that it went through.

17   Q.   Okay.  Can that -- can that timeline be shortened if

18   someone allows it to be?

19   A.   Yes.

20   Q.   Okay.  So if someone says we're headed back, you know,

21   shortly after making that payment, then that's consistent with

22   what can happen at Enterprise?

23   A.   Yes, sir.

24   Q.   Ms. Rudoff asked you some similar questions, but I just

25   want to nail it down.

```
 1              Enterprise does not have Ferraris?
 2   A.   Not that I know of, sir.
 3   Q.   Enterprise does not have Bentleys?
 4   A.   Not they I know of.
 5   Q.   No Lamborghinis?
 6   A.   Not that I know of.
 7   Q.   Are there any cars, even if we're not talking about
 8   250,000, are there any cars on the Enterprise lots that are
 9   120- or 125,000?
10   A.   Yes, sir.
11   Q.   There are?
12   A.   Yes.
13   Q.   Some of the higher SUVs?
14   A.   We have an exotic line.
15   Q.   I did not know that.
16              But 250,000 is inconsistent with anything that's on
17   the lot?
18   A.   Yes, sir.  Yes, sir.
19   Q.   Okay.
20              MR. GALLIAN:  Brief moment.
21              THE COURT:  Certainly.
22              (Pause)
23   BY MR. GALLIAN:
24   Q.   The names that you ran were at the request of the
25   Government; is that right?
```

```
 1    A.   Yes, sir.
 2    Q.   Okay.  Did you also run a name for Casi Gomez?
 3    A.   Yes.
 4    Q.   Okay.  And nothing came back?
 5    A.   No.
 6    Q.   Thank you for your time.
 7              MR. GALLIAN:  Pass the witness, Judge.
 8              THE COURT:  All right.
 9                     CROSS-EXAMINATION
10    BY MR. WESTFALL:
11    Q.   Hello.  I'm Greg Westfall.  We met briefly.
12    A.   Yes, sir.
13    Q.   When the Government asked you to run names for Enterprise,
14    did they ask you to run the name Joseph DeLeon?
15    A.   That does not ring a bell.
16    Q.   Okay.  Thank you.
17              (Pause)
18              MS. RUDOFF:  Nothing further from the Government.
19              May the witness be excused?
20              THE COURT:  Any objection?
21              MR. GALLIAN:  No objection.
22              MR. WESTFALL:  No objection, Your Honor.
23              THE COURT:  All right.  Thank you for coming.
24              THE WITNESS:  Thank you.
25              THE COURT:  It was short, but we enjoyed having you.
```

```
 1                    (Pause)
 2                    MS. MAX:  The Government calls Ranger Danny Briley.
 3                    THE COURT:  All right.
 4                    (Pause)
 5                    THE COURT:  Welcome to our labyrinth, Ranger.  Good
 6     to have you here.
 7                    THE WITNESS:  Thank you.
 8                    THE COURT:  If you will have a seat, get comfortable.
 9                    Once you have, let's test out your mic.
10                    How are you today?
11                    THE WITNESS:  I'm great.  Thank you.
12                    THE COURT:  Good.  Glad to have you here.
13                    THE WITNESS:  Thank you, Judge.
14                    THE COURT:  If you don't mind, just say your name
15     into the microphone.
16                    THE WITNESS:  My name is Danny Briley.
17                    THE COURT:  Okay.  And can y'all hear that okay?
18                    All right.  My court reporter will swear you in.
19                    (Witness sworn)
20                    THE COURT:  All right.  Glad to have you here.
21                    Your witness.
22                    MS. MAX:  Thank you, Your Honor.
23
24
25
```

```
 1              DANNY BRILEY, GOVERNMENT'S WITNESS, SWORN
 2                          DIRECT EXAMINATION
 3    BY MS. MAX:
 4    Q.   Ranger Briley, what do you do for a living?
 5    A.   I'm a Texas Ranger employed by the Department of Public
 6    Safety.
 7    Q.   And how long have you been a Texas Ranger?
 8    A.   16 years, eight months.
 9    Q.   Tell the jury a little bit about -- how do the Texas
10    Rangers operate in the sense of their jurisdiction with
11    criminal cases?
12    A.   So we have statewide jurisdiction.  And the way that we're
13    networked in or plugged in to cases is we work major crimes.
14    We assist the local, state, and federal agencies with major
15    crimes, such as murder, rape, robbery, whatever the major crime
16    may be.
17    Q.   And where is your home office?
18    A.   My home office is Stephenville, Texas.
19    Q.   And was that your home office back in 2019?
20    A.   Yes, ma'am.
21    Q.   And how many counties do you cover?
22    A.   Currently I cover 42 counties.
23    Q.   And tell the jury a little bit about some of the
24    investigations that you've worked in your career.
25    A.   Well, primarily homicide, murders is what I typically
```

1    work.  I have worked corruption cases as well.  I have worked

2    pretty much most any violent crime or won't say every financial

3    crime.  I never have liked financial crimes.  But mostly

4    murder.

