```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF TEXAS

 3                        DALLAS DIVISION

 4
       UNITED STATES OF AMERICA,     )    3:21-CR-236-E(2)
 5                                    )
            GOVERNMENT,               )
 6                                    )
       V.                             )    DALLAS, TEXAS
 7                                    )
       WILLIAM ROY STONE, JOSEPH      )
 8     DELEON                         )
                                      )
 9          DEFENDANTS.               )    AUGUST 2, 2023

10

11

12

13

14

15                -----------------------------

16                     TRANSCRIPT OF

17                      JURY TRIAL

18                      VOLUME 7B

19            BEFORE THE HONORABLE ADA E. BROWN

20               UNITED STATES DISTRICT JUDGE

21                -----------------------------

22

23

24

25
```

1                              A P P E A R A N C E S

2       FOR THE GOVERNMENT:

3            Jenna Danelle Rudoff
             US Department of Justice
4            1100 Commerce St
             3rd Floor
5            Dallas, TX 75242
             214-659-8600
6            Fax: 214-659-8500
             Email: Jenna.rudoff@usdoj.gov
7
             Donna S Max
8            US Attorney's office for Northern
             District of Texas
9            1100 Commerce Street
             Third Floor
10           Dallas, TX 75242-1699
             214-659-8664
11           Email: Donna.max@usdoj.gov

12           Marcus J Busch
             US Attorney's Office
13           1100 Commerce St
             Suite 300
14           Dallas, TX 75242
             214-659-8642
15           Fax: 214-659-8809
             Email: Marcus.busch@usdoj.gov
16

17      FOR THE DEFENDANT WILLIAM ROY STONE:

18           Gregg Gallian
             Gallian Firm
19           Parkside Tower
             3500 Maple Ave
20           Suite 720
             Dallas, TX 75219
21           214-432-8860
             Email: Gregg@gallianfirm.com
22
             Jaclyn Annette Gallian
23           Bryan Cave Leighton Paisner
             2200 Ross Avenue
24           Ste 4200w
             Dallas, TX 75201
25           214-721-8058
             Email: Jaclyn.gallian@bclplaw.com

```
1   FOR THE DEFENDANT JOSEPH DELEON:

2        Greg Westfall
         Westfall Sellers
3        1612 Summit Avenue
         Suite 200
4        Fort Worth, TX 76102
         817-928-4222
5        Fax: 817-385-6715
         Email: Greg@westfallsellers.com
6
         Frank Sellers
7        Westfall Sellers
         1612 Summit Avenue
8        Suite 200
         Fort Worth, TX 76102
9        817-928-4222
         Fax: 817-385-6715
10       Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C H R O N O L O G I C A L   I N D E X

August 2, 2023                                          PAGE

Appearances........................................................2

Proceedings........................................................6

W I T N E S S   I N D E X

| GOVERNMENT | DIRECT | VOIR DIRE | CROSS |
|---|---|---|---|
| Danny Briley | 6 | -- | -- |

Court in Recess....................................108

Reporter's Certificate.............................109

```
 1                    E X H I B I T   I N D E X

 2
       GOVERNMENT:
 3
       NO.   DESCRIPTION                        OFFERED/ADMITTED
 4
       7     Drawing...................................40/40
 5     65    Transcript of Recording...................18/18
       66    Audio Recording...........................18/18
 6     69    Transcript of Recording...................22/22
       70    Audio Recording...........................22/22
 7     73    Audio Recording...........................74/74
       74    Transcript of Recording...................74/74
 8     79    Audio Recording...........................79/80
       80    Transcript of Recording...................79/80
 9     83    Audio Recording...........................58/59
       84    Transcript of Recording...................58/59
10     141   Audio Recording...........................12/12
       142   Transcript of Recording...................12/12
11     143   Audio Recording...........................15/15
       144   Transcript of Recording...................15/15
12     153   Audio Recording...........................80/81
       156   Summary Chart.............................23/23
13     168   Transcript of Recording...................80/81
       174   Audio Recording...........................45/45
14     175   Audio Recording...........................48/48
       176   Audio Recording...........................87/87
15     177   Audio Recording...........................87/87
       178   Audio Recording...........................67/67
16     179   Audio Recording...........................73/73
       180   Audio Recording...........................93/93
17     181   Audio Recording...........................93/94
       182   Audio Recording...........................39/39
18     190   Audio Recording...........................50/50
       191   Audio Recording...........................96/96
19
                         *  *  *  *  *
20

