1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
     UNITED STATES OF AMERICA,    )        3:21-CR-236-E
5              Government,        )
                                  )
6                                 )
     VS.                          )        DALLAS, TEXAS
7                                 )
                                  )
8    WILLIAM ROY STONE, JR.,      )
     JOSEPH EVENTINO DELEON,      )
9              Defendants.        )        August 3, 2023

10

11           TRANSCRIPT OF JURY TRIAL, VOLUME 8A

12           BEFORE THE HONORABLE ADA E. BROWN

13              UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:        MS. JENNA DANELLE RUDOFF
                                UNITED STATES DEPARTMENT OF JUSTICE
18                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
19                              1100 Commerce Street
                                Dallas, Texas  75242
20                              jenna.rudoff@usdoj.gov
                                (214) 659-8600
21

22                              MS. DONNA S. MAX
                                UNITED STATES DEPARTMENT OF JUSTICE
23                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
24                              1100 Commerce Street
                                Dallas, Texas  75242
25                              donna.max@usdoj.gov
                                (214) 659-8664

```
 1                                  MR. MARCUS J. BUSCH
                                    UNITED STATES DEPARTMENT OF JUSTICE
 2                                  NORTHERN DISTRICT OF TEXAS
                                    U.S. Courthouse, Third Floor
 3                                  1100 Commerce Street
                                    Dallas, Texas  75242
 4                                  marcus.busch@usdoj.gov
                                    (214) 659-8642
 5

 6   FOR THE DEFENDANT,            MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:       Gallian Firm
 7                                  Parkside Tower
                                    3500 Maple Avenue
 8                                  Suite 720
                                    Dallas, Texas  75219
 9                                  gregg@GallianDefenseFirm.com
                                    (214) 432-8860
10

11                                  MS. JACLYN ANNETTE GALLIAN
                                    Bryan Cave Leighton Paisner
12                                  2200 Ross Avenue
                                    Suite 4200
13                                  Dallas, Texas  75201
                                    jaclyn.gallian@bclplaw.com
14                                  (214) 721-8058

15
     FOR THE DEFENDANT,            MR. GREG WESTFALL
16   JOSEPH EVENTINO DELEON:       Westfall Sellers
                                    1701 River Run
17                                  Suite 801
                                    Fort Worth, Texas  76107
18                                  greg@westfallsellers.com
                                    (817) 928-4222
19

20                                  MR. FRANK SELLERS
                                    Westfall Sellers
21                                  1701 River Run
                                    Suite 801
22                                  Fort Worth, Texas  76107
                                    frank@westfallsellers.com
23                                  (817) 928-4222

24

25
```



1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
2                                1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
3                                (214) 753-2170

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25

```
 1                  JURY TRIAL VOLUME 8A - AUGUST 3, 2023
 2                       P R O C E E D I N G S
 3           SECURITY OFFICER:  All rise.
 4           THE COURT:  Anything we need to take up before we
 5   bring them in?
 6           MS. MAX:  Not from the Government.
 7           MR. GALLIAN:  No, Your Honor.
 8           MR. WESTFALL:  No, Your Honor.
 9           THE COURT:  All right.
10           (Discussion off the record)
11           SECURITY OFFICER:  All rise for the jury.
12           (Jury in)
13           THE COURT:  Good morning.  How are y'all doing?  How
14   were breakfast tacos?
15           JUROR:  Delicious.
16           THE COURT:  Good.  Good.  I hadn't tried these.  My
17   trusty assistant said that there were some good ones, so I am
18   munching on one as I speak, and you guys are allowed to bring
19   them in.
20           So with that said, the lawyers are in place and ready
21   to go.
22           And your witness, ma'am.
23           If everybody will check your phones real quick.
24   Thank you.
25           MS. MAX:  Thank you, Your Honor.
```

```
 1              THE COURT:  You're welcome.
 2         DANNY BRILEY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 3                   DIRECT EXAMINATION CONTINUED
 4    BY MS. MAX:
 5    Q.   Ranger Briley, picking up where we left off yesterday, we
 6    were discussing the beginning of the execution of the search at
 7    Stone's residence on June 18, 2020; is that correct?
 8    A.   Yes.
 9    Q.   Now, you mentioned yesterday, we had talked about the fact
10    that there were quite a few individuals out there.  Did y'all
11    have to make multiple attempts to get Bill Stone to come to the
12    door?
13    A.   Yes, ma'am.
14    Q.   Okay.  Ultimately, did Bill Stone respond and give y'all
15    access and entry to the house?
16    A.   Yes, ma'am.
17    Q.   Okay.  So I believe yesterday you had testified that you
18    thought that y'all had to breach his door at the time of the
19    execution of the search warrant?
20    A.   Yes, ma'am.
21    Q.   Was that correct?
22    A.   No, ma'am.
23    Q.   At what time did you have to breach his door?
24    A.   I don't know what -- what time, but this situation as far
25    as the door, I don't remember if we ultimately had to ram the
```

```
 1   door or if he actually opened the door.  It was inconsequential
 2   to us which way it happened, but his response was very, very
 3   slow in coming out was the point.
 4   Q.   Okay.  Did you later on in the investigation execute an
 5   arrest warrant with Bill Stone?
 6   A.   I'm sorry, did I execute a what?
 7   Q.   An arrest warrant.
 8   A.   Yes, ma'am.
 9   Q.   Okay.  And did you arrest him at his home?
10   A.   Yes.
11   Q.   Okay.  So to be clear, on the day of the search warrant,
12   you're not telling the jury that ultimately he didn't come and
13   give y'all access to his home?
14   A.   Correct.
15   Q.   Okay.  And once you were in the home, describe to the jury
16   what his demeanor was in terms of cooperation with y'all.
17   A.   He was obviously nervous.  He stated that he wanted to
18   talk to us.  He had counsel at the time.  So there was some
19   apprehension on his part on what to do, what to say, what not
20   to say.
21   Q.   Okay.  Was there any point at the beginning of the search
22   where y'all temporarily detained Stone?
23   A.   Yes, ma'am.
24   Q.   Okay.  Explain to the jury what happened.
25   A.   On the beginning and as part of protocol, when we go to a
```

```
 1   house and execute a search warrant of this nature, we do
 2   handcuff people inside, the target, in which, of course, Bill
 3   Stone is the target of this investigation.  So he's handcuffed
 4   immediately.
 5          Once the house is cleared, we take those handcuffs
 6   off of him and tell him essentially, as we did in this case,
 7   you can stay here or you can leave.  We would like to stay
 8   here.  Maybe you can help us.  We would like your help.
 9          And he chose to help.
10   Q.   Okay.  So he chose to stay?
11   A.   Yes, ma'am.
12   Q.   And when you say help, were there times throughout the
13   search that maybe y'all asked him questions about his home --
14   A.   Yes.
15   Q.   -- or where you could find something?
16   A.   Yes, ma'am.
17   Q.   Did he provide you access to the safes in his home?
18   A.   Yes, ma'am.
19   Q.   Did you ask him for car keys to his vehicles?
20   A.   Yes, ma'am.
21   Q.   Did he provide those to you?
22   A.   Yes, ma'am.
23   Q.   Okay.  So is that what you're talking about when you say
24   the cooperation?
25   A.   Yes, ma'am.
```

```
 1   Q.   Okay.  And you had mentioned that you were aware that he
 2   had legal counsel; is that right?
 3   A.   Yes.
 4   Q.   Did an attorney show up that day?
 5   A.   No.
 6   Q.   Did you read Bill Stone his Miranda rights that day?
 7   A.   Yes, I did.
 8   Q.   And did he waive those rights?
 9   A.   Yes, he did.
10   Q.   During the search, what was your role?
11   A.   My role was to ensure that the evidence that's there is
12   collected.  My role was to interview Bill Stone and -- if -- if
13   he were willing to talk to me, and to keep gaining that
14   evidence that I would probably gain in an interview.
15   Q.   Was Stone willing to talk to you?
16   A.   Yes, he was.
17   Q.   Was Investigator Brian Luley from the OIG also present
18   that day?
19   A.   Yes, he was.
20   Q.   Was he also serving in the role with talking with Stone?
21   A.   Yes.
22   Q.   Were you recording your interactions with Stone?
23   A.   Yes, I was.
24   Q.   Was this on your audio recorder?
25   A.   Yes, ma'am.
```

```
1   Q.   Was Brian Luley recording his interactions with Stone as
2   well?
3   A.   Yes, he was.
4   Q.   So do we have multiple recordings, some of them
5   overlapping?
6   A.   Yes, that's true.
7            MS. MAX:  At this time, the Government moves to
8   introduce Government's Exhibit 86 and 87 -- I'm sorry, moves to
9   admit Government's 86 and 87.
10           MR. GALLIAN:  No objection.
11           MR. WESTFALL:  May I have just a second?
12           THE COURT:  Certainly.
13           (Pause)
14           THE COURT:  Let me know when you're ready.
15           (Pause)
16           MR. WESTFALL:  No objection, Your Honor.
17           THE COURT:  All right.  Admitted.
18               (Government's Exhibit Nos. 86 and 87 received)
19           MS. MAX:  Your Honor, Government also moves to admit
20   Government's Exhibit 85.
21           MR. WESTFALL:  No objection.
22           MR. GALLIAN:  No objection, Judge.
23           THE COURT:  Admitted.
24               (Government's Exhibit No. 85 received)
25           MS. MAX:  Permission to publish, Judge?
```

```
 1              THE COURT:  Granted.
 2              MS. MAX:  Can we go ahead and play Government's
 3   Exhibit 87, time stamped 12:25 to 13:53?
 4              (Audio played)
 5   BY MS. MAX:
 6   Q.   Ranger Briley, where are you located during most of the
 7   time you're talking with Stone?
 8   A.   Generally located in the backyard of his residence,
 9   sitting at a table with two chairs.
10   Q.   And did you -- this recording that we heard, is this
11   pretty early on --
12   A.   Yes.
13   Q.   -- once you gain entry?
14   A.   (Indicating in the affirmative)
15   Q.   Do you just -- you launch right in and ask him about the
16   probation; is that right?
17   A.   Yes.
18   Q.   Okay.  And so we heard -- I know it was a little hard to
19   hear Stone's voice there at the beginning of the recording, but
20   you ask him generally if Casi Thompson is on a probation, and
21   his response to you is, I'm not a federal probation officer; is
22   that right?
23   A.   That's right.
24   Q.   At that point had you brought up any conversation about
25   him being a probation officer?
```

```
 1    A.   I had not.
 2    Q.   You asked him about Judge Anderson on the recording,
 3    correct?
 4    A.   Yes.
 5    Q.   Did it take him a while to give you a response?
 6    A.   Yes.
 7    Q.   And when he responds, what we hear is -- he's referencing,
 8    he says, it's in here.
 9         Tell the jury what he's talking about, what he's
10    starting to reference there.
11    A.   He's starting to reference a manuscript for a book that he
12    is writing, and he's -- has that book there at his residence,
13    and he's wanting to refer me to that book.
14    Q.   Okay.  So you had asked him a question about probation and
15    then -- or Judge Anderson, and he responds, oh, it's here in
16    the book?
17    A.   Yes.
18    Q.   Did you find through the course of your questioning with
19    him at the beginning of the search warrant, did he -- did he
20    reference the book a lot?
21    A.   Yes.
22    Q.   Okay.  Kind of explain to the jury how that went about.
23    A.   It was strange.  I -- you know, when asking specific
24    questions that obviously they're hard to answer if you're -- if
25    you committed some crime, it was -- his answers were evasive.
```

1  He would refer me back to this book that he's writing and not

2  specifically answer the question.  There's many instances of

3  that occurring.

4  Q.   When he would refer you back to the book, would he really

5  explain, or would he just reference that, oh, the thing you

6  brought up is in the book?

7  A.   Yeah.  The interesting thing is even sometimes when he

8  would read the manuscript, the book still didn't make sense,

9  still didn't answer the question where -- who's Judge Anderson,

10  where is this person located, is there a Judge Anderson.  I'm

11  not getting an actual yes or no.

12  Q.   So are you saying that there's multiple times he actually

13  read aloud to you from his manuscript?

14  A.   Yes.

15  Q.   Okay.  You're saying that really didn't clear up anything

16  for you?

17  A.   Correct.

18          MS. MAX:  Can we go ahead and publish Government

19  Exhibit 87, time stamp 15?

20          (Audio played)

21  BY MS. MAX:

22  Q.   Ranger Briley, in that clip that we just heard, is Stone

23  showing you some sort of badge?

24  A.   Yes.

25  Q.   And what is it?

```
 1   A.   It's some FBI badge that I remember seeing with a -- like
 2   in a wallet.
 3   Q.   So when he's talking about impersonation, what is he
 4   denying that he's impersonating?
 5   A.   He's denying impersonating a -- being a federal agent.
 6   Q.   Federal probation officer?
 7   A.   And federal probation officer, yes.
 8   Q.   Have you specifically asked him if he's acted as a federal
 9   probation officer at this point?
10   A.   No, I have not.
11   Q.   Explain to the jury a little bit what your MO is when you
12   go into a search and you're talking to a defendant.  Kind of
13   what is your game plan?
14   A.   Well, there's many in play.  The initial part is building
15   rapport with that person, trying to bring their levels of
16   anxiety down to where I can start getting some truthful answers
17   from that person.
18          There is a portion of those interviews where I'm
19   asking very, very simple questions, waiting very patiently for
20   what their responses are, listening to those responses and
21   analyzing that information for its truth and veracity compared
22   to what evidence I have.
23          And then I build on forward from that, ultimately
24   getting to the point of -- I start confronting the other person
25   with evidence if I feel it needs to happen.  Sometimes I'll
```

1    withhold and not tell -- not reveal what evidence that I have.

2           For me, in interviews, it's really pretty simple.

3    It's they either tell the truth or they lie, and I still get

4    the evidence, you know.  I have either -- the end result is

5    either I have a defendant who lies and I have evidence to prove

6    these are lies, or I have a defendant who tells the truth and

7    there's evidence to prove that's the truth, and you still have

8    the same result judicially.

9    Q.   So in the beginning are you giving Stone a pretty long

10   leash to talk?

11   A.   Yes, I am.

12           MS. MAX:  Can we play Government's Exhibit 87, time

13   stamp 26:10?

14           (Audio played)

15   BY MS. MAX:

16   Q.   Again there, is Defendant Stone focusing on impersonating

17   a probation officer?

18   A.   Yes.

19   Q.   Okay.  Did you get the sense that he thought that that

20   would be a little beneath him?

21   A.   Oh, for sure.

22           MS. MAX:  Can we play Government 87, starting at

23   32:16?

24           (Audio played)

25   BY MS. MAX:

1    Q.    Do we hear there Stone saying that there's got to be a

2    simple fix?

3    A.    Yeah.  This is common, where this is what I would call a

4    bargaining phase, you know, what am I -- what am I looking at,

5    what's going to happen.

6    Q.    So when he says simple fix, what is he referencing?

7    A.    He's referencing this investigation.

8    Q.    And he says it's going to boil down to a he said/she said.

9    A.    Yes.

10   Q.    What did you take that to mean?

11   A.    I took that to mean that he's going to possibly try to

12   gamble with his word versus her word in this matter.

13   Q.    During the interview with Stone, did he -- did you get the

14   impression that he was trying to give you a specific impression

15   of Casi Thompson versus him?

16   A.    Yes.

17   Q.    And what was that?

18   A.    Well, one, definitely that she's beneath him.

19   Particularly he wanted to -- me to focus on her past, her

20   problems, her previous addictions in meth, these types of

21   things, the things that would be not so pleasant about Casi

22   Thompson's past.

23            MS. MAX:  Can we play Government 87 starting at

24   35:08?

25            (Audio played)

```
 1   BY MS. MAX:
 2   Q.   Ranger Briley, is this an example that you had talked
 3   about earlier of Stone referencing the book without answering
 4   your question?
 5   A.   Yes.
 6   Q.   Were you trying to pin him down to whether Dr. B is a real
 7   person or based on a real person?
 8   A.   Yes.
 9   Q.   Did you ever get an answer?
10   A.   No.
11   Q.   You also -- we hear you referencing probation documents in
12   this clip.  Did you ask Bill Stone if there were any probation
13   documents that he could show you related to this secret
14   probation?
15   A.   Yes, I did.
16   Q.   And what was his response?
17   A.   I believe his response on this was that there's not.
18   Q.   Did he end up ever providing you with any?
19   A.   He did not.
20        MS. MAX:  Can we go ahead and play Government 87
21   starting at time stamp 1:12:23?
22        (Audio played)
23   BY MS. MAX:
24   Q.   We reference -- we hear Stone referencing eating a shit
25   sandwich.  You heard that phrase before?
```

1    A.    Yes, ma'am.

2    Q.    What did you take that to mean?

3    A.    He is defeated, and he's asking where -- basically what's

4    going to happen here, you know.  And he's also asking for me to

5    extend some type of courtesy because of my position in that

6    same exchange.

7    Q.    Is this -- when you talked about it had kind of moved from

8    talking the book phase to kind of a bargaining phase, what am I

9    looking at, is this kind of the portion we've now entered?

