1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                     DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )    3:21-CR-236-E(2)
5                                  )
        GOVERNMENT,                )
6                                  )
   V.                             )     DALLAS, TEXAS
7                                  )
   WILLIAM ROY STONE, JOSEPH      )
8  DELEON                          )
                                   )
9       DEFENDANTS.               )     AUGUST 3, 2023

10

11

12

13

14

15              ------------------------------

16                     TRANSCRIPT OF

17                     JURY TRIAL

18                     VOLUME 8B

19          BEFORE THE HONORABLE ADA E. BROWN

20             UNITED STATES DISTRICT JUDGE

21              ------------------------------

22

23

24

25

```
 1                        A P P E A R A N C E S

 2    FOR THE GOVERNMENT:

 3          Jenna Danelle Rudoff
            US Department of Justice
 4          1100 Commerce St
            3rd Floor
 5          Dallas, TX 75242
            214-659-8600
 6          Fax: 214-659-8500
            Email: Jenna.rudoff@usdoj.gov
 7
            Donna S Max
 8          US Attorney's office for Northern
            District of Texas
 9          1100 Commerce Street
            Third Floor
10          Dallas, TX 75242-1699
            214-659-8664
11          Email: Donna.max@usdoj.gov

12          Marcus J Busch
            US Attorney's Office
13          1100 Commerce St
            Suite 300
14          Dallas, TX 75242
            214-659-8642
15          Fax: 214-659-8809
            Email: Marcus.busch@usdoj.gov
16

17    FOR THE DEFENDANT WILLIAM ROY STONE:

18          Gregg Gallian
            Gallian Firm
19          Parkside Tower
            3500 Maple Ave
20          Suite 720
            Dallas, TX 75219
21          214-432-8860
            Email: Gregg@gallianfirm.com
22
            Jaclyn Annette Gallian
23          Bryan Cave Leighton Paisner
            2200 Ross Avenue
24          Ste 4200w
            Dallas, TX 75201
25          214-721-8058
            Email: Jaclyn.gallian@bclplaw.com
```

```
 1   FOR THE DEFENDANT JOSEPH DELEON:

 2        Greg Westfall
          Westfall Sellers
 3        1612 Summit Avenue
          Suite 200
 4        Fort Worth, TX 76102
          817-928-4222
 5        Fax: 817-385-6715
          Email: Greg@westfallsellers.com
 6
          Frank Sellers
 7        Westfall Sellers
          1612 Summit Avenue
 8        Suite 200
          Fort Worth, TX 76102
 9        817-928-4222
          Fax: 817-385-6715
10        Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          C H R O N O L O G I C A L   I N D E X

 2  August 3, 2023                                    PAGE

 3  Appearances........................................2

 4  Proceedings........................................5

 5                W I T N E S S   I N D E X

 6  GOVERNMENT          DIRECT          VOIR DIRE        CROSS

 7  Danny Briley        --                --            8, 54

 8  DEFENDANT DELEON    DIRECT          VOIR DIRE        CROSS

 9  Ralph Mendoza       23, 51            --            38, 50

10

11  Court in Recess....................................85

12  Reporter's Certificate.............................86

13                E X H I B I T   I N D E X

14
    DEFENDANT STONE:
15  NO.   DESCRIPTION                      OFFERED/ADMITTED

16  183   AT&T Telephone Records....................14/14

17  DEFENDANT DELEON:
    NO.   DESCRIPTION                      OFFERED/ADMITTED
18
    27.1 Audio Clip.............................72/72
19
    33   Audio Clip.............................62/63
20
    36   Audio Clip (Record Purposes)...........66/66
21
    36.1 Audio Clip.............................66/66
22
    36.2 Audio Clip.............................66/66
23
    36.3 Audio Clip.............................66/66
24
    71   Audio Clip (Record Purposes)...........76/76
25
    109  Audio Clip.............................77/77
```

1              (P R O C E E D I N G S)

2              THE COURT:  Outside the presence of the jury.

3              All right.  So there was a request for a

4    sidebar, and the jury's not here.

5              Mr. Gallian, I think there was an objection to

6    facts not in evidence, was the first objection, and the Court

7    overruled that.  And Mr. Busch asked for a sidebar.  Why don't

8    I start with him for a second, Mr. Gallian.

9              What say you, Mr. Busch.

10             MR. BUSCH:  Your Honor, I don't want to make a

11   big deal out of this, and I'm not making an allegation that

12   anybody violated discovery.  The fact of the matter is we

13   didn't get any discovery in this case until the last trial

14   setting.  And it was the day before the exhibits were due.  And

15   so there was a letter that said, you know, please consider this

16   our reciprocal discovery, a month beyond the discovery

17   deadline.  I didn't raise it back then because I -- it's

18   really -- it's of no value.

19             So -- and I'm not making the allegation now.

20             THE COURT:  Okay.

21             MR. BUSCH:  My concern is, is just when

22   Mr. Gallian asks Ranger Briley, are you aware we produced, you

23   know, thousands of pages of records?  First of all, it was 1600

24   pages and it was mostly the exhibits that they were intending

25   to use in the February trial setting.  And I think that's

1   confusing to the jury.  I don't think we should be discussing

2   discovery matters or what was produced in discovery.

3              And secondly, the second time that Mr. Gallian

4   has gone into the First Independent Bank records, that they

5   were not able to obtain, he asked questions of the victim, Casi

6   Thompson, about that.  And he said, isn't it true you hired a

7   lawyer named Matt Smid and he filed a motion to quash, and if

8   it was quashed?  Well, yes, it was quashed by this Court.  This

9   Court quashed those subpoenas because this Court found they

10  were not relevant to this case.

11             And now it's the second time that Mr. Gallian

12  has brought up that we tried to get financial records, and we

13  were denied.  And I think it's -- I think that's why it's

14  improper to talk about discovery matters and motions that are

15  conducted by the Court pretrial in front of jury, because it is

16  confusing to the jury.  And I just -- I just ask the Court to

17  consider perhaps limiting those kinds of questions about

18  discovery, motions to quash, records that somebody could or

19  couldn't receive, because I just don't think that's proper.

20             And I'm not making allegations about discovery

21  because we're -- it's not relevant to this discussion.  It's

22  about the impression that's being left with the jury, and

23  that's the only reason why I asked to just discuss this

24  sidebar.

25             THE COURT:  Okay.  Sounds good.

1          So I don't have any concerns about you asking

2    it.  If we can just not get into the Court's rulings, pretrial

3    rulings, that kind of thing.

4                    MR. GALLIAN:  And, Your Honor, if I can add to

5    that.

6                    THE COURT:  Certainly.

7                    MR. GALLIAN:  The only reason I got into first

8    financial today, as you know, I don't get to talk to any

9    witnesses ahead of time.  And in Ranger Briley's report, it

10   says that he subpoenaed records from First Financial.

11                   THE COURT:  Okay.

12                   MR. GALLIAN:  So --

13                   THE COURT:  Okay.  Sounds like -- but that's the

14   only one we have, right?

15                   MR. GALLIAN:  Yep.

16                   THE COURT:  Okay.  I think we're -- I think --

17                   MR. GALLIAN:  We're done.

18                   THE COURT:  -- drop the puck and keep playing.

19   Sounds good to everybody?  Sounds good to me.

20                   Does anybody need this on the record?

21                   MR. GALLIAN:  No.

22                   (Off-the-record discussion.)

23                   MR. GALLIAN:  Just to make sure we're on the

24   same page, I do intend to ask Ranger Briley about the records

25   that we produced to see if he reviewed them before testifying.

```
 1   I think that's relevant.
 2              THE COURT:  I think that's proper, yeah.  Just
 3   don't get into motions to quash, details.  Does that sound
 4   good?
 5              MS. RUDOFF:  Or discovery.
 6              THE COURT:  Well, I mean, discovery in the sense
 7   that -- I think the only records at issue are the ones that he
 8   referenced in his report and that's what we're talking about
 9   now.  So is there anything else you foresee at least at this
10   time getting into any other?
11              MR. GALLIAN:  Nope.
12              THE COURT:  Okay.  I think we're all on the same
13   page.  I think we're good.
14              MR. GALLIAN:  Thank you, Judge.
15              THE COURT:  Sure.
16              (Brief recess.)
17              (Jurors enter courtroom.)
18              THE COURT:  Everyone, please be seated.
19              With that said, Mr. Gallian, your witness.
20                        DANNY BRILEY,
21   having been previously sworn, testified as follows:
22              CONTINUED CROSS-EXAMINATION
23   BY MR. GALLIAN:
24        Q.   Before we took the break, I was asking about some
25   documents that we produced in this case.  Are you aware that on
```

1   February 7th, 2023, we produced 1,673 pages of records?

2        A.   No, sir.

3        Q.   So it's safe to say that you were not asked to review

4   the records that we sent in; is that fair?

5        A.   That's fair.

6        Q.   You said something in direct today that didn't sit

7   well with me.  You said, people who are innocent don't have to

8   worry, don't have to bargain, the facts are the facts.  Do you

9   remember saying that?

10       A.   Yes, sir.

11       Q.   Okay.  You and I both know that people are wrongfully

12  arrested all the time, are they not?

13       A.   That does happen, yes.

14       Q.   People are wrongfully convicted all the time?

15       A.   I don't know about all the time.  But it does happen.

16       Q.   Okay.  So that statement in and of itself is not

17  accurate, is it?

18       A.   I believe my statement is accurate.  I stand behind

19  it.

20       Q.   My father-in-law is -- was the chief of police in

21  Lewisville.

22            MS. MAX:  Objection, Your Honor, sidebar.

23            MR. GALLIAN:  Briefly --

24            THE COURT:  I'll give you a little latitude.

25            MR. GALLIAN:  Thank you, Judge.

1    Q.    My father-in-law was the chief of police in

2  Lewisville until a couple of years ago.  Could you guess what

3  my three-year-old and five-year-old call their grandpa, what

4  name?

5                MS. MAX:  Objection; relevance.

6                THE COURT:  Sustained.

7                MR. GALLIAN:  Your Honor, if I may.

8                THE COURT:  All right.  I'll give you latitude

9  on this one question.

10    Q.    Let me get the relevance for you here.  When you were

11  asked questions about the text messages between Joe DeLeon and

12  Bill Stone, prosecution made a big deal about saying "SA

13  Stone," which you said stood for what?

14    A.    Special Agent Stone.

15    Q.    Okay.  And the fact of the matter is, is that people

16  who are in law enforcement, even after you retire, it's common

17  for you still to hold yourself out at least in a name capacity

18  as former law enforcement, correct?

19    A.    I don't -- I don't track what you're trying to tell

20  me.

21    Q.    My three-year-old and five-year-old are not

22  committing criminal offenses when they call grandpa chief, are

23  they?

24                MS. MAX:  Objection, Your Honor, relevance.

25                THE COURT:  Move on, Counsel.

1        Q.    September 3rd, 2019, you had a meeting with Casi.  Do

2   you recall that meeting?

3        A.    Yes, sir.

4        Q.    And in that meeting, you told Casi, quote, don't talk

5   to him without recording it.  Do you remember that?

6        A.    "Don't talk to him," referring to who?

7        Q.    Bill Stone.

8        A.    Yes, sir.

9        Q.    Okay.  December 19th, 2019, you had another meeting

10  with Casi; that one was in a Kroger parking lot.  Do you

11  remember that?

12       A.    I have met her in Kroger parking lots several times

13  to collect evidence.

14       Q.    And what you told her was if it looks like anywhere

15  later down the road you had all these 50 other conversations

16  with him, but not, you know, but they're not recorded, it's

17  going to look -- it'll look odd.  Do you remember saying that?

18       A.    I don't remember saying that.

19       Q.    If I showed you a transcript, would that help refresh

20  your memory?

21       A.    Sure.

22             MR. GALLIAN:  May I approach?

23             THE COURT:  You may.

24             (Documents tendered.)

