```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE NORTHERN DISTRICT OF TEXAS

 3                             DALLAS DIVISION

 4
     UNITED STATES OF AMERICA,      )        3:21-CR-236-E
 5                Government,        )
                                    )
 6                                  )
     VS.                            )        DALLAS, TEXAS
 7                                  )
                                    )
 8   WILLIAM ROY STONE, JR.,        )
     JOSEPH EVENTINO DELEON,        )
 9                Defendants.       )        August 7, 2023

10

11               TRANSCRIPT OF JURY TRIAL, VOLUME 9

12               BEFORE THE HONORABLE ADA E. BROWN

13                  UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:          MS. JENNA DANELLE RUDOFF
                                  UNITED STATES DEPARTMENT OF JUSTICE
18                                NORTHERN DISTRICT OF TEXAS
                                  U.S. Courthouse, Third Floor
19                                1100 Commerce Street
                                  Dallas, Texas  75242
20                                jenna.rudoff@usdoj.gov
                                  (214) 659-8600
21

22                                MS. DONNA S. MAX
                                  UNITED STATES DEPARTMENT OF JUSTICE
23                                NORTHERN DISTRICT OF TEXAS
                                  U.S. Courthouse, Third Floor
24                                1100 Commerce Street
                                  Dallas, Texas  75242
25                                donna.max@usdoj.gov
                                  (214) 659-8664
```

```
1                                MR. MARCUS J. BUSCH
                                 UNITED STATES DEPARTMENT OF JUSTICE
2                                NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
3                                1100 Commerce Street
                                 Dallas, Texas  75242
4                                marcus.busch@usdoj.gov
                                 (214) 659-8642
5

6    FOR THE DEFENDANT,          MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:     Gallian Firm
7                                Parkside Tower
                                 3500 Maple Avenue
8                                Suite 720
                                 Dallas, Texas  75219
9                                gregg@GallianDefenseFirm.com
                                 (214) 432-8860
10

11                               MS. JACLYN ANNETTE GALLIAN
                                 Bryan Cave Leighton Paisner
12                               2200 Ross Avenue
                                 Suite 4200
13                               Dallas, Texas  75201
                                 jaclyn.gallian@bclplaw.com
14                               (214) 721-8058

15
     FOR THE DEFENDANT,          MR. GREG WESTFALL
16   JOSEPH EVENTINO DELEON:     Westfall Sellers
                                 1701 River Run
17                               Suite 801
                                 Fort Worth, Texas  76107
18                               greg@westfallsellers.com
                                 (817) 928-4222
19

20                               MR. FRANK SELLERS
                                 Westfall Sellers
21                               1701 River Run
                                 Suite 801
22                               Fort Worth, Texas  76107
                                 frank@westfallsellers.com
23                               (817) 928-4222

24

25
```

Todd Anderson, RMR, CRR     (214) 753-2170

```
 1    COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                   United States Court Reporter
 2                                 1100 Commerce St., Rm. 1625
                                   Dallas, Texas  75242
 3                                 (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24    transcript produced by computer.

25
```

1                JURY TRIAL VOLUME 9 - AUGUST 7, 2023

2                     P R O C E E D I N G S

3           SECURITY OFFICER:  All rise.

4           THE COURT:  How is everybody doing?  Please be

5  seated.

6           Okay.  So we have an issue with a juror.  Our mom

7  apparently is feeling queasy.

8           Be seated everybody.

9           Our mom's feeling queasy, but she came today.  I

10  propose we tell her if she's feeling ill we will take a break,

11  but I don't want to cut her loose.  When we excused our first

12  guy, it kind of put us in a bind.

13          What do you think about that?

14          MR. WESTFALL:  We agree.

15          THE COURT:  I will tell her if she's feeling yucky,

16  we will take a break.

17          MR. GALLIAN:  I agree.

18          MS. RUDOFF:  Yeah, the Government as well.

19          THE COURT:  Sounds good.

20          Anything we need to take up before we bring them in?

21          MR. WESTFALL:  I'm trying to get to the bottom of

22  which exhibits have been admitted and which haven't.

23          THE COURT:  Okay.

24          MR. WESTFALL:  Which might save some floundering

25  around in front of the jury.  May I have five minutes to do

```
 1    that?
 2              THE COURT:  Sure.  Okay.  Yeah.
 3              MR. WESTFALL:  We can offer the ones that are just
 4    for the record.  We don't need to offer those in front of the
 5    jury, right?
 6              THE COURT:  Right.  I assume you guys aren't going to
 7    object to that.  For record purposes, I assume they can be
 8    offered any time.
 9              MR. WESTFALL:  We will take care of that before they
10    come in so I don't have to mess around with that.
11              THE COURT:  Sound good.
12              Did you get the e-mails about the time?  Starting to
13    lose our jurors.
14              All right.  Good deal.
15              All right.  Well --
16              MR. SELLERS:  So she's okay to sit right now?
17              THE COURT:  Yeah.
18              MR. SELLERS:  Just break if she gets --
19              THE COURT:  Yeah.  What she said is -- I read a text
20    message.  People in her family have a little stomach bug, she
21    said she feels all right, but she felt a little queasy for a
22    minute, but she came.
23              (Discussion off the record)
24              THE COURT:  If you guys are okay, I will have my
25    assistant talk to her and tell her if you feel unwell, let us
```

```
 1   know and we'll break immediately.
 2            And if you want to get your stuff together.
 3            MR. WESTFALL:  I think I have it together.
 4            THE COURT:  How about a sound check?
 5            (Pause)
 6            THE COURT:  All right.  I have relayed our concerns
 7   and that if she feels ill at all -- I have also got a room
 8   where she goes back to nurse, and she can just camp out there
 9   for the day if she wants to so she doesn't get anyone sick.
10            Doesn't sound like anything that is airborne, but
11   just in case.
12            Is everybody okay with that solution?
13            MR. WESTFALL:  Sure.  Yes.
14            THE COURT:  Obviously if she feels ill, we will take
15   it from there.
16            All right.  Stack them up.
17            MR. WESTFALL:  May we offer this stuff for the
18   record?
19            THE COURT:  Oh, sure.
20            MR. WESTFALL:  Outside of the presence?
21            THE COURT:  Sure.
22            MR. WESTFALL:  Is he going to get them?
23            THE COURT:  Yes, he is, but did you want to --
24            MR.  WESTFALL:  Sure.
25            THE COURT:  Sure.
```

1          MR. WESTFALL:  We'll offer DeLeon 32 for the record.

2     We will offer DeLeon 38 for the record, DeLeon 40 for the

3     record, 42 for the record, DeLeon 72 for the record, DeLeon 112

4     for the record, DeLeon 114 for the record, DeLeon 116 for the

5     record, and DeLeon 118 for the record.  And that is it for the

6     record.  Everything else I have is going to be for all purposes

7     or an excerpt.

8          THE COURT:  Okay.

9          MS. MAX:  Can you tell me the numbers again that were

10    after 42?

11         MR. WESTFALL:  Sure.

12         MR. GALLIAN:  72, 112, 114, 116, 118.

13         MS. MAX:  112, 116, 118.

14         What are those extracted from?

15         MR. WESTFALL:  112 is a covered phone call from

16    May 11 of '20, so --

17         MS. MAX:  The original.

18         MR. WESTFALL:  You tell me.

19         114 is an extracted phone call from May 12 of '20.

20    116 is an extracted phone call from May 13 of '20.

21         MS. MAX:  Okay.  And 118?

22         MR. WESTFALL:  118 is the second phone call from

23    May 13.

24         MS. MAX:  I'm sorry, you said 112 for what date?

25         MR. WESTFALL:  112 was May 11th.

```
 1              (Pause)

 2              THE COURT:  Any objection from either side on record

 3    admissions?

 4              MR. GALLIAN:  Your Honor, brief moment.  So the 112

 5    afterwards jumps to a different exhibit list, so we are

 6    checking that one real fast.

 7              THE COURT:  No problem.  I appreciate that.  Give me

 8    just a minute.

 9              (Pause)

10              MS. MAX:  No objection.

11              THE COURT:  Okay.  Great.  I'll work on the air

12    conditioning.

13              MR. GALLIAN:  One second.

14              (Pause)

15              MR. GALLIAN:  We're good, Judge.  No objection to all

16    of those exhibits for record purposes.

17              THE COURT:  For record purposes.  Okay.

18              MR. GALLIAN:  Thank you for your patience.

19              THE COURT:  Sure.  Absolutely.

20              All rise for the jury.

21              MR. WESTFALL:  Then I'll be offering the excerpts for

22    all purposes --

23              THE COURT:  Sure.

24              MR. WESTFALL:  -- in front of the jury.

25              THE COURT:  Sounds good.
```

```
 1              And everybody please check their phones.
 2              SECURITY OFFICER:  All rise for the jury.
 3              (Jury in)
 4              THE COURT:  Good morning.
 5              Parties have gotten together to harmonize their cases
 6    and admit new exhibits.  So appreciate you being here, and I'll
 7    plan to take a break at 10:00, but I'll look at you about 9:00
 8    and see if anybody needs a stretch break.  If you need anything
 9    before then, let me know.
10              Appreciate all of you being here.
11              Your witness, Mr. Westfall.
12              MR. WESTFALL:  Thank you, Your Honor.
13        DANNY BRILEY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
14                   CROSS-EXAMINATION CONTINUED
15    BY MR. WESTFALL:
16    Q.   Agent Briley, how are you?
17    A.   I'm good, sir.  Thank you.
18    Q.   When we're talking about trying to discern someone's
19    intent, context is useful, isn't it?
20    A.   Yes.
21    Q.   I want to talk to you a little bit about this fiancee
22    thing.
23              Now, Casi knew about the fiancee talk, right?  She
24    was familiar that that was going on?
25    A.   Not to my knowledge, no.
```

1    Q.   Okay.  Well, the fiancee talk turns up in the text

2    messages quite a bit, doesn't it?

3    A.   Yes, sir.

4    Q.   And here's -- these are all from the text messages between

5    DeLeon and Stone, okay?

6             Can you see it?

7    A.   Yes, sir.

8    Q.   So here is a -- from February 24th you see how -- start

9    asking about your fiancee soon.

10            That's from Bill to Joe?

11   A.   Yes, sir.

12   Q.   And this is February 26th, later in February.  Are you

13   with your fiancee yet.

14            This is March 31st.  And here Bill is calling Casi

15   Joe's fiancee.

16            At the beginning of April, Bill's referring to Casi

17   as Joe's fiancee.

18            At the middle of April, she's your woman, is your

19   fiancee driving you crazy today.

20            All these blue ones are Bill Stone, right?

21   A.   Yes, sir.

22   Q.   And mid-April, she's your woman, ha, ha, ha.  Are you

23   still planning to see your fiancee at 3 p.m.?

24            And during -- in and around and after and even a

25   little bit before these text messages were exchanged, Bill is

```
 1   the one that has a sexual relationship with Casi, right?
 2   A.   Your question is Bill has a relationship with Casi?
 3   Q.   Yes.
 4   A.   I know that they had sex.  I don't know the extent of that
 5   relationship.
 6   Q.   But certainly Joe didn't?
 7   A.   No, he didn't.
 8   Q.   He did not.
 9            THE COURT:  Let's pause for just a moment.  Just
10   don't talk over each other.
11            MR. WESTFALL:  My bad, Your Honor.
12   BY MR. WESTFALL:
13   Q.   Certainly Joe did not have a sexual relationship with
14   Casi?
15   A.   To my knowledge, no, sir.
16   Q.   And Joe never asked Casi to marry him?
17   A.   No, sir.
18   Q.   Bill did?
19   A.   Yes.
20   Q.   Yet Bill is continuously sending him messages referring to
21   Casi as Joe's fiancee?
22   A.   That's correct.
23   Q.   Is Bill making a reference to Casi's menstrual periods
24   there, I guess, 4-25, her situation?
25   A.   I don't know.  It's possible.
```

```
 1   Q.   Any fiancee updates?
 2        And we get into the end of April and quality time
 3   with your fiancee.  And it just goes into May, fiancee in
 4   Granbury, at the beginning of May.
 5        Are you still with your fiancee?
 6        He just doesn't seem to be able to leave it alone,
 7   does he?  That's the end of May.
 8   A.   Yes, sir.
 9   Q.   He's continuously referring to Casi as Joe's fiancee?
10   A.   Yes, sir.
11   Q.   So that provides a little bit more context to the whole
12   fiancee theme, right?
13   A.   It gives context.
14   Q.   And then here is one that is kind of a twist.  Joe -- or
15   another thing that Bill continuously did was ask for stories.
16   Have you seen that?
17   A.   Yes, sir.
18   Q.   Both fiancee stories and project stories?
19   A.   Yes, sir.
20   Q.   And Bill would ask for stories over and over and over
21   again, but at the same time Bill is talking to Casi on the
22   phone a lot, isn't he?
23   A.   Yes, sir.
24   Q.   I mean like hours per day, ultimately, yes?
25   A.   Yes, sir.
```

```
 1   Q.   Oftentimes he would be -- she would be the first phone
 2   call that he would have in the morning and the last phone call
 3   that he would have in the evening, right?
 4   A.   I don't -- I don't know that for sure, but frequently they
 5   did talk.
 6            THE COURT:  Just a moment.  Technical difficulty.
 7            (Pause)
 8            SECURITY OFFICER:  All rise for the jury.
 9            (Jury out)
10            (Pause)
11            SECURITY OFFICER:  All rise for the jury.
12            (Jury in)
13            THE COURT:  If everyone will be seated, please.
14            Let's do a quick sound check, do a little test on the
15   microphone.
16            MR. WESTFALL:  Can you hear me okay?
17            THE COURT:  I can you hear okay.  Yes, fantastic.
18   All right.
19            Your witness -- and, again, please do not hold it
20   against the parties.  That was my sound system.  We got it
21   going.  Thank you.
22            Your witness, sir.
23   BY MR. WESTFALL:
24   Q.   So the fiancee and project updates he would regularly --
25   Bill would regularly ask Joe for these updates, wouldn't he?
```

```
 1   A.   I saw that often.
 2   Q.   And this is at the same time when obviously Bill and Casi
 3   are talking on the phone quite a bit?
 4   A.   Yes, sir.
 5   Q.   But we have never seen any text messages between Bill and
 6   Casi, have we?
 7   A.   No, sir, we haven't.
 8   Q.   Now, there's been some talk about having a couple of
 9   Casi's phones.  What's exactly is the story with that?
10   A.   I don't recall exactly what that story was.  He took those
11   phones from her allegedly to delete some music and other
12   things.  At least that is what was said.  I don't remember all
13   the details of that.  Casi would know.
14   Q.   But he was able to access the data stored in not just the
15   phones but in the cloud, right?
16   A.   I have been told that from some forensic examiners.
17   Q.   Right.
18   A.   I don't know which phones or to the extent.
19   Q.   And so when you have access to the cloud, you have access
20   to that data that gets backed up into the phone, don't you?
21   A.   Yeah, that's not a question for me.  I couldn't answer
22   that.
23   Q.   But one of the possible reasons why there are zero text
24   messages between Bill and Casi is that Bill deleted them.
25   Isn't that a possibility?
```

```
1   A.   It is a possibility he deleted messages.
2   Q.   Now, on the topic of context again, in your direct
3   examination there was a reference made to 3 million reasons.
4        Along the same theme with the -- as the fiancee
5   language, Bill was also telling Joe he's going to marry Casi,
6   and it became sort of a running theme as well.
7        And then Bill says, Remember not too long ago, 3
8   million reasons for you to get married.  Bill came up with
9   that.  There's 3 million reasons for you to marry project.
10       And here is what Joe said, which is the only thing
11  we saw in your direct, but I would not marry her back then for
12  3 million reasons, I would not marry her if she was the last
13  woman on earth, so help me God.  I made a promise in church one
14  day.
15       You see how that additional information really
16  puts -- this last thing, that was the only thing we saw in your
17  direct, puts that into context.
18           THE COURT:  Counsel, would you would mind slowing
19  down just a little bit?
20           MR. WESTFALL:  Sorry, Your Honor.
21           THE COURT:  That's all right.
22  BY MR. WESTFALL:
23  Q.   See how it puts it into context?
24  A.   I see the response here.  Not sure of the context.
25  Q.   One more little thing of messages here.
```

```
 1            Have you seen this before, where Bill asks Joe, How
 2   much time would you be able to spend on a weekly basis with
 3   your project.
 4            This is at the first of May.  Have you seen this
 5   string?
 6   A.   Yes, sir, I have.
 7   Q.   Would you be able to monitor her on a regular basis more
 8   so than now.
 9            And, you know, at this time, Joe is spending hours at
10   the house virtually every day, right?
11   A.   Yes, sir.
12   Q.   And his restaurant is in a jam because he's gone all the
13   time.  I guess we heard that from Casi.  We heard it somewhere
14   in this trial.  But he is neglecting actually his employment
15   duties to spend time down there, right?
16   A.   I don't -- I don't know that.
17   Q.   And so Joe says, As much as needed I'm still right here
18   from yesterday.  I don't want it to interfere with your work.
19   Think about it real carefully.
20            This is what Bill is saying to Joe.
21            THE COURT:  Please slow down if you are going to read
22   that.
23            MR. WESTFALL:  I'm sorry, Your Honor.
24   BY MR. WESTFALL:
25   Q.   This is what Bill is saying to Joe.  Joe responds, I'm
```

```
 1  doing it already, I'll be glad to do more.
 2          This is -- what Bill is suggesting is that even more
 3  of his time is going to be involved in this, and he's willing
 4  to do that.
 5          I'm blessed to have a good manager at the restaurant,
 6  I'm able to see her whenever necessary.
 7          And, you know, at this time he's sleeping two, three,
 8  four hours a night.  We see these all over these text messages
 9  right?  He has trouble sleeping?
10  A.   Yeah, I -- I believe so.
11  Q.   And then, Is it worth all the time and effort you are
12  willing to commit?
13          Yes.
14          Okay, then I will pass it on.
15          So, okay, I will pass it on surely refers to he's
16  going to, you know, talk to somebody up the chain about upping
17  Joe's hours.  Isn't that a reasonable interpretation of that?
18          MS. MAX:  Objection, calls for speculation.
19          THE COURT:  Sustained unless you can establish how he
20  would know that.
21  BY MR. WESTFALL:
22  Q.   Well, what does it mean when you say, I'm going to pass
23  something up the chain?  Your chain of command, right?
24  A.   Yes, sir.
25  Q.   And so he's talking about passing something up his chain
```

```
 1  of command about Joe working more hours?
 2          MS. MAX:  Objection, calls for speculation.
 3          THE COURT:  Sustained.  Stick to what he knows.
 4  BY MR. WESTFALL:
 5  Q.   Do you want me to read them to you again?
 6  A.   The text messages?
 7  Q.   Yeah.
 8  A.   I don't believe I need them read to me.
 9  Q.   Okay.  So then let's just focus on this whole concept of
10  chain of command.
11          THE COURT:  Counsel, can we pause for just a moment?
12  I'm having trouble hearing you.
13          (Pause)
14          THE COURT:  Okay.
15  BY MR. WESTFALL:
16  Q.   The fact is that Bill didn't have a chain of command,
17  did he?
18  A.   That's correct.
19  Q.   But he's obviously talking to Joe as if he does, right?
20  A.   Yes.
21  Q.   Now, I want to go back just a moment to the long interview
22  that you had with Joe on the 5th of September of 2019.  And I
23  want to publish and offer into evidence for all purposes
24  segment 36.4.  It's from 36, which is in for the record, and it
25  is a -- it is a segment.  It's an excerpt.
```

```
 1                THE COURT:  All right.  Any objection?

 2                MS. MAX:  No objection.

 3                MR. GALLIAN:  No objection.

 4                THE COURT:  Admitted.

 5                    (Defendant DeLeon's Exhibit No. 36-4 received)

 6                MR. WESTFALL:  Thank you, Your Honor.

 7                (Audio played)

 8    BY MR. WESTFALL:

 9    Q.   Okay.  You're talking to him about this call he's about to

10    make with Bill Stone, right?

11    A.   I can tell you exactly what I was talking to him about if

12    you would like.

13    Q.   Well, I'm talking about what's on the tape first.

14    A.   Okay.

15    Q.   And you're saying, first of all, Do me a favor, after you

16    are done with your appointment, just call me and we will meet

17    up.  But he can't because Joe is still worried about Bill being

18    able to hear his phone calls, right?

19                THE COURT:  Can you slow down just a little bit,

20    counsel?

21                MR. WESTFALL:  Okay.

22    BY MR. WESTFALL:

23    Q.   Joe is still expressing to you that he's worried about

24    Bill being able to hear his phone calls?

25    A.   He had.
```

```
 1   Q.   And you tell him, He can't, he won't.  Now, when you talk
 2   to him, I'm assuming you're going to talk to him.
 3            Yeah.
 4            So you knew that he was going to be talking to Bill,
 5   right?
 6   A.   I suspected there was a propensity that these two would
 7   talk.
 8   Q.   And in the morning when you went to his house, you made a
 9   recording after you left saying, I didn't want to share
10   anything with him that he would tell Bill because I'm sure he's
11   about to call Bill, right?
12   A.   Yes, sir.
13   Q.   And you told him if he wants to push on any buttons about
14   Casi, you can say whatever you would have normally said about
15   that anyway.  In other words, act natural, right?
16   A.   That's fair.
17   Q.   And when we have a cooperating individual -- and Joe was a
18   cooperating individual, right?
19   A.   He cooperated.
20   Q.   He cooperated by giving six secretly recorded
21   conversations all directed by either you or Luley or both of
22   y'all, right?
23   A.   I know he gave me two.  I don't know the total number.
24   Q.   Right.
25            But you -- I mean, you were present for all but like
```

1   the last one or the last two.  You were present for everything

2   through May 12th.  You're on the record as being present.  Did

3   you forget those?

4   A.   I didn't forget.

5   Q.   Okay.  But cooperating -- being a cooperating

6   individual -- and you've managed people that cooperate before,

7   right?

8   A.   Yes, sir.

9   Q.   And you-all have to come up with a scenario that is going

10  to maximize a person's ability to gather information.  Is that

11  what you call it in your business?

12  A.   I'd say each case merits its own circumstances as to how

13  that is going to be managed.

14  Q.   Right.  But in this case, you're directing him to act

15  natural with Bill?

16  A.   That's correct.

17  Q.   And if he -- Bill was a guy that was highly suspicious,

18  wasn't he?

19  A.   I don't know what his state of mind was.

20  Q.   Might have been highly stupid, but he was highly

21  suspicious.  He would ask, Are we being recorded?

22          He did that with Casi and he did that with Joe,

23  didn't he?

24  A.   I know that I heard him ask if he was being recorded.

25  Q.   And toward the end he didn't want to say anything on the

1    phone, right?

2    A.   Toward the end I believe he was saying less.

3    Q.   So, anyway, the first one you-all did together was on that

4    day of the 5th.  And let's get to that.

5              MR. WESTFALL:  I would like to offer 38.1 for all

6    purposes, Your Honor.

7              THE COURT:  Let me know if there is any objection.

8              MS. MAX:  No objection.

9              MR. GALLIAN:  No objection.

10             (Defendant DeLeon's Exhibit No. 38.1 received)

11             (Audio played)

12             MR. WESTFALL:  May I have just a second, Your Honor?

13             THE COURT:  Certainly.

14             Members of the jury, are you doing okay?

15             All right.

16   BY MR. WESTFALL:

17   Q.   Did we hear Bill tell Joe, Hold on, let me go into the

18   conference room?

19   A.   Yes, we did.

20   Q.   So this is from Stone 165.  It is Bill's Verizon records.

21             And we've already heard testimony that origination is

22   where the phone is and destination is -- it's either incoming

23   or where the call is being placed to, okay?

24   A.   Yes, sir.

25   Q.   So on September 5th, we have those calls there, and then

```
 1  we have these locations.
 2          So we may not know exactly where he is in his house,
 3  but we know he's not in Washington, D.C., right?
 4  A.   Yes, sir.
 5  Q.   And so he's telling Joe, Let me step into the conference
 6  room, as though he's in D.C. and actually has access to a
 7  conference room?
 8          I mean, he's trying to make like he has a conference
 9  room, wouldn't you agree?
10  A.   Yes, sir.
11          MR. WESTFALL:  I would like to offer for all purposes
12  DeLeon 38.2, Your Honor.
13          MS. MAX:  No objection.
14          THE COURT:  Thank you.
15  BY MR. WESTFALL:
16  Q.   And this is the covered phone call, right?
17          THE COURT:  I'm sorry.  Pause for just a moment.
18          MR. WESTFALL:  I'm sorry.  I'm sorry.
19          THE COURT:  That's all right.
20          MR. GALLIAN:  No objection.
21          THE COURT:  It's admitted, sir.
22              (Defendant DeLeon's Exhibit No. 38.2 received)
23          MR. WESTFALL:  ADHD.
24          THE COURT:  That's all right.
25  BY MR. WESTFALL:
```

1   Q.   Y'all are sitting next to each other in the truck while he
2   is making this call, right?
3   A.   Yes, sir.
4        (Audio played)
5   BY MR. WESTFALL:
6   Q.   Okay.  Now, Joe is acting normal with Bill.  He's acting
7   natural as we say, right?
8   A.   I don't know that he's acting natural.
9   Q.   But whether he is or he isn't, Bill has just told him a
10  story, hasn't he?
11  A.   Bill has responded to him.
12  Q.   In a manner in which is factually incorrect, true?
13  A.   Yes.
14  Q.   Bill did not retire on December 31st and he did not retire
15  in 2016, right?
16  A.   That's correct.
17  Q.   So we have on record Bill lying about his retirement date,
18  wouldn't you agree?
19  A.   Yes, sir.
20  Q.   And I say lying.  Would you call that a lie?
21  A.   Yes, sir.
22        MR. WESTFALL:  38.3.  Your Honor, we offer 38.3 for
23  all purposes, Your Honor.
24        MS. MAX:  No objection.
25        MR. GALLIAN:  No objection, Your Honor.

```
 1                 THE COURT:  It's admitted.
 2                     (Defendant DeLeon's Exhibit No. 38.3 received)
 3                 MR. WESTFALL:  Thank you.
 4                 (Audio played)
 5    BY MR. WESTFALL:
 6    Q.   And so now he's kind of agreed that he retired at the end
 7    of December of '17, right?
 8    A.   Yes, sir.
 9                 MR. WESTFALL:  Your Honor, we will offer 38.4 for all
10    purposes.
11                 MS. MAX:  No objection.
12                 MR. GALLIAN:  No objection.
13                 THE COURT:  It's admitted.
14                     (Defendant DeLeon's Exhibit No. 38.4 received)
15                 (Audio played)
16    BY MR. WESTFALL:
17    Q.   Okay.  Bill just told Joe on the 5th of September 2019,
18    I've got to keep doing her 3x5 cards.  Would you agree that's
19    what he said?
20    A.   Yes, sir.
21    Q.   And would you agree that that is a lie?
22    A.   Yes, sir.
23    Q.   Because he's never had to do her 3x5 cards, has he?
24    A.   True.
25    Q.   The 3x5 cards is a complete sham, right?
```

1    A.   Yes, sir.

2    Q.   But he's telling it to Joe as if Joe isn't in on that

3    little information, isn't he?

4    A.   It would appear so, yes, sir.

5    Q.   And so on the subject of the 3x5 cards, there was a lot

6    more than that.  So here's January 8 of 2016.  Stone is telling

7    Joe, Still working on project's paperwork, which is a lie,

8    right?  Because project didn't have any paperwork.

9    A.   Yes, sir.

10   Q.   Here's Joe sending pictures of 3x5 cards, right?

11   A.   Yes, sir.

12   Q.   And he's sending them to Bill?

13   A.   Yes.

14   Q.   And they're filled out with things that Casi is going to

15   do that day, right?

16   A.   Or has done, yes, sir.

17   Q.   And then Joe was required to send these 3x5 cards to Bill,

18   right?

