1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
   UNITED STATES OF AMERICA,        )        3:21-CR-236-E
5                Government,         )
                                    )
6                                    )
   VS.                              )        DALLAS, TEXAS
7                                    )
                                    )
8  WILLIAM ROY STONE, JR.,          )
   JOSEPH EVENTINO DELEON,          )
9                Defendants.        )        August 8, 2023

10

11            TRANSCRIPT OF JURY TRIAL, VOLUME 10A

12            BEFORE THE HONORABLE ADA E. BROWN

13                UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:          MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664

```
 1                              MR. MARCUS J. BUSCH
                                UNITED STATES DEPARTMENT OF JUSTICE
 2                              NORTHERN DISTRICT OF TEXAS
                                U.S. Courthouse, Third Floor
 3                              1100 Commerce Street
                                Dallas, Texas  75242
 4                              marcus.busch@usdoj.gov
                                (214) 659-8642
 5

 6   FOR THE DEFENDANT,         MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:    Gallian Firm
 7                              Parkside Tower
                                3500 Maple Avenue
 8                              Suite 720
                                Dallas, Texas  75219
 9                              gregg@GallianDefenseFirm.com
                                (214) 432-8860
10

11                              MS. JACLYN ANNETTE GALLIAN
                                Bryan Cave Leighton Paisner
12                              2200 Ross Avenue
                                Suite 4200
13                              Dallas, Texas  75201
                                jaclyn.gallian@bclplaw.com
14                              (214) 721-8058

15
     FOR THE DEFENDANT,         MR. GREG WESTFALL
16   JOSEPH EVENTINO DELEON:    Westfall Sellers
                                1701 River Run
17                              Suite 801
                                Fort Worth, Texas  76107
18                              greg@westfallsellers.com
                                (817) 928-4222
19

20                              MR. FRANK SELLERS
                                Westfall Sellers
21                              1701 River Run
                                Suite 801
22                              Fort Worth, Texas  76107
                                frank@westfallsellers.com
23                              (817) 928-4222

24

25
```



```
 1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

1          JURY TRIAL VOLUME 10A - AUGUST 8, 2023

2                    P R O C E E D I N G S

3          SECURITY OFFICER:  All rise.

4          THE COURT:  Everybody please be seated.  Good

5    morning.

6          Did everybody eat their Wheaties?  Everybody is all

7    bright-eyed and bushy-tailed.

8          All right.  Let's take up the issue of the alleged

9    amendment -- the case of the alleged amendment.

10         Let me know when you're ready, Todd.

11         Okay.  Outside the presence of the jury, before we

12   broke yesterday, Mr. Gallian brought up a concern about what he

13   believed was an improper amendment to the indictment.  The

14   Court has looked at the pertinent case law.

15         Do you have anything further on that point,

16   Mr. Gallian?

17         MR. GALLIAN:  Yes, Your Honor.

18         THE COURT:  All right.

19         MR. GALLIAN:  If I may approach.  I have a case.

20         THE COURT:  Of course.

21         MR. GALLIAN:  I don't know if it's one you considered

22   already.

23         THE COURT:  Sure.  Be happy to take a look.

24         Thank you.

25         (Pause)

```
 1              THE COURT:  I do not think is one I did.  Let me take
 2    a look.
 3              So to let everybody know what I read this morning, I
 4    read Russell v. U.S.  And I will give you the citations if you
 5    like.  429 F.2d 237, a 1970 Fifth Circuit case.  U.S. v.
 6    Tunnell, T-U-N-N-E-L-L, and that is a 1982 Fifth Circuit case.
 7    Address is 667 F.2d 1182.  United States versus Girod,
 8    G-I-R-O-D, Fifth Circuit case from 2011.  And the street
 9    address of that is 646 F.3d 304.
10              If you'll give me just a moment.  Both sides take a
11    peek at Chandler which I've gotten from Mr. Gallian.  858 F. 2d
12    254, a 1988 Fifth Circuit case.
13              And, Government, do you have Chandler before you?
14              MS. RUDOFF:  I do, Your Honor.
15              THE COURT:  All right.  Great.  Let's take a moment,
16    all of us, to take a peek at that.
17              (Pause)
18              THE COURT:  I'm in subsection 2.  It looks like
19    that's where the meat is on page 256 to 257.
20              (Pause)
21              THE COURT:  One more moment.
22              (Pause)
23              THE COURT:  Okay.  I've looked at the pertinent parts
24    of his.
25              Mr. Gallian, anything you would like to highlight for
```

```
 1    the Court?
 2              MR. GALLIAN:  Yes, Your Honor.
 3              THE COURT:  Okay.  I'm listening.
 4              MR. GALLIAN:  First of all, good morning to you.
 5              THE COURT:  Good morning.
 6              Oh, I'm sorry.
 7              (Discussion off the record)
 8              MR. GALLIAN:  May I proceed, Your Honor?
 9              THE COURT:  You may.  And good morning.
10              MR. GALLIAN:  Good morning.
11              So I think to highlight the difference between the
12    cases that the Government provided and the case that we provide
13    is that this is not an on or about issue.  And the reason that
14    I say that is because there are withdrawals on both of those
15    dates, $5,000.00.
16              In the indictment, Count Four, Bill Stone was charged
17    with wire fraud for a withdrawal that was made on June 24,
18    2016, for $5,000.00.
19              During direct examination with Casi Thompson,
20    prosecution went through that withdrawal, said that it was for
21    probation, travel related fees, and thereby proving that there
22    was a transaction on that day for $5,000.00.
23              Now, what they're doing is, I believe, an improper
24    constructive amendment, because what they're trying to do now
25    is say, well, Count Four should actually say May 25, 2016,
```

 1    where there is also a $5,000.00 cash withdrawal.

 2              So it is not an on or about issue, because there are

 3    withdrawals on different days.  There are, in a sense, two

 4    separate offenses; however, the grand jury only charged Bill

 5    Stone for wire fraud as it relates to the actual transaction

 6    that occurred on June 24, 2016.

 7              And we all know that under the Fifth Amendment and

 8    quoting Chandler here, "Incident to this constitutional

 9    guarantee is the long-standing principle of our criminal

10    justice system that the charges contained in an indictment may

11    not be broadened or altered through amendment except by the

12    grand jury itself."

13              Now, I think I know why the Government is trying to

14    do it.  They are trying to do it because there's additional

15    evidence based on Bill Stone's planner that has a dollar sign

16    on May 25th.  The dollar sign is not present on June 24th.  I

17    think that's probably their advocacy speaking, but Bill Stone

18    hasn't been charged with wire fraud on June -- on May 25th.

19              This isn't an on or about issue because there was a

20    withdrawal on both of these dates.  The Government is trying to

21    do a workaround and essentially give an alternative theory that

22    the Government -- or that the jury can convict Bill Stone on

23    rather than what he's been charged by the grand jury in an

24    indictment.  We believe it's improper.  We don't think that the

25    Government should be able to pursue this line of questioning

1   anymore.  And, in fact, I plan to clear it up with Latham on
2   cross-examination.
3          THE COURT:  All right.  Thank you, sir.
4          Government, response?
5          MS. RUDOFF:  May I, Your Honor?
6          THE COURT:  Of course.
7          MS. RUDOFF:  Your Honor, the case United States
8   versus Chandler with the Fifth Circuit that defense counsel
9   provided, what this case says, and very clearly says if you
10  turn to page 3 of the opinion, the left column, the third
11  paragraph down, the basis for this appeal is that there was no
12  evidence that she committed the crime charged and that her
13  conviction rested on, if anything, evidence of a different
14  offense, because it went to the dollar amount and the evidence
15  which supported that.
16         Based on the argument that there was no testimony and
17  evidence sufficient in the record to show the elements of the
18  offense for that crime, then the Fifth Circuit said that would
19  be improper, it was insufficient, and would be an improper
20  constructive amendment.  So that is about the elements of the
21  offense, which is wholly and completely inapplicable to what
22  our facts are here.
23         Our facts are directly aligned with what the Fifth
24  Circuit explains and goes through in Girod, Russell, and
25  Tunnell.  And specifically in Girod, which I know Your Honor

1    has read and I won't spend a lot of time on it, but if you go

2    to page 12 it actually talks about the date alleged in the

3    indictment at the bottom half of the page.  And it says, "The

4    indictment charged with false statements on or about August 26,

5    2006, but the testimony from trial showed the false statements

6    were made on April 26, 2006."

7             Girod argues this four-month discrepancy constitutes

8    a material variance from or constructive amendment of the

9    indictment.  Fifth Circuit says we disagree.

10            They go on to say that fourth-month discrepancy is

11   not only an issue -- not an amendment, it is not a variance,

12   and the date of an offense is simply not an essential element

13   of the crime and not something that the Government has to prove

14   the exact date, and anything sufficiently surrounding it would

15   suffice.

16            The Court then goes through to explain further how

17   this is not a variance and this is not a constructive

18   amendment.

19            Additionally, it says, "A variance between allegation

20   and proof is fatal only when it affects the substantial rights

21   of the defendant by failing to sufficiently notify him so he

22   can prepare his defense and will not be surprised at trial."

23            The Government, prior to trial, provided defense

24   counsel with copies of the exhibits on multiple occasions, and

25   those exhibits were gone through.

1    Government Exhibit 46, which was entered with Casi

2    Thompson in this trial, which has already and previous to trial

3    been provided to defense counsel, is the withdrawal on May 25,

4    2016, from Chase.

5    And so the line of questioning was to talk with

6    Latham about the fact that there are several withdrawals on May

7    25th from two different banks in that amount.  There's also a

8    withdrawal on June 24, 2016, in that amount, but it's from a

9    different bank.

10    And so the question is -- the questioning was to show

11    that if there is evidence in the record, which Casi testified

12    to, Latham testified to, and there is documentary evidence that

13    there was a 5,000 withdrawal on or about the dates alleged in

14    the indictment, which would include May 25th per the Fifth

15    Circuit opinion, then it is sufficient, it's not a variance,

16    and it is not an amendment that needs to be addressed.  And,

17    finally, it is not harmful or a cause for error or reversal or

18    any prejudice for the Government to do exactly as it did.

19    And while I appreciate Mr. Gallian assuming what the

20    Government's plan or role was, it's absolutely not the case.

21    The case was to give clarification that the fact that there are

22    transactions, the same amount, which the 5,000 is a necessary

23    part of the offense.  The bank itself we consider surplusage,

24    but we're sticking to what's in there.  And that if there is

25    evidence to support transactions from that bank on or about

```
 1    those dates, then it is, in fact, sufficient.  And none of that
 2    questioning from the Government's position as well as from what
 3    Fifth Circuit has clearly stated raises any kind of issue.
 4              THE COURT:  Thank you.
 5              Give me just a moment.
 6              (Pause)
 7              MR. GALLIAN:  Your Honor, may I briefly respond?
 8              THE COURT:  Yeah, you may.
 9              MR. WESTFALL:  Could we, Your Honor, have Mr. Latham
10    step out of the courtroom?
11              THE COURT:  Oh, certainly.  Yes.  I'm sorry.  I
12    didn't realize he was here.
13              Thank you.  Sorry, I didn't catch that.
14              Yes, sir?
15              MR. GALLIAN:  So my worry here is that we're dealing
16    with not only a constructive amendment but also a very slippery
17    slope.
18              The jury is going to be charged with what the
19    elements of the offense are, what charges, what bank
20    transactions are therefore used.  But what the Government is
21    trying to do, I think, is not only improper, because, again,
22    it's wholly separate offenses.  It's not an on or about date
23    like some random DWI where the person was arrested at 12:01
24    versus 11:59.  It's not anything like that.  There are two
25    separate transactions, two wholly separate withdrawals on those
```

1    dates.

2             And so what the Government, by being able to argue

3    this, it's going to leave an impression with the jury that if

4    they think that any of the $5,000.00 cash withdrawals were for

5    travel-related funds, then they can use to find him guilty on

6    Count Four, which is improper, because they already put on

7    evidence about cash withdrawals in December, January, February,

8    May.

9             And so if we start allowing the jury to consider

10   wholly separate offenses, not only is it a constructive

11   amendment, not only does it confuse the issues and confuse the

12   jury, but also it's improper because it's a violation of Bill

13   Stone's right to be charged by the grand jury with the offense

14   that he committed.

15            We don't know what bank records they looked at to

16   find in this indictment.  And I truly worry about the

17   Government being able to say, well, this happened on -- in the

18   indictment it says June 24th, but if you think that it was

19   actually May 25th, that's fine, too.  And I just think that

20   sets the wrong message with the jury, and I think it's an

21   improper constructive amendment.

22            THE COURT:  All right.  Thank you.

23            So having considered the law and evidence the Court

24   has heard, I don't think there's a dispute that this other date

25   falls within the statute of limitations.  And it looks from the

1    case law that when this affects the substantial rights of the

2    defendant by failing to sufficiently notify him that he can

3    prepare his defense and will not be surprised at trial, if

4    those -- if that situation does occur, that we have a problem.

5    But I think this on or about is not a constructive amendment

6    and not an improper variance, so it is noted for the record,

7    for the appellate record and timely, but it's overruled.

8              Anything else we need to take up outside the presence

9    of the jury?

10             MR. SELLERS:  Briefly, Your Honor.

11             Yesterday we were getting into a lot of unconfronted

12   hearsay in kind of the predicate part of the questions.  I just

13   want to alert the Court to that and ask if we could curtail

14   that just a little bit, because some of it is new information

15   that we haven't gotten to cross-examine on.  So I just think

16   for fairness of this and if we're all limited on time to keep

17   it to the facts and that's it.

18             THE COURT:  Sounds good.  I think that's a warning

19   that there will be objections forthcoming, and it sounds like

20   they may be merited, so --

21             MS. RUDOFF:  I didn't catch the tail end of what --

22             THE COURT:  Yeah.

23             MS. RUDOFF:  What were you saying?  I'm sorry.

24             THE COURT:  That's okay.  I don't think we need that

25   on the record.

1           Is there anything we need on the record?

2           MR. GALLIAN:  No.  But I do have something before the

3    jury comes in.

4           THE COURT:  Absolutely.  So off the record for a

5    moment.

6           (Discussion off the record)

7           THE COURT:  Okay.  On the record when you're ready,

8    Todd.

9           Oh, thanks.

10          The Court spent this weekend looking at the

11   transcript of the case, and the Court believes that its

12   inherent docket authority requires it to -- required it to

13   revisit the time that we had given everybody for trial.

14          And so on Sunday -- is that right, Taylor?

15          Sunday the Court had its law clerk e-mail the parties

16   and let them know that all sides had six hours remaining, that

17   includes cross-examination.  Previously that did not include

18   cross-examination.  But this Court has already extended the

19   trial and asked the jury to sit for several extra days.  And

20   looking back at the transcript, the Court believes, because it

21   has to control its own docket, that this was necessary.  So the

22   Court informed the parties of that Sunday.

23          Government, you said you wanted to be heard on it.

24   What would you like to say?

25          MS. RUDOFF:  Yes, Your Honor.  I just wanted to put

 1 | some things on the record with regards to that.

 2 |          THE COURT:  Certainly.

 3 |          MS. RUDOFF:  Your Honor, as the Court is aware,

 4 | prior -- at the pretrial hearing on this case, we did discuss

 5 | timing, and the Government indicated that at that time 30 hours

 6 | to present its case, not including its cross-examination of two

 7 | separate defendant cases, would be -- 30 hours would be

 8 | sufficient.

 9 |          In utilizing that time appropriately, the Government

10 | at the end of week one -- and I did do my best to check these

11 | numbers with your law clerk so that I'm accurate as possible.

12 | At the end of week one the Government had used approximately 13

13 | hours and 35 minutes of that 30 hours available.

14 |          As of Friday morning, the 28th, the first week of

15 | trial, the Government passed their victim for cross, and that

16 | victim was on cross for another two days.  And so when the

17 | Government got the victim back, there was only -- in week two

18 | the Government only used another eight hours and 42 minutes,

19 | which still is within the 30 hours.

20 |          For week one and week two, the Government

21 | approximately used 22 hours and 13 minutes.

22 |          So going into yesterday with the Court's instruction

23 | of the six hours remaining for everybody to include cross,

24 | under what the Court had told the Government and the Government

25 | planned and anticipated for originally, the 30 hours, the

 1  Government still had the seven hours and 47 minutes remaining.

 2  Understanding the Court's ruling and the six hours, the

 3  Government, because of the timing, did not have an opportunity

 4  to further adjust its presentation of its case to allow for the

 5  Government an opportunity to cross-examine two separate

 6  defendant cases.

 7          We -- the Government yesterday used its time as

 8  quickly and judiciously as possible, which will continue to

 9  happen today, and there are just concerns with the now

10  inclusive of cross-examination.  It presents a situation where

11  the Government has to deal with two separate defendant cases

12  and is not being allotted time.  And this timing change was so

13  far in the Government's case that there wasn't an ability to

14  make further adjustments to accommodate to the Court's obvious

15  concerns and needs with timing.

16          THE COURT:  Okay.  So let me respond to that.

17          So we now have been playing for a day under these new

18  rules, so if you had concerns, I think yesterday would have

19  been a great time to tell me that.  I had the parties e-mailed

20  Sunday.  And so, you know, if that was a concern, I think we

21  should have addressed that yesterday.

22          Having said that, you know, the Government spent

23  several days with Casi going on and on about her mother -- her

24  grandmother dying, and all the ins and outs of the trust, and

25  that's okay, but part of the reason we had long

