1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                       DALLAS DIVISION

4
    UNITED STATES OF AMERICA,    )    3:21-CR-236-E(2)
5                                 )
        GOVERNMENT,               )
6                                 )
    V.                            )    DALLAS, TEXAS
7                                 )
    WILLIAM ROY STONE, JOSEPH     )
8   DELEON                        )
                                  )
9       DEFENDANTS.               )    AUGUST 8, 2023

10

11

12

13

14

15              ------------------------------

16                      TRANSCRIPT OF

17                       JURY TRIAL

18                       VOLUME 10B

19           BEFORE THE HONORABLE ADA E. BROWN

20            UNITED STATES DISTRICT JUDGE

21              ------------------------------

22

23

24

25

```
 1                         A P P E A R A N C E S

 2   FOR THE GOVERNMENT:

 3        Jenna Danelle Rudoff
          US Department of Justice
 4        1100 Commerce St
          3rd Floor
 5        Dallas, TX 75242
          214-659-8600
 6        Fax: 214-659-8500
          Email: Jenna.rudoff@usdoj.gov
 7
          Donna S Max
 8        US Attorney's office for Northern
          District of Texas
 9        1100 Commerce Street
          Third Floor
10        Dallas, TX 75242-1699
          214-659-8664
11        Email: Donna.max@usdoj.gov

12        Marcus J Busch
          US Attorney's Office
13        1100 Commerce St
          Suite 300
14        Dallas, TX 75242
          214-659-8642
15        Fax: 214-659-8809
          Email: Marcus.busch@usdoj.gov
16

17   FOR THE DEFENDANT WILLIAM ROY STONE:

18        Gregg Gallian
          Gallian Firm
19        Parkside Tower
          3500 Maple Ave
20        Suite 720
          Dallas, TX 75219
21        214-432-8860
          Email: Gregg@gallianfirm.com
22
          Jaclyn Annette Gallian
23        Bryan Cave Leighton Paisner
          2200 Ross Avenue
24        Ste 4200w
          Dallas, TX 75201
25        214-721-8058
          Email: Jaclyn.gallian@bclplaw.com
```

```
 1   FOR THE DEFENDANT JOSEPH DELEON:

 2        Greg Westfall
          Westfall Sellers
 3        1612 Summit Avenue
          Suite 200
 4        Fort Worth, TX 76102
          817-928-4222
 5        Fax: 817-385-6715
          Email: Greg@westfallsellers.com
 6
          Frank Sellers
 7        Westfall Sellers
          1612 Summit Avenue
 8        Suite 200
          Fort Worth, TX 76102
 9        817-928-4222
          Fax: 817-385-6715
10        Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            C H R O N O L O G I C A L   I N D E X
 2    August 8, 2023                              PAGE
 3    Appearances.........................................2
 4    Proceedings.........................................5
 5                    W I T N E S S   I N D E X
 6    GOVERNMENT        DIRECT          VOIR DIRE      CROSS
 7    Andrew Latham     --              --            5
 8    DEFENDANT STONE   DIRECT          VOIR DIRE      CROSS
 9    Kelsey Adams      36, 54          --            50
10    DEFENDANT DELEON  DIRECT          VOIR DIRE      CROSS
11    Bradley Thompson  59, 88          --            77
12    Rebecca Romero    95, 111         --            104
13    James Miller      113             --            122
14
15    Court in Recess....................................131
16    Reporter's Certificate.............................132
17                    E X H I B I T   I N D E X
18    DEFENDANT DELEON:
19    NO.   DESCRIPTION                      OFFERED/ADMITTED
20    60    Photograph...............................64/65
21    61    Photograph...............................64/65
22    63    Photograph...............................64/65
23    65    Photograph...............................64/65
24    66    Photograph...............................64/65
25    67    Photograph...............................64/65
```

```
 1                    (P R O C E E D I N G S)

 2                    (Jurors enter courtroom.)

 3                    THE COURT:  With that said, Mr. Westfall, your

 4    witness.

 5                    MR. WESTFALL:  Thank you, Your Honor.

 6                    ANDREW LATHAM,

 7    having been previously sworn, testified as follows:

 8                    CONTINUED CROSS-EXAMINATION

 9    BY MR. WESTFALL:

10        Q.   Okay.  Before we went to lunch, this is what we were

11    talking about, right?

12        A.   Yes, sir.

13        Q.   And you said that you had looked at some text

14    messages, and is this the text message that you looked at?

15        A.   I have seen that text message, yes, sir.

16        Q.   Were -- did you -- did you listen to any statements

17    or covered calls or anything like that --

18        A.   I've heard --

19        Q.   -- that pertains to this one deal?

20        A.   -- I don't remember if I've heard anything specific

21    on recorded calls about this.

22        Q.   Now, this -- this -- and this $15,000 and the truck

23    are the two monetary allegations made against Joe DeLeon,

24    right?

25        A.   I -- yes, Ms. Thompson did identify those as payments
```

1   made to Mr. DeLeon.

2      Q.   Right.  But that's -- that's the sum total of what

3   we're talking about in the evidence in this trial, that he is

4   alleged to have taken a truck and taken $15,000, right?

5      A.   I -- I believe she also said that she had given him

6   cash as well.

7      Q.   Uh-huh.  Did you say that?

8      A.   Sir?

9      Q.   Did you say that while you were testifying?

10      A.   I don't believe so.

11      Q.   Okay.  As we -- we've seen some things come in and

12   out.  But it seems like that what we keep going back to is the

13   $15,000 and the pickup truck.

14      A.   Those are things that were covered, yes, sir.

15      Q.   Okay.  And so anything else, like cash or -- or I

16   don't know, that's the only one we've heard.  But you didn't

17   testify to that, so you're not -- you-all are not carrying that

18   one along.  We're talking about 15,000 and the truck, right?

19      A.   I -- I did not testify about cash to Mr. DeLeon at

20   this point.

21      Q.   Okay.  Then the $15,000 was in late January,

22   January 29 -- 28 of 2016, right?

23      A.   I believe the date on the -- correct, is the 29th,

24   yes, sir.

25      Q.   Okay.  And then the pickup truck is mid-February?

1        A.   Yes, sir.

2        Q.   So let's talk about this one first, the $15,000,

3   okay?

4        A.   Yes, sir.

5        Q.   I'm going to show you right now what is in evidence

6   as Defendant 26.1.  And it is a transcript of a call that we

7   heard yesterday, all right?  Oops.  And this is Casi Thompson

8   telling Joe DeLeon:  Well, you're in the loop during that part.

9   He, meaning Bill, just didn't -- I wasn't allowed to tell you.

10            Oh, hey, that is no wonder I didn't know.  I did

11   not have a clue.

12            And then she continues about the financial part

13   of it:  Yeah.

14            So evidence has been that Bill told Casi to give

15   Joe a check, and Bill told Casi to give Joe the truck, all

16   right?

17            MS. RUDOFF:  Objection, Your Honor, as to not

18   being a question.

19            MR. WESTFALL:  It's a leading question.

20            THE COURT:  Okay.  Overruled.

21        Q.   So that's what the evidence has been.  Now, you want

22   to consider everything when we're trying to discern intent

23   based upon these transactions, right?

24        A.   Yes, sir.

25        Q.   And, you know, a -- a statement by the complainant

1    here, Casi Thompson, that she was not allowed to tell Joe that

2    Bill was pulling these strings, that is something that could

3    impact that analysis, isn't it?

4          A.   It could be a factor.

5          Q.   Yes, it could be a factor.  Because if that's true,

6    then we don't have the criminal offense, right?

7          A.   If what isn't true?

8          Q.   If it is true that he did not know about this scheme

9    or artifice to defraud that he can't be guilty of it.

10                   MS. RUDOFF:  Objection; calls for a legal

11   conclusion.

12                   THE COURT:  Overruled.

13         Q.   Are you familiar with the elements of conspiracy in

14   wire fraud?

15         A.   Can you repeat the question, sir?

16         Q.   Sure.  If Joe DeLeon did not know about this scheme,

17   if he was not a part of a scheme, he is not guilty of wire

18   fraud; don't you agree?

19                   MS. RUDOFF:  Objection; calls for a legal

20   conclusion.

21                   THE COURT:  I'll sustain on that.  It'll be up

22   to the jury to decide.  But you can ask him -- you can ask him

23   about the elements.

24         Q.   All right.  Let's turn to the -- the F-150.  Okay.

25   So we have to actually rewind a little bit from here.  Did you

1    consider text messages in this Ford F-150 transaction?

2         A.    Yes, sir.

3         Q.    Okay.  So you already considered this, the -- on the

4    16th of February -- not the 17th, when the check was written,

5    but on the 16th of February:  Oh, my God, this truck is sweet.

6    I love it.  Thank you.  To which Casi responds, I hope you like

7    it.  It's top of the line.  And then Joe says, I meant to say I

8    know that you are at Celebrating Recovery [sic] and that I

9    should leave you alone, but I love this truck.  Thank you so

10   much.

11              Now, once again, with our exercise of trying to

12   discern intent, don't you agree that looking at those things

13   could support a story that this was a gift?

14        A.    It's a possibility.  But with all the records that I

15   reviewed --

16        Q.    And do you remember my question?

17        A.    Sir?

18        Q.    Do you remember my question?

19        A.    Could you repeat it, sir?

20        Q.    Looking at this thing, you could conclude that this

21   was a gift?

22        A.    Looking solely at these messages, that is a

23   possibility.

24        Q.    Okay.  And let's just look at this here real fast.

25   Looking solely at those messages, that is a possibility.  What

1   we have here is this truck -- well, you don't have that the

2   truck was given.  Did you make this?

3       A.   Yes, sir.

4       Q.   How come you didn't put the stuff from -- from the

5   day before this check on it, the 2/16 e-mails -- or text

6   messages?

7       A.   This chart relates to the financial aspects of this

8   transaction.

9       Q.   So it doesn't even relate to whether or not this

10  truck was given to Joe?

11      A.   Mr. DeLeon and Ms. Thompson exchanged checks for it.

12      Q.   On the 16th?

13      A.   The following day, Mr. DeLeon --

14      Q.   Yes, sir.

15      A.   -- provided -- or dated the check.

16      Q.   So 2/16, truck goes to Joe.  And text messages.  I

17  mean, you don't -- well, let me ask you this.  Are you making

18  these charts with the sole intent of making Joe look guilty?

19  Is that your job here?  Are you an advocate or are you a

20  forensic, you know, investigator?

21      A.   I am an investigative analyst.  I'm not making a

22  chart for the purpose of making someone look guilty.

23      Q.   So is it then your position that you really don't

24  care, the data speaks for itself, whether it helps them or

25  hurts them; is that your position?

1    A.    I'm looking at the records available to me to review

2    and analyze to determine what happened.

3    Q.    Okay.  And that always raises the specter of garbage

4    in, garbage out, doesn't it, if you are given an incomplete

5    record?

6    A.    Yes, sir.

7    Q.    So on the 17th, Joe and Casi go down and get this

8    registration, the title changed over, right?

9    A.    I don't recall the exact date on the title.  I'd have

10   to see the document.

11   Q.    Okay.  Well, there it is.  So on the 17th, they go.

12   And the presumed value is 20,560.  The sales price is $20,100.

13   And Joe gives Casi Thompson a check for $20,100 on 2/17, right?

14   A.    Yes, sir.

15   Q.    Now, just looking at this, and the text messages from

16   the day before, does that support a story; does that support an

17   alternative theory that this was a gift and then Joe decided to

18   pay for it?  Like, I can't let you give me that truck?

19   A.    This seems to support a theory that he was paying for

20   the truck.

21   Q.    Now, two weeks later, though -- and it was two weeks

22   later, right, that she gave him back a check?

23   A.    I believe that is the date on the check that she

24   wrote to him.

25   Q.    And it was also for $20,100, right?

```
 1        A.   Yes, sir.
 2        Q.   Did you know that on the exact same day that check
 3   was written, that half a million dollars was put into a new
 4   account at Chase Bank?
 5        A.   Yes, sir.
 6        Q.   Did you know that she had received a million dollars
 7   from the insurance payment at that time?
 8        A.   Roughly a million.  I don't recall the exact amount.
 9        Q.   And that's the exact same date as this check that was
10   given to Joe, right; 3/2?
11        A.   The date of the account opening?
12        Q.   Yes.
13        A.   If you could flip back, I -- yes, sir.
14        Q.   And there's also the week that all three of them got
15   new cars.  Did you know that?
16        A.   Yes, sir.
17        Q.   Now, here's one other thing that, I guess, from your
18   testimony you didn't see this, okay?  But let me just show it
19   to you.
20             Do you see what this right here says?
21        A.   Yes, sir.
22        Q.   Do you see the date, 2/23?
23        A.   Yes, sir.
24        Q.   That's before 3/2, right?
25        A.   It is.
```

1    Q.   Does that say, Casi just ran over my F-150 pickup

2    truck with her new one?

3    A.   No, sir.

4    Q.   It says "car," right?

5    A.   It does.

6    Q.   There's more damage to hers than mine.  She is really

7    angry with herself.

8          So why did you testify that she backed her car

9    into Joe's truck, and then go through all of the -- the -- the

10   shape of the truck when it was given to Carmax and that -- and

11   the fact that it was in good condition; why did you do all

12   that?

13   A.   I don't believe I testified that she hit the F-150 or

14   drove the F-150 into a vehicle.

15   Q.   You testified yesterday that the truck was in good

16   condition when turned into Carmax, and that was in the context

17   of you -- of her asking you, did -- did Joe lie and say that

18   my -- you know, she hit my truck, basically?

19   A.   I was asked a -- for information on the appraisal of

20   what the condition of the truck was listed as.  And I -- I read

21   off what was listed there.

22   Q.   You know how difficult you are being to question

23   right now?

24   A.   No, sir.

25          MS. RUDOFF:  Objection, Your Honor, to the

1  sidebar.

2              THE COURT:  Sustained.

3      Q.   You testified --

4              THE COURT:  Question and answer.

5              MR. WESTFALL:  I'm -- I'm sorry, Your Honor?

6              THE COURT:  Let's stick to question and answer.

7              MR. WESTFALL:  Okay.

8      Q.   You testified yesterday -- actually, she asked you a

9  leading question yesterday about the car hitting the truck --

10             MS. RUDOFF:  Objection, Your Honor, to the

11  leading -- or to the sidebar, I'm sorry.

12             THE COURT:  Overruled.

13     Q.   She asked you a leading question.  You answered her

14  leading question in such a way to communicate to this jury that

15  she -- that Casi backed her car into that F-150 pickup.  Do you

16  remember that?

17     A.   I remember testifying regarding the condition of the

18  F-150 when asked what was listed on the appraisal offer.

19     Q.   All right.  I'm going to show you what's been

20  marked -- or what's already in evidence as DeLeon Exhibit 142,

21  okay?  You recognize that, right?

22     A.   Yes, sir.

23     Q.   And DeLeon Exhibit 143, you recognize that also,

24  right?

25     A.   Yes, sir.

1    Q.   These are toll records of Bill Stone's phones?

2    A.   Yes, sir.

3    Q.   And you were kind enough to look at some summary

4  exhibits of mine also?

5    A.   Yes, sir.

6    Q.   You are familiar with those?

7    A.   Yes, sir.

8    Q.   Okay.  And we're going to talk about those in a

9  second.  But I said something during opening statement that was

10  incorrect.  There were no calls in 2014, were there?

11    A.   I did not see any in 2014.

12    Q.   And the truth is that Bill Stone actually had two

13  different phone numbers during 2015, right?

14    A.   Yes, sir.

15    Q.   And one of those phone numbers was 422-2863, true?

16    A.   Yes, sir.

17    Q.   Now, are you familiar with the fact that Casi used

18  the phone number (714) 227-6930?

19    A.   Yes, sir.  I believe that was one of the numbers that

20  she had at one point.

21    Q.   Here.  We'll go to DeLeon's 144, which is in

22  evidence.

23         So here's the (714) 227-6930, right?

24    A.   Yes, sir.

25    Q.   And then prior to that phone, she had a phone that

1  was in DeLeon's contacts as saying 137, right?

2      A.    That appears to be part of the contact name, yes,

3  sir.

4      Q.    Yeah.  You see the 137, 137, 137?  There's been

5  testimony that 137 means a cooperating individual to the FBI.

6  Did you know that?

7      A.    I've heard that, yes, sir.

8      Q.    And then her test- -- her cell phone number changed

9  to the 714 number.  And then it changed to -- oh, it changed to

10 that after the -- okay.

11           This 3550 number, you know about that one,

12 right?  I can't see well enough.

13           You know that she used a number with the last

14 four of 3550?

15     A.    Yes, I believe that's correct.

16     Q.    Okay.  Well, in 142, which is the FBI phone, I guess,

17 for 2015, on the 25th of January, Casi calls Stone and speaks

18 with him for 63 minutes, true?

19     A.    Yes, sir.  There's a call from her phone to

20 Mr. Stone's FBI phone.

21     Q.    Right.  And here's an incoming call on the 3550

22 number for 78 minutes on 2/11, right?

23     A.    Yes, sir.

24     Q.    And an incoming call in -- for 37 minutes.  And

25 another outgoing call.  And these -- in fact, if you go through

1    all of these records, there are 108 calls in 2015 between Jim

2    Stone [sic] and Casi Thompson.  Would you agree with that?

3         A.   I would need to count to make sure of the exact

4    number.  Based on prior review, that seems to be an --

5         Q.   Okay.

6         A.   -- in the general range.

7         Q.   But it's in evidence.  Certainly the jury can count

8    them if they feel inclined.

9              Now, 2863 is the other number.  Now, this is his

10   local Dallas number, right?

11        A.   I believe this is his personal cell phone number,

12   yes, sir.

13        Q.   Right.  And there is another call here to this

14   (714) 227-6930.  And at the time she's in Santa Ana,

15   California; which I guess was the treatment center.  And that

16   is just in the evidence.

