1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )      3:21-CR-236-E
5              Government,         )
                                   )
6                                  )
   VS.                             )      DALLAS, TEXAS
7                                  )
                                   )
8  WILLIAM ROY STONE, JR.,         )
   JOSEPH EVENTINO DELEON,         )
9              Defendants.         )      August 9, 2023

10

11            TRANSCRIPT OF JURY TRIAL, VOLUME 11A

12            BEFORE THE HONORABLE ADA E. BROWN

13               UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:          MS. JENNA DANELLE RUDOFF
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
19                               1100 Commerce Street
                                 Dallas, Texas  75242
20                               jenna.rudoff@usdoj.gov
                                 (214) 659-8600
21

22                               MS. DONNA S. MAX
                                 UNITED STATES DEPARTMENT OF JUSTICE
23                               NORTHERN DISTRICT OF TEXAS
                                 U.S. Courthouse, Third Floor
24                               1100 Commerce Street
                                 Dallas, Texas  75242
25                               donna.max@usdoj.gov
                                 (214) 659-8664

```
 1                                    MR. MARCUS J. BUSCH
                                      UNITED STATES DEPARTMENT OF JUSTICE
 2                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 3                                    1100 Commerce Street
                                      Dallas, Texas  75242
 4                                    marcus.busch@usdoj.gov
                                      (214) 659-8642
 5

 6                                    MS. LINDSEY PRYOR
                                      UNITED STATES DEPARTMENT OF JUSTICE
 7                                    NORTHERN DISTRICT OF TEXAS
                                      U.S. Courthouse, Third Floor
 8                                    1100 Commerce Street
                                      Dallas, Texas  75242
 9                                    lindsey.pryor@usdoj.gov
                                      (214) 659-8600
10

11   FOR THE DEFENDANT,              MR. GREGG GALLIAN
     WILLIAM ROY STONE, JR.:         Gallian Firm
12                                    Parkside Tower
                                      3500 Maple Avenue
13                                    Suite 720
                                      Dallas, Texas  75219
14                                    gregg@GallianDefenseFirm.com
                                      (214) 432-8860
15

16                                    MS. JACLYN ANNETTE GALLIAN
                                      Bryan Cave Leighton Paisner
17                                    2200 Ross Avenue
                                      Suite 4200
18                                    Dallas, Texas  75201
                                      jaclyn.gallian@bclplaw.com
19                                    (214) 721-8058

20
     FOR THE DEFENDANT,              MR. GREG WESTFALL
21   JOSEPH EVENTINO DELEON:         Westfall Sellers
                                      1701 River Run
22                                    Suite 801
                                      Fort Worth, Texas  76107
23                                    greg@westfallsellers.com
                                      (817) 928-4222
24

25
```

```
 1                                  MR.  FRANK SELLERS
                                    Westfall Sellers
 2                                  1701 River Run
                                    Suite 801
 3                                  Fort Worth, Texas  76107
                                    frank@westfallsellers.com
 4                                  (817) 928-4222

 5
      COURT REPORTER:               MR.  TODD ANDERSON, RMR, CRR
 6                                  United States Court Reporter
                                    1100 Commerce St., Rm. 1625
 7                                  Dallas, Texas  75242
                                    (214) 753-2170
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          Proceedings reported by mechanical stenography and

24    transcript produced by computer.

25
```

 1              JURY TRIAL VOLUME 11A - AUGUST 9, 2023

 2                    P R O C E E D I N G S

 3         SECURITY OFFICER:  All rise.

 4         THE COURT:  Good morning.  Everybody be seated.

 5         Did everybody get a decent night's sleep?

 6         MS. GALLIAN:  Yes, Your Honor.

 7         THE COURT:  Good.  Good, good, good.

 8         I stuck my head in and told the jury that after we

 9    finish testimony, I told them the allocations of time overall

10    for closing, and everybody's fine.  So they have kind of that

11    expectation.  So we're good.  So I'm not going to nag anybody

12    to give time back.

13         And I appreciate everybody's hard work on this.

14         So I think we just need to go on the record for --

15    oh, we're on the record.

16         Thank you, Todd.  You're with it.

17         The Government had some proposed edits to the charge.

18    If we can tackle those real quick, then I think we will be

19    ready to go, and then I'll have the final charge ready.

20         Here's a really important question.  Is 14 font big

21    enough for people?  Because my eyes are old.

22         I want it in 14, you young whipper snapper.  That's

23    right.

24         I shot my eyes on the Court of Appeals.  I didn't

25    need glasses when I started, and then I need Braille.

1               So, okay.  Let's talk about -- I've got the proposed

2    edits from the Government.  I think it comes down to page 14 of

3    22, the second paragraph on the page which begins "the object

4    of the charged conspiracy."  Obviously, I have the proposed

5    edits from the Government.

6               Stone, have you had a chance to look at this?

7               MR. GALLIAN:  We have, Your Honor.

8               THE COURT:  Okay.  What are your thoughts?

9               MR. GALLIAN:  So in -- I'll just go -- I count them

10   in three different sections.

11              THE COURT:  Sure.

12              MR. GALLIAN:  So in the preface of the elements,

13   we're fine with that language.

14              THE COURT:  Okay.

15              MR. GALLIAN:  So I think that's fine.

16              THE COURT:  Okay.  So the first one is okay.  All

17   right.

18              MR. GALLIAN:  Yes, Your Honor.

19              THE COURT:  And Mr. DeLeon's counsel, posse?

20              MR. WESTFALL:  We incorporate his objections, Your

21   Honor.

22              THE COURT:  Sounds good.

23              All right.  Okay.  As to number two?

24              MR. GALLIAN:  Where it begins with "For Count One the

25   Government must prove beyond a reasonable doubt that Defendant

1    Stone" --

2            THE COURT:  Uh-huh.

3            MR. GALLIAN:  We also -- we prefer obviously that it

4    says beyond a reasonable doubt that the Defendants acted with

5    or Defendant Stone and DeLeon, but something that encompasses

6    both --

7            THE COURT:  Gotcha.

8            MR. GALLIAN:  -- because obviously both are there.

9    And the Government has agreed to that change.

10           THE COURT:  Okay.  Great.  We appreciate you guys

11   working on this.

