1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
   UNITED STATES OF AMERICA,     )    3:21-CR-236-E
5                                 )
        GOVERNMENT,               )
6                                 )
   V.                            )    DALLAS, TEXAS
7                                 )
   WILLIAM ROY STONE, JOSEPH     )
8  DELEON                        )
                                 )
9       DEFENDANTS.              )    AUGUST 9, 2023

10

11

12

13

14

15            ------------------------------

16                    TRANSCRIPT OF

17                 CLOSING ARGUMENTS

18                    VOLUME 11B

19         BEFORE THE HONORABLE ADA E. BROWN

20           UNITED STATES DISTRICT JUDGE

21            ------------------------------

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE GOVERNMENT:

 3       Jenna Danelle Rudoff
         US Department of Justice
 4       1100 Commerce St
         3rd Floor
 5       Dallas, TX 75242
         214-659-8600
 6       Fax: 214-659-8500
         Email: Jenna.rudoff@usdoj.gov
 7
         Donna S Max
 8       US Attorney's office for Northern
         District of Texas
 9       1100 Commerce Street
         Third Floor
10       Dallas, TX 75242-1699
         214-659-8664
11       Email: Donna.max@usdoj.gov

12       Marcus J Busch
         US Attorney's Office
13       1100 Commerce St
         Suite 300
14       Dallas, TX 75242
         214-659-8642
15       Fax: 214-659-8809
         Email: Marcus.busch@usdoj.gov
16

17   FOR THE DEFENDANT WILLIAM ROY STONE:

18       Gregg Gallian
         Gallian Firm
19       Parkside Tower
         3500 Maple Ave
20       Suite 720
         Dallas, TX 75219
21       214-432-8860
         Email: Gregg@gallianfirm.com
22
         Jaclyn Annette Gallian
23       Bryan Cave Leighton Paisner
         2200 Ross Avenue
24       Ste 4200w
         Dallas, TX 75201
25       214-721-8058
         Email: Jaclyn.gallian@bclplaw.com
```

```
 1   FOR THE DEFENDANT JOSEPH DELEON:

 2        Greg Westfall
          Westfall Sellers
 3        1612 Summit Avenue
          Suite 200
 4        Fort Worth, TX 76102
          817-928-4222
 5        Fax: 817-385-6715
          Email: Greg@westfallsellers.com
 6
          Frank Sellers
 7        Westfall Sellers
          1612 Summit Avenue
 8        Suite 200
          Fort Worth, TX 76102
 9        817-928-4222
          Fax: 817-385-6715
10        Email: Frank@westfallsellers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  C H R O N O L O G I C A L   I N D E X

2    August 9, 2023                                      PAGE

3    Appearances.........................................2

4    Proceedings.........................................5

5    Proceedings adjourned.............................100

6    Reporter's Certificate............................101

```
 1                   (P R O C E E D I N G S)

 2              (Jurors present.)

 3              THE COURT:  There were three small edits that I

 4    need to make to the draft that I read to you.  After closing

 5    arguments I'll have a perfected copy with the corrections made,

 6    but I just wanted to point out very quickly on Page 18, in

 7    Section B, Counts 2 through 7, Wire Fraud, 18 United States

 8    Code Section 1343.  The second paragraph under Section B reads

 9    specifically Defendant Willian.  It should be William with an

10    M.  Accidentally has an N.  So I'll correct that in the copy

11    that you get to take back and deliberate.

12                   The second tiny thing, if you turn to Page 23

13    of 26, in the fourth paragraph, which begins "The term

14    specified unlawful activity," there's a typo.  The sentence

15    should correctly read as follows:  The term specified unlawful

16    activity includes in this case that the Defendant Stone

17    unlawfully defrauded C.T. of money and other property in return

18    for Stone's purported involvement in C.T.'s fictitious federal

19    probation.  And so the corrected version will be given to you.

20                   And finally, the last small typo, which always

21    happens, on Page 24 under Section D, Count 9, False

22    Impersonation of a Federal Officer, 18 United States Code

23    Section 912.  In the second paragraph it should read, For you

24    to find the defendant guilty of this offense alleged in Count 9

25    rather than Count 8.  So the 8 is a typo; it should be 9.  And
```

1  so I will again have a corrected copy ready for you guys when

2  deliberation time happens.

3              And with that said, Counsel will give you their

4  closing arguments.

5              Government?

6              MS. RUDOFF:  Thank you, Your Honor.

7              THE COURT:  You're welcome.

8              MS. RUDOFF:  May it please the Court.

9              THE COURT:  Please.

10             MS. RUDOFF:  Ladies and gentleman of the jury, I

11  first want to take a moment to thank you.  Thank you on behalf

12  of Marcus, Donna and myself.  We appreciate all the attention

13  that you've given us.  All of your focus.  All of your

14  fairness.  And truly, and most importantly, your patience.

15             Protect and serve.  Those were the first words

16  out of my mouth when we started this journey together.  They

17  were words that relayed a meaning to Casi Thompson.  Words that

18  had meanings specifically related to the defendants.  Because

19  you -- because what you heard, and what I told you you would

20  hear, is that for more than a decade that is what the

21  defendants led Casi Thompson to believe they were there to do

22  for her.

23             The lies, the manipulation started back in 2005.

24  You heard that evidence.  Those lies and that manipulation

25  slowly built up over time.  Times when Casi Thompson told you

1  that she was at her very lowest.  Her family had abandoned her.

2  Her children were no longer in her custody.  She had been

3  arrested multiple times and she was hopelessly addicted to

4  meth.

5            These were times when Casi told you she confided

6  in Joe DeLeon and sometimes even Stone about these darkest

7  moments and her deepest vulnerabilities.  But what Casi didn't

8  know at the time, and truthfully she couldn't have known, is

9  that all those details she shared about her past would

10  eventually be the very weapons and tools the defendants used to

11  manipulate her, to terrorize her, to isolate her, to defraud

12  her from 2015 to 2019.

13            The evidence has clearly shown in this case the

14  only people the defendants ever protected were each other.  And

15  the only interest they've ever served were their own.

16            It wasn't about protect and serve for the

17  defendants.  It's always been about control and exploitation.

18  And it's those things that brought us here today.  And so to

19  understand those crimes which have been charged, and the

20  evidence that we've presented to you in support, we have to go

21  back to 2015.

22            January 2015.  You heard evidence that Casi came

23  home from rehab.  She was clean, healthy, happy.  Reunited with

24  her family.  Mending relationships with her children.  She was

25  on the up-and-up.

1           And in February 2015, you heard evidence that

2   Casi's beloved grandmother, Myrna Thompson, added Casi as the

3   executor of the estate.  This was a big deal to Casi.  She told

4   you about that.  It meant that her family had accepted the old

5   Casi was back.  The meth-using Casi was gone.

6           Unfortunately, November 6th, 2015, her

7   grandmother passed away.  With the matriarch of the family no

8   longer in the picture, it was up to Casi to plan the funeral

9   and to make sure it went exactly the way her grandmother

10  wished.

11          Soon after that, you heard evidence that that

12  very night, the defendants showed up at her house, ready to

13  talk.  And within just a couple weeks, Casi goes and gets the

14  will of Myrna Thompson probated.  The money's now released.

15  And the evidence showed you two days later, on December 16th,

16  2015, the plan, the scheme was set in motion.

17          And it was on December 16th, 2015, that Casi

18  Thompson officially went from a person to a project.  Project

19  Number 2.  That's what the evidence showed you.  That's how the

20  defendants referred to her.  No consideration for her feelings.

21  No consideration for the position that she was in.  Her fear,

22  her desperation to stay on the track she was on.  She was a

23  project.

24          A project.  Casi still thought the defendants

25  were there to protect and serve, but it very quickly became

1  very clear the defendants' own purpose was to control and

2  exploit.

3            You heard evidence and testimony about all the

4  different manners of control and exploitation.  You heard Casi

5  tell you that she had to get 12 sessions for tattoo removal.

6  The pain she had to go through because she was put under the

7  impression that there was a tattoo on her body that needed to

8  be removed as it related to her probation.

9            You also heard her testify about an experience

10 where Bill Stone told her, and described in great detail, about

11 a video in which he viewed and was publicly out and available,

12 where she was gang raped.  Gang raped.

13            And her only concern at that moment was, one, of

14 embarrassment, because she thought it actually happened to her;

15 and two, that this video, if it got out, what would happen to

16 her probation, what would happen to her children.  That

17 instance, along with all of the other ones the evidence

18 presented; the spoof call, the Jordan Green messages, CPS

19 scares, those were all the tools the defendants used to control

20 and exploit.

21            I want to walk you through the charges.  You

22 have the law in front of you.  The judge read it to you.

23 That's the law that guides this case.  And as we go through

24 them, I'm going to be sure to point out evidence in support.

25 But remember, all of the evidence you heard this week,

1    everything that came from that witness stand, these documents,

2    is for your consideration.  And that the words of the lawyers,

3    any one of us, it's not evidence.

4                    Looking at Count 1, Conspiracy to Commit Wire

5    Fraud.  The basic elements are that William Stone and

6    Joe DeLeon conspired to unlawfully defraud Casi Thompson of

7    money or other property.  The essential elements:  That there

8    was an agreement to commit the crime of wire fraud; that the

9    defendants each knew this plan was unlawful or a crime; that

10   they joined in this willfully to further that unlawful purpose.

11                   So in layman's terms, let's get down to the

12   nitty-gritty.  What does that mean?  What do we have to prove?

13   There was an agreement between the defendants.  Each defendant

14   understood the plan was unlawful.  They intentionally and

15   knowingly joined in, even just on one occasion; and they did so

16   with the intent to deceive and deprive another of money or

17   property.

18                   But let's talk about what we don't have to

19   prove.  We don't have to prove that there was any kind of

20   formal agreement.  There was no need for a contract; there was

21   no need for a full-on sit-down, let's lay this plan out.  We

22   don't have to prove that.  The law says so.

23                   We don't have to prove that anyone involved in

24   the conspiracy had knowledge of all the details of the

25   conspiracy.  We don't have to prove that each of the defendants

1   were in agreement to all the details of the conspiracy.  And we

2   don't have to prove, for the conspiracy purpose, that each

3   defendant or either defendant actually committed wire fraud.

4                   To break this down even further, one thing I

5   think is important to note that we also don't have to prove, we

6   do not have to prove whether Joe DeLeon believed the secret

7   probation was real or not.  That's what the law says.

8                   And so I want you to keep that --

9                   MR. SELLERS:  Can we approach, Your Honor?

10                  (Sidebar conference, off the record.)

11                  (Jurors exit courtroom.)

12                  THE COURT:  Please be seated.

13                  So I hate to interrupt closing arguments, but we

14  need to nail something down here.

15                  So all right.  Outside the presence of the jury,

16  what is your objection, Counsel?

17                  MR. SELLERS:  Our objection is that this is a

18  misstatement of the law in that she's telling them that Joe

19  didn't even have to know about the scheme or artifice to

20  defraud being real.

21                  THE COURT:  Where in the charge do we go through

22  that?  Help me with that.

23                  MR. SELLERS:  That is going to be in the

24  substantive section of Count 1.  And just so the record is

25  clear, she has displayed a slide to the jury that says, we

1    don't have to prove.  And in red it says, whether DeLeon

2    believed secret probation was real.  And we object to the slide

3    and the statement.

4                  THE COURT:  Okay.  Government, what's your

5    response?

6                  MS. RUDOFF:  Your Honor -- may I go ahead?

7                  THE COURT:  Go ahead.

8                  MS. RUDOFF:  Yeah, on Page 16, under Conspiracy,

9    it specifically says that they don't have to know all of the

10   details on the unlawful scheme.  And so the scheme and the plan

11   here is to -- well, we believe that Joe DeLeon knew it wasn't

12   real.  But even if he thought the probation was real, there is

13   evidence to show he knew to take money, property from a

14   criminal defendant probationer is unlawful and is a crime under

15   those pretenses.

16                  THE COURT:  Gotcha.  So you are saying this

17   falls within the not knowing all the details.

18                  MS. RUDOFF:  Not knowing all the details, Your

19   Honor.  And that the object of the conspiracy is to defraud

20   Casi Thompson under the basis of a probation, not whether the

21   probation was real or not.

22                  THE COURT:  Okay.

23                  MR. GALLIAN:  If I may be heard, Judge?

24                  THE COURT:  Sure.

25                  MR. GALLIAN:  Pulling from the superseding

1   indictment; specifically Page 3, Paragraph 9, Objects of the

2   Conspiracy, the object of the conspiracy was to unlawfully

3   defraud C.T. of money and other property in return for Stone

4   and DeLeon's purported involvement in C.T.'s fictitious federal

5   probation.  We join in DeLeon's objection, Your Honor.

6                    THE COURT:  All right.

7                    MS. RUDOFF:  And, Your Honor, may I respond?

8                    MR. WESTFALL:  May I say one more thing, Your

9   Honor?

10                   THE COURT:  Yes.

11                   MR. WESTFALL:  At Page 15, where it actually

12  sets out the elements, the second element is that the defendant

13  knew of the unlawful purpose of the agreement.  And in -- I

14  mean, that is another way of saying exactly what they've told

15  the jury that they don't have to prove, Your Honor.  I think it

16  lowers their burden of proof.

17                   THE COURT:  You've got your appellate here.

18  What's she say?

19                   MS. RUDOFF:  Your Honor, I -- may I ask her to

20  come up?

21                   THE COURT:  Sure.

22                   MS. RUDOFF:  And I did speak with appellate

23  prior.

24                   THE COURT:  You-all talk amongst yourself for

25  just a second.  We've got to get the show back on the road, but

1    I'm going to talk to my lawyers back here for a minute.

2                   (Brief pause.)

3                   THE COURT:  Outside the presence of the jury.

4    And I'll tell you, here's what we can't do, a bunch of

5    objections during closings.  So I understand this is -- this is

6    in good faith.  I'm not trying to get on to you about that.

7    But just so we're clear, I'll let everybody be heard on this.

8    But when I'm looking at the law, I don't think they have to

9    know all the details.  I think it is up to the jury as to what

10   they decide or not.

11                  So as -- from my read on this --

12                  MR. SELLERS:  Can the Court -- on Page 17, the

13   first element of this is that the defendant knowingly devised

14   or intended to devise a scheme to defraud.  The scheme to

15   defraud was the probation.  She's telling the jury he doesn't

16   even have to know about that.

17                  THE COURT:  That's not what I'm saying.  I'm

18   saying you have to look at all of this in context.  So here is

19   where I'm at on this.  I have given them the law.  You-all are

20   arguing what the facts are.  I want to instruct them when they

21   come back that they are to determine what the facts are and to

22   be governed by the law that I have given them.

23                  What we're not going to do is split hairs.  I

24   mean, I understand -- I'm not saying you're not in good faith.

25   You are.  But I don't read this the way you do.  So lay down

 1  whatever you need to lay down for the record.

 2                  MR. SELLERS:  Okay.

 3                  MR. WESTFALL:  Nothing further for the record,

 4  Your Honor --

 5                  THE COURT:  I'm sorry?

 6                  MR. WESTFALL:  -- if you admonish them, just as

 7  you said, and we don't say this stuff anymore.

 8                  THE COURT:  Because you guys are going to

 9  disagree a lot on the facts.

