# United States Court of Appeals
# for the Fifth Circuit

———————

No. 24-10115

———————

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

WILLIAM ROY STONE, JR.; JOSEPH EVENTINO DELEON,

*Defendants—Appellants*.

———————————————————

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CR-236-1

———————————————————

Before WIENER, WILLETT, and HO, *Circuit Judges*.

JACQUES L. WIENER, *Circuit Judge*:[*]

Following a thirteen-day trial, a jury convicted defendants-appellants William Roy Stone, Jr. and Joseph Eventino DeLeon in connection with an elaborate scheme they orchestrated to defraud a young woman out of her inheritance. Stone appeals only the application of the sophisticated means sentencing enhancement. DeLeon challenges his conviction on sufficiency

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 24-10115

grounds, the denial of his motion for a new trial, and the application of two sentencing enhancements. We affirm.

## I.

### *Background*

Bill Stone worked as an FBI Special Agent for twenty years, retiring on October 31, 2015. Before working with the FBI, he had been an Irving, Texas police officer. Joe DeLeon was a restaurant owner in Fort Worth, where he resided for the majority of his life. DeLeon was also a longtime volunteer with the Fort Worth Police Department, was involved with the department's Citizen's Academy, and volunteered his translation services to various law enforcement agencies. Stone and DeLeon first met in 2003 through DeLeon's volunteer work.

C.T. was a woman in her early twenties who had been struggling with substance abuse for ten years, causing her to be estranged from her family and at times to lose custody of her young children. Around 2005, C.T.'s ex, a former police officer, introduced her to DeLeon at his restaurant. When they first met, DeLeon represented to C.T. that he worked for the police and that he was an FBI interpreter. At one of these early meetings, DeLeon showed C.T. a "government-issued ID" that appeared to be "some sort of law enforcement ID." C.T. testified that in their meetings, DeLeon "would always refer to different places that he was going to assist in cases" and he "seemed pretty busy doing the Fort Worth Police Department stuff" alongside his restaurant business. He always wore a firearm on his waistband.

Shortly after meeting DeLeon, sometime between 2005 and 2006, DeLeon suggested that C.T. meet his friend Bill Stone. DeLeon was aware of C.T.'s drug problems as well as her family issues and custody challenges. C.T., nervous to meet an FBI agent, did not attend the first scheduled meeting, but DeLeon continued to push it until she agreed. There, Stone told C.T.

Case: 24-10115     Document: 149-3     Page: 3     Date Filed: 08/26/2025
Case 3:21-cr-00236-E     Document 302     Filed 08/26/25     Page 3 of 25     PageID 18284

No. 24-10115

that her car was seen near known drug houses that he was monitoring. She found this credible because she "was using drugs and it's probably likely that [her] car was seen in front of a drug house." She told Stone that she was "trying to maintain sobriety" and that she was experiencing family issues as a result of her drug use. She did not reach out to Stone following this meeting but kept in touch with DeLeon. She continued to struggle with addiction and then lost custody of her children.

In 2007, the Irving Police Department arrested C.T. on a drug charge. Upon searching her car, the police found a notebook in which C.T. had written Stone's contact information. She was released the next day after the police convinced her to act as an informant, and the arresting officer suggested she call Stone because he was a former Irving police officer. She did so and Stone told her "that he would take care of it." She was never charged, and she testified that DeLeon and Stone told her that it was because Stone had intervened on her behalf. Between 2007 and 2014, C.T. continued to struggle with addiction and had several encounters with law enforcement, none of which amounted to much. Throughout that time, C.T. was intermittently in touch with DeLeon for general support.

Then, in 2014, she was arrested and charged with felony drug possession in Hood County, Texas. Afraid of going to prison and losing any hope of regaining custody of her children, C.T. opted to go into rehab. She was in touch with DeLeon more frequently then, talking about her kids and family, the arrest and legal situation, and how her progress was going at the treatment facility. DeLeon told her that he was keeping Stone apprised of her progress.

C.T. successfully completed her rehab program in early 2015 and pleaded guilty to the drug charge. She was sentenced to six years of probation, during which she was required to maintain sobriety, not commit further crimes, and abide by other conditions. C.T. turned her life around: She

No. 24-10115

reconnected with her family, enrolled and excelled in college, and was made the sole executrix of her grandmother's will. When that happened, C.T. told DeLeon and Stone that she "might need [DeLeon's] help . . . because [she] didn't know how to do probate or anything like that." Her grandmother passed away later that year, in November 2015. Unbeknownst to C.T., her grandmother's estate was worth approximately $3 million. By that time, Stone had already retired from the FBI.