5    Q.   Is that probably a pretty common sentiment among Texas

6    Rangers, not liking financial crimes?

7    A.   Absolutely.

8    Q.   You mentioned that you've worked many a murder

9    investigation?

10   A.   Yes, ma'am.

11   Q.   Did you work the Chris Kyle murder investigation?

12   A.   Yes, ma'am, I did.

13   Q.   In fact, were you the lead investigator on that case?

14   A.   Yes, I was.

15   Q.   Tell the jury a little bit about what you did before

16   becoming a Texas Ranger.

17   A.   Before Texas Ranger, I was a Texas State Trooper.  I was

18   10 -- 10 and a half years as a Highway Patrol, promoted in that

19   division as a Highway Patrol sergeant before becoming a Texas

20   Ranger.

21        And prior to that, I went to college, got a degree in

22   criminal justice from Tarleton State University.

23   Q.   Are you a master peace officer?

24   A.   Yes, ma'am, I am.

25   Q.   And explain to the jury what that designation means.

```
1    A.   Essentially, I have the -- all the hours that are required
2    to meet the criteria of a master peace officer.  That's because
3    of my college and my training in both Highway Patrol and Texas
4    Rangers.
5    Q.   Ranger Briley, would you like a bottle of water?
6    A.   Yes, please.
7              MS. MAX:  May I approach, Your Honor?
8              THE COURT:  Of course.
9              (Pause)
10             THE COURT:  And feel free to take a moment, sir.
11   We're not in a hurry.
12             THE WITNESS:  Okay.  Thanks.
13             (Pause)
14   BY MS. MAX:
15   Q.   Ranger Briley, back in July of 2019, did you become
16   involved with a criminal complaint involving a William Stone?
17   A.   Yes, ma'am, I did.
18   Q.   Okay.  Let's talk about how that started.
19             Did it first begin with you by receiving a call from
20   the Hood County D.A., Ryan Sinclair?
21   A.   Yes, it did.
22   Q.   Is that common or uncommon for you to get a call directly
23   from a District Attorney about a potential case?
24   A.   It's common.
25   Q.   And why is that?
```

1   A.   That's another entity that we're obviously tied into, and

2   they often call us for any major crime or help with a case.

3   Q.   And is it even more common to get calls like that from

4   smaller counties?

5   A.   Yes.

6   Q.   And why is that?

7   A.   Typically, they don't have the resources or the experience

8   or the training, so that's where we provide the help.

9   Q.   And tell me a little bit, what was the call that you got

10  from Ryan -- D.A. Ryan Sinclair that night?

11  A.   He called and stated that there was a female by the name

12  of Casi Thompson that he wanted me to call.  It was on a

13  weekend, which was a bit odd, because it was like 10:30 at

14  night that he's calling me.  He wanted me to call her.  He

15  stated that there was a relationship between him and an FBI

16  agent and that there was some type of scheme or fraudulent

17  conduct behind it.  He wanted me to call her and try to set up

18  a time to meet with her and talk about the situation.

19          There was some discussion about probation, which

20  obviously it was a short call, didn't quite understand it all,

21  but at his request I called Casi Thompson that evening.

22  Q.   Okay.  Would that have been July 27, 2019?

23  A.   Yes, ma'am.

24  Q.   And based on that phone call with Casi, did you cover a

25  lot of ground, or what was your purpose in calling her that

1  night?

2  A.   I didn't cover much ground.  I didn't cover any ground

3  really with her that night.  I said I understand you want to

4  meet with me.  I gave her a location to meet me, set up that

5  time for the following Monday at 10:00 a.m.

6  Q.   And did you have a meeting with her then that following

7  Monday?

8  A.   Yes, ma'am, I did.

9  Q.   And was that July 29th?

10  A.   Yes, it was.

11  Q.   And at that meeting did you -- prior to that meeting had

12  you talked to Penny Weisend?