21

22

23

24

25
```

1          (P R O C E E D I N G S)

2          (Jurors enter courtroom.)

3          THE COURT:  With that said, your witness.

4                    <u>DANNY BRILEY,</u>

5   having been previously sworn, testified as follows:

6              <u>DIRECT EXAMINATION CONTINUED</u>

7   <u>BY MS. MAX:</u>

8        Q.   Picking back up where we were before lunch, now, you

9   had mentioned that you had looked in databases to confirm

10  whether Bill Stone was an FBI agent; active, retired, whatnot,

11  and you had mentioned that there was kind of -- you limited

12  your search because you didn't want things to be problematic.

13  Can you just explain to the jury what you meant by that?

14       A.   Yeah.  Basically, you know, in the initial stages, I

15  don't know if what I've been told is actually true.  So the

16  last thing I want to do is have another agency upset that I'm

17  querying one of their people.  So there's some confirmation I

18  need to have before I take those steps.

19       Q.   Okay.  But later on throughout the course of the

20  investigation, you were, in fact, able to confirm his FBI

21  employment and retirement?

22       A.   Yes, ma'am.

23       Q.   Okay.  And then we had mentioned that you were

24  provided a phone number that was attached to a spoof call that

25  Casi Thompson received, correct?

1    A.    Yes, ma'am.

2    Q.    And was that a (512) 845-9244 number?

3    A.    Yes, it was.

4    Q.    And did you find out what that number goes to?

5    A.    Yes, I did.

6    Q.    And what is it?

7    A.    The Tarrant County District Judge's office in Austin.

8    Q.    And you said Tarrant; did you mean Travis?

9    A.    I'm sorry.  Yes, I meant Travis; yes.

10    Q.    Okay.  So at the beginning of your investigation,

11  when you are saying, I've got this bizarre story, I'm checking

12  things out, did you find anything that would have confirmed the

13  existence of a secret probation?

14    A.    No, ma'am.

15    Q.    Okay.  Now, you met with Casi Thompson again on

16  August 1st, 2019, correct?

17    A.    Yes, ma'am.

18    Q.    Now, it sounds like you have met with her on

19  the 29th; you spoke with her on the 30th; you are meeting with

20  her again on the 1st.  Is this moving relatively quickly, the

21  pace of this investigation for you?

22    A.    I'm starting to get moving on it, I would say, yeah.

23    Q.    Is -- was her sense -- did she have a sense of

24  urgency about you moving on it?

25    A.    I would say everything was still, for her, centered

1   around the whole, am I on probation.

2        Q.   Right.  And so as you had testified earlier, that

3   was -- that was the number-one thing she was asking you to do,

4   was confirm the existence of this probation, correct?

5        A.   Yes, ma'am.

6        Q.   And did Casi seem to have a sense of urgency in

7   wanting you to give her that answer?

8        A.   Yes, ma'am.

9        Q.   Okay.  Now, when you met on August 1st, 2019, with

10  Casi, did you talk about the fact that you would like her to

11  make some phone calls?

12       A.   Yes, ma'am.

13       Q.   Who did you tell her you'd like her to talk to?

14       A.   Bill Stone.

15       Q.   Okay.  And you refer to these in law enforcement as

16  controlled calls?

17       A.   Yes, ma'am.

18       Q.   Okay.  Just kind of explain to the jury what you told

19  Casi that day in terms of how y'all were going about doing

20  this.  What was the plan?

21       A.   So the plan was to contact Defendant Stone with

22  her -- with a cell phone -- to use her phone number, with her

23  cell phone, and the call would be recorded.  I gave her themes

24  to talk about; such as, let's talk about this secret probation

25  with him, let's have a normal -- whatever a normal conversation

1   is, and let's -- let's talk about that.  Let's talk about what

2   the issue is at present; which at that time it was regarding

3   permission slips to fly out to, like, New Mexico.

4             So I -- just basic, general theme so that I

5   could confirm this is really happening and can be confirmed

6   from Bill Stone.

7   Q.    Now, okay, so that was covering kind of the content

8   of the calls you were hoping for.  What was the procedure with

9   which she would go about recording these calls?

10  A.    Okay.  Procedurally, she would use her cell phone at

11  all times.  She would record these calls on another -- a

12  different cell phone device, which had essentially a voice memo

13  that is on any iPhone, and just record that call with --

14  with it.

15            So in other words, she would use her cell phone,

16  put it on speaker phone, hit the record on the other phone and

17  capture every call that is -- that occurs.

18  Q.    Did you have the expectation -- was she to do this in

19  your presence?

20  A.    Some calls were in my presence, some were not.

21  Q.    And when you mentioned using another phone, did you

22  have knowledge that she had a phone that was belonging to Penny

23  Weisend?

24  A.    Yes, I did.

25  Q.    And is that what Casi ended up using to record the

1  phone conversation that she was having?

2       A.   Yes.

3       Q.   Okay.  So she was making the calls from her number

4  that Stone would recognize?

5       A.   Yes, ma'am.

6       Q.   And using Penny's to record.  Is there anything -- in

7  Texas, does it just require one person to have knowledge that a

8  phone call's being recorded to be legal?

9       A.   That's correct.

10      Q.   So is this -- making controlled calls, is this

11  something that you've used often in your law enforcement

12  career's investigations?

13      A.   Frequent, yes.

14      Q.   Okay.  What was -- when you approached Casi about

15  making controlled calls, what was her attitude to you about

16  doing it?

17      A.   Cooperative.  She was willing to do that.  I think

18  she was wanting to confirm on -- herself what's true.

19      Q.   In the beginning, did you tell her she needed to

20  record every single call with Stone?

21      A.   Yes.

22      Q.   Did you have the expectation that she would end up

23  recording every single call with Stone?

24      A.   No.

25      Q.   Why not?

1        A.   Well, I've been -- I've -- in my experience, I've

2   worked with a lot of cooperating witnesses, cooperating

3   sources, many, many times.  And it's very rare that everyone

4   does everything you want them do, you tell them do,

5   100 percent.

6        Q.   Okay.  Did you have any -- did you tell her how many

7   times she needed to reach out to Stone on a given day or -- or

8   week and try to record a call?

9        A.   No, ma'am.

10       Q.   And were there specific instructions that it could

11  only be incoming calls, outgoing calls to him, anything like

12  that?

13       A.   You know, of course, if he's calling, I wanted her to

14  record those incoming calls.  I wanted the frequency to be

15  basically organic, if that makes sense, to where it's just kind

16  of a natural flow of communication.

17       Q.   Okay.  And is it safe to say that Casi Thompson made

18  a lot of recorded calls in August of 2019 to Bill Stone; is

19  that correct?

20       A.   Yes, ma'am.

21       Q.   Okay.  The calls were always centering around

22  discussions of the secret probation for the most part, correct?

23       A.   Yes, ma'am.

24       Q.   And did she -- so you met with her on August 1st to

25  discuss making the controlled calls.  And did she, in fact,

1    make her first recording with Stone on August 2nd?

2         A.    Yes, ma'am.

3         Q.    Okay.  And did she make another recording with Bill

4    Stone on August 1st -- August 4th, 2019?

5         A.    Yes, ma'am.

6                    MS. MAX:  At this time, State moves to admit

7    Government's Exhibit 141 and accompanying transcript 142.

8                    THE COURT:  Any objection?

9                    MS. MAX:  Correction, Your Honor --

10                   MR. SELLERS:  The State --

11                   MS. MAX:  Old habits die hard, Your Honor.  The

12   Government moves to admit.

13                   MR. GALLIAN:  No objection.

14                   THE COURT:  All right.  The government's exhibit

15   is admitted.

16                   MS. MAX:  Thank you, Your Honor.  Permission to

17   publish at timestamp 12:50.

18                   THE COURT:  Granted.

19                   (Technical interruption.)

20                   (Jurors exit courtroom.)

21                   (Brief recess.)

22                   (Jurors enter courtroom.)

23                   THE COURT:  Your witness, ma'am.

24                   MS. MAX:  Thank you, Your Honor.  We would like

25   to publish Government's Exhibit 141, with accompanying

1    transcript 152; timestamp 12:50 to 15:05.

2                    (Audio playing.)

3         Q.    Ranger Briley, there was reference in the clip that I

4    played that Casi recorded on August 4th at -- talking about a

5    Dr. B.  Did you come to learn who Dr. B was?

6         A.    Yes, ma'am.

7         Q.    And who -- according to Casi, who was Dr. B?

8         A.    A doctor that he often talked about, he himself

9    having a relationship with.  And he was also, via through him,

10   a doctor as well for her, and helping as they -- their

11   relationship moved forward.

12        Q.    Earlier we had talked about the fact that when you

13   first met with Casi, you didn't go through with her any

14   potential criminal offenses that may have occurred.  At the

15   point that you have her make these controlled calls, have you

16   talked to her about specific crimes or what the elements of

17   those crimes may be?

18        A.    No, I didn't talk to her about crimes, you know.  I

19   did at some point say that, you know, if this probation is not

20   real, it's criminal.  But I didn't get into specific offenses

21   with her.

22        Q.    So you weren't telling her, say this exact thing

23   on -- or try to get, you know, Stone to agree or disagree with

24   some exact statement on a phone call, because that would help

25   satisfy certain elements of a crime?

1          A.    Correct.

2          Q.    Okay.  You didn't tell her to talk about one specific

3     thing in particular, because maybe you knew that that was an

4     aspect of helping to satisfy a crime?

5          A.    I -- my goal was to find out what the truth was.  And

6     so there was probably four to five core questions that I stayed

7     with.  And then the rest of the information that would be

8     gathered would be what she would obtain by just communication

9     with him.

10         Q.    And generally, what were the core questions, or the

11    gist of them?

12         A.    The gist of it was, am I on probation, am I not.  If

13    I am, when I do get off?  What about this character, Dr. Bryan;

14    what about that character.  All the various characters that

15    came about, you know, where they -- what -- the story behind

16    that.  There were questions structured along the lines of

17    financial aspects as well, moving forward.  Permission slips,

18    3x5 cards, status of those.  Who's doing the 3x5 cards.  Those

19    kinds of core questions.

20         Q.    At this point in early August, I mean, this is

21    just -- a few days, a week after she's first initially talked

22    to you and she's doing these controlled calls.  Have you

23    gathered any sort of bank records for Casi or from Casi?

24         A.    No, ma'am.

25         Q.    Have you reviewed any financial records with her?

1      A.    No, ma'am.

2      Q.    On August 8th, 2019, did Casi make a recording with

3   Bill Stone at your direction, a controlled call?

4      A.    What was the date again?

5      Q.    August 8th.

6      A.    Yes, ma'am.

7            MS. MAX:  At this time Government moves to admit

8   Government's Exhibit 143, and accompanying transcript 144.

9            MR. GALLIAN:  No objection.

10            MR. WESTFALL:  No objection, Your Honor.

11            THE COURT:  Admitted.

12            MS. MAX:  Permission to publish?

13            THE COURT:  Granted.

14            MS. MAX:  14:08 to 15:35.

15            (Audio playing.)

16      Q.    At that point in the investigation, had you learned

17   that there had been money given to both Bill Stone and

18   Joe DeLeon by Casi Thompson?

19      A.    Yes, ma'am.

20      Q.    Okay.  And property, in the form of vehicles and a

21   house?

22      A.    Yes, ma'am.

23      Q.    To one or both?

24      A.    Yes.

25      Q.    Okay.  Did Casi Thompson also make recorded calls for

1    you with Bill Stone on August 11th, August 12th, and

2    August 15th of 2019?

3          A.   Yes, ma'am.

4          Q.   Now, you had an interview with Casi Thompson again on

5    August 16th, 2019; is that correct?

6          A.   Yes.

7          Q.   What was the purpose of the interview at that point?

8          A.   I would have to --

9          Q.   Well, let me ask you this.  Can I ask --

10         A.   Yeah.

11         Q.   -- I'll withdraw that question.  Let me ask you this.

12   As Casi is making these controlled calls, how is she getting

13   the audio to you?

14         A.   She would meet me and those calls would be

15   transferred over to me.  I would then download them.

16   Oftentimes listen to those in her presence to debrief what

17   happened and give her advice on what to say next time she's in

18   communication with Bill Stone or Joseph DeLeon.

19         Q.   Was that often the purpose of your meetings with Casi

20   from here on out?

21         A.   Yes, every time.

22         Q.   Every time.  So on August 16th, 2019, when you meet

23   with Casi again, is one of the purposes to -- is to get the

24   audio of all of these controlled calls that she's been making?

25         A.   Yes, ma'am.

1      Q.   And on August 16th, did you ask her to make a
2   controlled call to Bill Stone in your presence?
3      A.   Yes.
4      Q.   Okay.  And why did you ask her to do that in your
5   presence?
6      A.   Apparently, for me at that point, there were some
7   questions that I felt probably needed to be answered sooner
8   than later.  And based upon previous information I've heard, I
9   needed those questions answered.
10      Q.   Did Casi have any hesitation in making the controlled
11   calls in your presence?
12      A.   No, ma'am.
13      Q.   Okay.  And as you are getting the audio from Casi,
14   are you listening to it?
15      A.   Yes, ma'am.
16      Q.   Okay.  And what conclusions are you drawing, or how
17   is it driving your investigation at this point?
18      A.   It's -- you know, I -- I'm continually confirming
19   what I've been told from the beginning.  And so the case is --
20   for me, from my standpoint, the criminal offenses are just
21   building.
22      Q.   Once you start getting the audio of some of these
23   controlled calls, and you are able to listen to Bill Stone as
24   well in the calls, does that also drive you to do any
25   independent fact-checking on your own?  Are you gathering

1   records during this point?

2       A.   Yes, ma'am, I do.

3       Q.   Okay.  And is that usually through the subpoena

4   process?

5       A.   Yes, ma'am.

6       Q.   Okay.  Are you getting financial records?

7       A.   Yes, ma'am.

8       Q.   Did Casi Thompson -- Casi Thompson did make another

9   recording with Bill Stone on August 18th, 2019, August 20th,

10  2019, and August 21st, 2019, correct?

11      A.   Yes, ma'am.

12      Q.   Okay.

13           MS. MAX:  And at this time, Government moves to

14  introduce Government's Exhibit 65 and 66, which is the audio

15  recording for August 21st, 2019.

16           MR. WESTFALL:  No objection.

17           MR. GALLIAN:  No objection, Your Honor.

18           THE COURT:  Admitted.

19           MS. GALLIAN:  Permission to publish timestamp

20  6:41 to 8:03?

21           THE COURT:  Granted.

22           (Audio playing.)

23      Q.   Ranger Briley, on the call that we just heard, did

24  you know what the reference to the Enterprise restitution was

25  about?

1          A.    Yes, ma'am.

2          Q.    And what was it?

3          A.    Well, there was -- about the restitution, there was

4    this Enterprise situation in which, according to Casi, she was

5    told she needed to pay 250,000 for -- to Enterprise.  But she'd

6    have to pay Defendant Bill Stone that $250,000; he would handle

7    that restitution charge.  And that's what I understood.  And

8    that is what was being -- the call was about.

9          Q.    So is this call an example of -- well, Casi had

10   previously told you about the $250,000 restitution, correct?

11         A.    Yes, ma'am.

12         Q.    Was that one of those bizarre facts that you heard in

13   the initial telling?

14         A.    For sure.

15         Q.    Once you heard this controlled call, what did it make

16   you feel about that fact?

17         A.    I just -- kind of a "wow," you know, like this is --

18   this is real.  I'm getting some confirmation, so I wonder what

19   else I'm going to find.

20         Q.    Casi Thompson recorded -- or, I'm sorry, you had

21   another interview with Casi Thompson on August 21st, 2019; is

22   that correct?

23         A.    Yes, ma'am.

24         Q.    Okay.  And, again, is this kind of in the heat of

25   y'all doing controlled calls, you getting the audio, you

1    discussing about where to go from there?

2         A.    Yes, ma'am.

3         Q.    And did she make another recording with Bill Stone on

4    August 30th, 2019?

5         A.    Yes, ma'am.

6         Q.    And in that call, did Stone indicate that he was

7    somewhere in the Middle East?

8         A.    Yes, ma'am.

9         Q.    Okay.  Based on what Bill Stone represented in that

10   call, what did you do?

11        A.    Conducted a surveillance.  Actually, I was -- I think

12   on that particular call, I was already actively doing

13   surveillance.  Tried to verify whether he was in the Middle

14   East or actually here -- or rather at his residence.

15        Q.    On August 30th, were you able to confirm if he was in

16   the Middle East or in his residence?

17        A.    Ultimately I confirmed it two ways.  And -- one, by

18   visibly laying eyes on him and knowing that he was not in the

19   Middle East.  And then later by forensic examinations.

20        Q.    And at this point, you'd had multiple interviews with

21   Casi Thompson.  Has she always been consistent with what she's

22   telling you?

23        A.    Yes.

24        Q.    And at this point you have multiple recorded calls.

25   What you were hearing in the calls; was it consistent also with

1   what she had been telling you?

2       A.   Yes.

3       Q.   Starting in September, did you decide to expand the

4   nature of the controlled calls?

5       A.   Yes, ma'am.

6       Q.   On September 3rd, 2019, did you have, once again,

7   another interview with Casi Thompson?

8       A.   Yes, I did.

9       Q.   Okay.  Tell me what y'all discussed at that

10  interview.

11      A.   Well, all this time I was aware of another person

12  involved in this probation; and that being Defendant DeLeon.

13  And so the -- the -- I had reached the point where, let's move

14  from controlled calls from Casi to Defendant DeLeon here to

15  determine what's true and not on that side.

16      Q.   So are you the one that brought the idea up to Casi?

17      A.   Yes, ma'am.

18      Q.   Was she cooperative?

19      A.   Yes.

20      Q.   Okay.  Did she seem to have any hesitation about

21  wanting to do the controlled calls with Defendant DeLeon?

22      A.   No, ma'am.

23      Q.   And in fact, did you ask her to do one right then in

24  the interview?

25      A.   Yes, I did.

1     Q.    And did she do one in your presence?

2     A.    Yes.

3     Q.    Okay.

4           MS. MAX:  Government moves to introduce

5     Government Exhibit 69 and 70, a controlled call from

6     September 3rd, 2019.

7           MR. WESTFALL:  No objection.

8           MR. GALLIAN:  No objection.

9           THE COURT:  Admitted.

10          MS. MAX:  Permission to publish.

11          THE COURT:  Granted.

12          MS. MAX:  Timestamp 9:47 to 10:45.

13          (Audio playing.)

14    Q.    Ranger Briley, just to put us in our fictional

15    timeline, if you will, this is September 3rd, 2019, you had the

16    understanding that Dr. B died at some point in July 2019; is

17    that correct?

18    A.    Yes, ma'am.

19          MS. MAX:  Your Honor, may I approach the

20    witness?

21          THE COURT:  You may.

22          (Documents tendered.)

23    Q.    Ranger Briley, I've handed you what's been marked as

24    Government's Exhibit 156.  Have you reviewed this chart prior

25    to today in court?

 1          A.   Yes, ma'am.

 2          Q.   And are you familiar with the exhibits that underlay

 3    the information that is contained in this chart?

 4          A.   Yes, I am.

 5          Q.   Okay.  And in fact, those exhibits are voluminous in

 6    nature, correct?

 7          A.   Very much so.

 8          Q.   And these charts are a summary of that voluminous

 9    data in a way that is easy for the jury to read and take in,

10    right?

11          A.   Yes, ma'am.

12          Q.   And that summary chart, Government 156, the basis for

13    that is already-admitted Government 26, DeLeon's phone records;

14    35, Stone Verizon records; and Government's Exhibit 37, DeLeon

15    texts, as well as recorded phone calls.

16               MS. MAX:  At this time, Government moves to

17    introduce Government's Exhibit 156.

18               MR. WESTFALL:  No objection.

19               MR. GALLIAN:  Brief moment, Your Honor.

20               THE COURT:  Sure.

21               (Sotto voce discussion.)

22               MR. GALLIAN:  No objection, Your Honor.

23               THE COURT:  All right, admitted.

24               MS. MAX:  Thank you.  Permission to publish?

25               Can we publish 156, page 1?

1            THE COURT:  Granted.

2       Q.   Ranger Briley, let's talk through -- there is a lot

3   to take in in this chart.  Starting at the top, is this page

4   represented for September 3rd, 2019?

5       A.   Yes, ma'am.

6            MS. MAX:  And if we can just zoom in down

7   through the yellow lines.  Can you start at the top and go down

8   through the fifth line?

9       Q.   Using phone records, does this summary show first --

10  starting on September 3rd, 2019, the first line, a 31-minute,

11  18-second phone call where Bill Stone calls Joe DeLeon?

12      A.   Yes, ma'am, it does.

13      Q.   Okay.  And looking to the far left, is that what the

14  local timestamp is, the 9:56?

15      A.   Yes, ma'am.

16      Q.   And that would be a.m., correct?

17      A.   Yes, ma'am.

18      Q.   Okay.  So that morning on September 3rd, we have a

19  31-minute phone call between Stone and DeLeon at approximately

20  10 o'clock in the morning?

21      A.   Yes, ma'am.

22      Q.   The next line is showing a phone call roughly at

23  noon.  Can you tell me who that phone call is between and how

24  long it is?

25      A.   14 minutes, 16 seconds, from Defendant DeLeon to

1  Defendant Stone.

2      Q.    And what happens immediately after that phone call?

3      A.    Meaning the next --

4      Q.    The next line.

5      A.    -- time?  Yeah, at 12:30 -- I'm sorry 12:13,

6  Defendant DeLeon returns a call from Thompson.  The call's

7  recorded by Thompson.

8      Q.    And is that the approximately 21-minute phone call

9  that we just listened -- the jury just listened to a portion

10 of?

11     A.    Correct, yes, ma'am.

12     Q.    So in that portion that we just published to the

13 jury, we had Joe DeLeon telling Casi Thompson that he had not

14 spoken to Bill Stone since back when Dr. B died; is that

15 correct?

16     A.    Yes, ma'am.

17     Q.    And it's your understanding that Dr. B died in July?

18     A.    Yes.

19     Q.    But yet from phone records, we're seeing that Bill

20 Stone and Joe DeLeon had already talked for about 45 minutes on

21 that exact day before that conversation, correct?

22     A.    Correct.

23     Q.    And in fact, doesn't it look like Joe DeLeon has a

24 14-minute phone call with Stone; and once he hangs up, he makes

25 a phone call to Casi?

1      A.   Yes, it does.  Shows that.

2      Q.   Okay.  So in fact, it hadn't been since July that

3   Joe DeLeon had talked to Bill Stone like he told Casi; it had

4   been one minute prior?

5      A.   Yes, ma'am.

6      Q.   Okay.  What happens immediately after the phone call

7   between Casi and Joe DeLeon ends?

8      A.   So it picks up at 12:34 p.m. -- I'm sorry, it ends at

9   12:34 p.m.  At 12:34 p.m., Defendant DeLeon sends a message to

10   Stone.

11              MS. MAX:  Can you zoom in on that lower message?

12      Q.   Now, you've had an opportunity to review the text

13   messages between Joe DeLeon and Bill Stone; is that correct?

14      A.   Yes, ma'am.

15      Q.   And what does this text message say?

16      A.   19.

17      Q.   Do you know what 19 means?

18      A.   I never was -- did decode that to -- to understand

19   it, no.

20      Q.   In reviewing the text messages between Stone and

21   DeLeon, did you often see -- or I shouldn't say often, did you

22   ever see any other instances of DeLeon sending a "19" message

23   to Bill Stone?

24      A.   Yes, I did.

25      Q.   Okay.  And if you want to zoom back out.