10   A.    Yes.

11         MS. MAX:  Can we publish Government 87, 1:16:40?

12         (Audio played)

13   BY MS. MAX:

14   Q.    Here we hear Stone saying, I'm not perfect; if I fucked

15   up, I fucked up?

16   A.    Yes.

17   Q.    Okay.  Ranger Briley, have you encountered a lot of people

18   in your career who upon learning that they're in trouble

19   criminally deny the offense?

20   A.    Yes.

21   Q.    Okay.  Are there a lot of people you encounter that when

22   you confront them with the fact that they are criminally in

23   trouble they don't bargain with you?

24   A.    Well, I mean, some do, some don't.

25   Q.    Okay.  Are there people who truly feel like they're

1    innocent and they're coming back at you with the facts?

2    A.   When they're in fact criminal?  That is a complicated

3    question.  I mean, as far as people that are innocent don't

4    have to worry, because the facts are there.

5    Q.   They don't have to bargain?

6    A.   Correct.

7              MS. MAX:  Can we go ahead and play Government 87,

8    1:17:54?

9              (Audio played)

10   BY MS. MAX:

11   Q.   The last thing Stone says in that recording is, if this

12   shit got out, I'm fucked.

13   A.   Yes.

14   Q.   Correct?

15             Explain to the jury what's happening in this portion

16   of the conversation with Stone.

17   A.   Yes.  So in this portion, like, we have essentially like

18   skipped over things, and he's -- he's asking about punishment,

19   like, we're still in that thing of I want to know what I'm

20   looking at here.  And also still hearing the same responses,

21   that he's defeated in this exchange.

22             He wants to sort of look behind the curtain and know

23   what evidence is here as well.  Like, you know, we know what

24   evidence we already have at this point.  We know the magnitude

25   of the offenses that he's looking at.  He wants to know as

```
 1   well.  And the reason he's asking about punishment is because
 2   he doesn't know what all we have against him, so he's wanting
 3   to know if this is a probationary thing or is this a
 4   penitentiary sentence, is this -- does this involve
 5   restitution.
 6           He's wanting to know what's at stake here for him and
 7   his -- himself.
 8   Q.   Are there courtesies that you are giving him because he's
 9   a retired FBI agent?
10   A.   No.  He's -- he's getting the same -- same approach,
11   same -- same skill set, same interview style, same everything
12   as anyone else gets.
13   Q.   Is there a certain strategy that you are approaching him
14   and communicating with him because he is a retired FBI agent?
15   A.   Yeah, certainly.  I mean, in interviewing and
16   interrogation, I do everything I can to develop that rapport.
17   He's a former supervisory agent with FBI.  I have a position in
18   the Rangers.  I'm here with the Department of Justice as well,
19   OIG.  These are all agencies that carry -- carry a lot of
20   responsibilities.
21           So he knows that.  And so, you know, I treat him
22   kindly like I would anyone else, but he's the one that is
23   asking for this professional courtesy in this exchange, and my
24   responses are quite -- quite -- not much.  I'm just one of --
25   like I am sitting here, like, sure, what do you have to say?
```

```
 1    You want some professional courtesy?  What -- let's talk.
 2            It's that simple.  There's not really a lot of
 3    trick -- trick to it.
 4    Q.   Did you get the impression that Stone was treating you and
 5    the OIG agent kind of like y'all were all on the same level?
 6    A.   Yes.
 7    Q.   Like this is law enforcement comrades talking?
 8    A.   Yes, he wanted that.
 9            MS. MAX:  Can we go ahead and play Government
10    Exhibit 87, time stamp 1:19:50?
11            (Audio played)
12    BY MS. MAX:
13    Q.   What is Defendant Stone trying to find out in that clip?
14    A.   Still punishment.  He's after whether probation is
15    possible for him.
16    Q.   All right.
17            MS. MAX:  Can we play Government Exhibit 87, starting
18    at time stamp 5:30?
19            (Audio played)
20    BY MS. MAX:
21    Q.   I know it's a little hard to hear in that clip, Ranger
22    Briley.  Is Stone saying, the devil is in the details and I
23    didn't do it?
24    A.   Yes, ma'am.
25    Q.   Okay.  What did you take that to mean?
```

```
1    A.    He's -- he's trying to push back some towards the victim
2    in this case while acknowledging the devil is in the details.
3    Q.    By saying those quotes like that, was he referencing that
4    he had, like, dropped the ball?
5    A.    Yes.
6    Q.    Okay.  So when he says, devil is in the details and I
7    didn't do it, is he referencing the fact that I didn't stay up
8    with the details?
9    A.    Yes, it's possible that he is.  I can't 100 percent say
10   that for sure, but I believe it's very possible.
11            MS. MAX:  Can we go ahead and play Government Exhibit
12   87, time stamp 20:15?
13            (Audio played)
14   BY MS. MAX:
15   Q.    In that one do we hear Stone asking how federal probation
16   works?
17   A.    Yes, ma'am.
18   Q.    Did you find any irony in that question?
19   A.    Very much so.
20   Q.    Is he also asking if there's community service on federal
21   probation?
22   A.    Yes.
23            MS. MAX:  Can we go ahead and play from
24   Government's 85, starting at 2:53?
25            (Audio played)
```

1   BY MS. MAX:

2   Q.   What are we hearing in that clip, Ranger Briley?

3   A.   We're hearing some of the charges that he's facing.  He's

4   starting to be confronted with some of the offenses that he's

5   going to be charged with.  And then in that we hear his

6   responses to those charges.

7            The response to impersonation of an officer, a

8   federal agent, seems to be something that he's opposed to

9   hearing and/or believing he's responsible for doing or having

10  done.  And the wire fraud in this particular exchange, I don't

11  hear him responding to that yet.

12  Q.   Okay.  But when you tell him that it's impersonation of an

13  FBI agent, does he respond back as if he is currently an FBI

14  agent?

15  A.   He does.

16  Q.   Okay.  Not seeing the distinction between being an FBI

17  agent and being a retired FBI agent?

18  A.   Yeah.  He -- he ultimately comes back and says that, well,

19  I'm a retired agent, but his initial response is not that.

20  Q.   It's how can I impersonate an FBI agent when I am one?

21  A.   Correct.

22  Q.   Okay.

23            MS. MAX:  Can we go to Government's Exhibit 85, 6:56?

24            (Audio played)

25  BY MS. MAX:

```
 1   Q.   So what was his explanation as to why he was in possession
 2   of Casi Thompson's phones?
 3   A.   I think it was somewhere along the lines of to take some
 4   music and things off of her phone, some trivial -- a trivial --
 5   trivial response.
 6          MS. MAX:   And can we play Government's 85, time stamp
 7   1:24?
 8          (Pause)
 9   BY MS. MAX:
10   Q.   Ranger Briley, how long were y'all at the house that day?
11   A.   Probably approximately four hours.
12   Q.   Did you take Bill Stone into custody at the end of the
13   search?
14   A.   No, ma'am.
15   Q.   Why not?
16   A.   He was not under arrest.
17   Q.   Okay.
18   A.   We were not charging him, arresting him on this particular
19   day.  We were still very much working the investigation.
20   Q.   Okay.  So that wasn't the goal of the search that day?
21   A.   That's correct.
22   Q.   Now, during the course of your investigation, have you had
23   an opportunity to review text messages that were extracted from
24   Joseph DeLeon's phone?
25   A.   Yes, ma'am.
```

```
 1   Q.   Okay.
 2           MS. MAX:  At this time, the Government would move to
 3   admit Government Exhibit 37, which is an extract of already
 4   admitted Government Exhibit 26.
 5           MR. WESTFALL:  No objection.
 6           THE COURT:  Hold on one moment.  Waiting for one more
 7   response.
 8           MS. MAX:  Oh, sorry, Your Honor.
 9           MR. GALLIAN:  No objection, Your Honor.
10           THE COURT:  All right.  It's admitted.
11              (Government's Exhibit No. 37 received)
12           MS. MAX:  Thank you, Your Honor.
13              Permission to publish?
14           THE COURT:  Granted.
15           MS. MAX:  We can go to page 1.
16              Can we start with the text that starts, "I am at the
17   cardiologist office"?
18   BY MS. MAX:
19   Q.   Ranger Briley, I'm showing you the text at the top of the
20   screen.  What is the date of that text, if you look over to the
21   far left?
22   A.   October 30, 2017.
23   Q.   Okay.  And this is a text between Joseph DeLeon and Bill
24   Stone; is that correct?
25   A.   Yes.
```

1  Q.   And to clarify, all the text messages that we're going to
2  cover today are between Stone and DeLeon; is that right?
3  A.   Yes, ma'am.
4  Q.   From the folder status and you see sent -- well, actually
5  from the direction you see outgoing.  Who does that mean the
6  sender is?
7  A.   This -- this would be, I think, Defendant DeLeon.
8  Q.   Okay.  Because it was DeLeon's phone, correct?
9  A.   Correct.
10  Q.   Okay.  Could you read the message to the jury?
11  A.   Yes.  The first message, "I'm at the cardiologist office
12  in the middle of a stress test.  P/2," meaning Project 2,
13  "called me freaking out that you are going to Austin again.  I
14  told her not to worry, take a breath.  I cannot be answering
15  the phone in the middle of this or taking texts.  I'm gonna
16  have to turn my phone off.  My health is more important.  She
17  can wait."
18  Q.   Okay.
19        MS. MAX:  Let's go to page 3, line 21, 642.
20  BY MS. MAX:
21  Q.   What is the date of this large text that you see at the
22  bottom of the screen?
23  A.   December 31, 2016.
24  Q.   And can you go over and read the message?
25  A.   Yes.  "S.A. Stone," meaning Special Agent Stone.  "This is

```
 1   a copy of what I sent P/2.

 2            "Casi, I'm trying to get everything done so that I

 3   can sneak over to see you and spend New Year's Eve with you and

 4   Tyler like we did last year.  Bill is still in Washington and

 5   DPS is not going to be able to keep an eye on you tonight

 6   because they are shorthanded because of the holiday and they

 7   are going to be on the highway so I should be okay.  I'm going

 8   to try to stop by and get a bottle of champagne or two.

 9            "Also I text you over on Mimi's phone because they're

10   not monitoring this one.  Again, I don't know what time.  It

11   all depends on whether my mother is okay or not."

12   Q.   Did Casi Thompson report to you that she believed DPS

13   troopers would monitor her house?

14   A.   Yes.

15            MS. MAX:  Can we go to the text message -- well, stay

16   on this one second.

17   BY MS. MAX:

18   Q.   How does DeLeon address Stone in this message?

19   A.   As Special Agent Stone.

20   Q.   Is that what the S.A. stands for?

21   A.   Yes, ma'am.

22   Q.   And what is the date on that message?

23   A.   December 31, 2016.

24            MS. MAX:  Can we go to the message immediately

25   above it?
```

```
 1    BY MS. MAX:
 2    Q.   What is the date of this message?
 3    A.   The one directly above is January 1, 2017.
 4    Q.   And how does DeLeon address Stone in this message?
 5    A.   Special Agent Retired Stone, SAR.
 6    Q.   That is what SAR stands for?
 7    A.   I don't know.
 8    Q.   Okay.  Are you speculating that the R means retired?
 9    A.   I'm definitely speculating.  Yes, I do not know.
10    Q.   Okay.  But it goes from on December 31st being S.A. Stone,
11    correct --
12    A.   Yes, ma'am.
13    Q.   -- to January 1st being SAR Stone?
14    A.   Yes.
15           MS. MAX:  Can we go to line 25 -- 25509?
16           (Pause)
17           MS. MAX:  Going over, can we just get --
18    BY MS. MAX:
19    Q.   So looking at the second message here, what is the date of
20    it?
21    A.   That's August 30, 2016.
22    Q.   And can you read the message?
23    A.   "S.A. Stone, an awesome opening/opportunity just posted a
24    while ago.  Chief of police Larry Boyd just announced his
25    retirement, in the area you're considering buying property."
```

```
 1   Q.   Okay.
 2            MS. MAX:  Can we go to 26196?
 3            (Pause)
 4   BY MS. MAX:
 5   Q.   Can you tell me what the date of the message is on
 6   line 125?
 7   A.   125?  August 12, 2016.
 8   Q.   And can you read the message?
 9   A.   Yes.  Beginning with the one "I can talk"?
10   Q.   Yes.
11   A.   Okay.  "I can talk to her at least three times today, make
12   sure everything was going good for her.  She of course is all
13   concerned about the Austin, Texas situation and I stated to her
14   I have not heard anything at all."
15            MS. MAX:  And can we go to line 27021?
16            (Pause)
17            MS. MAX:  And can we start, go across -- leave it
18   where it is and go across.
19   BY MS. MAX:
20   Q.   Starting with line 298, what is the date of this text
21   message?
22   A.   July 22, 2016.
23   Q.   And what is the time?
24   A.   Let's see.
25   Q.   It's next to it.
```

```
 1    A.   It's like midnight.

 2    Q.   Is it 00:35?

 3    A.   Oh, yes.  Military time, yes.

 4    Q.   Is that 12:35?

 5    A.   Yes, ma'am.

 6    Q.   Can you read the message?

 7    A.   "You get ahold of your fiancee yet?"

 8    Q.   Okay.  And who is -- is this an incoming or outgoing

 9   message?

10    A.   Incoming.

11    Q.   So this is a message from Stone to DeLeon; is that

12   correct?

13    A.   That's correct.

14    Q.   Okay.  And Stone is using a reference to DeLeon of your

15   fiance?

16    A.   Yes.

17    Q.   Saying that to DeLeon?

18    A.   Correct.

19    Q.   Did you see reference to DeLeon's fiancee multiple times

20   throughout the text messages with Stone and DeLeon?

21    A.   Yes, I did.

22    Q.   And was it always Stone saying to DeLeon your fiancee?

23    A.   Always.

24    Q.   Who did you take that as they were referencing?

25    A.   Casi Thompson.
```

```
 1  Q.   Okay.  So Stone is saying to DeLeon, Casi Thompson's your
 2  fiancee?
 3  A.   Yes.
 4  Q.   Okay.  Can you read the very next message above it?
 5  A.   "Have her make breakfast for all of you."
 6  Q.   And what time is that message?
 7  A.   6:56.
 8  Q.   So we started out -- is that the same day?
 9  A.   Yes.
10  Q.   So we started out at 12:35 saying -- Stone asking DeLeon,
11  did you get ahold of Casi.  And then at 6:56 in the morning, is
12  that Stone telling DeLeon have her make breakfast for you-all?
13  A.   Yes.
14  Q.   And what is the message above it?
15  A.   The message above is, "In your opinion is the shack
16  clean?"
17  Q.   And is that Stone sending that to DeLeon?
18  A.   Yes.
19  Q.   And what time is that message?
20  A.   6:57.
21  Q.   Can you read the message above it?
22  A.   "Yes, sir.  Nearly spotless."
23  Q.   Is that a message outgoing from DeLeon?
24  A.   Yes.
25  Q.   Can you read the message above it?
```

```
 1   A.   "She was up almost all night long making it that way."
 2   Q.   And who sent that message?
 3   A.   DeLeon.
 4   Q.   Read the message above it, please.
 5   A.   "As soon as I got a chance I will get you the pictures of
 6   the boys."
 7   Q.   And who sent that?
 8   A.   Defendant DeLeon.
 9   Q.   And the message above it?
10   A.   "Now she won't let the shack get dirty again."
11   Q.   Who sent that?
12   A.   That's Defendant Stone.
13   Q.   To DeLeon?
14   A.   Yes.
15   Q.   And the message above that?
16   A.   Defendant Stone says, "She is your woman!"
17   Q.   That's being sent to DeLeon?
18   A.   Yes, ma'am.
19           MS. MAX:  Can we go to Government 37, page 8?
20           (Pause)
21           MS. MAX:  And can we zoom in on the fourth text, the
22   big green one?
23   BY MS. MAX:
24   Q.   Ranger Briley, who is sending this text?
25   A.   Defendant DeLeon.
```

```
 1   Q.   And what is the date?
 2   A.   December 15, 2015.
 3   Q.   And can you read the text with starting with S.A. Stone?
 4   A.   Sure.  "Sir, I am just leaving her house 20:45 hours and
 5   heading back to Fort Worth.
 6            "Obtained a copy of her transcript, transfers from
 7   two different colleges and the hours that she is going to be
 8   taking this upcoming semester.  Her current grade point average
 9   is 4.0.  She is going to be taking nine hours this coming up
10   semester.  Also got lucky and looked into her e-mails going
11   back to 2014.  She has a lot -- a lot even some from Eric every
12   single one of them on opened and I left them untouched since
13   they were on opened.  JD."
14            MS. MAX:  Can we go to Government Exhibit 37, page
15   10?
16            And the large green box, the first one.
17   BY MS. MAX:
18   Q.   Can you read the first three -- well, what is the date of
19   this?
20   A.   December 22, 2015.
21   Q.   And who is the sender?
22   A.   Defendant DeLeon.
23   Q.   Can you read the first three lines?
24   A.   "S.A. Stone, sir, I just received this text message from
25   Project Number 2.  I'm on the do not rent list at Enterprise."
```

```
 1              MS. MAX:  Can you go to Government 37, page 19?
 2              Can you zoom in on the first two blue boxes?
 3    BY MS. MAX:
 4    Q.   Ranger Briley, the first text message, what is the date of
 5    that?
 6    A.   January 12, 2016.
 7    Q.   And who is sending the message?
 8    A.   Defendant Stone.
 9    Q.   And what does it say?
10    A.   It says, "Any project updates?"
11    Q.   And what's the date of the next message?
12    A.   December 12, 2016.
13    Q.   And can you read it?
14    A.   Defendant Stone says, "Project adhering to schedule?"
15    Q.   Looking through DeLeon and Stone's text messages, did you
16    find many instances of messages like this?
17    A.   Yes.
18    Q.   Okay.
19              MS. MAX:  Can we go to Government 37, page 20?
20              Can we go to the first blue box and those three
21    boxes?
22    BY MS. MAX:
23    Q.   With that first text message, what is the date?
24    A.   January 15, 2016.
25    Q.   And who is sending it?
```

```
 1   A.   Defendant Stone.

 2   Q.   Will you read it?

 3   A.   "Let me know how it goes at the bank."

 4   Q.   Okay.  Who is sending the next text message?

 5   A.   Defendant DeLeon.

 6   Q.   What does he say?

 7   A.   "Would you like to give me any advice before I go in just

 8   to refresher."

 9   Q.   Next text message, who's sending?

10   A.   Defendant Stone.

11   Q.   What is he saying?

12   A.   "I will you in 30 minutes.  In a meeting."

13        MS. MAX:  Next page, please, Government 21.

14   BY MS. MAX:

15   Q.   Starting at the top, who's sending this message?

16   A.   Defendant Stone.

17   Q.   What does it say?

18   A.   "Sounds like a plan."

19   Q.   Okay.  Next message?

20   A.   Defendant DeLeon:  "All I need her to do is introduce me,

21   from there I can take over.

22        "Okay.  Thank you."

23   Q.   And the next message?

24   A.   Defendant Stone:  "Call me."

25   Q.   And next message?
```

1   A.   Joseph DeLeon:  "Sir, I am just now walking out of the

2   bank, it was fantastic maybe."