25       A.    Okay, sir.

1          MR. GALLIAN:  May I approach, Your Honor?

2          THE COURT:  You may.

3     Q.   Okay.  You've seen the transcript that I just showed

4     you?

5     A.   Yes, sir.

6     Q.   Do you recall saying that?

7     A.   Yes, I do.

8     Q.   Okay.  What you told her was that if you had these

9     other 50 conversations and you don't record them, it's going to

10    look odd, right?

11    A.   Yes, sir.

12    Q.   And you told her that December 19th, 2019?

13    A.   Yes, sir.

14    Q.   And at this time the investigation was still very

15    much ongoing, was it not?

16    A.   Yes, sir.

17    Q.   And between December 19th, 2019, there is another

18    controlled call that Casi makes to Bill Stone March 2nd, 2020.

19    Does that sound familiar?

20    A.   Yes, sir.

21    Q.   In fact, that was in the presence of you and I think

22    Investigator Barton; is that right?

23    A.   Yes.  Yes, sir, that is correct.

24    Q.   Okay.  So there was definitely the need to continue

25    controlled calls with Bill Stone; is that fair?

1      A.    I definitely wanted to do one more controlled call

2  with him.

3      Q.    To your knowledge, did Casi record every phone call

4  with Bill Stone?

5      A.    To my knowledge, she did not record every phone call.

6      Q.    How many phone calls did she not record?

7      A.    I don't know.

8      Q.    Take a guess.

9      A.    I don't know.

10      Q.    Is that 10, 15?

11            MS. MAX:  Objection; asked and answered.

12            THE COURT:  Overruled.

13      Q.    Or 2 or 3?

14      A.    I -- I don't know.

15            MR. GALLIAN:  May I approach the witness, Your

16  Honor?

17            THE COURT:  You may.

18            (Documents tendered.)

19      Q.    Just handed you what's been marked as Stone's

20  Exhibit 183.  You're aware that in this investigation there was

21  a subpoena that was issued to AT&T for Casi Thompson's phone

22  number, correct?

23      A.    Yes, sir.

24      Q.    And her cell phone number ends in 8559.  Does that

25  sound accurate?

 1       A.    That's a familiar number, I'm -- if it comes back to

 2  her subscriber-wise, then yes.

 3       Q.    Okay.  We've talked about phone numbers a lot in this

 4  case.  Do you have any reason to dispute that the

 5  (817) 219-8559 number is indeed Casi Thompson's?

 6       A.    No, sir.

 7       Q.    Okay.  Before getting this responsive subpoena

 8  documents, have you looked through these call records?

 9       A.    No, sir.

10       Q.    Okay.

11             MR. GALLIAN:  Your Honor, at this time we move

12  to admit Stone's Exhibit 183, business records from AT&T.

13             MR. WESTFALL:  No objection.

14             MS. MAX:  No objection.

15             THE COURT:  All right.  Admitted.

16       Q.    I've been through your report.  And you did not ask

17  nor did Casi Thompson record any calls with Bill Stone in

18  February 2020, did she?

19       A.    I -- I don't -- I don't know.

20             MR. GALLIAN:  May I approach, Your Honor?

21             THE COURT:  You may.

22             (Documents tendered.)

23       A.    Okay.

24       Q.    You know that in this investigation, Casi was using

25  an extra phone from Penny Weisand to record her controlled

1  calls with Bill Stone; is that right?

2      A.   Yes.

3      Q.   Casi Thompson gave you that device in January 2020,

4  right?

5      A.   Yes, sir.

6      Q.   So that everything could be extracted from that

7  phone?

8      A.   That's correct.

9      Q.   The next entry that we see in your report, and your

10  report does go chronological, does it not?

11      A.   Yes, sir.

12      Q.   There's no notations in February 2020 for any

13  recorded calls of Casi Thompson and Bill Stone; is that right?

14      A.   That's correct.

15          MR. GALLIAN:  Now this time we move to publish

16  Stone's Exhibit 183.

17          May I?

18          THE COURT:  Any objection?

19          MR. SELLERS:  It's been admitted, right?

20          MR. GALLIAN:  It has.

21          THE COURT:  Oh, has it?  I'm sorry.  I thought

22  we were moving for admission.

23          Permission to publish granted.

24          MR. GALLIAN:  Thank you, Your Honor.

25          THE COURT:  You're welcome.

1    Q.   Now, you know that Bill Stone was utilizing or has,

2   even since this time, has always had two phone numbers,

3   correct?

4    A.   Yes, sir.

5    Q.   He had a 202 number and a 214 number, right?

6    A.   Yes, sir, that's correct.

7    Q.   All right.  We know and we've discussed that Casi's

8   phone number, (817) 219-8559, right?

9    A.   Yes, sir.

10    Q.   And one of Bill Stone's number is (202) 697-2932?

11    A.   Yes, sir.

12    Q.   And his other number is (214) 422-2863.  Are we on

13   the same page?

14    A.   Yeah, just verifying these numbers.

15    Q.   Sure.

16    A.   Okay.  Yes, sir.

17    Q.   All right.  So as we go across --

18         MR. GALLIAN:  Carly, if we just highlight that

19   yellow box, please.

20    Q.   What we've done is highlighted all calls that were

21   made between Bill Stone and Casi Thompson, one of Bill Stone's

22   numbers and Casi Thompson's, okay?

23    A.   Yes, sir.

24    Q.   And if we go to the fourth column -- I'm sorry, the

25   5th column from the left, where --

1              MR. GALLIAN:  Oops, Carly, if we can get the

2    header in there too just for this first one.  That's my fault.

3              Thank you.

4        Q.   If we go to the 1, 2, 3, 4 -- 5th column over, you

5    see where it says "ET"?

6        A.   5th column over, 1, 2, 3 -- I don't see your -- "ET"?

7        Q.   ET.  It's on the header.

8        A.   Oh, on the header.  I see -- yes.  Okay.  Yes, I see

9    that.

10       Q.   And that's estimated time, correct?

11       A.   Yes, sir.

12       Q.   All right.  So as we go down, what we can see is that

13   on February 17th, 2020, there was a call from Casi Thompson,

14   the originating number, to Bill Stone; is that right?

15       A.   Yes, sir.

16       Q.   And that call was approximately three seconds?

17       A.   Yes, sir.

18       Q.   Are we on the same page right now?

19       A.   We are.

20       Q.   Okay.  Going down, call from Casi Thompson to Bill

21   Stone, same date, one second?

22       A.   Yes, sir.

23       Q.   Same date, Casi Thompson to Bill Stone, six seconds,

24   agree?

25       A.   Yes, sir.

1          Q.    And then there are two entries where it looks like

2    the call was canceled or was hung up before there was a

3    voicemail.  Do we agree with the zeros?

4          A.    Yes.

5          Q.    All right.  Now, going to the next one,

6    February 17th, 2020, call between Bill Stone.  He calls on the

7    202 number to her 817 number.  They talk for 36 minutes and

8    25 seconds?

9          A.    Yes, sir.

10         Q.    Was that recorded?

11         A.    Not -- I -- not to my knowledge, no.

12         Q.    Next call, 24 minutes exactly.  Was that call

13   recorded?

14         A.    Not to my knowledge, no, sir.

15               MR. GALLIAN:  Next page, please, Carly.  Yellow

16   box.

17         Q.    February 18th, 2020, 12-second call from Bill to

18   Casi.  Do we see that?

19         A.    Yes, sir.

20         Q.    Okay.  It's not all that substantial.  The next line,

21   seven minutes and nine seconds, from Casi Thompson to Bill

22   Stone?

23         A.    Yes, sir.

24         Q.    Was that call recorded?

25         A.    No, sir.

1     Q.    Next page, please.

2           Connection date, February 18th, 2020.  Estimated

3     time, 41 minutes, 38 seconds, from Casi Thompson to Bill Stone,

4     agree?

5     A.    Yes, sir.

6     Q.    Was that call recorded?

7     A.    Not to my knowledge.

8     Q.    Next page, please.

9           First one is a seven-second phone call.  Do we

10    agree?

11    A.    Yes, sir.

12          MR. GALLIAN:  Skip down to the next one, please,

13    Carly.

14    Q.    February 20th, 2020, 68-minute phone call, Casi

15    Thompson to Bill Stone.  Was that number -- or was that phone

16    call recorded?

17    A.    Not to my knowledge.

18    Q.    February 21st, Bill Stone to Casi Thompson,

19    59 seconds.  Was that call recorded?

20    A.    Not to my knowledge.

21    Q.    Let's see if I can speed these up.  Looks like

22    there's a two-second call, a three-minute call, a 13-second

23    call, 15 minutes and 36 seconds, 16 minutes and 25 seconds.

24    None of those calls were recorded, were they?

25    A.    Not to my knowledge.

 1      Q.   One second, four seconds, zero seconds, one seconds,
 2 kind of silly, but none of those were recorded, right?
 3      A.   Yes, sir.
 4      Q.   Zero seconds, two seconds, 32 minutes and 57 seconds.
 5 Were those calls recorded?
 6      A.   Not that I'm aware of.
 7      Q.   Zero seconds, three seconds, zero seconds, one
 8 second.  None of those calls were recorded?
 9      A.   Not that I'm aware of.
10      Q.   All right.  Three seconds, zero seconds, nine
11 seconds, zero seconds, five seconds.  Same question?
12      A.   Not that I'm aware of.
13      Q.   2/26/2020, 60 minutes and 10 seconds, not recorded,
14 agree?
15      A.   Not that I'm aware of.
16      Q.   This one shows zero seconds and seven seconds, we
17 agree?
18      A.   Yes, sir.
19      Q.   Next page, please.
20           Ten seconds, we agree?
21      A.   Yes, sir.
22           MR. GALLIAN:  And, Carly, if we could skip to
23 page 15.  I apologize.  Let's go to 16.  Perfect.  Read my
24 mind.
25      Q.   February 22nd -- I'm sorry, March 22nd, two phone

1    calls, one was 39 minutes and 41 seconds, another was

2    44 minutes and 58 seconds.  To your knowledge, none of those

3    calls were recorded; is that right?

4        A.   I'm not positive now that you're in March, because

5    there was a call recorded in March.

6        Q.   That's March 2nd -- you still have your report up

7    there, don't you?

8        A.   Yes, sir.

9        Q.   If you can, just review that for me.

10       A.   Okay.  Okay.

11       Q.   Not recorded?

12       A.   Not recorded by me.

13       Q.   You know when Casi Thompson's birthday is?

14       A.   No, I do not.

15       Q.   March 26th sound right?  I know, you don't trust me.

16       A.   That's correct.

17       Q.   Looks like on her birthday, she called Bill Stone,

18   estimated time 22 minutes and 5 seconds?

19       A.   Yes, sir.

20       Q.   Okay.

21            MR. GALLIAN:  Thank you, Carly.

22       Q.   I'm going to ask you the exact same question that

23   Ms. Max asked you yesterday.  In your experience, how helpful

24   are controlled calls if the two individuals are talking

25   offline, meaning not capturing all of the controlled calls?

1       A.   How helpful are the offline calls?  I'm sorry, repeat

2    the question.

3       Q.   How helpful are controlled calls if the two

4    individuals are talking offline, meaning not capturing all of

5    the controlled calls?

6       A.   So the controlled calls are helpful.  The controlled

7    calls clean up what may have happened offline, meaning not

8    controlled, they were not recorded.  So the controlled calls

9    capture that information that may -- you might be missing.

10       Q.   You have no idea what they talked about for those

11    hours in March or February, 2020, do you?

12       A.   Well, I have some idea.  I mean, there were debriefs

13    and acknowledgment that she had talked to Defendant Stone, and

14    she would give me some summary of that during this

15    investigation.