19   A.   Yes, sir.

20   Q.   Because Bill said he was going to send them to Judge

21   Anderson, right?

22   A.   Yes, sir.

23   Q.   But Judge Anderson didn't exist.

24   A.   Correct.

25   Q.   The 3x5 card requirement was made up.

```
 1   A.   Yes, sir.
 2   Q.   And there was no reason for Casi to be doing 3x5 cards.
 3   A.   Yes, sir.
 4   Q.   And there was no reason for Joe to slavishly send 3x5
 5   cards to Bill, right?
 6   A.   Yeah.  That's true.
 7   Q.   Yet we see a ton of 3x5 cards all the way up till about
 8   July of 2016.  Joe continues to send these cards to Bill
 9   because that was one of Joe's requirements, right?
10   A.   Yes.
11   Q.   March, end of March.
12          We're at the end of March there.  Skip down a little
13   bit.
14          Okay.  We're at the end of April and mid-May, and
15   we're still faithfully sending 3x5 cards to Bill, right?  And
16   we got quite a few of those in our evidence, don't we?
17   A.   Got quite a few where?
18   Q.   These FBI cards -- FBI -- these 3x5 cards, we've got quite
19   a few of those in discovery, don't we?
20   A.   Yes, sir.
21          MR. WESTFALL:  Your Honor, I would like to introduce
22   or move to admit DeLeon 38.5 for all purposes.
23          MS. MAX:  No objection.
24          MR. GALLIAN:  No objection.
25          THE COURT:  Admitted.
```

```
 1              (Defendant's Exhibit No. 38.5 received)
 2              (Audio played)
 3   BY MR. WESTFALL:
 4   Q.   Okay.  So we heard a reference of Avery, and Joe was
 5   telling her the truth, but also -- I mean, Joe obviously, you
 6   know, not spilling any beans to Bill, right?  He's trying to
 7   maintain his cover, and Bill continues to talk, right?
 8   A.   It appears that -- that way so.
 9   Q.   Now, the fact that Bill lied to Joe about his retirement
10   date, isn't that a piece of evidence that was able to be
11   collected for the prosecution of Bill?
12   A.   Are you asking me if --
13   Q.   Yeah.
14   A.   -- Bill told Joe that he retired --
15   Q.   Evidentiary --
16              THE COURT:  Sorry.  Gentlemen, sorry.  One at a time.
17   BY MR. WESTFALL:
18   Q.   Did that have evidentiary value, the fact that Bill is on
19   tape lying about his retirement date?
20   A.   Yes.
21   Q.   And did it have evidentiary value that Bill is on tape
22   lying about 3x5 cards?
23   A.   Yes.
24   Q.   Did it have evidentiary value that Bill is on tape lying
25   about Avery?
```

```
 1    A.   Yes, sir.  The existence of Avery.

 2    Q.   Right.  And Bill says, I pinched Avery, she's real.

 3    A.   Yes, sir.

 4    Q.   Which we know is not true.

 5    A.   Correct.

 6    Q.   Because Avery is a figment of Bill's imagination.

 7    A.   Avery was a character that -- I'm sure we all know Bill

 8    knows is not a real person.

 9    Q.   Okay.  Now, here is pages from 107, I believe, DeLeon 107

10    or DeLeon 108.  It's text messages, the old SMS and MMS between

11    Bill Stone and Joe DeLeon.

12              And there's a conversation in here from back in 2016

13    where apparently Blanca, who also doesn't exist, right?

14    A.   Correct.

15    Q.   Blanca has heard of Topo Chico from Mexico, and she -- she

16    says she wants some and she misses it.  And this is Bill saying

17    this to Joe on August 10 of 2016.

18              And then asks, is it beer?

19              Joe says no, it's a form of mineral water that's made

20    right from down the street from where I was raised in

21    Monterrey, and I believe it's bottled by Coca Cola or --

22    Batteling Company in Mexico.

23              But according to Bill, Blanca wants some.

24              I can ship some up, I will order it through my

25    restaurant and I'll ship it up.
```

 1          And then Avery wants to get in on the action too.
 2   And they're just back and forth.  And he's going to send up
 3   Topo Chico for Avery and Blanca.  And then, of course, any
 4   fiancee stories.
 5          Here's a text message between them in May of 2017,
 6   says, I'm going to send that to Dr. B, I guess a picture of
 7   breakfast.  And then --
 8          THE COURT:  Counsel, if you will do this in the form
 9   of question and answer.
10          MR. WESTFALL:  I will, Your Honor.  Sorry.
11   BY MR. WESTFALL:
12   Q.   And then here is Joe asking Bill to pass a message on to
13   Blanca in March of 2017.  Do you see that?
14   A.   I see the message.
15   Q.   There also was, you know, this story about Dr. B and
16   Dr. S.  And this is, I guess, Casi actually sending a message
17   on -- relaying a message from Dr. B.  So Casi is also giving
18   Joe information about Dr. B as though she believes the same
19   thing he does.  Wouldn't you agree?
20   A.   Yes.  I see that she believes Dr. B is real in this
21   message, and it would appear so.
22          MR. WESTFALL:  Your Honor, at this time we would move
23   to admit DeLeon 38.6.
24          MS. MAX:  No objection.
25          MR. GALLIAN:  No objection.

```
 1                    THE COURT:  Admitted.
 2                         (Defendant DeLeon's Exhibit No. 38.6 received)
 3                    (Audio played)
 4    BY MR. WESTFALL:
 5    Q.   That's pretty dramatic, wasn't it?
 6    A.   Yes, sir.
 7    Q.   And that's on that same call?
 8    A.   Yes, sir.
 9    Q.   And then about, oh, a page or two later --
10                    MR. WESTFALL:  Your Honor, I would like to move to
11    admit DeLeon 38.7 for all purposes.
12                    MS. MAX:  No objection.
13                    MR. GALLIAN:  No objection.
14                    THE COURT:  It's admitted.
15                         (Defendant DeLeon's Exhibit No. 38.7 received)
16                    MR. WESTFALL:  Thank you, Your Honor.
17                    (Audio played)
18    BY MR. WESTFALL:
19    Q.   So he made kind of a speedy recovery there, doesn't it
20    sound like?  Bill has kind of collected himself?
21    A.   Yes, sir.
22    Q.   And then finally Bill gets a call from somebody while he's
23    talking to Joe, doesn't he?
24    A.   Yes, sir.
25                    MR. WESTFALL:  Your Honor, we would like to move the
```

```
 1    admission of 38 -- DeLeon 38.8 for all purposes.
 2              MS. MAX:  No objection.
 3              MR. GALLIAN:  No objection.
 4              THE COURT:  Admitted.
 5                 (Defendant DeLeon's Exhibit No. 38.8 received)
 6              MR. WESTFALL:  Thank you, Your Honor.
 7              THE COURT:  You're welcome.
 8              (Audio played)
 9    BY MR. WESTFALL:
10    Q.   Bill has definitely made a full recovery now, hasn't he?
11    A.   Yes.
12    Q.   And so this is Dr. S, who is supposed to be Dr. B's wife,
13    right?
14    A.   Yes, sir.
15    Q.   Another character from the book?
16    A.   Perhaps.
17    Q.   Another figment of Bill's imagination?
18    A.   Perhaps so.
19    Q.   So on the issue of lies, there are effective lies and
20    there are lies that aren't effective, right?
21    A.   In terms of what?  How --
22    Q.   Whether or not I can make you believe it, right?
23    A.   Yeah.  None of them are good.
24    Q.   Yeah.
25    A.   Some will be believed and some won't.
```

```
 1   Q.   Right.  I'm not talking good like in a moral sense.  I'm
 2   talking effective.
 3            If you and I are in a trust relationship like I'm
 4   your lawyer and I lie to you, you're probably going to stand a
 5   better chance of believing that than if I just walk to you off
 6   the street and said the same thing, wouldn't you agree?
 7   A.   Sure.
 8   Q.   And any other kind of close personal relationship would
 9   have that same effect, wouldn't it?
10   A.   Yeah.  It's all about trust.
11   Q.   Right.  And when we trust people, we assume that they're
12   not going to lie to us, don't we?
13   A.   Yes.
14   Q.   Or at least we hope that?
15   A.   Trust is a choice, not a feeling.
16   Q.   Right.  What does that mean?
17   A.   You choose to trust, and that's what you do when you're
18   having trust in someone.
19   Q.   Right.  Right.
20            And so do you remember that call that you all
21   recovered that -- from June with the fake, you know, Judge
22   Anderson call?
23   A.   You would have to refresh my memory.
24   Q.   When Bill did the spoof call with Judge Anderson and all
25   the characters in the courtroom?
```

```
 1   A.   Yes, sir.
 2   Q.   Kind of does the same thing here too, right?
 3   A.   Yes, sir.
 4            (Audio played)
 5   BY MR. WESTFALL:
 6   Q.   Would you agree with me that that's pretty audacious?
 7   A.   On the part of Mr. Stone?
 8   Q.   Bill.
 9   A.   Yes, sir.
10   Q.   And just -- spent close to ten minutes just pretending to
11   Joe.
12            Now, Joe had already spoken to you by this point
13   obviously, right?
14   A.   Yes, sir.
15   Q.   But he kept it up pretty well, didn't he?
16   A.   Defendant DeLeon or --
17   Q.   Yeah, Joe DeLeon.
18   A.   Yes, sir.
19   Q.   He kept it up good.
20            MR. WESTFALL:  Your Honor, I move to admit 40.1,
21   DeLeon 40.1 for all purposes, please.
22            (Pause)
23            (Off the record discussion between counsel)
24            THE COURT:  Members of the jury, are we doing okay?
25   Does anybody need a break?  Are you sure?
```

```
 1              All right.  Are we okay to the end?
 2              Ma'am, are you okay?  All right.
 3              MS. MAX:  No objection.
 4              MR. GALLIAN:  No objection.
 5              THE COURT:  Admitted.
 6                  (Defendant DeLeon's Exhibit No. 40.1 received)
 7              MR. WESTFALL:  Thank you, Your Honor.
 8              (Audio played)
 9    BY MR. WESTFALL:
10    Q.   So Joe left you handful of voicemails, didn't he?
11    A.   He left three.
12    Q.   And this is in response to one of them, and you're calling
13    him back on September 10th.
14              (Audio played)
15    BY MR. WESTFALL:
16    Q.   So he's now told you that Bill is going to be coming in to
17    get a surgery?
18    A.   Yes, sir.
19    Q.   And he also told you that Bill is in Washington, right?
20    A.   Yes, sir.
21              MR. WESTFALL:  Your Honor, may I approach?
22              THE COURT:  You may.
23              (Pause)
24    BY MR. WESTFALL:
25    Q.   Showing you what's already in evidence as Exhibit 165.
```

1   This is just one page of it.  That call is September 10.

2          Can you find anywhere in that phone record where Bill

3   Stone was in Washington, D.C. on September 10?

4   A.   No, sir.

5          MR. WESTFALL:  Your Honor, we will move to admit

6   DeLeon 40.2.

7          MS. MAX:  No objection.

8          MR. GALLIAN:  No objection.

9          THE COURT:  Admitted.

10             (Defendant's Exhibit No. 40.2 received)

11         (Audio played)

12  BY MR. WESTFALL:

13  Q.   So the 17th is going to be the day that Bill gets his

14  surgery.  17th of September, right?

15  A.   Yes, sir.

16  Q.   And what we heard there from Joe was that at this point on

17  the 10th of September, he has no idea where Bill lives.  In

18  fact, he thinks he lives in Grapevine, right?

19  A.   That's what he said.

20         MR. WESTFALL:  May I approach, Your Honor?

21         THE COURT:  You may.

22         (Pause)

23  BY MR. WESTFALL:

24  Q.   Before -- the day before, on the 16th now of September,

25  you met with Joe at a Starbucks, right?

```
 1   A.   I don't know.
 2   Q.   But you met with Joe the day before the 17th, right?
 3   A.   I may have.
 4   Q.   All right.  Well --
 5             MR. WESTFALL:  Your Honor, I move for the admission
 6   of 42.1 for all purposes, DeLeon.
 7             MS. MAX:  No objection.
 8             MR. GALLIAN:  No objection.
 9             THE COURT:  Admitted.
10             (Defendant DeLeon Exhibit No. 42.1 received)
11             (Audio played)
12   BY MR. WESTFALL:
13   Q.   Okay.  Now, I was incorrect.  That was a telephone call
14   you-all had together, and then you had a meeting at Starbucks
15   after that, so that was actually from the telephone call.
16             And Joe, as of the 16th of September, he's still
17   worried about the phones.  Bill took great pains to make Joe
18   and Casi believe that he could monitor -- his analysts could
19   monitor their phone calls, didn't he?
20   A.   Yeah, I don't -- I definitely know that he went a great
21   distance to cover the scheme and deception.
22   Q.   Yeah.
23             42.2, from the same phone call --
24             MR. WESTFALL:  Your Honor, we move to admit DeLeon
25   42.2 for all purposes, please.
```

```
 1              MS. MAX:  No objection.
 2              MR. GALLIAN:  No objection.
 3                  (Defendant DeLeon's Exhibit No. 42.2 received)
 4              THE COURT:  Admitted.
 5              (Audio played)
 6  BY MR. WESTFALL:
 7  Q.   So these characters that Bill has made up, he -- he killed
 8  off Dr. B, right?
 9  A.   Yes, sir.
10  Q.   Dr. B died of a heart attack?
11  A.   Yes, sir.
12  Q.   And that's the one where the fake funeral pictures were
13  sent, and it is kind of the beginning of his unravelling,
14  wasn't it?
15  A.   Yes, sir.
16  Q.   And then poor Avery has had lots of health issues, hasn't
17  she?
18  A.   Yes, sir.
19  Q.   And you met with Joe at the Starbucks, and then the next
20  day -- and y'all talked exactly about how this undercover wired
21  phone call was going to work, right?
22  A.   I gave him guidelines.
23  Q.   Okay.  And you had the equipment?
24  A.   Yes, sir.
25  Q.   And what was it, a microphone in a cigarette box?
```

```
 1   A.   Yes, sir.

 2   Q.   Tell -- please tell the jury how that works.

 3   A.   It's just a very small device.  It's -- it can be hidden

 4   in a cigarette carton.  Since Joe DeLeon was a smoker, that's a

 5   wise place for us to put that, because the likelihood of

 6   Defendant Stone trying to remove or check the cigarette carton

 7   would be unlikely, so we put it there.  And essentially it

 8   records and captures what is being said, and I can also monitor

 9   what is happening during that recording.

10   Q.   Now, we're talking about a former FBI agent that we know

11   has guns, right?

12   A.   Yes, sir.

13   Q.   So whenever somebody is cooperating or snitching or

14   whatever you call it, there's always a possibility of some

15   danger, right?

16   A.   Yes, sir.

17   Q.   So with that in mind, did you actually follow Joe and

18   surveil him the whole time he was riding along with Bill?

19   A.   Yes, sir.

20   Q.   And you met Joe after Bill was in the hospital?

21   A.   Yes, sir.

22   Q.   And you-all went to a little nearby restaurant and talked

23   for a bit?

24   A.   Yes, sir.

25   Q.   And then -- anyway, then he took him home later on that
```

```
 1  day?
 2  A.   He drove himself home.
 3  Q.   Oh, he drove himself home?
 4  A.   Yes, sir.
 5  Q.   We're talking about Bill drove himself home?
 6  A.   Defendant DeLeon drove Bill Stone -- Defendant Stone back
 7  together.
 8  Q.   Okay.  But you said he drove himself.  It sounded like --
 9  A.   So Defendant DeLeon picked up Defendant Stone, went to the
10  hospital, the surgery was had, and then after all that was
11  finished --
12  Q.   Correct.
13  A.   -- Defendant DeLeon, your client, picked up Defendant
14  Stone and drove him back home.
15  Q.   Okay.  On the morning of the 17th, Joe leaves you a
16  voicemail, right?
17  A.   Yes, sir.
18          MR. WESTFALL:  Your Honor, we move to admit Exhibit
19  45 for all purposes, DeLeon Exhibit 45.
20          MS. MAX:  No objection.
21          MR. GALLIAN:  No objection.
22          THE COURT:  It's admitted.
23              (Defendant DeLeon's Exhibit No. 45 received)
24          THE COURT:  Members of the jury, how are we doing?
25  Is everybody okay?  Anybody need a break?  Okay.  All right.
```

```
 1   Keep trucking.
 2           (Audio played)
 3   BY MR. WESTFALL:
 4   Q.   And, in fact, he didn't send him the address until he was
 5   either on his way or just about to be on his way; isn't that
 6   true?
 7   A.   I don't remember the timing of when the address was sent.
 8   Q.   Right.  But it was very late.  It was like Joe didn't
 9   already know it?
10   A.   I just don't remember when that address was sent.
11   Q.   Okay.
12           MR. WESTFALL:  Your Honor --
13   BY MR. WESTFALL:
14   Q.   Well, there was a recording made, right?
15   A.   Yes, sir.
16   Q.   And it was a long recording?
17   A.   Yes, sir.
18           MR. WESTFALL:  And that's already in the record, Your
19   Honor, as DeLeon 72.  We would move for the admission of DeLeon
20   72.1 for all purposes.
21           MS. MAX:  No objection.
22           MR. GALLIAN:  No objection, Your Honor.
23           THE COURT:  It's admitted.
24              (Defendant DeLeon's Exhibit No. 72.1 received)
25              (Audio played)
```

```
 1 | BY MR. WESTFALL:
 2 | Q.   So he's doing the opposite of admitting that he stole all
 3 | that stuff from Casi, isn't he?  I'm talking about Bill.
 4 | A.   He's saying that she bought these various items.
 5 | Q.   And he's -- he is -- he's actually saying that he didn't
 6 | get any of it.
 7 |          I never got any of it, the Rolex watch, the laptop,
 8 | the money for reservations.
 9 |          He's saying he didn't get any of it, isn't he?
10 | A.   I heard that, yes, sir.
11 | Q.   And he's saying that to Joe, right?
12 | A.   Yes, sir.
13 | Q.   There's no reason to believe that Bill knew he was being
14 | recorded, is there?
15 | A.   I would disagree with that.
16 | Q.   You wouldn't disagree?
17 | A.   I said I would disagree.
18 | Q.   Okay.  Then let's go to 72.2.
19 |          MR. WESTFALL:  Your Honor, we would move for
20 | admission of DeLeon 72.2 for all purposes.
21 |          MS. MAX:  No objection.
22 |          MR. GALLIAN:  No objection.
23 |          THE COURT:  Admitted.
24 |          (Defendant DeLeon's Exhibit No. 72.2 received)
25 |          THE COURT:  Members of the jury, are we doing okay?
```

```
 1            Okay.  Can you turn it down a little bit.  It's kind
 2   of blasting.
 3            MR. WESTFALL:  I --
 4            THE COURT:  Just a touch, please.
 5            Is it loud for you guys too?
 6            MR. WESTFALL:  Is everything okay?
 7            THE COURT:  If it's not too loud for you guys, I'll
 8   leave it as it is.  Can you - is it too loud?  No?
 9            Okay.  You can leave it as it is.  My ears can blast.
10   I'm good.
11            MR. WESTFALL:  I actually am trying to adjust it, and
12   every once in a while I hit a wrong button.
13            THE COURT:  That's okay.  You're doing better than
14   me.
15            (Audio played)
16   BY MR. WESTFALL:
17   Q.   So I really miss Dr. B, just miss him calling me, and oh,
18   man, I imagine why is this guy walking.  Have you talked to his
19   wife lately?
20            Bill:  I talked to her yesterday.  She was asking
21   about Avery.
22            So this is in the same wire recorded conversation,
23   right?
24   A.   Yes, sir.
25   Q.   And now we have Bill just shooting at about how he misses
```

Todd Anderson, RMR, CRR       (214) 753-2170

```
 1   Dr. B, right?
 2   A.   Yes, sir.
 3   Q.   Which is totally deceptive, right?
 4   A.   Yes, sir.
 5   Q.   And then saying that he talked to Dr. S yesterday.
 6   Deception, right?
 7   A.   Yes, sir.
 8   Q.   Saying she was asking about Avery.  Deception, right?
 9   A.   Yes, sir.
10   Q.   Are you impressed with the rich detail that his stories
11   have?
12   A.   I wouldn't say I'm impressed.  I would say it's bizarre.
13            (Audio played)
14            MR. WESTFALL:  Your Honor, we move for admission of
15   72.3, DeLeon 72.3 for all purposes.
16            MS. MAX:  No objection.
17            MR. GALLIAN:  No objection.
18            THE COURT:  Admitted.
19                (Defendant DeLeon's Exhibit No. 72.3 received)
20            (Audio played)
21   BY MR. WESTFALL:
22   Q.   Is Bill telling Joe what's going to happen to him if Casi
23   gets her cover blown?  Isn't that what he's saying?
24   A.   Yes, sir.
25   Q.   Now, he mentioned that he was going to go to Austin that
```

```
 1   week.
 2            MR. WESTFALL:  May I approach, Your Honor?
 3            THE COURT:  Yes.
 4            (Pause)
 5   BY MR. WESTFALL:
 6   Q.   Another page from telephone records.  So that was the --
 7   17th was a Tuesday, so the 20th is Friday.  Did he go to Austin
 8   on Friday?
 9   A.   No, sir.
10   Q.   This is another page from Stone and DeLeon SMS, which
11   would be 107.
12            Here we go.  On -- on 12-21 of 2016, this is Joe
13   telling S.A. Stone to have a safe flight, right?
14   A.   Yes, sir.
15   Q.   Another page from Stone 165.
16            You look all up and down this from the origination
17   standpoint, and that entire week he never leaves the DFW
18   Metroplex basically, right?
19   A.   That's correct, sir.
20   Q.   On 12-28 of 2015, Joe is asking him, How is everything in
21   New York.
22            On 12-28, according to his phone records, never went
23   to New York, did he?
24   A.   That's correct, sir.
25   Q.   Joe is obviously under the impression that Stone is in
```

1    Washington on February 24th of 2016.  But on February 24th of
2    2016, do his phone records actually tell a different story?
3    A.   Yes, sir.
4    Q.   This is on March 3rd of 2016.  And Joe tells Stone, I also
5    told her that you were still going to Austin on March 3rd of
6    2016.
7            And, in fact, on March 4th of 2016, Joe -- or Bill is
8    telling Joe, I'm on the plane waiting to leave.  Any project
9    stories before I leave?
10           And then on the 4th, I just landed.  Any project
11   stories?  Just in case something might have come up during that
12   hour that he was in the air to Austin, right?
13           Still taxiing to the terminal, 3-4-2016.
14           But here is three -- 3-3 and 3-4 of 2016, and he
15   never leaves the Metroplex, right?
16   A.   Yes, sir.  That's correct.
17   Q.   6-13 of 2016 -- or 3-10-2016, rather, especially right now
18   that her other man is out of town in Washington, any project
19   stories?
20           He's not out of town in Washington, right?
21   A.   Correct.
22   Q.   Here is another Austin.  I waited on your phone call when
23   you landed in Austin, never heard from you, 3-25.
24           And Bill says, I landed early a.m., didn't want to
25   wake you up, 3-25.

 1              But he never did go to Austin, did he?

 2     A.    That's correct.

 3     Q.    Now, this is actually from 2019.  June 13 of 2019.  And

 4     Joe asks him, Did you make it to Washington okay yesterday?

 5     June 11, 2019.

 6              And Stone says, Yes, dealing with a lot of B.S.

 7     already!

 8              June 11, Stone is actually with Casi in Key Largo,

 9     Florida, right?

10     A.    He's in Florida.

11              THE COURT:  Pause you there for just a moment,

12     counsel.

13              Are you all good to truck on for another ten minutes?

14              Okay.

15     BY MR. WESTFALL:

16     Q.    So at this time, Bill had two phones, right?  He had a 212

17     area code phone?

18     A.    Yes, sir.

19     Q.    And a 202 -- yeah.

20              And the 214 area code phone.

21              And so here is another June 14th call, 6:55 p.m., and

22     this is one from Key West.  And we know that he and Casi went

23     to Key West, right?

24     A.    Yes, sir.

25     Q.    So lying about locations was not something that just

1    started on that wire, you know, surveillance conversation,

2    right?

3    A.    True.

4    Q.    Now, while -- while -- while Stone was in the hospital,

5    you and Joe sat down over at the Neighborhood Grille for a

6    minute and talked, right?

7    A.    Yes, sir.

8    Q.    And are you familiar with the -- the Special Agent Nils

9    Hubert sending a text message to Joe saying that, you know,

10   that Stone retired several months ago?

11   A.    Yes, sir, I am.

12   Q.    Now, this is from the same text messages between Stone and

13   DeLeon.  And here's the -- 8-10-2016 at 1:53 p.m.  Did you know

14   that Bill Stone retired a number of months ago, right?

15   A.    Yes, sir.

16   Q.    This was at 1:56:35.  1:56:35.  This previous one was at

17   1:53.  So three minutes before, correct?

18   A.    Yes, sir.

19   Q.    So Joe sends this message to Bill at 1:56 p.m.

20          1:57 p.m., Bill calls him and is on the phone with

21   him for 46 minutes.  Isn't that true?

22   A.    Yes, sir.

23          MR. WESTFALL:  Your Honor, we move for the admission

24   of DeLeon 80.1 for all purposes.

25          MS. MAX:  No objection.

```
 1              MR. GALLIAN:  No objection.
 2              THE COURT:  Admitted.
 3                  (Defendant DeLeon's Exhibit No. 80.1 received)
 4              (Audio played)
 5  BY MR. WESTFALL:
 6  Q.   Once again, context.  Do you know that after Joe or maybe
 7  even while Joe was still kind of on the scene that Bill was
 8  saying bad things to Casi about Joe behind Joe's back?
 9  A.   I'm sorry, repeat that question, please.
10  Q.   Yeah.  Do you know that Bill was running Joe down to Casi?
11  A.   No, I don't know that.
12  Q.   Saying bad things behind Joe's back to Casi?
13  A.   It's possible.
14              THE COURT:  I'm sorry.  One at a time, please,
15  gentlemen.
16  BY MR. WESTFALL:
17  Q.   Playing -- playing people off against each other is an old
18  manipulator trick, isn't it?
19  A.   Playing people off against each other is an old
20  manipulator trick?  Can you explain further what you mean?
21  Q.   Keeping people at a distance from each other, people that
22  you're trying to use.
23              Do you know what a manipulator is?
24  A.   I think isolating from another person is maybe what you
25  are getting at is manipulative.
```

```
 1   Q.   Yeah.  And not just isolating, but you're right, I'm
 2   saying if I start trying to build dissension between you and
 3   one of these prosecutors here, I can go to the prosecutor and
 4   say, Well, did you know, you know -- and I can go to you and
 5   say, Well, did you know.
 6             I mean, that is something that people will do from
 7   time to time, right?
 8   A.   Yeah.  That's building division.
 9   Q.   Building division.  Right.
10             And Bill is telling Joe to stay away from all FBI
11   agents?
12   A.   Yes, he was.
13             MR. WESTFALL:  My next thing to do, Your Honor, is to
14   play a recording that is eight minutes and 31 seconds long.  Go
15   for it?
16             THE COURT:  Let's go ahead and take our break.
17             MR. WESTFALL:  Okay.
18             SECURITY OFFICER:  All rise for the jury.
19             (Jury out)
20             THE COURT:  And, Ranger, would you tell me your last
21   name again?
22             THE WITNESS:  Yes.  Briley, B-R-I-L-E-Y.
23             THE COURT:  Ranger Briley, please feel free to step
24   down.
25             Thank you, sir.
```

     1          All right.  Anything we need to take up before our

     2   break?

     3          MR. WESTFALL:  No, Your Honor.

     4          MR. GALLIAN:  Yes, Your Honor.

     5          THE COURT:  Yes?

     6          Please be seated everyone.

     7          MR. GALLIAN:  So this is a much calmer Gregg than I

     8   was last week, but something that just got mentioned in one of

     9   the recordings -- I don't think it's a big deal, I just want to

    10   make sure we're all on the same page.

    11          One of the individuals -- and I also think that

    12   jumping up when it happens brings more attention to it than

    13   anything, so that is why I didn't.

    14          THE COURT:  Sure.

    15          MR. GALLIAN:  Anna Moreno is one of the 404(b)

    16   witnesses that were excluded -- Adrianna Moreno.  Evidence

    17   would show she is referred to by Joe and Bill as Twiggy.

    18          THE COURT:  Twiggy.  All right.

    19          MR. GALLIAN:  Twiggy's name was mentioned in that

    20   last recording.

    21          THE COURT:  Okay.

    22          MR. GALLIAN:  I don't think anyone is going to take

    23   anything from it whatsoever.  I just want to make sure that

    24   we're all on the same page, that no doors have been opened, and

    25   we're all aware that we're good.  So, again, just bringing the

```
 1    Court's attention to it so that you know.
 2              THE COURT:  I appreciate that.  If everybody would
 3    just kind of check going forward -- definitely no doors are
 4    opened by that, but if -- I know we don't have expensive
 5    technology here where you can edit out words, but as much as we
 6    can, let's try to keep any recordings mentioning people.  We
 7    don't want to pop up like whack-a-mole for the jury.
 8              MR. WESTFALL:  We will do, Your Honor.
 9              THE COURT:  But I appreciate you calling that to my
10    attention, counsel.  No doors have been opened.
11              Yes, ma'am?
12              MS. MAX:  Can I actually ask Gregg one quick
13    question?
14              THE COURT:  Of course you may.
15              MS. MAX:  Because I may have a follow-up on that same
16    note.
17              (Discussion off the record between counsel)
18              MS. MAX:  We're good, Your Honor.
19              THE COURT:  Okay.  Everybody on the same page?
20              So just be cautious.
21              MR. WESTFALL:  I just have got to say, I recognize
22    Twiggy, and of course I recognize Anna Moreno.  I had no idea
23    they were the same person.
24              THE COURT:  Gotcha.
25              Well, I know everybody here is an officer of the
```

```
 1    court acting in good faith.  I know all of you guys.  You're
 2    all rock stars, so we're good.
 3              Okay.  But I appreciate you calling it to my --
 4              MR. GALLIAN:  Sure.
 5              THE COURT:  And I agree with you.  I think the last
 6    thing you want to do is flag.
 7              MR. GALLIAN:  Yes.
 8              THE COURT:  So -- all right.  Anything else we need
 9    to take up before we have our recess?
10              Okay.
11              MR. GALLIAN:  No, Your Honor.
12              THE COURT:  All right.  Court is in recess.
13              We'll see you back in a few.
14              SECURITY OFFICER:  All rise.
15              MS. RUDOFF:  What time, Your Honor?
16              THE COURT:  Oh, let's give you -- let's give you a
17    proper 30 minutes.  Does that sound good?
18              MR. GALLIAN:  Sounds great.
19              THE COURT:  All right.  I'll come back a couple
20    minutes early.
21              (Recess)
22              THE COURT:  Anything we need to take up before we
23    bring the jury back in?  Once, twice, three times.
24              Actually, don't be seated.
25              (Pause)
```

```
 1              SECURITY OFFICER:  All rise for the jury.
 2              (Jury in)
 3              SECURITY OFFICER:  Be seated.
 4              THE COURT:  Your witness, sir.
 5              MR. WESTFALL:  Thank you, Your Honor.
 6  BY MR. WESTFALL:
 7  Q.   Ranger Briley, on April 23rd of 2020 at 3:22 p.m. you sent
 8  Marcus Busch here, the prosecutor at the end, an e-mail, didn't
 9  you?
10  A.   I can verify if I did, but I sent him many e-mails.  I
11  don't remember the dates of all those e-mails.
12              MR. WESTFALL:  May I approach, Your Honor?  May I
13  approach?
14              THE COURT:  You may.
15              (Pause)
16  A.   Okay.  Yes, sir.
17  Q.   Are you familiar with it?
18  A.   Not familiar with it.  I would have to read it all, but --
19  Q.   Go ahead and do that.
20  A.   Okay.
21              (Pause)
22  A.   Okay.  Yes, sir.
23              MR. WESTFALL:  May I approach again, Your Honor?
24              THE COURT:  You may.
25  A.   Yes, sir.
```

1   BY MR. WESTFALL:

2   Q.   And in this April 23rd of 2020 e-mail, did you tell

3   Marcus, I found upon S.A. Stone's retirement from the FBI he

4   continued to deceive Thompson and others (DeLeon and Thompson)

5   through the same scheme and conduct and claims to be working

6   for, quote, the agency or Central Intelligence Agency where

7   S.A. Stone has the same law enforcement connections and

8   capabilities to influence Judge Anderson?