```
 1   cross-examinations is because we had a really long direct.  And
 2   this Court, looking at the transcript over the weekend, you
 3   know, I do not believe all that time was wisely spent.
 4          So having said that, I do understand that
 5   cross-examination is now being tagged against the Government.
 6   And that is -- that's a game change.
 7          So the problem is, I think, our cross-examinations in
 8   this case are not short and succinct.  They are taking on a
 9   life of their own and turning into full-on directs.
10          So this Court does have to control its own docket.
11   And what the Court has seen when I reviewed the transcript this
12   weekend is because cross-examination time isn't charged to
13   anybody, it's turned into death by a thousand paper cuts rather
14   than a couple of rapid fire questions and sitting down.  So
15   this jury has got to get back to work.
16          I appreciate that the Government is not pleased about
17   the Court's ruling and you've preserved it for appeal, but, you
18   know, part of the reason I had everybody e-mailed on Sunday was
19   so we could come in and play under the new rules on Monday.  So
20   that's what we've been doing.
21          You know, I think that -- how many -- what did we
22   say?  Yesterday we gave you guys a heads-up as to how much time
23   you had remaining at least once on the record.  We notified you
24   of the time.  I got on the bench and kind of cautioned, hey,
25   you need to know that this includes cross-examination and
```

1    objections, confirmed that that was the case, and so that you

2    now decide you want more time is not timely.

3            The Court has got to control its own docket.  And,

4    you know, if you guys wanted to play by different rules,

5    yesterday would have been a great day to talk about it.  But we

6    are now playing under these rules.  If you use your time

7    judiciously, that's plenty of time for cross-examination and

8    put on witnesses.

9            I'll be frank with you.  This witness talking about

10   financial stuff is going back into everything we've already

11   done.  I think that this witness could be used effectively much

12   shorter.

13           And so if you will carefully use your air time,

14   you've got plenty of time.  If you want to spend hours and

15   hours and hours going through spreadsheets and talking about

16   things that this Court believes have already been presented

17   multiple times to the jury, you are going to run out of time.

18           This Court, when it was a litigator, would try $500

19   million patent cases in eight hours.  So I believe I have given

20   more than enough time.

21           If this Court believed that it was used completely

22   judiciously, I might entertain the possibility of extending it,

23   but this witness has been on the witness stand for I don't know

24   how long.  Casi was on the witness stand for days and days and

25   days before I heard of one single element of the crime come out

1    of her mouth.

2         So the Government is in a bind of its own making, and

3    this Court did its best on Sunday to alert the parties that

4    because the Court has to have power to control its own

5    docket and because these people have got to get back to work, I

6    told you what the rules were.  And so that you now don't like

7    them is not timely.

8         I empathize with the change of rules, and that's why

9    I was here early yesterday and why I cautioned everybody as to

10   what the rules were and what the time was, and nothing was said

11   yesterday.  So if I were you, I would use my time judiciously.

12   If you do, you've got plenty of time.  If you don't, you'll run

13   the clock out.

14        So that's all I have to say on the matter.  If you

15   have -- it's been properly preserved for appeal.  But I believe

16   this falls well within the purview of the power to control my

17   docket.  This jury has got to get back.  I have already gone

18   hat in hand and fed them so many doughnuts my eyes are crossed

19   trying to get them to be in good graces for us to hand this

20   case to them Thursday.

21        And if we were to continue at this pace, they will

22   never get this case.  And that's not acceptable.

23        So you do have limited time.  It's enough time, in my

24   opinion, with three or four hours to try to completely wrap up

25   this case, leave plenty for rebuttal and appropriately

```
 1   cross-examine witnesses, but y'all are kicking a dead horse,
 2   and so the time clock is running.
 3            So with that said, anything further to take up
 4   outside the presence of the jury?
 5            Yes, sir?
 6            MR. GALLIAN:  This does not need to be on the record.
 7            THE COURT:  Okay.  Off the record.
 8            (Discussion off the record)
 9            THE COURT:  All right.  Let's stack them up.
10            (Pause)
11            SECURITY OFFICER:  All rise for the jury.
12            (Jury in)
13            THE COURT:  Gets you every time, huh?
14            Yeah, it's sort of a standoff.  I stand for you,
15   y'all stand for me, so we stand for each other.
16            So thanks for your -- everybody paid such attention
17   yesterday.  We appreciate your patience.  We're going to be
18   good stewards of your time; as we were yesterday, we will
19   today.
20            And so with that said, ma'am, your witness.
21            Oh, and if everybody will check their phones.  I will
22   do the same.  Make sure they're off.
23
24
25
```

```
 1              ANDREW LATHAM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 2                        REDIRECT EXAMINATION CONTINUED
 3    BY MS. RUDOFF:
 4    Q.   Good morning.
 5    A.   Good morning.
 6    Q.   Yesterday we were spending time on looking at Government
 7    Exhibit 19 and Government Exhibit 115, which were all the
 8    financial transactions, right?
 9    A.   That's correct.
10    Q.   And that -- tell me the timeframe that that chart covered.
11    A.   That chart covered December of 2015 through November of
12    2016.
13    Q.   And in that chart, were the transactions you included all
14    of -- inclusive of all the ones that have been charged here in
15    the case today?
16    A.   They are.
17    Q.   In addition to the Wells Fargo accounts, did you also
18    review Bill Stone's investment accounts?
19    A.   I did.
20    Q.   And did you, in reviewing those accounts, compare them to
21    the other financial transactions we saw?
22    A.   I did.
23              MS. RUDOFF:  Your Honor, at this time the Government
24    would move to admit Government Exhibit 184, 185, and 186.
25    These are financial records actually provided in Stone Exhibits
```

```
 1   171, 172, and 173.
 2             MR. WESTFALL:  For all purposes?
 3             MS. RUDOFF:  Yes.
 4             MR. WESTFALL:  No objection, Your Honor.
 5             THE COURT:  All right.
 6             MR. GALLIAN:  No objection, Your Honor.
 7             THE COURT:  All right.  Admitted.
 8             (Government's Exhibit Nos. 184, 185, and 186
 9             received)
10             MS. RUDOFF:  Thank you.
11   BY MS. RUDOFF:
12   Q.   In using Government's Exhibits 184, 185, and 186, did you
13   create a summary chart to analyze these voluminous records and
14   in comparison to the other financial records?
15   A.   I did.
16   Q.   And is that Exhibit -- Government's Exhibit 161?
17   A.   Yes.
18             MS. RUDOFF:  Your Honor, at this time the Government
19   moves to admit 161.
20             THE COURT:  Please let me know if there are any
21   objections.
22             MR. WESTFALL:  No objection.
23             THE COURT:  All right.
24             MR. GALLIAN:  No objection, Your Honor.
25             THE COURT:  Admitted.
```

```
 1                  (Government's Exhibit No. 161 received)
 2             MS. RUDOFF:  Permission to publish.
 3             THE COURT:  Granted.
 4   BY MS. RUDOFF:
 5   Q.   Andrew, is this the chart that you created?
 6   A.   It is.
 7   Q.   Okay.  And I want to talk first about the investment
 8   accounts of Bill Stone.
 9             MS. RUDOFF:  Can we zoom in on the boxes on the
10   right, please?
11   BY MS. RUDOFF:
12   Q.   Tell us what these boxes show.
13   A.   The top box shows the beginning balance of Mr. Stone's
14   Wells Fargo, Chase, and Navy Federal Credit Union accounts
15   beginning January of 2016.
16   Q.   What is that total?
17   A.   It's $208,913.50.
18   Q.   And what do we see in the boxes below that you included?
19   A.   These include income and deposits that he received, such
20   as his retirement income, an IRS tax refund, and bank account
21   interest and dividends.
22   Q.   And what was the total of this income and deposits for
23   2016 that Bill Stone received?
24   A.   $79,299.35.
25   Q.   And is that then where we get the calculation below in the
```

1   total bar?

2   A.   That's correct.

3   Q.   And what is that total?

4   A.   $288,212.85.

5   Q.   And so from a financial perspective, what does this number

6   represent as to Bill Stone?

7   A.   That would be the amount in his bank accounts during 2016

8   that would have been available for him to spend.

9   Q.   Okay.  And what do we see in the box below where it says

10  investments accounts?

11  A.   Those are the 2016 and 2017 beginning values of his

12  accounts with a Thrift Savings Plan, his Fidelity accounts, and

13  a J.P. Morgan account.

14  Q.   And what is the total in the beginning of 2016 of those

15  investments accounts?

16  A.   It is a little over $622,000.00.

17  Q.   We see a slight change from beginning value of 2016 to the

18  beginning value of 2017.  Can you explain this to the jury?

19  A.   I didn't see any withdrawals from the account, but it

20  appears that the market value of the investments in those

21  accounts decreased over that year.

22  Q.   So beginning -- so in 2016, between the Wells Fargo

23  accounts and the investment accounts, how much money was

24  available to Bill Stone?

25  A.   Around $900,000.00.

 1            MS. RUDOFF:  Can we zoom out and can we then zoom in

 2   on the left box?

 3   BY MS. RUDOFF:

 4   Q.   Can you explain what this box shows?

 5   A.   This shows payments that Mr. Stone made as well as the

 6   value of assets that he acquired during 2016.

 7   Q.   What do you mean by assets acquired?

 8   A.   Such as the house that was purchased, the Lexus that was

 9   transferred to him, as well as a Mercedes and Tacoma that were

10   purchased.

11   Q.   So you are looking at this from a perspective if he spent

12   that money himself what it would look like, right?

13   A.   Correct.

14   Q.   Okay.  And so what was the total -- let's look at credit

15   card payments.  Is that the total amount spent on credit cards

16   for the entire year?

17   A.   That is the total amount of the payments from his bank

18   accounts made to credit card companies.

19   Q.   Okay.  And so you may have said this, but what's the total

20   amount of money Bill Stone spent or would have spent had Casi

21   not provided money in 2016?

22   A.   It would be a little over 900 -- $905,000.00.

23            MS. RUDOFF:  Can we zoom out?

24   BY MS. RUDOFF:

25   Q.   Looking at these two numbers, did you see -- based on what

1  the money that Bill Stone had available between his checking

2  accounts and his investment accounts, would he have had enough

3  money to survive 2016 with the assets and expenditures?

4  A.   With those assets and expenditures listed on there, I

5  don't believe he would have been able to cover that cost from

6  the accounts listed on the right.

7  Q.   And if he were able to cover even most of those costs,

8  what would have had to happen to his investment accounts?

9  A.   He would have needed to sell the assets and withdraw those

10  from the investment accounts.

11  Q.   Most all of them, right?

12  A.   Correct.

13  Q.   And from the records did that happen?

14  A.   I did not see any withdrawals from the investment accounts

15  during 2016.

16  Q.   In 2017 through 2019, what did the evidence show about

17  Casi Thompson and financial transactions related to her secret

18  probation?

19  A.   I did not see any that appeared to relate to her secret

20  probation after 2016.

21  Q.   But did the evidence you reviewed indicate that there was

22  still a secret probation going on?

23  A.   That's correct.

24  Q.   Now, I want to talk about Bill Stone's retirement date

25  from the FBI.  Are you aware of when that was?

1   A.   My understanding is he retired October 31st of 2015.

2   Q.   And you reviewed financial records in support of that

3   information, right?

4   A.   Correct.

5   Q.   Did you also review information and evidence regarding

6   what Joe DeLeon's information or knowledge with regard to

7   Stone's -- Bill Stone retiring in October of 2015 was?

8   A.   I did.

9   Q.   And where was that evidence found?

10  A.   It was from the extraction of Mr. DeLeon's cell phone.

11  Q.   And did you create a summary chart to analyze and evaluate

12  these voluminous records to show Mr. DeLeon's knowledge of

13  these facts?

14  A.   I did.

15  Q.   Is that labeled Government's Exhibit 157?

16  A.   Yes.

17          MS. RUDOFF:  Your Honor, at this time the Government

18  moves to admit Government 157.

19          MR. WESTFALL:  No objection, Your Honor.

20          MR. GALLIAN:  No objection, Your Honor.

21          THE COURT:  157 is admitted.

22              (Government's Exhibit No. 157 received)

23          MS. RUDOFF:  Permission to publish?

24          THE COURT:  Granted.

25          MS. RUDOFF:  If we could zoom in on the white boxes

1    at the top all the way across before we hit the first yellow

2    line.

3    BY MS. RUDOFF:

4    Q.   What is the date here?

5    A.   The date in the first two lines is August 2, 2016.

6    Q.   And what do we see happen on August 2, 2016?

7    A.   There is messages between Mr. DeLeon and Nils Hubert.

8    Q.   And do you know who Nils Hubert is?

9    A.   At the time he was an active FBI special agent.

10   Q.   And so on August 2, 2016, what does Nils Hubert text Joe

11   DeLeon?

12   A.   "Hey Amigo!  Have you got a cell phone number for Bill

13   Stone?  No hurry.  Just wanted to update numbers in my phone."

14   Q.   And how quickly does Joe DeLeon respond to this message?

15   A.   The information shows approximately two minutes later.

16   Q.   And what did Joe DeLeon provide in his response?

17   A.   He provided Mr. Stone's cell phone number.

18   Q.   In the box below, what date do we see another incoming

19   message from Nils Hubert to Joe DeLeon?

20   A.   August 10, 2016.

21   Q.   And who is that message from?

22   A.   It's from Mr. Hubert.

23   Q.   And what does it say?

24   A.   "Did you know Bill Stone retired a number of months ago?"

25   Q.   And what's the time of this message?