17              So in this, the personal phone, there are 182

18   phone calls.  Would you take my word on that?

19        A.   I believe that's generally accurate.  Again, I would

20   need to count to be certain.

21        Q.   So between the two, that's 290 phone calls between

22   Jim Stone and Casi Thompson in 2015.  Would you agree?

23        A.   Yes, between Bill Stone and Ms. Thompson.

24        Q.   Bill Stone, I'm sorry.  All right.  And now -- you

25   know, these -- all of the -- all of the summary exhibits you

1   have talked about up to this point have only had DeLeon and

2   Stone's information on them.  But you know that the ones that I

3   made have everyone's information on them, right?

4       A.   I believe some of the -- the charts I made also

5   contain Ms. Thompson's information.

6       Q.   Stone, DeLeon telephone contact.  Stone --

7           MS. RUDOFF:  Objection, Your Honor.  These

8   aren't admitted exhibits that we're showing.

9           MR. WESTFALL:  Oh, sorry about that.

10         THE COURT:  Sustained.

11       Q.   You made this one, right?

12       A.   Yes, sir.

13       Q.   And that's only Stone and DeLeon, right?

14       A.   It does include information about calls with

15   Ms. Thompson.

16       Q.   Oh, when she calls them and they're covered?  Okay.

17   My bad.

18         So what we see in this 2015, 2016 -- let's just

19   go to 2016 -- is DeLeon and Stone, DeLeon and Thompson and

20   Stone and Thompson, right?

21       A.   Yes, sir.

22       Q.   And when we go into 2017.  What we see is a pretty

23   steep decline, right?

24       A.   In regards to --

25       Q.   In regards to the amount of traffic between DeLeon

1    and Thompson.  In fact, we start to see that decline by, it

2    looks like, September of 2016; wouldn't you agree?

3        A.    From the information on this chart, it looks like

4    there is a decrease that begins and a sharp drop-off between

5    August and September of 2016 between Mr. DeLeon and

6    Ms. Thompson.

7        Q.    Yes.  And then at the same time, we're seeing a

8    substantial increase with Stone and Thompson?

9        A.    There is a -- a substantial contact between Mr. Stone

10   and Ms. Thompson.

11       Q.    2017, it becomes more substantial, doesn't it?

12       A.    It's substantial.  I'd have to compare between the

13   two to see how much of an increase it is.

14       Q.    Meanwhile, DeLeon and Thompson have remained very

15   low.  I mean, 11 phone calls for the month in December of 2017,

16   right?

17       A.    That's correct, according to this chart.

18       Q.    And then in 2018, Bill Stone is speaking to Casi

19   Thompson an average of -- I guess if you added them all

20   together, it would be something just under two hours a day on

21   the phone, right?

22       A.    It would be over an hour a day.  I'd have to do the

23   math.

24       Q.    Okay.  And then 2/19, we have this steep drop-off.

25   But this is what the complete picture looked like.  What's that

1   phrase you used, "all of the available sources"?  This is what

2   the complete picture of these three people looks like, isn't

3   it, from a telephone standpoint?

4       A.    This is a picture of the phone records for these

5   three individuals during this date range.

6       Q.    Finally, in this Neils thing, did you -- you

7   considered text messages, I guess?

8       A.    Yes, sir.

9       Q.    You considered toll records, phone toll records?

10      A.    Yes, sir.

11      Q.    It looks like that is pretty much what you considered

12  for this particular piece of -- this particular summary chart,

13  right?

14      A.    I believe that's correct, yes, sir.

15      Q.    Well, this is 81.1.  This phone call -- or this

16  recording was played yesterday to the jury.  And 2 to 3 years

17  ago would have been about the time that the phone call actually

18  happened.  I'm talking 2016 and 2019, which is what I'll

19  represent to you when this occurred.

20              Bill tells Joe that he's forbidden from talking

21  with Neils.  Don't talk to Neils.  Neils is going to turn you

22  into a witness.  That guy is no good.  He's going to give you

23  up.  He's going to end up getting you to testify if you ever

24  help him on any case --

25              (Court instruction.)

1       Q.   I don't want you talking to him.  Keep it to a

2   minimum and just blow him off.

3            And when we look at that message he sent to him

4   afterwards on the same day, August 10th, that looks like a

5   blow-off.  Hey, Neils, how about my heart condition.  So would

6   you make room for the possibility that he was doing what Bill

7   told him to do?

8       A.   There is a possibility that Mr. Stone told Mr. DeLeon

9   to send this message that did not accurately capture the

10  contact between Mr. DeLeon and Mr. Stone.

11      Q.   And finally, this is Defendant's 109.  If you go in

12  here -- and here's an SAR Stone.  But this begins -- and that

13  was in August of 2016.  This is August of 2016.  It says, SA

14  Stone, SA Stone, SA Bill Stone.  Go SA Stone, SA Stone.

15           We go further into August here.  SA Stone --

16           MS. RUDOFF:  Objection, Your Honor.  There is no

17  question being asked.

18           MR. WESTFALL:  I'm publishing, Your Honor.

19           THE COURT:  Overruled.

20      Q.   You see that, right?  In September of '16, SA Stone?

21      A.   Yes, sir.

22      Q.   And here's September.  SA Stone, SA Stone, SA Stone,

23  SA Stone.  And he continues to call him SA Stone.

24           So when we're telling the jury about a few times

25  when we see SAR Stone, that would be like consistent with a

1    joke about the Neils' text message.  Don't you think it's fair

2    if we also tell the jury that that was a very isolated deal,

3    and the rest of the time it was SA Stone all the time?  Don't

4    you think that would be fair?

5         A.   It's not SA Stone all the time.  There are other

6    instances of SAR.

7         Q.   Uh-huh.

8         A.   He does use SA and SAR following the text message

9    exchange.

10        Q.   Well, here's the rest of the text messages for 2016.

11   This -- the last financial transaction that ever involves Joe

12   at all ends in February of 2016.  We're already in -- we're

13   already in September of 2017, and it's virtually all SA Stone.

14   And even if it weren't, that wouldn't be very good evidence of

15   something having to do with that truck, would it?

16        A.   The retirement-related stuff relating to the truck?

17        Q.   Right.

18        A.   For that individual transaction?

19        Q.   No.

20        A.   For that individual financial transaction, these

21   would be separate from that, yes.

22        Q.   Okay.

23                  MR. WESTFALL:  Your Honor, I'll pass the

24   witness.

25                  THE COURT:  Members of the jury, are we doing

```
 1   okay?
 2                   (Respond affirmatively.)
 3                   THE COURT:  All right.
 4                   MS. RUDOFF:  No redirect, Your Honor.
 5                   THE COURT:  All right.  Thank you so much for
 6   being here today, sir.
 7                   Any objection to me excusing this witness,
 8   Mr. Gallian?
 9                   MR. GALLIAN:  No, Your Honor.
10                   THE COURT:  Mr. Westfall?
11                   MR. WESTFALL:  No, Your Honor.
12                   THE COURT:  All right.  We appreciate you being
13   here yesterday and today.  Thank you so much for your
14   testimony.  You are free to go.
15                   THE WITNESS:  Thank you, Your Honor.
16                   (Witness excused.)
17                   MS. RUDOFF:  At this time, Your Honor, the
18   government rests.
19                   THE COURT:  Okay.  The government has rested its
20   case.  So why don't we take just a quick like five-minute
21   break.  Does that sound good?
22                   MR. GALLIAN:  That is great, Judge.
23                   THE COURT:  Take a stretch break and we'll come
24   back and hear the case from Defense.
25                   (Jurors exit courtroom.)
```

1          THE COURT:  All right.  Please be seated.

2          Okay.  Outside the presence of the jury, Defense

3  Counsel, what say you?

4          MR. GALLIAN:  Your Honor, I know a way that all

5  of us can get out of here a lot quicker than we anticipated.

6          THE COURT:  Hang on just a second.

7          (Sotto voce discussion.)

8          THE COURT:  Go ahead.

9          MR. GALLIAN:  At this time, because of the close

10  of the government's case, Stone moves for a motion for a

11  judgment of acquittal under Federal Rule of Criminal Procedure

12  Rule 29.  We don't believe that a rational jury could find from

13  the evidence presented sufficient evidence to find our client

14  guilty; and, therefore, we are asking for a judgment of

15  acquittal.  Specifically as it relates to the conspiracy count,

16  I think that it's clear for any rational juror to believe that

17  DeLeon was not involved; that he didn't have the understanding

18  that this probation was, in fact, fake.  In fact, I think

19  the -- the victim, Casi Thompson, conceded that very point on

20  cross-examination.  That's Count 1.

21          As it relates to the additional counts in this

22  case --

23          THE COURT:  Pause you for just a second.

24          (Sotto voce discussion.)

25          THE COURT:  Okay.

1              MR. GALLIAN:  As it relates to the additional
2    counts in this case, specifically Count 2, withdrawal for cash
3    of $9,000, Casi Thompson on the stand says she could not recall
4    what that amount was for.  Only after being redirected did she
5    then say it could have been for the ring or it could have been
6    for travel money.
7              Cashier's check for Park Place, and the other,
8    which is Count 3, Count 5, Count 6 and Count 7, I don't believe
9    that a rational juror could find that those were
10   probation-related expenses.  They were clearly in furtherance
11   of their relationship.
12             And the remaining count of Count 4, further
13   withdrawal of cash, there's been some jockeying by the
14   government at this point.  I'm not sure why, but they obviously
15   have some concerns about the veracity of that $5,000 cash
16   withdrawal in Count 4.
17             Count 8, again, for the reasons aforementioned,
18   I don't believe that there is any reason that a juror could
19   conclude that this money was derived from unlawful proceeds,
20   i.e., wire fraud.
21             And specifically Count 9, at all times relevant,
22   I went through it in painstaking detail.  Every time that Casi
23   Thompson was asked about what Bill Stone's employment status
24   was in all of the recorded interviews, she said unequivocally
25   that he was with the CIA.  It is a technicality, but it's one

1    that we'll gladly exploit.

2              And for those reasons, we believe that the Court

3    should grant our Rule 29 motion for judgment of acquittal as it

4    relates to Counts 1 through Count 9.

5              THE COURT:  Government, what say you?  And I'm

6    specifically interested in everything you have to say, but

7    specifically as to the last thing argued by Defense counsel

8    about CIA.

9              MS. MAX:  Oh, I'll start with that, Your Honor.

10             THE COURT:  Okay.

11             MS. MAX:  Count 9, there was -- the testimony of

12   Casi Thompson was that at the beginning of the probation she

13   believed he was an FBI agent, because that is the employment

14   that she had known.  And so that was being represented to her.

15   And she testified that was the representation upon which she

16   was working during that first, I believe she said, few years of

17   probation, which would certainly encompass all the times of the

18   cash transactions, the benefits that she gave him.

19             Her testimony was cleared up by both her and

20   Ranger Briley, that at the time she presented to report the

21   offense in 2019, at that point in 2019, Stone was representing

22   to her that he was working for the CIA.  So at that time in

23   2019, she was under the belief that he was working for the CIA.

24   But her unequivocal testimony was that at the time the

25   probation started, and throughout the course of the early years

1   when she was giving the benefits, monetary benefits to Stone,

2   she was under the belief that he was an active FBI agent, as he

3   had -- as she had known him for at least ten years prior.

4                    THE COURT:  Okay.

5                    MS. MAX:  And further testimony was that at some

6   point during the probation, years into it, Stone told her he

7   retired.  And then at that point he told her that he was

8   working with the CIA.  But there was ample testimony from her

9   that at the beginning of the probation, when she gave those

10  gifts, she believed that he was a special agent with the FBI at

11  that time.

12                   THE COURT:  Okay.  Anything further?

13                   MS. MAX:  Yes.  Going back to address all the

14  other counts.  Count 1 of the conspiracy, you know, there's

15  been ample evidence presented that both defendants carried out

16  the fraud of this secret probation directly with Casi Thompson.

17  At times in tandem and at times separately.  Both through

18  monitoring and supervising her.  Both men knew they were not

19  federal probation officers.  They both financially benefited

20  from the secret probation scheme.  They were both aware of her

21  inheritance and both did actions that controlled her financial

22  affairs.

23                   They both were working together to advance this

24  secret probation lie to Ms. Thompson throughout the course of

25  the scheme at various times.  We've seen obviously a lot at the

1   beginning, but we've also seen even at the end, they're both

2   advancing the lie to her.

3               Government does not believe it is a coincidence

4   that both men listed $20,100 of the value of the vehicles that

5   they received from Ms. Thompson in taxing documents to stave

6   authorities.  Both lied to investigators when questioned about

7   the money and property that they received from the victim.

8               We have destruction of communications.  Again,

9   going to the financial affairs, DeLeon was given a power of

10   attorney over her financial affairs.  Her cell phone was

11   monitored.  They both attempted to cover up the lying to the

12   victim about their continued contacts with each other when she

13   questioned them.  And they both engaged in active surveillance

14   of Casi Thompson as late as 2018 and 2019.

15               So this is just a smidge of the evidence that

16   the jury has heard to show that we have presented evidence that

17   would be sufficient to sustain a conviction for the conspiracy

18   count.

19               Moving on to Count 2, the --

20               THE COURT:  Let me pause you for just a moment.

21               (Sotto voce discussion.)

22               MS. MAX:  Count 2, the wire fraud.  Casi

23   Thompson's testimony was she wasn't exactly sure, but she

24   testified about the $9,000.  But she testified that around this

25   time she wasn't withdrawing cash for any other purpose; and

1    that when she withdrew cash, it was either for Bill or Joe as

2    it related to her probation.  She did not identify any other

3    large purchases at that time.  The ring purchase she identified

4    as a different cash transaction.

5                    We also showed a calendar entry which shows the

6    defendant meeting with Ms. Thompson on the same day as this

7    cash withdrawal.  And we also put forth texts that establish at

8    that exact same time period the -- the -- I'll just call it the

9    Austin trip lie, as to which she would have to pay travel

10   expenses for.  And Ms. Thompson's testimony was that but for

11   the probation scheme, she would not have given either of the

12   defendants cash.

13                   Count 3, wire fraud.  The cashier's check to

14   Park Place Mercedes.  We presented evidence of the cashier's

15   check and testimony of Casi Thompson that she obtained the

16   cashier's check for the purpose of buying Bill Stone a vehicle.

17   Again, but for the probation lie, she said she would not have

18   purchased this vehicle for him.  The car is titled to Stone and

19   was found in his possession.

20                   Count 4, wire fraud.  A $5,000 transaction.  We

21   presented to estimate -- testimony -- sorry, evidence of a cash

22   withdrawal by Casi, as well as her testimony.  But for the

23   probation and her belief that she had to pay for Bill Stone's

24   travel expenses related with that, she would not have given him

25   cash.  We presented a calendar entry that shows a meeting on

1   that same day.  And we also are showing a corresponding cash

2   deposit in Stone's account around that same time.  And there

3   are also texts that establish, again, the Austin probation

4   travel lie during this time period.

5                Count 5, the wire fraud.  The cashier's check

6   payable to Texas Toyota of Grapevine.  We presented evidence of

7   the cashier's check, testimony of Casi Thompson that she

8   obtained the cashier's check for the purpose of buying Stone a

9   vehicle based upon the probation lie.  And a -- truck title's

10  to Stone.  And we have traced out the truck that was found in

11  his possession was a derivative of this original vehicle that

12  she bought him.

13               Count 6, the wire fraud.  It's a withdrawal by

14  cashier's check for $154,000 to Bill Stone.  It is the

15  testimony of Casi Thompson that she obtained the cashier's

16  check for the purpose of buying Stone a home so that he could

17  maintain his role in her probation.  Again, her testimony was,

18  you know, but for the probation, I would not have given him

19  this money.  And we have shown how this money has ended up

20  being utilized by Stone to ultimately purchase his Colleyville

21  home.

22               Count 7, the wire fraud, is the check payable to

23  Bath Kitchen Design Center for 25,000.  We have evidence of

24  that check.  We have testimony of Casi Thompson that the check

25  was done for remodeling on Stone's home.  And, again, testimony

1  by her that she had to pay for the remodeling due to the

2  probation lie, to keep Stone, as her probation handler, happy.

3                So, again, her testimony that but for the

4  probation, she would not have remodeled his home.  There is

5  also evidence showing that this -- this remodeling went

6  directly to the Colleyville home.

7                And then Count 8, engaging in transactions and

8  property derived from specified unlawful activity.  We show a

9  purchase -- that Stone purchased a 349,000-and-change cashier's

10  check -- a cashier's check that was used to purchase his home.

11  And we have shown that the funds for that check come from

12  $154,500 cashier's check that Casi Thompson gave him, which was

13  the proceeds of wire fraud, as I've just previously explained

14  in Count 6, as well as the fact that the funds also came from a

15  $250,000 cashier's check that Casi Thompson gave Bill Stone on

16  March 2nd, 2016.  This is the check that was given by Casi

17  Thompson to Bill Stone based upon the probation lie that she

18  owned -- that she owed $250,000 in restitution to Enterprise

19  rental car.

20                And then in Count 9, the false impersonation.

21  Beyond just clearing up that Casi Thompson's testimony did

22  establish that she was working under the assumption in 2015,

23  2016, well into 2017, that Bill Stone was a special agent with

24  the FBI, the dollar amount that is listed in Count 9 is the

25  over -- approximately $700,000 comes from all of the

1    transactions that we have previously established, as well as

2    additional ones that the jury has heard about $5,000 cash

3    withdrawals that went to Bill Stone for the Austin travel lie.

4              And, again, Casi Thompson established that she

5    only gave the money because of the secret probation lie.  And

6    that the secret probation lie was only believable to her

7    because of her belief that Stone was an FBI agent.