12           MR. GALLIAN:  That's my understanding.  I'm not

13   speaking on --

14           THE COURT:  Is that right, Government?

15           MS. PRYOR:  That's right, Your Honor.

16           THE COURT:  Okay.  Great.  Thanks.

17           MR. GALLIAN:  And then after looking back -- I'm

18   sorry.  I'll wait.

19           THE COURT:  I'm ready.  No, no.  You're doing good.

20   Ready for the next one.

21           MR. GALLIAN:  And then beginning with the specific

22   intent language.

23           THE COURT:  Yes.

24           MR. GALLIAN:  I think we're all on the same page

25   there.

```
 1                THE COURT:  Okay.
 2                MR. GALLIAN:  No changes.
 3                Where it begins with "bear in mind, however" --
 4                THE COURT:  Yes.
 5                MR. GALLIAN:  -- based on our notes, we objected to
 6      that last time we talked.
 7                THE COURT:  Okay.
 8                MR. GALLIAN:  It was in the red line that's been
 9      deciphered for me --
10                THE COURT:  Okay.
11                MR. GALLIAN:  -- that we did object.  So we stand on
12      that objection for that language.
13                THE COURT:  All right.
14                (Discussion off the record between the Judge and the
15                Law Clerk)
16                THE COURT:  Government, on page -- appellate, just
17      one quick question for you.
18                Page 13, we've got a paragraph, "the Government does
19      not need to prove the alleged conspirators" -- is that
20      paragraph necessary in your opinion?
21                (Discussion off the record between the Judge and the
22                Law Clerk)
23                THE COURT:  Oh, okay.  Gotcha.  I'm sorry.
24      Appreciate it.  Gotcha.
25                I got the -- my whip smart young lawyer here advising
```

1    me.

2              So taking up the issue on page 14, that "bear in

3    mind, however" sentence, is that necessary in light of --

4    what's your position on if that's necessary in light of the

5    paragraph "The Government does not need to prove that the

6    alleged conspirators entered into any formal agreement..."?

7              Do I need that separate language on page 14 as to

8    "bear in mind"?

9              MS. PRYOR:  Yes.  Good morning, Your Honor.

10             THE COURT:  Good morning.  Sorry.

11             MS. PRYOR:  For the record, Lindsey Pryor for the

12   Government.

13             I do think -- so we did talk about that language.  We

14   know the Defendant objected at the last conference, but it was

15   our understanding the Court intended to keep it.

16             THE COURT:  Yeah.

17             MS. PRYOR:  And we do think it's correct and

18   necessary, because it just makes clear -- we're fine with

19   listing the elements of wire fraud, but it makes clear that the

20   Government can prove the -- that the agreement can be proved

21   without committing the underlying substantive offense, which is

22   correct --

23             THE COURT:  Okay.

24             MS. PRYOR:  -- under the law.

25             (Pause)

```
 1              MS. PRYOR:  One additional comment on the -- where it
 2   said Defendant Stone that we said we were in agreement.
 3              THE COURT:  Uh-huh.  Sure.
 4              MS. PRYOR:  Maybe suggest that it says reasonable
 5   doubt that a defendant acted instead of making it -- just
 6   mirror the language of the rest where it says -- and repeatedly
 7   refers to a defendant.
 8              THE COURT:  Okay.  Above, a defendant.
 9              Are you okay with that, Stone?
10              MR. GALLIAN:  I mean, we're not okay with any of it,
11   but --
12              THE COURT:  Oh, I'm not talking about the bear in
13   mind.  I'm talking about the language that the Government
14   agrees.
15              MR. GALLIAN:  Oh, yes.
16              THE COURT:  That part?
17              MR. GALLIAN:  Yes.
18              THE COURT:  Okay.  Yeah.
19              MR. GALLIAN:  Yes.  Yes, yes, yes.
20              THE COURT:  Okay.  And on your -- what's your
21   objection on the bear in mind?
22              MR. GALLIAN:  So the Court may recall -- sorry, Todd.
23              THE COURT:  Yeah, sure.
24              MR. GALLIAN:  The Court may recall that there was
25   some alternative language that was proposed by the Court at the
```

```
 1    unofficial State charge conference that we had a couple of days
 2    ago.  If the Court is inclined to put the instruction in, we
 3    prefer the language that the Court originally proposed.
 4              THE COURT:  Okay.
 5              MR. GALLIAN:  However, it's my understanding again
 6    after back and forth that we decided to take that portion out.
 7    Again, I could be wrong.
 8              But I think that it's -- I think that it's properly
 9    encompassed on the page before.  If you jump to page 13 where
10    it states that "nor must it prove that all of the persons
11    alleged to have been members of the conspiracy were such or
12    that the alleged conspirators actually succeeded in
13    accomplishing their unlawful objectives," I think that properly
14    encompasses exactly what this is; and so, therefore, it's
15    duplicative as well.
16              THE COURT:  Okay.  All right.  Well, that's noted for
17    the record.  I'm going to overrule it.  I'm going to keep that
18    in.
19              And if you'll tweak the language -- do we want
20    Defendants or Stone and DeLeon?  Six in one, half a dozen
21    another to me.
22              MS. PRYOR:  I would say a defendant.
23              THE COURT:  A defendant.
24              Are you okay with that, Stone?  And can we refer
25    to --
```

1          MR. GALLIAN:  Well, I think it has to be Defendants

2     plural, given that it's referring to Count One.  So I think it

3     needs to say Defendant Stone and DeLeon.

4          THE COURT:  Or Defendants?

5          MR. GALLIAN:  Or Defendants plural.

6          THE COURT:  Government, if you would look at that and

7     give me your thoughts.

8          (Pause)

9          MS. PRYOR:  I think it's more consistent with the

10    charge language as a whole, the jury is considering each

11    defendant who is charged with the offense, and so it should be

12    considered for a defendant.

13         THE COURT:  Okay.

14         MR. WESTFALL:  May I interject on that?

15         THE COURT:  Sure.

16         MR. WESTFALL:  I agree with the Government on this,

17    because the charge does go out of its way to tell the jury that

18    each defendant has to be considered separately and each charge

19    has to be considered separately.