10                  MR. SELLERS:  The facts are one thing; the law

11  is another.

12                  THE COURT:  I know.

13                  (Sotto voce discussion.)

14                  THE COURT:  And I -- Mr. Sellers, I want to

15  caution you.  I know you can be very passionate, and that is

16  fine.  I want you to represent your client and be zealous.  Do

17  not get cute with me.  So I've read this.  So don't make any

18  sidebars, all right?

19                  All right.  So here's what I'm going to do.  I'm

20  going to instruct them to come in.  They are to be governed by

21  the law that I've given them.  They are to determine what the

22  facts are there.  I understand your objection.  I think that

23  this falls within the province of the jury.  And so I'll -- I

24  will instruct them appropriately.

25                  Are there any other objections that need to be

```
 1   made at this time?

 2              MR. WESTFALL:  Not at this time, Your Honor.

 3              MR. GALLIAN:  No, Your Honor.

 4              MS. RUDOFF:  Your Honor, may I just clarify?

 5   Because I think Mr. Westfall had said something about me not

 6   speaking about it again.  But my understanding is that I can

 7   continue to speak about this in my argument.

 8              THE COURT:  I'm overruling the objection.

 9              MS. RUDOFF:  Thank you, Your Honor.

10              THE COURT:  And I will instruct them to

11   determine the facts as they found them.  So and --

12              MR. SELLERS:  May I have a running objection so

13   I don't have to do it again?

14              THE COURT:  No, no.  I mean, if you think

15   you've -- state your position.  And -- but if you think you

16   should object every time they have a fact you disagree with, or

17   if you think they're getting into something that they should

18   have to prove by law, I'm the judge of the law.  Preserve it

19   for appeal.  And if you feel like you need to reurge it, you

20   can.  But I'm not going to give you a running objection to

21   everything.

22              MR. WESTFALL:  That is fine.

23              THE COURT:  And I'm just -- I'm just saying,

24   both sides are going to say things the other side doesn't like.

25   So I'm not going to kick the jury out every time.  So I
```

1   understand you're advocating.  I'm not trying to get your tail

2   for that.

3                MR. WESTFALL:  May I say one more thing for the

4   record?

5                THE COURT:  Certainly.  Of course.

6                MR. WESTFALL:  Whether DeLeon believed the

7   secret probation was real, our position is they are making a

8   statement of law, not fact.  They're trying to tell the jury

9   that they don't have to prove something.  And -- and so

10  that's -- that's our big complaint.  Not any sort of a

11  disagreement about facts.

12               THE COURT:  Okay.  And so can you point to me

13  specifically -- we've got them kicked out now.  Point to me

14  specifically as to what you think -- why you believe that to be

15  so.

16               MR. WESTFALL:  Because the second element of

17  wire fraud, Page 15 --

18               THE COURT:  Okay.

19               MR. WESTFALL:  -- is that the defendant knew of

20  the unlawful purpose of the agreement.  And the -- the first of

21  the substantive wire fraud, I guess, on 17, is that the

22  defendant knowingly devised and intended to devise what -- this

23  statement, what she had up there --

24               (Brief interruption.)

25               MR. WESTFALL:  So the statement that they made

1    is actually of law and it actually undercuts their necessity to

2    prove intent.

3                 THE COURT:  So is it your position that the

4    unlawful purpose of the agreement was the secret probation; is

5    that what you're saying?

6                 MR. WESTFALL:  That's what's alleged in the

7    indictment, Your Honor.

8                 THE COURT:  What is your response, Government?

9                 MS. RUDOFF:  Your Honor, the -- the purpose of

10   the conspiracy, under the indictment and the law in this case,

11   is that the intent was to financially benefit from Casi

12   Thompson's belief in a secret probation.  If this were even a

13   real probation, the acts would still be crimes under the law.

14   So whether it's fake or not is not the consideration.

15                Additionally, Your Honor, with regards to having

16   to prove every element of wire fraud, as the Court knows in the

17   charge, we do not have to do that for purposes of the

18   conspiracy.

19                THE COURT:  And, Mr. Gallian, you have anything

20   you need to lay down?

21                MR. GALLIAN:  Nothing further, Your Honor.

22                THE COURT:  I agree.  I think that the unlawful

23   purpose is larger than that, yeah.

24                (Sotto voce discussion.)

25                THE COURT:  So all right.  Let's bring them back

1  in.  I don't plan to kick them out again.  So any objections

2  you have you'll need to make them live.

3           And with that being said, obviously don't give

4  them anything -- I sided with you on this one.  I think the

5  scheme is larger than this particular point.  But I'm not

6  saying waive making objections.  You are doing your jobs as you

7  should, so keep doing it.  And I'll just -- we'll take it from

8  there.

9           All right.  Thanks, guys.

10           (Jurors enter courtroom.)

11           THE COURT:  All right, everybody please be

12  seated.  Thank you all for your patience.

13           So before we go back to closing arguments,

14  remember that you are the judges of the facts, I am the judge

15  of the law.  I have given you the law that governs this case

16  and you are to be bound thereby.  But you will determine what

17  the facts are.

18           With that said, you may proceed.

19           MS. RUDOFF:  Thank you, Your Honor.

20           Based on what the law tells us and the facts of

21  this case, the government does not have to prove whether

22  Joe DeLeon believed the secret probation was real or not.

23  Because even if the secret probation was real, there could

24  still be a scheme and intent to defraud on the basis of Casi

25  Thompson believing she's on probation and believing she has to

1   pay these individuals for their services as a result of that

2   probation.

3               And the evidence you've seen this week shows

4   that there was an agreement between Stone and DeLeon, and that

5   agreement was to carry out Casi Thompson's secret probation.

6   That they had an intent to financially benefit from Casi

7   Thompson's belief in the secret probation, and that each knew

8   it was unlawful to financially benefit from the secret

9   probation.

10              Now, there were multiple false

11  misrepresentations related to whether or not each defendant

12  knew it was unlawful to financially benefit.  But this is what

13  the evidence shows.

14              Let's walk through the agreement.  How do we

15  know?  I told you at the beginning of this trial that this

16  wasn't going to just be the basis of Casi Thompson -- what Casi

17  Thompson said.  This was going to be about facts and evidence

18  and documents.  And that's why we took the time to put that in

19  front of you.  That's what this case is about.

20              And where it started was when Bill Stone told

21  Casi Thompson you are on secret federal probation in 2015.  We,

22  as in Bill Stone and Joe DeLeon, are the only individuals able

23  to carry out the administration of this secret probation.  You,

24  Casi Thompson, financially owe us for our time and efforts

25  related to the secret probation.  You, Casi Thompson, need to

1   pay for travel expenses related to this secret probation.

2   Keeping your children depends on our involvement in the secret

3   probation.  Failure to comply with our directions means prison,

4   50 years.

5               As a result, you heard evidence DeLeon and Stone

6   agreed to serve as Casi Thompson's probation officers for the

7   secret federal probation.  DeLeon and Stone, you heard evidence

8   of and you saw the 3x5 cards and the text messages, they both

9   enforced the conditions of these probations -- this probation

10  to Casi Thompson.  And both Joe DeLeon and Bill Stone accepted

11  money and property from Casi Thompson as a result of their role

12  in the secret probation.

13              And Casi told you what these conditions of the

14  secret probation were.  You see them here.  Commit no new

15  offense, account for all activities and whereabouts, which had

16  to be provided on a 3x5 card.  Spend designated time on phone

17  and in person with DeLeon and Stone.  Not allowed to travel

18  unless given permission and granted by the Court.  Not allowed

19  to date unless that individual is vetted and goes through a

20  background check by Bill Stone.  And you must pay costs

21  associated with probation.

22              Casi Thompson thought the purpose of this secret

23  probation and these conditions were to protect and serve.  But

24  the evidence told us it was simply to control and exploit.

25  Because for Casi Thompson, the next four years of her life

1    included that she could not tell anyone about this secret

2    probation.

3              All her phone calls and texts were being

4    monitored.  There was evidence that that actually happened to

5    her.  You saw messages where Bill Stone and Joe DeLeon were

6    conducting physical surveillance of her as she moved about

7    town.  You saw the document where she had to give over

8    financial power of attorney to Joe DeLeon.

9              For Casi Thompson, the reality of this secret

10   probation, she lived in constant fear.  She told you that she

11   experienced mental and emotional isolation because she was

12   living a life that she had to keep secret from everyone,

13   because her life depended on it, is what she was told.

14             The reality was Casi Thompson had to have every

15   vulnerability and aspect of her past, the past she had worked

16   so hard to come away from, and had pulled herself away from it,

17   that was all brought up again and used to exploit her.  Casi

18   Thompson told you she suffered in a state of silence about this

19   secret probation and the fears she was experiencing for four

20   years.

21             We showed you evidence about what else happened

22   to Casi Stone -- or Casi Thompson, excuse me, and what her

23   reality of this secret probation was.  In Government

24   Exhibit 155 and 172 there was a call on August 15th, 2019, and

25   it was between Casi and Bill Stone.  Casi says, you've got a

1    pretty good setup over there.  Bill Stone says, yeah, yeah.

2    I've got a good setup.  Definitely.  Casi says, you're welcome.

3              What does Stone say?  Well, thank you.

4              Casi then, in that same call says, that's the

5    other thing.  I can't even afford to put myself back through

6    school to get my social work degree.  Why?  Because she had

7    been forced to give over more than $700,000 in a one-year

8    period of her money to Joe DeLeon and Bill Stone.  This was the

9    other reality for Casi Thompson.

10             Let's talk about the reality of the secret

11   probation for Joe DeLeon.  Joe DeLeon's text messages and

12   phone, no evidence they were being monitored.  In fact, when he

13   got off recorded calls with Casi or with the agents, he texted

14   Stone to let him know he was done.  If Bill Stone could read

15   his messages and could tell when he was on the phone, why would

16   Joe DeLeon do that?

17             Joe DeLeon knew he was not being surveilled and

18   monitored.  No evidence of physical surveillance of Joe DeLeon.

19   No evidence that Joe DeLeon had to continue with this secret

20   probation because he feared prison.  No exploitation of his

21   vulnerabilities, his past experiences.  And there's no evidence

22   that he was isolated from friends, family or relationships.

23             But what did Joe DeLeon get out of this?  He got

24   to pretend to have a purpose, power, importance.  We know he

25   got a $15,000 check.  We showed you that check, the text

1   message, evidence of it.  30 days into this probation,

2   Joe DeLeon had to believe 30 days of his work as a probation

3   officer sufficed for $15,000.  And he had never received gifts

4   from Casi Thompson before.  Gifts, as they like to say.  All

5   the years he had helped her, all the years he had supported

6   her, no money exchanged.  But now, there's money on the table.

7   And Joe DeLeon took it.

8           He also got a brand-new F-150 30 days after he

9   gets a $15,000 check.  So for 60 days of work, the evidence

10  shows 60 days, Joe DeLeon thought as a probation officer he was

11  entitled to a $40,000 truck from the same probationer who just

12  gave him 15 grand?  That's not a gift.  That's not just a lie;

13  it's a crime.  The evidence showed that Joe DeLeon got more

14  than $50,000 as a result of his involvement in Casi Thompson's

15  secret probation.

16          Let's talk about the reality of the secret

17  probation for Bill Stone.  Bill Stone, at this point the

18  evidence has shown a retired FBI agent.  No more badge.  No

19  more gun.  No more power.  What did he get out of the

20  probation?  He too got to pretend he had a purpose; that he had

21  some kind of power, and that some way, somehow he was

22  important.

23          We also showed you his financials.  This is what

24  Bill Stone was able to attain in the very first year of secret

25  probation.  His very first year of retirement.  The calendars

1  told you he was debt free.  His house was paid for, $110,000

2  Mercedes paid for.  Tacoma, brand-new Tacoma paid for.  His

3  house was paid for.  By who?  Casi Thompson.  Why?  Because she

4  believed it was necessary to secure her secret probation and

5  maintain her freedom.

6              Here's a picture of the house.  We showed you

7  the evidence.  That house was bought by Casi Thompson, yet

8  she's nowhere on the deed, nowhere on the title.  Never once

9  lived there.  Never once even kept an article of her own

10  clothing there.  That is not Casi Thompson's house.  That was

11  Bill Stone's.  Casi Thompson was just forced to pay for it.

12              Here's a picture of the Mercedes.  Bill Stone

13  got this Mercedes in portion from a cashier's check that Casi

14  Thompson believed she had to give over, 76,000.  How did he get

15  the other 43,000?  He traded in Casi Thompson's Lexus that just

16  days before he had told Casi Thompson someone planted drugs in.

17  What was Casi Thompson's response?  I can't have anything to do

18  with that; I'm on probation.  I can't risk my children.  I

19  can't risk my freedom.  Take it.  The words Bill Stone wanted

20  to hear.

21              Toyota Tacoma.  Now, remember at this time Bill

22  Stone is telling Casi that he doesn't even live in Dallas, yet

23  he has two cars.  All a part of the different lies.  What else

24  did he get?  He got financial freedom for a while.  Go look at

25  the calendars, Government's Exhibit 92A through 98A.  You will

1  see that while Bill Stone was receiving payments in 2015 and

2  2016 from Casi Thompson as a result of this secret probation,

3  he was living financially free.  So much so that even in 2017

4  and 2018 and 2019, when he wasn't getting payments from Casi

5  Thompson, he was still able to be debt free.

6              He didn't have a car payment.  Didn't have a

7  house payment.  Cash in the bank.  And the records show you he

8  started receiving his full retirement.  In the fall of 2016,

9  Bill Stone's $700-a-month payment that he was getting from his

10  pension went considerably up.  He had almost double the source

11  of income legitimately, plus everything he got unlawfully from

12  Casi Thompson.

13              Also in the calendars -- that's what Casi

14  Thompson was to him.  Not a girlfriend, not a fiancee.  It was

15  a project.  A project to keep him debt free.  And a project to

16  make him feel like he had some sort of power.

17              Go look in the calendars.  It's evidence.  Look

18  at the kind of things Bill Stone writes down.  You'll find it's

19  very detailed.  You'll find it's very specific.  And when he

20  talks about Casi Thompson, even engaging in sexual acts with

21  her, he refers to her as project or pro.

22              Does that sound like a relationship?  Bill Stone

23  also got more than $700,000 in money and property out of this

24  secret probation.  And remember the evidence we showed you.  Go

25  look back.  That happened between December 2015 and

1   December 2016.  700,000.

2              How else do we know that there was an agreement

3   between the two to defraud Casi Thompson?  We showed you

4   evidence of the vehicle titles.  Casi Thompson testified that

5   in each instance she was brought the document to transfer title

6   from the truck to Joe DeLeon, and she was brought the document

7   from Bill Stone for the Lexus.  Yet both, within days of each

8   other, have the same sales price listed.  And not a round

9   number like 20- or 25,000, 30,000.  No, not that.  20,100.

10  It's evidence of agreement.

11             Here you see the Lexus.  Evidence of agreement.

12  The two talked it out.  They figured it out together.

13             We also showed you that they both financially

14  benefited from the conspiracy.  We've already talked about

15  evidence of the $15,000 check.  And go back and listen to the

16  recorded calls.  Ranger Briley's interview of Joe DeLeon.