*The Scheme*

C.T. informed DeLeon and Stone about her grandmother's death, and—although she organized the funeral—she did not invite DeLeon or Stone to attend. DeLeon showed up anyway, carrying a firearm as usual. He told C.T. that Stone instructed him to "keep eyes" on her for her protection and that Stone was in town to help C.T. on a case. It troubled her that DeLeon was there for that purpose, and she testified it made her "extremely uncomfortable."

Following the funeral, DeLeon went to C.T.'s house to talk about why Stone was "in town helping [her]" and Stone came over shortly after. Stone continued to represent that he was an FBI agent, and he told her that he had flagged her name in "the system" so that he "was alerted anytime [her] name was brought up." He also said that some older drug cases were resurfacing. When she asked to see evidence, Stone told her that she would have to go before a judge who would then revoke her probation. Stone also said that if she told her family, they would use it against her in the probate proceedings. He also told her that the only person she could tell anything to was DeLeon, and that he (Stone) could listen to her phone calls and read her text messages.

Stone then told DeLeon to go to the probate hearing with C.T., and it was there that they learned the value of her inheritance. Starting about a week after the probate hearing, Stone initiated more meetings with C.T. He

4

Case: 24-10115    Document: 149-3    Page: 5    Date Filed: 08/26/2025
Case 3:21-cr-00236-E    Document 302    Filed 08/26/25    Page 5 of 25    PageID 18286

No. 24-10115

claimed that he was in Austin to help C.T. with a pending drug charge there—even though she was unaware of what charge it could be because she had not gone to Austin—and that they should all meet to discuss it. Stone told C.T. that she was facing fifty years in prison and that she was "one lucky kid" that he was there to help her. He claimed to have seen a video of her conducting a drug deal, but when she asked to see the video, he told her she would have to go to court and then she would go to jail. He also said that she should not call an attorney because "there's no amount of money that [she] could pay an attorney to get for [her] what [Stone] could do for [her]." Instead, Stone said he worked out a deal with the judge to secure her "secret probation." Evidence at trial revealed that, at this time, Stone and DeLeon changed C.T.'s name in their phones to "Project #2" and began referring to her as such during the scheme.

Stone told C.T. that DeLeon had agreed to be her probation officer for her secret probation. Stone imposed stringent conditions on C.T. in connection with that probation.[1] Stone and DeLeon worked together to ensure that C.T. complied with those conditions. Stone created a cast of fictitious characters to support that ruse, including "Judge Anderson" in Austin who had worked out this secret probation plan for C.T.; a team of FBI "analysts" with names like Avery and Ainsley who Stone said worked in the "North Korea Unit" but who were helping him with C.T.'s case on the side, "sharpening their skills;" an FBI psychiatrist named Dr. Bryan, or "Dr. B," who treated C.T. over the phone; and a fictional state trooper named "Jerry" who Stone said would drive past C.T.'s house and report his findings to Stone.

_____

[1] These conditions required C.T. to fill out her entire day's activities, every day, on 3x5 index cards and send them to DeLeon, spend a certain amount of time with DeLeon each day, complete community service hours, enroll in school fulltime and earn good grades, send Stone a list of her financial assets, obtain permission (from Stone) before traveling, and obtain Stone's permission before dating anybody.

C.T. never once saw or heard these characters, but interacted with them over the phone through Stone in ways that strain credulity. For example, C.T. testified that she would be on the phone with Stone, and that Stone had a separate satellite phone that allowed the analysts (or Dr. B) to listen in on their call and respond in real time, but only to Stone who would then relay their responses back to C.T.

DeLeon furthered and reinforced these antics. When C.T. asked him why she never heard Stone's phone ring when he took calls from those characters, DeLeon told her that Stone had a device in his pocket that vibrated so he would know when to answer the phone. DeLeon once called C.T. in the middle of the night to tell her that Stone was trying to handle a Child Protective Services (CPS) matter for her and that she "needed to get up and get [her] house ready for a home visit." She complied, but CPS never came. She testified that she was told that Stone and DeLeon had handled it for her. Stone told C.T. that a condition of her secret probation was to get her tattoos permanently removed, an expensive and painful process with which she complied, and DeLeon helped enforce this condition. DeLeon carried a gun every time he came to her house, told her it was "standard operating procedure" to delete all texts with Stone, continued to insinuate that he was actively helping law enforcement with serious cases like homicides and SWAT activities, and frequently made it seem like he was up all night working on her case for her.