13  A.   No, ma'am, not prior to that meeting.  I knew her.

14  Q.   How do you know Penny Weisend?

15  A.   She is a secretary to a district judge in that -- in Hood

16  County where Casi Thompson was from, so I knew Penny through

17  the judge's office.

18  Q.   So you knew that Penny was in some way associated with

19  Casi Thompson, correct?

20  A.   Yes, ma'am.

21  Q.   Did that association and the fact that you already knew

22  Penny Weisend previously, did that have any influence on you

23  taking such a quick meeting with Casi Thompson or taking a

24  meeting at all?

25  A.   No, ma'am.  It was really the District Attorney urging me

1    to do that, that that's the reason I set up the meeting to do
2    it.
3    Q.   Going into that meeting, so you said the D.A. has
4    referenced to you there is some sort of fraud or scheme,
5    correct?
6    A.   Yes, ma'am.
7    Q.   But you haven't really asked Casi Thompson any information
8    before the meeting?
9    A.   That's correct.
10   Q.   Okay.  So do you go into that meeting with any set agenda?
11   A.   No, ma'am.
12   Q.   And why not?
13   A.   Like, I have a number of cases at any given time.  So when
14   someone comes to me to meet, there's nothing for me to think
15   about until I hear from that person.
16   Q.   Did that meeting on July 29, 2019, did that take place at
17   the Granbury courthouse?
18   A.   Yes, ma'am, it did.
19   Q.   And was Casi Thompson present along with Penny Weisend and
20   her mother?
21   A.   Yes, she was.
22   Q.   Okay.  Did Penny and her mom stay for a portion of the
23   meeting and then left?
24   A.   Yes, ma'am.
25   Q.   Okay.  Talk to the jury about how Casi Thompson presented

1   to you on that day.  What was her demeanor?  Let's start with
2   that.
3   A.   Her demeanor was one of very much fear.  She's very
4   scared, very nervous to even be there and to be talking to me
5   as far as what I could see in her demeanor.
6   Q.   Okay.  Tell the jury what she told you that day.
7   A.   Well, it was a lot.  She was there for quite a while.  She
8   told me that her big thing was, I want to know if I'm on
9   probation.  She said, I have been on this secret probation.  I
10  want to know, you know, am I still on it, in a very scared --
11  you know, she expressed fear and scare -- she was scared to be
12  telling me or asking me this.
13          And so from there, I sort of tried to ask her to
14  explore -- tell me more what's going on.  And from there she
15  gave me this story of -- that there's a person by the name of
16  Bill Stone and a person by the name of Joseph DeLeon, they were
17  probation officers, but Bill Stone was previously an FBI agent,
18  but now she believes that he's, you know, currently CIA and
19  that she's been on this probation for several years.
20          She started telling me the terms of this probation.
21  She talked about some financial parts of it.
22          It was just a quite bizarre story unlike anything I
23  had heard in my time.
24  Q.   So a few things.  When you say he said he was currently
25  on -- currently CIA, do you mean current as to the time of that

1  meeting?

2  A.   That's correct.

3  Q.   That was her understanding at that time in July of 2019?

4  A.   Yes, ma'am.

5  Q.   Okay.  But she had referenced that she had previously

6  believed he was an FBI agent?

7  A.   Yes, ma'am.

8  Q.   Okay.  And you mentioned that she had -- she told you

9  there was a financial component to this probation?

10  A.   Yes, ma'am.

11  Q.   As you're asking her -- are you asking her questions, or

12  are you just giving her a real broad arena for her just to tell

13  you what's in your mind?

14  A.   Yeah, I'm not asking many questions whatsoever.  Even now,

15  I would be curious to know how many questions I actually asked.

16  Probably not many.  But it was -- that's quite typical of how I

17  interview, is just listen.  And so it was more her talking and

18  me trying to absorb the story.

19  Q.   Did you record this interview?

20  A.   Yes, ma'am.

21  Q.   Okay.  And let's just get this out of the way.  You've

22  recorded a lot of interviews in this investigation; is that

23  right?