```
 1              And just to be clear, that is a message that
 2   DeLeon sends to Stone?
 3        A.    Yes, ma'am.
 4        Q.    Immediately after the phone call with Casi?
 5        A.    Yes, ma'am.
 6        Q.    And in fact, is the rest of this chart, all the other
 7   lines below the yellow portion, are those also calls between
 8   DeLeon and Stone?
 9        A.    Yes, they are.
10        Q.    Okay.  So just for September 3rd, we have a 22-minute
11   call, a 20-second call, a 42-minute call, a 19-minute call, a
12   51-minute call, one hour and eight-minute call, and one minute
13   and 57?
14        A.    Yes, ma'am.
15        Q.    Okay.  So not going to ask you to do math, especially
16   with time.  But approximately three and a half hours of phone
17   calls between Joe DeLeon and Bill Stone on September 3rd?
18        A.    Yes, ma'am.
19        Q.    Okay.  The "19" that we talked about with the text
20   message, that you mentioned seeing at other times within text
21   conversations between Stone and DeLeon, was it usually
22   following some sort of communication or interaction that DeLeon
23   had had with Casi Thompson?
24        A.    Yes, it always was.
25        Q.    At this point in your investigation, did you make
```

1  some determination of how to proceed with Joe DeLeon?

2      A.   Yes, ma'am.

3      Q.   Okay.  And tell the jury what you decided to do.

4      A.   So this was September 3rd.  September 5th I decided

5  to go directly to him and conduct a -- an interview with him to

6  see what his story -- what he's going to say.

7      Q.   Now, why did you reach out to DeLeon as opposed to

8  Defendant Stone?

9      A.   I had assessed through this investigation that of

10  the -- both defendants, this was, in my viewpoint and my

11  experience, the weaker vessel of the two; that I could

12  potentially utilize him in the investigation to gather more

13  truth about what happened.

14      Q.   By approaching DeLeon, did that mean you had ruled

15  him out as a suspect at this point?

16      A.   No, ma'am.

17      Q.   Let's walk through September 5th, 2019.  I think it

18  is safe to say it was a long day for both you and Joe DeLeon;

19  is that correct?

20      A.   Yes, ma'am.

21      Q.   Okay.  Let's start at approximately 10:40 that

22  morning.  Walk the jury through how you made initial contact

23  with Defendant DeLeon.

24      A.   I went directly to his house, knocked on his door.

25  Introduced myself.  Very briefly told him I would like to speak

1  with him.  My intention was maybe to speak with him at his

2  residence; if not there, then at a local agency where I'd have

3  a -- an interview room to speak with him.

4          Q.    Were you able to make contact with him that morning?

5          A.    Yes, I was.

6          Q.    Was he -- did he come to the front door readily?

7          A.    Yes, he did.

8          Q.    Were you identifiable as any type of law enforcement?

9          A.    Yes, ma'am.

10         Q.    In what ways?

11         A.    Pretty much as I'm dressed today.  Official capacity

12  is this way.

13         Q.    Okay.  So you had your ranger badge?

14         A.    Yes, ma'am.

15         Q.    Okay.  Did Defendant DeLeon seem to have any

16  hesitation in wanting to interact with you?

17         A.    No.

18         Q.    Were you able to sit down with him at his house right

19  then and talk?

20         A.    He had dogs barking and such.  And so I didn't need

21  that in the background of my recorder, so I requested that he

22  go to the local police department, to meet me there.

23         Q.    Okay.  Did you tell him why you were there?  I mean,

24  what's kind of your introduction to him?

25         A.    My introduction was quite vague.  I did not tell him

1   why I wanted to speak with him; just that maybe he could help

2   me with something.  And that's where I left it.

3        Q.   Did he actually inquire of you whether or not you

4   were there because one of his neighbors may have done

5   something?

6        A.   He did.

7        Q.   Okay.  So you've invited him to meet you at Fort

8   Worth Police Department?

9        A.   Yes, ma'am.

10        Q.   Does he act cooperative to that?

11        A.   Yes.

12        Q.   Okay.  Do you ask him to come with you right then?

13        A.   I asked him if he could go to that police station at

14   that time, and he said that he could.

15        Q.   Okay.  Did you ask him to ride with you?

16        A.   I offered, as I usually would customarily do, you can

17   ride with me or meet me there; whatever you'd like to do.

18        Q.   Okay.  And he ended up meeting you there about

19   30 minutes later, correct?

20        A.   Yes, ma'am.

21        Q.   Okay.  I think he had indicated to you maybe he

22   wanted to take a quick shower first?

23        A.   He did.

24        Q.   Okay.  So what you are describing is you are planning

25   on hopefully interviewing him in his home, but you made a quick

1  pivot to instead go the Fort Worth Police Department?

2      A.   Yes, ma'am.

3      Q.   Okay.  And same day, you are at the Fort Worth Police

4  Department at approximately 11:30 that morning; is that

5  correct?

6      A.   Yes, ma'am.

7      Q.   Okay.  Now, had Joe DeLeon, right at the start of

8  talking with you, indicated that he had doctors' appointments

9  that day?

10     A.   He did.

11     Q.   Okay.  Did he tell you that he was willing to cancel

12  or miss an appointment that was at noon?

13     A.   Yes.

14     Q.   Okay.  Did he tell you that he had one later on in

15  the afternoon, though, that he did want to try to make?

16     A.   He did.

17     Q.   Okay.  And did you agree to accommodate that?

18     A.   Yes, I did.

19     Q.   Now, where are you at the Fort Worth Police

20  Department?

21     A.   It's what they would call one of their small

22  substations.  I think it's called the West Fort Worth Police

23  Department substation.  There was a -- a room there, an

24  interview room that was utilized.

25     Q.   Okay.  In this room -- did your make a recording that

1    day with your audio handheld recorder?

2          A.   Yes, ma'am, I did.

3          Q.   That is your standard operating procedure that you

4    always do that?

5          A.   Yes, ma'am.

6          Q.   Okay.  The room that you were in, did it also have

7    the capabilities of recording audio and video?

8          A.   Yes, ma'am.  My understanding is that it did.

9          Q.   And at the conclusion of the interview that we're

10   going to get into in just a second, did you ask Fort Worth PD

11   for a copy of whatever they had recorded in that room that day?

12         A.   Yes, ma'am, I did.

13         Q.   Okay.  What did you assume that that recording

14   contained?

15         A.   I assumed that it was -- would be the -- a videotape

16   of our -- you know, our -- excuse me, our interview together.

17         Q.   Okay.  Did you ever view that disc?

18         A.   No, ma'am, I did not.

19         Q.   Did you work off the audio that you had obtained that

20   day?

21         A.   Yes, ma'am, I did.

22         Q.   Do you have any reason to believe that the audio that

23   you made with your handheld recorder is any more or less than

24   what would have been recorded by the audio/video room?

25         A.   No, ma'am.

1    Q.   Okay.  Once you got that video disc, what did you do

2  with it?

3    A.   I put it in our folder with the rest of my file, and

4  held that -- held it there.

5    Q.   At some point during COVID, did you drop the video

6  disc off at the U.S. Attorney's office?

7    A.   Yes, ma'am, I believe so.

8    Q.   Did you give it to a person?

9    A.   No, ma'am.

10    Q.   And why not?

11    A.   Well, it was COVID times, so it was somewhat like --

12  most people may be familiar with -- like kind of like a ghost

13  town coming here.  There was nobody around.  So I left it where

14  I was told to leave it.

15    Q.   Okay.  And have you since come to learn that the

16  video disc is not in the U.S. Attorney's office's possession?

17    A.   Yes, ma'am.

18    Q.   Cannot be found?

19    A.   Yes, ma'am.

20    Q.   Have you made an attempt to go back to the Fort Worth

21  Police Department and get a video of September 3rd?

22    A.   Yes, ma'am.

23    Q.   Okay.  And does that no longer exist?

24    A.   That's correct.

25    Q.   Okay.  And to be clear, when I say "video disc," I'm

1  referring to just a disc that may contain audio and video, but

2  you never confirmed for sure which was on there?

3      A.   That's correct.

4      Q.   Okay.

5           MS. MAX:  At this time, Government would like to

6  introduce Government 171 for record purposes only.

7           THE COURT:  Any objection?

8           MR. WESTFALL:  No objection, Your Honor.

9           MR. GALLIAN:  No objection.

10          THE COURT:  Admitted.

11     Q.   Ranger Briley, was the interview with Joe DeLeon that

12 day three hours and 20 minutes long?

13     A.   Yes, it was.

14     Q.   Did you read him his rights prior to or starting the

15 interview?

16     A.   No, ma'am, I did not.

17     Q.   Explain to the jury why not.

18     A.   He was not in custody.  He was not a -- what we would

19 call a custodial interrogation.

20     Q.   And so because he's not a custodial interrogation,

21 does that mean you do not have to read him his rights?

22     A.   Correct.  He was not under arrest.

23     Q.   Who was present in the room with you and Defendant

24 DeLeon?

25     A.   Only myself and he were present.

1    Q.   Did you feel that the -- his presence there speaking

2  with you was one of complete voluntariness on his part?

3    A.   Yes, ma'am.

4    Q.   When you had gone back to his house, had you made any

5  sort of threats or representations to him about, if he did not

6  speak to you?

7    A.   No, ma'am.

8    Q.   Okay.  Is three hours and 20 minutes a long interview

9  for you?

10   A.   Well, not for me.  It's quite typical.  Painful, but

11  typical.

12   Q.   Okay.  It was a lot --

13   A.   Yes, ma'am.

14   Q.   -- covered in that interview?

15   A.   Yes.

16   Q.   Okay.  First of all, tell the jury a little bit

17  about -- let's kind of break this in some parts.  Did

18  Joe DeLeon tell you a lot about his background?

19   A.   Yes.

20   Q.   Okay.  Share with the jury a little bit about what

21  you learned from Defendant DeLeon.

22          THE COURT:  Can we pause that for just a moment

23  before we go into that?

24          Is everybody okay?

25          (Responds affirmatively.)

1                THE COURT:  Okay.  Your witness.

2      Q.    Ranger Briley, what were some of the points that

3  Defendant DeLeon told you about his background?

4      A.    That he'd spent 15 years with the Fort Worth Police

5  Department Citizens Academy, and was like a -- an interpreter

6  for the Fort Worth Police Department.  That he owned a

7  restaurant in Fort Worth, Texas.  Benito's.  Or used to own it.

8  He stated that he owned a towing company for five years, maybe

9  seven.  Not exactly sure.

10                He spent a lot of time, a lot of interaction

11  with law enforcement, and was involved in some groundbreaking

12  cases of human trafficking.  That was essentially what kind of

13  background he gave me, other than his education.  Or actually

14  he was born in Fort Worth, Texas.  His education was from

15  Monterey, Mexico.

16                That's pretty much what he gave me in regards to

17  his background.

18      Q.    Did you believe he was trying to give the impression

19  that he was involved in the law enforcement community?

20      A.    Very much so.

21      Q.    But to be clear, he was -- he was making -- he did

22  not represent himself as a police officer?

23      A.    That's correct, he did not.

24      Q.    Okay.  Did you believe that he had been around a lot

25  of law enforcement?

1    A.   Yes.

2    Q.   Okay.  And why do you feel that he was trying to give

3    you that impression that he's part of that law enforcement

4    community?

5              MR. WESTFALL:  Not relevant, Your Honor;

6    objection.

7              THE COURT:  Overruled.

8    A.   I believe that he -- my opinion is he wanted to

9    impress me.  My thoughts were that he wanted to build

10   credibility and trust with me as well.

11   Q.   Did you pretty quickly on in the interview move into

12   the real reason you wanted to talk to him; Casi Thompson?

13   A.   Yes, ma'am.

14   Q.   And did he indicate that he knew her?

15   A.   Yes.

16   Q.   Okay.  And did you -- did he tell you a lot of facts

17   and background about Casi Thompson?

18   A.   Yes, he did.

19   Q.   And were most of these things -- or some of these

20   things, at least, facts that you had learned from Casi

21   yourself?

22   A.   Yes.

23   Q.   Okay.  So did that confirm for you that he did, in

24   fact, know Casi Thompson quite well?

25   A.   Yes, ma'am.

1    Q.   Okay.  Did you talk about the secret probation with

2    Defendant DeLeon?

3    A.   Yes, I did.

4    Q.   Okay.  Tell the jury a little bit more how that went

5    down and what Joe was describing to you.

6    A.   Well, he described to me how it began or -- and where

7    it began.  He talked to me about the terms of that probation,

8    which were consistent with what I had been told by Casi.

9              Would you like to know more?

10   Q.   Well, did he talk about the 3x5s?

11   A.   Yes, ma'am, he did.

12   Q.   Did he talk about the surveillance?

13   A.   Yes, he did.

14   Q.   Spending the night at her house?

15   A.   Yes.

16   Q.   Looking in her fridge to make sure there was food?

17   A.   Yes.

18   Q.   Did he talk about these external threats to Casi's

19   safety?

20   A.   He did.

21   Q.   Did he clarify that it involved a federal judge?

22   A.   He did.

23   Q.   Did he talk a lot about things being sealed?

24   A.   Very much.

25   Q.   Okay.  And you said he -- he had mentioned the start

```
 1   of the probation?
 2       A.   Yes.
 3       Q.   Okay.  In fact, did he tell you a story about it --
 4   it starting one night at Casi's house?
 5       A.   Yes.
 6       Q.   Okay.  Did he talk about probation papers actually
 7   being handed to Casi for her to sign?
 8       A.   Yes.
 9                MS. MAX:  At this time, Government moves to
10   introduce Government's Exhibit 182, which is a clip coming from
11   Government's Exhibit 171.
12                MR. WESTFALL:  No objection, Your Honor.
13                MR. GALLIAN:  No objection, Judge.
14                THE COURT:  Admitted.
15                MS. MAX:  Permission to publish?
16                MR. WESTFALL:  What are the times?
17                MS. MAX:  The times are 41:42 to 43:58 on 171.
18                MR. WESTFALL:  Thank you.
19                (Audio playing.)
20       Q.   Ranger Briley, on that recording, we hear what sounds
21   like Defendant DeLeon actually drawing out on paper what he's
22   describing?
23       A.   Yes, ma'am.
24       Q.   Did you have him to do that?
25       A.   I did.
```