3   Q.   And next message?

4   A.   Defendant DeLeon:  "Meeting is what I meant to say."

5          MS. MAX:  Can we go to page 35?  Starting with the

6   second blue box down.  The second blue.  Going all the way

7   down.

8   BY MS. MAX:

9   Q.   What is the date of this exchange?

10  A.   February 4, 2016.

11  Q.   And who is the sender?

12  A.   Defendant Stone.

13  Q.   Can you read his messages?

14  A.   Yes.  "Can you do Cracker Barrel in Arlington in about an

15  hour?"

16          "Or later."

17  Q.   Okay.  Moving down.  Next message?

18  A.   Defendant Stone:  "Will be finished here in about an

19  hour."

20          "Okay let's say 7:15 then.  A lot to talk about the

21  project."

22  Q.   Next message?

23  A.   Defendant DeLeon:  "Yes, I can be there by 7:15, 7:30."

24  Q.   And next message?

25          MS. MAX:  Oh, actually, can we go to page 33?

```
 1              Starting with the top two messages -- or top message.
 2   BY MS. MAX:
 3   Q.   And what is the date of this message?
 4   A.   February 2, 2016.
 5   Q.   And who is the sender?
 6   A.   Defendant DeLeon.
 7   Q.   And what does it say?
 8   A.   "S.A. Stone, are you on the ground yet?"
 9   Q.   Ranger Briley, what do you take this message to mean?
10   A.   That he wanted to know if he was out of state, out of
11   country.
12              MR. WESTFALL:  Your Honor, may we approach?
13              THE COURT:  Yes.  And actually, I'll tell you what,
14   your timing is perfect.  We've been going about an hour.  I
15   think it's time for a comfort break.  So why we don't take ten
16   minutes.
17              And members of the jury, if it's going to be longer
18   than ten, I will have him come back and let you know.
19              Let's take a stretch break.
20              All rise for the jury.
21              (Jury out)
22              THE COURT:  Everybody please be seated.
23              All right.  Outside the presence of the jury.
24              Everybody please be seated.
25              MR. WESTFALL:  May the --
```

1        THE COURT:  Oh, I'm sorry.  Feel free to step down if

2   you need to use the restroom.

3        THE WITNESS:  Okay.  Yes, ma'am.

4        THE COURT:  Yes.  What's your --

5        MR. WESTFALL:  Yeah, I didn't want to make anything

6   like a speaking objection.

7        THE COURT:  Sure.  No.  I appreciate that.

8        MR. WESTFALL:  I just want to explain just a little

9   bit.

10       THE COURT:  Certainly.

11       MR. WESTFALL:  By having him listen to something or

12  read something and then what does this mean, number one, it's

13  calling for speculation over and over again.  He even admitted

14  that he speculated the retired, which is an important fact.

15       Number two, it's a -- it's oftentimes a direct

16  opinion on credibility, which is not allowed.  It's not

17  relevant.  And it also invades the province of the jury.  The

18  jury is the one that gets to figure out what people mean by

19  this or that unless it's expert testimony or 701 testimony, and

20  this is not either one of those.  This is just -- he just

21  conjures it up in his brain, well, what does that mean?

22       Well -- almost like, I didn't know you were going to

23  ask me what that means, but let me take a stab at it.

24       It's just -- it's not good evidence, Your Honor.  We

25  object to that.

```
 1            THE COURT:  Okay.
 2            MS. MAX:  Your Honor, I will withdraw the question.
 3   And I just have a few more texts for him to publish.
 4            THE COURT:  Okay.
 5            MS. MAX:  I won't ask him any questions about them.
 6            THE COURT:  Okay.  Well, I will sustain the
 7   objection.  And unless he has some kind of specialized
 8   psychological or -- and he may have.  He may have some kind of
 9   interrogation training where he can weigh into whether someone
10   is telling the truth or not.  If that's the case, we need to
11   have a sub rosa hearing.  Otherwise, I will sustain the
12   objection.
13            MR. WESTFALL:  Thank you, Your Honor.
14            THE COURT:  Absolutely.
15            So let's take a 10-minute recess for you guys too, a
16   much needed break.
17            And I still have breakfast tacos.
18            So with that said, court is in recess for ten
19   minutes.
20            Thank you.
21            SECURITY OFFICER:  All rise.
22            MR. WESTFALL:  Thank you, Judge.
23            THE COURT:  You're welcome.
24            (Recess)
25            THE COURT:  Okay.  Are we ready?  Anything we need to
```

```
 1    take up outside the presence of the jury?
 2              MS. MAX:  No, Your Honor.
 3              (Pause)
 4              THE COURT:  Everybody please be seated.  Stretching
 5    my legs.
 6              (Pause)
 7              THE COURT:  Anything we need to take up before we
 8    bring them in?
 9              MS. MAX:  No, Your Honor.
10              MR. WESTFALL:  Not from us, Your Honor.
11              THE COURT:  Okay.  Sounds good.  Mr. Gallian, are you
12    good to go?
13              MR. GALLIAN:  Good to go, Judge.  Thank you.
14              THE COURT:  All right.  Sounds good.  Let's bring
15    them in.
16              SECURITY OFFICER:  All rise for the jury.
17              (Jury in)
18              THE COURT:  All right.  Everyone please be seated.
19              Members of the jury, thank you so much for your time
20    and your attention.  We're going to go till 10:00, and then
21    I've got a matter unrelated to this, just take our ordinary
22    half-hour break, and I will get my other matter taken care of.
23              But with that said -- if everybody will check their
24    phones for me as a courtesy.
25              And with that said, your witness.
```

```
 1              MS. MAX:  Thank you, your Honor.
 2              THE COURT:  You're welcome.
 3              MS. MAX:  We'll go back to Government --
 4              THE COURT:  Oh, I'm so sorry.
 5              MR. WESTFALL:  I think this got moved during the
 6    break.
 7              THE COURT:  Oh, sure, of course.  Good deal.  And
 8    remember, defense counsel, if you need to relocate to be able
 9    to see things, you have free rein to do that without needing
10    permission.
11              MR. WESTFALL:  Yes, thank you.
12              THE COURT:  You're welcome.
13              Your witness.
14              MS. MAX:  Thank you, Your Honor.
15              Can we go to Government's 37, page 40?
16              Can we go to the fifth message?
17    BY MS. MAX:
18    Q.   Ranger Briley, what is the date of this message?
19    A.   February 9, 2016.
20    Q.   Who is the sender?
21    A.   Defendant DeLeon.
22    Q.   And will you read it?
23    A.   Yes.  "She is nervous, concerned, and perplexed and she
24    feels horrible that you're having to work even more."
25              MS. MAX:  Can we go to Government 37, page 47?
```

```
 1              Can we do the second and third messages?  Second and
 2   third.
 3   BY MS. MAX:
 4   Q.   Who is the sender of the first message?
 5   A.   Defendant Stone.
 6   Q.   What is the date?
 7   A.   February 17, 2016.
 8   Q.   Can you read it?
 9   A.   "Talked briefly with her.  Doesn't know what kind of car
10   she wants."
11   Q.   And the second message, who's the sender?
12   A.   Defendant DeLeon.
13   Q.   And what is the date?
14   A.   February 8, 20 -- I'm sorry, February 18, 2016.
15   Q.   Can you please read it?
16   A.   "This is what she text me earlier about the car.  She's
17   looking for about a $70,000.00 car.  And she's worried about
18   running out of money.
19              "Lexus GS350 F sport."
20              MS. MAX:  Can we go to Government 37, page 54?
21              And the very last message.
22   BY MS. MAX:
23   Q.   Who is the sender?
24   A.   Defendant DeLeon.
25   Q.   And what does it say?
```

```
 1    A.    "Did you make it to Washington?"

 2    Q.    And what is the date?

 3    A.    February 24, 2016.

 4          MS. MAX:  And page 37 -- I mean Government 37, page

 5    66.

 6          Can we do the fifth message down?  Fifth message to

 7    the bottom of the page.

 8    BY MS. MAX:

 9    Q.    What is the date of this message?

10    A.    March 3, 2016.

11    Q.    And who is the sender?

12    A.    Defendant Stone.

13    Q.    Can you read it, please?

14    A.    "Just landed in Austin.  Any project stories?"

15    Q.    Next message?

16          MS. MAX:  Can you zoom out to get the bottom two?

17    BY MS. MAX:

18    Q.    The next message is sent by whom?

19    A.    Defendant DeLeon.

20    Q.    And what is the date?

21    A.    March 4, 2016.

22    Q.    And what does the message say?

23    A.    "S.A. Stone, are you on your way back?  Can we meet at

24    Cracker Barrel for something to eat?"

25    Q.    Will you read the next message?
```

```
 1    A.    Defendant Stone:  "Still in Austin.  Not finished yet.  On
 2    break.  Any project stories?"
 3             MS. MAX:  Can we go to the next page?
 4             And can we do the top five messages?
 5    BY MS. MAX:
 6    Q.    Can you read the first message?
 7    A.    Defendant Stone:  "Okay."
 8    Q.    Is this still March 4th?
 9    A.    Yes.
10    Q.    Okay.  Next message?
11    A.    Defendant DeLeon -- Defendant DeLeon:  "Yes, she just went
12    to the bank and after that she's going to Stephenville to pick
13    up the mail for her work."
14    Q.    The next message?
15    A.    Defendant Stone:  "Will you let -- will let you know when
16    done here and headed back."
17    Q.    And the next message?
18    A.    Defendant DeLeon responds:  "Thank you, sir."
19    Q.    Okay.
20             MS. MAX:  Can we go to Government 37, page 200?
21             Can we do the second through fifth message?
22    BY MS. MAX:
23    Q.    And what's the date on this message?
24    A.    May 13, 2017.
25    Q.    And who's sending it?
```

```
 1   A.   Defendant Stone.

 2   Q.   Will you read it?

 3   A.   "She's all yours."

 4   Q.   And the next message?

 5   A.   Defendant DeLeon:  "She is a hell of a headache and one

 6   dangerous person going backwards in her car.  Any time she gets

 7   in her car I will get the hell away from her."

 8        "I can't believe that she did that again."

 9   Q.   Next message?

10   A.   Defendant Stone:  "Can't either!  You need to spend more

11   time with her, at least five days and nights a week!"

12   Q.   And next message?

13   A.   Defendant DeLeon:  "3 million wasn't enough.  What she has

14   left damn sure ain't enough."

15        MS. MAX:  Government 37, page 310.  The first four

16   messages.

17   BY MS. MAX:

18   Q.   Can you start with the first message?

19   A.   Defendant Stone:  "Oh remember she is your woman!"

20   Q.   And what's the date of this?

21   A.   April 7, 2018.

22   Q.   Okay.  Can you read the reply?

23   A.   Defendant DeLeon:  "And everyone else's."

24   Q.   Okay.  Is there anything in the next message?

25   A.   No, ma'am.
```

```
 1   Q.   Okay.  And then can you read the next message?
 2   A.   Yes, ma'am.  Defendant DeLeon says:  "Not even for
 3   3 million reasons.  I remember my first conversation like it
 4   was last night, 'I wouldn't go out with you' and she was
 5   upset."
 6            MS. MAX:  And can we go to page 336?
 7            And can we do the first five messages?
 8   BY MS. MAX:
 9   Q.   Read the top message.
10   A.   Yes, ma'am.  Defendant Stone:  "Make her happy!"
11   Q.   Next message?
12   A.   Defendant DeLeon:  "Somebody's got to make some money.  I
13   sure am not doing it."
14   Q.   What's the date on these messages?
15   A.   December 8, 2018.
16   Q.   Okay.  Can you do the next message?
17   A.   Defendant Stone:  "Well, I remember not too long ago
18   3 million reasons for you to get married!"
19   Q.   Next message?
20   A.   "So true!"
21   Q.   And the next message?
22   A.   Defendant DeLeon:  "I would not marry her back then for
23   3 million reasons.  I would not marry her if this -- if is the
24   last woman on earth so help me God!!!  I made that promise in
25   church one day and I am not going back on that promise."
```

```
 1                MS. MAX:  Can we go to page 10?  And last message.
 2     BY MS. MAX:
 3     Q.   What is the date of this message?
 4     A.   December 23, 2015.
 5     Q.   And who sent it?
 6     A.   Defendant DeLeon.
 7     Q.   Can you read it out loud, please?
 8     A.   "S.A. Stone, G.S.A. Consultants.
 9                "Project Number 2.
10                "Progress report 12-23-2015, 15:45 hours.
11                "Miss Thompson is dressed properly.  Her kids are
12     with her.
13                "I got her started.  She is sitting at her office
14     entering assets, responsibilities and liabilities.
15                "JD."
16                MS. MAX:  And can we go to page 18?  And third and
17     fourth messages.
18     BY MS. MAX:
19     Q.   Can you read the top message?
20     A.   Defendant DeLeon:  "S.A. Stone, are you still in Parker
21     County?"
22     Q.   And who is the sender?
23     A.   Defendant DeLeon.
24     Q.   And what is the date?
25     A.   January 9, 2016.
```

```
 1   Q.   And will you read the second message?
 2   A.   "S.A. Stone, hope you have a good flight."
 3   Q.   And what date is that?
 4   A.   January 11, 2016.
 5            MS. MAX:  And can we go to page 138?
 6            And will you start with the fourth message and go all
 7   the way down.
 8   BY MS. MAX:
 9   Q.   And what is the date of this message?
10   A.   May 4, 2016.
11   Q.   And can you read it, please?
12   A.   "Are you still with your fiancee?"
13   Q.   And who's the sender?
14   A.   Defendant Stone.
15   Q.   Next message?
16   A.   "Not well at all."
17   Q.   Next message.
18   A.   Defendant DeLeon:  "No, sir.  Just left 20 minutes ago so
19   I can go and check on my mother, make sure she eats lunch."
20   Q.   Next message?
21   A.   "I plan on getting right back.  She needs the support
22   today."
23   Q.   Next message?
24   A.   "How are things going."
25            MS. MAX:  Okay.  Next page, 139.  Top five.
```

```
 1   BY MS. MAX:
 2   Q.   The top message, who's the sender?
 3   A.   Defendant Stone.
 4   Q.   Can you read it?
 5   A.   "No, just stay with her.  Don't have a answer to give you
 6   yet."
 7   Q.   And the next message?
 8   A.   Defendant DeLeon:  "Do I need to stay with her and place
 9   her in custody?"
10   Q.   And what's the date on that message?
11   A.   April -- I'm sorry.  May 4, 2016.
12   Q.   And the next message?
13   A.   "No, check on your mother and do your errands.  When I
14   leave here I will go to project's house and meet with both of
15   you.  Should be around 5:00 p.m."
16   Q.   The next message?
17   A.   "Okay.  I will turn around and go right back now."
18   Q.   Okay.  You can take off your readers, Ranger Briley.
19   A.   Okay.
20   Q.   Yesterday we had talked about Defendant DeLeon talking
21   with you in September 2019, correct?
22   A.   Yes.
23   Q.   And we talked about a lot of events that happened, a lot
24   of interactions that you had with Defendant DeLeon, right?
25   A.   Yes, ma'am.
```

1   Q.   But out of all of those interactions, how many times did

2   you have him on recording with Defendant Stone in September

3   2019?