16       Q.   And because they're not recorded, you're relying on

17    Casi Thompson to tell you the truth at that point, are you not?

18       A.   That's true.

19              MR. GALLIAN:  Thank you very much,

20    Ranger Briley.

21              I'll pass the witness, Your Honor.

22              THE WITNESS:  Yes, sir.

23              THE COURT:  So members of the jury, and, Ranger,

24    I'll allow you to step down.  Thank you so much for visiting

25    with us today.  We'll have you come back up in a little bit.

```
1    Appreciate you.

2              THE WITNESS:  Thank you.

3              THE COURT:  So members of the jury, due to a

4    witness's schedule only, the government's agreed to pause its

5    case and allow a defense witness out of order.  Counsel for the

6    government, counsel for Mr. Stone and Mr. DeLeon have all

7    agreed to allow this witness to testify.  After this one

8    witness, the government shall resume its case.  The jury is not

9    to draw any inference from this.

10             MR. SELLERS:  Your Honor, at this time

11   Mr. DeLeon calls Chief Ralph Mendoza.

12             (Witness sworn.)

13             THE COURT:  All right.  Glad to have you here.

14   If you need anything, please let me know.

15             Your witness, sir.

16                  RALPH MENDOZA,

17   having been first duly sworn, testified as follows:

18                DIRECT EXAMINATION

19   BY MR. SELLERS:

20        Q.   Chief, would you introduce yourself to the jury,

21   please?

22        A.   Hi.  My name is Ralph Mendoza.  I'm former Fort Worth

23   police chief after approximately 35 years and 6 months time

24   there.  Not all of that was as a police chief, though.  I have

25   to tell you, that was probably about eight and a half years as
```

1   police chief there.

2        Q.   And during your law enforcement career, was that all

3   with the Fort Worth Police Department?

4        A.   Yes, it was.  I started right out of high school at

5   18 years of age.  They had a police cadet program, and I was

6   needing a way or looking for a way to pay my way through

7   college.  So I got hired as an 18-year-old in -- at 21 we had

8   to make a decision whether we wanted to join the police

9   department or we would be out of work.

10            I had no idea what I wanted to do, so I decided

11   at -- at twenty and a half they asked me if -- to make that

12   decision.  So I did.  And I said, if you pay me more money than

13   what I'm getting paid now, yeah.  I mean, I'm pretty much just

14   a kid; you've got to remember that.

15            So at twenty and a half, I entered the academy.

16   I graduated approximately one month after my 21st birthday.

17   You had to be 21 to carry a gun and be commissioned as a police

18   officer.

19            My career started -- should I continue?

20        Q.   Go ahead.

21        A.   -- as a patrol officer, midnights.  And I worked east

22   side approximately of Fort Worth for about three years, and I

23   worked south side approximately two years.  Went to north side

24   and worked north side evenings for about a year or so.  I

25   became a corporal and I worked in crime analysis at that time

1   analyzing crimes, trying to figure out who's responsible for

2   the burglaries, actually try -- tracked rapists at one time.

3   Looking for MOs, method of operations.  You know, people are

4   creatures of habit whether we realize it or not.

5               And when they have done something or are

6   successful with it, then they typically tend to do the same

7   thing over and over the same way, even saying the same remarks,

8   the same things verbally to their victims and stuff.

9               After my tenure there, I became a sergeant.  I

10  was lucky enough to apply and be accepted to go to the Southern

11  Police Institute at the University of Louisville in Kentucky.

12  That's a three-month school, administrative officer school.

13  And came back.  We had a new police chief, and I filled in a

14  little bit in regards to doing research in regards to vehicles,

15  did about two years in SWAT as a sergeant, and I took a

16  promotional exam and became a lieutenant.

17              Went back to patrol, north side, for about

18  roughly three years.  Applied for the FBI National Academy.

19  Again, was lucky enough to be selected.  So I went to a

20  three-month school in Quantico, Virginia, at the FBI NA.  Came

21  back to Fort Worth, went back into patrol.  Back on the north

22  side.  And then eventually, the chief had transferred me into

23  the youth division, which for a patrol officer like me, was not

24  a cherished position.  I'm -- I'm more of the outside-type

25  person, kid growing up.  But a few months later he walked in

1    and decided he was going to promote me to deputy chief.

2              So I skipped the rank of captain, which means

3    that I did not have to take the captain's exam.  But at the

4    same time, as I -- as I told my officers and the captains, it

5    wasn't my choice, but I had gone two schools that none of them

6    had gone to, and I had taken numerous exams that none of them

7    had taken, so I think I was very well qualified for that

8    position.

9              Worked northeast bureau, that's two different

10   divisions.  And at the time we had what we call "neighborhood

11   policing districts."  And there were 12 of them in the city of

12   Fort Worth at that time.  So I ran -- actually, I went into

13   administrative services, which is a side of policing that's

14   more technical, side of policing that I'd never done; you have

15   communications and records and crime labs and things of that

16   sort.

17             So I was over the administrative services bureau

18   for -- I'm not sure how long.  Then I got transferred to the

19   northeast field operations bureau back over the patrol

20   divisions.  Eventually I got transferred to the executive

21   services bureau, which again, is pretty much right under the

22   chief, doing the administrative investigations on officers,

23   internal affairs unit, things of that sort.

24             THE COURT:  Chief, if you don't mind me pausing

25   you for just a moment.  You like me talk fast and there's

1    nothing wrong with that in daily conversation.

2                    THE WITNESS:  I'll slow it down.

3                    THE COURT:  I appreciate that.  My court

4    reporter will appreciate it, and please continue.

5         Q.   Let's go back to question and answer.  I think

6    everybody would probably appreciate that.

7         A.   I think I'm finished with that part of my career.

8         Q.   Safe to say you've done just about everything in the

9    police world over at Fort Worth PD?

10        A.    Not really.  Because I -- I -- you know, there's

11   areas of the department like vice and narcotics, I -- I never

12   had a desire to do that.

13        Q.   Sure.

14        A.    I quite honestly never wanted to be a detective.  So

15   I -- I did the crime analysis as -- as -- in regards to that

16   position, because corporal and detective is the same rank or

17   same position within our department.

18        Q.   Sure.

19        A.    By the way, I served on the citizen's review board

20   here in Dallas for about three years when I was a lieutenant.

21   So I'd come over once a month to listen to the complaints and

22   give my -- my input.

23        Q.   But you made very clear to me you are not a

24   politician?

25        A.    I'm not.  I -- I was asked several times after I

1  retired, because I was fairly young, to think about running for

2  office.  I -- I'm not a politician.  I -- I can't do that.

3  It's bad enough as a rank of police chief, but I had the

4  ability, because I had been there long enough, to not be

5  influenced by the politics of the council.  I -- I could stand

6  up and realize that my career depended on the city manager and

7  the council deciding they wanted to get rid of me, so they've

8  got to get the votes to demote me or fire me, and I could

9  retire.

10            So I was in a position of saying, no, I'm not --

11  I don't agree.  I'm -- you know, we're going to do police work.

12  And we're going to do it to the best of our ability.  You know,

13  we -- we entered community policing back when I was a deputy

14  chief.  That was part of the program that I had received at the

15  Southern Police Institute.  And there was a book called "Broken

16  Windows Concept."  When I was a deputy chief and we went into

17  community policing, that was a book that I required people to

18  read and to train officers with.  We began different programs.

19  In '95, we passed a half-cent sales tax, which is called the

20  crime controlled prevention district.  So we did a lot of more

21  proactive things, a lot of -- a lot more prevention and a lot

22  more intervention.

23            MS. RUDOFF:  Just going to object to the

24  narrative.

25            THE COURT:  Sustained.

1             MR. SELLERS:  Yes, ma'am.

2        Q.    So that kind of brings us right to how you met

3   Joe DeLeon.

4        A.    You know, you come across a lot of people as a police

5   officer.  I probably met him when I was a deputy chief, and I

6   made the rank of deputy chief in 1990.  So somewhere after that

7   time frame, as I recall correctly.

8        Q.    And how did you meet him?

9        A.    Well, it's -- it's difficult to say.  You know, I --

10  you meet a lot of people as -- as a lieutenant, but I didn't

11  work on his side of town.  So that's why I am -- and thinking

12  that I probably met him when I made deputy chief and we make --

13  different meetings and things throughout the community.

14       Q.    And is there a specific committee or something that

15  Joe was involved in that you for sure know you knew Joe by that

16  point?

17       A.    Definitely.  In 1995, we passed the crime control

18  prevention district.  He was on that board.

19       Q.    How does someone get on that board?

20       A.    They're selected by the -- at that time they're

21  selected by a council member in that district.

22       Q.    All right.  And at that time was it Wendy Davis who

23  was the council member in Joe's district?

24       A.    To be quite honest, I'm not sure.  It may have been

25  her that promoted him -- or not promoted him, but asked him to

1   sit on that board.

2       Q.   Okay.  And so he's appointed by someone in the city

3   council to serve on this community policing -- I'm sorry, what

4   was the name of it again?

5       A.   Crime control prevention district.

6       Q.   CCPD?

7       A.   May be easier to just say "CCPD."

8       Q.   And what did the CCPD board do, just to briefly give

9   the jury an idea?

10      A.   There was an -- an election or a vote by the citizens

11  to approve a half a cent sales tax that went to -- strictly to

12  the police department.  Their job was the overview of the

13  programs that we wanted to create and the funding for those

14  programs.

15      Q.   So y'all would propose a budget and they would get to

16  vote on it?

17      A.   Correct.  You know, we -- we -- we would create the

18  budget for the different programs, as I mentioned, prevention

19  intervention and sometimes enforcement as well.  They would

20  discuss it, ask the chief or deputy chiefs questions.  We would

21  go back, if we didn't have the answer, and do the research and

22  come back and give them an answer.

23      Q.   Sure.

24      A.   Those were -- typically once a budget was passed, we

25  would do quarterly meetings and give them updates on the

1    progress of all those programs.

2         Q.   Them being the CCPD board that Joe was sitting on?

3         A.   Correct.

4         Q.   So you would have regular, at least, quarterly

5    contact with Joe back then?

6         A.   Correct.

7         Q.   And then have y'all kept up with each other over the

8    years?

9         A.   Not really.  I come across him once every now and

10   then, but not -- not really any contact with him.

11        Q.   All right.  Would it be fair to say that in the

12   30 years you've known Joe that you also know a lot of people

13   who know Joe?

14        A.   Oh, correct.

15        Q.   Are you familiar with his reputation and character in

16   the community?

17        A.   Yes.

18        Q.   All right.  Let me ask you this, in terms of

19   somebody -- I mean, Joe, to your knowledge -- I mean, you were

20   a police chief for a while.

21             MR. SELLERS:  And if I may, Your Honor, one

22   second.

23        Q.   There was double or triple hearsay elicited that said

24   that Joe got in trouble with the Fort Worth PD for

25   impersonating a police officer.  Have you ever heard of

1    anything like that?

2        A.   No --

3                 MS. RUDOFF:  Objection.

4                 THE COURT:  What's your objection?

5                 MS. RUDOFF:  Objection, Your Honor, as to lack

6    of personal knowledge and relevance as to what this individual

7    feels about a statement related to this case when he has no

8    knowledge of the facts of this case.

9                 THE COURT:  Overruled.

10       Q.   To your knowledge, has Joe ever been in trouble for

11   impersonating a police officer for the Fort Worth PD?

12       A.   No.

13       Q.   Think you would have heard about it as chief if

14   someone on your CCPD board was out there impersonating a cop?

15       A.   Yes.  Including other programs we had where citizens

16   were actually patrolling their neighborhoods.  We would give

17   them strict rules that they had to go by.  So if anyone

18   violated the rule, like carrying a weapon, they would be

19   knocked out of that program, you know.  It would come to our

20   attention and we'd deal with them.