9   A.   Yes, sir.  Correct.

10  Q.   And did you also tell Marcus that covertly investigating

11  Bill Stone since July 2019, I have found Bill purposefully

12  deceived Thompson and DeLeon and extorted money from them based

13  upon a false pretense?

14  A.   Yes, sir.

15  Q.   And that was April 23, 2020?

16  A.   That's correct.

17  Q.   And then in May of 2020, you started using him again or, I

18  guess, Brian Luley did?

19  A.   Yes, sir.

20  Q.   But you were there for several of these covered calls,

21  right?

22  A.   Yes, sir.

23        MR. WESTFALL:  Your Honor, I would like to move for

24  admission for all purposes DeLeon 110.1.

25        MS. MAX:  No objection.

```
 1              MR. GALLIAN:  No objection.

 2              THE COURT:  Admitted.

 3                   (Defendant DeLeon's Exhibit No. 110.1 received)

 4   BY MR. WESTFALL:

 5   Q.   Okay.  May 7, 2020, you were with Brian Luley and Ivan

 6   Martinez, and you-all covered a call from Joe DeLeon to William

 7   Stone, right?

 8   A.   Yes, sir.

 9                   (Audio played)

10   BY MR. WESTFALL:

11   Q.   Another imaginary character, Lindsey?

12   A.   Yes, sir.

13                   (Audio played)

14   BY MR. WESTFALL:

15   Q.   So this was a change of strategy for y'all's use of Joe,

16   right?

17   A.   Yes, sir.

18   Q.   And, you know, beginning today you had him go ahead and

19   tell Joe that agents were talking to him.

20   A.   On that particular call, yes, sir.  That's correct.

21                   (Audio played)

22   BY MR. WESTFALL:

23   Q.   Okay.  So Stone just tells Joe that Casi was a CI, right?

24   A.   Yes, sir.

25   Q.   Which is, you know, something that Joe has mentioned many
```

```
1    times in text messages and mentioned with Casi, although Casi
2    denies it, but Joe obviously believes it, right?
3    A.   Joe says that he believes it in those messages.  It would
4    indicate so, yes, sir.
5    Q.   And here is Stone reinforcing that, true?
6    A.   Yes.
7             (Audio played)
8    BY MR. WESTFALL:
9    Q.   So he just says to him, Well, you don't know anything
10   about it.  It's done.
11            That's one way of telling somebody to shut your
12   mouth, right?
13   A.   I would agree with that.
14            (Audio played)
15   BY MR. WESTFALL:
16   Q.   So would you agree with me that this call has evidentiary
17   value in a prosecution against Bill Stone?
18   A.   Yes, sir.
19   Q.   Now, on May 11, four days later, there was another call
20   from Joe to Bill Stone, true?
21   A.   I had -- I don't know the timing --
22   Q.   Assuming that I have the date right?
23            THE COURT:  I'm sorry, gentlemen.  If you will --
24            MR. WESTFALL:  I'm sorry.
25            THE COURT:  Give him a chance to answer, please.
```

```
 1   BY MR. WESTFALL:
 2   Q.   Okay.  Let's assume that I have the date right, May 11,
 3   2020.  You know there was another call, though, right?
 4   A.   Yes, sir.
 5            MR. WESTFALL:  Your Honor, at this time we would move
 6   for admission for all purposes of DeLeon 112.1.  It is a
 7   portion of a call made May 11, 2020, from -- from Joe DeLeon to
 8   Bill Stone and monitored by Ranger Briley and Brian Luley --
 9   Special Agent Luley.
10            MS. MAX:  No objection.
11            MR. GALLIAN:  No objection.
12            THE COURT:  Admitted.
13                (Defendant DeLeon's Exhibit No. 112.2 received)
14            (Audio played)
15   BY MR. WESTFALL:
16   Q.   Certainly have gotten inside of Bill's head, haven't
17   you-all?
18   A.   Inside of his head?  What was the last part?  I'm sorry, I
19   didn't hear it.
20   Q.   That you-all have certainly gotten inside of Bill's head
21   at this point?
22   A.   I would say so.
23   Q.   He is very nervous, wouldn't you agree?
24   A.   He has a problem on his hands now.
25   Q.   And that's some evidence of guilt, true?
```

```
 1   A.   Yes, sir.
 2   Q.   And so -- so this conversation here has some evidentiary
 3   value in a prosecution against Bill?
 4   A.   Yes, sir.
 5   Q.   Now, on May 12, which was the next day, y'all -- y'all had
 6   Joe make another call?
 7   A.   Yes, sir.
 8            MR. WESTFALL:  Your Honor, may I approach?
 9            THE COURT:  You may.
10            (Pause)
11   BY MR. WESTFALL:
12   Q.   I just want you to see the top two pages.
13   A.   Sure.
14            (Pause)
15   A.   Okay.
16   Q.   That's probably the more fair way to do it rather than you
17   take my word for it.  But May 12th, certainly, y'all did
18   another call, right?
19   A.   Yes, sir.
20   Q.   Nothing in the world makes you look guiltier than trying
21   to destroy evidence, right?
22   A.   Yes, sir.
23            MR. WESTFALL:  Your Honor, we move for admission of
24   all purposes DeLeon 114.1, please.
25            THE COURT:  Any objection?
```

```
 1              MS. MAX:  No objection.

 2              MR. GALLIAN:  No objection.

 3              THE COURT:  Admitted.

 4                  (Defendant DeLeon's Exhibit No. 114.1 received)

 5              (Audio played)

 6  BY MR. WESTFALL:

 7  Q.   Now, that sounds shady, doesn't it?

 8  A.   Yes, sir.

 9              (Audio played)

10  BY MR. WESTFALL:

11  Q.   Bill was still trying to convince him, isn't he?

12  A.   It appears so, yes, sir.

13  Q.   I would like to go back to a document, and it's the same

14  one that we spoke about earlier where Bill is asking Joe how

15  much time can he commit.  Do you remember that, we were talking

16  about that?

17  A.   Yes, sir.

18  Q.   A little bit further in this document, once they're done

19  talking about that, you can see Joe asked, How are things

20  going?

21              You have noticed these text messages are sometimes

22  not absolutely in chronological order.

23              And then the response is:  Not well at all.

24              We go to the next page -- this is the same page -- I

25  plan on going back to Casi's house.  She needs support today.
```

1            Bill says, No, just stay with her.  Don't have an
2       answer to give you yet...
3            Do I need to stay with her and place her in custody?
4            And there's a No, just stay with her.
5            Okay.  I will turn around and head back right now.
6            No, check on your mother, do your errands.  When I
7       leave here, I'll go to project's house and meet with both of
8       you.  Should be around 5:00 p.m.
9            THE COURT:  Counsel, if you're going to read that,
10      you'll need to slow down for my court reporter, please.
11           MR. WESTFALL:  Okay.
12      BY MR. WESTFALL:
13      Q.   Bill says, No, check on your mother, do your errands.
14      When I leave here, I'll go to project's house and meet with
15      both of you.  Should be around 5:00 p.m.
16           And yes -- yes, she needs to be there with you.
17           And then he asks, How is she doing?
18           And Joe's response is:  She is a nervous wreck.
19           Now, we know that Bill would suddenly get a plan,
20      like, for instance, that time that he came and told her she was
21      going to do 50 years and Joe threw up out by the gate.  We have
22      seen those stories in the texts.  She's actually related that,
23      right?
24           Doesn't this look like he's got some plan to come in
25      and terrorize her?

```
 1   A.    Defendant Stone, it looks like to me he has a plan to meet
 2   with both of them.
 3   Q.    Okay.
 4   A.    That's all I can --
 5   Q.    One way or the other, she's a nervous wreck --
 6              THE COURT:  I'm sorry, please let him finish the
 7   question.  Let him finish the answer.
 8              MR. WESTFALL:  I'm sorry.
 9              THE COURT:  Just slow down, please.
10   A.    I was just going to say that's all I could deduce from all
11   that.
12   Q.    Right.  But she is a nervous wreck?
13   A.    That's what's stated.
14   Q.    Now, on the other hand, all through these records going
15   all the way back to before this whole thing ever even began,
16   all the way back to as early as Joe and Casi kind of meeting in
17   the early 2000s, he's always encouraged her, hasn't he?
18   A.    I can't tell you about those early in 2000 messages.
19   Q.    Right.
20   A.    It may be possible.  It may not.  I don't know.
21              THE COURT:  May I see the lawyers over here for just
22   a moment?
23              MR. WESTFALL:  Yes, Your Honor.
24              (Bench Conference held off the record)
25              THE COURT:  Take your time, counsel.
```

```
 1              MR. WESTFALL:  Thank you, Your Honor.
 2   BY MR. WESTFALL:
 3   Q.   So this is kind of what I'm talking about, January 10 of
 4   2016.  We knew this was coming, you'll be fine.
 5              Talking about school.
 6              Take a deep breath, keep going forward.
 7              And these -- and in looking through these text
 8   messages, you've seen a lot of messages like this from Joe to
 9   Casi, haven't you?
10   A.   I have not, sir.
11   Q.   Okay.  That's fine.  That's fine.
12              Here's -- I'm about to take a final.  Wish me luck.
13              I'm sending you all the luck in the world I can.
14              You're going to be fine.
15              Thank you.
16              You are so welcome.  You're going to do fantastic.
17              Made a 90."
18              Wow, congratulations, girl.  Keep up the good work.
19   I'm sure you can see light at the end of the tunnel.
20              I made a 97 on my exam."
21              Wow.  Congratulations.  There's you another A.  Yea!!
22              You're going to do fine on moving day.
23              And so, you know, sends a picture of her dog to Joe
24   and, I made a 97 on my quiz, 100 on my assessment.
25              Congratulations, that is awesome.
```

```
1              And the truth is that Joe and Casi talked to each
2    other very differently than Bill and Casi, true?
3              THE COURT:  Do you mind punching your lapel button?
4              MR. WESTFALL:  I'm so sorry.  It shows to be on.
5              THE COURT:  Is it okay?  Can you hear it, Todd?
6    We're good.
7    BY MR. WESTFALL:
8    Q.   Isn't that true?
9    A.   How differently do you -- are you asking me?
10   Q.   Well, I mean, Casi characterized it as Bill was
11   authoritative, but I think he was very authoritarian, and Joe
12   was -- they were like friends.  Didn't it seem that way?
13   A.   I would characterize it as that way.  She was unsure of
14   Joe in my investigation, but I would characterize the
15   authoritarian perspective of hers as accurate.
16   Q.   All right.  And then this is my last thing I want to do.
17             THE COURT:  Members of the jury, can you hear okay?
18   All right.
19   BY MR. WESTFALL:
20   Q.   So Casi made a total of four recorded phone calls with
21   Joe, right?
22   A.   I don't know the total.
23   Q.   All right.  So she had one on the 3rd of September.
24   A.   (Indicating in the affirmative)
25   Q.   That was two days before you met with Joe.
```

1   A.    (Indicating in the affirmative)

2   Q.    And then she had one on the 12th of September, several

3   days after you met with Joe.

4         And then on the 27th and the 28th, she had boom,

5   boom, back-to-back calls with him that she recorded.  True?

6   A.    Yes, sir.

7         MR. WESTFALL:  Your Honor, we would like to offer for

8   all purposes DeLeon Exhibit 29.

9         MS. MAX:  No objection.

10        MR. GALLIAN:  No objection.

11        THE COURT:  It's admitted.

12            (Defendant DeLeon's Exhibit No. 29 received)

13        MR. WESTFALL:  Thank you, Your Honor.

14        THE COURT:  You're welcome.

15            (Audio played)

16   BY MR. WESTFALL:

17   Q.    And did you ever tell Casi that Joe was cooperating?

18   A.    No, sir.

19   Q.    And you never told Joe that Casi was cooperating?

20   A.    Let me clarify that.  I told her during the investigation

21   at some point I had made contact with Joe.

22   Q.    Okay.

23   A.    But I did not tell her that I was conducting controlled

24   calls and that he was being utilized in the investigation.

25   Q.    Okay.  And so for all intents and purposes, neither one of

 1   these people know that the other one is cooperating?

 2   A.   Correct.

 3          (Audio played)

 4   BY MR. WESTFALL:

 5   Q.   We probably don't even need to rifle through the Verizon

 6   records to see if he was actually somewhere else, do we?

 7   A.   I would agree with that.

 8          MR. WESTFALL:  Your Honor, we move to admit

 9   exhibit -- DeLeon Exhibit 30.1 for all purposes.

10          MS. MAX:  No objection.

11          MR. GALLIAN:  No objection.

12          THE COURT:  Admitted.

13            (Defendant DeLeon's Exhibit No. 30.1 received)

14          MR. WESTFALL:  Thank you, Your Honor.

15          (Audio played)

16   BY MR. WESTFALL:

17   Q.   This is the call on the 28th, the last call they did

18   together, okay?

19   A.   Okay.  Thank you.

20          (Audio played)

21          MR. WESTFALL:  Now, Your Honor, the last thing I

22   would like to -- I think if it's not already in evidence, we

23   would offer Government's 67 for all purposes.

24          MS. MAX:  It's in.

25          MR. WESTFALL:  It's in?

```
 1                    MS. MAX:  Uh-huh.
 2                    MR. WESTFALL:  Then, Your Honor, request permission
 3      to publish Government's Exhibit 67.
 4                    (Audio played)
 5                    THE COURT:  Can we pause it a moment?  How much
 6      longer do we have?
 7                    MR. WESTFALL:  I'm going to be sitting down in three
 8      minutes, Your Honor.
 9                    THE COURT:  All right.
10                    (Audio played)
11      BY MR. WESTFALL:
12      Q.   In all of the conversations between Casi and Joe, she
13      never once even asks him about a truck or money, true?
14      A.   I don't remember her asking him about the truck.  And as
15      far as money, money was mentioned, but asking him about money
16      from him that he may have gained in this --
17      Q.   Right.
18      A.   -- I don't recall that ever being questioned.
19      Q.   Yeah, what's she told him was, Yeah, I wasn't allowed to
20      tell you about the financial part.  That was in the second
21      call, right?
22      A.   Yes, sir.  That is correct.
23      Q.   And in your dealing with her, the thing that she's been
24      primarily upset about is because she knows that Joe -- she
25      didn't tell Joe that Bill had told her to give him the truck,
```

```
 1   right?
 2   A.   What she is upset about is this entire --
 3           MS. MAX:  Objection, calls for speculation.
 4           THE COURT:  Sustained.
 5   BY MR. WESTFALL:
 6   Q.   She is upset that Joe accepted the truck.  She thinks he
 7   shouldn't have done that; isn't that true?
 8           MS. MAX:  Objection, calls for speculation.
 9           THE COURT:  Sustained.
10           Let's move on.
11   BY MR. WESTFALL:
12   Q.   Well, I mean, have you been in a meeting with her, more
13   than one occasion, where she says Joe should not have accepted
14   that truck?
15   A.   I don't recall hearing that, no, sir.
16   Q.   Okay.
17           MR. WESTFALL:  Your Honor, I'll pass the witness.
18           THE COURT:  All right.  Let's take a break.
19           Members of the jury, thank you so much for your time
20   and attention.
21           We will take us a half-hour break.
22           Come back at 12:05.
23           We appreciate you.
24           All rise for the jury.
25           (Jury out)
```

```
 1              THE COURT:  All right.  Anything we need to take up
 2     before we take our break?
 3              All right.  Court is in recess.  Feel free to stay
 4     here.
 5              Members of the gallery, you're not allowed to eat,
 6     chew gum, nothing, but everybody above the bar certainly can.
 7              So I'll come back a couple minutes early.  And thank
 8     you, guys.
 9              MS. RUDOFF:  Thank you, Your Honor.
10              THE COURT:  Thank you.
11              SECURITY OFFICER:  All rise.
12              (Recess)
13              THE COURT:  How is everybody doing?  Good?
14              MR. BUSCH:  Your Honor, I didn't realize the Court
15     wanted our edits to the charge by noon today.  I apologize for
16     the --
17              THE COURT:  Oh, that's okay.  If we need a little
18     extra time, that's okay.
19              MR. BUSCH:  We're working on it.
20              THE COURT:  Okay.  Sounds good.  Not a problem.  Not
21     a problem.  Y'all are fighting wars on all fronts.
22              MR. BUSCH:  We apologize.
23              THE COURT:  Oh, no, no, no.  Not a problem.  You guys
24     have got lots going on.
25              MR. GALLIAN:  Judge, I have got to go grab my client.
```

```
 1              THE COURT:  Okay.  Certainly.
 2              (Pause)
 3              SECURITY OFFICER:  All rise for the jury.
 4              (Jury in)
 5              THE COURT:  Everybody please be seated.
 6              Members of the jury, if anybody feels ill or needs a
 7    break, please let me know.  I'll try to look over at you, but
 8    you feel free to tell me if you need something.
 9              And with that said, Ms. Max, your witness.
10              MS. MAX:  Thank you, Your Honor.
11                      REDIRECT EXAMINATION
12    BY MS. MAX:
13    Q.   Ranger Briley, what was the date that you first met with
14    Casi Thompson?
15    A.   July 29, 2019.
16    Q.   I have there in front of you a transcript of that meeting
17    with her.  I would like to direct your attention to page 2 and
18    to page 38.
19    A.   Okay.
20    Q.   How did Casi identify Stone's employment the first time
21    you met with her?
22    A.   The first time I met with her, she identified -- her
23    employment?
24    Q.   Stone's employment.
25    A.   His employment.  As working for CIA in 2019.
```

1  Q.   Okay.  What did she say about prior employment?

2  A.   FBI.

3  Q.   Okay.  Did she indicate to you that at some point during

4  the probation it had switched from FBI to CIA?

5  A.   Yes, ma'am.

6  Q.   Okay.  So the messages that we saw through the course of

7  your investigation when you were mentioning CIA, is that

8  because that was your understanding in 2019, when you're

9  investigating in 2019, that he's CIA?

10  A.   Yes, ma'am.  That's correct.

11  Q.   Now, Stone's defense counsel last week went through phone

12  records with you that started in February of 2020.  Do you

13  recall that?

14  A.   Yes, ma'am.

15  Q.   Okay.  And phone calls between Casi Thompson and Bill

16  Stone were highlighted in these phone records; is that right?

17  A.   Yes, ma'am.

18  Q.   Okay.  So those records that we reviewed, would you agree

19  with me that all the records we went through were from

20  February 2020 and onward?

21  A.   Yes.

22  Q.   Okay.  How was Casi recording the phone calls that she

23  eventually turned over to you?

24  A.   She was recording them using Penny Weisend's cellular

25  phone that had been given to her in this investigation.  She

1    was using the voice memo app on the phone to record the calls

2    with Penny's phone.  Casi maintained using her regular cell

3    phone to make the phone calls or receive phone calls.

4    Q.   So Penny Weisend's phone was her recording device?

5    A.   That's correct.

6    Q.   Okay.  I have a copy of your report laying up there.  I'm

7    going to direct you to page 12 of your report.

8             What date did Casi Thompson turn Penny Weisend's

9    phone over to you?

10   A.   All right.  So she -- it would have been January 13, 2020,

11   and --

12   Q.   Go ahead.

13   A.   January 13, 2020.

14   Q.   Okay.  So that's the date that Casi Thompson no longer had

15   possession of Penny Weisend's phone?

16   A.   That's correct.

17   Q.   Okay.  After -- did she give you the phone on that day

18   because you asked her to?

19   A.   Yes.

20   Q.   That was at your request?

21   A.   Yes.

22   Q.   After you requested for her to basically give over her

23   recording device to you, did you have -- what were your

24   expectations about her further recording calls?

25   A.   At that point in the investigation, I had reached a place

 1   where I did not need further calls recorded, so I told her not
 2   to worry about conducting any other calls.
 3   Q.   Now, there is a call that occurred, a recorded call
 4   between Casi and Stone that occurred on March 2, 2020.  Was
 5   that in conjunction with a meeting with you?
 6   A.   That is correct.
 7   Q.   So did that call take place while she was meeting with
 8   you?
 9   A.   Yes.
10   Q.   Are you the one that suggested during the meeting to try
11   to place a call to Stone?
12   A.   Yes, I did.
13   Q.   And did Casi have any hesitation in doing so in your
14   presence?
15   A.   No, she did not.
16   Q.   I'm going to direct you back to your report.  On what
17   date -- well, did you eventually take possession of Casi's
18   phone?
19   A.   Yes, I did.
20   Q.   And on what date did that occur?
21   A.   Let's see.
22   Q.   Do you want to look at the second tab?
23   A.   Okay.  Sorry.  I'm looking for it here.  I think it was in
24   May.  Okay.  It was May 28, 2020.
25   Q.   That's when you took possession of Casi's phone?

```
 1   A.   That's correct.
 2   Q.   Did you warn her ahead of time that you were going to ask
 3   her for her phone that day?
 4   A.   No, I did not.
 5   Q.   Did she have any hesitation in turning it over to you?
 6   A.   No, she didn't.
 7   Q.   To clarify, with DeLeon's attorney you agreed that an
 8   interview took place with you and Joe DeLeon on September 12,
 9   2019.  But there was no interview on September 12, 2019; is
10   that correct?
11   A.   That's correct.
12   Q.   Okay.  On what --
13            MR. WESTFALL:  The first part of that misstated
14   facts.
15            THE COURT:  Okay.  I will leave it to the jury to
16   recall what the facts are.
17   BY MS. MAX:
18   Q.   On what day did you first interview Joe DeLeon again?
19   A.   Let's see.  September 5th of 2019.
20   Q.   And at that September 5, 2019 interview, DeLeon said,
21   quote, "I heard her say that she's been out 600-something
22   thousand dollars.  Yesterday she said something about, well,
23   I'm out like 600."
24            Is that correct?  That occurred in that interview?
25   A.   No.
```

```
 1    Q.    Well, that quote --
 2    A.    That was said, yes.
 3    Q.    Okay.
 4    A.    That quote.
 5    Q.    That quote was said in the September 5th interview?
 6    A.    Yes, ma'am.
 7    Q.    By Joe DeLeon.
 8                Prior to that interview, had Joe and Casi only had
 9    one controlled call?
10    A.    Correct.
11    Q.    And in that controlled call, does Casi mention anything to
12    Joe DeLeon about money?
13    A.    She does not.
14    Q.    On these various calls that we heard between Joe DeLeon
15    and Bill Stone, is it a possibility that Stone knows that he's
16    being recorded?
17    A.    It's a possibility.
18    Q.    How would he know?
19                MR. WESTFALL:  Object to speculation, Your Honor.
20                THE COURT:  You'll have to establish how he would --
21    sustain.
22                MS. MAX:  Sorry, Your Honor.
23                May I bring up Government's 156, page 2?
24    BY MS. MAX:
25    Q.    I'm directing your attention to Government 156, page 2,
```

1    Ranger Briley, September 5, 2019 call log.

2             At 10:48, we see it says, Ranger Briley departs

3    DeLeon's residence.

4             Do you see that?

5    A.   Yes, ma'am.

6    Q.   Okay.  After departing DeLeon's residence, who are the

7    next -- does DeLeon talk to Bill Stone?

8    A.   He does.

9    Q.   For a total of how many minutes?

10   A.   Approximately 15 minutes.

11   Q.   Okay.  And then there's the interview at Fort Worth Police

12   Department; is that correct?

13   A.   Yes, ma'am.

14   Q.   Okay.

15            MS. MAX:  If we could go down underneath the

16   conclusion of the interview.

17   BY MS. MAX:

18   Q.   After you conclude the interview with DeLeon, is there

19   another phone call between DeLeon and Stone?

20   A.   Yes.

21   Q.   And how long is that call for?

22   A.   Five minutes 39 seconds.

23   Q.   And then we see you meeting with DeLeon again, and

24   ultimately you're with him then until you do the controlled

25   call to Bill Stone; is that right?

```
 1    A.   Yes, ma'am.
 2    Q.   So we have roughly 20 minutes of phone calls between -- on
 3    that day between Bill Stone and Joe DeLeon from the time that
 4    you knock on Joe DeLeon's door until a recorded call is made
 5    with Bill Stone; is that right?
 6    A.   Yes, ma'am.
 7    Q.   Is there a possibility in your mind that Joe DeLeon and
 8    Bill Stone are keeping up the probation lie because you are
 9    listening?
10    A.   Yes.
11         MR. WESTFALL:  Object to speculation, Your Honor.
12         THE COURT:  Overruled.
13    BY MS. MAX:
14    Q.   You can answer.
15    A.   Yes, it is possible.
16    Q.   Is there the possibility that Stone and DeLeon are trying
17    to convince you that the probation is real?
18         MR. WESTFALL:  Object to speculation, Your Honor.
19         THE COURT:  Overruled.
20    A.   It is possible.
21    Q.   An April 23, 2020 e-mail between you and Marcus Busch was
22    brought up by defense counsel.  Do you recall that e-mail?
23    A.   Yes, I do.
24    Q.   At the point that you sent that e-mail, was your
25    investigation complete?
```

```
 1    A.    No, ma'am.
 2    Q.    I'm going to direct you back to your report.
 3              And can you -- looking at the second tab, can you
 4    tell me what date you seized Joe DeLeon's phone from him?
 5    A.    May 13, 2020.
 6    Q.    So prior to May 13, 2020, did Joe have -- at any point
 7    have possession of Joe DeLeon's phone?
 8    A.    No, ma'am.
 9    Q.    Okay.  But Joe DeLeon has been aware of an investigation
10    since we know at least September 5, 2019, right?
11    A.    Yes, ma'am.
12    Q.    So for a full eight months while knowing of an
13    investigation, Joe DeLeon had access -- complete and total
14    access and possession of his phone?
15    A.    Yes, ma'am.
16              MS. MAX:  Can we bring up Government's 37, page 200?
17              (Pause)
18    BY MS. MAX:
19    Q.    Ranger Briley, I'm going to direct you to the fourth --
20              MS. MAX:  Can we get the fourth and fifth messages on
21    the page?  No.  Go -- I'm sorry.  Go up one.  Fourth and fifth.
22    Yes.
23    BY MS. MAX:
24    Q.    Ranger Briley, who is the sender of that first message?
25    A.    Defendant Stone.
```

```
 1   Q.   And can you tell me what the date is?
 2   A.   May 13, 2017.
 3   Q.   Can you please read that message?
 4   A.   "Can't either.  You need to spend more time with her!  At
 5   least five days and nights a week!"
 6   Q.   And can you read the following message?
 7   A.   Defendant DeLeon:  "3 million wasn't enough.  What she has
 8   left dam sure ain't enough."
 9   Q.   And what's the date of that message as well?
10   A.   May 13, 2017.
11   Q.   Were you part of a meeting with Joe DeLeon that occurred
12   on July 21, 2021, at the U.S. Attorney's Office?
13   A.   Yes, I was.
14   Q.   Was DeLeon questioned about the two checks that went back
15   and forth in conjunction with his receiving the truck?
16   A.   The two checks, not exactly.  He wasn't given the evidence
17   that we have.
18   Q.   Okay.  Was he asked about any checks that would have been
19   exchanged in regards to the truck?
20   A.   Yes.
21   Q.   And did he -- was he able to provide you any explanation
22   for the two checks?
23   A.   No.
24   Q.   Was he questioned about the $15,000.00 check that he
25   received from Casi Thompson?
```

```
 1   A.   Yes.

 2   Q.   Was he able to recall why it was given to him?

 3   A.   No, sir -- no, ma'am.

 4   Q.   Was he asked if he had any remorse about the money that he

 5   got from Casi Thompson?

 6   A.   I don't remember if the term remorse was used, but what he

 7   thought about it was asked.

 8   Q.   Okay.  So if he was asked what he thought about the money

 9   that he got from Casi Thompson, did he have a reply?

10   A.   He did.

11   Q.   And what was it?

12   A.   He stated that she's wealthy and that she does not need it

13   anyway.

14           MS. MAX:  Pass the witness.

15           THE COURT:  Members of the jury doing okay?  All

16   right.

17           Ranger Briley, are you doing okay?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  All right.  Your witness, Mr. Gallian.

20           MR. GALLIAN:  Thank you, Your Honor.

21           THE COURT:  You're welcome.

22                       RECROSS-EXAMINATION

23   BY MR. GALLIAN:

24   Q.   Ranger Briley, I'm back.  Just a couple of questions for

25   you though, okay?
```

1    A.   Yes, sir.

2    Q.   I'll start with what Ms. Max was just talking with you

3    about.

4            There are instances where you talked with Joe DeLeon

5    or Joe DeLeon was confronted about the check or the checks that

6    were given to him, right?

7    A.   Yes.

8    Q.   And he didn't recall or give a reason for that, did he?

9    A.   I -- what I recall I think is that he bought the truck and

10   has the check to prove it.  That's to the extent that he ever

11   provided us.

12   Q.   Sure.  But the insinuation is that he didn't immediately

13   recall those gifts or those checks and didn't immediately come

14   forward with that information.  Is that fair?

15   A.   Yes, sir.

16   Q.   And in terms of your investigation, do you think that's an

17   indication of guilt or deception?

18   A.   I think there's some indication of some guilt.

19   Q.   Okay.  When Casi told you the restitution was 125,000 and

20   it turned out to be 250, what was her rationale for messing

21   that up?

22            MS. MAX:  Objection, calls for speculation.

23            THE COURT:  Overruled.

24   A.   I think that that amount of money -- she did not know the

25   dollar amount in regards to that.  Is it logical?  Is it

1    rational?  I don't know.