```
 1    A.   The time listed is 13:53.
 2              MS. RUDOFF:  Can we zoom out?
 3              And can we zoom in on --
 4    BY MS. RUDOFF:
 5    Q.   Well, first, the first yellow line, what is the first
 6    thing Joe DeLeon does after he gets this text?
 7    A.   At 13:56, Mr. DeLeon sends an MMS to Mr. Stone.
 8    Q.   What does that say?
 9    A.   It is -- contains a screenshot that you see there on the
10    right of his message with Mr. Hubert and then it includes the
11    words "S.A. Stone, for your information you retired several
12    months ago.  Wow.  I just received this message from S.A. Nils.
13    I'm sending you a picture of it."
14              MS. RUDOFF:  And can we zoom in on the yellow lines
15    at the bottom?
16    BY MS. RUDOFF:
17    Q.   After Joe DeLeon sends this message to Bill, what happens
18    immediately after?
19    A.   Mr. Stone places a call to Mr. DeLeon's phone.
20    Q.   And are there multiple calls in a row actually?
21    A.   There's two calls from Mr. Stone's phone to Mr. DeLeon's.
22    Q.   How long do they speak on those two calls?
23    A.   A little over 45 minutes on the first one, and the
24    duration of the second one is almost 20 minutes.
25    Q.   And then what happens after that?
```

```
 1  A.   There's a call from Mr. DeLeon's phone to Mr. Stone's.

 2  Q.   And how long was that call?

 3  A.   About three and a half minutes.

 4  Q.   So what time would that call have ended?

 5  A.   At approximately 15:38, 15:39.

 6  Q.   And then what do we see happen right after that?

 7  A.   There is a message from Mr. DeLeon to Mr. Hubert.

 8  Q.   What time is that message back?

 9  A.   At 15:39.

10  Q.   And what does -- and do we see here on the right-hand side

11  what DeLeon texts back to Nils Hubert?

12  A.   We do.

13  Q.   In that text, did Joe DeLeon mention having a call with

14  Stone a few days ago or the other day?

15  A.   He references that he had -- Mr. Stone had mentioned he

16  was going to retire awhile back.

17  Q.   And then what -- so read the first three sentences of this

18  message.

19  A.   "S.A. Nils, sorry it took me awhile to get back with you.

20  In reference to Bill Stone, he had mentioned he was going to

21  retire quite awhile back.  But I did not think to ask him the

22  other day when he called to check on me.  He found out through

23  a mutual friend of ours, J.D. Thomas, that I'm not doing well."

24  Q.   Anywhere in that text does Joe DeLeon mention the fact

25  that he talked to Bill Stone that very day?
```

```
 1   A.   No.
 2   Q.   After the text message -- after these text messages
 3   talking about DeLeon's now knowledge at least at this point in
 4   time he's saying of Bill Stone's retirement from the FBI --
 5            MR. WESTFALL:  Your Honor, I object.  That's a
 6   misstatement of the facts.
 7            THE COURT:  Okay.  So members of the jury, you-all
 8   are the judges of the facts, the factfinders.  You will
 9   remember the evidence as you heard it and determine what the
10   facts are.
11   BY MS. RUDOFF:
12   Q.   After this date, did DeLeon continue to have communication
13   with Nils Hubert?
14   A.   He did.
15   Q.   And what did the tolls show about that communication in
16   just the two months following this text message?
17   A.   Through October of 2016, there's approximately six other
18   phone calls between Mr. DeLeon and Mr. Hubert.
19   Q.   And was there any evidence to show that they, in fact, met
20   up or got together?
21   A.   There were text messages indicating that they were going
22   to meet.
23   Q.   Now, after --
24            MR. WESTFALL:  Your Honor, I object that it is vague.
25   We need a date on those messages.
```

```
 1              THE COURT:  Okay.  Sustained.
 2   BY MS. RUDOFF:
 3   Q.   Did you review other evidence, other than what we just
 4   saw, that gave you an indication that Joe DeLeon knew that Bill
 5   Stone had retired from the FBI?
 6   A.   Yes.
 7   Q.   And where did that evidence come from?
 8   A.   From the cell phone extraction of Mr. DeLeon's phone.
 9              MS. RUDOFF:  If we could republish Government
10   Exhibit 37.  This is an SMS messages spreadsheet.  Page 13.
11              (Pause)
12   BY MS. RUDOFF:
13   Q.   I know this is small.  We will zoom in.
14              MS. RUDOFF:  Page 13.  Can we zoom in on line 26247?
15              And can we scroll over -- I'm sorry.
16   BY MS. RUDOFF:
17   Q.   On line 26247, what is the date of this message?
18   A.   The date listed is August 11, 2016.
19   Q.   And who is this message from?
20   A.   From Mr. DeLeon.
21   Q.   And who is it to?
22   A.   Mr. Stone.
23              MS. RUDOFF:  Can we scroll over so we can see the
24   content of the message?
25   BY MS. RUDOFF:
```

```
 1   Q.   How does Joe DeLeon address Bill Stone in this message?
 2   A.   S.A. Bill Stone R.
 3   Q.   Now, based on your experience in the military and both law
 4   enforcement, what do you know the R to stand for?
 5   A.   It's very similar to military of officers that listed Ret.
 6   after their name and rank following their retirement.
 7   Q.   So how is he addressing with this R here, based on your
 8   experience, Bill Stone?
 9   A.   Given the R and the date of the message, it seems to
10   indicate he is referring to him as Special Agent Bill Stone
11   Retired.
12           THE COURT:  Let me pause there for just a second.
13           Taylor, if you will jot down the time.  I don't want
14   to charge them for this.
15           Both sides, I need to just swear somebody into the
16   district.  I'm going to take a short -- let's just take a
17   five-minute break, if you guys don't mind.
18           All rise for the jury.
19           (Jury out)
20           THE COURT:  Sir, please feel free to step down.
21           (Recess)
22           SECURITY OFFICER:  All rise for the jury.
23           (Jury in)
24           THE COURT:  All right.  Everyone please be seated.
25           If everybody will check your phones, make sure your
```

```
 1   phones are off.

 2             And with that said, ma'am, your witness.

 3             MS. RUDOFF:  Thank you, Your Honor.

 4             THE COURT:  And if anyone needs to break, either up

 5   here or in the jury box or gentleman on the witness stand, let

 6   me know.

 7   BY MS. RUDOFF:

 8   Q.   Before we took a break, we had Government's Exhibit 37 up

 9   on the screen, the SMS messages, page 13.

10             MS. RUDOFF:  Could we please put that up?

11             (Pause)

12             MS. RUDOFF:  And could we now go to page 10?

13             And on page 10, can we zoom in on the message in

14   line 25509?

15   BY MS. RUDOFF:

16   Q.   We see it at the top here.  Andrew, what is the date of

17   the message?

18   A.   The date listed is August 30, 2016.

19   Q.   And who is the message from and to?

20   A.   From Mr. DeLeon to Mr. Stone.

21             MS. RUDOFF:  And can we scroll over and see what the

22   content was?

23   BY MS. RUDOFF:

24   Q.   Does DeLeon say to Stone on August 30, 2016?

25   A.   "S.A. Stone, an awesome opening/opportunity just posted
```

 1 | awhile ago.  Chief of Police Larry Boyd just announced his
 2 | retirement, in the area you're considering buying property."
 3 | Q.   Based on your experience in law enforcement and working
 4 | with federal agents and Department of Justice, can an FBI -- an
 5 | active FBI agent also serve at the same time as a chief of
 6 | police?
 7 | A.   No.
 8 | Q.   So in order to be a chief of police, the agent would
 9 | either have to no longer be an agent or retire, correct?
10 | A.   That is my understanding, correct.
11 | MS. RUDOFF:  And can we go to page 2 of this exhibit?
12 | Line 20948.
13 | BY MS. RUDOFF:
14 | Q.   Who is this message from?
15 | A.   From Mr. DeLeon.
16 | Q.   To who?
17 | A.   Mr. Stone.
18 | Q.   What is the date?
19 | A.   The date listed is January 20, 2017.
20 | MS. RUDOFF:  And can we scroll over?
21 | BY MS. RUDOFF:
22 | Q.   How does DeLeon address Stone?
23 | A.   S.A.R. Stone.
24 | Q.   And throughout the record, are there other examples where
25 | Joe DeLeon addresses Bill Stone that same way?

```
 1   A.   There are.

 2   Q.   And are these just a few of those examples?

 3   A.   Correct.

 4   Q.   Now, in 2016, in September, did we see a financial -- or

 5   did you review a financial transaction of where Casi Stone

 6   [sic] wrote a cashier's check to a Toyota dealership?

 7   A.   I saw a transaction where Ms. Thompson purchased a

 8   cashier's check that was made out to a Toyota dealership.

 9   Q.   And did you -- what did the evidence show that that

10   cashier's check went for?

11   A.   It was used to fund the purchase of a Toyota Tacoma.

12   Q.   And did you review the records related to that Toyota

13   Tacoma purchase?

14   A.   I did.

15   Q.   And in reviewing those records, did you create a chart to

16   summarize your analysis of all of the records you considered?

17   A.   I did.

18   Q.   And is that chart consistent with Government's

19   Exhibit 158?

20   A.   It is.

21        MS. RUDOFF:  Your Honor, the Government moves to

22   admit Government Exhibit 158.

23        MR. GALLIAN:  No objection.

24        MR. WESTFALL:  No objection, Your Honor.

25        THE COURT:  158 is admitted.
```

```
 1                   (Government's Exhibit No. 158 received)
 2             MS. RUDOFF:  May we publish?
 3             THE COURT:  You may.
 4   BY MS. RUDOFF:
 5   Q.   Is this that chart that you created?
 6   A.   It is.
 7   Q.   And what evidence does this chart summarize with regards
 8   to the Tacoma?
 9   A.   It summarizes the purchase of two Toyota Tacomas, one in
10   2016 and one in 2017.
11   Q.   And who do the records show that this Tacoma was in the
12   name of?
13   A.   Mr. Stone.
14   Q.   Now, talking about September 2016, did you review
15   financial records or purchase records related to a house
16   purchased in Colleyville, Texas?
17   A.   I did.
18   Q.   And what records did you review for that?
19   A.   Mr. Stone's financial records, the closing package for the
20   purchase of the house, as well as public records from Tarrant
21   County.
22             MS. RUDOFF:  And if we can republish Government
23   Exhibit 93-A, page 12.
24             (Pause)
25   BY MS. RUDOFF:
```

```
 1   Q.   Do you recall when approximately the house was purchased
 2   in Colleyville in September?
 3   A.   I believe the closing was in the second half of September.
 4   I don't recall the exact date.
 5   Q.   And what financial transaction did you review related to
 6   that house from Casi Thompson?
 7   A.   In mid-September she purchased a cashier's check that was
 8   made payable to Mr. Stone.
 9   Q.   How much was that cashier's check for?
10   A.   1,054 -- I would have to see it.
11   Q.   Okay.  So here we are 93-A, page 12.
12             When we --
13             MS. RUDOFF:  If we zoom in on the top two weeks.
14   BY MS. RUDOFF:
15   Q.   What do we see on September 5th that Stone writes?
16   A.   There is an entry that states "bought house."
17   Q.   And the dates following the 5th, do we see any indication
18   after that date that Bill Stone and Casi Thompson are spending
19   time together?
20   A.   Not on the days immediately following.
21   Q.   Okay.
22             MS. RUDOFF:  And can we zoom out?
23             And zooming in then on the week -- the next week, the
24   12th through the 16th.
25   BY MS. RUDOFF:
```

```
 1   Q.   Where is the first time we see Bill Stone say he said he

 2   spent time with the project?

 3   A.   On September 13th.

 4   Q.   And what does Stone write on September 13th?

 5   A.   There is an entry that says "Meet, feed the project," and

 6   then also an entry, "pick up check."

 7   Q.   And in your view of the financial records, was this

 8   September 13th date consistent with the cashier's check that

 9   Casi Thompson purchased for the 154,000?

10   A.   That's -- that's the date.  I believe it was 154,500.

11   Q.   And then on the 14th, what do we see Bill Stone write?

12   A.   "Deposit check."

13   Q.   And in viewing the financial records, is that -- what

14   check was deposited by Bill Stone on the 14th?

15   A.   The cashier's check from Ms. Thompson.

16            MS. RUDOFF:  And can we zoom out?

17            Can we zoom in on the week of September 19th through

18   the 23rd?

19   BY MS. RUDOFF:

20   Q.   So the week before we saw Stone write "with project" on

21   the 13th.

22            Was there any other time they spent together after

23   that date before this week?