8              We also had testimony from Penny Weisand, many,

9    many moons ago, that during this time period, December of 2017,

10   is when Bill Stone represented to Penny Weisand, at Casi

11   Thompson's graduation party, that he was an FBI agent; and, in

12   fact, flashed a badge to Penny Weisand, which was of great note

13   to Penny Weisand, as she is a court coordinator and very

14   familiar with the different law enforcement entities.  And she

15   had unequivocal testimony that Bill Stone represented to her in

16   December of 2017 that he was an FBI agent.

17             THE COURT:  All right.  Thank you.

18             MR. GALLIAN:  If I may just briefly?

19             THE COURT:  Certainly.

20             MR. GALLIAN:  As it relates to Count 8, engaging

21   in monetary transactions and property derived from specified

22   unlawful activity.  Admittedly, even going into this case, the

23   trial, I was a little bit confused on how they were going to

24   prove that up.  What I heard Ms. Max just say was that they've

25   put on testimony that $154,500 check was given to him.  Well,

1    the problem is, is that they've already alleged that amount in

2    a wire fraud count; specifically Count 6.  And so to allege

3    that it is also in Count 8, I think, is inappropriate; and

4    therefore, it's double-charging for the same offense.

5              And then as it relates to what she said in the

6    alternative, which is a $250,000 check, there's been absolutely

7    zero, zero testimony from any analyst anywhere that can say

8    that that money was traced, that it was shown; that that

9    $250,000 that he deposited in March of 2016 was then used to

10   purchase the house.

11             You've been listening, just like I have.  No

12   tracing, no sort of saying, these are the same funds.  There is

13   no low-water threshold.  No tracing done on the 250 whatsoever.

14             So to assert that the allegation is that Count 8

15   is supported by 154,500 is inappropriate, because that is Count

16   6, I think it is double-charging.  And I also think that

17   there's been absolutely zero testimony that the 250 can be

18   traced to that cashier's check that was purchased in September

19   of 2016.

20             And so I just wanted to clear that up.

21   Additional grounds for why we believe Count 8 should be a

22   Rule 29 motion for judgment of acquittal as well.

23             THE COURT:  Anything from Mr. DeLeon's counsel?

24             MR. SELLERS:  Yes, Your Honor.

25             THE COURT:  I'm sure the record reflects this --

1   all of this is taking place outside the presence of the jury.

2                   MR. SELLERS:  Now that the door's closed, I'll

3   start.

4                   Your Honor, we too, on behalf of Joe DeLeon,

5   move for a Rule 29 judgment of acquittal.  As the Court has

6   noted to us a few times, we are only in one count, the

7   conspiracy count.  Although, it doesn't seem like we're only in

8   one count from the evidence.

9                   However, as hard as they may have tried, they

10  cannot overcome Casi Thompson herself's own testimony that

11  these were gifts to Joe.  No matter what happened after that;

12  at the time she gave Joe the truck, at the time she gave Joe

13  that 15,000, she said under oath from that stand that those

14  were gifts.  That cannot be a fraud if it is a gift.  For that

15  reason alone, we -- we believe we're entitled to the Rule 29.

16                  Furthermore, you go to the manner and means of

17  the conspiracy, and it all surrounds the secret probation and

18  the belief that Bill Stone is in the FBI.  As Mr. Stone's

19  counsel said in opening and, again, here on behalf of his

20  client, that Joe DeLeon did not know about the scheme or

21  artifice to defraud the secret probation.  Even Ms. Thompson

22  herself, when I asked her, you cannot rule out the possibility

23  that Joe also believed that Bill was in the FBI and the

24  probation was real.  And she said, I'm -- what was her words?

25  I'm still on the fence about that.

1          That is reasonable doubt language right there.

2    There is no basis from which a rational jury could find that

3    Joseph DeLeon conspired, confederated or combined to try to

4    defraud Casi of the truck and the $15,000 that she herself

5    admitted were gifts.

6          For those reasons, we move for a Rule 29.

7          THE COURT:  All right.  So I'm looking back at

8    the transcript.  These -- all of these objections were made

9    timely.  And I'll rule on them at the next break.  I want to

10   click around and click through some things and take my time on

11   one or two of them.  So I'll give you a ruling here shortly.

12   But everything is timely preserved for appeal, and I'll give

13   you a ruling on our next break.

14         MS. MAX:  Your Honor, may I just respond to one

15   point?

16         THE COURT:  Absolutely.

17         MS. MAX:  The only direct evidence that we've

18   heard that Joe DeLeon did not know that this was probation was

19   Defense counsel's opening statements, which are obviously not

20   evidence.  And there was no testimony that Casi Thompson said

21   that these were gifts to Joe DeLeon.  Her testimony was I was

22   directed by Bill Stone to give the truck to Joe DeLeon and I

23   did not want to.  So I just wanted to remind the Court of that.

24         THE COURT:  I appreciate that.  And I do not

25   foresee -- well, if I need further argument or evidence, I will

```
 1   certainly let you guys know.  I'm just going to check a couple
 2   of things and then I'll get back to you.
 3                   So let's proceed as if it is not going to be
 4   granted.  And if I decide it will be, then we'll take it up
 5   then.
 6                   (Off-the-record discussion.)
 7                   (Jurors enter courtroom.)
 8                   THE COURT:  Your witness.
 9                   MR. GALLIAN:  Your Honor, members of the jury,
10   at this time Bill Stone calls Kelsey Adams to the stand.
11                   THE COURT:  Your witness, sir.
12                              KELSEY ADAMS,
13   having been first duly sworn, testified as follows:
14                          DIRECT EXAMINATION
15   BY MR. GALLIAN:
16       Q.   Good afternoon, Ms. Adams.
17       A.   Hello.
18       Q.   How are you?
19       A.   Good.  How are you?
20       Q.   We've met before, haven't we?
21       A.   Yes, sir.
22       Q.   Let's tell the jury a little bit about who you are.
23   What do you do for a living?
24       A.   I'm a designer, and I specialize in remodeling homes.
25       Q.   Where do you currently work?
```

```
 1        A.    For The Design House.

 2        Q.    Where is that located?

 3        A.    In Denton, Texas.

 4        Q.    Where are you from originally?

 5        A.    I'm from a small town in south Texas.

 6        Q.    About when did you move to the D/FW area?

 7        A.    Around 2012.

 8        Q.    Okay.  I want to draw your attention to approximately

 9   the time frame of 2016.  Do you remember an individual that you

10   were working for around 2016?

11        A.    Yes, sir.

12        Q.    Who was that?

13        A.    Bill Stone.

14        Q.    Who was the employer at that point, who was your

15   boss?

16        A.    Stan Roberts.

17        Q.    And what company did Stan Roberts own?

18        A.    Bath Kitchen Design Center.

19        Q.    When did you start working for Mr. Roberts?

20        A.    2015.

21        Q.    What was the dynamic of y'all's relationship?

22        A.    It was a small company.  He was the owner and I was

23   the only designer on the team.  And we had several contractors

24   that we used for our jobs.

25        Q.    So if a lead would come in, would the lead be Stan's
```

1    job or would that be something you handled?

2         A.   It would be Stan's job.

3         Q.   Would Stan be responsible for creating the -- the

4    business connection?

5         A.   Yes.

6         Q.   And then it would be your job to go in and do the

7    interior design job?

8         A.   Yes, sir.

9         Q.   How long did you work for Mr. Roberts?

10        A.   I would say about two years.

11        Q.   From approximately 2015 to 2017?

12        A.   Yes.

13        Q.   Now, going into the fall of 2016, did you have an

14   opportunity to meet and work with an individual named Bill

15   Stone?

16        A.   Yes.

17        Q.   Okay.

18             MR. GALLIAN:  Carly, if we could publish -- let

19   me back up real quick.

20        Q.   How were you introduced to Bill Stone?

21        A.   I met him at the house, at his house.

22        Q.   Okay.  So at this point in time, had Bill Stone and

23   Casi Thompson, had they retained Stan Roberts to work on the

24   job?

25        A.   Yes, sir.

```
 1        Q.    And so you guys -- you guys were the remodeling
 2   company that had been decided at that point?
 3        A.    Yes, sir.
 4        Q.    And so the first time you met them was -- was when?
 5        A.    It was in the fall of 2016.  I went to their home.
 6        Q.    Okay.
 7              MR. GALLIAN:  And if we could publish Stone's
 8   Exhibit 108, please.
 9        Q.    Is that the house you remember?
10        A.    Yes, sir.
11        Q.    And so the first time that you met Stone, was it at
12   this house?
13        A.    Yes.
14        Q.    Who else was there?
15        A.    Casi.
16        Q.    Anyone else in that first meeting?
17        A.    Stan Roberts.
18        Q.    So it was just the four of you; it was you, Stan,
19   Bill and Casi?
20        A.    Yes.
21        Q.    What was your understanding of Bill and Casi's
22   relationship at that time?
23        A.    That they were a couple.
24        Q.    Any more particulars?
25        A.    They were engaged.
```

1      Q.    Why do you say that?

2      A.    Because there was a ring.

3      Q.    Okay.  We'll talk more about that.

4            MR. GALLIAN:  If we could publish Stone's

5    Exhibit 19.

6      Q.    Is this the same Bill and Casi that you were just

7    talking about?

8      A.    Yes, sir.

9      Q.    Do you remember anything exciting about the house

10   before you guys did the remodel on it?

11     A.    When you walk in to the home, before it was

12   remodeled, there were like mauve, pink pastel walls, and

13   columns.

14           MR. GALLIAN:  If we could publish 113, please.

15     Q.    That look familiar?

16     A.    Yes.

17     Q.    Okay.  You guys did quite a lot of work here, right?

18     A.    Yes, sir.

19           MR. GALLIAN:  Carly, if we could publish 102 and

20   then 103 as well.

21     Q.    And that is the kitchen area off of the main

22   entryway; is that right?

23     A.    That's the kitchen area.  That door leads to a

24   garage.

25     Q.    This door right here?

```
 1        A.    Yes.
 2        Q.    Okay.
 3              MR. GALLIAN:  And if we could publish 128 and
 4   129.
 5        Q.    Now, this is a picture of the renovation being
 6   completed; is that right?
 7        A.    In progress, yes.
 8        Q.    And what we can see, and would be able to see from
 9   the other pictures, this wall when you walk in was taken down
10   so it would be more of like an --
11        A.    Open concept.
12        Q.    -- open concept.
13              MR. GALLIAN:  If we could publish 129, please.
14        Q.    Is this how you remember the job looking after it was
15   completed?
16        A.    Yes, sir.
17              MR. GALLIAN:  130, please.
18        A.    Yes.
19        Q.    Okay.
20              MR. GALLIAN:  And 131.
21        A.    Yes, sir.
22        Q.    What room do you recall this being?
23        A.    The master bathroom.
24        Q.    Okay.  All right.  So let's talk more about your
25   involvement with Bill and Casi.  At what point in the process
```

1    do the individuals start picking out the finishes in the house?

2         A.    At the beginning, once we meet.

3         Q.    After you had that initial meeting with Bill and

4    Casi, did you guys have any subsequent meetings that you went

5    to any additional places to?

6         A.    Yes, to showrooms.

7         Q.    Okay.  What showrooms did you go to?

8         A.    We went to several in the D/FW area.  But the primary

9    one was Daltile.

10        Q.    Okay.  Who was at that meeting; was it Bill or Casi

11   or both?

12        A.    Both.

13        Q.    Were both Bill and Casi helpful in the design

14   decisions?

15        A.    Yes.

16        Q.    Now, you guys went to Daltile.  On that day do you

17   recall going to any other locations?

18        A.    The Tile Shop and Floor & Decor.

19        Q.    Is this a pretty common path for any clients of yours

20   to go to locations like that?

21        A.    Yes, sir.

22        Q.    Now, set the scene for us.  Was it everybody arriving

23   at Daltile in separate vehicles, or how was that?

24        A.    I arrived in a separate vehicle than they did.

25        Q.    But Bill and Casi were together?

```
 1        A.    Yes.
 2        Q.    Do you recall what kind of vehicle they were in when
 3   they arrived?
 4        A.    It was a truck, a Tacoma.
 5        Q.    Do you remember what color?
 6        A.    Blue, gray -- blue.
 7        Q.    Okay.  Do you remember if you went to Daltile first
 8   or Floor & Decor?
 9        A.    Daltile first.
10        Q.    After you guys went to Floor & Decor -- how did you
11   get there?
12        A.    I believe we drove our vehicles there separately.
13        Q.    Okay.  And after going to -- well, while you were at
14   Floor & Decor, were Bill and Casi both involved in the
15   design-making decisions?
16        A.    Yes.
17        Q.    After you went to Floor & Decor, did you, Bill and
18   Casi go anywhere else?
19        A.    No, we went and ate between those trips.
20        Q.    Okay.  Where did you guys go and eat?
21        A.    At Gas Monkey Garage, the grill.
22        Q.    Did you guys all ride together?
23        A.    Yes, sir.
24        Q.    In what vehicle?
25        A.    In Bill's truck.
```

1      Q.    Now, explain to the members of the jury, I mean, how

2  were Bill and Casi interacting during this time?  Are they

3  acting like a typical couple?

4      A.    Yes.

5      Q.    And why do you say that?

6      A.    Very normal couple in the middle of remodeling their

7  home; designing, picking choices out.  I talk to homeowners

8  every day.

9      Q.    In terms of the design decisions, were Bill and Casi

10 able to agree on most of the design decisions?

11     A.    Yes.  There were a couple that we had to work

12 through.

13     Q.    Couple issues?

14     A.    Yes.

15     Q.    Is it the backsplash?

16     A.    Yes.

17     Q.    Okay.  Who won that one?

18     A.    Bill.

19     Q.    When you are out at, you know, Gas Monkey Garage

20 having lunch, or at these showroom appointments, are they

21 acting like they are in a couple together?  I mean, are they

22 doing couple things?

23     A.    Yes, sir.

24     Q.    And what makes -- what comes to mind when I ask you

25 that question?

1        A.    Interacting like a normal couple would, as if you

2    were dating.  So...

3        Q.    Did you ever see them holding hands?

4        A.    Yes.

5        Q.    Did you ever see them kissing?

6        A.    No.

7        Q.    Do you recall how long the design process took,

8    approximately?

9        A.    A couple months.

10       Q.    About 2 to 3 months?

11       A.    Yes.

12       Q.    How often -- or was there a policy of yours how often

13   you would stop by your projects to check in?

14       A.    2 to 3 days a week, depending on the progress going

15   on.

16       Q.    When you would show up at those appointments, were

17   they just randomly -- or those kind of check-ins, were they

18   just randomly through the week?

19       A.    Yes.

20       Q.    When you would show up at those random times, were

21   Bill or Casi ever there?

22       A.    Yes.

23       Q.    Both of them?

24       A.    Yes.

25       Q.    Were Bill and Casi always there together, or was it

1    sometimes just Bill or sometimes just Casi?

2         A.    There were moments where they weren't together.

3         Q.    Was it more moments where they were together?

4         A.    Yes.  Bill was there most of the time.

5         Q.    Now, this is in the fall of 2016, right?

6         A.    Yes.

7         Q.    What was your understanding of where Bill was living

8    at the time?

9         A.    I wasn't quite sure.  But it was definitely in the

10   area.

11        Q.    D/FW area?

12        A.    Yes, sir.

13        Q.    What areas in the house did you guys remodel; do you

14   recall?

15        A.    The two primary areas were the kitchen and the master

16   bathroom.  And then we did just variation updates throughout

17   the home, like painting and flooring.

18        Q.    Were Bill and Casi, were they in a rush to finish the

19   design?

20        A.    I would say in a sorts.

21        Q.    What do you mean by that?

22        A.    Jobs typically run longer than we would like them to.

23   So towards the end, we were trying to get it done.

24        Q.    So do trials.

25        A.    Yes.

1    Q.    What was your understanding of their plan after the

2    renovation was complete?

3    A.    To move into the home.

4    Q.    Who is they?

5    A.    Bill and Casi.

6    Q.    Anyone else?

7    A.    Her son.

8    Q.    And that was something that they talked about in

9    front of you openly?

10   A.    Yes.

11   Q.    Now, in terms of the finances in this job, was that

12   Stan's job or your job to handle the checks and the payments?

13   A.    Stan's job.

14   Q.    This is going to sound like odd questions.  But was

15   there anything odd about Bill and Casi Thompson's relationship

16   as you noticed them from afar?

17   A.    No, sir.

18   Q.    There's an obvious age gap, which --

19   A.    Yes.

20   Q.    -- to each their own, right?

21   A.    Uh-huh.

22   Q.    But did you ever see Bill at times being excessively

23   controlling?

24   A.    No.

25   Q.    In terms of the design decisions that were made at

1    the house, aside from the backsplash, most of those decisions

2    were made collectively as a group, was it not?

3         A.   Yes, sir.

4         Q.   At all times that you were with Bill and Casi --

5    well, maybe not all times, but there were a certain number of

6    times -- do you recall Casi actually wearing an engagement

7    ring?

8         A.   Yes.

9         Q.   Is that something that you would typically notice?

10        A.   Yes.

11        Q.   And you saw Casi Thompson unequivocally wearing a

12   ring on her left finger; is that right?

13        A.   Yes, sir.

14        Q.   And was your understanding that her and Bill were

15   engaged?

16        A.   Yes, sir.

17             MR. GALLIAN:  Brief moment, Your Honor.

18             THE COURT:  Sure.

19             (Brief pause.)

20        Q.   Was there ever a time that you were walking through

21   the house where you remember Bill Stone or Casi Thompson

22   talking about the room that was going to be for their son?

23        A.   Yes.  It was on the left side of the house.

24        Q.   Okay.  So set the scene.  When you walk into the

25   house, what area do you walk into?

1        A.    You walk into the entryway; that would be your living

2   room.  The kitchen is on the right side, and it follows back to

3   the master bathroom and bedroom.  And then on the left side of

4   the home, I believe there was a couple bedrooms and a bathroom.

5        Q.    And it was your understanding that Bill and Casi were

6   talking about one of those bedrooms off to the left side being

7   for Casi's son?

8        A.    Yes, sir.

9        Q.    How did Bill and Casi's son interact?  Did you ever

10  get to see that?