20         THE COURT:  Okay.

21         MR. WESTFALL:  So a defendant makes more sense to us.

22         THE COURT:  That's acceptable to you?  All right.

23         So, Stone, you -- what's your final position on that?

24         MR. GALLIAN:  Defendants plural or Defendant Stone

25    and Defendant DeLeon, but encompassing both.

```
 1              THE COURT:  Okay.  I'm going to go with a defendant,
 2    but your objection is noted.
 3              MR. GALLIAN:  Also, I haven't won any this morning,
 4    so --
 5              THE COURT:  Keep hope alive.
 6              Okay.  I think that resolves it; is that right?
 7              MS. PRYOR:  Your Honor?
 8              THE COURT:  Yes.
 9              MS. PRYOR:  Can I ask one more question?
10              THE COURT:  Of course.  Please.
11              MS. PRYOR:  Make one more point for the record?
12              THE COURT:  Yes, ma'am, of course.
13              MS. PRYOR:  I know that at the last conference we
14    discussed the definition of specific intent to defraud --
15              THE COURT:  Yes.
16              MS. PRYOR:  -- and scheme to defraud in light of the
17    recent Greenlaw opinion.
18              THE COURT:  Yes, ma'am.
19              MS. PRYOR:  And it looks like the Court has, based on
20    its reading of Greenlaw, has kept the way the original charge
21    was drafted.  So I just want to make clear for the record that
22    the Government had proposed defining specific intent to defraud
23    as a conscious knowing intent to deceive someone and cause loss
24    and harm, but the Defendants were fine with the deceive and
25    cheat language, and we're fine with that as well.
```

 1              THE COURT:  Yes.  And one quick question on that.  I

 2    think I know the answer, but just in case.  Since that case is

 3    so new, I'm assuming we don't have any cases that have hurried

 4    up and gone upstairs where a judge has adopted language in

 5    response to that case, right?

 6              MS. PRYOR:  I believe that's right.

 7              THE COURT:  I figured we're it.

 8              MS. PRYOR:  I believe that's right, Your Honor.

 9              THE COURT:  We're the first one.

10              Okay.  Great.  Well, I appreciate your input.

11    Anything else?

12              MS. PRYOR:  No, Your Honor.  That's it.

13              THE COURT:  Okay.  Sounds great.  Appreciate you,

14    Government.

15              Anything else from you, Stone?

16              MR. GALLIAN:  Nothing from us, Your Honor.

17              THE COURT:  All right.  DeLeon?

18              MR. WESTFALL:  No, Your Honor.

19              THE COURT:  All right.  Well, I appreciate

20    everybody's really hard work on this, including my brilliant

21    Taylor's.

22              If you will blow it up in old-people font, I think

23    we'll be ready.