17  Doesn't bring up the $15,000 check.  Just doesn't.  He

18  specifically asked, did you receive any property, monetary?

19  What does he say?  Piddly stuff.  But I bought a truck.  No

20  mention of a $15,000 check.

21             And we heard evidence that Casi confronted Bill

22  Stone about this.  It's Government's Exhibit 155 and 172.  Casi

23  said in that call, I've always brought up the fact that Joe

24  should not have gotten that truck.  And I've always griped

25  about the fact that I had to pay 120-something thousand dollars

1  in restitution that I don't even have proof actually went to

2  the place.  You know, Eric, all that stuff when you used to

3  tell me about like him?

4         She's mad in that call.  Go listen.  You guys

5  heard it.  Because she realizes she's being defrauded.

6  Exploited.  What's Bill Stone's response?  Well, I'm sorry you

7  feel that way, Casi.

8         Now, in opening statement, Mr. Gallian, Bill

9  Stone's lawyer, told you, listen to the things on the calls

10 Casi says to Bill Stone, and listen to his responses.  And I

11 agree.  Because it tells you everything you need to know.

12        We also saw the $250,000 cashier's check that

13 Casi believed she had to give in restitution.  And how do we

14 know that there was a mutual intent to defraud Casi Thompson?

15 We showed you evidence of these checks.  The first one,

16 Joe DeLeon writes to Casi Thompson for how much?  20,100.

17 Remember, that's the same amount written on the transfer of

18 title for Lexus.

19        Two weeks later, Joe DeLeon says, Casi, write me

20 a check back.  Yet every single time Joe DeLeon meets with

21 Ranger Briley, and even Special Agent Brian Luley, he continues

22 to say, I bought the truck.  I have the check.  See, I have a

23 paper trail.  If you don't think you are doing something wrong,

24 if you're not committing a crime, why are you creating a fake

25 paper trail?

```
 1              And if this was a gift -- which we've heard no
 2   evidence to suggest.  No evidence to suggest that this was a
 3   gift.  Casi Thompson told you it wasn't.  That call she told
 4   you it wasn't -- even if it was a gift, why does Joe DeLeon
 5   himself, in every single recording, continue to tell law
 6   enforcement, I purchased it?  I purchased the truck.  But now
 7   it's a gift?
 8              Because if it's a gift, is it a crime?
 9   Joe DeLeon hadn't thought that through.
10              Further intent to defraud Casi Thompson.  We
11   showed you text messages between Joe DeLeon and Bill Stone.
12   This is dated in 2018.  Joe DeLeon says:  Somebody's got to
13   make some money.  I sure am not doing it.  Bill Stone responds:
14   Well, I remember not too long ago 3 million reasons for you to
15   get married.
16              Casi Thompson inherited $3 million.  Their
17   project.  What does Joe DeLeon respond?  I would not marry her
18   back then for more -- back then for 3-plus million reasons.  I
19   would not marry her if she's the last woman on earth, so help
20   me God.  I made that promise in church one day and I'm not
21   going back on that promise.
22              Does that sound like the kind of relationship
23   where you are getting $15,000 gifts from the person you are
24   speaking so poorly of, or that your only focus in speaking
25   about them is the money they inherited?
```

1             It's an intent to defraud.  How else do we know

2    Joe DeLeon was in on this intent to defraud?  I showed you the

3    progression of their relationship through the cell phone.

4    Joe DeLeon had Casi Thompson's number since 2010, 2012.  And

5    over time it progressed.  And it matched the progression that

6    Casi told you about the relationship.  They started to get

7    closer.  He was being supportive of Casi.  She leaned on him.

8    No request for money, but the relationship grew.  And when

9    their relationship grew, we see that he figures out how to

10   spell her name.  Makes sense, right?  And from November 2014 to

11   September 2015, she still exists in Joe DeLeon's phone as Casi

12   Thompson, spelled correctly.

13             Days after this secret probation starts,

14   Joe DeLeon goes into his phone and changes her to Project

15   Number 2.  To Joe DeLeon and Bill Stone, she was no longer a

16   person.  She was a project.  And she was their source of money.

17             Casi, again, is having a call -- we played this

18   for you -- with Bill Stone.  She tells Bill, I think you should

19   try to get that money back for me from Joe.  He didn't deserve

20   that.  For what?

21             What does he respond?  Casi, I don't talk to Joe

22   hardly.  But if you want me to, what do you want me to say?

23             It's a lie by Bill Stone.  We entered his toll

24   records.  Around this time in 2019, him and Joe DeLeon were

25   talking quite often.  Why is he lying to Casi Thompson about

1  when he speaks to Joe?  What's he trying to cover up?  His

2  connection and communication?  His attempts to keep Casi

3  Thompson under the guise that this secret probation exists?

4  Because with that comes what?  Control, exploitation and a

5  coverup of the crimes.

6          Casi then in that same call responds:  I mean, I

7  don't know what to say.  You can try.  I mean, you know what to

8  say.

9          Bill Stone says:  You know what, I will.  When I

10  get back, I'll do it.  I'll go meet with him and I'll talk to

11  him.

12          Never happened.  They met.  There's evidence of

13  it.  They talked.  There's evidence of that, too.  Never about

14  getting Casi her money back that she was exploited out of.

15          Further of intent to defraud.  We told you that

16  Government's Exhibit 98A, the calendar for 2020 that was found

17  neatly placed on Bill Stone's desk during the search warrant --

18  not hidden.  Go look at it -- it's blank until May 2020.  Then

19  you see entrance -- entries.  They don't match the real 2020

20  calendar that Don Stoner and Ranger Briley said were hidden

21  behind trash can liners.  It doesn't match.  Go compare them

22  for yourselves.  They're evidence.

23          Why would Bill Stone start creating a new

24  document, a fake document of what he's been up to in May of

25  2020?  Well, because that's when Joe DeLeon told him, hey,

1    Department of Justice is investigating us.  It's trying to

2    cover it up.  And he tried to hide it.  There's the real

3    March 2020.  There's the fake.

4                    Further intent to defraud, July 2019, around the

5    spoof call -- I'm sorry, June 2019.  June 18th, spoof call to

6    Project.  Project suspicious of me.

7                    Casi starts to wonder, starts to question.  What

8    does Bill Stone do?  He needs to silence her.  Joe DeLeon needs

9    her to be silent, too.  Because if she talks, the crimes come

10   out.

11                   Casi breaks up with me.  He increases

12   surveillance.  Bill Stone brings in Joe DeLeon.  If Bill Stone

13   is just worried about his girlfriend breaking up with him in

14   June of 2019, why does he need Joe DeLeon's help?  Why does

15   Joe DeLeon want to help him?  Because they both have crimes to

16   cover.  And the only way to keep them covered is to keep Casi

17   Thompson quiet and under their control and further

18   exploitation.

19                   May 2020.  Bill's doing surveillance.  Casi

20   Tahoe gone, Granbury.  Joe visit OIG.  Saw Joe; got intel.  We

21   told you the evidence showed that in between those recorded

22   calls, the two of them were meeting and talking.  Intel, to use

23   that word, Joe DeLeon's not cooperating with law enforcement.

24   He's making calls, yes.  He's cooperating with Bill Stone.

25                   At the point in which we know, and evidence

1   shows, he is aware fully this probation is not real; and that

2   to have engaged in it and receive money in return is a crime.

3   That's why Joe DeLeon is involved at this point in time even.

4   That's why Joe DeLeon is trying so nicely to offer his services

5   to law enforcement.  It's continuing to control.  Control the

6   narrative, control the situation, cover their crimes.

7                  Counts 2 through 7, wire fraud.  I'm going to go

8   through these quickly because we spent a lot of time talking

9   about financials.  And as much as Andy Latham probably enjoys

10  them, I don't know that that's everybody's take on the -- the

11  records and the numbers.  But you have the evidence.  It's

12  there and you can check it.

13                 So for wire fraud, Counts 2 through 7, this is

14  just with regards to Bill Stone.  Count 1 is Joe DeLeon and

15  Bill Stone.  And you have the law in front of you.  Which

16  states that Joe DeLeon -- we don't have to prove, for purposes

17  of the conspiracy, that wire fraud was actually committed.  But

18  for purposes of Counts 2 through 7, for Bill Stone, which are

19  wire fraud counts, we do have to prove that the offense was

20  committed.  And we've done that.

21                 Schemed to defraud, employed false material

22  representations and transmitted or caused to be transmitted by

23  way of wire and interstate commerce.  That's my least favorite

24  element because it is the most confusing.  Fortunately for you

25  guys there is a stipulation by the parties.  It's in your

1   charge.  That's been proven.  You don't have to worry about

2   that.

3           Mr. Gallian stood up in opening statement and

4   said this comes down to one thing.  Bill Stone didn't have an

5   intent to defraud.  Well, that is one of the elements we have

6   to prove, a specific intent to defraud.  What does that mean?

7   Well, a conscious knowing intent to deceive someone and to

8   cause loss or harm.

9           So what evidence did we do of Count 2?  We had a

10  cash withdrawal, $9,000, on or about June 3rd, 2016.  Here's

11  the cash withdrawal.  Casi Thompson, June 3rd, 2016, $9,000.

12  Here's the text messages that support it.  Why do these text

13  messages matter?  Because Casi Thompson told you any time there

14  was some legal crisis or crazy drama going on with her

15  probation or her legal situation, Bill Stone said, Casi, I've

16  got to travel for the work I'm doing for you.  I need you to

17  pay for my travel expenses.  And she did.  She would.  That's

18  what this 9,000 was for.

19          We also know that money went to Bill Stone

20  because Bill Stone told us.  It's in his calendar.  Joe,

21  Project 2:  Post office, money.  And then we see him deposit

22  cash.  Which Andrew Latham told you, at that point in time,

23  other than the $700 he was getting per month from his pension,

24  he didn't have another legitimate source of income.  There was

25  nowhere else for the money to be coming from.

1          So how do we know that -- about this lie?  About

2    the travel and the $5,000 withdrawals?  Well, Casi told you.

3    But there is also evidence to support it.

4          On 1-4, we see the $5,000 cash withdrawal.  Now,

5    this isn't one of the indicted wire fraud counts, but we see

6    it.  We also see a calendar entry saying Bill Stone and Casi

7    Thompson met the same day.  We then see, a couple days later,

8    text messaging, Bill Stone and Joe DeLeon.  What's Bill Stone

9    doing?  Says he's traveling.  We know from the toll records he

10   was in the Dallas/Fort Worth area the entire time.  But Casi

11   gave him money because he said he was traveling for her

12   probation.

13         February 22nd, 2016, Casi deposits that check

14   from Joe DeLeon in response to the check she already gave him,

15   and she gets $5,000 cash back.  Same day:  Dinner with Joe,

16   Project.  Money.  Went to Bill Stone.

17         Two days later, text message:  Did you make it

18   to Washington?  Bill Stone says he's traveling.  That's why

19   Casi gave him that money.  We see March 4th, 2016, Bill Stone

20   says -- I'm sorry, March 3rd, Just landed in Austin.  Any

21   project stories?  Joe DeLeon responds, Yeah, she just went to

22   the bank.  What does Bill Stone say?  Okay.  I'll head and meet

23   you there.

24         Casi Thompson leaves the bank, goes and meets

25   Bill Stone.  And we know that because Bill Stone told us.

1           Dinner with Project, Dave and Buster's, dollar

2   sign.

3           We also know, because it is in the recordings,

4   Casi confronted Bill about it.  Government's Exhibit 143 and

5   144.  Casi says, And then every time you took a flight, I had

6   to pay you $5,000.  I just don't understand what was so

7   expensive.

8           And Mr. Gallian told you pay attention to

9   Stone's response.  What does he say?  I can't answer that.  I

10  don't know.  He doesn't respond and say, Casi, what are you

11  talking about?  What 5,000; what money; what travel?  I was in

12  Dallas.  That's not what he says.  Why?  He knows he's being

13  recorded.  He knows there's an investigation.  And Bill Stone

14  and Joe DeLeon believed if they could keep up the fact that

15  this probation was real, law enforcement would back off.

16  Because in their mind, it was just the rangers; not federal law

17  enforcement.  And that's what their goal was.  Casi asks again,

18  5,000 every time you fly?

19          Count 3 is the cashier's check payable to Park

20  Place Mercedes.  I won't belabor this more.  Those are the

21  elements, and here is how we met them.  You've seen the checks.

22  Then Casi told him in a call, you know, I buy you a $120,000

23  car, and it would be worth it if I did get this probation.  But

24  if it was not real, then why did you accept the money?

25          What does Bill Stone respond?  Casi, you know

1   what, we've gone over this.  Beat this dead horse.

2                    We also see more evidence to support it.  Picked

3   up vehicle.  Breakfast with Joe.  Looked at new cars.  The

4   cashier's check was related to the probation.

5                    Count 4, wire fraud.  Cash withdrawal, 5,000, on

6   or about June 24th, 2016.  The law in front of you tells you

7   that these dates are on or about.  So if a $5,000 withdrawal

8   did not happen on June 24th, 2016, but happened around that

9   same time, it's still enough to support the count.  And we

10  showed you that.  There is a $5,000 withdrawal on May 25th,

11  2016, and the law says that is sufficient for the date.

12                    And we see more text messages in support,

13  Count 5, wire fraud.  Cashier's check payable to Toyota of

14  Grapevine.  Dates, checks, Bill Stone tells us.

15                    Count 6, wire fraud.  Cashier's check payable to

16  Bill Stone.  154,500.  I poorly did the math with Casi, if you

17  guys remember that far back, when we were talking about the

18  house.  But between the $250,000 restitution check she gave

19  Bill Stone and the 154,500 for the house, was more than what

20  Bill Stone paid in cash without a mortgage, without a lender,

21  for that home.  And that was on or about September 13th, 2016.

22                    Count 6, wire fraud.  There's that check.  Meet

23  and feed the project.  Pick up check.  And we later see Bill

24  Stone deposit it.

25                    Casi confronts Bill Stone.  We played the call

1  for you.  What does he say?  I'm sorry it's pissing you off,

2  Casi.  I really am sorry.  Doesn't offer to give the money

3  back.  If this was about a relationship, why not give the money

4  back?  Why continue the lie?

5            Count 7, wire fraud.  Mr. Gallian, in defense

6  for Mr. Stone, brought in a woman who worked on this design.

7  And she told you, yeah, Casi and Bill were engaged in 2016.

8  And when we asked her specifically about that.  She said, well,

9  she was wearing a ring on her left finger, and her boss told

10  her they were a couple.

11           That's not evidence.  Casi Stone -- or Casi

12  Thompson told you.  Defense counsel asked her, so you wear a

13  ring on your left finger?  She says, yeah, pretty common.  I do

14  it a lot.  Mr. Gallian said, so you're wearing one right now?

15  What did Casi do?  She lifted up her left hand.  What was she

16  wearing?  A ring.

17           That wasn't planned.  It is just truth.  It is

18  just facts.  Casi was telling the truth.  And Kelsey Adams

19  simply made an assumption.  Assumptions, they are not fact.

20  It's not evidence.

21           Count 7, wire fraud.  We see the checks.  We see

22  the calendar entries.  Casi then confronts Bill about it.  She

23  says, You think everything you did was worth half a million

24  dollars for the secret probation?  He says, I don't know what

25  that money was.  It was so long ago, I can't really remember.