Almost immediately after putting C.T. on "secret probation," Stone and DeLeon began to scheme to get her inheritance money for themselves. First, it was $5,000 cash installments for Stone's purported "travel expenses," which she gave Stone at least two or three times a month in the beginning. DeLeon also sought money, complaining often that he was going broke because he spent so much time with C.T. instead of at his restaurant. In January of 2016, one month into the secret probation, she gave DeLeon a

check for $15,000 for "working as [her] probation officer." She gave him $5,000 cash when he complained about the payroll at the restaurant, and bought him a new laptop and a new phone so they could "continue [their] communication per required from the court." Also in early 2016, Stone made her sign her power of attorney over to DeLeon.

Before long, Stone and DeLeon sought more than money. In February of 2016, Stone told C.T. to give DeLeon a truck because DeLeon "was acting kind of childish and acting as though he was going to quit on us." Against her own wishes, C.T. gave DeLeon her family's Ford F-150 truck, but DeLeon insisted they create a fake paper trail to make it look like she sold the truck to him. DeLeon wrote a check for the truck, and instructed C.T. to write a check back to him for the same amount. C.T. testified that the whole thing "felt extremely uncomfortable" to her and that she "didn't feel like he deserved to be given a truck." DeLeon quickly sold the truck for about $37,000 and kept the money. C.T. gave DeLeon over $50,000 related to his services as her probation officer in the first two months of the secret probation.

Also in February, Stone told C.T. to give him a vehicle—the Lexus SUV she was using as her primary car. She was told this was "a form of payment so there wasn't any monetary exchange for his efforts in helping [her]." She testified that she was told that any paper trail could impact her Hood County probation, and that DeLeon told her she was "the luckiest girl in the world" to have his and Stone's help. After she gave Stone the Lexus, he traded it in for a Mercedes and had C.T. pick up the tab on the difference between the trade-in value and full cost.

In March, Stone and DeLeon told C.T. she owed restitution in connection with the secret probation, and if she did not pay she could incur new criminal charges and violate her (real) probation. Stone told her she owed $250,000 in restitution, which she paid to Stone by cashier's check. In

August, Stone told C.T. he needed her to buy him *another* vehicle, which she did—a truck for about $24,000. In September, Stone said he was moving to Texas to work for the FBI remotely, but could not buy a house because his money was tied up in retirement trusts, so she gave him $154,500 for a down payment. When Stone asked her to help with the remodel of this house, she paid the remodeling company $25,000.

All told, her "secret probation" lasted four years. C.T. finished college in 2017 and completed her Hood County probation in 2018 earlier than scheduled, and Stone told her this was because Judge Anderson had written a letter to Hood County on her behalf. In December of 2017, DeLeon retired and sold his restaurant business because of his health issues. Those health issues also forced him to cease acting as her probation officer. But Stone had a solution. He told C.T. that Judge Anderson gave him permission to be her probation officer instead. Stone then initiated a romantic relationship with C.T. In the summer of 2019, C.T. and Stone took a trip to Florida, but they got into a fight there. C.T. asked Stone if they could break up and if she could have a different probation officer, but Stone rebuffed her.

When they returned to Texas, Stone told C.T. that he saw a video of her talking to waiters in Florida who were on a terrorist list, so he would need to intercede with Judge Anderson again. Stone then used a spoofing program to call C.T., mimicking the real 512 phone number from the Austin district court to make it look like he was calling from the judge's chambers. Following that call, Stone tightened the conditions of C.T.'s secret probation. Stone also enlisted a friend to leave a voicemail, pretending to be a Drug Enforcement Agency (DEA) agent, saying that C.T.'s name came up in more drug investigations and that the agent was alerting Stone because he controlled C.T.'s "law enforcement umbrella."

No. 24-10115

Shortly after those fake calls, Stone proposed to C.T. and she "reluctantly said yes." Stone then said that he had asked Judge Anderson to end her secret probation because they were engaged and in love, and—although he told her the judge said the probation can end—she testified that it did not end that day. C.T. did not want to marry Stone and—after a few more days—she "did not feel good wearing the ring knowing that's not what [she] wanted," so she called off the engagement. Stone did not react well, harassing her sixteen-year-old son, her brother, and her mother, telling them that C.T. was regressing in her progress. Around that time, Stone claimed that Dr. B had fallen off his Peloton and died, and he sent C.T. a picture of the purported funeral. However, C.T. saw that they were live photos and, when she clicked them, she discovered that Stone had just taken pictures of other pictures. So began C.T.'s doubts.

*The Investigation*

C.T. started to question whether the secret probation was real—she told a friend's mom because that mother worked with the judge who gave her the Hood County probation. When the friend's mom told C.T. that she was released early because of good behavior, not because a Judge Anderson intervened for her, C.T. called a Texas Ranger, Danny Briley, who began to investigate.[2] She was hurt and angry at both Stone and DeLeon for the "terror and sadness and fear" and all the time they made her spend with them instead of with her children. She testified that she never would have given either of them any money, vehicles, property, or time had she known the truth.