24  A.   Yes, ma'am.

25  Q.   Hours upon hours upon hours of interviews?

```
 1   A.   Yes.
 2   Q.   First of all, were you under any legal obligation to have
 3   to record Casi Thompson's interview or any of the subsequent
 4   interviews we're talking about?
 5   A.   No, ma'am.
 6   Q.   So why do you record them?
 7   A.   It's evidence.  It's where I can go back and reflect and
 8   make sure I've understood what this person has told me.  It's
 9   the way that I'm able to know what the truth is so I can
10   deliver it here.
11   Q.   I'm assuming certainly you get many things from recordings
12   that are of value to your investigation, correct?
13   A.   Yes.
14   Q.   And I'm also assuming that you probably end up getting a
15   lot of things that you record that you deem that aren't really
16   of value to the investigation as well?
17   A.   Absolutely.
18   Q.   Okay.  And when we talk about recording, are we talking
19   about audio, video, or both?  What do you primarily do?
20   A.   So I always have a digital recorder.  When I'm recording,
21   that's what I use.
22   Q.   And you're saying -- so an audio recording?
23   A.   Yes, ma'am.  Sorry.
24   Q.   Now, you said that Casi's biggest concern to you in this
25   meeting seemed to be, am I still on probation?
```

```
 1   A.   Yes, ma'am.
 2   Q.   So did you feel like she was coming to you to make a
 3   criminal complaint?
 4   A.   No, ma'am.
 5   Q.   Did you really talk to her about crimes?
 6   A.   I heard crimes from her, but I didn't really talk about
 7   crimes with her.
 8   Q.   Okay.  You didn't lay out like particular offenses?
 9   A.   No, ma'am.
10   Q.   Or what the elements of those offenses would be?
11   A.   No.  That's correct.  I did not.
12   Q.   You said it was a pretty long interview, correct?
13   A.   Yes, ma'am.
14   Q.   Okay.  Would it surprise you to know that in that
15   interview I think the word "crime" only came up like three
16   times?
17   A.   No, it would not surprise me.
18   Q.   Okay.  So she's not telling you a story, and you're not
19   filling in the blanks to her telling her, oh, this sounds like
20   false impersonation, this sounds like fraud?
21   A.   Yes.  It would be a waste of my time to ask that of her.
22   Q.   And, in fact, did you get the feeling that she was making
23   a criminal complaint to you that day?
24   A.   No, ma'am, I did not get that feeling.
25   Q.   Okay.  And, I guess, explain to the jury what that means
```

```
 1   when we say that somebody is coming to you making a criminal
 2   complaint.  What is somebody asking you to do?
 3   A.   When someone is coming to me with a complaint, they're
 4   wanting something judicial to happen, some kind of consequence
 5   to what has occurred.  In this instance, it wasn't I'm seeking
 6   consequence, it was I want to know if I'm still on this
 7   probation.
 8   Q.   Okay.  So it wasn't necessarily I'm coming to get Bill
 9   Stone in trouble?
10   A.   Correct.
11   Q.   Okay.  It's I'm coming to you wanting you to possibly
12   answer this question for me, am I still on probation?
13   A.   Yes, ma'am.
14   Q.   And you said that the story seemed bizarre to you?
15   A.   Yes, ma'am.
16   Q.   Okay.  As Casi Thompson presented herself to you, did you
17   form an opinion as to whether she believed that the secret
18   probation was real?
19   A.   Yes, I did.
20   Q.   And what was that opinion?
21   A.   I definitely believe that she believed it was real, and I
22   was going to test that.
23   Q.   Okay.  What was -- so when you say bizarre -- were you
24   skeptical of the story?
25   A.   It was so bizarre, I did have some skepticism.
```

1  Q.   Okay.  Is that directed at the way Casi Thompson was

2  presenting to you, or is it directed at literally the facts of

3  the story that she's telling you?

4  A.   The facts of the story.

5  Q.   Okay.  And so you had mentioned that you had believed that

6  Casi Thompson truly believed that she was on secret probation,

7  but you just mentioned you had a way to test that?

8  A.   Yes, ma'am.

9  Q.   And what was that?

10  A.   Well, of course, I'm recording.  And I know that if I meet

11  with her on other occasions I'm going to be recording.  But one

12  of the bigger ways or the over-looming way I would be

13  determining her credibility in this being true is through

14  conducting controlled phone calls, validating or invalidating

15  her story, her -- what she has said, in addition to other

16  investigative steps that would prove or disprove the facts.