```
 1                    MS. MAX:  Your Honor, may I approach?
 2                    THE COURT:  You may.
 3                    (Documents tendered.)
 4         Q.    Ranger Briley, I've shown you what's been marked as
 5    Government's Exhibit 7.  Is this the drawing that you had
 6    Joe DeLeon do for you that day that we hear in the recording?
 7         A.    Yes, it is.
 8                    MS. MAX:  Government moves to admit Government's
 9    Exhibit 7.
10                    MR. GALLIAN:  No objection.
11                    MR. WESTFALL:  No objection.
12                    THE COURT:  Admitted.
13                    MS. MAX:  Permission to publish?
14                    THE COURT:  Granted.
15         Q.    Ranger Briley, Government's Exhibit 7, did you have
16    any part in this drawing?
17         A.    No, ma'am.
18         Q.    Okay.  So who drew all of the drawing that we see on
19    Government's Exhibit 7?
20         A.    Defendant DeLeon.
21         Q.    Okay.  And is he drawing this out, in fact, as he's
22    describing to you the audio that we just heard?
23         A.    Yes.
24         Q.    And, again, where was this location supposed to be?
25         A.    This was at Casi Thompson's residence.
```

1          Q.    And did you have him write his name on the bottom?

2          A.    Yes, ma'am.

3          Q.    And did you have him date it September 5th, 2019?

4          A.    Yes, ma'am.

5          Q.    Ranger Briley, was it really important to you to know

6    who was standing where in Casi Thompson's kitchen and living

7    room when these so-called probation papers were presented?

8          A.    No, ma'am.

9          Q.    So why would you have Defendant DeLeon make this

10   drawing?

11         A.    So it is tangible evidence.  One, it is something

12   that the jury can see; two, he is establishing that all three

13   parties are in the same place four years ago.  Which is

14   relevant to what is going to be investigated throughout this

15   case.

16         Q.    And he's talking about probation documents that were

17   presented to Casi roughly four years prior?

18         A.    Yes.

19         Q.    Had Casi ever mentioned to you that she had any

20   probation paperwork presented to her four years prior?

21         A.    Yes.

22         Q.    Did you talk to Joe DeLeon about Bill Stone?

23         A.    Yes.

24         Q.    Okay.  Did he know Bill Stone?

25         A.    Yes.

1    Q.    Did he seem to know a lot about Bill Stone?

2    A.    Yes.

3    Q.    Okay.  At that point in time, what did Joe DeLeon say

4    about Bill Stone's status with the FBI?  Did he know Bill was

5    retired?

6    A.    Well, he -- he represented that, I want to say that

7    particular interview, December '17, or December -- I'm sorry,

8    December 2017 or December 2018 that he had -- he believed he

9    retired from FBI.

10    Q.    So -- a few times in the interview did he reference

11    December 31st?

12    A.    Yes, he did.

13    Q.    Okay.  And he makes clear in the interview that, and

14    it wasn't this year, right?

15    A.    Yes.

16    Q.    So if we're talking -- this is September 2019, and he

17    says it was December 31st, but not this year.  Did you take

18    that to mean not December 31st, 2018?

19    A.    Yes, correct.

20    Q.    And then says maybe last year or the year before that

21    he's been retired?

22    A.    Yes.

23    Q.    So did you take that to possibly be December 31st,

24    2016, or December 31st, 2017?

25    A.    2017.

1    Q.    Okay.  Did he indicate to you what he believed Bill

2    Stone did for employment in September 2019 when you were

3    talking to him?

4    A.    Central Intelligence Agency, is what he told me.

5    Q.    Okay.  Did you ask Defendant DeLeon when he had last

6    talked to Bill?

7    A.    Yes.

8    Q.    And had he indicated to you that it, in fact, had

9    been that day?

10   A.    Yes, he did.

11   Q.    And did he indicate to you that he had told Bill that

12   Casi believes that this is all a hoax?

13   A.    Yes.

14   Q.    So on September 5th, when you are talking to

15   Defendant DeLeon, does he reference the fact that he had talked

16   to Casi Thompson on September 3rd, and she had told him that

17   this is all a hoax?

18   A.    Yes.

19   Q.    Okay.  Do you tell Defendant DeLeon at this point

20   that, yeah, I know, I listened to the recording?  Did you give

21   any indication to him that you were recording any phone calls?

22   A.    No.

23   Q.    Okay.  Did Defendant DeLeon also indicate to you that

24   he had never been to Defendant Stone's house?

25   A.    Yes.

1      Q.    And that he had known him since approximately
2  2003-ish?
3      A.    Yes.
4      Q.    And did you ask him if he knew whether or not Casi
5  and Defendant Stone were dating, or had ever dated?
6      A.    Yes, I did ask him.
7      Q.    And what did he say?
8      A.    He did not -- he did not know.  Did not think so.
9      Q.    Did you talk to Defendant DeLeon about the
10 possibility of recording?
11     A.    Yes, I did.
12     Q.    And by "recording," I mean making controlled calls?
13     A.    Yes.
14     Q.    And who would you want Defendant DeLeon to make
15 recorded calls with?
16     A.    To Defendant Stone.
17     Q.    So when you talked to him about that, explain to the
18 jury what his attitude was.
19     A.    He was cooperative, willing to do so.
20     Q.    In that interview, did he express concern that he
21 thought that maybe actually Defendant Stone had some ability to
22 listen to his phone calls?
23     A.    Yes, he did.
24     Q.    And in fact, did he indicate that since he had talked
25 to Defendant Stone earlier in the day, that he had told

```
 1    Defendant Stone that he was talking to a Texas ranger?

 2         A.   Yes.

 3         Q.   Because he had shared that sort of information with

 4    Defendant Stone, did you, in fact, then need to come up with

 5    some sort of like cover story to explain why he was talking to

 6    a Texas ranger?

 7         A.   Yes, I did.

 8         Q.   Did you talk to Defendant DeLeon about any financial

 9    gain that he received from Casi Thompson?

10         A.   Yes, I did.

11              MS. MAX:  Your Honor, at this time Government

12    moves to introduce Government's Exhibit 174, which is derived

13    from Government's Exhibit 171.

14              MR. WESTFALL:  No objection, Your Honor.

15              MR. GALLIAN:  No objection, Your Honor.

16              THE COURT:  Admitted.

17              MS. MAX:  Permission to publish?

18              THE COURT:  Granted.

19              (Audio playing.)

20         Q.   Ranger Briley, we hear you ask Defendant DeLeon a

21    very direct question about compensation from Casi Thompson at

22    the beginning of the recording, correct?

23         A.   Yes, ma'am.

24         Q.   And he -- he talks a short while about what he says

25    are gifts that he received from her:  A phone, a laptop.
```

1  Piddly stuff --

2       A.   Yes.

3       Q.   -- were his words, correct?

4       A.   Yes.

5       Q.   And then in the recording, it gets a little

6  confusing, but he starts talking about a lady and a seal and

7  the door of his restaurant.  Did that story have anything to do

8  with Casi Thompson?

9       A.   No.

10      Q.   Okay.  Throughout the three-hour-and-20-minute

11 recording, are there many times that Defendant DeLeon goes off

12 into seemingly unrelated tangents from the direct question that

13 you asked him?

14      A.   Yes.

15      Q.   As -- as an experienced interviewer, do you draw any

16 conclusions from someone going off on tangents like this?

17      A.   I do.

18      Q.   Okay.  And what is that?

19      A.   They want my focus to be on some other issue other

20 than what they're being asked.

21      Q.   After mentioning the phone, laptop, piddly stuff as

22 gifts, Defendant DeLeon mentions that he had brought the

23 medicine that he might need with him that day.  Did you hear

24 that on the audio recording?

25      A.   Yes.

1          Q.    Did you know or what did you think that that

2     statement meant?

3          A.    About him possibly bringing his medication?  That he

4     might need it.  That he might go -- he might be incarcerated

5     himself.  I believe that he was in fear when -- from what he

6     said to me, that he might have to stay there.

7          Q.    Okay.  Now, he does bring up the truck eventually,

8     correct?

9          A.    Yes.

10         Q.    And I believe he says she gave me -- no, she sold me

11    a truck, correct?

12         A.    That's right.

13         Q.    And does he represent to you -- I think in two

14    occasions on that recording, that he presented her with a check

15    and that he has the check?

16         A.    Yes.

17         Q.    Okay.  And that he is happy to show it to you?

18         A.    Yes.

19         Q.    At any point in that portion of the interview when

20    you are talking about the truck and he mentions the fact that

21    she sold it to him and he has a check, did he tell you that

22    within days of writing that check to Casi Thompson, he in fact

23    had her write a check back to him for that exact same amount?

24         A.    No, he did not.

25         Q.    In fact, throughout the course of the three hour and

1   20 minute interview that day, did he ever mention the fact that

2   she wrote him back a check to basically negate the amount that

3   he gave her?

4        A.   No.

5        Q.   He also mentions -- he says he would take his own

6   coffee.  Was that in reference to taking his own coffee over to

7   Casi Thompson's house?

8        A.   I believe so.

9        Q.   Okay.  Is that -- was that like him trying to

10  demonstrate that he didn't want anything from her, so he even

11  took over his own coffee?

12       A.   Yes.

13       Q.   So that is the representation that he's trying to

14  leave with you?

15       A.   That is the representation that was left in my mind.

16       Q.   Did he also mention in that interview that she would

17  pay him to babysit her children from time to time?

18       A.   Yes.

19            MS. MAX:  At this time, Government moves to

20  admit Government's Exhibit 175, which is derived from

21  Government's Exhibit 171.

22            THE COURT:  Okay.  Any objection?

23            MR. GALLIAN:  No objection, Your Honor.

24            MR. WESTFALL:  No objection.

25            THE COURT:  Now, and after we play this, let's

```
 1  take a short break.
 2              MS. MAX:  It's just a short clip, Your Honor.
 3  Permission to publish?
 4              THE COURT:  Granted.
 5              (Audio playing.)
 6              THE COURT:  All right.  Members of the jury,
 7  let's take a ten-minute break.  And I'll really actually try to
 8  hold us to ten minutes.  Let's take a stretch break.
 9              (Jurors exit courtroom.)
10              (Brief recess.)
11              THE COURT:  All right.  Outside the presence of
12  the jury, we're going to go on the record for a clarification.
13              Government, what say you?
14              MS. MAX:  Your Honor, Government had published
15  Government's Exhibit 175, which was derived from Government's
16  Exhibit 171.  The wrong portion was played of that audio.  So
17  we would ask that I could substitute and make Government's
18  Exhibit 175 derived from Government's Exhibit 171 timestamp
19  129:18 through 129:52.
20              THE COURT:  Any objection from either defense
21  counsel?
22              MR. WESTFALL:  I have an issue with that -- you
23  know, the jury just listened to that.  It was all just
24  published, and new --
25              MS. MAX:  I can make a new one.
```

```
 1                    MR. WESTFALL:  So we can either strike
 2   everything they just heard as pertains to that exhibit and we
 3   can substitute.
 4                    THE COURT:  Okay.
 5                    MR. WESTFALL:  Or I think it probably ought to
 6   be in evidence for better or worse.
 7                    THE COURT:  You want to just do a new exhibit?
 8                    MS. MAX:  I'll just do a new exhibit.
 9                    THE COURT:  Is that the easiest way to deal with
10   it?  That is okay.
11                    Is that acceptable?
12                    MR. GALLIAN:  That's great, Judge, thank you.
13                    MR. WESTFALL:  Yes, Your Honor.
14                    THE COURT:  Sounds good.
15                    (Jurors enter courtroom.)
16                    THE COURT:  With that said, your witness.
17                    MS. MAX:  Thank you, Your Honor.
18                    At this point, Government moves to admit
19   Government's Exhibit 190, which is derived from 171.
20                    THE COURT:  Any objection?
21                    MR. GALLIAN:  No objection.
22                    MR. WESTFALL:  No objection.
23                    THE COURT:  Admitted.
24                    MS. MAX:  Permission to publish?
25                    THE COURT:  Granted.
```

1              (Audio playing.)

2      Q.    Is that once again in the interview on September 5th

3  Defendant DeLeon reiterating that the truck that he received

4  from Casi Thompson was sold to him?

5      A.    Yes.

6      Q.    And, again, is he offering to show you proof of the

7  check?

8      A.    Yes.

9      Q.    And we heard before the break that he mentioned she

10 received a laptop, a phone as a gift, piddly stuff as a gift.

11 Anytime during that three-hour interview did he tell you that

12 he had received $15,000 from Casi Thompson?

13     A.    No.

14     Q.    Did he tell you that on another occasion he had

15 received $5,000 from Casi Thompson?

16     A.    No, ma'am.

17     Q.    Now, going back to -- we had talked earlier about the

18 drawing and the recording of Defendant DeLeon talking about an

19 event that had occurred years prior.  And just to clarify for

20 the jury, what event was that that he was describing?

21     A.    He was describing the original onset, the beginning

22 of the secret probation.

23     Q.    Okay.  And when I had asked you if Casi Thompson had

24 mentioned to you anything about seeing any sort of probation

25 documents and you had said yes, explain to the jury what set of

1    probation documents you were talking about.

2        A.    Yes, she had told me that she had been presented some

3    documents to get off of probation for which she did not sign.

4    Those are the documents that I'm talking about.

5        Q.    Okay.  So she had never mentioned to you documents

6    that she had seen at the beginning of the probation?

7        A.    That's correct.

8        Q.    Okay.  But yet this drawn-out story with this drawing

9    of this picture where everybody is that night, that

10   Defendant DeLeon provided you in his interview, he's saying

11   that was all surrounding by her being shown documents to get

12   onto probation?

13       A.    Yes.

14       Q.    Okay.  And in that recording, Government's

15   Exhibit 182, we hear Defendant DeLeon say to you, I'm trying to

16   remember, you'll have to look at the tape of what I said

17   yesterday, end quote.

18             What does that quote mean to you?

19       A.    It was very interesting.  It means that he believes

20   that he's being recorded.  And so I can conclude that perhaps

21   he believes Bill Stone is monitoring him, is being recorded.

22   Or that he's aware of an investigation underway that he's being

23   recorded.

24       Q.    And in Government's Exhibit 182, he's referencing,

25   you'll have to look at the tape of what I said yesterday,

1    correct?

2        A.    Yes.

3        Q.    Does that give you an indication that he believes

4    it's a recording that you would have?

5        A.    Yeah, yeah.  It does give that representation.

6        Q.    Okay.  Going back to we had listened to Government's

7    Exhibit 174 where we were talking about the stuff that

8    Defendant DeLeon said that Casi had gifted him.  And he said,

9    quote, it's all in the laptop.  I still have it.  But right

10   now, I heard her say that she's been out 600-something thousand

11   dollars.  He said that to you on September 5th, correct?

12       A.    Yes.

13       Q.    Okay.  Now, you had -- had an opportunity to review

14   the recorded call between Casi Thompson and Defendant DeLeon

15   that took place on September 3rd?

16       A.    Yes.

17       Q.    And Casi does mention money that she gave to

18   Defendant Stone to DeLeon -- to Joe DeLeon in that recording,

19   correct?

20       A.    Yes.

21       Q.    Does she ever say the dollar amount 600,000?

22       A.    No, she does not.

23       Q.    Did you, during the course of your interview, ever

24   tell Defendant DeLeon that the dollar amount alleged was

25   $600,000?

```
 1        A.    No, I did not.

 2        Q.    Do you know where he got that number from?

 3        A.    No, I don't -- I do not.

 4        Q.    Okay.

 5              MS. MAX:  Let's go to Government's Exhibit 156,

 6   Page 2.  Let's just do through the middle of the table, please.

 7        Q.    Okay.  So we have September 5th, 2019, here.  We have

 8   approximately -- let's see, we're down to --

 9              MS. MAX:  Actually, can we go to the bottom

10   portion.  Starting with Ranger Briley departs DeLeon's

11   residence.

12        Q.    Ranger Briley, we had already covered the fact that

13   earlier that day Defendant DeLeon had sent a text message to

14   Defendant Stone once a phone call with Casi Thompson had

15   concluded, correct?

16        A.    Yes.

17        Q.    If in fact Defendant DeLeon believed that his phone

18   was being surveilled by Defendant Stone, would he have had the

19   need to communicate that text message?