4   A.   Two times.

5   Q.   Okay.  Was that one phone call?

6   A.   Yes.

7   Q.   And then we heard about the -- wearing the wire to the

8   hospital?

9   A.   Yes.

10  Q.   Okay.  So there were just two events that you got from

11  DeLeon recording Stone in September 2019?

12  A.   Yes.

13  Q.   Okay.  Tell the jury what useful information did you gain

14  from those two events?

15  A.   Essentially the real deal that I gained in utilizing

16  Defendant DeLeon was that Defendant Stone was willing to carry

17  on this secret probation story line in the matter.

18  Q.   Did you learn any new facts about the secret probation?

19  A.   No new facts, no.

20  Q.   To your understanding, what was the supposed purpose of

21  the secret probation?  What were they telling Casi?

22  A.   Supposedly to keep her clean, on a straight and narrow

23  path is what --

24  Q.   Did you find any reason as to why that lie should be kept

25  up in September 2019 all the way to May 2020?

```
 1  A.   No.
 2  Q.   Okay.  Is lying itself a crime?
 3  A.   No.
 4  Q.   Okay.  What makes lies become a crime?
 5  A.   When you're lying and there's a crime associated with your
 6  lie, such as money and lying about that.
 7  Q.   Did you draw an opinion as to why Stone and DeLeon were
 8  continuing to lie about the secret probation through 2019 and
 9  2020 when it's obvious Casi Thompson isn't being a probationer
10  anymore?
11  A.   Yeah.  Well, they had to carry on the lie that the
12  probation was real.  To acknowledge that it wasn't real would
13  be admitting criminal culpability, would be admitting crime, so
14  that was what I concluded.
15  Q.   Did you discover any aspect of wanting to -- did you draw
16  a conclusion as to why they would continue to lie to Casi about
17  the probation?
18           MR. WESTFALL:  Your Honor, object as speculation.
19           THE COURT:  Sustained unless Government --
20           MS. MAX:  I can rephrase the question, Your Honor.
21           THE COURT:  Okay.
22  BY MS. MAX:
23  Q.   You talked yesterday about Casi Thompson talking to
24  Defendant DeLeon in a controlled call on September 3, 2019,
25  correct?
```

```
 1   A.   Yes, ma'am.
 2   Q.   And in that call does Defendant DeLeon repeatedly try to
 3   convince Casi Thompson that the probation is real?
 4   A.   Yes.
 5   Q.   Okay.  Because in that call has she confronted DeLeon that
 6   she believes it's not real?
 7   A.   Yes.  You're talking about September 3rd, correct?
 8   Q.   Yes.
 9   A.   Yes.
10   Q.   After she had that call with DeLeon, did you talk with
11   Casi about how she felt at that moment about the secret
12   probation?
13   A.   Yes, I did.
14   Q.   And explain to the jury what she told you.
15           MR. WESTFALL:  Object to hearsay, Your Honor.
16           THE COURT:  Overruled.
17   A.   She -- she thought, you know, maybe this is real, you
18   know.  She was questioning that this probation is still
19   possibly very real to her at that moment, at that time.
20   Q.   But at that time you had told her it's not real?
21   A.   I had.  I had told her that.
22   Q.   But she has a phone call with Defendant DeLeon and reports
23   back to you that she's doubting that maybe it is actually real
24   again?
25   A.   Exactly.  Correct.
```

```
 1   Q.   Okay.  Did you draw any other conclusions as to why Stone
 2   and DeLeon may be keeping up the lie of the secret probation?
 3            MR. WESTFALL:  Object to speculation.
 4            THE COURT:  Unless you can establish how he would
 5   know it, I'll sustain it.
 6   BY MS. MAX:
 7   Q.   Ranger Briley, do Texas Rangers usually get involved in
 8   fraud investigations?
 9   A.   No, ma'am.
10   Q.   Is that something that your agency is not really known to
11   do?
12   A.   That's correct.
13   Q.   Would an FBI agent know that a fraud investigation is
14   something not in your wheelhouse, do you feel?
15            MR. WESTFALL:  Object to speculation.
16            THE COURT:  Sustained.  Move on.
17   BY MS. MAX:
18   Q.   Ranger Briley, we've talked about yesterday cooperating
19   with law enforcement, correct?
20   A.   Yes, ma'am.
21   Q.   In your opinion, when you have somebody cooperating with
22   you, are they cooperating if they're lying to you?
23   A.   No.
24   Q.   Okay.  Explain to the jury why you feel that way.
25   A.   Well, there's levels of cooperation.  And when lying to
```

1    me, it's actually hindering the investigation.  It's hindering

2    the truth that we're searching for, so you can't be cooperating

3    when you're lying.

4    Q.   Okay.  So you say you cannot be cooperating if you're

5    lying?

6    A.   Yes.

7    Q.   Okay.  During your interactions with DeLeon, did he lie to

8    you?

9    A.   Yes.

10   Q.   Okay.  Let's go through those lies.

11          We heard yesterday on September 5, 2019, when you

12   interviewed him, did you ask him specifically about whether he

13   had received any vehicles from Casi Thompson?

14   A.   Yes, I did.

15   Q.   And did he tell you that she had given him one -- I mean

16   that he had bought one?

17   A.   Yes.

18   Q.   Okay.  Did you come to find out that that was a lie?

19   A.   Yes.

20   Q.   On September 16, 2019, did you once again talk to

21   Defendant DeLeon about the truck?

22   A.   Yes.

23   Q.   And what did he tell you?

24   A.   On -- say the date again.  September --

25   Q.   September 16th.

```
 1   A.   Same story, that he -- she gave me -- no, I bought the
 2   truck.  I have the check.
 3   Q.   So September 16th, he told you another lie?
 4   A.   Yes.
 5   Q.   I bought the truck, I have a check.
 6   A.   Yes.
 7   Q.   What about September 17, 2019?  Did you once again talk
 8   about the truck?
 9   A.   I'm sure I did.  I would have to -- I know several --
10   several times.  I just don't know the exact date.
11   Q.   Okay.  If we have the recording of September 17th, you
12   once again asked him about the truck?
13   A.   Yes.
14   Q.   And once again, what did he tell you?
15   A.   Same -- the same story.
16   Q.   That he bought it and has the check?
17   A.   Yes, that he bought the truck and has a check.
18   Q.   And May 7, 2019, you once again interviewed Joseph DeLeon,
19   correct?
20   A.   Yes.
21   Q.   And, again -- I'm sorry, 2020.
22   A.   Yes.
23   Q.   And you once again asked him about the truck?
24   A.   Yes.
25   Q.   Once again, what did he tell you?
```

1   A.   Same -- same story, bought the truck, I have the check.

2   Q.   At any point in those four times that he brings up that he

3   bought the truck and he has the check, did he ever tell you

4   that Casi Thompson, a few days after giving her that check, she

5   paid him back the exact same amount?

6   A.   No.

7   Q.   Okay.  On September 5, 2019, when you asked him about any

8   other compensation that Casi Thompson may have given him, did

9   he tell you about the $15,000.00 check that he had received

10  from her?

11  A.   No.

12  Q.   So he lied to you on September 5, 2019?

13  A.   Yes.

14  Q.   When you talked to him again on September 16, 2019, he did

15  mention the 15,000 to you, right?

16  A.   Yes.

17  Q.   But did he tell you it was a year and a half into it?

18  A.   Yes.

19  Q.   Did you find out that was a lie?

20  A.   Yes, I did.

21  Q.   Did you find out that the truck and the money came to him

22  in the first 60 days of the secret probation?

23  A.   Yes, I did.

24  Q.   Did he explain why he was getting 15,000 from her?

25  A.   For what -- for what he did, his help, his mentorship.

```
 1   Q.   Okay.  And then on May 7, 2020, he does tell you about the
 2   15,000 again, correct?
 3   A.   Yes.
 4   Q.   Does he say at that point it was two and a half years into
 5   it?
 6   A.   Yes.
 7   Q.   Was that a lie?
 8   A.   Yes, that's a lie.
 9   Q.   We listened to a clip yesterday and we saw a drawing.
10   Remind the jury what that drawing and clip were about.
11   A.   That drawing was about the meeting that Defendant Stone
12   and Defendant DeLeon had at Casi Thompson's residence where the
13   super secret federal probation was -- where it began in
14   December 2015.
15   Q.   So probation papers at the beginning of the super secret
16   probation?
17   A.   Yes.
18   Q.   Was that a lie?
19   A.   That was a lie.
20   Q.   Papers didn't exist?
21   A.   Correct.
22   Q.   When you asked DeLeon if he would make controlled calls
23   for you and he agreed, explain to the jury, what sort of
24   prompts or scripts or questions did you give him in making
25   those calls to Stone?
```

```
 1   A.   In making these calls, again, like interviewing, very
 2   simple request would be made of him, very -- very easy ones
 3   like when is probation ending?  When did it begin?  Are you a
 4   federal agent?  You know, very simple questions like that would
 5   be asked of Defendant DeLeon.  That's how it was set up prior
 6   to those controlled calls.
 7   Q.   How was he able to follow that task?
 8   A.   Not very well.
 9   Q.   Explain.
10   A.   I have done a number of controlled calls in my career, and
11   I find that simple tasks --
12            MR. WESTFALL:  Object to relevance, Your Honor.
13            THE COURT:  Overruled.
14   A.   I find that it's very easy for people cooperating with me,
15   whether they're a victim or just a cooperating witness, to
16   follow very simple things.  Once they've agreed to make a call,
17   it's very easy for them to just -- for me write on a piece of
18   paper, say this, and then they do it.
19            In this instance with Defendant --
20            MR. WESTFALL:  Object to relevance, Your Honor.
21            THE COURT:  I'll sustain.  Move on.
22   BY MS. MAX:
23   Q.   Okay.  Was Joseph DeLeon able to stay on track when you
24   gave him specific instructions as to what to say to Stone?
25   A.   No.
```

1   Q.   Did you draw an opinion from that?

2   A.   Yes.

3   Q.   And what was that opinion?

4            MR. WESTFALL:  Object to improper opinion, Your

5   Honor.  Speculation.

6            THE COURT:  Read that back, Todd.  Or, actually, let

7   me just look over your shoulder.

8            (Pause)

9            THE COURT:  Sustained.  Move on.

10  BY MS. MAX:

11  Q.   We heard in a clip yesterday from Government's Exhibit 174

12  the interview of Joe DeLeon on September 5, 2019.  We heard a

13  clip where y'all were talking about Casi Thompson's money that

14  had gone out in the probation, correct?

15  A.   Yes.

16  Q.   Okay.  And Joe DeLeon said, "I still have it, but right

17  now I heard her say that she's been out 600-something thousand

18  dollars.

19            "On what did you ever hear that figure?

20            "Yesterday she said something about, well, I'm out

21  like 600."

22            Okay.  So that's what we have Joe DeLeon saying on

23  September 5, 2019, correct?

24  A.   Yes, ma'am.

25  Q.   Going back to that controlled call that Casi Thompson and

1  Joe DeLeon had on September 3rd, was that the first controlled
2  call between those two parties?
3  A.   Yes.
4  Q.   In that controlled call do they acknowledge how recently
5  they had spoken to each other?
6  A.   Yes.
7  Q.   Did both of them acknowledge that it had been some time?
8  A.   Yes.
9  Q.   Many months?
10 A.   Yes.
11 Q.   In fact, I think once of them says years?
12 A.   Okay.
13 Q.   Okay.  So placing us then that the first time that they've
14 communicated in a long time is September 3, 2019, correct?
15 A.   Yes.
16 Q.   You've listened to that controlled call?
17 A.   Yes.
18 Q.   Does Casi Thompson say anything in that controlled call
19 about money?
20 A.   Not anything.
21 Q.   So two days later, when Joe DeLeon says, "Yesterday she
22 said something about, well, I'm out like 600," was that true?
23 A.   Yes.
24 Q.   Was that a lie?
25 A.   Yes.

1    Q.   He did not hear her tell him that?

2    A.   He did not -- yes, he did not hear it on September 3rd.

3    There was no discussion of money.

4    Q.   In that September 5, 2019 interview, did you tell Joe

5    DeLeon anything about $600,000.00?

6    A.   No.

7    Q.   In that same interview on September 5th, DeLeon says, "She

8    claims they dated and that's why I brought up the fact that we

9    went to Cracker Barrel."

10           Joe DeLeon is telling you that on September 5, 2019,

11   correct?

12   A.   Yes.

13   Q.   Going back to that September 3rd call with Casi Thompson,

14   does she talk to Joe DeLeon at all about her dating Bill Stone?

15   A.   No, ma'am.

16   Q.   So was that a lie?

17   A.   That's a lie.

18   Q.   Did you tell Joe DeLeon during that interview that Casi

19   Thompson and Bill Stone had in fact dated?

20   A.   No, ma'am.

21   Q.   So we've counted up one, two, three, four, five, six,

22   seven, eight, nine, ten lies here in just some of your

23   interaction with Joe DeLeon, correct?

24   A.   Yes, ma'am.

25   Q.   In your opinion, did Joe DeLeon cooperate in your

1   investigation?

2   A.   No.  Minimal cooperation.

3   Q.   And one last thing, Ranger Briley.  In the course of your

4   investigation, did you look -- did you ever learn whether or

5   not Stone was, in fact, in the CIA?

6   A.   Yes, I confirmed he was not in the CIA.

7            MS. MAX:  Pass the witness.

8            THE COURT:  Members of the jury, are we doing okay?

9   All right.

10           (Pause)

11           THE COURT:  Your witness, sir.

12           MR. GALLIAN:  Thank you, Your Honor.

13           THE COURT:  You're welcome.

14                      CROSS-EXAMINATION

15   BY MR. GALLIAN:

16   Q.   Ranger Briley, I introduced myself to you yesterday.  My

17   name is Gregg Gallian.  I'm one of the attorneys representing

18   Bill Stone.  I've got some questions for you.

19   A.   Yes, sir.

20   Q.   Before yesterday, you and I -- we had never talked before;

21   is that right?

22   A.   That's right.

23   Q.   And this is actually the first time that you and I are

24   having any sort of conversation about the case; is that right?

25   A.   That's correct.

```
 1   Q.   And that's pretty typical in the criminal defense world,
 2   right?  You don't hear from the defense attorney till trial; is
 3   that right?
 4   A.   Yes, sir.
 5   Q.   Before we get into the substantive things about your
 6   investigation, in preparation for your testimony what all have
 7   you reviewed?
 8   A.   Well, I mean, I have reviewed some recordings, obviously,
 9   some reports.  Have I reviewed everything?  No.  But I reviewed
10   parts of which I was doing in this particular case and not
11   everything in that as well.  I can't tell you exactly
12   everything I read.
13   Q.   There are a lot of controlled calls, are there not?
14   A.   Yes, there are.
15   Q.   Okay.  If we have in our little corner of fun over there,
16   is what I like to call it, about ten boxes of transcripts,
17   would that surprise you?
18   A.   No, it would not surprise me.
19   Q.   Okay.  I have, fortunately or unfortunately, listened and
20   read all of them as I'm sure you have at some point.  Is that
21   fair?
22   A.   I can't say I've reviewed everything.  No, sir, I can't
23   say that's fair.
24   Q.   Okay.  Thank you for your honesty.
25             I want to talk to you about generally an
```

```
 1   investigation.  Someone comes in to you -- and just in this
 2   situation.  Someone comes in to you to report a crime, you
 3   obviously listen to what they have to say, right?
 4   A.   Yes.
 5   Q.   And as they're talking, you listen and you start thinking
 6   with all of your knowledge, maybe there's a crime here, maybe
 7   there's not; is that right?
 8   A.   That's fair.
 9   Q.   And it's not something where after an interview with
10   somebody for the first time that you are all of a sudden
11   representing that person, right?
12   A.   I'm not counsel to them.
13   Q.   Another way to describe it and what I've heard you say in
14   some of these controlled calls is that you don't have a dog in
15   the fight, right?
16   A.   That's fair.
17   Q.   Okay.  You find the truth, and that's what matters.
18   A.   I'm a factfinder.
19   Q.   Okay.  You don't pick sides?
20   A.   I look for the facts.
21   Q.   Okay.  In terms of your due diligence in meeting with
22   Ms. Thompson, you met with her quite a few times, didn't you?
23   A.   Yes, sir.
24   Q.   I'm going to read some dates, and tell me if I've gotten
25   any of these wrong.
```

```
 1              July 29, 2019, you met with Ms. Thompson?
 2   A.   Yes.  That's true.
 3   Q.   August 1, 2019?
 4   A.   I would have to verify that.
 5   Q.   Do you trust me on it?
 6   A.   No.
 7   Q.   I respect that.
 8              August 16th?
 9   A.   I would have to check that too.
10   Q.   Okay.  August 21st?
11   A.   The dates sound like dates of controlled calls, but I
12   don't -- I can't say that I met with her on those particular
13   days you're asking me about.
14   Q.   Since my trust is at issue here, if I just gave you a
15   ballpark and I said that you met with Casi Thompson about ten
16   times, does that sound about right?
17   A.   That's fair.
18   Q.   That way I don't trip you up on any of the dates and you
19   don't think I'm trying to trick you, okay?  Does that sound
20   fair?
21   A.   I'll answer your questions.
22   Q.   All right.  May 5, 2020, you sit down with Casi Thompson
23   with Ranger Briley -- I'm sorry -- Brian Luley, Andrew Latham,
24   Ivan Martinez, and yourself, correct?
25   A.   Yes, sir.
```

```
 1   Q.   Do you ever sit down with Casi Thompson again after that?
 2   A.   I'm sure, yeah.  I mean, there's been trial prep.  There's
 3   been a number of times that I've seen her since that time
 4   period.
 5   Q.   Okay.  Approximately how many?
 6   A.   I don't know.  Since what date?  May 2020?
 7   Q.   May 5, 2020, that last recorded interview.
 8   A.   I would be guessing.  Could be ten.
 9   Q.   Okay.
10   A.   Could be 15.
11   Q.   Ten or 15?
12   A.   Could be.
13   Q.   Every interaction that you had with Ms. Thompson prior to
14   May 5, 2020, that was recorded, was it not?
15   A.   Every interaction, no.  There were -- there were phone
16   calls and times that I'm not recording sometimes, so no.
17   Q.   Okay.  I didn't know that.  How often were you guys
18   talking on the phone?
19   A.   Not very often, but it's in -- I'm sure the records are
20   here.
21   Q.   Okay.  Now, as we go through and we get past May 5, 2020,
22   are any of those interviews with Casi, are they recorded?
23   A.   Any interviews that are recorded are in discovery, have
24   been provided.  I don't know what you have or what you don't,
25   but --
```

1   Q.   Well, I've gone through everything, and if I represent to

2   you that we have no recordings past May 5, 2020, do you have

3   any reason to think that any of those 10 to 15 were recorded?