21       Q.   Let me ask you this.  In terms of -- and I'm not

22   trying to knock the 35-year career and 36-year career you had

23   as a police officer for the City of Fort Worth, but to somebody

24   who's really -- I would say adores law enforcement, from a --

25   just an objective perspective, what's more -- what do you think

1    somebody who really adores law enforcement would be more

2    respectful of, city police officer or a federal agent?

3                    MS. RUDOFF:  Objection, Your Honor.  That calls

4    for speculation.

5                    THE COURT:  I'll give you some latitude.

6    Overruled.

7        Q.    Federal agent or city police officer?

8        A.    From my experience, we've had officers that were on

9    task forces that we had to -- had to bring in and tell them

10   they were not federal agents, they were police officers.  They

11   wanted to become something that they weren't.  So I would

12   suspect the same is true for most citizens.

13       Q.    So even city police officers who join a task force

14   sometimes like to make themselves out to be a little more than

15   they really are?

16       A.    Yes, sir.

17       Q.    All right.  Let me ask you something.  Simple Google

18   search would show up that you, Ralph Mendoza, sat on a board

19   with Joseph DeLeon; is that a fair statement?

20       A.    Probably, yes, sir.

21       Q.    Okay.  Did anybody from the Texas Rangers ever reach

22   out to you to ask about Joe DeLeon's background or character

23   before they impugned it by indicting him?

24       A.    No, sir.

25                    MS. RUDOFF:  Objection, Your Honor, as to

```
 1  sidebar.
 2                  THE COURT:  Overruled.
 3       Q.   How about anybody from the FBI, did anybody from the
 4  FBI come and ask you what you knew about Joe DeLeon?
 5       A.   No, sir.
 6       Q.   How about the Department of Justice or Mr. Marcus
 7  Busch, did anybody from their office come and ask you how do
 8  you know Joe, what kind of character is he --
 9       A.   No, sir.
10       Q.   -- is he susceptible to fall for something like this?
11  Did anybody come and ask you anything like that?
12                  MS. RUDOFF:  Objection as to leading.
13                  THE COURT:  Sustained.
14                  Open-ended questions.
15                  MR. SELLERS:  Sure.
16       Q.   Did anyone from the Department of Justice come and
17  ask you questions about Joe DeLeon?
18       A.   No, sir.
19       Q.   Did anyone from the Department of Justice Office of
20  Inspector General come and ask you questions about Joe DeLeon?
21       A.   No, sir.
22       Q.   Have you also talked to others in the community that
23  had no idea this was going on?
24       A.   Yes, sir.
25       Q.   All right.  And so fair to say that they didn't get
```

1 interviewed either and nobody really asked questions about
2 Joe DeLeon before we got here today?
3          MS. RUDOFF:  Objection, Your Honor, as to
4 speculation.
5          THE COURT:  If he knows.
6     Q.   You called other people after we've talked, right?
7     A.   Correct.  I called one and he didn't know anything
8 about it.
9     Q.   All right.  Let's talk now for just a minute.  You've
10 been doing police work for a long time, right?
11    A.   Well, it's been about 15 years since I did.
12    Q.   Let me ask you this, is everything that a person
13 maybe forgets to tell a cop the first time they're interviewed,
14 is that necessarily a lie?
15          MS. RUDOFF:  Objection, Your Honor.  It's an
16 improper opinion by this witness with regards to the facts of
17 this case.
18          THE COURT:  Overruled.
19    Q.   Is -- is --
20    A.   No, sometimes they don't remember at that given point
21 in time.  Sometimes a memory comes back to them a few days
22 later.
23    Q.   So, you know, if Joseph DeLeon, if he meets with
24 somebody on September 5th of '19 and forgets one thing but then
25 the very next meeting offers it up and tells them, does that

1    seem like a lie or something somebody forgot?

2              MS. RUDOFF:  Objection, Your Honor.  This is

3    improper character evidence as well.

4              MR. SELLERS:  It's in direct response to their.

5              THE COURT:  Overruled.

6         A.   It could be just forgetfulness.

7         Q.   All right.  Let me ask you this, in the 30-plus years

8    you've known Joe, being on boards with him, have you formed an

9    opinion about Joe DeLeon's character for telling the truth and

10   being honest?

11        A.   Yes, sir.

12        Q.   And tell the jury what your opinion about

13   Joe DeLeon's character for truthfulness and honestly is.

14        A.   Joe tends to be the type of person that volunteers

15   and goes overboard to try to help law enforcement.  I think

16   from my perspective, he was always in tune to the meetings and

17   what can we do, how -- what else can I help with.  Things of

18   that sort.  So he goes above and beyond.

19        Q.   In terms of being truthful and honest?

20        A.   Correct.

21        Q.   How about his reputation among other law enforcement

22   individuals in the community and all the other Fort Worth PD

23   folks that you know and others in the city council who know

24   Joe, have you formed an opinion about his reputation in the

25   community for telling the truth and being honest?

```
 1        A.   I think within our department it's going to be
 2   extremely positive of him being very honest and truthful and --
 3   and helpful.
 4        Q.   All right.  Let me ask you about something else.  How
 5   about Joe's character for being dedicated and supportive of law
 6   enforcement?
 7             MS. RUDOFF:  Objection, Your Honor.  That's
 8   improper character evidence.
 9             THE COURT:  Overruled.
10             MR. SELLERS:  Thank you.
11        A.   His -- his dedication from my perspective exceeded
12   what a normal citizen would do.  He's -- he just wants to help.
13        Q.   You're at least generally familiar with the
14   allegations in this case; is that right?
15        A.   Just very generally.
16        Q.   Yeah.
17        A.   Basically what's on -- on the website for the justice
18   department.
19        Q.   Okay.  And the press release?
20        A.   I -- I don't know if there's a press release or not.
21        Q.   In your time knowing Joe and knowing that somebody's
22   holding themselves out as a federal agent, you know Joe's
23   character; is Joe the type to be susceptible to fall for
24   something like that?
25        A.   I believe he would be.
```

1            MR. SELLERS:  Thank you, Chief.

2            I'll pass the witness.

3                    CROSS-EXAMINATION

4    BY MS. RUDOFF:

5        Q.   You said you were the former chief of police,

6    correct?

7        A.   Yes, ma'am.

8        Q.   And that you retired in 2008; is that correct?

9        A.   Yes, ma'am.

10       Q.   And so currently you're no longer in a law

11   enforcement position; is that also correct?

12       A.   That is correct, yes, ma'am.

13       Q.   Okay.  And so you have not yourself been a active

14   member of the law enforcement community as a police officer

15   since 2008, correct?

16       A.   Yes, ma'am.

17       Q.   And I think you testified that you were a law

18   enforcement officer and had been such for 20, 30 years, did I

19   catch?

20       A.   Total with the cadet program is 35 years and

21   6 months.

22       Q.   Thank you for that clarification.

23            So in that time frame, you -- you learned a lot

24   about the rules of being a part of the law enforcement

25   community, right?

1      A.   Yes, ma'am.

2      Q.   And you understand the duty and obligations of a

3  position like a law enforcement position?

4      A.   Yes, ma'am.

5      Q.   And you'd agree that there are specific duty and

6  obligations because there's a power that comes with that,

7  right?

8      A.   Definitely.

9      Q.   And there's an authority that comes with that?

10     A.   Yes, ma'am.

11     Q.   And so it's really important for you and the officers

12 you are supervising to know right from wrong, correct?

13     A.   Correct.

14     Q.   And be very clear on what they can and cannot do,

15 right?

16     A.   That's a lot of their training, yes, ma'am.

17     Q.   And other than just police officers, when you were

18 chief of police, you were also in charge of people who were

19 nonpolice officers, but worked for Fort Worth PD; is that

20 correct?

21     A.   Yes, a civilian aspect of our police department, plus

22 the volunteers for our department as well.

23     Q.   Okay.  And speaking just to employees, meaning your

24 civilian portion of your agency at the time, and your police

25 officer, peace officer, portion of the agency, those

1    individuals were paid by Fort Worth PD, correct?

2         A.    Yes, ma'am.

3         Q.    And because of their position and their payment by

4    Fort Worth PD, they wouldn't be allowed to be paid in cash or

5    property by a victim in a case, right?

6         A.    By a victim?  I'm not sure -- let me -- I'm not sure

7    what your question is.  But officers are allowed to work

8    part-time jobs in Fort Worth.  Some departments don't allow

9    that.  And they can potentially be paid cash there.

10        Q.    I understand, and that was my fault for a bad

11   question.  I wasn't referring to side jobs or extra jobs that

12   officers can do.  In regards to their duties and services and

13   their role with Fort Worth PD, would a victim in one of their

14   cases or a witness in one of their cases be allowed to pay that

15   officer for their work on their case in cash or property?

16        A.    No, ma'am.

17        Q.    And that's a big no, no, right?

18        A.    I would think it's a matter of circumstances.  I --

19   I'll give you an example.  If I make a traffic stop and a

20   person offers me $100 to not write him the ticket, he's going

21   to go to jail for trying to bribe me.

22        Q.    Understood.

23        A.    So the other scenario I think you're painting is

24   different.  It would be like a crime victim and, you know,

25   you're making an agreement that they're going to pay you more

1    for whatever you're offering them.  And we don't do that.

2        Q.   But you'd also agree that that officer who

3    accepted -- if that officer would accept $100 not to write that

4    ticket, that would be pretty improper?

5        A.   He'd get fired.

6        Q.   Because it's illegal, right?

7        A.   Correct.

8        Q.   And you wouldn't stand for that as chief of police,

9    correct?

10       A.   No, ma'am.

11       Q.   And it's important that police officers not accept

12   cash or property from victims or witnesses in their case

13   because it could be considered to be given under some sort of

14   false pretense, right?

15       A.   They're not supposed to take any gratuities, period,

16   you know, regardless of the situation.

17       Q.   And is part of that reason because it might create a

18   perception of that -- that individual gave over money under a

19   threat of power?

20       A.   Depending on the circumstances, yes, ma'am, that --

21   that's very possible.

22       Q.   And possibly based on that person's position as a

23   police officer, right?

24       A.   I'm not sure I understand that part of the question.

25       Q.   Okay.  I'll move on.  And you mentioned you also had

1   volunteers for Fort Worth PD, correct?

2        A.   Yes, ma'am.

3        Q.   And as a volunteer, the work and the services that an

4   individual would provide is done so freely, correct?

5        A.   Yes, ma'am.

6        Q.   And hence, that's what makes them a volunteer, right?

7        A.   That's correct.

8        Q.   They're choosing to give up that time?

9        A.   Yes, ma'am.

10        Q.   But as a volunteer, there's certain things that

11   they're not allowed to do because they're not an employee of

12   your agency, correct?

13        A.   Yes, ma'am.

14        Q.   And they wouldn't be allowed to represent themselves

15   as being affiliated with your agency other than as a voluntary?

16        A.   They would not be allowed to identify themselves as a

17   peace officer, because that's illegal as well.

18        Q.   I agree with you.

19             MR. SELLERS:  Object to the sidebar, Your Honor.

20             THE COURT:  Sustained.

21        Q.   Would it be unlawful for your agency to pay a

22   volunteer for their work?

23        A.   We -- we reimbursed our volunteers that did the

24   citizens on patrol money for their fuel, because they were

25   driving their own vehicles.  So I think there's -- there's a --

1    that exception to it.  But generally, no.

2         Q.   And you'd agree that reimbursement for a cost is

3    different than payment, right?

4         A.   Yes, ma'am.

5         Q.   And so you're talking about reimbursement.  But my

6    question relates to payment.  Would it be improper for the Fort

7    Worth Police Department to pay a volunteer for their time

8    volunteering?

9         A.   Yes, ma'am.

10        Q.   And would it be illegal for that volunteer to accept

11   cash from one of your police officers for their services as a

12   volunteer?