2    Q.    Fair to say that you're treating that analysis differently

3    as it relates to Joe DeLeon and Casi Thompson?

4    A.    Somewhat differently, yes.

5    Q.    Only because it was mentioned when Bill was on the

6    recorded call and started throwing up blood.

7              You are aware that Bill Stone had a stroke in the

8    fall of 2020, right?

9    A.    I was aware he had a stroke.  As far as when, I don't -- I

10   don't know.

11   Q.    Okay.

12             MR. GALLIAN:  Brief moment, Judge.

13             THE COURT:  Sure.

14             (Pause)

15   BY MR. GALLIAN:

16   Q.    It is very clear to me as we listen to the recordings, as

17   we listen to what people are saying in different text

18   messages -- and I think you will agree with me, there are

19   portions of the Joe and Casi relationship that Bill likely knew

20   nothing about.  Is that fair?

21             MS. MAX:  Objection, calls for speculation.

22             THE COURT:  Overruled.

23   A.    There are portions of the Joe/Casi relationship that

24   Defendant Stone did not know?  Is that what you're asking?

25   Q.    Yes.  Yes.

1   A.   That's probably fair, yeah.

2   Q.   Okay.  And there are obviously portions of the

3   relationship between Casi and Bill that Joe was unaware of,

4   right?

5   A.   It's possible.

6   Q.   Well, we know that because based on questions from the

7   prosecutor that Joe didn't know the financial side of it for

8   instance, right?

9   A.   Correct.

10  Q.   Okay.  So it's fair to say that there are secrets being

11  hidden from everybody?

12  A.   That is fair.

13  Q.   I don't want to beat a dead horse here.  When did Casi

14  tell you that Bill worked for the FBI at some point during

15  probation?

16  A.   So she told me on July 29, 2019, at the very beginning

17  that in laying out this circumstance of what happened that this

18  all began when he was FBI, referencing the secret probation.

19  She said currently at this time, meaning the day that we were

20  sitting there, that she believed that he was CIA.

21  Q.   Okay.  Now, we went through the transcript in that

22  sit-down in May of 2020 with Ivan, yourself, and Luley.  You

23  remember that portion, right?

24  A.   Yes, sir.

25  Q.   And when Ivan Martinez asked about Bill's employment at

```
 1  the time of retirement, Casi unequivocally said he worked for
 2  the CIA at that point, right?
 3  A.   Yes.
 4           MR. GALLIAN:  I'll pass the witness.
 5           Thank you, Ranger Briley.
 6           THE WITNESS:  Yes, sir.  Thank you.
 7           THE COURT:  Members of the jury doing okay?
 8           All right.
 9                        RECROSS-EXAMINATION
10  BY MR. WESTFALL:
11  Q.   Ranger Briley, the conversation that happened in July
12  of '21, do you remember it?
13  A.   You'll have to tell me.
14  Q.   Remember the fact of it?  You testified on redirect.
15  A.   Okay.
16  Q.   But that was one of those that you did not record, right?
17  A.   Oh, yeah.  You're talking about the U.S. Attorney's
18  office.  That's correct.  Yes, sir.
19  Q.   No recording of that conversation.
20  A.   That is correct.
21  Q.   Thank you.
22  A.   Yes, sir.
23           MR. WESTFALL:  Pass the witness, Your Honor.
24           MS. MAX:  No further questions of this witness.
25           THE COURT:  I'm sure you are glad to hear this, but
```

```
 1    Ranger, you can step down.

 2              MS. MAX:  May he be excused?

 3              THE COURT:  Any objection?

 4              MR. GALLIAN:  No objection, Your Honor.

 5              MR. WESTFALL:  No objection.

 6              THE COURT:  Thank you so much for having been with

 7    us.  We appreciate you.

 8              THE WITNESS:  Thank y'all.

 9              (Pause)

10              MS. MAX:  The Government calls Brad Leonard.

11              THE COURT:  Hi, Mr. Leonard.  Come on in.  It's kind

12    of a labyrinth there.  If you will just kind of shoot across

13    here.

14              How are you today?

15              THE WITNESS:  Good.  Thank you.

16              THE COURT:  We appreciate you coming.  Have a seat.

17    Get as comfortable as you can.

18              And I tell you what, if you don't mind, let's try

19    your mic out.  Do you mind telling the jury your name?

20              THE WITNESS:  It's Bradley Leonard.

21              THE COURT:  Everybody hear okay?  Great.

22              My court reporter will swear you in.

23              (The witness was sworn)

24              THE COURT:  All right.  And please let me know, sir,

25    if you need anything like water or a break, all right?
```

```
 1              THE WITNESS:  All right.
 2              THE COURT:  Glad to have you here.
 3              Your witness, ma'am.
 4              MS. MAX:  Thank you, Your Honor.
 5         BRADLEY LEONARD, GOVERNMENT'S WITNESS, SWORN
 6                    DIRECT EXAMINATION
 7    BY MS. MAX:
 8    Q.   Mr. Leonard, why don't you tell the jury what you do for a
 9    living?
10    A.   I'm a lead IT specialist with the United States Department
11    of Justice Office of the Inspector General.
12    Q.   And how long have you had that job?
13    A.   11 years.
14    Q.   Explain a little bit what being the lead IT specialist
15    means.
16    A.   For my position specifically, it involves performing
17    digital forensic examinations of all types of digital media.
18    Q.   Okay.  I feel like every question -- every answer is going
19    to give another question.  What is a forensic examination?
20    A.   So a forensic examination or digital forensics is
21    examining digital items primarily to be used in a court of law.
22    Q.   What is your educational background?
23    A.   I have a bachelor's in information technology and a
24    master's in computer forensics.
25    Q.   Okay.  So your master's is specifically in the forensic
```

1   examinations that you just talked about?

2   A.   It is.

3   Q.   Okay.  Do you have certifications in your field?

4   A.   I do.

5   Q.   Okay.  A few?  Numerous?

6   A.   I have quite a few.  I have several vendor certifications.

7   The Magnet Certified Forensic Examiner and Cellebrite Certified

8   Mobile Examiner in addition to some federal certifications,

9   like the Seized Computer Evidence Recovery Specialist.

10          THE COURT:  If you don't mind slowing it down a

11   little bit.  You're doing a great job.  But my court reporter

12   has to take everything down and like me, you talk a little

13   fast.  So if you don't mind slowing down just a little bit.

14          THE WITNESS:  I will do my best.

15          THE COURT:  Appreciate you.  Thank you.

16   BY MS. MAX:

17   Q.   Were you the forensic examiner related to the Bill Stone

18   investigation?

19   A.   I was.

20   Q.   Okay.  And are there numerous devices that you examined?

21   A.   Yes, I believe 26.

22   Q.   Okay.  We're going to talk about a few of those today,

23   okay?

24   A.   Okay.

25   Q.   Let's start with, was there an iMac that had been seized

1    from the search of Bill Stone's residence that you examined?

2    A.   Yes.

3    Q.   Okay.  Just briefly tell the jury, what is an iMac?

4    A.   An Apple iMac is an Apple computer that's designed as an

5    all-in-one computer.  So the computer parts, the hard drive,

6    ram, everything that builds -- that goes into the computer is

7    actually built into the monitor so it's just one giant unit.

8    Q.   Okay.  On the iMac, when you examined it, were there other

9    devices that were backed up onto it?

10   A.   Yes.  I identified three mobile backups that were -- that

11   existed on the hard drive.

12   Q.   Okay.  Explain to the jury what a backup is.

13   A.   So these mobile backups occur when you take specifically

14   an iPhone and you plug it into a computer, and it will prompt

15   you to -- if you want to back up the contents of that phone, it

16   will save those contents to the hard drive of the computer.

17   Q.   Okay.  Is it basically then just like making an image of

18   the phone onto the computer?

19   A.   For the most part.

20   Q.   Okay.  So for the iMac, you said there were three devices

21   that were backed up onto it; is that right?

22   A.   Yes.

23   Q.   Okay.  Let's first start with, was there an iPhone X?

24   A.   Yes.

25   Q.   Who was the owner of that iPhone X?

```
 1   A.    Mr. Stone.
 2   Q.    Okay.  And what was the last date that that iPhone X has
 3   been backed up on the iMac?
 4   A.    That was July 1, 2019.
 5   Q.    Okay.  Are you able -- when doing a forensic examination,
 6   are you able to look up the things that are backed up as easily
 7   as anything else that would be on a computer?
 8   A.    Yes.  We have to -- we just have to pull the backup out of
 9   the computer and treat it as a separate device, but we can then
10   examine it like we were examining a phone.
11   Q.    Okay.  So when you were looking at the iPhone X backup,
12   were you -- did you find an app called SpoofCard?
13   A.    I did.
14   Q.    Okay.  And do you have a date of when that app -- the
15   usage of that app?
16   A.    Yes.  There were usage logs that were backed up as well
17   that identified it as used it on June 18, 2019.
18   Q.    Were you able to recover an audio recording of a phone
19   call from that SpoofCard app?
20   A.    Yes.
21   Q.    Okay.  Now, you're saying you got those things off of the
22   iPhone X backup?
23   A.    Correct.
24   Q.    Okay.  And you said that was -- the backup to that
25   computer was done in July of 2019, correct?
```

```
 1    A.    Yes.
 2    Q.    Did you also have the actual iPhone X of Bill Stone that
 3    was seized?
 4    A.    I -- yes, I did.
 5    Q.    So we talked about the iPhone X image that's on the
 6    computer.  Now, looking at the actually iPhone X phone, did you
 7    do a forensic examination on it as well?
 8    A.    I did.
 9    Q.    Did it have the SpoofCard app on it?
10    A.    It did not.
11    Q.    Did it have the SpoofCard recording on it?
12    A.    It did not.
13    Q.    So what was the approximate date that you searched the
14    actual iPhone X phone?
15    A.    Sometime in June of 2020.
16    Q.    Okay.  So the phone when it was backed up onto the iMac in
17    July of 2019, did it have the SpoofCard stuff on it?
18    A.    Yes.
19    Q.    Okay.  But the actual phone that you looked at in June
20    2020 no longer had the SpoofCard data on it?
21    A.    That is correct.
22    Q.    Was there also an iPhone 8 that was backed up onto the
23    iMac computer?
24    A.    Yes, there was.
25    Q.    Did that phone also belong to Bill Stone?
```

```
 1   A.   It did.
 2   Q.   And what was the last date of the backup for that
 3   iPhone 8?
 4   A.   That was July 24, 2019.
 5   Q.   On that iPhone 8 backup, did you look at the voice
 6   messages?
 7   A.   I did.
 8   Q.   Did you recover a voice message that related to a DEA
 9   Agent Jordan Green?
10   A.   Yes.
11   Q.   Okay.  Do you have a date for that message?
12   A.   There were a couple on June 29, 2019.
13   Q.   Okay.  And, again, you're finding that on the backup?
14   A.   Yes.
15   Q.   Did you also have the actual iPhone 8 of Bill Stone that
16   you forensically examined?
17   A.   I did.
18   Q.   Okay.  On the actual phone of Bill Stone, did you find the
19   Jordan Green voice message?
20   A.   I did not.
21   Q.   Okay.  So once again, we have something that when the
22   iPhone 8 was backed up in July of 2019, the message was there?
23   A.   Correct.
24   Q.   But when you're looking at the phone in June of 2020, the
25   message is no longer there?
```

```
 1   A.   The voicemail, but correct.
 2   Q.   I'm sorry.  The voicemail.  Yes.
 3        Did you also find an iPhone 5S on the iMac backup?
 4   A.   I did.
 5   Q.   Okay.  Is that a phone that was belonging to Casi
 6   Thompson?
 7   A.   Yes.
 8   Q.   Okay.  And what was the last backup date of that?
 9   A.   That was July 3, 2019.
10   Q.   Meaning that that iPhone 5 belonging to Casi had been
11   plugged into that iMac computer last on July 3, 2019?
12   A.   Correct.
13   Q.   Did you find photos on that backup that came from mid to
14   late 2016?
15   A.   Yes.
16   Q.   Okay.  If that phone was no longer in Casi Thompson's
17   possession, explain to the jury how that phone or its backup
18   would end up having photos on it even when she no longer had
19   possession of the phone?
20   A.   So Apple -- it prides itself on enhancing the user
21   experience by syncing data across all devices that are owned by
22   an individual.  To do this, a user just has to log into the
23   same device as using the same Apple ID and enabling cloud
24   backup on the devices.  As long as that is set up, the data
25   should sync across all of your devices.
```

1    Q.   So meaning any phone that Casi Thompson had had linked to

2    her iCloud account across all those devices, all the same

3    things would be shown?

4    A.   Correct.

5    Q.   Would that include text messages?

6    A.   Yes.

7    Q.   Would that include photographs?

8    A.   Yes.

9    Q.   Can someone -- so we're talking about things being, I

10   guess, added, if you will, to all the devices across the iCloud

11   account.

12         On that same note, can you also delete from all

13   devices using one iCloud account?

14   A.   Yes.  If -- if you delete the data from the iCloud, it

15   should delete from the devices as well.

16   Q.   So all you need to do is be able to go to one device or go

17   into the iCloud account.  And if you delete something, it will

18   not show up across any devices; is that correct?

19   A.   Correct.

20   Q.   Does that include deleting text messages?

21   A.   Yes.

22   Q.   If the phone is not in Casi Thompson's possession during

23   this time period, explain what would a person have to do to get

24   access to that iCloud account?

25   A.   As long as the -- a person has access to a device, they --

```
1   as long as they can log in, they would be able to gain access,
2   as long as that device was set up with those settings.
3   Q.   To be able to do that, do you actually have to turn on the
4   device?
5   A.   Yes.
6   Q.   Okay.  So you would have to utilize the device or open up
7   the device to be able to sync, as you were saying?
8   A.   That's correct.
9   Q.   Okay.  To back up Casi Thompson's phones onto the iMac
10  computer, would you also have to open up the device?
11  A.   Yes.
12       And with the backup process, Apple requires you to
13  know the PIN.  In order to trust the computer, they have to
14  mutually talk to each other, and that cannot happen without
15  putting that PIN in specifically for the backup.
16  Q.   Okay.  So the two -- the two phones of Casi Thompson's
17  that were found at Bill Stone's residence during the search,
18  for them to find the updated photos and things that you found
19  on those phones, would they have had to have been turned on?
20  A.   Yes.
21  Q.   Recently?
22  A.   Yeah.  That is correct.
23  Q.   Okay.  The same, then, for the iPhone 6 Plus, which was a
24  phone of Casi Thompson's that was recovered at Bill Stone's
25  residence, correct?
```

```
 1    A.   Correct.
 2    Q.   And on that phone did you also find things that were more
 3    recently dated than 2016?
 4    A.   I did.
 5    Q.   Let's talk about text messages that you recovered on the
 6    phones and devices.
 7              How many total devices -- in terms of looking at what
 8    was recovered from Bill Stone's residence, how many Bill Stone
 9    devices did you analyze for text messages?
10    A.   That would be four cell phones and the mobile backup, so
11    three mobile backups for those cell phones.
12    Q.   Okay.  So a total of seven devices and/or their backups
13    you analyzed?
14    A.   Yes.
15    Q.   And does that include Bill Stone's phones as well as Casi
16    Thompson's phones that he had in his possession?
17    A.   Yes.
18    Q.   Okay.  So we're talking about a total of seven different
19    devices you looked at the text messages for?
20    A.   Correct.
21    Q.   Out of those seven devices, how many text messages
22    total -- across all seven devices, how many text messages total
23    did you see between Bill Stone and Casi Thompson?
24    A.   That would be 1,158.
25    Q.   Okay.  And to clarify, these are devices that were all in
```

1  Bill Stone's possession and recovered at the search of his

2  home?

3  A.   Correct.

4  Q.   Tell me a little bit about -- for those 1,158 messages,

5  what was the date range?

6  A.   The date varied.  There were -- some messages in the -- in

7  2016, some as well in 2018, but the majority were in 2019 and

8  2020.

9  Q.   The majority of those 1,158 messages were in 2019 and

10  2020?

11  A.   Yes.

12  Q.   Okay.  Did you also look again at those same devices that

13  were seized from Stone's residence, did you also look for the

14  total number of text messages between -- on those devices

15  between Bill Stone contacts and Joe DeLeon contacts?

16  A.   I did.

17  Q.   And how many total messages were there between Joe DeLeon

18  and Bill Stone on those seven devices put together?

19  A.   Four.

20  Q.   Did you also review an extract report for Joseph DeLeon's

21  phone?

22  A.   Yes.

23  Q.   How many unique text messages were there on Joseph

24  DeLeon's phone?

25  A.   Unique messages, it was for iMessage, SMS, and MMS

1  messaging.  There was 99,919.
2  Q.   Did you also look for text messages on Joseph DeLeon's
3  phone specifically between Bill Stone and Joe DeLeon?
4  A.   I did.
5  Q.   And out of those 99,000 unique text messages, how many
6  were there between Bill Stone and Joseph DeLeon?
7  A.   There were 3,141.
8  Q.   What was the date range for those 3,141 messages?
9  A.   It was from October 30, 2015, to May 12, 2020.
10  Q.   So a four-and-a-half-year period?
11  A.   Correct.
12  Q.   And you found 3,141 messages?
13  A.   That is correct.
14  Q.   Did you also look for text messages between Casi Thompson
15  and Joe DeLeon on Joe DeLeon's phone?
16  A.   I did.
17  Q.   What were the total number of messages between Casi
18  Thompson and Joe DeLeon on his phone?
19  A.   It was 8,634.
20  Q.   And what was the date range?
21  A.   That was from November 2, 2010, to September 5, 2019.
22  Q.   Did you find any evidence that Bill Stone had an ability
23  to delete Joe DeLeon's text messages?
24  A.   No.
25  Q.   Going back to what you explained to the jury about someone

```
 1    having access to a person's iCloud account, okay?
 2    A.   Okay.
 3    Q.   When someone has access to the iCloud account, are they
 4    able to monitor text messages in realtime?
 5    A.   Yes.
 6    Q.   Okay.  Explain to the jury a little bit more what you mean
 7    by that.
 8    A.   If you are logged into a device that has access and
 9    someone is using a different device, but the same Apple ID and
10    with the iCloud turned on, if they are messaging in real time,
11    those messages will appear on the phone.  There will be
12    obviously a momentary delay for the data to transmit.
13    Q.   So could Bill Stone, using Casi Thompson's old phones, be
14    able to remotely monitor what she is doing on her phone?
15    A.   Yes.
16    Q.   And using those old phones, could he be able to go in and
17    delete things from her phone in her possession?
18    A.   Yes.
19    Q.   Okay.  Did you find any evidence that Bill Stone could
20    remotely monitor Joseph DeLeon's phone?
21    A.   No.
22              MS. MAX:  Pass the witness.
23              THE COURT:  Members of the jury, are we doing okay?
24              Okay.  And, sir, if you decide you need a break, let
25    me know, please.
```

```
 1                THE WITNESS:  Thank you.

 2                THE COURT:  Your witness, Mr. Gallian.

 3                MR. GALLIAN:  Your Honor, Mr. Leonard, no questions.

 4     Thank you.

 5                THE COURT:  All right.

 6                MR. WESTFALL:  We have no questions.

 7                THE COURT:  All right.  Well, your lucky day.

 8                Any objection to this witness being excused?

 9                MR. WESTFALL:  No, Your Honor.

10                MR. GALLIAN:  No, Your Honor.

11                THE COURT:  All right.  Thank you for coming.  We

12     appreciate you.  You're welcome to step down and go about your

13     day.

14                THE WITNESS:  Thank you.

15                THE COURT:  Thanks for coming.

16                (Pause)

17                MS. MAX:  The Government calls Darla Bell.

18                THE COURT:  All right.

19                (Pause)

20                THE COURT:  Hi, Ms. Bell.  Come on down.  How are you

21     today?

22                THE WITNESS:  Fine.  How are you?

23                THE COURT:  You came prepared with water.  You're a

24     smart woman.

25                Please get comfortable and have a seat.  And once you
```

```
 1   get all comfy, we'll get you sworn in.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  Glad to have you hear.
 4              THE WITNESS:  Yes, ma'am.  Thank you.
 5              MS. MAX:  Your Honor, may we approach briefly?
 6              THE COURT:  Certainly.  Of course.
 7              (Bench Conference held off the record)
 8              THE COURT:  Okay.  Ma'am, let's do a sound check.  I
 9   have kind of a wonky sound system, so if you don't mind saying
10   your name and see if the jury can hear.
11              THE WITNESS:  Darla Bell.
12              THE COURT:  Ma'am, if you need a break or a stretch
13   break or anything, just let me know.
14              THE WITNESS:  Yes, ma'am.
15              THE COURT:  With that said, I'll have my court
16   reporter swear you in.
17              (The witness was sworn)
18              THE COURT:  If there is anything you need, let me
19   know.
20              THE WITNESS:  Thank you.
21              THE COURT:  Ms. Max, your witness.
22              MS. MAX:  Thank you, Your Honor.
23
24
25
```

```
 1                 DARLA BELL, GOVERNMENT'S WITNESS, SWORN
 2                          DIRECT EXAMINATION
 3      BY MS. MAX:
 4      Q.   Afternoon, Ms. Bell.  How are you?
 5      A.   I'm well.  How are you?
 6      Q.   Good.
 7               Ms. Bell, tell the jury what you do for a living.
 8      A.   I am a consultant in the oil and gas industry, and I help
 9      oil and gas companies comply with federal pipeline safety
10      regulations.
11      Q.   Do you own your own business?
12      A.   Yes, ma'am.
13      Q.   And how long have you owned your own business?
14      A.   Almost 14 years.
15      Q.   And how long have you been in the oil and gas industry?
16      A.   25 years.
17      Q.   Where is your business located?
18      A.   In Dallas.
19      Q.   Is that where you live?
20      A.   Yes, ma'am.
21      Q.   And what is your educational background?
22      A.   I have a master's in hazardous and environmental
23      management from SMU.
24      Q.   Your business, how many employees does it have?
25      A.   One.
```

```
 1    Q.   And who is that?
 2    A.   Me.
 3    Q.   Did you become friends with Bill Stone in approximately
 4    the spring of 2018?
 5    A.   Yes, ma'am.
 6    Q.   Describe to the jury a little bit about what your
 7    friendship with Bill Stone was like.
 8    A.   I met Bill Stone one time face-to-face in the spring of
 9    2018, and then beyond that it was telephone calls and text
10    communication.
11    Q.   Okay.  How many times have you ever met Bill Stone?
12    A.   In person?
13    Q.   Yes.
14    A.   Once.
15    Q.   Okay.  So the -- is it safe so say the entire course of
16    this friendship occurred over the phone?
17    A.   Yes, ma'am.
18    Q.   Okay.  Describe to the jury a little bit about that phone
19    friendship, how often y'all would talk, who would call who,
20    that sort of thing.
21    A.   It was sporadic.  There would be periods of time where
22    there would be communication, I might -- in many cases I would
23    initiate it more often -- that's just my personality -- and
24    there are times he would initiate it more often.  But it would
25    be sporadic.  There would be long periods of time where there
```

 1    would be no communication.
 2    Q.    And did this friendship last for approximately two and a
 3    half years?
 4    A.    Yes, ma'am.
 5    Q.    Okay.  On and off, like you said?
 6    A.    Yes, ma'am.
 7    Q.    Now, the jury has heard a voice recording of someone
 8    purporting to be DEA Agent Jordan Green.  Are you familiar with
 9    that recording?
10    A.    Yes.
11    Q.    How are you familiar with it?
12    A.    Because I was asked by Bill Stone to call his voicemail
13    and leave a message, and there were -- he asked me to and had
14    led up to having me do that by stating that he knew that I was
15    a good Christian woman and that he needed me to help save a
16    life tonight and explained to me the circumstances around that,
17    and I agreed to leave a voicemail because I wanted to help save
18    someone's life.
19    Q.    Ms. Bell, are you a DEA agent?
20    A.    No.
21    Q.    And your name is not Jordan Green?
22    A.    No, ma'am.
23    Q.    Do you regret making that voicemail?
24    A.    Yes, ma'am.  Yes, ma'am.
25    Q.    Let's step back a little bit.  That was pretty far into

1    your friendship with Bill Stone that you made that voice

2    recording, correct?

3    A.    Yes.

4    Q.    So backing up a little bit to how you got to making this

5    Jordan Green recording, I guess is it safe to say have you ever

6    impersonated a federal agent before?

7    A.    No, ma'am.

8    Q.    There are lots of things about your friendship with Bill

9    Stone that led you to make that decision to do that favor for

10   him?

11   A.    Yes, ma'am.

12   Q.    Okay.  So let's rewind that a little bit, then.

13            Going back to some of the phone calls that you would

14   have with Bill Stone, during the summer of 2019, did Bill start

15   to tell you about a relationship between a friend of his named

16   Ryan and Ryan's girlfriend Cassandra?

17   A.    Yes, ma'am.

18   Q.    Okay.  Explain to the jury a little bit about what he told

19   you about Ryan and Cassandra.

20   A.    He contacted me and told me that he was very distressed,

21   because there was a teammate on his work team named Ryan who

22   received a communication from his girlfriend that she wanted to

23   end the relationship, and he was very distraught.

24   Q.    What is your understanding?  What did Cassandra do for a

25   living?

1   A.   Bill Stone told me she was a hairdresser.

2   Q.   And did he say anything about Ryan being in any sort of

3   trouble?

4   A.   He said -- Bill Stone told me that Cassandra went into the

5   FBI headquarters in Washington, D.C. and said that he was

6   impersonating an FBI agent.

7   Q.   Okay.  So that's what Bill Stone is telling you happened

8   between Ryan and Cassandra?

9   A.   Yes, ma'am.

10  Q.   Did he tell you a little bit about Cassandra's past?

11  A.   Yes, ma'am.

12  Q.   What did he tell you?

13  A.   He told me that she had had problems with drugs and that

14  she had been on probation and that Ryan was helping to set her

15  straight and that she had inherited money and that they lived

16  together and that she just had been really troubled and Ryan

17  was helping to get her life straight.

18  Q.   Was there anything about the Ryan and Cassandra story that

19  dealt with money?

20  A.   Yes.

21  Q.   Okay.  Tell the jury about that.

22  A.   Bill told me that -- that Ryan was given some money from

23  his girlfriend Cassandra and that they lived together and they

24  were either looking to buy land to build a house or to buy

25  another home, but she wanted her money back, that she was mad

1    and that she wanted her money back.

2    Q.   And this is all what Bill Stone tell you?

3    A.   Yes, ma'am.

4    Q.   Did he indicate anything to you about Ryan having access

5    to Cassandra's phone?

6    A.   Yes.

7    Q.   What did he say?

8    A.   Well, he sent me some screenshots that he said he received

9    from Ryan that were from Cassandra's phone and wanted to know

10   what I thought that they meant.  It was emojis and a little bit

11   of a comment about, I'm not moving out or something to that

12   effect on one of the screenshots that Bill sent me that he said

13   he got from Ryan.

14             And I said how does he have access to her phone?

15             And he said, You don't want to know that.  I don't

16   want to know that.

17   Q.   Okay.  And, again, all of this is occurring -- the Ryan

18   and Cassandra timeline that we've been talking about is summer

19   of 2019?

20   A.   Yes, ma'am.

21   Q.   Okay.  What did you think about Bill Stone as a friend to

22   Ryan?  Did you think he was very caring about what was going on

23   with Ryan and Cassandra?

24   A.   I did.

25   Q.   Okay.

```
 1   A.   I did.
 2   Q.   Did you want to elaborate on that?
 3   A.   I thought it was -- he was very invested in their
 4   relationship.  And I said to him on several occasions, I love
 5   my friends and I care deeply about my friends, but I wouldn't
 6   do anything to harm my own health trying to help them navigate
 7   through their trials and tribulations, and he was very invested
 8   in it.
 9   Q.   Did that give you the impression that Bill Stone was a
10   good friend?
11   A.   It did.
12   Q.   So coming up to then -- tell the jury how Bill Stone
13   approached you to make this DEA Agent Jordan Green voicemail.
14   A.   It was in the summer of 2019, towards the end of June,
15   maybe June 28, 29th timeframe.  It was at the end of the day.
16   I was in the middle of a very complex work requirement.
17            And he called me and he said, Darla, he said, you're
18   a good Christian woman, and I know you want to help people, and
19   I know you will help me with this.  I need you to help save a
20   life tonight.
21            He said, I have a really good friend, and he's been
22   undercover, and he's gotten hooked on meth, and we need to do
23   an intervention.  Have you ever heard of that movie Scared
24   Straight, that show Scared Straight?
25            I said yes.
```

```
 1              He said, We need to do that kind of intervention.
 2   And I know you are good Christian woman, and I really need for
 3   you to call and leave a voicemail on my cell phone, and I need
 4   for you say some very specific things to help scare him
 5   straight.  And he had me write down a script, if you will.
 6   Q.   And when you say had you write down a script, who was
 7   authoring the words?
 8   A.   Bill was, and his friend Miles who he had on another line
 9   that he referred to often that was a friend of his and a former
10   law enforcement official with another agency.  And Miles could
11   hear me and what Bill was having me write, and then they had me
12   edit the script a little bit and then make changes.
13   Q.   You say, Miles could hear me.  How do you know that?
14   A.   Bill told me he could hear me.
15   Q.   Could you hear Miles?
16   A.   No, ma'am.
17   Q.   After you wrote down what Bill and Miles told you to say,
18   what did you do next?
19   A.   Well, I placed a phone call to his cell phone, and I
20   messed up and I had to redo it a couple of times or maybe more
21   than twice.  And I -- I left the message impersonating a DEA
22   agent, and I really regret that, and I'm very sorry that I did
23   that, very sorry.
24   Q.   Why are you very sorry?
25   A.   Because it was -- it was the wrong thing to do.  I thought
```

```
 1   I was helping someone, and I don't believe that that's what I
 2   was doing.
 3   Q.   After you --
 4   A.   And I'm also upset because I don't appreciate my
 5   Christianity being manipulated.  That really, really makes me
 6   sad.
 7            MR. GALLIAN:  I object at this time, Your Honor.
 8            THE COURT:  Objection?
 9            MR. GALLIAN:  She's just talking.
10            THE COURT:  Okay.
11            MR. GALLIAN:  There's no question asked.
12            THE COURT:  Question and answer format.  Sustained.
13   BY MS. MAX:
14   Q.   After you made the voicemail, did you get any feedback
15   from Bill Stone about it?
16   A.   I did.  He -- he said that he and Miles listened to it and
17   that it was -- I did a good job and that he had to go because
18   they had to do the intervention.
19            And then the next day I asked him, How did it go?
20            And he said good, they were able to get him into
21   rehab and that I helped save someone's life.
22            So that made me feel good that I was able to help
23   save someone's life.
24   Q.   So you were told your message worked?
25   A.   Yes, ma'am.
```

```
 1   Q.   Okay.  And I believe you said this was at the end of June
 2   2019?
 3   A.   Yes, ma'am.
 4   Q.   Okay.  Now, moving into July 2019, did you continue to
 5   hear more about the Ryan and Cassandra story?
 6   A.   Yes, ma'am.
 7   Q.   Okay.  Was there an engagement?
 8   A.   Yes, ma'am.
 9   Q.   Was that engagement broken off?
10   A.   Yes.
11   Q.   Who broke it off?
12   A.   Well, no, no, there wasn't -- it's a little confusing.
13   Q.   Okay.  Explain.
14   A.   Okay.  So Cassandra had broken up with Ryan while they
15   were in Europe on an assignment --
16   Q.   Okay.
17   A.   -- from their relationship, and then -- and then Ryan
18   proposed to Cassandra in an elaborate manner, from what I
19   recall, and she agreed to consider being -- getting married and
20   being engaged, which I found odd, because that's like being a
21   promise ring when you're in junior high.
22   Q.   Okay.  So, again, everything that you know about Ryan and
23   Cassandra is what Bill Stone told you?
24   A.   Yes, ma'am.
25   Q.   You had mentioned earlier that there had been talk that --
```

1  of money that Cassandra had given Ryan; is that correct?