24   A.   Not that I saw.

25   Q.   And is there any indication in these dates that Stone
```

1    spent time with Casi Thompson this week?

2    A.   I don't see her name or project listed on these entries.

3    Q.   And looking at the date of the 23rd, what do we see at the

4    top on that date that Stone writes in?

5    A.   "Closing on house 11:00 a.m."

6    Q.   Is there any indication from these records that Casi was

7    there at that closing with him?

8    A.   Her name and project are not listed.

9    Q.   Did you review the closing documents for the house?

10   A.   I did.

11   Q.   And do you recall what the total cost of the house was

12   approximately?

13   A.   I believe it was over $349,000.00.

14   Q.   And from review of those records, did you see any

15   indication that Bill Stone took out a mortgage to pay for the

16   house?

17   A.   I did not.

18   Q.   And so from your review of the records and the finances,

19   how did you determine Bill Stone paid for that house if not

20   through a mortgage?

21   A.   He purchased a cashier's check for the price of the house.

22   Q.   And in purchasing that cashier's check, was that after

23   Casi had given the check for 154,500 that you spoke about?

24   A.   That's correct.

25   Q.   And is that also after Casi had given the $250,000.00

1   cashier's check that you spoke about?

2   A.   That's correct.

3   Q.   We were talking about evidence regarding Joe DeLeon in

4   August of 2016 after having those text messages with Nils

5   Hubert.

6          After that time, did DeLeon, based on the records you

7   review, continue to act as Casi's secret probation officer?

8   A.   Yes.

9   Q.   Until approximately when?

10  A.   Sometime in 2017.

11  Q.   And what records did you review that further corroborated

12  that Joe DeLeon was no longer the probation officer sometime in

13  2017?

14  A.   Text messages, phone records.

15  Q.   And what did those phone records and text messages show to

16  you?

17  A.   There was less frequent contact between Mr. DeLeon and

18  Ms. Thompson.

19  Q.   And what about the communication records you saw at that

20  time between Bill Stone and Casi?

21  A.   There was frequent contact.

22  Q.   So after the point in which -- from the records, Joe

23  DeLeon doesn't seem to be as necessarily involved with the

24  secret probation, did you see instances in 2018 where there was

25  a spike in that communication?

```
 1   A.   I did.
 2   Q.   And when was that?
 3   A.   June of 2018.
 4          MS. RUDOFF:  Can we publish Government Exhibit 95-A,
 5   page 9?
 6   BY MS. RUDOFF:
 7   Q.   What date are we looking at here?
 8   A.   This is June 2018.
 9          MS. RUDOFF:  And can we zoom in on the pink?
10   BY MS. RUDOFF:
11   Q.   What do we see documented in the calendar from June 4th
12   through the 9th?
13   A.   Entries to indicate a trip to Maui.
14   Q.   And based on the records you reviewed, who was this trip
15   with?
16   A.   Ms. Thompson and Mr. Stone.
17          MS. RUDOFF:  And can we highlight the 6th and the 7th
18   and zoom in on those?
19   BY MS. RUDOFF:
20   Q.   What does Stone write happens on the 6th?
21   A.   "Disagreement with project.  L-word came out."
22   Q.   And what does he say on the 7th?
23   A.   "Talk about non-relationship."
24          MS. RUDOFF:  Can we zoom out?
25   BY MS. RUDOFF:
```

```
 1   Q.   After this trip happens, do we see based on the records
 2   Stone increasing his surveillance of Casi?
 3   A.   There are entries that would indicate that.
 4            MS. RUDOFF:  Can we zoom in on the 11th?
 5   BY MS. RUDOFF:
 6   Q.   What is written here?
 7   A.   "Granbury 10:00 a.m., project, project e-mailed Tony
 8   Giles, Facebook, 6-10-18."
 9   Q.   And below it?
10   A.   "Coffee Joe house," and then "went by Giles house."
11            MS. RUDOFF:  And can we zoom out and zoom in on the
12   18th?
13   BY MS. RUDOFF:
14   Q.   What does Bill Stone write here?
15   A.   The entry is "Casi changed her mind again.  Is the age
16   thing!  Watched her in Burleson today."
17            MS. RUDOFF:  And can we zoom out and zoom in on
18   the 23rd?
19   BY MS. RUDOFF:
20   Q.   What does Bill Stone write about project here?
21   A.   "Project" and then appears to be S-U-S and possibly an I.
22            MS. RUDOFF:  And can we zoom out?
23   BY MS. RUDOFF:
24   Q.   Around this same timeframe, did you review records or did
25   you review text messages between Bill Stone and Joe DeLeon
```

```
 1   about conducting surveillance of Casi Thompson?
 2   A.   I did.
 3            MS. RUDOFF:  Can we republish Government 37, the
 4   regular text messages, and go to page 366?
 5            Can we zoom in on the last two messages?
 6   BY MS. RUDOFF:
 7   Q.   What is the date of this message?
 8   A.   The message in green is dated June 11, 2018.
 9   Q.   And what's that a picture of that Joe DeLeon sends to Bill
10   Stone?
11   A.   It is a vehicle parked in front of a building.
12   Q.   And where is the picture being taken from?
13   A.   It appears to be taken from inside of a vehicle.
14   Q.   And then what does Bill Stone respond?
15   A.   "She's there and getting ready to leave."
16            MS. RUDOFF:  Can we go to page 367?
17            And can we zoom in on the top first green message to
18   the third blue message or -- yeah, there we go.
19   BY MS. RUDOFF:
20   Q.   Is this a continuation of the same date?
21   A.   It is.
22   Q.   And what does Joe DeLeon say?
23   A.   "Do we know where she's going."
24   Q.   What does Bill Stone respond?
25   A.   "Tan I think and then getting Tyler.  She came in back
```

```
 1   door."
 2   Q.   And what does his next message say?
 3   A.   "Should be leaving in a few I'm told."
 4   Q.   What does Joe DeLeon respond?
 5   A.   "Okay."
 6   Q.   And what does Bill Stone respond?
 7   A.   "She's on the go."
 8            MS. RUDOFF:  And can we go to page 368, the first
 9   green message to the second blue message?
10   BY MS. RUDOFF:
11   Q.   And what does Joe DeLeon say?
12   A.   "Can you tell which way she's going.  I stayed with the
13   car."
14   Q.   And what's the second message Bill Stone writes in
15   response?
16   A.   "She in Tahoe."
17            MS. RUDOFF:  And can we go to page 370?
18            Can we zoom in on first green message to the third
19   green message?
20   BY MS. RUDOFF:
21   Q.   What does Joe DeLeon say?
22   A.   "Do you think she's in the car and just parked the Tahoe
23   as a diversion."
24   Q.   What does Bill Stone respond?
25   A.   "Don't think so."
```

```
 1   Q.   And then what does he say?
 2   A.   "He told her he was coming there."
 3            MS. RUDOFF:  And can we highlight the last -- on the
 4   same page, the last three blue messages?
 5   BY MS. RUDOFF:
 6   Q.   What does Bill Stone say?
 7   A.   "She told him to bring her some lunch!"
 8   Q.   And then what does he say?
 9   A.   "Are you in a good location?"
10   Q.   Followed by?
11   A.   "To see her vehicle?"
12   Q.   So looking at these messages in conjunction with Stone's
13   calendar entries on this same timeframe, what did you
14   understand Bill Stone and Joe DeLeon were doing?
15   A.   Conduct --
16            MR. WESTFALL:  Object to speculation, Your Honor.
17            THE COURT:  Okay.  Sustained unless he can -- I don't
18   know how he would know that, so sustained.
19   BY MS. RUDOFF:
20   Q.   Other than these messages we see, was there any records to
21   indicate that DeLeon in June 2018 was otherwise involved in
22   Casi's secret probation?
23   A.   Not that I reviewed.
24   Q.   Is there additional evidence where -- in 2019 where Casi
25   tries -- again tries to break up with Bill Stone?
```

```
 1   A.   There is.
 2   Q.   And when was that?
 3   A.   Summer of 2019.
 4            MS. RUDOFF:  And can we republish Government's
 5   Exhibit 96-A?
 6            And can we go to page 1?
 7   BY MS. RUDOFF:
 8   Q.   And so in the 2019, did you review all the pages of this
 9   calendar as well?
10   A.   I did.
11   Q.   And in January or February, did you see any indication in
12   the calendars -- if we go to January and February -- that Bill
13   Stone marked down that he saw Joe DeLeon?
14   A.   I don't recall seeing an entry in January or February with
15   Mr. DeLeon's name.
16            MS. RUDOFF:  And can we go to March?
17            And can we zoom in on March 4th?
18   BY MS. RUDOFF:
19   Q.   What do we see -- who do we see Bill Stone saw on
20   March 4th?
21   A.   He writes down "Cracker Barrel, Mexican Joe."
22   Q.   And so, so far in 2019 is this the first indication that
23   you saw that Stone met in person with Joe DeLeon?
24   A.   This is the first entry that I see for Mr. DeLeon.
25   Q.   And when is the next time that you see entries in 2019 of
```

```
 1   Bill Stone meeting up with Joe DeLeon in this calendar?
 2   A.   I believe there are entries in June of 2019.
 3           MS. RUDOFF:  So can we go to June of 2019?
 4   BY MS. RUDOFF:
 5   Q.   What do we see here highlighted in yellow?
 6           MS. RUDOFF:  Can we zoom in on that?
 7   A.   In the yellow it indicates a Key West vacation.
 8   Q.   And based on the evidence you reviewed, who went on this
 9   Key West vacation?
10   A.   Ms. Thompson and Mr. Stone.
11           MS. RUDOFF:  And can we zoom in on the 12th and
12   the 13th -- through the 14th, I'm sorry.
13   BY MS. RUDOFF:
14   Q.   What does Bill Stone write happened on the 12th?
15   A.   "Blow up, drunk, strip club, Woody's, made out with
16   bartender she did."
17   Q.   And what about the 13th?
18   A.   "Farewell sex, fingered next morning, ate her out, had
19   bags packed, just like Hawaii."
20   Q.   And the 14th?
21   A.   "Key West, project drunk, distant again, talked to Dorothy
22   many times/friends."
23           MS. RUDOFF:  Can we zoom out?
24           And can we zoom in on the top left portion,
25   something I -- all the way to the top?
```

```
 1   BY MS. RUDOFF:
 2   Q.   Do we -- tell us what you see on the first line at the top
 3   above the dates.
 4   A.   "Stay debt free!  No regrets."
 5   Q.   Throughout your review of the calendars, would Stone often
 6   write "stay debt free"?
 7   A.   It does appear multiple times in his calendar.
 8   Q.   And at some point did that change?
 9   A.   I don't recall.
10            MS. RUDOFF:  And zoom out, please.
11            Can we zoom in on the week following the vacation,
12   the 17th through the 22nd?
13   BY MS. RUDOFF:
14   Q.   What do we see here that Bill Stone writes down on
15   the 18th?
16   A.   "SpoofCall to project."
17   Q.   And then what else does he say about project on that same
18   day?
19   A.   "Project suspicious of me."
20   Q.   What do we see written at the bottom for the 19th and the
21   20th and the 21st?
22   A.   "No project."
23   Q.   And here on the 20th --
24            MS. RUDOFF:  Can we zoom in?
25            THE COURT:  Someone needs to turn their phone off.
```

1    BY MS. RUDOFF:

2    Q.   What does Bill Stone write down that he did on the 20th?

3    A.   There's an entry for "rent truck" and "surveillance."

4    Q.   And then what does it say after that?

5    A.   "Granbury, project with Mex Joe."

6    Q.   And on the 21st, what does it say in the last line, the

7    dinner?

8    A.   "Dinner Denny's with Joe/Charles."

9    Q.   So on the 21st of June, is this the first indication in

10   the calendar since March that Bill Stone writes he saw Joe

11   DeLeon?

12   A.   That's the first one that I can see, yes.

13             MS. RUDOFF:  And then if we could zoom in on the last

14   week.

15   BY MS. RUDOFF:

16   Q.   What do we see written here on the 25th?

17             MS. RUDOFF:  We can zoom in.

18   A.   "Project doesn't believe me, blows me off!"

19             MS. RUDOFF:  Can we zoom out?

20   BY MS. RUDOFF:

21   Q.   And what do we see -- who do we see Joe -- or I'm sorry --

22   DeLeon has dinner with on the 30th.  It's the left-hand corner.

23   A.   There's an entry that says "dinner Mexican Joe."

24             MS. RUDOFF:  If we could go to page 10 of the exhibit

25   and move into July.

```
 1              Can we highlight the 13th?
 2   BY MS. RUDOFF:
 3   Q.   What does it say here?  What's the highlighted portion?
 4   A.   The highlighted portion is in quotes, "I agree to be
 5   engaged."
 6   Q.   And what is before that?
 7   A.   "Helicopter date, engagement day.  She said" --
 8   Q.   Now, these --
 9              MS. RUDOFF:  Can we zoom out?
10   BY MS. RUDOFF:
11   Q.   These highlights in yellow, you didn't make these
12   highlights, right?
13   A.   That's correct.
14   Q.   These were highlights that were on the calendar when they
15   were retrieved from Stone's home?
16   A.   That's correct.
17              MS. RUDOFF:  Can we look -- can we zoom in on the
18   week of -- or from the 16th to the 20th?
19   BY MS. RUDOFF:
20   Q.   On the 20th, what do we see above the black box?
21   A.   "Meet project, refused to sign papers."
22   Q.   And then what do we see below?
23   A.   "Asked about restitution money."
24              MS. RUDOFF:  And can we zoom in on the 22nd through
25   the 24th?
```

```
 1    BY MS. RUDOFF:
 2    Q.   What do we see on the 22nd?
 3    A.   "Surveillance, Fort Worth" and then "Casi talked texted."
 4            MS. RUDOFF:  And can we zoom out?
 5    BY MS. RUDOFF:
 6    Q.   On the 24th, below the black box, what does it say Stone
 7    did?
 8    A.   "Called Joe."
 9            MS. RUDOFF:  And can we zoom in on the 30th through
10    the last box of the month?
11    BY MS. RUDOFF:
12    Q.   Who does Stone meet with on the 30th?
13    A.   There is an entry that says "meet Joe."
14    Q.   And the last box on this screen, what does it -- Stone
15    write down?
16    A.   The entry is "Casi called -- called twice, said she knew I
17    was accessing her information from phone."
18    Q.   During this June and July time period, what did the tolls
19    show about the communications between Joe DeLeon and Bill
20    Stone?
21    A.   There's an increase during that time.
22    Q.   And was that increase similar to the one we saw in
23    June 2018?
24    A.   It was similar.
25            MS. RUDOFF:  Can we go to page 11 of this exhibit?
```