11       A.    Yes, just like they -- I think they had a normal

12  relationship.

13       Q.    How many times -- do you remember the name of the

14  child?

15       A.    I don't.

16       Q.    Okay.  Do you remember how many times he was over

17  there, the child?

18       A.    One specific time.  But there might have been a

19  couple others.  I don't remember.

20       Q.    How were Bill and Casi to work with as clients?

21       A.    Great.

22       Q.    I'm sure in the design business you have plenty of

23  people who are not great.  Do we agree?

24       A.    Yes, sir.  Yes, sir.

25       Q.    Was Bill always respectful and courteous to your

```
 1   contractors?
 2        A.   Yes, sir.
 3                  MR. GALLIAN:  You Honor, I'll pass the witness.
 4                  Thank you very much, Ms. Adams.
 5                  THE COURT:  Members of the jury, are you doing
 6   okay?
 7                  (Respond affirmatively.)
 8                  THE COURT:  All right.
 9                  MR. WESTFALL:  Your Honor, we have no questions.
10                  MS. MAX:  Thank you, Your Honor.
11                       CROSS-EXAMINATION
12   BY MS. MAX:
13        Q.   Ms. Adams, my name is Donna Max.  I'm an attorney for
14   the government and I have a few questions for you.
15        A.   Yes, ma'am.
16        Q.   We've never spoke before, have we?
17        A.   No, ma'am.
18        Q.   Okay.  Now, did Bill Stone tell you what he did for a
19   living?
20        A.   No, ma'am.
21        Q.   Okay.  And you are saying that your belief that Casi
22   and Bill were engaged is because you saw a ring on Casi's ring
23   finger; is that right?
24        A.   Yes, ma'am.
25        Q.   So you made an assumption based upon a piece of
```

1   jewelry?

2       A.   I believe I was introduced to them as a couple that

3   were engaged by my -- from my boss.

4       Q.   From your boss?

5       A.   Yes, as we walked into the home.

6       Q.   But you don't know how that information got to your

7   boss?

8       A.   No.

9       Q.   Okay.  Did you know that -- I'm assuming you did not

10  know that Casi Thompson was under some sort of secret probation

11  with Bill Stone?

12      A.   Not at all.

13      Q.   You had no idea that Bill Stone was acting as her

14  secret probation officer?

15      A.   Not at all.

16      Q.   You had no idea that Casi Thompson was living under

17  the threat of going to prison for 50 years?

18      A.   No.

19      Q.   Would you agree that would be like a really awkward

20  thing to try to present and explain to you as to how I know

21  this person and why we're together?

22      A.   Yes.

23      Q.   Probably just a lot easier to pass yourself off as a

24  couple, right?

25      A.   If I were in that position, I don't feel like I would

 1    be able to pass that off --

 2         Q.   Yeah, it would be hard to explain that to --

 3         A.   -- if I was uncomfortable.

 4         Q.   -- it would be hard to explain that to somebody in a

 5    very casual business relationship, right?

 6         A.   Yes and no.

 7         Q.   Okay.  You mentioned -- the Defense counsel asked you

 8    a question about Bill Stone being excessively controlling, and

 9    you say you didn't see any of that, correct?

10         A.   No, ma'am.

11         Q.   Would you agree with me that it's excessively

12    controlling to threaten someone with 50 years in prison if they

13    don't do what you say?

14         A.   I can't recall.

15         Q.   Okay.  Would it be excessively controlling to monitor

16    someone's cell phone?

17         A.   Depends on who you are.

18         Q.   Would it be excessively controlling to conduct

19    physical surveillance on a person?

20         A.   We have surveillance in my home.

21         Q.   All right.  In your home?  For who, your children?

22         A.   For our property.

23         Q.   Okay.  Were you aware that during this entire time

24    Casi Thompson had her own home?

25         A.   Yes.

1     Q.   Okay.  Were you aware that from 2016, when you met

2  Casi and Bill, through 2019, Casi never lived in that home that

3  we're discussing, and, in fact, only spent two nights there;

4  were you aware of that?

5     A.   No.

6     Q.   Were you aware that Bill Stone paid nothing for that

7  home?

8     A.   No.

9     Q.   Tell me about what female items you saw in the home

10  when you were there.

11     A.   The home wasn't lived in.

12     Q.   So you saw no evidence of Casi living in that home at

13  all?

14     A.   Neither her or Bill.

15     Q.   Okay.  And were you aware that in July of 2019, Bill

16  Stone very extravagantly proposed to Casi Thompson?

17     A.   No.

18     Q.   Okay.  So it wouldn't make a lot of sense of what you

19  are saying that you believe three years earlier they were

20  engaged when, in fact, Bill Stone proposed to her in July of

21  2019?

22     A.   I was not aware of that.

23     Q.   Okay.  So you'd agree with me, then, that maybe your

24  assumptions were incorrect?

25     A.   No, ma'am.

1          MS. MAX:  Pass the witness.

2          THE COURT:  Anything further?

3                    REDIRECT EXAMINATION

4    BY MR. GALLIAN:

5       Q.   Ms. Adams, I probably should have asked you this.

6    After the renovation was complete, did you ever see or speak

7    with Bill or Casi ever again?

8       A.   No, sir.

9          MR. GALLIAN:  Okay.  Your Honor, I'll pass the

10   witness.

11          THE COURT:  Okay.

12          MR. WESTFALL:  Nothing further, Your Honor.

13          THE COURT:  Government, anything?

14          MS. MAX:  No, Your Honor.

15          THE COURT:  Any objection to me excusing this

16   witness?

17          MR. GALLIAN:  No, Your Honor.

18          MS. MAX:  None from the government.

19          THE COURT:  Thank you so much for coming today,

20   ma'am.  We really appreciate you.  Have a good day.

21          THE WITNESS:  You too.

22          (Witness excused.)

23          MR. GALLIAN:  Your Honor, members of the jury,

24   at this time Bill Stone rests.

25          MR. WESTFALL:  May we approach?

1           THE COURT:  Certainly.  Actually, I tell you

2   what.  I can use a stretch break.  Why don't we take us five.

3           (Jurors exit courtroom.)

4           THE COURT:  Outside the presence of the jury.

5           MR. SELLERS:  I didn't know if they were

6   going to go -- I thought it was going to be more like an hour

7   or two.  So we --

8           THE COURT:  Okay.

9           MR. SELLERS:  -- we have two here that said

10  they'd be here by 2:00 p.m.  And she's out there calling

11  another to see if they can get here.  And then we'll have two

12  more.  They're all character.  They're very quick and short, I

13  hope.  But you never know how cross will go.  So we can call

14  all of them today or we can -- I mean, I just -- looking for

15  some guidance, I guess.

16          THE COURT:  I think if we could rest testimony

17  today, we will have a happy jury.

18          MR. SELLERS:  I totally agree.  But we have all

19  of our witnesses coming from Fort Worth.  Some are -- had to be

20  subpoenaed because they are still on the police force.

21          THE COURT:  Gotcha.

22          (Off-the-record discussion.)

23          THE COURT:  Outside the presence of the jury.

24  Let's talk about Mr. Stone and -- do you want to talk to

25  Mr. DeLeon, too, or just wait?

```
 1                    MR. SELLERS:  Wait.

 2                    THE COURT:  Talk about the right to testify.

 3                    And, Mr. Gallian?

 4                    MR. GALLIAN:  Thank you, Your Honor.

 5                    Bill Stone, as you know, we obviously just

 6     closed our case in front of the jury.  But you and I have had

 7     many conversations about testifying, have we not?

 8                    DEFENDANT STONE:  Yes, sir.

 9                    MR. GALLIAN:  And in those conversations, I made

10     it unequivocally clear that you have the absolute right to

11     testify should you want to, right?

12                    DEFENDANT STONE:  That is correct.

13                    MR. GALLIAN:  In those conversations, I told you

14     it was my advice that you not testify in this case; is that

15     fair?

16                    DEFENDANT STONE:  Yes, sir, it is.

17                    MR. GALLIAN:  And in following that advice, it

18     has been your decision not to testify in this trial; is that

19     correct?

20                    DEFENDANT STONE:  That is correct.

21                    MR. GALLIAN:  But the most important part of

22     that is that it is your understanding that regardless of what

23     my opinion is or what you think the jury is thinking of the

24     case at this point in time, you have an absolute, nonrevocable

25     right to testify in your defense if you want to.  Do you
```

 1  understand that?

 2                  DEFENDANT STONE:  That is correct.

 3                  MR. GALLIAN:  And keeping all of that in

 4  consideration, you and I had a conversation yesterday afternoon

 5  where you relayed you did not want to testify; is that correct?

 6                  DEFENDANT STONE:  That is correct.

 7                  MR. GALLIAN:  And we discussed it again this

 8  morning; is that correct?

 9                  DEFENDANT STONE:  Yes, sir.

10                  MR. GALLIAN:  And that all points relevant, you

11  said that you did not want to testify; is that true?

12                  DEFENDANT STONE:  That is correct.

13                  MR. GALLIAN:  Thank you, Your Honor.

14                  THE COURT:  Please be seated.

15                  And you too, Mr. Stone.

16                  I've been doing criminal law for about 23 years.

17  And I have to tell you, you certainly do have the absolute

18  right, whatever your lawyer says, to testify.  But I think you

19  have made a wise choice not to.  I think in light of the

20  evidence, and I -- I think it's just wise to listen to Counsel

21  on this one.  And so -- but for the record, you do understand

22  that whatever he says, it's ultimately up to you?

23                  DEFENDANT STONE:  Yes, ma'am, I understand.

24                  THE COURT:  And understanding that it's

25  ultimately up to you; not what I think and what your lawyer

 1   thinks, do you wish not to testify?

 2                 DEFENDANT STONE:  That is correct.

 3                 THE COURT:  Okay.  That is the end of the

 4   inquiry.

 5                 DEFENDANT STONE:  Thank you.

 6                 THE COURT:  You're welcome.

 7                 And as to motion for a directed verdict, that is

 8   denied.  I went back and clicked through the record, but it is

 9   timely preserved.

10                 So -- and, Mr. Stone, do you have any questions

11   you want to ask me?

12                 DEFENDANT STONE:  No, ma'am.

13                 THE COURT:  Okay.  I think you made a good

14   decision.

15                 All right.  Ready to stack them up and bring

16   them in.

17                 (Jurors enter courtroom.)

18                 THE COURT:  With that said, Mr. Stone has rested

19   his case, and so now is it the opportunity for the lawyers for

20   Mr. DeLeon to present any evidence they choose to, if they

21   choose to.

22                 MR. SELLERS:  Thank you, Your Honor.

23                 THE COURT:  You're welcome.

24                 MR. SELLERS:  We call Brad Thompson to the

25   stand.

 1              THE COURT:  Mr. Thompson, if you will come on
 2   down like The Price Is Right.
 3              (Off-the-record discussion.)
 4              (Witness sworn.)
 5              THE COURT:  I'm about to hand you to him for
 6   questioning.
 7              (Court instruction.)
 8              THE COURT:  Your witness, sir.
 9                    BRADLEY THOMPSON,
10   having been first duly sworn, testified as follows:
11                    DIRECT EXAMINATION
12   BY MR. SELLERS:
13       Q.   Good afternoon.
14       A.   How are you, sir?
15       Q.   I'm well.  Could you please introduce yourself to the
16   jury?
17       A.   My name is Carlson Bradley Thompson.
18       Q.   And, Brad, tell us, are you employed or retired?
19       A.   Well, I -- I currently am employed, but I retired
20   from the Fort Worth Police Department.
21       Q.   And when were you with the Fort Worth Police
22   Department?
23       A.   I was with the Fort Worth Police Department from
24   1991 --
25              (Reporter instruction.)

1    Q.   You were telling us about the Fort Worth Police
2    Department and your time there.
3    A.   Yes.  I was a Fort Worth police officer from 1991
4    until 2017.
5    Q.   During that time, what were your assignments and what
6    all ranks did you obtain?
7    A.   I was assigned to the south division patrol out of
8    the academy.  I went to the community services unit and the
9    directed patrol units during that time.  Then I transferred to
10   our special operations division as a K9 handler.  And spent the
11   bulk of my career in that particular unit.  Ending up as the
12   senior handler and the instructive trainer for the unit.  And
13   then for the final five years, I was a member of our special
14   investigations unit.
15   Q.   And what did you do in special investigations?
16   A.   Special investigations, we looked primarily at
17   department employees who had been alleged to have committed a
18   felony offense.
19   Q.   You mean police officer?
20   A.   Correct.  Any City employee or any elected official
21   fell under our purview, but most of our cases were against
22   fellow officers.
23   Q.   Kind of like a public integrity unit?
24   A.   Very much so.
25            THE COURT:  Let's slow it down just a little bit

1    more.  Y'all are doing great, but let's wind it down one notch

2    a little bit lower.

3         Q.    Let me ask you this.  Do you know the gentleman

4    seated over here?  I'm pointing to my left.  He's seated --

5    standing up now.

6         A.    Yes, I do.

7         Q.    How long have you known him?

8         A.    Pretty much that entire time in Fort Worth.

9    26 years.

10        Q.    All right.  Tell us how you met Joe.

11        A.    I met Joe.  Joe was very active in our Citizens

12   Police Academy, our Citizens on Patrol.  He was a member of our

13   crime committee -- or CCPD.  Crime Control Prevention District,

14   which was the tax entity that -- half-cent sales tax that

15   provided tens of millions of dollars to the police department.

16   He was one of the board members that was overseeing that at one

17   point.  He was a business owner.  Just very active in the

18   community.

19        Q.    What kind of business did you know Joe to own?

20        A.    Restaurant.

21        Q.    And --

22        A.    He also -- there were some wrecker businesses in the

23   past, but mostly restaurants.

24        Q.    Was the restaurant called Benito's?

25        A.    It was.

1    Q.    Was Benito's in the south side?

2    A.    It was.

3    Q.    And so would it be fair to say that you -- your beat

4    or your area was Joe's neighborhood and Joe's restaurant area?

5    A.    For part of that career, it was.

6    Q.    And so tell us about during that time how you -- how

7    much interaction you'd have with Joe.

8    A.    It varied over the years.  There was considerable

9    contact with him in the early years.  Because community

10   services unit, anything involving Code Blue or the Citizens

11   Police Academy, anything like that, we would all be at.  Joe

12   would always be at those functions.

13   Q.    Now, wait a second.  What is Code Blue?

14   A.    Code Blue is a Citizens on Patrol.  It is where

15   people go and they take a block of instruction to basically be

16   eyes and ears for the police department.

17   Q.    Do they get issued police uniforms?

18   A.    No.  They had a windbreaker with a patch on it and a

19   stencil on the back.  And they had police radios that they

20   could monitor our calls.  And they could also -- if they came

21   across something, they could call it in directly onto our

22   channels.

23   Q.    Do you remember specifically when or where you were

24   when you met Joe for the first time?

25   A.    It would have been at one of the community meetings.

1      Q.   Going on through the years, did you come to have more

2    interaction with Joe?

3      A.   I would have interactions on a regular basis with

4    Joe.  And somewhere in the mid to late '90s, the city council

5    decided that they wanted control of those tens of millions of

6    dollars of tax revenue.  And so they dissolved the board that

7    oversaw it and took it themselves.  And Joe called me one night

8    very concerned about that.  And we had probably an hour, hour-

9    and-a-half conversation, because he was so afraid that they

10   were going to misappropriate that money that was meant for the

11   police department.

12     Q.   How about continuing forward through the years?

13     A.   Like I said, almost any public event that the police

14   department had, Joe was typically a regular at.  When I worked

15   in the south division patrol, and even after I moved over to

16   special investigations and special operations, if I was doing

17   something on the south side and was out on a call along the

18   imperial corridor, which was one of our main travel

19   thoroughfares, it was not uncommon for Joe to show up on your

20   scene and wanting to chat with you.

21     Q.   What do you mean, "show up on your scene"?

22     A.   If he saw one of us that he recognized, he would stop

23   and wait for us to finish our call.  And a lot of times, even

24   if you're in the middle of the call, you know, if you saw him

25   pull up over there, he might nod or just give you a subtle wave

1    and like, hey, I'm here, just in case anything goes bad.  That

2    is kind of how he came across to us.

3         Q.    Through the years, did Joe actually become an

4    instructor at the Citizens Police Academy?

5         A.    He interpreted for the instructors at the Citizens

6    Police Academy.  He interpreted for me on a regular basis at

7    the Citizens Police Academy when we had our Spanish CPAs.

8         Q.    Was Joe actually instrumental in putting on the class

9    for the -- those who are not English speaking --

10        A.    It certainly appeared to be that way.

11        Q.    When we were out in the hallway, I showed you what's

12   been marked as DeLeon's Exhibit 60, 61, 63, 65, 66 and 67.  Did

13   you recognize those?

14        A.    Yes, I did.

15        Q.    Did you recognize what was depicted in those

16   photographs?

17        A.    I did.

18        Q.    And do they fairly and accurately depict what is

19   shown in the photographs?

20        A.    Yes.

21        Q.    All right.

22             MR. SELLERS:  We would offer DeLeon's 60, 61,

23   63, 65, 66 and 67 for all purposes.

24             MS. MAX:  No objection.

25             MR. GALLIAN:  No objection, Your Honor.

1           THE COURT:  Admitted for all purposes.

2           MR. SELLERS:  May I show the jury, Your Honor?

3           THE COURT:  You may.

4      Q.   I'm going to show you first, Mr. Thompson, what's

5   already been -- oops -- what's already been admitted as

6   DeLeon's 59 -- oh, there we go.

7           Are you familiar with what the inside of a

8   Mercedes looks like?

9      A.   Yes, I am.

10     Q.   What kind of car did Joe drive?

11     A.   Joe drove a small Mercedes SUV during a lot of years

12  that I knew him.