24              Thanks, everybody, for your hard work on that.  It

25    certainly makes it faster when we work on it throughout.

```
 1            Okay.
 2            MR. WESTFALL:  Your Honor, may I ask a question
 3   about --
 4            THE COURT:  Of course, you can.
 5            MR. WESTFALL:  This drive that we're going to make
 6   that's going to go back with the jury --
 7            THE COURT:  Yes.
 8            MR. WESTFALL:  -- I'm assuming that the only thing
 9   that goes on that are exhibits that were admitted for all
10   purposes.
11            THE COURT:  Correct.
12            MR. WESTFALL:  Okay.
13            THE COURT:  No record exhibits.  Correct.
14            MR. WESTFALL:  Okay.  Very good.
15            (Pause)
16            THE COURT:  We're off the record.
17            (Discussion off the record)
18            SECURITY OFFICER:  All rise for the jury.
19            THE COURT:  Come on down.  Frappuccino allowed.
20   Don't be shy.
21            (Jury in)
22            THE COURT:  All right.  Everybody be seated, please.
23            Good morning.
24            I'm just standing up so you can see me.
25            The lawyers have stayed late and worked overtime, so
```

```
 1   we have the jury charge ready.  So there will be no delay once
 2   we wrap up evidence this morning.
 3               And we'll probably take a break before closing so
 4   everybody can get everything together.  But they've worked so
 5   well together and are going to make good use of your time
 6   today.  I'm blowing everything up in gigantic font for me.
 7               And so if you-all need a break, please don't be shy
 8   about letting me know.
 9               And with that said, if everybody will check their
10   phones, please.
11               And your witness, sir.
12               MR. SELLERS:  Thank you.
13               THE COURT:  Whoever that is.
14               MR. SELLERS:  Joseph DeLeon calls J.D. Thomas.
15               THE COURT:  All right.  Mr. Thomas, come on down.
16   It's kind of a labyrinth.
17               How are you doing this morning?
18               THE WITNESS:  Fine.
19               THE COURT:  Good.  Come on up, please, and take your
20   time getting comfortable.  We're glad to have you here.
21               Where did you drive in from?
22               THE WITNESS:  Fort Worth.
23               THE COURT:  Oh, boy.  What time did you wake up this
24   morning?
25               THE WITNESS:  Early.
```

```
 1              THE COURT:  Yeah.  It was a drive.  I kind of like
 2    these 8:00 trials.  You miss all the traffic.
 3              So if you don't mind, let's do a quick sound check.
 4    And if you'll just say your name for the jury.
 5              THE WITNESS:  J.D. Thomas.
 6              THE COURT:  Can everybody hear okay?
 7              All right.  I'll have my court reporter swear you in,
 8    but before we do, just one or two little tips for you, please.
 9    You've probably testified before.  Everybody seems to not be a
10    rookie on that.
11              In normal life we talk over each other, which is
12    normal, but since the court reporter has to take down
13    everything said, if you don't mind trying to go a little bit
14    slower when you talk than we usually do.  And when he asks you
15    a question, if you don't mind trying to pause before you answer
16    to give my court reporter time to take it down.
17              But you'll do a great job, and we appreciate you
18    being here.  And if you need a break or any water or anything,
19    please just let me know.  We're glad to have you as our guest.
20              And with that said, Todd, you can swear him in.
21              (The witness was sworn)
22              THE COURT:  Great.  Thank you, sir, for being here.
23              And your witness, sir.
24              MR. SELLERS:  Thank you, Your Honor.
25              THE COURT:  You're welcome.
```

```
 1              J.D. THOMAS, DEFENDANT DELEON'S WITNESS, SWORN
 2                            DIRECT EXAMINATION
 3    BY MR. SELLERS:
 4    Q.   Good morning, Mr. Thomas.  Could you introduce yourself to
 5    the jury, please?
 6    A.   My name is J.D. Thomas.
 7    Q.   All right.  And where -- I'm asking you questions, but the
 8    answers are directed over there, okay?
 9              All right.  Mr. Thomas, what do you do?
10    A.   I'm a pastor at Cornerstone Church in Newark, Texas.  Also
11    own Thomas Wrecker Service in Fort Worth.
12    Q.   All right.  Do you know the gentleman to your right, my
13    left, sitting at the table, standing now over there?
14    A.   Yes, I do.
15    Q.   How long have you known Joe?
16    A.   Since 1979.
17    Q.   How did you first meet Joe?
18    A.   In the wrecker business.
19    Q.   How did that come about?  How does a taco vendor meet a
20    tow truck driver?
21    A.   He was also in the wrecker business.  And, you know, when
22    you're starting a business, you have some problems, and he came
23    and helped us out.
24    Q.   Would it be fair to characterize y'all as competitors?
25    A.   We were competitors, but we were friends.
```

```
 1   Q.   And then over the years did you develop a friendship
 2   with Joe?
 3   A.   Yes, sir.
 4   Q.   Eventually did -- I guess did you win out in that
 5   competition?
 6   A.   He chose to retire from the towing business.
 7   Q.   All right.  And is that when he started working with
 8   Benito's?
 9   A.   Yes.
10   Q.   All right.  Have you ever been to Benito's?
11   A.   Yes.
12   Q.   Any good?
13   A.   It was good food.
14   Q.   All right.  What kind of contact do you have with Joe
15   these days?
16   A.   I'm currently his pastor.
17   Q.   At the Cornerstone?
18   A.   Yes.
19   Q.   How often would you say that you see Joe?
20   A.   Well, because of his health, I haven't been able to see
21   him as much as I would like.  He does view our services online,
22   and we speak on the phone pretty regularly.
23   Q.   Have you ever been to his home?
24   A.   Yes, sir.
25   Q.   Has he ever been to yours?
```

```
 1   A.   Yes, sir.
 2   Q.   All right.  Pretty good friends?
 3   A.   Yes.
 4   Q.   All right.  To this day and not really any gaps in there?
 5   A.   No.
 6   Q.   Let me ask you this.  During the almost 50 years that
 7   you've known Joe -- is that right?
 8   A.   Forty -- 43, 44, something.
 9   Q.   In the 43 years that you've known Joe, have you developed
10   his opinion -- have you developed an opinion about his
11   character for telling the truth and being honest?
12   A.   He's very honest.  Even if it cost him, he'll tell you the
13   truth.
14   Q.   How about this?  Have you developed an opinion about Joe's
15   character for being gullible?
16   A.   He's -- he's pretty trusting.  He'll help people to the
17   point of hurting himself.
18              To give an example, one winter we had a lot of
19   homeless in Fort Worth that refused to go to the mission.  It
20   was 20 degrees.  And he went and opened his restaurant, and
21   they cooked soup and took it to the homeless so that they
22   wouldn't freeze to death.  That's just the kind of -- he didn't
23   ask anything for it.  Nobody even knew it.  I mean, he didn't
24   try to use it for PR or anything like that.  It was just
25   something he did.
```

```
 1   Q.   In other words, is it -- is it your opinion that Joe is a
 2   gullible person?
 3   A.   He's -- he's a little gullible, yes.
 4   Q.   All right.  And I have sent you a copy of the indictment.
 5   Did you have a chance to read that?
 6   A.   I briefly got to read it.
 7   Q.   Did you read the parts about Joe?
 8   A.   Yes.
 9   Q.   And let me ask you, is the character of the Joe you know
10   consistent with the allegations in the indictment?
11           MR. BUSCH:  Objection, Your Honor, improper character
12   testimony, and it invades the province of the jury.
13           THE COURT:  Overruled.
14   BY MR. SELLERS:
15   Q.   You can answer.  Is the character of the Joe you know
16   consistent with the allegations made against him in the
17   indictment?
18   A.   That's out of character for him.  I have a hard time
19   believing that stuff.
20   Q.   Thank you for being here, Mr. Thomas.
21           MR. SELLERS:  I pass the witness.
22           THE COURT:  Your witness, sir.
23           MR. BUSCH:  Thank you, Your Honor.
24           THE COURT:  You're welcome.
25
```

CROSS-EXAMINATION

BY MR. BUSCH:

Q.   Good morning, Pastor Thomas.

A.   Good morning.

Q.   My name is Marcus Busch.  I'm an Assistant United States
Attorney.

     You've told the jury that you have known Joe DeLeon
for about 43, 44 years?

A.   Since 1979, yes, sir.

Q.   Okay.  Whatever that comes to?

A.   Yes, sir.

Q.   Okay.  All right.  And during that time you've known him
to be a businessman.  First he owned a wrecker business?

A.   Yes, sir.

Q.   Okay.  Was that successful?

A.   Yes, sir.

Q.   Okay.  That's a pretty tough business, isn't it?

A.   Yes, it is.

Q.   Okay.  And very competitive?

A.   It can be pretty competitive.

Q.   Okay.  And there are a lot of rules and regulations that
you have to be aware of to be -- to even operate a wrecker
business in a city like Fort Worth.  Would that be fair to say?

A.   There's more rules now than there was back when we
started.

1    Q.   Okay.  Like everything else in life?

2    A.   Yes.

3    Q.   Okay.  So to be successful, though, you have to be savvy

4    enough to know the rules, follow the rules, and operate in an

5    environment where you have regulatory authorities, the local

6    law enforcement, other entities that are also looking at what

7    you do, right?

8              MR. SELLERS:  I'm going to object to compound

9    question.

10             THE COURT:  Overruled.

11   A.   There is lots of rules to follow, yes, sir.

12   Q.   I mean, there are actually people that kind of oversee

13   with the city of Fort Worth, right?

14   A.   Texas Department of License and Regulations regulate most

15   of the towing these days.  They started in 2007 or '08, I

16   believe it was.

17   Q.   Okay.  So to operate in that business, it's not for

18   dummies.  You've got to have some level of sophistication to

19   understand the environment to be successful in it.  Would you

20   agree with me on that?

21   A.   Well, sir, I can't say I totally agree with you, because

22   there are some operators in the towing business that are not of

23   the same caliber in different cities.  Fort Worth is different.