1          Bill Stone lies:  I don't remember that kind of

2     stuff right now.  Yes, he does.  He kept a calendar of it.  All

3     the way back to 2015.  Denial.  Lies.  Deflection.

4          Count 8, money laundering.  There's a lot of

5     elements here.  But this relates to the money that Casi

6     Thompson gave Bill Stone as a result of the secret probation,

7     criminally derived property and proceeds then used in a

8     transaction for the house.  That's money laundering.  And we

9     proved it.  The evidence meets all of those elements.  There

10    was the 250,000; we walked you through that.  Bill Stone

11    deposited it.  He then writes a check for the house.

12         Casi confronts him and said, I asked you if you

13    would give me the money that I put into your home back when you

14    sold it.  You said you'd have to think about it.  What does

15    Bill Stone say?  How is it rude?  Casi:  Because I feel like

16    the $100,000 vehicle that you are driving right now is

17    compensation enough.  Not gift; compensation.  What does Bill

18    Stone say?  Sorry you feel that way.

19         False impersonation of a federal officer.  That

20    William Stone falsely assumed and pretended to be an officer

21    and employee, acting under the authority of the United States

22    or any department, agency or office thereof that is a special

23    agent of the FBI.

24         While acting in that pretended character, Bill

25    Stone demanded and obtained money and things of value, and he

1   did so knowingly and with the intent to defraud.

2          Here's the definition.  It's in your charge.

3   Courtney Calloway came from FBI headquarters to tell you, there

4   is no legitimate reason any active or retired agent should have

5   these credentials.  Not in that way, not in that number, not in

6   that kind.  You have the physical credentials.  Feel them.

7   Touch them.  You'll see the difference right way.

8          If Bill Stone is not impersonating an FBI

9   officer to Casi Thompson, why does he have fake credentials?

10  Why does he need them?  Because Casi relied on it.  Who he was

11  in society.  And you know who else he presented that to that we

12  know was FBI [sic]?  Penny Weisand.  Penny Weisand didn't have

13  a dog in this fight.  She's a court coordinator.  She works in

14  the criminal justice system.  She remembered in 2017 Bill Stone

15  showed her an FBI credential badge.  2017.

16         We also saw text messages where Joe DeLeon

17  clearly, at this point at least, knows Bill Stone's retired.

18  How does a retired FBI agent act as a federal probation officer

19  at that point?  Joe DeLeon didn't really care.  He had already

20  gotten his money by then, right?  But he still needed to keep

21  the crime quiet.

22         These are not gifts to Joe DeLeon, because

23  Joe DeLeon told us that.  Briley says, What about vehicles?

24  She gave me -- no, she didn't give me; she sold me a truck.

25  And I got the check for it.  He brought the check with him.  I

1  don't know how many people walk around with proof of a check
2  when going meet with law enforcement, unless they're really
3  proud of the fact that they have it.  Unfortunately it's a lie.
4  And it's an intent to defraud.
5           DeLeon again, what about vehicles?  She sold me
6  a pickup truck, but I paid the sales tax.  And I've got the
7  proof of the check, and it says "purchase of the truck."
8  Continually lying to law enforcement.  Why?  If there's no
9  crime, why are you hiding the money?  And why now are you
10  saying it's a gift?
11           He says again, I bought a truck from her.
12  September 17th, again:  Sold it to me.  I've got the paperwork.
13  May 7th, Luley, the truck that she sold me?  He's continuing.
14           Go back and look at the evidence in June 2018
15  and July 2018, and compare it with June and July 2019.
16  Something similar happened in both those instances.  Bill and
17  Casi are on a trip.  They're in a relationship at both points
18  in time that I'm referring to.  They get in a fight.  Casi
19  says, I want to break up with you.  What does Bill Stone do?
20  Freaks out.  Because he loves Casi so much?  No.  Because he
21  needs to keep her quiet.  So who does he call to help him?
22  Joe DeLeon.
23           Joe DeLeon has not been involved in this secret
24  probation for some time now.  And the evidence supports that.
25  Yet he jumps back in because Bill and Casi are having a

1  relationship dispute?  No.  He jumps back in because he knew he

2  needed to help cover the crime he also committed.

3          The calendars are there.  They're evidence.  Go

4  read what Joe -- or what Bill told you.

5          You heard from Darla Bell, you heard from Brad

6  Leonard, evidence that both Joe DeLeon and Bill Stone deleted

7  tens of thousands of text messages.  If Bill Stone was truly in

8  a relationship with Casi Thompson in 2015 and 2016, why would

9  he delete those messages if that's what it showed?  Casi

10  Thompson told you that's not what it would show, but yet Bill

11  Stone, the only messages recovered were from 2019.  If it was a

12  relationship, why aren't they there?

13          From the beginning of the trial, I told you

14  about protect and serve.  And that's what Casi believed.  Bill

15  Stone and Joe DeLeon had a different plan.  They conspired,

16  they engaged -- Bill Stone engaged in wire fraud, money

17  laundering.  They controlled.  They exploited.  They received

18  money as a result.

19          But now Project Number 2, after 2019 she got to

20  go back to being Casi Thompson.  All of the evidence we showed

21  you, all of the lies, the conspiracy, the coverup, the

22  impersonation, the exploitation was sinister.  It was evil and

23  it was deceitful and it was criminal.  That's why we ask you to

24  return a verdict of guilty on all counts for the defendants as

25  they're charged.

 1              THE COURT:  All right, members of the jury,

 2   let's take our lunch break.  Let me instruct you, you -- you

 3   still have yet to hear the closing arguments of defense counsel

 4   for both sides.  And so we are close to the point at which you

 5   can discuss the case, but we're not there yet.  And so if you

 6   would hold off talking about the case until you have heard all

 7   of the closing arguments, the Court would be grateful.

 8              With that said, please don't discuss the case

 9   until I've given you the green light to do so.  And please

10   don't do any independent research.  And with that said, I'll --

11   I'll join you back here in a minute to find out how long you

12   guys would like for lunch, but we are in recess until then.

13              Anything further we need to take up before we

14   excuse them?

15              MR. WESTFALL:  No, Your Honor.

16              THE COURT:  All rise for the jury.  Thank you

17   for your time and your attention.

18              (Jurors exit courtroom.)

19              (Lunch recess.)

20              (Jurors enter courtroom.)

21              THE COURT:  Whenever you are ready.

22              MR. GALLIAN:  May I proceed, Your Honor?

23              THE COURT:  You may.

24              MR. GALLIAN:  Members of the jury, I stood here

25   not too long ago in my opening statement and I told you two

1   things.  I told you that this case was about lies, lies and

2   lies.  And I told you that this was the weirdest case I have

3   ever worked, I ever will work.  And I'm sure all now of you --

4   all of you can now agree.

5           I also told you that as a criminal defense

6   attorney I was going to do something very weird.  I was going

7   to tell you the truth.  The good, the bad and the ugly truth.

8   And that is what we did.  All the way through this case, I did

9   not waste your time with silly questions.  I did not waste your

10  time asking questions to witnesses that had no relevance to us

11  whatsoever.  I asked questions when I felt that you guys needed

12  to hear the answers.  That's the sole purpose of how we tried

13  this case and why we tried this case.

14          Beginning with my client, Bill Stone.  I told

15  you, in pursuit of that truth in opening, you were not going to

16  like Bill Stone.  That he was a bad guy and that he lied.  And

17  you got 20 minutes into that chambers phone call and you knew

18  exactly what I was talking about.  You probably hate him.  And

19  I don't disagree with you at that point.

20          But we need to look at the facts and we need to

21  look at the story and how all of this unfolded to truly

22  understand what happened.  And I truly believe that at the

23  beginning of this, Bill Stone had Casi's best intention in the

24  front of his mind.

25          At that point in time, in 2015, Myrna had just

1  passed away.  She was on probation for the first time in her

2  life, and she was starting to crumble under the pressure of it

3  all.  And Bill Stone concocted this horrible, at times

4  psychotic, probation.  Because let's be very frank about one

5  thing.  Casi, at that point in time, had had both of her

6  children taken away from her.  Multiple times.  The only reason

7  that Casi got her life together in 2015, the evidence very

8  clearly shows, is because it was the first time in her life

9  that a fear of prison was hanging over her head.

10          It wasn't the kids; it wasn't Cade; it wasn't

11  Slayter.  It was the fact that she very really thought that she

12  could go to prison on that Hood County case.  And so therein

13  lies the premise of why Bill Stone did what he did.

14          It was messed up.  It was wrong.  But I admitted

15  to it in opening so that you did not go all the way through

16  this case listening, trying to figure out if the probation was

17  real or not real.  It was fake.  It was all fake.

18          At the beginning, the intentions of this

19  probation were very clear.  Casi, take care of your kids.  Do

20  well in school.  Write your daily activities on 3x5 cards, just

21  like I do in my planner.  That's it.  Because all the other

22  terms and conditions of her probation that she told us that she

23  had to do, well, we asked some follow-up questions and those

24  all fall like a house of cards.

25          At the end, however, this probation was very

1   much used as a way to control and to manipulate Casi Thompson.

2   They go to Key West in the summer of 2019.  Casi says I'm done.

3   They're in a full-blown relationship at that point.  She kisses

4   a bartender.  Bill Stone gets upset.  But at the end of that,

5   she realizes, I don't want to be in this relationship anymore.

6   I don't want to be with you anymore.

7                    And so she starts to push back.  That's why we

8   hear the chambers call.  Bill, for the first time ever, he puts

9   it in his planner, spoof call.  That didn't quite get Casi back

10  to him, so he took it up another level.  Brought in Darla Bell;

11  a.k.a. Jordan Green, DEA agent.  Turned up the heat a little

12  bit more.  And it worked.  He and Casi got back into a

13  relationship.  In fact, they got engaged.

14                   But then shortly thereafter, Casi says this

15  still is not a relationship that I want to be a part of.  So

16  Bill tries one more thing in an act of desperation.  Dr. B

17  dies.  You know, the made-up Dr. B?  And so then Bill sends

18  funeral pictures from Dr. B's funeral.  The only problem is it

19  is a live photo.  And Casi very clearly figures out it is a

20  photo of a photo.  It wasn't very well planned out.  Casi right

21  then realizes, I need to talk to somebody about this, and she

22  sits down with Ranger Briley.

23                   The intentions at the beginning of this thing

24  were far different than what he was doing at the end.  The end

25  is where we hear the spoof call.  The end is where we hear the

1    DEA phone call.  The end is when Dr. B dies.

2              Now, with those characters, when you keep up a

3    lie, you have to keep up the lie.  And as a lie gets bigger and

4    bigger and bigger, well, apparently so do the characters.

5              There are plenty of names:  Chet, Jerry, Dr. B,

6    Dr. Z.  None of them exist.  All a figment of Bill Stone's lie

7    to convince Casi that she was on this probation, 100 percent.

8    He didn't do it with the intent to defraud her of money and

9    property.  And that is clear.

10             I think what we realized -- at least what I

11   realized when Casi was on the stand, is that I believe, at the

12   end of the day, Casi cares about Casi.  I think that Casi will

13   do anything and will say anything in a moment to do what's best

14   for her in that moment.  We talked about the law enforcement

15   that's in her life.

16             Kent Barnes, father of her oldest child Cade,

17   works for the police department.  Charles Tangney, private

18   investigator; former Burleson police officer.  Bill Stone,

19   retired FBI agent.  Joe DeLeon, interpreter for the Fort Worth

20   Police Department.  Mitch Galvan, chief of police, Granbury,

21   rents her house.  She surrounds herself with people, because I

22   truly believe that Casi didn't trust herself enough to not have

23   a couple of people that she could reach out to in a time of

24   need.

25             And what did the prosecution elicit from her?

1   2005, 2007, 2010, '12, '14, when she had those issues, who was

2   she reaching out to?  She was reaching out to Joe DeLeon.  She

3   was reaching out to Bill Stone.  She was reaching out to

4   Charles Tangney.  Those were the people that could help her in

5   those situations, and that is exactly what she did.

6                Who wasn't she reaching out to?  Any of her

7   friends.  The government called Daralyn.  Daralyn Crites is a

8   long-time friend of Casi Thompson's.  And you'll see all the

9   way through this -- I'm using transcripts from the trial so

10  that there's no misunderstanding of what was said.

11               Question from me:  Casi didn't tell you about

12  the actual probation she was on?

13               No, sir.  We didn't discuss that.

14               She didn't tell you about the Hood County

15  probation?

16               No, sir.

17               Are you aware that probation started in 2015;

18  discharged in '18?

19               No, sir.

20               She didn't tell you about the times that she was

21  arrested?

22               No, sir.

23               Can we agree that you're finding some stuff out

24  for the first time today?

25               Maybe a little.

1              It didn't benefit Casi to tell her friend

2    Daralyn that she had these problems; that she had these

3    arrests; that she had these cases, because Casi cares about

4    Casi.

5              Casi lies when Casi sees fit.  She lied to the

6    government.  The people that were here to help her, she lied

7    time and time and time again.  This is when I was questioning

8    Ranger Briley.

9              What was your understanding of their

10   relationship, February through October 2015?

11             From February 2015 to October 2015, probably

12   minimal contact.  Maybe talking on the phone some.  Not much.

13   They had a meeting before.

14             How much, Ranger Briley?

15             Maybe three hours.

16             When I confronted him and I said that it was

17   actually 40 hours, and I asked him if it was a red flag, he

18   conceded and he said it was a flag.  Not sure what that means.

19   But he had no accurate understanding of what their relationship

20   was in 2015.  In fact, his guess of three hours was only a mere

21   12 times off the actual amount that they spent on the phone in

22   2015.

23             She lies to who she needs to lie to at the time.

24             Ranger Briley told Casi very clearly, make sure

25   you record every phone call, because it would look bad to the

1    jury.  She doesn't recall if he said that.  But then said, I

2    just know I was supposed to.

3              Ranger Briley confirmed the same.  I remember

4    telling her that if she had these other 50 conversations and

5    you don't record them with Bill Stone, that's going to look

6    odd.  He then said yes.

7              And on redirect, the prosecution asked, Did you

8    record all the calls?

9              All but one.

10             Could have been more?

11             Nope, just one.

12             They gave her a chance.  And do you remember I

13   ended my cross-examination with that one very question?

14   Because I knew the answer.

15             17 non-recorded phone calls.  This does not

16   include any phone calls that were less than a minute.  17

17   non-recorded phone calls in February and March of 2020.

18             Lies.  She lied to me.

19             Would you say you guys talked a lot on the phone

20   in 2015?

21             No.  If he'd text, I'd text back.

22             Did you guys ever talk on the phone?

23             I'd say maybe.

24             We confront her with the 40 hours of phone

25   calls.  What was the excuse that she gave?  I let her talk.

1                    I was like a baby deer learning to walk in a

2      way.

3                    She lies, she pivots, she adjusts.  She tells

4      whatever story in the moment that she needs to tell to benefit

5      Casi.

6                    Isolation.  Remember this one?

7                    I wasn't allowed to talk to anybody.

8                    Bill and Joe isolated you; is that right?

9                    Yes.

10                   Then I brought out the box -- thousands of pages

11     of text messages, and I threw them on here -- because I have a

12     flair for the dramatic -- and I went through them.  Hundreds

13     and hundreds of pages at a time.  She then concedes, Well, I

14     wasn't really isolated.  It was more like house arrest.  I

15     wasn't allowed to go out and communicate with people and be who

16     I am.

17                   This is when she was on the Hood County

18     probation.  She lied about being isolated.