---

[2] C.T. testified that the impetus for all of this was that she wanted to travel to New Mexico to go to a family wedding, but Stone was being evasive about giving her permission to travel.

No. 24-10115

During the subsequent investigation, law enforcement interviewed DeLeon several times. He continued to stay in touch with Stone, despite being told not to tip Stone off, and lied repeatedly to law enforcement about the nature of the scheme and his role in it.[3] He lied to Ranger Briley when he said Stone gave C.T. probation papers to sign, drawing a diagram of where they were standing in her home when she signed, but that never occurred. He told law enforcement that he believed Stone was still an FBI agent when text messages show he knew that Stone had retired earlier. DeLeon insisted he never received any payment from C.T. despite having received cash and the $15,000 check. He also told law enforcement that he purchased the F-150 truck and that he had a check to prove it, omitting that he made C.T. write the check back to him at the same time. When DeLeon ultimately told law enforcement about the $15,000 check, he lied about when he had received it and, when pressed, he told Ranger Briley that "she's wealthy and that she does not need it anyway."

### The Trial & Sentencing

Stone and DeLeon were charged with conspiracy to commit wire fraud, and Stone was charged with six counts of wire fraud, one count of money laundering, and one count of falsely impersonating a federal officer. At trial, C.T. testified extensively, and the jury also heard from Ranger Briley and ten other witnesses for the prosecution. The government offered volumes of evidence in the form of thousands of text messages, recorded phone calls, and various other exhibits. At the close of the government's case, both

_____

[3] The investigators pored over text messages between DeLeon and Stone, including messages of them joking about the $3 million, and found a secret set of calendars hidden in Stone's trash can liner documenting his and DeLeon's efforts and conversations about C.T.—including late in the scheme after DeLeon had stopped acting as her probation officer.

No. 24-10115

defendants moved for acquittal, reasoning that if DeLeon did not know the secret probation was fake, then he (and they) could not have conspired together. However, the court denied the motions.[4] Neither Stone nor DeLeon renewed these motions at the close of their cases.

DeLeon's defense was consistently that (1) he did not know the probation was fake, (2) he blindly trusted Stone because he respects law enforcement so much, and (3) absent knowledge about the probation's fiction, he could not have the requisite intent to conspire. At trial, DeLeon called several former Fort Worth police officers who knew him from his volunteering to testify to his character for honesty. Each testified that DeLeon: (1) knew volunteers cannot accept payment, especially from a defendant or supervisee; (2) "knew more than your average citizen" about law enforcement; (3) had "40 or 50" friends in law enforcement at all levels of leadership that he could turn to if he had questions; (4) was entrusted by Fort Worth Police Department with leadership positions given his knowledge and capabilities; (5) knew that if something did not "look right" DeLeon would know to report it; (6) in all his years DeLeon never accepted payment from the police or anyone else for his volunteer work; and (7) would know not to lie to a Texas Ranger. The prosecution cross examined these witnesses, asking about specific bad acts by DeLeon, and DeLeon objected only once.

The trial lasted thirteen days. During deliberations, the jury sent a question to the judge, asking: "Do defendants of this case for Count 1 have to have the same verdict in order for it to be a conspiracy?" The court invited

---

[4] The prosecution's position throughout the case has been that the unlawful purpose of the conspiracy was to defraud C.T. out of her money and property, and that the fake probation was but one means to that end. Because a co-conspirator need not be aware of every aspect of the conspiracy to be convicted, the prosecution did not find the defendants' argument to hold water, and the court agreed.

No. 24-10115

the parties' position on a response, and—although Stone's attorney wanted to point the jury to a particular part of the charge—DeLeon's attorney agreed with the government's position: "[I]t seems like the most appropriate thing to do is just say you have all the law applicable in this case in the jury charge, and I direct you back to the jury charge. Some words to that effect." The court responded to the jury according to DeLeon's and the government's wishes.

The jury convicted both men on the conspiracy count and convicted Stone on all other counts except one of the six wire fraud charges. At Stone's sentencing hearing, the government urged the court to apply the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C).[5] That enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). The court agreed with the government and applied the enhancement. Stone was sentenced to 87 months incarceration. At DeLeon's sentencing, the court applied two enhancements: (1) the sophisticated means enhancement, and (2) the abuse of trust enhancement under U.S.S.G. § 3B1.3. The court sentenced DeLeon to 70 months incarceration.

Stone only appeals the application of the sophisticated means enhancement. DeLeon brings several issues on appeal: (1) the denial of his motion for a new trial on grounds of ineffective assistance of counsel, prosecution's allegedly improper closing remarks, and the jury note response; (2) improper cross examination of character witnesses that he claims undermined his presumption of innocence; (3) the sufficiency of the evidence to

---

[5] The court applied various other enhancements to both defendants but, in this opinion, we discuss only the ones on appeal.