17  Q.   And in that meeting, did you learn quite a bit about Casi

18  Thompson's past?

19  A.   Yes, ma'am.

20  Q.   She tell you about her meth addiction?

21  A.   Yes.

22  Q.   Her grandmother dying?

23  A.   Yes, ma'am.

24  Q.   Things that -- the scheme that she was telling you about

25  started the night of her grandmother's funeral?

```
 1   A.   Yes, ma'am.
 2   Q.   Okay.  She tell -- did she tell you some facts about the
 3   secret probation itself, such as what were her requirements?
 4   A.   Yes, ma'am, she did.
 5   Q.   Okay.  Did she mention the fact that she had to fill out
 6   daily 3x5 cards?
 7   A.   She did.
 8   Q.   Did she mention that she had to turn over a list of
 9   assets?
10   A.   Yes, ma'am.
11   Q.   Now, we talked about the fact that you didn't talk to Casi
12   Thompson about, you know, what criminal offenses may exist, but
13   based upon what you were hearing, if in fact what she was
14   telling you was true, were you seeing at this point that there
15   could have been potential crimes that had been committed?
16   A.   Yes, ma'am.
17   Q.   Okay.  Now, you're not a -- you've never been a probation
18   officer, correct?
19   A.   Correct.
20   Q.   But you are familiar with probation as part of the
21   criminal justice system; is that correct?
22   A.   Yes, ma'am.
23   Q.   Is it fair to say there were many aspects of what she was
24   telling you that were completely inconsistent with what you
25   knew about any probation that you had ever heard of?
```

```
 1   A.   Yes, ma'am.
 2   Q.   Okay.  Now, you had mentioned that Casi Thompson's
 3   demeanor was one of fear because she was talking to you.  Did
 4   she explain why she was scared for you to learn this
 5   information?
 6   A.   Yes, ma'am.  She expressed to me that there was just this
 7   tremendous amount of surveillance that was always occurring
 8   with regard to any phone conversation, any contact she would
 9   have with anyone, and then all these terms of this probation
10   that she explained was the reason that she had so much fear.
11   At least that's what I gathered from hearing her.
12   Q.   Did she express any fear in the fact that you would now
13   know about the secret probation?
14   A.   Yes, ma'am.
15   Q.   Was this something that wasn't supposed to be shared?
16   A.   Yeah, definitely not supposed to be shared.  And she
17   didn't know, like, hierarchy-wise -- she was concerned, like,
18   where I had -- what powers I had in comparison to the FBI.
19   Q.   So you're talking about she's comparing your role as a
20   Texas Ranger versus the secret probation that she has within
21   the FBI, so maybe you're not powerful at all in terms of her
22   secret probation?
23   A.   Yes, ma'am.
24   Q.   Okay.  Did you feel she was forthcoming with the
25   information you asked her, besides the fact she's reluctant to
```

```
1   tell you that day?  When you did ask her any questions, did you
2   feel like she was forthcoming?
3   A.   Yes, she was -- she was forthcoming.
4   Q.   Okay.  And did you feel like the facts that she was
5   reporting to you came to her -- readily available to her?  She
6   was able to be an accurate reporter to you?
7   A.   Yes, ma'am.
8   Q.   Okay.  So you've got somebody that's come to you.  They're
9   not really telling you they want you to open a criminal
10  investigation.  They've told you this, in your words, bizarre
11  story.  What do you do next?
12  A.   Well, this -- you know, it was so bizarre that I remember
13  going home that day thinking, you know, what do I do with this?
14  This is way out there.
15           So the next day I was still kind of going through it
16  in my head.  And so she calls me the next day and --
17  Q.   She being Casi?
18  A.   Yes, ma'am.
19  Q.   Sorry.
20  A.   And she said, hey, are you -- and I had told her, listen,
21  you are not on probation.  I had checked the records, and
22  you're not on probation.
23           But she called that next day asking me, you know, are
24  you sure?
25           And that's when it -- that's when I said, you know,
```

1    come back to my office, let's talk some more.

2    Q.   Okay.  Did you feel like she was going to keep bugging you

3    until you could completely convince her that she was not on a

4    probation?

5    A.   Yes, ma'am.

6    Q.   Okay.  Now, you say you ran a records check.  So after

7    your first meeting, did you try to find out if there was the

8    existence of any type of probation for Casi Thompson?

9    A.   Yes, ma'am.

10   Q.   Okay.  Did you -- were you -- you ran a records check, and

11   were you able to find any existence of a federal probation for

12   her?

13   A.   No, ma'am.

14   Q.   Were you able to find the existence of a Judge Anderson in

15   Austin?

16   A.   No, ma'am.

17   Q.   Were you able to confirm that she had, in fact, previously

18   been on probation in Hood County?

19   A.   Yes, ma'am.

20   Q.   And -- but to be clear, that's not what y'all were ever

21   talking about when she came to you and talked about secret

22   probation?