20        A.    I'm sorry, can you repeat?

21              MR. WESTFALL:  Object to speculation, Your

22   Honor.

23              THE COURT:  Sustained.

24        Q.    Walking through the rest of this September 5th

25   timeline here where we're up to in the interview, so we have at
```

1    approximately 10:48 you left Defendant DeLeon's residence,

2    correct?

3          A.   Yes, correct.

4          Q.   That is when you left with the agreement that y'all

5    would meet back at the Fort Worth Police Department?

6          A.   Yes, ma'am.

7          Q.   And in between the time of you leaving

8    Defendant DeLeon at his residence and beginning an interview

9    40 minutes later at the Fort Worth Police Department, were

10   there two phone calls between the Defendant DeLeon and

11   Defendant Stone?

12         A.   Yes, ma'am.

13         Q.   Were those approximately 15, 16 minutes in total?

14         A.   Yes.

15         Q.   Now, when Defendant DeLeon met with you at the Fort

16   Worth Police Department, he told you in fact that he had talked

17   to Defendant Stone that day, correct?

18         A.   Yes, ma'am.

19         Q.   Because in fact he told you, I told Defendant Stone

20   that a Texas ranger had come to my house?

21         A.   Yes.

22         Q.   So the existence of those calls, does that surprise

23   you?

24         A.   No.

25         Q.   Okay.  After you have your long interview at the Fort

1   Worth Police Department, does it end because Defendant DeLeon

2   needs to go to his doctor's appointment?

3        A.   Yes.

4        Q.   Okay.  Do y'all make plans to meet up afterwards?

5        A.   Yes.

6        Q.   Is this in conjunction with the fact that

7   Defendant DeLeon told you he was willing to make controlled

8   calls?

9        A.   Yes.

10        Q.   Okay.  So after the interview, break for the doctor's

11   appointment, do y'all meet back up at a local restaurant?

12        A.   Yes.

13        Q.   Just tell the jury, what was the purpose of this

14   meeting?

15        A.   The purpose of that meeting was to be together and

16   he'd be in my presence while he makes a controlled call to

17   Defendant DeLeon [sic].

18        Q.   And prior to y'all meeting back at that restaurant,

19   if we look down at the 15:05 -- I'm terrible with military

20   time, but that I believe is 3:05, correct?

21        A.   Yes.

22        Q.   And do we see another phone call between Joe DeLeon

23   and Bill Stone?

24        A.   Yes, ma'am.

25        Q.   And how long is that call?

1     A.    It is, let's see, five minutes 39 seconds.

2     Q.    And who initiates that call?

3     A.    Defendant DeLeon to Defendant Stone.

4     Q.    And this was prior to you meeting back up with him at

5   the restaurant, correct?

6     A.    Yes.

7     Q.    And when you met with him at the restaurant, did he

8   indicate to you that he had talked to Bill Stone between the

9   last time -- since the last time he saw you?

10     A.    Yes.

11     Q.    Okay.  After y'all have that meeting, does he make a

12   controlled call to Bill Stone?

13     A.    Yes.

14     Q.    Tell the jury about where that went down.

15     A.    In Fort Worth, in a parking lot, there's a Mexican

16   food restaurant called Cancun Mexican food.  The controlled

17   calls literally -- literally done in my truck.  He was in my

18   passenger seat when the recording occurred.

19     Q.    Did you kind of go through the same procedure

20   explanation, protocol explanation for making a controlled call

21   with Bill Stone as you had done with Casi Thompson?

22     A.    Yes.

23     Q.    So had you told Defendant DeLeon exactly what to say?

24     A.    Not exactly.  But there were definitely themes,

25   talking points, that I wanted him to bring out.

1        Q.    Did he at all seem nervous about making the call?

2        A.    He -- he was willing.  Somewhat nervous.

3        Q.    Okay.  And was the point of the call -- I mean, the

4   theme being talked about, the secret probation?

5        A.    Yes.

6        Q.    Okay.  And he made a call in your presence in your

7   truck that evening of September 5th; is that correct?

8        A.    That's correct.

9        Q.    And that call is approximately 51 minutes long; is

10  that right?

11       A.    Yes, ma'am.

12       Q.    Safe to say that they are talking about secret

13  probation all throughout that call, correct?

14       A.    Yes.

15       Q.    Okay.  And Defendant DeLeon is mentioning several

16  aspects of the secret probation, correct?

17       A.    Correct.

18       Q.    And in that call, does Defendant Stone ever deny any

19  of those aspects of the probation?

20       A.    No, ma'am.

21       Q.    Does he ever say anything to Defendant DeLeon that

22  would indicate he doesn't know what Defendant DeLeon is talking

23  about or is surprised about receiving some sort of information?

24       A.    No.

25             MS. MAX:  At this time, Government moves to

1    introduce Government's Exhibit 83 and transcript 84.

2                    MR. WESTFALL:  No objection.

3                    MR. GALLIAN:  No objection, Your Honor.

4                    THE COURT:  Admitted.

5                    MS. MAX:  Permission to publish?

6                    THE COURT:  Granted.

7                    MS. MAX:  Can we publish Government's

8    Exhibit 83?  First timestamp is 37:56 through 38:15.

9                    (Audio playing.)

10                    MS. MAX:  And publish Government's Exhibit 83,

11   40:37 through 41:02.

12                    (Audio playing.)

13        Q.   On that clip that we just heard, revisiting what we

14   had discussed that Defendant DeLeon had said to Casi Thompson

15   on the September 3rd recorded phone call, where he had

16   mentioned to Casi that he had not talked to Bill in a very long

17   time, correct?

18        A.   Yes.

19        Q.   Is the clip that we just heard, is that

20   Defendant DeLeon relaying back to Defendant Stone that he

21   reported to Casi that they had not talked in a long time?

22        A.   Yes.

23                    MS. MAX:  Then if we can play Government's

24   Exhibit 83, 45 minutes through 45:44.

25                    (Audio playing.)

1      Q.   In that clip when they're -- when Defendant Stone and

2 Defendant DeLeon are talking about "they," are they referencing

3 Casi Thompson's family?

4      A.   Yes.

5           MS. MAX:  Can we bring back up Government 156,

6 Page 2.  If we can Zoom in on the lower half of the table.

7      Q.   Now, Ranger Briley, you said that Defendant DeLeon

8 had mentioned to you when y'all met back up at Cancun

9 Restaurant that he had talked to Defendant Stone in between the

10 interview and meeting back up at the restaurant; is that

11 correct?

12     A.   Yes.

13     Q.   Did he mention to you what they had talked about?

14     A.   No.

15     Q.   In your experiencing, how helpful are controlled

16 calls if the two individuals are talking offline, meaning not

17 capturing all the controlled calls?

18     A.   Yeah, well, they're still going to capture the truth.

19 You'll find -- you'll find who's still -- who's being truthful

20 and who's not.  I mean, it's -- literally like that.  You will

21 figure out that they've been talking perhaps without you

22 knowing.  You'll find out other information to follow up on and

23 to investigate.

24     Q.   And to wrap up September 5th, we see there, so the --

25 the green line, that is the recorded call that we just heard

1  portions of, correct?

2       A.   Yes, ma'am.

3       Q.   How did you leave things with Joe DeLeon at the end

4  of September 5th?

5       A.   I left him with, hey, listen, if you talk to

6  Defendant Stone any further, let me know.  And really just to

7  kind of keep a distance from him, let me know if you hear

8  anything, is essentially what I was telling him.

9            I didn't give him any directions.  I told him I

10 would like him not to be talking to Defendant Stone, but that

11 if he did, to contact me and tell me what that is about.  And

12 if in my assessment of him calling me back about such, I would

13 then meet with him again and perhaps do additional controlled

14 calls to Defendant Stone.

15      Q.   So you didn't leave him with any instructions to

16 record calls with Defendant Stone?

17      A.   That's correct.

18      Q.   You didn't leave him with any instructions to not

19 talk to Defendant Stone?

20      A.   Correct.

21      Q.   Did you give him any instructions as to his

22 communications with Casi Thompson?

23      A.   No.

24      Q.   Once he had agreed to make the controlled call with

25 you for Bill Stone, did you reveal to him that Casi Thompson

1  was recording calls with him, DeLeon?

2      A.   No, ma'am.

3      Q.   Okay.

4           MS. MAX:  If we could bring up Government's

5  Exhibit 156, Page 3.

6      Q.   On September 9th, 2019, Defendant DeLeon reached out

7  to you and left you a voicemail; is that correct?

8      A.   Yes, ma'am.

9      Q.   Okay.  And did you follow up the next day on

10 September 5th and have a brief discussion with him?

11     A.   On what -- on what date again?

12     Q.   On September 10th?

13     A.   Yes, ma'am.

14     Q.   And did Defendant DeLeon relay to you that Defendant

15 Stone was having surgery the next week?

16     A.   Yes, ma'am.

17     Q.   Okay.  Did you look at that as a possible opportunity

18 to get some more recordings?

19     A.   Yes, ma'am.

20     Q.   Okay.  Explain to the jury how you would go about

21 doing that?

22     A.   Well, I saw the opportunity to capture audio-video

23 type surveillance footage with Defendant DeLeon being with

24 Defendant Stone.  Defendant Stone had a scheduled surgery at a

25 hospital, so that -- because that was happening, I used covert

1    surveillance equipment to install it on Defendant DeLeon to

2    capture additional evidence.

3         Q.   Did y'all make plans to meet the next week on the day

4    before Stone's scheduled surgery?

5         A.   Yes.

6         Q.   And on September 12th, 2019, did Casi Thompson make a

7    recorded call with Defendant DeLeon?

8         A.   Yes.

9         Q.   Okay.  Now, we talked about the fact that you hadn't

10   left him with any specific instructions when it came to him

11   talking with Casi Thompson, correct?

12        A.   Yes.

13        Q.   Did you give him the instruction to act as though the

14   probation was real when talking with Casi?

15        A.   No.

16        Q.   Did you give him the instruction that he could not

17   tell Casi Thompson that he was also recording calls?

18        A.   I did not give him that instruction, no.

19        Q.   So you didn't tell him, you have to keep up the

20   probation lie with Casi?

21        A.   That's correct.  I did not.

22        Q.   But you did tell him, don't talk to anybody about the

23   fact that I've spoken with you?

24        A.   Yes, I did.

25                  MS. MAX:  Let's go to Government 156, Page 4.

1   If you could just zoom in on the top half of the entire page.

2       Q.   Okay.  So we see here on September 12th at 7:33 in

3   the morning, is it a phone call between Stone and DeLeon?

4       A.   Yes, ma'am.

5       Q.   Is it Stone calling DeLeon?

6       A.   Yes, it is.

7       Q.   And what is the length of that call?

8       A.   I'm sorry, what is that?

9       Q.   What is the length of time of that call?

10      A.   About four minutes, 16 seconds.  The first one.

11      Q.   And then what is the second call?  When does that

12  occur?

13      A.   Same date; September 12th, 2019, for 19 minutes and

14  27 seconds.

15      Q.   And is that at 11:20 in the morning?

16      A.   Yes.

17      Q.   And is that again Defendant Stone calling Defendant

18  DeLeon?

19      A.   Yes, that's correct.

20      Q.   Okay.  And do we see if that 11:20 call was

21  approximately 20 minutes --

22                 (Brief technical interruption.)

23      Q.   After that 20-minute phone call that started at

24  11:20, what happens at 11:47?

25      A.   11:47, Defendant DeLeon attempts to call Thompson.

1     Q.   Okay.  So he gets off the phone with Stone and

2  attempts to call Casi?

3     A.   Correct.

4     Q.   What happens three minutes later?

5     A.   He sends -- Defendant DeLeon sends Defendant Stone

6  an -- an iMessage.

7     Q.   And what does it say?

8     A.   19.

9     Q.   And again, is this the -- the sort of messages that

10  we talked about earlier, that DeLeon would frequently send

11  Stone after attempting communication with Thompson?

12     A.   Yes, it is.

13     Q.   Okay.  And then what is the next call that we see at

14  11:50?

15     A.   At 11:50, Defendant Stone calls Defendant DeLeon.

16     Q.   For how long?

17     A.   22 minutes, 49 seconds.

18     Q.   And then at 12:13 what happens?

19     A.   Thompson makes a recorded call -- telephone call to

20  Defendant DeLeon.

21     Q.   And approximately eight minutes later that call ends;

22  is that correct?

23     A.   Yes, ma'am.

24     Q.   And then three minutes after the call ends, what does

25  DeLeon do?

1    A.    Defendant DeLeon sends Defendant Stone an iMessage.

2    Q.    And what does that iMessage say?

3    A.    19.

4    Q.    Okay.  And then looking at the rest of the calls for

5    that day between Stone and DeLeon on September 12th, do we see

6    a 12-minute call, a 15-minute call, a 16-minute call, and a

7    38-minute call?

8    A.    Yes, ma'am.

9    Q.    On September 16th, Defendant DeLeon reached back out

10   to you to discuss the events surrounding taking Bill Stone to

11   surgery, correct?

12   A.    Yes.

13   Q.    Okay.  And did y'all meet for approximately an hour

14   on September 16th?

15   A.    September 16th?

16   Q.    Yes.

17   A.    Yes.

18   Q.    Is that a meeting at Starbucks?

19   A.    Yes.

20   Q.    Okay.  And did you record that meeting?

21   A.    Yes.

22          MS. MAX:  At this time, Government would like to

23   introduce DeLeon's Exhibit 44 for record purposes.

24          THE COURT:  Any objection?

25          MR. WESTFALL:  No, Your Honor.

1          MR. GALLIAN:  Sorry, Judge, we had to switch

2    lists.  Hold on just a second.

3          THE COURT:  No problem, take your time.

4          MR. GALLIAN:  No objection.

5          THE COURT:  Admitted.

6          MS. MAX:  And the Government moves to introduce

7    Government's Exhibit 178, which is derived from DeLeon

8    Exhibit 44.

9          THE COURT:  Any objection?

10          MR. WESTFALL:  No objection.

11          MR. GALLIAN:  No objection.

12          MS. MAX:  Permission to publish?

13          THE COURT:  Granted.

14          (Audio playing.)

15     Q.   On that recording that day when you are meeting at

16    Starbucks, when Defendant DeLeon is referencing taxes, is he

17    again referencing him purchasing the truck from Casi Thompson?

18     A.   Yes, he is.

19     Q.   Okay.  So once again he's making the purchase that

20    Casi Thompson sold him a truck?

21     A.   Yes.

22     Q.   Okay.  And when he's referencing -- is this -- is

23    this the first time that he told you about the fact that she

24    had written a $15,000 check to him?

25     A.   Yes.

1       Q.   And he references the fact that that was a year and a

2   half into it; is that correct?

3       A.   Yes.

4       Q.   Okay.  And that he was being compensated for all the

5   time he was spending doing the secret probation?

6       A.   Yes.

7       Q.   At that meeting at Starbucks, does Defendant DeLeon

8   also tell you that he's gotten a second phone?

9       A.   Yes, he makes a reference to that.

10      Q.   Did you ask him to get a second phone?

11      A.   I did not, no.

12      Q.   Did you understand or did he explain to you why he

13  got a second phone?

14      A.   I don't remember him explaining to me.  It's

15  possible.

16      Q.   And we haven't really talked about, but you've told

17  Defendant DeLeon at this point that the secret probation is not

18  real, correct?

19      A.   Yes.

20      Q.   Okay.  Y'all have discussed extensively that it is

21  not real?

22      A.   Yes.

23      Q.   Did you have any indication that at this point

24  Defendant DeLeon may not have believed you?

25      A.   I think -- I think he believed me, but I -- I'm not

1    sure.

2          Q.    Okay.

3          A.    You know, I told him what the truth was.

4          Q.    And, again, you didn't encourage him -- if he in fact

5    had communication with Casi Thompson, you didn't encourage him

6    to keep up the secret probation story line with Casi?

7          A.    That is correct.

8          Q.    However, you did encourage him to keep up the secret

9    probation story line with Defendant Stone?

10         A.    Yes, I did.

11         Q.    At that meeting on September 16th, do y'all walk

12   through kind of the game plan for the next day when

13   Defendant Stone has surgery?

14         A.    Yes.

15         Q.    Okay.  So tell the jury, what is the plan.

16         A.    It's going to be more of talking about the -- the

17   probation, when she's getting off probation, the same themes,

18   anything financial is -- is what the point is, is to capture

19   that information, continue capturing it.

20         Q.    And how exactly is he going to record this meeting

21   with Defendant Stone?

22         A.    It's what we call wires, a covert wire that he would

23   wear inside -- it's actually inside of a cigarette carton

24   contains an extremely small wire, and it records.  And then

25   also there's like a cell phone, but it's actually both

1    recording and videotaping.

2                   MS. MAX:  If we can publish 156, Page 5.

3                   THE COURT:  Any objection --

4                   MS. MAX:  This is in.

5                   THE COURT:  Okay, great.

6          Q.   Page 5 shows the interactions that you had with

7    Defendant DeLeon on September 16th when y'all are preparing for

8    surgery day; is that correct?

9          A.   Yes, ma'am.

10         Q.   Okay.  So going through, prior to seeing you that

11   day, at approximately 10:49, did Stone and DeLeon have a

12   26-minute phone call?

13         A.   Yes.

14         Q.   Okay.  And then you placed a call to DeLeon at 12:54;

15   is that correct?

16         A.   Yes.

17         Q.   Okay.  Looks like y'all are playing a little phone

18   tag, but ultimately end up meeting at 2:11 in the afternoon; is

19   that right?

20         A.   Yes, ma'am.

21         Q.   Y'all met for a little bit over one hour?

22         A.   Yes.

23         Q.   After you met with DeLeon that day, did he proceed to

24   have approximately 40 minutes of phone calls with Stone?

25         A.   Yes.

1    Q.    So September 17th is the day Defendant Stone is

2    having surgery; is that correct?

3    A.    I believe that is correct, yes.

4    Q.    Okay.  And Defendant DeLeon is going to drive him to

5    the hospital?

6    A.    Yes.

7    Q.    And also drive him home?

8    A.    Yes, ma'am.

9    Q.    Okay.  You said you had given DeLeon a recording

10   device that was planted in what?

11   A.    A cigarette carton.

12   Q.    Okay.  Were you following them that day as well?

13   Describe to the jury what your actions were throughout

14   that day.

15   A.    So I essentially sat in the parking lot of where this

16   hospital was located.  And I had a monitoring device, so I

17   could hear what was happening, what was being said.

18   Q.    Did DeLeon first pick Stone up at Stone's house?

19   A.    Yes, he did.

20   Q.    Were you -- where were you located when that was

21   occurring?

22   A.    When that was occurring, I was a few cars behind

23   them, watching the residence, watching them leave the

24   residence, following them to the hospital.

25   Q.    And in fact, when DeLeon went to pick up Stone, he

1    went in his house for a while; is that correct?

2         A.   That's correct.

3         Q.   Okay.  And all of that interaction was recorded?

4         A.   Yes, ma'am.

5         Q.   And then they're in the car driving to the hospital,

6    getting to the hospital, waiting for surgery, correct?

7         A.   Yes, ma'am.

8         Q.   And that interaction was recorded as well?

9         A.   Yes, ma'am.

10        Q.   And in that interaction with Stone and DeLeon that

11   morning, when they are prior to surgery, when they are

12   together, the recording captures Stone mentioning where does

13   she come up with 600,000; is that correct?

14        A.   Yes, ma'am.

15        Q.   Okay.  So, again, we're hearing that 600,000 number?

16        A.   Yes.

17        Q.   Okay.  Once Stone goes back for surgery, did you meet

18   independently with DeLeon?

19        A.   Yes, I did.

20        Q.   Okay.  Where did you meet with him?

21        A.   Both in the parking lot, but primarily that was just

22   to give him directions to where we would meet off-site, away

23   from the hospital, which was -- it was a place at a restaurant

24   called the Neighbor -- the Neighborhood Grill, located in Fort

25   Worth.  We -- we met there in a parking lot inside my truck.

1    Q.   Was that meeting for approximately 45 minutes?

2    A.   Yes, ma'am.

3    Q.   And you recorded that as well; is that correct?

4    A.   Yes, ma'am.

5         MS. MAX:  At this time, Government would move to

6    introduce for record purposes only DeLeon Exhibit 80.

7         THE COURT:  Any objection?

8         MR. WESTFALL:  No objection, Your Honor.

9         MR. GALLIAN:  No objection, Your Honor.

10        THE COURT:  Admitted.

11        MS. MAX:  At this time, Government moves to

12   admit Government Exhibit 179, which is derived from DeLeon 80.

13        MR. GALLIAN:  No objection.

14        MR. WESTFALL:  No objection.

15        THE COURT:  Admitted.

16        MS. MAX:  Permission to publish?

17        THE COURT:  Granted.

18        (Audio playing.)

19   Q.   Ranger Briley, are y'all actually -- you are inside

20   your truck at this point, or what's the background noise that

21   we're hearing?

22   A.   Yeah, in that situation it's either the parking

23   lot -- but I -- probably either in my truck with the window

24   rolled down at the Neighborhood Grill or we're at the parking

25   lot of the hospital.  Most likely at the restaurant.