4   A.   All I can tell you is I don't know what got recorded,

5   what -- what -- after May 5th, I don't know.

6   Q.   Okay.  You mentioned that when you're asking whether it's

7   a defendant or a subject, you ask them questions and they seem

8   evasive, that that's a tell that they're probably lying.  Do

9   you recall that portion of your testimony?

10  A.   Yeah.  I mean, when people are being evasive, there's a

11  deceptive -- there's a reason behind it.

12  Q.   That's -- that is not -- you obviously have lots of

13  training in law enforcement, but that's not something that you

14  need to have a whole lot of training for to determine whether

15  or not somebody is lying, right?

16  A.   I would think you need quite a bit of training to be

17  interviewing people about serious crimes.

18  Q.   I understand.  But if you're asking somebody a question,

19  if somebody is sitting right where you are and I'm asking them

20  question after question after question and they are being

21  evasive in their answers, is that something that all of us can

22  take that they're being untruthful?

23  A.   No.

24  Q.   Let's talk about the search warrant.

25           You went and executed the search warrant in

1    June 2020, correct?

2    A.   Yes, sir.

3    Q.   And in terms of what the operation was that day, you said

4    that there were maybe 15 agents there that were part of the

5    actual search.  How many people were on scene at that time

6    approximately?

7    A.   Could be 25, 30.  I don't know.

8    Q.   It's a pretty big operation, is it not?

9    A.   It was a serious operation.

10   Q.   Did I see in the report that there was even a drone

11   involved?

12   A.   Yes, sir.

13   Q.   Okay.  Now, yesterday you weren't in the courtroom, but my

14   wife asked a question to Ranger Stoner.  He was the Ranger that

15   came afterwards to do the pictures, correct?

16   A.   Yes, sir.

17   Q.   Before Ranger Stoner got there, did y'all put a tank in

18   Mr. Stone's front yard?

19   A.   Yes.

20   Q.   Okay.  That's what you're using the PA before, correct?

21   A.   Yes.  Armored vehicle is basically what it is.

22   Q.   To us non-law enforcement people --

23   A.   A tank.

24   Q.   -- it looks like a tank, right?

25             MS. MAX:  Objection, Your Honor, sidebar.

```
 1                THE COURT:  Overruled.
 2    BY MR. GALLIAN:
 3    Q.   Okay.
 4    A.   Yeah.
 5    Q.   It's a pretty sturdy-looking vehicle?
 6    A.   It's a large armored vehicle.
 7    Q.   Okay.  And that was put in his front yard on the grass?
 8    A.   Yes.
 9    Q.   And I'm glad that you corrected your testimony, because
10    Bill Stone, on the search warrant day, he opened the door for
11    y'all, didn't he?
12    A.   That's fair.
13    Q.   He opened the door for you.  And when he opened the door,
14    what was he wearing?
15    A.   He was wearing, I think, underwear or shorts.
16    Q.   Okay.  Underwear only, correct?
17    A.   Yes.
18    Q.   And then you guys, as you said, you took him into custody?
19    A.   Yes.
20    Q.   Well, detention.  You and I know that bears meaning, but
21    you put him in detention at that point, right?
22    A.   Correct.
23    Q.   And you cleared the house?
24    A.   Yes.
25    Q.   And while you were clearing the house, you took Mr. Stone
```

```
 1   outside, did you not?
 2   A.    We stayed -- we remained -- actually went inside after the
 3   house was cleared, stayed inside for a bit, talked about --
 4   Q.    Before the house was cleared, you took Mr. Stone outside
 5   in the front yard --
 6   A.    Yes.
 7   Q.    -- in handcuffs?
 8   A.    Yes.
 9   Q.    All right.  This is Colleyville, Texas.  There are -- it's
10   a standard neighborhood.  There are plenty of people seeing
11   what's going on, plenty of people outside seeing what's
12   happening, right?
13   A.    Yes, sir.
14   Q.    Now, we'll come back to the search warrant in just a
15   second.
16         Are you aware of -- well, let me back up.  Did the
17   prosecution tell you what our opening statement was?
18   A.    No, I don't have the opening statement for you.
19   Q.    Okay.  Did they tell you that in my opening statement I
20   admitted that the probation was fake?  Did they tell you that?
21   A.    I have been in -- I have learned that you're operating
22   under everything was a lie, that it is true that it was a lie,
23   everything except the money.
24   Q.    Okay.  And that's the point.  Because in terms of the
25   probation, you and I and the jury very clearly know at this
```

```
 1   point that there was no probation, right?
 2   A.   I mean, we know it's not true, I believe.  But we know it
 3   was --
 4   Q.   That wasn't a trick.
 5   A.   Okay.
 6   Q.   I mean, we know there was no probation out of Austin.
 7   A.   Okay.
 8   Q.   Right?
 9   A.   Yes.
10   Q.   Okay.
11   A.   Yes.
12   Q.   There was no Judge Anderson?
13   A.   Yeah.
14   Q.   There is no Avery, analyst?
15   A.   Uh-huh.
16   Q.   Right?
17   A.   Uh-huh.  Yes, sir.
18   Q.   There is no Dr. B?
19   A.   Correct.
20   Q.   There is no Dr. Z?
21   A.   (Indicating in the affirmative)
22   Q.   Right?
23   A.   Yes.
24   Q.   There's no Chet?
25   A.   Correct.
```

```
 1   Q.   There's no Jerry, the trooper?
 2   A.   True.
 3   Q.   All lies?
 4   A.   Yes.
 5   Q.   Okay.  We're on the same page, right?
 6   A.   Yes.
 7   Q.   Now, if this jury -- because you understand in a criminal
 8   case -- well, in any case before a jury, the jury determines
 9   the outcome.  Do we agree?
10   A.   Yes.
11   Q.   If this jury believes that all of the gifts, all of the
12   money that Casi Thompson gave to Bill Stone were gifts and not
13   given under the pretenses of this fake probation, they can
14   believe that, can't they?
15   A.   I trust their decision.
16   Q.   Okay.  And in that case that would not be a criminal
17   offense, would it?
18   A.   I -- none of this was gifts from our criminal
19   investigation.  They decide --
20   Q.   I very fully understand your position on it, and we'll
21   talk more about your investigation; but I'm asking you, if the
22   jury decides that these were all gifts from Casi Thompson, that
23   is not a crime; it?
24   A.   Yeah, the jury wouldn't -- that would not be a crime for
25   them.
```

```
 1   Q.    Thank you.
 2              MR. GALLIAN:  Your Honor, at this time I need to take
 3   up something outside the presence of the jury --
 4              THE COURT:  Sure.
 5              MR. GALLIAN:  -- based on some questions that were
 6   asked.
 7              THE COURT:  Certainly.  And now is a good time for a
 8   break.  So why don't we go ahead and break a minute or two
 9   early.
10              All rise for the jury.
11              We'll call you back in about 10:30.
12              And thank you for your time and attention.
13              Don't discuss the case or do any research.
14              Thank you.
15              (Jury out)
16              THE COURT:  Everybody please be seated.
17              Mr. Taly, I see you there.  We'll get you knocked out
18   here in just a minute.
19              MR. HAFFAR:  Thank you, Judge.
20              THE COURT:  Sure.
21              (Pause)
22              THE COURT:  Okay.  Outside the presence of the jury.
23              Yes, sir.
24              MR. GALLIAN:  You can -- with permission, can he step
25   down?
```

```
 1                    I do not need him.
 2                    THE COURT:  Yes.  Absolutely.
 3                    Sir, feel free to take a break.  Thank you.
 4                    THE WITNESS:  Thank you.
 5                    THE COURT:  Appreciate you.
 6                    MR. GALLIAN:  Judge, I'm trying to follow the rules
 7         here.
 8                    THE COURT:  Absolutely.
 9                    MR. GALLIAN:  And --
10                    THE COURT:  I'll tell you what, let's wait if you
11         don't mind.
12                    MR. GALLIAN:  Yes, Your Honor.
13                    THE COURT:  Because I don't think he was the case
14         agent who stayed in, was he?  Okay.  So just since we invoked
15         the rule.
16                    Ranger, whenever you -- we'll wait for you to step
17         outside, sir.  This doesn't pertain to you, I don't believe;
18         but in an abundance of caution, we'll keep everything all
19         tidied up.
20                    All right.  And so now I don't believe there are
21         any -- if y'all turn around, I don't believe there's any
22         witnesses who will testify present, other than the people who
23         are exempted from the rule.
24                    Yes, sir.  Outside the presence of the jury, what say
25         you?
```

```
 1            MR. GALLIAN:  So I'm trying to follow the rules.
 2            THE COURT:  Certainly.
 3            MR. GALLIAN:  I believe that the Government violated
 4   their own motion in limine.
 5            THE COURT:  Okay.
 6            MR. GALLIAN:  And, therefore, I wanted to approach
 7   before I got into it.
 8            THE COURT:  Okay.
 9            MR. GALLIAN:  The motion in limine that I'm
10   discussing is the one that references any sort of punishment
11   that can happen in this case.
12            The Court will recall that they played a portion of
13   the interview with Bill Stone where Mr. Stone says -- and I'm
14   reading the transcript from that call:  "What's the best
15   case/worst case?  Do you think this would be a probation case?"
16            Mr. Luley then responds, "Personally I believe so.  I
17   can't say that for sure."
18            "I understand."
19            And then they stop the clip.
20            So two issues with that.  One, not only did they
21   admit the call for all purposes with no redactions and the
22   corresponding transcript, but now they have left with the jury
23   the impression that he's going to get probation when if you go
24   just two sentences down Mr. Luley is saying that it's
25   obviously if you're found guilty of 1343 it's a 20-year
```

1   sentence.

2          So I don't know if it was an error, I don't know what

3   the reason is, but they've left this impression with the jury

4   that Bill Stone was facing probation.  They didn't just open

5   the door, they kicked the thing down by putting the transcript

6   in evidence.  And I think it's fully fair game for us to get

7   into it at this point.

8          THE COURT:  Okay.

9          MR. WESTFALL:  Your Honor, we will join

10  wholeheartedly in that motion.

11         THE COURT:  All right.  Appreciate that.  So --

12         MR. WESTFALL:  I'm glad that he brought it up,

13  because I was -- I'm still in State court, I was just going to

14  go there, so --

15         THE COURT:  I'm glad you didn't.

16         MR. WESTFALL:  I know.  I know.

17         THE COURT:  And I appreciate everybody's courtesy

18  doing what I expect professionals to do and doing this outside

19  the presence of the jury so the Court can weigh in.  I

20  appreciate that.

21         So just to refresh, I'm looking at Document 89,

22  Government's motion in limine.  And Number 1, I'll just read

23  it.  And Government, I'll get your response.

24         First motion in limine from the Government is any

25  reference to potential sentence and conviction ramifications.

1              Todd, if you'll indulge me for a moment.

2              "The Government moves to preclude any direct or

3    indirect references to the sentence that might be imposed

4    should either defendant be convicted of the offenses charged,

5    the conditions the defendants may face in prison if convicted

6    and sentenced to a term of imprisonment and any impact that a

7    sentence may have on the defendants or their families.  Such

8    references are expressly inadmissible and irrelevant and they

9    would be unfairly prejudicial.

10             "It is well established that a jury may not, in

11   reaching its verdict, consider any possible sentence that might

12   be imposed following conviction."

13             And then there's a citation to a case.

14             This principle "is a reflection of the basic division

15   of labor in our legal system between judge and jury.  The

16   jury's function is to find the facts and to decide whether on

17   those facts the defendant is guilty of the crime charged.  The

18   judge, by contrast, imposes sentence on the defendant after the

19   jury has arrived at a guilty verdict.  Further, reference to

20   any potential punishment would put before the jury a matter

21   that the Court specifically directs the jury not to consider in

22   the following pattern jury instruction."

23             And so -- anyway, I won't read that.  It's

24   instruction 1.22, caution - punishment.

25             And the last sentence of the motion in limine reads:

1    "Therefore, the Government respectfully requests that the Court

2    exclude evidence and argument regarding the potential sentences

3    or consequences each defendant is facing."

4              And I believe that the parties agreed to this, but if

5    you would please confirm my recollection.

6              MR. WESTFALL:  We did agree, Your Honor.

7              MR. GALLIAN:  We agreed.

8              THE COURT:  All right.  If you'll be seated for a

9    moment.

10             Government, what say you?

11             MS. MAX:  Your Honor, we've had multiple, at least

12   two that I'm aware of, possibly even more, meetings prior to

13   trial to discuss the evidence.  This has been on the

14   Government's evidence list, this entire exhibit the entire

15   time.  And they -- the entire recording.  And --

16             THE COURT:  What does that have to do with my motion

17   in limine?

18             MS. MAX:  Because they have never objected to us

19   introducing it in its entirety.

20             THE COURT:  They don't have to.  I had a motion in

21   limine that we were not going to get into this, and y'all did.

22             So whether it's listed or not, your duty as to this

23   Court, as an officer of the Court, is to follow this Court's

24   rules.  And it was your own motion in limine that they agreed

25   to, and this Court expects it to be enforced.

1          So I don't care if it's on an exhibit list.  I don't

2     care if it's blown up on a piece of paper.  Y'all are sensible

3     lawyers who know not to get into things this Court has ruled

4     inadmissible by your own agreement and your own motion.

5          So talk to me about something not about being on an

6     exhibit list.  Why did you violate this Court's rule?

7          MS. MAX:  Your Honor, these are the Defendant's own

8     statements.  And we've already established in testimony -- I

9     elicited from Ranger Briley that the things that he says to a

10    defendant in the course of an interview may not necessarily be

11    true statements by him.

12         He explained to the jury, I'm saying things to elicit

13    from them certain responses and to get them in a certain place,

14    but I don't have to tell the truth.

15         And the agents said they don't know what the charges

16    would be.  They say throughout their recording that it's up to

17    the prosecutor.

18         So, you know, if they want to play the rest of the

19    recording so that they can have the entirety of the

20    conversation with that defendant -- I mean, it is in evidence,

21    so they're not leaving -- we're not leaving just a portion of

22    that out.  But it should be limited to just that.  I mean, that

23    is a conversation that the Defendant had at the time of the

24    search that isn't getting into the range, per se.  It's going

25    toward what the Defendant's state of mind was when learning

```
 1    upon that he is look at potential criminal charges.
 2            THE COURT:  I don't disagree with any of that.  But
 3    you still haven't answered why you violated this Court's rule.
 4            (Pause)
 5            THE COURT:  It was your own motion.  Said not going
 6    to get into it.  You agreed to it.  You did.
 7            MS. MAX:  Your Honor, we look at it as the motion in
 8    limine is to preclude what they are going to bring up and
 9    discuss with the jury versus the evidence that the Defendant
10    has provided us directly of his guilt.
11            THE COURT:  No, that's a distinction without a
12    difference.  When this Court issues -- you've been a prosecutor
13    a long time.  When this Court issues an order, there are no
14    nuances to this.  I didn't say if it was brought up on cross or
15    if it's rehabilitation.  We were not going to get into this.
16    It's your own motion.
17            So I've given you an opportunity to be heard.  Please
18    be seated.
19            I'm going to let y'all clean this up any way you
20    wish.
21            MR. GALLIAN:  Thank you, Your Honor.
22            THE COURT:  Court is in recess.
23            SECURITY OFFICER:  All rise.
24            (Recess)
25            THE COURT:  Please be seated.
```

1          I think I snuck out without my court officer.  Just a

2    second.  Let me know when you're ready to go on the record.