13        A.   For them to accept cash from a police officer for

14   their services, I don't know that that would be illegal.  It

15   would probably be inappropriate, but I'm not sure about a legal

16   statute that they violate.

17        Q.   Okay.  You said earlier on direct that your

18   volunteers who do -- I think you said citizens on patrol?

19        A.   That's one of them.

20        Q.   I think you were referring to that.  You said that

21   they are not allowed to carry a gun, correct?

22        A.   Yes, ma'am.

23        Q.   Why is that?

24        A.   Because they're not police officers.  They're not law

25   enforcement officers.  And even now that they have a right to

```
 1   carry, we would not allow it.  Because I think it brings too

 2   much of a liability to you as -- as a department and as a city

 3   as well.

 4        Q.   What do you mean by "liability"?

 5             MR. SELLERS:  I'm going to object to relevance

 6   at this point, Your Honor.

 7             THE COURT:  Overruled.

 8        A.   Get sued, basically, for allowing someone that

 9   you've -- are working basically in your uniform, because they

10   have a basic uniform that they wear as well.

11        Q.   And so it would give an impression that this person

12   who's wearing your uniform as a volunteer and carrying a gun

13   has some sort of power, right?

14        A.   Correct.

15        Q.   And some sort of authority?

16        A.   Correct.

17        Q.   You said that you haven't seen or spoken to

18   Joe DeLeon in some time.  Do you recall saying that?

19        A.   Yes, ma'am.

20        Q.   Do you know exactly how long?

21        A.   It's been several years.  But I can't tell you how

22   far back that is.

23        Q.   Would you say you've spent significant time around

24   him between 2015 and present?

25        A.   No.
```

1      Q.    You have not?

2      A.    I have not.

3      Q.    So you don't know what Joe DeLeon has or hasn't been

4  involved in or up to since prior to 2015?

5      A.    That's correct.

6      Q.    So you also wouldn't know other people's opinion or

7  knowledge of Joe DeLeon since 2015?

8      A.    No, I would know -- because I still come across a lot

9  of my officers, I would know their opinions of him.  But the

10  citizens, I -- I wouldn't have any idea.

11      Q.    Defense counsel, Mr. Sellers, asked about, you know,

12  someone could maybe forget something, have a poor memory and

13  that doesn't necessarily mean they're lying, right?

14      A.    Correct.  Yes, ma'am.

15      Q.    Would it change your opinion if what they forgot was

16  something pretty significant?

17      A.    No.

18      Q.    Okay.  What about receiving a brand-new truck, would

19  that be something you would expect someone to forget that

20  happened?

21      A.    No, ma'am.

22      Q.    What about being handed a $15,000 check, not in a

23  business relationship, would that be something you'd expect

24  someone to forget?

25      A.    No, ma'am.

```
 1          Q.   And when approached about potentially forgetting that
 2    significant fact, the individual continued to lie.  Would that
 3    change --
 4                    MR. SELLERS:  Objection, Your Honor.
 5          Q.    -- your opinion?
 6                    THE COURT:  Hey, let's step over here.
 7                    (Sidebar conference.)
 8                    THE COURT:  Members of the jury, we're going to
 9    take a ten-minute break.
10                    (Jurors exit courtroom.)
11                    (Brief recess.)
12                    THE COURT:  Outside the presence of the jury.
13                    So we need to talk about appropriate court
14    behavior.
15                    Mr. Sellers, this Court is slow to boil and
16    pretty indulgent, but you have misbehaved.  And so if you
17    cannot control your temper, we're going to have to do
18    something.
19                    MR. SELLERS:  I'm sorry, Your Honor.  It won't
20    happen again.
21                    THE COURT:  All right.  Okay.  Are you cooled
22    out?
23                    MR. SELLERS:  I am.
24                    THE COURT:  Okay.  You're doing a good job; you
25    just can't -- you cannot explode.
```

```
1              MR. SELLERS:  I understand.
2              THE COURT:  All right.  Okay.  I accept your
3    apology.
4              MR. SELLERS:  Thank you.
5              THE COURT:  You're welcome.
6              With that said, let's get back.  Okay.
7              (Off-the-record discussion.)
8              (Jurors enter courtroom.)
9              THE COURT:  Your witness, ma'am.
10             MS. RUDOFF:  Thank you, Your Honor.
11        Q.   Chief Mendoza, we talked a few minutes ago about how
12   it would be unlawful for an officer of Fort Worth PD to accept
13   money or to expect money even from a victim or a witness in an
14   active case they were working, right?  Do you recall that?
15        A.   Yes, ma'am.
16        Q.   What about if it were from a defendant?
17        A.   I -- I think that would even be worse, quite
18   honestly.
19        Q.   Why do you say it's worse?
20        A.   Because a defendant -- the victim is -- is asking for
21   a favor to maybe work a little harder or dig a little deeper,
22   whatever.  The defendant typically is looking for a way out.
23        Q.   And if in your scenario that defendant were looking
24   for a way out, would there be some -- sort of a pressure on
25   them to feel to give money to get that way out?
```

1          MR. SELLERS:  Object to speculation.

2          THE COURT:  Overruled.

3          If you know, sir.  If you don't, don't answer.

4     A.   Would you repeat the question, please?

5     Q.   You said that it would be even worse if it were a

6  defendant and a police officer involved in a case and there was

7  an exchange of money, right?

8     A.   Yes, ma'am.

9     Q.   When I asked you why you thought it would be worse,

10  you said because the defendant might be thinking money is

11  somehow going to -- I don't want to misspeak for you, but

12  change the outcome?

13     A.   Correct.  Change the outcome.  The detective or

14  officer may not be as diligent to follow up on leads and things

15  of that sort.

16     Q.    Or might be willing to get them out of a situation,

17  right?

18     A.   I think by not following up on leads can get them out

19  of that situation potentially.

20     Q.   And so that could create a pressure on a defendant,

21  then, to feel the need to get that money?

22          MR. SELLERS:  Again, object to speculation.

23          THE COURT:  I'll sustain at this point.

24     Q.   I'm going to ask you a different question, sir.

25     A.   Okay.

1      Q.   Earlier we also talked about how it would be unlawful

2  for a volunteer, let's say, of Fort Worth PD to accept money

3  from a victim or a witness related to a case they're working

4  on, right, you told me that?

5      A.   I -- I don't know that a volunteer, again, has any

6  ability to help someone in that type of a situation.  So

7  whether it would be illegal, again, I -- I'd have to look at

8  the statute to see if it qualifies in regards to violating some

9  criminal law.

10     Q.   And what if that volunteer had represented that they

11 did have some kind of authority or power in their position as a

12 volunteer --

13              MR. SELLERS:  Object to --

14     Q.   -- that could help in that case?

15              MR. SELLERS:  Assuming facts not this evidence.

16              THE COURT:  Overruled.

17     A.   So the question was --

18     Q.   Yes, if I can recall it, I'll repeat it.

19              MR. SELLERS:  It's also, Your Honor, a legal

20 conclusion.  I'll object on that ground as well.

21              THE COURT:  Overruled.

22     Q.   You said that you weren't sure that if a volunteer

23 who, as you said, would have no authority or power in the case

24 to do anything, that it would necessarily be unlaw for them to

25 accept money from the victim or witness related to a case,

1    right, that's what you just said?

2         A.   I think what you're getting to, and I don't

3    necessarily want to put words in your mouth, there are -- there

4    are people perpetrating crimes by fraudulent means.  So I think

5    you get into that arena in regards to committing some sort of

6    fraud.

7         Q.   And because by representing that you have some kind

8    of power, then you're looking at a fraudulent interaction,

9    right?

10        A.   Yeah, I -- I've seen it where, you know, they just

11   befriend someone, no -- nothing going on and typically that

12   happens a little bit more frequently to the elderly, where they

13   befriend someone and -- and then they start asking them for

14   money and -- the person gives them money, and then, you know,

15   the relationship or the friendship breaks off and they're out

16   several thousand dollars.

17                  THE COURT:  So I'm going to grant that out of

18   time.  Let's stick to the facts of this case.

19                  MR. SELLERS:  Yeah.

20                  THE COURT:  As to legal conclusions and

21   speculations, let's move on.

22                  MS. RUDOFF:  Your Honor, with that, I'll pass

23   the witness.

24                  THE COURT:  All right.  Anything further?

25                       CROSS-EXAMINATION

1    BY MR. GALLIAN:

2         Q.    Mr. Mendoza, my name's Gregg Gallian.  I'm one of the

3    attorneys representing Bill Stone.  I have a question for you.

4    Is it all right if I call you Chief?

5         A.    I'm not a chief anymore, but I answer to it.  I -- or

6    my name.

7         Q.    Because you were a chief for how long?

8         A.    Eight -- well, deputy chief for about ten years, and

9    the chief for eight and a half years.

10        Q.    Thank you for your time.  Thank you for your service.

11               MR. GALLIAN:  Your Honor, I'll pass the witness.

12               THE COURT:  All right.

13               MR. SELLERS:  Brief.

14               THE COURT:  Certainly.

15                        REDIRECT EXAMINATION

16   BY MR. SELLERS:

17        Q.    Are you going on vacation next week?

18        A.    Yes, sir.  Sunday.

19        Q.    So that's why you're here out of time; is that right?

20        A.    Correct.  And I appreciate y'all making allowance for

21   that as well.  Thank you.

22        Q.    Would it surprise you to learn that there's no

23   testimony ever anywhere, interview, anything that Joe ever wore

24   a uniform purporting to be Fort Worth PD, would that surprise

25   you?

1           MS. RUDOFF:  Objection, Your Honor.  I'm not

2    sure of the relevance of his surprise to the facts.

3           THE COURT:  Okay.  Overruled.

4      A.    That would surprise me.

5      Q.    It would surprise you if there was nowhere anywhere

6    that Joe ever wore a uniform or held himself out as Fort Worth

7    PD?

8      A.    I'm not sure I understand the question.  I -- I think

9    what you're asking is, if I would be surprised if he wore a

10   uniform or didn't wear a uniform.

11     Q.    Did not wear a uniform?

12     A.    I wouldn't expect him to wear a uniform.

13     Q.    Right.  And so do you see how some of those

14   hypotheticals might have been a little misleading?

15     A.    It's got that potential.

16     Q.    Let me ask you this, when she asked you about the

17   $15,000 check, and said, you think you'd remember getting a

18   $15,000 check, and you said yes, right?

19     A.    Yes, sir.

20     Q.    What kind of time frame were you envisioning in your

21   mind when -- in that little scenario she gave?

22     A.    I didn't really have a time frame that I -- I was

23   looking at.

24     Q.    Do you think over the course of four years somebody

25   might forget a check they got four years ago?

1          A.    I still think that would be a little difficult to do.

2          Q.    All right.  Well, let me ask you this way.  If Joe

3     went in and met with the rangers on September the 5th, told

4     them about the truck, and then on September the 16th went in

5     and said, I forgot to tell you there's also a $15,000 check,

6     you think that Joe, knowing his character, meant to mislead or

7     lie to anybody?

8                     THE COURT:  Let's stop there for a second.

9                     What's your objection?

10                    MS. RUDOFF:  This is an improper opinion and

11    comment on the evidence.

12                    THE COURT:  Okay.  Sustained.

13                    Let's move on.

14         Q.    All right.  You -- you've said on direct that you

15    haven't talked to Joe in -- since couple -- a few years?

16         A.    Correct.

17         Q.    Is your phone number (817) 925-8094?

18         A.    Yes, sir.

19         Q.    Did you know that you and Joe had a 20-minute

20    discussion on the phone on May 14th, 2021?