2  A.   Yes, ma'am.

3  Q.   Okay.  Was there ever a discussion about whether Cassandra

4  could prove the money that she had given Ryan?

5  A.   Yes.

6  Q.   Okay.  Tell the jury about that.

7  A.   Well, Bill was asking, you know, about Cassandra having to

8  prove that Ryan owed this money, and so I had a stream of

9  consciousness and I spoke to a friend of mine who is an

10  attorney.  And my stream of consciousness was kind of aligned

11  with, you know, the burden of proof is on Cassandra to prove

12  that this money was given or loaned or whatever the

13  circumstances are, and that Ryan didn't have to prove that he

14  was innocent, but if he's an attorney he needs to act like one.

15  Q.   Okay.  So this is a conversation that you're having back

16  and forth with Bill Stone?

17  A.   Yes.  It was on the phone and text message.

18  Q.   Okay.  By phone and text, you're talking to Bill Stone

19  about whether or not Cassandra can prove the money that she

20  gave to Ryan?

21  A.   Yes, ma'am.

22  Q.   Okay.  In July of 2019, did Bill Stone seek your

23  assistance in deleting information off of his phones and

24  computers?

25  A.   He was asking technical questions, yes, ma'am, about you

1   know, how would you know what's been deleted from a phone or a

2   computer.  And I'm not -- I was not tech support, and so -- I

3   mean, I know enough to be dangerous with my phone.  But I

4   called Geek Squad, and then I called Mactracks, which is a

5   company -- I use Apple products, and they've helped me before

6   for my tech support.  So I called them, and I had them on

7   speakerphone, and then Bill was on speakerphone.  And he was

8   texting me questions to ask, specific questions to ask the tech

9   support people.

10   Q.   So you're not talking to Geek Squad or Mactracks for your

11   own personal benefit; is that right?

12   A.   No, ma'am.

13   Q.   Okay.  You're calling because Bill had been asking you so

14   many technical questions beyond your expertise?

15   A.   Yes, ma'am.

16   Q.   Okay.  Is Bill Stone able to, the way you're describing

17   the speakerphone, the speakerphone, is Bill Stone able to hear

18   the Geek Squad people?

19   A.   Yes, ma'am.

20   Q.   Did you ever say to Bill, Why don't you just call them

21   back?

22   A.   I don't recall.

23   Q.   Okay.  Why did you need to be the middleman?

24   A.   That's a good question.

25   Q.   I'm sorry, Ms. Bell.  You're going to have to let me

1    finish my question, because he can only take one at a time.

2    A.    I'm sorry.

3    Q.    Did you ever say to Bill Stone, why do I have to make the

4    call to Geek Squad?  Why can't you just call them directly?

5    A.    I don't recall.

6    Q.    Did you have any understanding as to why you had to be the

7    person placing the call to Geek Squad or Mactracks?

8    A.    I probably offered, because that is my personality.  He

9    was asking me all of these technical support questions, and I'm

10   not tech support, so I was like, I'll just call Geek Squad real

11   quick or Mactracks.

12             I called both of them, because I don't think Geek

13   Squad was very helpful.  But I had personally dealt with

14   Mactracks, so I talked to them.

15   Q.    And explain to the jury, what kind of technical support or

16   technical questions are y'all going over with Geek Squad?

17   A.    Well, it was basically if you -- if you get a device back

18   that has previously been yours and you lost it or you gave it

19   to someone, can you then see what was done on it, and can you

20   retrieve any information that was on it before, and can you see

21   what was done.

22   Q.    Were there any questions to Geek Squad about deleting

23   things off your devices?

24   A.    Yes, ma'am.

25   Q.    Okay.  Explain to the jury.

1   A.   Well, it was just can you see what was deleted, can you

2   retrieve what was deleted.  And I don't remember all of the

3   details pertaining that particular discussion and all of the

4   technical terms that were used by the tech support companies.

5   Q.   But to be clear, these were Bill Stone's questions to Geek

6   Squad, not your questions?

7   A.   Yes, ma'am.

8   Q.   In this conversation -- and this conversation would have

9   been about when?

10  A.   July 2019, maybe early August of 2019.

11  Q.   Okay.  Around that same time period, did Bill Stone

12  mention to you anything about needing to destroy hard drives?

13  A.   Yes, ma'am.

14  Q.   Okay.  Tell the jury about that.

15  A.   He told me that he was cleaning up his office and

16  decluttering and organizing and that he needed to get rid of

17  some old computer hard drives and old devices and that he was

18  going to go to a location in Plano because they could provide a

19  certificate of destruction.

20          And I said, Well, why don't you go to Shred-it.

21  They're a world -- you know, they have a great reputation.

22  Most companies use Shred-it.  I use them.  And they give you

23  onsite a certificate of destruction.

24          And while we were talking, I looked up the location

25  in Coppell and I texted it to him.

1   Q.   So this would have been in that same time period, end of
2   July, early August of 2019?
3   A.   Yes, ma'am.
4   Q.   At some point did you find out that Bill Stone was under
5   investigation?
6   A.   Yes, ma'am.
7   Q.   Explain to the jury how you found that out.
8   A.   It was early May of 2020, maybe May 6, May 7 kind of
9   timeframe.  And he told me that he had gotten -- he was working
10  in the D.C. area and that he had gotten a phone call from a
11  friend of his here in the Dallas-Fort Worth area that he had
12  been interviewed by investigators and that he was in trouble
13  and that there were some recordings that were -- that people
14  had of Bill and that he was under investigation.
15          And I asked him what for.
16          And he said, I don't know.  He said, but I need an
17  attorney and need to get one fast.
18  Q.   Did he eventually tell you that the investigation involved
19  an ex-girlfriend and allegations of money?
20  A.   Yes, ma'am.
21  Q.   Okay.  Whenever you found that out, what went through your
22  mind?
23  A.   Well, I was very distraught, because what he -- the little
24  bit that he shared with me -- and he shared bits of information
25  during different conversations when we would communicate.  And

```
 1    it was so closely aligned with the Cassandra and Ryan saga,
 2    which is the best way for me to describe it, that I spent a lot
 3    of time with him in 2019.
 4    Q.   Okay.
 5    A.   It was nearly aligned.
 6    Q.   Did you find out in June of 2020 that a search warrant had
 7    been executed on Bill Stone's home?
 8    A.   Yes, ma'am.
 9    Q.   Okay.  How did you find that out?
10    A.   He told me.
11    Q.   Tell the jury about -- well, did you have any concerns at
12    that point upon learning that information?
13    A.   Yes, ma'am.
14    Q.   Okay.  Tell the jury about that conversation.
15    A.   Well, Bill told me about the search warrant being executed
16    and what that entailed.  And I asked him, I said, one of --
17    what am I supposed to do if people come knocking on my door?
18              And he said, Why would they knock on your door?
19              And I said, Well, if they've confiscated your
20    technology and downloaded your technology, they're going to see
21    that we communicate.  They're going to figure out that we talk.
22              He said, they're not going to come knocking on your
23    door.
24              But I said what about that call, that Jordan Green
25    call?
```

```
 1                 He said, What call?

 2                 And I reminded him of the call he had me make.  And

 3    he said -- and excuse my language -- he said, You don't know

 4    shit.  He said, You don't say anything to anybody, what call.

 5                 And I told him, I said, If they come knocking on my

 6    door, I'm not lying for you.  I'm not lying to anybody, and I'm

 7    not lying for you.

 8                 MS. MAX:  Pass the witness.

 9                 THE COURT:  Members of the jury, are we doing okay?

10                 All right.  Ma'am, again, if you decide you need a

11    break, let me know.

12                 THE WITNESS:  Thank you.

13                 THE COURT:  Thank you.

14                 MR. GALLIAN:  May I proceed, Your Honor?

15                 THE COURT:  You may.  Your witness.

16                          CROSS-EXAMINATION

17    BY MR. GALLIAN:

18    Q.   Ms. Bell, my name is Gregg Gallian.  I'm an attorney

19    representing Bill Stone.  We have never met, have we?

20    A.   No, sir.

21    Q.   And I know that you have your frustrations in this case,

22    and I understand that.  I'm going to ask you some questions.

23    If at any point I ask a bad question, just let me know and I

24    will ask it again, okay?

25    A.   Okay.
```

```
 1   Q.   We attempted -- by "we," I mean collectively my team.  We
 2   tried to talk to you earlier this year, didn't we?
 3   A.   You did.
 4   Q.   Our investigator Jeff Clark, did you ever meet him in
 5   person?
 6   A.   Well, I saw him through my doorbell camera.
 7   Q.   Is that Jeff Clark sitting over there in the corner?  Does
 8   he look somewhat familiar?
 9   A.   Well, this is kind of blurry, and the Ring camera is a
10   little fuzzy.
11   Q.   Jeff had been trying to make contact with you for some
12   time.  Is that fair?
13   A.   Yeah, over about four days, I believe.
14   Q.   And at that point in time, you had been named as a witness
15   in a previous trial setting.  Were you aware of that?
16   A.   In a previous trial setting?
17   Q.   This case was originally supposed to go to trial back in
18   February.
19   A.   Yes, sir.
20   Q.   And you were placed on the government's witness list.  Did
21   you know that?
22   A.   Yes.
23   Q.   Okay.  So just in our due diligence, we tried to reach out
24   to you, correct?
25   A.   Yes.
```

```
 1   Q.   And very politely but also directly, you said you didn't
 2   really have any desire to talk to us, right?
 3   A.   Yes, sir.
 4   Q.   In fact, this is the first time you and I are talking.
 5   Can we agree?
 6   A.   Yes, sir.
 7   Q.   All right.  You don't want to be here.  Is that fair?
 8   A.   Yes.  That's correct.
 9   Q.   It's not fun being in the position that you're in right
10   now.  Do we agree?
11   A.   I agree with that.
12   Q.   And you probably despise Bill Stone for putting you in
13   that spot.  Do you agree?
14   A.   No.
15   Q.   Okay.  All right.  We've heard a phone call where an
16   individual announces themselves as Jordan Green who is a DEA
17   agent.  I'm sure that you've heard that phone call since the
18   time that you made it?
19   A.   Yes, sir.
20   Q.   Did the agents play it for you?
21   A.   They did.
22   Q.   When is the last time you heard that call?
23   A.   The last time I heard that call was in a meeting with the
24   prosecution team.
25   Q.   When would that have been, approximately?
```

```
 1   A.   February and then -- well, this trial has been moved so
 2   many times, so it's been played, I think, in every one of the
 3   meetings.
 4   Q.   So every time that we hear the recording, "My name is
 5   Jordan Green, I'm a DEA agent," that's the same call?  We're
 6   talking about the same call?
 7   A.   Yes, sir.
 8   Q.   Okay.  Prior to testifying today, were you ever threatened
 9   with prosecution by the Government?
10   A.   No.
11   Q.   In promise for your testimony today, were you promised
12   immunity?
13   A.   No.
14   Q.   Did they give you any sort of assurances whatsoever that
15   you would not be charged in this case?
16   A.   I'm sorry, I don't understand the question.  For what?
17   Q.   Well --
18   A.   Well, I mean, I -- I am not in trouble for anything.
19   Q.   Okay.  Did the Government, the prosecutors, or the case
20   agents, did they ever make you feel like you were in trouble?
21   A.   No, sir.
22   Q.   Prior to speaking with the Government or the case agents,
23   did you retain or hire a criminal defense attorney?
24   A.   No, sir.
25   Q.   Prior to taking the stand today, were you read your
```

1   Miranda rights or told that you have a right not to testify

2   against yourself?

3   A.   No, sir.

4   Q.   Okay.  And you're okay answering my questions?

5   A.   Yes, sir.

6   Q.   I'm going to ask you a question, and I want you to tell me

7   if this comports with what you did in that phone call.

8        Darla Bell falsely assumed and pretended to be an

9   officer, an employee acting under the authority of the United

10  State or any department, agency, or office thereof, that is, a

11  DEA agent.

12       Did you do that?

13  A.   I did.

14  Q.   We had you on a recorded phone call holding out as a DEA

15  agent; is that right?

16  A.   Yes, sir, I was manipulated into pretending to be a DEA

17  agent.

18  Q.   I understand.  But what I'm reading is the statute for

19  false impersonation of a federal official.

20  A.   Right.

21  Q.   We agree -- we agree that in that phone call you held

22  yourself out as a DEA agent, did you not?

23  A.   I did.

24  Q.   Okay.  Next factor, that while acting in such an assumed

25  and pretended character, Darla Bell demanded and obtained money

```
1    and other things of value.
2            Did you do that?
3    A.   No.
4    Q.   Never demanded money?
5    A.   From whom?  Demanded money?
6    Q.   For whoever the call was for.  Did you demand money?
7    A.   This call that you're talking about?  I'm so sorry, you
8    are confusing me.
9    Q.   In the phone call did you demand money?
10   A.   No.
11   Q.   Okay.  In the phone call did you demand property?
12   A.   No, sir.
13   Q.   What was your reason for making that phone call?
14   A.   I was helping Bill Stone be able to leave a message that
15   would scare his former colleague who had been undercover who
16   was hooked on meth to be able to get that individual into
17   rehab.
18   Q.   You thought you were helping somebody?
19   A.   I did think that.
20   Q.   Would you agree that with what you did it was kind of
21   messed up?
22   A.   I would agree at the time that I thought that I was doing
23   something to help save someone's life, but in retrospect I
24   would not allow myself to be manipulated again.
25   Q.   Do you think it's probably good advice never to do what
```

```
 1    you did again.  Do we agree there?
 2    A.   Yes.
 3    Q.   And the point I'm making, Ms. Bell, is that your sole
 4    purpose in making that phone call that day was to help the
 5    person that it was trying to scare, right?
 6    A.   Yes.
 7    Q.   You had no intention of getting money, no intention of
 8    getting property, correct?
 9    A.   Correct.
10         MR. GALLIAN:  Brief moment, Your Honor.
11         THE COURT:  Sure.
12         (Pause)
13         MR. GALLIAN:  Thank you very much, Ms. Bell.
14         Your Honor, I'll pass the witness.
15         THE COURT:  All right.  Are we doing okay, members of
16    the jury?  Are you doing okay?
17         THE WITNESS:  Yes, ma'am.
18         THE COURT:  If you need a break, let me know.
19         THE WITNESS:  Okay.
20         THE COURT:  Thank you.
21         THE WITNESS:  You're welcome.
22                      CROSS-EXAMINATION
23    BY MR. SELLERS:
24    Q.   Hello, Ms. Bell.
25    A.   Hi.
```

```
 1   Q.   How are you?
 2   A.   Hanging in there.  How are you?
 3   Q.   I'm good.  Thank you for asking.
 4   A.   Yes, sir.
 5   Q.   I have a few questions for you.  You met Bill -- I think
 6   it was around July of 2019?
 7   A.   No.
 8   Q.   '18?
 9   A.   No.
10   Q.   When?
11   A.   March of 2018.
12   Q.   March of '18.  But then in --
13   A.   I'm sorry, who are you?  I didn't -- I didn't get your
14   name.  I'm so sorry.
15   Q.   You're right.  I'm Frank Sellers.  I represent Joseph
16   DeLeon.
17   A.   Okay.
18   Q.   Fair to say you have never heard his name before?
19   A.   Correct.
20   Q.   Fair to say that the only -- I guess the story you were
21   told about Cassandra and Ryan only involved Cassandra and Ryan
22   and, you know, other characters, right?  It was rich with
23   detail, wasn't it?
24   A.   Yes, sir.
25   Q.   But Cassandra hadn't given money to anyone but Ryan,
```

```
 1   right?
 2   A.   Yes, sir.
 3   Q.   Okay.  And you said that that Cassandra and Ryan situation
 4   was closely aligned with what you believed could possibly be
 5   real life.  Is that true?
 6   A.   Yes, sir.
 7   Q.   All right.  But there was no -- there was no Joe character
 8   in that Cassandra and Ryan real life story, was there?
 9   A.   No, sir.
10   Q.   So I don't think I ever got -- so you met March of '18.
11   And y'all have, you know, a long text relationship.
12            Did you actually meet him in July of '19?  Is that
13   when it was?
14   A.   No, sir.
15   Q.   When did you meet him in person?
16   A.   We met face-to-face one -- only time, March 23, 2018.
17   Q.   March 23, 2018.
18            And when was it that you made that phone call?  In
19   '19?
20   A.   Yes, sir.
21   Q.   All right.  So between March of '18 or, you know, first --
22   that y'all met -- because y'all met and then kind of -- I guess
23   you met virtually and then met in person pretty shortly
24   thereafter.  Is that fair?
25   A.   Yes, sir.
```

```
 1   Q.   Okay.  And then that relationship sort of continued
 2   through 2019 and '20?
 3   A.   A friendship.
 4   Q.   A friendship.  Fair enough.
 5            And during that time, y'all exchanged a lot of text
 6   messages; is that right?
 7   A.   And phone calls.
 8   Q.   And phone calls?
 9   A.   Yes, sir.
10   Q.   In fact, I counted 571 pages of texts between you and
11   Bill.  Is that fair?
12   A.   Sure.
13   Q.   All right.  Sound about right?
14   A.   I haven't -- you would know better than I would.
15   Q.   You said something earlier.  Well, let me ask you this.
16   Did you trust the information that Bill was giving you back in
17   July of '19?
18   A.   Yes.
19   Q.   And did you trust him because of -- you know, we heard
20   about the stories he was telling you and the trifle or, you
21   know, the strife they were having in their marriage between
22   Cassandra and Ryan, right?
23   A.   No, they weren't married.
24   Q.   Well, relationship, whatever it was.
25   A.   Yes, I trusted Bill.
```

```
 1   Q.   And he gave you a lot of details about that story and why,
 2   you know, more to make it believable.  Is that correct?
 3   A.   Yes, sir.
 4   Q.   And then once he got your trust, you used the word he
 5   manipulated you with it.
 6   A.   Yes.
 7   Q.   Fair to say that he -- he used or abused your trust?
 8   A.   Well, I think that manipulation is abuse.
 9   Q.   Fair enough.
10            And his position in whatever federal agency it may or
11   may not have been, was that something that helped to fortify
12   the trust that you had in Bill?
13   A.   Yes.
14   Q.   And then so adding onto that, when he adds rich detail and
15   friends with names and stories and backgrounds, that ultimately
16   makes you trust him even more.  Is that fair?
17   A.   I think it adds to it, yes.
18   Q.   And, nevertheless, the only thing he did with it was
19   manipulate your trust?
20   A.   Yes.
21            MR. SELLERS:  Pass the witness.
22            THE COURT:  All right.
23                       REDIRECT EXAMINATION
24   BY MS. MAX:
25   Q.   Ms. Bell, did you ever financially benefit from your
```

```
 1   friendship with Bill Stone?
 2   A.   No.
 3           MS. MAX:  Can I publish Government Exhibit 90?
 4           THE COURT:  Has it already been admitted?
 5           MS. MAX:  Yes, Your Honor.
 6           THE COURT:  All right.  Permission is granted.
 7           (Audio played)
 8   BY MS. MAX:
 9   Q.   Ms. Bell, whose voice is that we hear there on
10   Government's Exhibit 90?
11   A.   Mine.
12   Q.   What was your intent when you made that call?
13   A.   To help save someone's life.
14   Q.   Did you have any intent to defraud anyone of money?
15   A.   No.
16   Q.   Did you have any intent to defraud someone of property?
17   A.   No.
18   Q.   Did you have any intent to defraud anyone of their
19   liberty?
20   A.   No.
21   Q.   If you had known that this call was being used to defraud
22   an innocent person of money, would you have done it?
23   A.   No.
24   Q.   Did you ever at any time expect to get money as a result
25   of you making this call?
```

```
 1   A.   No.
 2   Q.   Once you found out that Bill Stone had manipulated you --
 3   do you --
 4              THE WITNESS:  Do you have a tissue?
 5              MS. MAX:  May I approach, Your Honor?
 6              THE COURT:  You may.
 7              THE WITNESS:  Oh, thank you.  I'm sorry.
 8              THE COURT:  That's all right.  If you need a moment,
 9   let us know.
10              THE WITNESS:  I'm sorry.  I'm sorry.
11              THE COURT:  It's all right.  If you need a moment,
12   it's okay.
13              THE WITNESS:  No, I'm just disgusted.
14   BY MS. MAX:
15   Q.   Ms. Bell, is it safe to say at some point you realized
16   that Bill Stone had manipulated you into making that phone
17   call?
18   A.   Yes, ma'am.
19   Q.   Once you had found out that he had manipulated you, were
20   you willing to lie for him?
21   A.   Absolutely not.
22   Q.   Were you willing to lie to law enforcement for him?
23   A.   No.
24              MS. MAX:  Pass the witness.
25              MR. GALLIAN:  No further questions, Your Honor.
```

```
 1                 MR. SELLERS:  Same.

 2                 THE COURT:  All right.  Any objection to this witness

 3     being excused?

 4                 MR. GALLIAN:  No, Your Honor.

 5                 MR. SELLERS:  No, ma'am.

 6                 THE COURT:  All right.  Thank you for coming, ma'am.

 7     We appreciate you.  You are free to go.

 8                 THE WITNESS:  Thank you.

 9                 (Pause)

10                 THE COURT:  Members of the jury, are we doing okay?

11                 All right.  Everybody at the tables, clients,

12     everybody all right?

13                 MR. WESTFALL:  Yes, ma'am.

14                 THE COURT:  All right.  If anybody needs a break, let

15     me know.

16                 MS. RUDOFF:  Your Honor, at this time the Government

17     would call Andrew Latham.

18                 THE COURT:  All right.

19                 (Pause)

20                 THE COURT:  Go another half hour and then just a

21     stretch break.  Okay.  If you need one before that, please let

22     me know.

23                 Mr. Latham, come on down.  How are you?

24                 THE WITNESS:  Good.  How are you?

25                 THE COURT:  Good.  Come on in, get as comfortable as
```

```
 1   you can in a hard chair, please.  Glad to have you here.
 2            Let's do a little sound check.  I have an antiquated
 3   sound system.  So if you don't mind, just say your name for the
 4   jury.
 5            THE WITNESS:  Andrew Latham.
 6            THE COURT:  Can everybody hear okay?
 7            All right.  My kind court reporter Todd here will
 8   swear you in.
 9            (The witness was sworn)
10            THE COURT:  All right.  And so if you need anything,
11   please let us know.  If you need a break, just let me know.
12            THE WITNESS:  Thank you, Your Honor.
13            THE COURT:  Glad to have you here.
14            Your witness, ma'am.
15            MS. RUDOFF:  Thank you, Your Honor.
16            THE COURT:  You're welcome.
17            ANDREW LATHAM, GOVERNMENT'S WITNESS, SWORN
18                       DIRECT EXAMINATION
19   BY MS. RUDOFF:
20   Q.   Good afternoon.  Could you please introduce yourself for
21   the Court and the jury?
22   A.   My name is Andrew Latham.  I'm an investigative analyst
23   with the Department of Justice-Office of the Inspector General.
24   Q.   And how long have you been employed in that position?
25   A.   Since October of 2018.
```

```
 1   Q.   And how long in total have you been employed with the
 2   Department of Justice-Office of the Inspector General?
 3   A.   Since October of 2018.
 4   Q.   So approximately 18 -- or five years?
 5   A.   Almost five years.
 6   Q.   And for ease in communicating, is Department of
 7   Justice-Office of the Inspector General, is it often referred
 8   to shorthand as DOJ-OIG?
 9   A.   It is.
10   Q.   You said your current title was an investigative analyst,
11   correct?
12   A.   Correct.
13   Q.   I want to talk a little bit about your educational
14   background and your employment before coming to DOJ-OIG, okay?
15   A.   Okay.
16   Q.   Where did you graduate college?
17   A.   I graduated from the University of Texas at Arlington.
18   Q.   And what year did you graduate?
19   A.   2012.
20   Q.   What was your degree in?
21   A.   Business management.
22   Q.   Where did you work immediately following graduation in
23   2012?
24   A.   I worked for the Texas International Guard.  I held a
25   variety of full-time positions from 2013 through October of
```

1    2018.

2    Q.   And did any of those positions include a role as a

3    criminal intelligence analyst?

4    A.   I spent about two years serving as a criminal intelligence

5    analyst for the Texas Joint Counter Drug Task Force.  I was

6    assigned to support the DEA's Dallas field division.

7    Q.   And Texas International Guard, is that a component of the

8    Air Force?

9    A.   It is a reserve component of the Air Force.

10   Q.   Other than working and serving in that capacity after

11   graduation, did you serve in the military or for the

12   International Guard at any other point?

13   A.   I originally enlisted in July of 2007.

14   Q.   And are you currently still enlisted?

15   A.   I'm currently still serving.

16   Q.   In what capacity?

17   A.   I'm a captain serving as a security forces officer for the

18   Texas International Guard.

19   Q.   And is that something you do in the full-time capacity at

20   this point?

21   A.   I'm currently a traditional guardsman, so I typically go

22   in one weekend a month for military duty.

23   Q.   And so is that how you're able to also be full-time

24   employed with DOJ-OIG?

25   A.   Correct.

```
 1   Q.   I want to circle back to the time you spent as an
 2   investigative analyst -- I'm sorry -- a criminal intelligence
 3   analyst with the International Guard as well as your current
 4   role as an investigative analyst.
 5             What type of courses or training have you received to
 6   serve in this position?
 7   A.   I have received training on the financial records
 8   analysis, reviewing and analyzing phone records, as well as
 9   on-the-job training relating to analyzing records and law
10   enforcement information.
11   Q.   And you talked about financial records.  Did you say --
12   what other kind of records did you say?
13   A.   Phone records as well.
14   Q.   And so what are your duties currently in your position as
15   an investigative analyst with DOJ-OIG?
16   A.   I support case agents in their investigations regarding
17   fraud, waste, abuse and misconduct by reviewing and analyzing a
18   variety of different types of records.
19   Q.   When you say support a case agent, what do you mean by
20   that?
21   A.   I will review and analyze records, provide that -- the
22   results to the case agent to help them identify evidence that
23   they may need to locate or the next investigative steps that
24   would help their investigation.
25   Q.   And so as an investigative analyst, are you typically
```

1   involved in a case from the beginning all the way through to
2   the end?
3   A.   It just depends on the situation.
4   Q.   I want to turn your attention to the investigation of Bill
5   Stone and Joe DeLeon.  Are you familiar with it?
6   A.   I am.
7   Q.   And at what point did you become involved in this
8   investigation?
9   A.   Late April, early May of 2020.
10  Q.   And from the initial onset, what was your role in this
11  investigation of Joe DeLeon and Bill Stone?
12  A.   I was supporting the case agent, reviewing financial
13  records, phone records, extractions of cell phones and
14  computers, and then other records that were obtained during the
15  course of the investigation.
16  Q.   And is this the type of work that your background and
17  experience allows you to do?
18  A.   Yes.
19  Q.   You said that you became involved in late April or early
20  May of 2020, right?
21  A.   Correct.
22  Q.   Is that when DOJ-OIG also first became involved in the
23  investigation?
24  A.   Correct.
25  Q.   And how did that involvement come to fruition?

```
 1   A.   We received information from the U.S. Attorney's Office in
 2   Dallas of a complaint involving a then retired FBI agent who
 3   had convinced a woman that she was on secret probation and then
 4   obtained money from her.
 5   Q.   And understanding these basic facts, is this the type of
 6   investigation that DOJ-OIG would normally be called in to
 7   assist with?
 8   A.   Yes.
 9   Q.   Why is that?
10   A.   It relates to an employee or contractor of the Department
11   of Justice.  At the time we weren't sure how far back the
12   secret probation had gone, so it could potentially have
13   involved the subject at the time that he was still employed.
14   Q.   And so as an agency, part of your work is to investigate
15   individuals that may be employed by a federal law enforcement
16   agency or have prior connection to it?
17   A.   To the Department of Justice, correct.
18   Q.   After you received this basic information as a referral,
19   what was your next step?
20   A.   The next step was -- we received some information from the
21   Texas Rangers, and then there was an interview of Ms. Thompson.
22   Q.   Were you present for that interview?
23   A.   I was.
24   Q.   And from those meetings with Ms. Thompson, what types of
25   information did you receive as it related to this
```

1   investigation?