```
 1              And can we zoom in at the top starting with Wednesday
 2  and going to the end?
 3  BY MS. RUDOFF:
 4  Q.   This Wednesday entry, what is the date written in?
 5  A.   August 2nd.
 6  Q.   And what does it say?
 7  A.   "Casi tried to get info, was recording, denied Dorothy
 8  talked about situation, not healthy to talk to me, claimed
 9  local" -- I can't tell what that next word is.
10  Q.   That's okay.
11              So based on this calendar entry, was there evidence
12  to suggest or --
13              MS. RUDOFF:  Sorry, Todd.  Let me scratch that.
14  BY MS. RUDOFF:
15  Q.   Was there evidence of a recorded call that Casi made on
16  August 2, 2019, to Bill Stone?
17  A.   I believe there was a recorded call on that date.
18  Q.   And does the calendar also corroborate that?
19  A.   There is an entry indicating, I believe, that there --
20  that Ms. Thompson was recording a call.
21  Q.   At this point in time had -- from what you know, had the
22  investigation by the Rangers begun?
23  A.   Yes.
24  Q.   Was there evidence, other evidence from the cell phone
25  extractions that you reviewed that indicated Stone was aware
```

```
 1   there was an investigation besides his mention of the
 2   recording?  Did anything happen with the phones?
 3   A.   Which phones?
 4   Q.   Bill Stone's phones and the phones he had in his
 5   possession.
 6   A.   I don't remember.
 7   Q.   Okay.
 8            MS. RUDOFF:  Can we zoom in on August 3rd?
 9   BY MS. RUDOFF:
10   Q.   Did you review evidence related to Bill Stone's
11   interaction with Darla Bell around this time?
12   A.   I did.
13   Q.   And was there evidence that Bill Stone talked to Darla
14   Bell about deleting things off an iPhone?
15   A.   I believe there's information about removing data from an
16   iPhone to a thumb drive.
17   Q.   Was there any information regarding shredding?
18   A.   Yes.
19   Q.   And what do we see here with regard to shredding on
20   August 3rd that Bill Stone write down?
21   A.   There is an entry that says "Box Shredded Plano."
22            MS. RUDOFF:  Can we go to page 12?
23   BY MS. RUDOFF:
24   Q.   Now, in August -- June, July, you said there was increased
25   tolls with DeLeon and Stone.  What about in August?
```

```
 1   A.   I believe there's an increase in the August timeframe as
 2   well.
 3            MS. RUDOFF:   Can we zoom in with September the 3rd
 4   through the 5th?
 5   BY MS. RUDOFF:
 6   Q.   What do we see here written at the bottom of the 3rd?
 7   A.   "Casi called Joe."
 8   Q.   And from your review of the investigation, was there, in
 9   fact, a recorded call from Casi to Joe DeLeon on the 3rd?
10   A.   Yes.
11   Q.   And in that call, did Joe DeLeon say he hadn't talked to
12   Casi in a while?
13   A.   I believe that's correct.
14   Q.   And based on your review of the 2019 calendars, was that
15   accurate?
16   A.   That Mr. DeLeon had not --
17   Q.   Seen Casi.
18   A.   Correct.
19   Q.   We also -- Joe DeLeon also said that he hadn't talked to
20   Bill since Mr. B died.   Based on the records, was that
21   accurate?
22   A.   There was less contact between Ms. Thompson and
23   Mr. DeLeon.
24   Q.   Sorry, that was a bad question.   I'm talking about Joe
25   DeLeon told Casi that he hadn't talked to Bill Stone since
```

 1   Dr. B died in July.  And based on the evidence you reviewed, is

 2   that accurate?

 3   A.   No.

 4         MR. WESTFALL:  Your Honor, I have never heard in the

 5   evidence --

 6         THE COURT:  Okay.  What's your -- don't speak

 7   objection.

 8         MR. WESTFALL:  Okay.  I'm sorry.

 9         THE COURT:  What's your legal objection?

10         MR. WESTFALL:  My legal objection is misstates facts

11   and vague.

12         THE COURT:  All right.  Members of the jury, you are

13   the judge of the facts.  Overruled.

14   BY MS. RUDOFF:

15   Q.   What do we see written at the bottom on September 5th?

16   A.   "Still all a hoax, Casi called Joe."

17   Q.   And on September 5th, was there a recorded call -- or I'm

18   sorry.  On September 5th, was that when Joe DeLeon met with

19   Ranger Briley?

20   A.   Yes.

21         MS. RUDOFF:  Your Honor, may I approach the witness?

22         THE COURT:  You may.

23         (Pause)

24         MS. RUDOFF:  For purposes of the record, I handed the

25   witness what's already been admitted as Government Exhibit 156.

```
 1   BY MS. RUDOFF:
 2   Q.   So on September 3rd, when Casi calls Joe DeLeon and tells
 3   him that the probation isn't real, had -- who else had Joe
 4   talked to before that call happened?
 5   A.   Before the call, recorded call occurred --
 6             THE COURT:  Let's pause for just a second.  There's
 7   an objection on floor.
 8             Yes, sir?
 9             MR. WESTFALL:  I didn't hear the question.
10             THE COURT:  All right.
11             MS. RUDOFF:  I can repeat it.
12             THE COURT:  Okay.  Thanks.
13   BY MS. RUDOFF:
14   Q.   So you said that September 3rd, Casi does a recorded call
15   with Joe DeLeon, right?
16   A.   Correct.
17   Q.   Based on the toll records, did Joe DeLeon talk to anyone
18   else that same day before he talked to Casi?
19   A.   There are calls between Mr. Stone and Mr. DeLeon.
20   Q.   And is that also consistent with the toll records on
21   September 5th before Joe DeLeon meets with Ranger Briley?
22   A.   Yes.
23             MS. RUDOFF:  Can we go back and republish 96-A?
24             And can we go to page 12?
25             And can we zoom in on the 12th?
```

```
 1  BY MS. RUDOFF:
 2  Q.   What do we see here?
 3  A.   There is an entry at the bottom regarding Ms. Thompson.
 4  Q.   And what does it say?
 5  A.   "Joe called Casi, not good."
 6  Q.   And is that consistent with the text messages and toll
 7  records we saw between communications of Joe DeLeon and Bill
 8  Stone on that same day?
 9  A.   Correct.  There was a recorded call between Ms. Thompson
10  and Mr. DeLeon.
11  Q.   And in addition to the recorded calls, were there also
12  toll records and communications between Joe DeLeon and Bill
13  Stone?
14  A.   That's correct.
15          MS. RUDOFF:  Can we zoom in on the 27th?
16  BY MS. RUDOFF:
17  Q.   What do you see here?
18  A.   "Joe told Casi."
19  Q.   And was there also a recorded call done between Casi and
20  Joe DeLeon on the 27th?
21  A.   That's correct.
22  Q.   So after --
23          MS. RUDOFF:  Can we zoom out?
24  BY MS. RUDOFF:
25  Q.   After September 2019, do we see another dip in the toll
```

1    communications between Joe DeLeon and Bill Stone?

2    A.   There's less frequent contact, correct.

3    Q.   And if we go to page 13, do we see in October that there

4    is much notations of Bill Stone and Joe DeLeon meeting.

5    A.   I don't see Mr. DeLeon's name listed.

6    Q.   And is that also the same for November and December of

7    2019 from what you reviewed in the calendars?

8    A.   I believe that's correct.

9         MS. RUDOFF:  Can we go to page 15, which is December

10   2019?

11        Can we zoom in on the top above the dates?

12   BY MS. RUDOFF:

13   Q.   What does Mr. Stone write here?

14   A.   The entry is "No regrets!  Be debt free!  So what!"

15   Q.   And is this different than what you testified he would

16   write previously?

17   A.   It is different.

18        MS. RUDOFF:  Can we go to Exhibit 97-A, page 4?

19        Can we go to -- I'm sorry -- page 6?

20   BY MS. RUDOFF:

21   Q.   In 2020, based on the toll records and the calendars you

22   reviewed, did you see much interaction between Bill Stone and

23   Joe DeLeon before March 2020?

24   A.   I did not.

25        MS. RUDOFF:  And can we zoom in on March 26th?

```
 1   BY MS. RUDOFF:
 2   Q.   And do we see that Bill Stone and Joe got together on
 3   the 26th?
 4   A.   There is an entry that says "Joe's house."
 5   Q.   And is this the first entry we see in 2020 where Joe
 6   DeLeon -- Bill Stone marks down that he saw Joe DeLeon?
 7   A.    It's the first recollection I can recall of that occurring
 8   in 2020.
 9            MS. RUDOFF:  And can we go to page 8?
10            This is May 2020.
11            Can we zoom in on the first two weeks?
12   BY MS. RUDOFF:
13   Q.   Do we see entries where Bill Stone is writing down talking
14   about a Tahoe?
15   A.   Yes.
16   Q.   And based on your knowledge and information with the
17   evidence, who drove a Tahoe at this time?
18   A.   Ms. Thompson.
19            THE COURT:  When you reach a natural breaking point,
20   it's time for a break.
21            MS. RUDOFF:  I can do that now, Your Honor.
22            THE COURT:  All right.
23            All rise for the jury.
24            (Jury out)
25            THE COURT:  All right.  If everybody will please be
```

```
 1    seated.
 2              (Pause)
 3              THE COURT:  So I hope you're making good use of your
 4    time.  You're down to two hours and seven seconds.
 5              Okay.  All right.
 6              THE LAW CLERK:  Seven minutes.
 7              THE COURT:  Seven minutes.  I'm sorry.  Yeah, two --
 8    two hours and seven minutes.
 9              Okay.  Anything we need to take up before break?
10              No?  All right.
11              MR. GALLIAN:  Not on the record, Your Honor.
12              (Discussion off the record)
13              (Recess)
14              SECURITY OFFICER:  All rise.
15              THE COURT:  Everybody please be seated.
16              And so I just wanted to make a note for the record.
17    We talked a little bit earlier about timing.  And the Court has
18    its -- I will make this Court's Exhibit Number 2.
19              The Court has its e-mail sent by its law clerk Taylor
20    Hinojosa to the parties, Jenna Rudoff, Donna Max, Marcus Busch,
21    Gregg Gallian, Jaclyn Gallian, Frank at Westfall Sellers and
22    Greg at Westfall Sellers.
23              The subject line is "Remaining Time for Trial."  It
24    was sent Sunday, August 6, 2023, at 3:52 p.m.
25              "Good afternoon everyone,
```

 1          "In the interest of docket control and consideration

 2    of the jury's time, the Court has reviewed the record and

 3    determined that each party shall have six hours remaining.

 4    This time is inclusive of cross-examinations, rebuttal, and all

 5    objections.

 6          "Thank you.

 7          "D. Taylor Hinojosa, Term Law Clerk to the Honorable

 8    Judge Ada Brown, U.S. District Court for the Northern District

 9    of Texas."

10          And so I sent this out Sunday to apprise the parties

11    before they came Monday as to the docket control concerns this

12    Court had.

13          And before our -- we resumed court yesterday, I asked

14    the parties if there were any matters we needed to take up.

15    None were raised relating to this time.

16          And I also want to note that originally we had set

17    aside nine days for this trial.  We've now been in this trial

18    by my count about three weeks.  And the Government still has

19    yet to rest its case, which is okay.  That is part of the

20    reason that the Judge -- this Judge had to -- believes it was

21    important to have a docket control order.  We've already kept

22    this jury a long time.

23          And so that's what I've got.

24          Off the record.

25          (Discussion off the record)

```
 1              THE COURT:  Let's bring them in.  Stack them up.
 2    Bring them in.
 3              (Pause)
 4              SECURITY OFFICER:  All rise for the jury.
 5              (Jury in)
 6              THE COURT:  All right.  Everyone please be seated.
 7              If everybody will check their phones for me.
 8              And with that said, your witness, ma'am.
 9    BY MS. RUDOFF:
10    Q.   Andrew, we talked about -- a lot about a lot of financial
11    records you reviewed, right?
12    A.   Correct.
13    Q.   And we saw the summary charts you made, right?
14    A.   That's correct.
15    Q.   And in making those charts, did the records include Bill
16    Stone's Wells Fargo, J.P. Morgan, and Navy Federal accounts?
17    A.   They did.
18    Q.   Did it also include Joe DeLeon's Wells Fargo account?
19    A.   It did.
20              MS. RUDOFF:  Your Honor, at this time the Government
21    moves to admit Exhibits 11, 12, 13, and 23.
22              MR. GALLIAN:  No objection.
23              MR. WESTFALL:  No objection.
24              THE COURT:  Admitted.
25
```

```
 1                    (Government's Exhibit Nos. 11, 12, 13, and 23
 2                    received)
 3    BY MS. RUDOFF:
 4    Q.   And when discussing the vehicle purchases and the summary
 5    charts related to them, in creating those charts did you review
 6    the purchase agreement records for a 2016 Mercedes?
 7    A.   I did.
 8    Q.   And the title records for the 2015 Lexus as well as the
 9    F-150?
10    A.   I did.
11    Q.   And did you also review the purchase agreement for a
12    Toyota Tacoma with a VIN ending in 1559?
13    A.   I did.
14    Q.   And purchase records for a Tacoma ending in 1853?
15    A.   I did.
16    Q.   And in reviewing those records, were they voluminous?
17    A.   They were.
18    Q.   Did you also then create -- using those records create a
19    summary chart to explain the financial transactions related to
20    the 2016 Mercedes purchase?
21    A.   I did.
22              MS. RUDOFF:  Your Honor, at this time the Government
23    moves to admit Exhibits 159, 43, 136, 21, 48, 162.
24              MR. GALLIAN:  No objection.
25              MR. WESTFALL:  No objection, Your Honor.
```

```
 1                THE COURT:  Admitted.
 2                     (Government's Exhibit Nos. 21, 43, 48, 136, 159
 3                     and 162 received)
 4                MS. RUDOFF:  And at this time, Your Honor, the
 5     Government would also want to admit Government Exhibit 173,
 6     which is the stipulation of the parties regarding the
 7     interstate commerce.
 8                THE COURT:  All right.  Gentlemen, if there's any
 9     objection, please?
10                MR. WESTFALL:  173 was the stipulation?
11                Then no objection, Your Honor.
12                MR. GALLIAN:  No objection.
13                THE COURT:  Admitted.
14                     (Government's Exhibit No. 173 received)
15                MS. RUDOFF:  Thank you, Your Honor.
16                THE COURT:  You're welcome.
17                MS. RUDOFF:  If we could go back and republish
18     Government Exhibit 97-A, starting with page 8.
19                Can we zoom in on the 7th of May?
20     BY MS. RUDOFF:
21     Q.   What do we see Bill Stone writes here at the bottom
22     regarding Joe DeLeon?
23     A.   "Joe visit OIG."
24                MS. RUDOFF:  And can we zoom in on the 8th?
25     BY MS. RUDOFF:
```