13     Q.   All right.  And so there's been testimony that

14  Mr. Briley and Joe had some discussions in Mr. Briley's truck,

15  not in Joe's car, and that is where the controlled calls were

16  made.

17          Where does it appear the person taking this

18  photo is sitting?

19     A.   In the passenger seat.

20     Q.   Of a truck or something else?

21     A.   That, I -- based on that photograph, I could not tell

22  you.

23     Q.   Fair enough.  Volunteer Spanish interpreter herein

24  DeLeon's 59, that's Joe there, isn't it?

25     A.   That is correct.

1        Q.    FWPD access:  Anywhere?

2        A.    Unescorted access in our facilities.

3        Q.    Huh.  So there's been some suggestion that Joe is

4   just really impersonating a police officer.

5                    MS. MAX:  Objection; leading, Your Honor.

6                    THE COURT:  Sustained.

7        Q.    Okay.  If anyone were to say that Joe was

8   impersonating a police officer, have you ever heard a report

9   like that?

10       A.    No, I have not.

11       Q.    Do you believe it's in Joe's character to hold

12  himself out as law enforcement?

13       A.    It has never been my experience to have him do that.

14       Q.    All right.  Let's move now to Exhibit 60.  Do you

15  recognize the folks in this photo?

16       A.    I recognize two of the three.

17       Q.    All right.  Who's the gentleman on the left with all

18  the --

19       A.    That was our former chief, Ralph Mendoza.

20       Q.    All right.  And who is the young man on the right?

21       A.    That would be a younger Joe DeLeon.

22       Q.    Much younger Joe DeLeon.  And you don't know who that

23  is in the middle?

24       A.    I do not.

25       Q.    All right.  And we see here Joe has on a shirt.  Is

1   that kind of the same type of shirt that the Citizens Police --

2       A.    That is.  And that is probably a Citizens Police

3   Academy graduate.  They would oftentimes have photos made with

4   the chief and Joe.

5       Q.    All right.  Here in DeLeon 61, where is this photo

6   taken?

7       A.    This photo -- let's see.  Well, the mats would make

8   me think it's a gym.  But those chairs up on that stage, that

9   is in the auditorium -- the old Fort Worth Police Academy.

10      Q.    And here we see Joe holding a rope with a carabiner

11  on it; is that right?

12      A.    Yes, sir.

13      Q.    Do you know the female on the right side of the

14  photo?

15      A.    I do not recognize her.

16      Q.    All right.  Was it a pretty regular occurrence to see

17  Joe around the Fort Worth PD?

18      A.    Very regular.

19      Q.    Do me a favor before we both get yelled at, all

20  right?  Thank you.  It's not your first -- it is not my first

21  time, but it's yours, and I don't want that for you, Brad.

22            How about Exhibit 62 here?  Nope, sorry, 63 --

23  65, I mean.  Where is this photo taken?

24      A.    This is also in the auditorium at the old Fort Worth

25  Police Academy.

1    Q.    Now, if Joe had no affiliation with the Fort Worth

2    PD, and he's just doing all this crazy stuff, why does he get

3    to stand behind a podium; do you have any idea?

4    A.    Joe was very instrumental in a lot of entities within

5    the police department.  I would say he was formational Spanish

6    CPA.  Even translating the COP, the Citizens on Patrol,

7    curriculum for our Hispanic volunteers.  This is -- based on

8    the uniform being worn by the officer behind him, this is a

9    formal occasion too.

10    Q.    And there Joe is right in the middle of it?

11    A.    Correct.

12    Q.    Let me show you 66 here.  Are you familiar with who's

13    in this photo?

14    A.    Only -- Joe's the only one I recognize right off

15    hand.

16    Q.    Right.  How about here in 67?

17    A.    That -- Joe DeLeon.  And then the gentleman to

18    Joe's -- to Joe's right would be one of our COP volunteers.  I

19    have forgotten his name now.  And I -- the gentleman on the far

20    end seems like another community leader, but I don't know who

21    it is.  I've seen him around, but couldn't tell you who he is.

22    And they're at the graves of two Fort Worth police officers,

23    Duane Freeto and Hank Nava.

24    Q.    And is this at a funeral, or do you know?

25    A.    This would have been after the funeral, after the

1    stones had been set and the -- like I say, you had very similar

2    stones.  And with them being side by side, to me, it probably

3    would have been on the anniversary of one of the two deaths.

4         Q.    Fallen officers' memorial?

5         A.    Could have been.

6         Q.    All right.

7         A.    Could be, yeah.

8         Q.    And there we see, again, Joe right in the mix of it,

9    right?

10        A.    Correct.

11        Q.    How many times over the years would you say that you

12   had to interact with Joe?  Just ballpark for us.

13        A.    Probably 60 or 70 or better.

14        Q.    If anyone had asked around at the Fort Worth PD about

15   Joe, do you think it's likely that they'd end up talking to you

16   for people who knew Joe?

17        A.    I think there was a whole lot of people that could

18   have answered for -- for things about Joe.

19        Q.    All right.  Did -- let me ask you this.  Did anybody

20   from the FBI ever reach out to you to vet or learn about Joe's

21   background with the Fort Worth PD?

22        A.    No.

23        Q.    How about the Texas Rangers?

24        A.    No.

25        Q.    How about the Department of Justice Office of

1    Inspector General?

2        A.    No.

3        Q.    Any law enforcement at all?

4        A.    Nobody's reached out to me questioning me about Joe.

5        Q.    All right.  Before coming here, I sent you a copy of

6    the accusations against Joe, did I not?

7        A.    You did.

8        Q.    And we'll get into that in just a minute.  But one of

9    the important things in a fraud case is determining whether or

10   not somebody's -- what their intent was, right?  And what they

11   knew or didn't know.

12             And so let me ask you this.  During the times

13   that you've known Joe for, gosh, almost 25-plus years,

14   30 years, even, have you formed an opinion, a personal opinion,

15   about his character for telling the truth and being honest?

16       A.    I've never known Joe to not be honest.  He's never

17   lied to me, to my knowledge.

18       Q.    And so what would your opinion be?  Would it be good

19   or would it be bad?

20       A.    Be very good.

21       Q.    How about others in the community, the reputation of

22   Joe in the community for telling the truth and being honest?

23   And I'm talking about Fort Worth PD and citizens that you know

24   that know Joe.  What is his reputation among that community for

25   being honest?

1    A.   To my knowledge, it's good.  Like I say, I've never
2   heard anybody badmouth Joe.
3    Q.   All right.  We talked about this one last night.  And
4   if you'd answer the same way you did when I brought it up, I'd
5   love it.  But have you also formed an opinion about Joe's
6   character for dedication and unquestioned support of law
7   enforcement?
8    A.   Oh, he absolutely trusts law enforcement a
9   100 percent.  He just -- he -- he revered us, is how it came
10   across.
11    Q.   Out in the hallway you gave me an example that if you
12   told Joe a dog could deal blackjack --
13                 MS. MAX:  Objection.  Defense counsel is
14   testifying.
15                 THE COURT:  Sustained.
16    Q.   What's the example you gave me in the hallway?
17    A.   The example I gave the counselor out in the hallway,
18   and from my time as a K9 instructor/trainer, I said, if I had
19   told Joe that I could teach a dog to deal blackjack, he would
20   have believed me.
21    Q.   That obviously can't happen?
22    A.   No.
23    Q.   Even if you are a good K9 handler?
24    A.   I wasn't that good.
25    Q.   What kind of dog did you have?

1    A.    Belgian Malinois and German shepherds.

2    Q.    Joe -- did Joe ever get to meet the dogs?

3    A.    Joe got bit by dogs.

4    Q.    What do you mean he got bit by a dog?

5    A.    We put him in a bite suit.

6    Q.    How many times?

7    A.    Just a couple.

8    Q.    You put him over there in a bite suit?

9    A.    Uh-huh.

10   Q.    Did he scream like a little girl?

11   A.    No.

12   Q.    All right.  Let me ask you now, did you have a chance

13   to read through the indictment that I sent you; specifically --

14   A.    I did.

15   Q.    -- specifically Count 1 and all the different acts

16   that they claim that Joe was directed by DeLeon [sic] to do?

17   Did you read all that?

18   A.    Yes.

19   Q.    All right.  Or directed by Stone to do, rather.  Is

20   the Joe you know of a character that is consistent with the

21   allegations in this indictment?

22        MS. MAX:  Objection; improper character evidence

23   and asks this witness to draw a legal conclusion.

24        MR. SELLERS:  Straight from the charge.

25        MS. MAX:  It's not going to a character trait.

1          THE COURT:  Give me just a minute.  Hold that

2     thought for a second.

3                (Brief pause.)

4          THE COURT:  Nikki, would you read back that last

5     question, please?

6                (Requested portion read by Reporter.)

7          THE COURT:  I'll allow it.

8     Q.   Go ahead.

9     A.   I would find it would be very out of character for

10    him to be involved in the things that are in this indictment.

11    Q.   Is the Joe you know susceptible to being hoodwinked

12    by somebody who's law enforcement, tricked?

13    A.   I would say yes.

14    Q.   I want to talk to you now about -- I want to go back

15    to your training and experience in the police field.  What was

16    one of the most important things you had to do as a police

17    officer?

18    A.   Accurate reporting.

19    Q.   Why is accurate reporting so important?

20    A.   Because --

21              MS. MAX:  Objection; relevance.

22              THE COURT:  Overruled.

23    A.   A, it's the notes that you are going to refer back to

24    maybe years later on the stand.  It also gives prosecutors an

25    idea of what case you are presenting to them.  Defense needs it

1  for, you know, fair defense of a client.  We were always told

2  that if you don't put it on paper, it didn't happen.

3      Q.   And do you expect when you write a report -- and

4  after you write a report, don't you have to submit it to

5  somebody to sign off on?

6      A.   Yes.

7      Q.   Is that pretty consistent?  You know, you've worked

8  at the sheriff's office, too, right?

9      A.   Correct.

10     Q.   And at the PD?

11     A.   Yes.

12     Q.   Do you expect it would be any different with the

13  Texas Rangers?

14     A.   I would assume it would be the same with them in the

15  chain of command.

16     Q.   And so if it's not in the report, it didn't happen?

17            MS. MAX:  Objection; improper character

18  evidence.

19            MR. SELLERS:  This is not character.

20            THE COURT:  If I need a response, I'll tell you.

21            Overruled.

22     Q.   What about if a suspect or somebody you are

23  investigating makes a -- why don't you tell the jury what a res

24  gestae statement is.

25            MS. MAX:  Objection; offering an expert opinion.

1          THE COURT:  If you can establish how he would

2   know that.

3      Q.   Do you know what a res gestae statement is?

4      A.   I do.

5      Q.   Okay.  How do you know that?

6      A.   32 years total as a police officer.

7      Q.   Right.  So could you tell the jury what a res gestae

8   statement is?

9      A.   Just an unprompted utterance by a defendant.

10     Q.   Why would it be important to note or to put in your

11  report an -- a res gestae statement or a -- an excited

12  utterance of a person you are investigating?

13     A.   Usually if it's to the point where you classify it as

14  a res gestae statement, it is going to be something material to

15  your case.

16     Q.   And so did I ask you to review Ranger Briley's

17  35-page report?

18     A.   You did.

19     Q.   And I told you what I heard that didn't sit right

20  with me, right?

21     A.   You did.

22          MS. MAX:  Objection; sidebar.

23          THE COURT:  I'll overrule.

24     Q.   Where in there did you see any notation even close to

25  resembling the statement that Joe made, according to

1    Ranger Briley, that she's wealthy and she doesn't need the

2    money?

3                    MS. MAX:  Objection; going outside the scope of

4    character testimony.

5                    THE COURT:  Overruled.

6        A.    I did not see it.

7        Q.    In other words, if Ranger Briley were to testify

8    about it, he'd just have to be drawing on memory from years and

9    years ago?

10       A.    Correct.

11       Q.    Without any notes for anybody to review ahead of

12   time?

13                   MS. MAX:  Objection; calls for speculation.

14   Outside the scope of this witness' personal knowledge.

15                   THE COURT:  You'll have to establish, if you are

16   going to go further down this, how he knows this particular

17   ranger's memory.  So sustained.

18       Q.    Nevertheless, when a suspect makes an incriminating

19   statement, you expect it to be written down, right?

20       A.    I certainly would.

21       Q.    So that everyone can rely upon it, right?

22       A.    That's correct.

23       Q.    And there is no trial by ambush?

24       A.    Correct.

25       Q.    When's the last time you saw Joe?

 1      A.    It's been 6 to 8 years.

 2      Q.    Last time you talked to him?

 3      A.    It would have been that same time frame.

 4      Q.    All right.  Well, I mean, how do you know that over

 5 the last 6 to 8 years Joe hadn't just become this dishonest

 6 fraudster; how can you say that?

 7      A.    I just base it on the 20-plus years that I knew him.

 8      Q.    Thank you for being here.

 9            MR. SELLERS:  I'll pass the witness.

10            THE COURT:  All right.

11                     CROSS-EXAMINATION

12 BY MS. MAX:

13      Q.    Hi, Mr. Thompson.  I'm Donna Max.  We have not spoken

14 before, have we?

15      A.    We have not.

16      Q.    Okay.  I'm representing the government.  I have a few

17 questions for you.

18      A.    Yes, ma'am.

19      Q.    Now, you say you've known Joe DeLeon for 26 years?

20      A.    Approximately that, yes.

21      Q.    And it sounds like all of those have been in some

22 sort of law enforcement capacity; is that right?

23      A.    That is correct.

24      Q.    Okay.  So this Code Blue that you talked about, the

25 Citizens on Patrol?

1          A.    Correct.

2          Q.    Okay.  And you said Joe was very actively involved

3    with that?

4          A.    He was.

5          Q.    And when volunteers are going out and doing the

6    Citizens on Patrol, is a police officer accompanying you?

7          A.    No, they are not.

8          Q.    Okay.  So Fort Worth PD is entrusting these

9    volunteers to go out and really represent the Fort Worth Police

10   Department to the community, right?

11         A.    To a certain degree, they are.

12         Q.    So the Fort Worth Police Department has a -- has a

13   trust in Joe DeLeon, right?

14         A.    That is correct.

15         Q.    They believe he has the knowledge and the

16   intellectual capabilities to represent them in the community?

17         A.    Seems to be, yes, ma'am.

18         Q.    Right.  By the Code Blue.  So it would also seem that

19   the Fort Worth PD would believe that Joe knows a little bit

20   more than the average person about law enforcement, correct?

21         A.    I would say he knew more than your average citizen,

22   certainly.

23         Q.    Okay.  So he's more familiar with law enforcement

24   than the average person?

25         A.    He's more familiar with law enforcement personnel,

1    the people involved.

2        Q.    But if he's going out and doing the Citizens on

3    Patrol, he clearly has a level of knowledge that's above the

4    average citizen, right?  I mean, what else is the purpose of

5    going out -- Citizens on Patrol if you don't know a little bit

6    more than the average citizen?

7        A.    You were the eyes and ears of the police department.

8    If you saw something that didn't look right, you called it in,

9    you -- that is their whole deal.

10       Q.    Would you agree with me that Joe DeLeon has an

11   above-average knowledge of law enforcement processes?

12       A.    Processes, once they leave the street, I don't know

13   that he does.

14       Q.    Would you agree with me that Joe DeLeon knows more

15   about law enforcement in general than the average person?

16       A.    Yes.

17       Q.    And it sounds like he has a lot of friends in law

18   enforcement; is that right?

19       A.    That is correct.

20       Q.    Okay.  I mean, how many -- how many people do you

21   think Joe DeLeon knows in the Fort Worth Police Department?

22       A.    Peripherally or pretty directly?

23       Q.    At the level of relationship that you have with him.

24       A.    Probably 40 or 50 of us.

25       Q.    So he -- he knows 40 or 50 people as well as he knows

1    you?

2         A.    I would say so.

3         Q.    In the Fort Worth Police Department?

4         A.    I would say so, yeah.

5         Q.    And that would include chiefs?

6         A.    That is.

7         Q.    Sergeants?

8         A.    Yes.

9         Q.    Lieutenants?

10        A.    Yes.

11        Q.    Patrol officers?

12        A.    Yes.

13        Q.    So there's lots of people that Joe DeLeon could go to

14   and ask questions about any aspect of law enforcement?

15        A.    Yes.

16        Q.    Do you find that in law enforcement community, fellow

17   officers are happy to educate people and answer questions?

18        A.    Typically, yes.

19        Q.    Those officers like to talk about their job, don't

20   they?

21        A.    Most of the time.

22        Q.    And they're happy to share that knowledge with others

23   that are interested, right?

24        A.    Yes.

25        Q.    So you'd agree with me, then, that Joe DeLeon had

1    a -- 40 to 50 people that at any point he could go and ask any

2    sort of questions about law enforcement to?

3         A.    Correct.

4         Q.    Okay.  So if he had questions about how a federal

5    probation was handled, he had at least 40 to 50 people in the

6    Fort Worth PD that he could go and talk to?

7         A.    Not necessarily about federal probation.  I don't

8    know anything about federal probation.

9         Q.    Do you think if he was friends with FBI agents, he

10   would be able to ask them those questions?

11        A.    They would know a little -- you know, far more than I

12   would know about that sort of thing, in the federal -- anything

13   in the federal system.

14        Q.    And what you are describing of Joe DeLeon's volunteer

15   roles in the Fort Worth PD, it sounds like he's not just your

16   average volunteer.  It sounds like Fort Worth PD has put him in

17   leadership positions; is that correct?

18        A.    That's correct.

19        Q.    So they've entrusted him -- they've seen something in

20   Joe that's even more than the average volunteer?

21        A.    Correct.

22        Q.    They've certainly not hesitated to put him in a

23   leadership position to represent Fort Worth Police Department?

24        A.    That's correct.

25        Q.    Wouldn't you agree to have that sort of trust would

1    require a belief that Joe DeLeon certainly has a good basic

2    knowledge of law enforcement?