24   Q.   Okay.  And Mr. DeLeon's wrecker business was in Fort

25   Worth?

```
 1   A.   Yes, sir.
 2   Q.   And so you put him in your category of the people who
 3   are -- had some sophistication and were savvy enough to be
 4   successful in that environment?
 5   A.   Yes, sir.
 6   Q.   Okay.  And, in fact, I think you told the jury that he
 7   already had his wrecker business, and then when you started
 8   your wrecker business you went to him for advice?
 9   A.   No, sir.  He came to us -- it was just a couple of months
10   in difference in time, but he came to us.  We were having truck
11   trouble, and he actually lent me a truck.
12   Q.   Oh, that's what you meant when you said, "He helped us out
13   when we had problems"?
14   A.   Yes.
15   Q.   Okay.  All right.
16        Okay.  So then we -- you spoke about his restaurant,
17   Benito's?
18   A.   Sir?
19   Q.   You spoke about his restaurant, Benito's?
20   A.   Yes, sir.
21   Q.   How long did he have that restaurant?
22   A.   I'm not sure.
23   Q.   Five years?  Ten years?  Twenty years?
24   A.   I'm not sure of the start or stop dates of it.
25   Q.   Okay.  Was that a successful business?
```

 1   A.   I think so.  Everybody liked to eat there.

 2   Q.   Okay.  A lot of people would go to eat there or --

 3   A.   Yes, sir.

 4   Q.   Okay.  Not a taco stand or truck.  I mean, it's a

 5   restaurant in a building, right?

 6   A.   It was a small restaurant --

 7   Q.   Okay.

 8   A.   -- in a building, uh-huh.

 9   Q.   Did he seem to manage that business well?

10   A.   I thought so.

11   Q.   Okay.  Did he seem to have any difficulties understanding

12   how to manage a restaurant?

13   A.   Not that I'm aware of.

14   Q.   Okay.  All right.  Have you met the victim in this case?

15   A.   No, sir.

16   Q.   All right.  Do you know what her story is?

17   A.   No, sir.

18   Q.   Have you heard any of the testimony in this courtroom?

19   A.   No, sir.

20   Q.   Do you know any of the evidence in this case?

21   A.   No, sir.

22   Q.   Okay.  So when you say to Mr. Sellers that you've looked

23   at the indictment and what's alleged in the indictment is

24   outside of the character of the man you know, that's just based

25   on what you feel in your heart?

1    A.    That's what I saw written on the indictment.

2    Q.    Okay.  But your opinion is based on what you feel in your

3    heart and not based on any actual evidence in this case and

4    testimony in this case?

5    A.    I base my opinion on my track record with Mr. DeLeon.

6    Q.    Okay.  But I'm just asking you the basis of your opinion.

7    It's not based on the evidence, the things that are in this

8    courtroom and the testimony that this jury has heard, is it?

9    Because you don't know that stuff.

10   A.    I'm saying it's out of character for him to have done

11   things like that knowingly.

12   Q.    Okay.  But you understand the indictment is not evidence,

13   that evidence is actually in a courtroom?

14   A.    Okay.

15   Q.    I'm just simply asking you, have you heard any of the

16   testimony in this case?

17   A.    I -- this is my first time in the courtroom today on this.

18   Q.    Okay.  And have you looked at any of the evidence,

19   listened to any recordings?

20   A.    No.

21   Q.    Or looked at any financial records?

22   A.    No, sir.

23   Q.    Okay.  All right.  I mean, he's your friend, right?  You

24   have told us that.

25   A.    Yes.

```
 1  Q.   You don't want to see anything bad happen to your friend,
 2  do you?
 3  A.   No.
 4  Q.   Okay.  Now, would you be surprised to learn that he was
 5  untruthful to the victim in this case?
 6       MR. SELLERS:  Object to mischaracterization of the
 7  evidence, outside of the scope.
 8       THE COURT:  Okay.  Well, members of the jury, you-all
 9  will be the judge of the facts, and so you'll remember the
10  facts as you have heard them.
11       Overruled.
12  BY MR. BUSCH:
13  Q.   Would you be surprised to learn that?
14  A.   To learn what, sir?
15  Q.   That he was untruthful to the victim in this case.
16  A.   I would be surprised, yes, sir.
17  Q.   Would you be surprised to learn that he was untruthful to
18  a Texas Ranger?
19       MR. SELLERS:  Same objections, Your Honor.
20       THE COURT:  Overruled.
21       Members of the jury, you will decide what the facts
22  are.
23  A.   Yes, sir, I would be surprised.
24  Q.   All right.
25       MR. BUSCH:  No further questions.  Thank you, Your
```

1    Honor.

2              THE COURT:  Thank you.

3              Not yet.

4              MR. GALLIAN:  No questions, Your Honor.

5              THE COURT:  Okay.  Thanks.

6              MR. SELLERS:  Now?

7              THE COURT:  Certainly.

8              MR. SELLERS:  Okay.

9                        REDIRECT EXAMINATION

10   BY MR. SELLERS:

11   Q.   What does untruthful mean to you?

12   A.   Telling an untrue statement.

13   Q.   All right.  And if you were never asked about something

14   and you just didn't offer it on your own, would that be

15   untruthful?

16   A.   If I was never asked about something, didn't know about

17   it, no.

18             MR. SELLERS:  Pass the witness.

19             THE COURT:  Anything further?

20             MR. BUSCH:  Nothing further, Your Honor.

21             THE COURT:  All right.  Anything, Mr. Gallian?

22             MR. GALLIAN:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  Any objection to me excusing

24   this witness?