19                   Another fun part.  My frustration in this entire

20     case is that the agents who investigated it never asked her any

21     follow-up questions.  Ever.  And so the first time that she was

22     ever asked these follow-up questions, her story starts to

23     crumble.  Time and time and time again.  I reluctantly made up

24     a list of my assets.  The list of assets that Joe and Bill made

25     me turn over, I had to type it all up.

1              This list?  Are you talking about the one from

2    Andrew Ottaway's office?

3              Yep.  He had it there at his office.  It was at

4    his office.  Yes, my grandmother did this.

5              They didn't make her compile a list of assets.

6    And they didn't make her move any of those assets into their

7    names.  It was a lie.  Because it sounds good to the agents

8    that she was telling at the time.

9              But when you are forced with the truth, again,

10   another lie.  She lied to y'all.

11             Y'all weren't in a relationship in 2015?

12             Right.

13             You weren't in a relationship in 2016?

14             Correct.

15             No relationship at all?

16             We were not in a common relationship, or what I

17   would call a relationship.

18             We know that's a lie.  I asked specifically.

19   Again, I knew that Kelsey Adams was coming as a witness.  And

20   she very clearly remembers that she went to Daltile and Floor &

21   Decor with Bill Stone and Casi Thompson, and they went to Gas

22   Monkey Garage for lunch in Bill Stone's Tacoma.

23             I asked Casi that question:  You didn't go with

24   Bill?

25             I specifically remember being with the designer

1    myself; just her and I.

2                    Kelsey Adams is on the stand.  We went to

3    several in D/FW, but the primary one was Daltile.

4                    Who was at that meeting?  Was it Bill or Casi or

5    both?

6                    Both of them.

7                    Because if she concedes to you that they were

8    there, picking out stuff for their house, that's not good for

9    Casi.  And so Casi, on the stand in front of you, is willing to

10   lie.  Because she knows that that hurts her story.

11                   2016:  Did you ever hold yourself out as engaged

12   to Bill Stone?

13                   No.

14                   Hand on the Bible, swear to God, 100 percent

15   certainty?

16                   I would never say I was engaged to Bill Stone in

17   2016.

18                   Kelsey Adams says different.  You want to talk

19   about someone that doesn't have a dog in the fight?  That is

20   Kelsey Adams.  No contact with either one of them since.  Not a

21   lifelong friend of Casi Thompson's.  Not a lifelong friend of

22   the mom.  Kelsey Adams.  Some random interior designer that we

23   found in our investigation, seven years after the fact, told

24   you the truth.

25                   With this remodel, this was not your intention

1    to live in this home?

2              Nope.

3              Last thing that she lied about.  The IUD.

4              Did you remove your birth control that you had

5    at the time?

6              Because she left the impression that there was

7    just kind of this brief moment of conversation that her and

8    Bill were having a baby together.  And so luckily we have the

9    record and other things to point to.

10             I have not been on birth control.

11             In 2020, didn't you tell this dude Royce that

12   you and your last boyfriend, Bill, were considering having

13   another baby, right?

14             Yes.

15             Got Bill's planner here.  The government wants

16   to use it all day, every day; so I will, too.

17             July 21st, 2018.  Sex project.  No IUD.

18             And let me be very clear about this.  I can,

19   with 100 percent certainty, tell you that Bill Stone never, in

20   his wildest imaginations, thought this planner would be read

21   aloud in a courtroom.  This is his diary.  Or maybe what men

22   would call a journal.  This is embarrassing as heck for him.

23             What he put down about the times that they

24   engaged in intercourse is what Bill Stone's prerogative is for

25   his journal, for his planner, for his whatever this is.  Okay?

1    Don't act like -- don't believe the government, where it's

2    like, we knew this was going to be brought into the courtroom

3    one day.  I can promise you he didn't assure that was going to

4    happen.

5               Then -- so that was July 2018.  Here's the text

6    message in evidence, Stone's Exhibit 159.  January 21st, 2019,

7    Casi is sending a text to Bill saying, February 5th, 6th and

8    7th are pregnancy days.

9               She continues to lie.  Because if she tells the

10   truth, that will be bad for the story that she's concocted in

11   this case.

12              What I was very disappointed in was the

13   government's lies.  Lies, lies and more lies.  And I almost

14   said it in my opening, the government's lies.  But I held back.

15   Because I think when the government becomes an advocate and not

16   a truth-teller, we should all be very, very, very scared.

17              And I sat right here, right next to the lectern,

18   when Casi was asked questions on direct examination for two

19   full days.  And with the specs on my face, every once in a

20   while I could lean up and I could see how many pages were left

21   in the outline.  And I know that Ms. Rudoff had an outline that

22   was about 60-something pages.  60-something pages that Casi

23   Thompson conceded they had gone through before, with

24   carefully-manicured questions to hide the truth from you.

25              Don't believe me?  Let's go through it.

 1                    Casi, about how much roughly do you make per

 2    year as a stylist?

 3                    It varies.  Probably 65,000.  It can be anywhere

 4    from 35 to 65; it just depends on the year.

 5                    Now, here is the trick, here's the gotcha.

 6                    Other than the income you bring in, does anyone

 7    else help support you financially?

 8                    Where's the advocacy in that?  All encompassing,

 9    other than the income you bring in, does anyone else help

10    support you financially?  They are leaving with you an

11    impression that Casi makes 35,000 a year so you feel bad for

12    her.  But they know dang well, just as much as I do, that she

13    gets the $6,000 a month ranch payment, she gets her rental

14    income.  These are the games that the government is playing.

15    They're not telling you the truth.

16                    There's more examples.

17                    When being asked on direct examination again by

18    the government:  Do you recall going to the Mercedes dealership

19    in 2016?

20                    Yes.  He called me one day in the morning and

21    said meet me at the Mercedes dealership.

22                    What happened?  Oh, sorry.  Got ahead of myself.

23    We know what happened.  They left that day with a Mercedes

24    together.  They were at the dealership together to get

25    Mercedes.  They're playing games.  They are hiding the truth

1    from you.

2              Nowhere in the direct examination did the

3    prosecution ever get out the fact that Casi bought a Mercedes

4    that same day.  It wasn't until I asked her the question on

5    cross-examination.

6              Here is another trick:  Did you give him the

7    Lexus?  Did you then have to get a new vehicle?

8              I then had my grandmother's vehicle that I

9    drove.

10             It's a lie.  It's a lie.  Casi had two Lexuses.

11   She traded one in, got her new Lexus; and then gave the older

12   Lexus to Bill Stone.

13             And I asked her, You gave Bill a Lexus right

14   after that, didn't you?

15             Yes.

16             You were well within your power to trade in both

17   Lexuses if you wanted, right?

18             Yes.

19             Totally different story.

20             This is my favorite one.  If you are paying

21   attention to the words that are being said, Casi Thompson and

22   the government are not saying the same thing.

23             Bill said to resolve the issue with the Green

24   Dot card, the Green Dot Mastercard, that he would have to fly

25   directly to them, hand them a check and pay restitution for me

1   and my boyfriend at the time.  Because if he had to get me off,

2   then he had to get him off.

3                    Ms. Rudoff then says:  Okay.  I want to make

4   sure I'm understanding your sentence.  So Bill Stone tells you

5   there is a possible resolution to the situation with

6   Enterprise?

7                    She doesn't say Enterprise.  She says Green Dot

8   Mastercard.  And she said it all the way through her

9   examination.

10                    They are forcing this Enterprise issue so much

11   so that they brought someone from Enterprise down.  Flew him

12   down here, got him a hotel; put him on the witness stand to

13   say, what we all know, is that there was no restitution issue

14   with Enterprise.

15                    The restitution issue with Enterprise was

16   handled the day that Casi got that car and drove off.  When she

17   called and talked to corporate.  The Enterprise story was

18   mentioned the first time by Joseph DeLeon on a recorded call.

19   And he said he thought it was 4- or $5,000.

20                    Now, here's the crazy part.  We've spent so much

21   dang time talking about this restitution.  You want to know

22   something crazy?  It's not even in the charges.  It's not in

23   Count 2; it's not in Count 3; it's not in Count 4.  And I could

24   keep going.

25                    It's not in the counts, but we spent all this

1  time talking about it.  Because again, if you get mad about the

2  250,000, then surely you'll convict Bill Stone.

3          Let's talk about the counts.  Count 1, I told

4  you in the beginning of this trial that I thought the evidence

5  would show that Joseph DeLeon did not know that the probation

6  was fake.  That's what I said.  And much to my surprise, in the

7  government's closing, they said the same thing.  Now, I've been

8  doing this for a while, and every time that the government

9  starts their presentation off by saying these are the things we

10  don't have to prove, that means that we're wreaking some damage

11  on their case.

12          Count 1, conspiracy, that means two people had

13  an agreement to commit a criminal act.  And because I don't

14  have the opportunity to talk to Casi, because I didn't get a

15  chance to do a deposition of her, I heard a lot of stuff from

16  the stand that I'd never heard before.

17          This is one of them:  Stone was pretending that

18  he was in Washington when actually he and Casi were in -- says

19  Key Largo, but when they were in Key West together.

20          And so here is a very important part.  Something

21  that I think has been glossed over.  Bill Stone and Casi

22  Thompson hid their relationship from Joseph DeLeon.  He didn't

23  know.  He didn't know that they were in a relationship

24  together.  And I think all of the text messages about Bill

25  saying, your fiancee, your fiancee, your fiancee, I think

1    that's because Bill was embarrassed to be falling in love with

2    Casi Thompson.  A woman who had all of these issues.  A woman

3    that Joseph DeLeon said, I would never marry in a million

4    years.  But Bill Stone started to fall for her.  He was

5    embarrassed.  He didn't mention their relationship, but nor did

6    Casi.

7                     Conspiracy requires the agreement of two people.

8    Because there was no agreement on the super-secret probation

9    between Bill and Joe, it should be not guilty on both.

10                    Okay.  And this is a question I asked Ranger

11   Briley.  I said, Fair to say that there were secrets being

12   hidden from everybody?

13                    Counts 2 and 4, I'm lumping these together.

14   Before I came into this trial, my thought -- and I think the

15   evidence supports this as well -- was that the cash was being

16   paid -- not all of it, not all of that -- was being paid to

17   Bill Stone to help Casi as an investigator.  Just like she did

18   with Charles Tangney in the years before.  That was my thought.

19   But after listening to the way that the government presented

20   this case, I'm truly more confused now than ever.  Let me

21   explain.

22                    Testimony on direct examination, day one,

23   June 3rd, which is Count 2 of the indictment:  Why did you make

24   a $9,000 cash withdrawal on that date?

25                    Casi:  I'm not 100 percent sure.  I'm not sure.

1                    This is her case.

2                    Day two:  Why were you withdrawing cash; what

3     was it typically for?

4                    For either Bill and Joe.

5                    So now they've taken this position that all cash

6     withdrawals are for Bill and Joe, right?  So that's the

7     position we're in.  All cash withdrawals are for Bill and Joe.

8     Just accept it as true.  Casi can't remember what it is, but

9     she just knows the only reason she took out cash was for Bill

10    and Joe.  There is a couple problems with that.

11                   One, she had five bank accounts in another

12    institution that we know nothing about.  And two, it's not

13    true.

14                   Because then this ring.  Oh, my God, the ring.

15    No one can remember this ring.  The conversation with Casi

16    happened a month ago about the ring and how much was paid for

17    it, but yet no one can recall it.

18                   How much was this cash withdrawal for the ring?

19    You have no idea?  Was it 5,000?

20                   The ring?

21                   Yes, ma'am.

22                   No, it was not.

23                   Was it the $9,000 cash withdrawal?

24                   It could have been.  I don't know, it could have

25    been.

1            All right.  So now we've gone from a position of

2    every single cash withdrawal that I have is for Bill and Joe,

3    to now, well, there is a ring that I've purchased.  That's

4    doubt.  That's confusion.  And that is what I'm talking about.

5            Here are some more clips.

6            I'm not sure.  Maybe 8,000.  That's a ballpark.

7            This is the one we just went over:  Could have

8    been the $9,000 cash withdrawal.

9            When Ms. Rudoff asked:  How much did you pay

10    Bill Stone for that ring in particular?

11            $7,490.

12            All over the place.

13            This is the last thing that the government's

14    done -- they did it the again in their closing -- that is

15    confusing me about the cash.  There is 100 percent a cash

16    withdrawal from Casi Thompson in the indictment date of

17    June 24th, and yet now they're asking you to consider the one

18    on May 25th.  Why?  I don't know.

19            Count 3.  They didn't tell you the whole story.

20    Bill and Joe [sic] went to the Mercedes dealership together.

21    They left with a Mercedes together.  That's not fraud.

22            Count 5.  Count 5 is the $24,000 cash payment --

23    I'm sorry -- cashier's check to the Tacoma dealership, okay?  I

24    asked Casi on cross-examination:  She, being Myrna, bought you

25    like three houses and like six cars.  You don't think that's

1    getting spoiled?

2                    If that is what you want to call it.

3                    Two things to point out here.  It is not a

4    similarity or a coincidence that Myrna Thompson would buy Casi

5    cars and houses.  As I said in my opening, it's the Thompson

6    love language.  And so what does she do and for the person that

7    she's in a relationship with?  Cars, and helps buy the house.

8                    Count 6.  Why 154,500?  If the intent of this

9    scheme was to steal as much money from Casi Thompson as

10   possible, why in the heck a random amount of $154,500?  I'll

11   tell you.  Because when Bill took into consideration the

12   $230,000 restitution he paid his wife, that 20,000 extra went

13   to her half of their house.  And Slayter was going to live

14   there, too.

15                   Count 8.  I think Count 8 is encompassed by

16   Count 6 in the sense where we'll go through the charge in a

17   second.  But ultimately when you guys find that that house was

18   bought for Casi and Bill, there's nothing to do on Count 8

19   other than to find Bill Stone not guilty.

20                   Penny Weisand.  So I pressed her on the badge.

21   And I did that for a reason.  Because I had reason to believe

22   he never flashed a badge.  And here's why we know that that's

23   true.

24                   Was there any metal, the badge part?

25                   It was a brass gold type.

1            I was annoying, I was persistent and I asked

2    that question for a reason.  Because he doesn't have a brass

3    badge.

4            Darla Bell freaked out on the stand.  And I

5    don't blame her.  I asked her -- I read from the elements of

6    impersonating a federal official.  Darla Bell falsely assumed

7    and pretended to be an officer, a DEA agent.

8            Did you do that?

9            I did.

10           Check.

11           While acting in such an assumed and pretended

12   character, Darla Bell demanded and obtained money and things of

13   other value.

14           Did you do that?

15           No.

16           That's why she wasn't charged.  That's why she

17   wasn't indicted.  That's why she didn't have any cooperation

18   agreement with the government.  That's why she didn't need a

19   criminal defense attorney.

20           The government is very able and clearly able to

21   see that there are times where someone can pretend to be an

22   agent and not be holding themselves out with the intent to

23   defraud somebody.