No. 24-10115

support his conviction; and (4) the application of the sophisticated-means and abuse-of-trust enhancements.

## II.

We begin with DeLeon's motion for a new trial. We next turn to his insufficiency challenge. We then address DeLeon's objections to the cross-examination of his character witnesses. We conclude with the sentencing enhancements applied to both defendants.

## A.

We review a denial of a motion for a new trial for abuse of discretion. *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004). "This standard is necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe the demeanor of witnesses." *Id.* (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)). In our review, "to some extent [we] must begin with the error or grounds upon which the district court based its decision" and we "examine the court's decision as measured against the relevant standard." *Id.* at 466; *see also United States v. Logan*, 861 F.2d 859, 864 (5th Cir. 1988) (holding that the *Strickland v. Washington* standard applies to new trial motions based on ineffective assistance of counsel) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

DeLeon challenges the denial of his motion for a new trial on three grounds: (1) ineffective assistance of counsel; (2) improper prosecutorial jury closing arguments; and (3) the court's response to the jury question. We address each in due course.

No. 24-10115

DeLeon insists that one of his two trial attorneys provided ineffective assistance because that attorney misunderstood a ruling on a motion in limine and therefore did not call DeLeon's then-girlfriend, Margarita, as a witness.[6]

To make a claim of ineffective assistance of counsel, DeLeon must show that (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. DeLeon must also show "that counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Decisions about which witnesses to call and how to question them "are tactical determinations" and "[e]rrors, even egregious ones, in this respect do not provide a basis for postconviction relief." *United States v. Rubin*, 433 F.2d 442, 445 (5th Cir. 1970).

Allegedly, Margarita would have testified that Stone told DeLeon that Margarita was to be deported imminently unless DeLeon complied with Stone's directives, showing that Stone employed similar tactics against

---

[6] Just one of DeLeon's two attorneys attended one of several pretrial hearings and, at that hearing, the court explained it would not allow the government's 404(b) witnesses to testify about conduct irrelevant to the fraud perpetrated on C.T. Margarita's testimony would have described how Stone furthered a scheme unrelated to C.T. that involved Margarita's immigration status, and DeLeon contends that this testimony would make him appear to be another one of Stone's victims instead of a perpetrator. But the court ruled that witnesses can testify as to "the allegations contained in this indictment," not as to "any other alleged bad acts, crimes, or wrongs" unless counsel raises it outside the jury's presence first. Attached to his new trial motion, DeLeon's attorney—who was absent from that hearing—filed an affidavit attesting that he misunderstood this ruling as barring *all* 404(b) witnesses, not just those the government sought to call, and that Margarita would have corroborated DeLeon's victimhood. There were several other witnesses in this bucket besides Margarita, even though all of them would have testified to matters unrelated to C.T., and the affidavit focuses on Margarita.

No. 24-10115

DeLeon and reinforcing his position that he was a victim just like C.T. But failing to call Margarita was not a deficient performance under *Strickland*. *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *Rubin*, 433 F.2d at 445. Moreover, "admissions of inadequate performance by trial lawyers are not decisive in ineffective assistance claims" because "[i]neffectiveness is a question for the courts, not counsel." *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy may have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.").

Even if DeLeon could show deficient performance—which he cannot—he certainly cannot show the requisite prejudice to prevail under *Strickland*. *See* 466 U.S. at 694. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The district court reasoned that Margarita's testimony would have not only been irrelevant to the fraud perpetrated on C.T., but that it also would have been cumulative because DeLeon consistently offered evidence that he was duped by Stone. The jury did not believe him. Therefore, the court did not abuse its discretion in denying his motion on that basis.

DeLeon next contends that the court should have granted him a new trial because, at closing, the prosecution told the jury it need not prove that

No. 24-10115

DeLeon knew that the probation was fake.[7] We "consider the magnitude of the prejudicial effect of the challenged statements, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant's guilt." *United States v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005) (quoting *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002)). "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989). If we find that the remarks were improper, we must then consider whether they prejudiced DeLeon's substantial rights. *Holmes*, 406 F.3d at 357. A prosecution's misstatement of law does not prejudice the defendant when the court accurately instructs the jury on the law, explains to the jury that counsel's statements are not evidence, and there is sufficient evidence to support the guilty verdict. *United States v. Fierro*, 38 F.3d 761, 771–72 (5th Cir. 1994); *United States v. Loeffel*, 172 F. App'x 612, 618 (5th Cir. 2006).