23   A.   That's correct.  She told me about it, but that wasn't

24   what we were talking about.

25   Q.   Okay.  And did you actually look into that Hood County

```
 1   probation as just part of being thorough?
 2   A.   Yes, ma'am.
 3   Q.   Okay.  And did you come to find out that she had gotten
 4   discharged from that probation after three years due to her
 5   excellent compliance?
 6   A.   Yes, ma'am, I did.
 7   Q.   Okay.  So you didn't find out that there was anything
 8   untoward or sinister or any favors pulled with that Hood County
 9   probation?
10   A.   Correct.  Yes, ma'am.
11   Q.   Okay.  Did you also confirm whether a William Stone or a
12   Joe DeLeon were involved at all with that Hood County
13   probation?
14   A.   I mean, not -- no, not at that time.  I couldn't -- I
15   couldn't confirm if either one of those defendants were
16   involved.
17   Q.   Okay.  Did you confirm whether Bill Stone had ever been
18   with the FBI, was currently with the FBI?
19   A.   So I -- I waited several months.  I mean, I tried to
20   verify through some open source information, but I stayed away
21   from databases that would, you know, potentially be problematic
22   for me.  So I waited until I had contact with the Department of
23   Justice to verify.
24   Q.   Okay.  And you did verify that he had been employed with
25   the FBI but had retired in 2015?
```

```
 1   A.    Yes, ma'am, I did.
 2   Q.    Okay.  And just for a little housekeeping purposes, can
 3   you confirm that Grapevine, Arlington, Colleyville, Granbury,
 4   and Fort Worth are in the Northern District of Texas?
 5   A.    Yes, they are.
 6   Q.    Okay.  Did Casi also at some point in those meetings talk
 7   to you about a phone call that she had gotten from Judge
 8   Anderson's chambers?
 9   A.    I'm sorry, can you repeat that question?
10   Q.    Did Casi in those initial interviews talk to you about the
11   fact that she had gotten this phone call that represented to be
12   coming from a Judge Anderson's chambers?
13   A.    I don't believe I heard about that in the initial phases,
14   but during that investigation I did eventually hear about that
15   from her.
16   Q.    Okay.  During the investigation, did she end up providing
17   you with the phone number that she had received that call from?
18   A.    I found out what the phone number was, but I don't know
19   that I found it out through her directly.
20   Q.    Okay.  Have you -- were you provided with a 512 phone
21   number?
22             THE COURT:  Let me pause you there for just a moment.
23             We need to take our lunch break here in a minute.  So
24   is now a good breaking point for you?
25             MS. MAX:  Sure.
```

1          THE COURT:  Okay.  Great.

2          Ranger, we have kind of an early lunch, and so we'll

3   be in recess until just -- we'll be five minutes after 12:00,

4   if that's all right.

5          All rise for the jury.

6          Thank you so much.  And we'll bring you back in after

7   lunch.

8          (Jury out)

9          THE COURT:  And if I can see the lawyers for just a

10  moment over here.

11         Please be seated.

12         (Bench Conference held off the record)

13         (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2                                                      Further
                  Direct  Cross  Redirect  Recross  Redirect
3
     WITNESSES FOR THE
4    GOVERNMENT

5    DON STONER            22      42,48     50

6    COURTNEY CALLOWAY     52      73,77     79       79

7    AARON SULLIVAN        82

8    TIMOTHY KNAPP         91     101,106

9    DANNY BRILEY         108

10
     GOVERNMENT'S EXHIBITS                            Received
11
         59   DPS search inventory log                  22
12
         92   Stone 2015 Day Minder calendar            36
13
         93   Stone 2016 Cambridge calendar             27
14
         94   Stone 2017 At-A-Glance calendar           31
15
         95   Stone 2018 Mead calendar                  31
16
         96   Stone 2019 At-A-Glance calendar           27
17
         97   Stone 2020 At-A-Glance calendar           27
18
         98   Stone 2020 Weekly Monthly Planner         31
19
         99   Envelope                                  40
20
         99A  Stone's FBI credentials                   40
21
         99B  Stone's FBI credentials                   40
22
         99C  Stone's FBI credentials                   40
23
        106   U.S. Customs and Border Protection records  84
24            regarding stone

25
```

Todd Anderson, RMR, CRR      (214) 753-2170

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 2nd day of August, 2023.

7

8

9
                                /s/Todd Anderson
10                              TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25