```
 1        Q.    Now, I know it's kind of hard to hear the beginning
 2   of that clip.  Is Defendant DeLeon expressing to you that
 3   Defendant Stone told him that Casi's family is going to go
 4   after him because he -- civilly because he received a laptop, a
 5   phone, and the truck was sold to him for cheap?
 6        A.    Yes, I think that -- yes.
 7        Q.    That is what he's referencing?
 8        A.    Yes.
 9        Q.    And then at the very end, is he making reference that
10   once again that he had knowledge that there was an issue with
11   Casi Thompson and some car rental company and restitution?
12        A.    Yes.
13        Q.    On September 27th, 2019, did Casi Thompson make
14   another recorded call with Defendant DeLeon?
15        A.    Yes, ma'am.
16             MS. MAX:  At this time, Government moves to
17   admit Government's Exhibit 73 and 74, which is the accompanying
18   transcript.
19             MR. WESTFALL:  No objection.
20             MR. GALLIAN:  No objection, Your Honor.
21             THE COURT:  Admitted.
22             MS. MAX:  Permission to publish from zero
23   timestamp to one minute?
24             THE COURT:  Granted.
25             (Audio playing.)
```

1          MS. MAX:  Can we bring up Government's 156,

2     Page 6?

3     Q.   Ranger Briley, we're looking at a summary chart of

4     calls for September 27th.  Do we see approximately -- well, the

5     first yellow line in the middle of the table, does that

6     represent the phone call that we just heard between Thompson

7     and DeLeon?

8     A.   Yes, it does.

9     Q.   Okay.  And did that call occur approximately at

10    6:45 at night?

11    A.   Yes, it did.

12    Q.   And prior to that call, did Stone and DeLeon have

13    approximately 40 minutes of phone calls that day?

14    A.   Yes.

15    Q.   Okay.  And after the phone call between Thompson and

16    DeLeon ends, what does DeLeon do next?

17    A.   Defendant DeLeon sends Defendant Stone an iMessage.

18    Q.   And what does the message say?

19    A.   19, good.

20    Q.   Okay.  And what happens -- well, are there two more

21    phone calls that day between DeLeon and Stone?

22    A.   Yes.

23    Q.   Okay.  And then off to the lower left-hand corner, is

24    that a note that was recovered from DeLeon's phone?

25    A.   Yes, it is.

1      Q.   And is that a note that was created on

2   September 28th, 2019?

3      A.   Yes, it is.

4      Q.   And can you just read that note aloud to the jury?

5      A.   The note says, SA Bill Stone reached out to me and

6   wanted me to reach out to you to let you know that you are off

7   of probation as of October 1, and he will reach out to you at a

8   later date.

9      Q.   Okay.  And, again, at this point you had never -- you

10  had not told Defendant DeLeon to keep up the probation lie with

11  Casi Thompson?

12     A.   Correct.

13     Q.   Listening to these calls, does it make any sense to

14  you why Defendant DeLeon is keeping up the lie with Casi

15  Thompson?

16          MR. WESTFALL:  Object to speculation, Your

17  Honor.

18          THE COURT:  You'll have to establish how he

19  would know that.

20          MS. MAX:  Okay.  Thank you, Your Honor.

21     Q.   Does it make sense to you that Defendant DeLeon is

22  keeping up the probation lie with Casi Thompson?

23     A.   No, ma'am.

24     Q.   On September 28th, Casi Thompson made another

25  recorded call with Joe DeLeon; is that correct?

```
 1        A.   Yes, ma'am.

 2             MS. MAX:   Can we bring up Government 156,

 3   Page 7.

 4        Q.   And is this the summary chart that captures the

 5   interactions between Stone and DeLeon and Thompson on

 6   September 28th?

 7        A.   Yes, it is.

 8        Q.   Okay.  And up at the top, at 11:45 in morning, do we

 9   see a 21-minute phone call between Stone and DeLeon?

10        A.   Yes, ma'am.

11        Q.   And does Casi Thompson then have a recorded call with

12   DeLeon that day?

13        A.   Yes, ma'am.

14        Q.   Lasting just approximately three minutes; is that

15   correct?

16        A.   Yes.

17        Q.   And it looks like four minutes after that phone call

18   we have DeLeon calling Bill Stone.  Is that what your chart's

19   showing?

20        A.   Yes, it does.

21        Q.   And finishing out that day, is there approximately

22   45 minutes of phone calls between DeLeon and Stone?

23        A.   Yes, ma'am.

24        Q.   Okay.  Now, at this point, near the end of September,

25   I mean, you're playing a very complicated game of telephone
```

1    throughout this past month or two; is that correct,

2    Ranger Briley?

3        A.   Yes, ma'am.

4        Q.   Okay.  Did you continue any of the controlled calls

5    at this point with Defendant DeLeon?

6        A.   No.

7        Q.   Okay.  Why did you quit trying to get him to do

8    controlled calls with Stone?

9        A.   I had gathered -- essentially utilized what I needed

10   for the investigation at that point, so I didn't -- I didn't

11   need him.

12       Q.   Okay.  At this point were you continuing to encourage

13   Casi Thompson to make recorded calls with Defendant Stone?

14       A.   Let's see, September.  No, I -- I had -- at the end

15   of September, I had sort of digressed to reset with the

16   investigation.  There is a lot of other information I'm running

17   down investigatively at this point.

18       Q.   At this point, based on what Casi Thompson had told

19   you, and all of the audio -- which I'm assuming at this point

20   it's hours upon hours upon hours of audio that you have

21   gathered between Thompson, DeLeon, and Stone in any

22   combination, correct?

23       A.   Yes.

24       Q.   Okay.  Had you established clearly in your mind the

25   fact that there was this lie of secret probation?

```
 1        A.    Yes.
 2        Q.    Casi Thompson did make a few more recorded calls with
 3   Defendant Stone throughout the course of the end of 2019,
 4   correct?
 5        A.    Yes, ma'am.
 6        Q.    And she shared those calls with you?
 7        A.    Yes, ma'am.
 8        Q.    Okay.  In fact, she called -- made a controlled call
 9   on November 21st, 2019, is that correct?
10        A.    Yes, ma'am.
11        Q.    And then did she also make a controlled call on
12   December 12th, 2019?
13        A.    Yes, ma'am.
14        Q.    And that is between Casi Thompson and Bill Stone?
15        A.    Yes.
16              MS. MAX:  At this time, Government moves to
17   admit Government's Exhibit 79 and accompanying transcript 80.
18              THE COURT:  Any objection?
19              MR. WESTFALL:  Your Honor, we just heard
20   testimony that he had nothing to do with any controlled
21   calls --
22              THE COURT:  What's your legal objection, not
23   speaking objection?
24              MR. WESTFALL:  Okay.  I don't think that she has
25   made a foundation for these phone calls out at this date.
```

```
 1                    THE COURT:  Okay.

 2                    MR. WESTFALL:  We'd ask that she do so.

 3                    THE COURT:  Improper foundation, okay.

 4                    Any objection from you?

 5                    MR. GALLIAN:  No objection.

 6                    THE COURT:  All right.  I'll overrule that.

 7                    MS. MAX:  Permission to publish Government's

 8      Exhibit 79 and 80?

 9                    THE COURT:  Uh-huh.

10                    MS. MAX:  Timestamp 11:58 to 12:29.

11                    (Audio playing.)

12         Q.   Now, just because you've finished getting DeLeon to

13      make controlled calls and you've listened on Casi Thompson

14      making controlled calls, you're still continuing your

15      investigation throughout the end of 2019 and moving into 2020;

16      is that correct?