3          (Pause)

4          THE COURT:  Okay.  Outside the presence of the jury.

5          I was thinking over our short break about the

6    appropriate remedy, and here is what I propose, something along

7    the lines of a statement that -- or in the form of a question,

8    it will be up to this Court to determine the punishment and

9    that that could be anything from probation to -- is 20 the

10   statutory max?  Is that what you-all were -- well, let me ask

11   you what you guys are proposing first.

12         MR. GALLIAN:  Your Honor, I don't think anything too

13   crazy.  I believe that fat pigs get slaughtered.  So I'm not

14   going to ask for a whole bunch.  But I do think in fairness

15   that we should read the portion of the transcript that they

16   went into and admitted as evidence and just finish that next

17   statement.

18         THE COURT:  Can you show that to me?

19         MR. GALLIAN:  Sure, actually.

20         THE COURT:  Government, do you have it?

21         MR. GALLIAN:  May I approach?

22         THE COURT:  Yeah, sure.

23         (Pause)

24         THE COURT:  Okay.  And remind me -- and Government, I

25   need you to weigh in too.  How far did we get into this?

1   What's the best case/worst case?  Do you think this would be a

2   probation case?

3            Let's go off the record for a second.

4            (Discussion off the record)

5            THE COURT:  Sorry, Mr. Gallian.  If you could repeat

6   that.  I've got before me the transcript of the interview.

7   It's been represented to me that what the jury has heard

8   already -- and this is from page 51 -- is the following:

9            "Mr. Stone:"  Question -- or statement.  "What's the

10  best case/worst case?  Do you think this would be a probation

11  case?

12           Response, "Mr. Luley:  Personally I believe so.  I

13  can't say that for sure."

14           And so what I heard off the record is that defense

15  counsel proposes to add the following remark from Mr. Stone, "I

16  understand."  And also the remark from Mr. Luley in response,

17  "But I personally believe the worst case scenario is we do take

18  it to trial, Danny and I put on a solid investigation, and

19  obviously if you're found guilty 1343 is a 20-year sentence."

20           And is that what you propose to enter into evidence?

21           MR. GALLIAN:  Yes, Your Honor.

22           THE COURT:  All right.  Now, I would -- for

23  clarification purposes, my only concern about that is that

24  makes it sound as if it is for certain a 20-year sentence, and

25  both sides know that it would be up to this Court to determine

```
1    that.  It wouldn't be a 20-year mandatory minimum, would it?  I
2    haven't looked into the punishment.
3              MR. GALLIAN:  No.
4              THE COURT:  Okay.  And so I would propose that if the
5    Court agrees to do that, that we follow it up with me just
6    making a very short plain statement to the jury in the event
7    that either defendant is convicted it will be up to this Judge
8    to determine what an appropriate punishment is.
9              MR. GALLIAN:  I believe that that's fine.
10             THE COURT:  Okay.  And that could be anywhere from
11   probation to -- is 20 years the max?
12             MS. MAX:  Yes, Your Honor.
13             MR. GALLIAN:  Well, according to the DOJ press
14   release, it's 178 years.
15             THE COURT:  Oh, my goodness.
16             MS. RUDOFF:  They weren't grouping.
17             MR. GALLIAN:  But you know they love the press
18   release.
19             MS. RUDOFF:  They weren't grouping or doing by the
20   guidelines or anything like that.
21             THE COURT:  Okay.  All right.  And so because what I
22   don't want to do is create a new misimpression that it is a
23   slam-dunk 20-year case when I would be the one determining what
24   it would be.
25             MR. WESTFALL:  Probation is actually precluded by
```

1  law, Your Honor.

2          THE COURT:  Is it by law?

3          MR. WESTFALL:  Yeah.

4          THE COURT:  Okay.  All right.

5          All right.  So, Government, what say you as to a

6  remedy?

7          MS. MAX:  Your Honor, I'd just like to put on the

8  record that, again, the Government introduced these statements.

9  They were not statements of the lawyers or the Court.  They

10  were a statement that was showing the Defendant's perspective

11  at the time that he was confronted with a search warrant and

12  told of the crimes that were being investigated of him.  So the

13  Government introduced these as his statements as evidence of

14  his guilt.

15          And also the Government had already established with

16  the jury that the statements made by investigators of the time

17  of an investigation may not be truthful and are said to elicit

18  different responses.

19          We do -- I like your line of thinking, Your Honor.

20  There is -- we ask that -- in the jury instructions we would

21  ask for an inclusion of the Fifth Circuit pattern jury charge

22  of 1.22, caution - punishment.

23          THE COURT:  All right.  So just to make clear for the

24  record -- I appreciate your statement, but to make clear for

25  anyone who would be reviewing this case, the Government's own

```
 1    motion in limine Number 1 was excluding -- was the Government
 2    moving to preclude any direct or indirect references to the
 3    sentence that might be imposed should either defendant be
 4    convicted of the offenses charged and further.
 5              And so that was agreed to by all the parties.  The
 6    Court believes that in whatever form it came in, this certainly
 7    was a direct reference to the sentence that might be imposed.
 8              And so I believe that my motion in limine -- the
 9    motion in limine that was reached by the parties has been
10    violated.
11              The remedy proposed by defense counsel is acceptable
12    to the Court with the proviso that I will add, if you-all don't
13    have objections, either side, something to the effect of
14    ultimately it will be up to the Court to determine, if the
15    Defendants are convicted, what the sentence would be.
16              MR. GALLIAN:  I think that's more than fair, Judge.
17              THE COURT:  Sound good?
18              MS. MAX:  And, Your Honor, I think what you're saying
19    is exactly captured by 1.22, if you would just include this in
20    the jury instructions.
21              THE COURT:  Okay.  Well, I'll take that up at the
22    charge conference.  But as far as remedy for right now, have
23    you any objection?
24              MS. MAX:  No, Your Honor.
25              THE COURT:  All right.  Okay.  Let's do that as the
```

```
 1   fix.  And how do you want to do this?  Do you want to just read
 2   that in?
 3              MR. GALLIAN:  I'm going to get to it.
 4              THE COURT:  Okay.
 5              MR. GALLIAN:  I'm going to go through a couple of
 6   different portions on the transcript.
 7              THE COURT:  Okay.
 8              MR. GALLIAN:  I can do it first, so that way we
 9   can --
10              THE COURT:  Okay.
11              MR. GALLIAN:  I will defer to the Court.  I can move
12   things around.
13              THE COURT:  I think it would be good to just knock
14   that out real quick --
15              MR. GALLIAN:  That sounds great.
16              THE COURT:  -- and take it from there.
17              MR. GALLIAN:  Perfect.
18              THE COURT:  I do appreciate the parties having a sub
19   rosa hearing not in the presence of the jury.
20              If you believe that anything else, both sides, has
21   been violated or something that could potentially result in a
22   mistrial, if you will do the Court the courtesy you have by
23   allowing me to discuss it outside the presence of the jury, I
24   would be most grateful.
25              Yes, ma'am?
```

```
 1              MS. MAX:  Your Honor, I'm sorry.  Can you clarify
 2    exactly what is going to be said to the jury right now?
 3              THE COURT:  Sure.  Let me write it out.
 4              (Pause)
 5              THE COURT:  Okay.  Here's what I propose saying:
 6    Ultimately, if either defendant is convicted of any crimes, it
 7    will be up to me to sentence them.
 8              Any objection from defense?
 9              MR. GALLIAN:  No objection.
10              MR. WESTFALL:  No objection.
11              MS. MAX:  Your Honor, could you also add that you
12    should not be concerned with punishment in any way, it should
13    not enter your consideration or discussion?  That's following
14    the pattern jury charge, Your Honor.
15              THE COURT:  Any objection, defense?
16              MR. GALLIAN:  I think -- I defer to the Court.
17              THE COURT:  All right.  I'll add it.  You should not
18    be concerned with punishment in any way.
19              What was the last part?
20              MS. MAX:  It should not enter your consideration or
21    discussion.
22              THE COURT:  Okay.
23              MR. GALLIAN:  Judge, I thought you were leaning our
24    way, so now we object -- no, I'm just kidding.
25              THE COURT:  Okay.  Should not enter your
```

1    consideration or -- what was the last?

2           MS. MAX:  Discussion.

3           THE COURT:  Discussion.

4           Okay.  Any objection to that, either side?

5           MR. GALLIAN:  I hate to do this.  Can you read it in

6    its entirety?

7           THE COURT:  Sure.  Absolutely.  That's a fair

8    request.

9           Here's what I propose saying:  Ultimately, if either

10   defendant is convicted of any crimes, it will be up to me to

11   sentence them.  You should not be concerned with punishment in

12   any way.  It should not enter your consideration or discussion.

13          Acceptable to Government?

14          MS. MAX:  Yes, Your Honor.

15          THE COURT:  Acceptable to defense?

16          MR. GALLIAN:  Acceptable.

17          THE COURT:  All right.

18          MR. WESTFALL:  Yes, Your Honor.

19          THE COURT:  Great.  Then we'll move on from there.

20   Fantastic.

21          All right.  Todd, you have not had a break at all.

22   Do you need to stretch your legs?

23          Absolutely.  Why don't you run into -- are you sure?

24          THE REPORTER:  I'm good.

25          THE COURT:  Okay.  All right.  Ready to bring them

1    out?

2            MR. GALLIAN:  Your Honor, may I approach to retrieve
3    the transcript?

4            THE COURT:  Oh, yes.  Of course.  Oh, and I'm sorry.
5    Can I -- can I give you everything but the first page?

6            MR. GALLIAN:  No, no.  I got it.  You can have it.

7            THE COURT:  Okay.  No.  How about this?  I will hand
8    it to you as soon as I read it.  Is that okay?

9            MR. GALLIAN:  Sure.

10           THE COURT:  Well, actually, you were going to -- you
11   know what?  Let me just write this down real quick.

12           MR. GALLIAN:  It's all up here, Judge.  I've got it.

13           THE COURT:  Why don't you stack them up?

14           No, no, no.  I'll write it down on a piece of paper.
15   I wasn't thinking.

16           If you'll stack them up, I'll just write it down
17   here, my part.  Sorry.

18           (Pause)

19           THE COURT:  Thank you-all for working together.

20           One moment.  One moment.

21           (Pause)

22           THE COURT:  All right.  Everybody ready?

23           Everybody check your phones.

24           Okey-dokey.  I think we're ready.

25           SECURITY OFFICER:  All rise for the jury.

```
 1                    (Jury in)
 2              THE COURT:  All right.  Everyone please be seated.
 3              If everybody will check your phones, please.
 4              Sir, your witness.
 5              MR. GALLIAN:  Thank you, Your Honor.
 6                    CROSS-EXAMINATION CONTINUED
 7    BY MR. GALLIAN:
 8    Q.   Ranger Briley, I want to go back to something that was
 9    discussed on direct examination.
10              MR. GALLIAN:  Carly, if we could publish Government's
11    Exhibit 86, page 51, please.
12    BY MR. GALLIAN:
13    Q.   Do you recall this portion of the recording that the
14    Government played while you were on direct examination?
15              MR. GALLIAN:  Carly, if we could just zoom in on that
16    top part, please, through page 11.
17    A.   Yes, sir, I do.
18    Q.   Mr. Stone was asking, "Do you think this would be a
19    probation case?"
20              And we heard on the recording Brian Luley say,
21    "Personally, I believe so.  I can't say that for sure."
22              Mr. Stone then says, "I understand."  Correct?
23    A.   Yes, sir.
24    Q.   Then Brian Luley, where it was cut off, then says, "But I
25    personally believe the worst case scenario is we take it to
```

```
 1   trial, Danny and I put on a solid investigation, and obviously
 2   if you're found guilty 1343 is a 20-year sentence."
 3            Did I read that appropriately?
 4   A.  Yes, sir, you did.
 5            MR. GALLIAN:  Thank you, Carly.
 6            THE WITNESS:  Yes, sir.
 7            THE COURT:  So members of the jury, I will instruct
 8   you at the end of this trial, and I'm doing so now, ultimately
 9   if either defendant is convicted of any crimes, it will be up
10   to me to sentence them.  You should not be concerned with
11   punishment in any way.  It should not enter your consideration
12   or discussions.
13            Your witness, sir.
14            MR. GALLIAN:  Thank you, Judge.
15            THE COURT:  You're welcome.
16   BY MR. GALLIAN:
17   Q.  All right.  Going back to the conversation with Bill Stone
18   that day --
19            MR. GALLIAN:  I would like to publish again
20   Government's 86.
21            And, Carly, if we could jump to page 8, please.
22            Line 18 all the way to 25, please.
23   BY MR. GALLIAN:
24   Q.  All right.  So obviously we're all taking different
25   portions of this interview that you and Luley had with Bill
```

1  Stone at his house that day, correct?

2  A.   We're taking what?

3  Q.   Prosecution is using different clips.  We're using

4  different clips.  But this is from the interview that day,

5  right?

6  A.   This is from the interview that day.

7  Q.   Okay.  And based on page 8, this was pretty early into

8  your conversation with Bill Stone.  I'm going to read this out

9  loud and tell me if I read it correctly.

10  A.   Okay.

11  Q.   Mr. Stone says:  "I will tell you guys whatever."

12          Then it says:  "Unknown male:  Yeah."

13          Mr. Stone then says:  "We were engaged to be married.

14  We were going to -- we bought this house.  She was going to

15  move up here from Granbury.  I mean, I just -- I mean, it was

16  just we fell in love."

17          Did I read that appropriately?

18  A.   Yes, sir, you did.

19  Q.   And when we say "this house," just to be unequivocally

20  clear, you guys are at his house in Colleyville, Texas, when

21  this interview was happening, correct?

22  A.   Yes, we were at his house.

23  Q.   Okay.

24          MR. GALLIAN:  Carly, if we could jump to page 13,

25  please, and lines 13 to 25.

1   BY MR. GALLIAN:

2   Q.   At some point Brian Luley excused himself from the

3   conversation, didn't he, and he went outside to make a phone

4   call?

5   A.   There was a time when he excused himself.  I don't

6   remember for what purpose.

7   Q.   Okay.  I'm going to start on line 18, so please follow

8   along with me.

9            "He's just kind of frazzled right now.  He called his

10  attorney from my phone.  Of course we (indiscernible at 9

11  minutes 52 seconds) and his attorney advised him not to give

12  the codes to his phones, but after he hung up he said F it

13  here's the codes.  So that's where we're at in the process."

14           Did I read that correctly?

15  A.   Yes, sir.

16  Q.   All right.  And to be clear, I was not representing Bill

17  Stone at this time, correct?

18  A.   Correct.

19  Q.   But he did have a conversation with his attorney at the

20  time, right?

21  A.   Yes.

22  Q.   And his attorney at the time told him not to give you guys

23  the codes to the phones, right?