21         A.    I didn't recall it.

22         Q.    Were you lying to the jury?

23         A.    No.  I hope it's not interpreted that way.

24                    MR. SELLERS:  I'll pass the witness.

25                    MS. RUDOFF:  No further questions, Your Honor.

```
 1                    THE COURT:  All right.  Any objection to this
 2       gentleman being excused?
 3                    MR. SELLERS:  As long as he's court ordered to
 4       have a good vacation.
 5                    THE COURT:  That's fine.
 6                    MR. GALLIAN:  No objection.
 7                    THE COURT:  I will court order that.  I'm not
 8       sure I have jurisdiction, but I'm happy to order it.
 9                    Thank you.  Appreciate you coming today.
10                    (Witness excused.)
11                    (Jurors exit courtroom.)
12                    (Brief recess.)
13                    (Jurors enter courtroom.)
14                         DANNY BRILEY,
15       having been previously sworn, testified as follows:
16                      CROSS-EXAMINATION
17       BY MR. WESTFALL:
18            Q.   Mr. Briley, I'm Greg Westfall.
19            A.   Good afternoon, sir.
20            Q.   We've met here out in the hallway.
21            A.   Yes, sir.
22            Q.   All right.  But like I was saying before the jury
23       came in, your voice is forever etched upon my mind.
24            A.   I apologize.
25            Q.   Do you know why?
```

1      A.    I think I do.

2      Q.    How much time do you think you spent with Joe DeLeon?

3      A.    In terms of hours?

4      Q.    Yes.

5      A.    I don't know.  You know.

6      Q.    He was -- you came to his house on the 5th of

7  September of 2019, and that was the first time you ever met

8  him.

9                  (Court instruction.)

10      Q.    You came to his house in September 5th of 2019, and

11  that was the first time you met him, right?

12      A.    Yes.

13      Q.    He has a little Chihuahua dog that was barking?

14      A.    Yes, sir.

15      Q.    And you wanted him to come to the station and talk to

16  you, a Fort Worth PD location, right?

17      A.    That's correct.

18      Q.    So how did he treat you when you came to his house

19  that day?

20      A.    He was responsive, ready, willing to talk with me

21  about whatever it was I -- I had to ask him.

22      Q.    Okay.  That wasn't a very long meeting, right?

23      A.    The one at his house, no, sir.

24      Q.    Then he came and y'all talked for 3 hours and

25  20 minutes, right?

1          A.    That's correct.

2          Q.    And then came back and -- and did a recorded call for

3    you with Bill?

4          A.    Yes, sir.

5          Q.    You-all spoke at least twice on the phone, right?

6          A.    Yes, sir.

7          Q.    And then you spent quite a bit of time with him on

8    the 17th of September in connection with this wire that you

9    talked about, right?

10         A.    Yes, sir.

11         Q.    And you also took part in it seems like at least

12   three covered calls with OIG where you were actually present

13   there also, right?

14         A.    Yeah, I don't know the number.

15         Q.    Right.  But it was the 7th, the 11th and the 12th of

16   May of 2020.  So then -- and you also sat through the OIG's --

17   in effect, you talked to Joe at the same time that OIG was

18   speaking to him, right?

19         A.    I -- yes, I believe so.

20         Q.    Yeah.

21         A.    Uh-huh.

22         Q.    And so I've listened to all of those, and every time

23   you -- every time you ever refer to Joe, you refer to him as

24   Joe.  The first time I ever heard you say Defendant DeLeon was

25   in here in front of this jury.  Why did you do that, why do you

1    do that?

2        A.    He is a defendant.

3        Q.    So it's -- you -- it's just a situational thing, a

4    formality?

5        A.    He is a defendant, and so, therefore, it's what I

6    refer to him as.

7        Q.    You're not trying to dehumanize him with the jury?

8        A.    No.

9        Q.    You're not trying to get the jury to disregard the

10   presumption of innocence?

11       A.    No, sir.

12       Q.    Okay.  Do you believe in presumption of innocence?

13       A.    Absolutely.

14       Q.    All right.  Good.  Now, what kind of cases do you

15   usually work?

16       A.    Homicide.

17       Q.    Homicide?

18       A.    Yes, sir.

19       Q.    Okay.  All kinds of homicides?

20       A.    Yes, sir.

21       Q.    Like family violence homicides?

22       A.    All types.

23       Q.    All types.

24       A.    Whatever I end up working.  I actually do cold case

25   now, so...

1   Q.   Oh, yeah.  Okay.  Have you worked like child

2  molestation cases?

3   A.   Yes, sir.

4   Q.   Have you worked any cases where there was like a real

5  trust relationship between the perpetrator and the victim?

6   A.   I need to -- can you add to that, a real trust

7  relationship between perpetrator and victim?

8   Q.   Right.

9   A.   Yeah, I mean, there's -- there's family that is

10  violent towards other family, where trust was -- is broken.

11   Q.   Uh-huh.  And that betrayal that can come from that is

12  huge, isn't it?

13   A.   Yes, sir.

14   Q.   It's very hard for the victim to get over with.

15  Sometimes they carry it with them the rest of their lives.

16   A.   It's traumatic.

17   Q.   And so often do you see in these cases where a victim

18  may get blamed, right?

19   A.   A victim blamed where, by who?

20   Q.   For instance, a sexual assault.  The perpetrator

21  points to the fact that the -- that the -- the victim is

22  employed as a topless dancer, so as to imply that she can't be

23  raped.  We know about that, right?  You've had --  you've seen

24  that?

25   A.   I think I know what you're trying to say.

1    Q.    Right.  Well, isn't it a common thing for -- for

2  victims to get blamed for their own behavior in criminal

3  courts?

4    A.    I -- I wouldn't -- I wouldn't agree with that.

5    Q.    Have you ever worked a date rape case?

6    A.    I have not.

7    Q.    Okay.  What's a common dynamic in a date rape case?

8  I mean, do you know about, have you ever been trained about the

9  dynamics of date rape?

10    A.    Maybe -- what -- what -- what dynamics, about what?

11    Q.    Well, a -- you know, an acquaintance raping someone

12  and then say she was drunk and she consented?

13    A.    Okay.

14    Q.    Okay.  Well, let me ask you this, though.  We'll

15  break away from offenses.  When a lion meets a herd of antelope

16  and is going to take one down, does that lion go to the front

17  of the pack or the back of the pack?

18    A.    I haven't studied that.  I don't know if they would

19  go to the front or the back.

20    Q.    So no idea?  Never saw National Geographic or

21  anything like that?

22    A.    Definitely seen it, but don't know the answer to

23  that.

24    Q.    Well --

25    A.    I think they go for the throat, though.

1    Q.    Do you think that a predator knows what prey looks
2    like?
3    A.    Yes.
4    Q.    And that's not just animal predators, right?
5    A.    Maybe -- not sure where you're going with this.
6    Q.    Okay.  Well, there's animals and then there's humans.
7    A.    Uh-huh.
8    Q.    Do you think there are human predators?
9    A.    There are human criminals, if that's what you're
10   referring to.  Humans that do bad things to other humans.
11   Predator is just a word.  Maybe -- maybe I could say that this
12   person is a predator, I mean.
13   Q.    Uh-huh.
14   A.    I'm not -- I'm not trying to say I don't agree with
15   you.  I'm just -- don't know where you're going.
16   Q.    You're just saying you don't agree with me.  And it's
17   okay.  I mean, maybe I'm not going anywhere, maybe I just want
18   to talk to you, okay?
19   A.    Sure.
20   Q.    So you mentioned on direct examination that you went
21   to see Joe because -- and I wrote it down, "he was the weaker
22   vessel," which is to say that he -- between Bill Stone and
23   Joe DeLeon, he was the weaker person in your eyes?
24   A.    That's correct.
25   Q.    You know, we -- the word "lies," I'm going to try not

1    to say lies.  Lies is a very strong word, isn't it?

2        A.   It is.

3        Q.   And we can -- if we just call everyone a liar for

4    every statement that turns out to be technically not a fact at

5    that time, I mean, we're going to paint with a pretty broad

6    brush, aren't we?

7        A.   I don't agree with that.

8        Q.   You don't?  My tie is red.  Did I just lie to you?

9        A.   Yes, sir.

10       Q.   Okay.  So if I turned out to be colorblind, would

11   that still be a lie?

12       A.   No, sir.

13       Q.   Do you see how you jumped to a conclusion there about

14   me lying?

15       A.   I --

16       Q.   Which is why I want to stay away from lying, okay?

17       A.   I understand you.

18       Q.   But I want to talk to you about, you know, something

19   else.  So let me show you one thing.

20            MR. WESTFALL:  May I have just a moment, Your

21   Honor?

22            THE COURT:  Certainly.

23            (Brief technical interruption.)

24       Q.   Okay.  Casi testified in here under oath very

25   emphatically that she never backed into Joe's car.  Now, here

```
 1    is a text message where Joe says, "at the time she just backed
 2    into my car with her new car."  This was done at the time,
 3    okay?  Was Casi lying?
 4         A.   I don't know.
 5         Q.   We don't know, do we?
 6         A.   Right.
 7         Q.   She said something that's not factually correct, but
 8    we don't know?
 9         A.   Correct.
10         Q.   Because she could have just forgotten?
11         A.   Yes.
12         Q.   Okay.
13                   MR. WESTFALL:  Your Honor, may I grab one thing?
14                   THE COURT:  Certainly.
15                   (Brief pause.)
16                   MR. WESTFALL:  Okay.  I can fake this.
17                   Your Honor, I would ask -- or seek to admit
18    DeLeon Exhibit 33 for all purposes.
19                   THE COURT:  Any objections?
20                   MS. MAX:  Your Honor, we need to approach about
21    this exhibit.
22                   THE COURT:  Okay.  Let's take a short recess and
23    we'll call you back in here in just a few minutes.
24                   (Jurors exit courtroom.)
25                   THE COURT:  Please be seated.
```

1              MS. MAX:  My mistake.  There's multiple

2    transcripts for the same day, and I believed it was another one

3    that we had an understanding of.  The government does not

4    object.

5              THE COURT:  Okay.  Actually -- this actually

6    worked out okay.

7              MR. GALLIAN:  So, Your Honor, we had a

8    conversation with Westfall and Sellers, and obviously we're all

9    on the same page.  There's been your motions in limine

10   regarding 404(b).  It's our understanding that when we say no

11   objection to things that if there's 404(b) in those things that

12   they've been taken care of and redacted.

13             THE COURT:  That's my assumption, that the

14   parties have all appropriately -- everybody's an officer of the

15   court in good standing, and so I know that everyone will be

16   checking to make sure nobody inadvertently lets anything in.

17             MR. WESTFALL:  And I can represent to you, Your

18   Honor, that I have checked it a -- you know, several times.

19             THE COURT:  Sure.  Oh, I know --

20             MR. WESTFALL:  To make sure that that's not

21   going to happen.

22             THE COURT:  I know nobody would do that on

23   purpose.

24             MR. WESTFALL:  If there is, you can slug bug me.

25             THE COURT:  All right.  Well, everybody has

```
 1   their cautious eyes looking.  I know no one would ever on
 2   purpose violate this Court's rules.  I would never accuse
 3   anybody of such.  And I appreciate if everybody keeps looking,
 4   we can catch everything we need to see.
 5                    (Recess taken.)
 6                    (Jurors enter courtroom.)
 7        Q.   So, Ranger Briley, I'd like to -- I'd like for us to
 8   listen together to the recording that you made when you went to
 9   Joe's house initially, okay?
10        A.   Yes, sir.
11                    (Audio playing.)
12        Q.   All right.  Did Joe speak to you respectfully that
13   morning?
14        A.   Yes, sir, he did.
15        Q.   And you already knew some things about Joe, because
16   you'd spoken with Fort Worth PD?
17                    (Court instruction.)
18        Q.   And you'd already spoken with Fort Worth PD about
19   Joe?
20        A.   Yes, sir.
21        Q.   And so you went there alone?
22        A.   Yes, sir.
23        Q.   You didn't go there with a SWAT team or anything like
24   that?
25        A.   Yes, sir.
```

1      Q.    And Joe invited you to come in?

2      A.    He did.

3      Q.    Apologized profusely for the dog?

4      A.    He did.

5      Q.    And started telling you about his doctors'

6   appointments that day?