2   A.   I received financial records, phone records, and then

3   later received extractions of cell phones and computers as well

4   as documents related to vehicle purchases and the purchases of

5   a house.

6   Q.   And what information did Ms. Thompson provide you with

7   regards to what the secret probation was or how it worked, if

8   she provided any at all?

9   A.   She provided some information of her background with

10  Mr. Stone and Mr. DeLeon and kind of a general overview of the

11  secret probation.

12  Q.   Did she describe some of the nature of the financial

13  transactions that she engaged in related to the secret

14  probation?

15  A.   She did.

16  Q.   What kind of financial transactions did she describe?

17  A.   She mentioned cash withdrawals, checks, and a vehicle.

18  Q.   When she talked about cash withdrawals, did she give any

19  further description of what types of withdrawals they were?

20  A.   Large round dollar amounts, typically -- or the one that

21  she remembered best was $5,000.00.

22  Q.   Did she explain what these cash payments were for or why

23  she was making the withdrawals?

24  A.   She stated it was for travel expenses for Mr. Stone

25  relating to traveling to deal with her secret probation.

```
 1   Q.   And when she described that these payments would be made
 2   in conjunction with there being some kind of new case or legal
 3   crisis brought to her attention by Stone and DeLeon?
 4   A.   I'm sorry, can you say that one more time?
 5   Q.   Did she explain that -- anything about these withdrawals
 6   and cash transactions occurring in conjunction or at the same
 7   time as she would receive information from Mr. Stone about new
 8   legal crises or new charges she might be facing?
 9   A.   It seemed she would have to pay this money in relationship
10   to whenever Mr. Stone would need to travel to deal with
11   something related to her probation or another case.
12   Q.   And did she say how long these cash withdrawals and cash
13   transactions with Stone lasted approximately as it related to
14   her secret probation?
15   A.   She -- it started near the beginning of the secret
16   probation and continued until approximately -- I believe when
17   he said that he had moved from D.C. back to Texas.
18   Q.   And when you say "he," are you referring to Bill Stone?
19   A.   Mr. Stone, yes.
20   Q.   Did Casi Thompson talk about multiple vehicles that were
21   exchanged or bought by Casi for either Joe DeLeon or Bill Stone
22   as it related to the secret probation?
23   A.   Yes.
24   Q.   Did she explain how the vehicles would relate to this
25   probation?
```

A.   She gave an indication that they were payment for services
related to the probation.

Q.   And did she describe what kinds of vehicles these were?

A.   She mentioned a Mercedes, a Ford truck, and I believe a
Toyota truck as well.

Q.   Did she also -- I think you mentioned she talked about
financial transactions, including checks?

A.   Correct.

Q.   What information did she give you surrounding large checks
that she had provided to either Joe DeLeon or Bill Stone
related to the secret probation?

A.   She mentioned a large check for restitution and then a
large check for the purchase of a house.

Q.   Did she mention any other checks related to the secret
probation?

A.   I believe there's checks related to remodeling a home and
then a check to Mr. DeLeon.

Q.   And you said that she mentioned one large check was a
restitution payment.  Did she give any further description
about restitution for what or how that was related?

A.   It was related to some type of incident with Enterprise,
and I believe she estimated it was approximately $120,000.00
sometime in 2016.

Q.   Based on the initial information you received from Casi
Thompson, what type of documents did you start reviewing?

1    A.   Reviewed bank records for Ms. Thompson, Mr. Stone, and

2    Mr. DeLeon, along with telephone records for those three

3    individuals.

4              MS. RUDOFF:  Your Honor, may I approach the witness?

5              THE COURT:  You may.

6              (Pause)

7    BY MS. RUDOFF:

8    Q.   I'm showing you what's been previously marked as

9    Government's Exhibit 60.  What is this?

10   A.   This is a list of bank accounts belonging to Ms. Thompson,

11   Mr. Stone, and Mr. DeLeon that were relevant to the

12   investigation.

13   Q.   And did you create this document to show the bank records

14   you reviewed for these individuals related to this case?

15   A.   I did.

16             MS. RUDOFF:  Your Honor, at this time the Government

17   moves to admit Exhibit Number 60.

18             MR. GALLIAN:  No objection, Your Honor.

19             MR. WESTFALL:  No objection, Judge.

20             THE COURT:  Admitted.

21             (Government's Exhibit No. 60 received)

22             MS. RUDOFF:  Permission to publish?

23             THE COURT:  Granted.

24   BY MS. RUDOFF:

25   Q.   Is this the various bank accounts that you reviewed in

1    your investigation for each of the individuals we see listed

2    here?

3    A.   These are the relevant accounts that were reviewed.

4    Q.   And when you say relevant, do you mean that there were

5    other potential accounts you found not to be relevant?

6    A.   Correct.

7    Q.   And why were those not relevant?

8    A.   I did not see any information relating to the financial

9    transactions related to the secret probation.

10   Q.   And what time period were the records for these financial

11   accounts?

12   A.   They were for January of 2014 through May of 2020.

13   Q.   And why were those the relevant time periods you reviewed?

14   A.   They covered the time period leading up to the start of

15   the secret probation, the duration of the secret probation, and

16   the time immediately following.

17   Q.   Now, you have it broken down nicely in this chart for us

18   on Exhibit 60.

19        Is it fair to say that these records which we see

20   listed here contain a lot of pages of documents?

21   A.   That's correct.

22   Q.   And so, therefore, were the records voluminous?

23   A.   They were.

24   Q.   And how would you describe the amount of pages and records

25   you had to review related to the financials?

```
 1   A.   They were contained in dozens of files with thousands of
 2   pages.
 3   Q.   In reviewing the financial records, did you find that the
 4   information contained within them was helpful to your
 5   investigation?
 6   A.   It was.
 7   Q.   And how were they helpful to you?
 8   A.   They corroborated information provided by Ms. Thompson.
 9   Q.   And so after Casi Thompson was able to describe the types
10   of financial transactions, were you then able to go through the
11   records and find those transactions?
12   A.   I was.
13   Q.   In addition to reviewing bank records for Casi Thompson,
14   Joe DeLeon, and Bill Stone, did you also review cell phone
15   extraction reports generated from the cell phone devices of
16   these same three individuals?
17   A.   I did.
18   Q.   And from those extractions, what was the most important
19   information you focused on for your purpose of the
20   investigation?
21   A.   For the reviews I was conducting, it focused primarily on
22   messages, text messages, iMessages between those three
23   individuals.
24   Q.   And what types of information did the messages give you
25   additional evidence about?
```

1   A.   It provided additional context of things that were going

2   on during the timeframe of the payments or the financial

3   transactions as well as information related to the secret

4   probation.

5   Q.   Did it help you establish a timeline of when the secret

6   probation began and ended?

7   A.   It did.

8   Q.   Did the messages also help you determine the nature of the

9   roles and relationships between the parties throughout the

10  secret probation timeframe?

11  A.   It provided additional information regarding that.

12  Q.   Did the text messages and the phone communications assist

13  you in evaluating various information or statements provided by

14  Casi Thompson, Joe DeLeon, and Bill Stone?

15  A.   They did.

16  Q.   And were the cell phones extraction reports and the

17  messages you reviewed from them, were they also large and

18  voluminous to go through?

19  A.   They were.

20  Q.   And how would you describe them?

21  A.   There was multiple devices that were -- that had

22  extractions contained in multiple files with tens of thousands

23  of pages.

24  Q.   Did you also review telephone call records for Casi

25  Thompson, Joe DeLeon, and Bill Stone during this same

1   timeframe?

2   A.   I did.

3   Q.   And are those telephone call records what we often refer

4   to in law enforcement as toll records?

5   A.   That's correct.

6   Q.   Why was it important for your part of the investigation to

7   review the toll records of these three individuals?

8   A.   It helped provided additional information and context

9   regarding their communication as well as assisting in

10  developing a timeline of the secret probation.

11  Q.   And what years of records did you review for the tolls?

12  A.   We had toll records from 2014 through May of 2020.

13  Q.   And were these records also helpful in establishing the

14  physical location of the parties at different portions of the

15  secret probation?

16  A.   Yes.

17  Q.   How were these records helpful with regards to the

18  frequency of communication that you saw between the parties?

19  A.   They provide a record of calls and text messages between

20  the phone numbers used by those individuals that gives an

21  indication of how frequently they were talking with each other

22  and the duration of those calls.

23  Q.   And did the frequency corroborate some of the information

24  you received about when Joe DeLeon was involved as a probation

25  officer in the secret probation?

1    A.    They did.

2    Q.    And what about help you corroborate and establish a

3    timeline for when Joe DeLeon was no longer serving as a secret

4    probation officer?

5    A.    They provided an indication that was consistent with that.

6    Q.    Did they also provide information with regards to the

7    development over time of Bill Stone and Casi's interactions and

8    the frequency of them?

9    A.    It provided some information, yes.

10   Q.    Were these toll records for these individuals also

11   voluminous?

12   A.    They were.

13   Q.    How did you describe them?

14   A.    Again, contained in dozens of files with tens of thousands

15   of individual records.

16   Q.    Did you also review vehicle purchase agreements and title

17   records related -- and house records related to this case?

18   A.    I did.

19   Q.    What kind of records did you review for the vehicles that

20   Casi Thompson had mentioned?

21   A.    I reviewed purchase records from car dealerships as well

22   as title information.

23   Q.    And what types of records did you review for the house in

24   Colleyville?

25   A.    The closing package for the purchase of the home along

1    with public records from Tarrant County.

2    Q.    Why were these records important for you to review and

3    analyze?

4    A.    It showed how those assets were purchased along with the

5    ownership, how they were titled.

6    Q.    Did these records also corroborate the timing of the

7    transactions?

8    A.    They did.

9    Q.    Were these records also voluminous?

10    A.    They were.

11    Q.    Did you also have an opportunity to review and analyze

12    evidence that was recovered from Bill Stone's house during a

13    search warrant in June of 2000 -- I'm sorry -- June of 2020?

14    A.    I did.

15    Q.    What specific evidence recovered from the search of Bill

16    Stone's house was most important to your analysis in this

17    investigation?

18    A.    The -- Mr. Stone's calendars for 2015 through 2020.

19    Q.    And approximately how many calendars were seized that you

20    reviewed?

21    A.    I believe seven.

22    Q.    So seven.  That's more than the number of years, right?

23    A.    Correct.  There was two for 2020.

24    Q.    Talking about these calendars, are you talking about like

25    physical handwrite-in type calendars?

1    A.    Yes.

2    Q.    And how are the calendars helpful to your analysis?

3    A.    They provided information of Mr. Stone's activity,

4    including providing information that corroborated some of the

5    financial transactions.

6    Q.    Did it also provide documentation of the types of

7    interactions that -- and the frequency of interactions that

8    Stone was having with Casi Thompson throughout this time?

9    A.    They did.

10   Q.    Did it also provide you with realtime documentation of

11   Bill Stone's actions after he found out law enforcement was

12   investigating him?

13   A.    It did contain information on his activities following the

14   start of the investigation.

15   Q.    And did some of those activities also that were documented

16   also relate to Joe DeLeon?

17   A.    Some did.

18   Q.    And were these records also voluminous in nature?

19   A.    They were.

20   Q.    We've talked about a couple of different categories of

21   records, but just to be clear, these were just some of the

22   records you reviewed and analyzed for your portion of the

23   investigation, right?

24   A.    That's correct.

25   Q.    I want to talk first about the financial transactions that

1   took place within the first year of the secret probation, so

2   2015 through 2016.

3          Starting with your review of Casi Thompson's

4   financial records, what accounts did you review?

5   A.   For Ms. Thompson, I reviewed her accounts at J.P. Morgan

6   Chase and Navy Federal Credit Union.

7   Q.   And were you aware that Casi Thompson had other bank

8   accounts besides just these?

9   A.   I was.

10  Q.   And why were those not analyzed or reviewed?

11  A.   During the review of the accounts that we had records for,

12  as well as the information that she provided, we didn't see any

13  indications that there were financial transactions related to

14  the secret probation from those accounts.

15  Q.   And upon your review of the Navy Federal Credit Union and

16  the J.P. Morgan Chase accounts for Casi Thompson, what was the

17  timeframe that you established these transactions for the

18  secret probation took place?

19  A.   It would have been December of 2015 through November

20  of 2016.

21  Q.   And based on your investigation, is November 2016 when the

22  secret probation ended?

23  A.   No.

24  Q.   But that is when the -- you saw the financial transactions

25  to end, right?

1    A.    Correct.

2    Q.    Did you review the financial transactions alongside some

3    of the other evidence and records that we've discussed you

4    analyzed?

5    A.    I did.

6    Q.    And are all these records collectively voluminous in

7    nature?

8    A.    They are.

9    Q.    And would they be difficult to examine individually in

10   court?

11   A.    They would.

12   Q.    As a result, was part of your role in this investigation

13   to generate a chart to summarize some of the information

14   gathered from these voluminous records?

15   A.    It was.

16   Q.    And is your chart regarding the financial transactions,

17   what specifically -- what voluminous records is it based on?

18   A.    It's based on bank records, Mr. Stone's 2015 and 2016

19   calendars, as well as purchase information related to vehicles.

20   Q.    And is this chart something that would help in

21   understanding the analysis of the evidence you derived from the

22   voluminous record?

23   A.    It would be helpful.

24   Q.    Is the chart that you created for Casi Thompson's

25   financial records, has it previously been marked as

1    Government's Exhibit 19?

2    A.   Yes.

3            MS. RUDOFF:  Your Honor, at this time, Government

4    moves to admit Government's Exhibit 19.

5            THE COURT:  Any objection?

6            MR. WESTFALL:  No objections from us, Your Honor.

7            (Pause)

8            MR. GALLIAN:  A brief moment, Judge.  I'm sorry.

9            THE COURT:  Actually, I think now is a good time to

10   take a break.

11           Why don't we take our 10-minute break or even

12   shorter, just to powder noses, and then we'll come back.

13           All rise for the jury.

14           (Jury out)

15           THE COURT:  All right.  Everybody please be seated

16   for a minute.

17           So -- so everybody -- we will recess for a stretch

18   break.

19           Oh, please be seated -- or feel free to step down,

20   I'm sorry.

21           We are going to send you -- thanks for your feedback

22   on the jury charge.  We are going to send you back our edits

23   and talk about it later.  I don't expect you guys to do it

24   during the 10-minute break, but I wanted you to know it is

25   coming and we will discuss it later.

```
 1                   Let's take ten and come back.
 2                   SECURITY OFFICER:  All rise.
 3                   (Recess)
 4                   SECURITY OFFICER:  All rise.
 5                   THE COURT:  Everybody ready to rock and roll?
 6                   (Pause)
 7                   THE COURT:  Why don't you go ahead and stack them up
 8       for me.  If anybody needs a break, let me know.  Is everybody
 9       ready?  Check your phones.
10                   (Pause)
11                   SECURITY OFFICER:  All rise for the jury.
12                   (Jury in)
13                   THE COURT:  Everyone please be seated.
14                   And if you will check your phones for me as a
15       courtesy.
16                   Your witness.
17                   Oh, I'm sorry, sir?
18                   MR. GALLIAN:  No objection to 19, Your Honor.
19                   THE COURT:  All right.  Thank you.
20                   And --
21                   MR. WESTFALL:  No objection from us.
22                   THE COURT:  All right.  19 is in.
23                       (Government's Exhibit No. 19 received)
24                   MS. RUDOFF:  Permission to publish.
25                   THE COURT:  Granted.
```

```
 1   BY MS. RUDOFF:
 2   Q.   Andrew, do you see in the bottom left-hand corner --
 3             MS. RUDOFF:  If we could zoom in the bottom left-hand
 4   corner of this document.
 5   BY MS. RUDOFF:
 6   Q.   What is this list of?
 7   A.   This is a list of exhibits that were used to create this
 8   chart.
 9   Q.   And so those exhibits, they're records that have already
10   been entered into evidence as far as you know, right?
11   A.   As far as I'm aware.
12   Q.   Okay.
13             MS. RUDOFF:  Can we zoom back out?
14             And for columns 1 through 4, can we highlight those
15   or zoom in on those?
16             All the way to the bottom.  Sorry.
17   BY MS. RUDOFF:
18   Q.   Columns 1 through 4, where specifically did this
19   information come from?
20   A.   This is coming from the bank records for Ms. Thompson and
21   then for the vehicles from the titles for those vehicles.
22             MS. RUDOFF:  And if we could zoom out and highlight
23   the fifth column.
24   BY MS. RUDOFF:
25   Q.   Column Number 5, where is this information coming from?
```

```
 1   A.   This is from Mr. Stone's 2015 and 2016 calendars.
 2   Q.   Did you also review the financial records for Bill Stone
 3   and Joe DeLeon regarding the same time period?
 4   A.   I did.
 5   Q.   And did you also review those financial records alongside
 6   the other voluminous records that you described previously?
 7   A.   I did.
 8   Q.   And did you also create a chart summarizing the
 9   information obtained from these voluminous records?
10   A.   I did.
11   Q.   And does this chart help in presenting your analysis in
12   court that would otherwise be difficult to examine?
13   A.   That's correct.
14   Q.   And did you create the -- did you create this chart
15   yourself?
16   A.   I did.
17   Q.   And has that chart been labeled as Government's
18   Exhibit 115?
19   A.   That's correct.
20            MS. RUDOFF:  Your Honor, at this time the Government
21   moves to admit Government's Exhibit 115.
22            THE COURT:  Any objection?
23            MR. WESTFALL:  No objection from us, Your Honor.
24            THE COURT:  All right.
25            MR. GALLIAN:  No objection, Your Honor.
```

```
 1                THE COURT:  Admitted.
 2                    (Government's Exhibit No. 115 received)
 3                MS. RUDOFF:  Permission to publish?
 4                THE COURT:  Granted.
 5                MS. RUDOFF:  Government Exhibit 115, can we highlight
 6      the first four columns from top to bottom again?
 7      BY MS. RUDOFF:
 8      Q.   Where did this information come from?
 9      A.   This is coming from Mr. Stone and Mr. DeLeon's bank
10      records and then for the vehicles for the title information.
11      Q.   And what's the date range on this?
12      A.   This is December of 2015 through September of 2016.
13      Q.   And to be clear, this is not all financial transactions
14      located in these two individuals' accounts, right?
15      A.   That's correct.
16      Q.   So what specifically are these transactions related to?
17      A.   To the transactions detailed on Exhibit 19.
18      Q.   But what do these transactions relate to as far as the
19      timing and why you put them on this chart?
20      A.   These relate to the secret probation.
21                MS. RUDOFF:  If we could zoom out and highlight
22      column 5, please.
23      BY MS. RUDOFF:
24      Q.   On column 5 here, where did this information come from?
25      A.   This information comes from Mr. Stone's 2015 and 2016
```

1    calendars.

2    Q.   Would it aid your testimony to review these exhibits side

3    by side in a demonstrative version?

4    A.   It would.

5    Q.   And why would that help?

6    A.   To show the connection in timing between the transactions.

7    Q.   And would it aid the jury in understanding your testimony

8    to look at these exhibits together side by side in a

9    demonstrative?

10   A.   It would.

11           MS. RUDOFF:  Your Honor, at this time, permission to

12   publish Government demonstrative of Exhibit 19 and 115

13   together?

14           THE COURT:  Any objection?

15           MR. WESTFALL:  No, Your Honor.

16           MR. GALLIAN:  I have never seen it, but no objection.

17           THE COURT:  All right.  Permission granted.

18           MS. RUDOFF:  Thank you, Your Honor.

19   BY MS. RUDOFF:

20   Q.   This is small writing, so we're going to zoom in, if you

21   bear with me.

22           MS. RUDOFF:  Can we zoom in on just the two charts

23   next to each other to make those larger?

24   BY MS. RUDOFF:

25   Q.   Okay.  So here on the screen we have Government's

1    Exhibit 19 side by side with Government's Exhibit 115, correct?

2    A.    That's correct.

3    Q.    And before we go into the specifics of these exhibits --

4    we can leave them right here -- based on your review of all the

5    records in this case, after Bill Stone retired from the FBI in

6    October of 2015, when did he start receiving payments monthly

7    from his pension?

8    A.    In December 2015.

9    Q.    So starting in December 2015, approximately how much was

10   Bill Stone initially receiving per month from his pension

11   payout?

12   A.    Less than $700.00.

13   Q.    And so in the beginning, starting in December 2015, he's

14   receiving less than $700.00 a month from his pension to live

15   off of.

16          How long did the 700 or less payments last?

17   A.    Until July of 2016.

18   Q.    So from December 1, 2015, to July 1st of 2016, other than

19   the $700.00 a month Bill Stone was receiving from his pension,

20   did Bill Stone have any other legitimate source for money that

21   was coming into his accounts that you saw?

22   A.    He had some small monthly interest payments on his bank

23   account, a tax refund.  The only regular legitimate income that

24   I saw was the retirement payments.

25          MS. RUDOFF:  If we could highlight the first line on

1    the left side, the withdrawal on 12-16-15.

2    BY MS. RUDOFF:

3    Q.   What information led you to believe that this was related

4    to the secret probation?

5    A.   A review of the information provided by Ms. Thompson as

6    well as text messages.

7    Q.   And what text messages around that date did you look at?

8    A.   Messages between Mr. DeLeon and Ms. Thompson.

9    Q.   And what did those messages confirm to you?

10   A.   That this is the approximate start date of the secret

11   probation.

12   Q.   And what was contained in some of those messages that gave

13   you that inclination?

14   A.   There was information that Mr. Stone and Mr. DeLeon had

15   traveled to Ms. Thompson's home and met with her.

16          MS. RUDOFF:  Could we zoom out?

17          And can we highlight the first line across both -- we

18   can do the first three lines across both charts.

19   BY MS. RUDOFF:

20   Q.   So we see this on the left-hand side, the cash withdrawal,

21   the $1,000.00 from Casi Thompson's account on 12-16-2015.

22          What contained in Stone's financial records led you

23   to believe that this $1,000.00 was related to secret probation

24   and went to him?

25   A.   There is a $1,000.00 cash deposit on December 17th into

1    Mr. Stone's Wells Fargo account.

2    Q.   On December 18, 2015, we see on the left-hand side a cash

3    withdrawal made by Casi Thompson, right?

4    A.   That's correct.

5    Q.   And when you were looking through the financial records,

6    why did this $5,000.00 withdrawal stand out to you?

7    A.    It was consistent with the information provided by

8    Ms. Thompson regarding paying Mr. Stone $5,000.00 for travel

9    expenses.

10   Q.   And after the withdrawal was made, was there evidence that

11   you reviewed to show that Casi met in person shortly after that

12   with Bill Stone?

13   A.   Yes, there's a calendar entry from Mr. Stone's calendar.

14   Q.   And when was that calendar entry?

15   A.   On December 21, 2015.

16   Q.   So Bill Stone's calendar says he meets with -- we see it

17   says, Dinner project plus Joe.

18        What -- where did that terminology come from?

19   A.   That's the entry that's in the calendar.  The information

20   that I reviewed from Ms. Thompson indicated that she would be

21   referred to as project or project Number 2.

22   Q.   And on the same date that Stone writes in his calendar

23   that he meets project or Casi Thompson and Joe for dinner, what

24   do his financial records then show?

25   A.    His financial records show a $4,500.00 cash deposit into

1    Mr. Stone's Wells Fargo account.

2    Q.    And so in addition to his own notation in his calendar

3    about meeting with Casi, was there anything he -- any money

4    that you saw coming into his account at this time that would be

5    a reasonable alternative source for the $4,500.00 besides Casi

6    Thompson?

7    A.    No.

8    Q.    And on December 24, 2015, do we see Casi Thompson make yet

9    another $5,000.00 withdrawal?

10   A.    There is a $5,000.00 cash withdrawal from her account.

11   Q.    And does Bill Stone's financial records indicate a deposit

12   around that same time too?

13   A.    His records show a $5,000.00 cash deposit into his Wells

14   Fargo account on December 26th.

15   Q.    And how many days after Casi's withdrawal is there that

16   cash deposit by Bill Stone?

17   A.    Two days.

18            MS. RUDOFF:  If we could zoom out.

19            If we could highlight December 30, 2015, cash

20   withdrawal.

21   BY MS. RUDOFF:

22   Q.    What happens on December 30th according to the -- Casi

23   Thompson's financial records?

24   A.    There is a $5,000.00 cash withdrawal from her account.

25   Q.    Did you review any text messages that indicated why Casi

1   made this withdrawal or what the money was for?

2   A.   Yes.

3         MS. RUDOFF:   At this time, can we republish

4   Government's Exhibit 38 and go to page 498?

5         And can we zoom in starting with the second green

6   message from the top to the third green message from the top?

7   BY MS. RUDOFF:

8   Q.   And Andrew, Government Exhibit 38, what -- where are these

9   text messages coming from?

10  A.   These are from Mr. DeLeon's cell phone.

11  Q.   And who are these messages that we see here on the screen

12  between?

13  A.   Mr. DeLeon and Ms. Thompson.

14  Q.   What is the date of the messages?

15  A.   The date is December 27, 2015.

16  Q.   And can you read slowly the first green message we see on

17  the right?

18  A.   The first green message says, "S.A. Stone, FYI, booked his

19  flight to New York for tonight instead of tomorrow due to the

20  weather pattern.   He will leave tonight at 2300 hours instead

21  of 0300 hours.

22        "Still trying to book him a flight back hopefully

23  military so he doesn't have to pay."   And there's three dollar

24  signs.

25  Q.   And can you read -- and Casi Thompson responds to Joe

```
 1   DeLeon's message, right?
 2   A.   Correct.
 3   Q.   And she talks about having to pay for a hotel as well?
 4   A.   That's correct.
 5   Q.   And can you read Joe DeLeon's response?
 6   A.   The second green message states, "I don't know, the
 7   biggest concern was he would not make it because of the weather
 8   pattern.  We are tough, we can stay outside, underneath an
 9   awning, a lean-to or front porch.  Or he can hang out in the
10   airport.  It's always entertaining in an airport like that.  It
11   would be worth it to save you the money on the hotel room for
12   six hours or six and a half hours.  No way we would cost you
13   the money."
14   Q.   So we see here in Joe DeLeon's message, he says, "It would
15   be worth it to save you the money."
16            Who is he referring to the money would be
17   provided by?
18   A.   That would indicate Ms. Thompson.
19            MS. RUDOFF:  And can we go to page 506?
20            And can we highlight or zoom in on first green text
21   message?
22   BY MS. RUDOFF:
23   Q.   What is the date of this message?
24   A.   The date is December 29, 2015.
25   Q.   So the prior message we just went through, that was
```

1    December 27, 2015, right?

2    A.   Correct.

3    Q.   Okay.  So this is a couple of days later.  What is Joe

4    DeLeon discussing in this green message?

5    A.   Mr. Stone's travel back to the Dallas-Fort Worth area.

6    Q.   And is there a specific reference to where in the

7    Dallas-Fort Worth area, a city or county?

8    A.   He mentions Waxahachie, Texas.

9    Q.   And why does Waxahachie, Texas, matter or is relevant to

10   your investigation?

11   A.   I believe that is in Ellis County, which is one of the

12   counties that Ms. Thompson had mentioned that she supposedly

13   had issues -- legal issues in.

14   Q.   And were those legal issues that Bill Stone told her about

15   related to the secret probation?

16   A.   Correct.

17   Q.   And so is Joe DeLeon talking with her about the travel

18   plans for Bill Stone to go handle her legal issues related to

19   the secret probation?

20        MR. WESTFALL:  Object to speculation, Your Honor.

21        THE COURT:  You'll have to qualify how he knows, if

22   he knows; otherwise, I'll sustain.

23   BY MS. RUDOFF:

24   Q.   Do you know it based on that's what this message says?

25   A.   This message does talk about his travel to Waxahachie.

1            MS. RUDOFF:  Can we go to page 513?

2            And can we zoom in on the last blue message?

3   BY MS. RUDOFF:

4   Q.   Who is this message from?

5   A.   This is from Ms. Thompson.

6   Q.   And it says here on the screen Mimie, but how do we know

7   it's Casi Thompson?

8   A.   Based on the other messages from that number and the

9   information that Ms. Thompson provided that she had used her

10  grandmother's phone for a period of time.

11  Q.   And did her grandma go by Mimie?

12  A.   She did.

13  Q.   What does this text messages say?

14  A.   It says, "Do you know if he made it there."

15  Q.   And what is the date on that?

16  A.   December 30, 2015.

17  Q.   And can we go now to page 515?

18            MR. WESTFALL:  Your Honor, I'm not sure that's in

19  evidence.

20            THE COURT:  Okay.

21            MR. WESTFALL:  Mimie's phone, can we just check?

22            THE COURT:  Okay.

23            MS. RUDOFF:  It's -- the messages from Mimie's phone

24  are contained within Government's Exhibit 38.