```
 1   Q.   What does it say regarding Joe DeLeon at the top?
 2   A.   "Saw Joe got intel."
 3            MS. RUDOFF:  And can we zoom in on the 12th?
 4   BY MS. RUDOFF:
 5   Q.   What does it say regarding Joe DeLeon here?
 6   A.   "Joe called OIG clone phone."
 7            MS. RUDOFF:  Can we zoom out, please?
 8   BY MS. RUDOFF:
 9   Q.   97-A, this is the calendar for 2020, right?
10   A.   That's correct.
11   Q.   Did you review an additional calendar for 2020?
12   A.   I did.
13   Q.   And what was -- what is your knowledge of where the other
14   2020 -- how the other 2020 calendar came into be a part of this
15   investigation?
16   A.   My understanding is it was seized at Mr. Stone's residence
17   during the execution of a search warrant.
18            MS. RUDOFF:  At this time can we publish Government
19   Exhibit 98-A, which has already been admitted?
20            And can we go to page 27?
21            Actually, can we go to page 26?
22            Sorry.  Can we go to the beginning of April?
23   BY MS. RUDOFF:
24   Q.   Do we see anything written here?  This is the additional
25   2020 calendar that was found at the search warrant, 98-A.  Do
```

```
 1    we see anything written here in April?
 2    A.    I don't see any handwritten entries.
 3    Q.    And is that consistent with what we saw in the other 2020
 4    calendar, Government Exhibit 97-A?
 5    A.    If I recall correctly, there are handwritten entries in
 6    the other 2020 calendar for April.
 7           MS. RUDOFF:  And can we go to page 27?
 8           And can we -- and this is May 2020.  Can we zoom in
 9    on the 7th?
10    BY MS. RUDOFF:
11    Q.    Now, on the other calendar on May 7th it said, "Joe visit
12    OIG."  Do we see here anything here on this 2020 calendar
13    written in?
14    A.    No.
15           MS. RUDOFF:  Zoom out.
16    BY MS. RUDOFF:
17    Q.    What about on the 8th?  Do we see anything written there?
18    A.    No.
19           MS. RUDOFF:  Can we zoom out?
20    BY MS. RUDOFF:
21    Q.    What about on the 12th?  Do we see anything written there?
22    A.    No.
23    Q.    In this 2020 calendar that you reviewed, did you find any
24    notations by Bill Stone related to Casi or Joe DeLeon or the
25    secret probation?
```

1    A.   I do not remember seeing any references to Ms. Thompson or

2    the secret probation.

3    Q.   Now, I want to talk about -- I'm going to turn back a

4    little bit to 2015.

5         Did you have a chance to review the 2015 calendar as

6    well as toll records from 2015?

7    A.   I did.

8    Q.   And from your review of that, approximately how often

9    between January 2015 and October 2015 did Bill Stone make

10   visits home to Dallas per month?

11   A.   Usually once per month.  It appears in May he returned

12   twice and did not return to Dallas in June.

13   Q.   So in those 10 or 11 visits from January to October 2015,

14   what did the tolls and the calendars tell you as to how many

15   times he actually saw Casi when he was here in Dallas?

16   A.   The calendars show two possible references to

17   Ms. Thompson.

18   Q.   Anywhere in the calendars did you see Bill Stone write

19   anything about sex with Casi Thompson in 2015?

20   A.   No.

21   Q.   And based on your review of the calendars, is the first

22   mention of sex by Bill Stone in the calendar not until

23   July 2016?

24   A.   That's correct.

25   Q.   And from July 2016 through the end of 2016, did you have

1    an opportunity to review how often in the calendar it was
2    notated by Bill Stone that he had sex with Casi Thompson?
3    A.    Yes.
4    Q.    And do you know how often -- or approximately how many
5    times?
6    A.    I believe there was maybe one or two other occasions
7    around August or September.
8    Q.    Okay.  And so September you said there was maybe one.  Did
9    you say October or August?
10   A.    I believe August, but I would have to look to be certain.
11   Q.    Okay.  And so if the calendar had -- then looking at the
12   tolls, from January to September 2016.  Of the parties, who
13   talks the most -- or I'm sorry.  Who does Casi talk to the most
14   between January and September 2016?
15   A.    She -- I believe she talks to Mr. DeLeon most frequently.
16   Q.    Let me clarify that.  From January to April 2016, who does
17   Casi definitely talk to the most?
18   A.    That would be Mr. DeLeon.
19   Q.    And do we see that communication start to trail off a
20   little bit more?
21   A.    Correct.
22   Q.    And in 2016, in the calendars, do we see a lot of
23   notations of meetings between the parties?
24   A.    There are multiple entries regarding meetings.
25   Q.    And do the majority of them indicate that the meetings

```
 1   were between all three of the individuals?
 2   A.   That's correct.
 3              MS. RUDOFF:  Can we republish Exhibit 92-A?
 4              And go to page 12.
 5              Can we zoom in on 12?
 6   BY MS. RUDOFF:
 7   Q.   Is this one of the instances you're referring to in the
 8   2015 calendar, one of the only two instances where Bill Stone
 9   marks that he met with Casi?
10   A.   There is an entry that says "Cassie dinner."  That could
11   potentially refer to Ms. Thompson.
12   Q.   And if it was referring to Casi Thompson, is the name
13   spelled incorrectly?
14   A.   That is not how Ms. Thompson spells her first name.
15   Q.   Now, moving into 2017 to 2019, based on the tolls and the
16   calendars, who was Casi Thompson communicating with and
17   spending the most time with?
18   A.   Her most frequent communication was with Mr. Stone.
19   Q.   And in 2017 through 2019, do we also see more frequency of
20   notations of Casi Thompson -- of Bill Stone writing that he had
21   had sex with Casi Thompson?
22   A.   There are more entries referencing sex with Ms. Thompson,
23   yes.
24   Q.   As far as you know, is the FBI a branch of the Department
25   of Justice?
```

```
 1    A.   It is.
 2    Q.   And are special agents of the FBI considered officers and
 3    employees acting under the authority of the United States?
 4    A.   They are.
 5              MS. RUDOFF:  Your Honor, pass the witness.
 6              (Pause)
 7              MR. GALLIAN:  May I proceed, Your Honor?
 8              THE COURT:  You may.  Yes, sir.
 9                        CROSS-EXAMINATION
10    BY MR. GALLIAN:
11    Q.   Mr. Latham, my name is Gregg Gallian.  I represent Bill
12    Stone.  I have some questions for you, okay?
13    A.   Yes, sir.
14    Q.   I'll be honest with you.  I'm tired.  And I'm going to try
15    and make this as quick as possible for all of us, okay?
16    A.   Yes, sir.
17    Q.   Now, on that I need some cooperation from you, okay?
18    A.   Yes, sir.
19    Q.   All right.
20              MR. GALLIAN:  Your Honor, at this time we move to
21    admit Stone's Exhibit 171, 172, 173, and 174.
22              MS. RUDOFF:  No objections, Your Honor.
23              MR. WESTFALL:  No objection, Your Honor.
24              THE COURT:  All right.  Admitted.
25
```

```
 1                    (Defendant Stone's Exhibit Nos. 171, 172, 173,
 2                    and 174 received)
 3            MR. GALLIAN:  And at this time we move to admit
 4      Stone's Exhibit 176, 177, 178, 179, 180, and 181.
 5            MS. RUDOFF:  No objections, Your Honor.
 6            MR. WESTFALL:  No objection, Your Honor.
 7            THE COURT:  Admitted.
 8                    (Defendant Stone's Exhibit Nos. 176, 177, 178,
 9                    179, 180, and 181 received)
10            MR. GALLIAN:  Permission to publish 176 through 181.
11            THE COURT:  Granted.
12      BY MR. GALLIAN:
13      Q.   So, Mr. Latham, are you aware that we had a forensic
14      accountant ready to testify on our -- on our team?
15      A.   I was not.
16      Q.   Okay.  But the prosecutors did ask you to look at some of
17      the charts that we provided; is that fair?
18      A.   That's correct.
19      Q.   In hopes that you would agree to the information and save
20      us all one more witness?
21      A.   Correct.
22      Q.   All right.  And you have had a chance to review those?
23      A.   I have had a chance to review some charts.
24      Q.   All right.
25            MR. GALLIAN:  If we could pull up 176, please, Carly?
```

1  BY MR. GALLIAN:

2  Q.   This right here states William Stone Liquid Asset

3  Positions, Thrift Savings Plan as of October 31, 2015,

4  $243,995.15.

5          Did I read that correctly?

6  A.   Yes, sir.

7  Q.   And based on your review of our records and these charts,

8  that's accurate?

9  A.   Yes, sir.

10          MR. GALLIAN:   If we could publish 177, please.

11  BY MR. GALLIAN:

12  Q.   Fidelity Investments IRA, as of October 31, 2015,

13  $203,806.13.

14          Did I read that correctly?

15  A.   Yes, sir.

16  Q.   Based on your review of the records and this summary

17  chart, is that accurate?

18  A.   Yes, sir.

19          MR. GALLIAN:   178, please.

20  BY MR. GALLIAN:

21  Q.   Fidelity Investments-Individual, as of October 31, 2015,

22  $41,409.11.

23          Did I read that correctly?

24  A.   Yes, sir.

25  Q.   Based on your review of the information in this, is that

```
 1   correct?
 2   A.   It is.
 3            MR. GALLIAN:   179.
 4   BY MR. GALLIAN:
 5   Q.   Wells Fargo, October 31, 2015, $178,732.36.
 6            Is that correct?
 7   A.   Yes, sir.
 8   Q.   Based on your review of the information, that's supported
 9   by the documentation?
10   A.   Yes, sir.
11            MR. GALLIAN:   180, please.
12   BY MR. GALLIAN:
13   Q.   J.P. Morgan Chase, as of October 31, 2015, $113,984.30.
14            Did I read that correctly?
15   A.   You did.
16   Q.   And the reason that the asterisk is there is that J.P.
17   Morgan, if you recall in 2015, only had a balance at the
18   beginning of October; is that right?
19   A.   I recall there was a beginning balance for the beginning
20   of 2016 and the end of 2016, but not for the end of -- sorry.
21   Beginning of 2015 and the beginning of 2016, but there wasn't
22   one for the end of October.
23   Q.   Okay.  So the best that we could -- that we could recall
24   from the records, J.P. Morgan, this appeared to be about his
25   balance at that time.  Is that fair?
```

1    A.   That was the balance at the beginning of 2015 based on my

2    review of those records.

3    Q.   Okay.

4          MR. GALLIAN:  And could we do 181, please?

5    BY MR. GALLIAN:

6    Q.   If we add all of these up, at the time of Bill Stone's

7    retirement, October 31, 2015, he had in the bank approximately

8    $781,927.05.  Did I read that correctly?

9    A.   Yes, sir.

10   Q.   Okay.  Rich people can commit crimes, do we agree?

11   A.   Yes, sir.

12   Q.   Poor people can commit crimes, do we agree?

13   A.   Yes, sir.

14   Q.   But at the time of Bill Stone's retirement, he had over

15   three-quarters of a million in the bank; is that right?

16   A.   That's correct.

17         MR. GALLIAN:  I would like to publish Government's

18   Exhibit 31.  It's previously been admitted.

19         And if we could zoom in on the last portion of the

20   style of the case, please.

21   BY MR. GALLIAN:

22   Q.   All right.  We've gone through a lot of the planners, and

23   I think it's helpful to the jury to at least give some context

24   to some of the names.

25         You understand that Kirsten Leigh Stone, Keley Helen

 1   Stone, and Taylor Shea Stone are Bill and Stacey's children,

 2   correct?

 3   A.   That's my understanding.

 4   Q.   And we will see their names throughout the planner when

 5   he's mowing their yard, having lunch with them, that sort of

 6   stuff, correct?

 7   A.   Those names do appear in the planner.

 8   Q.   We also see a name of Abbey.  Do you know who Abbey is?

 9   A.   I believe that was Mr. -- is or was Mr. Stone's dog.

10   Q.   Yes.  Correct.  Okay.

11        MR. GALLIAN:  All right.  If we could pull up

12   Government's Exhibit 60, please.

13   BY MR. GALLIAN:

14   Q.   All right.  When showed this yesterday, you said that

15   these were the various bank accounts that you reviewed in your

16   investigation for each of the individuals listed here; is that

17   right?

18   A.   The ones relevant to the payments related to the secret

19   probation.

20   Q.   Okay.  You say relevant.  Did you review other bank

21   records?

22   A.   I did.

23   Q.   What other bank records?

24   A.   There were other accounts at Chase and Wells Fargo.

25   Q.   Did you review any accounts from First Financial from Casi

1    Thompson?

2    A.   I did not.

3    Q.   Were you aware that Casi Thompson had First Financial bank

4    accounts?

5    A.   Yes.

6    Q.   Were you aware that she had five accounts at First

7    Financial?

8    A.   I don't believe I knew the exact number.

9    Q.   Okay.  How many cash withdrawals did Casi make from the

10   First Financial account?

11   A.   I did not review those records, so I don't know.

12   Q.   How many checks did Casi Thompson write from the First

13   Financial account?

14   A.   I don't know.

15   Q.   You don't know because you didn't see those records.  Is

16   that fair?

17   A.   Yes, sir.

18   Q.   In a white-collar wire fraud investigation like this, at

19   any point in this investigation you didn't deem it relevant to

20   look through Casi's other accounts?

21   A.   We reviewed -- I reviewed other accounts for her at Chase.

22   I did not see any indications or review any information

23   indicating that there were payments from accounts at other

24   banks from her to Mr. Stone or Mr. DeLeon.

25   Q.   But you don't know what you don't know, right?