3         A.    For us, it was more Joe DeLeon has a good reputation

4    within that community than what we had him doing.

5         Q.    Okay.  So going to your career as a police officer --

6    and how long were you a police officer?

7         A.    A total of 32 years.

8         Q.    Okay.  As a police officer, you knew that it was

9    illegal to take money from a defendant in a criminal case; is

10   that correct?

11        A.    Correct.

12        Q.    Okay.  And I'm going to assume you never took money

13   from a defendant while doing your job.

14        A.    No.

15        Q.    Okay.  Well, why do you make that face?

16        A.    Because this is just -- it is absurd to me.

17        Q.    It is absurd.  Okay.  Pretty basic principle in the

18   criminal justice system, right?

19        A.    To a police officer, it should be.

20        Q.    Are Fort Worth Police Department volunteers told to

21   never take money while acting as a volunteer?

22        A.    I cannot recall that being in their curriculum, but

23   I'm sure it probably is.

24        Q.    Would you expect a volunteer to also not take money?

25        A.    I would expect that.

1    Q.    Okay.  And volunteers, they are not paid for their

2    time with Fort Worth PD, correct?

3    A.    Correct.  Only fuel for reimbursement.

4    Q.    Okay.  And as far as you know, Joe DeLeon never asked

5    Fort Worth PD for any sort of payment?

6    A.    I never knew him to ask for a payment for anything.

7    Q.    Never asked Fort Worth PD for cash for any of his

8    time volunteering?

9    A.    No, not to my knowledge.

10    Q.    Never asked Fort Worth Police Department for all his

11    time volunteering?

12    A.    No.

13    Q.    And would it be safe to say that by the estimate of

14    what you've given about how Joe DeLeon volunteers with the Fort

15    Worth PD, and how long he's volunteered, that he has spent

16    hundreds if not thousands of hours volunteering for the Fort

17    Worth Police Department?

18    A.    I would say that is a fair estimate.

19    Q.    And to your knowledge, during any of those points,

20    has Joe DeLeon ever got reimbursement for any of that volunteer

21    time?

22    A.    Not to my knowledge.

23    Q.    Okay.  Speaking of knowledge, you don't have any

24    personal knowledge of the facts of this case, right?

25    A.    That is correct.

1    Q.   So you are not aware that Joe DeLeon agreed to act as

2  a federal probation officer for Casi Thompson?

3    A.   I am not.

4    Q.   Okay.  But based on what you do know of Joe DeLeon,

5  and his employment and background, there's no basis for him to

6  be a federal probation officer for anyone; is that right?

7    A.   I'm not sure what the criteria is to be a federal

8  probation officer, but I wouldn't think so.

9    Q.   So you don't know him to be employed by a probation

10 office?

11   A.   No.

12   Q.   You don't know him to be employed by a court?

13   A.   No.

14   Q.   You don't know him to be employed by a federal

15 agency?

16   A.   That is correct.

17   Q.   Okay.  And from what you know of Joe DeLeon, you know

18 of no reason why he would think that he could be somebody's

19 federal probation officer?

20   A.   I think he may be gullible enough that if someone

21 told him -- someone within the federal system told him he was,

22 he would think he was.

23   Q.   You're telling me that somebody who has volunteered

24 for thousands of hours with the Fort Worth Police Department,

25 that the Fort Worth Police Department entrusts to go out in the

1    community and represent them, and be in leadership positions,

2    you believe that that person would turn around and, if someone

3    said, you are a federal probation officer, they'd believe that?

4         A.   It would have to be someone he trusted.  And someone

5    with -- with an actual background.

6         Q.   And you believe that Joe DeLeon, with all of his

7    knowledge of law enforcement, would say, you can anoint me a

8    federal probation officer?

9         A.   I have no idea what he'd believe.

10        Q.   Okay.  Does it surprise you to know that Joe DeLeon

11   acted as someone's federal probation officer for years?

12        A.   It would.

13        Q.   Would it surprise you to learn that within the first

14   60 days of acting as a federal probation officer, he received a

15   $40,000 truck from that, quote, probationer?

16        A.   Yeah, that would not be right.

17        Q.   I'm sorry, what was that?

18        A.   That would not be right.  Doesn't sound right.

19        Q.   Would you be surprised to learn that in the first

20   60 days of acting as a, quote, federal probation officer, that

21   Joe DeLeon accepted $15,000 from that federal probationer?

22        A.   I would be surprised.

23        Q.   Going back to your question about -- or your answer

24   about if somebody that he trusted, you know, said that he was a

25   federal probation officer.  Do you believe he trusted you as a

1    Fort Worth police officer?

2         A.   Yes.

3         Q.   So do you think if you told Joe DeLeon, you are a

4    Fort Worth police officer, he'd believe it?

5         A.   I don't think he'd believe that he could be a police

6    officer.  Something else within the system, I might could have

7    convinced him of.

8         Q.   Including a court officer?

9         A.   Does he even know what a court officer is?

10        Q.   No, my question to you is, do you think even a court

11   officer?

12        A.   That he could believe that he was a court officer; is

13   that what you are asking me?

14        Q.   Yes.

15        A.   And my response was, I'm not sure he would even

16   understand what a court officer is.

17        Q.   In his training with the Code Blue, you said that

18   they're the eyes and ears and they are told to report if -- if

19   something doesn't look right, to report it?

20        A.   Correct.

21        Q.   Okay.

22        A.   They knew their neighborhood better than, you know,

23   we do.  It's their neighborhood.

24        Q.   So you'd agree, then, that Joe DeLeon knows and

25   apparently has been trained that if something doesn't look

1    right, to report it to law enforcement?

2        A.   Correct.

3        Q.   To ask law enforcement?

4        A.   Correct.

5        Q.   To bring it to someone's attention?

6        A.   Correct.

7        Q.   Those 40 or 50 officers that he --

8             MR. SELLERS:  Object to asked and answered.

9             THE COURT:  Overruled.

10       Q.   To those 40 or 50 officers that he knows?

11       A.   He could.

12       Q.   Now, you have testified that you believe Joe DeLeon

13   to be an honest person; is that correct?

14       A.   That is correct.

15       Q.   Truthful person?  You'd agree with me that an honest

16   person wouldn't pretend to be someone's federal probation

17   officer knowing they had no authority to do so; would you agree

18   with that?

19       A.   I do agree with that.

20       Q.   And you'd agree that an honest person would answer

21   questions that law enforcement asked them truthfully, correct?

22       A.   Correct.

23       Q.   Would you agree they would do that the first time

24   they're asked a question?

25       A.   I would say so.

1      Q.   How about the second time they're asked a question?

2      A.   I would say so.  They shouldn't have to ask a second

3   time.

4      Q.   What about the third time they are asked that same

5   question?

6      A.   Same.

7      Q.   And what about the fourth time they're asked that

8   question?

9      A.   Right.

10              MS. MAX:  Pass the witness.

11              THE COURT:  All right.

12              MR. GALLIAN:  Mr. Thompson, thank you for your

13   time; thank you for your service.  I have no questions.

14              THE COURT:  Any objection to me excusing this

15   witness?

16              MR. SELLERS:  I have some redirect, Your Honor.

17                    REDIRECT EXAMINATION

18   BY MR. SELLERS:

19      Q.   Would it surprise you to know that the lady who gave

20   those things to Joe said they were gifts?

21              MS. MAX:  Objection.  This -- facts outside this

22   witness' knowledge.

23              MR. SELLERS:  I think it is fair game at this

24   point.

25              THE COURT:  Okay.  I'll allow it.

1    A.    I would be surprised.

2    Q.    Because of the way she asked the questions, it's not

3  really in context, is it?

4    A.    If it's a gift, then that does blur the line.  But

5  excessive gift.

6    Q.    I agree.  But let's just say -- you ever know

7  somebody that won the lottery?

8    A.    Unfortunately, no.

9    Q.    Fair enough.  Fair enough.  You ever seen somebody

10  who lives paycheck to paycheck?

11    A.    Absolutely.

12    Q.    All right.  People who spend money as fast as it

13  comes in?

14    A.    Yes.

15    Q.    All right.  And if the young lady who gave the truck

16  to Joe says she gave the truck to Joe, a gift is not a fraud,

17  is it?

18              MS. MAX:  Objection; calls for speculation and a

19  legal conclusion.

20              THE COURT:  Overruled.

21    A.    I would say, no, it's not fraud if it is a gift.

22    Q.    And you've dealt with lots of citizens, haven't you?

23    A.    Yes.

24    Q.    When you show up at a citizen's door and knock on the

25  door at 7:00, 8 o'clock in the morning and they are sleeping --

1  you ever done that before?

2      A.    Many a time.

3      Q.    Are they always the most awake and alert when they

4  first come to the door?

5      A.    Nope.

6      Q.    And let me -- are people generally nervous when the

7  police show up at their house unannounced?

8      A.    Yes.

9      Q.    And then if they ask you to follow them over to the

10  police station, do they get sometimes a little more nervous?

11      A.    Yes.

12      Q.    How about if you then start asking them questions in

13  vague terms about what happened 4-, 5-plus years ago, do you

14  always get the most accurate information?

15      A.    No.

16      Q.    Does that mean they're lying to you?

17      A.    No.

18      Q.    Well, if -- just to put this -- what the evidence has

19  been is that there was one meeting where Joe forgot to mention

20  a $15,000 check she wrote him, and then the second meeting, on

21  his own, he offers that information.

22              MS. MAX:  Objection; Defense counsel is

23  testifying.

24              THE COURT:  Sustained.  There is no question

25  there.

1     Q.    Would it surprise you that it took Joe until the

2  second meeting to tell the officer about a $15,000 check?

3              MS. MAX:  Objection; Defense counsel testifying

4  and asking this witness for facts outside of his knowledge.

5              THE COURT:  You'll have to explain how he would

6  know that.

7     Q.    Do you remember her questions?

8     A.    Yes.

9     Q.    How about do you think somebody would, you know, tell

10  them the first, second, third, fourth time?

11     A.    Yes.

12     Q.    Let me ask you this.  If you don't ask a suspect

13  about something, are they just automatically lying if they

14  don't offer it themselves?

15     A.    No.

16     Q.    So if Joe were never asked about, for example, a -- a

17  check that was given to him after he was given the truck, if he

18  was never asked by anybody about that, and he didn't say

19  anything about that, is that lying?

20     A.    No.

21              MR. SELLERS:  If I could have just one moment,

22  Your Honor?

23              THE COURT:  Sure.

24              (Brief pause.)

25     Q.    I want to show you a series of texts that are in

1    evidence.

2                    MS. MAX:  Objection, Your Honor.  This is

3    improper character testimony.  This witness has no personal

4    knowledge of any evidence in this case.

5                    MR. SELLERS:  I haven't asked a question.

6                    THE COURT:  I'll let you -- I'll hold that

7    objection in abeyance until I hear more.

8        Q.   I'll represent to you -- you can see the green ones

9    here on the screen?

10       A.   Yes.

11       Q.   The blue ones also?

12       A.   Yes.

13       Q.   All right.  If I represent to you that the evidence

14   has been that this is -- blue is Bill Stone's messages.

15                   MS. MAX:  Objection, again, Your Honor.  He's --

16   this is outside the scope of character evidence.  He's not --

17   he's not an expert -- he's not been named as an expert witness.

18   Nor does he have facts --

19                   THE COURT:  Okay.

20                   MS. MAX:  -- personal knowledge of this.

21                   THE COURT:  No speaking objections.  I'll

22   sustain.

23                   He's not an investigator.

24                   MR. SELLERS:  Your Honor, may we approach?

25                   THE COURT:  No.

1          MR. SELLERS:  Okay.

2     Q.   Do you know what a chain of command is?

3     A.   Yes.

4     Q.   If someone talks about passing stuff on to their

5   chain of command, who do they usually mean to?

6     A.   The next person higher up the level than they are.

7     Q.   And if somebody were to convince Joe to believe that

8   they had a chain of command, and even though they were retired

9   from the FBI, but still an active contractor, do you believe

10  that's something Joe could fall for?

11          MS. MAX:  Objection; leading.

12          THE COURT:  Sustained.

13    A.   I do believe that Joe --

14          MS. MAX:  Your Honor?

15          THE COURT:  If you could rephrase your question.

16          THE WITNESS:  I'm sorry, Your Honor.

17          THE COURT:  That's okay.  That's okay.  I know

18  you are doing the best you can.

19          If you will just rephrase your question, please.

20          MR. SELLERS:  Yes, ma'am.

21          THE COURT:  And if you still need to approach,

22  you can.  But if you don't, let's keep going.

23          MR. SELLERS:  No.

24    Q.   Can you talk to us about the difference between a

25  probation officer and just a mentor?

1      A.   Well, to my knowledge, a probation officer has the

2   legal obligation and authority to actually oversee a person's

3   activities once they're released from custody.  Whereas a

4   mentor is just someone who's trying to help you and point you

5   in the right direction.

6      Q.   And do you think it's in Joe's character to be

7   convinced that he was a mentor for a federal probationer?

8                MS. MAX:  Objection; improper character

9   testimony.

10                THE COURT:  Sustained.

11      Q.   If Joe were told a federal judge requested him to be

12   a mentor for a federal probation officer -- or a federal

13   probationer, rather, do you believe that Joe might believe

14   something like that, based on you knowing his character?

15                MS. MAX:  Objection; speculation.

16                THE COURT:  Overruled.

17      A.   I would think under those context that Joe would

18   believe that.

19      Q.   And you can tell they don't, right?

20                MS. MAX:  Objection; sidebar.

21                THE COURT:  Sustained, sustained.

22                MR. SELLERS:  Pass the witness.

23                MS. MAX:  The government has no further

24   questions of this witness.

25                THE COURT:  Anything further from anybody?

```
 1                    MR. SELLERS:  No, ma'am.

 2                    MR. GALLIAN:  No, Your Honor.

 3                    THE COURT:  Sir, thank you so much for coming

 4   today.  We appreciate you being here, and you have a good rest

 5   of your day.

 6                    THE WITNESS:  Thank you.

 7                    (Witness excused.)

 8                    MR. SELLERS:  Your Honor, we'd call Becky

 9   Romero.

10                    MS. MAX:  May we approach?

11                    THE COURT:  You may.

12                    (Sidebar conference, off the record.)

13                    (Witness sworn.)

14                    THE COURT:  With that said, your witness.

15                         REBECCA ROMERO,

16   having been first duly sworn, testified as follows:

17                       DIRECT EXAMINATION

18   BY MR. SELLERS:

19        Q.   Ms. Romero, could you please introduce yourself to

20   the jurors?

21        A.   Yes, my name is Rebecca Romero.

22        Q.   What do you do for a living?

23        A.   I'm a Fort Worth police officer.

24        Q.   How long have you been a Fort Worth police officer?

25        A.   26 years.
```

1    Q.   And before we both get in trouble, I got to finish

2    the question.  If you could just take a quick beat in your head

3    before you answer so that we don't get yelled at, I'm --

4    A.   Okay.  I'm sorry.

5    Q.   -- I'm sensitive.

6            So how many years did you say?

7    A.   26.

8    Q.   So about the same amount of time as Officer Thompson?

9    A.   Sure.  I'm not sure.

10    Q.   Okay.  Fair enough.  And where is your beat or your

11    area that you patrol?

12    A.   Right now I actually work in the youth division.

13    Q.   Okay.  Why don't you walk us through your police

14    career and tell us where all you've been and what you've done.

15    A.   I actually started in east Fort Worth in patrol.

16    Which back then it's called the weed and seed (phonetic).  And

17    then I moved to north patrol.  And then after a little while

18    there, I went back to east patrol.  And then after that, I went

19    back to central patrol.  And then after that, I went to west

20    patrol.  And then I went back to central patrol.  And now in

21    youth division.

22    Q.   So you've been everywhere but south?

23    A.   Well, actually, central back then was south.

24    Central, south worked together.

25    Q.   And what years was that that you were in central?

 1      A.   Let's see.  Let's see.  I started in '96.  Let's see.

 2  So it was around -- like 2000, maybe.

 3      Q.   Okay.  Gotcha.  And when did you -- let me ask you

 4  this.  Do you know the gentleman seated over there -- or

 5  standing now at the table over there?

 6      A.   Yes, I do.

 7      Q.   How do you know him?

 8      A.   I know him because I used to patrol in the area where

 9  his restaurant used to be.

10      Q.   And tell us a little bit about the restaurant.

11      A.   It was a mom-and-pop-type restaurant.  It was like a

12  taqueria, so it was -- you know, always people in and out.

13      Q.   Was it more of like a taco truck or like a

14  stand-alone place?

15      A.   No, it was actually a -- a building.  Attached next

16  to it, it was -- on one side it was a bar and then taqueria.

17  And then it was a laundromat.  So it was like a -- like a

18  little strip, but he was like in the middle.

19      Q.   Sounds like a good place to spend a Saturday?

20      A.   Yeah, a lot of family went there.

21      Q.   All right.  Did you ever go into his restaurant?

22      A.   Yes, I did.

23      Q.   Few or many times?

24      A.   Many times.

25      Q.   And is that how you met Joe?

1      A.    I actually met Joe in a different situation.

2      Q.    Tell us about it.

3      A.    I actually was dealing with a homeless in the park.

4  And normally we had our problems with the homeless in that

5  park.  And so I was dealing with him and I could see a

6  gentleman in the far, like behind me.  And since we've been

7  trained to like check our surroundings, I kept seeing him.

8  Like I was trying to be -- like I didn't know him.  So I was

9  like cautious.  So after I was done with the gentleman in the

10  park, then this gentleman approached me.  It happened to be

11  Joe.

12            Joe says, I'm watching your back.  I just wanted

13  to make sure you were okay.  So that is how I met Joe.

14      Q.    Did you come to learn that this was kind of a common

15  thing that Joe did?

16      A.    Yes.

17      Q.    Tell us how you learned that or what other kind of

18  similar experiences you've had.