25             MR. BUSCH:  No, Your Honor.

```
1              MR. SELLERS:  No, Your Honor.

2              THE COURT:  Pastor, thank you so much for coming

3    today.  We appreciate you waking up early to join us.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  Have a great morning.

6              (Pause)

7              THE COURT:  How are you, sir?  Come on down.  How are

8    you?  You're looking dapper today.

9              Come on down and join us.  It's kind of a labyrinth

10   here.

11             And the chair is not that comfortable, but take your

12   time getting in it.

13             THE WITNESS:  Okay.

14             THE COURT:  We are so glad to have you here today.

15             THE WITNESS:  Thank you, ma'am.

16             THE COURT:  Absolutely.  Please be seated, get

17   comfortable.

18             Just a couple of -- couple of tips.  I don't know if

19   you've ever testified before or ever been in court before, but

20   the court reporter has to take everybody down individually.  So

21   in conversations we kind of finish each other's sentences, and

22   that's okay.  But as much as you can remember, if you'll kind

23   of talk a little slower than you usually do.  And if you'll

24   wait a second or two after he asks a question to answer it, it

25   will give my court reporter time.
```

```
 1                THE WITNESS:  Yes, Your Honor.
 2                THE COURT:  So, we're so glad to have you here.  If
 3   you need a break or water or anything, please let us know.  I'm
 4   glad to have you here as our guest.
 5                And let's just do a quick sound check.  If you don't
 6   mind saying your name for the jury.
 7                THE WITNESS:  William Mitchell.
 8                THE COURT:  All right.  Is that Mitchell?
 9                THE WITNESS:  Yes, ma'am.
10                THE COURT:  All right, Mr. Mitchell.
11                Can everybody hear okay?  Fantastic.
12                Again, let me know if you need a break or anything.
13   Glad to have you here.
14                And your witness, sir.
15                MR. SELLERS:  Thank you, Your Honor.
16                THE COURT:  You're welcome.
17                Oh, I'm so sorry.  We need to swear him in.
18                (The witness was sworn)
19                THE COURT:  Your witness.
20        WILLIAM MITCHELL, DEFENDANT DELEON'S WITNESS, SWORN
21                        DIRECT EXAMINATION
22   BY MR. SELLERS:
23   Q.   Good morning, sir.  Could you please introduce yourself to
24   the jury?
25   A.   Good morning.  My name is William Mitchell.  I am a
```

1    retired Fort Worth police officer.

2    Q.   How long were you with the Fort Worth Police Department?

3    A.   Thirty years.

4    Q.   What was your rank whenever you retired?

5    A.   Officer.

6    Q.   And during your law enforcement career, did you ever work

7    for any other department?

8    A.   No, sir.

9    Q.   All the time with Fort Worth PD?

10   A.   Yes, sir.

11   Q.   What did you do specifically for the Fort Worth Police

12   Department?  What was the majority of your time spent doing?

13   A.   I worked four-and-a-half years of patrol.  I worked 12

14   years as a school resource officer.  I worked the last 13 years

15   as the Peer Support Critical Incident Stress Management

16   coordinator, and during that time I also served 13 years as a

17   hostage negotiator.

18   Q.   Okay.  So after being in school with the kids, they then

19   decided you would be a good hostage negotiator?

20   A.   That was the prerequisite it seems.

21   Q.   Okay.  Because sometimes you've got to talk to kids that

22   are barricaded, I guess, right?

23   A.   That can happen.

24   Q.   All right.  Do you know the gentleman seated over here to

25   your right, my left?

1   A.   Yes, sir.

2   Q.   Standing now.  How do you know him?

3   A.   In 2005, when I became a hostage negotiator, he served as

4   an interpreter for the hostage negotiation team.

5   Q.   What do you mean by that?

6   A.   When we would have individuals that spoke Spanish only, we

7   would have him interpret for us during that time.

8   Q.   Dangerous situations?

9   A.   Since we were in the hostage negotiation van usually, it

10  wasn't particularly dangerous for us except for the fact that

11  there were lives that could have been taken if we made

12  mistakes.

13  Q.   How many times, you know, just ballpark, do you recall Joe

14  being in that van with you helping to negotiate with hostages

15  or hostage takers?

16  A.   I would guess around eight times; however, he also did a

17  lot of training with us.

18  Q.   All right.  Tell the jury a little bit more about that,

19  please.

20  A.   As far as the training goes, what he would do is when we

21  were having training scenarios where we would act as the

22  hostage negotiation team and we would have other actors act as

23  bad guys, so to speak, he would help us interpret so that we

24  can formulate a strategy during those times.

25  Q.   And these were training situations?

```
 1   A.   Yes, sir.
 2   Q.   How often would he do that for you?
 3   A.   During my 13 years, probably about once a year.
 4   Q.   About ten times?
 5   A.   Yes, sir.
 6   Q.   What about Joe's willingness to help police?  Have you
 7   ever seen those tendencies from Joe?
 8   A.   Yes, sir.
 9   Q.   Tell us about that.
10   A.   In 2009, I became the Critical Incident Stress Management
11   coordinator for the Fort Worth Police Department, also known as
12   the peer support team.  Our purpose there was the assist -- to
13   assist law enforcement, the whole law enforcement family, with
14   situations in which they were dealing with stress.  It could be
15   from a police shooting to perhaps a divorce.
16           And we helped family members as well as civilians on
17   the department and also other departments as far as Pasadena,
18   Texas.
19   Q.   How about a police officer, if there's a fallen officer?
20   Did y'all ever call on Joe for help then?
21   A.   Yes, sir.
22           During that time if there's an officer that was
23   injured, if Joe found out before we contacted him, during the
24   time when he owned the restaurant, he would contact me
25   personally and simply ask, How many plates do you need?
```

```
 1              And Joe would provide food for however many people I
 2   said we needed plates for and often would have, I think,
 3   Michael Cohen deliver those plates to the hospital.
 4   Q.   Who is Michael Cohen?  I never heard that name.
 5   A.   He was an individual who worked with Joe.  I believe that
 6   was his name.
 7   Q.   Okay.  I got you.
 8              To be fair, you don't know any of the evidence in
 9   this case, do you?
10   A.   Evidence?  No, not really.
11   Q.   But I did send you a copy of the indictment, right?
12   A.   Yes, sir.
13   Q.   And, nevertheless, you read them, and those allegations
14   are serious.  You know that, don't you?
15   A.   Yes, sir.
16   Q.   Nevertheless, you're willing to put your name and
17   reputation out there for Joe?
18   A.   Yes, sir.
19   Q.   Since 2005, you said, or '07 that you have known Joe?
20   A.   Around 2005.
21   Q.   Okay.  So in the 18 years that you've known Joe, have you
22   formed an opinion about his character for telling the truth and
23   being honest?
24   A.   Yes, I have.
25   Q.   What is that opinion?  You can tell the jury.
```

```
 1   A.   In my opinion, he appears to be very honest.  He seems to
 2   be honest to a point at which -- yeah, I think that he would --
 3   he would make decisions that weren't necessarily in his best
 4   interest.  For example, just providing out of his own pocket
 5   food for those officers who were involved in injuries and those
 6   family members.
 7            I've got a small business myself, and I asked Joe for
 8   help, because he had something to do with the planning for food
 9   services in the -- in Fort Worth.  And he gave me a lot of good
10   advice on how to handle those situations.
11   Q.   Well, now you've got to give a plug.  What kind of
12   business do you own?
13   A.   Barbecue, sir.
14   Q.   Is it good?
15   A.   Yes, sir.
16   Q.   The best?
17   A.   I wouldn't say that, but it's pretty good.
18   Q.   All right.  In your time knowing Joe, have you developed
19   an opinion about his character for helping those in need?
20   A.   Yes, sir.
21   Q.   What is that opinion about the character?
22   A.   I would say that he was always willing to help anyone that
23   I had ever seen where he was asked, whether he was asked or
24   not.  I've just seen some situations -- like I said, when he
25   would call me up, when he found out an officer was injured, to
```