24           And need I point out that every time that Casi

25   was asked in any sort of recorded call with the agents, she

1  always said that Bill was a CIA agent, not FBI.  Bill Stone's

2  been charged with impersonating an FBI agent.

3            Again, follow-up, Darla Bell:  You had no

4  intention of getting money, no intention of getting property,

5  correct?

6            Correct.

7            Count 1:  Defendant and at least one other

8  person, not guilty.  Bill Stone and Joseph DeLeon, they did not

9  have an agreement together.

10            Counts 2 through 7, here are the points that I

11  want you to focus on.  The same points that I asked you to

12  focus on in opening.  Did he do it with the intent to defraud

13  C.T. and obtain money, and did he act with the specific intent

14  to defraud?

15            That's what I'm asking you to decide.

16  Throughout this whole trial, I've agreed to so many bad facts

17  for us.  But at the end of the day you need to again decide if

18  that was what Bill Stone's intent was at the time.

19            Count 8, specified unlawful activity; namely,

20  wire fraud.  Again, it all follows the same language.  Did he

21  intend to deprive Casi of money and property?

22            Second thing, or second element, Count 9, the

23  defendant demanded and obtained money and other things of

24  value.

25            In every single count, worded differently, is

1    the same question.  Did he do it to obtain money and property

2    from Casi?  That's the question that you have in Counts 2

3    through 9.  That single question.

4             There's a caution charge in there.  Defendants

5    are not on trial for any act, conduct or offense not alleged in

6    the superseding indictment.  Okay?  By referencing that, I'm

7    talking about the $250,000.

8             Jury selection.  Seems like a month ago at this

9    point.  All not guilty people are not guilty.  I'm not asking

10   you to find Bill Stone innocent.  We had that whole

11   conversation.  Went up and down the list.  Innocent:  Probably

12   not, maybe, I suspect, possibly, likely.  They must get beyond

13   all reasonable doubt.

14            Now, if I'm sitting where you are, I'm telling

15   myself two things.  That I hate Bill Stone, and that you

16   probably never would have taken that money.  I get it.  That's

17   not a proper analysis on this case.

18            The law requires you to consider the facts of

19   this case.  And so what I'm asking you is, this probation went

20   from the 2015 all the way to 2019.  Not a single dime was

21   exchanged in 2017, 2018, 2019, 2020.  Why keep up the fake

22   probation if the intent of the probation is not to get as much

23   money from Casi Thompson as possible?  Why stop?  If it's

24   working, why stop?

25            Why did Bill Stone pay for the Tacoma the next

1   year?  Just have Casi do it.  It's because the intent to

2   defraud wasn't there.  It doesn't matter what you would do in

3   that situation.  The question is, was it Bill Stone's intent to

4   deceive her and to take money and property from her.

5              Before I sit down, I want us all to imagine

6   something.  Imagine that we're Casi Thompson in the summer of

7   2019, and she just found out that this fake probation was fake.

8   Imagine if when she sat down with Ranger Briley, instead of

9   telling the story that she told, she told the truth.

10             Ranger Briley, in 2015, I got out of rehab.

11  There were only a few people in my life that I could lean on at

12  that time.  Bill Stone and Joseph DeLeon.  And somewhere along

13  the lines, Bill Stone and I, we hatched a romantic

14  relationship.  And we dated all the way throughout 2015.  In

15  fact, when Mimi fell at the end of July, he's one of the people

16  I called.

17             We talked and talked and talked.  And when he

18  could, when he could fly in from D.C., we would see each other.

19  And that relationship grew and grew and grew.  But then

20  something weird happened at the end of 2015.  Bill and Joe sat

21  me down and Bill said, you are on this super-secret federal

22  probation, and here are the terms:  Do well in school, write

23  down your daily activities, take care of your kids and make

24  sure you handle your actual probation-related matters.

25             Well, that's weird.  Tell me more about that.

1              Well, Bill Stone, he had retired from the FBI at

2    that point, but he was still doing some CIA work.  But I don't

3    know, the whole thing was just really weird.

4              So what did he make you do?

5              Well, I had to tell him every single day what I

6    was doing.

7              Were you guys still dating during this time?

8              Yeah, we were.  In fact, in February of 2016, I

9    bought us Rolexes.  It was a little Valentine's Day gift.  And

10   then a month later, this is right before my grandma's estate

11   was cashed in, I came into a lot of money.  And unfortunately I

12   didn't manage it all that well.

13             COURT CLERK:  Five minutes.

14             MR. GALLIAN:  And so I started spending and

15   spending.  But I spent money on the people that I cared about.

16   And so I bought myself a Lexus.  I then gave Bill, my boyfriend

17   at the time, a Lexus so that he and I would have matching

18   Lexuses.

19             A couple months later I'm still on this

20   probation.  He's still wanting me to tell him on a daily basis

21   what I'm doing.  But then we go into a Mercedes dealership and

22   we get our matching cars.  And then a couple months go by, and

23   you know what?  Bill and I decide we're going to take the next

24   step in this relationship.  We're going to move in together and

25   we're going to buy a house.

1              And so I paid half of our house.  And over the

2     next three months, Bill and I remodeled that house together,

3     where we were going to live as a family.

4              It was an odd relationship, because Bill Stone's

5     much older than I am.  But I care for him.  He clearly cared

6     about me.  He had my best interest at heart.  And so our

7     relationship continued.

8              All the way until she finally concedes it, in

9     2017.

10             But our relationship goes and goes, and now

11    we're starting to take trips together.  And I enjoy these trips

12    together so much that I buy us bags, his and her bags.  And

13    then at the end, the very end of our relationship, a lot of

14    very weird stuff started happening.

15             I got a fake call from a judge, which has never

16    happened before.  I got a fake DEA phone call, which has never

17    happened before.  All these friends that I thought I had

18    started dying off.  And I realized that everything he'd been

19    telling me about this federal probation was fake.

20             If Casi sat down with Ranger Briley and told

21    that story, would any of us be here?

22             Thank you.

23             THE COURT:  All right, members of the jury, do

24    we want to take a quick stretch break or keep going?

25             Are y'all ready?

1                    (Respond affirmatively.)

2                    MR. SELLERS:  If I could have just one minute?

3                    THE COURT:  Certainly.

4                    (Brief pause.)

5                    MR. SELLERS:  Good afternoon.  During

6    deliberations, you'll have three jobs.  The first of those is

7    to decide how you feel about the issues in this case.  The

8    second is to follow the law.  No juror has a right to ask you

9    to step outside of the law.  That's just not allowed.  And you

10   are duty-bound to let the Court know if one juror asks another

11   to do that, whether you are involved or not.  The third is to

12   explain how you feel about what you've heard in this case.  And

13   I hope to give you some ideas about how to do that through my

14   presentation now.

15                   Remember back at the very beginning of this case

16   the judge said a common thing that we hear in these courtrooms;

17   and that is, you do the accusing, you do the proving.  Do y'all

18   remember hearing that?

19                   Well, that's exactly how it works.  And this is

20   the indictment that they chose.  We had no involvement in this.

21   We never believed we would have been indicted after cooperating

22   for so long like we did.  But here's what's important.  Rudoff

23   got up here and was playing fast and loose with their

24   accusations.  The truth is, what they put in their indictment

25   and their accusing document is that DeLeon engaged in a scheme

1    and artifice to defraud and deceive the victim herein

2    identified by C.T., with false statements, including, one, that

3    Stone was still an active federal agent; two, that C.T. was

4    under federal probation, and pursuant thereto was under the

5    supervision of Stone and DeLeon.  They wrote that.  And now

6    they're trying to tell you, we don't have to prove that.

7              Mr. Gallian's exactly right.  When they get up

8    and tell you in opening, we're going to prove this to you, and

9    then in closing get up and say, you know, we don't have to

10   prove that; and, in fact, maybe we were wrong about that; it

11   doesn't matter, that is a red flag.  A big one.

12             Because here's the rest of it.  At Stone's

13   direction, C.T. gave DeLeon 50,000 in money and property for

14   his participation.  They knew that from the start.  They knew

15   that.  DeLeon's name appears 11 times in this indictment.

16   Stone's appears 39 times.

17             Had you looked at the evidence in this case, and

18   what they presented and how they had their stingers out for

19   Joe DeLeon, you wouldn't know it.  You wouldn't know it at all.

20   And when they stoop to that level, to try to convince you that

21   he lied, to try to convince you that wearing a wire is not

22   cooperating.  Wearing a wire alone, with somebody that they

23   were so afraid of when they did a search warrant they took a

24   tank to his front yard, with 35 officers and a helicopter

25   flying over.  There is only one of two conclusions.  They're

1   either just very poor stewards of our taxpayer dollars; or,

2   number two, they knew Stone was dangerous.  And yet they let

3   DeLeon go in a car with him while wearing a wire in a cigarette

4   box.

5                So what does the jury charge say?  Well,

6   remember that scheme or artifice to defraud?  There it is.

7   First, that the defendant knowingly devised or intended a --

8   devised a scheme to defraud C.T., knowingly intended to involve

9   themselves in a scheme and artifice to defraud.  And what did

10  they accuse that scheme of being?  The probation.  Which they

11  now say -- almost admit that Joe didn't even know.  So now

12  they've told you.  They've told you.  I don't know who else has

13  to tell you Joe did not know.

14               So what are the reasonable doubts in this case?

15  Straight from the jury charge.  First, maybe Joe believed the

16  fake probation was real.  Without abandoning logic and reason,

17  if you can believe that Joe thought maybe that probation was

18  real, he didn't know about the scheme or artifice to defraud.

19  Maybe Joe believed that Bill was still a federal agent.  Which

20  means if he believes that, he also is way more likely to

21  believe that fake probation was real.  And three, maybe Casi

22  gifted Joe the F-150 and the $15,000, okay?

23               Let's talk about that for a minute.  They have

24  to prove those things beyond a reasonable doubt, right?  And

25  I'll tell you, we talked in the jury selection about that green

1   bar there, a preponderance of the evidence.  This case belongs

2   in civil Court.  This is a case about money.  She wants her

3   money back.  She should sue them in civil court.  And she still

4   can do that.  But instead she's done this.  This is different.

5   These are federal crimes.  That is a federal judge.  This is

6   way different.

7           But thankfully we have these burdens of proof.

8   And even if you have a firm belief, but still have reasonable

9   doubt about whether Joe believed that probation was real, Joe

10  is not guilty.  And they have to rule out all the other

11  logical, reasonable possibilities.

12          They don't get to tell you -- and we've seen it

13  time and time and time again.  They don't get to give you just

14  one version of the facts, one version of how they think this

15  all played out, while either ignoring other facts completely or

16  just acting like they don't exist.  They don't get to do that

17  when other logical, reasonable explanations exist for what

18  really happened.  Because we're all innocent unless this table

19  produces the witnesses, the testimony and the evidence beyond

20  any reasonable doubt to convict Joe DeLeon.

21          What they've been asking you to do this whole

22  time is jump to conclusions.  And what happens when you do

23  that?  It can be wrong.  It can have lifelong effects on

24  Joe DeLeon.

25          Let's talk about the believability of the

1  witnesses.  I want to go back to the scheme part real quick.

2  If there is another scheme or artifice to defraud that they

3  didn't put in their indictment, make her answer that question

4  when she gets up.  What is the scheme?  What is the scheme

5  then?  What is the -- the method by which they were doing this

6  conspiracy?  What is the -- the way that they devised this

7  plan?  Because what you said in your indictment was it was the

8  fake probation, and now apparently it is something else.  So

9  make her answer that.

10              Believability of witnesses.  That's your job.

11 That is your job as jurors.  There is nobody who can tell you

12 who to believe and who not to believe.  That is exclusively

13 within your job description.  And you can believe some, all or

14 none of what any witness has to say.

15              Remember back in opening I talked to you -- or

16 jury selection, I guess, now, I talked to you about how to tell

17 whether a witness is being truthful or credible with you or

18 not?  And the best definition I've ever heard is, is the

19 witness trying to help you learn the facts or trying to get in

20 your way from learning the facts.

21              And we saw it time and time and time again.  Let

22 me give you some examples.  Ms. Thompson, for example, why did

23 Grandma -- questioned by Ms. Rudoff:  Why did Grandma take Mom

24 and cut her out of the will?

25              Do I have to answer that?

1            And then she just goes on to another question.

2            We know why.  Casi went and batted her pretty

3   little eyes at Grandma while she was on her way out and got her

4   to change that will.  The facts support it.  The timeline

5   supports it.  Changed that will to cut her mom and her brother

6   out.  And naturally, like anyone who does a family member like

7   that, she was scared.  She was truly scared of her mother and

8   her brother at that time.

9            And that is not -- I mean, that is supported by

10  the text messages.  Remember the question I asked about, Did

11  you -- do you remember when you backed your car into Joe's

12  Mercedes?

13           No.  No, no.  That 1,000 percent didn't happen.

14           What do we see in the text messages?  That

15  apparently did happen.

16           The -- Mr. Gallian already covered the IUD

17  thing.  I mean, we're all adults here.  We know how an IUD gets

18  there and we know how it gets out.  You don't forget that.  You

19  simply don't forget that.  That oath either means something to

20  you or it doesn't.  And apparently it doesn't.

21           And that -- her word.  None of these people that

22  testified after her; none of these government agents, none of

23  these Texas Rangers can supplant what they believe or what they

24  want you to believe for what she said on that witness stand.

25           If you follow the law, the sworn testimony from

1    her on that witness stand, you can't rule out the possibility

2    that Casi is just not credible.  And either she doesn't

3    remember or she doesn't care.  And I'm not sure which it is.

4                The funeral invite:  Joe had to escort me to my

5    grandmother's funeral.

6                Then you look back at the texts between Joe and

7    Casi from like 2005 on.  And let me address something.  She

8    told you in her open -- close that Joe deleted text messages.

9    That never happened.  Every single text message you saw was

10   from Joe DeLeon's phone, because he had nothing to hide.

11   Joe DeLeon did not delete messages.  Bill Stone did.  Casi

12   Thompson did.  But not Joe DeLeon.

13               Oh, and then there was this one.  I asked her on

14   cross-examination on Friday:  Do you remember the badge?  You

15   see this badge before?

16               Nope, it wasn't that one.  It wasn't that one.

17               And then we go for the weekend and Ms. Rudoff

18   has her back on redirect.  I guess they didn't put this in

19   their script.  But she asked her:  And this isn't the badge,

20   was it?

21               I'd like to change my testimony on that.

22               Do you remember when she said that?

23               I'd like to change my testimony on that.  I take

24   that back.  That was the badge I saw.

25               Because they've been trying to convince you

1   since the start that Joe DeLeon's affiliation with the Fort

2   Worth PD was all smoke and mirrors.  I think we all know that

3   that's not true now.  He truly was affiliated and supportive

4   and loved his law enforcement community.  Obsessed with it,

5   even.

6              Andrew Latham.  Poor guy.  You know, and this is

7   a recurring theme.  You'd see them over here and you heard me

8   sitting over here objecting, leading; leading; leading.

9              Well, remember when she was leading him into

10  this thing about the F-150 truck yesterday -- or two days ago?

11  And she's asking him:  Does it say anywhere that the F-150

12  truck was hit?  And he's like, I didn't say that.  I didn't say

13  that.