We do not find the statement improper, but—assuming arguendo that we did—"[w]e do not view the prosecutor's comments in isolation, but rather in the context of the entire trial." *Fierro*, 38 F.3d at 771. Here, the court provided the jury with the correct statement of the law, instructed the jury that counsel's statements are not evidence, and DeLeon and Stone both repeatedly argued that DeLeon did not know the probation was real—contentions that the government rebutted with evidence throughout the trial.

---

[7] At closing, the prosecution told the jury that it did not need to find DeLeon knew the probation was fake in order to find him guilty of conspiracy. Defense counsel called for a sidebar, the jury was excused, and DeLeon argued that this misstates the law. The prosecution maintained that a co-conspirator need not know all of the details of the conspiracy to be convicted, and that the probation was one such detail, while the overall agreement was to take C.T.'s money and property. The court agreed with the prosecution, stating: "I have given [the jury] the law. You-all are arguing what the facts are."

No. 24-10115

The court did not abuse its discretion in denying DeLeon's motion on this basis.

Last, DeLeon insists that he is entitled to a new trial because of the court's response to the jury note. Because the court sent the response that DeLeon specifically requested, we review this matter under the invited-error doctrine and reverse only if DeLeon proves manifest injustice. *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014) ("A defendant may not complain on appeal of errors that he himself invited or provoked the district court to commit." (alterations accepted) (citing *United States v. Wells*, 519 U.S. 482, 487–88 (1997))). DeLeon alleges that he suffered manifest injustice because the nature of the conspiracy charge is inherently confusing to laypeople, and even confuses lawyers. But manifest injustice requires more. *United States v. Taylor*, 973 F.3d 414, 418 (5th Cir. 2020) ("Manifest injustice occurs when the district court's 'error was so patent as to have seriously jeopardized the rights of the appellant.'" (quoting *United States v. Lemaire*, 712 F.2d 944, 949 (5th Cir. 1983)).

The court did not abuse its discretion in denying DeLeon's motion for a new trial on any of the grounds he urges.

## B.

We review unpreserved insufficiency challenges for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009). A defendant must show a clear or obvious error that affected his substantial rights, meaning that it affected the outcome of the case. *Id.* If a defendant makes such a showing, we may only correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (alterations accepted) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). We "will reverse only if there is a '*manifest* miscarriage of justice.'" *United States v. Delgado*, 672 F.3d

320, 331 (5th Cir. 2012) (quoting *United States v. Pierre*, 958 F2d 1304, 1310 (5th Cir. 1992) (en banc)).

DeLeon complains that the evidence was insufficient to support a conspiracy conviction because he did not know the probation was fake, and therefore the prosecution failed to prove beyond a reasonable doubt that he had the requisite intent to further an unlawful purpose. DeLeon did not preserve this challenge because he did not renew his Rule 29 motion after the close of all evidence. In any event, he misconstrues the nature of the conspiracy by focusing on the means—the fake probation—while ignoring the object of the conspiracy, viz., to cheat C.T. out of her money and property.

On the record before us, we see no clear error. As we have recounted, the jury heard extensive testimony and saw volumes of physical evidence, including text messages, recorded phone calls, secret calendars, and financial records. This evidence was sufficient to show that DeLeon knowingly agreed with Stone to cheat C.T. out of her money and property and that he: (1) frequently emphasized his law enforcement ties and carried a firearm to support the inference that he was law enforcement; (2) attended the probate hearing where he learned of the $3 million, and one week later unveiled the secret probation scheme with Stone; (3) worked with Stone to enforce the secret probation; (4) complained about needing money and cars so C.T. would pay him; (5) created a fake paper trail to conceal the truck transaction; (6) was in frequent contact with Stone about the scheme and about C.T.'s money; and (7) lied repeatedly to law enforcement. The jury also heard DeLeon's own character witnesses testify that he knew more about law enforcement than the average person, had plenty of friends in law enforcement he could turn to if he had concerns or questions, and knew that accepting payment from a defendant was improper.

No. 24-10115

DeLeon fails to establish an error that is clear or obvious and that affected the outcome of the case, let alone one that constitutes a manifest miscarriage of justice. *See Puckett*, 556 U.S. at 135; *Delgado*, 672 F.3d at 331.

## C.

We review "a district court's decision to permit a certain line of cross-examination for abuse of discretion." *United States v. Smith-Bowman*, 76 F.3d 634, 636 (5th Cir. 1996). If there is no objection at trial, however, we review for plain error. *United States v. Burns*, 526 F.3d 852, 858 (5th Cir. 2008). DeLeon challenges five statements on appeal but at trial objected to only one.[8]

If a criminal defendant puts forth evidence of his good character at trial, the prosecution may cross examine the defendant's character witness or witnesses, and "the court may allow an inquiry into relevant specific instances of the person's conduct." FED. R. EVID. 405(a). To do so, the prosecution "must have a good faith factual basis to believe that the

---

[8] Those five questions are:

"So then it probably would come as a surprise to you that [DeLeon] volunteered for a position and within 60 days received a Ford truck as compensation. Would that be surprising to you?"