17         A.   Very much so.

18         Q.   Okay.  Do you meet again with Casi Thompson on

19      March 2nd, 2020?

20         A.   Yes, I do.

21         Q.   And do you have her make a controlled call to Bill

22      Stone on that day?

23         A.   Yes, I do.

24                    MS. MAX:  Government moves to admit Government's

25      153 and accompanying transcript 168.
```

1          THE COURT:  Any objection?

2          MR. WESTFALL:  No, Your Honor.

3          MR. GALLIAN:  No, Your Honor.

4          THE COURT:  Admitted.

5          MS. MAX:  Permission to publish?

6          THE COURT:  Granted.

7          Members of the jury, are we doing okay?

8          (Respond affirmatively.)

9          MR. WESTFALL:  Timestamp 13:43 to 14:24.

10          (Audio playing.)

11     Q.   Ranger Briley, as a Texas ranger, do you have a team

12   of analysts that are working underneath you?

13     A.   I have access to analysts.  I use analysts.  A team

14   of analysts -- I mean, I have two or three.

15     Q.   So at this point of the investigation we're going on

16   roughly six months, correct?

17     A.   Yes, ma'am.

18     Q.   Six, seven months.  And have you been conducting this

19   investigation pretty much entirely on your own at this point?

20     A.   Yes, ma'am.

21     Q.   Okay.  Did you start to look outside of your agency

22   for additional resources?

23     A.   Yes, I did.

24     Q.   Okay.  Explain to the jury why you did that.

25     A.   So I -- I needed more resources, so I needed more

1  help, assistance, especially on the financial pieces.  I don't

2  have -- essentially didn't have time for it, to do it all on my

3  own.

4           So also this case, I realized it had very much a

5  federal nexus to it.  So I'd established that the federal

6  offenses were probably as good at -- as or better than state

7  offenses that he could be charged with.  So I reached out to

8  the U.S. Attorney's Office for assistance with both prosecution

9  and investigative assistance.

10      Q.   And did that end up becoming a joint investigation

11  with the Texas Rangers and with the Department of Justice

12  Office of Inspector General?

13      A.   Yes, it did.

14      Q.   Okay.  And was that in the spring of 2020 that they

15  became involved in your investigation?

16      A.   Yes, ma'am.

17      Q.   And from there on out, did you work the investigation

18  with them jointly?

19      A.   Yes.

20      Q.   Okay.  And in the meantime, you said you are doing

21  things besides just having gotten these controlled calls,

22  correct?

23      A.   Yes.

24      Q.   Have you received and recovered Penny Weisend's phone

25  at this point?

 1          A.    Yes.

 2          Q.    And later on were you -- did you get Casi Thompson's

 3   phone from her?

 4          A.    Yes, ma'am.

 5          Q.    Did Casi Thompson have any hesitation in wanting to

 6   hand her phone over to you?

 7          A.    No, ma'am.

 8          Q.    Once Department of Justice OIG -- and we'll just

 9   refer to them as OIG, okay?

10          A.    Okay.

11          Q.    Did y'all decide to re-approach Defendant DeLeon?

12          A.    Yes, we did.

13          Q.    Can you explain to the jury why that decision was

14   made?

15          A.    There was some assessments that were ongoing with

16   regard to his culpability in this whole scheme that we were

17   already working, so we thought that we would continue that

18   investigation, both using DeLeon and continuing to use him also

19   against Stone.

20          Q.    So because you approached or were discussing

21   approaching DeLeon again, did that mean anything in terms of

22   you ruling him out as a suspect?

23          A.    I -- well, I mean, we were trying to determine what

24   he was in this investigation, whether criminal or not --

25          Q.    Okay.

1          A.     -- if that answers your question.

2          Q.     Okay.  And when you are re-approaching again and

3     having the discussions with him, I think you had testified

4     earlier that what you say to someone in an interview is not

5     necessarily what your level of knowledge is or what your belief

6     is; is that correct?

7          A.     Oh, yeah.

8                    MR. WESTFALL:  That is a misstatement of the

9     record.

10                   THE COURT:  Okay.  Members of the jury, you will

11    recall the evidence as you have heard it.  You-all will be the

12    judges of the facts, and you will decide what the facts are.

13         Q.     Ranger Briley, the statements that you make in an

14    interview with a witness, a victim, a potential suspect, are

15    those always necessarily what your belief is?

16         A.     No.

17         Q.     And why not?

18         A.     The law allows me to do what I need to do

19    investigatively to extract the truth, and sometimes that means

20    saying whatever has to be said to find that out.

21         Q.     So if you agree with someone in an interview, does

22    that necessarily mean that you agree with the fact that that

23    person has just told you?

24         A.     Correct, no, it does not mean I would have to agree.

25         Q.     Okay.  Likewise, if you disagree with a person in an

1    interview, that doesn't mean you necessarily disagree with the

2    fact?

3         A.   Correct.

4         Q.   And if you make any sort of statement of fact in an

5    interview with a person, that doesn't necessarily mean that

6    that statement of fact is true?

7         A.   That's correct.

8         Q.   You were speaking of the fact that there was a

9    decision made by OIG and you to re-approach Defendant DeLeon?

10        A.   Yes.

11        Q.   Is that correct?

12                  And how did y'all decide to go about doing that

13   in terms of where and when?

14        A.   We decided we would go to his residence and do

15   another deep investigative interview with him, much like that I

16   had done previously in Fort Worth, to establish some truth

17   there.

18        Q.   Did you contact Defendant DeLeon before going back to

19   his residence?

20        A.   I probably didn't give him much warning, but would

21   have given him a little bit of notice.

22        Q.   At this point had it been many months since you had

23   communicated with DeLeon?

24        A.   Yes, it had.

25        Q.   Okay.  And he hadn't been calling back to you about

1    the status of the investigation for many months?

2        A.    Yes.

3        Q.    Do you know what time of day it was that y'all went

4    out to Defendant DeLeon's home?

5        A.    Yeah, I think it was likely mid-morning.  I'm not

6    100 percent positive.

7        Q.    And who was present with you when you went to

8    DeLeon's home?

9        A.    OIG Agents Brian Luley, Ivan Martinez, also with OIG.

10   And myself.

11       Q.    And was that date May 7th, 2020?

12       A.    Yes, it was.

13       Q.    And did you in fact make contact with Defendant

14   DeLeon at his home that day?

15       A.    Yes.

16       Q.    Did he allow you in?

17       A.    Yes, he did.

18       Q.    Okay.  Just describe to the jury a little bit about

19   that.  Did he come to the door?  Was he friendly?  Did he

20   hesitate in letting y'all come inside, those kind of things?

21       A.    He invited us in.  He was willing to allow us into

22   his home and talk to him further about this.

23       Q.    Okay.  And once again, was a recording made of that

24   interview of DeLeon on May 7th, 2020?

25       A.    Yes.

 1                    MS. MAX:  At this time, Government would move to

 2     introduce DeLeon 83 for record purposes only.

 3                    THE COURT:  Any objection?

 4                    MR. WESTFALL:  No objection, Your Honor.

 5                    MS. MAX:  And at this time --

 6                    THE COURT:  I think we're waiting for one more

 7     response.

 8                    MR. GALLIAN:  Are you not putting in 82?

 9                    MS. MAX:  I'm doing 83 right now.

10                    MR. GALLIAN:  No objection to 83.

11                    THE COURT:  It's admitted.

12                    MS. MAX:  And at this time, Government moves to

13     introduce Government's Exhibit 176, which is extracted from

14     DeLeon Exhibit 83.

15                    MR. GALLIAN:  No objection.

16                    MR. WESTFALL:  No objection, Your Honor.

17                    THE COURT:  Admitted.

18                    MS. MAX:  Permission to publish?

19                    THE COURT:  Granted.

20                    (Audio playing.)

21                    MR. GALLIAN:  And at this time, Government would

22     move to introduce Government Exhibit 177, which is derived from

23     DeLeon 83 as well.

24                    MR. WESTFALL:  No objection, Your Honor.

25                    MR. GALLIAN:  No objection.

1            THE COURT:  Admitted.

2            MR. WESTFALL:  Permission to publish

3  Government 177?

4            THE COURT:  Granted.

5       Q.   On May 7th, 2020, at DeLeon's home, did you ask him

6  if he would make another controlled call with Bill Stone?

7       A.   Yes.

8       Q.   Okay.  And to be clear, he sat down and agreed to an

9  interview with you guys again, right?

10      A.   Yes, he did.

11      Q.   Okay.  And that was once again a rather lengthy

12  interview?

13      A.   Yes.

14      Q.   And in the course of that interview, did y'all

15  request him then to make a controlled call to Bill Stone?

16      A.   Yes.

17      Q.   And did he make a call that day in your presence?

18      A.   Yes.

19      Q.   Okay.  And once again, was the nature of that call

20  discussing the secret probation?

21      A.   Yes.

22      Q.   Okay.

23            MS. MAX:  Can we go to Government 156, Page 8.

24      Q.   Is this a summary of interactions from that May 7th,

25  2020 date?

1      A.   Yes.  Yes, ma'am.

2      Q.   Okay.  And starting at the very top, the top yellow

3   line, is that --

4           MS. MAX:  If you want to just -- if you could do

5   the top half of the table.

6      Q.   I'm going to start at approximately 9:44, OIG begins

7   interview with DeLeon at his residence.

8      A.   Yes, ma'am.

9      Q.   Okay.  And it looks like actually in the course of

10  that interview, is that next line -- white line representing

11  that Bill Stone attempted to make a phone call to DeLeon while

12  y'all are interviewing DeLeon?

13     A.   Yes.

14     Q.   Okay.  And at 12:29, y'all end the interview; is that

15  correct?

16     A.   Yes.

17     Q.   Okay.  And then DeLeon and Stone, it looks like there

18  is a series of very short calls or attempts of calls between

19  them; is that correct?

20     A.   Yes.

21     Q.   Was that when DeLeon had told you that he would agree

22  to a controlled call with Stone and y'all are attempting to

23  make that call?

24     A.   Yes.

25           MS. MAX:  Can you do starting with the green

1  line at the bottom half?

2      Q.   Okay.  And then the two green lines, a 7-minute 45

3  second call, and a 5-minute 12 second call, are those the two

4  controlled calls you made that day?

5      A.   Yes.

6      Q.   And did y'all leave at approximately 2:09 that

7  afternoon?

8      A.   Yes.

9      Q.   And then on the rest of that day, do we see a series

10  of very short phone calls between DeLeon and Stone?

11      A.   Yes, ma'am.

12      Q.   Okay.

13          MS. MAX:  Can we go to Government's 156, Page 9.

14      Q.   Is this a summary table of calls between Stone and

15  DeLeon from May 8th through May 10th, 2020?

16      A.   Yes, ma'am.

17      Q.   Okay.  And do we see a one-second call, a 20-second

18  call, 16 minutes; 30 seconds; 26 minutes; 13 minutes;

19  3 seconds; 9 minutes; 11 seconds; and 33 seconds over -- I

20  mean, 33 minutes, over the course of those next three days; is

21  that correct?

22      A.   Yes, ma'am.

23      Q.   On May 11th, 2020, did DeLeon make a recorded call to

24  Stone?

25      A.   Yes.

1        Q.    Did he do that independently or was law enforcement

2   present?

3        A.    Presence of law enforcement.

4        Q.    Okay.  Did this happen at his house, or where did it

5   occur?

6        A.    I don't remember the location.

7        Q.    Okay.  But DeLeon made the call in the presence of

8   law enforcement?

9        A.    In our presence, yes, ma'am.

10        Q.    Okay.  Actually, backing up to the May 7th call that

11   DeLeon made to Stone, in that call, does DeLeon tell Stone that

12   agents are at his house wanting to talk him -- that agents came

13   to his house wanting to talk to him that day?

14        A.    Yes.

15        Q.    So y'all had no problem with the fact that DeLeon was

16   telling Stone that agents had come to his house?

17        A.    That's correct.

18        Q.    Why at that point were you comfortable with DeLeon

19   revealing the existence of your investigation?

20        A.    It was a tactic of ours.  Basically we were letting

21   Stone know that, you know, we're -- we're definitely

22   investigating.  There's -- can't be any question about it.

23   And -- and that, you know, he would be on notice that we're

24   coming to -- we're coming to ask him more; we're going to seek

25   other evidence from you, to see what he would say, what is his

1    response to the Department of Justice and Texas Rangers coming

2    after him from -- with this, to see what he would say.  You

3    would expect a certain kind of reaction from that.

4                MS. MAX:  Can we bring up 156, Page 10.

5        Q.   This -- does this, then, show the call that was made

6    on May 11th, 2020, between Stone and DeLeon?

7        A.   Yes, ma'am.

8        Q.   Okay.  And we see there -- looks like there's an

9    attempt for Stone calling DeLeon.  But then we see a follow-up,

10   that 42-minute phone call DeLeon is calling Stone; is that

11   correct?

12       A.   Yes.

13       Q.   Okay.  And the green indicates that's the recorded

14   call made in your presence?

15       A.   Yes, ma'am.

16       Q.   Okay.  We don't see any other phone calls that day

17   between the two men, do we?

18       A.   No.

19       Q.   And that recorded call occurred at approximately

20   10:07 in the morning; is that right?

21       A.   That is right.

22       Q.   Okay.  The very next day, May 12th, 2020, DeLeon made

23   another recorded call to Stone, correct?

24       A.   Yes, ma'am.

25       Q.   And once again, was that in the presence of