24  A.   That's what he said.

25  Q.   Not to give you guys the codes to the safe, right?

```
 1   A.   I don't know what his attorney said.
 2   Q.   Well, after his conversation with the attorney, Bill Stone
 3   gave you combination to all the safes, right?
 4   A.   Yes, sir.
 5   Q.   Gave you the key to the safes?
 6   A.   Yes.
 7   Q.   And gave you the passwords to his devices as well?
 8   A.   Yes, he did.
 9   Q.   And an individual who is a defendant, a subject, a target,
10   whatever you want to say, if something is being taken from
11   their possession, whether it's a phone, a computer, or
12   what-have-you, that individual is under no obligation to give a
13   passcode or anything, correct?
14   A.   Yes, that's correct.
15   Q.   There was a moment in time where you guys informed Bill
16   Stone that you were taking the vehicles from his house, right?
17   A.   Yes, there was.
18   Q.   Okay.  And the vehicles that we're talking about are the
19   Tacoma and the Mercedes Benz; is that right?
20   A.   Yes.
21   Q.   When you told him that you were taking the cars, do you
22   recall his reaction to that?
23   A.   Why, I think was his response.  I don't remember further
24   what his response was.
25   Q.   Okay.
```

```
 1              MR. GALLIAN:  Carly, if we could publish Government's
 2   Exhibit 86, page 16, please.
 3              If we could do line 9 through 14.
 4   BY MR. GALLIAN:
 5   Q.   Follow along with me, Ranger Briley, and tell me if I read
 6   this correctly.
 7              Mr. Stone:  "Can you guys tell me why you're seizing
 8   my trucks, my vehicles?  Can you tell me why?"
 9              Unknown male says:  "Yeah."
10              Mr. Stone then says:  "That doesn't have anything to
11   do with this."
12              Did I read that correctly?
13   A.   Yes, sir.
14              MR. GALLIAN:  Thank you, Carly.
15   BY MR. GALLIAN:
16   Q.   It is common in your investigations to compile an
17   investigation report in any case that you're working; is that
18   right?
19   A.   Yes.
20   Q.   And in this situation, I'm sure you reviewed it before you
21   testified, that there was a report that you compiled that was
22   about 35 pages; is that right?
23   A.   Yes, sir.
24   Q.   That report was provided to the Government and then
25   ultimately provided to us.  You're aware of that?
```

```
 1    A.    Yes, sir.
 2    Q.    In your report -- well, backing up, you don't like
 3    financial fraud crimes, right?
 4    A.    That's accurate.
 5    Q.    They're boring as heck?
 6    A.    Yep.
 7    Q.    Okay.  You would rather do some violent, drug related,
 8    anything other than let's look at someone's bank accounts; is
 9    that fair?
10    A.    Yes.
11    Q.    Okay.  So at some point in this investigation after some
12    controlled calls, you realize that this could possibly be a
13    financial crime.  Do we agree?
14    A.    I realize there was a financial component to this, this
15    investigation from -- from probably about -- maybe the second
16    interview with the victim.
17    Q.    Okay.  And that's what I'm asking --
18    A.    Uh-huh.
19    Q.    -- is at some point you determined this is a possible
20    financial crime, right?
21    A.    Yes, sir.
22    Q.    Okay.  Unfortunately for you, financial crimes require
23    that you have to review bank records; is that right?
24    A.    Financial crimes do require review of financial records
25    from wherever those records exist.
```

```
1    Q.   Okay.  Now, when you sat down with Casi in October,
2    specifically October 2nd of 2019, Casi told you that she had
3    five different accounts at First Financial Bank.  Do you recall
4    that?
5    A.   No, sir.
6    Q.   Okay.  If I had a transcript from that meeting that you
7    had with Ms. Thompson and I showed you that transcript, do you
8    think that would help refresh your memory?
9    A.   Yes, sir.
10   Q.   Okay.
11          MR. GALLIAN:  May I approach, Your Honor?
12          THE COURT:  You may.
13          (Pause)
14   BY MR. GALLIAN:
15   Q.   So I just handed you two stacks.  One is just the front so
16   you can see how the interview started on the day.  The second
17   one is the relevant page, page 19.
18          If you could refresh -- read that until you have
19   refreshed your memory, and then let me know when you're done
20   please.
21   A.   You want me to review page 19?
22   Q.   Page 19, yes, sir.
23   A.   Okay.
24          (Pause)
25   A.   Okay.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Okay.  In October 2019, Casi Thompson told you that she
 3   had five bank accounts at First Financial Bank; is that right?
 4   A.   I just don't know the date of this.  It's not reflected on
 5   here.
 6   Q.   Okay.  I believe on that one it's on the last page --
 7   A.   Okay.
 8   Q.   -- before you end your recording.
 9   A.   Okay.  So it's page 60 -- I'm not seeing a date.
10   Q.   Okay.
11   A.   October 2, 2019.  Yes.  Is that what you said?
12   Q.   Yes, sir.
13   A.   Yes, sir, it's there.
14   Q.   All right.  You don't trust me very much, do you?
15   A.   No, sir.
16   Q.   Okay.  Appreciate the honesty.
17             Thankfully everything that I ask you can be pointed
18   in your records, okay?
19   A.   Yes, sir.
20   Q.   All right.  So October 2, 2019, Casi Thompson tells you
21   she has five accounts at First Financial, do we agree?
22   A.   Yes, sir.
23   Q.   Okay.  In your report you mentioned that in September 2019
24   you issue grand jury subpoenas for both Bill Stone and Casi
25   Thompson at the following institutions:  First Financial Bank,
```

1   J.P. Morgan Chase, Navy Credit Union bank, and Wells Fargo

2   Bank, right?

3   A.   Yes, sir.

4   Q.   When you issued those subpoenas, those agencies then give

5   you all the dreaded stuff that you don't want; is that right?

6   A.   Sometimes they provide it; sometimes they don't.

7   Q.   Okay.  In this situation when you sent subpoenas to First

8   Financial Bank, did you get responsive documents?

9   A.   I don't know.  Not all of those financial institutions

10  actually responded.

11  Q.   Okay.  There was no follow-up from you?

12  A.   There was follow-up on the DOJ side for the financial --

13  Q.   Okay.

14  A.   -- all these financial records.

15  Q.   Do you ever recall receiving any records from First

16  Financial?

17  A.   I don't.

18  Q.   Do you recall at any point in this investigation ever

19  going through bank records from First Financial?

20  A.   I don't.

21  Q.   In any sit-down with Brian Luley, Casi Thompson, Andrew

22  Latham, do you ever recall anyone pointing to a First Financial

23  Bank record?

24  A.   No, sir.

25  Q.   Okay.  The reason I ask is because you know that -- you

```
 1   may or may not know, but we asked for those bank records and we
 2   were denied.  Did you know that?
 3   A.   No, sir.
 4   Q.   Casi Thompson has five accounts at First Financial.
 5   Agree?
 6   A.   That's what is said in the record.
 7   Q.   Okay.
 8            MR. GALLIAN:  May I approach, Your Honor?
 9            THE COURT:  You may.
10            (Pause)
11   BY MR. GALLIAN:
12   Q.   All right.  I want to talk to you about what I call red
13   flags in your investigation.  You may not agree with the term,
14   but we'll go through them section by section, okay?
15   A.   Yes, sir.
16   Q.   All right.  First, let's talk about this ring.
17            At any point did Casi Thompson ever tell you she
18   bought a ring from Bill Stone?
19   A.   That she bought a ring from Bill Stone?
20   Q.   Yes, sir.
21   A.   I don't recall that.  I'm not saying it didn't happen, I'm
22   just saying I don't recall that.
23   Q.   I know, but it's a financial fraud crime, and you have no
24   memory of Casi Thompson ever mentioning that she bought a
25   diamond ring from Bill Stone.  Is that fair?
```

```
 1    A.   Yes.
 2    Q.   Next topic, restitution.  I think there are two separate
 3    restitution things going on at the same time, okay?  And I want
 4    to talk to you more about that.
 5         You've seen the text messages where Casi texted Joe
 6    about the Enterprise restitution, have you not?
 7    A.   Yes, sir.
 8    Q.   Okay.  Now, in those texts Casi says -- and the jury has
 9    seen them like 5,000 times at this point.  But Casi tells Joe,
10    I'm on the do-not-rent list, and then she says that she paid
11    the balance and she was able to take the car and drive away.
12    Is that an accurate summary?
13    A.   I don't remember about her able to take the car and drive
14    away, but I remember that they had a discussion about it.
15    Q.   Okay.  Since my trust is at issue, we'll pull it up.
16         MR. GALLIAN:  Carly, Government's 38, jump page 477,
17    please.  You're fast.
18         All right.  On that first blue text, please.
19    BY MR. GALLIAN:
20    Q.   "Casi Thompson 2014 new cell.
21         "I'm on the do not rent list at Enterprise."
22         Did I read that correctly?
23    A.   Yes, sir.
24         MR. GALLIAN:  All right.  Carly, if we can go to the
25    next green text message and the next -- yep, that's fine too.
```

```
 1    BY MR. GALLIAN:
 2    Q.   That text message chain is clearly a conversation with
 3    Joseph DeLeon, do we agree?
 4    A.   Yes.
 5    Q.   And he says, "why?"  Did I read that correctly?
 6    A.   Yes.
 7              MR. GALLIAN:  All right.  Carly, if we could go to
 8    the third blue text message, please.
 9    BY MR. GALLIAN:
10    Q.   Casi then says, "I called and talked to Enterprise
11    cooperate," corporate.  "They said balance has been paid and
12    I'm able to rent.  So we're headed back.  We were almost home."
13              Did I read that correctly.
14    A.   Yes, sir.
15    Q.   Okay.  So there was -- based on these text messages, there
16    was some issue at Enterprise at some point that Casi had in
17    December 2015; is that right?
18    A.   Yes, sir.
19    Q.   All right.  Casi, in one of the recorded phone calls with
20    Joe DeLeon mentions the word "restitution" for the first time.
21    Do you recall that interview?
22    A.   I recall the mentioning of restitution.
23    Q.   Okay.  And if we go with what Joe -- I'm sorry, Casi then
24    tells Joe that it was $120,000.00 in restitution, do you
25    remember that?
```

1  A.   Yeah.  She actually says 125,000.

2  Q.   125,000 in restitution, to which Joe DeLeon then says

3  something along the lines of, what?  I thought that was 4- or

4  $5,000.00.

5          Do you recall that?

6  A.   Yes, sir.

7  Q.   Okay.  I think you and I can both agree that 4- and

8  $5,000.00 is much more consistent with what a restitution would

9  be at Enterprise than $250,000.00.  Do we agree?

10 A.   Yes, sir.

11 Q.   I have an Excel spreadsheet here that Jaclyn put a lot of

12 time -- my wife put a lot of time and energy into about this

13 restitution issue.

14          Would it surprise you if the first person who

15 mentions Enterprise as it relates to restitution was actually

16 Joe DeLeon?

17 A.   I don't take it as a surprise.

18 Q.   Okay.  Because up until that point, I think you and I can

19 agree that in the 7-29 and the August 1st interview with Casi

20 Thompson she never mentioned restitution or Enterprise.  Do we

21 agree?

22 A.   Timeline-wise, I don't remember that order.

23 Q.   Okay.

24 A.   I'm okay with that, though.

25 Q.   Starting to trust me more.  I like it.

1           All right.  October 2, 2019 -- I'm sorry.  Here it

2    is.  September 19, 2019, Casi makes a controlled call with Joe

3    DeLeon.  Does that sound about right?

4    A.   I would think she made a controlled call to DeLeon.  She

5    made a few.

6    Q.   Okay.  Casi says that, "Remember that time you made me do

7    the restitution in a cashier's check?"

8           And Joe says, "Yes."

9           Do you recall that portion of the controlled call?

10   A.   Yes.

11   Q.   And Casi says, "Makes me wonder if it was a legit deal or

12   if he pocketed the money."

13          Joe then says, "What was it, Avis?  Not Avis, the

14   other one.  Enterprise, right?  Enterprise?"

15          And she said, "Yes, that was the restitution for

16   $125,000.00."

17          Do you recall that conversation?

18   A.   Yes, I do.

19   Q.   And that's the one that we were just discussing, right --

20   A.   Yes.

21   Q.   -- where Joe DeLeon says, "I thought that was like 4- or

22   5,000"?

23   A.   Yes, sir.

24   Q.   Okay.  Would it surprise you if up until that point Casi

25   Thompson had never said the word "Enterprise" or "restitution"

1   together ever?

2   A.   No, sir.

3   Q.   Is that a red flag for you?

4   A.   No, sir.

5   Q.   All right.  Next red flag.  This restitution amount, you

6   met with Casi upwards of -- we already said approximately ten

7   times until May 5, 2020, right?

8   A.   Yes.

9   Q.   In none of the recorded conversations with Casi does she

10  ever say it was $250,000.00, does she?

11  A.   I don't remember at what point in the investigation we

12  determined it was 250,000, but that was determined on the --

13  through the DOJ investigation of this -- this case.

14  Q.   Okay.  When you say we determined, what does that mean?

15  A.   As an investigative team, that's what was determined.

16  There's a lot of different people working on this case

17  collaboratively, and so through that process evidence is

18  brought in.

19  Q.   Sure.  I understand that.  But the victim in this case,

20  the alleged victim in this case, Casi Thompson, we agree?

21  A.   Yes, sir.

22  Q.   And in none of the recorded phone calls, interviews,

23  anything does she ever say that it was $250,000.00, does she?

24  A.   I don't recall it in the recorded conversations being a

25  factor that we requested her to ask.

```
1    Q.   Okay.  But even in the interviews where you guys are
2    asking her questions about the restitution, she never said it
3    was $250,000.00, did she?
4    A.   That's correct.
5    Q.   All right.  When did that happen?
6    A.   When did what happen?
7    Q.   The first time I heard $250,000.00 from Casi Thompson's
8    mouth was in trial.  So I'm wondering when she told you guys.
9    When did that happen?
10   A.   I think that will be forthcoming in evidence.  I don't
11   know the date or the actual timeframe that 250,000 was
12   determined to be the actual amount.
13   Q.   Correct me if I'm wrong.  She says restitution payment.
14   She says large check.  Then you guys go and look through her
15   bank records and find a cashier's check for $250,000.00, right?
16   A.   I do know that a $250,000.00 check was found --
17   Q.   Okay.
18   A.   -- through the Department of Justice analyst.
19   Q.   And then what?  Casi changed the number to $250,000.00
20   after seeing that bank record?
21   A.   I don't -- I don't know that Casi knew the --
22            MS. MAX:  Objection, Your Honor, calls for
23   speculation.
24            THE COURT:  Overruled.
25   A.   I don't know that Casi knew the exact amount.
```

```
 1   BY MR. GALLIAN:
 2   Q.   Okay.  $10,000.00 to you and I is a lot of money, is it
 3   not?
 4   A.   Yes, sir.
 5   Q.   $50,000.00 is a lot of money, is it not?
 6             MS. MAX:  Objection, sidebar.
 7             THE COURT:  Overruled.
 8   A.   Yes, sir.
 9   Q.   $150,000.00 is a lot of money, is it not?
10   A.   Yes, sir.
11   Q.   Okay.  Casi Thompson, when she recalled this restitution,
12   her memory or her story was off by $125,000.00; is that right?
13   A.   Her dollar amount was what she stated.  That's all I can
14   tell you.  I don't --
15   Q.   And the difference between $250,000.00 and $125,000.00 is
16   $125,000.00, right?
17   A.   Yes.
18   Q.   Okay.  You didn't consider that a red flag?
19   A.   I considered it an issue that needed to be investigated
20   further.
21   Q.   Let's talk about some other stuff that Casi has never
22   said.
23             Until trial Casi had never said on a recorded call or
24   an interview that Bill Stone held himself out as an FBI agent.
25   Do you agree?
```

```
 1   A.   No.
 2   Q.   Okay.
 3           MR. GALLIAN:  Sorry, Judge, we have papers all over
 4   the place.
 5           THE COURT:  That's okay.
 6           MR. GALLIAN:  One brief moment.
 7           THE COURT:  Sure.  Take your time.
 8           Members of the jury, I have us going about another 20
 9   minutes until lunch.  Everybody okay?
10           All right.  Take your time, counsel.
11   BY MR. GALLIAN:
12   Q.   All right.  So we'll find it.  But in your investigation,
13   not only do we have your report, but we were also produced all
14   of the e-mails that you would send in this case; is that right?
15   A.   Yes, sir.
16   Q.   Okay.  There are three e-mails in particular that you send
17   from 2019 through 2020 that reference his employment status.
18   Do you recall generally those e-mails?
19   A.   That's been three years since I've seen those.  His
20   status, I think, was in -- up for debate probably around that
21   time.
22   Q.   Okay.  But what you said in all of those e-mails was that
23   Bill Stone was former FBI holding himself out as CIA?
24   A.   That is possible, yes.  I think that is probably correct.
25           MR. GALLIAN:  May I approach, Your Honor?
```

```
 1              THE COURT:  You may.

 2              (Pause)

 3    BY MR. GALLIAN:

 4    Q.   I just handed you an e-mail from August 17, 2020.  If you

 5    could read it, refresh your memory, and then I'll ask you some

 6    questions.

 7              (Pause)

 8    A.   Okay.

 9    Q.   Have you had a chance to review the whole thing?

10    A.   Yes, sir.

11              MR. GALLIAN:  May I approach, Your Honor?

12              THE COURT:  You may.

13              (Pause)

14    BY MR. GALLIAN:

15    Q.   I've just handed you two more e-mails, one from 2020 and

16    one from 2019.  If you could also review those and let me know

17    when you're done.

18              (Pause)

19    A.   Okay.  I'm done.

20              MR. GALLIAN:  May I approach, Your Honor?

21              THE COURT:  You may.

22              (Pause)

23    BY MR. GALLIAN:

24    Q.   Let's go earliest in time.  It looks like you sent an

25    e-mail July 29, 2019, and sent to Heidi Prather?  Prather?
```

```
 1   A.   Yes, sir.

 2   Q.   Someone in DPS?

 3   A.   Yes, sir.

 4   Q.   In that you say that Stone represents himself as a former

 5   FBI agent and a current contractor for the CIA; is that right?

 6   A.   Yes, sir.

 7   Q.   Next in time, July 30, 2020, which we can agree is after

 8   you interviewed Casi in May 2020, right?

 9   A.   Yes, sir.

10   Q.   And in that e-mail to Jason Hester, another person

11   with DPS --

12   A.   Yes, sir.

13   Q.   -- "he," being Bill Stone, "has been passing himself off

14   as a CIA agent for several years now."

15             Did I read that correctly?

16   A.   Yes, sir.

17   Q.   And finally another e-mail, August 2020, that you sent to

18   William Casper and Jason Bobo, also with DPS?

19   A.   Yes, sir.

20   Q.   "Stone was purporting himself to be a contractor and CIA

21   agent after retirement."

22             Did I read that correctly?

23   A.   Yes, sir.

24   Q.   Okay.  Now, when you sat down with Casi in May of 2020,

25   specifically May 5, 2020, do you recall Ivan Martinez being
```

```
 1   there?
 2   A.   Yes, sir.
 3   Q.   And in that interview, Ivan Martinez asked Ms. Thompson
 4   point-blank, like when you met him at the funeral, did he
 5   share -- again, funeral, we're talking about Myrna's passing in
 6   2015, correct?
 7   A.   Yes, sir.
 8   Q.   Okay.  When you met him at the funeral, did he share
 9   anything to you about his job, his job status, or his
10   employment?
11           Ms. Thompson said, yeah, he was working for the CIA.
12           Do you recall that portion?
13   A.   I don't remember that -- no, I don't remember that
14   portion, but --
15           MR. GALLIAN:  May I approach, Your Honor?
16           THE COURT:  You may.
17           (Pause)
18   A.   Yes, sir.
19   Q.   Okay.  All right.  That's what Casi said, isn't it?
20   A.   Yes, sir.
21           MR. GALLIAN:  May I approach?
22           THE COURT:  You may.
23           (Pause)
24   BY MR. GALLIAN:
25   Q.   In this case Bill Stone is charged with impersonating an
```

 1  FBI agent; is that right?
 2  A.   He is charged with impersonating an officer.  I don't know
 3  the exact arrest title offense.
 4  Q.   Okay.  If I told you that the indictment read that he was
 5  being charged with impersonating an FBI agent, not CIA, you
 6  would have no reason to dispute that, correct?
 7  A.   Yes, sir.
 8  Q.   Casi comes in in this initial interview with you in July
 9  of 2019.  She sits down and she tells you the weird -- one of
10  the weirdest stories you've ever heard.  Can we agree?
11  A.   Yes.
12  Q.   And in my opening I told the jury that this was the
13  weirdest case ever.  It's a pretty good description of it,
14  don't you think?
15  A.   Yes, sir.
16  Q.   Okay.  When Casi sat down and told you the story, if we
17  back the story up before the probation began, before the fake
18  probation in December of 2015, what was your understanding of
19  their relationship at that point, Bill and Casi?
20  A.   Very distant.
21  Q.   Explain more for me, please.
22  A.   So she was in and out of rehab prior to this 2015 time
23  period and not much contact between the two.
24  Q.   All right.  When you say -- just so we're unequivocally
25  clear, when you say not a lot of contact, what does that mean

1   in your mind?