7      A.    That's correct.

8      Q.    He had one at, I guess, noon and another around 3:30?

9      A.    Yes, sir.

10     Q.    And he -- he offered to just cancel the noon one so

11  you-all could go talk?

12     A.    He did.

13     Q.    And then you asked him if he would come up, and you

14  didn't even tell him what you wanted to talk about, you just

15  said I want to talk about some stuff; you were very general,

16  right?

17     A.    Yes, sir.

18     Q.    But he knew you were a Texas ranger?

19     A.    Yes, sir.

20     Q.    And you asked him to drive or he -- he wanted to take

21  a shower and so you asked him to drive up to the police

22  department and meet with you, right?

23     A.    Yes, sir.

24     Q.    And he did drive up to the police department and meet

25  with you?

1      A.   He did.

2      Q.   All of that was absolutely voluntary?

3      A.   That's correct.

4      Q.   And he spoke with you at length?

5      A.   Yes, sir.

6      Q.   Right?

7           MR. WESTFALL:  I'd like to play -- first of all,

8   I want to admit DeLeon 36, which is the

9   three-and-a-half-hour-long meeting, for purposes of the record

10  only.  And then for the record, 36.1, 36.2 and 36.3 for all

11  purposes.

12          MS. MAX:  No objection.

13          MR. GALLIAN:  No objection.

14          THE COURT:  Admitted.

15     Q.   So I'm going to play the first segment of this from

16  the -- the interview, okay?

17     A.   Yes, sir.

18     Q.   And we'll listen to it together.

19          (Audio playing.)

20     Q.   Okay.  You have not even told him yet what you want

21  to talk to him about, right?

22     A.   Right.

23     Q.   So yesterday you said sometimes these interviews are

24  painful.  Is this an example of that?

25     A.   It's -- it is over a period of hours and hours.

1   That's when it does pain become painful.  I use that term
2   lastly, you know.
3        Q.   I get it.  I get it.  I have painful experiences too.
4             Joe talks a lot about his health, doesn't he?
5        A.   He does.
6        Q.   And he actually really has some health conditions
7   that you know about, right?
8        A.   I believe he does.
9        Q.   Yeah.
10            MR. WESTFALL:  I want to now publish 36.2, Your
11   Honor.
12            THE COURT:  I assume that's already been
13   admitted?
14            MR. WESTFALL:  It has.
15            THE COURT:  All right.  Permission granted.
16            (Audio playing.)
17       Q.   Okay.  Let me talk to you a little bit about trust
18   and betrayal, okay?
19       A.   Okay.
20       Q.   Which, you know, you encounter.  In a -- well, Casi,
21   before she met you, had been speaking to her mother, right?
22       A.   Yes.
23       Q.   About this situation, right?
24       A.   Yes.
25       Q.   And, in fact, when y'all had that first meeting, her

1    mother showed up and Penny Weisand actually took her out of the

2    office and away so that you and Casi could talk; isn't that

3    true?

4        A.   They both left the room, but I don't know that Penny

5    removed mother from the room.  I don't know that that's

6    accurate.  It's possible, but --

7        Q.   Right.

8        A.   That both of them left at the same time.

9        Q.   Right.  And it was preceded by Penny saying,

10   Candiss --

11       A.   Yes.

12       Q.   -- why don't you and I go out and get some air or why

13   don't you and I go out and get some coffee or something, right?

14       A.   Yeah, I don't remember the context of how they

15   exited.  It just -- the fact that they did.

16       Q.   But prior to that, Candiss had been like answering

17   Casi's questions before she could answer; isn't that correct?

18       A.   That's correct.

19       Q.   And so -- and Candiss had also filed a complaint

20   against Bill Stone, right?

21       A.   Yes, sir.

22       Q.   With the FBI?

23       A.   Yes, sir.

24       Q.   And so you weren't the first one that started to

25   raise questions in Casi's mind about the legitimacy of this

1  probation, wouldn't you agree?

2      A.   I wasn't the first person to be -- the complaint to

3  be given to.  Is that what you're asking?

4      Q.   Yeah.  You weren't the first person to raise

5  questions with Casi about the legitimacy?  I mean, you told her

6  it was fake, right?

7      A.   Yeah, I told her it was fake after doing the

8  research.

9      Q.   Yeah --

10                 (Court instruction.)

11     Q.   After you looked into it, you did your due diligence,

12  which took about a day.  And then you told her that she's not

13  on probation?

14     A.   Yes, sir.

15     Q.   But her mother had been challenging the fact that she

16  was on probation for some time before you even met her, right?

17     A.   I don't know what all the challenges were.  She was

18  challenging a lot.  But I don't -- I don't really know

19  specifically what -- what it all was.  I didn't even get into

20  interviewing her.

21     Q.   I get it.  Now, when we talk about a child

22  molestation case, sometimes it can be very difficult for a

23  mother, even, to believe their child when they say father

24  molested them, right?

25     A.   I'm sure that happens.

```
 1        Q.   Yeah.  And of course we know about all the priests
 2   and all the -- you know, all that issue there.  The delayed
 3   outcries for 20 years and whatnot, right?
 4        A.   Yes, sir.
 5        Q.   And a position of trust can be a very, very powerful
 6   thing, can't it?
 7        A.   Yes.
 8        Q.   And when Casi first began to entertain the
 9   realization that this thing was not real, it took her a while
10   to really get her head wrapped around that, right?
11        A.   Yes.
12        Q.   Now, can you make room for the possibility that Joe
13   had a position of trust with Bill?
14        A.   I can make room for the possibility.
15        Q.   And that it might have taken a little bit of time for
16   him to wrap his mind around the fact that he had been betrayed
17   for like 15 or 20 years?
18        A.   I don't know.
19        Q.   You don't know?
20        A.   No.
21        Q.   Okay.
22             MR. WESTFALL:  I'm going to publish 36.3, Your
23   Honor.
24             THE COURT:  All right.
25        Q.   Now, what I'm about to play is about two and a half
```

1    hours into your "3 hours and 20 minute long" conversation with

2    Joe, all right?  And you had been working very, very steadily

3    at trying to get Joe to look at this probation issue

4    differently than he was, hadn't you?

5         A.   No, I would not say that.

6         Q.   Well, I don't mean you're trying to change his mind

7    or something, but, I mean, Joe was absolutely steadfast in

8    believing that the probation was real, true?

9         A.   That's what he said.

10        Q.   And that Casi had signed papers, right?

11        A.   He did say that.

12        Q.   And that the three-by-five cards and all of that was

13   legit?

14        A.   He said that it was happening.

15        Q.   He said it over and over and over again, like he

16   really believed it, wouldn't you agree?

17        A.   Yes.

18        Q.   But then at about two and a half hours, you had a

19   tide change.  Let me play this.

20                  (Audio playing.)

21        Q.   You -- he was overcome by emotion there, wasn't he?

22        A.   He was expressing emotion about that.

23        Q.   Right.

24        A.   About the realization of that.

25        Q.   Right.  And then as time went by, he started wrapping

1   his mind around the fact that Bill had done this, didn't he?

2       A.   I'm not sure.

3       Q.   Okay.  We'll explore.  We'll go on this journey

4   together.

5       A.   That's great.

6       Q.   Okay.

7               MR. WESTFALL:  Your Honor, I'd offer DeLeon

8   Exhibit 27 for the record, and 27.1 for all purposes.

9               (Sotto voce discussion.)

10              MR. WESTFALL:  I'm sorry, they -- that was one

11  they put in, Your Honor.

12              THE COURT:  Oh, all right.

13              MR. WESTFALL:  And so I'd like to just publish.

14              THE COURT:  Okay.  Granted.

15      Q.   Little set up.  This is Casi's first recorded phone

16  call to Joe, which is September 3rd of 2019.

17      A.   Yes, sir.

18      Q.   And this was two days before you went and visited

19  Joe, right?

20      A.   Right.

21              (Audio playing.)

22      Q.   Okay.  And that was the September 3rd call.  That was

23  actually more of it than the jury has heard up to this point.

24              Okay.  Do you see how this is your --

25              (Off-the-record discussion.)

```
 1          Q.    So couple things.  Number one, we know from the
 2   Exhibits 158, that you testified to, right, the -- the calls,
 3   with the covered calls and whatnot?
 4          A.    Yes, sir.
 5          Q.    Is that 158?
 6          A.    Yes, sir, it is.
 7          Q.    156.
 8          A.    Oh, 156, yes.
 9          Q.    I don't have my glasses on.
10                So on the 12th, Casi -- or Joe brought up the
11   number 600,000 on the 12th, right?
12          A.    Yes.
13          Q.    And Joe sent Stone a text right afterward with the
14   number 19 on it.  So I guess different police departments have
15   different codes, but with the Fort Worth PD, that means an
16   intoxicated person.  Did you know that?
17          A.    No, I did not know that.
18          Q.    And then we see 1, 2, 3, 4, 5, 6, 7 different phone
19   calls between Stone and DeLeon, true?
20          A.    On what day, September 3rd?
21          Q.    September 3rd.
22          A.    Yes, sir.
23          Q.    Now, do you recall on the 17th of September when Joe
24   wore the wire and they were in his house, in Bill's house?
25          A.    Yes.
```

1    Q.   And we're going to listen to that in just a bit, but

2  just a foreshadow, Bill said, "project says I took $600,000."

3  He said that, right?

4    A.   He did.

5    Q.   So can you make room for the possibility that in

6  these calls, it was Bill that told Joe that, yeah, project's

7  saying that I took $600,000 from her?

8    A.   Yes, sir.

9           MR. WESTFALL:  I'd like to offer into evidence

10  DeLeon 28, if it's not already in evidence.

11           MS. MAX:  It is.

12           MR. WESTFALL:  Okay.  Then I'd like to publish a

13  part of that, Your Honor.

14           THE COURT:  Permission granted.

15           MR. WESTFALL:  And I also -- both 27 and 28, if

16  they're not already done so, I'd like to offer them for all

17  purposes.  I know that we had record versus all purposes.

18  Those are two phone calls that Casi and Joe were on.  I don't

19  think there's any problem with them.  I'd just like to offer

20  them for all purposes.

21           MS. MAX:  They are admitted for all purposes.

22           MR. WESTFALL:  Are they?  Okay.  Very good.  28.

23    Q.   Oh, this is the next call, which is on the 12th,

24  okay?

25    A.   Okay.

1              (Audio playing.)

2       Q.   Could you hear how bad he wanted to tell her that he

3  knew what was going on?  Could you hear that in his voice?  He

4  almost did a couple of times, didn't he?

5       A.   Knew what was going on in -- in regards to what?

6       Q.   This investigation.  That he knew --

7       A.   Oh, I gotcha.

8       Q.   Yeah.  Let me play you a little bit more of 36.  Now,

9  this is the "3 hour and 20 minute long" hearing -- or meeting.

10              (Audio playing.)

11              MR. WESTFALL:  It's 36.2.  Yeah.  Okay.

12              (Audio playing.)

13      Q.   A relationship of trust takes time to build, doesn't

14  it?

15      A.   Yes, sir.

16      Q.   Okay.  So immediately before this, we listened to

17  that September 12th call.  Was that the one that earlier you

18  testified Joe brought up the $600,000 -- it was, wasn't it?

19      A.   Yes.

20      Q.   I didn't hear it in there.  And I read the transcript

21  to be sure.  He didn't actually say that, did he?