25            MR. WESTFALL:  Okay.  Thank you.  Sorry about that.

```
 1                THE COURT:  No problem.  Takes a village.
 2                Your witness.
 3                MS. RUDOFF:  I think I said 515.  If we could go
 4     there next.
 5                And can we highlight the last two messages?
 6     BY MS. RUDOFF:
 7     Q.   And what is the date of this message?
 8     A.   The message in green is on December 30, 2015.
 9     Q.   And what is Joe DeLeon saying?
10     A.   "I will let you know as things develop today when I get
11     first report."
12     Q.   And what does Casi Thompson, using Mimie's phone, respond?
13     A.   "Okay.  What are you doing today?"
14                MS. RUDOFF:  And can we finally go to page 517?
15                Can we highlight and zoom in on the first two blue
16     messages?
17     BY MS. RUDOFF:
18     Q.   Are these messages also from Casi Thompson?
19     A.   They are.
20     Q.   What is the date of these messages?
21     A.   December 30, 2015.
22     Q.   And who is she sending the messages to?
23     A.   To Mr. DeLeon.
24     Q.   And what errands is Casi Thompson talking about running
25     that day?
```

1   A.   She mentions several, including the bank.

2   Q.   And what does the second text message say from Casi?

3   A.   "Still need to know how much," and then the dollar sign.

4   Q.   And this is what she's asking Joe DeLeon, correct?

5   A.   Correct.

6   Q.   And so all the messages we just reviewed were leading up

7   to December 30, 2015, right?

8   A.   Leading up to and on December 30th.

9   Q.   What do the toll records that you reviewed for Bill Stone

10  show as far as his location between December 27th and

11  December 30th of 2015?

12  A.   That he was in the Dallas-Fort Worth area.

13  Q.   And was there any evidence in those records indicating

14  that Bill Stone was traveling anywhere or left the state at the

15  time?

16  A.   No.

17  Q.   After Casi makes that $5,000.00 withdrawal on December 30,

18  2015, do we see Bill Stone making any deposits into his

19  account?

20  A.   We do.

21  Q.   And when do we see that?

22  A.   I believe it's January 2nd, but I need to see the chart.

23            MS. RUDOFF:  Can we republish Government's

24  demonstrative exhibit -- yes.

25            Can we go up so it includes 12-30?

```
 1              (Pause)
 2   BY MS. RUDOFF:
 3   Q.   So on the left-hand side we see the 12-30 cash withdrawal
 4   by Casi Thompson, and what do we see happen in Bill Stone's
 5   accounts in the days following?
 6   A.   On January 2nd, there is a $3,000.00 cash deposit into
 7   Mr. Stone's Wells Fargo account, and also on that same date
 8   there's a $2,000.00 cash deposit into Mr. Stone's Chase
 9   account.
10   Q.   And in the calendars do -- does Bill Stone write in his
11   own calendar the date of these deposits?
12   A.   There are -- there is an entry stating -- or WF deposit
13   and then Chase deposit, both on January 2nd.
14   Q.   And from what you reviewed of these records during this
15   timeframe, did you find any other reasonable legitimate source
16   of income that these cash deposits would be based on?
17   A.   No.
18              MS. RUDOFF:  If we could zoom -- actually, let's
19   leave it here.
20   BY MS. RUDOFF:
21   Q.   In January 2016, does Casi make several other 5,000 cash
22   withdrawals?
23   A.   She does.
24   Q.   When is the first one in January?
25   A.   First one is January 4th.
```

1  Q.   And on January 4, 2016, what does Bill Stone write in his
2  calendar?
3  A.   "Movie, project, Arlington."
4  Q.   And so for you is that evidence that Bill Stone met with
5  project on that evening?
6  A.   That would indicate that he met with her.
7  Q.   When is the next cash withdrawal in January that we see?
8  A.   January 8th.
9  Q.   And how much is that for?
10  A.   That is a $5,000.00 cash withdrawal.
11  Q.   Did you review any evidence to show that Casi met with
12  Bill Stone in person soon after that withdrawal?
13  A.   I reviewed text messages and phone records.
14  Q.   And the text messages and the phone records you reviewed,
15  did they indicate that there was a meeting on January 10th, two
16  days after that withdrawal was made?
17  A.   They indicate that Mr. Stone was in the Granbury area on
18  that date on the 10th.
19  Q.   And does it indicate when Bill Stone would have arrived in
20  Granbury and when he would have left Granbury?
21  A.   It does.
22  Q.   What does it say?
23  A.   I would have to see them again to know the exact times.
24  Q.   Is it a couple-hour timeframe?
25  A.   Approximately.

```
 1   Q.   And to be clear, at this time based on what you know from
 2   the evidence, where does Casi Thompson live?
 3   A.   In Granbury, Texas.
 4   Q.   And where does Bill Stone live?
 5   A.   During this time, I believe he is in Grapevine, Texas.
 6   Q.   When is the next $5,000.00 withdrawal we see Casi Thompson
 7   make?
 8   A.   On January 22nd.
 9   Q.   And is there evidence you reviewed from the text messages
10   to show that Casi met with Joe and Bill the same day she made
11   the withdrawal?
12   A.   I believe so.
13           MS. RUDOFF:  Can we republish Government 38?
14           And go to page 601.
15           Can we zoom in on the first green message from the
16   top through the third green message?
17   BY MS. RUDOFF:
18   Q.   The first green message from Joe DeLeon, what is the date?
19   A.   The date is January 22, 2016.
20   Q.   Is that the same date that Casi made the $5,000.00
21   withdrawal?
22   A.   It is.
23   Q.   And what is Joe DeLeon asking Casi?
24   A.   What time that she'll be home.
25   Q.   And what does Joe DeLeon respond once Casi provides him
```

1    with the time?

2    A.    He states that he's on his way from Dallas.

3    Q.    And does Casi respond okay?

4    A.    She does.

5    Q.    And then the last green message, what is Joe DeLeon's

6    response?

7    A.    "Casi, have a good night and sweet dreams.  Just walked in

8    the door.  Bill still has 79 more miles to go to get to

9    McKinney, Texas.  I'm looking forward to going to the movie

10   tomorrow."

11   Q.    What is the date and time of this message?

12   A.    The date is January 23, 2016, at approximately 1:10 in the

13   morning.

14   Q.    And so did these messages provide you evidence that Casi

15   met with Joe DeLeon and Bill Stone on January 22nd after she

16   made the $5,000.00 withdrawal?

17   A.    Yes.

18   Q.    And what about the toll records?  Did they further

19   corroborate Stone's location around that same time on

20   January 22, 2016?

21   A.    They did.

22         MS. RUDOFF:  If we could go back to the Government

23   demonstrative.

24         Can we highlight January 29, 2016?

25   BY MS. RUDOFF:

1    Q.   On January 29, 2016, what financial transaction do we see

2    Casi Thompson make?

3    A.   There is a $15,000.00 check payable to Mr. DeLeon and then

4    a $5,000.00 cash withdrawal from her account.

5    Q.   And on the same date, February 9th -- I'm sorry.  Soon

6    after that check is written by Casi on January 29th, do we see

7    a deposit of the same check into Joe DeLeon's account?

8    A.   There is a deposit or that check is deposited into

9    Mr. DeLeon's Wells Fargo account on February 9th.

10   Q.   Do we see after that check, January 29th, do we see

11   several cash withdrawals made by Casi in February of 2016?

12   A.   Yes.

13          MS. RUDOFF:  And if we could zoom out.

14          Can we highlight just Casi's February transactions?

15   BY MS. RUDOFF:

16   Q.   What dates do we see Casi Thompson do $5,000.00

17   withdrawals in February?

18   A.   February 3rd and February 11th are cash withdrawals, and

19   then on February 22nd there's -- she received $5,000.00 cash

20   back from a check deposit.

21   Q.   And on the dates February 3rd, 11th, and 22nd of 2016 when

22   Casi Thompson makes withdrawals, what evidence did you review

23   to indicate that Casi Thompson met with Joe DeLeon and Bill

24   Stone and provided the money to Bill Stone?

25   A.   Mr. Stone's 2016 calendar.

 1          MS. RUDOFF:  Can we at this time, Your Honor, publish
 2   Government Exhibit 93?  It has been admitted in the physical
 3   form, but this is the electronic version.
 4          THE COURT:  Sure.
 5          MS. RUDOFF:  Can we go to page 5?
 6          (Pause)
 7          MS. RUDOFF:  Your Honor, I misspoke, actually.  The
 8   physical calendars have been admitted already for record
 9   purposes, but I would like to admit Government's Exhibit 93,
10   the electronic version, for all purposes.
11          THE COURT:  All right.
12          MR. GALLIAN:  No further objection, Your Honor.
13          THE COURT:  All right.
14          MR. WESTFALL:  No objection from us, Your Honor.
15          THE COURT:  All right.  Admitted.
16          (Government's Exhibit No. 93 received)
17   BY MS. RUDOFF:
18   Q.   What is this that we see here on the screen?
19   A.   This is February 2016 from Mr. Stone's 2016 calendar.
20   Q.   And we're on page 5 of the calendar.
21          MS. RUDOFF:  And can we highlight February 3rd?
22   BY MS. RUDOFF:
23   Q.   What does it say on Wednesday, February 3rd?
24   A.   It says, "Project Number 2 paid."
25   Q.   And on February 3rd, is that the same date you saw the

1  cash withdrawal by Casi Thompson of 5,000?

2  A.   That's correct.

3         MS. RUDOFF:  Can we highlight February 11th?

4  Q.   What do we see written here on February 11th?

5  A.   "Project Number 2 house," and then the dollar sign.

6  Q.   And does this notation by Bill Stone match the same date

7  Casi Thompson made a $5,000.00 withdrawal?

8  A.   It does.

9         MS. RUDOFF:  Can we zoom out?

10        And can we go to February 22nd and highlight?

11  BY MS. RUDOFF:

12  Q.   What does Bill Stone write here on February 22nd?

13  A.   The calendar states "dinner with Joe/project" and a dollar

14  sign.

15        MS. RUDOFF:  Can we zoom out?

16  BY MS. RUDOFF:

17  Q.   And keeping this exhibit up, also in February your chart

18  lists there were transfer of title for vehicles to an F-150 and

19  a 2015 Lexus.  Do you recall that?

20  A.   I do.

21  Q.   And were the dates of those -- of the F-150 February 17,

22  2016?

23  A.   That's correct.

24  Q.   And the transfer of the Lexus title, was that February 22,

25  2016?

```
 1   A.   Correct.
 2           MS. RUDOFF:  Can we highlight here on Government's
 3   Exhibit 93 February 16th?
 4   BY MS. RUDOFF:
 5   Q.   What do we see here written by Bill Stone on
 6   February 16th?
 7   A.   The calendar entry is "Joe gets Project 2 truck."
 8   Q.   And is that consistent with the title record you reviewed
 9   as well as the information provided in the statements of Casi
10   Thompson?
11   A.   It is.
12           MS. RUDOFF:  Can we zoom out?
13           Can we zoom in on February 16th through the 19th?
14   BY MS. RUDOFF:
15   Q.   What date does the calendar -- Bill Stone's own notation
16   in the calendar and the records you reviewed show that Casi
17   purchased a new car for herself?
18   A.   That would be February 19th.
19   Q.   And is that what we see here where it says "Project new
20   car"?
21   A.   Correct.
22   Q.   And that is after the 16th where the records indicate and
23   the calendar shows Joe gets Project 2's truck, correct?
24   A.   That's correct.
25   Q.   So any testimony that Casi gave Joe DeLeon the truck
```

1   because she backed her new car into his car, based on the
2   records, would that statement be a lie?
3   A.   That would not be consistent with the records.
4   Q.   And do the title records that you reviewed show the title
5   to the F-150 was transferred from Thompson to Joe DeLeon on
6   February 17th?
7   A.   That was transferred from a trust controlled by
8   Ms. Thompson to Mr. DeLeon.
9   Q.   And on this transfer title documents, do you recall what
10  the listed sales price was for that F-150?
11  A.   It was listed as $20,100.00.
12  Q.   And did your review of the financial records show DeLeon
13  wrote Casi a check for this same amount?
14  A.   He did.
15  Q.   And was that also on February 16th?
16  A.   I don't recall the exact date that's on the check.
17  Q.   Did your review of the financial records indicate that at
18  some point Casi wrote a check back to Joe DeLeon for the same
19  amount?
20  A.   She did.
21          MS. RUDOFF:   And can we zoom out?
22  BY MS. RUDOFF:
23  Q.   Related to your review of records for this F-150, did you
24  learn what Joe DeLeon ultimately did with that F-150 that Casi
25  Thompson gave him?

```
 1    A.   He later sold it to CarMax.
 2    Q.   And did you review records from CarMax related to this
 3    transaction?
 4    A.   I did.
 5              MS. RUDOFF:  Your Honor, at this time the Government
 6    moves to admit Government's Exhibit 137.
 7              MR. GALLIAN:  No objection, Your Honor.
 8              THE COURT:  All right.
 9              MR. WESTFALL:  That's the records of CarMax?
10              MS. RUDOFF:  Uh-huh.
11              MR. WESTFALL:  Okay.  No objection, Your Honor.
12              THE COURT:  All right.  Admitted.
13              (Government's Exhibit No. 137 received)
14              MS. RUDOFF:  Permission to publish Government's
15    Exhibit 137?
16              THE COURT:  Granted.
17              Members of the jury, are you doing okay if I keep us
18    trucking 15 more minutes?
19              All right.
20              MS. RUDOFF:  Could we go to page 10 of these records?
21    BY MS. RUDOFF:
22    Q.   Andrew, did you review these CarMax records for the F-150?
23    A.   I did.
24    Q.   And what is this document that we see here on the screen?
25    A.   It's an appraisal offer from CarMax for that 2014 F-150.
```

 1                    MS. RUDOFF:  And can we zoom in from the top where it

 2     says vehicle all the way down to the appraisal offer price?

 3     BY MS. RUDOFF:

 4     Q.   Does this document confirm it's the Ford F-150 that was in

 5     Casi Thompson's -- or the Thompson trust before it went to Joe

 6     DeLeon?

 7     A.   It does.

 8     Q.   What does the mileage say?

 9     A.   10,160.

10     Q.   And what year was it?

11     A.   The appraisal offer or --

12     Q.   The vehicle.

13     A.   2014.

14     Q.   And what date is this appraisal offer made on?

15     A.   July 5, 2016.

16     Q.   And what do we see here the amount that CarMax offered Joe

17     DeLeon was for the truck?

18     A.   The offer was $37,000.00.

19                    MS. RUDOFF:  And can we highlight the conditions

20     assessed on the right-hand side of the screen?

21     BY MS. RUDOFF:

22     Q.   Per the CarMax records, was there any damage noted to the

23     body of the F-150?

24     A.   All the items are listed as good condition.

25     Q.   Is there anything here that indicates that the F-150 had

1   been hit by another car?

2   A.   No.

3   Q.   Or involved in any kind of accident?

4   A.   No.

5          MS. RUDOFF:  Can we go to page 23 of Government's

6   Exhibit 137?

7          And can we zoom in where it says "Addendum to Vehicle

8   Purchase" down to the bottom of the signature line?

9   BY MS. RUDOFF:

10   Q.   What is this document?

11   A.   It is an addendum to Texas Vehicle Purchase Agreement.

12   Q.   And is this something also contained in the CarMax

13   records?

14   A.   It is.

15   Q.   And can you read the second paragraph?

16   A.   "Except as disclosed by you in the blanks below:  You

17   represent and warrant that the vehicle is not rebuilt or

18   reconstructed, has not been involved in an accident, and has

19   not suffered body damage, frame damage, or flood damage."

20   Q.   And who is this document signed by?

21   A.   Mr. DeLeon.

22   Q.   What is the date of signature?

23   A.   The date listed is July 6, 2016.

24   Q.   So based on your review of the evidence, if in DeLeon's

25   interview with Ranger Briley on September 5th, if he told

1    Ranger Briley that he ended up having to sell the F-150 that

2    Casi transferred to him because Casi had backed into the truck

3    and caused damage, would that be consistent with what the

4    evidence shows?

5            MR. SELLERS:  I'm sorry, what date did you say?  I

6    couldn't hear you.

7            MS. RUDOFF:  I was referring to the interview with

8    Joe DeLeon on September 5, 2019.

9            MR. SELLERS:  Thank you.

10   BY MS. RUDOFF:

11   Q.   Would the records you reviewed be consistent with Joe

12   DeLeon's statement that the reason he sold the truck to CarMax

13   was because Casi had backed into it and caused damage?

14   A.   The records I reviewed did not indicate that there was any

15   damage to the vehicle.

16   Q.   And the 37,000 that was offered, did the financial records

17   you reviewed indicate whether or not that 37,000 was ever given

18   to Joe DeLeon from CarMax?

19   A.   The records indicated that he received a check from CarMax

20   for $37,000.00.

21   Q.   And did the financial records indicate that that check was

22   deposited into his account by Joe DeLeon?

23   A.   That's correct.

24   Q.   Did you also create a chart summarizing all of the records

25   related to the transfer and the purchase -- I'm sorry -- the

1  transfer and sale of the F-150 between Casi Thompson and Joe

2  DeLeon?

3  A.   I did.

4  Q.   And is the chart that you created based on the records

5  that we've already discussed and admitted into evidence?

6  A.   Yes.

7  Q.   And did you label that chart Government's Exhibit 160?

8  A.   That's correct.

9          MS. RUDOFF:  Your Honor, at this time I would move to

10  admit Government's Exhibit 160.

11          MR. GALLIAN:  No objection, Your Honor.

12          MR. WESTFALL:  No objection.

13          THE COURT:  All right.  It's admitted.

14          (Government's Exhibit No. 160 received)

15          MS. RUDOFF:  If we could republish Government's

16  Exhibit 93.

17          Actually, I'm sorry, let's publish Government's

18  Exhibit 160 for just a second.

19  BY MS. RUDOFF:

20  Q.   Is this that summary chart that you were referring to to

21  explain the transfer of the F-150?

22  A.   It is.

23          MS. RUDOFF:  Now can we republish Government's

24  Exhibit 93 and go to page 5?

25          Can we highlight February 19th?

1    BY MS. RUDOFF:

2    Q.    What does Bill Stone enter on February 19th in his

3    calendar?

4    A.    The entry for February 19th is "picked up Lexus vehicle,

5    Granbury, project's new car."

6    Q.    Based on your review of the records, what Lexus vehicle is

7    Stone referring to?

8    A.    This is likely the vehicle that had been owned by

9    Ms. Thompson that was then transferred to him.

10              MS. RUDOFF:  And can we zoom out and highlight

11   February 20th?

12   BY MS. RUDOFF:

13   Q.    What do we see about the Lexus on February 20th?

14   A.    There is an entry, states "clean Lexus."

15              MS. RUDOFF:  And can we highlight page -- I'm

16   sorry -- February 21st?

17   BY MS. RUDOFF:

18   Q.    What does Bill Stone write here about the Lexus?

19   A.    The entry is "new insurance for Lexus."

20              MS. RUDOFF:  And can we highlight February 22nd?

21   BY MS. RUDOFF:

22   Q.    What do we see here regarding project and the Lexus?

23   A.    There's an entry "dinner with Joe/project" and a dollar

24   sign, and then there's an entry "Lexus inspect" and then

25   "registered."

```
1              MS. RUDOFF:  And can we zoom back out?
2              And can we --
3     BY MS. RUDOFF:
4     Q.   So looking on what we just highlighted from February 19th
5     through February 22nd, is February 22nd the date that the title
6     records show the transfer happened?
7     A.   That's correct.
8     Q.   But does Stone's own calendar entries indicate that he had
9     the Lexus in his possession prior to that date?
10    A.   They do.
11    Q.   And that he was engaging in activities like cleaning and
12    getting insurance for it?
13    A.   That's correct.
14    Q.   And from the title records that were signed on
15    February 22, 2016, do you recall what Bill Stone entered was
16    the sales price listed for the transfer of the Lexus?
17    A.   I believe the purchase price was listed at $20,100.00.
18    Q.   Is that the same amount that Joe DeLeon listed in the
19    transfer of title documents for the truck?
20    A.   It's the same amount listed on the transfer of the truck.
21    Q.   Did any financial records that you review show that Stone
22    ever paid Casi any amount to take title of that Lexus?
23    A.   I didn't see anything in the records that I reviewed.
24    Q.   And at some point later did the records you reviewed show
25    what Stone did with this Lexus?
```

1    A.   The Lexus was used as a trade-in for the purchase of a

2    Mercedes.

3    Q.   And at the time of purchasing the Mercedes, what trade-in

4    value was given to Bill Stone for this Lexus?

5    A.   The dealership value of the trade-in at $43,000.00.

6    Q.   And so is the 43,000, is that why your financial summary

7    chart shows $43,000.00 on Stone's transactions for

8    February 22nd?

9    A.   That's correct.

10   Q.   I want to move on.  Looking at March 2016 --

11            MS. RUDOFF:  Can we go to page 6 of Government

12   Exhibit 93?

13            And can we highlight March 1st?

14   BY MS. RUDOFF:

15   Q.   What does Bill Stone write that he is doing on March 16,

16   2016?

17   A.   The entry says "mediation 9:00 a.m., settlement reached!"

18   Q.   Did you review records related to a mediation Bill Stone

19   attended on March 1, 2016?

20   A.   I did.

21   Q.   And were these records obtained from the civil case filing

22   for Bill Stone's divorce with his ex-wife?

23   A.   They were.

24   Q.   And where were these records obtained from?

25   A.   From Tarrant County.

```
 1    Q.   Is it the District Clerk's office?
 2    A.   I believe that's correct.
 3              MS. RUDOFF:  Your Honor, at this time, the Government
 4    moves to admit Government's Exhibit 31.
 5              THE COURT:  Is that a new exhibit?
 6              MS. RUDOFF:  Yes, Your Honor.
 7              THE COURT:  All right.
 8              MR. GALLIAN:  No objection.
 9              MR. WESTFALL:  No objection.
10              THE COURT:  Admitted.
11                  (Government's Exhibit No. 31 received)
12              MS. RUDOFF:  Permission to publish Government's
13    Exhibit 31?
14              THE COURT:  Granted.
15    BY MS. RUDOFF:
16    Q.   Looking at page 1, what is this document?
17              MS. RUDOFF:  Can we zoom in from cause number down to
18    the title of the document?
19    BY MS. RUDOFF:
20    Q.   What is this document?
21    A.   The title is "Agreed Order to Abate Qualifying Retirement
22    Benefits Court Order for Division of Civil Service Retirement
23    System Benefits and Modify Property Division."
24    Q.   And prior to getting these records from the Tarrant County
25    District Clerk's office, did you otherwise come across these
```

1    records in your investigation?

2    A.   I did.

3    Q.   And when or where was that?

4    A.   There was documents seized during the search warrant of --

5    executed at Mr. Stone's house.

6    Q.   So a copy of this document existed in Bill Stone's house

7    at the time of the warrant?

8    A.   I would have to look at the rest of this document to

9    verify it was the same one, but there was one relating to a

10   modification of his divorce agreement.

11            MS. RUDOFF:  Can we go to page 3 of this document?

12            And can we highlight that first paragraph?

13   BY MS. RUDOFF:

14   Q.   Can you please read the first sentence of this paragraph?

15   A.   "It is ordered that William R. Stone, Jr. shall tender to

16   Stacey F. Stone the sum of $230,000.00 on or before March 4,

17   2016 in the form of a cashier's check payable to Stacey F.

18   Stone."

19   Q.   Can you read the second sentence?

20   A.   "It is further ordered that as of March 1, 2016 Stacey F.

21   Stone relinquishes any and all interests she has or may have in

22   William R. Stone, Jr.'s civil service retirement system

23   benefits."

24   Q.   And based on your investigation, are you familiar with

25   what civil service retirement system benefits are?

1   A.   Yes.

2   Q.   And what are they?

3   A.   It's a retirement system previously used by the federal

4   Government.

5   Q.   Would that include the FBI?

6   A.   It would.

7         MS. RUDOFF:  Can we go to page 7, please?

8   BY MS. RUDOFF:

9   Q.   And what is this document?

10  A.   The title of this document is Mediated Settlement

11  Agreement.

12  Q.   And based on the time stamp in the upper right-hand

13  corner, when was this document filed?

14  A.   It was filed on March 1, 2016.

15  Q.   What time?

16  A.   The time listed is 1:42 p.m.

17  Q.   And it says it is a mediated settlement agreement, right?

18  A.   That's correct.

19  Q.   So were these records related to the mediation Bill Stone

20  wrote in his calendar on March 1, 2016?

21  A.   Yes.

22        MS. RUDOFF:  Can we go to page 11?

23  BY MS. RUDOFF:

24  Q.   What date is this document signed and agreed to?

25  A.   March 1st, 2016.

1   Q.   And who are the parties that have signed and agreed to it?

2   A.   Stacey Stone and William Stone.

3            MS. RUDOFF:  And can we go to page 12, please?

4   BY MS. RUDOFF:

5   Q.   Under Exhibit A, paragraph 1, what does this say?

6   A.   "Husband to tender to wife the sum of $230,000.00 on or

7   before March 4th, 2016, in the form of a cashier's check

8   payable to wife.  Said sum shall be delivered to wife's

9   attorney by 3:00 p.m. on March 4th, 2016."

10           MS. RUDOFF:  And finally, can we go to page 13?

11           Can we highlight the handwritten portion?

12  BY MS. RUDOFF:

13  Q.   Might be a little difficult.  Can you read what that says?

14  A.   "Failure to tender the sum agreed herein, at the times and

15  dates set forth, shall revoke this agreement and award wife 100

16  percent of husband's Civil Service Retirement System benefits

17  accrued from date of marriage through date of divorce.

18           THE COURT:  When you reach a natural stopping point,

19  it is time for a break.

20  BY MS. RUDOFF:

21  Q.   And based on your review of the modified divorce agreement

22  and the settlement agreement, was this what the parties agreed

23  to on March 1st, 2016?

24  A.   Yes.

25           MS. RUDOFF:  We can take a break.

```
 1                THE COURT:  All right.

 2                Everyone will rise for the jury.

 3                We will take our half-hour break.

 4                (Jury out)

 5                THE COURT:  All right.  Everybody please be seated.

 6                Let's do just a little bit of housekeeping and then

 7     I'll release everybody -- sir, feel free to step down and start

 8     your break.  Appreciate you.

 9                So off the record for a moment.

10                (Discussion off the record)

11                SECURITY OFFICER:  All rise.

12                THE COURT:  Got everybody back?

13                MR. WESTFALL:  Yes, Your Honor.

14                THE COURT:  Did Taylor give everybody time

15     calculations?  We understand that includes cross.

16                Yes?

17                MR. GALLIAN:  All right.  So we're in first place.

18     We only used 11 minutes.

19                THE COURT:  First place?  Awesome, awesome.  Okay.

20                As long as everybody knows that includes everything.

21                Oh, yeah.

22                (Pause)

23                SECURITY OFFICER:  All rise for the jury.

24                (Jury in)

25                THE COURT:  All right.  Everyone please be seated.
```

```
 1              And as a courtesy to the Court, if everybody will
 2    check, make sure their phones are off.
 3              And with that said, your witness, ma'am.
 4              MS. RUDOFF:  Thank you, Your Honor.
 5              THE COURT:  You're welcome.
 6              MS. RUDOFF:  May I clarify one thing for the record.
 7    I had previously referred to and admitted Government Exhibit 93
 8    for all purposes.  I want to clarify that the electronic
 9    version is going to be Government Exhibit 93-A, so that there
10    is a distinction between the one that is for just the record
11    and the one that's going to be for all purposes.
12              THE COURT:  Okay.  Have we previously just admitted
13    that as 93?
14              MS. RUDOFF:  Yes.
15              THE COURT:  I've got you.  Any objections to 93-A?
16              MR. GALLIAN:  No further objection, Your Honor.
17              THE COURT:  All right.
18              MR. WESTFALL:  No objection.
19              THE COURT:  All right.  It's admitted.
20                 (Government's Exhibit No. 93-A received)
21              MS. RUDOFF:  And with regard to the other calendars,
22    which are Government Exhibit 92 through 98, having already
23    discussed 93, the Government would move at this time to admit
24    for all purposes 92-A.  We already discussed 93-A, 94-A, 95-A,
25    96-A, 97-A, and 98-A; each of which will be for all purposes.
```

```
 1              THE COURT:  All right.  Any objection?
 2              MR. GALLIAN:  No further objection, Your Honor.
 3              MR. WESTFALL:  No objection.
 4              THE COURT:  All right.  Admitted.
 5                  (Government's Exhibit Nos. 93-A, 94-A, 95-A, 96-A,
 6                  97-A, and 98-A received)
 7              MS. RUDOFF:  Thank you, Your Honor.
 8              THE COURT:  You're welcome.
 9    BY MS. RUDOFF:
10    Q.   Andrew, before the break, we finished looking at Bill
11    Stone's mediated divorce agreement, right?
12    A.   Yes, ma'am.
13    Q.   When you reviewed Bill Stone's financial records for the
14    time -- for the date of March 1st, 2016, do you recall
15    approximately how much money he had in his account?
16    A.   His Wells Fargo account had approximately $207,000.00.
17    Q.   And so on March 1st, 2016, did his financial records
18    indicate he made a purchase that day for a cashier's check?
19    A.   That was March 1st, yes.
20    Q.   And do you recall how much that cashier's check's was for?
21    A.   The cashier's check was for $230,000.00.
22    Q.   After Bill Stone purchased that cashier's check, do you
23    recall how much approximately remained in his Wells Fargo
24    account that day?
25    A.   It was a little over $7,600.00 remaining in that Wells
```

1    Fargo account.

2    Q.   Based on this information, does it appear he purchased the

3    $230,000.00 cashier's check using money from his Wells Fargo

4    account as well as additional cash that he had?

5    A.   Yes, it appears likely he used some additional cash to

6    complete the purchase of that check.

7            MS. RUDOFF:  If we could republish Government's

8    Exhibit 93-A and go to page 6.

9            And can we highlight March 2, 2016?

10   BY MS. RUDOFF:

11   Q.   What do we see Bill Stone wrote here?

12   A.   The entry for March 2nd says "Cashier's check to Jessica

13   for settlement."

14   Q.   And is that documentation consistent with the $230,000.00

15   cashier's check Stone purchased for the divorce settlement?

16   A.   It is.

17           MS. RUDOFF:  If we could republish the Government

18   demonstrative.

19           If we could highlight on Casi's side, March 2nd,

20   2016.

21   BY MS. RUDOFF:

22   Q.   What do we see on March 2nd, 2016, from Casi's financial

23   records?