```
 1   A.   Correct.
 2   Q.   Meaning because you never looked at them, you were never
 3   able to see whether or not Casi was writing large checks to
 4   other individuals or withdrawing cash on a regular basis, can
 5   we agree?
 6   A.   I do not know what transactions were in those accounts.
 7            MR. GALLIAN:  Okay.  Thank you, Carly.
 8   BY MR. GALLIAN:
 9   Q.   Yesterday you mentioned that the toll records that you
10   reviewed went back to 2014; is that correct?
11   A.   Correct.
12   Q.   All right.  Let's put some context on that.
13            The toll records that were subpoenaed by you guys, by
14   the Government, actually started in November of 2015; is that
15   right?
16   A.   That's correct.
17   Q.   Okay.  The records that we provided are the ones that
18   started in 2014; is that right?
19   A.   Yes, sir.
20   Q.   And you reviewed those?
21   A.   I have.
22   Q.   And you've seen a lot of correspondence between Bill Stone
23   and Casi Thompson in 2015, right?
24   A.   I did see phone calls between Ms. Thompson and Mr. Stone.
25   Q.   Phone calls that had we stuck with the subpoena date that
```

1    the Government used we never would have known those phone calls

2    existed?

3    A.   We would not have had toll records for those calls.

4    Q.   What's your position on the planner?  Are you of the

5    position that if it's not in the planner it didn't happen?

6    A.   I'm of the position that there are entries in the planner

7    and I don't know if Mr. Stone documented everything that he

8    did.

9    Q.   So you're not saying if it's not in the planner then it

10   didn't happen; is that correct?

11   A.   That's correct.

12   Q.   If we look at the planner, just generally speaking, it

13   appears to be what Bill did on any particular day; is that

14   right?

15   A.   Generally.

16   Q.   Obviously some of it has to do with this case, other

17   things just have to do with when he ran to the post office,

18   things like that; is that right?

19   A.   Yes, sir.

20   Q.   Just kind of a collection of his daily activities, agree?

21   A.   Generally, yes.

22   Q.   Have you had a chance to review the 3x5 cards that Casi

23   was sending to Joe DeLeon?

24   A.   I have seen some of them.

25   Q.   And some of those 3x5 cards, are they just a mere

1   recollection of what she did that day?

2   A.   My understanding is those are her notes of what she did on

3   certain dates.

4            MR. GALLIAN:  All right.  If we could pull up, Carly,

5   Government's 96, jump page 11.  96-A.

6            And if we could zoom in on August 3, 2019.

7   BY MR. GALLIAN:

8   Q.   You mentioned Box Shredded Plano that Bill Stone went to

9   in August of 2019, correct?

10  A.   Yes, sir.

11  Q.   Okay.  Did you do any investigation at Box Shredded Plano?

12  A.   I did not.

13  Q.   Did anyone?

14  A.   I'm not aware of any.

15  Q.   Okay.  You yourself didn't go to Box Shredded Plano to try

16  to pull any receipts of anything, right?

17  A.   I did not.

18  Q.   What did Bill Stone shred that day?

19  A.   I do not know.

20  Q.   He sure as heck didn't shred any planners, did he?

21  A.   I don't know.

22  Q.   We know that he still has Casi Thompson's phones in the

23  safe, right?

24  A.   I believe there were two of Ms. Thompson's phones in the

25  safe.

1   Q.   There was no investigation done at Box Shredded Plano to

2   show what Mr. Stone shredded; is that right?

3   A.   I'm not aware of anyone going to that location.

4   Q.   All right.  Let's go through some old planner dates really

5   quickly.

6        MR. GALLIAN:  Carly, get ready.

7        Permission to publish -- well, never mind.  I don't

8   need permission.  Thank you, Judge.  Sorry.

9        Government's 92-A, jump page 6.

10       If we could zoom in on March 21st.

11  BY MR. GALLIAN:

12  Q.   Third line down says, "date Casi."  Is that right?

13  A.   Yes, sir.

14  Q.   All right.  Now, if Ranger Briley and Casi Thompson both

15  stated it was their understanding that Bill and Casi had sex in

16  2015, you're not disputing that, are you?

17       MS. RUDOFF:  Objection, Your Honor.  That's a

18  misstatement of the facts in evidence.

19       THE COURT:  The jury will be the judge of the facts.

20  Overruled.

21  BY MR. GALLIAN:

22  Q.   Okay.  So if Casi said that she had sex with Bill Stone in

23  2015 and Briley recalled Casi saying that as well, you're

24  not -- you're not disputing that, are you?

25  A.    I haven't heard that statement, so I don't know the

 1   context or the details on that.

 2   Q.   But this kind of gets back to what I'm talking about, is

 3   just because it's not in the planner doesn't mean that

 4   something may or may not have happened, right?

 5   A.   Correct.

 6            MR. GALLIAN:  All right.  If we go to 93-A, Carly,

 7   jump page 5.

 8            If we could zoom in on February 12th.

 9   BY MR. GALLIAN:

10   Q.   "Project bought Rolex."  Did I read that correctly?

11   A.   Yes, sir.

12   Q.   February 12, 2016, is two days before what major holiday?

13   A.   I believe that's two days before Valentine's Day.

14            MR. GALLIAN:  If we could go to February 14, 2016,

15   please.

16   BY MR. GALLIAN:

17   Q.   It says "Project/Joe look at cars."  Is that right?

18   A.   Yes.

19   Q.   It also says, "Shea and Leigh took them food."

20            Obviously we now know he's referring to his

21   daughters, correct?

22   A.   Yes, sir.

23            MR. GALLIAN:  All right.  February 18th, please,

24   Carly.

25   BY MR. GALLIAN:

```
 1   Q.   "Looked at new cars with project and Joe."
 2           Did I read that correctly?
 3   A.   Yes, sir.
 4   Q.   You're aware that February 18th or 19th, Casi Thompson
 5   purchased a new Mercedes -- a new Lexus for herself, correct?
 6   A.   Around that date, yes, sir.
 7   Q.   Okay.
 8           MR. GALLIAN:  If we go to February 20th, please.
 9   BY MR. GALLIAN:
10   Q.   It says here "clean Lexus."
11           Did I read that correctly?
12   A.   Yes, sir.
13   Q.   That is after the date that Casi purchased that new Lexus,
14   correct?
15   A.   I believe that's correct.
16   Q.   All right.
17           MR. GALLIAN:  If we could publish 93-A and start on
18   page 13, please.
19           And if we could highlight the first day.
20   BY MR. GALLIAN:
21   Q.   Last entry says, "tear carpet out."
22           Did I read that correctly?
23   A.   Yes, sir.
24   Q.   This is October 1, 2016.  We know that Bill was in
25   possession of his and Casi's house by this time, correct?
```

```
 1   A.   Of Mr. Stone's house, yes.
 2   Q.   Sure.  But that -- presumably he's talking about the --
 3   the house in Colleyville, correct?
 4   A.   Yes, sir.
 5   Q.   All right.
 6            MR. GALLIAN:  And, Carly, if we could just highlight
 7   the 2nd, 3rd, 4th, and 5th.  Speed this up a little bit.
 8   BY MR. GALLIAN:
 9   Q.   The 2nd, "tear carpet out."
10            Did I read that correctly?
11   A.   Yes, sir.
12   Q.   The 3rd, "washer/dryer delivered."
13            Did I read that correctly?
14   A.   Yes, sir.
15   Q.   The 4th, "tear" -- oh, "locks changed and paint samples."
16            Did I read that correctly?
17   A.   Yes, sir.
18   Q.   The 5th, "tear up title" -- maybe "tile."
19            But did I read that correctly?
20   A.   Yes, sir.
21   Q.   All right.  In any of these entries does it mention that
22   project was there?
23   A.   No, sir.
24   Q.   Does it mention that Casi was there?
25   A.   No, sir.
```

```
 1  Q.   All right.
 2            MR. GALLIAN:  If we could go to the 6th, 7th,
 3  and 8th.
 4  BY MR. GALLIAN:
 5  Q.   The 6th, "clean out gutter/driveway, power washed."
 6            Did I read that correctly?
 7  A.   Yes, sir.
 8  Q.   On the 7th, it says, "remodel apartment."
 9            Did I read that correctly?
10            Oh, I'm sorry.  "Remodel appointment."
11  A.   Yeah.  Yes, sir, I believe that's the abbreviation there.
12  Q.   Okay.  And what we notice is on the 6th and the 7th, they
13  both mentioned the remodel appointment, right?
14  A.   Yes, sir.
15  Q.   Neither of those dates have Casi Thompson there, is that
16  correct, based on the planner?
17  A.   Based on those entries, that's correct.
18  Q.   But on the 8th, we see "stain fence and project," agree?
19  A.   Yes, sir.
20  Q.   All right.
21            MR. GALLIAN:  Carly, if we could go to the 17th,
22  please.
23  BY MR. GALLIAN:
24  Q.   It says, "start remodeling of the palace," which is what
25  he called his home, correct?
```

```
 1   A.   It does say, yeah, "start remodeling of palace."
 2   Q.   Okay.
 3            MR. GALLIAN:  The 22nd, please.
 4   BY MR. GALLIAN:
 5   Q.   "Look" -- it says, "project" on this day, "look at
 6   furniture appliances."
 7            Did I read that correctly?
 8   A.   Yes, sir.
 9            MR. GALLIAN:  Carly, if we go to page 14, which is
10   November of 2016, please.
11            And if we could do the 11th and the 12th.
12   BY MR. GALLIAN:
13   Q.   "Holiday, cabinets installed on the 11th."
14            Did I read that correctly?
15   A.   Yes, sir.
16   Q.   On the 12th, project is -- he's with her.  They're
17   somewhere, agree?
18   A.   There is an entry that states "project."
19            MR. GALLIAN:  If we can do the 15th and the 16th,
20   please.
21   BY MR. GALLIAN:
22   Q.   All right.  It looks like on the 16th, "ordered iron
23   doors" and "palace."  Is that right?
24   A.   Yes, sir.
25   Q.   Finally, on the 18th, "install appliances."
```

```
 1              Did I read that correctly?
 2   A.   Yes, sir.
 3   Q.   Okay.  Those last two ones that we just went over do not
 4   have any mention of Casi or project, do we agree?
 5   A.   Yes, sir.
 6              MR. GALLIAN:  Can we go to page 15, which is December
 7   of 2016, please.
 8              And the 2nd.
 9   BY MR. GALLIAN:
10   Q.   "Hardware installed today."
11              Did I read that correctly?
12   A.   Yes, sir.
13   Q.   No mention of Casi or project?
14   A.   Correct.
15              MR. GALLIAN:  12-7.
16   BY MR. GALLIAN:
17   Q.   "Appliance repair."  No mention of project?
18   A.   That's correct.
19              MR. GALLIAN:  Thank you, Carly.
20   BY MR. GALLIAN:
21   Q.   Just to button that up, you're not saying that project
22   wasn't there on any of those days or that she wasn't around.
23   You're just saying that's not what the calendar reflects.  Do
24   we agree?
25   A.   I agree that she is not mentioned on those dates that we
```

```
 1   agreed on.
 2            MR. GALLIAN:  If we could publish 1 -- Government's
 3   Exhibit 158, please.
 4   BY MR. GALLIAN:
 5   Q.   All right.  Just to kind of clear this up, there was a car
 6   that Casi purchased for Bill in 2016, is that right, the Toyota
 7   Tacoma?
 8   A.   Yes, sir.
 9   Q.   And we see that reflected in the middle of the page,
10   right?
11   A.   That's correct.
12   Q.   And then the next year there was another Tacoma that was
13   purchased, specifically August 22, 2017, right?
14   A.   Yes, sir.
15   Q.   And the delta from the amount that was used for the
16   trade-in of that 2017 Toyota Tacoma to get the new 2017 one,
17   the difference was $9,500.00; is that right?
18   A.   Yes, sir.
19   Q.   And Bill Stone himself paid the $9,500.00?
20   A.   It came out of his account, yes, sir.
21   Q.   Okay.  Well, that brings me to my next point.  There's no
22   allegations in the indictment or anywhere that Casi was giving
23   Bill Stone money in 2017, is there?
24   A.   No, sir.
25   Q.   2018, no allegations that Casi was giving Bill Stone
```

```
 1  money?
 2  A.   No, sir.
 3  Q.   2019, same question.
 4  A.   That's correct.
 5  Q.   All of the money that's at the focus of this
 6  investigation, this indictment, happened in 2016.  Do we agree?
 7  A.   2015 and 2016.
 8  Q.   You got me.  You're correct.  End of 2015 through 2016.
 9  Do we agree?
10  A.   Yes, sir.
11  Q.   All right.
12           MR. GALLIAN:  Thank you, Carly.
13  BY MR. GALLIAN:
14  Q.   How many -- how many meetings were you a part of with Casi
15  Thompson?
16  A.   Several.
17  Q.   What's that?  What's that number?
18  A.   I don't remember the exact number.
19  Q.   Five?  Ten?  15?  20?
20  A.   I don't know.
21  Q.   Just take a ballpark.  I'm just curious.
22  A.   I don't remember.
23  Q.   Was it more than ten?
24  A.   I don't remember.
25           MS. RUDOFF:  Objection, asked and answered.
```

```
 1                THE COURT:  Overruled.
 2      BY MR. GALLIAN:
 3      Q.   Okay.  You don't know how many meetings you had with her.
 4      That's fine.
 5                Were you in any of the meetings when this ring was
 6      mentioned?
 7      A.   The engagement ring?
 8      Q.   The ring that Casi bought from Bill Stone.
 9      A.   Yes, sir.
10      Q.   Okay.  How did that happen?
11      A.   How did she purchase the ring?
12      Q.   No.  How did the whole thing get brought up?
13      A.   I don't recall.
14      Q.   Why can no one recall that?
15      A.   I don't know.
16      Q.   To your recollection, was Casi shown pictures of the ring?
17      A.   I believe so.
18      Q.   Okay.  Was she shown bank records as well?
19      A.   She was shown bank records during meetings, yes.
20      Q.   What about as it relates to the ring?  Was she shown bank
21      records for the ring?
22      A.   I don't recall if she was shown bank records at that time.
23                MR. GALLIAN:  If we could publish Stone's Exhibit 43,
24      please?
25      BY MR. GALLIAN:
```