19      A.    Joe would be around police all the time.  He helped

20  us with bar checks.  He would help us with any situation we

21  wanted.  If we needed him, he was always there.  Always --

22  never -- if we said, Joe, we need help.  Joe was there.  Never

23  questioned.  He never -- just helped.  He always helped.

24      Q.    And would you say that was like 1 or 2 times?

25      A.    Oh, no.  This happened -- the 20 years I know Joe,

1  this is Joe.

2      Q.    Like all the time?

3      A.    All the time.

4      Q.    When you say "bar checks" --

5      A.    Yeah, we --

6      Q.    -- what do you mean?

7      A.    -- we used to be -- in central patrol, we had a lot

8  of bars.  And we'd do bar checks to make sure there was no

9  under drinking [sic], there was no illegal activities going on,

10 stuff like that.

11     Q.    Why would you need Joe's help for that?

12     A.    Joe would help -- even though I spoke Spanish, he was

13 also an interpreter.  He always helped interpreting.  And

14 sometimes he knew more people in the community, because he was

15 real community oriented.  You know, he dealt with a lot of

16 people, so people -- people knew Joe.

17     Q.    Did you know Joe to be involved with the Citizens

18 Police Academy?

19     A.    Yes.

20     Q.    What did you understand his involvement to be?

21     A.    Well, I didn't -- I know he was involved.  I don't

22 know exactly what he did, because I didn't actually attend

23 their meetings.  But I know he was involved into it.  I know

24 that he did a lot of community service with the -- you know,

25 with the Citizens Patrol and all -- you know, anything to do

1    with police, he was always involved.

2        Q.   Let me ask you this.  Prior to this and even -- we've

3    been talking and you've been on our witness list since

4    February, right?

5        A.   Yes.

6        Q.   I mean, we talked back, you know, I think, close to

7    New Year's or Christmas, and then again as this trial

8    approached, right?

9        A.   Correct.

10       Q.   Has anybody in that time from the FBI reached out to

11   you to ask what you know about Joe?

12       A.   No.

13       Q.   Anybody from the Texas Rangers?

14       A.   No.

15       Q.   Anybody from the Department of Justice Office of

16   Inspector General?

17       A.   No.

18       Q.   And if they had called you, would you have been happy

19   to tell them about all of the things that you know about Joe?

20       A.   Yes.

21       Q.   Let me ask you this -- well, first of all, the other

22   night, did I send you a copy of the indictment charging Joe

23   with conspiracy to commit wire fraud?

24       A.   Yes.

25       Q.   So did you have a chance to read it?

```
 1        A.    Yes.

 2        Q.    And let me ask you first.  Is the Joe you know

 3   consistent with the character -- the allegations against him in

 4   the indictment?

 5              MS. RUDOFF:  Objection, Your Honor.  This is

 6   under -- improper under 701, 702 and 608.

 7              THE COURT:  Overruled.

 8        Q.    Is the character of the Joe you know consistent with

 9   the allegations in the indictment?

10        A.    No.

11        Q.    One thing you mentioned is you have been around Joe

12   quite a bit, right?

13        A.    Yes.

14        Q.    And one thing stuck out to you in the indictment.

15   What was that?

16              MS. RUDOFF:  Objection, Your Honor.  This is an

17   opinion on the evidence in the case.

18              THE COURT:  Overruled.

19        Q.    What was that?

20        A.    It said that Joe always wore a gun -- that he was

21   wearing a gun.  Joe always wore a gun.  Joe always -- the time

22   that I've ever known him, he always has a license to carry and

23   he is always wearing a gun.

24        Q.    And has he ever been unsafe with it in any way?

25        A.    No.
```

1    Q.    And carrying a gun is perfectly legal, isn't it?

2    A.    Yes, in Texas.

3    Q.    And Joe carrying with a license on his hip is

4    perfectly legal, isn't it?

5                MS. RUDOFF:  Objection to leading.

6                THE COURT:  Sustained.

7    Q.    Is -- would it be legal, if a person were to carry --

8    if they have a license to carry -- I guess not even anymore --

9    but on their hip, openly?

10                MS. RUDOFF:  Same objection, Your Honor;

11   leading.

12                THE COURT:  I'll give a little latitude.

13   Q.    Would it be legal to wear a gun on your hip?

14   A.    Yes, it is legal.

15   Q.    And so I guess that wasn't really a surprise to you,

16   was it?

17   A.    No.

18   Q.    Let me ask you, in the time you've known Joe, have

19   you formed an opinion about his character for telling the truth

20   and being honest?

21   A.    Yes.

22   Q.    And what is that opinion?

23   A.    Joe's always been very helpful.  He never -- all the

24   times that I've seen him help citizens, from all walks of life,

25   he's never asked anything for return.  He's never -- even in

1    law enforcement, he's always -- is willing to help without

2    asking for any explanations.  Joe trusts police or law

3    enforcement to the max.  It's like a lot.

4         Q.    Would you say that Joe trusts law enforcement more

5    than the average bear?

6         A.    Yes.

7         Q.    How about this, do you have an opinion or have you

8    formed an opinion about Joe's character for dedication and

9    unquestioning support of law enforcement?

10        A.    Yes.  He -- he trusts and supports police, any type

11   of law enforcement, anything.  Anything that's to do with law

12   enforcement, he does not question; he trusts.

13        Q.    Do you -- knowing the character of Joe, do you

14   believe that if asked about his knowledge of facts and things

15   that happened, that he would be an honest answerer of those

16   questions if they had been asked of him?

17        A.    Yes.

18        Q.    When is the last time you saw Joe?

19        A.    About five years.

20        Q.    So we're in 2023.  So about 2017, '18?

21        A.    I -- around about that time.

22        Q.    And so kind of right in the middle of all of the

23   stuff that was going on in the indictment that I sent you?

24        A.    Correct.

25        Q.    And, you know, it's been a few years, right?

1        A.    Yes.

2        Q.    How can you assure this jury that Joe hadn't become

3    some fraudster that you just have no idea about in those last

4    five years?

5        A.    The 20 years that I've known Joe, Joe's always been

6    the same.  He's never changed, never varies.  He's always been

7    constant, the same person.

8        Q.    Thank you for being here today.  And thank you for

9    your service.

10                  MR. SELLERS:  I'll pass the witness.

11                  THE COURT:  Members of the jury, are we doing

12   okay?

13                  (Respond affirmatively.)

14                  THE COURT:  Ma'am, are you all right?

15                  THE WITNESS:  Yes, ma'am.  Thank you.

16                       CROSS-EXAMINATION

17   BY MS. RUDOFF:

18       Q.    Good afternoon.  My name is Jenna Rudoff, and I'm one

19   of the prosecutors for the government in this case.  We've

20   never met before, correct?

21       A.    Correct.

22       Q.    And you said you've been employed with Fort Worth PD

23   for 26 years, right?

24       A.    Correct.

25       Q.    And as an officer, you understand your duties serving

```
 1    as a police officer?
 2         A.   Correct.
 3         Q.   And the obligations that come with being a police
 4    officer, right?
 5         A.   Correct.
 6         Q.   And part of that is knowing what you are allowed to
 7    do legally, right?
 8         A.   Correct.
 9         Q.   And you said you've known Joe DeLeon for, fair to
10    say, over 20 years?
11         A.   Correct.
12         Q.   And you mentioned that you know he's been involved in
13    the Fort Worth PD, the Citizens on Patrol, right?
14         A.   Correct.
15         Q.   And the citizens academy?
16         A.   I don't know about the police academy, but I know
17    Citizens on Patrol for sure.
18         Q.   And you know that you are not the only law
19    enforcement officer that he knows well, right?
20         A.   Correct.
21         Q.   In fact, he seems to know a lot of people at Fort
22    Worth PD; is that fair to say?
23         A.   Yes.
24         Q.   And he interacts with a lot of law enforcement, at
25    least at Fort Worth PD, right?
```

1        A.    Yes.

2        Q.    And these include chiefs and sergeants, right?

3        A.    At least sergeants, that I know.  I don't know about

4   the chiefs, but sergeants I knew.

5        Q.    Based on this interaction, would you agree that

6   Joe DeLeon knows more than the average person about how law

7   enforcement works?

8        A.    At least what patrol is, he -- he kind of knew.

9        Q.    And would you say that he has more than the average

10  person's knowledge about how the criminal justice system works?

11       A.    I'm assume so, since he's around police all the time.

12       Q.    And from what you know with Joe DeLeon's contacts in

13  law enforcement, do you believe that if he had a question about

14  whether something was a crime or not, that he could come and

15  ask you about it?

16       A.    If it was coming from a law enforcement asking --

17  telling him, no, he would not ask.  If it was coming from a

18  citizen, yes, he probably would have asked.

19       Q.    So it is your position that Joe will do anything a

20  law enforcement officer tells him to do?

21       A.    Yes.

22       Q.    So if a law enforcement officer told Joe DeLeon to

23  come into this courthouse with a gun and scream and start

24  shooting, you really believe Joe DeLeon would do that?

25       A.    Now, I don't think Joe would commit a crime if he was

1    told to do it.

2         Q.   So he would do what a law enforcement officer said as

3    long as it wasn't committing a crime?

4         A.   As long as he knew it was not committing a crime, he

5    would not do it.

6         Q.   Okay.  Now, you know as a police officer it's illegal

7    to take money from a defendant in a case, right?

8         A.   Correct.

9         Q.   And I'm pretty sure I can safely say you yourself

10   have never taken money from a defendant in a criminal case you

11   were handling?

12        A.   Correct.

13        Q.   And you'd agree that doing so would be illegal?

14        A.   Yes, it's illegal.

15        Q.   And you would report -- if you found out another

16   officer was doing that, you would report that officer, right?

17        A.   Yes, I would.

18        Q.   And Fort Worth PD volunteers, they are not paid,

19   correct?

20        A.   Correct.

21        Q.   And you wouldn't expect a Fort Worth PD volunteer to

22   accept money for their services, right?

23        A.   Correct.

24        Q.   Because that is wrong?

25        A.   I'm assuming.

1      Q.   And so Joe DeLeon, as a volunteer for Fort Worth PD,

2  would also know that's wrong?

3      A.   I hope so.

4      Q.   And as far as you know, in all the time and years

5  that Joe DeLeon has been a volunteer for Fort Worth PD, he's

6  never asked for payment, right?

7      A.   Not in my presence, he's never asked.

8      Q.   Because he's volunteering his time, correct?

9      A.   Correct.

10     Q.   And so you've never known him to expect payment for

11  his volunteering of time, right?

12     A.   Correct.

13          MR. SELLERS:  Your Honor, can we have just a

14  second?

15          (Brief interruption.)

16     Q.   And to be clear, you don't have any personal

17  knowledge about the facts of this case?

18     A.   No, I don't.

19     Q.   And so other than Defense counsel showing you the

20  indictment and telling you what it said, you have no personal

21  information to offer?

22     A.   No, I don't.

23     Q.   So you are not aware that Joe DeLeon agreed to act as

24  a federal probation officer?

25          MR. SELLERS:  Object to speculation.  She just

1    said she didn't know.

2              THE COURT:  Overruled.

3    Q.    I'll repeat my question.  You are not aware that

4    Joe DeLeon agreed to act as a federal probation officer?

5    A.    No, I did not.

6    Q.    Do you -- are you aware of anything in Joe DeLeon's

7    background that would give him the ability or authority to be a

8    probation officer?

9    A.    No, I don't.

10   Q.    You've never known him to work for a court, right?

11   A.    No, I don't.

12   Q.    Or a probation office, right?

13   A.    No, I don't.

14   Q.    And because you don't have any personal knowledge of

15   this case, would you expect the investigators investigating the

16   case to ask you about the case?

17   A.    No.

18   Q.    So it made sense to you that you didn't get a call

19   from DOJ-OIG about this case, right?

20   A.    Correct.

21   Q.    And it would make sense to you that you didn't get a

22   call from the Texas Rangers about this case, right?

23   A.    Correct.

24   Q.    As far as you know of Joe DeLeon, do you believe

25   there is any reason he would think he could be a probation

1  officer?

2      A.    No.

3      Q.    And you said you know Joe DeLeon to be an honest

4  person, right?

5      A.    Yes, I do.

6      Q.    And a truthful person?

7      A.    Yes, I do.

8      Q.    And you'd agree with me that an honest person

9  wouldn't pretend to be a probation officer knowing they didn't

10  have the authority to do so?

11      A.    Correct.

12      Q.    And knowing what you testified to, Joe DeLeon's

13  respect and -- well, respect of law enforcement, you would

14  expect Joe DeLeon to be forthcoming with any information to law

15  enforcement when he's asked questions, right?

16      A.    Yes.

17      Q.    And you would expect that Joe DeLeon would answer law

18  enforcement questions fully and honestly, right?

19      A.    Yes.

20      Q.    You'd agree that someone who repeatedly lies to law

21  enforcement is not an honest person?

22      A.    Correct.

23      Q.    And you would agree that when law enforcement is

24  asking questions about financial transactions and sharing of --

25  or financial transactions related to a case, an honest person

1   would give information related to those questions?

2       A.   Yes.

3            MS. RUDOFF:  Pass the witness.

4            THE COURT:  All right.

5            MR. SELLERS:  Briefly.

6            THE COURT:  I think it is his turn.

7            MR. GALLIAN:  No questions, Your Honor.

8            THE COURT:  All right.  Thank you.

9                    REDIRECT EXAMINATION

10  BY MR. SELLERS:

11      Q.   Quickly, Ms. Romero.  What if the evidence was not

12  that he was a probation officer, but a mentor commissioned by

13  the federal judge at the -- via a former federal agent who he

14  believes is still a federal agent, would that change your

15  opinion?

16           MS. RUDOFF:  Objection to leading.

17           THE COURT:  Sustained.

18      Q.   Okay.  If the evidence was that he was a mentor and

19  not a probation officer, would that change your opinion?

20      A.   Yes.

21      Q.   If Joe believed that a federal judge asked him to be

22  a mentor, do you think that's within Joe's character to believe

23  that he's helping?

24           MS. RUDOFF:  Objection; leading.

25           THE COURT:  I'll give you some latitude.

```
 1   Overruled.
 2        Q.   To believe that he's helping?
 3        A.   Definitely.
 4        Q.   Does Joe have character for helping people?
 5        A.   Yes, he does.
 6        Q.   Drug addicts?
 7        A.   Anybody.
 8        Q.   Homeless people?
 9        A.   Yes.
10        Q.   People who are influential and people who are not?
11        A.   Yes, anybody.
12        Q.   And is that kind of just how he is?
13        A.   Yes, that's how Joe is.
14             MR. SELLERS:  Pass the witness.
15             MS. RUDOFF:  Nothing further, Your Honor.
16             THE COURT:  All right.  Any objection to me
17   excusing this witness?
18             MR. GALLIAN:  No, Your Honor.
19             MR. SELLERS:  Our last one for the day is here
20   if we want to power through.
21             (Reporter request.)
22             (Jurors exit courtroom.)
23             (Brief recess.)
24             (Witness sworn.)
25             THE COURT:  Your witness, sir.
```

1                       JAMES MILLER,

2    having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. SELLERS:

5        Q.   Sergeant Miller, could you please introduce yourself

6    to the jury?

7        A.   I'm James Michael Miller.  I'm retired from Fort

8    Worth police; retired as a sergeant.  I was a sergeant for

9    24 years; retired after 32 years.  And then they sucked me back

10   in to be a part-time civilian.

11       Q.   What does a part-time civilian do?

12       A.   I'm the desk person when you come into a substation

13   or a division headquarters.

14       Q.   All right.  And so you get to be in charge, so to

15   speak, of that little area?

16       A.   Yes, sir.  That's my area.

17       Q.   That is your domain?

18       A.   Yes, sir.

19       Q.   All right.  Do you know the gentleman seated over

20   here to my left, your right?

21       A.   Yes, sir, I do.

22       Q.   How do you know him?

23       A.   I met Mr. DeLeon when I was a neighborhood --

24   neighborhood police sergeant, which is community policing.

25       Q.   All right.  Tell us a little bit about community

1  policing.

2      A.   We -- Fort Worth was a forefront on starting what

3  they call NPO program, Neighborhood Police Officers, where

4  officers, instead of having to go from call to call like a

5  regular patrol officer, they were assigned a geographical beat.

6  And they would be the problem solvers for that beat.  It would

7  be like the patrol officers, they would be ambulance attendants

8  on a problem.  They put a Band-Aid on.  NPOs then would go in

9  and do the surgery, whatever needed to make the problem,

10  whether it be criminals -- whatever they could do to solve the

11  problems.

12      Q.   What kind of problems would y'all deal with, just

13  curious?

14      A.   Burglary -- burglaries, auto thefts, sex crimes.  Big

15  ones were domestic disturbances and neighborhood disturbances.

16      Q.   Gotcha.  And so how did you meet Joe through that

17  process?

18      A.   He became what we call a -- a COP, which is Citizen

19  on Patroller.  And they were civilians we had a training class

20  for, and I was one of the instructors for it.  And he lived --

21  he -- had a -- two restaurants technically in our geographical

22  area.

23      Q.   The central division?

24      A.   Well, at that time they called it south division.

25  Hospital district.

1    Q.   Gotcha.

2    A.   And he volunteered to assist us whenever we needed

3    for anything that might need bilingual speakers.

4    Q.   What kind of stuff just to give us an idea?

5    A.   We would assist TABC, Texas Alcohol and Beverage

6    Commission, on joint exercises.  Bar checks.  Let's call it

7    that.

8    Q.   Sure.

9    A.   And a lot of our areas were Hispanic.  And so they --

10   we didn't want any problems; we just needed to make sure

11   everything's good.

12   Q.   Be able to communicate?

13   A.   Yes.  And we only had a few officers, very few

14   officers at that time that could speak Spanish.

15   Q.   So how would Joe help you guys?

16   A.   He would translate for us as needed.  If we are

17   interviewing somebody, whether it be a complainant, a victim of

18   something, or the suspect.  And he would translate it for us

19   and then it would go to the detective it needed to be.  It

20   would go to a detective's office from there.