1    make sure that they had enough food.  That was just one of

2    those situations.

3    Q.   How often did you interact with Joe as the peers

4    coordinator, do you think?

5    A.   Probably when he was running the Benito's restaurant,

6    during my 13 years as peer support coordinator, probably about

7    two times a year for the first ten years of my running the peer

8    support program.

9    Q.   Gotcha.

10          You know, back to Joe's character for telling the

11   truth and being honest, do you think if Joe were confronted

12   with something and said, Hey, Joe, what is this, that he would

13   be honest about that?

14   A.   I believe -- I believe so.

15   Q.   And is someone who's never asked about something and who

16   doesn't just offer it up on their own, are they being

17   dishonest?  The reverse of the last question.

18   A.   I don't believe they're being dishonest.

19   Q.   All right.  Let me ask you, would you say that you and Joe

20   have a relationship of trust?

21   A.   Yes, sir.

22   Q.   Because of that relationship of trust, do you think it

23   would be easier or harder to make Joe believe something?

24   A.   I believe because we have a relationship of trust, it

25   would be easier to make him believe something that I said.

1   Q.   How about your status as a police officer?  Does that
2   enhance that trust?
3   A.   Yes, sir.
4   Q.   All right.  How about if someone was a federal agent?  Do
5   you think that would enhance the trust even more?
6   A.   Yes, sir.
7   Q.   Let me ask you this.  Let me read the note first.
8          (Pause)
9   BY MR. SELLERS:
10  Q.   Have you ever seen anyone take advantage of Joe?
11  A.   Not to my knowledge.
12  Q.   Could you see how Joe might get taken advantage of?
13  A.   Yes, sir.
14  Q.   All right.  You've read the allegations in the indictment,
15  have you not?
16  A.   Yes, sir.
17  Q.   For the character of the Joe you know and have known since
18  2005, are the allegations in the indictment consistent with the
19  character of the Joe that you know?
20  A.   No, sir.
21  Q.   Thank you for being here, Mr. Mitchell.
22          MR. SELLERS:  I'll pass the witness.
23          (Pause)
24          MR. SELLERS:  Oh, one more thing.  If I may?
25          THE COURT:  Sure.

```
 1              MR. SELLERS:  Thank you.
 2    BY MR. SELLERS:
 3    Q.   When is the last time you saw Joe?
 4    A.   About three months ago.
 5    Q.   Have you been to his home?
 6    A.   Yes, sir.
 7    Q.   Y'all keep in touch pretty frequently?
 8    A.   I would say more infrequently, but we -- we keep in touch.
 9    Q.   All right.  So -- but y'all haven't had any gaps of like
10    five years or six years or anything like that where you didn't
11    talk?
12    A.   No, sir.
13    Q.   All right.
14              MR. SELLERS:  Pass the witness.
15              THE COURT:  Members of the jury, are we doing okay?
16              All right.  Ms. Max, your witness.
17              MS. MAX:  Thank you, Your Honor.
18              THE COURT:  You're welcome.
19                        CROSS-EXAMINATION
20    BY MS. MAX:
21    Q.   Mr. Mitchell, my name is Donna Max.  I'm an Assistant
22    United States Attorney.  I'm going to ask you a few questions,
23    okay?
24    A.   Yes, ma'am.
25    Q.   How long have you been a police officer?
```

```
 1   A.   Thirty years.
 2   Q.   And you've known Joe for how long?
 3   A.   Since about 2005.
 4   Q.   Okay.  Now, it sounds like Joe has had a lot of positions
 5   within the Fort Worth Police Department, correct?
 6   A.   I would imagine so.  I know -- I knew him as a -- as a
 7   volunteer for the peer -- I'm sorry, for the hostage
 8   negotiation team.
 9   Q.   Okay.  So in that volunteer capacity, I mean, that sounds
10   like a pretty important volunteer position, right?
11   A.   Yes, ma'am.
12   Q.   Okay.  So would you agree with me that Fort Worth PD has
13   seen qualities in Joe that they can trust him, they think he's
14   smart, that he can -- believe that he's going to make the right
15   sort of decisions in very stressful situations it sounds like,
16   right?
17            MR. SELLERS:  Object to compound question.
18            THE COURT:  Overruled.
19   A.   Yes, ma'am.
20   Q.   So he's one of your all-star volunteers is what it sound
21   like?
22   A.   I would -- I would say that he is a very good volunteer,
23   yes.
24   Q.   Okay.  And to be put on a hostage negotiation team, as you
25   said, you -- you can't be a dummy and have somebody around
```

1  doing that, right?

2  A.   Since he was interpreting and that was pretty much it -- I

3  mean, he's absolutely not a dummy, no.

4  Q.   Absolutely not a dummy.

5       Joe is a pretty smart guy, right?  Owns a couple of

6  businesses?

7  A.   I would imagine -- yes.  Yes, sir.  Yes, ma'am.  I'm

8  sorry.

9  Q.   Okay.  You think he's pretty savvy business-wise?

10  A.   I would imagine.  I mean, I know he's not running those

11  businesses now, so I would imagine so.  I don't know about his

12  business dealings.