14             Well, luckily they've been buying the

15  transcripts, and Gregg says, hey, look at this.

16             So based on your review of the evidence -- this

17  is back two days ago now in your -- DeLeon's interview with

18  Ranger Briley on September 5th -- if he told Ranger Briley that

19  he ended up having to sell the F-150 truck that Casi

20  transferred to him, because Casi backed into the truck and

21  caused damage, would that be true?  It's like they're either

22  just learning the case or they don't care about what the truth

23  is.  And that is dangerous.

24             The power they have is an awesome power.  And

25  they're supposed to wear the white hat.  And they are supposed

1    to do the right thing.  And they are not supposed to lie to

2    you.  They are not supposed to try to get witnesses to tell a

3    story that supports their case.  But that is what we've seen

4    over and over and over again for three weeks.

5                    The failure of a party to produce a witness

6    within the party's power creates an inference that his

7    testimony would be unfavorable.  So where is senior Special

8    Agent Brian Luley?  He's been here every single day.  He's

9    walked by you every day.  When you're in line for security, he

10   walks by.  He's been in the courtroom.  They spent 30 hours on

11   their case.  They didn't think -- Ms. Max went to great lengths

12   to say, hey, Ranger Briley, you weren't the lead person on this

13   case, were you?

14                   The lead investigator?  No, that was Luley.

15                   So where is Luley?  Can you imagine sitting in a

16   case and not hearing from the lead detective?  What did they

17   not want you to hear?  What did they not want you to hear?  Was

18   it because they were going to hear the rest of Joe's

19   cooperation through him?  Because he controlled it after that.

20   They didn't want you to hear how Joe really did cooperate?

21   Hear more of Joe's true, genuine conversations, where he's

22   trying to help them make a case, because that is what Joe is

23   like?  No.

24                   No.  They don't want that.  They don't care

25   about the truth.  A predator knows what its prey looks like.  A

1    predator knows what its prey looks look.  A predator knows a

2    wounded deer learning to walk again.  A predator knows who the

3    weakest links are.  A predator knows how to exploit people's

4    weaknesses.

5              For Casi, her drug addiction.  Fear of losing

6    her children.  Fear of going to prison.  For Joe, his love of

7    law enforcement.  His reverence for those who are in the law

8    enforcement community.  His health.  You'll hear in just a

9    minute, exploited his health.  Darla Bell, exploited her

10   Christianity.  Exploited her fear of somebody dying.

11             (Audio playing.)

12             MR. SELLERS:  Ranger Briley said it best:  Joe

13   was the weaker vessel of the two.  No doubt.  He was prey.  He

14   was somebody that Bill used because Bill Stone is a user.  Been

15   that way his entire life.

16             What does Casi say about Joe?  He was a sheep.

17   He idolized Bill.  He would do anything Bill said.  He was a

18   puppet.  What does a puppet need?  A master.  And Bill was that

19   master.

20             And they know what prey looks like, too.  They

21   know when they've got one.  They know who is not prey.  They

22   know who not to go to.  Because you've got to sit and ask

23   yourself, Darla Bell has a Master's degree.  She has a good

24   job; lives in a nice house, and yet she fell for Bill Stone's

25   stuff.  A Master's degree.  Joe was high school educated in

1    Mexico.  And they've been over here trying to convince you he's

2    some sort of genius.  High school educated in Mexico.

3                And then put -- combine his 20 years at that

4    point of helping the police and loving the law enforcement

5    community, and there you have the perfect recipe for Bill to

6    prey upon.  And he did.

7                And you know, trust takes time.  This wasn't

8    something that just happened, you know, in 2015.  They worked a

9    human trafficking case together in 2003 that Joe reported.  Joe

10   helped the FBI.  Helped Bill Stone put together a human

11   trafficking case that they know about.  It was tried in federal

12   court in Fort Worth.  This is not some sham relationship.  Joe

13   truly trusted Bill.  And Bill manipulated that trust and

14   exploited his vulnerabilities, and used it to his advantage.

15               Listen here.  Ask yourself, does this sound like

16   Casi and Joe are in the same boat or whether Bill and Joe are

17   in the same boat?  Listen here.

18               (Audio playing.)

19               MR. SELLERS:  You are a federal agent.  He was a

20   federal agent.  The reason Joe trusted him.  The reason Casi

21   trusted him.  Why is Joe not entitled to that same level of

22   trust that Casi is because of his status as a federal agent?

23   There is no evidence from which you can conclude that Joe did

24   not just totally believe his puppet master that he was still a

25   federal agent.

1          So how about betrayal?  What do you do to betray

2   somebody?  You gather information.  You learn their weaknesses.

3   You exploit them.  Casi's weight, her addiction, her love of

4   her children.  Joe's love of law enforcement, his health.

5   Darla Bell -- you may think these people are just stupid.  And

6   that's fine.

7          And, Joe, I'll tell you, you were stupid at

8   times.

9          But stupid is not guilty.  That's it.  Stupid is

10  not guilty.  And don't let them try to convince you because Joe

11  was able to run a taco shop that he's some kind of genius.

12  That is just ludicrous.

13         You can save a life tonight.  I know you're a

14  Christian woman.

15         Manipulated and exploited her Christian faith

16  and caused real pain.  You saw it for yourself.  Those were

17  genuine tears.  Those words you just heard from Joe were

18  genuine shock and surprise.  He had no idea.  Why?  Because

19  they weren't allowed to tell him.  They didn't tell him.

20  Whether Bill was embarrassed or whatever the reason, he told

21  Casi, don't tell Joe.  And that's exactly what she did.  She

22  didn't tell him.

23         So maybe they can't rule out the possibility Joe

24  believed that Bill was still a federal agent.  Never thought

25  that my mom making me read Mark Twain in elementary school

 1   would come in so useful these days.  But I mean some of these

 2   things just ring true.  It's harder -- it's easier to fool

 3   people than to convince them they have been fooled.

 4                   (Audio playing.)

 5                   MR. SELLERS:  Three hours.  Three hours it took,

 6   Briley told you, to convince Joe the probation wasn't real and

 7   Bill was not an agent.  Here's the best evidence, though; Casi

 8   herself.

 9                   Casi, I asked you at the beginning, I'm going to

10   ask you now at the end, can you rule out the possibility that

11   Joe also believed Bill was an FBI agent?

12                   What was her answer?  I'm on the fence about

13   that.  That means she's not sure.  And you know what not sure

14   means?  Not guilty.

15                   Those are reasonable doubts.  She spent so much

16   time with him.  She knows -- or should know, and even she's not

17   sure.  If she's not sure, you can't be sure.

18                   We don't have photo finishes in criminal law.

19   We don't guess people into the penitentiary.  We just don't do

20   that.  Maybe Joe believed the fake probation was real.  And I'm

21   going to go back to the meeting with Briley there.

22                   Remember when Mr. Westfall was cross-examining

23   Briley and he went and showed him that e-mail from April of

24   2020?  The e-mail where he says that it appears that Stone has

25   deceived both DeLeon and Thompson, and appears that DeLeon and

1  Thompson are victims?

2          Where is Luley?  The person who apparently

3  decided to overrule Briley on that issue?  So Ranger Briley

4  himself was at least partially convinced that Joe shouldn't be

5  in the hot seat.  And then Mr. Luley decides that ought to be

6  different, or they decide together collectively as a

7  prosecution team that that should be different.  And then they

8  don't call the person who might know the reason why as a

9  witness.

10          You've got to make yourself -- you've got to

11  think about that.  What are they trying to hide from you?  Even

12  to Casi it appeared that her and Joe were in the same position.

13  And, you know, how could one not believe it?

14          And they keep -- see how they did yesterday with

15  these character witnesses?  What if Joe, you know, told someone

16  he was a probation officer?

17          That didn't happen.  That didn't happen ever.

18  He was her mentor.  It was what Bill said to him.  You will be

19  her mentor.  Can you help your project?  Can you help this girl

20  stay off of drugs, stay out of jail and with her children?  And

21  to Joe, who would help anyone, even if it hurt him -- and it

22  did.  It caused him to lose his restaurant helping her so much.

23          And this -- this BS about 60 days, 60 days, no.

24  She told you herself he wasn't out of there until 2017.  Stop

25  letting them -- y'all are smart.  Y'all are a smart jury.

1    Don't let them do that to you.

2              I mean, I -- I guess they think you are just

3    unintelligent.  I don't know what they think.  But I hope you

4    see it.

5              Will you be able to monitor?  How much more time

6    can you dedicate on a weekly basis?  Monitor more than now.

7              As much as I'm needed.

8              Don't want to interfere with your work.  Think

9    about it carefully.

10             He's working him.  This is a predator doing his

11   thing.  Working him just like he worked Darla Bell; just like

12   he worked Casi Thompson.

13             And what an easy mark Joe was.

14             Is it worth all the time and effort you're

15   willing to commit?

16             Okay, then I'll pass it on.

17             Who is he passing it on to?

18             And then:  Are you still with your fiancee?

19             Well, look at Joe.  You know, this guy, if

20   that's what's best for her son, I'm willing to do it.  The

21   children are our future.

22             That's just who he is.

23             And dutifully answer the call he did.  Spending

24   60, 70, 80 hours a week out there sometimes.  And you're like,

25   oh, Joe is spending the night?  That's strange.  He was sitting

1  on the back porch brushing her dogs, her three Lassie dogs, her

2  three collies, helping her day in and day out.

3           They were friends.  And at times, he was her

4  only friend.  And when you treat your friends like that, it is

5  a wonder you don't have more.

6           Knowledge of the conspiracy.  No knowledge of

7  the conspiracy beyond a reasonable doubt.  No knowledge of

8  unlawful purpose, highly likely.  No knowledge of unlawful

9  purpose, likely.

10           You know, maybe you can put Joe somewhere around

11  here.  But anywhere down here, no way.  And even if you think

12  it's highly likely he had knowledge of the unlawful purpose,

13  he's still not guilty.  That's how strong this law is.  You

14  take every inference -- what they're asking you to do is take

15  every inference in favor of their case.  That is not how this

16  works.  You are supposed to take every inference in favor of

17  the accused.  The default verdict is not guilty.  And that's

18  where it stays unless they overcome it.

19           (Audio playing.)

20           MR. SELLERS:  This is perhaps the most telling.

21  This is at the end.  It's at the end.  Remember at the

22  beginning when Joe threw up when he thought something bad was

23  happening to Casi?  Remember that?  When he threw up when Joe

24  learns about the -- that she's got to be on this secret federal

25  probation?  Listen to this.

1          (Audio playing.)

2          MR. SELLERS:  Gotta keep doing her 3x5 cards.

3  If Joe is in on this, where is the part about, hey, man, you

4  know this is all a hoax, you know this stuff ain't real; you

5  know she's not really on this probation; this 3x5 stuff was

6  just kind of something we made up.  You know that.  Why is he

7  continuing to lie to him if he's in on it?  Why is he

8  continuing to lie to him?  This is in '19.

9          (Audio playing.)

10          MR. SELLERS:  Did y'all hear at the beginning?

11  Hang on, I've got to pull over so I can throw up.  Because he

12  forgot he was in that conference room.  Why is he lying to him?

13  Why?  Last one.

14          (Audio playing.)

15          MR. SELLERS:  That call right there is about

16  50 minutes long, 5-0.  It has all the lies you need being told

17  to Joe by Bill in 2019.  The fake probation, the 3x5s that he's

18  still got to do; Dr. S and Dr. B; the fake calls on the phone.

19  All of it.  Why is he lying to Joe if Joe's in on it?  That's

20  crazy.

21          This is my Bill only list.  Remember when I went

22  through with Casi -- I had three more pages to do with Luley,

23  but they didn't decide to call him.  Said Joe got in trouble

24  with Fort Worth PD, deleted messages, threatened CPS case;

25  nicknames for everyone Casi had contact with; tried to change

1    the wills and trust; calm about probation.  Not Joe.  Joe was

2    throwing up.

3           Well, you notice, Bill was calm.  He was calm.

4    There was no trauma, she said.  But when does Bill throw up?

5    That was that call that I just played.  It was 38.1 at the very

6    end when he finds out that he's caught.  That's when he throws

7    up.  The irony, you know?  The irony of it.

8           Dr. B and Dr. S, the trauma, the analysts; the

9    friends and family; the drugs in the car and having to sell it;

10   the spoof call.  I didn't hear Joe in the spoof calls.  I

11   didn't hear anything about Joe in the spoof call, did y'all?

12   No.  That was Bill only, Bill only, Bill only.

13          And so with that, you got to ask yourself, where

14   does Joe really follow on this?  Doesn't really matter.  He

15   falls in the not guilty zone.

16          And if Joe knew everything -- you got the two

17   co-conspirators here in the same courtroom on the same

18   conspiracy.  And if Joe was so involved and in on everything,

19   why is he not charged with the substantive counts of wire

20   fraud?  Even they know.  They know because they didn't charge

21   him with wire fraud.  Don't be fooled by the stuff you're

22   hearing from these folks over here.

23          Three, maybe Casi gifted Joe the F-150 and the

24   $15,000.  This one's pretty easy.  These are from the chart I

25   had.  Casi tells you, I don't believe I ever told Joe I didn't

1   want to give him the F-150.

2                   The check.  Joe never asked Casi for money;

3   true.  Casi never asked Joe to give the money back; true.

4                   The 5,000 cash.  Do you remember they talked

5   about the 5,000 cash and they had the analyst up there?  And

6   Westfall even brought it up.  I was just like, don't do that,

7   man.  They're going to come up with some story for it.  Even

8   they disregarded that 5,000 cash.  Because during the course of

9   this trial, they've realized they were wrong themselves.  That

10  is why they didn't ask him the question about it.  They left it

11  on his chart hoping you'll just forget that they didn't ask him

12  about it.

13                  The truck.  It's pretty simple.  She told OIG in

14  May of 2020, I gave him the truck.  Bill told me to give him

15  the truck.  From her mouth in 2020, before any of this was ever

16  even a thought in their minds.

17                  The text messages.  You know, the context, we

18  had to bring you the context of everything.  They'd show you

19  one text, like, oh, my God, Joe is so bad.  But then if you go

20  look at the days surrounding it, the truth is there.

21                  And then, of course:  Tell Slayter I said good

22  night and sweet dreams.

23                  A few months later:  Did it hail on your truck?

24                  No.  I got up and moved it underneath --

25  underneath the -- the bridge.

1              The truck timeline.  You know what, here it is.

2    There's that text about the -- the car she didn't hit.  Not an

3    F-150.  You know what they're trying to do to y'all.  I mean,

4    it's just wild.  I've never seen anything like it.  They should

5    be ashamed of themselves.

6              The car is not even a week old.

7              Yes, I know.  She's kind of beating herself up

8    about it.

9              But here's the truth.  She gets that $500,000.

10   And she's got more money than she's ever had in her whole life,

11   and she writes Joe a check back.  Here's the truth of the

12   matter.  You know, very nice truck.  And he's like, give it to

13   Joe.  What happened after that does not matter.  And this

14   argument that they're making about, oh, they had to have a

15   paper trail; what kind of criminal do you ever know that says

16   let's make a paper trail.  That's crazy.