"And would it surprise you to know that [DeLeon] was untruthful to the victim in this case?"

"Okay. So you're not telling the jury in any way that your opinion has any weight on what the evidence and what the facts show in this case?" This is the only statement to which DeLeon's counsel objected, asserting it invaded the province of the jury. It was overruled.

"You'd agree with me that an honest person wouldn't pretend to be someone's federal probation officer knowing they had no authority to do so; would you agree with that?"

"And you'd agree with me that an honest person wouldn't pretend to be a probation officer knowing they didn't have the authority to do so?"

defendant committed the bad act" and "the incidents must be relevant to the defendant's character traits that are testified to by the character witness," in this case, DeLeon's honesty. *United States v. Dilliard*, 354 F. App'x 852, 860 (5th Cir. 2009) (first citing *Michelson v. United States*, 335 U.S. 469, 481 n.18 (1948), then citing *United States v. Nixon*, 777 F.2d 958, 970 (5th Cir, 1985)). We have held, however, that the prosecution may not ask such a witness to assume the defendant's guilt. *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) ("Government counsel asked if Ledesma's reputation would be affected if he were convicted of the alleged crime.").

Here, the questions did not ask the character witnesses to assume DeLeon's guilt—they asked about specific instances of misconduct, such as that his acceptance of the truck was while volunteering, that he was untruthful to C.T., and that he pretended to be a probation officer. This is a far cry from asking the witness to assume DeLeon gets convicted of the instant offense. *See id.* In any event, just because there must be some basis in fact "does not mean that the basis in fact must be proved as a fact before a good faith inquiry can be made." *Nixon*, 777 F.2d at 970. We find no plain error in the court's permitting those four questions.

As for the one question to which DeLeon objected, we see no abuse of discretion. The prosecution asked William Mitchell, a retired Fort Worth police officer: "So you're not telling the jury in any way that your opinion has any weight on what the evidence and what the facts show in this case?" DeLeon objected on grounds that this question invades the jury's province. We simply cannot say the court abused its discretion in overruling that objection and permitting the prosecution to ask the witness a question that clarifies the nature of his character testimony. Moreover, we strain to find that this question even falls within 405(a), as it does not inquire into any bad act.

No. 24-10115

None of the cross examination statements require reversal.

## D.

A determination that an offense involved sophisticated means is a factual finding that we review for clear error.[9] *See United States v. Valdez*, 726 F.3d 684, 695 (5th Cir. 2013); *United States v. Patel*, 789 F. App'x 981, 984 (5th Cir. 2019). We also review the application of the abuse-of-trust enhancement for clear error. *United States v. Ollison*, 555 F.3d 152, 164–65 (5th Cir. 2005). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (quotation and citation omitted).

We begin with the sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), which both defendants challenge. The application notes explain that this enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). "We have affirmed the application of the sophisticated means enhancement in cases involving some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated." *Valdez*, 726 F.3d at 695; *see also United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996) (upholding the enhancement when a defendant moved funds from his account to an account in his wife's name); *United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008) (upholding the enhancement when a defendant used fake identities and fake business names). But we found it inapplicable when a

_____

[9] Stone contends that the relevant facts are undisputed and that we should review this enhancement's application *de novo*. He is incorrect. *United States v. Miller*, 906 F.3d 373, 376–77 (5th Cir. 2018) (reviewing for clear error "the factual determinations that [defendant] abused a position of trust and *used sophisticated means*." (emphasis added)). DeLeon concedes that clear error is the appropriate standard of review.

No. 24-10115

defendant took money from his own "operating account, which was in his name, and moved it into his investment accounts, which were also in his name." *Valdez*, 726 F.3d at 695 (describing the conduct as "open and transparent direct deposit and movement of funds").

Both Stone and DeLeon contend that they did not use sophisticated means because all of the transactions were in their own names and were easily traceable by looking at C.T.'s financial transactions alongside their own. DeLeon further contends that the Guidelines require that the court look at the individual defendant's conduct, not the scheme. On clear error review, their arguments fail.