```
 1    investigators and yourself?
 2        A.   Yes.
 3        Q.   Okay.  And that call was recorded, correct?
 4        A.   Yes, ma'am.
 5        Q.   Okay.
 6             MS. MAX:  Government moves to introduce
 7    Government's Exhibit 132 and 133 for record purposes only.
 8             THE COURT:  Any objection?
 9             MR. GALLIAN:  No objection, Your Honor.
10             MR. WESTFALL:  No objection.
11             THE COURT:  Admitted.
12             MS. MAX:  Government moves to introduce
13    Government's Exhibit 180, which is an extract of Government's
14    Exhibit 132 and 133.
15             MR. GALLIAN:  No objection, Your Honor.
16             MR. WESTFALL:  No objection.
17             THE COURT:  Admitted.
18             MS. MAX:  Permission to publish?
19             THE COURT:  Granted.
20             (Audio playing.)
21        Q.   Is this the first time, to your knowledge from the
22    controlled recorded calls, that DeLeon had indicated to Stone
23    that he has given investigators access to his phone?
24        A.   Yes.
25        Q.   Okay.
```

1          MS. MAX:  Government moves to introduce
2  Government's Exhibit 181, which is an extract of Government's
3  Exhibit 132.
4          MR. WESTFALL:  No objection.
5          MR. GALLIAN:  No objection.
6          THE COURT:  Admitted.
7          MS. MAX:  Permission to publish.
8          THE COURT:  Granted.
9          (Audio playing.)
10          THE COURT:  Let's break there.
11          Members of the jury, I need to come back and
12  visit with you for just a minute and then we'll have our break.
13          All rise for the jury.
14          (Jurors exit courtroom.)
15          (Recess taken.)
16          (Jurors enter courtroom.)
17          THE COURT:  Your witness.
18          MS. MAX:  Can we bring up 156, Page 11?
19     Q.   Ranger Briley, before the break we had listened to
20  two snippets of a phone call from May 12th, 2020, between
21  DeLeon and Stone; is that correct?
22     A.   Yes, ma'am.
23     Q.   Okay.  And that's where DeLeon was telling Stone that
24  investigators had taken his phone and Stone was wanting DeLeon
25  to go look back through his messages to see how far back they

1   went; is that correct?

2        A.    Yes, that's correct.

3        Q.    Looking at Government 156, Page 11, is this a summary

4   chart for phone communications for DeLeon and Stone on

5   May 12th, 2020?

6        A.    Yes, it is.

7        Q.    Okay.  Is that top line at 11:12, is that the

8   controlled call between the two?

9        A.    Yes, ma'am.

10        Q.    And how long was that controlled call?

11        A.    Eight minutes, 59 seconds.

12        Q.    And if following seven lines, is that the remainder

13   of the calls between Stone and DeLeon for that day?

14        A.    Yes, ma'am.

15        Q.    And what is the longest call in length on May 12th?

16        A.    The controlled call.

17        Q.    Okay.  What's the second longest?

18        A.    Second longest is the -- for three minutes and

19   41 seconds that day.

20        Q.    Okay.  And many five-second calls, two-second calls,

21   six-second calls, correct?

22        A.    Yes.

23        Q.    These -- the lack of -- or the length of calls --

24   and, I mean, would you agree with me, those calls that day on

25   May 12th, after the controlled call, equal up to 10 or

1  12 minutes?

2      A.   Yes.

3      Q.   That's a lot less phone time than what we saw between

4  Stone and DeLeon from the charts that we saw back in September;

5  is that right?

6      A.   Yes.

7      Q.   Okay.  And going backwards just a second, we had

8  talked about when OIG and yourself decided to re-approach

9  Defendant DeLeon on May 7th, 2020, at his home, correct?

10     A.   Yes, ma'am.

11     Q.   And we had talked about the fact that y'all had

12  recorded an interview with him?

13     A.   Yes.

14         MS. MAX:  At this time, Government would like to

15  admit DeLeon Exhibit 82 for record purposes only.

16         MR. GALLIAN:  No objection.

17         MR. WESTFALL:  No objection.

18         MS. MAX:  Your Honor, to correct the record, I

19  had previously admitted, I believe, DeLeon 83, and I'm properly

20  identifying now DeLeon Exhibit 82.  And from that, Government

21  moves to admit Government's Exhibit 191, which is an extract of

22  DeLeon 82.

23         MR. GALLIAN:  No objection.

24         MR. WESTFALL:  No objection.

25         THE COURT:  Admitted.

1          MS. MAX:  Permission to publish?

2          THE COURT:  Granted.

3          (Audio playing.)

4     Q.    And Ranger Briley, who is the voice besides Defendant

5   DeLeon that we hear on that recording?

6     A.    Special Agent Brian Luley with OIG.

7     Q.    Is he one of the agents that you had referenced was

8   now involved in the investigation with you?

9     A.    Yes, ma'am.

10    Q.    And in that recording, do we hear Defendant DeLeon

11  talking about the $15,000 check that we mentioned before?

12    A.    Yes, we do.

13    Q.    Does he say that -- at what point in time in the

14  probation that he had received the $15,000?

15    A.    He does.

16    Q.    And how long of a period is that?

17    A.    I -- it was early on.  I don't remember his exact

18  wording with that.

19    Q.    Does he say at this point it was two and a half years

20  of my life at this time?

21    A.    Yes.

22    Q.    Okay.

23          MS. MAX:  Your Honor, I believe I've already

24  introduced Government's Exhibit 177, but I have not yet

25  published it.  So at this time the government would like to

1    publish Government 177.

2              THE COURT:  Permission is granted.

3              (Audio playing.)

4        Q.   So again, that was a recording from May 7th, 2020,

5    with Joe DeLeon, correct?

6        A.   Yes, ma'am.

7        Q.   At this point, this is the third, fourth or fifth

8    time you've talked to him about this truck, correct?

9        A.   Yes.

10       Q.   And once again, we're hearing that he's representing

11   that he bought the truck from Casi Thompson; is that correct?

12       A.   Yes.

13       Q.   And he is offering to -- he mentions that -- the fact

14   that he paid for it by check?

15       A.   Yes.

16       Q.   And he's offering to show you that check?

17       A.   Yes.

18       Q.   Okay.  Was there a little bit -- in the recording

19   that we just heard, was that a little bit more detail -- was

20   there more to the story this time with the truck than what you

21   had been told prior?

22       A.   Yes.

23       Q.   Okay.  What was that detail?

24       A.   Well, the detail that -- I knew the purchase price as

25   far as what he told me.  Now he's telling me that he also sold

1   the truck.  So that was new information for me.  Sold it for

2   higher than he bought it for.

3       Q.   Had he --

4       A.   That's it.

5       Q.   -- had he offered before that the fact that Casi had

6   offered the truck to him, but he refused to take it?

7       A.   Yes, that was also new information.

8       Q.   Okay.  And in this interview, which we just played a

9   snippet of, and you had previously said lasted an hour-plus, at

10  any point in the interview did he tell you that Casi Thompson

11  had, in fact, given him a check back for the same amount as the

12  check that he gave her for the truck?

13      A.   No, he did not.

14      Q.   Were you involved with -- at this point, did you and

15  OIG investigators make a decision to execute a search warrant

16  on the residence of Bill Stone?

17      A.   Yes, we did.

18      Q.   Talk to the jury about why at that point in the

19  investigation you came to that decision.

20      A.   Well, there was a lot of evidence that we had, at

21  this point, established through controlled calls.  We also had

22  a lot of financial records and verifiable proof of many claims

23  at this point.  At least enough probable cause we would -- we

24  were willing to go to the district judge and a federal judge

25  and ask for a search warrant to go to his house and seize

1    additional evidence that we believed we would find.

2        Q.   So for an investigator to get a search warrant, do

3    they have to make an affidavit to a district court judge?

4        A.   Yes.

5        Q.   Okay.  And that judge has to sign off on the search

6    warrant?

7        A.   Yes, ma'am.

8        Q.   In the warrant, do you have to specify the types of

9    items that you are looking for?

10        A.   Yes.

11        Q.   At that point were y'all aware that Bill Stone was in

12    possession of a few of Casi Thompson's phones?

13        A.   Yes, we were.

14        Q.   Was that one of the items that y'all were looking for

15    in the search?

16        A.   Yes.

17        Q.   Okay.  What else, generally, were you thinking may be

18    present at his home, or were you looking for?

19        A.   We were looking for financial records, documents, of

20    that such.  Other electronic records.  We were looking for

21    anything associated with the financial aspects of this case, on

22    any kind of document.

23             We were looking for any personal belongings that

24    would be connected to Casi.  We were also looking to find the

25    two trucks we believe that he had -- I'm sorry, a truck and a

1    car that he had received during this investigation.  We of

2    course found those.  Any photographic evidence as well.

3         Q.   And were you looking for potentially any electronic

4    evidence beyond the two phones that we just mentioned?

5         A.   Yes.

6         Q.   Were you interested in getting his phone and his

7    computer as well?

8         A.   Yes.

9         Q.   Explain to the jury, once the judge agrees to a

10   search, is there a certain time frame with which you, law

11   enforcement, must execute the search warrant?

12        A.   Yes.  It's usually three days, exclusive the date of

13   issuance and execution.

14        Q.   So prior to the search, do y'all put together a plan

15   as to how to go about the search?

16        A.   Yes, we do.

17        Q.   Okay.  Is that called an operational plan?

18        A.   Yes, ma'am.

19        Q.   And at the time of the search, does everyone that's

20   present have a very specific task?

21        A.   Yes.

22        Q.   Were there any concerns that you or the operational

23   team had prior to going into the search?

24        A.   Yes.

25        Q.   And what were they?

1    A.   Well, we know that at this point we're dealing with a

2    very trained retired officer from the federal government.  And

3    so with that, we also had knowledge during the investigation

4    that some guns had been -- guns were revealed during this

5    investigation.  So we knew there were guns at the residence.

6              We also knew that we didn't want evidence

7    destroyed.  And so that -- we wanted to get in peacefully, but

8    quickly, so that nothing would be destroyed we were after.

9              So obviously there is a risk when you're --

10   you've already -- I mean, in this case, the defendant knows --

11   should know the Department of Justice and Texas Rangers are

12   investigating this thing.  It's not -- you know, it is very

13   real.  It should be.

14             So with that, there's always the risk that a

15   defendant could be very scared, you know, of what they're

16   facing.  So we did a -- everything we could to set up a strong

17   perimeter in this case to execute this safely.  In fact, they

18   actually tried to call the defendant in this case prior to

19   actually executing the search warrant to try to get him to come

20   out of the residence.  Tried two phone calls.

21             If you'd like me to explain further, we

22   announced with a PA system, very, very loud, to just come out.

23   You know, we've already tried cell phone calls.  He's not

24   answering, he's not responding.  So then we tried the PA

25   speaker, which is very, very loud.  And of course we used a --

1    a team of guys that are very well trained in what they do.

2              So eventually there was not anyone that came

3    outside the residence or responding to the calls.  So within, I

4    would say, ten minutes of that not happening, the front door

5    was breached with our personnel.  Meaning the door was busted

6    open.  At which point we did encounter the defendant, Stone.

7         Q.   Okay.  Backing up for a second.  The date of the

8    search was June 18th, 2020; is that correct?

9         A.   Yes.

10        Q.   And so going back from the timeline that we'd

11   established, we know that at least since May 7th we have on

12   recording that Defendant Stone knows now that a federal agency,

13   not just a Texas ranger, but a federal agency is involved in

14   investigating him; the OIG, correct?

15        A.   Yes, ma'am.

16        Q.   So that's a good four or five weeks before the search

17   warrant?

18        A.   Yes, ma'am.

19        Q.   So you were saying that is -- was one of your major

20   concerns, is the fact that at this point he knows y'all are

21   investigating him, and he's known for a little while?

22        A.   Yes.  And there's other reasons.  I mean, I'm well

23   aware of many, many calls of which I've covered and listened

24   to.  So I have a pretty good idea of the state of mind that

25   this is driving him into as far as his mental state.

1      Q.    And at this point, when DeLeon made the controlled

2   call to Stone in May, DeLeon had clearly told Stone that

3   federal agents had shown up at his house that day unannounced,

4   correct?

5      A.    Yes.

6      Q.    So it wasn't just the fact that Stone knows --

7            MR. GALLIAN:   Your Honor, I'm going to object to

8   leading at this point.

9            MS. MAX:   I'll move on.   I'll withdraw my

10   question.

11           THE COURT:   All right.

12     Q.    So at this point, did you have reason to believe that

13   Stone would be aware that you may show up at his house

14   unannounced?

15     A.    Yes.

16     Q.    And what was that based on?

17     A.    Based on -- I mean, we -- we've notified him in every

18   form we could -- possibly can at this point, up to even trying

19   to call him before executing a warrant.   We've done everything

20   we could.

21     Q.    Why wouldn't you just take the route of calling Bill

22   Stone and asking him to come down to the police department for

23   a chat?

24     A.    Again, there's evidence that I believe is going to be

25   destroyed if I don't use the authority of a district judge to

1    go in and seize evidence at his residence.

2         Q.   On the day of a search, and you are working with an

3    operational team, does everybody that's involved on that

4    operational team have a specific task for the search?

5         A.   Yes, ma'am.

6         Q.   Can you kind of tell the jury what those task groups

7    look like?

8         A.   So there's -- there's a team that -- you know,

9    tactical-wise, there's a team that breaches the door.  There is

10   an arrest team and a team that only is -- their only job is to

11   go in and just -- literally just capture the person, take them

12   into custody and remove them from the residence.

13             There's another team that does additional

14   searching throughout the residence, only for things that are

15   going to potentially harm anyone.  Once that team clears,

16   the -- there's another team that is -- as in this case, a crime

17   scene team.  And they -- they are there waiting for the house

18   to be cleared so that they can go in and recover evidence that

19   is believed to be at the residence.

20        Q.   Even for the most basic search, are there a lot of

21   individuals involved?

22        A.   Yes, I would say so.  Just -- it depends on each

23   case.

24        Q.   For the search on June 18th, did that involve agents

25   from both the Texas Rangers and the OIG?

 1          A.   Yes, it did.

 2          Q.   Do you know approximately how many law enforcement

 3     officers were involved in the search that day?

 4          A.   There was -- in the search piece, I would say there

 5     was probably 15, maybe.

 6          Q.   Okay.  And that was to -- was that to cover all the

 7     different tasks that you had just previously talked about?

 8          A.   Yes, there was a very specific collection method as

 9     well.  And so everyone has very, very detailed jobs of what

10     they're doing.

11          Q.   Did you have an arrest warrant for Bill Stone that

12     day?

13          A.   No, I did not.

14          Q.   So there were no plans to actually arrest him that

15     day?

16          A.   That's correct.

17          Q.   Getting back to -- you had said that y'all had first

18     attempted to call him that morning?

19          A.   Yes.

20          Q.   It was just over the phone, a phone call?

21          A.   Yes.

22          Q.   Approximately what time was that?

23          A.   I want to say that that would have been potentially

24     around 7:00 or 8:00, but I'm not positive.  It was definitely

25     in the morning.

1    Q.    Is there a strategic reason why you would choose that

2    time of day?

3    A.    I would say typically we like to do it at night,

4    definitely early in the morning.  But it's more about the

5    person's going to be there that we -- can potentially even help

6    us gather evidence when they're together.  Like even though

7    we're dealing with defendants, oftentimes even the defendant

8    makes it easier and says, this is what you are looking for, you

9    know, go here, go there.

10             So there's like a number of reasons why we pick

11   the time of day we do.  It is also about resources that are

12   coming in.  Like in this case, you know, there's resources that

13   are coming in from D.C. or, you know, Washington, D.C. or other

14   places.  So it's all about getting people there together, from

15   wherever they are from, to -- to locate the evidence that we

16   need.

17   Q.    And you said that after you called out for Defendant

18   Stone on the PA system, you did not get a response?

19   A.    That's correct.

20   Q.    And you said the front door at that point was

21   breached?

22   A.    Yes.

23   Q.    Explain to the jury what exactly that means.

24             THE COURT:  Why don't we stop there.

25             Does that sound good, members of the jury, and

```
 1    we'll pick back up.
 2                    All rise for the jury.
 3                    (Jurors exit courtroom.)
 4                    THE COURT:  Anything we need to take up before
 5    we break for the evening?
 6                    MS. MAX:  Nothing from the government, Your
 7    Honor.
 8                    MR. GALLIAN:  No, Judge.
 9                    (Proceeding adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              I, BROOKE N. BARR, United States Court Reporter

2   for the United States District Court in and for the Northern

3   District of Texas, Dallas Division, hereby certify that the

4   above and foregoing contains a true and correct transcription

5   of all proceedings in the above-styled and -numbered cause.

6

7              WITNESS MY OFFICIAL HAND this the 2nd day of

8   August, 2023.

9

10

11                      /S/ BROOKE N. BARR
                        BROOKE N. BARR, CSR NO. 6521
12                      CSR Expiration Date:  7/31/24
                        United States Court Reporter
13                      1100 Commerce Street
                        Room 1376
14                      Dallas, Texas 75252
                        (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25