2   A.   To -- what that means is not -- not a lot of -- not

3   physical contact, not communication by phone.  I'm not saying

4   it didn't happen, I'm just saying it's not much at all.

5   Q.   Okay.  That was -- did you get left with this impression

6   that Bill Stone just kind of appeared around the funeral time?

7   A.   I was left with the impression that he swooped in around

8   the time of the funeral time in a more aggressive posture.

9   Q.   Sure.  But based on them not really seeing each other and

10   not really talking, your impression of their relationship

11   before this probation was that there was very little, if any,

12   relationship.  Would you agree with that?

13   A.   Well, I think I would need to explain what I know is --

14   from the -- what I know that happened prior to 2015 to maybe

15   answer your question better.

16   Q.   Okay.  Well, maybe I -- sometimes I ask bad questions.

17            I think we can agree that Casi was discharged from

18   rehab in about January of 2015.  Does that timeline sound

19   right?

20   A.   I don't -- I don't know the timeline, sir.

21   Q.   Okay.  If she's out of rehab in 2015, from February 2015

22   to when Bill Stone retired from the FBI October 31, 2015,

23   explain to the jury in the most detail as you can, what was the

24   status of their relationship, Bill Stone and Casi?

25   A.   Well, the status of the relationship was one in which she

1    knew Bill Stone because he was FBI prior to this whole 2015

2    forward investigation we've been talking about.  She knew Bill

3    Stone.  And how she knew Bill Stone is because of her drug

4    situation.  Her meth addiction back in the day landed her in

5    jail.  And when that happened, she contacted the FBI, ended up

6    talking to Bill Stone, and actually initially my understanding

7    is --

8    Q.   And, Ranger Briley, I'm not trying to cut you off.

9         MR. GALLIAN:  My apologies, Todd.

10   BY MR. GALLIAN:

11   Q.   I want to keep it more to the -- we've heard this story

12   for hours.

13   A.   Okay.

14   Q.   I want to keep this more to 2015 time period, if we can.

15   A.   Okay.

16   Q.   So what was your understanding of their relationship in

17   February through October 2015?

18   A.   From February 2015 to October 2015?

19   Q.   Yes, sir.

20   A.   I don't -- I don't know.  I don't know.  I would say

21   probably minimal contact, maybe talking on the phone some, not

22   much.  They may have had a meeting before.  I don't know.

23   Q.   Okay.  One more question about this.  When you say some

24   phone contact, what's in your mind in terms of time?

25   A.   I don't know.

```
 1              MS. MAX:  Objection, Your Honor, calls for
 2   speculation.
 3              MR. GALLIAN:  His mind.
 4              THE COURT:  Overruled.
 5   A.    Seven times, 15 times.  I don't -- I don't know.
 6   Q.    Okay.  How long are those phone calls in your mind?
 7   A.    In totality?
 8   Q.    Sure.
 9   A.    Maybe three hours.
10   Q.    Okay.  Did Casi Thompson ever tell you that her and Bill
11   were intimate in 2015?
12   A.    There was an -- there was a date in which there was some
13   type of intimate encounter, I think I recall in 2015 where they
14   went out to eat at a Mexican restaurant or something like that.
15   I don't know the details, but --
16   Q.    March 2015?
17   A.    That may be possible, yeah.
18   Q.    Did that sound more like a meeting or a date to you?
19   A.    It could be a date.  I don't know.  I wasn't there.
20              MR. GALLIAN:  Your Honor, at this time we move to
21   publish what's already been admitted as Stone's Exhibit 182.
22              THE COURT:  Granted.
23   BY MR. GALLIAN:
24   Q.    So we went through the call records with Casi when she was
25   on the stand.  Would it surprise you to learn that in
```

1    February 2015 Casi Thompson and Bill Stone talked on the phone
2    for 262 minutes?
3    A.   That's quite a bit, but, you know, given the situation,
4    anything is possible.  I don't -- that wasn't --
5    Q.   Well, I agree, because I asked you for what you thought in
6    your mind was their contact from February to October, and you
7    said like three hours.  This is four and a half hours by
8    itself, and that's only February.  Is this news to you?
9    A.   Yeah, I'm unaware of this.
10   Q.   Okay.
11        MR. GALLIAN:  Carly, if we can go to the next page,
12   please.
13   BY MR. GALLIAN:
14   Q.   March is a long one.
15        MR. GALLIAN:  We'll just go to page 3, please.
16   BY MR. GALLIAN:
17   Q.   Would it surprise you that Bill Stone and Casi Thompson
18   talked on the phone for 418 minutes in March of 2015?
19   A.   Again, it's -- I don't know that surprise is the accurate
20   word for me.  It's more -- it's more of like insignificant in
21   that I don't draw any conclusions to it right now.
22        Well, I take that back.  I do draw conclusions to it,
23   but --
24   Q.   Okay.  2015 is a relevant time period, because Bill Stone
25   is still in the FBI at this point.  We agree?

```
 1   A.   Yes.  October 3 --
 2   Q.   31st, 2015.
 3   A.   Yes.
 4   Q.   So we will note that all of these phone calls are
 5   happening generally after work hours?
 6   A.   Uh-huh.
 7   Q.   But they're talking a lot, are they not?
 8   A.   Yes, sir.
 9   Q.   Okay.  If we could, we'll just zoom through these pretty
10   quickly.
11             MR. GALLIAN:  April 2015.  Let's go to page 5,
12   please, Carly.
13   BY MR. GALLIAN:
14   Q.   April 2015, if this chart is correct, 418 minutes.  Did I
15   read that correctly?
16   A.   Yes, sir.
17             MR. GALLIAN:  Next page, please.
18   BY MR. GALLIAN:
19   Q.   May 2015, they talked for 201 minutes.  Did I read that
20   correctly?
21   A.   Yes, sir.
22             MR. GALLIAN:  Next page.
23   BY MR. GALLIAN:
24   Q.   June 2015, 185 minutes.  Did I read that correctly?
25   A.   Yes, sir.
```

```
 1  Q.   July 2015, 206 minutes.  Did I read that correctly?
 2  A.   Yes, sir.
 3  Q.   August 2015, 196 minutes.  Did I read that correctly?
 4  A.   Yes, sir.
 5  Q.   Okay.  September 2015, 161 minutes.  Yes?
 6  A.   Yes, sir.
 7  Q.   And finally, October 2015, 270 minutes.  Did I read that
 8  correctly?
 9  A.   Yes, sir.
10  Q.   And when I used a calculator, I came up with approximately
11  40 hours.  Any reason to dispute that?
12  A.   No, sir.
13  Q.   It's a little more than three.  Would you agree?
14  A.   Yes, sir.
15  Q.   Is this a red flag to you?
16  A.   It's something that -- I would call it a flag, like what's
17  the information behind this.
18  Q.   Sure.
19  A.   Yeah, I would look at it.
20  Q.   Well, what's troubling about the investigation was that
21  Casi comes in and says this happened in November --
22           MR. GALLIAN:  Sorry, Todd.
23  BY MR. GALLIAN:
24  Q.   This happens in November, December of 2015, right?
25  A.   Yes, sir.
```

```
 1    Q.   And when you guys start executing subpoenas or sending out
 2    subpoenas for companies to send you information, you use the
 3    date of November 2015 as a start, do you not?
 4    A.   I don't know.
 5    Q.   Okay.
 6    A.   I don't know those records.
 7    Q.   If I represented to you that all bank records, all call
 8    records, everything that you got from subpoenas started in
 9    November 2015, do you have any reason to dispute that?
10    A.   I mean, if that's what the records are you have, I don't.
11    Q.   Okay.  Well, I have more records, because we subpoenaed
12    records all the way back to September of 2014.  Were you aware
13    of that?
14    A.   No, sir.
15    Q.   Okay.  You understand that in a criminal case the
16    Defendant has the presumption of innocence, right?
17    A.   Yes, sir.
18    Q.   I could literally sit at that table, fall asleep, do
19    nothing.  And if the jury believes the Government hasn't proven
20    the case, Bill Stone is not guilty, right?
21    A.   Yes, sir.
22    Q.   But in this case we did an investigation, and are you
23    aware that we produced the Government 2,000 pages of records?
24    A.   No, sir.
25              MS. MAX:  Objection, Your Honor, assumes facts not in
```

1    evidence.

2              THE COURT:  Overruled.

3    BY MR. GALLIAN:

4    Q.   When we produced those records, did the Government ask one

5    of the main investigators, you, to look through those records?

6              MR. BUSCH:  Your Honor, may we approach the bench?

7              THE COURT:  Let's go ahead and take our break.  We

8    are about a minute before lunchtime, so now sounds like a good

9    time for me.

10             All rise for the jury.

11             SECURITY OFFICER:  All rise for the jury.

12             (Jury out)

13             THE COURT:  Ranger, feel free to step down and take a

14   break if you need to.  Thank you, sir.

15             All right.  Please be seated.

16             All right.  Outside the presence of the jury, what's

17   going on?  What are we doing?

18             MR. BUSCH:  Your Honor, the Government doesn't recall

19   receiving any discovery.

20             THE COURT:  Okay.

21             MR. BUSCH:  Not one page of discovery from the

22   defense.  There may have been some productions, but --

23             THE COURT:  Let's go ahead and let the ranger step

24   out.

25             MR. BUSCH:  -- I don't recall receiving any discovery

1    in this case.  The first time we saw any --

2              THE COURT:  Oh, let's pause for just a moment.

3              Ranger, if you will step out.  Thank you, sir.

4              Anybody else subject to the rule in here?  I don't

5    want to mess up anybody's testimony.

6              Okay.  Great.

7              MR. BUSCH:  The first time we recall receiving any

8    documents from the defense was when they produced their

9    exhibits at the -- whatever that date was before the

10   February trial setting --

11             THE COURT:  Okay.

12             MR. BUSCH:  -- that I recall.

13             So there may have been some productions, but I just

14   asked Nicole and our litigation support person, and we don't

15   recall receiving any discovery whatsoever in this case, I think

16   from the either defendant.

17             THE COURT:  Okay.  So what's happening there?

18             MR. GALLIAN:  Yeah.  I think that it would be wise

19   for Mr. Busch to collect with his people and realize that we

20   produced all of these documents.  I have nothing more to say

21   than that.  I am 1,000 percent unequivocally correct that we

22   produced thousands of pages of records.  We did it before

23   pretrial last time, and they've had them in our exhibits.

24             THE COURT:  Okay.  I tell you what, this is the kind

25   of thing where obviously I want to know what we've got.  So if

1  everybody would, dial it down just a little bit.  Hopefully

2  you've gotten from me I'll do what law requires and what the

3  evidence shows.

4          So if you'll take a look over lunch at your stuff,

5  and if you guys will check your paperwork too.

6          Yes, sir?

7          MR. GALLIAN:  In addition, the Government used some

8  of our records for their own exhibits, so --

9          THE COURT:  Okay.  So if --

10          MR. BUSCH:  Your Honor, may I respond to that?

11          THE COURT:  You may.

12          MR. BUSCH:  Again, none of that was discovery, met

13  none of the discovery deadlines in this court.  And every time

14  we produced discovery to the defendants in this case, our

15  letter requested reciprocal discovery.  We never got one

16  document from either defendant in reciprocal discovery.

17          What we did get was at the Court's scheduling

18  deadline for the February setting, we got exhibits from both

19  Defendants.

20          Government doesn't consider that to be discovery.

21  Those are exhibits that they intend to use in the case, but

22  that's not discovery.

23          THE COURT:  Okay.  Is there a distinction there that

24  the Court needs to be aware of?

25          MR. BUSCH:  Distinction in the rules.

```
 1                MR. GALLIAN:  Tuesday, February 7th, my paralegal,
 2    Carly Ray, sent an e-mail to Marcus Busch,
 3    Marcus.Busch@usdoj.gov, Katherine Miller, Nicole LeBlanc, Frank
 4    Sellers, and Greg Westfall, saying, "Good afternoon, please see
 5    correspondence from Gregg Gallian attached.  Documents have
 6    been uploaded to the Dropbox link below."  And that's what
 7    compiled all of our stuff.
 8                THE COURT:  Okay.  And so are those exhibits?  Are
 9    those -- I mean, I just -- I need more information from both of
10    you.
11                MR. GALLIAN:  Of course, Your Honor.
12                And in addition, we had a letter that stated,
13    "Pursuant to the Government's request for -- for reciprocal
14    discovery dated January 11, 2023, please find Defendant William
15    Roy Stone, Jr. document production, Bates numbered Stone 000001
16    through 001673.  At this time, Stone is producing reciprocal
17    discovery in good faith."
18                THE COURT:  Okay.  So Government, check your records,
19    defense counsel.
20                When we come back, if you guys come back five minutes
21    early, we'll take it up.  If there's anything that this Court
22    has ruled on that's misleading, I will clear it up then, and
23    we'll come up with agreed language and so forth.
24                I want to make sure that what I said to the jury is
25    accurate.  And so I'll let both sides be heard on it.  I'm not
```

```
 1   making any decisions.  But just be ready to tee that up,
 2   please, okay?  And that will give hopefully everybody a chance
 3   to take a look at stuff.
 4              MR. WESTFALL:  Your Honor, may I?
 5              THE COURT:  Oh, yes.  I'm sorry.
 6              MR. WESTFALL:  I think in Marcus's last sentence he
 7   lumped us in that also.  Did I hear that correctly?
 8              MR. BUSCH:  I think so.
 9              MR. WESTFALL:  Okay.  Everything that we are
10   introducing in this trial was something the Government gave us,
11   so there was no Rule 16 reciprocal discovery for us to give.
12              THE COURT:  Okay.  Yes.
13              MR. SELLERS:  We have our witness here, Retired Chief
14   Mendoza that we all agreed.
15              THE COURT:  Okay.  Sure.
16              MR. SELLERS:  I wanted to remind the Court.
17              THE COURT:  I appreciate that.
18              MR. SELLERS:  Yes, ma'am.
19              THE COURT:  And is there anything else we need to put
20   on the record before we go to lunch?
21              Anything from the Government before we go to lunch?
22              I'll let everybody tee this up.  I don't -- hopefully
23   you'll have an opportunity to look at the records and all that
24   stuff, and I'll flesh it out and let everybody be heard.
25              Okay.  Off the record.
```

1          (Discussion off the record)

2          SECURITY OFFICER:  All rise.

3          (Recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2
                                                       Further
 3                 Direct   Cross   Redirect   Recross  Redirect

 4  WITNESS FOR THE
    GOVERNMENT
 5
    DANNY BRILEY          5        61
 6

 7  GOVERNMENT'S EXHIBITS                              Received

 8     37  Text messages between DeLeon and Stone          24
           extracted from Apple IPhone 6S
 9
       85  DOJ-OIG recordings during search of Stone's      9
10         residence on Kennedy Dr., Colleyville, Texas,
           on June 18, 2020
11
       86  Transcript of DOJ-OIL recording during search    9
12         of Stone's residence on Kennedy Dr.,
           Colleyville, Texas, on June 18, 2020
13
       87  Texas Ranger recording during search of Stone's  9
14         residence on Kennedy Dr., Colleyville, Texas,
           on June 18, 2020
15

16

17

18

19

20

21

22

23

24

25
```

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 3rd day of August, 2023.

7

8

9
                                /s/Todd Anderson
10                              TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25