22      A.   Right.

23      Q.   I don't believe that you were trying to mislead me.

24  I do not believe.

25      A.   No, I didn't.

```
 1         Q.    Thank you.

 2               MR. WESTFALL:  Your Honor, this would be a good

 3    time to...

 4               THE COURT:  All right.  Members of the jury,

 5    we're going to take our half-hour break.

 6               (Jurors exit courtroom.)

 7               (Brief recess.)

 8               (Jurors enter courtroom.)

 9               THE COURT:  Please be seated.

10               Your witness.

11         Q.    Ranger Briley, they spoke with you on direct about

12    some of the SMS and MMS messages between Joe and Stone, right?

13         A.    Yes.

14               MR. WESTFALL:  Your Honor, I would like to offer

15    DeLeon Exhibit 109 for all purposes.

16               THE COURT:  Okay.  Let me know if you have any

17    objection.

18               (Sotto voce discussion.)

19               MR. WESTFALL:  Your Honor, we would like to

20    offer for record purposes only DeLeon Exhibit 71.

21               MS. MAX:  No objection.

22               THE COURT:  Any objection?

23               All right.  Any objection?

24               MR. GALLIAN:  No objection.

25               THE COURT:  It's admitted.
```

1          MR. WESTFALL:  Now we'd like to offer for all

2     purposes Exhibit 109, which was extracted from 71.

3          MS. MAX:  No objection.

4          THE COURT:  All right.

5          MR. GALLIAN:  No objection, Your Honor.

6          THE COURT:  Admitted.

7          MR. WESTFALL:  Thank you.

8     Q.   Okay.  So these are the SMS messages, which are text

9     messages, right?

10    A.   Yes, sir.

11    Q.   And they're between Joseph DeLeon and Bill Stone; am

12    I right?

13    A.   Okay.  Yes, sir.

14    Q.   There's that "AAA Bill Stone" that we see there, and

15    then we know these were taken from Joe DeLeon's phone.  So, I

16    mean, are we good that that is your source?

17    A.   Yes, sir.

18    Q.   Okay.  Now -- now, you were -- you learned that

19    Joseph DeLeon believed that he was a confidential source for

20    Bill Stone for many years, right?

21    A.   It varied as to what I understood from him as to what

22    he actually did do for Stone.

23    Q.   Okay.  But that rings a bell that he was a

24    confidential source for the FBI, or at least he believed he

25    was?

1    A.    He represented to me that he did some work for the

2    FBI through his interpretation.

3    Q.    Okay.  Well, that's different than what we're talking

4    about here.  Here is the full message.  See, this is

5    January 20th of 2010, right?

6    A.    Yes, sir.

7    Q.    And it says, SA B.  Stone, I have a group of nine

8    police officers from Mexico City that have set up shop sailing

9    false IDs from this country here in Fort Worth.  What do you

10   want me do with this intel?  And he sent that to Bill Stone.

11   That clearly sounds like he's trying to pass information to

12   Bill Stone about some ongoing criminal enterprise, doesn't it?

13   A.    Yes, sir.

14   Q.    And here are some others.  Here, I hope all is well,

15   and this is 2010 also -- and go.  We have more of a problem

16   that I thought with not just 1 Class 3 weapons, but multiple,

17   as of 2/6/10.  Let me know if you have a -- AF person that you

18   trust, whatever that means.

19          And so Class 3 weapons is like some sort of

20   guns?

21   A.    Yes, sir.

22   Q.    So here's one I want to look at.  This is from June

23   of 2010.  SA Bill Stone, sir, I need to make you aware that I

24   will be buying a new car for myself personally and picking it

25   up from Dallas tomorrow.  As soon as I find out what the

1  license plate number is, I will text it to you so that you can
2  have it on record for what you need to have in my filed on me.
3  Also, to take the old car's license plate off my file, because
4  it'll be going back to dealer.  I will be texting you at that
5  time.  Thank you in advance.  Joseph DeLeon.  P. S.  Don't you
6  love it when someone knows the proper procedure?
7              And you see right above it, Special Agent Bill
8  Stone, do you still claim me and hold a file on me as a 137?
9  Now, there's been testimony that 137, I believe, is like a
10  cooperating person, confidential informant for the FBI.  Does
11  that ring a bell at all?
12     A.   I've never heard that.
13     Q.   Okay.  So he obviously -- and then this was back in
14  2010.  He obviously believes that he is a confidential
15  informant for Bill Stone, right?
16     A.   I don't know --
17              MS. MAX:  Objection; calls for speculation.
18     Q.   Okay.  These text messages, he is talking with Bill
19  Stone about being a 137, true?
20     A.   True.
21     Q.   And he is giving his new license number to Bill
22  Stone.  You know, with -- I mean -- it appears Bill Stone keeps
23  records of that, at least in his mind.  Is that a possibility?
24     A.   It -- it -- I don't know what his -- his state of
25  mind is.

1       Q.    I get it.  Yeah.

2       A.    I mean --

3       Q.    But just it appears -- I mean, if I -- if I give you

4   my license number --

5       A.    Yeah.

6       Q.    -- there's got to be a reason for it.  You've asked

7   me for it or I think you should have to have it.  I mean, it's

8   kind of a strange thing to do, don't you think?

9       A.    Yes.

10      Q.    In your due diligence, did you ever come upon any

11  record that said Bill Stone worked for the Obama security

12  detail?

13      A.    No, sir.

14      Q.    Wouldn't that have been kind of like a secret service

15  thing, wouldn't you think?

16      A.    Yes, sir.

17      Q.    And then just above that, he's following through and

18  giving his new license plate information to Bill Stone?

19      A.    It appears that's the case, yes, sir.

20      Q.    And there's -- there's -- I won't wear you out with

21  this, but there just continues to be more of this passing

22  information up about various public corruption things or --

23  have you -- have you read these?  Did you review these

24  particular SMS messages?

25      A.    I'm familiar with some of these.

1    Q.   Okay.  And it also -- there's a lot of this -- this

2  kind of stuff, isn't there?

3    A.   There is.

4    Q.   Yeah, just being very gushing with Bill Stone about

5  his service and keeping us all safe and all that.  I mean, he

6  obviously thinks an awful lot of Bill Stone, doesn't he?

7    A.   It appears so.

8    Q.   Okay.  Now, here's one.  It is 8/24 of '12, so this

9  is still a long time before you ever met Casi Thompson, right?

10   A.   Yes, sir.

11   Q.   Seven years.  And here's a message to SA Bill Stone,

12 Casi Thompson called last night and gave me some information on

13 someone that is wanted by the FBI.  There was apparently two of

14 them, one of them Jessica and the other one Mary.  Jessica has

15 been arrested by the bureau and are still seeking Mary.  This

16 Mary person, who she doesn't have a last name, came into her

17 beauty shop and spilled the beans about some of the crimes that

18 she was wanted for.  Casi is wanting to reach out to you.

19 Signed, Squeaky Clean.

20        Now, did you see instances in here where he's

21 referring to himself to Bill as "Squeaky Clean"?

22   A.   I had not seen that be before.

23   Q.   Okay.  He does it right there above too.  Do you see

24 that?

25   A.   Yes, sir, he does.

1    Q.    So does it appear as though he is passing information

2    from Casi Thompson to Bill Stone?

3    A.    Yes.

4    Q.    And this is back in 2012?

5    A.    Yes, sir.

6    Q.    And here's the one right above it.  Just wanted to

7    share with you that on the suspect that Casi Thompson, not

8    spelled correctly, is trying to give you.  There is a reward

9    out by the FBI, so she's apparently high profile for them to

10   have a reward.  Her name is Mary Renee Kashay Walton Slack.

11   Signed, Squeaky Clean.

12               Does that sound like he's trying to pass

13   information from Casi again?

14   A.    Yes.

15   Q.    All right.  9/8 of 2014, SA Bill Stone, FYI, Casi

16   Thompson left for inpatient treatment today.  She should be

17   there minimum of 3 to 6 months, maybe a year.

18               So it appears Joe DeLeon is passing along

19   pertinent information, information about Casi Thompson to Bill

20   Stone, right?

21   A.    Yes.

22   Q.    Now, you are -- part of the interview -- the part of

23   the interview that we listened to just before the break, it

24   sounded like you were actually giving Joe some instructions

25   on -- on what to say if he talks to Bill, didn't it?

1      A.   I -- I actually don't recall.  But --

2      Q.   Want me to play it again?

3      A.   No, but if you want to ask me specifically what I

4    asked or didn't.

5      Q.   Well, you were telling him -- you know, giving him

6    sort of instructions on how to speak to Bill Stone, what to say

7    to Bill Stone.

8                 Let me just...

9                 (Audio playing.)

10     Q.   And we heard a little bit of the beginning.  He was

11   wanting to know what words to use, because he was afraid that

12   he wasn't a good enough liar to fool Bill.  Does that sound

13   fair?

14     A.   I don't know what his view -- or didn't know what his

15   view was at that time of talking to him.

16     Q.   But that's what he expressed, I'm not that good of a

17   liar.  That's what he actually said.

18     A.   Yes.

19     Q.   And so that very day, though, you actually used him

20   as a covered call?

21     A.   Yes, sir.

22     Q.   Now, where were you-all when you did this?

23     A.   This was in Fort Worth at a place called Cancun.

24   It's a local restaurant near that Fort Worth police station.

25   It was in a parking lot inside my government vehicle.

1       Q.    Okay.  And so there was some talk, I guess, at the

2    Cancun before you did this and you recorded that also?

3       A.    Yes, sir.

4              MR. WESTFALL:  Your Honor, I'm about to embark

5    on something that's going to take at least 30 minutes to get

6    through.  Can we maybe break?

7              THE COURT:  Time to break for the day, yes.

8              Members of the jury, we appreciate your time and

9    attention today.  Let me give you a couple of instructions real

10   quick since we're going to break for the weekend.  First of

11   all, if you'll remember, please, not to discuss this case

12   amongst yourselves until I've handed it to you and you've heard

13   all of the evidence in the case.  Also, it's not unusual that

14   family members and friends will want to know exactly what

15   you've been doing this past week, and whenever the case is all

16   over, you can tell them all about it.  But not yet.

17             So if you will please not discuss this case with

18   anyone other than yourselves when I tell you it's the

19   appropriate time.

20             And finally, please don't do any independent

21   research.  All of the evidence and law you'll need will come in

22   the four walls of this courtroom.

23             And so with that said, you are court ordered to

24   have a fabulous weekend.  Court will be in recess and we will

25   see you bright and early Monday.

```
 1                    (Jurors exit courtroom.)

 2              THE COURT:  I want to go back to our little

 3   disturbance from earlier today.  This Court forgives what

 4   happened.  This cannot happen again.  So the temper tantrum

 5   cannot happen.

 6              And I just want to say on the record, I have

 7   already pulled counsel aside earlier this week about making

 8   faces, and so we had what I thought was an inappropriate

 9   explosion in front of the jury that I tried to diffuse.  That

10   can't happen again.

11              Do you understand that?

12              MR. SELLERS:  Yes, ma'am.

13              THE COURT:  All right.  Okay.  With that said,

14   everybody's court ordered to have a great weekend.  And I look

15   forward to seeing you back.

16              So is there anything we need to take up before

17   we go?

18              MS. MAX:  Nothing from the government.

19              MR. GALLIAN:  No, Your Honor.

20              MR. WESTFALL:  No, Your Honor.

21              THE COURT:  Have a wonderful weekend.

22              (Proceedings adjourned.)

23

24

25
```

1              I, BROOKE N. BARR, United States Court Reporter

2  for the United States District Court in and for the Northern

3  District of Texas, Dallas Division, hereby certify that the

4  above and foregoing contains a true and correct transcription

5  of all proceedings in the above-styled and -numbered cause.

6

7              WITNESS MY OFFICIAL HAND this the 3rd day of

8  August, 2023.

9

10

11                        /S/ BROOKE N. BARR
                          BROOKE N. BARR, CSR NO. 6521
12                        CSR Expiration Date:  7/31/24
                          United States Court Reporter
13                        1100 Commerce Street
                          Room 1376
14                        Dallas, Texas 75252
                          (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25