24   A.   On March 2nd, she purchased a cashier's check that was

25   payable to Mr. Stone for $250,000.00.

1   Q.   And based on the record, when does Stone deposit the

2   $250,000.00 cashier's check?

3   A.   Based on the records, on March 5th, 2016.

4   Q.   And is that based on the financial records?

5   A.   And the 2016 calendar as well.

6         MS. RUDOFF:  Can we republish Government's Exhibit

7   93-A, page 6?

8         If we could highlight March 4th and 5th.

9   BY MS. RUDOFF:

10  Q.   And what do we see Bill Stone write down on his calendar

11  March 4th?

12  A.   The entry for March 4th is "dinner Dave/Busters with

13  project, kids, Joe," and then "project" with a dollar sign.

14  Q.   And what about March 5th?

15  A.   The entry on March 5th states "dinner with project, kids,

16  Joe," and then "bank deposit."

17  Q.   On March 4th, 2016, do we see Casi make a withdrawal in

18  cash?

19  A.   I believe that's correct.

20  Q.   And was that withdrawal for 15,000?

21  A.   It was.

22  Q.   And based on the calendar entries on March 4th, did the

23  record indicate that Stone met with "project," as it states?

24  A.   That's correct.

25  Q.   And did he enter a dollar sign regarding that meeting?

1  A.   There's a dollar sign on the calendar entry for March 4th.

2  Q.   Now, when Casi Thompson was interviewed by DOJ-OIG in May

3  of 2020, did she mention having to give Stone a large check for

4  restitution to Enterprise?

5  A.   She did.

6  Q.   Do you remember, how much did she initially recall the

7  amount of the check being?

8  A.   She provided an estimate of 120,000.

9  Q.   And during her interview, did she say she knew it was

10 120,000 for sure?

11 A.   She identified that as an estimate.

12 Q.   And did she indicate that the amount was in that range?

13 A.   She indicated it was a large amount.

14 Q.   Did she tell you approximately when Stone told her about

15 the restitution or that she had to pay it?

16 A.   In 2016.

17 Q.   Based on this information, did you look in her bank

18 records and look for my large cashier's checks issued to Bill

19 Stone in 2016?

20 A.   I did.

21 Q.   And what did you find?

22 A.   There were two large cashier's checks that were made

23 payable to Mr. Stone in 2016.

24 Q.   What were the two checks?

25 A.   That there was one in March for $250,000.00 and then one

1    in, I believe, September for $154,500.00.

2    Q.   So nowhere in the records did you find a large cashier's

3    check made out to Bill Stone for $120,000.00?

4    A.   That's correct.

5    Q.   Based on the information in the financial records, as well

6    as the statements given and Bill Stone's calendars as

7    corroborating evidence, did you determine what the $250,000.00

8    cashier's check was related to?

9    A.   Based on a review of the records, the $250,000.00

10   cashier's check is the Enterprise payment for restitution that

11   Ms. Thompson identified.

12   Q.   Was there any evidence in the records that you could find

13   to show that a $250,000.00 cashier's check from Casi Thompson

14   to Bill Stone in March of 2016 could be for something besides

15   the restitution payment to Enterprise?

16   A.   Not that I found.

17   Q.   And did you also review text messages between Casi and Joe

18   DeLeon and Joe DeLeon and Bill Stone that took place around

19   March 3rd and March 4th, 2016?

20   A.   I did.

21   Q.   And with regards to the messages between Bill Stone and

22   Joe DeLeon, do you recall what these messages discussed?

23   A.   During that time period, I believe they discussed

24   Mr. Stone traveling to Austin.

25   Q.   And did Bill Stone indicate around when he would be flying

```
 1   back from his travel to Austin?
 2   A.   I believe that was on March 4th, but I would need to view
 3   the messages to be sure.
 4   Q.   And in the calendar entry that we saw in 93-A, was there a
 5   meeting with Joe and Casi and Bill Stone on March 4th?
 6   A.   There is an entry for a meeting, yes.
 7   Q.   And where was that at?
 8   A.   I believe -- I would need to see it.
 9            MS. RUDOFF:  Can we republish Government's
10   Exhibit 93-A?
11            And highlight March 4th.
12   BY MS. RUDOFF:
13   Q.   Do you see where it says that the -- where the dinner was
14   at?
15   A.   Yes.
16   Q.   And where is that?
17   A.   Dave/Busters.
18   Q.   And was the mention of Dave and Busters also consistent
19   with the conversation and text messages between Joe DeLeon and
20   Casi for March 4th?
21   A.   It was.
22            MS. RUDOFF:  Can we publish Government Exhibit 96-A?
23   And go to page 10.
24            And can we highlight and zoom in on July 20th?
25   BY MS. RUDOFF:
```

1   Q.   On July 20th of 2019, do we see Bill Stone write down

2   anything about Casi and the restitution?

3   A.   Yes.

4   Q.   And what -- first of all, what is the full context -- or

5   content of this calendar from Bill Stone?

6   A.   This is the calendar for 2019.

7   Q.   What is written on this date?

8   A.   On the 20th there's an entry, it states, "Meet project,

9   refused to sign papers."  And then further down, "asked about

10  restitution money."

11  Q.   And is this calendar entry also consistent with the

12  information you reviewed in the financials and received from

13  Casi Thompson about restitution to Enterprise?

14  A.   It is.

15        MS. RUDOFF:  And can we republish the Government

16  demonstrative of Exhibits 19 and 115?

17        Can we highlight or can we zoom in on March 2016, all

18  the way across?

19  BY MS. RUDOFF:

20  Q.   What do we see on the left-hand side the cash withdrawal

21  is from Casi on March 4th, 2016?

22  A.   On March 4th there is a $15,000.00 cash withdrawal from

23  Ms. Thompson's account.

24  Q.   And based on what we just looked at in the calendar, was

25  there indication in Stone's calendar that money was given to

1  him by project on March 4th?

2  A.   There was.

3  Q.   And did you review additional evidence from Bill Stone's

4  financial record that showed a series of cash deposits between

5  March 28th, 2016 and April 23rd, 2016?

6  A.   I did.

7  Q.   Is that what we see here on the right-hand side?

8  A.   That's correct.

9  Q.   And do we also see calendar entries for those dates in

10 Bill Stone's calendar on the far right?

11 A.   That's correct.

12 Q.   Approximately how much do those cash deposits total up to?

13 A.   It's a little over $12,000.00.

14 Q.   So based on your review of those records, was that

15 consistent with Casi Thompson giving Bill Stone 15,000 in cash

16 on March 4th?

17 A.   It was.

18 Q.   From your review of the financial records, was there any

19 evidence you saw to show that these series of cash deposits

20 made by Bill Stone came from a source other than Casi Thompson?

21 A.   The records that I reviewed did not indicate another

22 source for that -- those cash deposits.

23 Q.   And you said the text messages on March 3rd and 4th

24 between the parties were consistent with Stone saying he was

25 having to travel for Casi's cases, correct?

1    A.   That's correct.

2    Q.   Did you review the toll records for that timeframe with

3    regards to Bill Stone?

4    A.   I did.

5    Q.   And where was Bill Stone located, according to those toll

6    records?

7    A.   Those records indicate that he was in the Dallas-Fort

8    Worth area during that time.

9    Q.   And so there was no actual travel?

10   A.   There is no indication in the phone records of travel

11   outside of the Dallas-Fort Worth area.

12   Q.   In this same image, do we see a cash withdrawal on May

13   6th, 2016?

14   A.   That's correct.

15   Q.   And how much is that for?

16   A.   That is a $5,000.00 cash withdrawal.

17   Q.   And what evidence did you have to corroborate that this

18   5,000 was given to Bill Stone?

19   A.   The following day there is a cash deposit into Mr. Stone's

20   Chase account, along with a calendar entry indicating a dinner

21   with project.

22   Q.   And were there, in fact, during this timeframe, two

23   dinners -- two different dinner dates?

24   A.   There's also a meeting indicated on May 6th.

25   Q.   So in the calendar on May 6th, Bill Stone writes "Meet

```
 1  project," right?
 2  A.   That's correct.
 3  Q.   On May 7th he writes what?
 4  A.   "Dinner with Joe, project" on May 7th.
 5  Q.   Did you see anything else in the financial records that
 6  indicated this money, this $5,000.00 withdrawal in May of 2016
 7  went anywhere other than Bill Stone?
 8  A.   I did not see any indication otherwise.
 9            MS. RUDOFF:  Can we republish Government's
10  Exhibit 93-A?
11            Can we go to page 8?
12            And can we zoom in on May 6th, 7th, and then the
13  notes next to it?
14  BY MS. RUDOFF:
15  Q.   Are these the calendar entries that you just referred to
16  on your summary charts?
17  A.   That's correct.
18  Q.   And so what does it say on May 6th?
19  A.   "Meet project" and "Arlington."
20  Q.   And May 7th?
21  A.   "Dinner with Joe, project."
22  Q.   And here we see in the notes, what is listed there?
23  A.   It says "Amex annual fee due, pay USAA," and "paid FBIAA."
24            MS. RUDOFF:  Can we zoom out?
25            And can we zoom in on May 18th?
```

```
 1   BY MS. RUDOFF:
 2   Q.   What does it state here?
 3   A.   States "Chase and Wells Fargo."
 4   Q.   And what else does it say?
 5   A.   It also states "P.O. box, paid AMEX annual fee, paid Citi,
 6   paid FBIAA."
 7   Q.   And throughout the calendars would you -- did you see a
 8   lot of instances where Bill Stone would list out all the bills
 9   he needed to pay in any particular month?
10   A.   I did see multiple instances of that occurring.
11          MS. RUDOFF:  Keeping May 18th in mind, can we go back
12   to the Government demonstrative exhibit?
13          Can we highlight and zoom in on the May 6th
14   transaction all the way across?
15   BY MS. RUDOFF:
16   Q.   So you've already discussed that Casi makes a withdrawal
17   on May 6th, 2016, for 5,000.
18          What do we see Bill Stone do?
19   A.   There are three cash deposits into Mr. Stone's accounts.
20   Those occurring on May 7th, May 9th, and May 18th.
21   Q.   And those collectively, about how much do they result in?
22   A.   Appears to be a little over $2,700.00.
23   Q.   And based on your review of the record for this timeframe,
24   did you find any evidence to say that these cash deposits came
25   from a source other than Casi Thompson?
```

1    A.   The records I reviewed did not indicate another source for

2    that money.

3    Q.   Did you review any text messages which further

4    corroborated this withdrawal by Casi was given to Bill Stone as

5    it related to her probation?

6    A.   Yes.

7         MS. RUDOFF:   Can we republish Government's Exhibit 37

8    and go to page 138?

9         And can we zoom in on the first two blue messages

10   through the following, to the bottom?

11   BY MS. RUDOFF:

12   Q.   Who are these messages between?

13   A.   These are messages between Mr. Stone and Mr. DeLeon.

14   Q.   And what is the date of the messages Bill Stone is sending

15   to Joseph DeLeon?

16   A.   May 4th, 2016.

17   Q.   And what does Bill Stone say first on May 4th, 2016?

18   A.   "Are you still with your fiancee?"

19   Q.   And how does Joe DeLeon respond?

20   A.   "No, sir, just left 20 minutes ago so I can go and check

21   on my mother, make sure she eats lunch."

22   Q.   Can you read the messages following?

23   A.   "I plan on going right back.  She needs the support today.

24   How are things going?"

25   Q.   And how does Bill Stone respond to the "how are things

```
 1   going" message?
 2   A.   "Not well at all."
 3           MS. RUDOFF:  Can we go to the next page, 139?  Zoom
 4   in on the first two messages.
 5   BY MS. RUDOFF:
 6   Q.   What does Bill Stone say back to Joe DeLeon?
 7   A.   "No, just stay with her.  Don't have an answer to give you
 8   yet."
 9   Q.   What does Joe DeLeon respond?
10   A.   "Do I need to stay with her and place her in custody?"
11   Q.   At any point in time in your investigation did you come
12   across information that Joe DeLeon had any authority to place
13   anyone in custody?
14   A.   No.
15           MS. RUDOFF:  Can we go to page 140?
16           And can we zoom in on the third green message from
17   the top?
18   BY MS. RUDOFF:
19   Q.   What does Joe DeLeon tell Bill Stone?
20   A.   "She is a nervous wreck."
21           MS. RUDOFF:  And if we could go to page 141, the
22   fourth green message from the top and the one below it.
23   Q.   What does Joe DeLeon say?
24   A.   "What about CPS?"
25   Q.   And what date is this?
```

1   A.   This is May 4th, 2016.

2   Q.   What does Bill Stone respond?

3   A.   "They wouldn't meet with me until tomorrow, at the

4   earliest."

5   Q.   And so do these text messages provide you additional

6   corroborating evidence that Casi would have given the 5,000 to

7   Bill Stone related to her secret probation?

8   A.   They do.

9        MS. RUDOFF:  If we could go back to Government's

10  demonstrative.

11       And if we could highlight transactions on May 25,

12  2016.  There's two.

13  BY MS. RUDOFF:

14  Q.   What transactions do we see Casi engage in on May 25th,

15  2016?

16  A.   There are two $5,000.00 cash withdrawals; one from her

17  Navy Federal Credit Union account and one from her Chase

18  account.

19  Q.   Now, in the indictment, Count Four, there's a listing of

20  5,000 from J.P. Morgan Chase, and it is a cash withdrawal on or

21  about June 24th, 2016.  Do you recall that?

22  A.   I do.

23  Q.   And what is supposed to be the date of that transaction?

24  A.   It should be May 25th.

25  Q.   And is that what we see here in the record indicating a

1   Chase withdrawal for 5,000 on May 25th?

2   A.   That's correct.

3   Q.   And do the financial records also show a $5,000.00

4   withdrawal made by Casi on June 24th, 2016?

5           MS. RUDOFF:  If we could zoom out.

6   A.   Yeah.

7   Q.   Do we also see a 5,000 withdrawal on June 24th, 2016?

8   A.   That's correct.

9           MS. RUDOFF:  And can we zoom out and go back to the

10  May 25th, 2016 withdrawals?

11          And can we go all the way across?

12  BY MS. RUDOFF:

13  Q.   What evidence did you see that corroborated Casi giving

14  these two different $5,000.00 withdrawals on May 25th to Bill

15  Stone as it related to her secret probation?

16  A.   There was an entry in Mr. Stone's 2016 calendar on that

17  date, and the same day there was also a cash deposit into his

18  Chase account.

19          MS. RUDOFF:  Can we republish Government's

20  Exhibit 93-A and go to page 8?

21          Can we highlight May 25th?

22  BY MS. RUDOFF:

23  Q.   What does Bill Stone write?

24  A.   The entry for the 25th is "Meet Joe, project, Fort Worth,"

25  and then two dollar signs.

```
1   Q.   Was this evidence -- did it corroborate that those cash
2   withdrawals by Casi Thompson were given to Bill Stone?
3   A.   It does.
4           MS. RUDOFF:   Can we go back to Government's
5   demonstrative exhibit?
6           And can we zoom in on the June 3rd and go all the way
7   across?
8   BY MS. RUDOFF:
9   Q.   It is really small, but on June 3rd, what kind of
10  transaction do we see?
11  A.   There was a $9,000.00 cash withdrawal from Ms. Thompson's
12  account.
13  Q.   And was there anything from the calendars that
14  corroborated that this 9,000 would have gone to Bill Stone?
15  A.   There's an entry for the 3rd indicating a lunch with
16  project.
17  Q.   Were there also text messages -- text message evidence
18  that you reviewed that further indicated this $9,000.00 was
19  consistent with cash given to Stone for travel expenses for the
20  secret probation?
21  A.   There were.
22          MS. RUDOFF:   Can we republish Government 38 and go to
23  page 1027?
24          THE COURT:   And when you reach a stopping point, it
25  is about time to break.
```

1          MS. RUDOFF:  Yes, Your Honor.

2          Can we zoom in on the third green message from the

3   top?

4   BY MS. RUDOFF:

5   Q.   What's the date of this message?

6   A.   The message is dated June 2nd, 2016.

7   Q.   And who is this message from?

8   A.   From Mr. DeLeon.

9   Q.   And what does he say to Casi?

10  A.   "Casi, I just asked Special Agent Stone if there was any

11  word yet.  This is his reply."

12          "No, still here discussing the situation.  Been here

13  since 8:00 a.m.  Back is really hurting."

14          MS. RUDOFF:  Can we jump to page 173, and zoom in

15  from the top to the third green message?

16          Oh, I'm sorry.  Different exhibit.

17          Can we republish Government's Exhibit 37?

18          And go to page 171.

19          Can we please zoom in on the fourth green message

20  through the end of the page?

21  BY MS. RUDOFF:

22  Q.   What does Joe DeLeon say in this first message?

23  A.   "S.A. Stone, are you okay?"

24  Q.   What's the date of the message?

25  A.   June 1st, 2016.

```
 1   Q.   And when does Bill Stone respond?
 2   A.   The next message is dated June 2nd.
 3   Q.   What does Bill respond?
 4   A.   "Up and read [sic] for meeting with your fiancee."
 5   Q.   And then what does he respond?
 6   A.   "What does she want?"
 7            MS. RUDOFF:  And then can we go to page 173, and can
 8   we zoom in on the top of the page through the third green
 9   message?
10            THE COURT:  Let's do this last exhibit and then
11   break.
12            MS. RUDOFF:  Yes, Your Honor.
13   BY MS. RUDOFF:
14   Q.   Does Joe DeLeon respond to Bill Stone?
15   A.   He does.
16   Q.   What does he say?
17   A.   "How do you feel this morning?"
18   Q.   And what does Bill Stone respond?
19   A.   "She is your woman!"
20   Q.   What does Joe DeLeon respond?
21   A.   "I am so sorry especially that you hurt and are having to
22   get up and deal with her stuff."
23   Q.   Were these text message conversations consistent with
24   there being some type of legal crisis or situation around
25   June 2nd, 2016?
```

```
 1  A.   They are.
 2            THE COURT:  Okay.  I think that's a good breaking
 3  point, members of the jury.
 4            If everyone will rise for the jury.  Actually be
 5  seated for just a second.  I know you guys remember my
 6  rapid-fire instructions, but I'm going to give them to you once
 7  again.
 8            Please don't talk about the case until you have heard
 9  everything and I told you it's all right to discuss it.  Please
10  don't do any independent research and please don't tell
11  anybody who -- I'm sure everybody's very curious as to where
12  you've been, what you have been hearing.  When we get a verdict
13  and it is all over, you can talk to them until you are blue in
14  the face.
15            With that said, court will be in recess.
16            We will see you in the morning.
17            We appreciate you.
18            All rise for the jury.
19            (Jury out)
20            THE COURT:  All right.  Everybody please be seated.
21            Sir, feel free to step down.
22            THE WITNESS:  Thank you, Your Honor.
23            THE COURT:  All right.  Taylor is going to print me
24  out the best draft.  Do you guys need me to print you some too?
25  Would you mind hollering for him to come back?
```

```
 1              MR. GALLIAN:  Your Honor, if I may --

 2              THE COURT:  On the record, okay.  Outside the

 3    presence of the jury.  Mr. Gallian, you have an issue for the

 4    Court?

 5              MR. GALLIAN:  I don't think it's an issue.  I know I

 6    get up here and I bark a lot.

 7              THE COURT:  That's okay.  Your job is to bark.

 8              MR. GALLIAN:  I think that there might be some sort

 9    of amendment issue going on with the indictment, based on the

10    line of questioning that I heard.

11              THE COURT:  Okay.

12              MR. GALLIAN:  Again, I could be wrong.  I have tiny

13    ears.  But it sounded like Ms. Rudoff asked Andrew Latham if

14    the date in the indictment should be a different date.  Again,

15    I could be wrong on that, and happy to admit that I am.  But it

16    sounds like they are trying to change the indicted conduct and

17    the time.  That's what I heard on the direct.

18              THE COURT:  Okay.

19              MR. GALLIAN:  And the transaction at issue is for a

20    $5,000.00 cash withdrawal.  It's on June 24th, 2016, in the

21    indictment.  It is Count Four.  She asked Andrew Latham if that

22    should actually be the cash withdrawal on May 25th instead.  So

23    I want to figure all that out together, because I think it's an

24    improper amendment if I heard correctly.

25              THE COURT:  Okay.  Appreciate you calling that to my
```

1    attention.  Let me pull up my superseding indictment here.

2              Government, what is going on?

3              MS. RUDOFF:  Your Honor, the testimony elicited from

4    Andrew Latham was with regards to two different $5,000.00

5    withdrawals that took place on May 25th, 2016, as well as one

6    that took place on June 24th, 2016.

7              For purposes of Count Four in the indictment, it

8    lists June 24th, 2016, J.P. Morgan Chase, 5,000.  The actual

9    date of the offense is not an element.  It's an on or about.

10   So we were just eliciting testimony to show that there were

11   cash withdrawals from J.P. Morgan Chase on May 25th, 2016, that

12   would satisfy this date, as well as there were other cash

13   withdrawals on 6-24-2016.  So because it is an on-or-about

14   date, there isn't actually a requirement legally to make an

15   amendment.

16             THE COURT:  Okay.  So hang on a minute.  Let me pull

17   this up.

18             (Pause)

19             THE COURT:  So I guess to cut to the chase, and you

20   guys know the case far better than I, are we alleging something

21   other than in the indictment?

22             MR. GALLIAN:  Sounds that way.

23             MS. RUDOFF:  No, Your Honor.  But the date --

24             THE COURT:  Okay.  Let's go off the record for a

25   second.

1                    (Discussion off the record)

2                    (Recess)

3                    THE COURT:  All right.  On the record, outside the

4        presence of the jury.

5                    The Court and the lawyers have had a good

6        old-fashioned state court jury charge conference, and I have

7        given the parties the most recent draft of the Court's proposed

8        charge.

9                    Government, have you any objections you would like to

10       lay down for the record as to the Court's proposed charge?

11                   MR. BUSCH:  I believe all our concerns have been

12       addressed except the specific language the Court is going to

13       come up with on the Greenlaw case.

14                   THE COURT:  Okay.

15                   MR. BUSCH:  I think with the other things, we don't

16       have any.

17                   I don't want to misspeak here, but --

18                   THE COURT:  Sure.

19                   MR. BUSCH:  Based on the comments by the Court and

20       counsel, I don't believe we have any other comments at this

21       time.

22                   THE COURT:  And I'm not trying to play gotcha with

23       anybody.  Hopefully you all know me better than that.  This is

24       to get your preliminary agreement.  You are not waiving

25       anything, anybody.  We will have a final version of the charge

 1   and we will go over it one more time with a fine tooth comb,

 2   everybody, before we submit it to the jury, but this lets me

 3   know if you have any big substantive objections we need to take

 4   up.

 5          MR. BUSCH:  There are none by the Government.

 6          THE COURT:  Okay.  Sounds good.  And no party has

 7   waived any rights to lodge objections at the last moment.

 8          So this just gets us, I think, closer.  Appreciate

 9   it.

10          Mr. Gallian, what say you?

11          MR. GALLIAN:  Page 14 of the proposed draft, second

12   paragraph beginning with "Bear in mind, however, that in

13   considering the conspiracy charge in Count One, the Government

14   is not required to prove that defendant you are considering

15   actually committed wire fraud or that the crime of wire fraud

16   was actually committed, but only that the specific defendant

17   you are considering conspired to commit wire fraud."

18          We object to the language as proposed.  I don't

19   believe that it tracks any pattern jury charge.  I know we

20   discussed that off the record.  And it's Stone's position that

21   that is unnecessary surplusage.  That's our objection on that

22   one.

23          And then as the next sentence where it goes on to

24   state, "Because Count One of the superseding indictment charges

25   a conspiracy against only two alleged co-conspirators,

1    Defendant Stone and DeLeon, if your verdict as to Count One is
2    not guilty for either of the defendants it must be not guilty
3    as to both defendants."
4             I know the Court's position on this and the way you
5    are currently leaning.  However, based on the way that the
6    conduct was charged in this case, specifically the superseding
7    indictment, the conspiracy alleges William Roy Stone and Joseph
8    DeLeon only, and so it is legally impossible for them to return
9    a verdict because there are not, as we typically see, others
10   that are known or unknown to the grand jury.  And so we believe
11   that this addition should be made to further clarify the law
12   and to aid the jury.
13            THE COURT:  All right.  Response?
14            MR. WESTFALL:  Your Honor, we -- that exact same
15   language that he was just talking about.  We believe there is
16   serious constitutional problems with that for Joe DeLeon,
17   because what is being proposed is to tie the jury's hands and
18   tell them they cannot acquit Joe DeLeon unless they also acquit
19   Bill Stone.  And that is -- I mean, there's serious
20   constitutional problems and due process, fair trial.  And it is
21   from a very old case, probably not even good language anymore,
22   but we certainly object to that.
23            THE COURT:  Okay.  And unless there is case law to
24   the contrary the Court hasn't been presented with, this Court
25   has concerns that by telling the jury that if your verdict as

```
 1    to Count One is not guilty for either of the defendants it must
 2    be not guilty as to both defendants.  I'm concerned that
 3    telling them the consequences of their decision may perhaps
 4    influence their willingness to acquit one party understanding
 5    that the other party would also be acquitted.
 6              So in light of that, this Court is going to
 7    respectfully overrule the objection, subject to if you guys
 8    find a case that says do it, that's what I'll do.
 9              All right.  Oh, I'm sorry.  That will be sustaining
10    your objection.  Sustained.
11              MR. WESTFALL:  Okay.  Great.
12              THE COURT:  I'm tired too.  Thank you.
13              MR. GALLIAN:  I ended up winning it.  I got all
14    excited.
15              THE COURT:  Everybody needs dinner, which is why I'm
16    saying I'm really not trying to play gotcha.  This just gets us
17    kind of in the zone together.
18              All right.  So on page -- is there anything else,
19    Mr. Gallian, you need to preserve?
20              MR. GALLIAN:  That was everything I needed to put on
21    the record, Your Honor.
22              THE COURT:  Okay.
23              MR. GALLIAN:  Everything else we agreed in our charge
24    conference.
25              THE COURT:  Sounds great.
```

```
 1              And I don't think -- DeLeon, you don't have any
 2    objections to anything substantive at this time?
 3              MR. WESTFALL:  No, not at all, Your Honor.
 4              THE COURT:  Okay.  Sounds good.
 5              All right.  Off the record.
 6              (Discussion off the record)
 7              THE COURT:  On the record.
 8              It is not this Court's intention to noogie everybody
 9    and make them at 5:00 to agree to everything.  The spirit of
10    this is to help us get closer and closer to the draft charge
11    we'll present to the jury with less work and less waiting.  But
12    none of the parties have waived their right to timely object to
13    anything in the jury charge.
14              All right.  Off the record.
15              (Discussion off the record)
16              (Recessed for the day)
17
18
19
20
21
22
23
24
25
```

```
1                              INDEX

2
                                                           Further
3                  Direct  Cross  Redirect  Recross  Redirect

4  WITNESSES FOR THE
   GOVERNMENT
5
   DANNY BRILEY              9        70       80,84
6
   BRADLEY LEONARD    86
7
   DARLA BELL        101  117,123   127
8
   ANDREW LATHAM     131
9

10
   GOVERNMENT'S EXHIBITS                           Received
11
      19   Summary chart of CT's payments to Stone and    151
12         DeLeon

13    31   Stone's 2016 divorce decree modification       183

14    60   Summary chart of bank accounts for CT, Stone,  140
           and DeLeon
15
      93   Stone 2016 Cambridge calendar                  171
16
      93A  Calendar                                       189
17
      94A  Calendar                                       189
18
      95A  Calendar                                       189
19
      96A  Calendar                                       189
20
      97A  Calendar                                       189
21
      98A  Calendar                                       189
22
      115  Summary chart of Stone's financial transactions  154
23
      137  CarMax records for purchase of 2015 F-150 pickup  175
24
      160  Summary Chart:  Ford F-150 pickup truck        179
25
```

Todd Anderson, RMR, CRR      (214) 753-2170

| | DEFENDANT DELEON'S EXHIBITS | | Received |
|---|---|---|---|
| 1 | | | |
| 2 | 29 | Phone call - Casi to Joe - 9-27-2019 | 65 |
| 3 | 30.1 | Audio excerpt | 66 |
| 4 | 36.4 | Audio excerpt | 19 |
| 5 | 38.1 | Audio excerpt | 22 |
| 6 | 38.2 | Audio excerpt | 23 |
| 7 | 38.3 | Audio excerpt | 24 |
| 8 | 38.4 | Audio excerpt | 25 |
| 9 | 38.5 | Audio excerpt | 28 |
| 10 | 38.6 | Audio excerpt | 31 |
| 11 | 38.7 | Audio excerpt | 31 |
| 12 | 38.8 | Audio excerpt | 32 |
| 13 | 40.1 | Audio excerpt | 35 |
| 14 | 40.2 | Audio excerpt | 36 |
| 15 | 42.1 | Audio excerpt | 37 |
| 16 | 42.2 | Audio excerpt | 38 |
| 17 | 45 | Audio excerpt | 40 |
| 18 | 72.1 | Audio excerpt | 41 |
| 19 | 72.2 | Audio excerpt | 42 |
| 20 | 72.3 | Audio excerpt | 44 |
| 21 | 80.1 | Audio excerpt | 49 |
| 22 | 110.1 | Audio excerpt | 56 |
| 23 | 112.1 | Audio excerpt | 58 |
| 24 | 114.1 | Audio excerpt | 60 |
| 25 | | | |

1          I, TODD ANDERSON, United States Court Reporter for the

2     United States District Court in and for the Northern District

3     of Texas, Dallas Division, hereby certify that the above and

4     foregoing contains a true and correct transcription of the

5     proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 7th day of August, 2023.

7

8

9
                                    /s/Todd Anderson
10                                  TODD ANDERSON, RMR, CRR
                                    United States Court Reporter
11                                  1100 Commerce St., Rm. 1625
                                    Dallas, Texas  75242
12                                  (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25