```
 1   Q.   This is the ring that I'm talking about.  Does this look
 2   familiar to you?
 3   A.   That picture does look familiar.
 4   Q.   It does or does not?
 5   A.   It does.
 6   Q.   And this is your understanding of the ring that Casi
 7   purchased from Bill Stone?
 8   A.   Yes, sir.
 9   Q.   Okay.  How much did she purchase it for?
10   A.   I don't believe she was certain on the exact amount.
11   Q.   In preparation for your testimony, did you go through
12   recorded calls that Casi had with Ranger Briley before you got
13   involved in the investigation?
14   A.   I did hear some of those recorded calls.
15   Q.   Is it fair to say that in none of the recorded phone calls
16   or interviews with Briley or with y'all in May 2020 that Casi
17   never mentioned buying a ring from Bill Stone prior to that?
18   A.   I don't recall that being discussed in the recorded calls
19   or the May interview.
20   Q.   We've done well.  I'm almost done, okay?
21        This case boils down to Casi Thompson, does it not?
22   A.   She is the victim, yes, sir.
23   Q.   Because the allegations that Casi has made about the
24   money, about the cars, about the houses, and the travel money,
25   if she was lying to you about those things, that's important in
```

1    your investigation, isn't it?

2    A.   Yes, sir.

3    Q.   Meaning -- let's just take the cash, for instance.

4         If she lied about that cash being for travel money,

5    there's nothing else that you can point to that would support

6    that, right?

7    A.   There are -- as far as the specifics of what it was for,

8    or when you say lie --

9    Q.   What it was for.

10   A.   There are text messages around some of those dates that

11   reference travel that give that indication.

12   Q.   I understand that there's an indication.  But what I'm

13   asking you is that you take what Casi says and you impart it in

14   your investigation.  Is that fair?

15   A.   It is a factor.

16   Q.   Now, when it comes to the cars and the houses, Casi told

17   you she paid that because of Bill's help or cooperation with

18   the secret probation, right?

19   A.   Yes, sir.

20   Q.   But if she did that out of the goodness of her heart and

21   bought them as gifts or otherwise, that would not be a crime,

22   would it?

23   A.   If she gave him gifts, that would not be a crime.

24   Q.   Based on your investigation, based on all the sit-downs

25   that you had with Casi Thompson, did she ever share with you

```
 1    that it was her intent to move into the house with Bill Stone
 2    in Colleyville?
 3    A.   I don't remember her sharing that.
 4    Q.   Did she ever call it her house?
 5    A.   I never recall her referring to the Colleyville house as
 6    her house.
 7    Q.   Did she ever tell you that she was holding herself out as
 8    engaged in 2016 to Bill Stone?
 9    A.   I remember -- I believe she said her engagement is in
10    2019.
11    Q.   Correct.  I'm talking about 2016.
12    A.   I don't recall mention of an engagement in 2016.
13    Q.   Thank you for your cooperation.
14            MR. GALLIAN:  I'll pass the witness, Your Honor.
15            THE COURT:  All right.
16            (Pause)
17            MR. WESTFALL:  May I have just a moment, Your Honor?
18            THE COURT:  Certainly.
19            (Pause)
20                    CROSS-EXAMINATION
21    BY MR. WESTFALL:
22    Q.   Mr. Latham, I'm Greg Westfall.
23    A.   Yes, sir.
24    Q.   So you went to U.T.A?
25    A.   That's correct.
```

```
 1  Q.   You got a management degree?
 2  A.   Yes, sir.
 3  Q.   How many semesters of accounting did you have?
 4  A.   One or two, I believe.
 5  Q.   And how long have you been working with OIG again?  2018,
 6  you said?
 7  A.   Since October of 2018.
 8  Q.   And what did you do before that that was of this kind of
 9  nature, forensic work?
10  A.   For -- relating to this I spent about two years serving as
11  a criminal intelligence analyst with the Texas Joint
12  Counterdrug Task Force.
13  Q.   Okay.  And in what capacity did you do that?
14  A.   As a member of the Texas International Guard.
15          MR. WESTFALL:  Your Honor, we would like to in bulk
16  move for admission to exhibits as well.
17          THE COURT:  All right.
18          MR. WESTFALL:  We would like to move for admission of
19  DeLeon 101, 102, 103, 104.
20          THE COURT:  All right.  Any objection?
21          MS. RUDOFF:  No objection, Your Honor.
22          MR. GALLIAN:  No objection.
23          THE COURT:  Admitted.
24              (Defendant DeLeon's Exhibit Nos. 101, 102, 103,
25               and 104 received)
```

```
 1                MR. WESTFALL:  We would also like to move for
 2    admission of DeLeon 142, which is an excerpt from 165 that
 3    contains the 2015 toll calls for one of Bill Stone's phones,
 4    8465.  It is not on the list.  I just did it last night.  Stone
 5    165.
 6                (Discussion off the record with counsel)
 7                MR. GALLIAN:  We have no objection, Judge.
 8                THE COURT:  All right.  And, Government, did you have
 9    an objection?
10                MS. RUDOFF:  Just checking the pages, Your Honor.
11                THE COURT:  Sure.  Take your time.  Not trying to
12    rush you.
13                MS. RUDOFF:  No objections, Your Honor.
14                THE COURT:  All right.  It's admitted.
15                    (Defendant DeLeon's Exhibit No. 142 received)
16                MR. WESTFALL:  Thank you, Your Honor.
17                And move to admit Defendant's 144, which is extracted
18    from 38.  It's just the SMS spreadsheet.
19                (Discussion off the record with counsel)
20                MS. RUDOFF:  No objection, Your Honor.
21                MR. GALLIAN:  No objection.
22                THE COURT:  All right.  It's admitted.
23                    (Defendant DeLeon's Exhibit No. 144 received)
24                MR. WESTFALL:  Thank you.
25                And I want to move for admission of DeLeon 81.1,
```

```
 1   which is the transcript for 80.1, which was put into evidence
 2   yesterday.
 3             MR. GALLIAN:  No objections.
 4             MS. RUDOFF:  No objections, Your Honor.
 5             THE COURT:  All right.  Admitted.
 6             (Defendant DeLeon's Exhibit No. 81.1 received)
 7             MR. WESTFALL:  I would like to move for admission of
 8   DeLeon 26.1, which is the transcript for 27.1, which was put
 9   into evidence yesterday.
10             MS. RUDOFF:  No objections, Your Honor.
11             MR. GALLIAN:  No objection.
12             THE COURT:  Admitted.
13             (Defendant DeLeon's Exhibit No. 26.1 received)
14             MR. WESTFALL:  I would like to move for admission of
15   DeLeon 26.2, which is the transcript for DeLeon 28.1, which was
16   put into evidence yesterday.
17             MS. RUDOFF:  No objection, Your Honor.
18             MR. GALLIAN:  No objection.
19             (Defendant DeLeon's Exhibit No. 26.2 received)
20             MR. WESTFALL:  I would also like to move for
21   admission, Your Honor, of DeLeon 117.1.
22             THE COURT:  All right.  And the earlier one is
23   admitted because there was no objection.
24             And so let me know, please, if you have any objection
25   for this.
```

```
 1                  (Discussion off the record with counsel)
 2                  MS. RUDOFF:  No objection, Your Honor.
 3                  MR. GALLIAN:  No objection.
 4                  THE COURT:  Admitted.
 5                      (Defendant DeLeon's Exhibit No. 117.1 received)
 6                  MR. WESTFALL:  And then also finally move for
 7      admission of 119 -- DeLeon 119.6, which is also a segment from
 8      May 13 of 2020, the covered call.
 9                  MS. RUDOFF:  No objection, Your Honor.
10                  MR. GALLIAN:  No objection.
11                  THE COURT:  Admitted.
12                      (Defendant DeLeon's Exhibit No. 119.6 received)
13      BY MR. WESTFALL:
14      Q.   You made a statement earlier, or actually she did, about
15      the complete record.  I have it written down.
16                  (Pause)
17      BY MR. WESTFALL:
18      Q.   Is that consistent with the full record?  Remember her
19      asking you questions based upon is that consistent with the
20      full record?
21      A.   Specifically referring to --
22      Q.   Well, I mean, you were I think at that time specifically
23      referring to monetary amounts and trying to discern the intent
24      behind them, and maybe the full -- I'm wondering what does --
25      what did you look at to come to your conclusions here?
```

```
 1   A.   What records did I review?

 2   Q.   Yes.

 3   A.   Bank records, phone records, extractions from cell phones

 4   and electronic devices, vehicle purchase records, property

 5   records.

 6   Q.   All right.  Let me just show you one thing here.

 7            Okay.  You see that?

 8   A.   Yes, sir.

 9   Q.   So do you like working with records like this, paper and

10   trying to figure out, you know, what happened?

11   A.   I don't mind it.

12   Q.   Don't mind it.

13            Well, it's kind of interesting, isn't it, to get a

14   paper trail and try to figure out what's the story, right?

15   A.   It can be.

16   Q.   This right here, this is the only piece of paper we have.

17   The story it told is that on January 29, 2016, Casi Thompson

18   wrote Joe DeLeon a check for $15,000.00, right?

19   A.   That's what this piece of paper shows.

20   Q.   We don't know anything else other than that based upon

21   this piece of paper right here, right?

22   A.   Based on this piece of paper, we only know the information

23   that's on there, correct.

24   Q.   Correct.

25            And so you have to go outside of this in order to try
```

```
 1   to figure out what happened, right?
 2   A.   Correct.
 3   Q.   Now, in doing this process, did you work independently of
 4   the prosecutors and the agents?
 5   A.   At times.
 6   Q.   How much input did they have into what you should be doing
 7   here?
 8   A.   They would provide or the case agent would provide records
 9   to review and provide information to him then.
10   Q.   Okay.  And so you were provided with everything that you
11   analyzed, right?
12   A.   Yes, sir.  I did not have Ms. Thompson's bank records on
13   my own.
14   Q.   I get it.
15   A.   Yes, sir.
16   Q.   But you also didn't go and try to get her records?
17   A.   Personally, no, sir.
18   Q.   Right.  Because everything you had, the entire universe of
19   what you had was provided to you by the prosecutors or the
20   agents?
21   A.   By the agents, yes.
22   Q.   Okay.  Now, this check right here -- first of all, you
23   know what kind of case this is, right?
24   A.   Yes, sir.
25   Q.   What is it?
```

```
 1   A.   I believe the charges are wire fraud and money laundering
 2   and impersonation.
 3   Q.   Right.
 4        And so for our purposes, that's conspiracy to commit
 5   wire fraud.  And you know that deals with money, right?
 6   A.   Yes, sir.
 7   Q.   And every money thing happened in 2016, you said, except
 8   for the stuff 2015, right?
 9   A.   Yes, sir.
10   Q.   Okay.  Well, this is from 2016.  And what did you look at
11   when you came to your conclusions on whatever they are on this
12   check?
13   A.   For this check --
14   Q.   Uh-huh.
15   A.   -- I looked at the -- Ms. Thompson's bank records,
16   Mr. DeLeon's bank records, information provided by Ms.
17   Thompson, and text messages.
18   Q.   Okay.  What text messages?
19   A.   Text messages from Mr. DeLeon's phone.
20   Q.   So did you see this particular text message that said,
21   "When you want to come pick up your check, I have it here"?
22   A.   I have seen this message.
23            THE COURT:  Let's take a break.
24            MR. WESTFALL:  Okay.
25            THE COURT:  Let's take our lunch break.
```

```
 1              SECURITY OFFICER:  All rise for the jury.
 2              (Jury out)
 3              THE COURT:  All right.  Everybody please be seated.
 4              Anything we need to take up before we go to lunch?
 5              MR. WESTFALL:  Not from us, Your Honor.
 6              THE COURT:  Going once, twice, three times.
 7              All right.  Feel free to stay here.
 8              And feel free to step down, sir.
 9              THE WITNESS:  Thank you, Your Honor.
10              THE COURT:  You're welcome.
11              I'll be back here.
12              Let me know you if you need anything.
13              And we'll give you a good solid half hour, so how
14    about we start ten after.
15              (Discussion off the record)
16              MR. GALLIAN:  Your Honor, just real brief.
17              THE COURT:  Of course.
18              MR. GALLIAN:  For planning purposes, when the
19    Government does rest their case, obviously at that point we
20    need to make motions outside the presence.
21              THE COURT:  Certainly.  Yeah.  Absolutely.
22              MR. GALLIAN:  So it will be kind of up and down for
23    the jury.
24              THE COURT:  You bet.  And if it's convenient to kick
25    them out, we will.  If not, I'll find them timely.
```

1          MR. GALLIAN:  Thank you.

2          THE COURT:  Absolutely.  Thanks.  Y'all have a great

3   lunch.  See you soon.

4          MS. RUDOFF:  Thank you, Judge.

5          SECURITY OFFICER:  All rise.

6          (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              INDEX

                                              Further
                   Direct  Cross  Redirect  Recross  Redirect

WITNESS FOR THE
GOVERNMENT

ANDREW LATHAM        21      71,93
```

GOVERNMENT'S EXHIBITS                                    Received

    11  Stone's Wells Fargo bank account ending in      64
        X-9065

    12  Stone's J.P. Morgan Chase bank account          64
        ending in x-2257 and x-3766

    13  Stone's Navy Federal accounts ending in         64
        x-7533 and x-9100

    21  Titles to CT's 2014 Ford F-150                  65

    23  DeLeon's Wells Fargo bank account ending        64
        in x-5399

    43  Photo of Stone's 2016 Mercedes                  65

    48  Purchase agreement of Stone's Toyota Tacoma     65

   136  Titles for CT's 2015 Lexus GX4                  65

   157  Summary chart:  Retirement Messages             27

   158  Summary chart:  Toyota Tacoma purchases         37

   159  Summary chart:  Mercedes purchase               65

   161  Summary chart:  Expenditures and Acquired Assets  23

   162  Purchase records for Stone's Toyota Tacoma      65

   173  Stipulation of the parties regarding            65
        interstate commerce

   184  Bill Stone's financial records                  22

   185  Bill Stone's financial records                  22

1    186  Bill Stone's financial records                    22

2
     DEFENDANT STONE'S EXHIBITS                         Received
3
     171  Bill Stone's J.P. Morgan Chase records           72
4
     172  Bill Stone's TSP records                         72
5
     173  Bill Stone's Fidelity records                    72
6
     174  Bill Stone's Wells Fargo records                 72
7
     176  Summary chart of Bill Stone's Exhibit 172        72
8
     177  Summary chart of Bill Stone's Exhibit 173        72
9
     178  Summary chart of Bill Stone's Exhibit 173        72
10
     179  Summary chart of Bill Stone's Exhibit 174        72
11
     180  Summary chart of Bill Stone's Exhibit 171        72
12
     181  Summary chart of Bill Stone's Exhibits 171-174   72
13

14   DEFENDANT DELEON'S EXHIBITS                        Received

15   26.1 Transcript for DeLeon's Exhibit 27.1           96

16   26.2 Transcript for DeLeon's Exhibit 28.1           96

17   81.1 Transcript for Exhibit 80.1                    96

18   101  Phone call summary 2015-2016.pdf                94

19   102  Phone call summary 2017.pdf                     94

20   103  Phone call summary 2018.pdf                     94

21   104  Phone call summary 2910.pdf                     94

22   117.1 Audio excerpt                                  97

23   119.6 Audio excerpt                                  97

24   142  Excerpt from Stone's Exhibit 165 that contains  95
          the 2015 toll calls for one of Bill Stone's
25        phones

144  Excerpts from Exhibit 38                                    95

1      I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 8th day of August, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25