21   Q.   Well, what other involvement has Joe had with the

22   Fort Worth PD while you were around?

23   A.   He -- anything we had that needed citizen support

24   group.  Let's call it that.  If they -- it's hard to say.

25   Because any time we would put a call out, saying -- I'm

1   sorry -- that we needed somebody -- people just to help us.  It

2   might be if we had a major disaster in the area, we would put

3   up the barricades, but we couldn't staff the barricades

4   normally, completely.

5              And so they -- we'd trained them how -- not to

6   direct traffic, but to -- we had -- they had safety vests, and

7   they would stand there on the inside of the barricades and make

8   sure and tell people, no, you can't come through here, and give

9   them directions to wherever they need to go.  Do the

10  barricades.

11      Q.   So like if there was a -- you know, say we had a

12  summer unlike this one and it rained a whole lot and there was

13  a flood on the street and y'all would put up barricades, is

14  that kind of --

15      A.   We had several -- we had several good areas that

16  would flood up -- and also, we'd have fires.  They wouldn't be

17  close to the fires, by the way.  But they -- we've had problems

18  around the hospital district where something might have

19  happened.

20              Major accidents where they're not in the

21  roadway, but they're just a support service.  If officers were

22  out there directing traffic, and they needed -- they'd been out

23  there three hours, they would bring them a bottle of water.

24  Any way to support us as a -- a support service to the police.

25      Q.   What about SWAT callouts?  Did y'all ever need

1   Spanish speakers on SWAT callouts?

2       A.   I know they did, but I was not personally involved in

3   any of the SWAT callouts.

4       Q.   Fair enough.  And they would be the same type to

5   handle hostage-type situations as well?

6       A.   We actually have trained hostage negotiators.  And if

7   we need a -- whatever -- whether it be a Spanish speaker or

8   something, we can -- we will get them from the police

9   department somewhere.

10      Q.   Okay.  Fair enough.  Have you ever used Joe as an

11  interpreter?

12      A.   Yes, sir.

13      Q.   For what kind of situations?

14      A.   The biggest ones, like I said, would be when we were

15  assist -- called to assist the alcohol and beverage control,

16  and you'd have a bar with 200, 300 people in it and you are

17  trying to interview people.  Joe was always there to assist us.

18  Many of the patrons spoke English.  Some spoke no English.

19  Some spoke a little of each.  I speak a little Spanish, but I

20  am not even close to being fluent.

21      Q.   Como estas?

22      A.   Bien, bien.

23      Q.   So let me ask you this.  What is a peer's

24  coordinator?

25      A.   I'm sorry?

1      Q.    Peer's coordinator?

2      A.    Peer's coordinator?

3      Q.    Yes, sir.

4      A.    The peer's program is -- now, I'm not well versed in

5  it.  They started that after my retirement.

6      Q.    Okay.

7      A.    It's a group of officers that serve as peer

8  counselors.  If an officer or even a civilian employee has a --

9  let's say an emotional problem, which are -- is quite common in

10  police work, they needed -- they need somebody that can

11  understand what they're talking about.

12            I hope no one is a psychiatrist in here, because

13  you could send them to psychiatrists -- which is all well and

14  good.  We'd end up doing that, believe me.  But a lot of times

15  they needed to be debriefed and just have -- be able to talk to

16  a police officer or a civilian that understood at least what

17  they were going through.  Usually these are times of crisis in

18  the officer's or civilian's life, whether it be family related

19  or on-duty related.

20      Q.    When's the last time you had contact with Joe DeLeon?

21      A.    I have not -- I don't believe I've spoken to Joe

22  since my retirement party.

23      Q.    When was that?

24      A.    That was January -- February 1st of -- I think of

25  2008.

1          Q.    Okay.   Congratulations.

2          A.    Thank you.

3          Q.    And then you got sucked back in?

4          A.    Yeah, I was gone for three years.

5          Q.    That's not very long.

6          A.    No.

7          Q.    Well, let me ask you.   In the -- how many years do

8    you think you've known Joe?

9          A.    Probably -- let's see.   I'm not good at math.   That

10   was never my strong suit.   I'd say 35 -- yeah, 35 to 40 years.

11         Q.    All right.   When's the last time you talked to Joe?

12         A.    I do not know.   I mean, I know that we shared some

13   comments on social media.   But that's not a conversation.

14         Q.    Sure.   I got it.

15         A.    Not the way I do it.

16         Q.    Right.   Let me ask you, in the time that you've known

17   Joe, 35 years or -- or however long, have you formed an opinion

18   about his character for telling the truth and being honest?

19         A.    Yes, sir.

20         Q.    Do you believe that if Joe DeLeon were asked specific

21   questions that he'd give direct answers to those?

22         A.    Yes, sir.

23         Q.    And if he were not asked direct questions, and he

24   doesn't give the answers that apparently he's supposed to,

25   would that be a lie?

1      A.   If he gave an answer that was -- that he knew was

2  untruthful?

3      Q.   Uh-huh.

4      A.   That's a lie.  And I've never known him to lie to me.

5      Q.   Would you say his character for telling the truth and

6  being honest is good or bad?

7      A.   Very good.

8      Q.   How about his character for unquestioned support and

9  dedication to law enforcement?

10     A.   Joe is 100 percent supportive of any law enforcement

11 agency.  He -- if he has a fault, that is his fault, that he

12 wants to help law enforcement.

13     Q.   I've sent you the indictment by e-mail.  We talked --

14 you are not really an e-mailer; is that fair?

15     A.   I did get -- yes, sir, I did read it.

16     Q.   Great.  Awesome.  I forgot to ask you in the hall.

17          Is the Joe you know of a character that is

18 consistent with the allegations set out in the indictment

19 against him?

20          MS. RUDOFF:  Objection, Your Honor.  It's

21 improper under 701, 702 and 608.

22          THE COURT:  Overruled.

23     Q.   Is the Joe you know consistent with the character of

24 the allegations against him in the indictment?

25     A.   I do not believe -- I'll give you 100 percent.  I

1    don't believe it.

2         Q.    Is that a no?

3         A.    That's a no.  I'm sorry, that is a no.

4         Q.    Okay.  And talk to me about the difference between

5    what you do and what a FBI agent does.  What you did in Fort

6    Worth PD versus what a FBI agent did, just briefly.

7         A.    FBI investigates -- there's a ladder in law

8    enforcement.  Now, conversely what most people believe -- the

9    FBI is the highest one -- one of the highest law enforcement

10   agencies in the United States.  But they only investigate

11   federal crimes.

12              A municipal police officer can investigate

13   anything from a city ordinance all the way up to federal

14   crimes, state crimes, county crimes.

15              The -- the next level would be a deputy sheriff.

16   They can't do city deals, but they can go from the county,

17   state and up.

18        Q.    And federal's kind of stuck in federal court, right?

19        A.    I'm trying to be polite.  FBI has a specialized --

20   they are a specialized group, and they are for the most part

21   good about their job.

22        Q.    Sure.  Let me ask you this.  If Joe had a question

23   about some things that were allowed or not allowed in the

24   federal system, would a state police officer like you be a good

25   person to ask for advice on that?

 1        A.   Depending what the question is and what access I
 2   would have.  I could talk to him about it, but -- let's say,
 3   mentor him on something; but if it had to do something that --
 4   by state or federal statute, that I was not allowed to address,
 5   that would be a different story.
 6        Q.   Great.  How about a federal probation?  Is that
 7   something you are familiar with or --
 8        A.   Oh, yes.  I understand federal probation all the way
 9   down to city probations.
10        Q.   But if Joe had an FBI agent, or so he thought, he
11   could rely upon to answer those questions, who do you think
12   would be better, you or the FBI agent?
13                  MS. RUDOFF:  Objection; leading.
14                  THE COURT:  Sustained.
15        Q.   Who would be the best source of information about a
16   federal probation, a state cop or a federal cop?
17        A.   A -- that goes without saying, a federal law
18   enforcement agent.
19                  MR. SELLERS:  Pass the witness.
20                  THE WITNESS:  Thank you, sir.
21                  MR. SELLERS:  You're welcome.
22                        CROSS-EXAMINATION
23   BY MS. RUDOFF:
24        Q.   Good afternoon.
25        A.   Good afternoon, ma'am.

1       Q.   You said that you were employed with Fort Worth PD

2   for over 30 years, right?

3       A.   Yes, ma'am.

4       Q.   And you've been retired since 2008?

5       A.   Yes, ma'am.

6       Q.   And in fact, you haven't spent much time around

7   Joe DeLeon since 2008, is what you said?

8       A.   Not -- not personally being around Joe, no.

9       Q.   So you don't really know what Joe's been up to since

10  2008?

11      A.   I do not -- I cannot answer that question with a yes

12  or no.  And I believe you was wanting me to give you a yes or

13  no.

14      Q.   I can clarify my question if that is easier.

15      A.   Okay.

16      Q.   Since 2008, on a daily basis, you wouldn't -- would

17  you be able to tell us what Joe does every day?

18      A.   No, I can't.

19      Q.   Would you be able to tell us what's going on with

20  Joe's family on a day-to-day basis?

21      A.   Not anymore.

22      Q.   Would you be able to tell us what's going on with

23  Joe's work situation on a day-to-day basis?

24      A.   Not anymore, ma'am.

25      Q.   And you said that your knowledge of Joe DeLeon

1    initiated with Citizens on Patrol, right?

2        A.    Technically, but I actually knew the family.  His

3    family had an -- in addition to restaurants, had a -- DeLeon's

4    wrecker service, which we used quite frequently on a rotation

5    list to tow impounded vehicles or vehicles involved in traffic

6    accidents.

7        Q.    Okay.  And you know from his interaction on Citizens

8    on Patrol that Joe DeLeon has spent a significant time around

9    law enforcement officers?

10       A.    Yes, ma'am.

11       Q.    Would you say, based on that, and I think you

12   testified the training he received to do Citizens on Parole --

13   Patrol, excuse me.  That's a slip -- Citizens on Patrol,

14   Joe DeLeon would know more than the average person about how

15   law enforcement works?

16       A.    It depends what level of law enforcement.

17       Q.    Talking about Fort Worth PD.

18       A.    He -- he would know -- we had -- it is an

19   eight-hour -- usually it was an eight-hour course.  And we

20   covered like 12 topics.  Just a little on investigative --

21   maybe one detective would come in and give them one hour.

22             When I was teaching, I taught patrol procedures

23   for them, what was allowed, what was not allowed, and gang

24   awareness at that time.

25       Q.    And Joe had that same training class, is my

1   understanding, right?

2        A.   Yes, ma'am.  I wrote the -- the manual on it.

3        Q.   So based on your manual and your training, fair to

4   say from that class Joe DeLeon would know what was right and

5   what's wrong with regards to police interaction?

6        A.   He would know what he was trained to not do and

7   trained to do in a -- in allowable areas as a Citizen on

8   Patroller.

9        Q.   Now, as a police officer, you know it's illegal to

10  take money from a defendant, right?

11       A.   Yes, ma'am.

12       Q.   That would be a crime?

13       A.   Yes, ma'am.

14       Q.   And you would expect that your volunteers for Fort

15  Worth PD would also not take money from a defendant, right?

16       A.   They shouldn't, no.  They would be kicked out of the

17  program.  And charges, possibly.

18       Q.   I'm sorry, what did you say?

19       A.   And charges possibly, depending on the situation.

20       Q.   And you talked about -- and I think you mentioned

21  something about being a mentor.  That if Joe DeLeon came to you

22  and had a question, and like a mentorship-type situation?

23       A.   Yes, ma'am.

24       Q.   You'd agree that a mentor isn't someone who should be

25  paid by the mentee, right?

1      A.    No, ma'am.  In my case, as a mentor, I was -- I

2  mentored hundreds of police officers and most of them on a

3  daily basis, and I still mentor police officers that are

4  working today that call me and ask my advice.  No one's ever

5  paid me.

6      Q.    Would you expect them to pay you?

7      A.    They could buy me a -- a barbecue sandwich.

8      Q.    What about a brand-new Ford F-150?

9            MR. SELLERS:  Objection, Your Honor.  It's not

10  the case.  Not the facts.

11            THE COURT:  Members of the jury, you-all are the

12  judges of the facts; you'll decide what they determine to be.

13            Overruled.

14      Q.    As a mentor, what you were saying is that it would be

15  okay if a mentee maybe bought you a barbecue sandwich, right?

16      A.    As long as I did not coerce or demand the sandwich.

17  Now, I have demanded that from some of my officers while I was

18  working.

19      Q.    I understand.  Probably good barbecue in Fort Worth,

20  right?

21      A.    I'm better cooking it now than I -- then.

22      Q.    Understood.  You wouldn't accept a brand-new Ford

23  F-150 truck from a mentee for being their mentor, would you?

24      A.    Not unless they own a Ford dealership.

25      Q.    Because that would seem like a lot, right?

1      A.    Yes, ma'am.

2      Q.    And it would be improper for you to expect payment as

3 being a mentor?

4           MR. SELLERS:  Object to improper impeachment.

5           THE COURT:  Overruled.

6      Q.    You can answer.

7      A.    Would you repeat the question?  I didn't want to jump

8 in to say anything yet.

9      Q.    No problem.  And it would be improper as a mentor for

10 you to expect payment of like an F-150 truck for your services

11 as a mentor?

12     A.    No, but I sure would like one.

13     Q.    Understood.  What about $15,000 as a mentor?

14     A.    Only way I could see any of that is if that was an

15 agreed-on deal up front.

16     Q.    So both parties would have to know that that's the

17 type of relationship, as a mentor and mentee, that it's

18 including 15,000 in payment; is that what you are saying?

19     A.    I would think so, yes.

20     Q.    Okay.  And fair to say you don't have any personal

21 knowledge about the facts of this case, right?

22     A.    No, ma'am.  Just the indictment.

23     Q.    And the indictment that you were given by Defense

24 counsel to read, that didn't include any of the evidence in

25 this case, right?

1    A.   Only the asset seizures that are being requested.

2    Q.   Okay.

3    A.   And amounts.

4    Q.   But no actual evidence that's been presented, right?

5    A.   No, ma'am.

6    Q.   So you don't know any of the facts or the testimony?

7    A.   No, ma'am.

8    Q.   And so your opinion about the indictment, that's

9  based on not knowing any of the facts or the evidence?

10    A.   True.

11    Q.   Is there anything you know about Joe DeLeon's

12  background or education that would give him the authority to be

13  a probation officer?

14    A.   No, ma'am.

15    Q.   And from what you know about Joe DeLeon, is there

16  anything about him that you think would make him think he has

17  the authority to be a probation officer?

18    A.   Based on my knowledge, no.

19    Q.   And you testified on direct that Joe DeLeon is

20  incredibly supportive of law enforcement, right?

21    A.   Yes, ma'am.

22    Q.   And always there to assist and help law enforcement,

23  right?

24    A.   Yes, ma'am.

25    Q.   Is he so supportive that he would help a law

1  enforcement officer commit a crime?

2      A.    Do you wish a yes-or-no answer?

3      Q.    Is that the kind of support we're talking about?

4      A.    I think he could be that naive.

5      Q.    He would help an officer commit a crime?

6      A.    If he did not understand what he was doing.

7      Q.    This same person that has been trained by you for

8  Citizens on Patrol, right?

9      A.    Waving a flashlight is different than -- and bringing

10 water to the officers on the street corner is different than

11 what the charges are in the indictment.  I'll put it that way.

12     Q.    And to be fair, the charges in the indictment, you

13 have no evidence --

14     A.    No, ma'am.

15     Q.    -- no evidence related to it?

16     A.    I have not seen, heard, read or been given any

17 testimony.

18     Q.    Okay.  That is just your assumption, then?

19     A.    It is my personal opinion, that he -- yeah, I'm not

20 going to go any further --

21     Q.    Okay.

22     A.    -- until you ask me.

23     Q.    Okay.

24           MS. RUDOFF:  Pass the witness.

25           THE COURT:  All right.  Thank you.

1          Anything further?

2          MR. GALLIAN:  No questions, Your Honor.

3          THE COURT:  All right.

4          MR. SELLERS:  Nothing further, Your Honor.

5          THE COURT:  All right.  Any objection to me

6  excusing this witness?

7          MS. RUDOFF:  Nothing from the government.

8          MR. GALLIAN:  No.

9          MR. SELLERS:  No.

10          THE COURT:  Thank you so much for coming today.

11  We enjoyed having you.

12          THE WITNESS:  Thank you very much, Your Honor.

13          (Off-the-record discussion.)

14          THE COURT:  So we're almost to the finish line,

15  but you have not heard everything yet.  And so I ask you please

16  not to talk about the case until I have finally handed it to

17  you and you've heard all the evidence from these four walls.

18          Also, when you go home, please don't do any

19  independent research.  All the evidence should come from this

20  courtroom.  Don't do any sleuthing, please.  And if people ask

21  you about the case, you've been picked because you are fair and

22  unbiased.  So that jury box gets full if we start talking to

23  other folks.  So if you guys will hold off on doing that.

24  You'll get the case tomorrow.

25          And with that said, all rise for the jury.  We

1  appreciate you.

2               (Jurors exit courtroom.)

3               (Proceedings adjourned.)

```
 1                    I, BROOKE N. BARR, United States Court Reporter

 2    for the United States District Court in and for the Northern

 3    District of Texas, Dallas Division, hereby certify that the

 4    above and foregoing contains a true and correct transcription

 5    of all proceedings in the above-styled and -numbered cause.

 6

 7                    WITNESS MY OFFICIAL HAND this the 8th day of

 8    August, 2023.

 9

10

11                              /S/ BROOKE N. BARR
                                BROOKE N. BARR, CSR NO. 6521
12                              CSR Expiration Date:  7/31/24
                                United States Court Reporter
13                              1100 Commerce Street
                                Room 1376
14                              Dallas, Texas 75252
                                (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25
```