13  Q.   Okay.  You've talked about a lot of things that Joe did

14  for others, but to your knowledge did Joe ever get any

15  compensation for those things?

16  A.   Besides my frequenting his restaurant, not -- not to my

17  knowledge.

18  Q.   And as a Fort Worth PD volunteer, Joe would know that he

19  can't get compensation for the work that he's doing for Fort

20  Worth PD, correct?

21  A.   I can't testify to what he would know, but I would

22  guess not.

23  Q.   As a Fort Worth PD volunteer, Joe would know that he

24  couldn't accept money from a criminal defendant, right?

25  A.   I would guess -- I would guess that would be the case.

```
 1   Q.   I mean, as a police officer, you know that you can't
 2   accept money from a criminal defendant, right?
 3   A.   Absolutely not as a police officer.
 4   Q.   And wouldn't you expect that the Fort Worth Police
 5   Department volunteers were trained the same way, that they
 6   can't accept money as well?
 7   A.   I would -- I would have to guess that.
 8   Q.   So for all of these things that Joe has done in volunteer
 9   positions, you don't know of a time, besides -- besides your
10   meals, that Joe has ever received compensation?
11   A.   Not to -- not to my knowledge.
12   Q.   So then it probably would come as a surprise to you that
13   Joe volunteered for a position and within 60 days received a
14   Ford truck as compensation.
15        Would that be surprising to you?
16   A.   If -- it would be surprising to me if he volunteered for a
17   Fort Worth police job that he would receive something like
18   that, yes, ma'am.
19   Q.   Would it be surprising to you if he volunteered for some
20   sort of law enforcement type job where he received compensation
21   like that in the first 60 days?
22   A.   Job?  If it was a job -- I wouldn't know.  I really don't
23   know what the circumstances were as far as that goes.
24   Q.   Okay.  Would it surprise you as well if he in that
25   volunteer position received $15,000.00 on top of the truck in
```

1  the first 60 days?

2  A.   It might be -- yeah, it would probably surprise me.

3  Q.   And would it surprise you to know that Joe was untruthful

4  to the victim in this case?

5  A.   That would be extremely surprising.

6  Q.   Would it be surprising to you to find out that Joe was

7  untruthful to a Texas Ranger repeatedly when interviewed in

8  this case?

9  A.   That would -- that would surprise me.

10  Q.   Would it be surprising to you that if Joe were directly

11  asked about a vehicle that he received that he would lie to a

12  Texas Ranger about it?

13       Would that be surprising to you?

14  A.   Yes.

15  Q.   Okay.  Now, you've said you read the indictment in the

16  case, correct?

17  A.   I -- not thoroughly, but I read over it, yes, ma'am.

18  Q.   But you're not telling this jury -- you don't know

19  anything about the victim in this case?

20  A.   No, ma'am.

21  Q.   You don't know anything about the evidence or testimony in

22  this case?

23  A.   No, ma'am.

24  Q.   Okay.  You've read some allegations on a piece of paper,

25  right?

```
 1   A.   Yes, ma'am.
 2   Q.   Okay.  So you're not telling the jury in any way that your
 3   opinion has any weight on what the evidence and what the facts
 4   show in this case?
 5            MR. SELLERS:  Objection, Your Honor.  That invades
 6   the province of the jury.
 7            THE COURT:  Overruled.
 8   BY MS. MAX:
 9   Q.   You can go ahead and answer.
10   A.   Ask the question again, please.
11   Q.   You're not -- as a police officer, you know that an
12   indictment is an allegation, correct?
13   A.   Yes, ma'am.
14   Q.   Okay.  But you know its facts and evidence that are
15   presented in a court of law is what proves a case, right?
16   A.   Yes, ma'am.
17   Q.   And you know nothing about the facts and evidence in this
18   case?
19   A.   To say nothing, I can't say that.  I mean, I did look over
20   the indictment.
21   Q.   But you know that the facts and evidence, what the jury is
22   to consider is what's happened in this courtroom, and you know
23   nothing about that?
24   A.   Not much, no.  Not really.
25            MS. MAX:  Pass the witness.
```

```
1              THE COURT:  All right.  Mr. Gallian?
2              MR. GALLIAN:  No questions.  Thank you, Your Honor.
3              THE COURT:  All right.
4              MR. SELLERS:  Briefly.
5              THE COURT:  Sure.
6                          REDIRECT EXAMINATION
7  BY MR. SELLERS:
8  Q.   Would it surprise you to learn that the person who gave
9  Joe the truck and the check has testified to this jury that
10 they were gifts?
11 A.   No, it would not surprise me.
12 Q.   Would it be improper to accept a gift from a friend?
13 A.   Absolutely not.
14 Q.   Would it be improper to accept a gift from a friend that
15 you've known for a long time?
16 A.   No, it would not be.
17 Q.   Would it be surprising to you if they made up these
18 allegations and they weren't true?
19             MS. MAX:  Objection, improper character testimony.
20             THE COURT:  Sustained.  Sustained.
21 BY MR. SELLERS:
22 Q.   Would it surprise you if the allegations in the indictment
23 were not true?
24 A.   Not at all.
25 Q.   Because that's the Joe you know?
```

```
 1  A.   Yes, sir.
 2            MR. SELLERS:  Pass the witness.
 3            MS. MAX:  No further questions, Your Honor.
 4            THE COURT:  All right.  Mr. Gallian, anything?
 5            MR. GALLIAN:  I'm good, Judge.  Thank you.
 6            THE COURT:  All right.  Thank you.
 7            All right.  Any objection to me excusing this
 8  witness?
 9            MR. SELLERS:  No, Your Honor.
10            THE COURT:  Officer Mitchell, it's been a pleasure to
11  have you here.  Thank you for coming today.  You are released.
12  And you are court ordered to have a great day.
13            THE WITNESS:  Thank you, Your Honor.
14            THE COURT:  Thank you.  Appreciate you.
15            (This concludes the requested testimony)
16
17
18
19
20
21
22
23
24
25
```

```
 1                            INDEX

 2
                                                      Further
 3             Direct   Cross   Redirect   Recross   Redirect

 4   WITNESSES FOR THE
     DEFENDANT DELEON:
 5
     J.D. THOMAS       17      21      27
 6
     WILLIAM MITCHELL  29      37      43
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6     WITNESS MY HAND on this 9th day of August, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25