17             If they wanted to keep it secret, they would

18   have never written checks about it.  The title office never

19   asks about that.  They could have just written whatever they

20   wanted in those forms.  But they wrote exactly what the puppet

21   master told them.

22             Casi gave Joe the truck.  She said it herself it

23   was true.  Bill told Casi to give Joe the truck, you know, and

24   for free, and she never asked him to give it back.

25             Casi, if you'd have asked him to give it back,

1    he would have done it.

2              She never asked him.  And you hear in the four

3    calls, the controlled calls, she never confronts Joe.  She

4    never confronts him once.  Yet with Bill:  Bill, why don't you

5    give my money back?  Bill, are you going to sell your house and

6    give me some of that money back?

7              But she never confronts Joe, because she knows

8    she gave it to him.  And she never asked him to give her the

9    money, which he would have gladly done.  Gladly done it.  What

10   she's really mad about is that he accepted it.  You know what,

11   I guarantee you, looking back, had to do over again, he

12   wouldn't have.  He wouldn't have even thought about it.  But

13   she gave it to him.  She was getting rid of her grandma's stuff

14   right and left.

15             Betrayal.  Lied to him about the relationship.

16   The financial part of it.  The sex.  The Key West trip.  All of

17   it.  Lied.  The Nils Hubert -- before they try to hoodwink you

18   with more lies, so it's not uncommon, Bill told me not to talk

19   to Nils.  Remember that Nils text?  And that Nils text back

20   or -- or Joe calls -- Bill calls Joe immediately for

21   47 minutes.  What does he tell them?  You can't trust that guy.

22   He's going to give you up.  He's going to cause you trouble.

23   Stay away.

24             Building division again from Ranger Briley.

25   That is what predators do.  Build division.

1            Yeah, but what about that 600,000?  Look at

2    their exhibits.  They knew Bill and Joe were talking.  In fact,

3    Ranger Briley told Joe not to act any differently than he did

4    before.  And so of course he knows about that $600,000, because

5    what happens when he walks in?  First thing he says.

6                    (Audio playing.)

7                    THE COURT:  Wrap it up.

8                    MR. SELLERS:  Yes, ma'am, I'm wrapping right

9    now.

10            First thing he says when they get together in

11   the house:  She's accusing me of stealing $600,000.  Is it

12   really that far-fetched to believe that if they're talking all

13   the time that they've had that discussion before?  Whenever --

14   first thing he says when he goes to his house, that he didn't

15   know was there or where it was until that day, first thing he

16   says is 600,000?  No.  Don't let her try to trick you

17   otherwise.

18            I'm going to wrap up now.

19                    THE COURT:  Wrap up quickly.

20                    MR. SELLERS:  Yes, ma'am.  If I can get there.

21            Many of you have never been on a jury before,

22   but I'd like to suggest your first vote should be by secret

23   ballot.  This prevents the monkey see, monkey do.  Do what you

24   want, but I think that's a good way to start.

25                    Ladies and gentlemen of the jury, it has been an

1    honor to present this case to you.  I maybe have lost my temper

2    at times, but I promised I would speak with peace this week.

3    And so I'm going to wrap it up now.

4                   And for two years, Joe has been our charge.

5    He's been on our conscious; he's been on our -- he's been the

6    reason we don't sleep at night.  And we hope we've done

7    everything we can to show you that he truly is just a simple

8    man who trusted the wrong person.  But now he's yours.  And I

9    hope at the end of this you will give him back to us just as

10   we're giving him to you.

11                   Thank you for your time.

12                   THE COURT:  All right.  Members of the jury, you

13   have now heard all of the -- we have -- I think we have

14   18 minutes.  Do we need a break or are we good?  Government

15   gets the last word.  They've reserved some time.  I apologize.

16                   MS. MAX:  No offense taken, Your Honor.  No

17   offense taken.

18                   Project and a dollar sign.  Project Number 2,

19   dollar sign.  That's what she was to them.  But we're supposed

20   to believe that none of this was about the money.

21                   December 18th, 2015, $5,000.  But we're not

22   supposed to believe this is about the money, ladies and

23   gentlemen.  December 24th, $5,000.  I guess it wasn't about the

24   money then either.

25                   $5,000, $5,000, $5,000, $5,000.  We're still in

1    January.  But it's not about the money?

2                    January 29th, one month in, a $15,000 check to

3    Joe DeLeon.  Guess that wasn't about the money.  $5,000,

4    $5,000, $5,000, the Ford F-150.  February 17th, we're only into

5    February, not even two months in, but this probation is not

6    about the money, ladies and gentlemen.

7                    A Lexus, on February 22nd.  $5,000, $250,000.

8    But it wasn't about the money.  A $15,000, $5,000, $5,000,

9    $5,000, $9,000, $76,000 for a Mercedes.  But we're supposed to

10   believe none of this was about the money.

11                   $5,000, a Toyota Tacoma, $154,000 for a house,

12   and $70,000 to remodel it.  But none of this was about the

13   money.

14                   Over $700,000 in a year.  It's dizzying to read.

15   Think about how dizzying for Casi.  Her money, her freedom.

16   Those were the choices she was left with.  Of course for Casi

17   it is an easy choice, right?  Her freedom.

18                   But did she really even have a choice?  Being

19   under constant stress, manipulation, control; exploitation;

20   surveillance; lies from the moment she woke up in the morning

21   until the moment she went to bed at night.  Wait a second, even

22   her sleep can't be peaceful.  Remember she gets roused as

23   2:00 a.m. with another crisis.  You've got to clean your house,

24   Casi, because CPS is coming first thing in the morning.

25                   But it's not about the money?  Go back and look

1    at Exhibit 37.  Those are the text messages between Bill Stone

2    and DeLeon.  The text messages they didn't delete.

3    October 30th, 2015.  One week before Casi's grandma dies.  Are

4    those two talking about Casi spiraling out of control, concerns

5    about her sobriety?  No.  DeLeon to Stone:  FYI, this is Casi

6    Thompson's family business, with the family name.  But it's not

7    about the money?

8                   She had a 4.0 that semester.  She was going to

9    school.  She was taking night classes.  She was taking her kid

10   to her friend Daralyn's.  There was no spiral.  There was no

11   need for this probation.  Except for the money.

12                  So we're supposed to believe Bill lies about

13   everything that we've heard for weeks now, except the money and

14   his intent about it.  So in the fog of all these lies they --

15   there is just this one sliver of truth, the one sliver of truth

16   that makes all of this a crime.

17                  I want to address a few things that were brought

18   up in closing.  We've shown you what all those $5,000 were for.

19   It was the travel lie.  You've got the documentation every

20   single time.  That restitution, the Green Dot Mastercard with

21   Enterprise.  You heard multiple phone calls.  Yeah, that did

22   exist.

23                  Here's the thing.  If he had to lie to her about

24   any one of these things, that blows this whole defense of

25   consent, "it was a gift," out of the water.  Why would he have

1  to lie about anything?  Because he had to lie about everything.

2          Casi told Ranger Briley the first time she met

3  him, and she told you on the stand, I believed he was an FBI

4  agent when this fraud started.  At some point well into the

5  probation he retired and became CIA.  So that's the end of that

6  matter.

7          Addressing their relationship.  It's a real

8  inconvenient truth for the defense that all the money goes out

9  in that first year.  Look at the calendars.  I submit to you

10  that's Bill Stone actually telling the truth.  Because those

11  are just for him.  That's for him to keep track of his lies.

12          That 2015 calendar, you see Casi in there twice

13  going to dinner.  But we're not even sure if it is Casi because

14  the name is not even spelled right.  Casi told you they had sex

15  for the first time in 2016.  You see in it the calendar.  Go

16  look.  Summer of 2016.  And if you look at these calendars you

17  are going to know, if he's having sex with her, it's in there.

18  She even told you that is not even when a relationship started.

19  And gosh knows that would be really expensive sex if it was.

20  She told you not until end of 2017 when I graduated college did

21  a relationship start then.  Inconvenient for them, no money is

22  going out at that point.

23          Defense counsel asked you, why did the money

24  stop?  The money stopped because they bled her dry in the first

25  year.  Remember, Casi, what she got that first year was a

1    million-dollar life insurance policy.  And in a year, they got

2    over $700,000 of that money.  He had a house.  He had two cars.

3    He had lots of cash.  He had to pace himself.

4              Also ask yourself this.  If this house that was

5    bought together in 2016 was bought for them to live in, and was

6    bought as a thing for them to be together, why did Casi never

7    live there?  There's been no evidence to the contrary.  We're

8    up to 2019.  Casi has never lived in that house that apparently

9    they bought together.

10             To answer another question, what was the scheme

11   between the two?  The scheme was that they would financially

12   benefit from Casi Thompson being on a probation.  Joe DeLeon

13   knew that that was unlawful for him to do so.  And that's why

14   four separate times, go look:  September 5th, two times with

15   Ranger Briley, September 17th with Ranger Briley, May 7th with

16   Brian Luley, each time Joe DeLeon says, oh, I bought that truck

17   from her.  Which he knows is a lie, but he knows he needs to

18   say that because he knows it is unlawful for him to financially

19   benefit from someone that's on probation, real or not.

20             Ask yourself this.  Fast-forward to June 2019

21   when things really start to unravel.  And they unravel because

22   Casi is starting to ask questions and realize the truth.  She

23   is coming out of the fog of lies.  Why doesn't Bill Stone at

24   that point just say, I'm sorry, I've been lying to you all

25   these years?  Bill Stone, FBI agent, of all people knows lies

1    aren't a crime.  It's just lies.  So why doesn't he just say to

2    her at that point, I'm a terrible person, but I've lied to you?

3                    He doesn't, because he knows it's not just lies.

4    He knows he's committed a crime and he needs her to believe so

5    that she doesn't talk.  So that his crime can stay covered up.

6    That's why he surveils her.  That's why he destroys hard

7    drives.  That's why he deletes texts.  And don't you find it

8    funny he deletes, God knows, thousands upon thousands of text

9    messages, but the few that remain are about their pregnancy?

10                   Don't think for one second that already in the

11   summer of 2019, FBI Agent Bill Stone isn't figuring out what

12   his defense is to all of this.  He's working multiple fronts.

13   Destroy, create a story line, but keep lying to Casi.  Because

14   maybe if she keeps thinking it's real, she'll just drop it and

15   move on.

16                   You know who else continues to lie is

17   Joe DeLeon.  So setting this up, if you look at the calendar on

18   August 2nd, 2019, Bill Stone writes:  Casi recording me.  He

19   knows from that point on.  DeLeon and Bill Stone talk for an

20   average of 30 minutes a day in August 2019.  Yet when DeLeon

21   gets on a recorded call with Casi on September 3rd, he tells

22   her, oh, I haven't talked to Bill in a long time.  Why?

23   They're scheming.  They have a plan.

24                   On that September 3rd call, Casi never once

25   mentions money.  Never says a $600,000 amount.  Yet two days

1    later, when DeLeon goes and interviews with Ranger Briley, he

2    says, oh, she told me it was something like 600,000.  He didn't

3    get that number from Casi.  He didn't get that number from

4    Ranger Briley.  He got that number from Bill Stone.

5                    So then you have to ask yourself, why doesn't

6    DeLeon sit in that interview and tell Ranger Briley, yeah, Bill

7    Stone told me that she's accused me -- that he has -- that Casi

8    has accused him of $600,000?  Why doesn't he tell Ranger Briley

9    that?  He doesn't.  He and Bill Stone are working out their

10   lies together.  They are doubling down on this probation story.

11   Maybe it'll make Casi back away.  Maybe it'll make

12   Ranger Briley go away.

13                   Yeah, I don't know, maybe there is such a thing

14   as federal probation.  I'm a Texas Ranger.  That's a -- I do

15   state crimes.  Maybe I'll just back off.

16                   They are working out a scheme and a plan.  They

17   are continuing to lie.  Not for the sake of the lie, not for

18   the sake of keeping this probation going.  For what reason?

19   They're continuing to lie to cover up their crimes.

20                   Remember Stone's attorney telling you to imagine

21   this story that Casi told you, just now in his closing?  And

22   imagine is a great word, because it was an imaginary story.  It

23   was nothing but the attorney's words.  It was not based on

24   facts, and it was not based on the evidence that you got in

25   this courtroom.

1              Casi didn't tell you that story because it isn't

2    the truth.  But you know what is the truth?  Casi told you

3    things.  And then we brought you Bill Stone's own words from

4    his calendars.  And it corroborated.  It backed up the dates.

5    It backed up the story line that she gave you.

6              And Casi, how easy would it have been for Casi

7    to come in here, and when that $9,000 was brought up, she could

8    say, oh, yeah, that money, too.  But, no, Casi is telling you

9    the truth.  So she says I'm not 100 percent sure about it.

10             Casi is listening to every question and trying

11   to give you the most thoughtful, honest response.  It would

12   have been so easy for her to just blanket all the money.  So

13   yeah, the Rolex, the bags, everything.  No.  She said no, no,

14   that -- I mean, we know it was still based on a lie -- I had to

15   give him a Rolex because he said he lost his when he had to go

16   to Austin, and I felt bad.  But she told you the painstaking

17   truth with each and every transaction.

18             And even with that 9,000, we've brought you

19   evidence to corroborate that it was part of the travel lie.

20   The travel lie occurred right on those same dates, and Bill

21   Stone put in his calendar, Project, dollar sign.

22             We've heard a lot of words used about this case.

23   Bizarre, weird, crazy.  This is Casi Thompson's life.  This was

24   her life for four years.  So anything bizarre and crazy that

25   you've heard about this story rests completely with these two

1    men.  None of that comes back on Casi Thompson.

2              Do not cheapen her victimization because of the

3    absurdity of their lies.  They exploited every vulnerability

4    she had to their financial gain.  It's not bizarre.  It's not

5    crazy.  It's not weird.  What it is is depraved, diabolical,

6    and most importantly for you guys, criminal.

7              It was about the money every single time.  Every

8    single day.  Project 2 and a dollar sign.

9              We ask you to return a guilty verdict on all

10   counts, because it is the only verdict that can be reached when

11   you apply the law to the facts that you've heard in this case

12   and your common sense.

13             Thank you.

14             THE COURT:  All right.  Members of the jury, now

15   you get to discuss the case.  I appreciate your time and your

16   attention to everything.  Before you actually begin your

17   deliberations, I need to give you one final instruction.  And

18   I'll come do that here in just a moment.

19             So if you would recess back and hold off on

20   discussing anything for just a moment, and I'll come and visit

21   you in just a second.

22             All rise for the jury.

23             (Jurors exit courtroom for deliberations.)

24             (Court adjourned.)

25

1          I, BROOKE N. BARR, United States Court Reporter

2     for the United States District Court in and for the Northern

3     District of Texas, Dallas Division, hereby certify that the

4     above and foregoing contains a true and correct transcription

5     of all proceedings in the above-styled and -numbered cause.

6

7          WITNESS MY OFFICIAL HAND this the 31st day of

8     August, 2023.

9

10

11                         /S/ BROOKE N. BARR
                           BROOKE N. BARR, CSR NO. 6521
12                         CSR Expiration Date:  7/31/24
                           United States Court Reporter
13                         1100 Commerce Street
                           Room 1376
14                         Dallas, Texas 75252
                           (214) 753-2661
15

16

17

18

19

20

21

22

23

24

25