In *United States v. Miller*, we upheld this enhancement even though we observed that "some aspects of Miller's scheme were not sophisticated" because we "view[ed] the scheme in its entirety." 906 F.3d 373, 380 (5th Cir. 2018). We noted that the defendant "employed multiple methods that made it more difficult to detect her bank fraud," including misrepresenting her boyfriend as a vendor, creating false bookkeeping entries for fake transactions, and forging signatures. *Id.* In *United States v. Connor*, we upheld the enhancement even though the conduct "was not the most sophisticated fraud." 537 F.3d at 492. In that case, the defendants used fake IDs and fake business accounts to obtain goods and resell them on Ebay, moving from state to state and pre-selling merchandise. *Id.* "*Taken together*, these aspects of the fraud indicate that the district court did not clearly err in finding that the crime involved sophisticated means." *Id.* (emphasis added).

We acknowledged that the cash withdrawals and checks that C.T. gave to Stone and DeLeon were straightforward to trace once law enforcement began its investigation. But the enhancement applies to "the execution *or* concealment" of the offense, and the scheme must be considered in its entirety. § 2B1.1 cmt. n.9(B); *Miller*, 906 F.3d at 380

No. 24-10115

(emphasis added). The district court did not clearly err in determining that the enhancement was proper as to both defendants.

Stone undeniably engaged in tactics that made the offense more difficult to detect: he created a fake federal judge and other fake law enforcement officials to reduce the chance that C.T. would divulge the scheme to friends, family, or her attorney; he frequently requested cash to reduce paper trails, falsely stated on the title transfer application that he purchased C.T.'s Lexus from her when he did not; and he created a fake set of calendars that omitted all mention of the scheme, while the real calendars were hidden in his trash can liners.

DeLeon also engaged in actions that made the scheme more difficult to detect. He made C.T. give him power of attorney, insisted on creating a fake paper trail for the truck transaction, justified Stone's lies and conduct to assuage C.T., and lied multiple times to law enforcement. The district court's application of the enhancement to each defendant was "plausible in light of the record as a whole" and in consideration of the scheme in its entirety. *See Cisneros-Gutierrez*, 517 F.3d at 764; *United States v. Rubio*, 225 F. App'x 290, 291 (5th Cir. 2007) (viewing the scheme in its entirety "even if some [] aspects of [her] offense were not sophisticated"); *United States v. Tape*, 73 F. App'x 83, 83 (5th Cir. 2003) (rejecting defendant's argument that the enhancement was improper as applied to him because he "did not personally engage in any sophisticated actions within the scheme").

Finally, DeLeon challenges the two-level enhancement for abuse of a position of trust under § 3B1.3, maintaining that he was not and never has been law enforcement and therefore did not hold such a position. We apply a two-part inquiry to determine whether this enhancement is proper: "(1) whether the defendant occupies a position of trust and (2) whether the defendant abused [his] position in a manner that significantly facilitated the

No. 24-10115

commission or concealment of the offense." *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010) (quotation and citation omitted). The enhancement is appropriate when "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not," such as by falsely holding oneself out as being a licensed physician or legitimate investment broker. § 3B1.3 cmt. n.3; *see, e.g.*, *United States v. Domingue*, 713 F. App'x 413, 413 (5th Cir. 2018) (per curiam) (affirming the enhancement when defendant "falsely portrayed himself to detainees in [ICE] facilities, and their relatives and friends, as an immigration consultant whose company performed immigration-related services"); *United States v. McConathy*, 619 F. App'x 359, 361 (5th Cir. 2015) (per curiam) (affirming the enhancement when defendant "misrepresented himself to the victim as a licensed oil and gas operator and that the investor would not have invested but for the misrepresentation").

The district court adopted DeLeon's presentence report (PSR), which stated that he "provided sufficient indicia to the victim, C.T., that he legitimately held a position of public or private trust; namely, that of a law enforcement officer and, later, as someone trusted by a federal judge to monitor C.T.'s compliance with the 'secret probation'—such as a federal probation officer." DeLeon showed C.T. a law enforcement ID, always carried a firearm, told her he was present to protect her on Stone's orders, and frequently discussed serious law enforcement matters that he claimed to be assisting on, like hostage and homicide cases. The PSR concluded that DeLeon abused that position of trust and thereby significantly facilitated the commission of the offense by, *inter alia*, enforcing the conditions of the secret probation, personally monitoring C.T.'s movements and activities, and reinforcing Stone's threats of prison and the loss of custody of her children. C.T. testified that she never would have complied with any of the conditions or given DeLeon any money or property if she did not believe those

No. 24-10115

misrepresentations. *See McConathy*, 619 F. App'x at 361 ("[T]he investor would not have invested but for the misrepresentations."). The court did not clearly err in applying this enhancement to DeLeon.

### III.

The district court did not err in denying DeLeon's motion for a new trial, permitting certain lines of cross-examination into DeLeon's character witnesses, or allowing the prosecution's closing statement. Neither did it err in applying the sentencing enhancements to either defendant.

AFFIRMED.